UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-CV-14314-MARTINEZ/LYNCH

DUBAI WORLD CORPORATION, and
its subsidiaries, EXOMOS, NAKHEEL,
and PALM MARINE,

                                                    Discovery Matter Referred to
                                                    Magistrate Lynch

        plaintiffs,

v.

HERVE JAUBERT and SEAHORSE
SUBMARINES INTERNATIONAL,
INCORPORATED, and Does 1-99,

        defendants.
_____/

DEFENDANTS' AND COUNTERCLAIM PLAINTIFF'S MATERIALS IN RESPONSE TO
PLAINTIFFS' MOTION TO COMPEL DEFENDANTS' PRODUCTION OF REQUESTED
DOCUMENTS, FOR SANCTIONS FOR FAILURE TO COMPLY WITH THE COURT'S
ORDER, AND ACCOMPANYING MEMORANDUM OF LAW

        Defendant Herve Jaubert ("Mr. Jaubert") and Seahorse Submarines International

Incorporated ("Seahorse"), pursuant to Federal Rule of Civil Procedure 37, hereby respond to

plaintiffs' motion to compel defendants to produce requested documents, for sanctions for failure

to comply with the Court's order ("Motion") as follows:

        Plaintiffs served their Request for Production of Documents and Things ("Request") on

November 25, 2009.  It was an extensive request.[1]

_____

[1] In essence, plaintiffs sought any and all documents relating to Mr. Jaubert's operation of his
business (Seahorse) before moving himself, his family, and the assets of Seahorse that had been
purchased by Dubai World to Dubai [at the request of Dubai World], as well as seeking
additional documents concerning Mr. Jaubert's prior life from 1995 until the present and

Mr. Jaubert and Seahorse requested and received from plaintiffs' counsel a two week extension of time to serve their Response to the Request for Production ("Response") that provided Mr. Jaubert and Seahorse through January 11, 2010 to serve their Response. Subsequently, Mr. Jaubert and Seahorse sought an additional 20 day extension of time, which motion was denied by the Court.  The Court, however, did allow Mr. Jaubert and Seahorse until February 1, 2010 "to respond to the Plaintiffs' Requests for Admissions and for Production" (DE 46).

Pursuant to this Court's Order thereon, Mr. Jaubert and Seahorse, on February 1, 2010, served their Response (as well as filing their Notice of Filing Response) as required by the Court. This Court's order, it must be emphasized, was respected and complied with by Mr. Jaubert and Seahorse.

In their Response, Mr. Jaubert and Seahorse stated (as is set forth in Exhibit "A" to plaintiffs' Motion) that the documents and things requested were available for plaintiffs/counterclaim defendant's inspection and copying at the offices of undersigned counsel. Other than attorney/client privileged information, there were no objections to any of the documents and things requested by plaintiffs.[2]

Federal Rule of Civil Procedure 34(b)(2)(B) states:

… the response must either state that inspection and related activities will be permitted as requested or state an objection t the request….

_____

documents concerning his later escape from Dubai and related writing and publishing of his book regarding his time in Dubai, among others.

[2] Plaintiffs claim that Mr. Jaubert has engaged in a 'pattern of delay in this lawsuit since the beginning'; a two week extension followed by a request for an additional 20 days request for an extension is hardly a 'pattern of delay.'  Moreover, as will be evidenced, plaintiffs had access and possession to all documents it requested with the exception of documents relating to Mr. Jaubert's life since his termination at Exomos and some documents regarding his prior life.

Moreover, 'the simplest response to a request for production is one stating that the discovery sought by the request will be allowed at the time and place and in the manner sought.' *Wright, Miller & Marcus,* <u>*Federal Practice and Procedure: Civil 2d §2213*</u>.

This is what Mr. Jaubert and Seahorse provided in its Response.  Plaintiffs complain about the delay in Mr. Jaubert's and Seahorse's Response, but they did agree to a two week initial extension; this was appreciated but it is unclear why plaintiffs bring this up in their Motion and complain about it now when they did agree to the initial request for extension of time.   In any event, Mr. Jaubert and Seahorse did file their Response in compliance with this Court's Order.

As the Court and the parties are certainly aware, the purpose of discovery is to compel a full disclosure of the facts.  The purpose of Rule 34 is to 'make relevant, nonprivileged documents and objects in the possession or control of one party available to other parties.' *Wright, Miller & Marcus,* <u>*Federal Practice and Procedure: Civil 2d §2202*</u>.

