# EXHIBIT "D"
## DEPOSITION OF SULTAN AHMED BIN SULAYEM WITH ATTENDANT EXHIBITS TO THAT DEPOSITION

**Page 1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 2:09-CV-14314-MARTINEZ/LYNCH

DUBAI WORLD CORPORATION, and
its subsidiaries, EXOMOS, NAKHEEL,
and PALM MARINE,

Plaintiffs,

vs.

HERVÉ JAUBERT and SEAHORSE
SUBMARINES INTERNATIONAL,
INCORPORATED, and Does 1-99,

Defendants.
/

Thursday, June 10, 2010
1601 Belvedere Road
Suite 204E
West Palm Beach, Florida
8:20 a.m. to 1:14 p.m.

VIDEOTAPED DEPOSITION OF SULTAN AHMED BIN SULAYEM

Reported before Tracey S. LoCastro, Registered
Professional Reporter, Notary Public in and for the
State of Florida at Large, pursuant to Notice of Taking
Deposition filed by the Defendants in the above cause.

*CERTIFIED TRANSCRIPT*

**Page 2**

APPEARANCES:

QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
865 South Figueroa Street
10th Floor
Los Angeles, California 90017
Phone: (213) 443-3000
E-mail: billurquhart@quinnemanuel.com
By: A. WILLIAM URQUHART, ESQ.
Counsel for Plaintiffs

ASTIGARRAGA, DAVIS, MULLINS & GROSSMAN, P.A.
701 Brickell Avenue
16th Floor
Miami, Florida 33131
Phone: (305) 372-8282
E-mail: emullins@astidavis.com
By: EDWARD M. MULLINS, ESQ.
Counsel for Plaintiffs

HESS & HEATHCOCK, P.A.
40 S.E. Osceola Street
Stuart, Florida 34994
Phone: (772) 223-0209
E-mail: whess@hhfirm.com
By: WILLIAM T. HESS, ESQ.
KATHRYN HEATHCOCK, ESQ.
Counsel for Defendants

Also present: Hervé Jaubert
George E. Dalton, Esq.

**Page 3**

INDEX
PAGE

DIRECT EXAMINATION                          5
BY MR. HESS:

EXHIBITS
PAGE
Sulayem Deposition Exhibit 1            105
Sulayem Deposition Composite Exhibit 2      108
Sulayem Deposition Composite Exhibit 3      108
Sulayem Deposition Exhibit 4            115
Sulayem Deposition Exhibit 5            116
Sulayem Deposition Exhibit 6            117
Sulayem Deposition Exhibit 7            118
Sulayem Deposition Exhibit 8            124
Sulayem Deposition Exhibit 9            125
Sulayem Deposition Exhibit 10           126
Sulayem Deposition Exhibit 11           129

**Page 4**

PROCEEDINGS
- - -

VIDEOGRAPHER:  We are now on media unit
number 1.  This is the videotaped deposition of
Sultan Ahmed Bin Sulayem.

Today's date is Thursday the 10th day of
June 2010.  And the time on the video monitor is
approximately 8:20 a.m.

The case number is 2:09-CV-14314.  The style
of our case is Dubai World Corporation, etcetera
versus Hervé Jaubert and Seahorse Submarines
International, Incorporated.

The court reporter today is Tracey LoCastro
from Veritext Reporting.  And the videographer
is Todd Cohen also with Veritext.

Would counsel please state their appearances
on the videotape record.

MR. HESS:  William Hess on behalf of
Mr. Jaubert and on behalf of Seahorse Submarines
International, Incorporated.

MS. HEATHCOCK:  Kathryn Heathcock on behalf
of Hervé Jaubert and Seahorse Submarines
International, Incorporated.

MR. URQUHART:  My name is Bill Urquhart.
I'm on behalf of the Plaintiff and also the

2  (Pages 5 to 8)

**Page 5**

1     witness.
2        MR. MULLINS: Ed Mullins, co-counsel for the
3     Plaintiff and the witness.
4     THEREUPON,
5            SULTAN AHMED BIN SULAYEM,
6     having been first duly sworn, was examined and
7     testified as follows:
8        THE WITNESS: I swear.
9            DIRECT EXAMINATION
10    BY MR. HESS:
11       Q.   Good morning.
12            Please state your name.
13       A.   Sultan Ahmed Sulayem.
14       Q.   How would you like to be called today?
15       A.   My name Sultan, my first name.
16       Q.   And where do you reside?
17       A.   Dubai.
18       Q.   And your address?
19       A.   Work address or home address?
20       Q.   Well, start with your home address.
21       A.   Home address is Dubai.  It's a placed called
22    Almamzer in Dubai.
23       Q.   And your work address?
24       A.   47th floor, Emirates Towers, Dubai.
25       Q.   Have you ever had your deposition taken

**Page 6**

1     before?
2        A.   I don't.
3        Q.   I'm sorry?
4        A.   No.
5        Q.   Do you understand or have you been told
6     what's going to transpire today?
7        A.   I understand.
8        Q.   You're under oath, you understand that?
9        A.   Absolutely.
10       Q.   And you've sworn to tell the truth and the
11    complete truth, correct?
12       A.   That's right.
13       Q.   And you understand that?
14       A.   Absolutely.
15       Q.   And that's your intention today?
16       A.   Absolutely.
17       Q.   You understand that I'm going to be asking
18    you questions, correct?
19       A.   Yes.
20       Q.   And you're going to answer those questions
21    truthfully and under oath?
22       A.   That's why I came.
23       Q.   If you at any time do not understand any of
24    the questions that I ask you, I'm going to rely on you
25    to tell me that, okay?

**Page 7**

1        A.   Okay.
2        Q.   The other important incidental in a
3     deposition, unlike normal conversation, I'm going toe
4     ask you for the sake of the court reporter when you
5     respond to questions if you would make your best
6     efforts for a verbal response.
7        A.   Absolutely.
8        Q.   Because if you shake your head or --
9        A.   I know.
10       Q.   You understand?
11            The court reporter needs to have a verbal
12    response to take it down.
13       A.   Excellent.
14       Q.   And then also the court reporter would have
15    a very hard time taking two bits of conversation at the
16    same time.  So if you would, and I'll do the same for
17    you, if you would hesitate before you interrupt me or
18    before you talk while I'm talking.  Okay?
19       A.   Okay.
20       Q.   And that way the court reporter won't have
21    any problem with taking down the transcription.
22       A.   Okay.
23       Q.   When did you arrive here for this
24    deposition?
25       A.   Three in the morning, 3:30.

**Page 8**

1        Q.   How did you arrive?
2        A.   I came from New York.
3        Q.   A commercial flight?
4        A.   No. I had to charter a flight.  I wouldn't
5     arrive here on time if I didn't.
6        Q.   And you have the necessity of leaving this
7     deposition at 3:00 to return to New York?
8        A.   Yes.
9        Q.   And you're chartering a flight back to New
10    York?
11       A.   The same plane taking back.
12       Q.   And what's the reason for your necessity of
13    being in New York today, or tomorrow, actually today?
14            MR. URQUHART: Objection.  That has
15    absolutely nothing to do with this matter.
16            MR. HESS: Are you instructing him not to
17    answer?
18            MR. URQUHART: Yes.
19            MR. HESS: Court reporter, if you could mark
20    that, please.
21    BY MR. HESS:
22       Q.   When did you become aware that you had to be
23    in New York today?
24       A.   When did I become aware?
25       Q.   Yes.

**9**

1    A.   My flight leaves from New York. I took a
2  flight from London to New York and I'm flying from New
3  York to Dubai.
4    Q.   What I'm suggesting is: When did you become
5  aware that you had to leave early today to go to New
6  York?
7    A.   I called them and I told them to I need to
8  leave early.
9    Q.   When was that?
10    A.   Yesterday, day before or yesterday.
11        MR. MULLINS:  We want to make sure we don't
12    invade the attorney-client privilege.
13        MR. HESS:  I understand. And you intend to
14    have one counsel speaking for your client as
15    well as the Plaintiff in this case?
16        Or do you intend to have two lawyers making
17    objections during the course of this?
18        MR. MULLINS:  If it's going to offend you,
19    I'll make sure that Bill makes the objections.
20    But I want to make sure we don't want to invade
21    the attorney-client privilege as I'm sure you
22    don't want to do, Mr. Hess.
23        MR. HESS:  I understand that, I just --
24        MR. MULLINS:  I don't want to offend you,
25    Mr. Hess.

**10**

1        MR. HESS:  I don't even know what that means
2    frankly.
3        The reason for my question is because if I'm
4    asking questions, I want to be able to
5    understand who's making an objection so I give
6    the appropriate courtesy to the person making
7    the objection and I take notice of whoever is
8    opening their mouth to object, that's why I ask.
9        MR. MULLINS:  I appreciate that.
10  BY MR. HESS:
11    Q.   Who is Ahmed Butti Ahmed?
12    A.   Ahmed Butti was the CEO of Istithmar, an
13  investment company that we had.
14    Q.   And he's no longer the CEO --
15    A.   No.
16    Q.   -- of Istithmar?
17    A.   No, he's not.
18    Q.   Does he continue to serve on the board of
19  directors of Dubai World?
20    A.   No. I don't think he's on the board.
21    Q.   You know he's not or you don't think he is?
22    A.   I -- we have -- I think the board of Dubai
23  World is inactive basically. We don't do any meetings.
24        But he's -- I don't think he is, because he
25  has another position.

**11**

1        COURT REPORTER: I'm sorry. I didn't hear
2    that.
3        THE WITNESS:  He has another position. He's
4    in the customs.
5  BY MR. HESS:
6    Q.   You still are chairman of Dubai World,
7  correct?
8    A.   Yes, I am. Yes.
9    Q.   And isn't one of your duties and
10  responsibilities to know who's on the board?
11    A.   Yes, it is. However, we have restructuring
12  going on with the company. And the board is not
13  meeting. And I don't remember really whether there was
14  a decision to remove him from the board. I don't
15  remember that.
16    Q.   So is it your testimony that you don't know
17  if you Ahmed Butti Ahmed is on the board of
18  directors --
19    A.   Yes --
20    Q.   -- or you know he's not on the board of
21  directors?
22    A.   No, I don't know.
23    Q.   You don't know?
24    A.   I don't know.
25    Q.   Do you know whether he's still the director

**12**

1  general of Dubai Customs --
2    A.   Yes.
3    Q.   -- Ports?
4    A.   Yes.
5    Q.   He is?
6    A.   He is.
7    Q.   And that also includes the Maritime and Free
8  Zone Authority?
9    A.   Yes.
10    Q.   Now, as the chairman of Dubai World, what
11  are your responsibilities?
12    A.   The chairman of Dubai World basically there
13  are companies under the umbrella of Dubai World. And
14  from my office of 47th floor we oversee the activities
15  of these companies.
16    Q.   And what companies are they?
17    A.   Well, Dubai Ports is one, Istithmar,
18  Nakheel, Maritime City, Drydocks.
19    Q.   Istithmar, is that still an operating
20  corporation?
21    A.   Yes, it is.
22    Q.   What does it conduct business in now?
23    A.   Istithmar is an investment company. And
24  they own hotels. They own shares in some companies.
25  Basically between hotels and shares in companies.

4 (Pages 13 to 16)

**13**

1    Q.    And Nakheel, is that still an operating --
2  operational company?
3    A.    Yes.
4    Q.    What does that do?
5    A.    It's a property company, property
6  development company.
7    Q.    And where does it develop properties?
8    A.    Mainly in Dubai.
9    Q.    Anywhere else?
10    A.    No.
11    Q.    So it's exclusively in Dubai, correct?
12    A.    Development is in Dubai, yes.
13    Q.    Palm Marine, is that still an operational
14  company?
15    A.    Palm Marine, I don't know.  I don't know.
16    Q.    Palm Marine is one of the Dubai World
17  Corporation's subsidiaries, correct?
18    A.    Yes, it is.
19    Q.    And you serve as the chairman of Dubai World
20  Corporation, correct?
21    A.    Yes.  Yes.
22    Q.    And you don't know whether or not Palm
23  Marine is operational?
24    A.    No.
25    Q.    Who serves under you -- who would know

**14**

1  whether or not Palm Marine is operational?
2    A.    The Drydocks, because they're overseen by
3  the Drydocks.
4    Q.    Now, why is it that the chairman of Dubai
5  World Corporation doesn't know whether or not Palm
6  Marine, a corporation subsidiary of Dubai World
7  Corporation, is operational or not?
8    A.    Because it is directly under the Drydocks.
9  Drydocks owns also a few yards in the world today.  And
10  I really don't know whether those yards are in
11  operation or they are working or not.  It's totally
12  under Drydocks.
13    Q.    Would that be something that when the board
14  of directors meets is that something that's discussed,
15  the viability or the conducting of business of these
16  various subsidiaries?
17    A.    They would discuss it within each entity,
18  so, for example, Drydocks when they meet, I assume that
19  they, the board also will discuss the subsidiaries.
20    Q.    And you preside over that meeting correct?
21    A.    No, I preside over the Dubai World meeting,
22  not the Drydocks.
23    Q.    How long have you served as chairman of
24  Dubai World?
25    A.    Seven, eight years.  We established the

**15**

1  company in 2002, I think, 2003.
2    Q.    And when I speak of Dubai World I'm speaking
3  of Dubai World Corporation, not Dubai World Holding,
4  but Dubai World Corporation, correct?
5    A.    Yes.
6    Q.    And you've served as the chairman since the
7  inception, since the creation of Dubai World
8  Corporation?
9    A.    Since the creation of Dubai World, yes.
10    Q.    What other positions have you held in the
11  past 10 years for Dubai World Corporation or for any
12  other corporation?
13    A.    I am the chairman of Dubai Ports Authority,
14  Jebel Ali Free Zone Authority.
15        COURT REPORTER:  I'm sorry.  What was that?
16        THE WITNESS:  Jebel Ali.  Jebel Ali Free
17     Zone Authority.
18  BY MR. HESS:
19    Q.    Anything else?
20    A.    Nakheel, which is our property company.
21        Another property company called Limitless
22  also, which is also I'm chairman of.
23        And the Port and Customs Authority.
24        MR. URQUHART:  Can we just pause for a
25     second.

