# EXHIBIT "L"

## DEPOSITION OF ABDULQADER OBAID ALI WITH ATTENDANT EXHIBITS TO THAT DEPOSITION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 2:09-CV-14314-MARTINEZ/LYNCH

DUBAI WORLD CORPORATION, and
its subsidiaries, EXOMOS,
NAHKEEL, and PALM MARINE,

                Plaintiffs,

    vs.

HERVE JAUBERT and SEAHORSE
SUBMARINES INTERNATIONAL
INCORPORATED, and Does 1-99,

              Defendants.

_____/

                  701 Brickell Avenue
                  16th Floor
                  Miami, Florida 33131

                  Thursday, 10:30 - 4:00 p.m.

                  July 1, 2010

D E P O S I T I O N

OF

ABDULQADER OBAID ALI

Taken on behalf of the Defendants
pursuant to Notice of Taking Deposition

Case 2:09-cv-14314-JEM Document 111-13 Entered on FLSD Docket 08/04/2010 Page 3 of 40

1 then?
2        MR. URQUHART: Objection, argumentive.
3 BY MR. HESS
4    Q. Not a very important deposition? You can
5 answer that question.
6    A. I mean I'm here to do the deposition, that's
7 why I'm here. If it's not important, I wouldn't be
8 here.
9    Q. Well you had to be here, you realize that,
10 right?
11    A. Absolutely.
12    Q. So whether it was important in your mind or
13 not, you had to be here, you understand that, correct?
14    A. Yes.
15    Q. So my question is that so you spent an hour to
16 prepare for today's deposition, do you believe that
17 gives you the preparation to answer the questions today?
18    A. I'm ready to answer the questions.
19    Q. Is the hour's preparation is that one of the
20 reasons so far we've only been in deposition for about
21 ten minutes and you've said I don't recall, is that --
22 am I to expect that?
23        MR. URQUHART: You know what, you're becoming
24 rude and this has absolutely nothing to do with
25 anything.

1        MR. HESS: Are you instructing him not to
2 answer?
3        MR. URQUHART: If you keep it up I will.
4        MR. HESS: Well, you know Bill, you know what
5 the law is regarding speaking depositions, right?
6 You've been doing this longer than I have and I'm
7 going to ask you not to interrupt my deposition,
8 just as I don't interrupt your depositions.
9        So far we've had two depositions. You've
10 actually taken a witness out of the deposition,
11 back in Dubai, stormed out of the room, and you've
12 done the same type of thing at the last deposition
13 and I'm going to ask you not to intervene with
14 speaking depositions --
15        MR. URQUHART: -- you meaning speaking
16 objections.
17        MR. HESS: Objections, exactly. That's what I
18 mean, as my partner just corrected me.
19 BY MR. HESS
20    Q. So you were saying in preparation for today's
21 deposition you've skimmed the, I'm sorry the --
22    A. -- executive summary, what's the most
23 important about the case.
24    Q. There came a time that you made a statement to
25 Mr. Higgins of the press, correct?

1    A. (No response.)
2    Q. Let me remind you, you don't recall?
3    A. I mean, I possibly -- can you please read the
4 statement, so I can see it.
5    Q. You don't recall making a statement to Mr.
6 Higgins?
7    A. I have authorized a lot of statements. If you
8 tell me, I will be more than happy to confirm that for
9 you.
10    Q. You stated that the submarine venture ran into
11 trouble for other reasons, that the submarines didn't
12 work and that the auditors uncovered evidence of fraud
13 involving overbilling for equipment purchases?
14    A. I confirm that statement. I have made it then
15 and I confirm it now.
16    Q. So that was your statement?
17    A. Absolutely.
18    Q. Any other statements that you've made to the
19 press?
20        MR. URQUHART: About?
21 BY MR. HESS
22    Q. About Mr. Jaubert.
23    A. Tell them to me and I can confirm them.
24    Q. You know, here's how we're going to do this;
25 I'm going to ask you the questions and I'm going to ask

1 you to answer the questions. You've had your deposition
2 taken before, correct?
3    A. I haven't done depositions in this case here
4 before.
5    Q. Let me spend some time going through that with
6 you then. You're under oath, you understand what that
7 means, correct?
8    A. Absolutely.
9    Q. And that means that you're to tell the truth
10 and the whole truth, correct?
11    A. Absolutely.
12    Q. And the whole truth means not half truths, not
13 a quarter truth, but all the truth, correct?
14    A. That's correct.
15    Q. Everything that you understand to be the
16 truth?
17    A. Yes.
18    Q. And you're obligated to do that and you're
19 agreeing to do that, correct?
20    A. Yes.
21    Q. The other thing is I'm going to ask you
22 questions. You understand that, right?
23    A. Yes.
24    Q. And it's not up -- the forum for conducting
25 depositions, whether it's right or wrong, you don't get

1 you.

2     Q. Thank you. Do you know what a complaint is?

3     A. You can explain that to me, but I don't

4 understand what that means.

5     Q. You're not aware that there is a document that

6 initiates a legal allegations in the United States and

7 that's called a complaint?

8     A. Now that you explained that, I'm aware of

9 that.

10     Q. And there's certain allegations in the

11 complaint and request for damages?

12     A. That's what the complaint is, according to you

13 and what you have said, yes, I understand that.

14     Q. You understand that?

15     A. Yes.

16     Q. And you understand that Dubai World

17 Corporation and various subsidiaries, Exomos, Nakheel

18 and Palm Marine, they've joined in the complaint against

19 Mr. Jaubert and Seahorse Submarines International, Inc.,

20 correct?

21     A. Correct.

22     Q. You're aware of that, right?

23     A. Correct. That's why we're here.

24     Q. Well we're also here because as you're aware

25 Mr. Jaubert has sued Dubai World Corporation too, you

1 understand that, correct?

2     A. Correct.

3     Q. You're not aware however, of the allegations,

4 the specific allegations in the complaint?

5     A. I'm not fully aware of the specific

6 allegations in the complaint. I know there is a

7 complaint as you indicated by yourself, and that's why

8 we're here.

9     Q. So you agree with the statement that,

10 defendant Jaubert and Seahorse secretly added an

11 undisclosed markup of ten percent on all purchase

12 materials?

13     A. Correct.

14     Q. And when I say agree with that, you agree that

15 it was secretly done, right?

16     A. Can you please define secretly for me, what

17 you mean by that?

18     Q. You don't know what secret means?

19     A. No, what do you mean secret, I mean, so I can

20 understand it better.

21     Q. Well let me -- because this brings up a point,

22 because I want to make sure there's no language barrier.

23 My understanding is that you attended University in

24 Arizona?

25     A. That's correct.

1     Q. And you attended there four years?

2     A. More than four years.

3     Q. More than four years?

4     A. More than four years.

5     Q. And that course work was conducted with

6 English, correct?

7     A. Correct.

8     Q. So there's no challenge with you understanding

9 English, correct?

10     A. I understand it to the best of my knowledge,

11 yes.

12     Q. Well then you had some post graduate work done

13 in Scotland, correct?

14     A. Absolutely.

15     Q. They speak a little different version of

16 English, correct?

17     A. Different dialect.

18     Q. Dialect, actually different -- whatever,

19 different, right?

20     A. Uh-huh.

21     Q. But you understand their dialect, correct?

22     A. Yes. No, I don't understand their dialect,

23 okay. But I understand when they -- because when speak

24 their own dialects, they're very difficult English to

25 understand.

1     Q. Do me this favor though, because I presumed

2 that given your history, you were fluent in English. Do

3 you need a translator to help you understand my

4 questioning?

5     A. No, I do not need a translator.

6     Q. If there are any other words -- I'm going to

7 go ahead and define secret for you, but if there are any

8 other words you don't understand in English, you need to

9 let me know, okay?

10     A. Fair enough.

11     Q. Secret means hidden. It means not obvious to

12 anyone else. And it means actually there -- it implies

13 this idea that it is orchestrated to be kept from other

14 person's knowledge, right?

15     MR. URQUHART: But you don't have to accept

16 his definition, which incidentally is wrong.

17     MR. HESS: Well, why don't you define it for

18 him then.

19     MR. URQUHART: I'm not defining it, but your

20 definition is incorrect.

21     MR. HESS: Well let's do this --

22     MR. URQUHART: -- get out a dictionary.

23     MR. HESS: Well it's not my office. We were

24 supposed to be conducting this deposition in my

25 offices but we changed it to accommodate you. So

1  I'm going to ask you, since this is your forum,
2  please go get a dictionary --
3      MR. URQUHART:  -- I will be happy to do that.
4      MR. HESS:  -- and we'll read it to your client
5  so that he makes sure he understands the English
6  definition of secret.
7      MR. URQUHART:  Right.  Off the record.
8      (Thereupon, after a short recess, the
9  proceedings continued as follows:)
10     MR. HESS:  I'll take it.  It's my depo,
11 please.  Thank you.
12 BY MR. HESS
13     Q.  While I look this up, is there any challenge
14 today -- are you tired, are you fatigued from your
15 travels?
16     A.  Absolutely, I'm very comfortable and you can
17 take your time, absolutely.
18     Q.  I just wanted to make sure because your
19 counsel was just saying that you traveled an enormous
20 distance.  I want to make sure that you're comfortable
21 and you're not fatigued and you can answer deposition
22 questions today?
23     A.  I can answer all the questions you want.
24     Q.  And in that regard how did you travel here
25 today, first class?

1      A.  No we don't, business class.
2      Q.  Business, okay.  And what airline did you
3  travel?
4      A.  Emirates from Dubai to New York.  And then New
5  York to Miami, on Delta.
6      Q.  I'm going to read you the definition that's
7  found in the New College edition of the American
8  Heritage Dictionary of the English Language that your
9  counsel has given to me, chosen I guess as the authority
10 for today's definition of secret.  It says, the first,
11 concealed from general knowledge or view, kept hidden.
12 Do you understand that?
13     A.  Absolutely.
14     Q.  Okay.  The allegation in paragraph 30 is that
15 defendant, Jaubert and Seahorse, secretly added an
16 undisclosed markup of ten percent on all purchased
17 materials.  Do you agree with that entire statement?
18     A.  It was secret because there were no documents
19 stating that he could add that ten percent.  From our
20 point, from the audit, when there's any kind of an
21 agreement, that agreement has to be documented.
22     Q.  So that's what you meant, you didn't mean --
23 I'll go into that.  I'll withdraw that question.
24     MR. HESS:  Would you mark this for me, please.
25     (Defendants' Exhibit No. B was marked for

1  identification.)
2      (Defendants' Exhibit No. C was marked for
3  identification.)
4      (Defendants' Exhibit No. D was marked for
5  identification.)
6      (Defendants' Exhibit No. E was marked for
7  identification.)
8      MR. URQUHART:  Could you just tell me which
9  ones are which?
10     MR. HESS:  I will.
11     MR. URQUHART:  Is that one of these too?
12     MR. HESS:  That's yours.
13     MR. URQUHART:  So these were marked previously
14 in Sultan's deposition?
15     MR. HESS:  They were.  I'm going to go ahead
16 and help you with your understanding of what they
17 are in the moment.
18     MR. URQUHART:  Okay.
19 BY MR. HESS
20     Q.  You understand when I read that sentence it
21 also included the phrase that added an undisclosed
22 markup of ten percent, correct?
23     A.  Yes.
24     Q.  Do you understand what undisclosed means?
25     A.  Yes.

1      Q.  What does undisclosed mean?
2      A.  Not shown, not indicated.
3      Q.  Okay and in that same paragraph the allegation
4  goes on to state that these markups were not listed as a
5  separate line item rather they were concealed, quietly
6  padding the final purchase prices, right?  Do you agree
7  with that?
8      A.  Can you repeat that again?
9      Q.  Sure.  These markups were not listed as a
10 separate line item?
11     A.  That's from -- you're reading that from the --
12     Q.  -- that's your -- the complaint filed by Dubai
13 World Corporation and the various subsidiaries, Exomos,
14 Nakeel and Palm Marine.
15     A.  Okay.
16     Q.  That's the one that you don't -- I understand
17 your testimony is you've never heard that allegation
18 before from the complaint, correct?
19     A.  I have not from the complaint, from out -- I
20 would give you more information about our audit, what we
21 have discovered in that audit, and the evidence from
22 that audit.  But I'm not -- I wasn't part of preparing
23 that complaint, and if you have anything to do with that
24 I would request that you would ask our lawyers.  They
25 would probably -- because they're the ones who prepared

Page 27

1  it. What I can answer is the work that we have carried
2  out, when we did our audit. I would be more than happy
3  to cover any question on that.
4      Q. Okay. Thank you. The statement was these
5  markups were not listed as a separate line item. Do you
6  understand that?
7      A. Yes.
8      Q. And what does that mean to you?
9      A. I mean they were actually hidden, part of the
10 price. That's what it means, my understanding.
11     Q. That means that the document that the charges
12 were -- withdraw that. That means that the
13 documentation for the charges do not reveal, or does not
14 reveal, the ten percent handling charge, right?
15     MR. URQUHART: Can you read that question
16     back, please?
17     MR. HESS: Rather than take the time to do
18     that, I'll withdraw that. Let me move on.
19 BY MR. HESS
20     Q. The statement goes on to say, first, the
21 markups were not listed as a separate line; but rather
22 they were concealed quietly padding the final purchase
23 prices. Do you understand that phrase?
24     A. I understand that.
25     Q. What does padding means?

Page 28

1      A. They were somehow added in the price. That's
2  my understanding.
3      Q. And conceal, do you know what that means?
4      A. Conceal which means, again, not known to
5  people, it's actually put in the price.
6      Q. It means hidden, correct?
7      A. Exactly.
8      Q. And is it your testimony that the ten
9  percent -- you said they're called handling charges,
10 right?
11     A. I didn't say handling charges.
12     Q. What did you say, what were they?
13     A. I said, you know, there was a ten percent
14 added which we could not find any document to verify
15 that that ten percent accepted knowing that have Jaubert
16 had his own company, that was not accepted.
17     Q. Okay, now what did you --
18     A. -- we would -- if you allow me, we would, you
19 know, if there was an agreement in place between
20 Seahorse and Exomos which indicates that there is a
21 charge of ten percent, as auditors we would not question
22 because we see that. But we could not find anything
23 that verifies that.
24     Q. So your statement is, your testimony is, it's
25 hidden, it's secret and it's undisclosed because there's

Page 29

1  no agreement that permits it?
2      A. I didn't say the word that you mentioned
3  before. We could not verify from our work in the field
4  that there was any kind of an agreement between Seahorse
5  and Exomos of an acceptance of a ten percent added on
6  the bill. That's what I'm saying.
7      Q. So you're not saying that the requisitions did
8  not clearly state that there were ten percent charges,
9  you're not saying that?
10     A. I'm going to repeat myself. I'm going to say
11 it again --
12     Q. -- well let me withdraw it. If you don't
13 understand my question --
14     MR. URQUHART: -- no, no, just let him finish
15     the answer and then you can --
16 BY THE WITNESS
17     A. -- let me try and say. That ten percent
18 charge that we're talking about --
19     Q. -- uh-huh.
20     A. -- this was a charge against Dubai World where
21 we could not find any kind of an agreement or evidence
22 to verify that. That's what I'm saying.
23     Q. How did you find out about the service charges
24 or -- I'm sorry, let me get back to what we were
25 originally talking about just recently.

Page 30

1      A. Yes.
2      Q. You didn't characterize these charges as
3  handling charges?
4      A. We characterized them -- we as auditors cannot
5  characterize them as handling charges, you know. We
6  didn't characterize them as handling charges.
7      Q. What were they?
8      A. You explain that to me.
9      Q. So you don't know?
10     A. I do not know the extra -- what we came to
11 understand that there was a additional ten percent added
12 to us in the work that was actually done in the field
13 were we could not verify that there was an agreement
14 between Seahorse and Dubai World for accepting those
15 charges, which we said we cannot accept them.
16     Q. What was the -- you are aware of the process
17 to obtain payment for expenditures, correct, with
18 Exomos?
19     A. In general, with particular -- Exomos, in
20 terms of getting payment, how you go about the process.
21 I can explain to you. There has to be a proper
22 authorization of payment, okay, documented from start to
23 end, in a simple term.
24     Q. And in a complex term, is it more complicated
25 than that?

Page 31

1    A.   It depends on the way that you make the
2  payments -- you can add more in there and make it more
3  complicated.
4    Q.   With Exomos, do you recall?
5    A.   How the payment was done in this particular
6  case?
7    Q.   In Exomos?
8    A.   The one that was out of the ordinary, that
9  actually -- when you want to buy something you usually
10  pay ten percent, or you pay twenty percent, or you pay
11  thirty percent.  And then you would inspect when you
12  receive the goods, and the goods were actually in good
13  order and you actually would check, then you would pay
14  the rest.  In this particular case, the full advance was
15  paid and that can be verified from our records, from the
16  audits.
17    Q.   What was the approval process for material
18  requisitions and payment for material requisitions?
19    A.   Explain to me what you mean to say.
20    Q.   Who approves these payments in Exomos' case,
21  did you, you didn't, right?
22    A.   Absolutely, we cannot we are independent.
23    Q.   Well we know Sultan did, correct, he was in
24  the line of approval?
25        MR. URQUHART:  Objection, vague and ambiguous.

