# EXHIBIT "Q"

## DEPOSITION OF KHURRAM NAGARIA WITH ATTENDANT EXHIBITS TO THAT DEPOSITION

**Page 1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

DUBAI WORLD CORPORATION and its
subsidiaries, EXOMOS, NAKHEEL
and PALM MARINE,
                    Plaintiffs,
                              CASE NO.
v.                    2:09-CV-14314-MARTINEZ/LYNCH

HERVE JAUBERT, SEAHORSE
SUBMARINES INTERNATIONAL
INCORPORATED, and DOES 1 - 99,
                    Defendants.

DEPOSITION OF KHURRAM NAGARIA
Saturday, April 3, 2010
9:00 a.m.
Galleries Building
CM4, Seventh Floor
Downtown Jebel Ali
Dubai, UAE

Reported by:
Jeanne Bullis
RPR, CSR
JOB No. 134048

**Page 3**

I N D E X

Examinations                              Page

KHURRAM NAGARIA
   Direct Examination by MR. URQUHART        4
   Cross-examination by MR. HESS            17

E X H I B I T S
No.       Description              Page
Exhibit No. 1    BMT Document              7
Exhibit No. 2    Ernst & Young Report     10
Exhibit No. 3    2005 Ernst & Young Report  13
Exhibit No. 4    Dubai World Document with
                   Attached PO            22
Exhibit No. 5    Material Requisition Form  37

**Page 2**

1  APPEARANCES
2
   Appearing on behalf of the Plaintiffs:
3
4      BILL URQUHART, ESQ.
       LAITH D. MOSELY, ESQ.
5      Quinn, Emanuel, Urquhart, Oliver
          & Hedges, LLP
6      865 S. Figueroa Street
       10th Floor
7      Los Angeles, CA  90017
       (213) 443-3000
8      billurquhart@quinnemanuel.com
       laithmosely@quinnemanuel.com
9
0
   Appearing on behalf of the Defendants:
1
2      WILLIAM T. HESS, ESQ.
       KATHRYN HEATHCOCK, ESQ.
3      Hess & Heathcock
       40 SE Osceloa Street
4      Stuart, FL  34994
       (772) 223-0209
5      whess@hhfirm.com
6
7
8
0
1
2
3
4
5

**Page 4**

1       WHEREUPON,
2            KHURRAM NAGARIA
3       having been first duly sworn as noted above, was
4       examined and testified as follows:
5            DIRECT EXAMINATION
6       BY MR MOSELY:
7            Q.  Good morning, Mr Nagaria.  What is your full
8       name?
9            A.  Khurram Nagaria.
10           Q.  Could you spell that for the court reporter?
11           A.  K-H-U-R-R-A-M  N-A-G-A-R-I-A.
12           Q.  Thank you.  Is there any reason this morning
13      that you wouldn't be able to give accurate testimony,
14      such as are you taking any medicines?
15           A.  No.
16           Q.  Good.  Over the course of this depositions,
17      if you have any questions, if something isn't clear to
18      you, just ask me to rephrase it, and also please allow
19      whoever is asking you questions to ask the entire
20      question before responding.
21           A.  Okay.
22           Q.  Mr Nagaria, where did you go to university?
23           A.  In Pakistan.
24           Q.  What did you study there?
25           A.  I've done my commerce graduation and

**1  (Pages 1 to 4)**

chartered accountancy and cost and management accountancy.

Q. Where did you work after graduating?

A. First few years in Pakistan with an audit firm. Then I came to Dubai in 1998.

Q. Which audit firm did you work with in Pakistan?

A. PriceWaterhouseCooper.

Q. And after working at PriceWaterhouseCooper, what company did you move to?

A. Arthur Anderson Dubai.

Q. What position did you hold at Arthur Anderson?

A. I started with senior auditor and then I moved to Ernst & Young. We merged with Ernst & Young, and then when I resigned, I was audit manager.

Q. And following your time at Ernst & Young, where did you work?

A. In Dubai, in audit assurance and business advisory services.

Q. When did you start working with Dubai World?

A. October 2003.

Q. Which department did you initially work with in Dubai World?

A. Group corporate finance.

Page 5

1   production facility and the vessels that we have, and
2   the facilities that we have like operations,
3   manufacturing, to provide information for the
4   insurance so that they can assess the risk before they
5   go for the insurance.
6       Q. Is this the report that BMT prepared for you?
7   I'd like to mark as Exhibit 1 this document, Bates
8   labelled DW0008515 through 0008551.
9       (Exhibit 1 marked for identification.)
10  BY MR MOSELY:
11      Q. Is this the reports that you have in front of
12  you that is the final report prepared by BMT at your
13  request?
14      A. Yes.
15      Q. Did you assist in the preparation of this
16  report in any way?
17      A. It was mostly technical, so my job was only
18  coordinator.
19      Q. I'd like to direct your attention to the
20  conclusions made in this report at DW0008531. That is
21  page 17 of 19.
22      MR HESS: Objection, hearsay.
23  BY MR. MOSELY:
24      Q. Did you review this report at the time that
25  it was prepared, after it was prepared?

Page 7

Q. What were your responsibilities there?

A. Financial analyst and auditing and reviewing all subsidiaries.

Q. When did you start working at Exomos?

A. 2005, Q4. Quarter 4, 2005.

Q. How did you come to start working at Exomos?

A. As a part of my job in group corporate finance, I was working on audit and reviews of subsidiaries. So first I started working with Platinum Yachts Free Zone Company in 2004, and 2005, Q4, they asked me to do financial job for Platinum Yachts and Exomos together.

Q. How long did you work at Exomos?

A. Almost one year and a half. Beginning of 2007, I moved to another group company.

Q. While you were working at Exomos, did you contact BMT Surveys?

A. Yes.

Q. And why did you contact BMT Surveys?

A. At the recommendation of an insurance broker, because they wanted to have builder risk insurance and operating vessel insurance. So it was their recommendation.

Q. What does BMT Surveys do?

A. They were performing a survey about the

Page 6

1       A. Yes.
2       Q. Did you agree with the conclusions that were
3   made in that report?
4       MR HESS: Same objection, hearsay, and also
5   assumes facts not in evidence. Improper predicate.
6   BY MR. MOSELY:
7       Q. You can answer. Did you agree with the
8   conclusions as you --
9       A. Some information was technical, so I had to
10  refer to other technical people. Some was about
11  processes, so I agreed with them.
12      Q. On the page to which I directed your
13  attention, do you see the conclusion in the second
14  complete paragraph? Do you see that?
15      A. Yes.
16      Q. It states that there is a lack of --
17      MR HESS: Same objection, hearsay.
18      MR URQUHART: He is not even finished with his
19  question.
20      MR HESS: It was actually two questions.
21  BY MR MOSELY:
22      Q. Did you assist the people who prepared this
23  document in obtaining information to support the
24  contents of this document?
25      A. Can you rephrase the question?

