# Exhibit 2

1/13/2011                    Herve Jaubert

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 2:09-CV-14314-MARTINEZ-LYNCH

DUBAI WORLD CORPORATION, and its
subsidiaries, EXOMOS, NAKHEEL
and PALM MARINE,

          PLAINTIFFS,

-vs-


HERVÉ JAUBERT, SEAHORSE
SUBMARINES INTERNATIONAL
INCORPORATED, and Does 1-99,

          DEFENDANTS.

----------------------------------X



          VIDEOTAPED DEPOSITION OF HERVÉ JAUBERT



DATE:          Thursday - January 13, 2011

TIME:          9:41 a.m. - 4:42 p.m.

PLACE:         422 SW Camden Avenue
               Stuart, Florida

TAKEN BY:      Plaintiff

BEFORE:        Laura E. Melton, Registered Merit
               Reporter and Notary Public of the State
               of Florida at Large

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

---

## Page 2

```
 1   APPEARANCES:
 2   FOR THE PLAINTIFFS:
 3   QUINN EMANUEL
     BY: A. WILLIAM URQUHART, ESQ.
 4   LAITH MOSELY, ESQ. (Via Livenote)
     865 S. Figueroa Street, 10th Floor
 5   Los Angeles, California 90017
     ASTIGARRAGA DAVIS
 6   BY: ANNETTE C. ESCOBAR, ESQ.
 7   701 Brickell Avenue, 16th Floor
     Miami, Florida 33131
 8
     FOR THE DEFENDANTS:
 9
     HESS & HEATHCOCK, P.A.
10   BY: WILLIAM HESS, ESQ.
     KATHRYN HEATHCOCK, ESQ.
11   Post Office Box 2195
     Stuart, Florida 34995
12
     ALSO PRESENT:
13
     Robert Probst, Videographer
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1         E X A M I N A T I O N S
 2   Witness                         Page
 3
 4   HERVÉ JAUBERT
 5   DIRECT EXAMINATION BY MR. URQUHART        6
 6   CROSS-EXAMINATION BY MR. HESS           171
 7   REDIRECT EXAMINATION BY MR. URQUHART    188
 8   RECROSS EXAMINATION BY MR. HESS         190
 9   FURTHER REDIRECT EXAMINATION BY MR. URQUHART  192
10   CERTIFICATE OF OATH                     194
11   CERTIFICATE OF REPORTER                 195
12   READ LETTER TO WITNESS                  198
13
14   =====================================
15
16         E X H I B I T S
17
18   PLAINTIFF'S MARKED FOR IDENTIFICATION
19
20   Exhibit    Description            Page
21
     1    French Military Records         6
22   2    Dubai World Corporation's First Set of   8
          Interrogatories
23   3    Supplemental Response to Interrogatory 5  8
     4    Letter dated 3/28/05 re Eugene Lodrini   26
24   5    Document re Seahorse Submarines        139
          International (NZ) Ltd
25   6    Sale and Purchase Agreements          150
```

## Page 4

```
 1         THE VIDEOGRAPHER:  This is the deposition of
 2   Mr. Hervé Jaubert in the matter of Dubai World
 3   Corporation, Exomos, Nakheel, and Palm Marine
 4   versus Hervé Jaubert, Seahorse Submarines
 5   International Incorporated.  My name is Robert
 6   Probst.  I'm the video specialist with Legal
 7   Video & Media.  The court reporter is
 8   Laura Melton with Esquire Reporting.  Today is
 9   January 13, 2011.  The time is 9:41 a.m.
10         Will counsel please state their appearance
11   for the record.
12         MR. URQUHART:  My name is Bill Urquhart.  I
13   represent Dubai World and related entities.
14         MS. ESCOBAR:  I'm co-counsel for Dubai
15   World, Annette Escobar with the firm of
16   Astigarraga Davis.
17         MR. HESS:  William Hess on behalf of
18   Mr. Jaubert.
19         MS. HEATHCOCK:  Kathryn Heathcock on behalf
20   of Mr. Jaubert and Seahorse International, Hess
21   and Heathcock.
22         THE VIDEOGRAPHER:  Please raise your right
23   hand to be sworn.
24   //
25   //
```

## Page 5

```
 1   THEREUPON:
 2                HERVÉ JAUBERT
 3   a witness called by the Plaintiffs, being first duly
 4   sworn, testified as follows:
 5         MR. HESS:  Before we go on the -- on with
 6   the inquiries of today, I did -- I mentioned to
 7   counsel for plaintiff, we are supplementing a
 8   document disclosure.  We just recently received
 9   a -- some documentation from the Ministry of
10   Defense in France regarding Mr. Jaubert.  And I
11   am providing that to counsel at the earliest
12   opportunity today.  It's marked HJ Supp B-1
13   through 31.  And I have a copy that I'm
14   presenting today.
15         MR. URQUHART:  Do you -- I mean, I see that
16   the documents are in French.  Do you have any
17   idea what they say?
18         MS. HEATHCOCK:  I think they are his service
19   records.
20         MR. HESS:  They are records.
21         MS. HEATHCOCK:  From when he was with the
22   DGSE and the military.
23         MR. HESS:  There has been a -- there was a
24   redaction made.  I will supply you with the
25   information on the redaction.  I just wanted to
```

Esquire Reporting, Inc.
(772) 283-8002

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

---

Page 6

1    get you the documents today rather than tie it up
2    with a -- with the disclosures regarding the
3    redaction.  But the redaction are for security
4    purposes and safety purposes, and they're
5    minimal.
6        THE WITNESS:  Can I respond to that?
7        MR. HESS:  He will ask you.
8        MR. URQUHART:  Can I ask the reporter to
9    mark this as Exhibit 1.
10            DIRECT EXAMINATION
11   BY MR. URQUHART:
12       Q.  And, Mr. Jaubert, would you mind taking a look at
13   those documents which are marked as Exhibit 1.
14       A.  Yes, sure.
15           (Plaintiff's Exhibit No. 1, French Military
16           Records, marked for identification.)
17   BY MR. URQUHART:
18       Q.  I mean, I realize there are a bunch of them.  Can
19   you tell me generally what they are.
20       A.  It's a review for the last five years that I was
21   working for the DGSE.  I requested these reviews after I
22   read the Dubai World statements and the corp report that
23   were attached to the Dubai World claims that were
24   staining my name and making claims -- false claims on the
25   reason why I left the service or the quality of

---

Page 7

1    performance of my work at the DGSE.  So this is to prove
2    otherwise.
3        Q.  All right.
4        A.  So it's review, and it says how well and
5    indispensable I was for the DGSE.
6        Q.  Okay.  Well, I will move to strike as
7    unresponsive.
8            But what -- how long did you serve in the DGSE?
9        A.  10 years.
10       Q.  From what period to what period?
11       A.  '95 to -- I am sorry.  1984 to 1993.
12       Q.  So the documents that you have before you that
13   constitute Exhibit 1, they pertain only to the period
14   that you worked for the DGSE?
15       A.  For the last five years.
16       Q.  All right.  So that -- so they -- there is
17   nothing in there about your service that goes beyond
18   1993?
19       A.  Beyond -- after 1993?
20       Q.  Let me state it -- did you resign from the
21   service in 1993?
22       A.  No, I retired.
23       Q.  You retired.
24       A.  (Nods head.)
25       Q.  Did you get the equivalent of an honorable

---

Page 8

1    discharge?
2        A.  There is no such thing as an honorable discharge
3    in France.  It just does not exist.
4        Q.  But subsequent to 1993 you did no more work for
5    DGSE, correct?
6        A.  No.
7        Q.  So that everything in that document refers to the
8    period before 1993?
9        A.  Yes.  Including 1993.
10       Q.  Okay.  Thank you.
11           MR. URQUHART:  What I would like to do, if I
12   could, is mark these two documents together.
13   One is Mr. Jaubert's original response to our
14   interrogatories, and the other is the
15   supplemental response.
16           And if you could mark them as Exhibits 2 and
17   3 respectively.
18           (Plaintiff's Exhibit No. 2, Dubai World
19           Corporation's First Set of Interrogatories,
20           marked for identification.)
21           (Plaintiff's Exhibit No. 3, Supplemental
22           Response to Interrogatory 5, marked for
23           identification.)
24   BY MR. URQUHART:
25       Q.  Do you have them in front of you Mr. Jaubert?

---

Page 9

1        A.  Yes, sir.
2        Q.  And Exhibit 2, can you tell me what the date is
3    of Exhibit 2?
4        A.  Exhibit 2, yes?  What about?
5        Q.  Do you know what date it is?
6        A.  I am sorry?
7        Q.  Do you know what date it is?
8        A.  The date?
9        Q.  Uh-huh.  Maybe I can be helpful.  If you take a
10   look at page 11.
11       A.  March the 2nd, 2010.
12       Q.  All right.  And is that your signature above
13   that?
14       A.  Yes, it is.
15       Q.  And at the time that you signed this, was it your
16   belief that the answers that you had provided were true
17   and correct?
18       A.  I believe so.
19       Q.  I would like to direct your attention to what is
20   page 9 and page 10 and page 11 of Exhibit 2.
21           MR. HESS:  Do you have another copy?
22           MR. URQUHART:  Oh.  I am sorry.  I do have
23   multiple copies.
24           MR. HESS:  Thank you.
25           MR. URQUHART:  And here, Bill.

---

3  (Pages  6 to 9)

Esquire Reporting, Inc.
(772) 283-8002

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

---

**Page 10**

1    MR. HESS:  Thank you.
2    BY MR. URQUHART:
3    Q.  Now, at page 10 it states that -- that you had
4    valued the damages at approximately $20 million?  Do you
5    see that?
6    A.  On -- I don't see that.  Page 10?
7    Q.  Right.  (Indicating.)  It says answer to
8    Interrogatory No. 5.  Or maybe it's 9-A, I apologize.
9    A.  9-A okay.  Yeah, I see that.
10   Q.  All right.  Do you see where it says $20 million?
11   A.  Yes.
12   Q.  Now, that was your best estimate as of March 2010
13   as to the damages you had incurred?
14   A.  As you said it, it was an estimate.
15   Q.  Right.
16   A.  (Nods head.)
17   Q.  And as of -- as of March 2010, you believed that
18   was approximately the amount of your damages?
19   A.  At the time, yes.
20   Q.  Okay.  And I would like to direct your attention
21   to Exhibit 3 and to the -- again, to the -- to your
22   response to Interrogatory No. 5.
23      Do you see that?
24   A.  Yes.  Page No. 3.
25   Q.  Right.  And as I add these up, it adds up to

**Page 11**

1    approximately $500 million.  Is that sort of the
2    same -- is your math basically the same?
3    A.  The first thing I would say is that I did not add
4    up anything.
5    Q.  Okay.
6    A.  You are the 500 million; I did not do that.  What
7    I did in the supplementary -- supplemental response is to
8    list precisely the damages.  I have not done that before.
9    Q.  Right.  Well, you would agree with me, wouldn't
10   you, that the damages have expanded far beyond
11   $20 million?
12   A.  Yes.
13   Q.  And I think today what we're going to focus on is
14   on -- primarily on two things.  You know, how did that
15   happen?  And then secondly, do I have or do we have all
16   of the documents that support your damages claims?
17      Now, am I correct that, with respect to all
18   documents that you believe that support any of the -- any
19   of the damages claims listed in your supplementary
20   response to Interrogatory No. 5, that you have given any
21   and all documents to Mr. Hess?
22   A.  Yes.  Yes, I have given everything that I have,
23   the documents, pictures or videos to Mr. Hess.
24   Q.  So any document that you have in your possession
25   that you believe supports any of the -- any of the

**Page 12**

1    damages claims with respect to the supplemental response
2    to Interrogatory No. 5, you have given to Mr. Hess?
3    A.  Yes, uh-huh.
4    Q.  So there won't be any additional documents?
5    A.  No.
6    Q.  So I can assume that if you had, for example, tax
7    returns, financial statements or anything that might
8    pertain to this supplementary response, Interrogatory No.
9    5, I have them and they have been given to Mr. Hess and,
10   to the extent that they're responsive, they have been
11   turned over to me?
12   A.  Everything I have or I had was given to Mr. Hess.
13   Q.  Okay.  Could I direct your attention to the
14   response to supplementary response to Interrogatory No.
15   5.  It's the first bullet, where it says the loss of
16   Mr. Jaubert's business, Seahorse Submarines
17   International, and attendant loss to Mr. Jaubert of
18   employment and employment benefits, including salary,
19   insurance and vehicle.
20   A.  Yes.  Uh-huh.
21   Q.  Am I correct that these damages that you're
22   claiming here are limited to the work that you had been
23   doing for Seahorse?
24   A.  I'm not sure to understand that question.
25   Q.  All right.  What -- how long was Seahorse in

**Page 13**

1    existence?  When did Seahorse start?
2    A.  Seahorse started in -- Seahorse was incorporated
3    in the year 2000.  Prior to that, I was operating
4    Caribbean Submarines.  So although Seahorse was
5    incorporated in the year 2000, I really started the
6    submarine business in 1996.  There have been a change of
7    name and a change of corporation in between, but I really
8    started in 1996.
9    Q.  Did -- was there a transfer of assets
10   from -- Caribbean Subs to Seahorse?
11   A.  Yes, there was a transfer of assets and
12   intellectual property.  The reason why I changed the name
13   and the corporation is because I moved from Puerto Rico
14   to Florida.
15   Q.  I am sorry.  From --
16   A.  The reason -- the reason of the change is because
17   I relocated my company from Puerto Rico to Florida.
18   Q.  Had Caribbean Submarines been registered to do
19   business in Puerto Rico?
20   A.  Yes, sir.
21   Q.  It was a corporation?
22   A.  It was a corporation, yes.  I don't remember if
23   it was a C-corp or an S-corp.  I believe it was a C-corp.
24   Q.  What was the business of Caribbean Submarines?
25   A.  Operating and building, requisition of

4 (Pages 10 to 13)

Esquire Reporting, Inc.
(772) 283-8002

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

### Page 14

1  submarines. So manufacturing and charter.
2      Q. How many submarines had Caribbean Subs
3  manufactured and sold?
4      A. If I remember, four or five.
5      Q. Were they designs that were the same or similar
6  to the designs that we have seen with respect to
7  Seahorse?
8      A. Yes, very similar.
9      Q. Which submarines were sold by Caribbean Subs?
10     A. The Adventurer, a three-seater submarine.
11     Q. Uh-huh.
12     A. And another one called Pioneer, P-I-O-N-E-E-R,
13 one-man submarine; and the Goby, three-man submarine.
14     Q. How many Adventurer submarines did you sell?
15     A. If I remember, it's three or four. I'm not sure.
16     Q. And how many Pioneer submarines did you sell?
17     A. Only one.
18     Q. How many Goby submarines did you sell?
19     A. I did not sell the Goby.
20     Q. Okay. So you sold between four and five
21 submarines?
22     A. Uh-huh.
23     Q. Total?
24     A. (Nods head.)
25     Q. Do you know what the sales price was of the

### Page 15

1  Adventurer submarines that you sold?
2      A. No, I -- I don't remember the exact price.
3      Q. Do you remember the approximate price?
4      A. It was under -- it was under -- anywhere between
5  75 and $95,000.
6      Q. That's 75 to $90,000 --
7      A. '90. Each.
8      Q. Do you remember who you sold any of the
9  Adventurer submarines to?
10     A. No, I don't remember.
11     Q. And you sold one Pioneer submarine?
12     A. Yes.
13     Q. How much did you sell that for?
14     A. About 30 -- 30, 35,000 maybe.
15     Q. Do you remember who you sold that to?
16     A. No, I don't remember.
17     Q. Do you remember approximately what years you sold
18 any of the Adventurers or the Pioneer submarine?
19     A. 1998, '99. '98, '99.
20     Q. When you sold these submarines, did you -- were
21 there bills of sale accompanying the sale?
22     A. Yeah, there was a bill of sale, yes. But on the
23 title -- all of those records were -- when I moved to
24 Dubai, all of those records were moved to Dubai as well.
25 So I don't -- I don't have them. Dubai has them.

### Page 16

1      Q. You have -- so you have no records relating to
2  the sale of the three or four Adventurer submarines or
3  the Pioneer submarines?
4      A. All these records were sent to Dubai, were moved
5  with the -- when I relocated to Dubai, it was in the
6  metallic file cabinet, three or four drawers.
7  Everything. The bill of material, invoices, bill of
8  sales, titles, correspondences with customers, with the
9  Coast Guard. Everything. I did not keep anything in the
10 U.S.
11     Q. Do you have any bank records that I could look at
12 which would show me what kind of income you derived from
13 the sale of the Pioneer or Adventurer submarines?
14     A. My bank records with Caribbean Submarines are in
15 Dubai. I don't have them.
16     Q. Do you have any personal records that would
17 reflect any income you received from the sale of
18 Adventurer or Pioneer submarines?
19     A. My personal records were also sent to Dubai.
20     Q. So when you moved to Dubai, all of your banking
21 records and everything --
22     A. Everything. Because I had an office, and when
23 those guys moved my stuff, they just took the cabinets
24 and boxes and moved everything to Dubai. I did not keep
25 anything -- even personal files were moved to Dubai, just

### Page 17

1  because they were in my office.
2      Q. So am I accurate to state then that you have no
3  tax returns relating to the business of Caribbean
4  Submarines?
5      A. No.
6      Q. You have no bills of sale?
7      A. I mean, they were in Dubai. I don't have them
8  with me.
9      Q. I'm asking whether you have them.
10     A. No.
11     Q. You have no income tax returns?
12     A. No. They are in Dubai or they were in Dubai.
13     Q. And would the same answer be true with respect to
14 Seahorse Submarines?
15     A. Pretty much the same. With Seahorse Submarines I
16 was able to recover some of the documents, very limited
17 number of documents.
18     Q. So as I -- I see that you said that you sold the
19 Adventurer submarines for 75 to $90,000 apiece.
20     A. Yeah. It was the first version of the
21 Adventurer. Once I moved to Florida, I built a second
22 version of the Adventurer that was more elaborate, which
23 means it cost more -- more expensive.
24     Q. What kind of investment had you made? What was
25 your level of investment in research and development with

Esquire Reporting, Inc.
(772) 283-8002

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                     Herve Jaubert

Page 18

1  respect to the Adventurer submarine?
2      A.  It took me three year -- three years of time,
3  almost every day, in design, research, engineering,
4  calculation, testing. It's a very, very extensive work
5  and research.
6      Q.  How much money did you invest in the design of
7  the Adventurer submarine?
8      A.  I could -- I could not be specific as to how much
9  money I invested just in the Adventurer because the money
10  I had was invested in the company in general, and I was
11  working on other projects as well.
12     Q.  Were they all submarine projects?
13     A.  Submarine projects.  Mostly submarine projects.
14  I would say 80 percent.
15     Q.  So how much money did you invest in Caribbean
16  Submarines?
17     A.  Caribbean Submarines and Seahorse or --
18     Q.  No.  For now I'm limiting it to Caribbean
19  Submarines.
20     A.  Caribbean Submarines, probably $200,000, cash.
21     Q.  And in addition to that, you invested your own
22  time and effort?
23     A.  And in addition, I invested my time and effort,
24  yes.
25     Q.  Do you know how much it costs to manufacture what

Page 19

1  was -- for the materials that went into the construction
2  of an Adventurer submarine?
3      A.  Today or then or when?
4      Q.  Then.
5      A.  In Puerto Rico?
6      Q.  Right.  At or about the time you sold them.
7      A.  Well, the cost to build a submarine would be
8  approximately -- approximately two-third of the price
9  tag.  So if I sell a submarine at $90,000, it's going to
10  cost me 50, 60 to build it, including -- not just bill of
11  material, but salary, rent, whatever.
12     Q.  How many people worked for you when you worked at
13  Caribbean Submarines?
14     A.  I had two or three employees, four; depending on
15  the labor, the work, the tasks.
16     Q.  What about the Pioneer submarine?  Did we
17  establish what you sold that for?  That was about
18  $30,000, right?
19     A.  About 30, 35 maybe.  Between 30 and 35.
20     Q.  And would the same --
21     A.  The same ratio, yes.
22     Q.  Ratio.
23         So basically you would have made, say, $10,000 on
24  a $30,000 submarine?
25     A.  10, 15,000.

Page 20

1      Q.  So -- so by the time that you moved Caribbean
2  Submarines to Florida, had you broken even on your
3  investment?
4      A.  Yes.
5      Q.  So you invested $200,000.
6      A.  (Nods head.)
7      Q.  And do we have -- I'm trying to do the math here.
8      A.  If I count -- when you mean investment, in cash
9  or in, what, time or --
10     Q.  Well, as I understood it, you said that you had
11  invested approximately $200,000 of cash money in
12  Caribbean Submarines, is that right?
13     A.  That's what I invested, yes.
14     Q.  And you had income in terms of sales of four
15  times, say, 75 -- say 300,000 of which 200,000 --
16  approximately 200,000 are costs of manufacture.  That
17  leaves 100,000.  That you have a sale of one Pioneer
18  submarine at 30,000, of which you said 20,000 was cost.
19         So my rough net math says that you had a profit,
20  not taking into account your capital investment, of about
21  110,000.
22     A.  I don't remember.  I don't know.  I would have to
23  look at the numbers myself, and --
24     Q.  But you can't look at the numbers because you
25  don't have the numbers to look at?

Page 21

1      A.  No, no.  I mean, I would just, you know, do what
2  you just did. (Indicating.)
3      Q.  Well, did you -- did you file tax returns when
4  you were in Puerto Rico --
5      A.  Yes.
6      Q.  -- for Caribbean Submarines?
7      A.  Yes, of course.  Uh-huh.
8      Q.  Did you -- did you -- did these tax returns show
9  a profit or did they show a loss?  During this initial
10  phase when you were --
11     A.  I remember it was showing a loss --
12     Q.  Right.
13     A.  -- when I started.
14         I'm not sure.  I don't remember -- I think the
15  last one I broke even.  I'm not sure, if it showed a
16  profit or -- if it showed a profit, it was a small one.
17     Q.  So at the time that you moved the Caribbean
18  Submarines to Florida, if it showed a profit, it was a
19  minimal profit?
20     A.  Yes.
21     Q.  When did you move your operations to Florida?
22     A.  I think it was June, July 2000.
23     Q.  June, July 2000.
24         Did you make any additional capital investments
25  into Seahorse Submarines from July 2000 until you moved

6 (Pages 18 to 21)

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

---

Page 22

1   to Dubai?
2       A.  Yes, I did.  I put 300,000, maybe 350.
3       Q.  So this is an additional 300 --
4       A.  Yes.
5       Q.  -- or $350,000 of your own money into here?
6       A.  Yeah.  My own money and money that I borrowed.
7       Q.  Who did you borrow money from?
8       A.  What's -- Mrs. Coury.
9       Q.  Mrs. Coury.  And how much money did you borrow
10  from Mrs. Coury?
11      A.  I don't remember.  200,000, 250,000.
12      Q.  Who is Mrs. Coury?
13      A.  She was my landlord.
14      Q.  The money that you borrowed from Mrs. Coury, did
15  that come in the form of actual cash investment?
16      A.  Yes.  Cash investment.
17      Q.  It wasn't a forgiveness of rent or anything like
18  that?
19      A.  No.  I was paying rent.
20      Q.  What kind of rent were you paying Mrs. Coury?
21      A.  It was not a fixed rent because I moved from one
22  building to another throughout the years.  But it was
23  from 2,500 to $5,000 monthly.
24      Q.  Does Mrs. Coury live in the area.
25      A.  She lives in the area, yes.

Page 23

1       Q.  Are you still in contact with her?
2       A.  No.  Once after I moved to Dubai, I reimbursed
3   her and never had contact with her.
4       Q.  And where did you get the funds to reimburse
5   Mrs. Coury?
6       A.  After I moved to Dubai, from the money I received
7   once I was in Dubai.
8       Q.  You mean from the sale of the assets --
9       A.  Yes.
10      Q.  -- of Seahorse?
11          So you took some of the proceeds of the sale of
12  the assets and paid off your loan to Mrs. Coury?
13      A.  Yes.
14      Q.  Did you borrow money from anybody other than
15  Mrs. Coury?
16      A.  Yes.  From myself.
17      Q.  Okay.  So you got 250 to $300,000 from
18  Mrs. Coury.  How much did you -- did you loan to
19  Seahorse?
20      A.  How much I loaned to Seahorse?
21      Q.  Well, I don't want to put words in your mouth.
22  Was your investment in Seahorse in the form of a loan?
23      A.  Yes, in the form of a loan, yes.
24      Q.  And how much money did you loan Seahorse?
25      A.  I don't have a precise figure, but 100, 150,000.

Page 24

1       Q.  And were there any investors in Seahorse other
2   than Mrs. Coury and yourself?
3       A.  No.  No investors, no shareholders.
4       Q.  Did you receive an investment or a loan from a
5   guy named Lodrini?
6       A.  Yes, I forgot about him.  It was a $35,000 loan.
7   And I reimbursed him --
8       Q.  Are you sure?
9       A.  -- prior -- prior to going to Dubai.
10      Q.  Are you sure you repaid Mr. Lodrini?
11      A.  I left -- because I was leaving, I left a
12  check -- a certified check at Mr. Hess's office and then
13  he went to Dubai.
14      Q.  Are you sure that money was paid?
15      A.  Now I remember that he never -- he never showed
16  up -- he never took the check.  I don't know what
17  happened.
18      Q.  All right.  So as of now, to the best of your
19  knowledge, Mr. Lodrini hasn't taken the $35,000?
20      A.  No.
21      Q.  So --
22          MR. URQUHART:  Can we go off the record for
23  a second.
24          MR. HESS:  Sure.
25          THE VIDEOGRAPHER:  Off the record at 10:14.

Page 25

1           (A recess was taken from 10:14 a.m. to
2   10:15 a.m.)
3           THE VIDEOGRAPHER:  Back on the record at
4   10:15.
5           MR. HESS:  Let's -- I am sorry to do that to
6   you.  Let's go off the record again, if we could.
7   I want to read it.
8           THE VIDEOGRAPHER:  Off the record at 10:15.
9           (A recess was taken from 10:15 a.m. to
10  10:17 a.m.)
11          THE VIDEOGRAPHER:  Back on the record at
12  10:17.
13          MR. HESS:  If you don't mind, I will start
14  this.  Counsel has provided a copy of an
15  exhibit -- of a document that is marked DW
16  0047445.  It may or may not contemplate
17  attorney-client privilege information.  It was
18  produced by Dubai World.  My understanding is
19  that counsel is agreeing that if I agree that he
20  can utilize the document, that he agrees that he
21  will not assert any waiver of the attorney-client
22  privilege by virtue of the disclosure of the
23  document.  Is that accurate?
24          MR. URQUHART:  That is accurate.  Can I have
25  that marked.