Mr. Jaubert and Seahorse responded as required under Rule 34.  The documents were made available for inspection at the offices of undersigned counsel.  However, prior to the date of inspection and copying that was offered, plaintiffs determined that as there were not a huge number of documents (approximately 4 bankers boxes and various DVDs with video clips and other media files) that were to be produced, that instead of traveling to Stuart, Florida to inspect the documents, plaintiffs' counsel would contract with Ikon to scan the documents into digital format for ease of transmission to plaintiffs' LA counsel.  Although undersigned counsel had already physically Bates stamped the documents, plaintiffs determined that they wanted Ikon to re-Bates label the produced documents, using different numbers.

After several emails exchanged in a cordial and professional manner between the parties, Ikon did pick up the documents from the offices of undersigned counsel on several different occasions; these were scanned, Bates labeled, and provided on disks to plaintiffs. There was an issue with respect to copying Mr. Jaubert's emails from his computer to a separate CD or thumb drive that was eventually solved when Mr. Jaubert purchased Outlook and was finally able to copy the requested emails to a separate disk to provide to plaintiffs, as confirmed by Mr. Jaubert in the attached Exhibit 1, Affidavit of Herve Jaubert.

However, it must be noted that with the exception of the issue with respect to Mr. Jaubert's emails and the Cowden maintained documents, the documents responsive to plaintiffs' request were available for inspection at the offices of undersigned counsel for plaintiffs' review and inspection. Plaintiffs were welcome to inspect them with reasonable notice to undersigned counsel.

## Background

Plaintiffs initiate their Motion in this matter by accusing Mr. Jaubert of engaging in a 'pattern of delay and discovery abuses.'

This is inaccurate and misleads the Court.

A wider view of the facts that will be proven at trial will show that when Mr. Jaubert moved to Dubai, he moved all business documents relating to his operation of Seahorse to Dubai as well and that he left no business documents relating to Seahorse in the United States. All of his business effects were shipped to Dubai. The affidavit of Herve Jaubert, Exhibit 1 hereto, confirms this.

In Mr. Jaubert's affidavit, he confirms that prior to its purchase of Seahorse's assets, plaintiff Dubai World conducted due diligence and retained the firm of Ernst & Young to review

Seahorse's business documents, visit the Seahorse manufacturing documents, and to interview employees; at that time, all documents relating to Seahorse, including the financial operations of Seahorse, corporate tax returns, corporate filings, bank statements, website, history, invoices, sales information, etc. were made available to plaintiffs and its representative, Ernst & Young, to appraise the value of Seahorse's assets.

Seahorse's documents were ultimately moved to Dubai and then ultimately maintained in Dubai at Exomos' (the Dubai World subsidiary for which Mr. Jaubert acted as CEO in Dubai for the manufacture of submarines and submersibles and other watercraft) facility.  Mr. Jaubert has attested that he personally oversaw the packing of Seahorse's documents for shipment from Florida to Dubai, the unloading and storage of Seahorse's documents to a temporary facility in Dubai, the move from the temporary facility to Exomos, and the unpacking of these documents at Exomos. Affidavit of Herve Jaubert.

These documents included employee records, payroll records, vendor invoices, inventory, accounting and financial records, marketing records, tax records, technical reviews, technical trials, legal files regarding the building requirements for submarines, US Coast Guard/ABS/US State Department and US Commerce Department regulations/requirements, sales contracts, charter documents, documents concerning my former operations in Puerto Rico, waivers for charters, passenger logs, dive logs, insurance, and all documents concerning the operations of Seahorse.

Years later, when Dubai World determined it was having financial difficulties and needed to close and discontinue the operations of Exomos and began to look for justification in order to do so, Mr. Jaubert was able foresee the signs of how things were to progress after a series of events occurred:

- Mr. Jaubert was interrogated regarding ammunition that he had brought to Dubai years earlier, with the knowledge of the Sultan bin Sulayem, chairman of Dubai World, and threatened with torture;

- Mr. Jaubert was accused of embezzlement for charging, openly and with prior permission, 10% handling to purchase inventory in the US for the manufacture submarines, despite having the Chairman of Dubai World's and other corporate officers' approval to do so;

- Mr. Jaubert was threatened with criminal confinement if he did not pay monies to Dubai World that had been used to purchase legitimate inventory to build prototypes under the direction of the chairman of Dubai World[3];

- Mr. Jaubert was required under duress to pay for expenses that had been approved by the Chairman of Dubai World *years* after these expenses had been paid to Mr. Jaubert, as they were found to have been suddenly deemed 'illegal'

When Mr. Jaubert understood that he would not get out of Dubai unless he capitulated to the demands of Dubai World, he went underground in Dubai and later was able to escape that place.