**16**

1        What happened, Sultan, is you're
2     interrupting him when he's in the middle of a
3     question.  And it's going to end up making the
4     record garbled, so wait for him to finish.
5        THE WITNESS:  Okay.
6  BY MR. HESS:
7    Q.    I'm going to take this nice and slow.  So I
8  hope you don't feel like you're in a hurry to answer.
9    A.    Take your time, take your time.
10    Q.    Now, when was it that -- do you still remain
11  as the chairman of Nakheel?
12    A.    Nakheel, recently during the restructuring
13  we appointed a new board to oversee Nakheel mainly to
14  deal with the restructuring of Nakheel.  So there's
15  a new board that is more of an operational board
16  really.
17    Q.    So your answer is you no longer serve as the
18  chairman of that board --
19    A.    As the chairman of Nakheel, no.
20    Q.    Do you serve in any capacity for Nakheel?
21    A.    Nakheel is part of Dubai World, so from the
22  Dubai World link, yes, but for the day-to-day
23  operation, the board, the existing board now is the --
24    Q.    So your relationship with Nakheel is
25  exclusively by virtue of your chairmanship of Dubai

---

**17**

1  World Corporation?
2   A.  Correct.
3   Q.  Now, Drydocks World, what is that?
4   A.  It's a shipyard which is in Dubai and in
5  Indonesia and in Singapore.
6   Q.  And until recently you served in some
7  capacity with that corporation, correct?
8   A.  Yes.
9   Q.  And you no longer serve in any capacity as
10 to that corporation?
11  A.  Again, it is the same as Nakheel, it is part
12 of Dubai World. There's a new board also running that
13 operation now.
14  Q.  Now, also would your answer be the same in
15 terms of your removal from the board of the Investment
16 Corporation of Dubai?
17  A.  I am no more in the Investment Corporation
18 of Dubai.
19  Q.  That was in November of 2009 that you were
20 removed?
21  A.  Yes.
22  Q.  And why were you removed from that post?
23  A.  Because we are negotiating with banks on
24 restructuring, and there is an entity Dubai, Investment
25 Corporation of Dubai is negotiating with banks to

---

**18**

1  borrow money to fund us. And it is a conflict of
2  interest if I am in the authority that's going to
3  borrow money to fund the authority that is borrowing
4  the money. So the government separate it and I needed
5  to go out of that investment board.
6   Q.  I'm going to read you something that
7  appeared in the Wall Street Journal in October of 2009
8  regarding Dubai World Corporation. And it was found in
9  the Heard on the Street -- it can be read in the
10 Heard-on-the-Street column.
11      In that column it was stated that "Dubai
12 World Corporation," and I'll quote, "has been radically
13 restructured after running up almost 60 billion dollars
14 of liabilities on ill-judged acquisitions like
15 struggling Madison Avenue retailer Barney's and the
16 Queen Elizabeth II Liner, which has since largely
17 languished in a Dubai dry dock."
18      And that's the end of the first part of the
19 quote.
20      "And that" -- beginning of the next part of
21 the quote -- "surprisingly, senior management remains
22 in place, including Sultan Bin Sulayem, the chairman
23 who master-minded the expansion."
24      Were you aware that appeared in the Wall
25 Street Journal?

---

**19**

1   A.  No.
2   Q.  You understand what I just said, correct?
3   A.  Yes.
4   Q.  What is your -- did you mastermind, are you
5  the mastermind of the expansion of Dubai World
6  Corporation?
7   A.  Yes. Not only me, we have a board, we have
8  directors. We have, you know, we are like 50,000
9  people in the company.
10  Q.  You're the chairman, correct?
11  A.  I'm the chairman, but each independent
12 company does plan their expansions. And decisions are
13 made based on this.
14  Q.  So you would disagree that you do not have
15 the responsibility for the expansion?
16      MR. URQUHART: Objection, mischaracterizes
17  the testimony.
18      MR. HESS: I'll rephrase that. I'll
19  withdraw that.
20 BY MR. HESS:
21  Q.  Would you -- do you disagree that you are,
22 as chairman, the individual who had the responsibility
23 for the expansion?
24      MR. URQUHART: Same objection.
25      THE WITNESS: I disagree that I made the

---

**20**

1  expansions myself in every business.
2      Drydocks decided to expand in Far East
3  because of the business. Every business
4  expanded because of the nature of the business
5  they are. And as a board, when they come with
6  requests for that, we have board members who
7  basically sit there and decide we'll let them
8  get on.
9  BY MR. HESS:
10  Q.  And when the board does meet --
11  A.  Yes.
12  Q.  -- you as chairman --
13  A.  Yes.
14  Q.  -- and you served as chairman during 2009,
15 correct?
16  A.  Yes. Yes.
17  Q.  And 2008?
18  A.  Of which, Dubai World you mean?
19  Q.  Yes.
20  A.  Yes, I'm still Dubai World.
21  Q.  I may have asked you this already, but I
22 apologize. When did you begin your chairmanship of
23 Dubai World, was that since its inception?
24  A.  Yes, since the inception.
25  Q.  And you already told me that, correct? And

---

6 (Pages 21 to 24)

**21**

1  I apologize for repeating that.
2     A.   No problem.
3     Q.   You mentioned that you were removed from
4  these other various chairmanships because of a conflict
5  of interest because of the refinancing of -- by banks
6  and whatnot.
7     A.   I stepped down from the Investment
8  Corporation of Dubai, ICD, because we are negotiating a
9  major borrowing from banks.  And it is a conflict of
10  interest to be in the board of Dubai Investment
11  Corporation while we are borrowing.  The banks will not
12  accept that I negotiate with them to give it to my
13  company.  In other words, they should be independent so
14  they can decide, in terms of the banks, which entity
15  needs the funds and how much they're going to give
16  them.  And I cannot be part of it if I'm borrowing.  If
17  I didn't borrow money from the ICD, then probably I
18  would be there.
19     Q.   And when you say borrow money, you're
20  speaking of borrowing money on behalf of --
21     A.   Meaning the government borrowing, not me
22  personally.  The government borrowing the money through
23  Investment Corporation of Dubai, which I was a board
24  member.
25     Q.   The Investment Corporation of Dubai, which

**22**

1  you were a member of --
2     A.   Yes.
3     Q.   -- is an arm of the government?
4     A.   Yes.
5     Q.   And what is its function?
6     A.   It's an investment arm.  It's an
7  investment -- a government investment, a sovereign fund
8  investment.
9        COURT REPORTER:  A what fund?
10        THE WITNESS:  Sovereign fund.
11        MS. HEATHCOCK:  Sovereign.
12        COURT REPORTER:  Sovereign, thank you.
13  BY MR. HESS:
14     Q.   And when you said that you were going to be
15  actively engaged in borrowing money, who were you
16  borrowing money on behalf of?
17     A.   ICD is going to borrow money.  Investment
18  Corporation of Dubai is going to borrow money.  And
19  when they go to the banks, they have to show who are
20  the board members.  And banks would object to see that
21  I will be a member and I will probably -- I will be
22  benefiting as a company.  Dubai World would be
23  benefiting as a company.
24     Q.   That's what I'm getting at.
25        So the borrowing of the money ultimately is

**23**

1  intended to result in Dubai World Corporation receiving
2  funding, correct?
3     A.   Dubai World will receive funding plus other
4  entities in Dubai will receive funding, not only Dubai
5  World.
6     Q.   How often does Dubai World Corporation's
7  board meet?
8     A.   I really don't remember how many times we
9  have met.  I know we met a few times in the beginning
10  when we establish the company.
11     Q.   So Dubai World Corporation's directors
12  haven't met during the year 2010?
13     A.   No.
14     Q.   And they haven't met during the year 2009?
15     A.   '9, I don't know.  Maybe once, but I doubt
16  it.  I don't remember.  I don't recollect.
17     Q.   Now, do the meetings, the Dubai World
18  Corporation director meetings, are they consequential?
19  Do they have importance?
20        MR. URQUHART:  Objection.  This line of
21  questioning has absolutely nothing to do with
22  this lawsuit.  And it's not calculated to lead
23  to discovery that has anything remotely to do
24  with this lawsuit.
25        MR. HESS:  Are you instructing the witness

**24**

1  not to answer?
2        MR. URQUHART:  I'm not instructing him not
3  to answer, but if you go beyond 3:00 and you
4  continue to waste the chairman of the board's
5  time by asking him questions that have
6  absolutely nothing to do with this lawsuit and
7  you want to go beyond that 3:00, then I'm going
8  to be talking --
9        MR. HESS:  You just took up more time than
10  three of the questions that I had.
11        MR. URQUHART:  Yeah, three of the relevant
12  questions that you have.
13        MR. HESS:  I appreciate you saying that.
14        And, I guess, for the record, since you
15  wanted to make that speech, I should respond
16  that he is the chairman of Dubai World
17  Corporation.  Dubai World Corporation has sued
18  Mr. Jaubert and Seahorse Submarines
19  International, Inc.
20        He is charged with the duty -- Sultan is
21  charged with the duty of knowing what goes on
22  with Dubai World Corporation.  That's why he's
23  here today.
24        And I wouldn't spend so much time except for
25  the fact that he couldn't remember the last time

e4355396-d0d9-48ea-805c-122768f4edbc

8 (Pages 29 to 32)

---

29

1    Q.   Right. So is there at any time during your
2  chairmanship that you understand the value of Dubai
3  World Corporation?
4    A.   Of course, yes.
5    Q.   When was the last time you understood the
6  value of the assets of Dubai World Corporation?
7    A.   I think we can come to you with documents if
8  you want later. We can show you documents that show
9  how much the value may be. You tell us which year you
10 want to know the value, we'll be happy to supply you
11 with information that shows you which year, what the
12 value of the company.
13   Q.   Would you prefer to do it that way?
14   A.   I'll give you precise information. Because
15 I'm under oath here to you and I need to give you
16 correct information. We're not guessing here.
17        So I want -- my duty to give you correct
18 information. I will promise you supply you that.
19 After the meeting or during the meeting if you want to
20 you can call and we'll get you a list or is it accounts
21 or value of the company which will help you.
22   Q.   Thank you. I'll move on then.
23   A.   Okay.
24   Q.   Who is Abdul Gadar?
25   A.   He is our internal auditor.

---

30

1        COURT REPORTER: He's a?
2        THE WITNESS: The internal auditor.
3  BY MR. HESS:
4    Q.   And he is employed by Dubai World
5  Corporation?
6    A.   Yes.
7    Q.   Who is Hamed Kazim?
8    A.   He was our previous CFO.
9    Q.   And when did he become a previous CFO?
10   A.   When did Hamed leave? I'm not good with
11 dates, but I would assume three years ago.
12   Q.   What does he do now?
13   A.   I'm not aware.
14   Q.   And of course you know who Jim Miller is?
15   A.   Yes.
16   Q.   Who is Jim Miller?
17   A.   Jim Miller worked for me in various
18 businesses as an assistant when we travel organizing
19 meetings and travel arrangements. That's when the
20 times he worked for me.
21   Q.   And during what period of time did he work
22 for you?
23   A.   The number. He left the company a few
24 months ago. He started, I think something like five
25 years ago, four, five years ago.