Page 33

1  to.
2    Q.   How many inquiries did you make about Sultans
3  participation in the approval process for materials?
4    A.   The process of our audit goes on the basis of
5  sample.  We don't go and check every requisition that's
6  actually in the system.  It's just we don't have enough
7  time and there are hundreds of the transactions.  So if
8  there are some which has Sultan's approval, we take a
9  look at it just like any other -- that's the normal
10  process we do, in the sampling we do.
11    Q.   And Sultans approval -- you know who Sultan
12  is, right?
13    A.   Of course.
14    Q.   What is his fall name?
15    A.   Sultan Bin Sulayem.
16    Q.   Did you look at his participation in any of
17  the invoicing, or requisition forms, or process, in the
18  Exomos audit?
19    A.   Are you asking me individually?
20    Q.   No because --
21    A.   -- or you're asking about my team?  I just
22  want to clarify that.
23    Q.   Well let me help you with that.
24    A.   Yes?
25    Q.   Because I thought you made very clear on a

Page 32

1  BY MR. HESS
2    Q.   You can answer.
3    A.   When you're saying Sultan was in the approval,
4  you know, there's a governance in terms of how the
5  payments can actually be made.  So when there is a need
6  to try to purchase anything, a request for payment is
7  actually raised, diligently gets approved within the
8  authorities and then when the goods are actually
9  checked, then payment is going to be made.  That's how
10  the process goes.
11    Q.   The approval process for the requisition of
12  materials, Sultan was -- he was one of the individuals
13  that would approve the requisitions, correct?
14    A.   Not necessarily.  It could be in some cases,
15  but not necessarily.  It depends on the level, the
16  amount you're talking about, you know.
17    Q.   Did the GIA -- well you call yourselves Group
18  Internal Audit?
19    A.   Yeah, you can say for short GIA.
20    Q.   We'll call it Group Internal Audit so we don't
21  confuse anyone.  Did any of the audits that were
22  conducted on Exomos, were they conducted on Sultan
23  participation in Exomos' business?
24    A.   Can you try to explain that question a bit
25  better, so I can understand what you're trying to get

Page 34

1  number of occasions already --
2    A.   -- it's my team.
3    Q.   -- that you don't -- you're not the hands on
4  person.
5    A.   Thank you.
6    Q.   It's always your team, correct?
7    A.   Absolutely.  That's what I just wanted to
8  clarify.  So it was the team that they have looked and
9  they have verified Sultan's stuff, definitely.  They
10  will look into it.
11    Q.   And they looked into Sultan's participation?
12    A.   Just part of the audit.
13    Q.   And they're aware that he signed requisition,
14  material requisition forms without reviewing them,
15  correct?
16    A.   I cannot remember that.
17    Q.   Well, that's not important?
18        MR. URQUHART:  Objection, vague and ambiguous.
19  BY THE WITNESS
20    A.   You know, you're saying it's not important,
21  what do you mean it's not important?
22    Q.   Well when there's a person that is signing to
23  approve a requisition of materials --
24    A.   -- okay, uh-huh.
25    Q.   -- they're signing their name there to

1  indicate what?  As an auditor, what does that mean?
2      A.  The approval of the work, yes.
3      Q.  If it says approved by, and then Sultan's
4  signature is on it, as an auditor, as the team leader,
5  that means that he reviewed the document, correct?
6      MR. URQUHART:  Objection, lack of foundation.
7  BY THE WITNESS
8      A.  Not really that he would.  You have to know
9  who Sultan is.  If you --
10      Q.  -- well, I do know who Sultan is?
11      MR. URQUHART:  Please don't interrupt him.
12  Let him finish.
13  BY THE WITNESS
14      A.  Okay, because, you know, when Sultan approves,
15  it doesn't mean that he goes and checks every single
16  item on that thing.  Because the way he works and the
17  way, in terms of delegation, is we delegate this to the
18  chief executive of a business unit, and then that chief
19  executive is entrusted that the information that's there
20  is correct and he would approve that.  So that's how it
21  was done.
22      Q.  Why have his signature on it, if it means
23  nothing?
24      MR. URQUHART:  Objection, assumes facts not in
25  evidence, mischaracterizes the testimony.

305-358-9047
www.mydepos.com     Taylor, Jonovic, White, Gendron & Kircher-Echarte
www.myreporters.com  Florida Realtime Reporting      Fax  305-371-3460

1  BY MR. HESS
2      Q.  You can answer.  Do you understand the
3  question?
4      A.  I understand the question, it's an approval
5  process.  It's an approval process which is in there,
6  but the ownership of the responsibility lies with the
7  chief executive who actually approved that invoice.
8      Q.  So my question again, why is it that in each
9  of -- why is it that there's an approval line with
10  Sultan's name on it, that requires his signature, before
11  the requisition can be paid, he doesn't have to review
12  it, or if his signature only means -- why include that
13  in the process?
14      A.  As I indicated before and I will say it again
15  for the record, you know, having approval processes
16  there is a trust element in the chief executive to
17  ensure, before something goes to the Chairman, the due
18  diligence is taken care of there.  So when I trust you
19  as the chief executive, I give you the authority and
20  then I will sign because of the trust that we put in the
21  chief executive.
22      Q.  And so you are a supervisor, correct, your
23  chief of the --
24      A.  -- current the chief of Internal Audit, yes.
25      Q.  So that would be apply to you also?

305-358-9047
www.mydepos.com     Taylor, Jonovic, White, Gendron & Kircher-Echarte
www.myreporters.com  Florida Realtime Reporting      Fax  305-371-3460

1      A.  -- when --
2      Q.  Let me finish please.
3      A.  Go ahead.
4      Q.  Because otherwise you're going to answer a
5  question that you don't know.
6      A.  Fair enough.
7      Q.  So when you sign a document --
8      A.  -- uh-huh --
9      Q.  -- as chief of the Internal Auditors, you
10  don't review it either because you rely on whoever
11  prepared it for you to have completely and thoroughly
12  done their job and just your signature is just a
13  formality, correct, because you are the chief of a group
14  of auditors, correct?
15      MR. URQUHART:  Could you read that back
16  please?
17      (Whereupon the question was read by the
18  reporter as above recorded.)
19      MR. URQUHART:  Objection, vague, ambiguous
20  compound, unintelligible.
21  BY MR. HESS
22      Q.  Let me help you with that just in case you
23  don't understand it.  When you sign your name to a
24  document you read it, don't you?
25      MR. URQUHART:  Objection, vague and ambiguous.

305-358-9047
www.mydepos.com     Taylor, Jonovic, White, Gendron & Kircher-Echarte
www.myreporters.com  Florida Realtime Reporting      Fax  305-371-3460

1  BY MR. HESS
2      Q.  Do you?
3      A.  Not every time, I would read everything, okay.
4      Q.  When don't you read it?
5      MR. URQUHAF T:  Objection, vague and ambiguous.
6  BY MR. HESS
7      Q.  You can answer.
8      A.  If it contains a lot of information, it was a
9  process of approval, we will sign.
10      Q.  You don't review it then?
11      MR. URQUHART:  Objection, vague and ambiguous.
12  BY MR. HESS
13      Q.  I don't understand your answer.
14      A.  Not every single time, if I sign a document I
15  would have read every single word in the document.
16      Q.  Do you read any of the words in the document.
17  Let's start with that.
18      MR. URQUHART:  Objection, vague and ambiguous.
19  BY MR. HESS
20      Q.  Every document you sign, you read some of the
21  words, correct?
22      A.  Absolutely, I understand what's in there,
23  okay.  I understand what is it, and I will sign.
24      Q.  Okay.  So for you, you understand that it's
25  important to at least understand what's in the document

305-358-9047
www.mydepos.com     Taylor, Jono .c, White, Gendron & Kircher-Echarte
www.myreporters.com  Florida Realtime Reporting      Fax  305-371-3460

Page 39

1 before you sign it, correct?

2    A.  Correct.

3    Q.  Part of your auditing or in the group audit

4 that was conducted, the number of group audits, I never

5 saw any recommendations in any of the audits that

6 include a recommendation that Sultan more thoroughly

7 review the material requisition forms.  Why?  Why isn't

8 that a recommendation?

9    A.  The person who is responsible for conducting

10 the business is the chief executive of a business.  He

11 is the ultimate person responsible for the action

12 conducted in his or her business.  Being the chief

13 executive, should make sure that everything is there, in

14 good governance.

15    Q.  You're an emirate, correct?

16    A.  Correct.

17    Q.  And Sultan is also, correct?

18    A.  Correct.

19    Q.  Mr. Jaubert is not, correct?

20    A.  Correct.

21    Q.  And before I get into the next line of

22 questioning, I want to make sure I understand your

23 testimony.  Your testimony is that when you agreed with

24 the statement that Jaubert and Seahorse secretly added

25 an undisclosed markup of ten percent on all purchased

305-358-9047
www.mydepos.com    Taylor, Jonovic, White, Gendron & Kircher-Echarte
www.myreporters.com  Florida Realtime Reporting    Fax 305-371-3460

Page 40

1 materials, and that these markups were not listed as a

2 separate line item -- you've agreed with both of those

3 statements, correct?

4    A.  I have agreed that from our audit, that we

5 have conducted, we have listed, okay, where we have seen

6 with evidence, that there was an additional ten percent

7 added on top of the purchases made from Seahorse.  Plus

8 that, we have also noted that on some of the purchases

9 which was done, when we have verified some of the

10 invoices that we could get ahold of, there were an

11 additional up to 135 percent added by Seahorse for Dubai

12 World to pay, which is not in line of any kind of an

13 agreement.

14    Q.  Then I guess I'm glad I asked that question

15 because I thought you had already acknowledged, but I

16 guess you didn't.  So let me ask you again.  Let me step

17 all the way back and let me try it again.

18        Paragraph 30, page 6 of the complaint reads,

19 the allegation, defendants Jaubert and Seahorse secretly

20 added an undisclosed markup of ten percent on all

21 purchased materials.  Let me go on, okay.  You

22 understand that's the allegation, correct?

23    A.  Correct.

24    Q.  And let me just point your attention to,

25 before you're asked my next question this, that that

305-358-9047
www.mydepos.com    Taylor, Jonovic, White, Gendron & Kircher-Echarte
www.myreporters.com  Florida Realtime Reporting    Fax 305-371-3460

Page 41

1 phrase includes the word secretly, undisclosed, all

2 purchased materials.  Okay, all.  Do you agree with that

3 statement, under oath today, is that an accurate

4 statement?

5    A.  This is an accurate statement from what we --

6 our work.

7    Q.  Yes.

8    A.  This is what was in the deposition, which I

9 have said and I indicated that I didn't see that.

10    Q.  But do you agree with the accuracy and

11 truthfulness of that statement?  Is that a true

12 statement according to your audit?

13    A.  It is true that during our audit that we have

14 noticed that there was a charge of ten percent on

15 purchases, as well as some of the purchase that were

16 done, they were actually overcharged up to 135.

17    Q.  This is going to be a long day, because you're

18 not answering my questions.  Let me ask it again, and I

19 understand that you didn't write the complaint.  You

20 probably weren't even consulted when the complaint was

21 written.  I'm not asking you whether or not you knew

22 about this being in the complaint.  I'm not asking if

23 you agree with it being included in the complaint.  I'm

24 not asking about the legal importance of it.  I'm asking

25 you simply, as the chief of the group of auditors that

305-358-9047
www.mydepos.com    Taylor, Jonovic, White, Gendron & Kircher-Echarte
www.myreporters.com  Florida Realtime Reporting    Fax 305-371-3460

Page 42

1 conducted the audit, is it a true statement?

2        Let me read it again, and I'm not asking what

3 you found out.  I'm not asking about the 135 percent

4 stuff.  I'm not asking about the ten percent.  I'm

5 asking if this statement is a true statement.  If it's

6 not a true statement, you tell me why.  If it is a true

7 statement, it's a simple yes; defendants, Jaubert and

8 Seahorse, secretly added an undisclosed markup of ten

9 percent on all purchased materials.  Is that a true

10 statement?

11    A.  True statement.

12    Q.  Let me ask you this one.  The same allegation

13 goes -- I mean that same paragraph goes on, these

14 markups were not listed as a separate line item.  Is

15 that a true statement?

16    A.  Repeat that again.

17    Q.  These markups were not listed as a separate

18 line item?

19    A.  I do not know about that.

20    Q.  You don't know?

21    A.  I do not know about that.

22    Q.  Rather they were concealed, quietly padding

23 the final purchase prices.  Is that a true statement?

24    A.  That's a true statement.

25    Q.  So when I go through requisitions, material

305-358-9047
www.mydepos.com    Taylor, Jonovic, White, Gendron & Kircher-Echarte
www.myreporters.com  Florida Realtime Reporting    Fax 305-371-3460

requisition forms, I will expect to find that there is
no mention of a ten percent handling charge, or a
service charge, right, because they're hidden, they're
secret, they're undisclosed, right?

A. As I state, you know, the --

Q. -- no, let --

MR. URQUHART: -- stop interrupting him.

MR. HESS: I'm asking him to answer the
question.

MR. URQUHART: No, no, no. Stop interrupting
him.

MR. HESS: It's a yes or no question.

MR. URQUHART: You don't like it when he
interrupts you.

MR. HESS: It's a yes or no question.

MR. URQUHART: No, he -- it's -- answer.

MR. HESS: -- I'll tell you what then we'll be
here all day.

MR. URQUHART: Then we will be.

MR. HESS: It's a simple question.

MR. URQUHART: You know what, he'll answer it
any way he can.

MR. HESS: Any way you want to answer. I'm
trying to save you some time to get back home.

THE WITNESS: Yes.

405-358-9047
www.mydepos.com   Taylor, Jonovic, White, Gendron & Kircher-Echarte
www.myreporters.com   Florida Realtime Reporting   Fax 305-371-3460

1  Q. All right. I thought I made it clear. I'm
2 not talking about the 135 percent.
3  A. But I am talking about -- when you said they
4 were a secret, I wanted to try to interrupt, after
5 explained that to us, that's what it came up in there.
6 So you're talking about the line in the purchasing.
7  Q. Let me read it to you again; defendants,
8 Jaubert and Seahorse, secretly added an undisclosed
9 markup of ten percent. I don't know where you get the
10 165 or 135, I'm talking about the ten percent
11 allegation, okay, on all purchase materials, all right.
12 You've already agreed. You said that's a true
13 statement.
14  A. That's a true statement and we can actually
15 verify it from our audit and give you the record for
16 that.
17  Q. Now what you're not sure of, or you can't
18 testify to, or you don't know, is these markups were not
19 listed as a separate line item, right?
20  A. I can't -- I don't know about that.
21  Q. What I would expect to find then, under your
22 testimony, is that the material requisition forms
23 contain no indication that there's a ten percent charge,
24 right?
25  MR. URQUHART: Objection, misstates his

405-358-9047
www.mydepos.com   Taylor, Jonovic, White, Gendron & Kircher-Echarte
www.myreporters.com   Florida Realtime Reporting   Fax 305-371-3460

1  MR. URQUHART: I'm sure you're being
2 charitable.
3  MR. HESS: I'm very charitable. Unlike you, I
4 still have charity in my heart.
5  MR. URQUHART: Yeah, unlike me.
6  MR. HESS: Yeah. I couldn't have said it
7 better. Thank you.
8 BY THE WITNESS
9  A. State that again about these things, so we
10 can...
11  Q. -- sure. Given your testimony that these
12 markups were secretly added, undisclosed, concealed, I
13 would expect to find on each of the invoices, or each of
14 the material requisition forms, no indications of a ten
15 percent handling or service charge. Would you agree
16 with that?
17  A. I didn't say that. I said that the word you
18 mentioned, if you mentioned the three words, way that I
19 would interpret that is that they were ten percent
20 padded, and then they were actually hidden, secretly
21 charged on some of the items that we actually bought.
22 Because they were bought at some price, and when they
23 got to us, nobody knew that they were actually marked up
24 135 percent. And we can prove that for you and that's
25 what I meant.

405-358-9047
www.mydepos.com   Taylor, Jonovic, White, Gendron & Kircher-Echarte
www.myreporters.com   Florida Realtime Reporting   Fax 305-371-3460

1 testimony. It's argumentative.
2 BY MR. HESS
3  Q. You can answer.
4  A. There could be a ten percent, I'm saying there
5 could be a ten percent, but this ten percent was never
6 agreed. We, from our side, when we look into any kind
7 of -- if there's a charge, that charge has to be agreed
8 by both parties, which I indicated that we did not see
9 any evidence of that being the case between Seahorse and
10 Dubai World. So there shouldn't be a ten percent line.
11 If there was a ten percent line, it shouldn't be at all.
12  Q. Lead me read the definition of secret to you
13 again, because what I'm hearing from you is, is that it
14 wasn't secret. You're saying it wasn't agreed to,
15 right?
16  A. It wasn't agreed to.
17  Q. Right, but it wasn't secret?
18  A. When it wasn't agreed to, nobody knows about
19 it. What do you define that?
20  Q. Let me show you what's been marked as
21 Defendant's Exhibit B, it's also DW137. Would you take
22 a look at that?
23  MR. URQUHART: This one?
24  MR. HESS: It's your Bates stamp on the lower
25 corners.

405-358-9047
www.mydepos.com   Taylor, Jonovic, White, Gendron & Kircher-Echarte
www.myreporters.com   Florida Realtime Reporting   Fax 305-371-3460

Page 47

MR. URQUHART:  The one that ends 137?

MR. HESS:  The one that's 137 as I said.

MR. URQUHART:  And it's Abdul Cutter -- what
are we calling this.

MR. HESS:  It's marked as Exhibit B, right in
front of you, right there, yes.

MR. URQUHART:  Okay.  Uh-uh.

MR. HESS:  As I'm trying to do when I hand the
witness the document I say what it and I give the
Bates stamp number for your edification and help as
well as the name of the exhibit.

MR. URQUHART:  Thank you.

MR. HESS:  Your welcome.

BY MR. HESS

15  Q.  Have you had an opportunity to look at that?

16  A.  I haven't seen this.

17  Q.  Well you've seen it today?

18  A.  Absolutely, go ahead, yes.

19  Q.  I can't tell by looking at that document, it
20  is absolutely concealed from me and hidden, and secret,
21  the ten percent service and handling charges, do you
22  agree?

23  A.  Say that again.

24  Q.  I'm looking at Exhibit B.  I don't see any
25  indication, whatsoever, none, it seems a secret to me,

305-358-9047
www.mydepos.com    Taylor, Jonovic, White, Gendron & Kircher-Echarte
www.myreporters.com  Florida Realtime Reporting    Fax  305-371-3460

Page 48

1  undisclosed and concealed, the ten percent service and
2  handling charges.  Would you agree?

3  A.  We have no agreement on that service and
4  handling charges.

5  Q.  So you also don't see anything in that
6  document -- because I don't see it.  You don't see it
7  either do you, the ten percent service charge?

8  A.  I see it.  It's written here.

9  Q.  Oh, you see it on Exhibit B?  You see a ten
10  percent service charge on there?

11  A.  It says service and handling charge.

12  Q.  Oh, it's right there.  It's line 2, correct?

13  A.  Correct.

14  Q.  It's numbered line 2, isn't it?

15  A.  Correct.

16  Q.  Let me show you what's been marked as
17  Defendant's Exhibit C, which is also DW134.  I'm having
18  a hard time with that one too.  To me, I don't see any
19  indication whatsoever that there's a service and handling
20  charge that was requested in that document.  It looks to
21  me like it was secretly added, undisclosed, and not
22  listed as a separate line item and it was concealed and
23  it was quietly padding the final price.  Would you
24  agree?

25  MR. URQUHART:  Objection, argumentative.

Page 49

1  BY MR. HESS

2  Q.  Would you agree?

3  A.  This number 2 item that's you're talking
4  about, that you keep referring to, this was never agreed
5  between Seahorse and Dubai World.

6  Q.  What wasn't agreed?

7  A.  This added service and handing charge.

8  Q.  I don't see anything there on that document.
9  What are you talking about?

10  A.  I'm talking about item two.

11  Q.  Oh, the line item 2 on Exhibit C -- oh, I see
12  it now.  Line item two, it says in all capital letters.
13  Service and handling charges and then it says 11,900.00.
14  That's what you're talking about?