Page 8

**(Pages 5 to 8)**

1  Q. You don't have any technical expertise in the
2  manufacture, design or production of submersibles, do
3  you?
4  A. No.
5  Q. You don't have any expertise in the
6  manufacture, design of any water craft?
7  A. Before Exomos, I was in Platinum Yachts,
8  which is a mega yacht builder, so we were building the
9  world's largest yacht, which is already built now.  I
10  was there in that position from 2004, February, until
11  January 2007, so it was about three years, and they
12  were doing other mega yachts also.
13  So there were three mega yachts being built
14  there.  There was a staff of 500 people over there
15  almost.  So this was my experience.
16  Q. In an accounting capacity; correct?
17  A. Yes.  Accounting and business planning,
18  financial.
19  Q. Do you recall who -- try to pronounce this
20  name -- Rabindra Prabhu is?
21  A. Yes.
22  Q. I'm going to spell that.  I'm sorry, that is
23  the only thing I would like to request of you.
24  Whenever I ask a question, if you could make a verbal
25  response, because otherwise the court reporter is not

1  going to be able to take that down.  I'm going to
2  spell that name.  R-A-B-I-N-D-R-A P-R-A-B-H-U.  Who
3  was that individual?
4  A. Financial controller of Exomos before I
5  joined.
6  Q. Okay.  So was he -- he?  Is that a he?
7  A. He.
8  Q. Okay.  Did you take his place?
9  A. Yes.
10  Q. And who is Sanil Mohd Subair?  Let me spell
11  that name.  Spelled S-A-N-I-L M-O-H-D S-U-B-A-I-R.
12  A. He was on Exomos as a chief operating officer
13  before I came.
14  Q. And he is deceased, correct?
15  A. Yes.
16  Q. Who is Sultan bin Sulayem.  It's S-U-L-T-A-N
17  B-I-N S-U-L-A-Y-E-M?
18  A. Executive chairman of Dubai World.
19  (Exhibit 4 marked for identification.)
20  BY MR HESS:
21  Q. Could you take a look at that document.
22  Have you had an opportunity to review that
23  Exhibit 4?
24  A. Yes.
25  Q. What is that document?  Do you recall seeing

1  that document?
2  A. I beg your pardon?
3  Q. Do you recall ever seeing that document?
4  A. Yes.
5  Q. And that is, in fact, your signature that
6  appears on the document; correct?
7  A. Yes.
8  Q. Was your signature to document the commentary
9  that is included in the handwriting in the middle of
10  that document?
11  MR URQUHART:  Objection, vague and ambiguous.
12  Are you asking whether he wrote the commentary?
13  BY MR HESS:
14  Q. Let me ask it again.  I believe what I said
15  was, was your signature on that document to document
16  the accuracy of the commentary that is handwritten on
17  that document?
18  A. There are two signatures on the document.
19  One is next to "Checked By," which I'm supposed to
20  check.  But since I added commentary, I added another
21  signature there.
22  Q. Was that your handwriting on that document?
23  A. Yes.
24  Q. So the star followed by "Service charges are
25  not usually added.  However, purchase department

1  informed that this supplier is charging us very low
2  rate.  Therefore, they are allowed to recover
3  service/handling charges."  That is your writing?
4  A. Right.  Yes.
5  Q. What does the rest of that say?
6  A. Beg your pardon?
7  Q. Would you do me this favour?  Because I want
8  to make sure I've read that correctly and its
9  handwriting and I don't want to assume that I can read
10  that correctly.  Would you read the language that you
11  wrote in that document?
12  A. Sure.  "Service charges are not usually
13  added.  However, purchase department informed that the
14  supplier is charging us very low.  Therefore, they are
15  allowed to recover service/handling charges.  Average
16  10 per cent."
17  Q. In fact, where you said, "very low," there is
18  another word after that, isn't there?  It should say,
19  "very low rate" on the end of that second line?
20  A. It is not apparent on the paper.  Yes, right.
21  It is not apparent on the document, but --
22  Q. Do you know what it says?
23  A. Yeah, I read it.
24  Q. "Rate" is correct?
25  A. "Rate" is correct.  The last sentence says,

(Pages 21 to 24)

1  "To pay as per approved PO."
2      Q. And then it is signed by you?
3      A. Yes.
4      Q. Do you know what that last word is?
5      A. No.
6      Q. Okay.
7      A. Yes, it is 11 December, 11/December/05.
8      Q. Okay. Is that PO, what does that mean?
9      A. PO, purchase order.
10     Q. Okay. What does that mean, to pay as per
11  approved purchase order?
12     A. Part of my responsibility was to make payment
13  as per approved documentation. So the approved
14  documentation is not there, I cannot pay. So the
15  second part of my responsibility was to make sure that
16  all of the approved documents are there, does it make
17  financial sense.
18     I had an objection on this payment. I went to
19  the purchase guy. I asked him why we are paying this.
20  He gave me the answer which is written here. And in
21  the end, since my authority was not to stop the
22  payment, to check and raise my comments, I raised my
23  comments that I'm stamping this to pay as per approved
24  PO.
25     Q. Was it someone at Exomos or Dubai World that

Page 25

1      Q. What was Mr Shamsudeen's position with Dubai
2  World? Was he employed by Dubai World?
3      A. He was a Dubai World purchase department
4  employee working on Exomos as purchase controller.
5      Q. And he had the authority to approve the
6  10 per cent handling service charges?
7      A. No, he was supposed to process the purchase
8  order. The pay is drawn, approved material
9  requisition document. There was a material
10  requisition document approved by CEO, Herve. He was
11  supposed to process that, take it to purchase
12  department, get the purchase order issued and signed
13  by Dubai World purchase department.
14     Q. He is the one that told you that the 10 per
15  cent handling service charges were appropriate?
16     A. Yes.
17     Q. And based upon his advice to you about the
18  appropriateness of those service charges, you approved
19  those payments; correct?
20     A. No. I have to take -- approve purchase
21  orders, which are not approved by him. I only
22  question, challenge the information in the approved
23  purchase order as part of my duty, asking him although
24  the purchase order is approved, but why is it approved
25  to include 10 per cent. He just give me the

Page 27

1  told you about the service charges?
2      A. It was in the purchase order.
3      Q. But who gave you the understanding that that
4  was approved by Dubai World?
5      A. Purchase orders are approved and signed and
6  stamped by Dubai World purchase department. That is
7  the document.
8      Q. Who gave you the understanding that the
9  10 per cent rate for service handling charges was
10  approved?
11     A. It was in the purchase order attached, which
12  was saying amount and 10 per cent charges. It was all
13  mentioned in the purchase order. If you see the
14  attachment of this, you will see it.
15     Q. Okay.
16     A. It was a document there.
17     Q. Because it says, your language is, "However,
18  purchase department informed." So you talked to
19  somebody at the purchase department, correct?
20     A. I told him, I told Mr Shamsudeen, purchase
21  manager, "Why do you have a purchase order approved
22  with 10 per cent fee? You should not have this." He
23  gave me the certificate, which is written here.
24     Q. Who is the individual you just mentioned?
25     A. VK Shamsudeen.

Page 26

1  justification why it is there. I'm supposed to make
2  it based on the approved purchase order, not based
3  upon his recommendation.
4      Q. You did note on there that the purchase
5  department informed you that this supplier is charging
6  us a very low rate and, therefore, they were allowed
7  to recover service handling charges.
8      MR URQUHART: Hold on, excuse me. Can I just
9  read this first.
10     Objection, it is vague and ambiguous. Go ahead,
11  if you can answer.
12     A. I've made this comment because, based on my
13  job responsibility, I didn't find this payment
14  appropriate. But there was an approved purchase
15  order, and did I not have authority to refuse payment.
16  Authority was with Herve Jaubert. So I cannot only
17  make comments if I don't find something appropriate,
18  and that is what I did. I made the comment because I
19  could not have refused to pay. It was not my
20  authority.
21  BY MR HESS:
22     Q. It was part of your scope of work at that
23  time to check into the source of the 10 per cent
24  service charge determination; correct?
25     A. It was not part of my job to process payment

Page 28

7 (Pages 25 to 28)