7 (Pages 22 to 25)

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                         Herve Jaubert

**Page 26**

1   MR. HESS: This is my copy.
2   MR. URQUHART: Here, I will give you this.
3   (Plaintiff's Exhibit No. 4, Letter dated
4   3/28/05 re Eugene Lodrini, marked for
5   identification.)
6   BY MR. URQUHART:
7   Q. Do you see that, Mr. Jaubert?
8   A. Yes, sir.
9   Q. Was it a fact that -- does this refresh your
10  recollection that you told Mr. Hess not to pay back
11  Mr. Lodrini?
12  A. What is your question again?
13  Q. Have you ever paid back Mr. Lodrini the $35,000
14  he loaned you?
15  A. No.
16  Q. Was this a personal loan to you or was it a loan
17  to Seahorse?
18  A. It was a loan to Seahorse. I paid him the
19  interest, when I left Dubai I left a check with
20  Mr. Hess's office to reimburse the capital. And he never
21  showed up. So when he did not show up, I had just
22  cancelled the check and --
23  Q. So as of today he hasn't been repaid?
24  A. No. I don't know where he is. He never claimed
25  anything to me. I mean, a check was available for him to

**Page 27**

1   pick up, a certified check, not a personal check, not a
2   company check. I left a check with Mr. Hess's office.
3   Q. So if he showed up here today and said, I want my
4   check, you would write a check out to him?
5   A. Today I am no longer in a position to give him
6   money. But eventually, if I get money, yes.
7   Q. So --
8   A. I had no problem at the time to pay Mr. Lodrini.
9   He just did not show up. What do you want me to do?
10  Q. I understand. So I just want to get things
11  straight. So we had a $250,000 loan from Mrs. Coury;
12  $150,000 of money that you invested in Seahorse out of
13  your own pocket; and $35,000 from Mr. Lodrini?
14  A. (Nods head.)
15  Q. Were there any other loans to Seahorse before you
16  left to Dubai?
17  A. No, not that I remember.
18  Q. Did you or did Seahorse repay the $150,000 that
19  you loaned it?
20  A. Yes.
21  Q. And when did that happen?
22  A. It took time. When I moved to Dubai, I did not
23  close Seahorse right away. So I had -- I had the bank
24  account of Seahorse that is -- that was still running.
25  When I moved to Dubai -- after I moved to Dubai and that

**Page 28**

1   I created Exomos, Sultan -- Sultan Bin Sulayem put me in
2   charge of a certain number of projects, and they were all
3   priority, it was always urgent.
4   Q. Right. No. No. I understand that. But I just
5   have a simple question.
6   A. Yes, but --
7   Q. My question is --
8   A. I have to explain to you because it's not that
9   simple.
10  When Seahorse reimbursed me, then I would put
11  money back in Seahorse and back and forth for at least a
12  year. So I got my money back only maybe a year or two
13  later when I closed Seahorse. But when I was running
14  Seahorse, the money was going back and forth between me
15  and Seahorse because I was loaning money to Seahorse.
16  And then Seahorse would reimburse me and then Seahorse
17  would need money again, and I would loan money to
18  Seahorse so Seahorse could pay the bills.
19  Q. All right. But as of today, Seahorse owes you no
20  money?
21  A. No, as of today, no.
22  Q. And when you -- when you made the $200,000
23  investment out of your own pocket into Caribbean
24  Submarines, was that repaid?
25  A. If you consider my last response as for loan

**Page 29**

1   money between Seahorse and me, that has been paid. What
2   has not been paid -- or if -- I'm not -- I cannot be
3   precise or I'm not sure -- is that is for the time and
4   effort that I invested in Seahorse, that technology that
5   I developed --
6   Q. Well, no, I --
7   A. That was never paid to me.
8   Q. I understand that. All I'm talking about is the
9   cash that you invested.
10  A. Oh, the cash; we are clear.
11  Q. All right. So the $250,000 that you invested in
12  Caribbean Submarines, was that paid back?
13  A. Yes, somehow it was paid back.
14  Q. By whom?
15  A. Whichever company.
16  Q. As a practical matter, did -- was Caribbean
17  Submarines -- did that basically just become Seahorse?
18  A. No. Caribbean Submarines is one company.
19  Seahorse is one -- another company. So once I moved,
20  Caribbean Submarines transferred whatever assets to
21  Seahorse --
22  Q. Right.
23  A. -- against whatever money.
24  Q. Did it also --
25  A. And Caribbean Submarines was closed. And then

8 (Pages 26 to 29)

Esquire Reporting, Inc.
(772) 283-8002

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

Page 30

1   Seahorse Submarines was opened and continued to operate.
2       Q.  Okay.  Let's just focus on the period of the
3   operations of Caribbean Submarines before you opened
4   Seahorse.
5           At the time that you closed Caribbean Submarines
6   and opened Seahorse, had Caribbean Submarines paid you
7   back the $200,000 that you, Hervé Jaubert, had loaned it
8   out of your own resources?
9       A.  I don't remember if it was that amount, if it was
10  in one-time payment; that, I don't remember.  What I do
11  remember is that Caribbean Submarines does not owe me
12  money.
13      Q.  It doesn't owe you money at this point?
14      A.  Cash-wise.
15      Q.  While you were at Caribbean Submarines, did you
16  have sources of income other than the design, manufacture
17  and sale of submarines?
18      A.  Charter.
19      Q.  You had a charter business.  And what did you
20  charter?
21      A.  I chartered a three-passenger submarine.
22      Q.  Where?
23      A.  In Puerto Rico.
24      Q.  Where in Puerto Rico?
25      A.  Dorado, Cerro Gordo.

Page 31

1       Q.  At a hotel?
2       A.  Out of the hotel, yeah.  I mean, no, not at the
3   hotel.  I was taking customers from the hotel.
4       Q.  The hotel would recommend customers to come and
5   go on your submarines?
6       A.  I don't know if they would recommend.  I don't
7   know -- I don't remember the -- I had fliers at the hotel
8   and the people would take my flier.  Like, when you go to
9   a hotel, you see fliers --
10      Q.  Sure.
11      A.  -- for taxis, jet skis.  I just had my own flier.
12  I don't remember if the hotel recommended, or not, my
13  operation.
14      Q.  What was the total amount of money that you
15  received for your chartering work while you were at
16  Caribbean Submarines?
17      A.  I don't -- I don't remember.
18      Q.  Okay.
19      A.  I was charging -- I believe it was 75 or $95 per
20  person.  I would take two people at a time.  And I would
21  do that three, four times a day, three times, four times
22  a day.
23      Q.  And how long -- how long did you operate this
24  charter business?
25      A.  I'm not sure.  At least a year.  It's between a

Page 32

1   year -- a year and two years.  The operation stopped -- I
2   do remember when the operation stopped.  It was
3   at -- when Hurricane Georges hit the island.  I was not
4   affected directly by the hurricane, but the hurricane did
5   affect the tourism industry in Puerto Rico and shut down
6   the hotels.  So then, because I did not have customers
7   anymore, I had to move on to the U.S.  The money -- there
8   is more money in the charter than in the -- there is more
9   money to make in the charter than in the manufacturing.
10      Q.  Did you operate that as a separate business?
11      A.  No, it's the same business.  I had the license
12  for operating and building submarines.  And that license
13  is in Dubai.
14      Q.  And the reason that you moved operations from the
15  Caribbean, Puerto Rico, to Florida was as a result of the
16  hurricane?
17      A.  Mostly because of that Hurricane Georges.
18      Q.  What -- when did you actually begin operations of
19  Seahorse in Florida?
20      A.  I -- I incorporated Seahorse in 2000 -- I'm not
21  sure if it was June or July or September.  I believe -- I
22  believe it's around summer 2000.
23      Q.  What did you ship from -- if anything, from
24  Puerto Rico to Florida?
25      A.  My tools, equipment, two submarines.

Page 33

1       Q.  You shipped two submarines?
2       A.  Yes.
3       Q.  From Puerto Rico to Florida?
4       A.  From Puerto Rico to Florida.  (Nods head.)
5       Q.  Were these operational submarines?
6       A.  Yes.
7       Q.  Were these submarines that you had used in the
8   charter business?
9       A.  One of them was -- one of them I used as -- for
10  charter, the other one I never used it.
11      Q.  Why didn't you ever use it?
12      A.  I was going to sell it.
13      Q.  What design were these two --
14      A.  Adventurer.
15      Q.  They were both Adventurers?
16      A.  No.  One was Goby and the other one was
17  Adventurer.
18      Q.  So you shipped your tools, one Goby submarine,
19  and one Adventurer submarine?
20      A.  Yes.  I shipped -- I have extensive scuba
21  equipment with me --
22      Q.  Uh-huh.
23      A.  -- tools, molds -- no, not molds.  Inventories,
24  supplies.
25      Q.  And you opened up shop here in Florida in 2000,

9 (Pages 30 to 33)

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                     Herve Jaubert

Page 34

1  July through September 2000?
2      A.  Yes.  Uh-huh.
3      Q.  Did you have any charter business in Florida?
4      A.  No.  I was in the process to start one.
5      Q.  But it never started?
6      A.  It started because I incorporated the company who
7  would do so, that was Yellow Submarine.
8      Q.  Okay.  But am I accurate that you never received
9  any income for the charter business while here in
10  Florida?
11     A.  No.
12     Q.  How many submarines were you able to sell while
13  at Seahorse?
14     A.  How many submarines total?
15     Q.  Yes.
16     A.  If I remember, nine, ten.
17     Q.  Which submarines were you able to sell?
18     A.  I -- okay, for the Adventurer, I sold -- I
19  believe I sold four or five Adventurers.
20     Q.  Now, these are four or five sales, not including
21  the sales that you made of Adventurers in Puerto Rico,
22  these are additional?
23     A.  Yeah.  Additional, yes.  So it's four or five.  I
24  sold -- I took an order of two Discoveries for the
25  Italians.  I sold three subs to -- one completed, two

Page 35

1  partially complete, to Dubai World.  So that's ten.  I
2  recommissioned another one -- I recommissioned an
3  Adventurer from the second market.
4      THE REPORTER:  From the?
5      THE WITNESS:  From the second market.
6      THE REPORTER:  Thank you.
7  BY MR. URQUHART:
8      Q.  Okay.  Was the -- what was the -- what was the
9  sales price per vessel on the Adventurer?  You said you
10  sold four of them.
11     A.  Depending on the configuration, if I remember
12  it's 175, 195.
13     Q.  So 175.  Who did you sell these four Adventurers
14  to?
15     A.  One was local.  One was in Canada.  One was in
16  France.  Another one was for California, but ended up
17  being shipped to China and was seized by the Customs.  A
18  fifth one -- I'm not sure if there was a fifth one.  But
19  I don't remember where.
20     Q.  And you said that you had an agreement to deliver
21  two Discoveries to the Italians.  Do I take it --
22     A.  No.  I had an agreement for six Discoveries.
23  They put the down payment for two.
24     Q.  Two.
25        And how much was each Discovery submarine.

Page 36

1      A.  The Discovery -- 375, I believe.
2      Q.  And then you said earlier that the cost of
3  building these submarines, the ones that you built in
4  Puerto Rico, was roughly two-thirds of the sale price.
5  Is that -- was the same true here with respect to these?
6      A.  No.  The rate was -- that I'm not sure.  My CPA
7  would know better.
8      Q.  Who is your CPA?
9      A.  I don't remember that.
10     Q.  You had a CPA?
11     A.  I had a CPA, yes.
12     Q.  Here in Florida?
13     A.  Yes.
14     Q.  Did your CPA fill out your tax returns?
15     A.  Yes.
16     Q.  Did he fill out your tax returns for both
17  Seahorse and for yourself personally?
18     A.  I'm not sure about that.  Seahorse, I'm sure, but
19  myself, I don't know.
20     Q.  Was the accountant local to Stuart?
21     A.  It was local, yes.
22     Q.  How long --
23     A.  And then when I moved to Dubai, I tried to -- the
24  reason why I don't know him anymore is because after I
25  moved to Dubai -- yeah, he did file for my personal taxes

Page 37

1  because when I -- after I moved to Dubai, he told me he
2  could no longer take care of my filing because I was
3  abroad and I fell under a different classification, and
4  he was not qualified or something like that to file for
5  me.
6      Q.  Was this accountant a part of an accounting firm?
7  Was he an individual?
8      A.  Not -- he was an individual.  I mean, a CPA that,
9  you know, that you find in the Yellow Pages, not a big
10  firm.  I could not --
11     Q.  How long did this CPA work for you?
12     A.  Three -- three years maybe.  Three -- yeah, three
13  years.
14     Q.  What time frame?
15     A.  2004, 2003, and maybe 2002, I'm not sure.  At
16  least two years.
17     Q.  And you can't remember his name?
18     A.  No.
19     Q.  Do you know where his office was?
20     A.  I don't know -- when I came back from Dubai, I
21  needed a copy of my tax return, so I was looking for him.
22  And he was no longer at the address I saw him before.  So
23  maybe he stopped or moved out of the state.  I don't
24  know.  But he is not where -- because I needed him when I
25  returned him and I could not find him.  Then I went to

10 (Pages 34 to 37)

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

Page 38

1  the IRS to get my record, and they -- they did not have
2  them.  All they -- because it was too late or something
3  like that, they just -- they just gave me a summary, but
4  they did not have the record because it was past a
5  certain number of years.
6      Q.  So you went to the IRS looking for what?
7      A.  My tax returns.
8      Q.  When you say "my tax returns," are you talking
9  about your personal tax returns?
10     A.  Personal and Seahorse.  I left that in Dubai.  I
11  don't have anything.  At least I needed something for my
12  own record.
13     Q.  So all of -- all of your personal tax returns
14  were left in Dubai, all of Seahorse's tax returns were
15  left in Dubai?
16     A.  Yes, uh-huh.
17     Q.  All of Yellow Submarine's tax returns were left
18  in Dubai?
19     A.  I did not have -- I did not file tax returns for
20  Yellow Submarines.  I did not have any returns.  I just
21  filed the business.  Every year you have to file for a
22  business report or something.  But I did not -- I did not
23  file tax returns; I don't remember that.
24     Q.  When did you stop working with Seahorse here in
25  Florida?

Page 39

1      A.  I am sorry?  Where --
2      Q.  When?
3      A.  When.  What do you mean by working for Seahorse?
4      Q.  Well, at some point you went to work in Dubai.
5      A.  Yes.
6      Q.  Did you -- and at some point you sold the assets
7  of Seahorse to Dubai.
8      A.  Yes.
9      Q.  Do you remember when that was?
10     A.  We had an agreement -- it's not that easy because
11  we had an agreement for the purchase of assets of
12  Seahorse, but they signed it after I moved to Dubai and
13  they paid me after I moved to Dubai, in installments.
14     Q.  Okay.
15     A.  So it's not that -- it's not that I was working
16  for Seahorse or with Seahorse.  It's more like I was
17  using Seahorse.  So when I -- when I was in Dubai, I did
18  not have a salary or anything like that.  I did not
19  receive a salary from Seahorse or anything like that.  I
20  was just using Seahorse for Dubai World.
21     Q.  Right.
22          We will come back to that.
23          Can we focus now on the period between when you
24  opened business here in Florida in July or September of
25  2000 until the period that you -- you started working for

Page 40

1  Dubai.
2          Did you have -- did Seahorse have any source of
3  income other than the sale of submarines?
4      A.  Yes.  I was doing -- well, different -- different
5  nature, different sources.  One was engineering.
6  Sometimes I provided engineering to private individuals,
7  either on yachts or submarine.  One client, I do
8  remember, was somebody who had a submarine down there in
9  Florida, in the Keys.  And he had a technical
10  malfunction, so I was called upon for troubleshooting,
11  and I -- Seahorse charged for that service.  Another time
12  I went to Puerto Rico for diving services as a diver,
13  not -- that has nothing to do with a submarine.
14          I also -- I was -- Seahorse was contracted to
15  develop a portable dredging system.  So I developed it.
16  I built a prototype and I was in the process of building
17  six units.  So that included the barge and the dredging
18  system.
19          I'm trying to remember if there was anything
20  else.
21          I don't think of anything else so far.
22     Q.  Do you know how much money you received or
23  Seahorse received for the engineering work that you did
24  from 2000 to 2004?
25     A.  Total or for each --

Page 41

1      Q.  Total.
2      A.  No; that, I don't remember.
3      Q.  Do you have an estimate?
4      A.  I can't be precise.
5      Q.  If you can't be precise, don't bother.
6          With respect to the portable dredging system, was
7  that -- was that something that you were designing
8  with -- and building?
9      A.  It's a company called Sandtransisco,
10  S-A-N-D-T-R-A-N-S-I-S-C-O.  They -- it was an engineer
11  who owned that company.  So he had developed a dredging
12  system, but it did not work.  So he came to me to ask me
13  to make it work.  So I redesigned the system so it
14  worked.  And then we had an agreement -- it was for a
15  $2 million agreement to develop and build those portable
16  dredgers.  There was a significant market for that
17  because it was a small unit that people could use to
18  dredge their private berth in areas where the big
19  dredgers don't have access.
20          And when I moved to Dubai, that contract was
21  transferred to someone else because I could not continue
22  with that man.
23     Q.  Could you spell that company for me again.
24     A.  S as in Sierra, A-N-D.  Sand like "sand."
25  Transisco, T-R-A-N-S-I-S-C-O.

11 (Pages 38 to 41)

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

---

Page 42

1    Q.  So it's called Sandtransisco?
2    A.  Yes.
3    Q.  Where was Sandtransisco based?
4    A.  Stuart.
5    Q.  Do you know who runs Sandtransisco, who the
6  president is?
7    A.  The president's name is Jack -- I'm not sure how
8  to spell his last name.  But it's Jack Hirth.  That would
9  be H-R -- I am sorry -- H-I-R-T-H.  Something like that.
10  But he passed away in 2006.
11    Q.  Does Sandtransisco still exist?
12    A.  That, I don't know.
13    Q.  One way or the other?
14    A.  Probably.  I mean, the company had some value
15  with that unit --
16    Q.  But you don't know?
17    A.  I know when I moved to Dubai, it -- when he
18  transferred that contract to somebody else.  So maybe
19  that somebody else is operating that company at the
20  different name.  I don't know.
21    Q.  Had you, Seahorse, entered into an actual written
22  contract with Sandtransisco?
23    A.  Yes.
24    Q.  And where is that contract?
25    A.  It's in Dubai.  So I received incomes from

---

Page 43

1  Sandtransisco.  It was on a monthly basis, steady income.
2    Q.  Of what?
3    A.  Of what -- the amount you mean?
4    Q.  Yeah.  What amount did you receive?
5    A.  I don't remember.  That -- the amount that I
6  received was -- it was not billed as a service or -- it
7  included money to buy materials.  So whatever money I got
8  was -- it was not for service or 100 percent profit.  But
9  for one year that I worked -- I worked with Sandtransisco
10  for maybe a year, probably received -- but I'm not
11  sure -- maybe 100, 150,000.
12    Q.  Were there any other sources of income that you
13  had from Seahorse, from 2000 until 2004 when you left for
14  Dubai?
15    A.  Not that I remember.
16    MR. URQUHART:  Can we take a little break?
17    MR. HESS:  Sure.
18    MR. URQUHART:  Thanks.
19    THE VIDEOGRAPHER:  This is the end of Video
20  No. 1 at 10:49.
21    (A recess was taken from 10:49 a.m. to
22    10:56 a.m.)
23    THE VIDEOGRAPHER:  This is the beginning of
24  Video No. 2 at 10:56.
25  //

---

Page 44

1  BY MR. URQUHART:
2    Q.  After you moved your submarine business to
3  Florida, did you continue to make investments into
4  research and development?
5    A.  Yes, I did.  Uh-huh.
6    Q.  Do you know how much money you invested in
7  research and development from the time you moved to
8  Florida until the time you left for Dubai?
9    A.  It's difficult to come up with a figure.
10    Q.  Can you give me your best estimate?
11    A.  Basically, the money that I would put into
12  research and development -- for instance, if I'm looking
13  for an electric motor or a relief valve, before I find
14  one that is going to work for my application, I may have
15  to buy five or ten of them to try them out and eliminate
16  them until I find a good one.  So ...
17    Q.  Can you estimate what your monthly expenses were
18  at Seahorse from the time that you moved from Puerto Rico
19  to Florida until the time you left for Dubai?
20    A.  The monthly expenses?
21    Q.  Correct.
22    A.  Rent?  Everything?
23    Q.  Yes.  Just list them by item.
24    Rent.  How much did you pay in rent?
25    A.  Rent, at the peak I was paying $5,000.

---

Page 45

1    Q.  How long did that period run?
2    A.  I would say maybe two years at $5,000 and two
3  years at 2,500.
4    Q.  Did you have any other recurring expenses, ones
5  that you had to pay each month?
6    A.  The power bill.
7    Q.  Do you have an estimate of what your power bill
8  was?
9    A.  Maybe -- power bill and trash collection, maybe
10  $1,000.
11    Q.  Per month?
12    A.  Per month.
13    Q.  And --
14    A.  Phone bill, 500 maybe.
15    Q.  Must have made some long distance phone calls?
16    A.  I did have long distance phone calls, you know,
17  China or -- whatever.
18    Q.  Any other recurring expenses, ones that you had
19  to pay pretty much every month?
20    A.  I had to payroll for the employees.
21    Q.  All right.  Who was on the payroll?
22    A.  Depending on the time --
23    Q.  Let's start at the beginning.  Let's say, in 2000
24  when you opened up shop, who -- aside from yourself, who
25  was working at Seahorse?

12 (Pages 42 to 45)

Esquire Reporting, Inc.
(772) 283-8002

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

Page 46

1     A.  Well, I started with maybe four or five
2   employees.  And --
3     Q.  What kind of employees were they?
4     A.  Electrician, what we call laminators, fiberglass
5   laminators.
6     Q.  Old surfboard guys?
7     A.  Actually, they are pretty good.  One of the
8   reasons I moved to Stuart is there is an important and
9   significant boat industry, and if you need a laminator or
10  an electrician, you can get them on the phone call.  Even
11  if it's for three months.  Because at some time I had to
12  layoff employees for -- not layoff.  But I could need
13  employees for three months, let's say, and then for
14  another period of three months I would not need them and
15  then later on I would need more employees.
16     So the fabrication, the laminators --
17     Q.  How much money -- did the electrician work
18  throughout the four-year period that you were in Florida?
19     A.  Yeah.  I needed an electrician full-time.
20     Q.  How much -- how much did you pay the electrician
21  per month?
22     A.  An electrician it's $18 a month -- I am sorry --
23  $18 per hour.  18, 1-8.
24     Q.  So the electrician that worked for you was an
25  independent contractor?

Page 47

1     A.  No.  No.  It was an employee, but I don't
2   remember the salary.  I don't remember the hourly wage.
3   With a laminator, it's between 9 and $12 an hour.
4     Q.  How many hours on average did the electrician
5   work?
6     A.  It's -- I am sorry.  40 hours a week.  The
7   normal -- normal working hours.
8     Q.  So you would say that for this four-year period,
9   the electrician would average 40 hours per week?
10     A.  Yes.  And I had a secretary.
11     Q.  How much did you pay your secretary?
12     A.  $9 an hour.
13     Q.  How many hours per month --
14     A.  Same, 40.
15     Q.  40 hours per week.
16     And -- so you had the electrician the entirety of
17  the four years.  You had the secretary, the entire four
18  years?
19     A.  No.  Secretary; I -- I had a secretary for two
20  years.
21     Q.  Two out of the four years.  And the first -- was
22  that at the end of the --
23     A.  The end, yes.
24     Q.  2003, 2004?
25     A.  2004.  (Nods head.)

Page 48

1     Q.  And before that, who functioned in that capacity?
2     A.  The first two years of Seahorse, it was more like
3   I was in a development --
4     Q.  Uh-huh.
5     A.  -- setting up the shop, hiring people and
6   training them.  Laminators, for instance, they maybe
7   me -- they are very qualified in fiberglass and boat
8   building, yet I had to teach them the specifics of
9   building submarines.  So it took -- it took some time.
10     Q.  What was the -- was there an average number of
11  laminators that you had working for you from 2000 to
12  2004?
13     A.  For what I remember, you know -- laminating
14  is -- you need more laminators than electricians.  You
15  only need one electrician.  Laminators you need, three,
16  four -- four guys, depends.
17     Q.  So would it be accurate to say then on average
18  you would have say three and a half laminators --
19     A.  Yes.
20     Q.  -- working for you --
21     A.  Uh-huh.
22     Q.  -- working 40 hours per week?
23     Did you pay any benefits on top of salary to any
24  of the -- your employees?
25     A.  Could you describe what you mean by benefits?