Mr. Jaubert, when he realized what was happening to him in April 2007, was able to make copies of what he believed could be important documents relating to his business operations: these are the documents that he has now and these are the documents that he has

---

[3] Mr. Jaubert actually used Seahorse's credit card to purchase inventory in the US to save money and time: the same inventory, if purchased in Dubai, would have cost much more and taken a much longer time to receive than if it was purchased in the US (as it would have been necessary to go through middlemen/agents in Dubai who added significant mark ups to the inventory). After Mr. Jaubert/Seahorse advanced the payment, Dubai World then later reimbursed Mr. Jaubert/Seahorse, often months after the inventory was ordered and paid for by Seahorse. As such, Mr. Jaubert/Seahorse were often waiting to be repaid for purchases made on behalf of Exomos.

produced in this case to plaintiffs as appropriately responsive to plaintiffs' Request. He was able to obtain additional documents after his escape from remaining contacts in Dubai. He was not able, however, to obtain all documents regarding his operations of Seahorse except those already provided to plaintiffs.

When Mr. Jaubert filed his lawsuit in September, 2009 in State court in Martin County, Florida (which lawsuit was later removed to this Court and then was effectively consolidated into Mr. Jaubert's counterclaim in this action), he had those documents and materials that he had been able to assemble from various sources. They were not organized in any manner; they were not kept in a way that would be considered usual for a business because they had been obtained with a great deal of effort from various persons in bits and pieces. Now, apparently, plaintiffs are complaining that Mr. Jaubert did not do a good enough job in preparing for his exit from Exomos because he did not copy all documents from that business or Seahorse.

Moreover, Mr. Jaubert has not in any way impeded or caused plaintiffs any delay in its suit against Mr. Jaubert or Seahorse: in reality, *Dubai World* has all of Mr. Jaubert and Seahorse's documents relating to Seahorse's operations and Mr. Jaubert's operations of Seahorse and Exomos that it requested. It has these documents and materials because Mr. Jaubert provided them to Dubai World (before its purchase of Seahorse's assets when Dubai World conducted its due diligence and subsequently when Seahorse's assets, documents, and materials were shipped to Dubai) or they were documents and materials that were created in the ordinary course of business when Mr. Jaubert was CEO of Exomos in Dubai. These documents and materials were left at Exomos when Mr. Jaubert was fired from his position there.

For plaintiffs to accuse Mr. Jaubert of withholding documents is ridiculous: Dubai World has every document relating to Seahorse. It is most likely that Dubai World only requested the

documents to determine if Mr. Jaubert had any ability to make a claim against it.  It was probably hoping that Mr. Jaubert left Dubai with nothing more than the shirt on his back and that he had no documents to show the malfeasance and plot to discredit Mr. Jaubert that had been engineered against Mr. Jaubert by Dubai World and its officers and agents.

Why would Mr. Jaubert need or want to delay discovery of documents and materials? There is no benefit to him to do so.  Instead, Mr. Jaubert assembled all papers/materials/media/ things he was able to find/glean/beg for.   It is in Mr. Jaubert's interest that Dubai World have all of the proof of Dubai World's bad faith claim against him: document after document that shows that Mr. Jaubert was working over 60 hours/week to build a profitable company despite having had his hands tied by not being able to hire qualified engineers, proof that Mr. Jaubert's company was allowed to receive 10% handling on items he was purchasing through Seahorse in the US in order to save Exomos/Dubai World on costs and to shorten delivery time; proof that Mr. Jaubert's shipping of his two vehicles had been approved years before the 'audit' claimed that this was illegal; proof that Seahorse's legal fees had been approved to be paid due to the benefit to Exomos of having an additional submersible for no additional cost; proof that Mr. Jaubert had been forced to flee Dubai or face imprisonment.

Plaintiffs wrote in their Motion [for a page] regarding the timing of the Response to their Request: it is unclear why they need to rehash the chain of events.  Mr. Jaubert and Seahorse had requested extensions of time to respond, the Court eventually ordered Mr. Jaubert and Seahorse to respond on February 1, 2010, and Mr. Jaubert and Seahorse did so respond.  To repeatedly go on and on about the history of issues of undersigned counsel serves no purpose.

It is incorrect, however, that plaintiffs assert that 'Jaubert did not meet that deadline.'

<u>MEMORANDUM OF LAW</u>

**A. Waiver**

Under Local Rule 26.1(h) of the Federal Rules of Civil Procedure, all motions related to discovery, including but not limited to motions to compel discovery, 'shall be filed within thirty (30) days of the occurrence of grounds for the motion.'

> Failure to file a discovery motion within the thirty (30) days, absent a showing of reasonable cause for a later filing, may constitute a waiver of the relief sought.

US District Court -- Southern District, Gen. Rule 26.1(h) Discovery Motions.