---

31

1    Q.   And you said he left the company a few
2  months ago?
3    A.   Yeah.
4    Q.   And under what circumstances did he leave
5  the company?
6    A.   He just decided he wanted to leave.
7    Q.   He performed many functions, he had many
8  responsibilities in terms of being an assistant to you,
9  correct?
10   A.   Yes.
11   Q.   And he engaged -- and you met with him and
12 he had access to you on a frequent basis, correct?
13   A.   Yes.
14   Q.   And you had many discussions with him
15 regarding Mr. Jaubert and Seahorse Submarines
16 International, Inc., correct?
17   A.   Yes.
18   Q.   And during the period of time from 2004
19 until 2007 you continued to -- you had these
20 discussions about Mr. Jaubert and Seahorse Submarines
21 International, Inc. and Exomos, correct?
22   A.   Yes.
23   Q.   And, in fact, he relayed your advice and
24 wishes to Mr. Jaubert at least in 2004, correct?
25        MR. URQUHART: Objection, vague and

---

32

1  ambiguous.
2        THE WITNESS: What do you mean? Can you
3  explain?
4  BY MR. HESS:
5    Q.   He operated as your liaison, as your agent
6  between you and Mr. Jaubert in 2004.
7    A.   He did liaise in the capacity of I wanted
8  him to be in the factory to basically -- well, Jim
9  Miller is actually the one who found the company, who
10 found Seahorse. And so, naturally, when I needed to
11 know information, I'll ask Jim to get the information.
12   Q.   And you authorized him to convey information
13 from you to Mr. Jaubert, correct?
14        MR. URQUHART: Objection, vague and
15 ambiguous.
16        THE WITNESS: Jim Miller, if I asked for
17        information, he'll give me feedback. Jim Miller
18        had no authority to instruct or basically commit
19        the company financially. If that's what you're
20        asking.
21 BY MR. HESS:
22   Q.   Well, did he have the authorization to
23 convey to Mr. Jaubert in September of 2004 that you
24 were genuinely excited about the continuing
25 breakthroughs in the acquisition of Mr. Jaubert and

---

e4355396-d0d9-48ea-805c-122768f4edbc

33

1  Seahorse Submarines International, Inc.'s assets?
2      A.   Can you ask me again?
3      Q.   Sure.
4          Did he have the authority to convey in
5  September of 2004 to Mr. Jaubert that you were
6  genuinely excited about the continuing breakthroughs in
7  terms of the acquisition of the Seahorse Submarine
8  International, Inc. assets?
9      A.   What do you mean "continuing breakthrough"?
10  I don't understand that.
11      Q.   Well, the acquisition --
12      A.   No, no, you said the breakthrough.  I don't
13  understand what you mean by breakthrough.
14      Q.   Did he have the authority to convey to
15  Mr. Jaubert your interest in acquiring the technology
16  of Mr. Jaubert?
17      A.   We did visit Mr. Jaubert to see the factory.
18  And then we invited Mr. Jaubert to come to Dubai to see
19  the boat show.  And after that we were interested in
20  developing these submarines production in Dubai.
21  During that time Jim was the contact person with
22  Jaubert.  If that's what you asked.
23      Q.   So he was appointed by you to be the contact
24  person with Mr. Jaubert in terms of the -- this
25  pursuing the submersible business, correct?

34

1      A.   Correct.
2      Q.   And, in fact, you told Mr. Jaubert that he
3  should be discussing these matters with Mr. Miller when
4  you met with Mr. Jaubert, correct?
5          MR. URQUHART:  Objection, vague and
6      ambiguous.
7          THE WITNESS:  Can you repeat?
8  BY MR. HESS:
9      Q.   Sure.
10          In fact, when you met with Mr. -- because
11  you're a busy man, correct?  Right?
12      A.   Yes.
13      Q.   You're always moving, right?
14      A.   Absolutely, yes.
15      Q.   You're flying to New York.  You're flying to
16  London.  You're back to Dubai.  You're flying back to
17  New York today, right?
18      A.   Yes.
19      Q.   So you don't have the time to spend, the
20  day-to-day time to acquire a business or do the due
21  diligence in acquiring a business, correct?
22          MR. URQUHART:  Objection, vague and
23      ambiguous.
24          THE WITNESS:  Due diligence is done by the
25      group.  There are people -- I don't do the due

35

1  diligence.  Show me one chairman of a company
2  that does the due diligence personally.
3          So you're asking me a multitude of questions
4  and please can ask me one by one so I answer
5  you.
6          MR. HESS:  Sure.  Happy to.
7          THE WITNESS:  Because I'm happy to answer
8  you any questions, but the only thing I want to
9  make sure that I understand it and I get you the
10  right answer.
11  BY MR. HESS:
12      Q.   And that's exactly what I want to have
13  happen, too.  Thank you.  And I appreciate you saying
14  that.
15          You appointed Mr. Miller as, as you put it,
16  the contact person back in 2004 regarding the
17  discussions with Mr. Jaubert, correct?
18      A.   Yes.
19      Q.   And what were those -- what was your
20  understanding of those discussions?
21      A.   The discussion was is to look at basically
22  producing -- first of all, we wanted to buy one of the
23  submarines, which we agreed when we came here.  We
24  agreed on looking at that.
25          But later on we discussed maybe producing

36

1  them in Dubai.  And the contact person at that time was
2  Jim Miller.
3      Q.   And Mr. Miller reported back to you about
4  his discussions with Mr. Jaubert?
5      A.   He reported to me as well as Hamed Kazim,
6  the CFO.
7      Q.   And did you have discussions with Hamed
8  Kazim?
9      A.   We did discuss, yes.
10      Q.   So Hamed Kazim told you then that he would
11  like to see Mr. Jaubert as the chief executive officer
12  of the new corporation that's going to be formed, which
13  turned out to be Exomos, have a vested interest in the
14  profit of the company, correct?
15          MR. URQUHART:  Objection, vague and
16      ambiguous.
17          THE WITNESS:  I don't understand the
18      question.
19  BY MR. HESS:
20      Q.   You had a discussion with Mr. -- you just
21  brought it up.  You said that you not only talked to
22  Mr. Miller, but you also discussed the Seahorse
23  Submarines International, Inc. and Mr. Jaubert's role
24  in this submarine endeavor with Mr. Kazim, correct?
25      A.   Yes.

10 (Pages 37 to 40)

---

**37**

1   Q.   And Mr. Kazim discussed with you the concept
2   of Mr. Jaubert sharing in the profits of the new
3   venture, correct?
4   A.   There was a discussion like that, yes.
5   Q.   And that was back in 2004, right?
6   A.   I think so.  I'm not sure of the dates.
7   Q.   You never told Mr. Jaubert ever -- you never
8   told Mr. Jaubert that Mr. Miller was not authorized to
9   discuss the -- let me withdraw that.  Let me start that
10  again.
11       Back in 2004, what's your recollection of
12  how contact was made with Mr. Jaubert?
13  A.   What was your question?  I didn't understand
14  the question.
15  Q.   Back in 2004 -- let me ask you this.
16       When was it that you first became aware of
17  Mr. Jaubert?
18  A.   When we met him first.
19  Q.   Before then Mr. Miller told you about him,
20  correct?
21  A.   Before that Mr. Miller, yes.
22  Q.   So you became aware of him through
23  Mr. Miller?
24  A.   Absolutely.
25  Q.   And that was in 2004?

---

**38**

1   A.   I think so.  I'm not sure.
2   Q.   And it's true that one of the things that
3   you were interested in is developing a tourist shallow
4   water submarine, correct?
5       MR. URQUHART:  Objection, vague and
6   ambiguous.
7       THE WITNESS:  We were interested in buying a
8   submarine that basically was at his factory.
9   BY MR. HESS:
10  Q.   You were aware that Mr. Miller communicated
11  with Mr. Jaubert back in, actually it was December of
12  2003 saying that Dubai World, or actually Dubai with
13  its large, as he put it, the world's largest artificial
14  reef has an immediate need of a shallow-water,
15  tourist-style submarine, correct?
16  A.   Yeah.
17  Q.   And that's something you and Mr. Miller
18  discussed, correct?
19  A.   Mr. Miller, I ask him to find a supplier of
20  submarine that we can use it for the tourists in Dubai.
21  Q.   And what was the intention, when you said
22  shallow water --
23  A.   I really didn't tell him go shallow water or
24  deep water, but I have no idea, no knowledge of
25  submarines.  Of course Mr. Jaubert is an expert in

---

**39**

1   that.  We assumed when we met with him we assumed that
2   he knows and he has the qualification to produce
3   submarines.  We've seen submarines with him.
4   Q.   So your testimony is back in 2003 and 2004
5   when you -- was this your brain child, that was
6   something you thought of, to have a tourist submarine
7   capability in Dubai?
8   A.   We are building Atlantis, which is just like
9   the Bahamas.  And we thought that a submarine would be
10  attractive for the tourists.  And we started looking
11  for submarines.
12  Q.   How deep is the water there where you
13  intended to use it?
14  A.   I'm not an expert.
15  Q.   Was this your idea, though, the use of a
16  tourist submarine?
17  A.   Yes.
18  Q.   So you just knew you wanted a tourist
19  submarine, but you didn't really -- it's not -- you
20  came up with the idea, the details were for someone
21  else?
22  A.   The details were for whoever was going to
23  supply us basically.
24  Q.   So you never knew that Mr. Miller
25  communicated with Mr. Jaubert Dubai's immediate need

---

**40**

1   for a shallow-water, tourist-style submarine?
2   A.   No.  I am aware based -- I asked him to find
3   somebody.  And he communicated with Mr. Jaubert as well
4   as with others maybe.  I have no idea.
5   Q.   Because I thought you said that you didn't
6   say you wanted a shallow-water, tourist submarine.  I
7   thought you said that you just wanted a submarine --
8   A.   A submarine.  If he said shallow, I have
9   never asked him shallow.  I don't know what shallow is.
10  What is shallow?  Is that 10 meter, 5 meter, 20 meter?
11  I don't know.
12  Q.   You don't know?
13  A.   Absolutely.
14  Q.   Do you know why Mr. Miller would ask that?
15  A.   I think we should ask him.  I don't know.  I
16  don't know why.
17  Q.   Where is Mr. Miller?
18  A.   At this moment I'm not aware.
19  Q.   I'm sorry?
20  A.   At this moment I assume he's in California,
21  but I don't know at this moment where he is.
22  Q.   Do you know what he does for a profession?
23  A.   After he left me?  No.  He's a photographer
24  diver, that I know.
25  Q.   Do you communicate with him?

---

**49**

1  A.  Please.  Please.
2  Q.  My question was:  You were impressed by
3 Mr. Jaubert when you met with him that first time?
4  A.  We were impressed with what we've seen.
5  Q.  I'm sorry, you were impressed?
6  A.  With what we have seen, a submarine and the
7 website we've seen also before we came.
8  Q.  What did you see when you came to Stuart?
9  A.  We saw, if I recollect very well, two
10 submarines or three.  One of them was a wet submarine,
11 they call it, and another submarine for three or four
12 people, I remember.  And another one also.  So we saw
13 three submarines.
14  Q.  And you have a distinct recollection of that
15 meeting?
16  A.  I remember what I saw.
17  Q.  And did you always know the distinction
18 between a wet submarine and a dry submarine?
19  A.  No, I have no idea.  He told us, this is a
20 wet submarine.
21  Q.  And what is your understanding of the
22 difference between a wet and dry submarine --
23  A.  When I asked him what's a wet submarine, he
24 said, it means if you dive with it, you'll be in the
25 water.  And so that's what we understood that.

**50**

1  Q.  And you dive, correct?  You scuba dive?
2  A.  Yes.
3  Q.  How long did you spend with Mr. Jaubert on
4 that first visit?
5  A.  An hour maybe, two.
6  Q.  Do you know?  I mean, is that --
7  A.  Exactly I don't remember.
8  Q.  Could have been one hour, could have been
9 two hours?
10  A.  One or two hours.
11  Q.  Could have been more?
12  A.  I doubt.
13  Q.  And at the end of that meet -- and
14 Mr. Miller was with you, correct?
15  A.  He was.
16  Q.  Did he typically travel with you?
17  MR. URQUHART:  Objection, vague and
18 ambiguous.
19  THE WITNESS:  You mean --
20 BY MR. HESS:
21  Q.  Did you understand my question?
22  A.  No.
23  Q.  When you traveled on business, did
24 Mr. Miller accompany you?
25  A.  Sometimes.

**51**

1  Q.  Would you characterize his accompanying you
2 for this trip to Stuart in December of 2003 as unusual
3 or typical?
4  MR. URQUHART:  Objection, vague and
5 ambiguous.
6  THE WITNESS:  What do you want to know?
7 BY MR. HESS:
8  Q.  Was there a reason that Mr. Miller was
9 traveling with you to go to meet Mr. Jaubert?
10  A.  Because Mr. Miller was going to show me.  I
11 didn't know Mr. Jaubert.  I didn't know the location.
12 And he had all the background information that he made.
13 So, naturally, he came with me for that visit.
14  Q.  Mr. Miller was the point man, do you
15 understand what that means?  The point man, the contact
16 person, right?
17  A.  At that time, yes.
18  Q.  He had the responsibility of serving your
19 desire to get Dubai a submarine, right?
20  A.  He was the person whom I asked to find
21 submarines.
22  Q.  And so he had that responsibility?
23  A.  At that time.
24  Q.  Did that change?
25  A.  We didn't ask him to find other submarine

**52**

1 after that.
2  Q.  Now, in terms of your contact with
3 Mr. Jaubert, what transpired next after the -- let me
4 withdraw that.
5  Did that meeting in 2003, that first meeting
6 with Mr. Jaubert, what was the result of that?  Was
7 there a submarine purchased or --
8  A.  We were interested in buying one submarine,
9 yes.
10  Q.  And was that discussed with Mr. Jaubert?
11  A.  We initiated the discussion when we were
12 there.
13  Q.  And when you said "we," did you mean --
14  A.  Me and Jim Miller initiated the discussion.
15 And we agreed that in Dubai we will, you know, if --
16 we'll decide.
17  Q.  What was the discussion that you initiated,
18 do you recall?
19  A.  The fact that I wasn't -- we wanted one
20 submarine that was ready.  And Mr. Jaubert said the
21 only one ready is the wet submarine.  And I mentioned
22 that I don't think it would be useful for people to go
23 in a wet submarine.  And Mr. Jaubert said he can make
24 the dry submarine.  He can adapt it or make changes in
25 it to make it a dry submarine.