15  A.  Exactly.

16  Q.  You saw that on that document?

17  A.  Now.

18  Q.  And what percentage of the item requested is
19  that amount, can you calculate that?

20  MR. URQUHART:  Objection, unintelligible.

21  BY MR. HESS

22  Q.  What relation does 11,900 have to 119,094?

23  A.  It's ten percent.

24  Q.  It's ten percent, right?

25  A.  Yes.

Page 50

1  Q.  So you see that on Exhibit C?

2  A.  Yes, I do.

3  Q.  It's clear isn't it, right?

4  A.  I see it.

5  Q.  Let me show you what's been marked as
6  Defendant's Exhibit D.  It's also DW210.  This one, I
7  can't make out.  I cannot find any indication -- it
8  looks like if there were service and handing charges
9  that were in this requisition, certainly they were
10  undisclosed, secretly added, not listed as a separate
11  line item, and concealed, because it's just -- it's
12  too -- do you agree?

13  A.  I see it here, service -- right there.

14  Q.  Oh, it says service and handing charges.  Oh,
15  it's item three, right?

16  A.  Correct.

17  Q.  How is it that you found that?  Because you're
18  an auditor you have that special ability to --

19  A.  -- it's obvious.  It's in front of you.  You
20  can take a look at it.

21  Q.  Going to show you what's been marked
22  Defendant's Exhibit E.  It's also the Bates stamp DW220.
23  Well, I'm not even going to guess on this one.  I
24  just -- can you find a service and handing charge in
25  this one?

305-358-9047
www.mydepos.com    Taylor, Jonovic, White, Gendron & Kircher-Echarte
www.myreporters.com  Florida Realtime Reporting    Fax  305-371-3460

**Dubai vs. Jaubert**  July 1, 2010

Page 51

Q. Number 4.

A. Number 4, oh, line item four where it says and handing charges $9,730, right.

A. Correct.

Q. What else does it say on there, under line four?

A. (No response).

Q. I'll strike that. Now in each of -- you still have all those exhibits in front of you?

A. Yes.

Q. You've got B, C, D, and E?

A. Yes.

Q. Sultan's signature appears on each one of those, correct?

A. This one (indicating), I could possibly see it. This one (indicating) is not very clear. And this one (indicating) is not very clear. But it could be. Those signatures could be him.

Q. It just might not have come through on the copies, correct?

A. It could be. It could be, yeah.

Q. His printed name certainly appears on there, correct?

A. Yes. I can see Sultan.

Q. Sultan Amid Bin Sulayem, right?

---

**Dubai vs. Jaubert**  July 1, 2010

Page 52

1  A. Yes.

2  Q. That's his name?

3  A. Yes.

4  Q. His name appears on each of the exhibits.

5 Correct?

6  A. You're correct.

7  Q. And right above his name it says approved by.

8 Correct?

9  A. It says approved by.

10  Q. On the each one of those exhibits, correct?

11  A. Correct.

12  Q. Now if you look at the -- can you tell me what

13 the date of these material requisition forms are, what

14 the dates are? So I don't know mean to tell you your

15 job because I'm sure you've seen a bunch of these, but

16 the upper right hand corner. Let's start with E. You

17 would agree that it's November 7, 2005, correct?

18  A. Correct.

19  Q. D, October 15th?

20  A. October 15th.

21  Q. C it looks like the corner is bent?

22  A. You're right. I can't see that.

23  Q. B, November 5, 2005, correct?

24  A. Correct.

25  Q. Before I move on, I just want make sure I

---

**Dubai vs. Jaubert**  July 1, 2010

Page 53

1 understand, there's nothing hidden about those service

2 and handing charges on the requisition forms, correct?

3  A. There's nothing hidden. This has not been

4 agreed to.

5  Q. I understand that. It's not hidden in the

6 material requisition forms, correct?

7  A. Correct.

8  Q. It's very obviously, correct?

9  A. It is there.

10  Q. It's very obviously, correct?

11  A. Correct.

12  Q. And you're suggesting that Sultan, it's not

13 his responsibility to even notice the obvious service

14 and handing charges that he approved by signing these

15 requisitions? That's your testimony, right? He's too

16 busy, right?

17  A. You're correct, he's busy. Ownership of this

18 lies with the chief execute of the business unit to

19 ensure that whatever is actually present, is actually in

20 line of the governance of our company.

21  Q. What is your understanding about -- and I

22 realize that you're the chief of the Internal Audit

23 Group, but what is your understanding about the

24 provision of materials, boat building materials in the

25 emirates? Do you have any understanding about how

---

**Dubai vs. Jaubert**  July 1, 2010

Page 54

1 difficult it is to obtain batteries, the pricing, and

2 the comparison between battery prices in the Dubai, and

3 battery prices in the states o  other places in the

4 world? Is that something you have a knowledge of?

5  A. I'm not an expert in that field.

6  Q. Are you an expert in the cost differentials of

7 purchasing materials such as fiberglass and resin,

8 whether it's more cost -- whether there's a better cost

9 benefit to the company in purchasing those materials

10 locally or through a company elsewhere? Do you have any

11 understanding of that?

12  MR. URQUHART: Objection, vague and ambiguous.

13 BY MR. HESS

14  Q. Do you have any understanding of that?

15  A. I'm not an expert in that field.

16  Q. That's something however, that certainly that

17 the Group Internal Audit Group -- what is it? How do

18 you call yourselves again?

19  A. Group Internal Audit.

20  Q. That's something that that entity has an

21 expert understanding of, correct?

22  A. We have people who are actually experts in

23 different fields.

24  Q. And you have a person or people in the group

25 that conducted the audits of Exomos, who is an expert at

Page 55

the requisition and provisioning of boat building
equipment, correct?

    MR. URQUHART: Can you please read the
question, back?

    (Whereupon the question was read by the
reporter as above recorded.)

BY THE WITNESS

    Q. We have experts, not in boat building. We
have people who are auditors, who understand the system,
and they would follow the system, but not necessarily an
expert in boats.

12     MR. URQUHART: Can we take a break?

13     MR. HESS: Sure, how long to you need?

14     MR. URQUHART: Five minutes.

15     (Thereupon, after a short recess, the
16 proceedings continued as follows:)

17 BY MR. HESS

18     Q. Are you ready to proceed?

19     A. Go ahead.

20     Q. The -- at least three of the -- well let me
21 just tell you which ones, exhibits B, D, and E are
22 clearly marked 2005 documents, correct?

23     A. Correct.

24     Q. What happened with the 2005 audit that didn't
25 pick these things up?

---

Page 56

1     MR. URQUHART: Objection, assumes facts not in

2   evidence, misstates the record.

3 BY MR. HESS

4     Q. Why didn't the 2005 audit raise this so-called
5 hidden, concealed, secret, surcharge in 2005?

6     A. I'd have to answer that.

7     Q. Well you have to answer that. I'm glad you
8 like to, that works for me.

9     A. Because I indicated earlier, the way we do
10 with audit is we do them on a sampling basis. Not
11 everything since record we have the time to go through,
12 so some of these, we could have missed, but the fact
13 which I would like to put for the record again, is that
14 there was no agreement between Seahorse and Dubai World
15 regarding this excess, that actually you've indicated in
16 here as a handing charge of ten percent. We verified
17 that, you know, by speaking with Mr. Jaubert at that
18 time, and also with some of the people there who
19 indicated that we do not have that.

20     Q. Have what?

21     A. Have any kind of an agreement, such an
22 agreement of ten percent.

23     Q. Such an agreement of what?

24     A. To add this ten percent handling charge.

25     Q. What is handling charge?

---

Page 57

1     A. You define that for me.

2     Q. I haven't defined it for your.

3     A. You asked me, and I said you define that, what
4 is handling —

5     Q. -- oh, you want me to define it for you?

6     A. Yes, please.

7     Q. Do you know what it means?

8     A. Handling means if somebody actually goes out
9 of their way, they do a lot of work to try to make sure
10 that they can collect the material, they can put the
11 cost of transport over tha´, do all that work so we can
12 say it's a handling charge, okay. If you're paying
13 somebody a postal, and you're paying that, that money
14 you're paying is a handling charge, in my own terms.

15     Q. And if we were to look at all of the various
16 Dubai World Corporation enterprises, we would never find
17 a handling or service charge attached to Dubai World or
18 it's subsidiary services?

19     A. That could be. That could be, provided there
20 is an agreement between the two parties.

21     Q. Okay. And you earlier said that I'm the one
22 that raised the service and handling charges. They're
23 in these documents that we looked at today, correct?

24     A. You're correct.

25     Q. These are Dubai World Corporation documents,

---

Page 58

1 correct?

2     A. Correct.

3     Q. So your testimony is that that audit in 2005
4 just missed these requisition forms?

5     MR. URQUHART: Objection, vague, ambiguous,
6   misstates the witness's testimony, assumes facts
7   not in evidence.

8 BY MR. HESS

9     Q. Well, tell me, what happened? Is that what it
10 is? What happened to that 2005 audit?

11     A. When we do an audit, the audit is based on a
12 sample, a random sample that we look into. This could
13 not be -- I do not know because I told you the team did
14 it, they could not -- maybe they missed them. Or if
15 they have found it, we do not find an agreement between
16 Seahorse and Exomos regarding this charge.

17     Q. How many of these material requisition forms
18 and other documents indicates a service and handling
19 charge, do you know?

20     A. I do not know.

21     Q. Now you also stated to the press that the
22 submarines didn't work. Do you have first-hand
23 knowledge of that?

24     A. I stated they don't work because looking at
25 internal reports, which we will be able to try and

Page 59

provide you if you want, I'm not an expert in
submarines, we have people from Exomos, as well as
external people who indicated from their report, that
those submarines don't work. I'm not an expert in
submarines.
   Q.   So you don't know.  You're relying on other
people to tell you, correct?
   A.   I do not know everything.  We have to rely on
expert in the field, especially in the submarine world.
   Q.   You don't know whether the submarines work or
not from personal knowledge.  You're relying on other
person's opinions that are relayed to you?
   A.   Other person's who are experts in that field,
who actually we take their opinion.
   Q.   You're relying on their opinions, not your
personal knowledge, correct?
   A.   Absolutely.  You're correct.
   Q.   Who are those people that you are relying on?
   A.   Going to try to remember their names.  They
were two people working in Exomos who made the report.
One is maybe Craig, and another person.  I can't
remember their names but, you know, I'll be more than
happy to request that.  We can look at the report, give
you the names, who were actually people working, who
were hired by the chief executive of Exomos, working at

Page 61

1    Sultan's signature on a requisition form?
2       MR. URQUHART:  Objection, vague and
3    ambiguous.
4    BY THE WITNESS
5       A.  What do you mean by that?
6       Q.  Well why have him -- again, it comes back to
7    that.  Why have a space for him to approve it, if it
8    really doesn't mean anything?
9       A.  As I stated earlier, and for the record, you
10   know, Sultan being the Chairman would trust the chief
11   executive to handle the affairs of the business
12   themselves.  And when they trust a person, it's that
13   person's responsibility to make sure whatever Sultan is
14   signing is correct.
15      Q.  So it's only if Sultan doesn't trust the
16   person that he will review the requisition forms?
17      A.  You're correct.
18      Q.  And in this case, he trusted Mr. Jaubert?
19      A.  At that time, but I think more of that you can
20   ask Sultan, he will give you the indication.
21      Q.  Well you just said at that time.  So you
22   believe he did, right?
23      A.  Correct.
24      Q.  Now the Group Internal Audit, that was
25   designated GIASP008-2006 is that an accurate -- I mean,

Page 60

1    Exomos, and another person, that was an independent
2    report which is was from a person by the name of Daniel
3    who was actually a French person, who was brought in by
4    Exomos, and in their report, they indicated that those
5    are not working.
6       Q.  What changes in the requisitioning process
7    have been made by Dubai World in light of the --
8       A.  -- the first that we did is we requested Mr.
9    Jaubert to stop dealing with Seahorse.
10      Q.  When was that?
11      A.  I cannot recall exactly to be very honest.
12   But as a result of an audit, because of the rise of a
13   conflict of interest, we requested him to stop dealing
14   with the company.
15      Q.  Was that done in writing to him?
16      A.  I do not recall that we have put in writing
17   but actually in our report, you'll probably see that.
18   And I'm sure a copy of the report has been given to
19   Herve.
20      Q.  So that's where he would have been instructed,
21   by virtue of the report?
22      A.  I agree with that.
23      Q.  Any other changes that were made?  I was
24   thinking more along the lines of, wouldn't you think it
25   appropriate to make it a little more valuable to have

Page 62

1    is it accurate as far as you know?
2       MR. URQUHART:  Could you read that back,
3    please?
4       (Whereupon the question was read by the
5    reporter as above recorded.)
6       MR. URQUHART:  I don't think -- I don't
7    understand the question.
8    BY MR. HESS
9       Q.  Are you familiar with the designations of the
10   audits that you've prepared?
11      A.  You're talking about the reports?
12      Q.  Uh-huh.
13      A.  That could be a reference to a report.
14      Q.  Well it is, isn't it?
15      A.  A reference to a report.
16      Q.  You stand by the audits, correct?
17      A.  Correct.
18      Q.  They're all accurate?
19      A.  Correct.
20      Q.  In every way?
21      A.  In every way and everything that's actually in
22   those documents, can be verified.
23      Q.  Who is Yousuf Kazim?
24      A.  Yousuf Kazim.
25      Q.  Who is that?

Dubai vs. Jaubert          July 1, 2010

Page 63

1     A.  He's one of the senior officials of Dubai
2  World, at one time he was looking after Exomos.
3     Q.  And you met with him in June of 2007, correct,
4  regarding Mr. Jaubert?
5     A.  I -- you know, I cannot remember that date,
6  but I definitely met with a lot of people and I could
7  have met with Yousuf.
8     Q.  Well how many times do you meet with Yousuf to
9  discuss confiscating a person's passport?
10    A.  We confiscate people's passport?
11    Q.  Are you testifying that the Group Internal
12 Audit did not confiscate Mr. Jaubert's passport?
13    A.  We do not confiscate people's passport.
14    Q.  You didn't tie it up, you didn't prevent him
15 from getting it back?
16    A.  We do not hold anybody's passport.
17    Q.  You didn't instruct any governmental official
18 or anyone to maintain Mr. Jaubert's passport?
19    A.  Correct.
20    Q.  And you didn't request anyone to put a lien on
21 Mr. Jaubert's house?
22    A.  There are two different things here you're
23 talking about.
24    Q.  Let me make sure you understand the question.
25 I am talking ---

Dubai vs. Jaubert          July 1, 2010

Page 64

1        MR. URQUHART:  No, no, would you let him
2     finish.
3  BY THE WITNESS
4     A.  Yeah, you're talking about two different
5  things.
6     Q.  I am.
7     A.  But I think you've got to understand -- let me
8  try to explain to you the process we're working on.  We
9  do not have the right to confiscate people's passports.
10 We're not an authority to have anybody's passport.
11 There are different authorities in the country that they
12 have that right, but not us.
13    Q.  I agree, you don't have the right to do it.
14    A.  Thank you.
15    Q.  Why did you do it?
16    A.  I do not have Jaubert's passport.
17    Q.  So your testimony is that in 2007 you did not
18 have a conversation with Mr. Kazim regarding --
19 confirming that the GIA, the Group Internal Audit, had
20 tied up Mr. Jaubert's passport?
21    A.  I do not recall that.  Do you want me to
22 explain to you the process how we do things.
23    Q.  No.  I just want to know the answer, because
24 you understand you're under oath, correct?
25    A.  Yes, of course, yes.

Dubai vs. Jaubert          July 1, 2010

Page 65

1     Q.  And if you don't remember, that's one thing.
2  Is that what you're saying?
3     A.  I do not remember that, to be very honest with
4  you.  I don't remember.  If you show me something, I
5  can -- you know, it will bring up my memory.  I'll be
6  more than glad to understand and give you the evidence,
7  but, you know, you're talking about 2007.  We are in
8  2010.  It's very difficult for me to remember that.
9     Q.  It's very difficult for you to remember taking
10 someone's passport and preventing him from leaving your
11 country, that's difficult to remember?
12       MR. URQUHART:  Can you read the question back,
13    please.
14       (Whereupon the question was read by the
15    reporter as above recorded.)
16       MR. URQUHART:  I object to the question, it
17    mischaracterizes the witness's testimony, assumes
18    facts not in evidence and it's argumentative.
19 BY MR. HESS
20    Q.  You can answer the question.
21    A.  I said again, we do not hold anybody's
22 passport.  We have no right to hold anybody's passport.
23    Q.  And I say again, I agree with you, you have no
24 right to hold anyone's passport.
25    A.  No, sir.  I don't have the right to hold

Dubai vs. Jaubert          July 1, 2010

Page 66

1  anybody's --
2     Q.  -- again, my question is, why did you do it?
3  Why did you Group Internal Audit do it?
4     A.  We do not hold people's passports.  I say it
5  again.
6     Q.  And you never had a conversation with Mr.
7  Kazim about Group Internal Audit tying up Mr. Jaubert's
8  passport in 2007 -- I'm asking?
9     A.  I don't remember.
10    Q.  Is it possible that that conversation
11 happened?
12    A.  It's possible, but I don't remember.
13    Q.  Okay.  You do remember however that Group
14 Internal Audit requested that a lien be put on Mr.
15 Jaubert's home, correct?
16    A.  When we -- part of our process if we have a
17 case against anybody, to protect our assets, we can
18 request the authority to put the lien, to protect our
19 right, that's part of the process of the system.
20    Q.  And you do remember doing that or you don't
21 remember?
22    A.  I don't remember, honestly.  But, if you show
23 me something, I could look into it and verify it.  It's
24 been a while ago.
25    Q.  That means that you may have done that, but

**Dubai vs. Jaubert**  **July 1, 2010**

Page 67

1 you just can't recall. Is that your answer?
2   A.  Yeah because, you know we do have a lot of
3 cases we work with.
4   Q.  You have a lot of cases where you put liens on
5 people's homes?
6   A.  If there is a case, that's part of the process
7 through the courts. We do not do it. We do request the
8 court, and then the court will put the lien. We do not
9 put the lien. I would like to clarify that.
10   Q.  So you're speaking of a process where you go
11 to court, Dubai World Corporation goes to court, files
12 papers, correct?
13   A.  Correct.
14   Q.  And requests the court to put a lien on the
15 property?
16   A.  That's only way you can put a lien on the
17 property.
18   Q.  That's the only legal way, correct?
19   A.  That's the legal way of putting, yes.
20   Q.  And are you saying that you never requested
21 that lien in a different way?
22       MR. URQUHART: Objection, vague and ambiguous.
23 BY THE WITNESS
24   A.  Now that you're talking, we put a lien if we
25 have a case against somebody. If we know somebody who's

**Dubai vs. Jaubert**  **July 1, 2010**

Page 68

1 actual -- who owes us a lot of money, to make sure that
2 we can protect the company's asset, okay, we can request
3 to put a lien, yes.
4   Q.  Through the court system, just as you said?
5   A.  Through the court system. But I would like to
6 also clarify that you have actually brushed my memory
7 again, yes, is that we put a request to put a lien for
8 Mr. Jaubert's -- at Nakheel.
9   Q.  So you on behalf of --
10   A.  -- we put a request. Let me put that again,
11 we put a request. Let's make sure that it is known, we
12 put a request.
13   Q.  Who is Dubai World Corporation owned by?
14   A.  The government.
15   Q.  The government of?
16   A.  Dubai.
17   Q.  And you're speaking of the court system is the
18 governmental -- the system of courts operated by Dubai,
19 correct?
20   A.  Correct.
21   Q.  The owner of Dubai World Corporation, correct?
22   A.  Explain to that to me, again. Say that again.
23   Q.  Well, I believe your testimony is that Dubai
24 World Corporation is owned by the government of Dubai?
25   A.  Correct, owned by the government of Dubai.