1  based on approved documents, which were as follows:
2  number one, purchase order approved by Dubai World;
3  number two, material requisition approved by CEO;
4  number three, CAPEX or OPEC's approval by the relevant
5  authorities.
6      Q. Your signature was dated December of 2005;
7  correct?
8      A. Yes.
9      Q. What efforts did you make to inquire into the
10  appropriateness of the continuation of the 10 per cent
11  service handling charges?
12      MR URQUHART: Objection, vague and ambiguous,
13  assumes facts not in evidence and lacks foundation.
14  BY MR HESS:
15      Q. Following your information that you acquired
16  regarding the 10 per cent service charges --
17      A. Can you rephrase the question?
18      Q. Sure. After you found out from the
19  purchasing department about the 10 per cent charges
20  that were occasioned by these purchases, did you make
21  any other inquiries?
22      MR URQUHART: Are you talking about other than
23  this single invoice? Because that is all you've had,
24  is the single invoice. So I just want to make sure
25  you're not going to jump from a single invoice to many

Page 29

1  is that you're not supposed to be making these
2  speaking objections. So I'm just going to ask you
3  again if you would just make an objection, the legal
4  objection, and then we can proceed. We don't have an
5  understanding on that?
6      MR URQUHART: Just ask on.
7  BY MR HESS:
8      Q. Was December 2005 the first time that you
9  became aware of the service charges?
10      MR URQUHART: Objection, vague and ambiguous.
11  Lacks foundation.
12      A. I don't remember.
13  BY MR HESS:
14      Q. So it may be that you knew before December of
15  2005?
16      A. I don't remember.
17      Q. If you were aware of the service charges,
18  would you have put the same notation on the purchase
19  orders, or other payment documentation?
20      MR URQUHART: Objection, vague and ambiguous.
21      A. For whatever --
22      MR URQUHART: Lack of foundation.
23      A. I don't know what I would have done if I
24  were -- I don't know what I would have done.
25  BY MR HESS:

Page 31

1  invoices. Your questions relate to this single
2  invoice.
3      MR HESS: I think my question says -- I'll read
4  it back.
5      Frankly, I don't understand your objection, but
6  let me rephrase it.
7      MR URQUHART: My objection is I don't want you to
8  be taking a single invoice and turning it into
9  something that you haven't established a foundation
10  for.
11      MR HESS: So it is lack of foundation? Is that
12  the objection?
13      MR URQUHART: Yes.
14      MR HESS: Okay. And we got into this a little
15  bit at the other deposition. If you would do me the
16  favour -- and I've done you the favour, and it
17  comports with the rules, as you know better than I do,
18  that speaking objections are discouraged and just a
19  simple objection will not permit a waiver of your
20  objection. If you would do that. I've done that for
21  you and I've asked you to start doing that for me.
22      MR URQUHART: Just go ahead.
23      MR HESS: Because what you continue to do is by
24  your colloquy, you inform the witness and the witness
25  actually stops testifying, and that is exactly why it

Page 30

1      Q. You don't have any recollection as to whether
2  or not, prior to December 2005, you were aware of
3  service charges?
4      A. I don't remember.
5      Q. Do you recall when you became aware of the
6  service charges, as documented in your invoice in
7  Exhibit 4?
8      MR URQUHART: You mean this service charge?
9  (Indicating.)
10      MR HESS: Bill, we're only talking about one
11  service charge: correct?
12      MR URQUHART: Well --
13      MR HESS: Well, I don't understand. You keep
14  saying "this service charge." So far I'm talking
15  about a 10 per cent service charge as to Exhibit 4;
16  right?
17      MR URQUHART: Okay, that's fine.
18      MR HESS: Right?
19      MR URQUHART: No, I'm happy that is what you're
20  saying.
21      MR HESS: Well, I don't understand. What else
22  would I be saying? I'm trying to limit my language to
23  exactly what the language is supposed to mean and
24  continually you have these questions about what my
25  words mean. And I think if we read it back, it says

Page 32

8  (Pages 29 to 32)

1 exactly what it says and I don't understand why it is
2 that you have to interrupt me to ask me to clarify a
3 question that I think the witness understands.
4      The only reason I can think that you would do
5 that is to permit the witness to understand that it is
6 an important question to you and to make the witness
7 reflect on it so that the witness answers it in a way
8 favorable to Dubai World.  That is the only reason I
9 can think of that you would do that, because my
10 language was very, very clear and very succinct.  I
11 could read it back to you.
12      MR URQUHART:  Well, I know.  You're --
13      MR HESS:  Can you help me with that?
14      MR URQUHART:  It is not "service charges," it is
15 "service charge."  And you're going from the singular
16 to the plural and that is the only reason that I'm
17 objecting to this.
18      MR HESS:  The language that the deponent actually
19 wrote, if you would look at Exhibit 4, is "service
20 charges."
21      MR URQUHART:  All right, let's just go ahead.
22      MR HESS:  Do I understand?  Is that correct?
23      MR URQUHART:  Yep, it is.
24      MR HESS:  That is why I said it, because that is
25 the deponent's language.

Page 33

1      MR URQUHART:  Point well taken.
2 BY MR HESS:
3      Q.  Mr Nagaria, you don't have any knowledge of
4 when you first became aware of any service charges,
5 any service charges, that were being charged by
6 Seahorse Submarines?
7      A.  I don't remember the date.
8      Q.  Do you remember the year?
9      A.  2005.
10      Q.  So in 2005, that is when you first became
11 aware of any service charges being charged by Seahorse
12 Submarines?
13      A.  Yes.
14      Q.  Since that time in 2005, have you made -- I
15 mean from the date you became aware in 2005 until
16 today, have you made any inquiries about the nature of
17 those service charges or the authorisation for those
18 service charges?
19      A.  I did two things:  Number one, I made inquiry
20 from the purchase department and wrote my comments on
21 this one.  And after that I have reported the matter
22 to internal audit to do further investigation.
23      Q.  Who at the internal audit did you report that
24 to?
25      A.  I don't remember the name.  They were about

Page 34

1 to start the normal audit.  So they do interviews with
2 all the staff.  They asked me questions.  So there was
3 no particular person.
4      Q.  And that was, as you've testified, in the
5 course of a normal audit?
6      A.  Normal audit.
7      Q.  And when was that?
8      A.  I don't remember.  It was some time in 2006.
9 I remember that the audit report was issued by
10 internal audit department.
11      Q.  You said that the capital expenditures
12 earlier were approved by -- your language was
13 "relevant authorities."  Who were the relevant
14 authorities?
15      A.  After CEO, it goes to the person who the CEO
16 reports to.  There were various capital expenditure
17 documents.  I was not part of that work load, but I'm
18 aware of in some cases it was corporate office; in
19 other cases it was Istithmar, which was the parent
20 company of Exomos.  Istithmar became parent company in
21 2006, so that is why various people were involved who
22 Herve was reporting to during that period.
23      Q.  And certainly Sultan bin Sulayem had that
24 approval, correct?
25      A.  I've seen some signatures on the papers

Page 35

1 attached to the purchase orders of Mr Sultan bin
2 Sulayem.
3      Q.  What I'm asking you is he certainly had the
4 authority to approve those type of expenditures,
5 correct?
6      A.  I did not have authority to check what is his
7 authority.  I was told that purchase orders are
8 purchased by the purchase department after this paper
9 is signed.
10      Q.  Why wouldn't you have the authority to check
11 into Sultan bin Sulayem's authorities?
12      A.  My job was to make payment as per approved
13 purchase order issued by Dubai World purchase
14 department with their signature.  So my job was to
15 check the document, not to check the authority of the
16 executive chairman of Dubai World.
17      Q.  Okay.  What was his title again?
18      A.  What I can recall was now was executive
19 chairman.
20      Q.  Okay.  So what you're saying is -- well, I'm
21 not sure what you're saying.  Are you suggesting that
22 there is any question that Sultan bin Sulayem had the
23 authority to approve --
24      A.  I was not questioning --
25      Q.  -- capital expenditures or even 10 per cent

Page 36

9  (Pages 33 to 36)

1  service charges?  He had that authority; correct?
2    A.  Maybe.  I can not say "yes" or "no" because
3  I'm not the right person to say he had the authority,
4  he does not have the authority.
5    Q.  But you certainly don't have the ability to
6  question his authority; correct?
7    A.  Yes.
8    Q.  At the time, when you were employed by Dubai
9  World, he far exceeded your level of authority;
10  correct?
11    A.  Correct.
12    MR. HESS:  I had other copies of this, but
13  apparently didn't make my file today, but if you could
14  mark this as Exhibit 5.
15    (Exhibit 5 marked for identification.)
16  BY MR HESS:
17    Q.  Mr Nagaria, I'm going to show you the
18  original copy.  Well, it's a copy, but it's got the
19  original tag on it, just in case the copy is in any
20  way inaccurate.  You're looking at the original copy.
21    Are you aware of Sultan bin Sulaym'm's signature?
22    A.  Yes.
23    Q.  And his signature appears on that document?
24    A.  Yes.
25    Q.  What is that document, do you know?