Page 49

1     Q.  Sure.  Did you provide them, at your cost,
2   Seahorse's cost, health insurance?
3     A.  Yes, they did have medical insurance, yes.
4     Q.  Did all of the people who worked for you have --
5     A.  Including myself.
6     Q.  What was the average -- what was your average
7   monthly bill for health insurance?
8     A.  I don't remember.
9     Q.  Can you give me an estimate?
10     A.  I can't be precise on the wage, the
11  hourly -- hourly wage on nonemployee.  But that's for
12  medical and -- medical cost insurance.  I have absolutely
13  no idea.  I don't remember.  But I would say it was
14  pretty much standard.  There was -- it was not over the
15  top or it was not below.  It was really average,
16  otherwise I would not have employees, you know --
17     Q.  Who -- do you know which provider --
18     A.  Oh, yes, that I do remember.
19  Blue Cross/Blue Shield.
20     Q.  Did you have an insurance broker that you used?
21     A.  No.
22     Q.  How did you secure the insurance, the health
23  insurance?
24     A.  I just looked over the Internet.  I looked for
25  health coverage and then I got bombarded with -- you know

13  (Pages 46 to 49)

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

Page 50

1  how they are, offers and representatives and sales, and
2  then somebody from health -- I am sorry -- somebody from
3  Blue Cross/Blue Shield came to my office and offered me a
4  package and I signed up.
5      Q.  Did you provide health coverage throughout the
6  period of 2000 to 2004?
7      A.  No, only the last two years.
8      Q.  And before that, you didn't provide health
9  insurance?
10     A.  No, only to -- no, actually I did.  At least for
11 myself and my family, and I only had two or three
12 employees, maybe four, when I started.  So I believe I
13 did from the beginning, just to make it right.  Yeah, I
14 think I did.
15     Q.  Do you know how much money you paid for your own
16 health insurance for you and your family?
17     A.  For my own family, for myself, including wife and
18 children?
19     Q.  Yes.
20     A.  How much was that?  Maybe three -- I don't
21 remember -- 300, $400, something like that.
22     Q.  Per month?
23     A.  Per month.
24     Q.  Were there any other recurring expenses that
25 Seahorse had each month, aside from rent, which we've

Page 51

1  discussed, employees' salaries, power, electric, and
2  phone bills and health insurance?
3      A.  And trash collection.  When you are in the boat
4  business, you produce a lot of trash.  And you
5  cannot -- it's a little bit more expensive than if you
6  have a shoe store.
7      Q.  Sure.
8      A.  Because you produce materials that are toxic and
9  you cannot just dump it in the Dumpster like anything
10 else.
11     Q.  Can you think of any other expenses, recurring
12 expenses, that Seahorse incurred on a monthly basis other
13 than the ones we've discussed?
14     A.  I did have an insurance on the building, but I
15 don't remember how much I paid.
16     Q.  Did you use --
17     A.  Liability, you know, hurricane.
18     Q.  Did you use an insurance broker to secure that
19 insurance?
20     A.  No, I did not use a broker.  I went straight
21 to -- again, went online, looked for insurance protection
22 and ...
23     Q.  Do you recall whether or not Seahorse made a
24 profit the first year that you were in business in
25 2000 -- in 2000?

Page 52

1      A.  No, no profit.
2      Q.  Did it incur a loss?
3      A.  Probably.
4      Q.  Do you know what the loss was?
5      A.  No.
6      Q.  Can you estimate what the loss was?
7      A.  Neither.
8      Q.  Do you know whether Seahorse made a profit or a
9  loss in 2001?
10     A.  No.  It was loss.  I was in -- building up the
11 company, so I was putting money in and no money was
12 coming in.
13     Q.  And do you recall what the magnitude of the loss
14 was in 2001?
15     A.  No, I don't remember.
16     Q.  Did Seahorse make a profit --
17     A.  That's why I borrowed money --
18     Q.  Yeah, of course.
19     A.  -- to cover that.  So then when -- at the end of
20 2004, when I balanced everything, it was -- there was
21 no -- no profit, not taxable profit.
22     Q.  So at the end of 2004, when you balanced the
23 accounts going back to 2000, there were -- was no profit?
24     A.  No.
25     Q.  Do you recall whether or not you recorded a

Page 53

1  profit or a loss in 2002?
2      A.  2002, I don't remember.
3      Q.  How about 2003?
4      A.  2003?  The same -- I cannot be specific year by
5  year.  I know that altogether at the end I zeroed on the
6  profit net and cost.
7      Q.  Okay.  And that was at the time that you and your
8  family moved to Dubai?
9      A.  Yes.  But at the same time I had the loan going
10 between Seahorse and myself, so -- but I'm not -- I don't
11 remember exactly when I paid it off or when they paid me
12 off.
13     Q.  During the period 2000 to 2004, did you pay
14 yourself or I should -- let me strike that.
15         Did Seahorse pay you a salary from 2000 to 2004?
16     A.  Yes.  I was on the payroll.
17     Q.  What was the salary?
18     A.  When I started, maybe $8,000 and then 10,000, in
19 2004.
20     Q.  $8,000 per month?
21     A.  Yes.
22     Q.  Did you actually pay the salary to yourself or
23 was it -- did it go into a loan?
24     A.  No, I was on the payroll.
25     Q.  So you --

14 (Pages 50 to 53)

Esquire Reporting, Inc.
(772) 283-8002

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                Herve Jaubert

Page 54

1    A.  And then if it was -- let's say -- if Seahorse
2  needed money, I would loan money to Seahorse.  But it
3  would not be in the form of, you know, cutting the salary
4  or something.
5    Q.  So is it accurate to state then that you received
6  a monthly salary each month?
7    A.  Yes.
8    Q.  And you think it was $8,000 per month in 2000?
9    A.  Well, when I started, I don't remember if -- I
10  don't remember.  Probably it was less when I started
11  because the company was not making money.  So I don't
12  want -- you don't want to be too much of a burden on the
13  cash flow of the company.  So at the beginning I don't
14  remember how much it was.  Maybe -- probably not 8,000.
15  Less than that.
16    Q.  When did you start to receive a salary of $8,000?
17    A.  2003.
18    Q.  2003.
19      And when did it -- did it ever get to 10,000
20  or --
21    A.  2004.
22    Q.  Do you know what -- the total amount of salary
23  that you received from Seahorse?
24    A.  No, I don't remember that.
25    Q.  Am I right that at certain months you would

Page 55

1  forego your salary and that would become part of the
2  loan?
3    A.  No.  I was -- if I was in a situation where
4  Seahorse needed cash, I would make a loan to Seahorse,
5  rather than lowering my salary.
6    Q.  How many loans -- separate loans did you make to
7  Seahorse?
8    A.  I don't know, maybe 10 times.
9    Q.  When you made these loans to Seahorse, did you
10  have somebody document them for you?
11    A.  I would either -- no, I would do it myself.
12    Q.  I mean, what -- did you have, like, promissory
13  notes?
14    A.  Yes.
15    Q.  How -- did you document them?
16    A.  Uh-huh.
17    Q.  And do you have copies of them, any of these --
18    A.  Everything in Dubai.
19    Q.  Oh, did you take out insurance on the premises?
20    A.  Yeah, I did take insurance on the premises, yes.
21    Q.  Do you know how much that was per month?
22    A.  No.  It was mandatory, anyway.  I think around
23  here you could not have -- you could not run a commercial
24  operation without insurance.
25    Q.  What about the assets that you had in the

Page 56

1  building?  Did you take out insurance on that?
2    A.  I remember I had -- it was in the umbrella of the
3  insurance on the building, but I did not have a separate
4  insurance for the assets, no.
5    Q.  You didn't have a separate insurance policy on
6  the vessels that you were constructing?
7    A.  No.  In Puerto Rico I had an insurance on my
8  operation, for a charter; the liability, you know, like a
9  passenger liability program.
10      When I moved to the U.S., I stopped the charter,
11  so I did not have that kind of insurance either.
12    Q.  And it says here in this response to the
13  interrogatory, that you were also -- received some form
14  of reimbursement for a vehicle while you were at
15  Seahorse.  Is that accurate?
16    A.  Not -- I was driving a company car.
17    Q.  What was the company car?
18    A.  I believe it was a Ford pickup truck, a big one.
19    Q.  Like, an F-40 or something like that?
20    A.  Yeah.
21    Q.  Did you lease it?
22    A.  I leased it, yes.
23    Q.  Do you know what the monthly lease payment was?
24    A.  I'm not sure.  Maybe $1,400 a month.  I'm not
25  sure.

Page 57

1    Q.  Did you --
2    A.  How much -- I did not lease it.  I am sorry.  I
3  bought it.  I had the loan so it was financed.  I bought
4  that pickup truck.  It was not leased.  It was a
5  purchase.  And I paid off the loan.
6    Q.  But did you charge the cost of the vehicle to the
7  company?
8    A.  The company was -- the company owned the car.  I
9  was just driving it.  So I did not -- I did not receive
10  any compensation or anything like that.  I was just
11  driving the car of the company.
12    Q.  But you don't remember what the payment was on
13  the car?  Do you remember how much money you paid for the
14  truck?
15    A.  It was five years.  I believe it was a five-year
16  loan on a pickup truck.
17    Q.  Do you know what the original purchase price was
18  on that truck?
19    A.  Probably -- maybe $35,000.
20    Q.  And the company paid the $35,000, not you?
21    A.  No, not me, the company.
22    Q.  Did you sign a personal guarantee?
23    A.  No.
24    Q.  Do you recall how much the insurance was on the
25  truck per month?

15 (Pages 54 to 57)

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

**Page 58**

1    A. No, I don't remember that.
2    Q. All right. Did any other company employee have
3  the use of a company vehicle from 2000 to 2004, aside
4  from yourself?
5    A. No. But if an employee -- the reason why I had a
6  pickup truck is because it's convenient to go get
7  materials or to tow a submarine to the water. So if an
8  employee needed the car for business purpose, they would
9  use my car to go pick up whatever materials or -- but
10  they would not use it for personal use.
11    Q. Am I accurate to say that that was the only
12  vehicle that Seahorse purchased or leased; there weren't
13  any other vehicles?
14    A. No.
15    Q. No forklifts?
16    A. No forklift. I was looking to buy one, but I did
17  not have one. The neighbor had one.
18    Q. This contract that you had with Sandtransisco --
19    A. "Sandtransisco."
20    Q. Was that -- that was a written contract?
21    A. It -- I remember -- it was a written agreement,
22  yes.
23    Q. And who was the agreement between? Was it
24  between you personally and Sandtransisco?
25    A. No. Between Sandtransisco and Seahorse.

**Page 59**

1    Q. And what was the term of the contract? How long
2  was it?
3    A. Two years.
4    Q. Two years.
5       Running from when to when?
6    A. I believe I started in 2003 maybe. And I do
7  remember that the contract included a clause that
8  whatever I designed belonged to them. I remember I was
9  not very comfortable with that, but ...
10    Q. Do you know what the total amount of moneys
11  Seahorse received from Sandtransisco from the inception
12  of the contract until the time you left for Dubai?
13    A. Probably $150,000.
14    Q. But you don't know?
15    A. I don't know for sure, no. I'm just estimating.
16    Q. Was that gross?
17    A. Gross, yes.
18    Q. Do you know what the net was?
19    A. No, I don't.
20    Q. I just want to confirm. You didn't have
21  insurance on the actual vessels themselves?
22    A. No.
23    Q. I'm going to now move down and ask you some
24  questions about the sale of your business to -- if I use
25  Dubai World, you will understand what that means?

**Page 60**

1    A. (Nods head.) Yes.
2    Q. At some point you sold, I guess, the assets of
3  Seahorse to Dubai World?
4    A. Yes. Tangible and intangible.
5    Q. What was the price?
6    A. The price was $3.5 million.
7    Q. That was not the contract price, though?
8    A. That was not the contract -- the contract said
9  1.5.
10    Q. When you say the initial price was $3.5 million,
11  what do you mean?
12    A. When Dubai World initiated the process of me
13  moving to Dubai and acquiring Seahorse Submarines, they
14  hired -- they contracted Ernst & Young to evaluate -- to
15  make an appraisal on Seahorse Submarine. So they came
16  down from New York numerous times, maybe four, five
17  times, and they came up with an estimate and a proposal
18  of $3.5 million. I saw it in written. I don't have that
19  document; it's in Dubai. However, when Sultan made me
20  the proposal, along with Hamed Kazim, they told me that
21  they would buy the assets of Seahorse for $1.5 million,
22  instead of 3.5; because I would get 20 percent of the
23  profit of the new company.
24       So in return of buying the assets for half, I
25  will get 20 percent of the new company.

**Page 61**

1    Q. Did you ever get that promise in writing?
2    A. Yes. What promise?
3    Q. Well --
4    A. The 20 percent or --
5    Q. Well, let's go back.
6       A contract was signed between you and Dubai World
7  under which Dubai World purchased the tangible and
8  intangible assets of Seahorse for $1.5 million, correct?
9    A. Yes. But I would -- I just want to make it
10  precise something, is that agreement was presented to me,
11  but it was never signed. It was signed only after I
12  moved to Dubai and I transferred everything.
13    Q. But the amount in the contract says $1.5 million?
14    A. Yes.
15    Q. It doesn't say $3.5 million?
16    A. No, it doesn't say $3.5 million.
17    Q. And there is no provision in that asset sale
18  contract which says that you get 20 percent of --
19    A. The 20 percent --
20    Q. I'm just focusing on the contract itself, the
21  written contract.
22    A. The contract itself said only $1.5 million. The
23  20 percent was -- it's in other documents --
24    Q. Right.
25    A. -- not in the contract.

16 (Pages 58 to 61)

Esquire Reporting, Inc.
(772) 283-8002

1/13/2011                    Herve Jaubert

<table>
<tr><td colspan="2">

Page 62

1    Q.   But not in the contract.
2         Did actually -- you received the $1.5 million?
3    A.   I did receive it in installments.
4    Q.   But you received all of the 1.5 million?
5    A.   Yes.
6    Q.   Can you list for me any -- any documents that
7    state that these assets that were sold to Dubai World
8    were worth $3.5 million?
9    A.   There is one document that I saw in your records,
10   in the documents that you presented to Mr. Hess, that one
11   document from Ernst & Young where it listed assets for
12   3.5 million.  I don't have it and you don't have it.
13   What I saw is the document that was used to put that
14   number, $3.5 million.  So if you look in your
15   records -- I don't know where the number of the -- the
16   reference of that document.  But what Ernst & Young did
17   is to list how much time -- how much engineer time it
18   takes to get to every single product.
19        So let's say, for -- let me give you an example.
20   So you would have that -- you have that document.  That's
21   from Ernst & Young that says that, for instance, for the
22   Adventurer the air pressure system would take 200 hours
23   engineer time.  So it was -- it's a long document, maybe
24   30 -- 30 pages.  So when you add up all of those
25   engineering time and the cost of material, you get to

</td></tr>
</table>

Page 64

1    they would came -- they would came up to the same figure,
2    because it adds up the engineering time, technician time,
3    to get to that point, to that intellectual property.
4         THE REPORTER:  To that?
5         THE WITNESS:  Intellectual property.
6         THE REPORTER:  Thank you.
7    BY MR. URQUHART:
8    Q.   Right.
9         But when was the last time you saw the document
10   that actually uses $3.5 million as a valuation?
11   A.   It was in Dubai.  So I would say 2006, 2007.
12   Q.   Did you ever have a valuation done of the assets
13   of Seahorse?
14   A.   Yes, by Ernst & Young.
15   Q.   No.  I know you said that Dubai World did this.
16   I'm asking you if you did.
17   A.   If I did it myself?  No.
18   Q.   Do you know how Ernst & Young came up with these
19   calculations for the amount of engineering time would
20   take to design and produce these submarines?
21   A.   When they interviewed me and they asked me for
22   every product or every system, what it does, and --
23   Q.   Had you kept engineering logs as you were
24   developing each of the submarines?
25   A.   Yes, uh-huh.

Page 63

1    $3.5 million.
2    Q.   All right.  Is there any other document that you
3    have ever seen ever --
4    A.   No.
5    Q.   -- that references $3.5 million as the value of
6    the assets?
7    A.   No.
8    Q.   And you haven't seen that document in connection
9    with your review of the documents which Dubai World
10   produced in this case?
11        MR. HESS:  Objection.  Confusing.
12   Ambiguous.
13        MR. URQUHART:  You are right.  It's a
14   horrible question.
15        THE WITNESS:  I -- let me --
16        MR. HESS:  There is no question.  He is
17   going to rephrase.
18   BY MR. URQUHART:
19   Q.   So you don't know where this document is that
20   says that the value of the assets which you sold to
21   Seahorse -- from Seahorse to Dubai World is 3.5 million?
22   A.   No.  That document that says 3.5 million, I don't
23   know where it is.  The document that I saw is the
24   document that served to put that number 3.5.  If you gave
25   that document back to Ernst & Young or to somebody else,

Page 65

1    Q.   And what was in these engineering logs?
2    A.   The time spent -- my time -- or it was mostly my
3    time.  Because we're talking about the intellectual
4    property, right?
5         THE REPORTER:  Talking about the?
6         THE WITNESS:  Intellectual property.
7         THE REPORTER:  Thank you.
8         THE WITNESS:  So it was mostly my
9    time -- how many hours that I would spent on a
10   system to develop it.  So I would keep -- I kept
11   a log of that.
12   BY MR. URQUHART:
13   Q.   Tell me what this log looked like.
14   A.   Just a -- a bundle of pages with a title.  And,
15   you know, it looks like a draft.  It's not something that
16   is typed or -- and on the -- on the hours, I would
17   check -- and I would add, like, two hours, three hours,
18   every time I would do something.
19   Q.   Would you do this each day?
20   A.   No.  I would do it every week.
21   Q.   When did you start to practice?  Was it --
22   A.   From the start.
23   Q.   So when you say the start, do you mean back when
24   you were with Caribbean Submarines?
25   A.   Yes.  No.  From when I was in Florida.  For

                                    17 (Pages 62 to 65)

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

Page 66

1    the -- the time in Puerto Rico, I just estimated it.
2        Q.  And so each week you would sit down and try to
3    estimate the amount of engineering time you invested.
4    Did you do it on a vessel by vessel basis?
5        A.  Vessel by vessel --
6            MR. HESS:  Objection.  Improper predicate.
7    Mischaracterizes testimony.
8            MR. URQUHART:  Huh.
9    BY MR. URQUHART:
10       Q.  If I'm wrong, correct me.  You said that once you
11   came to Florida, you started keeping logs of the time
12   that you had invested in engineering.
13       A.  Yes.
14       Q.  I'm trying to figure out what the logs looked
15   like.  Did you -- like, for example, if you took four
16   hours, would you assign it to Discovery?  Would you
17   assign it to the propulsion system on Discovery?  How
18   would you allocate it and assign it?
19       A.  I had the page for either a model or a system.
20   So, for instance, I would have air pressure system and
21   then I would have time, material or employee or whoever
22   would have been in the process.  And so I have that
23   somewhere.  And if I think or work four hours on that air
24   system, then later down the -- later on, during the week,
25   then I just put four hours with my hand, handwritten.

Page 67

1    And if I bought three valves, I would put the amount.
2        And then because it was a long process, after a
3    certain time, when everything is filled up, I would
4    make -- I would sum up and start a new one.  So the new
5    one would have already maybe 50 hours, and then I would
6    continue to -- and discard the first one, keep the new
7    one.
8        Q.  Why did you decide to start this process when you
9    moved to Florida?
10       A.  Well, because I knew I saw -- evidently that all
11   of the time I was putting in -- the reason was -- it is
12   simple.  And I keep saying it because people don't
13   understand.  When you have -- when you look at a
14   submarine and you look at the valve, just a simple valve,
15   and you look in the catalogs, and you see, oh, that valve
16   is 30 bucks.  But in the book it's not 30 bucks.  You may
17   have bought that valve $30, but it's not $30 because you
18   may have spent 20 hours and you may have bought 5 -- 5
19   valves like that before coming to the decision that it
20   was the one that you are going to use.
21       So in the book it's not 30, it's $30, the valve.
22   The valve is maybe $1,000.
23       Q.  But my question was much more narrow.  I'm just
24   asking why you decided to --
25       A.  So I did it for that reason.  Because I needed to

Page 68

1    keep track on what it cost me to get there.  Because
2    once -- once the product is finished, maybe I can build a
3    submarine, a one-man submarine for $15,000.  Because I
4    used a $30 valve and a $200 motor.  But the intellectual
5    property of that one -- one-man submarine is much more
6    because it costs me more than a $30 valve and a $200
7    motor to get there.
8        So I needed to keep that down because there is a
9    value to it.  It's called intellectual property.
10       The second reason is that I was operating
11   Seahorse under the trade secret umbrella, not patents.
12   Personally, as an individual or a small company, I do not
13   believe in patents.  The patent system is not a good
14   protection.  It's a good protection when you -- when your
15   name is Microsoft or McDonnell Douglas, but when you're a
16   small company it's easy for another company to just go
17   around and, you know, modify something on your design and
18   then they come up with a new product which is a copy of
19   yours, but with a slight difference.  So to fight
20   that -- you can always fight it, but it costs a fortune
21   in patent lawyers.
22       Now, there is another way of operating a company.
23   It's under trade secret.  Pretty much like a
24   recipe -- like when a baker or a soap -- a company has a
25   secret recipes.  For instance, Coca-Cola, the recipe of

Page 69

1    Coca-Cola, it's not protected by patent.  You won't find
2    that patent; it's more like a trade secret.
3        So when you work under trade secret, you need to
4    keep track of what you did, because otherwise trade
5    secret for what?  You could be challenged, like I am
6    today.  And when you keep record, at least you can show,
7    wait a minute, I spent 500 hours just to work on that
8    system, to come up with that system.
9        Q.  So part of the reason that you started keeping
10   these records was to assist you in determining how you
11   were going to price the vessels?
12       A.  Not to price the vessel.  To --
13       Q.  Well, how did you determine what price you were
14   going to put on each of these submarines?
15       A.  On what it costs to build it, not on the cost to
16   design it.  The cost to design it would be an overall
17   cost.  So when the submarine -- if the submarine costs
18   me, let's say, $15,000 to build, I'm going to sell it 30,
19   $30,000, for instance.  And only -- but I don't include,
20   in the manufacturing cost, the cost of the developing it.
21       Q.  Right.
22       A.  It was more -- I did some -- I do somehow.  But
23   it was more to value the intellectual property.
24       Q.  So that when I asked you questions earlier this
25   morning about the submarines which you designed and sold

18  (Pages 66 to 69)

Esquire Reporting, Inc.
(772) 283-8002

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

Page 70

1   in Florida, and you told me that the cost of construction
2   was roughly two-thirds of the sale price, that didn't
3   include --
4       A.  No.
5       Q.  -- the capital investment?
6           MR. HESS:  Objection.  Mischaracterizes
7   testimony.
8   BY MR. URQUHART:
9       Q.  Do you have an estimate of how much research and
10  development, including engineering time, you had invested
11  in Discovery?
12      A.  No, I don't remember.  I put it -- I put down on
13  paper, and it was -- Ernst & Young put it down on paper
14  how much time I put on the Discovery, but I don't
15  remember.
16      Q.  If I asked you the same question about the other
17  submarines that you designed, would you give me the same
18  answer, like, for example, the Goby?
19      A.  For instance, the Adventurer.  I know it took me
20  three years to get to that design.  Now, in the
21  Adventurer, the pressure system in the Adventurer is the
22  same than the pressure system in the Discovery.  So when
23  I designed the Discovery, it took me less time because
24  part of it was already designed.
25      Q.  All right.  But without access to these -- or to

Page 71

1   your notes -- which I assume you are going to tell me are
2   in Dubai?
3       A.  Yeah.  That is in Dubai.  But, I mean, I saw it;
4   you have it.
5       Q.  What?
6       A.  The Ernst & Young put that on -- in writing.
7   They based the report partially on what I told them.
8       Q.  Well, did you give them access to these --
9       A.  I gave them my log.
10      Q.  I am sorry?
11      A.  I gave them my logs.
12      Q.  You gave them your logs?
13      A.  (Nods head.)
14      Q.  And they based their assessment on your logs?
15      A.  Partially.  I'm sure that -- you know,
16  Ernst & Young is a very large company.  They don't take
17  years in an answer.  So I'm sure they checked somewhere
18  else what I was telling them.
19      Q.  But you -- without access to the -- to
20  these -- your own notes -- let me back up.
21          I assume you're going to tell me that all of the
22  notes that you kept regarding the engineering investment
23  are in Dubai?
24      A.  All of the notes?
25      Q.  You told me you took these detailed notes

Page 72

1   summarizing --
2       A.  They're in Dubai, yes.
3       Q.  Everything is in Dubai.
4       A.  I clearly remember the file -- because this is --
5   to me, this is my baby.
6       Q.  Sure.
7       A.  The design, the -- how I got to there.  So I
8   clearly remember where those files were.
9       Q.  Did you leave your own personal tax information
10  in Dubai also?
11      A.  Same.  Yes, uh-huh.
12      Q.  So that you have no records predating your return
13  to the United States?
14      A.  No.  It's not that I did it on purpose.  I would
15  like to remind you that on September 29, without any
16  notice, prior notice or any warning or whatsoever, I was
17  escorted to the door by security guards, and I did not
18  have the luxury to take with me any record.  I was just
19  escorted to the door.  And they told me they would mail
20  me my stuff, even -- even my personal documents.
21      Q.  Okay.  Had you -- who did you have a discussion
22  with about the price that Dubai World was willing to pay
23  for the assets of Seahorse?
24      A.  Hamed Kazim.  I talked about it with Sultan, but
25  he did not seem interested by the numbers.

Page 73

1       Q.  Jim Miller?
2       A.  Jim Miller, yes.
3       Q.  So he was involved in these discussions also?
4       A.  But Jim Miller was more like the middleman.  So
5   he did not have any -- I don't know if he had anything to
6   say in the decision.  I know that Jim Miller did the
7   research on other submarine manufacturers, so I'm sure he
8   did the comparison.  But as far as the numbers, he was in
9   between.  He did not suggest anything.  He did not
10  discuss the number.  He was just --
11      Q.  He was a participant, but not -- an observer, but
12  not a participant?
13      A.  Yes.
14      Q.  I mean, how did the number -- how was the number
15  arrived at?  I mean, did you say, I want 5 million and
16  they said, we want 10 million.  I mean, how did the
17  negotiation go?
18      A.  It started with the Ernst & Young estimate.  So I
19  went -- I went with their estimate.  When they came up
20  with 3.5, I said, okay, I want 3.5 million.  And then
21  they said, no, we will give you 1.5 and 20 percent of the
22  company.
23      Q.  Who said that?
24      A.  Sultan, Jim Miller, Hamed Kazim.
25      Q.  When did they say that?  Was it in one

19 (Pages 70 to 73)

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

| Page 74 | Page 76 |
|---|---|

**Page 74**

1 conversation?
2 A. Actually -- it's Sultan who started, and he
3 said -- he asked me -- he asked me whatever I wanted. So
4 I said, how about 50 percent? So we agreed to that. It
5 was confirmed by Jim Miller. Later it was -- so it
6 happened more than one time. Sultan for me, 50 percent.
7 Now, later I found out it was not possible, that
8 it could not be more than 49 percent anyway in Dubai.
9 And down the line, it was Hamed Kazim who said
10 20 percent. And I agreed and Sultan agreed. But when it
11 started, it was -- it was 50/50. It was a 50/50 venture.
12 Me, at the time, 20, 50, it did not matter, because
13 Sultan was throwing me numbers at me; they were so big
14 that I would be happy anyway with 20 or 50 percent.
15 Q. But you never had a final writing in which you
16 were promised 20 percent, 50 percent or any amount,
17 right?
18 MR. HESS: Objection. Ambiguous, vague.
19 THE WITNESS: I have the documents that say
20 that I would receive 20 percent of the profits.
21 BY MR. URQUHART:
22 Q. Where are they?
23 A. You have them. I have them. (Indicating.)
24 E-mails. Notes by Jim Miller.
25 Q. No. Do you have -- do you know -- do you have an

**Page 75**

1 executed contract that says that you are going to receive
2 20 percent --
3 A. No.
4 Q. -- of the profits?
5 A. It was never signed. Again, I went to Dubai on
6 the shake of a hand. When I moved there, I did not have
7 any contract, no signature whatsoever. I went there
8 because I shook the hand of Sultan Bin Sulayem. Once I
9 get there, I did not get paid. They did not sign. I
10 mean, they did; but later, not right away.
11 Q. Now, in this third bullet, you see it says that
12 you had certain patent rights. Now, it's accurate
13 that -- bless you --
14 A. Sorry.
15 Q. -- that neither you nor Seahorse was ever
16 actually granted a patent by the United States patent
17 office, isn't that correct?
18 A. Where is that bullet again?
19 Q. Bullet No. 3. (Indicating.) It's --
20 A. Oh, okay.
21 Q. Sale of assets of Mr. Jaubert's business,
22 including certain patent rights.
23 A. Okay. What is your question, please?
24 Q. I know you applied for patents.
25 A. I applied for two patents, yes.