Again, Mr. Jaubert and Seahorse filed their Response to plaintiffs' Request for Production on February 1, 2010.  They subsequently produced, over the course of several weeks, documents responsive to plaintiffs' request, including going to the effort of having Mr. Jaubert purchase Microsoft Outlook in order to enable him to copy and produce, in the format requested by plaintiffs, all emails that were responsive to plaintiffs' request.

Plaintiffs even failed to retrieve documents that had been waiting for pick up at Ikon until the end of April, 2010, after they were reminded that these documents were available by undersigned counsel, and weeks after they were available to plaintiffs for retrieval.[4]

Plaintiffs then waited until June 15, 2010, four and a half months (4 1/2) since the serving of Mr. Jaubert's and Seahorse's Response, to file the instant Motion.  There is no reasonable cause for the late filing of this Motion and as such, the Motion must be denied in whole.[5]

---

[4] At that point, plaintiffs' counsel (L. Mosely) argued for days about who was responsible for paying for the imaging costs for these documents, including causing undersigned counsel to spend a Friday night speaking with Ikon's manager regarding same, on into Saturday.

[5] The only documents that have not yet been produced are those that were not available to Mr. Jaubert at the time of his Response: those maintained by his former attorney and editor, attorney, Ms. Leigh Cowden, with whom his relationship had been severed.  Ms. Cowden only supplied these to undersigned counsel on May 21, 2010 due to her concerns over a confidentiality clause

As to all other specific discovery requests as detailed below, all have already been responded to and any motion to compel their production must be denied as plaintiffs have waived any such relief pursuant to Local Rule 26.1(h).  They have not shown reasonable cause for having waited to file this motion and have hardly addressed a number of the specific discovery requests sufficiently to even determine the relief they are seeking.

**B. Specific Discovery Requests:**

Should the Court entertain plaintiffs' Motion despite the plaintiffs' waiver of the relief sought as set forth in Local Rule 26.1, Mr. Jaubert and Seahorse have addressed below the specific reasons for denying plaintiffs' Motion.

*As to Request for Production number 4*

Request for Production ("RFP") number 4 (generally regarding documents relating to sales of submarines from 1997 through 2002): Mr. Jaubert clearly stated that he does not have the documents responsive to this request in his possession, custody, or control.  Affidavit of Herve Jaubert, Exhibit 1 hereto.

---

(which Mr. Jaubert waived at Ms. Cowden's deposition on May 24, 2010) and attorney/client privileged materials. These were produced in a format that could not originally be opened by undersigned counsel in the form provided by Ms. Cowden (CD).  These are being reviewed and redacted (to avoid additional inadvertent disclosure) and will be provided to plaintiffs within the next week or sooner.  Regardless, the time it has taken to review these materials for attorney/client privileged information is just over a month; given the depositions of Mr. Jaubert, Mr. bin Sulayem, Mr. Abdulqadar, scheduled depositions of Mrs. Jaubert and the continuation of Mr. Jaubert's deposition (later cancelled by plaintiffs), and attendant trials and hearings in the interim period, the delay in providing Ms. Cowden's documents to plaintiffs does not rise to the level of sanctionable activity, especially when considering that Ms. Cowden's relevance to this lawsuit is tangential at best (given her role as attorney/editor/ghostwriter of Mr. Jaubert's experiences in Dubai and that she had no involvement with the underlying causes of action in this case).

We agree with plaintiffs that the documents they inquired about at Mr. Jaubert's deposition would be responsive to this request.  However, if Mr. Jaubert does not have them, he does not have them.  Moreover, if any party has them, it is Dubai World.  It must be restated: documents that would be responsive to this request were shipped to Dubai by Mr. Jaubert, were maintained at the Exomos facility, and they were left in Dubai at the offices of Exomos.  What Dubai World did with them is not known, but Mr. Jaubert certainly does not have them.

Plaintiffs claim that Mr. Jaubert will not able to prove his damages due to his not having the documents requested; this does not address the issue as to whether Mr. Jaubert has the documents or not.  He has stated he does not have these documents.  The Motion seeks to compel documents that are not in Mr. Jaubert's possession, custody, or control. As such, the plaintiffs' Motion as to RFP 4 must be denied.

Although not truly relevant to plaintiffs' Motion, it did expend some effort to advise the Court as to what it understands Mr. Jaubert 'earned' at Dubai World (Motion at page 7).  It must be noted that as to the alleged $5.6 million that Mr. Jaubert supposedly received from Dubai World, Dubai World is misleading this Court:  the $3.23 million that was expended on inventory to build the prototypes did not go into Mr. Jaubert's pocket.  It was used to purchase legitimate inventory for use at Exomos.  Mr. Jaubert purchased inventory in the US through Seahorse.  He used Seahorse's credit card to purchase these items and waited months to be reimbursed by Dubai World.  Mr. Jaubert had requested approval from the Chairman of Dubai World for Seahorse to receive 10% in handling to cover the costs of his having advanced payment for this inventory as well as to pay for the time and efforts of his personnel in Florida to place and track these orders.  Mr. Jaubert received this approval from the Chairman of Dubai World.