65

1 Kazim about the attractiveness of -- was it just one
2 discussion?
3     A.   I think after the first purchase of the
4 submarine the discussion happened after that.  Now
5 whether it is once or twice, I really don't remember.
6     Q.   And where did these discussions occur?  Are
7 they in your office --
8     A.   In Hamed's office, yes, in our office.
9     Q.   And they just, they seem so general.  Were
10 they just in minutes of duration these discussions?  A
11 few minutes?
12    A.   I don't remember.  I mean, we talk business
13 when we are in the office.  So Hamed came up and said,
14 by the way, we are going to buy this submarine, we
15 spoke to Jaubert, you know, so that's good.  And we
16 talking about those and maybe studying the idea of
17 setting up maybe manufacturing or production facility.
18    Q.   Is that the same time that Mr. Kazim talked
19 to you about the profit sharing between Mr. Jaubert and
20 Dubai World Corporation?
21    A.   I think that was something that he discussed
22 with Jaubert as, you know, how the relation could be.
23    Q.   Right.  But is that the same time that
24 Mr. Kazim apprised you of that?
25    A.   I don't remember.

66

1     Q.   Do you remember how many conversations you
2 had about this concept of --
3     A.   Maybe two, three times, I don't remember.
4     Q.   If I could finish, please.
5     A.   Sorry.
6     Q.   That's okay.
7          Do you remember how many conversations you
8 had with Hamed Kazim about this concept of developing a
9 manufacturing facility in Dubai to build submarines?
10    A.   I don't remember.
11    Q.   Did you ever -- and do you recall the amount
12 of the investment that was contemplated to develop this
13 manufacturing facility in Dubai?
14         MR. URQUHART:  Objection, vague, ambiguous.
15         THE WITNESS:  I don't remember.
16 BY MR. HESS:
17    Q.   You don't remember?
18    A.   Exact figures I don't remember.
19    Q.   Do you have any idea?  I mean, was it 20
20 million dollars?
21    A.   I have no idea.
22    Q.   So it could be anything from a dollar to --
23    A.   Two billion.
24    Q.   -- to 2 billion?
25    A.   I don't know.

67

1     Q.   Okay.
2          Now, is it your philosophy in business to,
3 when Dubai World Corporation engages itself in an
4 enterprise to fully resource that enterprise?
5          MR. URQUHART:  Objection, vague and
6 ambiguous.
7          THE WITNESS:  I don't understand the
8 question.
9 BY MR. HESS:
10    Q.   Does Dubai World Corporation go into its
11 various enterprises without resourcing them adequately
12 to be successful?
13         MR. URQUHART:  Same objection.
14         THE WITNESS:  I don't understand.
15 BY MR. HESS:
16    Q.   What's the last big enterprise that you were
17 involved in on behalf of Dubai World Corporation?
18    A.   I don't remember.
19    Q.   You don't remember?
20    A.   No.
21    Q.   What's the last purchase that Dubai World
22 Corporation made that you were involved in?
23    A.   Dubai Ports.
24    Q.   What was that?
25    A.   Dubai Ports.

68

1     Q.   And what did they do with Dubai boats?
2     A.   Ports not boats.
3     Q.   Dubai what?
4     A.   Ports.
5     Q.   Ports.  Okay.  What did they do with Dubai
6 Ports?
7     A.   We own and manage ports around the world.
8     Q.   And you made a huge investment in terms of
9 dollars, in terms of money -- not talking about
10 dollars -- in terms of money to facilitate that
11 management capability, correct?
12    A.   Sorry?
13         MR. URQUHART:  Objection.
14 BY MR. HESS:
15    Q.   To facilitate that management capability.
16    A.   The question is?
17    Q.   You made a huge investment, monetary
18 investment to ensure that Dubai World Corporation would
19 be successful in that regard, correct?
20         MR. URQUHART:  Objection, vague and
21 ambiguous.
22         THE WITNESS:  I don't understand the
23 question.
24 BY MR. HESS:
25    Q.   Did you invest any money in the port

e4355396-d0d9-48ea-805c-122768f4edbc

105

1     A.   I don't recall.
2     Q.   And so, are you a sportsman, a sports
3  shooter?
4     A.   No.
5     Q.   So how is it that you know the law so well
6  about guns, but you don't know whether or not
7  prostitution is illegal in Dubai?
8     A.   Ah, in the customs. Customs we know what is
9  allowed and what is not allowed.
10    Q.   Is it illegal to bring a prostitute into
11 Dubai?
12    A.   I don't know.
13         (Sulayem Deposition Exhibit 1 was marked for
14 identification.)
15    MR. URQUHART: Do you know where this came
16         from?
17         MR. HESS: It came from your deposition of
18         Mr. Jaubert. But the ultimate answer to your
19         question, no. I know what the allegations you
20         made during the questioning of Mr. Jaubert were,
21         but I don't know where it came from.
22         MR. URQUHART: This is an exhibit?
23         MR. HESS: It's an exhibit, it's been marked
24         as 1.
25 BY MR. HESS:

106

1     Q.   Mr. Bin Sulayem.
2     A.   Yes, sir.
3     Q.   You've seen what's been put in front of you
4  that's been marked as Exhibit number 1?
5     A.   Yes.
6     Q.   Have you ever seen that before, that emblem?
7     A.   No. I mean, this here emblem?
8     Q.   Right.
9     A.   I've seen it in movies maybe.
10    Q.   Never seen it in public in Dubai?
11    A.   No.
12    Q.   Never seen it on an Internet or e-mails in
13 Dubai World Corporation offices?
14    A.   I haven't seen that, no.
15    Q.   Let me, just so I can show this to the court
16 reporter.
17         If that were -- you would agree that's --
18 how do you -- offensive, not offensive, what?
19    A.   It's offensive, of course.
20    Q.   Have you ever heard that that type of an
21 emblem is being circulated in any Dubai World
22 Corporation office?
23    A.   No.
24    MR. URQUHART: Objection, vague and
25         ambiguous.

107

1         THE WITNESS: I haven't heard this.
2  BY MR. HESS:
3     Q.   If it was, wouldn't that be -- you would
4  agree that would be an important breach of protocol,
5  correct?
6         MR. URQUHART: Objection, vague and
7         ambiguous.
8         THE WITNESS: Let me tell you. I haven't
9         seen anything like this circulated. But am I
10        sure that there's no e-mail having that being
11        circulated? I'm not sure. Hundreds of e-mails
12        are circulated in Dubai World, but I haven't
13        seen it myself.
14 BY MR. HESS:
15    Q.   And it never came to you?
16    A.   This one I haven't seen. First time I've
17 seen it.
18    Q.   It never came to you in an e-mail?
19    A.   No.
20    Q.   Or do you mean that you never opened an
21 e-mail that that was in it?
22    A.   I haven't seen an e-mail with something like
23 that.
24    Q.   So that doesn't mean it didn't arrive in an
25 e-mail to you, it just means you didn't open it.

108

1     A.   I receive many e-mails. And sometimes when
2  e-mails, I don't know who the sender or it could be
3  spam, I mark it spam and never open it.
4     Q.   What was your understanding of the -- I'll
5  withdraw that
6         There came a time that you approved a 10
7  percent service charge on purchases that were being
8  made through Seahorse Submarines International, Inc.,
9  correct?
10        MR. URQUHART: Objection.
11        THE WITNESS: I don't remember that.
12 BY MR. HESS:
13    Q.   You don't remember?
14    A.   No.
15    Q.   Does that mean it didn't happen?
16    A.   Maybe it didn't happen. I say I don't
17 remember it.
18        (Sulayem Deposition Composite Exhibit 2 was
19 marked for identification.)
20        MR. MULLINS: Do you have a copy for us?
21        MR. HESS: Then in the meantime, while I'm
22        getting copying counsel copies, could you mark
23        this as Composite Exhibit 3.
24        (Sulayem Deposition Composite Exhibit 3 was
25 marked for identification.)

28 (Pages 109 to 112)

---

**109**

1    MR. URQUHART: While you're looking, I'm
2  going to take a quick run to the bathroom.
3    MR. HESS: We can go off the record.
4    VIDEOGRAPHER: Going off record at 10:57
5  a.m.
6    (A recess was taken from 10:57 a.m. to 11:00
7  a.m.)
8    VIDEOGRAPHER: We're now back on the video
9  record. This is still media unit 2. The time
10  is 11:00 a.m.
11 BY MR. HESS:
12   Q.   Mr. Bin Sulayem, I'm going to show you again
13 what's been marked as Composite Exhibit 2, it's two
14 documents. If you can take a look at those and let me
15 know after you've reviewed them.
16   A.   Yes.
17    MR. MULLINS: That's just a copy of that
18  one.
19    THE WITNESS: Yes.
20 BY MR. HESS:
21   Q.   First of all, your signature appears on both
22 of those documents?
23   A.   Yes.
24   Q.   Let me show you what's been marked as
25 Composite Exhibit 3, also two documents, take a look at

---

**110**

1  those and let me know when you've had an opportunity.
2  Make sure these two stay together because they're a
3  composite.
4    A.   Yes, sir.
5    Q.   Your signature appears on both those
6  documents in Composite 3?
7    A.   Yes.
8    Q.   And right above your signature on Composite
9  Exhibit 2 it states, "Approved by," correct?
10   A.   Yes. Yes.
11   Q.   On both documents?
12   A.   Yes.
13   Q.   And then on the other Composite Exhibit 3?
14   A.   Yes.
15   Q.   So by signing those documents you approved
16 those documents?
17   A.   This is a request to spend basically and it
18 came to me to sign on behalf of -- to approve the
19 purchase of equipment, which I approved.
20   Q.   It came to you -- you approved the document,
21 correct, you approved everything in the document,
22 correct?
23   A.   What I had seen in this, which was brought
24 to me by Hamed Kazim, he said a request that Hervé had
25 requested to spend this much and I approve it.

---

**111**

1    Q.   And you didn't review it any closer that
2  than?
3    A.   When it comes to finance, they do their job.
4  After we approve this, then there's a process of how
5  to -- this an approval to spend the money, okay.
6    Q.   And you approved a 10 percent service
7  charge, correct?
8    A.   Approval of the total amount that is being
9  spent.
10   Q.   If I could see that exhibit again, I misread
11 it.
12   A.   No, you didn't misread. I see --
13   Q.   Are you saying that because the way I read
14 it says, approved by, it doesn't say, approving the
15 total amount, but not approving the 10 percent service
16 and handling charges.
17   A.   No, no. Service and handling there, now,
18 what is the service and handling? I have no idea. Is
19 it shipping?
20   Q.   Is it?
21   A.   Insuring? I don't know.
22   Q.   Is it?
23   A.   I don't know. I don't know. I assume it is
24 shipping and handling. Shipping and handling basically
25 this is normal when something is shipped, I assume.

---

**112**

1    But I don't read the details. I didn't look
2  at that and say, oh, that's 10 percent, is this so much
3  for shipping and handling? No, I didn't look at that.
4  I have many documents.
5    But once it leaves the office that it is
6  approved to spend this, then there's a process of how
7  it's going to be processed, which I don't get involved
8  in that. But I do agree I signed approved to spend
9  that.
10   Q.   You do agree that it's a 10 percent shipping
11 and handling -- well, it says service and handling
12 charge, doesn't it?
13   A.   Yes.
14   Q.   Why did you say shipping and handling?
15   A.   Could be shipping. No, because handling in
16 our business is shipping. Handling is shipping. When
17 we ship something, I'm the port. I know he that
18 handling is shipping.
19   Q.   You know, I didn't think this was going to
20 be this complicated. Can we take a break one second, I
21 want to get a copy of those.
22    VIDEOGRAPHER: Going off record at 11:05
23  a.m.
24    (A recess was taken from 11:05 a.m. to 11:11
25  a.m.)