**Dubai vs. Jaubert**  **July 1, 2010**

Page 69

1   Q.  One hundred percent?
2   A.  Not all of it because there are some companies
3 which are public leasing companies. Some companies
4 within Dubai World are public leasing companies, that
5 means that they have it. But the majority of them --
6 hold by the government of Dubai.
7   Q.  What is the estimate of the value of Dubai
8 World Corporation?
9   A.  I can't recall exactly.
10   Q.  Well approximately?
11   A.  Approximately a hundred billion.
12   Q.  A hundred billion dollars?
13   A.  I would say more dirhams. I wouldn't say
14 dollars. I'd say dirham.
15   Q.  A hundred billion dirhams, that's it?
16   A.  Yeah.
17   Q.  Really?
18   A.  I recall that, yes.
19   Q.  I thought it was more than that. Okay. Where
20 did you get that number?
21   A.  You gave me -- you told me an estimate, so I
22 gave you an estimate.
23   Q.  What are you relying on in providing that
24 estimate?
25   A.  The numbers I can't say, but I can't remember

**Dubai vs. Jaubert**  **July 1, 2010**

Page 70

1 very well, so I gave you that number.
2   Q.  It could be --
3   A.  -- it could be more. It could be less, yes.
4   Q.  Okay, so the government of Dubai owns Dubai
5 World Corporation, the majority of it, vast majority of
6 Dubai World Corporation?
7   A.  Correct, correct.
8   Q.  And if you do me this favor, I'll try to do
9 the same for you. Let me finish with my question
10 because otherwise the court reporter has to take two
11 things down at one time and it's very difficult for her
12 to do that?
13   A.  Correct.
14   Q.  And this is the same government of Dubai who
15 maintains and operates the court system in Dubai,
16 correct?
17   A.  Correct.
18   Q.  And it's your testimony today that when you
19 requested a lien be placed on Mr. Jaubert's home, you
20 did it through the court system of Dubai?
21   A.  We did it through Nakheel. We put a request
22 through Nakheel.
23   Q.  So not the court system?
24   A.  No, that was through Nakheel.
25   Q.  And can you explain who Nakheel is?

Page 71

1    A.  It's one of the entities in Dubai World.
2    Q.  Owned by the --
3    A.  -- the government.
4    Q.  The government of Dubai, right?
5    A.  Exactly.
6    Q.  So when you testified earlier that the only
7  legal way to put a lien on someone else's home is going
8  through the court system, and when I had asked you to
9  file papers and have the court do it, you were wrong?
10   A.  The legal way that's correct.  The only legal
11 way you could do it, is to go through the court.  We put
12 a request.  There are two different definitions here.
13 Putting a request is not a legal way, but you can put a
14 request, you follow with your papers through a legal
15 way.
16   Q.  So you requested that there be a lien placed
17 on Mr. Jaubert's home, through the courts or no?
18   A.  Not through the courts.  We put a request to
19 Nakheel to put a lien on the property while we process
20 the papers to put a lien through the legal way.
21   Q.  So you -- well I thought you said there's only
22 one legal way to do it and it's through the court?
23   A.  The legal way is through the court, but we put
24 a request to make sure that we protect our asset.
25   Q.  So you put a request in to get an illegal

Page 72

1  lien, until you could get the legal lien?
2       MR. URQUHART:  Objection, argumentative,
3       assumes facts not in evidence.
4  BY MR. HESS
5    Q.  You can answer the question.
6    A.  We put a request that request could be
7  accepted or not accepted, okay, that's a request.
8  Because Nakheel is working with us and we do have a case
9  against Jaubert.  Until we go with the process of doing
10 that work, okay, which will eventually put a lien.  So
11 you understand what I'm saying is, we're trying to
12 protect your assets.
13   Q.  I understand what you're saying.
14   A.  You understand what I'm saying?
15   Q.  I do.
16   A.  But we do not, okay, can't do it any other
17 way.  The legal way is to go through the court and the
18 only people who can put a legal, is from the court.  Not
19 from us, we don't have a legal right.
20   Q.  Let me see if I understand.  You correct me if
21 I'm wrong about this, here's what you're saying; in
22 order to get a legal lien on Mr. Jaubert's property you
23 must go through the court system?
24   A.  You're correct.
25   Q.  While you were putting the papers together to

Page 73

1  get the legal lien through the court system, which you
2  know you would get, correct?
3    A.  Correct.
4    Q.  Because the court system is country of Dubai,
5  correct?
6    A.  That's for the court to decide.
7    Q.  I thought you said you knew you were going to
8  get it?
9    A.  If they grant it to us we would get it based
10 on the legal request we put in there.  So they would
11 evaluate the legal request.  If they see it's warranted,
12 then they would do it.
13   Q.  But while you were waiting to do that, you
14 decided that you would make a request for a non-legal
15 lien?
16   A.  I would say a request, to Nakheel to try and
17 put a hold on the property, of Jaubert.
18   Q.  And that's legal?
19   A.  I can't understand -- what do you mean that's
20 legal?  The only legal way is through the court.  That
21 was a request for us too, to hold the property.  I hope
22 you understand what I'm trying to --
23   Q.  -- I do understand.
24   A.  Fair enough.
25   Q.  Here's what I understand, that you couldn't

Page 74

1  get a legal lien right away, so you decided that request
2  an illegal lien?
3    A.  I wouldn't use the word illegal lien.
4    Q.  Well how about a non-legal lien?
5    A.  It's a request to put a lien.
6    Q.  Other than a court lien?
7    A.  Correct.
8    Q.  And you just said the only legal lien is a
9  court lien?
10   A.  Absolutely, that's correct.
11   Q.  Now when you request that, what shall we call
12 this, a non-legal lien?
13   A.  A request for a lien.
14   Q.  When you request a lien outside of the court
15 system, you do that confidentially, don't you?
16   A.  Yeah, you would request the people of the
17 person we're like to trying to, or anybody would who
18 like, to refer back to us because we do have some issues
19 with that person and we would like to deal with that.
20 So in on way, we're trying to protect out own assets.
21   Q.  Well since we used the term secretly, we all
22 know what it means now.  When you requested that there
23 be a lien placed on Mr. Jaubert's property, without
24 going through the court system, you requested that that
25 be secret, correct?

Page 75

1  A.   What do you mean secret?  It had to be -- when
2  you put a request, we're putting it -- we're documenting
3  that request.  You know, people would know about it,
4  definitely, we had to put the request and send it to the
5  person who is actually going to do that operation for
6  us.
7      Q.   Secret, here is the definition again, in the
8  New College Edition of the American Heritage Dictionary
9  of the English Language that your counsel provided.
10 Secret means concealed from general knowledge, right?
11 So other than the operative that you requested the lien
12 to be facilitated by, you requested that no one else
13 know, correct?
14     A.   Correct.
15     Q.   Is that the way the court system is also?
16     A.   I cannot comment on that, I'm sorry.
17     Q.   Well if you went through the court system to
18 get a lien --
19     MR. URQUHART: -- hold on, two questions ago,
20     vague, and ambiguous, and argumentative.
21     MR. HESS:  Well, I would argue that you waived
22     it and maybe you should stop with your telephone
23     and you can make a contemporaneous objection.
24     MR. URQUHART:  I'll do what I want to do,
25     you'll do what you want to do.

Page 76

1      MR. HESS:  I'm sure you will.  For the record
2  you're on your phone and you're making objections
3  two questions late.
4      MR. URQUHART:  Just go ahead.
5      MR. HESS:  Just what?
6      MR. URQUHART:  Just go ahead.
7      MR. HESS:  I was going to.  Thank you for
8  acknowledging my ability to do that.
9      MR. URQUHART:  It's your deposition.
10     MR. HESS:  It is, except for when you
11     interrupt it.  And I note that you interrupted it
12     when I was ready to ask another question that was
13     important.  Then you interject objections to
14     questions two earlier.
15 BY MR. HESS
16     Q.   So when you obtain a lien through the court
17 system, is it the same way, it's secret?
18     MR. URQUHART:  Can you read that question
19     back?
20     MR. HESS:  I'll state it.
21 BY MR. HESS
22     Q.   When you obtain a lien, through the court
23 system, is it secret?
24     A.   No.
25     Q.   And when you utilize this operative to get a

Page 77

1  lien on Mr. Jaubert's property, you also instructed that
2  person that no sale or transfer should be authorized
3  without the approval of the Internal Audit, right?
4      A.   Correct.
5      Q.   The Internal Audit has a lot of power in
6  Dubai, doesn't it?
7      MR. URQUHART:  In Dubai, you mean within Dubai
8      World?
9  BY MR. HESS
10     Q.   No.  I think I said Dubai.  Doesn't it?
11     A.   Internal Audit.  Which Internal Audit are you
12 talking about, because you are -- there's different
13 Internal Audit.  There's the Internal Audit, Dubai
14 World.  There's the Internal Audit which is part of the
15 government.
16     Q.   The Group Internal Audit?
17     A.   The group within Dubai, we do not have any
18 jurisdiction.  We only have it within our entities, you
19 know, that's why we're called internal.  We're not
20 external auditors, we're internal auditors.
21     Q.   That's how it's supposed to be, right?
22     A.   Internal, yes.
23     Q.   But yet you retain an operative to get a lien,
24 to request a lien, to be placed on Mr. Jaubert's
25 property secretly?

Page 78

1      MR. URQUHART:  Objection, assumes facts not in
2      evidence, and it's argumentative.
3      MR. HESS:  You can answer.
4      MR. URQUHART:  Read the question back.  Listen
5      to it carefully.
6      THE WITNESS:  Go ahead and read the question
7      back.
8      MR. HESS:  That's what she does.  She's way
9      better at it than I am.
10     (Whereupon the question was read by the
11     reporter as above recorded.)
12 BY MR. HESS
13     Q.   Right?
14     A.   Nakheel is one of Dubai World's entities,
15 which is where we do have -- it's part of Dubai World.
16 So Nakheel is not outside of Dubai World for the record
17 so I understand.  So we told Nakheel to put a lien on
18 the property, and Mr. Jaubert wanted to try to sell to
19 come back to us.  So we can make sure that we first get
20 our rights and then we would let go.  That's how it
21 works.
22     Q.   Nakheel didn't own Mr. Jaubert's property,
23 right?
24     A.   Correct.
25     Q.   And Nakheel has properties all over Dubai,

Page 79

1  correct?
2      A.  Correct.
3      Q.  So even though Group Internal Audit doesn't
4  have jurisdiction in Dubai, your testimony is you
5  believe they have the ability to make those type of
6  decisions in any property that's associated with
7  Nakheel?
8      MR. URQUHART:  Objection, ambiguous, overly
9  broad, incomplete hypothetical.
10 BY MR. HESS
11     Q.  You can answer.
12     A.  When we put a request, when we do have a case
13 against an individual who's working for Dubai World,
14 within Dubai World, to protect our own assets to make
15 sure that we can settle this issue that we have with the
16 individual, we do, if we see it's beneficial for Dubai
17 World, we put a request to make sure that that lien, you
18 know, is there, for us to be able to communicate with
19 the person and deal with the issue.  That's how it
20 works.
21     Q.  Do you remember when you requested that lien?
22     A.  I can't remember exactly but I remember
23 putting that lien.  Can I add to that?
24     Q.  Sure.
25     A.  From your point of view, how you know that --

Page 80

1  has that lien taken effect?
2      Q.  Again, I actually wish that you could ask me
3  questions and I could answer them to you, but it's just
4  not the way this works.
5      A.  Fair enough.  Accepted.  But for the record,
6  the lien never took place.
7      Q.  When you requested that confidential lien, was
8  there a judicial request for a lien pending?
9      A.  We were in the process but it wasn't at a
10 particular time.
11     Q.  Because Dubai World Corporation just didn't
12 have the resources to get a lawyer and file for the
13 lien?
14     MR. URQUHART:  Objection.
15 BY THE WITNESS
16     A.  I can't remember at that time.
17     Q.  Who is Chris O'Donnell?
18     A.  Chief executive of Nakeel.
19     MR. HESS:  Can we mark this one please.
20     (Defendants' Exhibit No. F was marked for
21 identification.)
22 BY MR. HESS
23     Q.  Your counsel just handed what's been marked as
24 Defendant's Exhibit F.  Would you take a look at that?
25     A.  Uh-huh.

Page 81

1      Q.  Is that an email that you sent to, Chris is it
2  McDonnell?
3      A.  Chris O'Donnell.
4      Q.  O'Donnell?
5      A.  Correct.
6      Q.  That's your email, correct?
7      A.  Correct.
8      Q.  Thank you.  Did you write that email?
9      A.  Correct.
10     Q.  Do you have any idea when Mr. Jaubert became
11 aware that there was this attempt to place a secret lien
12 on his property?
13     A.  I do not know.
14     Q.  Did you ever tell him?
15     A.  No.
16     Q.  Did you ever place a legal lien on his
17 property?
18     A.  I told you, we were in the process, but we
19 didn't put a lien because --
20     Q.  -- did you ever place a legal lien on his
21 property?
22     MR. URQUHART:  You interrupted him in the
23 middle of his sentence.
24 BY MR. HESS
25     Q.  Did you have something else to say?

Page 82

1      A.  No.
2      Q.  And because your counsel was speaking, I just
3  want make sure.  You've never, Dubai World, no entity
4  placed a --
5      A.  -- we were starting to place a lien as I told
6  you earlier --
7      Q.  -- if you could let me finish my question,
8  please.
9      A.  Go ahead.
10     Q.  There was never, ever, a legal lien placed on
11 Mr. Jaubert's property, correct?
12     A.  We were in the -- we put an internal lien on
13 the property as indicated.  We were in the process of
14 putting a legal lien on the property because of what we
15 have.  The property was actually sold, then there was no
16 need to go ahead and put a legal lien.
17     Q.  There was never a legal lien placed on Mr.
18 Jaubert property, correct?
19     A.  Correct.
20     Q.  Is that what you call this, an internal lien?
21     A.  It's an internal lien for us to try and settle
22 the issue.  But before we could put the legal lien,
23 okay, the property was sold.  Therefore there was no
24 need to go ahead and put a legal lien.
25     Q.  How much time transpired between your request

Page 83

1  to have an internal lien, a non-judicial lien placed on
2  Mr. Jaubert's property and the sale of Mr. Jaubert's
3  property?
4      A.  I cannot remember that.
5      Q.  Days?
6      A.  I can't remember.
7      Q.  Months?
8      A.  I can't remember.
9      Q.  Years?
10     A.  It cannot be years.  But it could be in
11 months, but I can't remember exact time.
12     Q.  How long does it take to put together, if you
13 know, a request for a legal lien, to file papers for a
14 legal lien?
15     A.  That's really depending on the law and the
16 courts, and looking at the papers.  So I cannot really
17 put a time on it.
18     Q.  You don't know?
19     A.  I don't know.
20        MR. HESS:  Mark that please.
21     (Defendants' Exhibit No. G was marked for
22    identification.)
23 BY MR. HESS
24     Q.  Can you take a look at what's marked as
25 Defendant's G.  That's your email, correct?

Page 84

1      A.  Correct.
2      Q.  You prepared that?
3      A.  Correct.
4      Q.  And who did you send that to?
5      A.  At that time Brenda Thomas.
6      Q.  And who is that?
7      A.  She was the HR Director.
8      Q.  Did you obtain Mr. Jaubert's file and copies
9  of any relevant documents?
10     A.  Correct.
11     Q.  Do you recall what you obtained?
12     A.  Sorry?
13     Q.  Do you recall what you obtained?
14     A.  It was obtained by the team that's actually
15 working on that -- I gave the instruction and they
16 obtained the file.
17     (Defendants' Exhibit No. H was marked for
18    identification.)
19 BY MR. HESS
20     Q.  I'm going to show you what's been marked as
21 Defendant's Exhibit H.  Would you take a look at that
22 please?  You wrote that email?
23     A.  Correct.
24     Q.  That email states that you're conducting an
25 investigation at Exomos, and to please grant -- who is

Page 85

1  that?
2      A.  That is a person that work in IT.
3      Q.  And what are you requesting in that email?
4      A.  We are requesting, trying to take, legally the
5  emails that Mr. Jaubert had done.
6      Q.  So this is going through a court also?
7      A.  No this is for us.  We do because any email
8  that is actually -- is our own property.  The use of
9  email within Dubai World and all emails is considered
10 company property.  That's why I'm using the word
11 legally.  So we requested that because we have the right
12 to request that information, not only of Jaubert, of any
13 other person.
14     Q.  Of anyone that works --
15     A.  -- of anyone.  If there is a need to do any
16 kind of an investigation.
17     Q.  Where is that legality derived?
18     A.  That is actually documented and we have a
19 policy to support that.
20     Q.  I'm just curious, why did you say -- because I
21 don't see the word legally in there, but you interjected
22 it.  Why did you say legally?
23     A.  Just to make sure, it was done within our
24 policy.  It was not something outside.
25     Q.  So it wasn't like the lien with the courts, it

Page 86

1  was different.  Is that what you're trying to say?
2      A.  It's just a request.  If you object to that
3  word, legally, you can take it out.
4      Q.  I don't object to it.  I'm just wondering why
5  you said it.  And did you get access to the email
6  accounts of Mr. Jaubert and his executive assistant?
7      A.  Correct.
8      Q.  You did?
9      A.  Correct.
10     Q.  And you got access to them -- this was
11 important, right, this investigation?
12        MR. URQUHART:  Objection, vague and ambiguous.
13 BY MR. HESS
14     Q.  Right?  I mean did you understand my question?
15 I mean are there investigations that are prioritized.
16     A.  Every investigation has its own priority.
17     Q.  How long did it take to get access to the
18 email accounts?
19     A.  I cannot remember the exact time to be very
20 honest.  Because, you know, we do put up the request to
21 our IT people.  Then our IT people will prepare that
22 document and they will send it to us.
23     Q.  It wasn't months?
24     A.  No it wasn't months.
25     Q.  It was days or weeks, correct?