                                        Page 37

1    A.  Material requisition form.
2    Q.  Does that document include a 10 per cent
3  service and handling charge?
4    A.  Line number 3, service and handling charges
5  are there.
6    Q.  Okay.  It is correct that Sultin bin Sulayem
7  approved this purchase material requisition form with
8  the service charges included; correct?
9    A.  Correct.
10    Q.  Okay.  Did you ever become aware that Sultan
11  bin Sulayem had approved service and handling charges?
12    A.  Rephrase, please.
13    Q.  Had you ever become aware, prior to today,
14  that Sultan bin Sulayem approved service charges?
15    A.  Yes.
16    Q.  And service charges that were charged by
17  Seahorse Submarines?
18    MR URQUHART:  Objection, vague and ambiguous,
19  overly broad.
20    A.  Yes.
21    MR URQUHART:  Lacks foundation.
22  BY MR HESS:
23    Q.  Do you recall when you became aware that
24  Sultan bin Sulayem had approved service charges
25  charged by Seahorse Submarines?

                                        Page 38

1    A.  I cannot, because I came to Exomos in 2005
2  and the company was in operation before.
3    Q.  Okay.  When you arrived at Exomos in the
4  third quarter of 2005, did you conduct a review of
5  documentation?
6    MR URQUHART:  Objection, vague and ambiguous.
7    A.  Review of documentation?
8  BY MR HESS:
9    Q.  What did you do?  When you joined Exomos in
10  2005, and in the capacity of what, what were you?
11    A.  Financial controller.
12    Q.  Okay.  Did you at that time have any
13  awareness that there was a service or handling charge
14  being charged by Seahorse Submarines?
15    MR URQUHART:  Objection, it is vague and
16  ambiguous.  Overly broad.
17    A.  I don't recall.
18  BY MR HESS:
19    Q.  Because I think you said, in response to one
20  of my questions earlier, that you joined Exomos in
21  2005, so you really weren't aware about when these
22  service charges or handling charges began.
23    A.  Exactly.
24    Q.  Okay.  So, to me, that means you knew they
25  were in existence when you joined Exomos or shortly

                                        Page 39

1  thereafter.
2    MR URQUHART:  Objection, argumentative.
3    A.  I can say today I'm aware that it was in
4  existence.  But was I aware when I joined?  That could
5  be a wrong assumption.
6  BY MR HESS:
7    Q.  So today you are aware that it was in
8  existence, that the service charges were in existence
9  at Exomos prior to you joining Exomos?
10    MR URQUHART:  Objection, vague and ambiguous.
11    A.  Might be.
12  BY MR HESS:
13    Q.  I thought you just said today you are aware.
14  Why would you say "might be"?
15    A.  Because I don't know what you are trying to
16  ask.  What I'm saying is that I recall this document
17  because I signed this.  Was I aware before that?  I
18  don't remember.
19    Q.  You're aware now, though, that there were
20  service charges charged by Seahorse Submarines?
21    A.  I'll give you one answer in this deposition,
22  that after this matter, since I did not have
23  authority, I reported the matter to audit and audit
24  investigated.  So it was possible that audit
25  investigated and they come up with more instances.

                                        Page 40

.0 (Pages 37 to 40)

1  That does not mean that I was aware when I joined the
2  company.
3      Q.  I appreciate that, but I'm not asking you now
4  what you were aware of when you joined the company.
5  My question is today, sitting here --
6      A.  Based on the audit report, I realised that
7  there were more circumstances and this is why the
8  matter was highlighted and covered in the audit
9  report.  And the service charges were stopped after
10  that.  Although those were approved by the chairman,
11  those were stopped once those were reported to audit.
12      So if you're asking me to assume a lot of things,
13  I'm assuming there were a lot of instances and those
14  were stopped once those were reported to audit.
15      Q.  When you said although they were approved by
16  the chairman, you're speaking of Sultan bin Sulayem;
17  correct?
18      A.  Yes.
19      Q.  Now, what conversations have you had with
20  Dubai World or any of the Dubai World subsidiaries
21  regarding your deposition today?
22      A.  I just called one of my colleagues, who was a
23  group corporate finance employee, and I was reporting
24  to him.  So I called him and he said, "If there is a
25  call, just go."  No other conversation.

                                                    Page 41

1  Q.  Who was that person you talked to?
2      A.  Junaid Rahimullah.
3      Q.  This is a person currently employed by Dubai
4  World?
5      A.  Yes.
6      Q.  In what capacity?
7      A.  Group corporate finance.  He is in group
8  corporate finance.
9      Q.  What did you talk about?
10      A.  I asked him -- this is the first time I'm
11  coming to this.  I asked him what to do.  He said, "If
12  you know something, just tell what you know."  I told
13  him okay.  It is my first time through ever in my
14  life, so I asked him what I had to do.  He said,
15  "There will be questions.  You have to answer them."
16      Q.  Have you spoken at any time with any of the
17  Dubai World attorneys, including the two attorneys
18  that are here today?
19      A.  About?
20      Q.  About anything?
21      A.  About anything?  I received a call explaining
22  that I have to come for the deposition.  I said I
23  cannot come because I work in Abu Dhabi.  They said,
24  "When can you come?"  I said, "I can come on
25  Saturday."  They sent me an e-mail that told me where

                                                    Page 42

1  to come.
2      Q.  And that was the only conversation you've had
3  with any attorney for Dubai World corporation or any
4  subsidiary?
5      A.  Yes.  Oh, Mr Mohammed called me and changed
6  the location.  This was one other information, because
7  I thought it was in Jebel Ali, because he said the
8  location is now changed.
9      Q.  You would agree that Dubai World corporation
10  is a very large concern in the region?
11      A.  Yes.
12      MR URQUHART:  Objection, it is vague and
13  ambiguous.
14  BY MR HESS:
15      Q.  Did you know what I meant by that?  What did
16  you think I meant by that?  A "large concern in the
17  region"?
18      A.  You're saying generally it is perceived,
19  understood by people as large.  Because it is not --
20  it is a private company.  People do not know the
21  numbers.  So when I sit with my friend, I just
22  casually tell him it is a big corporation.  I
23  understood you were asking a general question and I am
24  answering generally.  If you ask me to compare it with
25  any other company, I cannot do that because I do not

                                                    Page 43

1  know the numbers.
2      Q.  Okay.  You remain on good terms with Dubai
3  World corporation and its subsidiaries?
4      MR URQUHART:  Objection, vague and ambiguous.
5      A.  "Good terms"?  How do you define that?
6  BY MR HESS:
7      Q.  Well, I mean, you placed a call to a
8  colleague.
9      A.  When I resigned, they have accepted my
10  resignation.  When I left, they have paid my dues.
11  And I received a call from the internal audit saying
12  that I have to go for a deposition.  And I called my
13  colleague, asking him what is this.  I heard first
14  time.  He said go ahead and attend.  If you said this
15  is good relation?  Yes, this is good relation.
16      Q.  I was going to ask you this, but how did you
17  come about understanding that your deposition was to
18  be taken?
19      A.  Group internal audit called me and said,
20  "You'll receive a message from a lawyer.  Tell us your
21  e-mail address.  We want to send you official notice."
22      Q.  Who was that that advised you of that?  Group
23  internal audit?
24      A.  Department, someone from the department
25  called me.