**Page 76**

1 Q. But they were never issued?
2 A. They were in the process of being issued.
3 Q. But they haven't been issued?
4 A. No. As of today they have been abandoned.
5 Q. Okay. And who abandoned them?
6 A. The patent office for failure to update and
7 continue the process.
8 Q. Can we take a look down to the next bullet. It
9 says loss of Mr. Jaubert's business opportunities,
10 including a chance of a contract with PADI.
11 A. (Nods head.)
12 Q. What is PADI?
13 A. PADI is the No. 1 diving organization in the
14 world. If you are a scuba diver, if you want to go scuba
15 diving, 90 percent, 80 percent of the people will go to
16 PADI to get their training and their course and their
17 certification. So PADI is a -- it's a franchise, they
18 are all over the world, and they have -- so they are
19 present in dive shops throughout the world; big shop,
20 small dive shop, depending where you are located.
21 Q. Well, what's the opportunity you're discussing
22 here?
23 A. I was approached by an attorney. And I talked to
24 two persons at National Geographic. They wanted to start
25 a diving program associated with PADI.

**Page 77**

1 Q. Can I ask you when you had a --
2 A. 2002.
3 Q. You had a discussion in 2002 from -- with a
4 representative of PADI or a representative of National
5 Geographic?
6 A. National Geographic.
7 Q. So how does PADI come into this?
8 A. Okay. Let me -- let me explain. PADI and
9 National Geographic together were working on a venture, a
10 program, where PADI would operate recreational submarines
11 under the franchise of National Geographic. So it will
12 be both, PADI and National Geographic.
13 Q. Got you.
14 A. They started that with
15 somebody -- another -- another engineer, but
16 that -- that -- another submarine engineer, Mr. Terro
17 (phonetic), he had designed before one-man submarine. So
18 they approached him, but then he was not able to go into
19 that kind of venture because he was hospitalized and he
20 was sick, and his submarines were too small. So then
21 they came to make me that -- to make me the same offer.
22 Q. So this was in 2002?
23 A. This was in 2002.
24 Q. Who -- was it a representative of PADI or a
25 representative of National Geographic?

20 (Pages 74 to 77)

Esquire Reporting, Inc.
(772) 283-8002

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

Page 78

1    A.   National Geographic.
2    Q.   Who was the person?
3    A.   One was Mr. Nadler.  Jeff Nadler.
4    Q.   Uh-huh.
5    A.   And I believe there was another person.  He was
6    the director of licensing at National Geographic.  I
7    don't -- I have his name somewhere; I don't remember now.
8    He is a builder or something like that.
9    Q.   Do you remember when in 2002 they approached you?
10   A.   No, I don't know.  I don't remember exactly when.
11   Q.   How many discussions did you have with the
12   representatives of National Geographic?
13   A.   With National Geographic, it was a few, maybe
14   three, four.
15   Q.   When was the -- the first one was in 2002.  When
16   was the last one you had with them?
17   A.   Oh, the last one was in -- either end of 2003 or
18   early 2004.
19   Q.   Did you ever enter into a contract with either
20   PADI or National Geographic?
21   A.   It was not -- we were not at that stage yet.
22   Q.   What were the -- what were you -- what were the
23   economic terms that you were discussing, if any?
24   A.   When they came to me, they had pretty
25   much -- pretty much prepared everything as far as

Page 79

1    numbers.  So they knew -- it was an extensive study, they
2    knew exactly what they were doing.  It's not like they
3    asked me, how do we do charter business.  They knew
4    exactly where they were going.
5         So I believe you have the -- that study somewhere
6    in the documents.  So they came to me with numbers.  The
7    basic economics is that you have the huge name, National
8    Geographic, supporting PADI, another huge name.  And PADI
9    has at the time -- had 6,000 dive centers throughout the
10   world.  They wanted to put a submarine in 2,500 of them.
11   So that means a minimum of 2,500 submarines.  Of course,
12   it's going to take a little more than a week to get
13   there.  Yes.  But they were conservative.  When I talked
14   to them, they were not dreaming.  I mean, and I know
15   myself how it works, because I have been with PADI.  I
16   have been to PADI dive centers, I know how that works.
17   When you go to a PADI dive center in Hawaii, they have
18   3,000 people a year.  And if you put a submarine there,
19   people are going to want to be in one of them.
20        So they came to me and say, Okay, we want to
21   enter an agreement, PADI and National Geographic, with
22   you, the submarine maker, so that we can start this and
23   provide 2,500 submarines to those dive centers in -- they
24   wanted to do it in five years.  I said five years, I
25   doubt it; maybe a little more.  And it has to be a

Page 80

1    progressive way, which they understood.
2         Now, they would not provide the funding.  I would
3    have to fund myself or find a loan myself to develop and
4    start building those submarines.
5    Q.   But it's accurate that there was never a formal
6    contract signed by you and PADI and or National
7    Geographic?
8    A.   It was in the process.
9    Q.   Right.
10   A.   The process was stopped because I moved to Dubai.
11   If I had stayed in Stuart, Florida, it would have come
12   through.  I have absolutely no doubt.  Because there is
13   the -- there is a demand for that.  And with people like
14   National Geographic or PADI, there is no reason why it
15   would not happen.
16   Q.   Who made the decision to stop discussions with
17   PADI and National Geographic when you moved to Dubai?
18   A.   I did.  National Geographic wanted to move fast,
19   but PADI did not -- I did not know it, but PADI is an
20   organization that works slow.  So they were, like -- it's
21   not that they were dragging their feet; they were not.
22   But they were working slow in making that deal come
23   through.  Me, on my end, if I don't have -- if I don't
24   secure a contract, I'm not going to get funding.
25   However, I was working with banks already to at least

Page 81

1    know if I can get funding.  And I -- I had a source of
2    funding in New Zealand.  I would have preferred in the
3    U.S., of course.  But the source of funding that appeared
4    to be available came from New Zealand.  So I started
5    working with those guys in New Zealand and the project
6    was endorsed by the embassy in New Zealand in Washington.
7    And then came Sultan.  And Sultan came with a much nicer
8    offer, where he basically -- he is telling me come to
9    Dubai, I give you everything you need to build everything
10   you want.  Because nothing was concrete yet with PADI and
11   National Geographic, I said, well, let me go to Dubai and
12   we will take it from there.
13   Q.   Well, how much money did you estimate you would
14   need to raise in order to enter into a contract with
15   National Geographic and PADI to build 2,500 submarines?
16   A.   That's when -- that was one of the points in the
17   discussion.  I needed $5 million.  Because $5 million
18   would help me to start.  Because once you start putting
19   those submarines in operation, the money that is
20   generated by the charter, you reinvest it in building
21   more submarines.
22        So the discussion with National Geographic was,
23   like, if I get more funding, I can get quicker to the
24   2,500 submarines.  If I get a small funding, it's going
25   to take more time to get there because it will take more

21  (Pages 78 to 81)

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

Page 82

1    time to reinvest the money into building more submarines.
2        Q.  Did you ever get a written commitment to provide
3    $5 million of funding?
4        A.  What do you mean by "written commitment"?
5        Q.  Did you ever reach an agreement that some entity
6    would loan you $5 million?
7        A.  No.  I had strong interest from New Zealand.  And
8    once I left -- as I was leaving Florida, the SBA came
9    with a $3 million loan offer, which I turned down.
10       Q.  So the Small Business Administration offered you
11   a $3 million loan to do what?
12       A.  To start making submarines for PADI and National
13   Geographic.
14       Q.  Did they present you with a document?
15       A.  Well, it was by e-mail.
16       Q.  Do you have copies of the e-mail?
17       A.  I don't remember if -- I don't remember the form
18   of that document.  I do remember the loan officer
19   contacted me and said -- he was very happy; at last you
20   got your loan, come to the office.
21       Q.  Who was that loan officer?
22       A.  I have to look in the -- I have his name, but I
23   don't remember his name on the top of my head.
24       Q.  Which office did he work for?
25       A.  I think he was -- it was West Palm Beach.

Page 83

1        Q.  When had you first begun discussions with this
2    loan officer?
3        A.  Well, it was 2002, I believe.
4        Q.  How long did the discussions continue?
5        A.  Until I left Dubai -- until -- until -- he is
6    not -- it's not an SBA loan, per se SBA officer.  He is a
7    broker working for SBA, West Palm Beach.
8        Q.  But no loan was ever executed?  Or you never
9    borrowed the money --
10       A.  No.
11       Q.  -- never signed the documents?
12           So you had been working with PADI and National
13   Geographic for over two years before you left for Dubai,
14   right?
15       A.  I would say a year and a half --
16       Q.  And --
17       A.  -- two years.
18       Q.  And after those two years, you didn't have -- or
19   after that year and a half you didn't have any written
20   agreement with either PADI or National Geographic?
21       A.  Nothing concrete.  Nothing finalized.
22       Q.  And you didn't have any written commitment with
23   any source of funding to provide the seed capital that
24   you would need to commence the building of the
25   submarines?

Page 84

1        A.  Nothing finalized.
2        Q.  And am I accurate that the SBA would have only
3    loaned you the money if, in fact, you had an agreement in
4    place with PADI and National Geographic?
5        A.  No.  That, I don't remember.
6        Q.  Do you know what percentage interest SBA was
7    offering?
8        A.  I don't remember.
9        Q.  Do you know what percentage interest the people
10   in New Zealand you talked about were offering?
11       A.  No.
12       Q.  Had you ever done a financial pro forma or any
13   other kind of estimate with respect to the -- building an
14   enterprise of this size for your anticipated business
15   with PADI and National Geographic?
16       A.  I did and National Geographic did, too.  So we
17   both did.
18       Q.  Do you have copies of it?
19       A.  I believe you have one.
20       Q.  A copy of the financial pro forma which shows the
21   costs of building an operation sufficient to build 2,500
22   submarines for PADI and National Geographic?
23       A.  I have seen documents related to that.  I would
24   have to go through my records to remember.  But I do
25   remember some numbers and projections.

Page 85

1        Q.  I have never seen these projections.  Can you
2    identify them so that if I went to look for them, I might
3    be able to find them?
4        A.  It was under the documents from the New Zealand
5    people.
6        Q.  What do you recall of the documents from the New
7    Zealand people?
8        A.  Well, it says Seahorse Submarine New Zealand
9    program, something like that.
10       Q.  Is it your understanding that the people from New
11   Zealand sent you financial projections about what the
12   cost would be --
13       A.  No.  No.  It was -- the financial projections
14   were in that document.  The reason being that in order
15   for me to get funding from New Zealand, I had to relocate
16   to New Zealand and build those submarines in New Zealand.
17   If I had taken the loan from SBA, they would have
18   required that I stay in Stuart.
19       Q.  All right.
20       A.  So because the -- those submarines were to be
21   built in New Zealand, in their documents, they included
22   the projections.
23       Q.  What was -- was the -- were the discussions you
24   were having with the New Zealand people, were they
25   dependent upon your obtaining a contract with National

Esquire Reporting, Inc.
(772) 283-8002

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

---

Page 86

1    Geographic and PADI?
2        A.  No.  That was -- that was a given.  They were
3    pending to getting the funding from whoever in -- I don't
4    remember who -- in New Zealand.
5        Q.  Well, when you say that was a given, what do you
6    mean?
7        A.  There was -- there had no doubt -- they had no
8    doubt that National Geographic and PADI would come up
9    with signing an agreement with Seahorse.
10       Q.  My question was, whether or not their agreement
11   to provide funding was conditioned on an agreement being
12   reached with National Geographic and PADI.
13       A.  Yes.
14       Q.  And if you look at the last line in that bullet,
15   it says profits between 30 million and 320 million.  Is
16   that -- is that -- is that a typo?  Was the "2" that
17   you -- that's include in the second number meant to be
18   there?
19       A.  It's not a typo.  Actually, I was much more
20   conservative than the National Geographic people.
21   National Geographic people show huge numbers.  I was just
22   more conservative -- the number that I put there, it's
23   based on what -- on their feasibility study.  When I put
24   30 million, that's my number.  National Geographic --
25       Q.  Well, at some point we're going to trial on this,

---

Page 87

1    like, in February or maybe even this year.  Are you going
2    to be seeking $30 million in lost profits or 320 million,
3    or something in between?
4        A.  Something in between.
5        Q.  Uh-huh.
6            How did you do these calculations?
7        A.  First, when you put a submarine --
8        Q.  No.
9        A.  -- anywhere in the choice location, people are
10   going to --
11       Q.  No.  No.  My question is very, very narrow.
12           First of all, who -- who came up with the number
13   30 million to $320 million?
14       A.  Both me and National Geographic.
15       Q.  All right.  When you --
16       A.  When they came to me, they already had their
17   projections and these numbers.  I just lowered them.
18       Q.  When you decided to put these numbers in here, I
19   mean, how did the process go?  How did you come up with
20   $300 million?  Was it a piece of paper you looked at?
21       A.  No.  No.  It's a very precise calculation.
22   You -- the first data is how much you pay -- how much a
23   person pay for a ride.  About $90.
24       Q.  All right.
25       A.  If you take a ride in a submarine, you are going

---

Page 88

1    to pay $90.  Now, if it's -- if it's a six-passenger
2    submarine, that means that's for each dive.  That's six
3    times $95.
4            Now, a submarine is going to make six dives a
5    day.  So that's times six.
6        Q.  So is this based upon the assumption that there
7    are 2,500 of these submarines scattered around the world
8    being used each day?
9        A.  Yes.
10       Q.  Did you take a piece of paper out and
11   calculate --
12       A.  Yes.
13       Q.  Where is it?
14       A.  Where is that piece of paper?
15       Q.  Yeah.
16       A.  (Indicating.)  It's in my docs, and you -- I have
17   one that is updated and you have another one from PADI
18   and National Geographic.
19       Q.  I don't know what you're referring to.  I have
20   not seen anything that looks like a projection of
21   revenues with respect to this project.  Can you be more
22   specific than that?
23       A.  On what?
24       Q.  I want to know where these numbers come from that
25   we've been scouring the documents and we can't find them.

---

Page 89

1    In fact, the first that I have ever heard of this was
2    when I received this supplementary response to the
3    interrogatory.
4            MR. HESS:  I am sorry.  Is that a question?
5    I don't -- are you expecting a reply to that.
6            MR. URQUHART:  I'm not sure whether it's a
7    question.
8            MR. HESS:  Okay.
9    BY MR. URQUHART:
10       Q.  Did anybody help you with the computation of
11   these damages with respect to this contract or, I guess,
12   anticipated contract between PADI and National
13   Geographic?  Did you do it yourself?
14       A.  If anybody helped me with the --
15       Q.  Yeah.  Like, how did you come up with these
16   numbers?  Did you just fill them in?
17       A.  No.
18       Q.  Did you sit down with somebody?  Did you have a
19   calculator?
20       A.  I told you, it's based on what's the market is.
21   You take one -- per submarine that is $95 per person, six
22   passenger, six dives a day, 300 days a year.  So when you
23   do that, you have the gross per submarine.  Now, if you
24   have 2,000 submarines --
25       Q.  Can I stop you there?  Where is that computation?

23 (Pages 86 to 89)

Esquire Reporting, Inc.
(772) 283-8002

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

Page 90

1  I have not seen it. Is this something you did recently
2  in connection of answering or supplementing the
3  interrogatories?
4     A.  There is old documents that either you have or
5  that I have seen in your records or I have in my records.
6  And recently I did an estimate, an updated estimate for
7  those claims. Because the estimate that I saw in your
8  record or in my record are no longer accurate as of
9  today.
10       And, anyway, the document that you have, it was,
11  like, a draft, and I remember that we were -- I was
12  talking to National Geographic because we did not agree
13  on the numbers, on how we came up with the numbers. It's
14  not that the number is too high or too low, but, for
15  instance, the cost to build the submarines were too low
16  in their projection. And their estimate on how many
17  submarines would be operated was too high. I told them
18  it would take more than five years to put 2,500
19  submarines out there. So that in their numbers, their
20  numbers had to be corrected; and which I did when I
21  prepared that. I reviewed the documents that already you
22  have or that are in my records, and that I updated them.
23  So that I could come up with a more precise figure.
24     Q.  Can you tell me what this looks like, is it one document? Is it

Page 91

1  a series of documents?
2     A.  No. It's a bundle of documents on the front
3  page. There is a Seahorse -- like a logo and it says
4  Seahorse Submarines something related to New Zealand.
5     Q.  So you estimated that -- let me sort of back up.
6  Did PADI or National Geographic, did they approach you or
7  did you approach them?
8     A.  They approached me.
9     Q.  And had they been looking for a manufacturer of
10  submarines?
11     A.  Yes. So they had found one prior to me.
12     Q.  Uh-huh.
13     A.  And --
14        MR. HESS:  I don't want to interrupt you. I
15  don't really -- maybe this makes sense for you.
16  Over the break I will be happy to give you a
17  Bates number on that -- on what you're talking
18  about. You have it.
19        MR. URQUHART:  Oh, that would be great.
20        MR. HESS:  On the break I will make sure
21  that is one of the things I do.
22        MR. URQUHART:  That would be fabulous.
23        THE WITNESS:  Although those numbers look
24  big, they are conservative.
25  //

Page 92

1  BY MR. URQUHART:
2     Q.  I understand. All I want to do is see them.
3        So do you know whether or not since you broke off
4  your discussions with National Geographic and PADI -- in
5  2004?
6     A.  Either early 2004 or late 2003.
7     Q.  Are you aware of any other entity, any place on
8  earth that has entered into a contract with National
9  Geographic and PADI to supply submarines?
10     A.  What do you mean another --
11     Q.  I mean, did somebody step into your shoes?
12     A.  No, nobody.
13     Q.  Are you still pursuing this?
14     A.  It's going to be difficult with all of the bad
15  names that Dubai World called me. It kind of clouded me,
16  my reputation. I doubt they would -- I don't know, but I
17  feel very uncomfortable going back to National Geographic
18  with that kind of clouds above my head.
19     Q.  Well, did you go back to them?
20     A.  I am sorry?
21     Q.  When was the last time you spoke with anybody at
22  either National Geographic or PADI?
23     A.  Either 2004 or -- early 2004.
24     Q.  So it's your decision that -- not to speak with
25  them now?

Page 93

1     A.  It is my decision, based on what transpired
2  through that whole thing.
3        MR. URQUHART:  Okay. We have to take a
4  break.
5        THE VIDEOGRAPHER:  This is the end of Video
6  No. 2 at 12:13.
7        (A recess was taken from 12:13 p.m. to
8  12:28 p.m.)
9        MR. URQUHART:  Ready, Mr. Jaubert?
10        THE WITNESS:  This is the beginning of Video
11  No. 3 at 12:28.
12  BY MR. URQUHART:
13     Q.  I'm moving down the page, I realize slowly, but
14  I'm making progress here. I'm looking now at the bullet
15  that says the loss of Mr. Jaubert's business opportunity
16  to sell and operate charter business in California and
17  the Bahamas.
18        What's the basis for that comment?
19     A.  Just -- that was in 2004. I was approached by a
20  couple of gentlemen out of California. They had already
21  worked out the permits, licensing, for a small tourist
22  operation in the Bahamas.
23        I know myself the Bahamas, it's an excellent
24  location for this kind of charter. And they wanted me to
25  be a partner with them to build -- first to build

24  (Pages 90 to 93)

Esquire Reporting, Inc.
(772) 283-8002

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

Page 94

1  submarines and then operate them in the Bahamas.
2      Q.  So this was in 2004?
3      A.  I believe they contacted me first in 2003.
4      Q.  Uh-huh.
5      A.  And then it went on to 2004.  And I also remember
6  that when he went to Dubai they were not very happy.
7      Q.  Do you remember the names of these people?
8      A.  Peterson.  The last name is Peterson.  First name
9  will come up -- I will remember.
10     Q.  Was there more than one person in addition to
11 Mr. Peterson?
12     A.  It was two person.  The other person I don't
13 remember the name.  I was talking mostly to Mr. Peterson.
14     Q.  Was first contact over the telephone?
15     A.  The first contact was, like always, by e-mail,
16 then phone.  And then he flew over here to discuss
17 the -- the details.  And he showed me what he have --
18 what he had as far as the contact he had in the Bahamas.
19         One of the aspects of doing that kind of business
20 is you need some sort of a sponsor or --
21     Q.  Did -- do you remember what city Mr. Peterson was
22 from in California?
23     A.  No, I don't.  I have that somewhere, but off the
24 top of my head I don't remember.
25     Q.  Do you know how I might contact him?

Page 95

1      A.  Yes.  If I go back in my record and I find him.
2      Q.  These records weren't left in Dubai?
3      A.  I am sorry?
4      Q.  These are records that weren't left in Dubai?
5      A.  It's one of those documents that I managed to
6  recover.
7      Q.  Okay.
8      A.  An e-mail or something.
9      Q.  How many times did you speak with Mr. Peterson
10 either over the telephone or in person?
11     A.  How many times?  I don't remember.
12     Q.  More than ten?
13     A.  More than ten, yeah.
14     Q.  More than 20?
15     A.  About.
16     Q.  Between 10 and 20?
17     A.  About 20.
18     Q.  And how many times did you speak with this other
19 person whose name you don't remember?
20     A.  Well, they came together to Stuart.  So that was
21 the -- the only time I talked to him.  I was talking
22 mostly to Mr. Peterson.  They went further down because I
23 started to build a product for them.  What they -- what
24 they were interested was to start a charter operation
25 with a small sub, one-man submarine.  And to make

Page 96

1  it -- to make the operation easy, retrieval, launching, I
2  designed -- I had one in Puerto Rico, actually.  I did
3  the same, so I knew exactly what I was talking about.
4  It's a submersible platform.  It's like a lift where you
5  put a couple of subs on the platform and then you lower
6  it and you release the submarine and then when you
7  recover -- you retrieve the submarine, you lift the whole
8  thing and you tow that platform back to shore.  So that
9  makes the operation easy.  So I started to build one.
10 And when I moved to Dubai, I refunded the -- the deposit.
11     Q.  How much was the deposit?
12     A.  Maybe $20,000.  Something -- 20,000 out of
13 35,000.  There is no engines --
14         THE REPORTER:  There is no?
15         THE WITNESS:  No engine.  It's just a hull,
16 a hull, so it's not --
17 BY MR. URQUHART:
18     Q.  So, in other words, you used ballasts to go up
19 and down?
20     A.  Yes.
21     Q.  So an observation type of a submarine?
22     A.  Yes.
23         So I refunded them and I took it with me to
24 Dubai.
25     Q.  Was -- did you have a written contract with these

Page 97

1  people to supply this one submarine?
2      A.  Yes, uh-huh.
3      Q.  And your recollection is that the -- that the
4  price for the vessel was $35,000?
5      A.  Yeah, give or take, from what I remember.
6      Q.  Was the contract in writing?
7      A.  Yes.
8      Q.  Do you know where that is now?
9      A.  It's in a metallic cabinet.
10     Q.  In Dubai.
11     A.  In Dubai.
12     Q.  Did the company that Mr. -- or strike that.
13         Was Mr. Peterson affiliated with a company?
14 Like, what I'm saying is you're Seahorse Submarines --
15     A.  Yes.
16     Q.  -- even though everybody knows you are
17 Mr. Jaubert.
18         Was he with some company with a name other than
19 "Peterson"?
20     A.  No.  Because he had a position in a company
21 somewhere, so he was an employee.  I don't remember the
22 bill of sale or the contract, what it says, if it was a
23 company name or his name.  I don't remember that.
24     Q.  So was it your impression that Mr. Peterson was
25 doing this on a full-time basis or, like, sort of as a

                          25 (Pages 94 to 97)

1/13/2011                    Herve Jaubert

Page 98

1  sideline?
2      A.  No.  He was looking at leaving his job and move
3  to the Bahamas to do that full-time.
4      Q.  Right.  But at that point anyway --
5      A.  At that point.
6      Q.  He worked for somebody else, somebody not in the
7  submarine business.
8          And was your contract with them to build one
9  submarine?
10     A.  No.  It was to build -- I think it was ten.  Ten,
11 one-man submarine.
12     Q.  At $35,000 a copy?
13     A.  Yeah.  Something like that.
14     Q.  Do you know whether Mr. Peterson ever started the
15 business in the Bahamas?
16     A.  No, he never started.  When -- he contacted me
17 recently, maybe -- not recent -- maybe six months ago.
18 So I know he did not start.
19     Q.  So did he contact you for the purpose of the
20 possibility of your building submarines for him again?
21     A.  Yeah, uh-huh.
22     Q.  And what happened?
23     A.  Again, I told him I'm in the middle of a
24 legal -- he said, well, yes, I'm aware of it.  And you
25 have to understand, it's difficult for me -- very