The $14 millions[6] [sic] that Seahorse supposedly received in income during the period of time does not show payments by Seahorse to vendors.  Plaintiffs seem to be continuing their interesting accounting practices that they tried to apply to Mr. Jaubert.

Again, Mr. Jaubert and Seahorse agree that the documents that it requested should be produced: however, Mr. Jaubert, both individually and as the corporate representative of Seahorse, does not have these documents in his possession, custody, or control.  If any party to this action has these documents, it is Dubai World.

As such, RFP number 4 has been adequately responded to and no motion to compel should be granted as to RFP number 4.

*RFP number 22*

Plaintiffs requested documents relating to any act regarding his being arrested, questioned, detained, etc. for any criminal matter punishable by imprisonment for a term exceeding 1 year.

After the documents responsive to plaintiffs' Request had been produced, Mr. Jaubert's deposition was taken.  At his deposition, Mr. Jaubert was questioned regarding his possession of any of these types of documents and regarding his understanding of this incident.  Mr. Jaubert's affidavit attached hereto as Exhibit 1 sets out in clearer form what was not brought out at his deposition due to the confusing pattern of questions by plaintiffs' lawyer:  Mr. Jaubert confirms therein that he does not have *any* documents relating to this incident, that he had looked into this incident and received documents by email *at his Exomos email account in 2007*, but that he never printed them.  It is interesting that plaintiffs were able to locate the documents at issue

---

[6] It must be another mistake in the accounting efforts of Dubai World as this figure should be, in order to at all be applicable, in UAE Dirham's.

from Mr. Jaubert's computer at Exomos and now are seeking these same documents, despite the plaintiffs being the only party with any access to same.

*RFP number 33*

Plaintiffs requested documents relating to the amount of money owed to Mr. Jaubert from Dubai World.

Mr. Jaubert was damaged personally by the actions of Dubai World when its agents interrogated Mr. Jaubert repeatedly, wrongfully, and without, basis in fact, accused Mr. Jaubert of embezzlement[7] and fraud at Exomos, extorted Mr. Jaubert into paying for costs that had been approved years before and then wanting payment for same, and defaming Mr. Jaubert throughout the UAE and the US (indeed, throughout the world) as a 'fraudster,' prosecuted Mr. Jaubert and obtained a criminal judgment against him in Dubai, and listed Mr. Jaubert with Interpol to impede his ability to travel internationally.  Mr. Jaubert also lost business opportunities, etc. as set forth in his counterclaim.

Again, Mr. Jaubert and Seahorse have produced everything in their possession, custody and/or control.  There may be supplemental discovery responses, as Mr. Jaubert and Seahorse are required to provide under the Federal Rules of Civil Procedure and which they will provide as required should additional documents responsive to plaintiffs' Request for Production become available.  However, as of this date, the documents responsive to plaintiffs' Request for Production have been produced.

---

[7] These claims from Dubai World against Mr. Jaubert despite the Requests for Payment made to Exomos from Seahorse that clearly showed, in separate line items, a 10% handling cost as well as Seahorse invoices that also showed 10% handling costs, despite Exomos having had no checking account, and despite Mr. Jaubert having no ability to sign a check for ANY amount on behalf of Exomos, many of which were personally approved by the Chairman of the Board of Dubai World.

The good faith of Mr. Jaubert in responding to plaintiffs' Request for Production can be gleaned from the chain of emails between undersigned counsel and various attorneys for plaintiffs: a review of these emails (attached hereto as composite Exhibit 2) demonstrates that plaintiffs did not want the documents that were Bates stamped by undersigned counsel, they wanted Ikon, their contractor, to Bates label them (again).  Additionally, plaintiffs waited over a month to obtain from Ikon the remaining documents (in April 2010) and then argued for hours about why they had to pay for it with Ikon's manager, despite plaintiffs being the parties requesting the documents.

It must be restated: Seahorse's documents were ultimately maintained in Dubai at Exomos' facility.  Mr. Jaubert has attested that he personally oversaw the packing of Seahorse's documents for shipment from Florida to Dubai, the unloading and storage of Seahorse's documents in Dubai, the move from the temporary facility to Exomos, and the unpacking of these documents at Exomos. Affidavit of Herve Jaubert.

These documents included the types of documents sought by plaintiffs.  However, these very documents are and have been in plaintiffs' possession, custody and control since 2004: Mr. Jaubert was forced to leave them in Dubai.  As such, it can be argued that Mr. Jaubert *did* produce these documents (when he arrived in Dubai at the end of 2004).  Of the parties involved in this lawsuit, it is plaintiffs that had the last complete access to these types of records, not Mr. Jaubert.