---

29 (Pages 113 to 116)

---

113

1    MR. HESS: Can you let them know we're
2  ready.
3    VIDEOGRAPHER: We are now back on media unit
4  number 2. The time is 11:11 a.m.
5  BY MR. HESS:
6    Q.  Mr. Bin Sulayem, we've been off the record
7  for approximately --
8    How long have we been off the record, court
9  reporter?
10    COURT REPORTER: We went off at 11:05 and
11  it's now 11:11.
12  BY MR. HESS:
13    Q.  You've had a bit more time to think about
14  and contemplate these documents?
15    A.  No.
16    Q.  No?
17    A.  No.
18    Q.  I think I was asking you about your
19  characterization of shipping charges. And you would
20  agree that on none of the four documents does the word
21  "shipping charge" or words "shipping charge" appear,
22  correct?
23    A.  No. But usually handling, service/handling
24  usually means also shipping and insurance and all.
25    And I've seen it because I'm in the port

---

114

1  business. I've seen these words and it's always
2  handling. Handling in a port, it could be packaging,
3  it could be the crane carrying, putting it in a truck,
4  taking it, it could be handling.
5    Q.  And on the first page of Exhibit 2, you have
6  that in front of you?
7    A.  Exhibit 2, yes.
8    Q.  Service and handling charges of $11,900,
9  correct?
10    A.  There is 11,000, yes. Yes.
11    Q.  On the first page of Exhibit 3, service and
12  handling charges of $11,165.
13    A.  Yes.
14    Q.  On the second page of Exhibit 3, service and
15  handling charges of $9,730.
16    A.  Yes.
17    Q.  And the second page of Exhibit 2, service
18  and handling charges of $6,120, correct?
19    A.  Yes.
20    Q.  All approved by you?
21    A.  All those invoices, yes, were approved by
22  me.
23    Q.  The shipping, the service and handling
24  charges -- I'm sorry, withdraw that.
25    The service and handling charges on each of

---

115

1  those four documents --
2    A.  Yes.
3    Q.  -- were approved by you?
4    A.  I approved the total amount including that.
5    Now, this is an approval to spend. And we
6  have so many documents that we approve to spend,
7  sometimes it gets spent and sometimes it doesn't get
8  spent.
9    The minute I sign this, that doesn't mean
10  it's going to be spent. There's a process of spending
11  it. And this means it's approved to spend the money,
12  but how they going to spend it and what process, that
13  is to the concerned party, finance and purchase people.
14    Q.  I'm asking a very simple question. What I'm
15  asking you is: By signing this, these documents, these
16  four documents --
17    A.  Yes.
18    Q.  -- you approved, that's the language that's
19  on the documents, correct?
20    A.  Yes.
21    Q.  You approved the service and handling
22  charges on each one of those documents.
23    A.  I approved it, yes.
24    (Sulayem Deposition Exhibit 4 was marked for
25  identification.)

---

116

1  BY MR. HESS:
2    Q.  Mr. Bin Sulayem, if you could review that
3  what's been marked as Exhibit 4.
4    A.  Yes.
5    Yes.
6    Q.  Your signature appears on that document
7  also, correct?
8    A.  Yes.
9    Q.  Do you have an understanding what this
10  document is? I'll withdraw that question.
11    It's a capital expenditure proposal,
12  correct, that you signed off on?
13    A.  Yes.
14    Q.  It's regarding the development of the
15  Intruder?
16    A.  Yes.
17    Q.  What is the Intruder?
18    A.  I don't remember which one is Intruder.
19    Q.  Okay. At the time that you signed this
20  document did you know what the Intruder was?
21    A.  I'm sure I did, but now I don't remember.
22    (Sulayem Deposition Exhibit 5 was marked for
23  identification.)
24  BY MR. HESS:
25    Q.  Mr. Bin Sulayem, the court reporter has

---

e4355396-d0d9-48ea-805c-122768f4edbc

117

1  given you what's been marked as Exhibit 5.
2      A.   Yes.
3      Q.   Have you had an opportunity to review that?
4      A.   Yes.
5      Q.   Now, by signing that document you are giving
6  your approval to what that document contains, correct?
7      A.   Yes.
8      Q.   And at the time you were fully advised and
9  aware of what you were reviewing and what the -- what
10 was contemplated by the document?
11     A.   At that time, yes.
12     Q.   Today do you understand the --
13     A.   I don't remember. I think it is a design.
14 I mean, here, for example, in Exhibit 5, construction
15 testing of single passenger prototype submarine. It
16 is, of course, one of the submarines, I just don't know
17 which one it is.
18          (Sulayem Deposition Exhibit 6 was marked for
19 identification.)
20 BY MR. HESS:
21     Q.   You're being shown what -- the court
22 reporter has handed you what's been marked as Exhibit
23 6. Would you please take your time to look at that and
24 let me know when you've had a chance to review it.
25     A.   There must be an inventory list, which isn't

118

1  here, but...
2      Q.   But you executed that, you signed that
3  document also, correct?
4      A.   I signed it, yes.
5      Q.   And by signing that document you approved
6  that document, correct?
7      A.   Yes.
8          (Sulayem Deposition Exhibit 7 was marked for
9  identification.)
10 BY MR. HESS:
11     Q.   If you would review that one also.
12          MR. URQUHART:  Do you have like a whole mess
13 of these?
14          MR. HESS:  I do.
15          MR. URQUHART:  Is there any chance like at
16 lunch break you could put them together and
17 we'll stipulate to the fact that he signed them
18 and approved them?
19          MR. HESS:  I may want to talk about each --
20 well, I don't mind taking a lunch break and
21 marking them and just wheeling them through.
22          MR. URQUHART:  Well, right. But, I mean, if
23 the questions are going to be the same for each
24 one.
25          MR. HESS:  No, they're not going to be the

119

1  same.
2          MR. URQUHART:  All right.
3          THE WITNESS:  Yes.
4  BY MR. HESS:
5      Q.   So you executed that document?
6      A.   I approved this.
7      Q.   And you approved it, correct?
8          Did you understand what you were approving
9  at the time you executed that document?
10     A.   Yes. If you want me to go through them.
11 This one, for example, says we're going to spend
12 650,000 and projected value would be 4 to 5 million
13 dollars.
14          So usually they show in these documents that
15 by spending this, you're going to save for that, so
16 this should be -- and you can see clearly, in dirhams,
17 you're going to spend 2.5 or 2.9, 2.9, I guess and
18 you're going to make 7 million.
19          So I look at these figures myself and I say,
20 oh, I'm going to spend this much and I'm going to make
21 that much, the company is good. I have always done
22 that.
23     Q.   What is your understanding of the item 10 in
24 that document?
25     A.   This is approved through Seahorse. I can't

120

1  read the whole thing.
2      Q.   But your understanding is that the -- well,
3  it says, "All major system are going to be procured
4  through Seahorse Submarines," correct?
5      A.   That's what it says here.
6      Q.   And you approved that, correct?
7      A.   I approved the amount. The detail I didn't
8  know.
9      Q.   So is it your testimony today that when you
10 sign these documents you're not really looking at the
11 details, you're just approving the amounts?
12     A.   I approve the amount based on the signature
13 of the people who signed it who sent it to me. I don't
14 go in detail and say, let me read this, because I sign
15 many documents, if you can imagine, I would not leave
16 my office, I need more than 24 hours to read every
17 document and say, oh, is this -- George, can you look
18 at that? I would not. I only have 24 hours. It
19 wouldn't be enough for that.
20          There are other people who their job is to
21 go through the proper requirement and documentation
22 after I sign. So it doesn't mean if I sign it it is a
23 go-ahead, they need to look at it. But it's an
24 approval at least that they can go ahead.
25     Q.   You were aware when you signed it that the

121

1  document said that all major systems were going to be
2  procured through Seahorse Submarines, correct?
3      A.  I'm not aware of that, no.
4      Q.  You're not aware of that?
5      A.  No. No.
6      Q.  Whose other signature appears on that
7  document as project manager?
8      A.  Sanil. Sanil is a guy who passed away
9  actually. He used to work for Jaubert.
10     Q.  And what did he do?
11     A.  I think project manager. He was working
12 with Jaubert.
13     Q.  So is your answer the same as your answer to
14 my questions regarding item 10 or in item 12 it says
15 that, "The projected selling value of the Intruder is 4
16 to 5 million with the latest technology upgrade. Palm
17 Marine intends to build 100 Intruder in the next five
18 years and expect a significant profit."
19         Again, you ignored that when you signed it?
20     A.  I looked at here, when they bring this to me
21 I said, oh, approve this 2.9 and we're going to make --
22 we're going to sell it for this. And when I looked at
23 these figures I said, Sanil signed it, the people
24 signed it. I have no issue.
25         Now they go and they do the process.

122

1  Whether they will eventually spend it -- if you tell
2  me, have they spent this? Are you sure they spent
3  this? I have no idea. Because I sign many of these
4  documents. It goes through, you know, all kind of
5  process, some get approved, some of them don't.
6      Q.  Why even have your signature on the
7  document?
8      A.  Because to allocate funds they have to get
9  my signature. But once the funds are allocated that
10 doesn't mean they have the right to go spend it. They
11 do their process before that.
12         I don't get involved in that process.
13     Q.  So if there were an item 14 on there and it
14 said $100,000 of these moneys will go to Mr. Sultan
15 Ahmed Bin Sulayem, you wouldn't -- you're not going to
16 notice that?
17         MR. MULLINS: Objection, form.
18         THE WITNESS: Listen, I don't speculate.
19     You know, you are speculating. You're
20     speculating.
21 BY MR. HESS:
22     Q.  I said if there was.
23         MR. MULLINS: I'm sorry.
24         THE WITNESS: I'm not going to answer
25     something "if." I'm going to answer you what is

123

1  here. If it is here, I can answer you. But if
2  you --
3  BY MR. HESS:
4      Q.  So your testimony is -- and you are a
5  college-trained businessman, correct?
6      A.  What do you mean by college-trained?
7      Q.  Well, you went to college, right?
8      A.  I did.
9      Q.  In fact, where did you go to school for
10 business?
11     A.  Temple University, Philadelphia.
12     Q.  Anywhere else?
13     A.  No.
14     Q.  And The Wharton School of Business?
15     A.  No, I haven't been there.
16     Q.  So it's your practice to execute documents
17 just based upon a number that's provided?
18         MR. URQUHART: Objection, vague and
19     ambiguous.
20 BY MR. HESS:
21     Q.  To approve that number?
22     A.  I approve a number knowing that always we
23 have a process after that.
24         This is not a check. If somebody takes a
25 document like that and goes to the bank and said, I

124

1  have approval, it will not pass. Because to spend it
2  they have to write checks. And the person writes the
3  checks will do the process. I don't write the checks.
4      MR. HESS: This is 8, please.
5      (Sulayem Deposition Exhibit 8 was marked for
6      identification.)
7      THE WITNESS: Yes.
8  BY MR. HESS:
9      Q.  Now, of course, you signed that document
10 also, correct?
11     A.  Yes.
12     Q.  And you approved the 50 percent advance
13 payment?
14     A.  I signed the document, okay, which is
15 basically for that amount, yes.
16     Q.  And, again, your testimony is the same as
17 your others in that regard is that you're just -- what
18 are you approving? What is your understanding of what
19 you're approving in this document?
20     A.  Allocation of fund to invest.
21     Q.  How much money?
22     A.  Here it says the amount is $42,000. And,
23 basically, I looked that the figure and I see the
24 signature and it goes to the process.
25         Now, the process is somebody else's, because

32 (Pages 125 to 128)

125

1  those who write the checks will have their process.
2      Q.   You do agree that in the remarks section it
3  says, "50 percent advance payment towards development,
4  design, patent and construction of passenger prototype
5  Palm Stingray Duo wet submarines," correct?
6      A.   I see that.
7      Q.   And then it also goes on to say, "and U.S.
8  dollars 25,000 towards 50 percent ownership and
9  worldwide patent rights as per attached" -- what does
10 M/S mean to you?
11     A.   I have to guess.  Seahorse Submarines, I
12 guess.
13     Q.   So now you understand that it's for a 50
14 percent advanced payment, correct?
15     A.   Now from this document, yes.
16     Q.   But before when you signed it back in -- do
17 you know when you signed this document?
18     A.   When I signed it, as I tell you, and I will
19 also tell you again, this is a request to pay.  And
20 then there's a process for it.
21          (Sulayem Deposition Exhibit 9 was marked for
22 identification.)
23          THE WITNESS:  Yes.
24 BY MR. HESS:
25     Q.   You signed and approved that document also?

126

1      A.   That's right.
2      Q.   What was your understanding of what you were
3  approving in that document?
4      A.   It's a request to spend $85,000.
5      Q.   And now when you look at it, is it anything
6  more specific in there?
7      A.   There are many specific there in it.
8      Q.   So you never looked at the fact that in item
9  10 it was Seahorse Submarines International, Inc. that
10 was the supplier, proposed supplier?
11     A.   No.
12     Q.   Now, so far the documents that I've shown
13 you, these exhibits, without your signature, without
14 your approval of these documents that the capital
15 expenditure proposal can go no further, correct?
16     A.   It will not be allocated.
17     Q.   So it can go no further, won't be allocated?
18     A.   Basically by that signature they understand
19 in their budgeting that they're going to leave this
20 amount.  We might spend it for this, we might, because
21 it's been approved.
22          (Sulayem Deposition Exhibit 10 was marked
23 for identification.)
24          (Cell phone interruption.)
25          MR. MULLINS:  10 is Bates number 100978?  Or

127

1      937?  There's two Bates numbers.
2          MS. HEATHCOCK:  We're old fashioned, before
3  you guys redid them.
4          MR. MULLINS:  I see.
5          THE WITNESS:  Yes.
6  BY MR. HESS:
7      Q.   Now, who signs before -- do you sign before
8  Ahmed Kazim --
9      A.   No.
10     Q.   -- or do you sign after?
11     A.   After.
12     Q.   And, again, you didn't care to notice any of
13 the other items other than the expenditure which was
14 requested, which was, what, 5.6 million dirham?
15     A.   Absolutely, yes.
16     Q.   Now looking at it, you understand that, you
17 read the other portions of it, correct?
18     A.   I see the other portions of it, yes.
19     Q.   And it was for the --
20     A.   Test pool.
21     Q.   Are you aware of the test pool?
22     A.   Yes.
23     Q.   And what is your awareness of the test pool?
24     A.   To test, it's in here, to test the submarine
25 for leakage and all that.