1    A.  It could be a maximum of a week or so, yeah,
2  but because that's an internal request.
3    Q.  And so you wrote that email that's marked as
4  H, correct?
5    A.  Correct.
6    Q.  You sent it on April 30 of 2007?
7    A.  Correct.
8    Q.  So you or your team received all of Mr.
9  Jaubert's and his executive assistant's email accounts,
10  and their records, and their contents, correct?
11    A.  Correct.
12    Q.  Within a week?
13    A.  I don't remember exactly but it could be
14  within a week, yes.
15    Q.  Well I thought you said it was no more than a
16  week?
17    A.  Yeah, I mean -- I mean most of the cases that
18  I recall -- but I don't recall exactly within a week or
19  ten days, but within that time frame.
20    Q.  Okay.  Okay.  Now do you recall anything
21  unusual about his emails?
22    A.  We pass that to our department and they do the
23  analysis into it.
24    Q.  Who does the analysis?
25    A.  Our FPD department.

1  preparation, you don't remember anything particular
2  about the emails in Mr. Jaubert's accounts?
3    A.  I can't remember that.
4    MR. HESS:  Defendant's Exhibit I?
5    (Defendants' Exhibit No. I was marked for
6  identification.)
7  BY MR. HESS
8    Q.  Now the Group Internal Audit had a problem
9  with Mr. Jaubert being -- withdraw that.  One of the
10  findings in one of the audits was that it was
11  inappropriate for Mr. Jaubert to be reimbursed for the
12  expense of his vehicles being shipped to Dubai, correct?
13    A.  Correct.
14    Q.  Who is Sanil Mohd Subair, do you know that
15  name?
16    A.  I don't remember that name.
17    Q.  And you -- was the finding based upon the --
18  well what was wrong with him being reimbursed for the
19  transportation of his vehicles to Dubai?
20    A.  That's his personal expenses.  It should be
21  not part of the company expenses.
22    Q.  And that's never done for the company?
23    A.  If there was an agreement to that, but there
24  were no agreements to that.
25    Q.  Showing you what's been marked as Exhibit I.

1    Q.  The what department?
2    A.  Fraud and prevention department.
3    Q.  Was that part of your team.
4    A.  Group Internal Audit.  We have, you know,
5  audits, when we do audits.  And then we do have another
6  group which is called fraud prevention department and
7  that is where, if any kind of an email request, it would
8  be for that department because we have a separation
9  between audit and fraud.
10    Q.  Both of those departments, however, you
11  oversee, correct?
12    A.  Correct.
13    Q.  Are you aware of anything unusual that was
14  contained in those emails?
15    MR. URQUHART:  Objection, vague and ambiguous.
16  BY THE WITNESS
17    A.  What we really have recovered through our
18  audit findings, that's what I would say.
19    Q.  Whatever is in your audit, that's --
20    A.  -- whatever is in our audit report actually
21  indicates -- comes out of the evidence that we collect.
22    Q.  And you would agree that in your audit reports
23  you exclude any remarkable findings, correct?
24    A.  Correct.
25    Q.  And off the top of your head here with your

1  Just take a look at that.  Have you looked at that
2  document?
3    A.  I'm looking at it right now.
4    Q.  Okay.  I thought you looked at me and you were
5  ready to talk.  It's also marked as DW80.
6    A.  Fair enough.  Go ahead.
7    Q.  Do you know -- I'm probably mispronouncing his
8  name but Sanil Subair, do you know that person?
9    A.  No.  I don't really know that person.
10    Q.  What's indicated on Exhibit I as his title?
11    A.  Project manager.
12    Q.  Okay.  What's the date of that document?
13    A.  2004, if I'm not mistaken, thirtieth of
14  October.
15    Q.  Okay.  And the request is signed by the
16  project manager, correct?
17    A.  Correct.
18    Q.  And also by who?
19    A.  By Sultan, from the document I have.
20    Q.  And that's Sultan Bin Sulayem, correct?
21    A.  Correct.
22    Q.  He signed it?
23    A.  Correct, according to this.
24    Q.  And the amount that's indicated on that
25  Exhibit I?

1    A.  $13,875 US dollars.

2    Q.  And what is the name of that document -- have

3  you seen these -- well, let me withdraw that.  Have you

4  seen these kind of documents before?

5    A.  It's a request for payment.

6    Q.  Okay.  Now there came a time in April of 2008

7  that you -- do you have any knowledge if Mr. Jaubert was

8  conducting a business out of his home in Dubai?

9    A.  I don't have knowledge of that, no.

10   Q.  Among the findings that your Internal Audit

11  Group made -- included that Exomos had an excellent

12  facility built work by standards, correct?

13   A.  That's correct.

14   Q.  It was Mr. Jaubert that was the chief

15  executive officer when those facilities were being

16  constructed, correct?

17   A.  Correct.

18   Q.  You also -- the Group Internal Audit also

19  found that there was a created value of intellectual

20  property in Exomos and the submarines and the various

21  other vessels that were being developed there under the

22  head of Mr. Jaubert, correct.

23      MR. URQUHART:  Could you read that back,

24   please?

25      MR. HESS:  I'll just save some time and I'll

1  withdraw it and rephrase it.

2  BY MR. HESS

3    Q.  One of the other findings that were made by

4  the Group Internal Audit was that there was a

5  substantial value attached to the intellectual property

6  that Mr. Jaubert brought to Exomos, correct?

7    A.  I can't recall, you know, that to be very

8  honest.  I can't remember that.

9      VIDEOGRAPHER:  We're off the record at 12:45.

10   This is the end of tape one.

11      (Thereupon, after a lunch recess, the

12   proceedings continued as follows:)

13      VIDEOGRAPHER:  We're back on the record at

14   1:41.  This is the start of tape two.

15  BY MR. HESS

16   Q.  Ready to proceed?

17   A.  Go ahead.

18   Q.  Thank you.  The communications between, you

19  and Sultan, Butti, Kazim, as here is it the same in

20  Dubai, email communication?

21      MR. URQUHART:  You mean is that the only way

22   he communicates?

23  BY MR. HESS

24   Q.  It is typical that you communicate by email?

25   A.  Sometime with email.  Sometimes we talk on the

1  phone.  A lot of the time we talk on the phone.

2    Q.  Do you have any idea how many times you

3  communicate with Sultan about Mr. Jaubert by email?

4    A.  I can't remember, honestly.

5    Q.  More than once?

6    A.  Possibly.  I can't remember.

7    Q.  More than ten, do you know?

8    A.  I can't remember.

9    Q.  So your testimony is you don't remember, could

10  be one, would be ten, could be a hundred?

11   A.  Not hundred, but I can't remember exactly what

12  would be the number of times I communicated with Sultan

13  about Jaubert.

14   Q.  Or Exomos?

15   A.  Or Exomos for that matter, yes.

16   Q.  So it's less than a hundred, certainly, right?

17   A.  Possibly, yes.

18   Q.  Well I thought you said, yes, certainly it's

19  less?

20   A.  It's less than a hundred.

21   Q.  Is it less than fifty?

22   A.  I can't remember.

23   Q.  So it could be fifty?

24   A.  It could be.  I can't remember.

25   Q.  Somewhere between one and fifty?

1    A.  Could be.  I can't remember the number.

2    Q.  Would that be the same with Mr. Kazim

3  regarding Exomos, or Mr. Jaubert?

4    A.  I can't remember exactly.

5    Q.  Would your testimony be the same, somewhere

6  between one and fifty?

7    A.  Possibly.

8    Q.  Would it be more than fifty?

9    A.  I do not think so.

10   Q.  And Mr. Butti same, email-wise, your

11  communications with him about Mr. Jaubert or about

12  Exomos?

13   A.  Probably the same, less than fifty.

14   Q.  Somewhere between one and fifty?

15   A.  Yes.

16   Q.  And Mr. O'Donnell?

17   A.  Same thing possibly.

18   Q.  And Ms. Sharaf (phonetic)?

19   A.  Who?

20   Q.  Miriam Sharaf.  Do you know Miriam Sharaf?

21   A.  It's a possibility, yes, same thing.

22   Q.  One to fifty?

23   A.  It's possible, yes.

24   Q.  Now there was a physical audit that was

25  conducted, at least one physical audit, conducted on

1    Exomos properties?

2    A.  Possibly, yes, that's part of our work what we

3  do.  We do sometimes a physical audit.

4    Q.  Do you know if there was a physical audit ever

5  accomplished regarding Exomos.

6    A.  There was a physical audit accomplished.

7    Q.  And who did that.

8    A.  It would be my team.

9    Q.  Do you know who did it, who was the lead

10 auditor?

11    A.  Members of my team.

12    Q.  Okay.  And these are people that have a

13 specialty in submarine components?

14    A.  Can you -- what do you mean they are

15 specialized in submarines.

16    Q.  They have specialty, they're experts in the

17 components of submarines?

18    A.  They're not experts in submarine components.

19    Q.  They're not?

20    A.  They're not expert in submarines.  I mean they

21 are auditors.  They're not experts in submarine

22 components.

23    Q.  Okay.  And I'm sorry, I don't mean to -- I

24 want to make sure I understood you.  They're not experts

25 in submarine components, that was your testimony?

1    A.  They are not experts in submarine components.

2    Q.  Thank you.  Are you aware, was there a

3  criminal prosecution of Mr. Jaubert in Dubai?

4    A.  There's a case, criminal prosecution, about

5  Jaubert.

6    Q.  Is that still going on?

7    A.  I understand that a verdict has been issued in

8  that case.

9    Q.  And that was issued when -- in the absence of

10 Mr. Jaubert, correct?

11    A.  Correct.

12    Q.  And what was your involvement in the criminal

13 case?

14    A.  Personally, I was not involved in the criminal

15 case.

16    Q.  You presented no testimony?

17    A.  I personally was not testified in the court in

18 his case.

19    Q.  Was your team, someone from your team

20 testifying?

21    A.  Correct, some of my team were there testifying

22 in this case.

23    Q.  And what did they testify about?

24    A.  It's really about the audit, our findings and

25 our, really claim.

1    Q.  So your audits were presented to the Court?

2    A.  Correct.

3    Q.  You testified early that it was your

4  understanding that Mr. Jaubert had been told by Exomos

5  not to include handling charges any longer, correct?

6    A.  Can you try and say that again?

7    Q.  Didn't you say that there came a time that Mr.

8  Jaubert was instructed that handling charges were not

9  appropriate?

10    A.  We have told him that you should not add the

11 ten percent charge on the expenses that come from

12 Seahorse to us because we did not do not have any

13 agreement in that.  And we told him to stop dealing with

14 his previous company, or his company.

15    Q.  And you told him to do that, those

16 recommendations and instructions were made back in 2005?

17    A.  Correct.

18    Q.  In fact, isn't it true that your

19 recommendations were that the handling charges had to be

20 on a separate line in the purchase order?

21    A.  I can't remember that.

22    Q.  Could you mark this as whatever that next

23 exhibit is, please?

24    (Defendants' Exhibit No. J was marked for

25 identification.)

1  BY MR. HESS

2    Q.  If you can take a look at that, and you'll

3  have to pardon me, I took the copy that was attached to

4  one of the experts that was retained by your counsel.

5  So there are going to be some notations in there that

6  you probably won't recognize, because you probably

7  haven't seen them.  But can you take a look at that

8  document.  Is that the -- did your group prepare that,

9  this Group Internal Audit?

10    A.  Correct.

11    Q.  Now, if you could turn to page 6?

12    A.  Yeah.

13    Q.  On 4.3 of the definitions and references, your

14 group -- well we'll have you've reviewed this before, this audit

15 report, correct?

16    A.  It was reviewed.  At that time it was

17 reviewed.

18    Q.  Exactly and in fact it was your responsibility

19 to ensure that it was accurate, complete, correct?

20    A.  I stand behind our audit report.

21    Q.  A hundred percent?

22    A.  Hundred percent.

23    Q.  And you make no exception to that, correct?

24    A.  I make no exception to that.

25    Q.  Now under 4.3 of that page 6, conflict of

1  interest, you've read that definition because it's
2  included in your report, correct?
3      A.  As I stated earlier, I do not read every
4  single item in every report, but what I do, I would
5  agree to what's in the report.
6      Q.  Well do you want to take a moment and read 4.3
7  for me, please.  Have you read that?
8      A.  I read, yes.
9      Q.  Before we get to that, though, I want to ask
10  you something else.
11      A.  Uh-huh.
12      Q.  On page 11 of the report, at the top of the
13  page under subsection E.
14      A.  Page 11?
15      Q.  Page 11, yes.
16      A.  Uh-huh.
17      Q.  Top of the page?
18      MR. URQUHART:  Under 66.3?
19      MR. HESS:  I have page 11.
20      MR. URQUHART:  So it starts on page 10.
21      MR. HESS:  Well page 11 starts on page 11 but,
22      the subject may start on page 10.
23      MR. URQUHART:  Duly corrected.
24  BY MR. HESS
25      Q.  And I have no problem, you reading as much as

305-358-9047   www.mydepos.com
Taylor, Jonovic, White, Gendron & Kircher-Echarte
www.myreporters.com  Florida Realtime Reporting   Fax 305-371-3460

1      A.  It's added to the price.
2      Q.  Oh, you think it means added?
3      A.  Embedded into the price, to the best of my
4  understanding, it's embedded into the price.
5      Q.  Not separated.  Correct?
6      A.  (No response)?
7      Q.  Right?
8      A.  Let me try to put this for you understand how
9  it was --
10      Q.  -- well, first I would like an answer to my
11  question.  It's not --
12      MR. URQUHART:  No, no, no, no.  Let him finish
13  and then you can follow up with whatever question
14  you want.  You can't interrupt him.
15      MR. HESS:  It's not responsive.
16      MR. URQUHART:  Yeah, but you can't stop him.
17  You're not supposed to.
18      MR. HESS:  It's not responsive to my question.
19  I'd like an answer to my question.
20      MR. URQUHART:  No, I understand that --
21      MR. HESS:  -- let him -- I've got no
22  problem --
23      MR. URQUHART:  -- to have every right to get
24  an answer to your question, but you have no right
25  to --

305-358-9047   www.mydepos.com
Taylor, Jonovic, White, Gendron & Kircher-Echarte
www.myreporters.com  Florida Realtime Reporting   Fax 305-371-3460

1  you want, the whole report if you'd like, but I just
2  want to draw your attention -- I'm going to be asking
3  you about subsection E at the top of page 11, but you
4  tell me when you're ready.
5      A.  Go ahead.
6      Q.  You said that you stand by that report a
7  hundred percent.  Do you want to change that testimony
8  at all after reading that?
9      A.  Correct.
10      Q.  You still stand by it a hundred percent?
11      A.  Yeah.
12      Q.  Okay, because this introduces a new word.  In
13  addition to the language that we talked about at the
14  beginning of the deposition that's found in the
15  complaint filed by Dubai World Corporation against Mr.
16  Jaubert on paragraph thirty, the allegation that
17  defendants, Jaubert and Seahorse secretly added an
18  undisclosed markup of ten percent on all purchased
19  materials, these markups were not listed as a separate
20  line item, they were concealed.  We've got a new word.
21  In subsection E on page 11 states that the charges prior
22  to August of 2005, were embedded in the purchase price.
23  Do you know what embedded means?
24      A.  Yes.
25      Q.  What do you think it means?

305-358-9047   www.mydepos.com
Taylor, Jonovic, White, Gendron & Kircher-Echarte
www.myreporters.com  Florida Realtime Reporting   Fax 305-371-3460

1      MR. HESS:  -- I'm not going to argue with you.
2  I'm not going to argue with you.
3  BY MR. HESS
4      Q.  Go ahead, take as much time as you want.  If
5  you want to answer it that way, go.
6      A.  If you want take to look at this chart, you
7  look into it, you're looking at section E.  If you look
8  into the case is a conflict -- we're talking about a
9  conflict of interest.
10      Q.  No, I'm not talking about a conflict of
11  interest anymore, just so you know.
12      A.  This part that you're referring to, this is
13  our report.
14      Q.  Uh-huh.
15      A.  We have generated this report.
16      Q.  Okay.
17      A.  Therefore, you know, we interrupted the way it
18  is.  These are items.  Item E is part of the conflict of
19  interest, okay.  So reading part E by itself is not
20  really inclusive.  You've got to look at conflict of
21  interest from A all the way to G to understand the
22  whole, all of the situation.
23      Q.  That was your answer?
24      A.  That's my answer, yeah.
25      Q.  Okay.  My question, however, is this, that you

305-358-9047   www.mydepos.com
Taylor, Jonovic, White, Gendron & Kircher-Echarte
www.myreporters.com  Florida Realtime Reporting   Fax 305-371-3460

**Dubai vs. Jaubert    July 1, 2010**

Page 103

1 testified earlier that -- withdraw that. The language
2 in paragraph E, is it your testimony that is accurate?
3    A. I said everything in this report is accurate.
4    Q. Okay. And then we used the words, I think we
5 left off when I was questioning you about the word
6 embedded and I was asking, do you know what embedded
7 means?
8    A. Inserted.
9    Q. What do you mean by inserted in the purchase
10 price?
11    A. You asked me what embedded is. I told you
12 inserted. Another word for embedded.
13    Q. Does it -- so it's -- so the meaning that was
14 intended by the charges were embedded in the purchase
15 price, means it's inserted in the purchase price?
16    A. Yes, embedded, inserted, the best, next
17 explanation I can find for the word embedded.
18    Q. Now I'm going to show you again the material
19 requisition forms that have been marked B, C, D, E.
20 Could you take a look at those again? And could you
21 remind me the dates of those -- except for one, I
22 realize there's not a date apparent.
23    A. Seven, November 2005, exhibit Number B; C is
24 the one we can't find the date; D is 15th October 2005,
25 E is 7, November 2005.