                                                    Page 44

                                      11  (Pages 41 to 44)

1     Q. Who is... that... Who is group internal audit?
2     A. It is one of the departments in Dubai World.
3     Q. So you were in no way compelled to come here
4 today?
5     A. No.
6     Q. It was done by the request of Dubai World?
7     A. By the request of group internal audit
8 department.
9     Q. Who is Dubai World.
10     A. Yes.
11     Q. Is there a reason that you want to make that
12 distinction? Why would you say that "at the request
13 of internal audit"?
14     A. This is my first deposition and I'm sorry to
15 say I'm getting confused with your questions.
16 Sometimes you're asking one question in two or three
17 ways. Sorry for that, because I'm not exposed to this
18 kind of thing. So that is why I feel that, you know,
19 when you say "Dubai World" and then I say "Dubai
20 internal audit department," it makes a difference. So
21 I want to be more specific, you know. Just trying to
22 be more specific.
23     Q. Okay. Mr Nagaria, back to Exhibit 4. Do you
24 have a copy of that in front of you?
25     A. Yes.

Page 45

1     Q. Your handwritten notation states -- if you
2 look down to the end of the third line and then into
3 the last line, it says, "Service/handling charges" and
4 then what is the rest of that? That is "average
5 10 per cent," correct?
6     A. Yes.
7     Q. And does "average 10 per cent," does that
8 have a meaning?
9     A. Yes.
10     Q. What does that mean?
11     A. When I divide this figure, 25,698.49, divide
12 by the sum of the first two lines, it is slightly less
13 than 10.
14     Q. But don't you need more than just one item to
15 have an average?
16     A. English is not my mother tongue. Maybe I
17 made a mistake in writing the sentence. The purpose
18 was to convey the message to the people and they got
19 the message, so they didn't argue why I'm writing the
20 wrong English maybe. Maybe it was my mistake in the
21 way I drafted the sentence. And I think I just
22 drafted it in a couple of seconds and issued this
23 message out. So maybe there are mistakes in the way I
24 drafted the message, not the right way as you perceive
25 it should be.

Page 46

1     Q. When you wrote that, what was your position
2 again?
3     A. Financial controller.
4     Q. Financial controller of Exomos?
5     A. Yes.
6     Q. What type of resources at that time did
7 Exomos have? What type of money were you responsible
8 for?
9     MR URQUHART: Objection, it is vague and
10 ambiguous. Lacks foundation.
11     A. There was no business plan and there was no
12 money in Exomos. So whenever we need to make payment,
13 we have to send the request to head office that
14 paid --
15     Q. So -- I'm sorry. I didn't mean interrupt
16 you.
17     A. There was no business plan and there was no
18 money with Exomos. So whenever we want to make
19 payment, we have to send this request to head office
20 to pay on our behalf.
21     Q. Because Exomos had no bank account; correct?
22     A. Because Exomos had no business plan and there
23 was no money. There was no sales.
24     Q. There was no bank account; correct?
25     A. I was working in -- I worked in four or five

Page 47

1 entities in Dubai World during my tenure. The bank
2 account was centralised, but then other companies have
3 money. If you're a businessman and you are earning
4 rental income, it can be clearly recorded in your
5 accounting records. You record the related party
6 accounts, receivable and payable. In our case, it was
7 only payable because we didn't have any business.
8     Q. Exomos had no bank account; correct?
9     A. No bank account. But the reason it was
10 happening was not because of that, it was because of
11 no business.
12     Q. So your testimony is that when you -- did you
13 hastily write that notation on Exhibit 4? Is that
14 your testimony?
15     A. No.
16     Q. Is it your testimony that -- well, again,
17 could you explain -- let me explore your education a
18 bit. What was your education?
19     A. Commerce graduation.
20     Q. Where did you go to school?
21     A. Pakistan.
22     Q. And where did you learn English?
23     A. During my experience, studies in Pakistan and
24 my experience with audit firms in Pakistan and Dubai.
25     Q. Okay. And you were taught in your

Page 48

(Pages 45 to 48)

1  educational preparation that the word "average" can be
2  used loosely and doesn't have a particular meaning?
3       A. No.
4       MR URQUHART: Objection, this is argumentative
5  and insulting.
6       A. No.
7  BY MR HESS:
8       Q. So why would you use the word "average" as a
9  financial officer --
10      A. I don't remember why I used the word
11  "average" when there was one instance known to me and
12  why it was less than 10 per cent.
13      Q. So your testimony is despite the use of the
14  word "average," you only knew, as of the time of this
15  exhibit, of this one event of service charge.
16      A. As I said, I don't remember it was one event.
17  I'm trying to recall reading from this one why I said
18  "average."
19      Q. Okay. So you don't know whether or not you
20  knew of events prior to that or not.
21      A. I don't remember that.
22      · Q. You don't remember.
23      A. I don't remember that.
24      Q. Okay. So maybe you meant the word "average."
25      MR URQUHART: Oh, come on.

**Page 49**

1       A. There are so many documents --
2       MR URQUHART: This is argumentative.
3       MR HESS: Bill --
4       MR URQUHART: You're being insulting.
5       MR HESS: Bill, that is absolutely inappropriate
6  for you to --
7       MR URQUHART: Let's take a break.
8       MR HESS: No, I want to stay on the record.
9       MR URQUHART: You stay on the record. You stay.
10  Come.
11      MR HESS: For you to interrupt my question, it is
12  cross-examination, Bill.
13      MR URQUHART: I don't care. I don't care. I
14  don't like people condescending to other people.
15      MR HESS: You're going to utilise this in trial.
16  This is cross-examination and it is appropriate
17  cross-examination.
18      MR URQUHART: You be courteous.
19      MR HESS: It is courteous.
20      MR URQUHART: No, it is not courteous.
21      MR HESS: What you're acting like is not
22  courteous.
23      MR URQUHART: Come with me, please.
24      MR HESS: I'm going to object. I am in the
25  middle of my examination --

**Page 50**

1       MR URQUHART: I am courteous to every one.
2       MR HESS: So you're instructing this witness not
3  to answer my question?
4       MR URQUHART: I'm taking a break.
5       MR HESS: You're instructing my witness not to
6  answer this question? I have a question pending.
7       MR URQUHART: I don't care.
8       MR HESS: I'm going to object and I'm going to
9  move to strike him as a witness if you're going
10  interrupt this deposition at this time.
11      MR URQUHART: Do whatever you wish.
12      MR HESS: I'm just putting you on notice.
13      Okay. For the record, Mr Urquhart is instructing
14  the witness to leave the room and the witness has left
15  the room.
16      MR MOSELY: I believe that we just took a break,
17  in fact, and --
18      MR HESS: Well, taking a break in the middle of
19  my question isn't a break. It is instructing the
20  witness not to answer. If we're taking a break,
21  Laith, then what are you doing right now?
22      MR MOSELY: I don't need a break. Maybe they
23  needed to use the restroom or something.
24      MR HESS: So what you're saying is maybe they
25  need the restroom? Is that what you're saying?