Page 99

1  difficult for me to start a business when you are in the
2  middle of a lawsuit and your name is all over the
3  Internet in a bad way.
4      Q.  So am I accurate to state that he wants you to
5  build submarines, but you're telling him that it's a bad
6  time for you because of this lawsuit?
7      A.  He wants to go -- he wants to do that business,
8  yeah.  He wants to pursue what we -- he initiated.
9      Q.  But you have told him that it's a bad time for
10 you to do that right now?
11     A.  I told him I could not do that now.
12     Q.  And the reason is because of the lawsuit?
13     A.  No, not just the lawsuit, but, you know, my
14 reputation.
15     Q.  Did he tell you that he was concerned about your
16 reputation?
17     A.  No.  It's not just about him.  He trusts me and
18 using my capabilities, but whoever this business is going
19 to be associated with might have a different look.
20     Q.  Right.
21         And do you know whether this Mr. Peterson has
22 launched a charter business in California?
23     A.  No, he has not.
24     Q.  Well, you have the number -- $1 million in lost
25 profits -- lost net profits.  How did you calculate that

Page 100

1  number?
2      A.  That's an estimate based on the same datas, how
3  many dives per day, how many dives per year, how
4  many -- how much --
5      Q.  How many submarines were you estimating would be
6  part of this --
7      A.  10 submarines.
8      Q.  10.
9          And the 1 million -- and the $1 million, is that
10 net profits per year based upon these 10 submarines?
11     A.  I don't remember if it's per year, but it's based
12 on 10 submarines.
13     Q.  10 submarines.  But it's the charter revenue from
14 these 10 submarines over some length of time?
15     A.  Yes.  So 10 submarines, that's 95 -- that's $950
16 per dive.  So if you have -- let's say, if you do that
17 eight times during the day -- because a one-man submarine
18 is very easy to operate.  You can have more operations
19 than a big submarine.  So that's 8 times 950.
20     Q.  Well, I'm trying to -- like, are you saying that
21 you anticipated that this project of -- involving 10
22 submarines would throw off $1 million of net profits per
23 year, over 10 years, over what length of time?
24     A.  It was not per year.  It was over -- it was -- I
25 don't remember if it was three years, but it was not

Page 101

1  10 years.  You -- you come up with the million dollars
2  pretty quick.
3      Q.  No.  I know you came up with the million dollars.
4  I'm trying to figure out how you calculated it.  Was
5  it -- was it one year, two years, three years?
6      A.  I don't remember precisely.  I remember the
7  figure, but I don't remember how I calculated it.  If you
8  want me to recalculate it, I can do it quickly.
9      Q.  Who came up with the assumptions regarding the
10 cost of operations?
11     A.  I did.
12     Q.  And what did you base that on?
13     A.  That's -- that is -- it's not difficult to
14 estimate.  You have employees, you pay them on an
15 existing rate.  The boat captain; you know how much is a
16 boat captain on the market or a master diver, as an
17 instructor.  You need a hostess.  So you are two, maybe
18 three, employees, including manager, hostess and a master
19 diver, maybe a boat captain.
20         So once you have that, you have the payroll, and
21 then you have the whatever, rent or lease that you have
22 to pay to keep the boat somewhere, either it's a
23 berth --
24     Q.  So was the arrangement that you were speaking
25 about with Mr. Peterson, one in which you were going to

26  (Pages 98 to 101)

Esquire Reporting, Inc.
(772) 283-8002

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

## Page 102

1  contribute submarines and he -- and to the venture, and
2  he would operate it and you would split profits? I mean,
3  what was the financial arrangement?
4      A.  He would operate the company.  I would get him
5  there, because he -- he was not -- he never operated a
6  submarine before or a charter company before.  I have
7  the -- I have that knowledge.  So I would have -- part of
8  the agreement was for me to -- because I would not move
9  to Bahamas.  He would.  I would not -- I would not
10  operate that company, that charter, myself.  He would.
11  But in order to get there, it would take me maybe a
12  couple of months to show him how to run the business.
13  And then there was -- in the agreement there was, like, a
14  franchising fee.  Because it's very important, again, the
15  money in the submarine business is in the charter, not
16  the manufacturing.
17      So it's important for the manufacturer -- for the
18  manufacturer to secure a licensing fee or a franchising
19  fee because otherwise you would -- you would go out of
20  business quickly.  The charterer would make money out of
21  the submarine -- the -- built by the manufacturer, but
22  then the manufacturer would not make anymore money once
23  he sold the submarine.
24      Q.  Had you reached an agreement on what percentage
25  you would get of revenues?

## Page 103

1      A.  Yes, it was -- I don't remember the percentage,
2  but we discussed that.  We agreed -- we had an agreement.
3      Q.  Was it on gross revenues, the percentage, or on
4  net --
5      A.  On the net profits.
6      Q.  What was the -- was Mr. Peterson going to
7  purchase the vessels?
8      A.  I don't remember the detail, whether it was a
9  purchase or if it -- or I was putting that as my share.
10  I think it was more, like, I was bringing the -- in my
11  share, but I'm not sure.
12      Q.  All right.  Let's go down -- we've already spoke
13  about Sandtransisco.  Did I ask you about how the
14  $2 million was calculated with respect to the
15  Sandtransisco?
16      A.  In that agreement, Sandtransisco owned the
17  designs although I came up with the design.  So I agreed
18  to that.  But in return -- why it's $2 million is because
19  the -- that project is like a niche project.  You have a
20  lot of boat people here with boats in the waterways or
21  whatnot, where the big barge do not have the access.
22      So in that contract there was a provision of -- I
23  don't know how you call that -- either franchising fee or
24  licensing fee.  Because, again, once I built those units,
25  I'm not making anymore money.  The person who is using

## Page 104

1  them is making the money; charter or -- I mean, the
2  service.
3      Q.  Do you --
4      A.  So I would get a portion of that.  And over the
5  next, I would say, 10 years I would get that number.
6      Q.  How did you pick 10 years?
7      A.  Huh?
8      Q.  How did you pick 10 years?
9      A.  Well, that was an estimate in the projection.
10      Q.  Uh-huh.
11      Do you know whether, in fact, these vessels that
12  you designed are in use as we speak?
13      A.  That, I don't know.  I built -- I built one
14  complete unit which comprised of a dredger and a barge,
15  and I had five dredgers under construction and then it
16  was transferred to another entity.
17      Q.  This was the deal between Seahorse and
18  Sandtransisco?
19      A.  Yes.
20      Q.  And those were the parties to the arrangement?
21      A.  I am sorry?
22      Q.  Those were the parties to the arrangement?
23      A.  Yes.
24      Q.  And these franchise fees that you were going to
25  obtain from Sandtransisco, they were dependent upon

## Page 105

1  Sandtransisco making revenue --
2      A.  Yes.
3      Q.  -- and profits?
4      A.  Of course, uh-huh.
5      Q.  So if it didn't, then you wouldn't have gotten
6  the 2 million?
7      A.  (Nods head.)
8      Q.  And you don't know what kind of revenues
9  Sandtransisco is deriving from any of these vessels that
10  you designed?
11      A.  He did tell me, but I don't remember.
12      Q.  Okay.  Can we skip down to the next one.
13      It says loss of -- at $100,000 of service and
14  training.  What does that mean?
15      A.  Like I said before, I had other sources of
16  revenues that were growing.  It was either training or
17  services or engineering, diving services.
18      Q.  Okay.  But what I'm trying to figure out is, is
19  this $100,000.
20      When we spoke earlier, I had the impression that
21  this was services that you were providing under the
22  Seahorse name.
23      A.  Yes, of course, under Seahorse, yes.  But me as
24  an employee of Seahorse, I'm the one who was doing the
25  job.  So --

27  (Pages 102 to 105)

Esquire Reporting, Inc.
(772) 283-8002

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

Page 106

1    Q.  So this was an additional -- is this 100 million?
2    A.  No, no.  100,000.
3    Q.  100,000.
4        This would have been money that came into
5  Seahorse?
6    A.  That came into Seahorse.  And then I would get a
7  salary.  I would be compensated for whatever services I
8  had to provide.
9        Now, when you read $100,000, the cost to that is
10 very -- there is nothing to manufacture or there is
11 nothing to build.  It's a service.  So the profit on that
12 is big.
13   Q.  All right.  I understand that.  Do you have
14 any -- any records that would show what kind of revenues
15 Seahorse derived from your provision of services that
16 weren't related to the -- to the submarine business?
17   A.  It's in Dubai.  I don't have -- I don't have
18 them.
19   Q.  Thank you.
20       And the next item is, the loss of manufactured
21 submarines and profits thereunder valued at $500,000.
22 What is that claim?
23   A.  As Seahorse would be making submarines, profits
24 would be generated to Seahorse, and I would get a salary
25 or dividends.

Page 107

1    Q.  But this would be Seahorse's claim against --
2    A.  Not Seahorse claim.  My claim.
3    Q.  Your claim?
4    A.  If Seahorse does not make money, I don't make
5  money --
6    Q.  I understand that.  I understand that.
7    A.  -- whether it's salary or dividends or
8  profit -- or what ...
9    Q.  So this is a component of the -- are you talking
10 about profits?  You are talking that you anticipated that
11 Seahorse would make $500,000 of profits --
12   A.  At the time.
13   Q.  -- on the submarine business?
14       At which time?
15   A.  2004.
16   Q.  2004.
17       And when did you anticipate that Seahorse's
18 profits would get to $500,000 annually on the manufacture
19 of submarines?
20   A.  That was if I projected the normal business
21 operation of Seahorse.  Now, if I had entered an
22 agreement with National Geographic and PADI, that would
23 not apply.
24   Q.  Right.
25   A.  That was, like, a minimum figure.

Page 108

1    Q.  What do you recall -- is this a calculation you
2  did, like, recently in connection with trying to figure
3  out what your damages were?
4    A.  Yes.
5    Q.  Which you hadn't done -- and how did you get from
6  basically a break-even basis in 2004 to $500,000 in
7  profits in -- like, when was -- when was -- when did you
8  anticipate on the timeline starting 2004, when you would
9  reach a level of profitability of $500,000 for the
10 manufacture and sale of submarines?
11   A.  I saw that coming with the -- I was getting more
12 and more inquiries and interest --
13   Q.  Right.
14   A.  -- from potential customers.  And so I knew I was
15 going there.
16   Q.  I understand that.  But did you write this out on
17 a piece of paper?  Did you -- did you take an Excel
18 spreadsheet out --
19   A.  No, no, no.
20   Q.  And I'm -- I'm asking you, like, at what
21 point -- as of 2004 we were at a break-even basis.  And
22 when did you anticipate you would hit $500,000 a year?
23       MR. HESS:  Objection.  Mischaracterizes
24 evidence.
25       Go ahead.  You can answer.

Page 109

1        THE WITNESS:  In 2004 I had the
2  numbers -- even though the -- there was little or
3  no profit in 2004 --
4  BY MR. URQUHART:
5    Q.  No.  I understand that.  I'm just asking, like
6  if -- like, if I looked at -- what kind of profits did
7  you predict in 2005, 2006, 2007, 2008?
8    A.  Okay.
9    Q.  Because I'm assuming --
10   A.  Yeah, I did that.
11   Q.  Okay.  You did that.
12   A.  Assuming that I would sell 10 submarines in 2004,
13 I would be 15 in 2005, 25 -- 20 in 2006, and so forth.
14 It's not a linear actually --
15       THE REPORTER:  It's not?
16       THE WITNESS:  Linear projection.  Not
17 exponential either, but somewhere in between.
18 BY MR. URQUHART:
19   Q.  Right.  How far out in time did you go?  You
20 started in 2004.  Did you go out to, what --
21   A.  For that it was five years.
22   Q.  Five years?
23   A.  No more than five years.
24   Q.  So you anticipated that you would derive annual
25 profit of $500,000 on the sale of submarines?

Esquire Reporting, Inc.
(772) 283-8002

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

| Page 110 |
|---|

1      A.   Assuming that I had no large agreement such as
2   National Geographic or something like that.
3      Q.   All right.  So you made your assumptions from
4   2004 to 2009?
5      A.   Yeah, about five years.
6      Q.   Well, how much did you anticipate in profits in
7   2009?
8      A.   500,000 -- that 500,000 figure here is an
9   average.
10     Q.   Right.  That's why I asked you 2009.
11     A.   So 2009 would be probably 800,000.
12     Q.   But you don't remember as you sit here today?
13     A.   No.
14     Q.   Do you remember for 2008?
15     A.   A little less, a little under that.
16     Q.   And would the same be true that you don't
17   remember for 2006 or 7?
18     A.   Same.
19     Q.   What kind of costs did you assume in coming up
20   with these calculations?
21     A.   As I moved further in time, the cost would be
22   reduced significantly to 50 percent instead of
23   two-thirds.  Because as I move forward, there is
24   no -- the cost for research and development is limited, I
25   pay off the loans, I pay off the debt, the efficiency in

| Page 111 |
|---|

1   production is getting better, my employees are getting
2   more efficient, they are trained.  So with time, the
3   cost -- the ratio is getting better.
4      Q.   What -- what costs did you assume in 2009?  Total
5   costs.
6      A.   Total cost would be 50 percent of the sale -- the
7   sales, 50 percent of the cost of running the company.
8      Q.   All right.  And would the same be true with
9   respect to each of the other years?  You would just
10   assume sales here, costs are 50 percent of sales,
11   everything else profit?
12     A.   Yes.
13     Q.   Okay.  And these would be Seahorse profits?
14     A.   That would be Seahorse profit.
15     Q.   Did -- in coming up with these figures, did you
16   assume, like, different numbers of submarines would be
17   sold in each year?
18     A.   No.  It would be the same -- what do you mean
19   different numbers?
20     Q.   Well, in coming up with the $500,000 profit
21   annually, this was based, according to the response, on
22   actual sales of submarines, profits from, right?
23     A.   (Nods head.)
24     Q.   Well, how many submarines did you assume would be
25   sold in each of the years?

| Page 112 |
|---|

1      A.   It would be, like, a dozen in 2005; 5 or -- 15 or
2   16 in 2006.  And with a progressive increase years to
3   years.
4      Q.   And what would the average -- what was the
5   average price you assumed with respect to each submarine?
6      A.   Well, the best model -- the model I would sell
7   the more -- I mean the better would be the Adventurer.
8   It is really a nice, nice submarine.  It works well.  And
9   it -- that is an affordable by private individuals.
10          Now, the six-passenger submarine I was looking
11   into, not -- I was looking into making a charter with
12   them, not -- not manufacturing.  Or if I manufactured
13   them, there would be some license agreement.  Because a
14   six-passenger submarine, it is no longer a private sub
15   or -- it's -- it's for commercial purpose.
16     Q.   Right.
17          Is there -- is there an actual spreadsheet that
18   you used to calculate this or did you do it in your head?
19     A.   It's more like I remember the spreadsheet.  The
20   spreadsheets -- I had that all over in my file in Dubai.
21   Not one time, like 25 times.  So when I put those
22   numbers, I did it --
23     Q.   From memory?
24     A.   -- from memory.  But the spreadsheets -- they
25   were spreadsheets.

| Page 113 |
|---|

1      Q.   Okay.  But we don't have them now because they
2   were in Dubai.
3      A.   No.
4      Q.   Can we take a look at the next bullet that says
5   loss of 20 percent of profits.  The -- I guess, the
6   manufacturing enterprise promise -- let me start over
7   again.
8          Do you see this bullet that says loss to
9   Mr. Jaubert of 20 percent of the profits of the submarine
10   design, manufacturing enterprise, promise by Dubai World
11   to Mr. Jaubert, the value of that $100 million?
12     A.   Yes.
13     Q.   Where did you come up with the $100 million?
14     A.   Sultan came to -- Sultan Bin Sulayem, chairman of
15   Dubai World -- Sultan came to Stuart in December 2003,
16   and then invited me to go to Dubai.  So when I first met
17   him and then when I went to Dubai, I spent a lot of time
18   with him.  And he gave me those numbers repeatedly.
19     Q.   No, I understand that.  I'm asking -- like, so
20   are you basing this number here, the $100 million, on
21   profits that Sultan said were going to be made?
22     A.   He was very specific because, of course, when he
23   gave me these kind of numbers I was more, like, how is it
24   possible?
25     Q.   Right.

29  (Pages 110 to 113)

Esquire Reporting, Inc.
(772) 283-8002

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

---

**Page 114**

1    A.  And he told me how and where and how would that
2  happen. So he was -- he had plans in his head already.
3  And --
4    Q.  Big plans?
5    A.  Big plans. Not only he told me speaking-wise,
6  but he also wrote it. To give you an example, it is his
7  numbers, not mine. But when we're talking about a
8  specific model, the one that he wanted me to design and
9  build the Proteus.
10      THE REPORTER: The?
11      THE WITNESS: The Proteus. That's a
12    $15 million boat. And in the discussions or in
13    the budget preparations and the -- he himself
14    signed that he -- he expected to build one
15    hundreds of the Proteus.
16  BY MR. URQUHART:
17    Q.  Well, I'm just focusing on the $100 million.
18    A.  Right. The $100 million. My share of that
19  Proteus would be $100 million.
20    Q.  In other words, of the 100 million, you would get
21  $1 million?
22    A.  That's how I got the $100 million. Because if I
23  built 100 Proteus, I know that per Proteus, I get
24  $1 million. The Proteus, it's $5 million profit, I get
25  20 percent of that; that's 1 million. I get $1 million

**Page 115**

1  per boat. If I built 100 boats, as Sultan promised me,
2  I'm going to have $100 million. Of course, not over two
3  years. It's going to take 10 years, maybe 15. But over
4  that period of time, that's $100 million, and Sultan
5  wrote it --
6    Q.  So this is -- this isn't discounted to present
7  value?
8    A.  What do you mean?
9    Q.  In other words, this -- what you did was simply,
10  like, add up -- you multiplied 100 times a million
11  and -- I mean, did you plot out what the sales were going
12  to be over time?
13    A.  Yeah. Uh-huh. The reason why I did that is
14  because I wanted to make sure that what he was telling
15  me -- he was aware of what he was telling me.
16    Q.  Right. But at this point anyway there had been
17  no sales of the Proteus?
18    A.  No. When he started talking to me about it, I
19  was not even in Dubai.
20    Q.  He started speaking with you about building 100
21  of these Proteus submarines while you were in discussions
22  in Florida?
23    A.  In Florida, and then when I went to Dubai. And
24  then he was -- for instance, Sultan has a yacht, a large
25  yacht, that I estimate $25 million, 20 maybe. You know,

**Page 116**

1  I like boats. I have been on boats all my life.
2  Probably sensed it, and he told me, like, two or three
3  times at different occasions that should I move to Dubai
4  and start this venture, I would have a yacht like his
5  soon.
6    Q.  But the $100 million here, these were based upon
7  things that Sultan told you?
8    A.  That he told me and that he wrote. Now, I would
9  come up with different figures because he would consider
10  only the Proteus, but that -- the Proteus would not be
11  the only product. When I was in Dubai I was working on
12  32 Proteus, not one.
13      So there would be profit generated by other
14  profit -- by other products. So although I did not -- I
15  was not sure I would build 100 Proteus, but I would build
16  boats. So when I signed the contract and not -- not a
17  letter of intent, not a feasibility study. I had a
18  signed contract with the Indonesia Navy, one deal, 10
19  boats, in the first six months of my operation.
20      So it was not crazy to think that we would build
21  200 of those in 10 years. One deal, ten of those boats.
22    Q.  Did you ever receive --
23    A.  Right now it's $10 million for me.
24    Q.  Did you ever receive any money? Did the
25  Indonesian Navy make any deposit?

**Page 117**

1    A.  That's not my problem.
2    Q.  No. I'm just asking you.
3    A.  They never came up with a payment, no. Whether
4  they did not have the money or somebody broke the deal or
5  opposed it, I don't know. But I had a signed contract
6  with the Indonesian Navy. We are not talking about --
7    Q.  But you don't know why the deal didn't go
8  forward?
9    A.  Still today I have no idea why it did not go
10  forward. Jim Miller spent one month and a half in
11  Indonesia to secure the down payment and it did not
12  happen. And I remember Sultan being very angry. The
13  contract, for instance, contained a penalty that if the
14  Indonesian Navy did not come up with -- did not finalize
15  the order with the payment, there was a $10 million
16  penalty, and Sultan wanted to go after them to collect
17  this $10 million.
18    Q.  So the $100 million here is based simply on the
19  Proteus projected sales out into the future?
20    A.  Yes.
21    Q.  But I take it that you would have anticipated
22  making even more than that because you have these other
23  submarines under design?
24    A.  Yes, or charter. I tried also to do charter.
25  But --

30  (Pages 114 to 117)

Esquire Reporting, Inc.
(772) 283-8002

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                     Herve Jaubert

Page 118

1    Q. Did you ever finish design of the Proteus?
2    A. No, at the time the design was not finished.
3    Q. At the time you left Dubai it was not finished?
4    A. No. At the time -- at the time they escorted me
5    to the door, it was not finished.
6    Q. Okay.
7    A. I left Dubai a year later exactly. I know as a
8    fact -- as a matter of fact, I know that Sultan tried to
9    hire another engineer, Phil Newton, to finish -- to
10   complete the Proteus.
11   Q. Do you know who Phil Newton is?
12   A. Oh, yes. He is a -- he is a -- he is a -- he
13   made a name of himself in the submarine community.
14   Q. Good name, bad name?
15   A. Good name. There is no bad name in submarines
16   community. I mean, you may -- Dubai World made my
17   name -- people don't believe it anyway, so the
18   professional -- sorry.
19   Q. Did you serve in the submarine service?
20   A. No.
21   Q. They are a close-knit group of people?
22   A. I am sorry?
23   Q. Submariners are close-knit?
24   A. Yes.
25   Q. And do you know what happened with Mr. Newton and

Page 119

1    the Proteus?
2    A. I don't know what happened. I can only assume.
3    I know -- I know he did not sign it.
4    Q. Okay. Can we skip down to the next one, which
5    says $350,000 for your services in constructing an ISO
6    certified facility.
7    At that time -- this was the facility where the
8    submarines were being manufactured in Dubai, right?
9    A. Yes. When Sultan came to Florida -- so he came
10   to Florida. I went to Dubai. So we discussed I had to
11   build submarines in Dubai.
12   Q. Right.
13   A. But he did not have a facility. So he asked me
14   to design one. And I asked him what's my budget? What
15   are we looking at? And so on the basis of building 100
16   boats in 10 years or whatnot, plus other projects -- so I
17   started to work on the design of his factory, probably in
18   June or July 2004.
19   And so although I was in Stuart, I was in contact
20   with people in Dubai to design and start the construction
21   of the factory although I was not there.
22   Q. Was there ever any kind of a written contract
23   between you and anybody at Dubai World --
24   A. No, no contract.
25   Q. -- to pay $350,000?