As Mr. Jaubert and Seahorse have produced all documents in their possession, custody and control regarding RFP number 33, and as plaintiffs already have these documents in their possession, plaintiffs' Motion as to RFE 33 must be denied.

14

<u>*As to Plaintiffs' Request for Sanctions*</u>

It is disingenuous, at the very least, for plaintiffs to seek sanctions against Mr. Jaubert when plaintiffs actually had the documents sought in their custody and Mr. Jaubert produced every document he was able to obtain prior to his leaving Dubai (although Mr. Jaubert does agree to 'strike **Plaintiffs'** fraud claim' as requested in the plaintiffs' Motion (at page 13).[8]

Plaintiffs have requested that this Court strike 'Plaintiffs' fraud claim' [sic] as a sanction due to 'Jaubert's deleterious discovery practices.'

Under Rule 37(a), a party may apply for an order compelling discovery as follows:

(2) Motion.

(A) If a party fails to make a disclosure required by Rule 26(a), any other party may move to compel disclosure and for appropriate sanctions. …

(B) … if a party, in response to a request for inspection submitted under Rule 34, <u>fails to respond</u> that inspection will be permitted as requested or <u>fails to permit inspection</u> as requested, the discovering party may move for an order compelling an answer, or a designation, or an order compelling inspection in accordance with the request.

*Emphasis added.*

Under Rule 37(b)(2), if a party fails to obey an order to provide or permit discovery, then the Court may make such orders in regard to the failure as are just, including striking out pleadings or parts thereof.

And, under Rule 37(d), if a party fails to serve a written response to a request for inspection submitted under Rule 34, then the Court may make such order in regard to the failure as are just.

---

[8] However, it is believed this was a typographical error and plaintiffs meant to write 'defendant's fraud claim.'

In this instance, neither Mr. Jaubert nor Seahorse has caused the application of Rule 37 in any of its parts.  First, under Rule 37(a), Mr. Jaubert and Seahorse did respond by serving their Response to Plaintiffs' Request for Production.

Second, under Rule 37(b)(2), both Mr. Jaubert and Seahorse obeyed this Court's Order directing that Mr. Jaubert and Seahorse respond to Plaintiffs' Request for Production.

Finally, both Mr. Jaubert and Seahorse did serve a written response to Plaintiffs' Request for Production as required under Rule 37(d).

As such, plaintiffs have not met their burden of proving that Mr. Jaubert and Seahorse failed to comply with this Court's Order.  As such, sanctions are neither appropriate nor warranted.

In considering whether a dismissal of a claim is appropriate, in *United States v. Wright,* 187 F.3d 633 (4th Cir.1999), the Fourth Circuit suggested a four factor test:

1. whether the noncomplying party acted in good faith;

2. the amount of prejudice the noncomplying party's noncompliance caused the opposing party

3. the need for deterrence of the particular sort of noncompliance; and

4. the effectiveness of less drastic sanctions.

In this instance, Mr. Jaubert and Seahorse certainly have been acting in good faith by producing all documents in their possession, custody and control.

Additionally, there is no real prejudice to plaintiffs in that they have received all documents responsive to this request and the fact that plaintiffs actually had more completely responsive documents in *their* possession at Exomos.

16

There is no need for deterrence against Seahorse or Mr. Jaubert in this instance. And, if sanctions are applicable, which is not supported by the Motion, something less drastic would certainly be more just.

Here, a two week extension followed by a 20 day request for extension (which was denied) followed by actual production of all available documents and the purchase of Outlook by defendant, together with plaintiffs' failure to pick up available discovery and corresponding argument over plaintiffs' paying for the imaging of same, hardly equals 'deleterious discovery practices.' When looked as a whole, together with the fact that plaintiffs actually had all of Seahorse's business records, all of Exomos' business records, all of Mr. Jaubert's Exomos emails, and that plaintiffs were, in effect, merely seeking these same documents to determine the strength of Mr. Jaubert's case against them reveals that *plaintiffs* are not acting in good faith.

To sanction Mr. Jaubert would be unfair and would not follow the strictures of Rule 37(b)(2). Rule 37(b)(2) applies only when a party fails to obey an order entered by the Court. There has been no showing that Mr. Jaubert or Seahorse failed to serve a response to plaintiffs' Request for Production; to the contrary, plaintiffs' provided Mr. Jaubert's and Seahorse's Response to the Request for Production as required by this Court's Order. Moreover, Mr. Jaubert and Seahorse have produced all documents available with respect to the Request for Production.