128

1      Q.   Did you know about the test pool prior to
2  today?
3      A.   No, I am aware of it before, yes.
4      Q.   Now, what is your knowledge of the -- do you
5  have an understanding of whether or not Mr. Jaubert was
6  to be -- let me withdraw that.  Let me rephrase that.
7          Dubai Corporation was to pay for the
8  relocation expenses of Mr. and Mrs. Jaubert and his
9  family in traveling from Stuart and picking up from
10 Stuart and starting again in Dubai World -- in Dubai,
11 correct?
12          MR. URQUHART:  Objection, vague.
13          THE WITNESS:  Sorry?
14 BY MR. HESS:
15     Q.   Dubai World Corporation, in order to
16 facilitate Mr. Jaubert's beginning the enterprise in
17 Dubai to construct these submarines to build this
18 factory, Dubai World Corporation agreed to compensate
19 him for the delivery of his vehicles and his
20 possessions, correct?
21          MR. URQUHART:  Objection, vague and
22 ambiguous.
23          THE WITNESS:  I'm unaware of that.
24 BY MR. HESS:
25     Q.   You're not aware of that?

e4355396-d0d9-48ea-805c-122768f4edbc

---

**129**

1    A.   No.  I am unaware of the details that he
2  might have made with them, but I'm not aware of that
3  personally.
4         But usually people who travel, who relocate,
5  they compensate them.
6    Q.   So it doesn't surprise you that he was to be
7  compensated for the delivery of his vehicles?
8         MR. URQUHART:  Objection, vague and
9  ambiguous.
10        THE WITNESS:  Vehicles, no.
11 BY MR. HESS:
12   Q.   It does surprise you or it doesn't?
13   A.   It does surprise me.  We don't relocate
14 vehicles for people.
15   Q.   I'm going to show you what's going to be
16 marked as Composite Exhibit 11.  I'm sorry, it's not a
17 composite, just one exhibit.
18        (Sulayem Deposition Exhibit 11 was marked
19 for identification.)
20 BY MR. HESS:
21   Q.   Mr. Bin Sulayem, if you would take a look at
22 what's been marked as 11.
23   A.   Yes.  I see it, yes.
24   Q.   Rather than Hamed Kazim approving it, you
25 crossed out his name and you approved it, correct?

---

**130**

1    A.   No, I didn't cross that.  Maybe he wasn't
2  available in Dubai and the secretary crossed it.
3    Q.   You signed it?
4    A.   I signed it.  I see my signature here.
5  However, you know --
6    Q.   Let me guess, you don't have any idea what
7  was contained in that document --
8    A.   No.  No.  No.  I'm trying to understand,
9  because we don't usually ship people's cars for them.
10 And it could have been, again, and I don't know, I'm
11 just trying to remember and I don't have a memory,
12 could have been that he has asked for us to pay for
13 this and he will pay us back, maybe, I have no idea.
14 But this is unusual.  But this is my signature.
15   Q.   So your testimony under oath today is
16 maybe -- your explanation is it's unusual, maybe he
17 asked you to ship them over --
18   A.   Maybe, maybe he has people --
19   Q.   If I could finish.
20   A.   Yes.
21   Q.   Maybe he asked you to ship them over, Dubai
22 World Corporation to ship them over so that he could
23 pay you back?
24   A.   Maybe he will reimburse them.  I have no
25 idea.

---

**131**

1    Q.   Maybe Dubai World Corporation agreed to pay
2  for the two Hummers being shipped over to Dubai, right?
3    A.   Unlikely.
4    Q.   It's more likely that you would requisition,
5  you would approve funds so that you could be paid back?
6    A.   Oh, yeah, it happens with us.  People would
7  say, pay me, I will pay you.
8    Q.   Does it say that anywhere in there?
9    A.   In this one?
10   Q.   Yeah.  Does it say "to be paid back" --
11   A.   No.
12   Q.   -- or to be compensated?
13   A.   No, but could be anything attached to it.  I
14 have no idea what's behind it.  Again, this is a
15 request.  As I told you, this is not a check, it's a
16 request.  When we sign it, it goes through the process.
17   Q.   Was there anything attached to it?
18   A.   I don't know.
19   Q.   So this document, though, when you signed it
20 you recognize that it was for the shipping expense of
21 containers and two Hummer vehicles?
22   A.   I don't remember the circumstances when I
23 sign it, but I did sign it.
24   Q.   Why this document would you not remember if
25 you read the particulars, but in all of the other

---

**132**

1  countless documents you've testified that it wasn't
2  part of your duties or your abilities to review the
3  details, you were only signing off on a requisition --
4         MR. URQUHART:  Objection.
5         THE WITNESS:  No, no, easy.  We always sign
6     requests.  And I told you many time we sign
7     them.  Some of them get paid, some of them
8     don't.
9  BY MR. HESS:
10   Q.   But when you signed it you knew that this
11 was for a shipping expense of containers and two Hummer
12 vehicles?
13   A.   I don't remember the detail.  There must be
14 something, but this is unusual, I don't remember we
15 ever shipped for somebody any car, especially in Dubai
16 we have plenty of cars.
17   Q.   Do you ever remember hiring a person to come
18 to Dubai to develop a multi-million-dollar submarine
19 manufacturing and design facility?
20        MR. URQUHART:  Objection, vague and
21     ambiguous.
22        THE WITNESS:  Sorry.
23 BY MR. HESS:
24   Q.   Do you remember ever -- it's very unique
25 that Dubai brought Mr. Jaubert to Dubai to construct a

---

34 (Pages 133 to 136)

### 133

1  multi-million-dollar submarine design and construction
2  facility, correct?
3      MR. URQUHART: Objection, vague and
4  ambiguous.
5      THE WITNESS: It is what?
6  BY MR. HESS:
7  Q.  Unique.
8  A.  What is unique about it?
9  Q.  You know, it's my confusion. I thought
10 before when I was asking you, you only have one
11 manufacturing plant for submarines in Dubai, right?
12 A.  That I'm aware of, yes.
13 Q.  Well, what does unique mean to you?
14 A.  I wouldn't consider it's a unique thing that
15 you have asked a designer to go and design. There are
16 people who are asked to design an underwater hotel, it
17 never got built. It's not unique.
18 Q.  It's not unique -- so you don't construe the
19 hiring -- well, the urging of Mr. Jaubert to come to
20 Dubai --
21     (Cell phone interruption.)
22     THE WITNESS: Excuse me, I'm going to kill
23 this phone. It's off, I don't know why it's on.
24     Sorry, yes.
25     MR. HESS: Let me take a break for a couple

### 134

1  of minutes.
2      MR. URQUHART: Want to just grab lunch?
3      MR. HESS: That works for me.
4      VIDEOGRAPHER: Going off record at 11:41
5  a.m.
6      (A lunch recess was taken from 11:41 a.m. to
7  12:22 p.m.)
8      VIDEOGRAPHER: We are now back on media unit
9  2. The time on the record is 12:22 p.m.
10 BY MR. HESS:
11 Q.  We talked a lot about your approval of
12 requisitioning of funding, correct?
13 A.  Yes.
14 Q.  It's accurate to say that without your
15 signature on a funding requisition, it doesn't happen
16 in Dubai World, correct?
17 A.  Not necessarily. Because some of the
18 company, like DP World, for example, they approve their
19 own requisition --
20 Q.  Let me make is easier. But as far as is
21 Mr. Jaubert was concerned --
22 A.  No. As far as Exomos, if I didn't approve
23 this, then there will not be a process to pay.
24 Q.  So any moneys that Mr. Jaubert requested,
25 desired or received had to begin with your signature?

### 135

1  A.  Had to begin with Hamed Kazim and whoever
2  requested on the form and then it comes to me.
3  Q.  So Mr. Jaubert never had an opportunity
4  to -- he didn't have checks for the Exomos account? He
5  couldn't sign checks?
6  A.  Checks cannot be signed. Even the
7  requisite, even my signature is not have a check, it is
8  a process.
9  Q.  In fact, Exomos doesn't have a checking
10 account?
11 A.  I don't know.
12 Q.  Did you involve yourself during any period
13 of time of the Exomos business or Mr. Jaubert's tenure
14 constructing and designing submarines and other
15 vessels, did you involve yourself in any business
16 viability assessments?
17 A.  Viability, no.
18 Q.  So any of the studies that came out, that
19 wasn't something that you were involved with?
20 A.  What's your question?
21 Q.  Viability studies. I think you just
22 answered, but I want to make sure.
23 A.  No, I didn't. It comes through the group, I
24 mean, the CFO and all that.
25 Q.  We touched upon it earlier, but do you have

### 136

1  any knowledge or information or opinion about what
2  makes Dubai such a favorable place -- well, let me
3  withdraw that.
4      Let me start that again.
5      Back in 2004 when Dubai was encouraging
6  Mr. Jaubert to come there to build submarines --
7  A.  Yes.
8  Q.  -- was the labor force and the relative
9  cheapness of the labor force, is that something you
10 have any knowledge of? Is that something that
11 concerned you or didn't concern you or something that
12 you know of?
13 A.  Regarding this business?
14 Q.  Uh-huh.
15 A.  Obviously, I think when he came to see the
16 boat show it was enlightening for him to see boat
17 manufacturers there. I don't know really, I can't
18 recall whether labor was a main factor.
19 Q.  What I'm asking is do you --
20 A.  Yeah.
21 Q.  -- did you then, do you have any particular
22 knowledge of the labor force or the dynamics of the
23 labor force back --
24 A.  No, no. Personally?
25 Q.  Yes, personally.

e4355396-d0d9-48ea-805c-122768f4edbc

153

1   Q.   So is your -- my question was: You are
2   aware that one of the accusations is is that
3   Mr. Jaubert improperly charged the 10 percent service
4   and handling charges.
5   A.   I'm not aware really of the total thing
6   against him. If you say this is one of them, I'll take
7   your word, but I haven't seen the document that been
8   submitted, to be honest with you.
9   Q.   I don't want you to take my word.
10   A.   I haven't seen it. And my auditor will have
11   actually the list of things that they're accusing him
12   of mishandling. They have it.
13   Q.   So your testimony is is that you just don't
14   know that one of the items that they're accusing
15   Mr. Jaubert of --
16   A.   I don't know. It could --
17   Q.   -- is this 10 percent --
18   A.   Yeah --
19       MR. MULLINS: Whoa, whoa. Question and
20   answer.
21       THE WITNESS: I'm sorry, it's me.
22   BY MR. HESS:
23   Q.   I'm just trying to get a yes or no.
24       Right now I know there's a bunch of things,
25   but I'm just asking you about one thing. And the only

154

1   thing I'm asking you about is this 10 percent charge.
2       You're not aware that Dubai World
3   Corporation is accusing -- is saying that that was
4   wrong that he received the 10 percent charges?
5   A.   It could be one of them. I haven't seen
6   the...
7   Q.   Why is it that you haven't been required
8   to -- have you been required to account for your
9   approving those 10 percent charges?
10       MR. URQUHART: Objection, lack of
11   foundation.
12       THE WITNESS: By whom?
13       MR. URQUHART: It's vague and ambiguous.
14   BY MR. HESS:
15   Q.   By anyone.
16   A.   I approved the bills, then they do a
17   process, as I told you. And they could be -- it could
18   happen one day actually somebody puts a request for
19   payment, falsifies completely and I would sign it,
20   trusting the people who requested it.
21       But in the process, they figure it out and
22   they will stop it. And they come to me, sorry, we
23   stopped it, it was wrong. They do that. So the
24   process they do, I don't really.
25   Q.   Yeah, I'm not asking about falsification,

155

1   because I haven't asked you about that, correct?
2       You're not aware that Mr. Jaubert falsified
3   any documents, are you?
4   A.   I am not aware. And I'm not aware not also
5   both ways.
6   Q.   I'm not asking that.
7       What I'm asking is is this 10 percent
8   surcharge. Did the auditors come to you and say,
9   Sultan, you approved this?
10   A.   No.
11       (A discussion was held off the record.)
12   BY MR. HESS:
13   Q.   Did you read the Escape From Dubai book?
14   A.   No.
15   Q.   Have you talked to people about it other
16   than your lawyers?
17   A.   No.
18   Q.   Now, you said that you had a conversation
19   with Mr. Jaubert about the ammunition, correct?
20   A.   Yes.
21   Q.   And you told him, if you've got anything --
22   if you didn't -- you asked him: Did you do anything
23   wrong?
24       And he said, no.
25       Right?