Page 105

1    MR. URQUHART: Answer the question anyway you
2 want.
3    MR. HESS: Go ahead, answer.
4 BY THE WITNESS
5    A. Okay. What I've said, in this in here I said,
6 to read this you've got to read the whole thing. If you
7 read it says Exomos purchasing controller, okay --
8    Q. -- I'm listening.
9    A. That's the person who was working there, okay,
10 asked Herve because there were -- there were these
11 charged were added, and I think the best thing is, when
12 you're looking at this is to go and speak -- to have a
13 better understanding, to speak to the purchasing
14 controller, to why this thing happened in the first
15 instance. Then we would come to understand a better
16 understanding why it is there.
17    So before it was not there. The person wanted
18 to try and say on what basis you're paying this. So
19 that person said, put it there so it actually can be
20 seen. But I'll go back to my point, there were no
21 agreement between Seahorse and Dubai World to accept
22 such a charge. And that is the meaning of this in here.
23    Q. Are these -- the items that have been marked
24 as Exhibits B, C, D, and E, is it your testimony today
25 that these service and handling charges, which appear as

Taylor, Jonovic, White, Gendron & Kircher-Echarte   305-358-9047
www.mydepos.com   Florida Realtime Reporting   Fax 305-371-3460
Taylor, Jonovic, White, Gendron & Kircher-Echarte   305-358-9047
www.myreporters.com   Florida Realtime Reporting   Fax 305-371-3460

**Dubai vs. Jaubert    July 1, 2010**

Page 104

1    Q. Okay. Are those handling charges embedded in
2 the purchase price?
3    A. They are inserted, embedded into the purchase
4 price.
5    Q. So they are embedded?
6    A. Correct.
7    Q. So they still violate the instructions that
8 are portrayed in subsection E?
9    A. Can you please explain that to me better?
10 What do you mean.
11    Q. Well let's read subsection E. What does that
12 say? Why don't you read that out loud, please.
13    A. In August of 2005, Exomos purchasing
14 controller asked Herve to show handling charges by SSI
15 as a separate line item in the purchase order. Prior to
16 August 2005 said charges were embedded in the purchase
17 prices.
18    Q. Okay. Are these still embedded or are they on
19 a separate line item?
20    A. Let me try to explain what this thing really
21 means.
22    Q. First please answer my question. Are these
23 embedded or are these on the separate line item?
24    A. He told me to read this and I'm trying to read
25 and explain that.

Page 106

1 separate line items -- they do, correct, they appear as
2 separate line items, don't they?
3    A. You're correct.
4    Q. Are they embedded in the purchase price?
5    A. They are embedded in the purchase price.
6    Q. According to the statement in subsection E in
7 your audit report, I don't see any language in there
8 whatsoever about this concept that you continually bring
9 up in answer to my question about the separate line
10 items of the service charges, I don't see anything in
11 there where it says in August 2005 Exomos purchasing
12 controller told Mr. Jaubert that there was no
13 contractual ability to charge a ten percent surcharge,
14 or handling charge, or service charge. That's not in
15 there, is it?
16    MR. HESS: I'm sorry, sometimes I'm really,
17 really funny and I don't even know. But could you
18 explain my joke on that one?
19    MR. URQUHART: Well, you'll say I'm coaching
20 the witness.
21    MR. HESS: Or did you just choke?
22    MR. URQUHART: No, I was laughing.
23    MR. HESS: Well why don't you share with us.
24    MR. URQUHART: All right, if you take a look
25 at the page before, it says precisely that. That's

Taylor, Jonovic, White, Gendron & Kircher-Echarte   305-358-9047
www.mydepos.com   Florida Realtime Reporting   Fax 305-371-3460
Taylor, Jonovic, White, Gendron & Kircher-Echarte   305-358-9047
www.myreporters.com   Florida Realtime Reporting   Fax 305-371-3460

why I was laughing.

MR. HESS: Did I say the page before, or did I say item E?

MR. URQUHART: Well take a look at item C.

MR. HESS: I'm happy and we'll go through that. You know, as you know, or maybe you don't know, you're going to have the ability to take -- ask questions of the deponent. So, you know, I just -- it's funny. I agree, it's hilarious. It's pretty funny to me to, but I'm trying to maintain myself and not laugh so much during my own deposition.

MR. URQUHART: I apologize.

MR. HESS: And I'll do the same for you because it's just disruptive.

MR. URQUHART: I understand and I apologize.

MR. HESS: If I laughed every time I thought something was funny that you did during a deposition, I'd be choking.

MR. URQUHART: I apologize. I'm sorry, I shouldn't have snickered.

BY MR. HESS

Q. So let me try this again in item I, it doesn't say that the Exomos purchasing controller told Mr. Jaubert that he can't charge ten percent service or

Taylor, Jonovic, White, Gendron & Kircher-Echarte     305-358-9047
www.mydepos.com  Florida Realtime Reporting  Fax 305-371-3460
www.myreporters.com

handling charges. It doesn't say that, does it?

A. Your correct. It doesn't say that, but let me try to say this again. Looking at this part E, you cannot look at it by itself. It's part of the whole story and I would recommend that you would speak -- why would the controller tell a chief executive to add a line in there. You can ask that question to the purchase controller.

The idea is, when a person is entrusted he can't go ahead and sell things to his own company, pay the whole advances, in term of purchasing, you pay the whole advances to your company, and some of the items were not actually received, and not only that, add on every single purchase surcharge where there was no agreement to do that. That's the point.

Q. Okay. My question is, is why is it that there's no discussion in your report about back in 2005 when at least one person at Exomos, other than Mr. Jaubert, knew about the ten percent charges, meaning the Exomos purchasing controller? Why doesn't the audit discuss why it is that the purchasing controller didn't tell Mr. Jaubert that those ten percent charges were not authorized?

A. Let me go back to what we do in audit. We don't go and discuss the business of the business people

Taylor, Jonovic, White, Gendron & Kircher-Echarte     305-358-9047
www.mydepos.com  Florida Realtime Reporting  Fax 305-371-3460
www.myreporters.com

doing there. We go and look at the processes, look at the procedure, look if there is anything. Outside that we do report it. What we have discovered during our audit is that Mr. Jaubert, having his own company, he made a lump sum, a large sum of more than $11-million, to his business, to his own company. By doing that, first of all, his own company, he made sure that a lot of advances were paid and some of the goods were not there. And that we also have evidence that there was this, what you call a ten percent, is the incremental that he's embedding into this purchasing because, it does not have any type of agreement. So I would say, looking at item E, not looking at it by itself, you look into the whole of that section, to understand the whole situation.

Q. Let me get to this, let's hope we can all hold on to our laughter for a moment. Let's look at subsection C that's on the preceding page 10. There's nothing in subsection C that says back in 2005 the Exomos purchasing controller instructed Mr. Jaubert that handling charges were not authorized, is there? It doesn't say that there, does it?

A. Can you please -- you're referring me to section C here?

Q. It doesn't say that, does it?

Taylor, Jonovic, White, Gendron & Kircher-Echarte     305-358-9047
www.mydepos.com  Florida Realtime Reporting  Fax 305-371-3460
www.myreporters.com

A. Okay. Can I read this.

Q. Go ahead. I want you to take your time.

A. Okay, Herve alleged --

Q. -- no, I'm asking you a question. There's nothing in subsection C that says that the Exomos purchasing controller instructed Mr. Jaubert that the ten percent charges were not authorized?

A. I'm not talking about section E or F. I'm talking about section C.

Q. I'm asking you.

A. Yes.

Q. There's nothing in subsection C that says the Exomos purchasing controller, back in August 2005, instructed Mr. Jaubert that ten percent service, or handling charges were not authorized?

A. Can I read section C?

Q. No. I'm asking -- yes, you can read it to yourself, but I'm asking you a question?

A. -- because --

Q. -- objection, not responsive.

MR. URQUHART: You know, you're just interrupting him all time. Say whatever you want. He has no right --

MR. HESS: -- objection, not responsive.

MR. URQUHART: That's okay. Move to strike.

Taylor, Jonovic, White, Gendron & Kircher-Echarte     305-358-9047
www.mydepos.com  Florida Realtime Reporting  Fax 305-371-3460
www.myreporters.com

Page 113

1    Exomos discontinued purchases with SSI.  We have told
2    him not to continue from November 200 -- onward,
3    however, we found six transactions in the amount of
4    $387,000.  This is after we have told him not to deal
5    with SSI -- he continued to do that a company which
6    belongs to him.
7        Q.  Okay, you done?
8        A.  Thank you.
9        Q.  Item E states that the Exomos purchasing
10   controller -- who was the controller, do you know?
11       A.  I cannot -- I do not remember that person.
12       Q.  Okay, I was going to make it easier with a
13   name.
14       A.  No, I don't remember.
15       Q.  But the Exomos purchasing controller asked Mr.
16   Jaubert to include the handling charges as a separate
17   line item.  You agree that's what it says, right?
18       A.  Exactly.
19       Q.  What was the monies that -- if you turn to
20   page.
21       A.  Page 17, okay.
22       Q.  Why don't you take a look at the
23   recommendations on 7.  Not page 7, but item 7, on the
24   top of that it says --
25       A.  -- handling and service charges.  Item 7 is

---

Dubai vs. Jaubert                    July 1, 2010

Page 112

1    between Exomos and SSI, to charge ten percent for
2    handling, service charge, for ordered material placed
3    through SSI.  Ex-chief operating officer, Jim Miller,
4    contested existence of such agreement.  According to
5    various testimonies of Exomos staff, there was
6    deliberate effort to route purchases to through SSI.  So
7    this is the case in here.
8        Q.  So let me ask the question -- are you done?
9        A.  Yes.
10       Q.  There's nothing in subsection C, or anywhere
11   for that matter, in your report, that says or indicates
12   that back in 2005 or 2006, or any time, Mr. Jaubert was
13   instructed that -- let me limit this to you.
14       A.  Fine.
15       Q.  Because that will make it easier for you.
16       A.  Right.
17       Q.  There is also nothing in your report --
18       A.  -- yes.
19       Q.  -- that says that back in 2005, Mr. Jaubert
20   was told that ten percent service and handling charges
21   were not authorized?
22       A.  In the report indicates that Mr. Herve, not to
23   buy stuff from his own company and if you look into this
24   particular part, you would go back and refer to items G
25   in the report where it says, Herve informed auditor that

---

Page 111

BY MR. HESS
1        Q.  I'll ask it again.  There's nothing in
2    subsection C --
3        MR. URQUHART:  -- no.  Let him finish, stop
4    interrupting him.
5    BY MR. HESS
6        Q.  There's nothing in subsection C that says that
7    the Exomos purchasing controller instructed Mr. Jaubert
8    that the handing and service charges were not
9    authorized?
10       A.  Can I answer that now?
11       Q.  That's yes or no.
12       MR. URQUHART:  Answer it any way you wish.
13   BY THE WITNESS
14       A.  I would like to answer that question.
15       Q.  It's a yes or no answer.
16       MR. URQUHART:  Don't listen to him.
17   BY THE WITNESS
18       A.  I don't see it yes or no.  What I can see is
19   that Herve --
20       Q.  -- who's Herve?
21       A.  Herve.
22       Q.  Mr. Jaubert.
23       A.  Mr. Jaubert, my apologies.  According to this
24   it says Mr. Jaubert alleged existing verbal agreement

---

Dubai vs. Jaubert                    July 1, 2010

Page 114

1    handling and service charges.  Am I correct?
2        Q.  No.  I'm sorry.  What it says is
3    recommendations, and it's item 7 on the top of the page?
4        MR. URQUHART:  Which page?
5        MR. HESS:  Page 17.
6    BY MR. HESS
7        Q.  Isn't the subheading, 7, recommendations?
8        A.  Correct, yes.
9        Q.  That's what I was saying.  I was confusing.
10       A.  Because you put number 7 and there's an item
11   7.
12       Q.  Then there's page 17 and that's why I was
13   trying to just simplify it for you.
14       A.  Fair enough.
15       Q.  So it's page 17, let's look at the top of that
16   page, paragraph number I or -- is that 1?
17       A.  That's number 1.
18       Q.  At the time of this report, you recommended
19   terminating Mr. Jaubert, correct?
20       A.  I have to look at the end of the report and --
21       Q.  -- well it says right there in paragraph 1?
22       A.  Correct.
23       Q.  Right.
24       A.  (Witness nodding head.)
25       Q.  Do you know date of the report?

305-358-9047
www.mydepos.com    Taylor, Jonovic, White, Gendron & Kircher-Echarte
www.myreporters.com Florida Realtime Reporting    Fax 305-371-3460

Dubai vs. Jaubert     July 1, 2010

Page 115

1  A. I can't. I have to look at the date of the
2  report. It says, I think it was in 2006, the exact date
3  I can find out for you if you want.
4  Q. It doesn't have the date in the report?
5  A. It was in it 2006. I'm not so sure but I can
6  find out the exact dates of the report for you.
7  Q. And does the case number on the front page,
8  does that mean anything?
9  A. It's a reference number that we have, you
10 know. But we have so many reports, I do not remember
11 the exactly the time.
12 Q. So that doesn't give you any indication of the
13 date, just 2006, correct?
14 A. It's in 2006. The best thing is that possibly
15 in maybe it isn't -- that 8 is maybe August. But I
16 can't, I can't --
17 Q. -- you know it's a 2006 report?
18 A. But I can definitely if you want, I'll be more
19 than happy to make a phone call and find out, and I can
20 give you that recommendation -- that time if you want.
21 Q. When was Mr. Jaubert terminated?
22 A. Exact date, I can't remember.
23 Q. What year?
24 A. At the time that we have filed the case, two
25 years later. I can't -- we can find out exactly from

Dubai vs. Jaubert     July 1, 2010

Page 116

1  the record and give it to you.
2  Q. You don't know?
3  A. I can't remember honestly.
4  Q. He wasn't terminated in 2006, correct?
5  A. You're correct, I think in that.
6  Q. Wasn't terminated in 2007, was he?
7  A. I don't recall that. I don't want to give you
8  a time that I don't remember. Simple as that, but if I
9  would remember the time and the date, I'd be more than
10 happy to give it you to.
11 Q. No, I don't want you to testify to anything
12 that isn't the truth.
13 A. Yeah, because --
14 Q. -- if that's not the truth and we have a deal
15 that you're telling the truth, correct?
16 A. Absolutely.
17 Q. Why is it that after you recommend, your audit
18 group recommends the termination of his employment, Mr.
19 Jaubert was actually given the leadership of another
20 corporate entity, also?
21     MR. URQUHART: Objection, assumes facts not in
22  evidence.
23 BY MR. HESS
24 Q. Do you know?
25 A. You have to ask the right people for this one.

Dubai vs. Jaubert     July 1, 2010

Page 117

1  I'm not -- our job is to do the recommendation to the
2  management. The management has the right to accept or
3  reject our recommendation.
4  Q. Do you know whether Mr. Jaubert was actually
5  given additional duties and responsibilities following
6  your recommendations that he be terminated?
7  A. I'm not aware of that.
8  Q. Does that mean that it didn't happen, or you
9  don't know?
10 A. I don't know.
11 Q. Are you aware of Mr. Jaubert being -- his
12 duties being expanded to Palm Marine in 2007?
13 A. I'm not aware of that.
14 Q. You haven't done an audit of Paul Marine --
15 you didn't do an audit of Palm Marine in 2007, did you?
16 A. I can't remember that to be very honest. You
17 know, we do multiple audits every year and you've asked
18 about 2007. But what I can tell you is I can go back,
19 check our records and find out if we have done an audit
20 about Palm Marine.
21 Q. Now if you had done an audit of Palm Marine
22 involving Mr. Jaubert, you'd remember that though,
23 correct?
24 A. I said I do not remember if we have done an
25 audit about Palm Marine. So if I do not remember, I

Dubai vs. Jaubert     July 1, 2010

Page 118

1  cannot say anything more than that.
2  Q. So your testimony is that you wouldn't even
3  remember an audit of Palm Marine in 2007, if Mr. Jaubert
4  was running the corporation?
5  A. Let me try to put my answer to you. If I
6  would remember, I would tell you. We do a lot of audits
7  but if you would like, I can go back, verify and check
8  to see if we have done an audit of Palm Marine in 2007.
9  I would be more than glad to answer, because I just
10 don't remember.
11 Q. So your recollection today is you have no
12 recollection of an audit conducted regarding Mr.
13 Jaubert's running of Palm Marine in 2007?
14 A. I do not remember.
15     MR. URQUHART: Objection, assumes facts not in
16  evidence.
17 BY MR. HESS
18 Q. Thank you. Were you involved in any way in
19 these bullets that are attributed to Mr. Jaubert in
20 Dubai?
21     MR. URQUHART: Objection, vague, ambiguous.
22 BY THE WITNESS
23 A. Can you be more specific to exactly what you
24 mean involved?
25 Q. Well do you have any knowledge of them?

**Dubai vs. Jaubert**                    July 1, 2010

Page 135

1  Corporation, the head of the fraud department, Mr.
2  Khamis, to call the police about bullets that were
3  allegedly found at that time, correct?
4      A.  When the bullets were discovered by our
5  department, whether they were bullets or they were
6  anything outside of our jurisdiction, we would inform
7  the authorities, in this case Dubai police, to come and
8  take over that case.  And this is exactly what happened.
9      Q.  But again, the bullets, that's not the fraud
10 department's jurisdiction, that's not the auditor's
11 jurisdiction, that's outside of Dubai World Corporation,
12 right?
13     A.  Correct.
14     Q.  Why is it that you're talking to Herve Jaubert
15 about the bullets then?
16     A.  He opened the subject and I talked with him.
17 I mean I -- the business, the case is with the
18 authorities, but I talked with him.
19     Q.  Okay.  When did you call Sultan about the
20 bullets?
21     A.  The same time when I was informed about the
22 bullets from Abdullah Khamis, okay, I informed my boss,
23 Sultan, about the bullets.
24     Q.  And you informed him by email?
25     A.  No, I called.