**Page 51**

1       MR MOSELY: We're not off the record, are we?
2       MR HESS: No, we're not off the record. Is that
3  what you're saying, so they just left to use the
4  restroom?
5       MR MOSELY: No, I'm not saying that at all. I
6  said that they could be doing that. And that is
7  enough. I'm not speaking now until this break is
8  over.
9           (A short break.)
10  BY MR HESS:
11      Q. Mr Nagaria, did you have a conversation with
12  Mr Urquhart?
13      A. He asked me to stay out and then they went
14  away.
15      Q. He asked you to stay outside of this room?
16      A. I was here, yes.
17      Q. Did you have a conversation with anyone else?
18      A. No.
19      Q. Did you go to the bathroom?
20      A. I was there. (Indicating.)
21      Q. Did you use the restroom?
22      A. No, I was there, just outside of the room.
23  (Indicating.)
24      Q. I believe you were specifying that -- and I
25  think you've said this on a number of occasions. You

**Page 52**

**13 (Pages 49 to 52)**

1  don't have to answer this yet.  Correct me if I'm
2  wrong.  I'm just trying to catch up because we had
3  that interruption.
4      You testified that you can't be certain or you
5  don't recall if you knew of any other instances of
6  service charges other than the event that is
7  documented by Exhibit 4; correct?
8      A.  At the time signing this document.
9      Q.  Yes.  Correct?
10     A.  Correct.
11     Q.  Which means, to me -- and correct me if I'm
12  wrong -- at the time of this document, at the time of
13  December 2005, you may have been aware of other
14  instances.  You just don't recall; correct?
15     A.  I don't recall.
16     Q.  Okay.
17     A.  Correct.
18     Q.  Your position with Dubai World corporation
19  and with Exomos was such that you were never the
20  person that approved any purchase orders; correct?
21     A.  Correct.
22     Q.  You checked them.  You didn't approve them.
23     A.  True, yes.
24   ·  Q.  Upon your arrival with Exomos in the third
25  quarter of 2005, did you check every purchase order?

Page 53

1  Was that your job duty?
2      A.  No.
3      Q.  Which purchase orders did you check?
4      A.  Payment request.  Purchase orders attached to
5  the payment request.
6      Q.  So was it your responsibility to check every
7  payment request?
8      A.  Yes.
9      Q.  Okay.  So each and every payment request, you
0  checked.
1      A.  Yes.
2      MR HESS:  I have nothing further.
3      MR URQUHART:  I have no questions either.  Thank
4  you very much for taking time out of your weekend.
5  (The deposition was concluded at 10:35 a.m.)
6
7
8
9
0
·
·
·

Page 54

9      I, KHURRAM NAGARIA, do hereby declare
10  under penalty of perjury that I have read the
11  foregoing transcript; that I have made any
12  corrections as appear noted, in ink, initialed
13  by me, or attached hereto; that my testimony
14  as contained herein, as corrected, is true and
15  correct.
16      EXECUTED this____ day of_____,
17  20___, at _____, _____
           (City)          (State)
18
19
20      _____
        KHURRAM NAGARIA
21
22
23
24
25

Page 55

CERTIFICATE OF REPORTER

1      I, JEANNE BULLIS, RPR, CSR, hereby certify
2  that the testimony of the witness, Khurram Nagaria, in
3  the foregoing transcript, numbered pages 1 through 54,
4  taken on the 3rd day of April, 2010, was recorded by
5  me in machine shorthand and was thereafter transcribed
6  by me; and that the foregoing transcript is a true and
7  accurate verbatim record of the said testimony.

8      I further certify that I am not a relative,
9  employee, counsel or financially involved with any
10  of the parties to the within cause, nor am I an
11  employee or relative of any counsel for the parties,
12  nor am I in any way interested in the outcome of the
13  within cause.

18  Signed:   .............................
19  Name:     Jeanne Bullis
20  Date:     .............................
21
22
23
24
25

Page 56

**(Pages 53 to 56)**

DW 0008515



**BMT Surveys LLC**

# "EXOMOS"

## PRE-RISK SURVEY

**EXOMOS, Dubai, UAE**

**Date: 14th April 2006**

| DOCUMENT DETAILS AND ISSUE RECORD | | | | | | |
|---|---|---|---|---|---|---|
| GSS Number | | 250487 | Report Number | | AUH/0422/R.01 | |
| Issue | Rev | Date | Details | Author | Checked | Approved |
| 1 | 0 | 14/04/06 | Draft Report issued to Client for comment and review | PJB | RKN | PJB |
| 1 | 1 | 1/05/06 | Final Report | PJB | RKN | PJB |

Member of the BMT group of companies
Registered Office Shaikha Fatima and Zayed / Sheikh Suroor Bin Mohamed Al Nahyan and Sons Building,
Hamdan Bin Mohahamaed Street, P.O. Box 4030, Abu Dhabi, U.A.E.
Registered in Abu Dhabi No. 53662



D☐ P☑ Exhibit 1
Deponent KN
Date 4/3/10  Rptr. JB
Merrill Legal Solutions
www.merrillcorp.com

DIW 0008517

**EXOMOS**
**GSS 250487**
**Pre-Risk Survey**



## 1    INTRODUCTION

### 1.1    Instructions Received

Following instructions received from Khurram Nagaria of Exomos, Dubai,
UAE, purchase order number 06-16417, dated 1 March 2006,
representatives from this office attended on location at Jebel Ali Free
Zone, UAE on 2 March 2006 for the purpose of carrying out a pre-risk
assessment survey of the Exomos submersibles in order to establish the
risk associated with the manufacture, build and testing processes currently
on-going.

### 1.2    Attendance

At the time of our attendance, we were assisted throughout by Mark Rego
(Works Manager) and Khurram Nagaria (Financial Controller).

In addition, during the course of the survey we had meetings with Paul
Rodig (Production Supervisor) and Herve Jaubert (Chief Executive
Officer).

DW 0008618

EXOMOS
GSS 250487
Pre-Risk Survey



## 2   EXOMOS SUBMERSIBLES

Exomos are not concentrating on a single submersible design, but on numerous designs, each with a specific target market. As a result of this philosophy, there are a number of submersible designs already at the prototype stage.

### TABLE.1 – Designs Under Various Stages of Prototyping

| Type | Adventurer | Discovery | Nautilus | Proteus | SDV | SPV | Slingray |
|---|---|---|---|---|---|---|---|
| | Dry | Dry | Dry | Dry | Wet | Dry | Semi-Wet |
| Capacity (pax) | 3 | 7 | 8 | 8-dry cabin 14-wet deck | 2 | 8-dry cabin 10-wet deck | 1 |
| Length (m) | 6.4 | 6.9 | 13.76 | 20 | 5 | 20 | 2.7 |
| Beam (m) | 2.25 | 2.1 | 2.32 | 8 | 1.8 | 6 | 1.4 |
| Height (m) | 2.6 | 2 | 2.5 | 4.8 | 2.3 | 4.6 | 1 |
| Displacement (tonnes) | 2.3 | 5.5 | 8 | 45 | 1.7 | 45 | 0.2 |
| Max Depth (m) | 40 | 40 | 40 | 18 | 76 | 18 | 40 |
| Speed (knots) - Surface | 8 | 8 | 8 | 25 | 25 | 25 | 4 |
| - Submerged | 5 | 5 | 4 | 5 | 6 | 5 | 3 |

DW 0008519

**EXOMOS**
**GSS 250487**
**Pre-Risk Survey**



The Exomos company (formerly Palm Submarines) is a new company based within Jebel Ali Free Zone. The submersible designs and some working prototypes originated the buy-out of "Seahorse Submarines" Florida, USA – which were then moved, along with moulds, shells and key personnel to the new company in UAE.