Page 120

1    A. No. I build this factory for free. There was no
2    contract.
3    Q. It was not part of your responsibilities as the
4    CEO of Exomos?
5    A. Yes. If -- if everything had gone like it was
6    supposed to be, yeah, I would never have claimed -- it's
7    not entirely true. We did not have a contract. But the
8    reason why -- we discussed that with Sultan as well. The
9    reason why that figure came up is because I would have a
10   percentage on the profit, whether it was -- at the time
11   it was 50 percent or whatever. If I build a factory,
12   it's their factory.
13   Q. Uh-huh.
14   A. And he found it fair that if they say -- let's
15   say I run the company for 10 years and after that I leave
16   or -- they -- somebody else takes over or whatever. So
17   if they sold the factory to someone else, I don't get
18   anything on that, but I built it.
19   Q. Right. But I'm just trying to understand why, in
20   addition to the moneys that were being paid to you as the
21   CEO of Exomos, why you think you were entitled to an
22   additional $350,000. Like, to me, anyway. You could
23   disagree --
24   A. In July of 2004, I was not a Dubai World
25   employee. They did not pay me the dime. And I was

Page 121

1    doing --
2    Q. How many hours had you dedicated to the design of
3    this building before you moved to Dubai?
4    A. How many hours? I would say at least three hours
5    every day.
6    Q. Three hours every day for how long?
7    A. Six months.
8    Q. Six months.
9    A. At least -- at least six months before I
10   became -- if I became an employee. But I don't -- I
11   don't see it as a per hour billing. I delivered and I
12   also certified factory. It did not come up like that
13   from the sand, from nothing.
14   Q. No. I understand all that. I mean, but from my
15   perspective, looking at this, I would have assumed that
16   was part of your responsibility as running this company.
17   I assumed there were other people who worked for you, who
18   worked on the facility, and they weren't paid extra.
19   A. Contractors; they were paid for that.
20   Q. Right.
21   So how long did it take to physically construct
22   the facility?
23   A. So I -- I designed it and they started to build
24   it as I was in Stuart. Once I -- I got to Dubai, the
25   building was pretty well -- the building was advanced

31 (Pages 118 to 121)

Esquire Reporting, Inc.
(772) 283-8002

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

Page 122

1    already, and I completed the place, maybe April or
2    June 2005.
3        Q.  Had you ever had any discussion with anybody at
4    Dubai World about your receiving a separate fee for your
5    contribution to the design of the factory?
6        A.  I talked about it only to Sultan.
7        Q.  And --
8        A.  But there was not contract.  There was no --
9        Q.  There was no agreement?
10       A.  No, not in written.
11       Q.  Did you have a discussion with Sultan about the
12   fact that he would pay you $350,000 extra, over and above
13   your salary for the design?
14       A.  From what -- from what I remember, it was -- when
15   I went to Dubai, the -- the one thing that was left to
16   discuss or agree was the end of my contract, what would
17   be the conditions of my entitlement or of anything or
18   dividends or whatever.  I have e-mails -- I saw e-mails
19   in the records where Jim Miller says that the exit terms
20   of my contract were left to be discussed -- to be
21   finalized.  I discussed that with Hamed Kazim and Sultan.
22   And the $350,000 was one of the topics.
23       So it's not something that I would have gotten
24   from the start or on the top of the salary.  It was part
25   of my exit --

Page 123

1        Q.  So you're --
2        A.  -- contract.  If it was 10 years, I would have
3    gotten that after 10 years.  If it was 5 years, I would
4    have gotten that in 5 years.
5        Q.  It's your testimony you had a discussion with
6    Jim Miller that after 10 years you would be paid $350,000
7    as a separate amount of money --
8        A.  No.
9        Q.  -- separate and apart from salaries, separate and
10   apart from -- you said you were entitled to 20 percent of
11   the profits.
12       A.  No.  Jim Miller -- Jim Miller -- I testified that
13   Jim Miller was aware that my exit -- exit terms of my
14   contract were left open and not finalized, but he did not
15   know the details.
16       Q.  But you never reached agreement on the exit
17   terms?
18       A.  No.
19       Q.  And you never reached a final agreement on the
20   $350,000 fee?
21       A.  No.
22       But they do have a factory; I so certified.  And
23   somebody build it for them.
24       Q.  Understood.
25       I'm looking now at the claim which says the

Page 124

1    balance for two submarines delivered under contract are
2    valued at $90,000.  Which two submarines are you
3    referring to?
4        A.  One is Discovery.
5        Q.  Uh-huh.
6        A.  And the other one is -- one of the Stingrays; I
7    don't know which one.
8        Q.  All right.  But in your previous deposition you
9    testified that they weren't completed.
10       A.  No, they were not completed.  And I waived --
11   Seahorse waived the last installment because the
12   submarines were being shipped by Aziz.  I see it as a
13   damage claim because I did not make any money on those
14   submarines.  When -- the cost profit is two-third, so I
15   shipped the submarine that I already put two-thirds of
16   money in it.  So the last payment was -- was the profit.
17   Had I stayed in Dubai and complete my -- my contract, I
18   would not claim that.  But since they threw me out in
19   between, I have never been paid for that on the profit of
20   those two submarines.
21       Q.  Is that the same for the next one, Discovery?
22       It's $170,000.
23       A.  No.  The next one -- when Seahorse -- when Dubai
24   World purchased Seahorse assets, there was a submarine
25   that was not completed.  Let me read that again.  Yeah,

Page 125

1    this is the Italian submarine.
2        When Dubai World purchased Seahorse assets, there
3    was, on the list there was a submarine, but -- that
4    submarine has zero value because it was -- there was a
5    pending litigation, so I could not sell that submarine.
6    But the value of that submarine was 175,000 worth in
7    equipment, the hull, the materials, the motors, the
8    batteries.  So when I --
9        Q.  Hadn't somebody else paid for that already?
10   Once?
11       A.  Yes.  The -- somebody paid for that.
12       Q.  And you never reimbursed them for that, did you?
13       A.  They never want -- they never asked for the
14   reimbursement.  They wanted a submarine.
15       Q.  Was -- was the Discovery listed in the schedule
16   of assets that were transferred --
17       A.  It was listed with zero value.  It was listed as
18   an inventory, but it was not sold as is, because there
19   was a litigation.
20       Now, when I went to court with the Italians -- I
21   don't remember what is the ruling -- but they lost that
22   submarine.  So, therefore, it becomes mine.
23       Q.  Uh-huh.
24       A.  So they paid for it.  Yeah, they paid for it, but
25   it becomes mine.  However, Dubai World got that submarine

32  (Pages 122 to 125)

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

**Page 126**

1  for free. They did not pay for it.
2      Q. But it was part of the -- the assets that you
3  transferred?
4      A. No. No.
5      Q. It's not listed?
6      A. It's listed with a zero value. I have the
7  choice. And I asked Sultan, what do I do? I have a
8  submarine, but it's not mine because we have a -- a
9  litigation. So it's either I leave it in Stuart left to
10 be rotten and abandoned. Because if it's not mine, I'm
11 not going to put any money in there. I cannot sell it
12 either because it's not mine.
13     Now, I told Sultan I can bring it with me. The
14 judge allowed me -- the judge will allow me to take that
15 submarine to Dubai, given that if I lost the lawsuit, I
16 would have to return it to the Italians. I was confident
17 that I would not lose, so I took it with me to Dubai,
18 pending the end of that litigation.
19     But it was -- so for that reason, it was not part
20 of the assets purchase. I had to list it because it's
21 there, physically it's there. I have to ship it for the
22 Custom --
23     Q. But it's listed as one of the assets that are
24 being transferred?
25     A. No, it was the other -- no, no. With a zero

**Page 127**

1  value; I'm sure of that.
2      Q. But is it listed -- it's listed as an asset
3  that's being transferred. I don't care what the value
4  is. It's listed, right?
5      A. It -- it was listed as an asset.
6      Q. Okay. Let me -- so this $170,000 is -- is that
7  in addition to the $1.5 million that you say you were
8  underpaid for the assets?
9      A. Yeah. Because the 170,000 was not --
10     Q. I have to add --
11     A. Yes, you have to add --
12     Q. -- 1.5 plus 170,000.
13     A. Yes.
14     MR. URQUHART: Do you want to break now?
15     MR. HESS: It works for me.
16     MR. URQUHART: Okay. So I will see you at
17 2:30.
18     MR. HESS: Perfect.
19     THE VIDEOGRAPHER: This concludes Video
20 No. 3 at 1:22.
21     (A recess was taken from 1:21 p.m. to
22 2:45 p.m.)
23     THE VIDEOGRAPHER: This is the beginning of
24 Video No. 4 at 3:46.
25 //

**Page 128**

1  BY MR. URQUHART:
2      Q. Are you ready?
3      A. I am ready.
4      Q. There is -- I would like to have you take a look
5  back at that supplementary response to our Interrogatory
6  No. 5. And toward the bottom, in fact, the second to the
7  last bullet on the bottom, talks about emotional distress
8  damages, valued at $5 million.
9      A. (Nods head.)
10     Q. How did you come up with the $5 million?
11     A. The one thing that comes to my mind is if anyone
12 offered me $5 million to go back to what I went through,
13 I would decline.
14     Q. Anything else?
15     A. As to why 5 million?
16     Q. Yes.
17     A. Because I estimate that this is the right number
18 for what I went through.
19     Q. Based upon the fact that you would take -- you
20 would pay $5 million not to go through it again?
21     A. That's another thing. But when I -- when I
22 thought about it, putting a number on something like
23 that, it's not -- first of all, it's not easy, but it's
24 not $500,000. It's not -- it's not 1 million. Maybe
25 it's not 10 million either. But anywhere in between.

**Page 129**

1      Q. Excuse me.
2      A. It was a very difficult experience, really,
3  really difficult. And I believe it's a fair number and
4  that's my number. I believe it's fair.
5      Q. Aside from any discussions you might have had
6  with Mr. Hess and Ms. Heathcock, did you -- did you
7  discuss the $5 million number with anybody else?
8      A. Actually, I did not discuss that number with
9  anybody.
10     Q. You just wrote it down yourself?
11     A. No. No. I mean, I read newspapers, I go on
12 Internet, I see what people do, what people don't do,
13 what they claim, what they don't. I look at my
14 background, I look at what I went through.
15     Q. Okay. I would like to talk a little bit about
16 what you went through. You -- I know that in your
17 previous deposition you talked about being threatened
18 with torture by the Dubai authorities.
19     A. Yes.
20     Q. And as I recollect it, you said that you sort of
21 scoffed at their abilities because you said that if you
22 are going to torture somebody, you torture them, but only
23 amateurs threaten to torture.
24     A. What I mean by that is that thanks to my
25 background and experience with police officers or

33 (Pages 126 to 129)

1/13/2011                    Herve Jaubert

Page 130

1  intelligence officer, I can tell that those guys were not
2  professional. They were incompetent, which makes them
3  dangerous. And I have seen that before.
4      Q. Uh-huh.
5      A. When you deal with a professional and competent
6  and trained police officer, these officers they see liars
7  and criminals all day long, every day of the year, and
8  they recognize a liar or a thief or a criminal. And
9  because of their training, they know how to get
10  information from them.
11     Now, when you go to a place like that, these
12  people are not trained, they are not competent. I can
13  tell you they are not. So when they see -- when they
14  have somebody in front of them, whether it's me or
15  somebody else, we are guilty, boom, from the start.
16     Q. I understand.
17     A. And because they don't know how to get
18  information from you, they assume that you are a liar and
19  guilty, whoever you are. And in the end, in the end,
20  they result to -- I believe they result to torture
21  because for them that's the only way they can get
22  information from people.
23     Now, when that police officer went into the
24  details as to the needles and up his nose -- up my
25  nose -- I am sorry. I have to admit I have never heard

Page 131

1  of that method. I -- trust me, I know some methods; I
2  never heard of that one. But because of the way he was
3  talking about it, it's not like he read it in a book or a
4  magazine a week before. He spoke out of -- out of
5  experience. So, which makes it more scarier, because
6  they are amateur. I don't know what they are up to.
7      Q. Uh-huh.
8      But, in fact, they did not physically torture
9  you, did they?
10     A. No, they did not. At one point he raised his
11  fist in front of my face. I really thought he was going
12  to hit me, but he did not.
13     Q. So you weren't physically damaged in any way by
14  them?
15     A. Not physically.
16     Q. Uh-huh.
17     Did -- since the events in Dubai, have you sought
18  medical treatment? Have you spoken with a psychologist,
19  a psychiatrist, anybody?
20     A. No. But because you bring up the medical aspect
21  of it, all my life I have been a sporty guy, extensive
22  physical training. And I was -- I have been always in
23  good health --
24     Q. Right.
25     A. -- not nothing whatsoever. When I was in that

Page 132

1  situation, after the police interrogation, the
2  questioning with the prosecutor, the auditors, I
3  experienced what you call arrhythmia or, you know, when
4  your heart skips beats and -- I never had that before.
5  So I went to a doctor and he said, What are you doing? I
6  had my blood pressure at 480 and never had that before.
7      So I bought a device. I never had to buy a
8  device before to check myself with my blood pressure.
9  And I had to do -- go through certain exercises to reduce
10  that blood pressure.
11     After I came to the U.S., it's all gone. My
12  blood pressure returned to normal, no -- no heart
13  palpitation. When I went to the doctor, he said the
14  heart palpitation, you have that when you are under
15  stress, it's not lethal. But at the same time, I
16  was -- I'm not a doctor, and I have seen the effect of
17  oppression and pressure of work on my -- the people
18  around me. Six months after I arrived in Dubai, my
19  assistant died of a heart attack at 39 years old. And I
20  put it on the stress or -- I was seeing myself going that
21  way, so it's scary.
22     Q. Well, my question is different. I said have you
23  consulted a psychiatrist or a psychologist?
24     A. No.
25     Q. And who did you visit? What doctor did you visit

Page 133

1  in -- was it in Dubai?
2      A. In Dubai, uh-huh.
3      Q. Do you remember the doctor's name?
4      A. No, I don't remember the name.
5      Q. Was the doctor in a hospital?
6      A. It was a clinic.
7      Q. In a clinic.
8      Do you remember what clinic it was?
9      A. If I saw the name, I would recognize it.
10     Q. Do you know the location of the clinic?
11     A. The location is when you -- when you are driving
12  to the Dubai -- the Port Rashid --
13         THE REPORTER: The?
14         THE WITNESS: Port Rashid.
15         THE REPORTER: Okay. Thank you.
16         THE WITNESS: And at the end, on the left
17  there is a clinic there. It's an Arabic name. I
18  would not remember the name.
19  BY MR. URQUHART:
20     Q. Did you have to pay for your visit?
21     A. Yeah, I did pay for my visit, yeah.
22     Q. How did you pay? Credit card?
23     A. Credit card most likely, yeah.
24     Q. Do you have a receipt showing --
25     A. No.

34  (Pages 130 to 133)

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

| Page 134 |
|---|

1   Q. -- your payment?
2   A. No.
3   Q. Do you have any credit cards receipts, or are
4   they all in Dubai?
5   A. I don't have any credit card receipt. My -- my
6   credit card receipt would go through Exomos, and they
7   forwarded that for some time. But after that, I did not
8   get anything, so I did not get -- I just did not get
9   them.
10   Q. So that you charged the doctor's visit to Exomos?
11   A. No. No. To me. But my address for the credit
12   card --
13   Q. Got you.
14   A. -- was at Exomos.
15   Q. Did you go to see a specialist?
16   A. No.
17   Q. It was just -- did the doctor prescribe any
18   medication?
19   A. He did prescribe it, but I did not take it.
20   Q. Do you know what he prescribed?
21   A. I don't remember.
22   Q. So you said you had these heart palpitations.
23   And when did they start exactly?
24   A. Started in July 2007. It was going on and off,
25   and it would go away for a month and come back a couple

| Page 135 |
|---|

1   of months later.
2   Q. But these symptoms ended when you got back to
3   The States?
4   A. Actually, no, it ended before.
5   Q. Before.
6   A. It ended when I put -- shortly after I put my
7   wife and children on the plane.
8   Q. Okay.
9   A. Because from then, I was in a different state of
10   mind.
11   Q. Okay. And you haven't had a recurrence of these
12   symptoms since you got back to The States?
13   A. No. And, you know, I'm not -- I don't smoke. I
14   don't drink. There was no reason -- I watch my diet. So
15   there is no reason for me to build up blood pressure
16   other than stress.
17   Q. Okay. Now, there is a claim in here for -- is it
18   loss of consortium? It's on the next page.
19   A. Yes.
20   MR. URQUHART: Are -- could we go off the
21   record?
22   MR. HESS: Sure.
23   MR. URQUHART: Are you guys going to really
24   press this claim?
25   THE VIDEOGRAPHER: Off the record at 2:59.

| Page 136 |
|---|

1   (A recess was taken from 2:59 p.m. to
2   2:59 p.m.)
3   THE VIDEOGRAPHER: Back on the record at
4   2:59.
5   BY MR. URQUHART:
6   Q. Has your physical relationship with your wife
7   changed?
8   A. When we were in Dubai, yes.
9   Q. What about when you came back to the
10   United States?
11   A. Came back. And not as the same as before, but
12   came back.
13   Q. I mean, do you have sex with your wife?
14   A. Yes, of course.
15   Q. Do you have any problems getting an erection?
16   A. No.
17   Q. Has your wife complained about your performance?
18   A. No. It's -- it's not -- it has never been a
19   physical issue. It's an emotional or desire issue.
20   When your mind -- when my mind is on something else, you
21   can put a Victoria secret model in front of me, if I
22   don't want it, it's not going to work. It's not because
23   I cannot. It's because I do not feel like it.
24   Q. So there was some period of time, starting when
25   and ending when, when you felt you were having

| Page 137 |
|---|

1   difficulties with your sexual relationship with your
2   wife?
3   MR. HESS: Objection. Mischaracterizes
4   testimony.
5   BY MR. URQUHART:
6   Q. Does that -- is that unfair? Do you think that's
7   inaccurate? Did you have -- have you ever had
8   difficulties sustaining a sexual relationship with your
9   wife?
10   A. I would not put it that way. I never had
11   difficulties. If you don't want something, it's not a
12   difficulty. It's a difficulty for my wife. Then it
13   affects our relationship because it doesn't work as the
14   same as before. So it's --
15   Q. Was there any period of time longer than a week,
16   assuming you and your wife were in the same geographic
17   location, when you couldn't have sexual relationships
18   with her?
19   A. Not that I could not. That I did not want.
20   Q. That you did.
21   What was the longest period of time that you went
22   between having sexual relationships?
23   A. One month.
24   Q. This is when you were both in the same city,
25   staying in the same house?

35  (Pages 134 to 137)

Esquire Reporting, Inc.
(772) 283-8002

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

Page 138

1    A. Yes.
2    Q. When was the last time that happened?
3    A. In Dubai.
4    Q. Has it ever happened before or since?
5    A. No.
6    Q. So it was one period of -- that lasted
7  approximately one month?
8    A. Yeah. About -- it lasted about a year.
9    Q. A year now.
10   A. Over there. (Indicating.)
11   Q. From when to when?
12   A. From July 2007 to -- until I came back, to
13  June 2008.
14   Q. Did you have physical relationships with your
15  wife at any point during that one-year period?
16   A. Yes, uh-huh.
17   Q. How many times?
18   A. Oh, I don't know. Five, ten times.
19   Q. Have you ever gone to the -- a doctor with
20  respect to problems with your sexual relationship with
21  your wife?
22   A. Why would I go to a doctor? For instance, I
23  don't smoke --
24   Q. No. No. All I'm asking you is if you ever went
25  to --

Page 139

1    A. I don't need to go to a doctor.
2    Q. You hear the radio things. Erectile dysfunction.
3  Did you ever go to see anybody about it. That's all I'm
4  asking.
5    MR. HESS: Objection. Mischaracterizes the
6  testimony.
7    THE WITNESS: I did not go to a doctor.
8  BY MR. URQUHART:
9    Q. All right. So the answer is, no, you have never
10  gone to a doctor?
11   A. (Shakes head.)
12   MR. URQUHART: Okay. What I would like to
13  do is have this, whatever the next in order is.
14      (Plaintiff's Exhibit No. 5, Document re
15      Seahorse Submarines International (NZ) Ltd,
16      marked for identification.)
17  BY MR. URQUHART:
18   Q. Have you seen this document before?
19   A. Yes.
20   MR. HESS: May I state on the record -- I
21  don't want to interrupt. I just want to
22  interject that this is the document that we
23  referred to at the previous component of this
24  deposition earlier today that we -- that we --
25  volunteered to provide the Bates stamp number,

Page 140

1  and instead we provided you with a copy of the
2  document, correct?
3    MR. URQUHART: Yes.
4    MR. HESS: Is this it? Yeah, right.
5    MR. URQUHART: I think that's what it is.
6    MR. HESS: It has originally been produced.
7  It's Bates Stamp No. 110217. It was part of
8  Mr. Jaubert's and Seahorse Submarine's
9  International, Inc., production of documents back
10  in April of 2009.
11   MR. URQUHART: I'm not suggesting it wasn't
12  produced.
13   MR. HESS: No, I know. I just wanted to be
14  clear that we did.
15  BY MR. URQUHART:
16   Q. Is this the -- is this the document you were
17  referring to this morning, Mr. Jaubert?
18   A. It's one of them. I'm -- I'm going through the
19  document to look at the number that you were asking me
20  this morning.
21   Q. Are you finished?
22   A. Yes.
23   Q. Is this the document to which you referred this
24  morning?
25   A. It's one of them. It's not the one I had in mind

Page 141

1  when I gave you those numbers this morning. But it's
2  one -- one of the drafts that we were working on.
3    Q. When you say "we," who is we?
4    A. National Geographic, PADI, the attorney
5  that -- that was in between.
6    Q. In terms of the words that are in this document,
7  who -- who had input into these words?
8    A. I don't remember who. I know it's not me. It's
9  either -- because it's the draft from New Zealand, I'm
10  comfortable to say that it's the New Zealand guy who
11  wrote it. But he wrote it based on other relevant
12  information from PADI and National Geographic and myself.
13   Q. Now if you take a look at page 5, second to the
14  last paragraph, it refers to a high profile marketing and
15  promotional contract that exists with the National
16  Geographic Society. There wasn't, in fact, a contract,
17  was there?
18   A. I am sorry. What is your question again?
19   Q. Well, it says that -- it says in that paragraph
20  that there was a contract. And then this morning you
21  said you never entered into a contract with National
22  Geographic.
23   A. The contract was never finalized.
24   Q. Okay. What is this a proposal for? Are you
25  trying to raise money?

                                    36   (Pages 138 to 141)

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                        Herve Jaubert

Page 142

1      A.  The proposal was to get an agreement between
2    National Geographic, PADI and the Yellow Submarine, use
3    that agreement to get funded and start that project.
4      Q.  And can you go back to the front page where it
5    says REV 3802.  What does that mean?
6      A.  That -- I don't know what that means.
7      Q.  Does that refer to the -- August 30th, 2002?
8      A.  Probably.
9      Q.  So this -- was this proposal ever put into final
10   form and submitted?
11     A.  Yes, but not this one.  (Indicating.)  The
12   number -- the number changed.  The number I see here are
13   not the same number that I saw later.
14     Q.  How much -- so the idea was that -- that you were
15   seeking funding from the New Zealand government to help
16   finance the project to build the vessels, which would
17   then be used in this chartering business with National
18   Geographic?
19     A.  I was seeking funds from anywhere.  But I
20   received interest from New Zealand.  Of course, they
21   wanted 50 percent of the manufacturing company.  But
22   that's why I have that write-up from New Zealand.
23   Because the interest I received came from New Zealand.
24     Q.  Did you -- did you ever reach an agreement with
25   the people from New Zealand?

Page 143

1      A.  Yes.  I had an agreement, yes.
2      Q.  For what?
3      A.  On the terms of the agreement between Manaia -- I
4    believe the name was Manaia, the New Zealand company.
5    Manaia Limited and Seahorse.
6      Q.  To do what?
7      A.  To manufacture submarines.
8      Q.  But the project was dependent upon funding,
9    right?
10     A.  But the project was dependent on funding, yes.
11     Q.  And you never were able to finalize an agreement
12   to provide that funding, correct?
13     A.  No.  Because we never -- at the time we did not
14   finalize the agreement between National Geographic, PADI
15   and the Yellow Submarine.
16     Q.  And you didn't do that in 2002 or 2003?
17     A.  We were discussing and -- it's a complicated deal
18   and it takes time.  And PADI was not moving fast enough.
19     Q.  Okay.
20     A.  So it's --
21     Q.  Okay.  Thank you.
22         So, I would like to go back to this lack of
23   consortium.
24     A.  Yes.
25     Q.  I mean, did that affect your personal

Page 144

1    relationship with your wife?
2      A.  It affected, not just that, but it did affect the
3    relationship between my wife and myself.
4      Q.  Has your wife sought counselling or medical
5    advice?
6      A.  No.
7      Q.  How was your relationship affected?
8      A.  Loss of attention, loss of affection.
9      Q.  And for this one-year period?
10     A.  For this one-year period.
11     Q.  And it ended when you came back to The States?
12     A.  Yes.  Almost immediately.  When I came back, I
13   was overwhelmed in joy, so I put that behind me.
14     Q.  So things are good now?
15     A.  So things are good now.
16     Q.  Now, I want to skip -- if you take a look at page
17   3 of that exhibit --
18     A.  Exhibit 5?
19     Q.  Uh-huh.  No.  I am sorry.  This is Exhibit 2, I
20   think, or --
21     A.  Okay.  Page 3.  I follow you.
22     Q.  The -- at page -- page 3, do you see where it
23   says, Mr. Jaubert has sustained the following damages due
24   to the abusive process?
25     A.  Yes.

Page 145

1      Q.  Then it says moneys paid, $45,000.  What was
2    that?
3      A.  I had an agreement, and it's supported by signed
4    documents, approvals by Sultan to bring over my cars to
5    Dubai.
6      Q.  Uh-huh.
7      A.  And there were many reasons for that.  In
8    actuality I was saving money for the company, not costing
9    money, by doing that.  However, it worked out for two
10   years and a half.  And after two years and a half
11   Mr. Abdul Qadar asked me to reimburse that money.
12     Q.  Was the $45,000 -- was that --
13     A.  $30,000 were for the car.
14     Q.  $30,000, was that for --
15     A.  For my vehicles.
16     Q.  -- for the cost of shipping?
17     A.  It was cost of shipping, yes.
18     Q.  I'm trying to understand, how do you calculate
19   it?  Is it -- you already had purchased the cars, right?
20     A.  Yeah.  It was --
21     Q.  You owned the cars?
22     A.  It was the cost of shipping.
23     Q.  And it costs $30,000 to ship two cars to Dubai?
24     A.  Well, there were other things that --
25     Q.  What other things?

37  (Pages 142 to 145)

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

Page 146

1      A. -- went for the cars.  And then I paid legal
2  expense for Seahorse.  They claimed it was personal
3  expenses.
4      Q.  These -- this is the -- amount of money that
5  you paid for legal fees with respect to the --
6      A.  Yeah.
7      Q. -- lawsuit --
8      A.  Yes.
9      Q. -- that was started before you came to Dubai?
10     A.  (Nods head.)  Yes.
11     Q.  Why did you think that Dubai World should pay
12  those legal expenses?
13     A.  It was agreed.  Because if it had not been
14  agreed, I would have left that submarine in Stuart.  Why
15  would I take a submarine and pay for a submarine if it's
16  not mine?
17     Q.  Okay.  Now, skipping down here, you have $100,000
18  for a sailboat.  Did you own a sailboat?
19     A.  When I planned my escape, I explored different
20  ways to get out of the country.  And the last one was to
21  escape the country on a rubber boat --
22     Q.  Right.
23     A. -- and go on a sailboat.
24     Q.  I --
25         MR. HESS:  Objection.  He is trying to

Page 147

1  answer your question barely.  If you would let
2  him finish, please.
3         THE WITNESS:  I did not have a sailboat and
4  I had to buy one.
5  BY MR. URQUHART:
6      Q.  Can we stop there.  Where did you buy it?
7      A.  I bought it in Dubai.
8      Q.  From whom did you buy it?
9      A.  From the brother of the president.
10     Q.  The president of what?
11     A.  Of the UAE.
12     Q.  And what kind of sailboat was it?
13     A.  Beneteau, a French make sailboat.
14     Q.  How long was it?
15     A.  40 -- 40 feet, 44 feet, something like that.
16     Q.  Well, what year was it constructed?
17     A.  If I remember, it would be 2000 -- it was not a
18  new boat.  And the boat had, like, five different owners.
19     Q.  Was it in good shape physically when you bought
20  it?
21     A.  No.  Average.  The sails were used.  I find out
22  later that I had problem with pumps and other systems in
23  the boat.
24     Q.  I'm laughing because I have been a boat owner.
25  So did you pay exactly $100,000 for this boat?

Page 148

1      A.  No.  I paid, I believe, $250,000.
2      Q.  Uh-huh.
3      A.  $200,000.  I think I paid $200,000.  Then I used
4  the boat for my escape.  And then, because I needed cash,
5  I sold it.  So the difference is $100,000.  I sold the
6  boat for half the price.
7      Q.  Where did you sell it?
8      A.  In Dubai.
9      Q.  In Dubai.
10     A.  So I had my friend take it back to Dubai.  But
11  because he was not a sailor, the boat was damaged when he
12  returned to Dubai with it.  And I lost significant value
13  on the boat because of that.
14     Q.  And do you have a -- do you have a bill of sale
15  reflecting the purchase price of the boat?
16     A.  I have a bill of sale.  It's not under my name
17  because, of course, I could not buy a boat under my name,
18  I had to use somebody -- somebody else name.
19     Q.  Whose name?
20     A.  Sebastian Travert.
21     Q.  Do you have that bill of sale now?
22     A.  Now?  Like, right now?
23     Q.  I mean, did you have it and did you give it
24  to --
25     A.  I have it, yes.  And you have it.