The entry of an order striking a claim is a harsh sanction and should be used cautiously. *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649 (W.D.N.Y. 1992). Should the Court be considering the imposition of sanctions in this instance, a hearing would be requested by Mr. Jaubert and Seahorse to allow the Court the opportunity to weigh the evidentiary basis for sanctions and to determine, after a thorough review, the sufficiency of the response by Mr. Jaubert and Seahorse to the Request for Production.

*RFP number 39, 43, and 44*

Plaintiffs also seek documents responsive to their Requests for Production number 39, 43, and 44; RFP 39 involves documents regarding employees of Seahorse, RFP 43 involves documents regarding communications between Mr. Jaubert and foreign governments/agencies relating to the counterclaim, and RFP 44 involves documents relating to communications with any person related to the claims in the counterclaim.

Again, Mr. Jaubert has produced everything in his possession, custody, and control relating to the respective requests for production. He did so in a process that was made more difficult by plaintiffs' insistence of using a third party contractor to pick up and scan and electronically Bates label the documents at issue.

They were made available to plaintiffs as set forth in the Response by Mr. Jaubert and Seahorse; when Mr. Jaubert was able to open the emails and copy them to disk after his purchase of Outlook, those emails were also made available to plaintiffs in the format requested by plaintiffs. Moreover, plaintiffs then complained about paying for the costs of these imaged documents.

A review of the various emails among counsel for the parties confirms that counsel for Mr. Jaubert and Seahorse have in good faith produced all documents in the possession, custody and control of these two parties. There is no basis to sanction Mr. Jaubert or undersigned counsel for any deleterious practices.

**D. Ms. Cowden's documents**

The only documents that were not produced with Mr. Jaubert and Seahorse's initial production are the documents that were retained by Ms. Leigh Cowden, Mr. Jaubert's previous attorney and editor. As is evident, the documents from Ms. Cowden were retained and

controlled by her and were not in Mr. Jaubert's possession, custody or control and were only produced by Ms. Cowden in order to comply with the *subpoena duces tecum* served upon her.  In fact, when it was required, Mr. Jaubert, through undersigned counsel, WAIVED the confidentiality strictures that Ms. Cowden understood applied to her relating to these documents to enable plaintiffs to have access to them and to allow the production of the documents she maintained regarding Mr. Jaubert:

```
      3          A.  Yes, however, as I explained previously,
      4     and I'd like to put it on the record, I have
      5     signed a confidentiality agreement with Mr. Herve
      6     Jaubert.

      7          And in that confidentiality agreement, I
      8     agreed not to divulge any information that he
      9     provided to me during my services as an editor and
     10     ghostwriter of his book Escape from Dubai.

     11          And he has not given me the required
     12     written release of that, and so, therefore, I feel
     13     that I'm unable to share any information that he
     14     provided to me in writing that book, otherwise, I
     15     could be found in breach of contract, and I do not
     16     want to be sued by Mr. Jaubert for breaching a
     17     contract.

     18          MR. HESS:  I will on the record waive
     19     the confidentiality strictures that are imposed
     20     under the contract's logistic confidentiality
     21     strictures, no other privileges or no other work
     22     product or other protections.

     23          THE WITNESS:  Can I confirm with you
     24     that even though the contract requires that that
     25     waiver be in writing that he's waived that?

      1          MR. HESS:  Yes, he has.
```

(Cowden deposition at pages 10-11.)

These were requested via subpoena from plaintiffs to Ms. Cowden for her deposition that was initially scheduled for May 14, 2010 and later held on May 24, 2010.  Ms. Cowden provided

CD of these documents to undersigned counsel on May 21, 2010 as was testified to by Ms.

Cowden:

```
25          Q.  So for ease of responding to the
1    subpoena, what you decided to do, which is fair,
2    is you turned over everything you had regarding
3    Mr. Jaubert, is that correct, to allow Mr. Hess to
4    make the determination what should be produced?

5          A.  Yes, but in fairness to Mr. Hess, due to
6    my crazy moving schedule, he didn't get it until
7    Friday, so it didn't leave him enough time
8    probably to go through all of it because there are
9    many items there.

10          I did also reproduce it on a disk and
11    bring it with me today, but the problem is it's
12    mixed in with attorney/client privileged
13    information.

14          So it would really need Mr. Hess to look
15    at each item to determine whether that's something
16    he's going to assert the privilege on.

17          Additionally, I would need to see if I'm
18    going to assert the privilege, but there are
19    copies of the book on there, which you've waived
20    the confidentiality agreement.  So --

21          Q.  Well, just for the record, I think it's
22    the client's privilege, so I do think Mr. Hess
23    could probably protect the attorney/client client
24    privilege for ease of you because I know you're
25    leaving the country.

1          A.  Yeah, but Mr. Jaubert was also my
2    client, and so I have a duty to assert privilege
3    on his behalf as well, and I'm not going to
4    delegate that duty over to Mr. Hess because
5    Mr. Hess does not speak for my license.

6          Q.  Well, you did already turn over
7    everything to Mr. Hess, correct?

8          A.  Because Mr. Jaubert asked me to do that
9    through his attorney, but that doesn't release me
10    from my duty to protect my former clients.
```

(Cowden deposition at pages 37-38.)