156

1       And you said, then you have nothing to worry
2   about?
3   A.   Absolutely.
4   Q.   He did write you, though, and say that they
5   threatened to hurt him, right, to torture him?
6   A.   I don't remember he wrote me about that.
7   Q.   You just don't remember, or it didn't
8   happen?
9   A.   No, I don't remember it.
10       MR. HESS: Bear with me one second.
11   BY MR. HESS:
12   Q.   Do you have an e-mail address of
13   ssulayem@aol.com?
14   A.   Yes.
15   Q.   And that's been your e-mail address for the
16   last how many years?
17   A.   Many years.
18   Q.   Did there come a time where you had
19   discussions about Mr. Jaubert with newspaper or
20   magazine or other type of reporters?
21   A.   I don't recall. I guess somebody could have
22   asked me, but I don't recall.
23       MR. MULLINS: Are you asking him personally?
24       MR. HESS: I'm sorry, I don't understand.
25       MR. MULLINS: Are you asking him personally?

e4355396-d0d9-48ea-805c-122768f4edbc

# PORTS, CUS... MS & FREE ZONE CO... ORATION

## MATERIAL REQUISITION FORM

No.

DATE : 07-2

DEPARTMENT :

SECTION : EXOTICS

Deliver to :

ALL REQUISITIONS MUST BE APPROVED IN ACCORDANCE WITH THE CORPORATION APPROVAL POLICY

| STOCK NUMBER | DESCRIPTION | DEBIT G/L ACC. NO. | QTY. REQUIRED | EST. UNIT COST | O.E.P. / CAPEX NO. | QTY. AVAILABLE | BACK ORDER | MAXIMO REQ. NO. | REMARKS |
|---|---|---|---|---|---|---|---|---|---|
| 1 | ELECTRIC DC PERMANENT MAGNET FOR SPV | 07110S /SPV | | | CAPEX CO33.5 | | | W3#05 71803 | |
| 259 | AS PER M/s SEAHORSE INVOICE Re: 07110S /SPV | | | | | | | | |
| | ELECTRIC D.C. NEODYMIUM PERMANENT | | 2 | $119,094.00 | | | | | |
| | MAGNET, 200 KW | | | | | | | | |
| 2. | SERVICE AND HANDLING CHARGES | | | $ 11,900.00 | | | | | |
| | TOTAL | | | $130,994.00 | | | | | |

REQUESTED BY
Direct stock item or technical services request.

Please Print Name : HERVE TAUBERT
SIGNATURE :
Date : 07/1/09

APPROVED BY
Please Print Name : HERVE TAUBERT
SIGNATURE :
Date :

APPROVED BY
Please Print Name : SULTAN AHMED BIN BULAYEM
SIGNATURE :
Date :

DATE RECEIVED BY
MATERIAL CONTROL
SIGNATURE :
Date :

DISTRIBUTION, DIRECT, STOCK ITEM OR TECHNICAL SERVICES REQUEST :
White, Yellow and Pink to Stores or Material Control; Blue to be retained by originator.
DISTRIBUTION, SERVICE CONTRACT REQUEST :
White, Yellow and Pink to Purchasing Dept.; Blue to be retained by originator.

Doc. ref : reqform.xls



ENGAD 800-631-6989
Sylayem
27-10-10
EXHIBIT 2
composite

DW 0000137

# PORTS, CUSTOMS & FREE ZONE CORPORATION

## MATERIAL REQUISITION FORM

No. 22533.

DATE : 07 - NOV - 2005

DEPARTMENT : EXODOS

SECTION : EXODOS

ALL REQUISITIONS MUST BE APPROVED IN ACCORDANCE WITH THE CORPORATION APPROVAL POLICY

| STOCK NUMBER | DESCRIPTION | DEBIT G/L ACC. NO. | QTY. REQUIRED | EST. UNIT COST | O.E.P./ CAPEX NO. | QTY. AVAILABLE | BACK ORDER | MAXIMUM REQ. NO. | REMARKS |
|---|---|---|---|---|---|---|---|---|---|
| | 1. 100 KW GENERATOR, WATER COOLED, 600VDC, 60-40HA/PROTEUS | | 1 | $ 61,995.00 | CAPEX 3630 | | | WE4505 - #1899 | |
| | 100 KW GENERATOR FOR PROTEUS AS PER M/S SEAHORSE SUBMARINE REQUOTATION WITH INSULATION HOUSING | | | | | | | | |
| | 2. SERVICE AND HANDLING CHARGES | | | $ 6,120.00 | | | | | |
| | TOTAL | | | 68,115.00 | | | | | |

-258-

-898-

23172

REQUESTED BY
Please Print Name
HERVE JAUBERT
SIGNATURE
Date

APPROVED BY
Please Print Name
HERVE JAUBERT
SIGNATURE
Date 04/11/05

APPROVED BY
Please Print Name
SULTAN AHMED BIN SULAYEM
SIGNATURE
Date

DATE RECEIVED BY
MATERIAL CONTROL

DISTRIBUTION, DIRECT, STOCK ITEM OR TECHNICAL SERVICES REQUEST :
White, Yellow and Pink to Stores or Material Control. Blue to be retained by originator.

DISTRIBUTION, SERVICE CONTRACT REQUEST :
White, Yellow and Pink to Purchase

01200000210

# PORTS, CUSTOMS & FREE ZONE CORPORATION

## MATERIAL REQUISITION FORM

No. 222526

DATE: 15 - OCT - 2005

**ALL REQUISITIONS MUST BE APPROVED IN ACCORDANCE WITH THE CORPORATION APPROVAL POLICY**

DEPARTMENT : EXOMOS

SECTION : EXOMOS

| STOCK NUMBER | DESCRIPTION | DEBIT G/L ACC. NO. | QTY. REQUIRED | EST. UNIT COST | O.E.P. / CAPEX NO. | QTY. AVAILABLE | BACK ORDER | MAXIMUM RECI. NO. | REMARKS |
|---|---|---|---|---|---|---|---|---|---|
| | ASDS | | | | | | | | |
| 1. | DEVELOPMENT OF A CUSTOM, UNMARKED, SELF CONTAINED BREATHING SYSTEM, THAT IS SUITABLE FOR A 100% OXYGEN TO SEMI CLOSE CIRCUIT PORTABLE BACK PACKS. THE SYSTEM IS TO BE ADAPTED AND INSTALLED ON THE EXOMOS ASDS-10 SWIMMER DELIVERY VEHICLE ALL SPECIFICATIONS AND CABIN ARRANGEMENT TO BE PROVIDED. CAPACITY: 5 HOURS MINIMUM DURATION AT 40 MTRS DEPTH. NAME: EXOBREATH MK1 | | | $25,000 | COS286 (ASDS) | | | | |
| 2. | 10 x COLOR BLACK, EXOBREATH MK1, PARTS AND EQUIPMENT INCLUDING CONSUMABLE FOR 2 DIVES OF 5 HOURS | | | 86,650 | | | | | |
| 3. | SERVICE AND HANDLING CHARGES. | | | 11,165 | | | | | |
| | TOTAL | | | 1,122,815.00 | | | | | |

REQUESTED BY

Please Print Name : HERVE JAUBERT

SIGNATURE :

Date : 15/10/2005

APPROVED BY

Please Print Name : HERVE JAUBERT

SIGNATURE :

Date :

APPROVED BY

Please Print Name : SULTAN AHMED BIN SULAYEM

SIGNATURE :

Date :

DATE RECEIVED BY MATERIAL CONTROL

'DISTRIBUTION: DIRECT, STOCK ITEM OR TECHNICAL SERVICES REQUEST : White, Yellow and Pink to Stores or Material Control, Blue to be retained by originator.
'DISTRIBUTION: SERVICE CONTRACT REQUEST ': White, Yellow and Pink to Purchasing Dept. Blue to be retained by originator.

BAD 800-631-6989

PCF : reqform.xls

Po# 05-223732

EXHIBIT 3

# PORTS, CUSTOMS & FREE ZONE CORPORATION
## MATERIAL REQUISITION FORM

No. 222534

DATE: 01-NOV-2005

DEPARTMENT: EXOMOS

DIVISION: EXOMOS

ALL REQUISITIONS MUST BE APPROVED IN ACCORDANCE WITH THE CORPORATION APPROVAL POLICY

| No. | DESCRIPTION | DEBIT G/L ACC. NO. | QTY. REQUIRED | EST. UNIT COST | DEP / CAPEX NO. | QTY. AVAILABLE | BACK ORDER | MAXIMO REQ. NO. | REMARKS |
|---|---|---|---|---|---|---|---|---|---|
| 1. | JET DRIVE TJ609 & ACCESSORY PERMANENT MAGNET FOR ASDS | | 1 | 764410.00 | | | | | |
| 2. | SERVICE AND HANDLING CHARGES AS PER M/s SEAHORSE SUBMARINE INVOICE RE.0711/06/ASDS | | 1 | 4410.00 | | | | | |
| 3. | ELECTRIC DC, NEODYMIUM PERMANENT MAGNET, FOR RSU | | 2 | 97,360.00 | | | | | |
| 4. | SERVICE AND HANDLING CHARGES AS PER M/s SEA HORSE SUBMARINE INVOICE RE.0711/06/ASDS | | 1 | 9430.00 | | | | | |
| | SUB TOTAL | | | 155,600.00 | | | | | |

REQUESTED BY
Print Name: HERVE JAUBERT
SIGNATURE:
Date:

APPROVED BY
Please Print Name: HERVE JAUBERT
SIGNATURE:
Date: 02/11/05

APPROVED BY
Please Print Name: SULTAN AHMED BIN SULAYEM
SIGNATURE:
Date:

DATE RECEIVED BY
MATERIAL CONTROL
Date:

# DUBAI PORTS & FREE ZONE AUTHORITY
## CAPITAL EXPENDITURE PROPOSAL

(For all Capital Expenditure exceeding Dhs. 10,000)

| 1 Project Name | 4 (Delete as applicable) | CAPEX NO 3630 |
|---|---|---|
| (P0154D) INTRUDER DEVELOPMENT | a) To support existing business | 5 Any link with: |
| | b) Business expansion | a Other CAPEx |
| 3 Port/JAFZA | c) Replacement | b OEP |
| Location   Jebel Ali | | c Other Expenditure |
| Department   Palm Marine | | |
| Cost Centre   40-480   //88 | | |

| 6 Budget Item No | 7 Budgeted Project Amount | Not Budgeted |

**9 Summary and reason for proposal**

Development & Preliminary design of Intruder Hybrid fully submersible boat

**Proposed Supplier(s)**
SEA HORSE SUBMARINE INTL, Inc. Florida

40-000-11300-000000-003630

**11 Alternatives considered**

NIL

| 12 Profitability/Benefit arising from this proposal in summary (Details attached) | 13 Total Expenditure summary (Dhs.) (To include internal labour/mills consultancy, installation etc.) |
|---|---|
| Development of highly profitable Leisure Submarines business in Dubai. | 1. Development & preliminary design of Intruder Hybrid    US$ 15,000.00 |
| Submarines will be an added attraction for the Marketing of all Nakheel Projects. | 2. Scale Model Design of above    US$ 5,000.00    Total Amount    US$ 20,000.00 |
| The total Intruder development cost is around US$ 1.0 Million and expected sale price is US$ 3.0 Million. | Dhs. 73,480 |

Any foreign currency rates used

| | Name | Signature | Date |
|---|---|---|---|
| Departmental Senior Manager | Sanil Mohd. Subair | | 27/4/2007 |
| Director | | | |
| MD/ED | Ahmed Butti Ahmed | | |
| Director of Finance | | | |
| Chairman | Sultan Ahmed Bin Sulayem | | |

**IMPORTANT** All sections must be completed - see instructions overleaf. Separate sheets to be attached where necessary to provide complete information

DPA-SUP-PUR-006-F01 (MAY, 1998)

EXHIBIT
Sulayem
4
6-10-10

8323

DW 0000437

  

| URGENT |
| --- |

## PORTS, CUSTOMS & FREE ZONE CORPORATION
### Request for Payment

| Cheque ☐ <br> Bank Transfer ☑ | OEP# / Capex # <br> *(Capex under process)* | *(For Finance Use only)* <br> Date Received: |
| --- | --- | --- |
| Date: 13.04.2004 | P.O. # | Cost Center: |
| Due Date: Immediate | <u>Attachments:</u> | Account Code: |
| Currency: US$ | Original Invoice ☑ | Cheque #: |
| Amount: US$ 76,000/- | Other Approvals by BU ☐ | |

| Details |
| --- |

**Payable To: SEAHORSE SUBMARINES INTL. INC.**

| Remarks |
| --- |

Construction and testing of single passenger prototype submarine — US$ 31,000
Patent, Copyright, trademark ownership rights — US$ 25,000
Design and Development of the Intruder Hybrid Submersible
with design model — US$ 20,000

All the above as per M/s. Seahorse Submarines Intl. Inc. Invoice copy attached.