---

**Dubai vs. Jaubert**                    July 1, 2010

Page 136

1      Q.  And what did you tell Sultan?
2      A.  I told him that we had discovered bullets in a
3  warehouse in Exomos.
4      Q.  Now did you have other conversations with Mr.
5  Jaubert -- how many times have you had a conversation
6  with Mr. Jaubert, do you recall?
7      A.  I don't not remember.
8      Q.  Many times?
9      A.  I do not remember.
10     Q.  More than two?
11     A.  It could be.  I do not remember the exact
12 number of times.  I mean you're talking about a time
13 which was a couple of years ago.  So I do not really
14 remember.  I don't really note it down, I met today Mr.
15 Jaubert, no.
16     Q.  And this event, these allegations against Mr.
17 Jaubert, they're not extraordinary enough to have that
18 type of memory?
19     A.  To us, whether it was Mr. Jaubert, or X, or Y,
20 we would do the same thing.  We would report this to the
21 authority and we'd let the authority take care of it.
22     Q.  I was speaking more generally about
23 conversations with Mr. Jaubert about anything?
24     A.  And I told you I cannot remember exactly.
25     Q.  Okay.  There came a time where you demanded

---

**Dubai vs. Jaubert**                    July 1, 2010

Page 137

1  that Mr. Jaubert pay monies to be permitted to leave the
2  country, correct?
3      A.  Can you say -- what do you mean by demanded?
4  If you just want to -- I want to understand, you know,
5  on what basis I would demand?
6      Q.  That's what I'm asking you.
7      A.  Yeah, that's what I'm saying.  I do not
8  understand the word demand.  Can you explain that to me?
9      Q.  You don't know what the word demand means?
10     A.  No, no, you say I demanded and I would like --
11 I do not demand.  We -- based on the evidence we do
12 find, if there is any kind of money due to us based on
13 our evidence, then we request the person to settle
14 his -- I do not have the power to demand.  We request
15 the person to come forward and pay the amount that's
16 actually due to us.
17     Q.  You open up a communication?
18     A.  We open a communication, that's correct.
19     Q.  Just like when you secretly lien someone's
20 house?
21     A.  Can I go back into that point.
22     Q.  Sure.
23     A.  When you're trying to say that -- for the
24 record, okay.  We put a request, we put a request to
25 Nakheel in case if there is any kind of sale that's

---

**Dubai vs. Jaubert**                    July 1, 2010

Page 138

1  going to happen on that property, knowing that we could
2  be part owners of the that property, because, you know
3  Nakheel is part of us and when a person is buying, maybe
4  there is not full payment been made, we need to be
5  involved in that case.  So we can actually adjust and
6  make sure we can get our money.
7      Q.  I don't have a clue what that means.  How does
8  that relate to Mr. Jaubert?
9      A.  From the reports that we worked -- and you can
10 actually be more than happy, and thank you for giving me
11 this report, we saw that the extra charges, the money
12 that it was actually in there, the money that we have
13 identified that Mr. Jaubert needs to pay for us, we
14 internally wanted to try to put in the internal
15 mechanics for ourselves to make sure that we get our
16 money from Jaubert.  We can not demand.  The only people
17 can actually enforce that are the courts, not us.
18     Q.  That's my point, but just like with the liens,
19 you can get around the courts, you can do it internally,
20 correct?
21     A.  No, no, no.  What do you mean by going around
22 the courts?
23     Q.  Well I thought we already talked about that.
24 When you requested a lien from your operative at
25 Nakheel, you were going around the courts, weren't you?

**Dubai vs. Jaubert**          **July 1, 2010**

Page 139

1     A.   Excuse me, would you please define the work
2  operative, so we both understand it?
3     Q.   You're the one that said it first.
4     A.   I would like, I would like for the record.
5  Please tell me what do you mean by operative.
6     Q.   I'm using your term.
7     A.   Okay, I withdraw that because that's not what
8  I mean.  Because you mentioned that in the beginning.
9     Q.   I'm not going to argue with you?
10    A.   No, no what I'm saying is I would be more than
11 happy, but what I'm saying is that, you know, the word
12 operative, I would like to understand it from you.  You
13 tell me what do you mean?
14    Q.   As the record will reveal, that's the word you
15 used, but I'm responding to Mr. O'Donnell, about Mr.
16 O'Donnell?
17    A.   Okay, Mr. O'Donnell, the way -- just for the
18 record so it will show.  Internally Mr. Jaubert owed us
19 some money, which actually is in the report.
20    Q.   And how much is that money?
21    A.   I can't remember exactly but we can look in
22 the figures and we can say that's the money.  I think it
23 was around $5 million plus, $5-million which is in here.
24 And he is in here, all right.  And he came to us and we
25 were going to try to settle that amount with him, settle

**Dubai vs. Jaubert**          **July 1, 2010**

Page 140

1  that amount with him, because it's the money that
2  belongs to -- as auditors, it's our duty to make sure
3  that we protect the company's asset.
4         In this case we have evidence that this money
5  which was paid, we never received the services.  So we
6  did request from Mr. Jaubert to pay us.  For us to put
7  the mechanics in place to ensure that we do protect our
8  asset, we requested a lien from Chris O'Donnell, who is
9  a chief executive of Nakheel to make sure if there is
10 any kind of an attempt sale, that they discuss that with
11 us first, to make sure we can recover the assets of the
12 company.
13    Q.   Are you finished?
14    A.   Thank you.
15    Q.   Okay.  A couple of things, you brought some
16 things up and I appreciate you telling me all this.
17 It's not what I'm asking you, but I appreciate your
18 talking about that.
19    A.   But I just wanted to, you know, for the record
20 state that.
21    Q.   I appreciate it.  I don't know how that was
22 responsive, but I'm happy to have you talk.
23    MR. URQUHART:  Can we take a two-minute break?
24    MR. HESS:  Sure.
25    VIDEOGRAPHER:  We're off the record at 2:50.

**Dubai vs. Jaubert**          **July 1, 2010**

Page 141

1     (Thereupon, after a short recess, the
2  proceedings continued as follows:)
3     VIDEOGRAPHER:  We're back on the record at
4  3:00.
5  BY MR. HESS
6     Q.   Back on the record.  We were talking about,
7  well you were discussing -- you said something about a
8  figure, a $5-million figure?
9     A.   Five million dirhams, correct, 5,329,243, from
10 there.
11    Q.   And you're referring to page 17 of the report?
12    A.   You're correct.
13    Q.   However, the amount that, according to your
14 report, that is due from Mr. Jaubert is 140,011 dirhams,
15 correct?
16    A.   That was what we had discovered that Jaubert
17 had to pay, exactly, personally, personally Mr. Jaubert.
18    Q.   And in fact he wrote a check for 140,011
19 dirhams and provided that to you, correct?
20    A.   I recall whether it was one check or two
21 checks but those were paid.  I can't recall was it one
22 check or two check, but those were paid, exactly.
23    Q.   The 140,011 dirhams?
24    A.   The 140,011 dirhams.
25    Q.   Okay.  What is your memory regarding -- what

**Dubai vs. Jaubert**          **July 1, 2010**

Page 142

1  do you recall regarding the conversations you had Mr.
2  Jaubert about the -- I'll withdraw that.  Did you have
3  conversations with Mr. Jaubert about repaying monies to
4  Dubai World Corporation?
5     A.   Say that again?
6     Q.   Did you have conversations with Mr. Jaubert
7  about repaying monies to Dubai World Corporation?
8     A.   This is part of the settlement that we did
9  request Mr. Jaubert after seeing -- after seeing the
10 evidence is to pay back --
11    Q.   I'm sorry.
12    A.   -- after sitting down with Mr. Jaubert and I
13 cannot remember but I know Jaubert came to us and we
14 were trying to strike a deal with him, trying to
15 finalize, trying to finalize the issue and to pay us the
16 money that owed to us.
17    Q.   The money that you determined was owed to you,
18 or to Dubai World?
19    A.   It was determined based on the evidence, based
20 on the evidence discovered in the audit, okay.  And we
21 did request based on the evidence that we have gathered
22 is that Mr. Jaubert, we requested him to pay that money.
23    Q.   It was the amount that the auditors determined
24 to be repaid?
25    A.   Based on the evidence that we had discovered

1  during the audit. It was not the auditors, it was based
2  on the evidence that the amount was requested from Mr.
3  Jaubert to pay.
4      Q.  The evidence that the auditors obtained?
5      A.  Correct.
6      Q.  And the evidence that the auditors determined
7  to be relevant?
8      A.  Correct.
9      Q.  Mr. Jaubert didn't admit or agree that he owed
10  money to Dubai World, did he?
11      A.  We have a statement that was signed by Mr.
12  Jaubert, okay. We have a statement that was signed by
13  Mr. Jaubert, and that's based on that, and based on the
14  evidence, we requested Mr. Jaubert to pay back the money
15  owed to Dubai World.
16      Q.  Was that the 140 dirhams -- 140,000 dirhams?
17      A.  Plus the other amount.
18      Q.  And if Mr. Jaubert didn't repay the monies to
19  Dubai World Corporation, he would be imprisoned,
20  correct?
21      A.  Let me correct that. We do not imprison it's
22  not up to us, you know. I would like, because when you
23  say -- what we would do is we would raise a case against
24  Mr. Jaubert, or anybody for that case, and the case
25  would go to the court. The court are the only authority

1  to be able to put the judgment and according to that
2  judgment, then we will take it. But we have no control
3  over that. We are internal auditors and we do not have
4  that power.
5      Q.  Just like it's the same thing as with the
6  bullets, right? You don't have power to confiscate a
7  passport regarding the bullets, right?
8      A.  Can you please repeat that?
9      Q.  Sure. I think your testimony was that you
10  don't have any authority, or legal authority, to
11  confiscate Mr. Jaubert's passport regarding the bullets?
12      A.  It is not us. I would go back, whenever we
13  discover a case, this case would go to the authority.
14  We have no authority to hold anybody's passport or
15  confiscate -- we're internal auditors. The only people
16  that have the right are the authorities in the country,
17  in this case the police or the court according to their
18  own system and their own judgment.
19      Q.  What do you mean their own system?
20      A.  Because the system of the courts, we have no
21  control at all. We have no control over the court
22  system or the police system. We are internal. We are a
23  corporate company, just like any company in here. They
24  have no control over, you know, the police or the court
25  system here.

1      Q.  Well it's not like any corporation here, is
2  it?
3      A.  We are a corporation. I do not know about the
4  laws in hereby. But in the UAE we do not have any power
5  over the police. We have no power definitely over the
6  court. They are the higher authority.
7      Q.  The difference between any corporation here
8  and Dubai World Corporation is that Dubai World
9  Corporation is owned almost exclusively by the
10  government of Dubai?
11      MR. URQUHART:  Objection, assumes facts not in
12  evidence.
13  BY THE WITNESS
14      A.  Although we are owned by the government as a
15  stakeholder, but the law applies to all of us the same.
16  Which means we have no control over the police or over
17  the government. Yes it's owned by the government, but
18  we have to be under the law of the land.
19      Q.  Of course. All you can do, all Dubai World
20  Corporation can do is call the Dubai police, right?
21      A.  Correct.
22      Q.  So when Dubai World Corporation called the
23  police about Mr. Jaubert and the debt that they asserted
24  was owed, it went to court, correct?
25      A.  I'll try and recall the process. What we have

1  done is, when we have -- you know, we tried to -- you
2  know we try where possible, like any corporation to
3  settle, you know, in a nice matter, outside the court.
4      When we find ourself, you know, not getting
5  anywhere, to protect the assets of Dubai World, then we
6  would raise a case. In this case we did raise a case,
7  okay, and the case is with the authorities for to try to
8  get our right as I indicated. That's how we did it.
9      Q.  And the case went to court, correct?
10      A.  The case went to court.
11      Q.  And in Mr. Jaubert's absence what happened?
12      A.  Let me try to state. It didn't go to court
13  first. We wanted to try to settle, initially, we wanted
14  to try and settle. When we saw ourself not getting
15  there, we put the case to the authorities.
16      Q.  And when the case went to the authorities in
17  Mr. Jaubert's absence, he was sentenced to prison,
18  right?
19      A.  You have to go to look in there but my
20  understanding is that is not our judgment, that's the
21  court judgment. Has nothing to do with Dubai World.
22  That's the court's judgment that actually put the
23  sentence.
24      Q.  The court, when you went, you took the case to
25  court, and it resulted in a sentence of imprisonment,

Page 147

1 correct?

2      A. That's correct.

3      Q. So Mr. Jaubert fails to pay Dubai World

4 Corporation money, ultimately it resulted in a prison

5 sentence, correct?

6      A. We wanted to settle with Mr. Jaubert, without

7 going to the courts, and then when we saw there was no

8 hope, to protect Dubai World we put a case. And then

9 the case went to the court, and the court put the

10 sentence.

11      Q. Do you know if Mr. Jaubert knew that he would

12 be this imprisoned for failure to pay the money?

13      A. That is not my call.

14      Q. You never had a -- Mr. Jaubert never asked you

15 or you never talked to him about that?

16      A. See, you're asking me something -- I would

17 like to repeat, you know, we do not have the right nor

18 the power, okay. That was the sentence by the court.

19      Q. I known the only power you have is to call the

20 police, the Dubai police, right?

21      A. It's not a power. It's when we discover a

22 case which resides outside of our jurisdiction, we do

23 call the authorities to be able to handle that case

24 accordingly.

25      Q. And you never had a conversation with Mr.

Page 148

1 Jaubert about the possibility of imprisonment if you

2 weren't able to resolve the case?

3      A. We had a conversation with Mr. Jaubert about

4 the settlement, okay. And I think you my might be aware

5 of that settlement, case that we have done. Failing to

6 do that, we have put the case to the authorities and

7 they are the ones who actually put out the verdict.

8      Q. Again, my question is, so you never had any

9 conversation with Mr. Jaubert about the possibility of

10 imprisonment if the courts should he fail to be able to

11 come to a resolution with Dubai World Corporation?

12      A. I do not recall. I do not recall saying the

13 word. We brought Mr. Jaubert to be able to discuss and

14 settle amicably in the situation, okay. And if he

15 doesn't settle, it's not Mr. Jaubert, it's anybody

16 within our corporation, if they owe us money, the only

17 way we are going to get our money, is we go through the

18 court and let the court -- they are the final authority

19 to decide whether we have the right or not.

20      Q. I understand, but in good conscience, didn't

21 you want to have a conversation with Mr. Jaubert to the

22 effect that, if you don't settle this, you could have

23 bigger problems with the court, didn't that conversation

24 ever come up?

25      A. We sat down and discussed with Mr. Jaubert.

Page 149

1      As a matter of fact, we sat down with our

2 representative, legal, because we wanted to try and make

3 sure we can settle things, and Mr. Jaubert's legal. It

4 was in the presence of his legal attorney and our legal

5 attorney, to try to make the settlement, okay. And he

6 knew that you he does not settle, the only way we're

7 going to get our money, is we take our case to the

8 authorities and they will decide what is going to be the

9 outcome.

10      Q. You've taken other cases to the authorities?

11      A. That's correct.

12      Q. And the other cases they resolved, again for

13 failure to pay monies, in prison sanctions, correct?

14      A. That depends on every single case, and it

15 depends on the court's judgment.

16      Q. Other cases that you've referred to the court

17 have resulted in prison sentences, correct?

18      A. Some cases have resulted.

19      Q. Do you have any distinct recollections about

20 conversations, other than what you've just talked about,

21 with Mr. Jaubert about during the resolution process?

22      A. To the best of my recollection we invited Mr.

23 Jaubert to come. We showed him that this is the money

24 that he owed us. He brought in his lawyer and Asha Alli

25 (phonetic) what represented him, and our lawyer in this

Page 150

1 case was Galadari (phonetic), it's a group. We came

2 down and he came to my office. We sat down in my office

3 with both lawyers, okay, and we were trying to make an

4 amicable settlement together with us, okay, at that

5 time. There was a draft of settlement to be done and it

6 was -- then after that, it didn't happen.

7      Q. What was the settled amount that you're

8 referring to?

9      A. Initially the amount was five million. Then

10 we have agreed on three million as a final settlement

11 where Mr. Jaubert would pay a million in cash and two

12 million later. And we would make a settlement.

13      Q. And these are dirhams or dollars?

14      A. These are dirhams.

15      Q. When -- do you have any idea when Mr. Jaubert

16 left Dubai?

17      A. I do not know exactly.

18      Q. What was the last, your last involvement in

19 Mr. Jaubert and Seahorse Submarines Incorporated

20 International?

21      A. I can say March 2008 and that is the last time

22 I recall, I want to verify the date, because you know,

23 it's March 2008 is the last we heard of Mr. Jaubert.

24      Q. Now have you been contacted by any -- other

25 than the reporter that we discussed Mr. Higgins, during

Page 151

1  the beginning of the deposition, have you been contacted
2  by any reporter or news media personnel, about Mr.
3  Jaubert?
4      A.  I recall, I don't remember the time, we had a
5  conversation I think Rubinberg (phonetic), Mr. Copitus,
6  I think Copitus -- that's the name that I recall.
7  That's the person that we discussed.
8      Q.  And when was that conversation?
9      A.  I don't remember the exact date.  But if you
10  would, I will go back and check because you know, I will
11  find the record and pass the record, but I don't
12  remember the date exactly.
13      Q.  Do you remember if it was this year?
14      A.  I don't think it was this year.
15      Q.  Last year?
16      A.  It's possibly last year, but you know if you
17  want, I would ask somebody to try to give you that
18  information.  I do not exactly remember the exact date
19  that we sat down.
20      Q.  And what was the nature of the conversation?
21      A.  He was -- I think it was a reporter and
22  came -- he wanted to try discuss about the case and we
23  were more than happy to try to sit down with him and
24  answer his questions.
25      Q.  What questions did he ask you?