## 2.1   General Design

The Exomos submersible designs are essentially limited to the maximum depth of 40m by PADI dive table, although being 'designed' for a deeper operation, approximately 200ft. The hull concepts are designed to be hydrostatically balanced, with water depth pressure exerted on the external hull being equalised by an increased pressure on the internal hull, by means of compressed air from storage bottles. This allows on a fully functioning system to minimise any pressure loadings onto the hull.

## 2.2   Adventurer

The Adventurer is a three person dry submersible craft, operating to a maximum submerged depth of 40m.

There are two (2) prototype Adventurer submersibles – Adventurer I & Adventurer II, both of which are operational. Adventurer I and II were both wholly built at "Seahorse Submarines" Florida, USA. However upon delivery to the UAE both prototypes have been completely stripped and retrofitted with additional/upgraded systems.

AUH/0422/R.01-Final Report

Case 2:09-cv-14314-JEM   Document 111-32   Entered on FLSD Docket 08/04/2010   Page 17 of 26

**EXOMOS**
**GSS 250487**
**Pre-Risk Survey**



## 2.3   Discovery

The Discovery is a seven person dry submersible craft, operating to a maximum submerged depth of 40m.

There are two (2) prototype Discovery submersibles – Discovery I & Discovery II. The Discovery I is fully operational, with the hull being fabricated at "Seahorse Submarines" Florida, USA and the outfitting completed at the UAE. The Discovery II (at time of survey) is a new fabrication (wholly within the UAE), with completed fabrication process only being the outer shell/hull.

## 2.4   Nautilus

The Nautilus is a ten person dry submersible craft, operating to a maximum submerged depth of 40m.

The Nautilus is a new fabrication (wholly within the UAE), with completed fabrication process only being the outer shell/hull.

## 2.5   Proteus

The Proteus is an eight person dry submersible craft, with a wet deck that can accommodate 14 swimmers, operating to a maximum submerged depth of 18m.

The Proteus hull and superstructure were designed/fabricated at "Seahorse Submarines" Florida, USA and then shipped to the UAE. Within the Exomos Jebel Ali facility, construction is to be completed, the machinery will be installed and final assembly completed.

DW 0008521

**EXOMOS**
**GSS 250487**
**Pre-Risk Survey**



### 2.6    SDV – Swimmer Delivery Vehicle

The SDV is a two person wet submersible craft, operating to a maximum submerged depth of 76m.

The SDV-II prototype is fully operational built from components delivered from "Seahorse Submarines" Florida, USA. This prototype currently has a military bearing to it, with specifications for crash-dive radar detection, etc. being designed to accommodate an 'operational' requirement.

### 2.7    SPV – Submersible Patrol Vessel

The SPV is a six person dry submersible craft, with a wet deck that can accommodate 10 swimmers, operating to a maximum submerged depth of 18m.

The SPV is a new fabrication (wholly within the UAE), with completed fabrication process only being the outer shell/hull.

### 2.8    Stingray

The Stringray is a single-person semi-wet submersible craft, operating to a maximum submerged depth of 40m.

There are two (2) prototype Stingray submersibles – Stingray I & Stingray II. The Stingray I prototype is fully operational built from components delivered from "Seahorse Submarines" Florida, USA, with outfitting completed in the UAE. The Stingray II prototype is also fully operational and was constructed wholly within the UAE.

DW 0008522

EXOMOS
GSS 250487
Pre-Risk Survey



## 3    EXTENT OF SURVEY

The survey of the Exomos prototype submersibles, offices, construction and test facilities was conducted 2 March 2006 at Jebel Ali, Dubai, UAE. Access to all areas was possible, however as a number of the submersibles are working prototypes, access to/inspection of enclosed engine rooms, ballast systems, etc. is not possible.

In-depth technical data (engine size, fuel capacity, control system, communications system, ballast capacity, etc.) for each of the submersibles was not requested.

### 3.1    Construction

Essentially the construction material for each of the submersibles is either fibre-glass reinforced vinyl ester plastic or Kevlar reinforced epoxy resin.

Fabrication of various prototypes is currently on-going within purpose built facilities. There are fully functioning Mechanical and Electrical workshops as well as enclosures for cleaning/painting.

An additional 'purpose built' facility for the SPV/Proteus production is nearing completion adjacent to current workshops. Date of completion not advised.

At the time of survey, the Quality Assurance side of the prototype manufacturing process was still an 'on-going' issue with audits to verify procedures still taking place. However, we have been informed from Exomos that they hold certifications for ISO 9001-2001 (as well as 14001-2004).

AUH/0422/R.01-Final Report

Case 2:09-cv-14314-JEM   Document 111-32   Entered on FLSD Docket 08/04/2010   Page 20 of 26

DW 0008623

**EXOMOS**
**GSS 250487**
**Pre-Risk Survey**



### 3.2   Instrumentation – Component Build

Other than the hull design and manufacture, all other components of the design are essentially 'off-the-shelf' components.

Each item is certified off-the-shelf and is then subsequently tested by Exomos prior to either installation into a component sealed unit or into the submersible itself.

Machinery and hydraulic systems are sealed and integrity tested to an IP68 rating[1].

### 3.3   Testing Facilities

Exomos are able to test in one of three ways:

1. Component Testing – (as mentioned above) components and sealed units are pressure tested/leak tested using a small tank facility.

2. Tank Testing – Exomos has 'Zebra Station' which is a tank testing facility. The tank is free-standing, above ground structure, measuring 12m x 4m x 3.5m, with scaffolding viewing/access around three sides and lifting gantry crane fitted for submersible lifting/entry/egress.

3. Sea Trials – within and around the Jebel Ali Freezone Port area.

---

[1] The two digit rating indicates the 'solid' protection rating and the 'liquid' protection rating, with the first digit scaled from 0 to 6 (corresponding to zero protection to totally protected from dust) and the second digit scaled from 0 to 8 (corresponding to zero protection to protected from extended periods of immersion under pressure). In this instance, the 68 rating relates to total dust protection (6) and protection from extended periods of immersion under pressure (8).

**Page 9 of 19**

AUH/0422/R.01-Final Report

DW 0008524

**EXOMOS**
**GSS 250487**
**Pre-Risk Survey**



## 4    DESIGN VERIFICATION

### 4.1    Engineering

All the submersible designs (either at prototype stage or fabrication stage) are not wholly engineered and analysed prior to going to build. There are no structural, hydrostatic, hydrodynamic analyses performed and no verification of any analyses by model, computational, tank or Third Party review.

Prototype designs (for build purposes) are based on basic engineering concepts and an extensive program of operational validation, be it tank testing or open sea trials.

We have been informed that structural and hydrostatic analyses are to be retro-actively conducted and will be completed for all submersible design, before 1st July 2006.

### 4.2    Classification

'Completed' units, such as Stingray, SDV, Proteus and Adventurer, essentially built in the USA, have been constructed to comply under the American Bureau of Shipping (ABS) Rules and US Coastguard Regulations. However, we have not sighted any documentation, Class-approved engineering notes or drawings in this regard.

Currently, the submersible models SPV & Adventurer (SPV still in the build process, whilst Adventurer is fully operational) are undergoing review and classification under Bureau Veritas (BV) Rules and Regulations. As a result of putting these submersibles through a classification process, engineering relating to the structural integrity of the craft (subjected to hydrodynamic, pressure, vibration, thermal loads, etc.) we be verified by

**Page 10 of 19**

Case 2:09-cv-14314-JEM   Document 111-32   Entered on FLSD Docket 08/04/2010   Page 22 of 26

DW 0008525

EXOMOS
GSS 250487
Pre-Risk Survey



Bureau Veritas Marine Department, in order to ensure compliance. The Finite Element Modelling (FEM) required to perform such analyses is currently underway, however we are not aware of how the above loadings will be calculated. It is estimated that this classification process will be completed by October 2006.