Page 149

1      Q.  Uh-huh.
2         And is there also a bill of sale reflecting the
3  sale of the boat?
4      A.  Yes.  That I have, yeah.
5      Q.  And you gave that to Mr. Hess.
6      A.  Yes.
7      Q.  And then it talks about loss of deposits on
8  properties of $800,000.  What properties are these?
9      A.  I put a down payment on apartments in Dubai.
10     Q.  How many apartments?
11     A.  Seven.
12     Q.  Seven.  So these are seven different properties?
13     A.  Seven different properties, yes.
14     Q.  And then you made a down payment on each of those
15  seven different properties?
16     A.  I made a down payment, yes.
17     Q.  And you weren't able to get reimbursed for the
18  down payment?
19     A.  No.  Because since I gave you those documents,
20  the contractor, the real estate people over there, told
21  me that there was a problem.  And if I needed to solve
22  the problem, I had to go back to Dubai; that they would
23  be happy to pick me up at the airport.
24         So ... yes, those are the properties.
25         MR. URQUHART:  Can we just go off the record

38 (Pages 146 to 149)

Esquire Reporting, Inc.
(772) 283-8002

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

---

Page 150

1    for a second.
2        MR. HESS:  Sure.
3        MR. URQUHART:  So these are them?
4        THE WITNESS:  I'm sorry?
5        THE VIDEOGRAPHER:  Off the record at 3:22.
6        (A recess was taken from 3:22 p.m. to
7    3:27 p.m.)
8        (Plaintiff's Exhibit No. 6, Sale and
9    Purchase Agreements, marked for identification.)
10       THE VIDEOGRAPHER:  Back on the record at
11   3:27.
12   BY MR. URQUHART:
13       Q.  The court reporter has placed before you what's
14   been marked as Exhibit 6 to your --
15       A.  Yes.
16       Q.  Do you recognize these documents?
17       A.  Yeah.  Those documents are the property I
18   purchased with the down payment.
19       Q.  Are these all of them?  You said there were seven
20   down payments?
21       A.  Seven.
22       Q.  Can you take a look and make sure that they're
23   the right ones and --
24       A.  Yes.
25       Q.  Okay.  This is all of them?

---

Page 151

1        A.  (Nods head.)
2        Q.  All right.  I would like to turn your attention
3    to what's been Bates stamped 127313.
4        A.  What is that number?
5        Q.  It's the second page.
6        A.  Okay.  Yes.
7        Q.  When it says a purchase price, that's the full
8    purchase price of the --
9        A.  Yes.
10       Q.  -- of the apartment?
11       A.  Uh-huh.
12       Q.  And so that if I multiply 20 percent times that,
13   that would be the amount of the down payment?
14       A.  Yes, uh-huh.
15       Q.  And it says purchase date, October 10th, 2007.
16   Is that the date which you entered into the contract to
17   purchase it?
18       A.  Yes.
19       Q.  And I take it that this -- this apartment
20   building was not completed at the time.
21       A.  Yeah, it was an off-plan property.
22       Q.  Do you know whether or not it has been completed?
23       A.  Those seven apartments we located in two towers,
24   two buildings.
25       Q.  I'm just talking about the first one.

---

Page 152

1        A.  The first one has been completed.  The second one
2    has not been completed.
3        Q.  Okay.  Well, let's go through them one at a time
4    so I don't get confused.
5        So the first one, which is Apartment No. 1701,
6    you believe that that building has been completed?
7        A.  Yes, or it's near completion.
8        Q.  As of today, is it completed, do you know?
9        A.  I'm not sure.  I believe it's near completion.
10       Q.  Let's take a look at the next one for which
11   is -- think it's Office No. 903.
12       A.  Yes.
13       Q.  So if I look down at the bottom there, it says
14   that the purchase date was January 9th, 2008.
15       A.  Yes.
16       Q.  But that one hadn't been completed as of the date
17   of the --
18       A.  Yeah.
19       Q.  So if I were to -- your deposit was 20 percent of
20   the -- this amount?
21       A.  (Nods head.)
22       Q.  How did you pay for these?  Was it by check?
23       A.  By check, yes.
24       Q.  Do you have copies of the checks?
25       A.  Yes.

---

Page 153

1        Q.  Where are they?
2        A.  I'm not sure if I gave them to you.
3        Q.  Uh-huh.
4        But you have them?
5        A.  But I have them.
6        Q.  I take it, these are not the full contract.  Are
7    these -- is this the entirety of the contract of sale?
8        A.  But those are the --
9        Q.  In other words --
10       A.  Those are the full contract, yes.
11       Q.  I mean, there is no longer version of this?
12       A.  What is not there is the terms --
13       Q.  Right.
14       A.  -- the general stuff that applies to all of them.
15       Q.  Do you have those, the general terms?
16       A.  Yes, I have those.
17       Q.  In The States?
18       A.  In The States, yeah.
19       Q.  Okay.  Do you know whether or not Office No. 903,
20   whether that has been completed?
21       A.  Not completed.
22       Q.  And the next one is Office No. 901.
23       A.  It's the same building.  Not completed.
24       Q.  Office No. 902.
25       A.  Same building.  Not completed.

---

39 (Pages 150 to 153)

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                Herve Jaubert

## Page 154

1  Q.  And these purchase dates and -- those are the
2  dates on which you actually made the down payments?
3  A.  What dates?
4  Q.  In other words, these are the -- each one of
5  these has a purchase date, the first one is October 7th,
6  October 10th, 2007, that was the date in which you signed
7  the contract and made the down payment?
8  A.  No. 1 -- I changed the contract. When I
9  purchased those apartments, when I see on No. -- for
10  instance, 902, purchase date 9th of January, 2008 --
11  Q.  Uh-huh.
12  A.  -- I believe it was not the purchase date,
13  although it says purchase date. It's because I changed
14  the contract. I changed the names.
15  Q.  From what to what?
16  A.  You see where it says Mrs. Helen Jaubert.
17  Q.  Right.
18  A.  When I purchased that apartment, it was under my
19  name.
20  Q.  All right.
21  A.  And later on, I changed it under my wife's name.
22  Q.  Okay. Can you tell me what the purchase date was
23  for each of these seven?
24  A.  For which one?
25  Q.  For each of them.

## Page 155

1  A.  The purchase price is written --
2  Q.  I know -- I'm asking about the date of purchase,
3  not the purchase price. I assumed the purchase price did
4  not change.
5  A.  No. The purchase price did not change, but the
6  date would be anywhere between October 2007 and
7  December 2007, from what I remember.
8  Q.  Right. Let's go through them individually. The
9  first one says October 10th, 2007.
10  A.  Yes, this is accurate.
11  Q.  That's accurate.
12      And then we go to Office No. 903. That says
13  January 9th, 2008, is that accurate?
14  A.  No. This one would be the same date,
15  October 2008.
16  Q.  October 2008. Okay.
17      And the next one, Office No. 902, that says
18  January 9th, 2008, purchase date. Is that correct?
19  A.  If I remember correctly, that will be
20  October 2007.
21  Q.  And what about the next one?
22  A.  Same.
23  Q.  So all of them -- all of these were signed the
24  same day?
25  A.  Yeah. Some of them I changed the name to my

## Page 156

1  wife.
2  Q.  And I guess the -- are there any -- and the last
3  one is October 10th, 2007. Is that the correct date?
4  A.  That's accurate.
5  Q.  Uh-huh.
6      MR. URQUHART:  Bill, can you get me copies
7  of the checks?
8      MR. HESS:  Whatever -- whatever we -- I will
9  get you whatever you don't have. I presume you
10  want the other documents, too, if they exist.
11      MR. URQUHART:  Yeah, please.
12  BY MR. URQUHART:
13  Q.  So the --
14      MR. HESS:  I don't have them, just so you
15  know. Just letting you know.
16      MR. URQUHART:  All right.
17  BY MR. URQUHART:
18  Q.  Why is it that you can't get your deposit back?
19  A.  I talked to the person I bought those properties
20  from. He is a close friend of the owner of the company.
21  And he told me that there is a problem and that -- he
22  said -- he used the word -- that my name was "toxic" --
23  Q.  Uh-huh.
24  A.  -- in Dubai, and that anyone who would try to
25  touch those properties to either represent me, collect

## Page 157

1  the money, wire the money, whatever, would be in trouble
2  with the police.
3  Q.  But all of these -- all of these purchase
4  contracts were switched to your wife's name, right?
5  A.  Yes.
6  Q.  When did you have this conversation?
7  A.  I talked several times to this person.
8  Q.  What's -- what's the name of the person?
9  A.  Sanjay, S-A-N-G -- J-A-Y. Karanchy.
10  K-A-R-A-N-C-H-Y, but I'm not sure. I might misspell -- I
11  don't know if his name is in here somewhere.
12  Q.  And he owned all of these apartments himself?
13  A.  I am sorry?
14  Q.  He owned all of these apartments?
15  A.  No. No. He represented me. And he is the one
16  who --
17  Q.  He is a real estate broker --
18  A.  Yes.
19  Q.  -- acting on your behalf?
20  A.  Yeah.
21  Q.  Not -- as opposed to a real estate broker acting
22  on behalf of the real estate company?
23  A.  No. On their behalf. He is an MED.
24  Q.  Did he say whether or not there was a lien placed
25  on any of these properties?

40  (Pages 154 to 157)

Esquire Reporting, Inc.
(772) 283-8002

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                 Herve Jaubert

| Page 158 |
|---|

1    A.  No lien.
2    Q.  How many conversations did you have with him?
3    A.  At least five.
4    Q.  When?
5    A.  When?  Like, once every two months.  The last
6    time was two weeks ago when I sent him my greetings for
7    the new year.  He did not respond.
8    Q.  Okay.  Have you done anything else to try and get
9    your deposits back?
10   A.  I tried with a different person, another real
11   estate broker.  I don't remember name.  So he went there
12   and basically told me the same thing.
13   Q.  Which was?
14   A.  I also talked to the MED.  I also talked to an
15   MED manager, not real estate, a lady.  And she said that
16   if I was any problems, that I had to go to Dubai and that
17   they would pick me up at the airport.  I found that
18   really unusual that they would pick me up at the airport.
19   So I was guessing that those that were picking me up at
20   appoint were not MED.
21   Q.  But by this time you knew that you had been
22   convicted in absentia in Dubai and there was a judgment
23   outstanding against you, right?
24   A.  Yeah, but there is no lien on the properties.
25   Q.  I understand that.  But isn't that the reason you

| Page 159 |
|---|

1    didn't want to go back to Dubai, you were afraid you were
2    going to be arrested?
3    A.  Yeah, obviously, I did not want to go back to
4    Dubai.  Whether there was a conviction in absentia or
5    not, I will never go back to Dubai, regardless of what
6    happens tomorrow.
7    Q.  Got you.
8    Now, next down there it says, loss of value of
9    Mr. Jaubert's house contract in Dubai due to selling at
10   the distressed price of the amount of $817,000.
11   And what's that claim?
12   A.  It started with -- I had a meeting with Abdul
13   Qadar.  I bought my house through Nakheel, which is Dubai
14   World.
15   Q.  Right.
16   A.  And I had my first meeting with Abdul Qadar in
17   April, May -- no, March 2007.  But then June -- early
18   July -- June, I had another meeting with Abdul Qadar.  He
19   asked me if I bought a house on the palm.  I thought he
20   knew, but -- with him asking me the question, raised
21   immediately a red flag.  So --
22   Q.  So did you sell the house?
23   A.  I did sell the house.
24   Q.  For 8 -- for $817,000?
25   A.  No.  What happened -- if you let me

| Page 160 |
|---|

1    finish, please.  I had that meeting with Abdul Qadar.
2    So, boom, red flag.  Why would he ask me if I bought a
3    house on the palm?  Then I received a call from a friend
4    at Nakheel who told me that I should sell my house, like,
5    today.  Not tomorrow, not in two weeks, today.  So I
6    grabbed the phone, sold my house in 15 minutes.  In order
7    to -- but in order for me to sell my house in 15 minutes
8    I had to lower the house.
9    Q.  From what to what?
10   A.  From 11 million -- from -- do I have to give the
11   numbers in dirham or in dollars?
12   Q.  It doesn't make any difference.  What's the
13   converse rate 6.9?
14   A.  3.67.
15   Q.  So tell me which one it is.
16   A.  So it was from 11 million -- 11.5 million --
17   dirham, not dollars, to 8.25 million dirhams.  So --
18   Q.  So your claim is the spread between 11.5 and
19   8.25?
20   A.  Yes.  That's the difference.  Because I sold my
21   house below the market to be able to sell it quick.  And
22   later on the year -- during the year, it was confirmed.
23   When I had another meeting with Abdul Qadar, when he told
24   me, You sold your house, 11 million.  And I said, No, I
25   did not sell it 11 million.  The reason why he said he

| Page 161 |
|---|

1    sold it 11 million is because at the time the house was
2    not registered yet.  So it's not me who sold the house
3    11 million, it's the guy -- the buyer who bought it from
4    me.  So he bought it 8 million from me to sell
5    three months later 11 million, and he cashed 3 million
6    dirham on the house, but it was not me.
7    Q.  I'm just trying to understand your damages claim.
8    A.  It's the difference between -- the 3 million
9    dirham difference.
10   Q.  Uh-huh.
11   A.  So which is $800,000 and change.
12   Q.  Uh-huh.
13   And the next one is the damages at 5 million.
14   Those are the same emotional distress damages that you
15   claimed before?
16   A.  Yes.
17   Q.  The same with the mental anguish.
18   Now, you talk about -- can we talk a little bit
19   about what you have -- what you have done since you have
20   come back to the United States from Dubai?  Have you
21   applied for any jobs?
22   A.  I did not fill out a job employment application.
23   I contacted people that I know in the boat business.
24   Q.  Who?
25   A.  A Chinese -- Chinese company, Malaysian company,

41  (Pages 158 to 161)

Esquire Reporting, Inc.
(772) 283-8002

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

Page 162

1  Singapore company, a Greece -- a Greek company and people
2  I already knew from before. But then when they heard
3  me -- although they were nice with me, they just turned
4  me down. They would not respond or -- I'm still in
5  contact with them, but they're being polite. They're not
6  going to say we don't want to hire you because you are in
7  the middle of a lawsuit.
8     Q. So you're guessing that's the reason why you're
9  not --
10    A. I know that is the reason.
11    Q. Well, how do you know? You said you haven't
12 discussed it with them.
13    A. Because these people were after me -- that
14 company in Singapore, I know them since 2002. I have
15 been talking to them all the way. When I moved to Dubai,
16 they follow me. They came to Dubai, they visited me.
17 And then the Dubai drama happened and then they are
18 quiet.
19    Q. So -- but you just said that none of them have
20 told you the reason. So you're -- you're hypothesizing,
21 that is the reason.
22    A. Yes, I know that is the reason. They did not
23 tell me, but I know that is the reason.
24    Q. How do you know?
25    A. To tell someone, in order to do business with

Page 163

1  you -- because you are stuck up in a lawsuit, we are
2  afraid or they don't want to be involved. It's
3  embarrassing.
4     Q. I understand that. But they didn't tell you that
5  was the reason, this is your surmise?
6     A. The Chinese told me.
7     Q. And what exactly did they tell you?
8     A. They told me that although my -- that Chinese
9  company, they were interested in Navy seal-type
10 submarines; so we're talking about Commodore (phonetic),
11 black subs.
12       So what they told me that -- although that Dubai
13 drama gave me some credibility as far as designing Navy
14 seal stuff, they would not do it because my name was
15 charged with liabilities, legalities, lawsuit. And,
16 especially with the Chinese, they don't want that.
17    Q. Who? What's the name of the company?
18    A. I don't remember the name of the --
19    Q. Do you remember the name of the individual that
20 you were dealing with?
21    A. It's a Chinese name. One company is out of
22 Dalian.
23    Q. But the Chinese company is the only one that said
24 we don't want to hire you because of your legal
25 difficulties?

Page 164

1     A. Yes. The company in Singapore, I don't remember
2  him saying -- being specific as to why he would not do
3  business with me.
4     Q. Did you meet with the Chinese people in person?
5     A. I went to China in March 2009. Just before Dubai
6  World put -- listed me on Interpol. And then when I was
7  listed on Interpol, I could not go back to China.
8     Q. How did you find out you were listed in Interpol?
9     A. How did I find out? Somebody told me.
10    Q. Have you been out of the country since 2009,
11 January 2009?
12    A. I have been -- I have been out of the country in
13 March 2009. And I found out that I was in -- that there
14 was a red notice with Interpol; I think it was issued in
15 June or July 2009. So from there -- and from there I
16 decided not to leave the country.
17    Q. And you haven't left the country since --
18    A. No.
19    Q. -- since June of 2009?
20    A. (Shakes head.) I have a passport.
21    Q. It's a French passport, right?
22    A. Yes. But I don't want to leave the country and
23 expose myself to an arrest or at least some questioning.
24    Q. Uh-huh.
25    A. Although I know that the UK and France have due

Page 165

1  process and they don't take people like that.
2     Q. So you spoke with the Chinese companies about the
3  possibility of a job. You spoke with an Italian company
4  about the possibility of a job. What's the name of the
5  Italian company?
6     A. What's the name of --
7     Q. The Italian company.
8     A. I did not say Italian. I am sorry.
9     Q. Oh, I thought you did. I apologize.
10    A. Greek.
11    Q. Greek?
12       MS. HEATHCOCK: He said Dalian.
13       THE WITNESS: In China the company is
14 Dalian, China.
15 BY MR. URQUHART:
16    Q. I got you.
17       What was the name of the Greek company you spoke
18 with?
19    A. It's not a company. It's an architect.
20    Q. What's his name or her name?
21    A. The first name is Theodoros.
22       THE REPORTER: Say that again.
23       THE WITNESS: Theodoros, T-H-E-O-D-O-R-O-S.
24 The last name is -- he is a he, not a she. The
25 last name -- I would never remember the name.

42 (Pages 162 to 165)

Esquire Reporting, Inc.
(772) 283-8002

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

Page 166

BY MR. URQUHART:
1   Q.   Okay.  And what did you speak with him about?
2   A.   He is in the process of designing a mega-yacht,
3   and he would need my expertise.
4   Q.   So this would be working with him in your
5   engineering capacity?
6
7   A.   Yes.
8   Q.   But he -- he said he didn't want to hire you?
9   A.   He did not say he did not want to hire me.  He is
10  just quiet or evading the issue, waiting, postponing.  I
11  don't know.  He did not say.
12  Q.   Okay.  Who else have you spoken with aside from
13  the Chinese company and the Greek naval architect?
14  A.   A company in Singapore.
15  Q.   What's the name of that company?
16  A.   Kingford Limited.
17  Q.   And what did you speak with them about?
18  A.   The name of the person is Danny Chew.
19  Q.   Uh-huh.
20  A.   Danny Chew is a -- he is a contractor.  He is a
21  military contractor.  And he discussed with me what we
22  discussed before, which is to provide Navy seal
23  submarines to Malaysia.
24  Q.   And this was the fellow that you said you had
25  been in contact with since 2002?

Page 167

1   A.   Since 2002.
2   Q.   And you were in contact with him in 2002 while
3   you were at --
4   A.   2003 maybe.
5   Q.   And this was about the possibility of Seahorse --
6   A.   Yes.  Seahorse.
7   Q.   -- building submarines for them.
8   A.   Marketing -- building and marketing submarines to
9   South Asia and Malaysia, in particular for the American
10  Navy.
11  Q.   And when you moved to Dubai World, you continued
12  these discussions?
13  A.   Yes.  I actually secured an order from Malaysia.
14  I built a prototype for that purpose.
15  Q.   Right.
16  A.   I was about to -- I sea-trialed the prototype in
17  September 2007.  And I was not able to finalize the
18  prototype or finalize the contract because they escorted
19  me to the door before I could get there.
20  Q.   And since you returned to Florida, you have been
21  speaking with him again?
22  A.   So then I disappeared from his screen and he
23  found me back in Florida, asked me what happened and
24  where are you, what happened with Exomos?  I did not go
25  too much in details.

Page 168

1   Q.   Uh-huh.
2   A.   But he read the rest in the news.
3   Q.   And what -- did he say that he didn't want to do
4   business with you?
5   A.   He did not say.  He did not want.  He just
6   postponed.
7   Q.   All right.  When was the last time you have
8   spoken with him?
9   A.   Danny Chew?  Eight months ago.
10  Q.   What -- aside from speaking with the Chinese
11  company, the Greek naval architect and Danny Chew, what
12  other efforts have you made to seek employment since you
13  returned from Dubai?
14  A.   I talked to maybe two other naval engineers.
15  Q.   About what?
16  A.   About bringing my expertise in their -- in their
17  business, in building boats or -- building boats.
18  Q.   What are the names of these two people?
19  A.   I don't remember.
20  Q.   Okay.  Have you -- have you started to try to
21  start up your own business?
22  A.   With -- with what?
23  Q.   I don't know.  Have you done anything to start a
24  business?
25  A.   No.

Page 169

1   Q.   Aside from income you derived from investments,
2   have you derived any income whatsoever since you left
3   Dubai?
4   A.   Yes.  I did give some consultations, engineering.
5   Q.   To whom?
6   A.   Yacht owners.
7   Q.   Can you tell me any of their names?
8   A.   Not -- not from the top of my head.
9   Q.   How much --
10  A.   It's a one-time --
11  Q.   Sure.
12  A.   One-time --
13  Q.   If you added up all the money that you received
14  from your engineering consulting, how much have you
15  received since you returned from Dubai?
16  A.   About 30,000 in 2009 and same in 2010.
17  Q.   And that's pretty much the totality of the income
18  that you've received since you came back from Dubai?
19  A.   Yes.
20  Q.   All right.  Can you turn to page 4 of this
21  exhibit where it says -- as a result of the defamation,
22  you have sustained these damages.  It says $7,500,000.
23  How was that calculated?
24  A.   I believe that because of what happened --
25  Q.   No, I understand that.  All I'm asking is how it

43 (Pages 166 to 169)

Esquire Reporting, Inc.
(772) 283-8002

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                        Herve Jaubert

Page 170

```
 1    was calculated.
 2        A.   It was my last salary with Dubai World times how
 3    many years until I have -- I reach a retirement -- an age
 4    to retire.
 5        Q.   Until age 65?
 6        A.   70.
 7        Q.   70.
 8             So you're 50 now?
 9        A.   I'm 54.
10        Q.   So it's your salary at Dubai World times 16?
11        A.   Yeah, I don't have the right -- I don't have the
12    formula, but basically, yes, that's what it is.
13        Q.   Was it only salary or did you include any kind of
14    fringe benefit income?
15        A.   What kind of --
16        Q.   Well, like, I read your contract.  For example,
17    you had a housing allowance, et cetera, things like that.
18        A.   I did not have a housing allowance.
19        Q.   Or let me state it another way.
20             Does this $7.5 million include anything other
21    than the calculation based upon your salary at Dubai
22    World?
23        A.   Salary plus medical benefits, things like that.
24        Q.   And that's -- and that's --
25        A.   And that's it.
```

Page 171

```
 1             MR. URQUHART:  Can we take a short break?
 2             MR. HESS:  Sure.
 3             THE VIDEOGRAPHER:  This is the end of Video
 4    NO. 4 at 3:58.
 5             (A recess was taken from 3:58 p.m. to
 6             4:04 p.m.)
 7             THE VIDEOGRAPHER:  Back on the record at
 8    4:04.  This is the beginning of Video No. 5.
 9             MR. URQUHART:  I have no further questions
10    subject to examination by Mr. Hess.
11             CROSS-EXAMINATION
12    BY MR. HESS:
13        Q.   Mr. Jaubert, if you would take a look at what's
14    been marked as Exhibit 3 for the purposes of this
15    deposition.  Let me point your attention to items that
16    are bulleted, page 2.  The second last bullet from the
17    top of the page, please read that to yourself.
18        A.   Damages from Mr. Jaubert and emotional distress?
19        Q.   No.  The one that is -- I am sorry.  Page 3.  I
20    apologize.
21             Where it says, Damages for Mr. Jaubert's loss of
22    consortium with Mr. Jaubert's wife and children valued
23    at, do you see that?  I'm going to point to it.  Right
24    there.  (Indicating.)
25        A.   Oh, okay.  Yes.
```

Page 172

```
 1        Q.   What did you -- the mention of children, what did
 2    you mean that to include?
 3        A.   My passport was confiscated in April 2007.  So
 4    from there I lost my capability -- my ability to travel.
 5    I had made reservations and plans to go back to the U.S.
 6    with my wife and children, and, therefore, I was not able
 7    to do that.  My children are young.  And it was difficult
 8    to -- they don't understand.  They would not understand
 9    why their father would not travel to -- with them back to
10    the U.S.  So not only it's humiliating, but it is
11    difficult.
12             I barely had any time off or vacation.  And when
13    I do have vacation, I cannot enjoy it with my children.
14    It happened several times when eventually my wife and
15    children left Dubai.  It's the same.  Young children,
16    young boys, and my wife alone at the -- travelling
17    through different airports and then going back home
18    without their father.
19        Q.   Now, are you claiming that you suffered damages
20    by virtue of you not having that ability to associate
21    with your children during any period of time?
22        A.   That, yes, plus the fact that I was suffering on
23    behalf of my children.  What are they thinking?  What are
24    they doing?  What are they thinking of their father?
25    That's not a comfortable situation.
```

Page 173

```
 1        Q.   Okay.
 2        A.   You know, if -- if I travel for business, that's
 3    different.  They know I travel for business.  I know I
 4    travel for business.  But if it's because my passport has
 5    been confiscated on trumped up charges, what do I say?
 6    And I don't want to lie to my children.  But, again, they
 7    would not understand.  This is -- this does not exist in
 8    a 6-year-old -- 5-years-old boys.  They don't understand.
 9        Q.   Now, did you miss time actually -- did you miss
10    the ability to spend time with your children?
11        A.   Absolutely.  When I was working I did not have
12    the luxury to spend a lot of time with my -- with my
13    children.  And I missed that time with them.
14        Q.   The -- I'm going to direct your attention to
15    the -- page 4.  If you would look at the -- the portion
16    on the top of the page, the damages that are included,
17    the damages for the abuse of process.  Do you see where
18    it says damages for Mr. Jaubert's loss of consortium with
19    Mr. Jaubert's wife and children?  What did you -- by the
20    phraseology of children there, what did you mean by that?
21        A.   With what?
22        Q.   Well, do you mean to claim damages by virtue of a
23    loss attributed to your relationship with your children
24    or your association with your children?
25        A.   Yes.
```

                                          44  (Pages 170 to 173)

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

Page 174

1    Q. Okay. And what -- and what are those damages?
2  Not the amount, but what -- describe why it is that --
3  how you have been damaged by virtue of that loss.
4    A. It's finding myself alone in Dubai, fighting with
5  the auditors, prosecutor, and having my wife sending me
6  pictures of and videos by e-mail of my children back at
7  home. So that made it worse.
8    Q. The -- if you would look at the bottom of
9  page -- of page 4, the same language -- basically the
10  same language utilized, including your children. Could
11  you explain, in terms of the defamation count, how is it
12  that you suffered losses by virtue of your relationship
13  or association with your children?
14    A. What I would add with loss of consortium is that
15  I knew it was over, but I had to come up with a plan.
16    Q. You knew what was over?
17    A. Me being in Dubai and the contract with Dubai
18  World. Me staying in Dubai. Me having a future in
19  Dubai. But I was literally tortured mentally, asking
20  myself, Do I leave my children back in the U.S. and
21  having not returned to Dubai, or I have them returned to
22  Dubai and be in a risky situation? So I had a conflict
23  and it was difficult to deal with.
24    Q. So --
25    A. A personal conflict.