Moreover, those documents that were on the CD provided to undersigned counsel by Ms.

Cowden initially could not be opened:

```
14              MR. HESS:  I think she's correct on how
15      she espoused the nature of the law.  Basically
16      because she was involved in the relationship.  She
17      has that obligation on behalf of her client to
18      also assert a privilege.  I'll work with her, and
19      she's been very responsible and cordial in terms
20      of getting me documentation.

21              As she represented today, I received the
22      documents on Friday.  There are hundreds and
23      hundreds of documents on that thumb drive, and,
24      again, as I represented today and as I e-mailed
25      Ms. Escobar late last night in order to avoid any
 1      waste of your time or anyone else's time here
 2      today that I advised that there were hundreds of
 3      documents, that a substantial number of those
 4      documents I could not open for programming or
 5      whatever.

 6              I don't know if it was a Mac program
 7      that was utilized or whatnot, but it wouldn't let
 8      me open a substantial number of those documents,
 9      and -- well, that's it.
```

(Cowden deposition at pages 38-39.)

In any event, the Cowden documents, now available to undersigned counsel, are being

reviewed for attorney/client privileged information; they were not available to undersigned

counsel until May 21, 2010 and will be produced to plaintiffs.  Although they are documents that

do not have any relevance to the issues (due to Ms. Cowden being an attorney, editor and

ghostwriter retained after Mr. Jaubert's return to the US after his years in Dubai) of whether Mr.

Jaubert 'embezzled' monies from Dubai World or committed fraud, or produced working

submarines, or breached any contract, they will be produced to plaintiffs at our earliest

opportunity or at this Court's direction.

## Summary

In summary, Mr. Jaubert and Seahorse have produced all responsive documents in their

possession, custody or control that have been requested by plaintiffs; these were produced to

plaintiffs to Ikon, plaintiffs' contracted company, at plaintiffs' request, despite the offer by Mr. Jaubert and Seahorse for plaintiffs' counsel to inspect these documents at undersigned counsel's offices in Stuart, Florida at a mutually convenient time.  There was a glitch with copying and producing some of Mr. Jaubert's emails: that was corrected.  There was a delay by plaintiffs in retrieving documents awaiting their retrieval [at Ikon] for weeks [and then plaintiffs complained about the costs].

A review of Mr. Jaubert's affidavit attached hereto as Exhibit 1, the emails among counsel attached hereto as Composite Exhibit 2, and the applicable Local Rules and Federal Rules of Civil Procedure, together with the relevant law, all lead to the conclusion that Mr. Jaubert and Seahorse have complied with this Court's Order, that plaintiffs' motion requesting relief was waived due to their not having filed their motion within 30 days of Mr. Jaubert and Seahorse's Response, and that many of the documents requested were last in the custody of plaintiffs.

All other documents that Mr. Jaubert and Seahorse had responsive to plaintiffs' Request for Production have been produced; Mr. Jaubert even purchase Outlook in order to copy and provide to plaintiffs complete information regarding emails.

Plaintiffs' Motion herein is an attempt to obfuscate and further damage Mr. Jaubert's credibility and malign his good faith efforts in pursuing his claims against Dubai World; plaintiffs' latest efforts in attempting to accuse Mr. Jaubert of engineering a plot of extortion through his publishing of his book and the supposed 'frivolous' lawsuit against Dubai World demonstrates the lengths to which they will go.

As Mr. Jaubert and Seahorse have not committed any sanctionable action, and as they have responded to plaintiffs' Request for Production by producing all responsive documents to

plaintiffs that were in Mr. Jaubert's possession, custody, and control, and as plaintiffs' cannot

sustain their Motion to Compel, that Motion must be denied.

Dated: July 2, 2010

         /s William T. Hess

William T. Hess, Fla. Bar No. 801224
Hess & Heathcock, P.A.
40 SE Osceola St.
Stuart, FL  34994
E-mail: whess@hhfirm.com
Telephone: 772.223.0209
Facsimile: 772.220.9727
Counsel for Defendant/Counterclaimant
Herve Jaubert and Defendant Seahorse
Submarines International Incorporated

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 2, 2010, I filed this document with the Clerk

electronically through the CM/ECF system which caused all counsel of record to be served by

electronic means.

   s/ William T. Hess

William T. Hess