**Requested by:**

Name    <u>SANIL MOHD. SUBAIR</u>        Signature

Title    Project Manager            Date    13/4/2004

**Approved by:**

Name    <u>SULTAN A. BIN SULAYEM</u>        Signature

Title    Executive Chairman            Date

Ref.: PM/SMS/007/ami

March 2004

EXHIBIT
5
Sulayem
6-10-10
PENGAD 800-631-6989

DW 0000502

# DUBAI PORTS & FREE ZONE AUTHORITY
## OPERATING EXPENDITURE PROPOSAL

(For all Operating Expenditure exceeding Dhs. 20,000)

2 OEP NO. 15179

| 1 Project Name | 4 Any link with: |
| --- | --- |
| INTRUDER - STOCK ITEMS | a) Other OEP |
| | b) CAPEX |
| 3 Port/JAFZA   Jebel Ali | c) Other Expenditure |
| Location | |
| Department   PALM SUBMARINES | |
| Cost Centre   55-571 | |

| 5 Budget Item No. | 6 Budgeted Project Amount | 7 Not Budgeted |
| --- | --- | --- |

**8 Summary and reason for proposal**

To procure long delivery specialised items of Intruder to start production immediately after the proto type testing in March 2005.  These items are special and not available in U.A.E.

**9 Proposed Supplier(s)**
All major systems are procured through Sea Horse Submarines to maintain confidentiality on the property design and limiting issuing design and other details to various suppliers.

**10 Alternatives considered**
NIL

55-000-15247

| 11 Profitability/Benefit arising from this proposal in summary (Details attached) | 12 Total Expenditure summary (Dhs.) (To include internal labour/mtls. consultancy, installation etc.) |
| --- | --- |
| To avoid delays in starting production immediately after the facility is completed. | 1. As per inventory breakdown attached - USD 270,000.00<br>2. Additional items expected to order. (As per Herve's Email attached dated 19/10/2004) - USD 200,000.00<br>USD 470,000.00<br><br>Dhs. 1,726,780.00 |

Any foreign currency rates used:

| | Name | Signature | Date |
| --- | --- | --- | --- |
| Project Manager | Sanil Mohd. Subair | | 27/10/2004 |
| | | | |
| Chief Financial Officer & Head of the Corporate Office | Hamed Kazim | | |
| Executive Chairman | Sultan Ahmed Bin Sulayem | | |

**IMPORTANT:** All sections must be completed - see instructions overleaf. Separate sheets to be attached where necessary to provide complete information



EXHIBIT

6

6-10-10

DW 0000513

Attn: ms. Noreen Pinto

# DUBAI PORTS & FREE ZONE AUTHORITY
## CAPITAL EXPENDITURE PROPOSAL

(For all Capital Expenditure exceeding Dhs. 10,000)

| 1 Project Name | 4 | (Delete as applicable) | 2 CAPEX NO. 3630 2 |
| --- | --- | --- | --- |
| (P615-ID) INTRUDER DEVELOPMENT | a) | To support existing business | 5 Any link with: a) Other CAPEX 3630 |
|  | b) | Business expansion | b) OEP |
| 3 Port/JAFZA | c) | Replacement | c) Other Expenditure |
| Location    Jebel Ali |  |  |  |
| Department  Palm Submarine |  |  |  |
| Cost Centre  55-571 |  |  |  |

| 6 Budget Item No. | 7 Budgeted Project Amount | 8 Not Budgeted |
| --- | --- | --- |

**9 Summary and reason for proposal**

The intruder is now equipped with the state of art technology and new "water rocket" propulsion system, thus increasing the cost of production with a significant increase in value for selling.   Email from Mr. Herve Jaubert attached.   Previous approved capex copy attached.

**10 Proposed Supplier(s)**

All major systems are procured through Sea Horse Submarines to maintain confidentiality on the proprietary design and building hosting, design and other details to various suppliers.   Local supplier for Fibre glass materials & Resins and wood

**11 Alternatives considered**

Nil.

55-000-11300-000000-003630

| 12 Profitability/Benefit arising from this proposal in summary (Details attached) | 13 Total Expenditure summary (Dhs.) (To include internal labour/mts. consultancy, installation etc.) | | |
| --- | --- | --- | --- |
| The projected selling value of the intruder is $4 to $5 Million with the latest technology upgrade. | 1.  Additional cost of construction with the upgraded propulsion system | - US$ | 300,000.00 |
| Palm Marine intends to build 100 intruder in the next 5 years and expect a significant profit. | 2.  Cost of construction of Mould & other construction cost | - US$ | 380,000.00 |
|  | TOTAL - | US$ | 680,000.00 |
| Total = 7,054,080.00 | Dhs. 2,388,100.00 | | |
|  | Any foreign currency rates used: | | |

| | Name | Signature | Date |
| --- | --- | --- | --- |
| Project Manager | Sanil Mohd. Suhair |  | 21/10/20. |
| Chief Financial Officer & Head of the Corporate Office | Hamed Kazim |  |  |
| Executive Chairman | Sultan Ahmed Bin Sulayem |  |  |

**IMPORTANT:**  All sections must be completed - see instructions overleaf. Separate sheets to be attached where necessary to provide complete information

DPA-SUP-PUR-006-F01 (MAY, 1998)

EXHIBIT
7
PENGAD 800-631-6989
Sulayem
6-10-10



# PORTS, CUSTOMS & FREE ZONE CORPORATION
### Request for Payment

| Cheque ☑ <br> Bank Transfer ☐ | OEP# / Capex # (under process) 3685 | (For Finance Use only) <br> Date Received: |
|---|---|---|
| Date: 19.06.2004 | P.O. # Nil | Cost Center: |
| Due Date: Immediate | <u>Attachments:</u> | Account Code: |
| Currency: US$ | Original Invoice ☐ | Cheque #: |
| Amount: US$ 42,500/-  R-11 | Other Approvals by BU ☐ | |

| Details |
|---|
| Payable To: SEAHORSE SUBMARINES INTL. |

| Remarks |
|---|
| 50% Advance payment (US$ 17,500/-) towards the Development, Design Patent & Construction of Passenger prototype Palm Stingray Duo wet Submarines and US$ 25,000/- towards 50% ownership and worldwide patents rights as per attached M/s. Seahorse Submarines Intl. Payment request and contract attached. |

**Requested by:**          Signature          Date

Name: <u>SANIL MOHD. SUBAIR</u>          19/6/2004

Title:  Project Manager

**Approved by:**

Name : <u>SULTAN AHMED BIN SULAYEM</u>

Title:  Executive Chairman



EXHIBIT
8
Sulayem
6-10-10

June 2004

3350

DW 0001480

# DUBAI PORTS & FREE ZONE AUTHORITY
## CAPITAL EXPENDITURE PROPOSAL.

(For all Capital Expenditure exceeding Dhs. 10,000)

| | |
|---|---|
| **2 CAPEX NO.** | |

**1** Project Name

(P019-SD) PALM STINGRAY DUO
DEVELOPMENT

**4** (Delete as applicable)

a) To support existing business

b) Business expansion

c) Replacement

**5** Any link with:

a Other CAPEX

b OEP

c Other Expenditure

**3** Port/JAFZA.

| Location | Jebel Ali |
|---|---|
| Department | Palm Marine |
| Cost Centre | 40-480 |

**6** Budget Item No.

**7** Budgeted Project Amount

**8** Not Budgeted

**9** Summary and reason for proposal

Development, Design Patent & Construction of Two Passenger Prototype Palm Stingray Duo Wet Submarines.

**10** Proposed Supplier(s)
SEA HORSE SUBMARINE INTL, Inc. Florida

**11** Alternatives considered

NIL

**12** Profitability/Benefit arising from this proposal in summary
(Details attached)

Development of highly profitable Leisure Submarines business in Dubai.

Submarines will be an added attraction for the Marketing of all Nakheel Projects.

**13** Total Expenditure summary (Dhs.)
(To include internal labour/mtls. consultancy, installation etc.)

| | | | |
|---|---|---|---|
| 1. Development of Stingray Duo prototype | - | US$ | 35,000.0 |
| 2. Purchase of 50% rights for Stingray Patent & Royalty. | - | US$ | 25,000.0 |
| 3. Attorney Fees & Royalty charges | - | US$ | 12,000.0 |
| 4. Shipping cost for stingray | - | US$ | 7,000.0 |
| 5. Contingencies | - | US$ | 6,000.0 |
| | Total Amount - | US$ | 85,000.0 |

Any foreign currency rates used:

| | Name | Signature | Date |
|---|---|---|---|
| Project Manager | Sanil Mohd. Subair | | 19/6/20 |
| Executive Vice President - Projects | Yousuf Kazim | | |
| Chief Executive Officer | Ahmed Butti Ahmed | | |
| Chief Financial Officer & Head of the Corporate Office | Hamed Kazim | | |
| Executive Chairman | Sultan Ahmed Bin Sulayem | | |

**IMPORTANT:** All sections must be completed - see instructions overleaf. Separate sheets to be attached where necessary to provide complete information

*DPA-SUP-PUR-006-F01 (MAY, 1998)*


EXHIBIT
9
6-10-10

7/

DW 0001487

# DUBAI PORTS & FREE ZONE AUTHORITY
## CAPITAL EXPENDITURE PROPOSAL

(For all Capital Expenditure exceeding Dhs. 10,000)

2 CAPEX NO. 3774

**1 Project Name**

PALM SUBMARINE TEST POOL

**3 Port/JAFZA**

| Location | Jebel Ali |
| Department | Palm Marine |
| Cost Centre | 40-488 |

**4** (Delete as applicable)

a) To support existing business
b) Business expansion
c) Replacement

**5 Any link with:**

a) Other CAPEX
b) OEP
c) Other Expenditure

**6 Budget Item No.**

**7 Budgeted Project Amount**

**8 Not Budgeted**

**9 Summary and reason for proposal**

The test pool will allow us to test, ballast and configure the submarine built by Palm Marine. The test pool also enable us to train pilots on submarine operation and conduct course on diving. The facility will be a unique in the region and as such will be marketed for possible testing of sub sea objects.

**10 Proposed Supplier(s)**

Veth Consultant - Structure
Mario Associates - MEP Consultant
Marine Contractors selected on the basis of competitive tender.

**11 Alternatives considered**
Nil

40-000-1300-000000-003774

**12 Profitability/Benefit arising from this proposal in summary (Details attached)**

**This facility will complement the submarine construction Facility.**

**The submarine business is expected to generate profits over Dhs.700 Million in the next 5 years as per the business plans.**

**13 Total Expenditure summary (Dhs.)**
(To include internal labour/mtls. consultancy, installation etc.)

| | | |
|---|---|---|
| Structural Consultancy & Supervision | - AED | 120,000.00 |
| MEP Consultancy & Supervision | - AED | 100,000.00 |
| Soil Investgation | - AED | 25,000.00 |
| Earth Works | - AED | 100,000.00 |
| Dewatering | - AED | 150,000.00 |
| Test pool construction | - AED | 2,200,000.00 |
| Structural steel building & cladding - | AED | 1,800,000.00 |
| MEP works & Pump Station | - AED | 750,000.00 |
| Contingencies | - AED | 355,000.00 |
| **TOTAL** | - AED | 5,600,000.00 |

Any foreign currency rates used:

| | Name | Signature | Date |
|---|---|---|---|
| Project Manager | Sanil Mohd. Subair | | |
| Chief Financial Officer & Head of the Corporate Office | Hamed Kazim | | |
| Executive Chairman | Sultan Ahmed Bin Sulayem | | |

**IMPORTANT:** All sections must be completed - see instructions overleaf. Separate sheets to be attached where necessary to provide complete information

100937

100978


EXHIBIT
10
6-10-10

   

URGENT

# PORTS, CUSTOMS & FREE ZONE CORPORATION
### Request for Payment

| | | (For Finance Use only) |
|---|---|---|
| Cheque ☐ | QEP# / Capex # 3800 | Date Received: |
| Bank Transfer ☑ | | |
| Date: 30-10-2004 | P.O. # Nil | Cost Center: |
| Due Date: 06-11-2004 | **Attachments:** | Account Code: |
| Currency: US$ | Original Invoice ☐ | Cheque #: |
| Amount: *US$ 13,875/-* | Other Approvals by BU ☑ | |

### Details

Payable To:  SEAHORSE SUBMARINES INTL.

### Remarks

### ACQUISITION OF SEAHORSE SUBMARINE ASSETS

Shipping expense of containers and two Hummer vehicles as per M/s SEAHORSE SUBMARINE Invoice ref:0904033 dated 30/10/04.

| Requested by: | Signature | Date |
|---|---|---|
| Name: SANIL MOHD. SUBAIR | | 30/10/2004 |
| Title:  Project Manager | | |

Approved by:

Name: HAMED KAZIM   *Sultan B. Sulayem*
*EXC. Chairman*

Title:  Chief Financial Officer and Head of the Corporate office   *6/11/04*



EXHIBIT 11

3324
October 2004

DW 0000080