Page 153

1      A.  -- as an example, yeah.
2      Q.  Exhibit B, is he approving a payment there?
3      A.  It says there approved.  It says approved.
4      Q.  Right but it also says approved over the
5  Sultan, Sultan's name too, right?
6      A.  I would like to refer to this particular one
7  or any other payment, the chief executive is responsible
8  for what's happening in their activity, he or she.  He
9  has the final authority over there.  In this case he
10  sent it to Sultan, Sultan being the chairman, okay,
11  trusted the chief executive and signed on that line.
12      Q.  I remember you saying that.  Are you say that
13  he did have -- that Exomos had a checking account that
14  he could write checks to pay things?
15      A.  I do not remember that honestly.  I can't
16  remember that and I have to go back on the record to
17  see.  They have an account, definitely, okay.  But I
18  don't remember those small details of whether he has the
19  right to write the check or not.  I'm not so sure.
20      Q.  Or withdraw money from a bank account?
21      A.  I can't remember.  I cannot remember that
22  honestly.  But I can find that information for you.
23      Q.  You're not aware of any allegation that he
24  took money from an Exomos account improperly, are you?
25  Or he went to an Exomos bank, or presented a check on

Page 152

1      A.  I can't remember exactly.  They were about,
2  about -- one of the issues I believe was Mr. Jaubert.
3      Q.  That's all you can remember about that?
4      A.  I can't remember really.  The specific details
5  is going to be difficult for me to remember.
6      Q.  Okay.  Mr. Jaubert did not have the authority
7  to write checks or make payments on behalf of Exomos or
8  any of the corporations, correct?
9      A.  I do not remember that.  He's the chief
10  executive.  He is the chief executive of the firm.  Him
11  writing checks, I do not remember, I can't remember, but
12  he definitely -- being a chief executive, like any other
13  chief executive, has the authority to approve payments.
14      Q.  So he can approve payments?
15      A.  As a chief executive, he has the authority to
16  approve payments.
17      Q.  Well then why did he have these requisitions
18  sent to Sultan?
19      A.  Part of the governance.
20      Q.  So that's, in your terminology, he is
21  approving payments when he signs the material
22  requisition form, an example is B, Exhibit B, is that
23  what you're saying?
24      A.  Can you please say that again to me?
25      Q.  As an example --

Page 154

1  the Exomos account and took money that way?
2      A.  I don't know.  I don't know about that.
3      Q.  You don't recall that?
4      A.  I don't recall that, but I don't know
5  that.
6      Q.  So that may have happened, or it may not have
7  happened, you just don't recall?
8      A.  I do not know.  You're asking me something,
9  you know, what we know and I can actually tell you is
10  that based on what we have done in the audit, and what
11  we have gathered the evidence, that's what we actually
12  know about.
13      Q.  So if he had the authority to write checks or
14  to withdraw money somehow from Exomos accounts or other
15  Dubai World accounts, it would be in your audit report,
16  correct?
17      A.  I do not know actually if it has -- if it's in
18  there.  If it's not in there, then it's not in there.
19  But I cannot remember whether he signs checks or -- I do
20  not know about that.
21      Q.  Well if he took money from an account of
22  Exomos, or wrote checks on an account of Exomos
23  improperly, that would be in your audit report, correct?
24      A.  Correct.  If we did find it.
25      Q.  Now you mentioned that it wasn't the normal

Page 155

1 practice for Dubai World Corporation entities to pay in
2 advance for materials?
3    A. It's not part of our governance is to pay in
4 advance for materials that's going to be due. And I
5 would believe, you would in any corporation, the way you
6 would bring the material, unless specifically stated in
7 a contract, the normal practice is that you would pay at
8 a down payment awaiting the material to come. Upon
9 final inspection of the material being there, the rest
10 of the payment can actually go.
11    Q. Now I'm not going to argue about whether or
12 not that's good practice, bad practice, or universal
13 practice, but you are aware that Mr. Jaubert advanced
14 his money?
15    A. Advanced --
16    Q. -- his money to purchase these items for
17 Exomos?
18    A. Excuse me. What do you mean advance his
19 money?
20    Q. Paid for the items in advance using his money.
21    MR. URQUHART: Objection, vague and
22 ambiguous.
23 BY THE WITNESS
24    A. I've not sure of that.
25    Q. Do you have any understanding why it is that

---

1 Mr. Jaubert wasn't prosecuted or -- let me rephrase
2 that. Why is it that Dubai World Corporation didn't
3 call the Dubai police in 2006 or 2007 when they knew
4 about these ten percent handling charges?
5    A. When you have a case against anybody the best
6 thing you do first is to try to settle the case amicably
7 between the two parties. That's the best way of
8 handling it, whether Mr. Jaubert or any other party for
9 this matter. The same applies in here. We sat down, we
10 requested Mr. Jaubert to come and we tried to settle
11 this amicably but it didn't happen. Our alternative is
12 to put a case.
13    MR. HESS: I think I'm done. Give me one
14    minute off the record.
15    (Thereupon, after a short recess, the
16    proceedings continued as follows:)
17 BY MR. HESS
18    Q. Back on the record. Do you have any
19 understanding why it is that it wasn't until -- strike
20 that, withdraw that. When was it that Dubai World
21 Corporation first attempted to conduct these resolution
22 attempts with Mr. Jaubert?
23    A. I do not remember the exact time, but, you
24 know, I'll be more than happy to refer back to the
25 document and in the document it states exactly when we

---

Page 157

1 tried to settle amicably between both parties, between
2 us and Mr. Jaubert.
3    Q. Certainly Dubai World Corporation knew of the
4 ten percent handling and service charges as far back as
5 2005, correct?
6    A. According to the report, that was in the
7 report.
8    Q. Right. Why not negotiate the repayment back
9 in 2005?
10    A. We did start the payments, he did start paying
11 and we were hoping that actually we'd get the money
12 back.
13    Q. In 2005?
14    A. From the minute that we started -- from our
15 reports when we went back and we saw that some money was
16 owed to us, okay, we did request and he put some
17 money -- that first 110 and then we did request for the
18 rest to come.
19    Q. But that wasn't in 2005, was it?
20    A. I don't remember exactly but maybe it wasn't
21 in 2005 because that was our initial report. Until we
22 sat down and negotiated and we tried to get our money
23 from Mr. Jaubert.
24    Q. Why not 2006 then?
25    A. We were trying to get the money. As a matter

---

1 of fact we did request that some of the advance money
2 which was paid, was to be paid back. And I do not
3 recall exactly but there was a lump sum amount which was
4 repaid as well. Okay. A lump sum amount which was
5 paid. So in hope of us avoiding to go to court, we were
6 hoping that we would settle and that's the reason.
7    Q. You're not saying that those payments were
8 made in 2005 or 2006 though, are you?
9    A. I do not remember the exact when the payment
10 came, but we can definitely go back in the record and
11 find out when the first record went, but for your
12 question, we were hoping to be able to try and get the
13 money and settle out of court.
14    Q. Would the Group Internal Audit report, would
15 that contain when these attempts at resolution were
16 first made?
17    A. I do not think that's what you will see in the
18 audit, but that was outside -- definitely I remember
19 that our attempt to settle with him was not in the
20 audit. But what we can do is we can show you documents
21 and the time and the date when we sat down with
22 Mr. Jaubert to be able to try an negotiate the final
23 settlement.
24    Q. Do you know if those dates were in 2005 or
25 2006?

---

---

A. I don't think they were in 2005, okay. And I don't think they were in 2006, to the best of my ability. So they were after that.

Q. Okay. Fair enough. I don't have anything else?

MR. URQUHART: Thank you. I have no questions.

## CERTIFICATE OF OATH

STATE OF FLORIDA )
) SS:
COUNTY OF DADE )

I, CATHY J. RUNDELL MURPHY, certify that the witness, Abdulqader Obaid Ali, personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 1st day of July, 2010.

CATHY J. RUNDELL MURPHY
Notary Public, Florida
Commission #DD451169
Expires: October 31, 2009

---

Page 161

July 7, 2010

Mr. Obaid Ali
C/O QUINN EMANUEL URQUHART, ET AL.
A. William Urquhart, Esq.
10th Floor
865 South Figuero Street
Los Angeles, California 90017

Dear Mr. Obaid Ali,

With reference to the deposition taken on July 1, 2010, please be advised that the transcript of the deposition has been completed and is awaiting signature.

Please call and arrange for the reading and signing of the deposition at one of our offices. Our office hours are 9:00 a.m. to 5:00 p.m. Monday through Friday. You may, however, read a copy of the transcript provided by any of the attorneys connected with the case denoting any corrections by page and line number on a separate sheet of paper. This correction page must be signed by you and returned to us for filing with the original.

If this has not been taken care of, however, within the next thirty days, or by the time of trial, whichever comes first, I shall then conclude that the reading, subscribing and notice of filing have been waived. The original of this deposition has been forwarded to the ordering party and your errata sheet, once received, will be forwarded to all counsel of record.

Sincerely,

Cathy J. Rundell Murphy
cc: William Tess, Esquire

---

Dubai vs. Jaubert   July 1, 2010

Page 160

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA )
) SS:
COUNTY OF DADE )

I, CATHY J. RUNDELL MURPHY, certify I stenographically reported the deposition of Abdulqader Obaid Ali, the witness herein; that a review of the transcript was requested; and that the foregoing pages numbered from 1 to 162 inclusive, constitute a true and correct transcript of my shorthand notes; and that this computer-assisted transcript was prepared by me and/or under my supervision.

I further certify that I am not a relative, employee, attorney, or counsel for any of the parties in this cause, nor related to nor employed by any attorney or counsel herein, nor financially interested in the outcome of this action.

Dated this 4th day of July, 2010.

CATHY J. RUNDELL MURPHY
Notary Public, Florida
Commission #DD903948
Expires: October 31, 2013

---

Dubai vs. Jaubert   July 1, 2010

Page 162

***ERRATA SHEET***

PAGE:   LINE:   REMARKS:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Please forward the original signed errata sheet to this office so that copies may be distributed to all parties.

Under penalty of perjury, I declare that I have read my deposition and that it is true and correct, subject to any changes in form or substance entered here.

_____

# PORTS, CUSTOMS & FREE ZONE CORPORATION
## MATERIAL REQUISITION FORM

No. 2533.

DATE: 07 - NOV - 2006

DEPARTMENT: EXODUS

SECTION: EXODUS

**ALL REQUISITIONS MUST BE APPROVED IN ACCORDANCE WITH THE CORPORATION APPROVAL POLICY**

| STOCK NUMBER | DESCRIPTION | DEBIT G/L ACC. NO. | QTY. REQUIRED | EST UNIT COST | O.E.P./ CAPEX NO. | QTY. AVAILABLE | BACK ORDER | MAXIMO REQ. NO. | REMARKS |
|---|---|---|---|---|---|---|---|---|---|
| -560- | 100 KW GENERATOR FOR PROTEUS AS PER M/S SEAHORSE SUBSPARING RE:07110A/PROTEUS | | | | CAPEX 3630 | | | WE#OS-71899 | |
| | 1. 100 KW GENERATOR, WATER COOLED, 60.0VDC, WITH INSULATION HOUSING | | 1 | $ 61,995.00 | | | | | |
| | 2. SERVICE AND HANDLING CHARGES | | | $ 6,120.00 | | | | | |
| 3317² | TOTAL | | | 68,115.00 | | | | | |

Deliver to:

REQUESTED BY
Please Print Name   HERVE JAUBERT
SIGNATURE
Date:   07/11/06

APPROVED BY
Please Print Name   HERVE JAUBERT
SIGNATURE
Date:

APPROVED BY
Please Print Name   SULTAN AHMED BIN SULAYEM
SIGNATURE
Date:

DATE RECEIVED BY
MATERIAL CONTROL
Date

DISTRIBUTION. DIRECT, STOCK ITEM OR TECHNICAL SERVICES REQUEST : White, Yellow and Pink to Stores or Material Control. Blue to be retained by originator.
DISTRIBUTION. SERVICE CONTRACT REQUEST

DEFENDANT'S
EXHIBIT NO. D
FOR IDENTIFICATION
/5-10
DATE
PENGAD 800-631-6989 RPTR:

DW 0000137

# PORTS, CUSTOMS & FREE ZONE CORPORATION

## MATERIAL REQUISITION FORM

DEPARTMENT : EXOMOS

SECTION : EXOMOS

DATE : 03-12

No.

**ALL REQUISITIONS MUST BE APPROVED IN ACCORDANCE WITH THE CORPORATION APPROVAL POLICY**

| STOCK NUMBER | DESCRIPTION | DEBIT G/L ACC. NO. | QTY. REQUIRED | EST UNIT COST | O.E.P./ CAPEX NO. | QTY. AVAILABLE | BACK ORDER | MAXIMO REQ. NO. | REMARKS |
|---|---|---|---|---|---|---|---|---|---|
| 890 — 1 | ELECTRIC DC PERMANENT MAGNET FOR SPV AS PER M/S SEAHORSE INVOICE RE: 07105/SPV | | | | CAPEX C03525 | | | W3#05 71803 | |
| | 1. ELECTRIC DC, NEODYMIUM PERMANENT MAGNET, 200 KW | | 2 | $119,094.00 | | | | | |
| | 2. SERVICE AND HANDLING CHARGES | | | $ 11,900.00 | | | | | |
| | TOTAL | | | $130,994.00 | | | | | |

Deliver to:

REQUESTED BY
Please Print Name : HERVE JAUBERT
SIGNATURE :
Date :

APPROVED BY
Please Print Name : HERVE JAUBERT
SIGNATURE :
Date : 07/11/05

APPROVED BY
Please Print Name : SULTAN AHMED BIN SULAYEM
SIGNATURE :
Date :

DATE RECEIVED BY
MATERIAL CONTROL
Date :

White, Yellow and Pink to Stores or Material Control. Blue to be retained by originator.
White, Yellow and Pink to Purchasing Dept. Blue to be retained by originator.

DISTRIBUTION, DIRECT, STOCK ITEM OR TECHNICAL SERVICES REQUEST :
DISTRIBUTION, SERVICE CONTRACT REQUEST :

Doc. ref : reqform.xls



DEFENDANT'S
EXHIBIT NO. C
FOR IDENTIFICATION
7-1-10
DATE: 0834 PTR:
PENGAD 800-631-6989

EXHIBIT
2
Candy's K
16-10-10
PENGAD 800-631-6989

DW 0000134

# PORTS, CUSTOMS & FREE ZONE CORPORATION

## MATERIAL REQUISITION FORM

No. 222526

DATE: 15 - OCT - 2005

PO# 05-223732

DEPARTMENT: EXODUS

SECTION: EXODUS

**ALL REQUISITIONS MUST BE APPROVED IN ACCORDANCE WITH THE CORPORATION APPROVAL POLICY**

| STOCK NUMBER | DESCRIPTION | DEBIT G/L A/C. NO. | QTY. REQUIRED | EST. UNIT COST | G.E.P./ CAPEX NO. | QTY. AVAILABLE | BACK ORDER | MAXIMUM REQ. NO. | REMARKS |
|---|---|---|---|---|---|---|---|---|---|
| | ASDS | | | | | | | | |
| 1 | DEVELOPMENT OF A CUSTOM, UNMARKED SELF CONTAINED BREATHING SYSTEM, THAT IS SWITCHABLE CLOSE CIRCUIT 100% OXYGEN, TO SEMI CLOSE CIRCUIT 56% OXYGEN PORTABLE BACK PACKS. ONE SYSTEM IS TO BE ADAPTED AND INSTALLED ON THE EXODUS ASDS-10 SWIMMER DELIVERY VEHICLE. ALL SPECIFICATIONS AND CABIN ARRANGEMENT TO BE PROVIDED. CAPACITY: 5 HOURS MINIMUM DURATION AT 40 MTRS DEPTH. NAME: EXOBREATH MK | | $ | 25,000 | 00586 (ASDS) | | | | |
| 2 | 10x COLOR BLACK, EXOBREATH MKI, PARTS AND EQUIPMENT INCLUDING CONSUMABLE FOR 2 DIVES OF 5 HOURS | | $ | 86,650 | | | | | |
| 3 | SERVICE AND HANDLING CHARGES. | | $ | 11,165 | | | | | |
| | TOTAL | | $ | 122,815.00 | | | | | |

REQUESTED BY
Please Print Name  HERVE JAUBERT

SIGNATURE:

Date: 15/10/2005

APPROVED BY
Please Print Name  HERVE JAUBERT

SIGNATURE:

Date:

APPROVED BY
Please Print Name  SULTAN AHMED BIN SULAYEM

SIGNATURE:

Date:

DATE RECEIVED H
MATERIAL CONTROL

DISTRIBUTION: DIRECT, STOCK ITEM OR TECHNICAL SERVICES REQUEST: White, Yellow and Pink to Stores or Material Control. Blue to be retained by originator —
DISTRIBUTION: SERVICE CONTRACT REQUEST: White, Yellow and Pink to Purchasing Dept. Blue to be retained by originator.

Deliver to:

DEFENDANT'S
EXHIBIT NO. D
FOR IDENTIFICATION
PENGAD 800-631-6989

EXHIBIT 3
PENGAD 800-631-6989

# PORTS, CUSTOMS & FREE ZONE CORPORATION
## MATERIAL REQUISITION FORM

No. 222534

DATE : 03-NOV-2005

DEPARTMENT : EXOMOS

ATTN : EXOMOS

ALL REQUISITIONS MUST BE APPROVED IN ACCORDANCE WITH THE CORPORATION APPROVAL POLICY

| # | DESCRIPTION | DEBIT G/L ACC. NO. | QTY REQUIRED | EST UNIT COST | O.E.P / CAPEX NO. | QTY AVAILABLE | BACK ORDER | MAXIMO REQ. NO. | REMARKS |
|---|---|---|---|---|---|---|---|---|---|
| 1. | JET DRIVE TJ 609 & NEODYMIUM PERMANENT MAGNET FOR ABDS. JET DRIVE TJ 609. | | 2 | $ 74,100.00 | CAPEX CQ53470 | | | | |
| 2. | SERVICE AND HANDLING CHARGES AS PER M/S SEAHORSE SUBMARINE INVOICE RE:07106/ABDS | | | $ 4,410.00 | | | | | |
| 3. | ELECTRIC DC, NEODYMIUM PERMANENT MAGNET FOR RUV | | 2 | $ 77,360.00 | | | | | |
| 4. | SERVICE AND HANDLING CHARGES AS PER M/S SEAHORSE SUBMARINE INVOICE RE:07106/ABDS | | | $ 4,730.00 | | | | | |
| | SUB TOTAL | | | $ 156,600.00 | | | | | |

REQUESTED BY
Print Name  HERVE JAUBERT
SIGNATURE

APPROVED BY
Please Print Name  HERVE JAUBERT
SIGNATURE    Date:  07/11/05

APPROVED BY
Please Print Name  SULTAN AHMED BIN SULAYEM
SIGNATURE    Date:

DATE RECEIVED BY
MATERIAL CONTROL    Date:



DEFENDANT'S
EXHIBIT NO. 
FOR IDENTIFICATION  71-10
DATE  

PENGAD 800-631-6989

DW 0000220

   

**URGENT**

## PORTS, CUSTOMS & FREE ZONE CORPORATION
### Request for Payment

| | | |
|---|---|---|
| Cheque ☐ <br> Bank Transfer ☑ | OEP# / Capex # 3800 | **(For Finance Use only)** <br> Date Received: |
| Date: 30-10-2004 | P.O. # Nil | Cost Center: |
| Due Date: 06-11-2004 | **Attachments:** | Account Code: |
| Currency: US$ | Original Invoice ☐ | Cheque #: |
| Amount: US$ 13,875/- | Other Approvals by BU ☑ | |

| **Details** |
|---|
| Payable To:  SEAHORSE SUBMARINES INTL. |

| **Remarks** |
|---|
| <u>ACQUISITION OF SEAHORSE SUBMARINE ASSETS</u> <br><br> Shipping expense of containers and two Hummer vehicles as per M/s SEAHORSE SUBMARINE Invoice ref:0904033 dated 30/10/04. |

| Requested by: | Signature | Date |
|---|---|---|
| Name:  <u>SANIL MOHD. SUBAIR</u> | | 30/10/2004 |
| Title:   Project Manager | | |

Approved by:

Name:  <u>HAMED KAZIM</u>   Sultan Br Sulayem     5/11/04

Title:   <u>Chief Financial Officer and Head of the Corporate office</u>   Exc. Chairman

**DEFENDANT'S** <br> EXHIBIT NO. <br> FOR IDENTIFICATION <br> 7-1-10  JR <br> DATE: __ DPTR:

**EXHIBIT** <br> 11 <br> 6-10-10

Sulayem

3324
October 2004

Ref.: PM/SMS/074/mv