Upon completion of the classification of the SPV submersible, the Proteus vessel will also undergo classification with BV[2].

The Nautilus is the only other submersible that will currently undergo a classification process.

## 4.3 Operational Validation

In order to close the design-loop, each prototype is to undergo a series of operational validation tests, either at 'Zebra Station' (the onshore test facility) or sea-trials.

We have to hand dive records for a series of 4-weeks trials (see below), however we have not sighted a complete up-to-date record of operation validation tests for each of the submersible prototypes.

| | Week 1 | | Week 2 | | Week 3 | | Week 4 | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Test tank | Openwater | Test tank | Openwater | Test tank | Openwater | Test tank | Openwater | |
| Stingray 1 | 2 | 0 | 0 | 0.5 | 1 | 0 | 0.5 | 0 | 4 |
| Stingray 2 | 0 | 0 | 0.5 | 0 | 0.5 | 0 | 1 | 0 | 2 |
| Adventurer 1 | 0.5 | 2 | 0 | 0 | 0.5 | 0 | 1 | 0 | 4 |
| Adventurer 2 | 0 | 0 | 0 | 0 | 1 | 0 | 2 | 0 | 3 |
| Discovery | 0 | 0 | 0 | 0 | 0.75 | 0 | 1.5 | 0 | 2.25 |
| Proteus | 0 | 0 | 0 | 1.5 | 0 | 0 | 0 | 0 | 1.5 |
| Nautilus | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SPV | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

(The SPV 'open water' testing is only for surface craft mode and not for any submergence, i.e. submersible mode.)

---

[2] The SPV and the Proteus are similar in design specification, with only minor design changes due to operational requirements. With the SPV classed under the BV Rules and Regulations, it is believed that the Proteus will be 'fast-tracked' as a result of being essentially a sister-design.

**Page 11 of 19**

AUH/0422/R.01-Final Report

DW 0008528

**EXOMOS**
**GSS 250487**
**Pre-Risk Survey**



5.  The current on-site production facilities are very good, in this new purpose built facility. Similarly, the new production facility (yet to be completed to house the SPV/Proteus fabrication) appears to be of a similar standard. There were no Quality Control records for the manufacture process available for review and at the time of survey the ISO accreditation process was still ongoing, although we are in procession of the ISO 9001:2000 and ISO 14001:2004 certification.

6.  The prototyping testing is very good, from what we have seen and witnessed. The tank testing facilities at 'Zebra Station' are good, with plans to develop further onshore facilities close by, namely a sunken test tank measuring 30m x 15m x 15m. The documentation in regard to tank testing (trial brief, report, results-feedback) and the various levels of responsibility (designated pilots, safety divers, engineers, emergency contact, etc.) are similarly very good. Concerns relate to the lack of a qualified procedure for tank testing operations, although we have been provided with some 'individual submersible unit' checklists, that are specific for each unit, which are used prior to any testing (essentially "pre-flight" checklists). We have not sighted any method for closing out the discrepancies/enhancements that are issued within the Trial Report after each tank-testing.

7.  The open-sea testing is an area of the prototyping testing required for validation purposes, but again has a lack of qualified procedures in place for these operations. At time of survey, we witnessed a brief open-sea trial of an Exomos surface craft and noted the levels of manning, communication, safety to be good, however, would it be sufficient for submersible trials?

DW 0008533

**EXOMOS**
**GSS 250487**
**Pre-Risk Survey**



For:   BMT Surveys LLC

Original signed by: _____
Paul Binks

Countersigned by: _____
Robin Nicholls
BMT Surveys LLC

Dated:              1st May 2006

**CONFIDENTIALITY:** This report is confidential. It may also be privileged. It is prepared solely for the benefit of the clients to whom it is addressed with the purpose of assisting in the resolution of the issues with which it deals. In the event of authorised release to the relevant Assured or any other party it is to be used for that limited and confidential purpose only. In the event of unauthorised release, it and all records or copies of it are to be returned immediately. No reproduction nor repetition nor disclosure of any conclusion in it or of any information drawn from it, in whatever form, for any other purpose than that, is permitted without the specific written permission of BMT Surveys LLC.

AUH/0422/R.01-Final Report

DW 0008560

## STINGRAY PRE DIVE CHECK LIST

| CHECK LIST | | YES | NO |
|---|---|---|---|
| 1. | Check the battery charger has charged the battery | | |
| 2. | Check battery box drain plugs are closed | | |
| 2. | Check air in both tanks are a minimum of 3500 PSI | | |
| 3. | Check flight controls | | |
| | a.  Thruster forward (right joystick forward) | | |
| | b.  Thruster reverse (right joystick back) | | |
| | c.  Hover up (left joystick back) | | |
| | d.  Hover down (left joystick forward) | | |
| | e.  Vent main ballast (Left joystick left) confirm clicks | | |
| | f.  Blow main ballast (pull right hand lever under control panel towards pilot) confirm air release | | |
| 4. | Check manual air pressure (left joystick right) confirm air release from silencer | | |
| 5. | Check VBT venting and blowing (left hand switch under control panel, pull switch to vent and push to blow) | | |
| 6. | Empty drain valve (left hand bottom of seat). Ensure the drain valve is closed | | |
| 7. | Safety equipment | | |
| | a.  Turn on air tanks | | |
| | b.  Check regulator | | |
| | c.  Spare air is in place and full | | |
| 8. | Check lights are working | | |
| 9. | Hull check | | |
| | a.  No cracks on hull | | |
| | b.  Bubble secure | | |
| | c.  Tail secure | | |
| 10. | Check five computer operational | | |

**NOTE: Abort the trail or mission if one check is negative and service the submarine**



RECEIVED
Ports Customs & Free Zone Corporation
1 2 DEC
Finance Dept.

## PORTS, CUSTOMS & FREE ZONE CORPORATION
### Request for Payment

**5**

| | | | | (For Finance Use only) |
|---|---|---|---|---|
| Cheque | | OEP# / Capex # | | Date Received: |
| Bank Transfer | | | | |
| Date: 07.12.05 | | P.O. # : See the attached statement | | Cost Center: 55-571 |
| Due Date: 11.12.05 | | **Attachments:** | | Account Code: |
| Currency: US Dollars | | Original Invoice ☑ | | Cheque #: |
| Amount: 311,372.34 | | Other Approvals by BU ☐ | | |

**Details**

**Payable To:** SEAHORSE SUBMARINES INTL. INC

**Remarks**

Payment towards Invoice no 201105/Trimaran, 082808, 082809, 071106/ASDS, 071105/SPV, 082807
082805 and 071605/Intruder as per the attached staement enclosed.

| | Amount (US$) |
|---|---|
| Breakdown of payment | 42,100.00 |
| Consultancy charges and technical attendance | 243,573.85 |
| Materials | ⊗ 25,698.49 |
| Service and handling charges | |
| Total cost | 311,372.34 |

⊗ *Service charges are not usually added However, Purchase d informed that this supplier is charging us very low therefore theiy were allowed to recover service/handling charg are 'o'. TO PAY AS PER APPROVED D.C. (Chairman) "Decb*

| | Signature | Date |
|---|---|---|
| Requested by: Name: Reshmia D'souza | (Chairman) | 11 Dec/05 |
| Checked by: Name: Khurram Nagaria Title  Financial Controller | | 11/12/05 |
| Approved by: Name  Herve J P Jaubert Title  Chief Executive Officer | | 11/12/05 |

101255

JP Exhibit 4
Deponent KN
Date 4/3/10 Rptr 265
Merril Legal Solutions
www.merrilcorp.com