Page 175

1    Q. Each of the times you utilize the word
2  "consortium," do you mean that to include your
3  association with your children?
4    A. Yes. Definitely. Definitely with my children.
5    Q. Okay. The --
6    A. My elder son, he is an Asperger. And he needs
7  special attention. And I could not provide that.
8    Q. Did that bother you?
9    A. Tremendously. That child cannot be alone. And
10  he has a mother, yes, but he has a father and I'm very
11  close to my boys.
12    Q. Did you miss them?
13    A. Tremendously.
14    Q. How often did you think about them when you were
15  in Dubai when they were away?
16    A. I am sorry?
17    Q. How often did you think about them when you were
18  in Dubai?
19    A. Every day, every evening when I go home.
20    Q. And when you were -- and when you were -- when
21  they -- when they were here back in The States and you
22  were -- and your passport was confiscated, how often did
23  you think of them?
24    A. When they were in the U.S.?
25    Q. Uh-huh.

Page 176

1    A. Every day. As soon as I got home.
2    Q. And when you were -- and when you were planning
3  your escape from Dubai and escaping from Dubai, did you
4  think about your children?
5    A. Yes. It was strong because this was -- I'm a
6  professional. Going on the water, I mean, it's
7  not -- you always risk your life. You don't know. The
8  weather can change. You don't know what can happen on
9  the water.
10      And I was concerned that, if anything happened to
11  me -- you know, when something happens on the ocean, you
12  just disappear, gone. You don't know what happens. Your
13  father is not there anymore. There is no body. There is
14  no body to recover. So they would never know. And
15  that's tough.
16    Q. Now, you -- when you were asking -- being asked
17  questions earlier today, you were asked about this ratio
18  of two-thirds, cost to build, to sales price. Was
19  it -- was the cost-to-build ratio to sales price, was it
20  always two-thirds?
21    A. No. It was two-thirds at the beginning. There
22  was --
23    Q. When you say "the beginning," beginning of what?
24    A. Beginning with Caribbean Submarines and beginning
25  with Seahorse. And then as the time passed, I reduced

Page 177

1  that to 50/50.
2    Q. And did you have an opportunity -- did you recall
3  the name of the other individual that was involved and
4  that was discussed during the earlier part of the
5  deposition today regarding the -- Mr. Peterson's
6  associate?
7    A. Jason Peterson -- Jason Patterson.
8    Q. Patterson.
9      So you recall his first name as Jason?
10    A. Now I recall his first name, yeah.
11    Q. Okay. Now, you were -- I don't know if it was to
12  save time or what, but -- you were asked about the
13  emotional distress that you described in your damages
14  supplement. What was the distress?
15    A. It is a long list. It's a -- it's the
16  humiliation at my place of work. I was hired as CEO, and
17  the auditors would come to Exomos and treat me like I was
18  a third-class citizen. So my status of CEO was just
19  brushed away. They would -- for instance, they would
20  come to the company to do a head count. They would count
21  the employees as if my employees were skipping their
22  work. And me, as a CEO, I look like I'm not able to
23  check that myself. So that's one. And second one, when
24  they would do a head count, they would not even notify
25  me. So I'm here in my office and I see some -- some

45 (Pages 174 to 177)

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                   Herve Jaubert

Page 178

1  movement down on the production floor. And I see all of
2  my employees in a row. And they didn't even tell me, the
3  auditors. They just walk in there like I'm the clerk. I
4  was not a clerk. I was hired to be the CEO.
5          So then when I go on the floor and when I talk to
6  my employees, they don't look at me like the CEO anymore.
7  They look at me like, well, oh, he is another puppet from
8  Dubai World. So when they did that, it just brushed off
9  my status of CEO. And when you are the head of a
10  company, the head of a company is -- especially in a
11  field like mine where it's a novelty, if it's new, if
12  there is nothing like that anywhere else, the CEO, not
13  only he manages and runs the company, but he is also the
14  soul of the company -- S-O-U-L.
15         Picture a company abroad in the Middle East. 250
16  employees. I believe I had 16 different nationalities,
17  four different religions. You need a soul to run that.
18  Because if you don't, it's going to spread apart
19  everywhere. You need a cement. I was the cement.
20  Q.  Now, aside from how that affected your ability to
21  be CEO, how did it affect you personally, that
22  that -- when you were talking about humiliation and the
23  way the auditors treated you?
24  A.  Well, it was considerable because in my life it
25  never happened to me before. I never, never in my life I

Page 179

1  was humiliated. You would never get to that point. I am
2  a strong man with strong beliefs. And when I interact
3  with people, if there is -- a conflict rises, they're
4  going to see that I can respond whichever way. But in
5  Dubai I felt helplessness. I could not do anything about
6  it. And humiliated.
7          I could give you an example. If I walk in a dark
8  alley with my wife and we are being mugged, attacked by
9  thugs. Someone is attacked by thugs, most people, they
10  will take the beating, they will lose their watch, their
11  wallet and everything. In my case, it's not going to
12  happen. Most likely the thugs are going to run away.
13         Now, in Dubai I felt like I'm in the dark alley.
14  I get the beating. I lose my wallet and my watch, my
15  wife is going to get raped. And I have means to respond,
16  but I can't use it. It's like I have a gun, but I cannot
17  use it because someone -- somehow else -- I cannot use it
18  because somebody or something is going to retaliate
19  against me or my wife. So it's like I'm hit two times.
20         And that's why I say humiliations. It's -- I
21  have the capability to fight. When I was in the service,
22  in the secret service, I was in control. And if I was
23  threatened or if I was put in a situation, I had means to
24  fight back or disappear or fight back in general. In
25  Dubai I could not do that. I could not fight back. And

Page 180

1  I -- I mean, I could fight back. But I would -- I did
2  not do it because I knew that somehow the police or Dubai
3  World or the auditors, they would retaliate on my wife.
4          So it's -- it's very frustrating and it's
5  frustrating twice. If you cannot fight back from the
6  start, then you are not frustrated because you know you
7  cannot fight back, anyways. But when you know that you
8  can fight back and you don't because of the situation,
9  that makes it tremendously worst.
10  Q.  Were you told -- did you perceive anything while
11  you were in Dubai or were you told anything while you
12  were in Dubai by people from Dubai World or otherwise
13  that gave you a feeling of fear or distress regarding
14  your circumstances in terms of the interrogation and in
15  terms of the auditors' interrogation and questioning and
16  demands for payment, and your treatment by Dubai World?
17  A.  I am sorry. The beginning of your question?
18  Q.  Were you -- did you become aware of the
19  environment in Dubai or the -- by virtue of what you
20  read, what you saw, or did people -- did someone ever
21  tell you something, whether from Dubai World or not, that
22  gave you a particular fear for your safety in terms of
23  the interrogation, in terms of the auditors' treatment of
24  you, while you were in Dubai?
25  A.  No. I became aware and to my -- to my surprise.

Page 181

1  I travelled to other Middle Eastern countries before.
2  But in Dubai I was surprised. But I saw the signs. And
3  I'm trying to recognize the signs. And I became -- I
4  became aware of that. Not only that, but -- nobody told
5  me. Because in 2007 there was -- the hunt for the CEO
6  and manager and -- did not start yet. So nobody knew
7  about people being jailed and trumped up charges or
8  passport taken away. It just started end of 2007. So I
9  did not know.
10         But what I did know, and what I saw, at one
11  episode as I was going back, driving back home, I see
12  some agitation in the street and there is a police force
13  there who is dragging out of the house a mother, my
14  neighbor. And I knew her. She was my neighbor. And my
15  wife's neighbor, because she is from Argentina. My wife
16  is Puerto Rican, so they speak Spanish; they know each
17  other. So I'm going home and I see that poor woman
18  dragged out of house, dragged, screaming, and the two
19  little girls left just like that. (Indicating.) And so
20  I go home.
21         And the next day, the housemaid of the neighbor
22  comes home and tells me that the husband was not home.
23  So because the husband was not home, they arrested the
24  wife, and they left me with the two little girls, so they
25  were dirty, crying. So she was asking -- the husband was

46 (Pages 178 to 181)

Esquire Reporting, Inc.
(772) 283-8002

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

Page 182

1    a Filipino. She was not a nanny. So my wife took care
2    of the two little girls. But then I knew that, Whoa,
3    wait a minute, if I disappear, then it's going to be my
4    kids ending up in the neighbor's house.
5        No due process. They just kick the door and take
6    whatever, wife or people are in the house, just because
7    the husband is not present.
8        So that's how I became aware of their methods and
9    what -- and what I was facing. My wife did not see it
10   the same way because she -- she doesn't have the same
11   perspective.
12       For instance, another example, there is a guard
13   in front of my house. It's a Dubai World guard on -- in
14   position, 80 yards from my house. My wife doesn't know,
15   but I know that this guy, he is reporting every hour at
16   least every day of whatever is going on in the street.
17       So if I walked away or if I go somewhere, Dubai
18   World is going to know. I know that.
19       Q.  How do you know that?
20       A.  Because that's the way it works. They don't put
21   a guard just to be there, be in the street. The guy is
22   there to report. And I know that because I had guards
23   myself in my company; they would do the same job. The
24   sub -- South Asian guards, that's all they do, they
25   report everything they see.

Page 183

1        So they -- it goes -- he follows the chain of
2    command. And so you never know. Maybe -- I'm
3    not -- maybe he is not watching me. But because he is
4    there. If one day there is a signal or something, he
5    will be watching me because he is available and he is
6    there ready to do so. It doesn't mean he is going to do
7    it. But for me, it's -- you know, it's difficult to
8    live. You have to consider it.
9        Q.  And do you have any particular skills by virtue
10   of your history with the service?
11       A.  To do what?
12       Q.  To perceive danger or to --
13       A.  I have eyes behind my back. I have -- it became
14   a second nature. I have a radar. I feel, if there is
15   a -- again, those people, they are not trained. When
16   I -- when I was in the service, I was up against the
17   counterespionage in the KGB, the Stasi, the Gerhue
18   (phonetic). Those are -- I mean, mean, professional,
19   secret agent. They have been doing that since Stalin and
20   Lenin. They know from generation to the next.
21       And I have the chance -- I had the chance and the
22   luxury to operate in the former communist countries
23   before the end of the war. I know how it was -- how it
24   was then when I was -- in former communist countries. So
25   those guys are -- they were professional, they still are.

Page 184

1        And by me going to this country back and forth, I
2    learned from them. At the beginning it took me -- it
3    would take me hours to get rid of the followers and the
4    surveillance. And a couple of years later, I would do it
5    in much less time because I knew their habits and I had a
6    sense on how they operated.
7        So then when I go to Dubai, I already know the
8    surveillance, how -- I know how it works. I was in
9    Lebanon. I saw how the -- the Druzes, the Palestinian --
10   I have been there, I know how they work. So when I went
11   to Dubai, it's the same.
12       The surveillance -- it's -- they don't -- they
13   don't make surveillance like the KGB would do, but I was
14   trained to be -- to detect any -- anything suspicious.
15       Q.  Now, that knowledge, when you were in Dubai, when
16   you were in the -- making your efforts to escape, during
17   the interrogation, these are different time periods, I
18   realize that. Efforts to escape, during the
19   interrogation by the police, regarding the bullets,
20   during the threats that were made by the auditors to you,
21   did your skills as a -- as a secret service operative, did
22   that -- did those skills make you more anxious, more
23   distressed in Dubai or less?
24       MR. URQUHART: Objection. Leading. Vague,
25   ambiguous, compound.

Page 185

1        THE WITNESS: It made me more anxious.
2    Because if it was you over there, you would not
3    worry. You would not see those signs. And then
4    if something goes wrong, if you get in a conflict
5    with them, then you get arrested the next day and
6    you don't know.
7        Let me give you an example. It's -- it's
8    also being an intelligence officer, which in
9    the -- I was in the counterespionage which
10   includes the art of manipulation. So with the
11   art of manipulation there is a large part of
12   psychology. And -- I am sorry. What was the
13   question?
14   BY MR. HESS:
15       Q.  You already answer it. You have answered it.
16   You're good. You were going to give me an example, but I
17   don't -- unless you need to give the example right now, I
18   don't need you to give that.
19       Were threats made? Did you hear threats made, in
20   terms that you perceived as threatening, the physical
21   welfare of any employees at Dubai World?
22       A.  I had an employee manager -- supervisor engineer,
23   American citizen, Bert de Wijs. You saw that report, the
24   technical report on submarine products.
25       Q.  I can't -- I get to ask you questions. I can't

                                47  (Pages 182 to 185)

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

Page 186

1  answer your questions.
2      A.  Okay.  He prepared a report that was negative
3  against me and against my design.  He was coerced to
4  write that report with the promise that he would replace
5  me.  So he would become the CEO and I would be fired.
6      Before I continue, I remember what I was going to
7  say.
8      The -- Abdul Qadar what he was trying to do is
9  push me to the door so I would resign.  Because of my
10  training, my skills, I knew that it was a manipulation.
11  In Dubai when you are under investigation, if you resign,
12  the next day you are arrested.  You cannot resign if you
13  are under investigation.  I knew there was something
14  wrong and I saw his game.  He was trying to push me to
15  the door.  They would not fire me.  But they were trying
16  to make me -- I'm fed up, I'm out of here, I resign.  If
17  I had done that, I would have been arrested.  I knew it.
18  I did not do it.  That's why it took a long time before
19  they eventually fired me.
20      So now back to Bert de Wijs.  He was promised a
21  situation of CEO if he would cooperate with the auditors
22  to -- help them throw me away.
23      Whatever he did, he made a mistake.  He tried to
24  build a business on the side, and there was something
25  that -- that did not work out.  And Ahmed Buti, who is

Page 187

1  the director of Dubai Customs and who is a former
2  director of CID, the Criminal Investigation Department --
3  so here he is a policeman, he is a police guy, Ruthless.
4  Now, he told me that they were trying to collect money
5  out of Bert de Wijs.  They were trying to --
6      Q.  Who is "they"?
7      A.  Dubai World.
8      And because he did not want to pay, because Bert
9  de Wijs did not want to pay, then Ahmed Buti came to me
10  and he said if he doesn't pay, I'm going to pick up the
11  phone to have him arrested, and I'm going to skin him.
12  He said it in such -- with a smirk on his face, that I
13  believed him.
14      But, again, if he -- at the same time I'm
15  thinking, if he is going to do that to Bert de Wijs,
16  maybe he is going to do that to me in six months.
17      Q.  Was it -- the Dubai property documents that you
18  were shown today, were all of the contracts switched
19  to -- your wife's name, do you know?
20      A.  Most of them.
21      Q.  Okay.
22      A.  Maybe, like -- most of them.
23      Q.  Do you have the documents in front of you?  Did
24  you want to refer to those?
25      A.  I think -- I think only one stayed under my name.

Page 188

1  I thought it would be an extra precaution, but obviously
2  that did not work.
3      MR. HESS:  Okay.  Nothing further.
4      MR. URQUHART:  I have a couple of questions.
5              REDIRECT EXAMINATION
6  BY MR. URQUHART:
7      Q.  You talked about the report that Mr. De Wijs
8  prepared.
9      A.  Yes.
10      Q.  He didn't prepare that himself, did he?
11      A.  What do you mean?  He prepared it with Lorenz
12  Kruger.
13      Q.  Do you have any evidence that Lorenz Kruger was
14  intimidated to write this false report?
15      A.  He told me.
16      Q.  Kruger told you?
17      A.  I confronted him.  And he told me -- he was told
18  a different promise.  He was -- his words were that he
19  was given the choice:  Either working with a new CEO or
20  go with the old CEO.
21      Q.  And both of them told you they falsified this
22  report?
23      A.  They did -- they did not use the word
24  "falsified."  They said they were asked to cooperate with
25  the auditors to be -- to help them find something against

Page 189

1  me.  That's the words they used.  He did not say he was
2  forced to falsify a report.
3      Q.  All right.
4      A.  He said he was forced to help the auditor to find
5  something against me.
6      Q.  Was there any discussion about the report itself?
7      A.  No.  Because I found out about the report during
8  a meeting with Abdul Qadar.  I asked Abdul Qadar to see
9  the report and he never showed it to me.  The first time
10  I saw that report is when you gave it to Mr. Hess.  I
11  never saw that report before.  And, again, it was -- one
12  of my claims is that you are -- they are accusing me of
13  something; they don't even give me the report to dispute
14  it or to challenge it.
15      Q.  So the first time you saw the report was when
16  Mr. Hess showed it to you in connection with this
17  litigation?
18      A.  Yes.
19      Q.  You talked about being subject to humiliation
20  while you were in Dubai --
21      A.  (Nods head.)
22      Q.  -- principally among your employees, et cetera.
23      What you -- what, if any, humiliation did you
24  suffer after you came back to the United States?
25      A.  After I came back to the United States, it's a

48  (Pages 186 to 189)

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

Page 190

1  feeling that -- you know, my name -- if anybody Googled
2  my name, they are going to find links of the French are
3  this, the French gone mad, whatever.  So every time I
4  have a social occasion or somebody asks me who you are or
5  what did you do, I don't know what to say.  I don't know
6  what to say anymore.  Where did you work last year?  I
7  don't want to say it because then it's going to unfold,
8  it's going to open the box, and I don't want to speak
9  three hours about that.  If people don't know me, it's
10  difficult.  It's embarrassing.
11     Q.  Has anybody actually brought it up to you?
12     A.  I am sorry?
13     Q.  Has anybody brought the subject up to you?
14     A.  Directly, face-to-face?
15     Q.  Yeah.
16     A.  No.
17     Q.  So this is something you just feel?
18     A.  It's something -- it's something I felt.  No
19  direct accusation or allegation or confrontation.
20         MR. URQUHART:  Okay.  Thank you very much.
21  I have no other questions.
22         MR. HESS:  One moment.
23              RECROSS EXAMINATION
24  BY MR. HESS:
25     Q.  You said no direct confrontation, and you said

Page 191

1  something else, but I don't exactly recall.  Did you
2  have -- do you mean that -- do you mean to say that
3  you -- that there was nothing on the Internet, or nothing
4  written about you, or nothing that was promoted in
5  writing?
6     A.  Well, in writing.
7         MR. URQUHART:  Objection.
8         THE WITNESS:  On the Internet, it's all
9  over; blogs, e-mails.  I received threats.  I did
10  not pay too much attention to it because I don't
11  know where they come from.
12  BY MR. HESS:
13     Q.  Why is it that you said no confrontation, no --
14  why did you say what you said in direction to -- in
15  response to the question that was asked by opposing
16  counsel?
17     A.  Nobody came to my face to tell me, Oh, you are a
18  con man, directly.  I read it.  People who -- people who
19  don't know me read it -- wrote it to me or -- wrote it on
20  blogs.  And, you know, I'm a submarine maker, so I -- I
21  belong to the submarine community.  It's a small
22  community.  So online you have PS subs org --
23  organizations, and people who build submarines for
24  private purpose, recreational or whatnot.  And most of
25  them are trashing my name because they just read the news

Page 192

1  and they repeat what they saw.  And I cannot go in there
2  without creating a debate and I have to justify myself
3  and explain and it's humiliating.
4         MR. HESS:  Okay.  Nothing further.
5         THE WITNESS:  It makes me look like I
6  don't -- I did not know what I was doing and I
7  got caught with something.
8         And I'm the type of person that, I would
9  rather keep it quiet and not go out and claim
10  otherwise.  I have got carried away now with the
11  book and the lawsuit, but I would rather skip
12  that.
13             FURTHER REDIRECT EXAMINATION
14  BY MR. URQUHART:
15     Q.  You said that members of the submarine community
16  were trashing your name.  Who?  Can you give me the name
17  of a person?
18     A.  There is no -- I don't know the names.  Those
19  people have code names or call names.  I don't know who
20  they are.  I know a few of them.
21     Q.  Who?
22     A.  There is a Marco.  There is an island.
23     Q.  Marco who?
24     A.  George.  I don't know the name.  They just go
25  with -- I don't know who they are.  I mean, I know who

Page 193

1  they are, but I don't know their last name, their
2  address.  I know the first name and where they live.  But
3  I don't know who they are in particular.
4     Q.  Other than that, has anybody in the submarine
5  community trashed your name?
6     A.  Well, I have read in the documents -- no, I'm not
7  sure about that.  I don't know.
8         MR. URQUHART:  Okay.  I don't have any other
9  questions.
10         MR. HESS:  Nothing else.
11         MR. URQUHART:  Thank you.
12         THE VIDEOGRAPHER:  This concludes the
13  deposition at 4:42.
14         (The reading and signing of this deposition
15  was not waived and the deposition concluded at
16  4:42 p.m.)
17
18
19
20
21
22
23
24
25

49 (Pages 190 to 193)

Esquire Reporting, Inc.
(772) 283-8002

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

---

Page 194

1                    CERTIFICATE OF OATH
2
3       STATE OF FLORIDA        )
4                              §
5       COUNTY OF MARTIN        )
6
7
8
9
10          I, LAURA E. MELTON, RMR, the undersigned
11      authority, certify that HERVÉ JAUBERT personally appeared
12      before me and was duly sworn or affirmed by me.
13
14          WITNESS my hand and official seal dated this
15      18th day of January, 2011, at Stuart, Florida.
16
17
18              Laura E Melton
19          LAURA E. MELTON, RMR
20      Notary Public, State of Florida at Large
21              Notary #DD 654030
22          My Commission expires: 7-7-11
23
24
25

---

Page 195

1                  CERTIFICATE OF REPORTER
2
3       STATE OF FLORIDA        )
4                              §
5       COUNTY OF MARTIN        )
6
7          I, LAURA E. MELTON, a Registered Merit
8       Reporter, in and for the County of Martin, do hereby
9       certify that I was authorized to and did stenographically
10      report the foregoing proceedings, and that the foregoing
11      transcript is a true and correct record of the deposition
12      of HERVÉ JAUBERT; that a review of that transcript was
13      requested; and that the foregoing transcript, pages 4
14      through 193, is a true record of my stenographic notes;
15      and that the transcript is a true and complete record of
16      my stenographic notes.
17
18          I FURTHER CERTIFY that I am not a relative,
19      employee, or attorney, or counsel of any of the parties,
20      nor am I a relative or employee of any of the parties'
21      attorney or counsel connected with the action, nor am I
22      financially interested in this action.
23          DATED this 18th day of January, 2011.
24
25              Laura E Melton
            LAURA E. MELTON, RMR

---

Page 196

1                      ERRATA SHEET
2       Page & Line
3       Number        CORRECTION        REASON
4       _____    _____    _____
5       _____    _____    _____
6       _____    _____    _____
7       _____    _____    _____
8       _____    _____    _____
9       _____    _____    _____
10      _____    _____    _____
11      _____    _____    _____
12      _____    _____    _____
13      _____    _____    _____
14      _____    _____    _____
15      _____    _____    _____
16      _____    _____    _____
17      _____    _____    _____
18      _____    _____    _____
19      _____    _____    _____
20      Under penalties of perjury I declare that I have
        read the above and that the facts stated in it are true.
21
        By the above corrections on the Errata Sheet, if any, and
22      my signature hereon, I hereby sign my deposition.
23      _____
24      Notary Public
                        HERVÉ JAUBERT
25

---

Page 197

1          - - - CERTIFICATE - - -
2
3       STATE OF FLORIDA
4
5       COUNTY OF MARTIN
6
7          I, HERVÉ JAUBERT, hereby certify that I have
8       read the foregoing transcript of my deposition and that
9       the statements contained therein, together with any
10      additions or corrections made on the attached Errata
11      Sheet, are true and correct.
12          Dated this _____ day of _____, 2011.
13
14
15              HERVÉ JAUBERT
16
17
18          The foregoing certificate was subscribed to
19      before me this _____ day of _____, 2011, by
20      the witness who has produced a _____ as
21      identification and who did not take an additional oath.
22      _____
23
24
25

50  (Pages 194 to 197)

Esquire Reporting, Inc.
(772) 283-8002

7795e1e4-3af4-4c31-99d2-c8cb98ad1282

1/13/2011                    Herve Jaubert

Page 198

ESQUIRE REPORTING
422 Camden Avenue
Stuart, Florida 34994
(772) 283-8002

January 18, 2011

HERVÉ JAUBERT
c/o HESS & HEATHCOCK, P.A.
BY:  WILLIAM HESS, ESQ.
KATHRYN HEATHCOCK, ESQ.
Post Office Box 2195
Stuart, Florida 34995
RE:  DUBAI WORLD CORPORATION, and its subsidiaries,
EXOMOS, NAKHEEL and PALM MARINE and HERVÉ JAUBERT,
SEAHORSE SUBMARINES INTERNATIONAL INCORPORATED, and Does
1-99

Dear HERVÉ JAUBERT:

Your deposition taken in the above-styled matter on
January 13, 2011, is now ready for you to read and sign
in our office at 422 Camden Avenue, Stuart, Florida.  Our
office hours are from 9:00 a.m. until 4:30 p.m.
If, for any reason, you choose to waive your signature or
need directions to our office, please contact us at your
earliest convenience at (772) 283-8002.
The transcript will be held in our office for 2 weeks
from the date of this letter.

Thank you for your cooperation in this matter.

Sincerely,

Laura E. Melton, RMR
Court Reporter
cc:
A. WILLIAM URQUHART, ESQ.
WILLIAM HESS, ESQ.

Esquire Reporting, Inc.
(772) 283-8002

7795e1e4-3af4-4c31-99d2-c8cb98ad1282