UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Ft. Pierce Division

**Case Number: 09-14314-CIV-MARTINEZ-LYNCH**

DUBAI WORLD CORPORATION, and its
subsidiaries, EXOMOS, NAKHEEL and PALM
MARINE,

       Plaintiffs,

vs.

HERVE JAUBERT, SEAHORSE
SUBMARINES INTERNATIONAL
INCORPORATED, and Does 1-99,

       Defendants.

_____/

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs Dubai World Corporation ("Dubai World"), and Dubai World's subsidiaries

Exomos, Nakheel and Palm Marine filed the instant action alleging that Defendants Herve

Jaubert ("Jaubert") and Seahorse Submarines International Inc. ("Seahorse") are liable for breach

of contract (Count I), fraudulent inducement (Count II), negligent misrepresentation (Count III),

conversion (Count V), and conspiracy to commit fraud (Count VI), and that Defendant Jaubert is

also liable for breach of fiduciary duty (Count IV).  Defendant Jaubert filed a separate action,

since consolidated with this case, in which he asserts that Dubai World is liable for fraud

(Counterclaim Count I), abuse of process (Counterclaim Count II), and defamation

(Counterclaim Count III).  This cause comes before the Court upon Plaintiff Nakheel and Palm

Marine's Motion for Partial Summary Judgment for Breach of Contract (Count I) **(D.E. No. 87)**

and Plaintiff Dubai World Corporation's Motion for Summary Judgment on Defendant's

Counterclaims **(D.E. No. 88)**.

## I. Factual Background[1]

### A.   Facts Relevant to Nakheel and Palm Marine's Contract Claim

On February 17, 2004, Seahorse, which is owned by Jaubert, entered into a contract with

Nakheel to sell Nakheel the three-passenger, 13-foot Goby submarine. (D.E. No. 118-3.)[2]  The

agreement provided that Nakheel would pay a total of $116,450 for the vessel, with $58,225 to

be paid up front, $23,290 to be paid after thirty days, and the remainder to be paid upon delivery

"provided the Vessel is fully constructed and ready for delivery in accordance with the terms and

conditions of this Agreement." *Id.*  The submarine was to be completed and delivered in ninety

(90) days. *Id.*  The contract states that "Buyer shall have no duty to take delivery of the vehicle

unless it is constructed pursuant to and in accordance with the terms and conditions of this

Agreement (including, without limitation, the provisions of Section 1.1 hereof [providing certain

specifications regarding the vessel, such as the requirement for life support] and the plans and

specifications set forth in Exhibit 'A.'" *Id.*  The contract goes on to state that,

> [i]n the event that Seller is unable to complete such construction and delivery of the
> Vessel by the Completion Date: the Initial Payment, and any other payments made by
> Buyer for the Vessel, shall be fully refundable to Buyer; and any refundable amounts
> Seller fails to pay Buyer when due shall accrue interest from the date such amount was
> due until such amount is paid in full in the lesser of (a) 18% per annum; or (b) the
> maximum rate of interest allowable under applicable law. *Id.*  The contract has a
> severability clause and specifies it shall be governed by California law.

---

[1] Facts not otherwise cited are derived from those statements in the parties' statements of
facts that have not been disputed as provided for in the local rules.

[2] Jaubert and Seahorse have challenged the authenticity of this document, along with the
contracts to sell the Stingray Duo and Discovery submarines.  That argument is discussed below,
*infra* Sec. III.A.

*Id.*

On June 12, 2004, Seahorse entered into two contracts with Palm Marine to sell Palm Marine the two-passenger, 13-foot Stingray Duo submarine (D.E. No. 118-4) and the seven-passenger, 24-foot Discovery submarine (D.E. No. 118-5). The total purchase price for the Stingray Duo was $35,000 with an additional $25,000 to be paid for 50% ownership of the worldwide patent rights, to be paid with an initial payment of $42,500 and the difference to be paid on delivery. (D.E. No. 118-4.) The total purchase price for the Discovery submarine was $313,450, with an initial payment of $156,725, a second installment of $78,362, and the remainder due on delivery. (D.E. No. 118-5.) The relevant terms in the contracts were otherwise the same as in the Goby contract. Jaubert testified that each contract required him to deliver a functioning vessel that operated safely for its intended purposes in accordance with contractual specifications and applicable rules and regulations. Jaubert Dep. 180-81.

Jaubert testified that Dubai World bought the Goby, the Stingray Duo, and the Discovery. Jaubert Dep. 177-78. Seahorse has not contested that it received the purchase price pursuant to the contracts.

Jaubert asserts that the submarines were delivered and accepted by Palm Marine and Nakheel. Jaubert 2d Aff. ¶ 11. Jaubert also asserts that the Goby was "operational" and in functioning condition when it was delivered to Nakheel. Jaubert 2d Aff. ¶ 3; Jaubert Dep. 184. Paul Rodig, a former employee of Seahorse and Exomos, also testified that the Goby was operational following its delivery and that he took it on dozens of dives. Rodig Aff. ¶ 4. Jaubert asserts that a subsequent fire that damaged the Goby was caused by incompetent personnel rather

than by a design flaw. Jaubert 2d Aff. ¶ 5.[3]  Jaubert testified that the other two submersibles were delivered "as is." Jaubert Dep. 184.[4]  Jaubert testified that the other submersibles were not functional because they were not completed when they were delivered. Jaubert Dep. 184. Despite Jaubert's testimony that the Discovery was not operational, Rodig affidavit also asserts that the Discovery submarine was operational following its delivery and that Rodig took it on eight dives. Rodig Aff. ¶ 6. An April 14, 2006 Exomos pre-risk survey from an organization called BMT also states that the Discovery is fully operational, seven months after the contracted delivery date to Palm Marine. (D.E. No. 110-4.)

A March 22, 2007 Exomos Engineers Submersible Product Report by Bert de Wijs and Lorenz Kruger details numerous design problems in the Exomos submarines. (D.E. No. 89-22.) The report states that certain problems are present in all the Exomos submersible projects. *Id.* These are that "[n]ot one submarine project has had hydrodynamic tests to back up the basic hull design" and that none have "stability calculations, detailed structural drawings or any other important engineering details"; that the submersibles lack state of the art life support systems and they all need an oxygen supply with a carbon dioxide scrubber; that "[m]ost of the installed equipment used in the subs is not made for subsea use (no longitudinal water tight cables, no under[]water switches . . .)"; and that the subs are designed "with a lot of expensive electronic

---

[3] The Court notes that Jaubert's testimony regarding the Stingray is not relevant to the contracts at issue, because the Stingray Duo, a two-passenger vessel, is a different vessel from the single-passenger Stingray.

[4] Jaubert also asserts that the submarines were delivered "as agreed." Jaubert 2d Aff. ¶ 7. This is a conclusory statement, however, and the Court will not consider it for the purposes of these motions. To the extent that this statement is, instead, an assertion that a new agreement superseded the contracts at issue, Jaubert has not pointed to any evidence of this new agreement in his brief.

equipment without making the basic functionality work: [d]iving the boat." *Id.* The report goes on to detail problems in specific submersibles, including multiple hydrogen explosions and airflow that is insufficient to keep a diver alive for more than 18 minutes. *Id.* The report states, "We have continually requested drawings and calculations for all the various submarine projects from the CEO. His comments are to stop asking and if we do not like it..... We know where the door home is!!" *Id.* (grammar and punctuation in original).

**B.     Facts Relevant to Jaubert's Fraud Claim**

Starting in February 2004, Jaubert entered into discussions with Jim Miller ("Miller"), Sultan Ahmed Bin Sulayem ("Sultan"[5]), and Hamed Kazim ("Kazim") regarding entering into business together to produce submarines. (D.E. No. 111-3.) In one email, Miller represented that the Sultan wanted to "[s]et up a joint venture to build Seahorse Submarines in Dubai." *Id.* Miller stated, "[i]t can be 50/50 or 75/25 . . . whatever suits you." *Id.* The email concluded that Jaubert should think about the proposal and then they could talk about "what it might take to make this happen." *Id.* Jaubert also testified that he understood from his discussions with Miller and the Sultan that he would receive a portion of the profits from the new business venture in Dubai, which would be funded by Dubai World. Jaubert 1st Aff. ¶ 111-2. Jaubert stated that he relied on representations about joint ventures in moving to Dubai in November 2004.

In his deposition, Jaubert testified that "once I got to Dubai in 2004, I became an employee, just an employee."

---

[5] Although the Court would not ordinarily abbreviate someone's name with a title, Sultan Ahmed Bin Sulayem is commonly referred to in all the exhibits and testimony in this case as "Sultan." There do not appear to be any other sultans connected with this case. As such, for purposes of clarity, the Court will adopt the same abbreviation.

Jaubert's November 20, 2004 five-year employment contract with the Ports, Customs & Free Zone Corporation specified that he would be the CEO of Palm Submarines with a six month probationary period. (D.E. No. 89-2.) It specified that he would work 48 hours per week, be paid 27,800 AED[6] per calender month, receive a villa until he could move into his own villa, receive the cost for utilities, receive allowances for transportation, education, and "compensatory/special" purposes, receive medical coverage for himself and his dependents, and be entitled to death or disability benefits. *Id.* It also provided that "[d]etails will be provided separately" with respect to "Profit Sharing Arrangements." *Id.* The employment contract also specified that Jaubert would protect confidential information, be subject to a non-compete agreement, and assign any intellectual property rights to the company, and that the employment contract would be governed by the laws of Dubai. *Id.* A virtually identical contract, which differed in that it provided for additional compensation, governed Jaubert's employment as Exomos's CEO. (D.E. No. 89-3.)

A January 16, 2005 email from Miller to Kazim states that the parties planned on setting up a five-year employment agreement for Jaubert as CEO of Palm Submarines wherein he would receive 20% of net profits during his employment. (D.E. No. 111-8.) The email suggested that Kazim set up a meeting with Jaubert to work out the details of the contract. (D.E. No. 111-8.) A January 25, 2005 email from Kazim to Jaubert referred to the meeting as having taken place and outlined "proposed compensation for your review and finalization." (D.E. No. 111-8.) The email listed a salary and certain substantial perquisites in connection with a five-year

---

[6] AED are Arab Emirate Dirhams, the currency of Dubai. The Court takes judicial notice of the fact that 3.67 AED equal $1.00 USD. This exchange rate has not been contested by Jaubert or Seahorse.

employment agreement. *Id.* The email then stated, "[b]ear in mind the above is in addition to the profit sharing arrangement of 20% of net profit of the Company." *Id.* It closed, "[p]lease let me know to enable me to finalize the agreement." *Id.* Jaubert has not introduced any reply email.

A November 3, 2005 memorandum prepared for Exomos and Exomos's parent corporation was entitled "Executive Compensation for Herve Jaubert, CEO of Exomos." (D.E. No. 89-4.) The authors of the memorandum reported as follows:

> It is our understanding that Mr. Jaubert and Sultan Ahmed bin Sulayem, the Chairman of the Port, have generally discussed the terms of Mr. Jaubert's "profit sharing" in Exomos, and that Mr. Jaubert now desires to memorialize those discussions and create an enforceable agreement. [Footnote omitted.] It is our further understanding that the parties have discussed compensating Mr. Jaubert in an amount equal to 20% (twenty percent) of the "net profits" of Exomos, although the parties have not specifically defined the terms and conditions when such "net profits" would be paid, if at all. . . . It is our further understanding that, after five (5) years of continuous employment with the Company, Mr. Jaubert may receive an additional 50% of the net profits on the year in which he leaves the Company.

(D.E. No. 89-4.) The memorandum discusses different issues to be considered before drafting an agreement to provide Jaubert with those profits, such as how "net profits" would be calculated and whether they would be calculated during the fiscal year or calendar year. *Id.* The memorandum explicitly did not offer an opinion with regard to whether Jaubert was entitled to a percentage of net profits. *Id.*

An August 23, 2006 email from Jaubert to an individual named Randa stated, ". . . I believe it is time now to finalize my contract employment to avoid any 'surprises' in the near future when Exomos generates significant profits." (D.E. No. 89-7.) He stated, "it was agreed with Hamed Kazim, Sultan and myself that I will be entitled to a yearly 20% of net profit." *Id.*

He also requested that after his first five years of contract employment ran, he would be entitled to 2% of net profit as "inventor royalty" going forward "when and if my contract is terminated." *Id.* No formal agreement granting Jaubert a percentage of Exomos profits was ever executed.

While Jaubert was CEO of Exomos, Exomos did not make a profit. Jaubert Dep. 130. During that period, Exomos built an 80,000 square foot factory. Jaubert Dep. 130. Jaubert asserts that he would not characterize the cost of this factory as a loss, but instead as an investment. Jaubert Dep. 130. He further testified that he had never agreed to be responsible for or share in Exomos's losses. Jaubert Dep. 130.

**C.     Facts Relevant to Jaubert's Abuse of Process Claim**

Dubai government officials served formal process on Jaubert in Dubai on two occasions. In the first occasion, during April 2007 Jaubert was charged with improperly attempting to smuggle large caliber bullets into the country.

Jaubert has introduced an October 2004 email from a Palm Marine project manager stating that the manager would process customs with regard to Jaubert's three cases of rifle cartridges and then apply for a license with the police. (D.E. No. 111-8.)

Abdulqadar Obaid Ali ("Ali") testified that he was out of Dubai when Abdullah Khamis, the head of the fraud prevention department, called him and told him that they found bullets in Exomos. Ali Dep. 123. Ali testified that he told Khamis to alert the authorities and let them handle it, which was the policy with matters such as the discovery of drugs on the premises. Ali Dep. 124-25. Ali testified that it was his understanding that the police confiscated Jaubert's passport while the case was ongoing. Ali Dep. 132-33.

Jaubert introduced an email from him to Sultan Sulayem stating that during his

questioning by police regarding the bullets, he was accused of being "some sort of mercenary" and threatened with torture.[7]  (D.E. No. 111-8.)  In the email, Jaubert asked the Sultan to intervene on his behalf.  *Id.*  He stated that he needed his passport back by July in order to go on a trip to the United States.  *Id.*  He gave the Sultan his word he would come back.  *Id.*  Then, in response to Jaubert's June 2007 email to a Nakheel employee expressing his confusion about why the police were still holding his passport, Jaubert received an email back stating that the Nakheel employee had met with Ali, that Jaubert's passport was "tied up with GIA," and that the Nakheel employee could not help.  *Id.*  Jaubert identified GIA as the Group Internal Audit at Dubai World, which was headed by Ali.  Jaubert 1st Aff. ¶ 10.  A series of subsequent emails with other employees of Dubai subsidiaries establish that the trip had to be canceled because Jaubert's passport was not returned in time.  *Id.*

Without explicitly tying this threat to the bullet case, except by including it in the same paragraph of his affidavit, Jaubert testified that Ali threatened him with imprisonment if he did not pay monies he owed.  *Id.*  Without explaining any basis for his personal knowledge on the subject or how it connected to the bullets, Jaubert also testified that Ali asked the owner of the development where Jaubert lived to place a lien on Jaubert's home following the bullet charges.

---

[7] The Court notes that Dubai World has introduced the expert report of an audio forensic expert reviewing what purports to be an audio recording of this interrogation. (D.E. No. 89-29.) The report states, "This recording is one of the most hideously created pieces of garbage I have ever heard in over 26 years as an audio forensic expert. Not only is this recording not genuine but it is a fabricated dialogue between two people who are obviously reading a script." *Id.* The report goes on to discuss voice tones, paper sounds, and the fact that the allegedly digital recording was only available on an analogue tape. *Id.* This Court must view evidence in the light most favorable to the non-moving party, however, and evidence that a recording of the interrogation was fabricated does not directly bear on whether or not the actual interrogation took place.

Jaubert 1st Aff. ¶ 11.  Ali testified that Dubai World requested that Nakheel, its subsidiary, place

an "internal" or "confidential" non-judicial lien on Jaubert's home as a part-owner of the home

so that they could attempt to take steps to preserve their interests.  Ali Dep. 80-82, 138, 140.  Ali

testified that the home sold before they could put a "legal" lien on it.  Ali Dep. 82.

In February 2008, Jaubert was charged with embezzling corporate funds, which was the

second time he was served with formal process in Dubai.  He testified that officials took his

passport again, and they never returned it.  Jaubert 1st Aff. ¶ 12.

An undated Dubai World executive summary from the fraud prevention department on

Project Exomos detailed the results of two audits previously conducted by Group Internal Audits

on December 31, 2005 and August 30, 2006.  (D.E. No. 89-5.)  The summary stated that based

on the audits, a fraud investigation was launched, and it discusses the results of that investigation

as well as the audits.  *Id.*  The summary stated that from its 2004 inception through the end of

2006, Exomos had more that 116 million AED in operational losses and had fundamental

problems in all its designs and production.  *Id.*  It further stated that Jaubert had a conflict of

interest, in that he owned Seahorse and his wife managed it.  *Id.*  While Jaubert was CEO,

Exomos had purchased almost 12 million AED in materials from Seahorse, paying in advance

and failing to comply with Dubai World's policies.  *Id.*  The report further noted that Seahorse

overcharged Exomos by up to 135% of the original vendor prices, that there was an additional

10% charge added to the final purchase price of Seahorse materials which Jaubert claimed was

based on an undocumented "verbal agreement" regarding shipping and handling, that Exomos

ordered and paid in advance for more than 2 million AEDs' worth of products that Seahorse

never delivered, and that Jaubert attempted to cover up the purchase orders of the undelivered

-10-

materials. *Id.*

The summary also stated that three submarines that Palm Marine had agreed to purchase

from Seahorse and had paid half the purchase price up front for were never completed and never

delivered, specifically the Goby, the Stingray, and the Discovery. *Id.* The summary noted that

Jaubert sold the Discovery submarine to both Exomos and Tao Dominicana. *Id.* The summary

further stated that Jaubert shipped his personal Hummers at the company's expense, that he used

Exomos funds to pay legal fees for litigation Seahorse was involved in, that he had been accused

of sexual harassment, and that three boxes of ammunition belonging to him had been discovered

in an Exomos store due to an employee tip. *Id.* The summary stated that the authorities were

alerted, arrived at the scene, and confiscated the ammunition. *Id.*

Ali testified that Dubai world negotiated with Jaubert in an attempt to reach a settlement

regarding whether Jaubert would repay the money at issue. Ali Dep. 141-43. Ali testified that

when Dubai World was unable to settle the alleged fraud with Jaubert internally, they called the

police in an effort to vindicate their rights. Ali Dep. 145-46. Ali asserted that Dubai World had

to bring a case against Jaubert like any other corporation, without any control over the courts or

the police. Ali Dep. 144-45. He testified that despite the fact that the government is a

stakeholder in Dubai World, "the law applies to all of us the same." Ali Dep. 145.

Tarek Mohamed Ahmed El Shabrawy ("Shabrawy"), an accountant with Chartered

Dubai, testified that his firm was appointed by the Dubai court to conduct an independent audit

of Exomos following allegations of embezzlement. Shabrawy Dep. 6-7. Shabrawy testified that

his audit revealed that Jaubert made nearly 12 million AED in personal gains while working at

Exomos by placing orders improperly with Seahorse, his own company. Shabrawy Dep. 11-12,

-11-

43.

Ali testified that he was not personally involved in the prosecution of Jaubert in Dubai for fraud. Ali Dep. 96-97. He testified that some members of his team testified about the results of their audit, and a verdict was issued in the absence of Jaubert. Ali Dep. 96. Ali asserted that as internal auditors, he and his employees did not have the power to imprison Jaubert whether or not he repaid money to Dubai World. Ali Dep. 143-44. They could only request that he pay the money back and then turn to the courts. Ali Dep. 137-38.

Jaubert, on the other hand, testified that Ali threatened him with imprisonment after the filing of embezzlement charges in February 2008. Jaubert 1st Aff. ¶ 13. Jaubert testified that when he signed a document stating he owed monies to Dubai World and its subsidiaries, he signed it under duress. Jaubert 2d Aff. ¶ 12. He testified that Ali repeatedly told him that if he did not sign the document, he would go to prison. Jaubert 2d Aff. ¶ 12. He also testified that Ali specifically told Jaubert that he had to pay earlier agreed-upon amounts to avoid imprisonment. Jaubert 2d Aff. ¶ 12. Jaubert testified that only being under duress from these threats had induced him to agree to pay the money because there was no basis for the claims. Jaubert 1st Aff. ¶¶ 10, 13.

The executive summary from Dubai World's fraud prevention department stated that in 2007, Jaubert agreed to the facts and findings presented by the internal audits. (D.E. No. 89-5.) He signed a confession and agreed to pay the embezzled amounts. *Id.* He also submitted a check as partial payment. *Id.* The summary went on to state:

> In 2008, Herve Jaubert was called again by Internal Audit where a new proposal was suggested and put forward by the Internal Audit which was amicably accepted and agreed [to] by both the Internal Audit represented by Galadari Law Firm and Herve Jaubert

represented by Al-Matrooshi Law Firm. During the meeting . . . both parties . . . agreed
to reduce the amount from AED 5 to AED 3 million ([w]hich was never paid). The
meeting ended with an agreement that Herve would meet with us with his lawyer in a few
weeks time once the draft agreement [wa]s ready. Herve also stated that he would be
bringing AED one million in cash and AED two million in cheques. The above
agreement was finally prepared and agreed [to] by both parties but was never signed.

*Id.* The executive summary concluded, "[a]fter 9th March 2008, the Group Internal [A]udit never

heard from or saw Herve Jaubert again." *Id.* Helen Jaubert, Jaubert's wife, testified that in

March 2008 she bought a full-length extra-large burka for Jaubert to "don for his escape."[8]

Helen Jaubert Aff. ¶ 6.

**D.     Facts Relevant to Jaubert's Defamation Claim**

On August 10, 2009, the Washington Post ran an article by Andrew Higgins titled "As

Dubai's Glitter Fades Foreigners See Dark Side." (D.E. No. 111-14.) The subheading read,

"More Jailings, Prosecutions Follow Downturn." *Id.* The article dealt with the rise of arrests and

prosecutions of expatriate businessmen in Dubai. *Id.* Jaubert was a focus of the piece, which

opened with, "Herve Jaubert, a French spy who left espionage to make leisure submarines for the

wealthy, was riding high." *Id.* It closed with an exciting story of Jaubert's exit from Dubai,

which involved sabotaging a patrol boat. *Id.* The article states that Jaubert attributes his

prosecution to "pressure on Dubai World to rein in some of the wilder investment projects

launched by Sultan Ahmed bin Sulayem, the company's chairman." *Id.* It quotes Jaubert as

saying, ""It was a palace struggle over money." *Id.* The sentence at issue in this case followed

shortly thereafter: "Dubai World's internal audit chief, Abdul Qadar Obaid Ali, said Jaubert and

his submarine venture ran into trouble for other reasons: His submarines didn't work, and

---

[8] The remainder of Helen Jaubert's affidavit does not appear to be based on personal
knowledge.

auditors uncovered evidence of fraud involving overbilling for equipment purchases." *Id.*

Ali testified that he told Mr. Higgins that the submarines did not work and that auditors uncovered evidence of fraud involving overbilling for equipment purchases. Ali Dep. 13. Ali testified that the statement was true. Ali Dep. 13, 16. He specified that he was referring to the ten percent added onto Seahorse purchases and to the fact that Seahorse charged as much as 135% over the original invoices for some purchases. Ali Dep. 16. He stated he had firsthand knowledge regarding the 10%, but he was relying on experts to tell him that the submarines did not work. Ali Dep. 57, 59.

Jaubert has written a book, *Escape from Dubai*, which is publicized on Jaubert's website as his "true life story." The book presents a negative view of both the Emirate of Dubai and of Dubai World. He accuses members of the Plaintiff Corporations of being "nefarious Emiratis" and accuses them of holding him hostage and engaging in extortion. Jaubert's website provides visitors with a way to contact him.

## II. Standard of Review

A motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). By its very terms, this standard provides that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there will be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). An

-14-

issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find

for the non-moving party. *Anderson*, 477 U.S. at 248; *Matsushita Electric Indus. Co.,* 475 U.S.

at 586. It is "material" if it might affect the outcome of the case under the governing law.

*Anderson*, 477 U.S. at 248. In addition, in considering a motion for summary judgment, the

Court is required to view the evidence in the light most favorable to the non-moving party. *Id.* at

255.

  If the moving party bears the burden of proof at trial, the moving party must establish all

essential elements of the claim or defense in order to obtain summary judgment. *See United*

*States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Counties*, 941 F. 2d 1428, 1438

(11th Cir. 1991). The moving party "'must support its motion with credible evidence . . . that

would entitle it to a directed verdict if not controverted at trial.'" *Id.* (quoting *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting)). "If the moving party makes such an

affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response,

'come[s] forward with significant, probative evidence demonstrating the existence of a triable

issue of fact.'" *Four Parcels of Real Prop. in Greene and Tuscaloosa Counties*, 941 F. 3d at 1438

(quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.3d 1472, 1477 (11th Cir. 1991)).

*See also* Fed. R. Civ. P. 56(e).

  In contrast, if the non-moving party bears the burden of proof at trial, the moving party

may obtain summary judgment simply by establishing the nonexistence of a genuine issue of

material fact as to any essential element of a non-moving party's claim or affirmative defense.

*Celotex*, 477 U.S. at 324. When the non-moving party bears the burden of proof, the moving party

does not have to "support its motion with affidavits or other similar material *negating* the

-15-

opponent's claim." *Id.* at 323 (emphasis in original). The moving party may discharge its burden

in this situation by showing the Court that "there is an absence of evidence to support the

nonmoving party's case." *Id.* at 324. Once the moving party discharges its initial burden, a non-

moving party who bears the burden of proof must "go beyond the pleadings and by [its] own

affidavits or by the 'depositions, answers to interrogatories, and admissions on file' designate

'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting Fed. R. Civ. P. 56(e)).

A non-moving party "may not rest upon the mere allegations or denials of the adverse party's

pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial."

Fed. R. Civ. P. 56(e).

### III. Analysis

**A.     Nakheel and Palm Marine's Breach of Contract Claim (Count I)**

Plaintiffs Nakheel and Palm Marine have moved for summary judgment on their breach of

contract claim, Count I of the complaint. The three contracts at issue here are the Agreement to

Purchase Goby Submarine between Nakheel (the buyer) and Seahorse (the seller), the Agreement

to Purchase Stingray Duo Submarine between Palm Marine (the buyer) and Seahorse (the seller),

and the Agreement to Purchase Discovery Submarine between Palm Marine (the buyer) and

Seahorse (the seller).[9] All three contracts specify that they are governed by California law.

Under California law, "[a] cause of action for breach of contract requires proof of the

following elements: (1) existence of the contract; (2) plaintiff's performance or excuse for

---

[9] The Court notes that Plaintiffs Nakheel and Palm Marine asserted this claim against
both Jaubert and Seahorse in the complaint. Only Seahorse is listed as a party to the contracts at
issue in this motion, however, and Plaintiffs have not produced evidence or argument to support
piercing the corporate veil. Accordingly, the Court will consider this motion for summary
judgment against Seahorse only.

nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach." *CDF Firefighters v. Maldonado*, 70 Cal. Rptr. 3d 667, 679 (Cal. App. 5th Dist. 2008).

As the moving party with the burden of proof, Plaintiffs have come forward with evidence establishing the existence of the three contracts at issue. Without directly disputing that the contracts exist, Jaubert asserts that the contracts are not authenticated. "To be admissible in support of or in opposition to a motion for summary judgment, a document must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." *Saunders v. Emory Healthcare, Inc.*, 360 Fed. Appx. 110, 113 (11th Cir. 2010). Nevertheless, "*otherwise admissible* evidence [may] be submitted in *inadmissible form* at the summary judgment stage, though at trial it must be submitted in admissible form." *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996) (emphasis in original). Courts have considered unauthenticated documents where their authenticity is not challenged or where the court finds the documents can be reduced to admissible evidence at trial. *See, e.g., Burger King Corp. v. Lumbermens Mut. Cas. Co.*, 410 F. Supp. 2d 1249, 1255 (S.D. Fla. 2005); *Simmons v. Conseco Life Ins. Co.*, 170 F. Supp. 2d 1215, 1219 (M.D. Fla. 2001).

In this case, Jaubert has not argued that the contracts are not authentic; he merely points to a failure to authenticate them. In his own deposition, however, Jaubert testified to the existence of the contracts. Jaubert Dep. 180-81. Moreover, and more to the point, during discovery Jaubert and Seahorse produced contracts identical to those provided by Nakheel and Palm Marine for the purposes of this motion. Mosely Decl. ¶¶ 3, 6-8 (D.E. No. 118-16). Under those circumstances, the Court finds that there is not any true factual dispute as to the authenticity of the contracts in

-17-

question, and the Court finds that they can be reduced to an admissible form at trial. *See Burger King Corp.*, 410 F. Supp. 2d at 1255 (considering the fact that the party objecting to the lack of authentication was the one who provided the documents in ruling that the documents would be considered on a motion for summary judgment). Accordingly, absent any evidence that the contracts do not exist or any testimony that the contracts turned over in discovery by both parties are in fact inauthentic, the Court concludes that the contracts existed.

The next requirement is evidence that Nakheel and Palm Marine performed. In this case, Jaubert testified that Nakheel and Palm Marine bought the submarines.[10] Neither Jaubert nor Seahorse has pointed to any evidence that Nakheel and Palm Marine did not buy or did not pay for the submarines. Therefore, the Plaintiffs have established that they performed.

With respect to breach, Seahorse and Jaubert assert that the Plaintiffs cannot establish breach in the absence of "Exhibit 'A'" referred to in the contracts. Neither party has been able to produce that Exhibit A for any of the three contracts. Mosely Decl. ¶ 5. The contracts in question nonetheless contain paragraphs outlining the specifications for the vessels in question, and they contain severability clauses that state that if one provision of the contract is unenforceable or invalid the remainder shall remain in effect. Notably, Plaintiffs are not alleging that individual engineering specifications are the source of the contractual breach. Rather, Plaintiffs have presented evidence that all three crafts lacked basic functionality and safety, including proper life

---

[10] Plaintiffs also point to the expert report by Maria Yip to establish payment by Nakheel and Palm Marine for the submarines. *See* (D.E. No. 87-9, at 12, 16-19.) Yip is not, however, testifying from personal knowledge to establish that Nakheel and Palm Marine paid for the submarines. Her report relies on financial documents that establish the payments; however, those documents are not attached to the report filed with the Court. If she is testifying as to the contents of those documents and not from her personal knowledge, her report runs afoul of the best evidence rule. *See* Fed. R. Evid. 1002.

-18-

support systems, in contravention of the sections of the contract describing the vessels.[11] The Court notes that Jaubert himself testified that the contracts required functional, safe submarines, and Plaintiffs have presented evidence that they did not receive submarines that were functional or safe as required by the clear terms of the contracts.

Jaubert has provided testimony, which is consistent between his deposition and affidavit, that the Goby was functional and operational when delivered. He has also produced evidence, in the form of Paul Rodig's affidavit, that the Discovery was operational when delivered.[12] Jaubert's own testimony on that matter contradicts Rodig, however. As laid out in the factual background, *supra* Sec. I, Jaubert testified that the Discovery and the Stingray Duo were not functional when he delivered it. Jaubert has not alleged in any affidavit that Discovery or Stingray Duo were operational when delivered, either. Jaubert testified that he is "an expert in the design and production of ambient pressure submersibles." Jaubert Dep. 184. Given that Jaubert was the president of the seller Seahorse, that he worked as the CEO for Exomos, and that he designed the submarines in question, no rational trier of fact could conclude that Discovery or the Stingray Duo was functional when delivered considering Jaubert's testimony to the contrary. Therefore, Plaintiffs have established that there is no issue of material fact with respect to the breach of the Stingray Duo and Discovery purchase contracts.

---

[11] The Court notes that the engineering report that establishes the most fundamental failures of the vessels is dated in 2007, long after the delivery of the vessels at issue. Nevertheless, the report lists problems that existed for the life of the vessels, such as the lack of carbon dioxide scrubbers or properly tested hull designs.

[12] The BMT report, (D.E. No. 110-4) does not establish that the Discovery worked when it was delivered to Palm Marine, which pursuant to the contract was seven months before the survey report was authored.

With respect to damages, Plaintiffs have put forth evidence that they suffered damages, namely by purchasing costly submarines that were not functional or safe as required by the contracts. As this Court has noted, *see supra* note 10, Plaintiffs have not put forth admissible evidence as to the precise amount of the damages, however. The Court will therefore grant summary judgment with respect to Seahorse's liability only. *See Tan Jay Int'l Ltd. v. Canadian Indemnity Co.*, 198 Cal. App. 3d 695, 704 (Cal. Ct. App. 1988) (ruling that there was enough evidence of damages to support a finding of liability for breach of contract and further finding that the trial court properly permitted a new trial with respect to the amount of damages only). The Court will require Plaintiffs to prove the precise amount of their damages from the breach of the purchase agreements for the Stingray Duo and the Discovery with admissible evidence in the form of testimony from persons with personal knowledge or properly authenticated documents.

**B.   Jaubert's Fraud Claim (Counterclaim Count I)[13]**

Dubai World argues that summary judgment should be granted on Jaubert's fraud claim pursuant to the statute of limitations, the statute of frauds, and on the grounds that Jaubert cannot demonstrate the prima facie case for fraud.

---

[13] The Court notes that there is some conflict between the parties regarding whether Jaubert properly pled a claim of fraud based on promises of profit sharing, rather than pleading a claim of fraud based only upon a joint venture. The Court notes that Jaubert's complaint makes it clear that, as he describes the allegedly fraudulent promises made to him, Dubai World was responsible for capitalizing the submarine-building venture. *See* Counterclaim ¶¶ 107, 109, 115. Accordingly, regardless of how Jaubert may have characterized the promises, under a liberal pleading standard, he alleged facts sufficient to support a claim for fraud based on an agreement to share profits but not losses. If such an arrangement is not legally recognizable as a joint venture or a partnership under Dubai law, that fact may go to the reasonableness of Jaubert's reliance rather than to whether the claim was pled at all.

1.    Statute of Limitations

The statute of limitations on fraud claims in Florida is four years. Fla. Stat. § 95.11(3)(j). The statute begins to run "from the time the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence." Fla. Stat. § 95.031(2)(a). The promises that Jaubert asserts induced him to move to Dubai primarily occurred between February and June 2004. Jaubert's employment contract, however, provided that details would be provided separately with regard to profit-sharing arrangements, and a January 2005 email from Kazim also informed Jaubert he would receive 20% of net profits. A November 2005 memorandum to Exomos discussed negotiation points for profit sharing. Not until August 2006 did Jaubert express any skepticism regarding whether Dubai World would engage in profit sharing, when he wrote an email wanting the profit sharing memorialized in case of future "'surprises.'" A reasonable trier of fact could find that Jaubert did not discover or could not have discovered the facts giving rise to his claim until August 2006. If the statute of limitations began to run in August 2006, then Jaubert's claim is not barred. Therefore, summary judgment on this claim is not warranted pursuant to the statute of limitations.

2.    Statute of Frauds

Florida's statute of frauds provides as follows:

> No action shall be brought . . . upon any agreement that is not to be performed within the space of 1 year from the making thereof . . . unless the agreement or promise upon which such action shall be brought, or some note or memorandum thereof shall be in writing and signed by the party to be charged therewith or by some other person by her or him thereunto lawfully authorized.

Fla. Stat. § 725.01. "Because the Statute bars any claim which requires as its gravamen, proof of a promise or agreement not reduced to writing, there is no distinction between an action *ex*

-21-

*contractu* and an action *ex delicto* in this regard." *Ferrell Law, P.A. v. Crescent Miami Center, LLC*, 313 Fed. Appx. 182, 185 (11th Cir. 2008) (internal punctuation and quotations omitted). Therefore, "[t]he Florida rule is that the statute of frauds may not be avoided by a suit for fraud based on oral representations." *Id.* (quoting *Ostman v. Lawn*, 305 So.2d 871, 873 (Fla. 3d DCA 1974) and *Eclipse Med., Inc. v. Am. Hydro-Surgical Instruments, Inc.*, 262 F. Supp. 2d 1334, 1345 (S.D. Fla. 1999)).

The representations that form the basis of Jaubert's fraud claim are representations that Jaubert would have a joint venture partnership interest or a share[14] of the profits in a submarine building venture. It is undisputed that these alleged representations covered, at the least, the five-year span of Jaubert's employment contract and possibly the life of the venture. The question before the Court, then, is whether the representations were put in a writing signed by a Dubai World representative.

In Florida, signed emails meet the writing requirement of the statute of frauds. *U.S. Distributors, Inc. v. Block*, No. 09-21635-CIV, 2009 WL 3295099, at *5 (S.D. Fla. Oct. 13, 2009) (citing Fla. Stat. § 668.004); *see also Kolski v. Kolski*, 731 So.2d 169, 171 (Fla. 3d DCA 1999) ("[t]o satisfy the statute, a note or memorandum may take almost any possible form"); *Heffernan v. Keith*, 127 So.2d 903, 904 (Fla. 3d DCA 1961) (finding that a telegram constituted a note or memorandum confirming a prior agreement). With respect to the 2004 emails from Miller, they contained a great deal of speculation and enthusiasm combined with words like "might" and "if." The only assertion of fact was that the Sultan was interested in a joint venture and was capable of

---

[14] The Court notes that the size of this share varies depending on the alleged misrepresentation to which Jaubert refers. As discussed below, only the 20% share is memorialized in a signed writing, however.

funding it.  Miller did not sign writings with any promises in them.  Even in Jaubert's pleadings, Jaubert alleges that the promises and statements of fact occurred orally during meetings in Dubai and Florida, and in his declaration, he does not ties the promises made to discussions as much as emails.  Counterclaim ¶¶ 103, 107, 109; Jaubert 2d Aff. ¶ 2.  Similarly, the memorandum on executive compensation that discusses negotiating points does not contain any promises whatsoever and it explicitly refrains from stating an opinion on whether Jaubert is entitled to a percentage of profits at all.

In January 2005, however, Kazim represented to Jaubert that he would get a 20% share of net profits from Palm Marine in a signed email.  Although it could be construed as a mere offer rather than an agreement, construing it in the light most favorable to the nonmoving party requires the Court to read the email as memorializing terms already agreed to during the referenced meeting.  It therefore meets the requirement for a signed writing.  The Court finds that Kazim's reference to an agreement regarding 20% of profit sharing prevents summary judgment from being granted on the entirety of Jaubert's fraud claim pursuant to the Statute of Frauds.

The Court notes, however, that Kazim's promise alone meets the writing requirement. None of the other alleged promises underlying the fraud claim are memorialized in any writing. With respect to those other allegedly fraudulent promises relating to Jaubert's employment, summary judgment is appropriate.

    3.    <u>Prima Facie Fraud</u>

In Florida, fraud requires "(1) a false statement concerning a material fact; (2) knowledge by the person making the statement that the representation is false; (3) the intent by the person making the statement that the representation will induce another to act on it; and (4) reliance on

-23-

the representation to the injury of the other party." *Lance v. Wade*, 457 So.2d 1008, 1011 (Fla. 1984). Dubai World asserts that Jaubert cannot create an issue of fact with respect to the prima facie case for fraud.

With respect to a false statement concerning a material fact, Jaubert acknowledges that the statements at issue in this case are agreements to do something in the future, namely to pay Jaubert a percentage of future profits or to execute an employment contract entitling him to the same. In most cases, "[a] promise of future action . . . is not false when made." *Schubot v. McDonalds Corp.*, 757 F. Supp. 1351, 1357 (S.D. Fla. 1990) (internal quotation omitted). In order to have a cause of action for fraud based on a promise to perform in the future, Jaubert must show that at the time the statement was made, it was made without any intention of performing it or with the positive intent not to perform it. *Bernard Marko & Assocs. v. Steele*, 230 So. 2d 42, 44 (Fla. 3d DCA 1970); *Alexander/Davis Properties, Inc. v. Graham*, 397 So.2d 699, 706 (Fla. 4th DCA 1981). In this case, Jaubert has not come forward with any evidence showing that Dubai World had no intention of performing at the time they made the statement. To the contrary, the evidence shows that in November 2005, well after Kazim's email, Dubai World paid two attorneys to draft a detailed memorandum addressing not whether they had to pay a percentage of the profits, but rather what issues they should consider in drafting such an agreement. Dubai World therefore paid the attorneys to help them give Jaubert a percentage of net profits. In the absence of any evidence to create a dispute of fact on this issue, Dubai World is entitled to summary judgment on Jaubert's remaining fraud claim.

## C.    Jaubert's Abuse of Process Claim (Counterclaim Count II)

"A cause of action for abuse of process requires proof that: (1) the defendant made an

-24-

illegal, improper, or perverted use of process; (2) the defendant had an ulterior motive or purpose

in exercising the illegal, improper, or perverted process; and (3) the plaintiff was injured as a

result of defendant's action." *Hardick v. Homol*, 795 So.2d 1107, 1111 n. 2 (Fla. 5th DCA 2001)

(citing *Thomson McKinnon Securities, Inc. v. Light*, 534 So.2d 757, 760 (Fla. 3d DCA 1988);

*Della-Donna v. Nova Univ., Inc.*, 512 So.2d 1051 (Fla. 4th DCA 1987)).[15] Courts in Florida have

made it clear, however, that an abuse of process claim, as opposed to a malicious prosecution

claim, requires more than the issuance of process for an improper motive. *McMurray v. U-Haul*

*Co., Inc.*, 425 So.2d 1208, 1209-10 (Fla. 4th DCA 1983); *Blue v. Weinstein*, 381 So.2d 308, 310

(Fla. 3d DCA 1980). Instead, a claimant must allege "an act which constituted misuse of the

process after it was issued." *McMurray*, 425 So.2d at 1209. "Ulterior motive alone is

insufficient; there is no abuse of process where it is confined to its regular and legitimate function

in relation to the cause of action in the complaint." *Id.* Indeed, "[t]here must be a use of the

process for an immediate purpose other than that for which it was designed." *Scozari v. Barone*,

546 So.2d 750, 751 (Fla. 3d DCA 1989). "There is no abuse of process, however, when the

process is used to accomplish the result for which it was created, regardless of an incidental or

concurrent motive of spite or ulterior purpose." *Id.*

     The Court will first address Jaubert's contention that placing a lien on his home

constituted abuse of process. On the subject of seeking a lien, the court in *Scozari* wrote:

> [The defendant] employed the action for the writ at least in part as a bargaining chip. If
> there was a reasonable basis in law and fact to initiate the judicial proceedings, then these
> processes were justified even though they may have served some other collateral purpose.
> However, if there was no reasonable basis in law and fact to bring the action to impress a

---

[15] For the purposes of the instant motion, both parties have applied Florida law to this claim.

lien on property, and this was done without any reasonable justification under the law and to force or compel the appellant to resolve some custody dispute, induce the appellant to pay money, or tie up the appellant's property, then there has been an abuse of process.

546 So.2d at 752. In this case, there is no evidence that the lien in question constituted any type of judicial proceeding at all, that it had any legal effect sufficient to give rise to an abuse of process claim, or that it lacked a reasonable basis in law and fact.

The Court will next address the April 2007 process involving the bullets. Even if Dubai World initiated the judicial proceedings by calling the Dubai police out of some wrongful motive, that does not constitute abuse of process. Jaubert must show act constituting misuse after process was issued. He has not tied threats issued by the police to Dubai World. He has not even alleged that Ali's threats regarding money owed were tied to the ongoing process with the bullets.

Jaubert has produced some evidence, however, that Dubai World either took steps to delay the release of his passport by the police[16] or held his passport themselves long enough for Jaubert's planned visit to the United States to be canceled. Specifically, Jaubert has produced an email from a Nakheel employee attributing Jaubert's inability to get his passport back to Ali and the internal auditing department of Dubai World. The email does not constitute the overwhelming weight of evidence in this case, and may or may not be reduced to an admissible form at trial, but it is sufficient to produce a dispute of material fact. Similarly, Jaubert alleges that Ali threatened him with imprisonment if he did not sign a private settlement document agreeing that he owed

---

[16] A claim based upon such a delay will not necessarily implicate the Act of State Doctrine. The delay could be obtained through lawful means. Regardless, however, it does not require a finding that a foreign sovereign's act was invalid. *See W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp., Int'l*, 493 U.S. 400, 401 (1990) (holding that a "cause of action that does not rest upon the asserted invalidity of an official act of a foreign sovereign, but that does require imputing to foreign officials an unlawful motivation (the obtaining of bribes) in the performance of such an official act" is not covered by the act of state doctrine).

-26-

and would pay back funds to Dubai World. Although this evidence is contested elsewhere in the record, it is sufficient to create a dispute of fact. Therefore, the Court finds that summary judgment should be denied on Jaubert's abuse of process claim.

**D.      Jaubert's Defamation Claim (Counterclaim Count III)**

The prima facie case for defamation is "(1) the defendant published a false statement (2) about the plaintiff (3) to a third party and (4) that the falsity of the statement caused injury to the plaintiff." *Valencia v. Citibank Int'l*, 728 So.2d 330, 330 (Fla. 3d DCA 1999). In addition, "[i]f the injured party is a public figure or official and the defamatory material involves issues of legitimate public concern, the plaintiff must prove that the defendant acted with actual malice to establish liability." *Silvester v. Am. Broadcasting Co., Inc.*, 839 F.2d 1491, 1493 (11th Cir. 1988) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)). For purposes of liability, injury is presumed where the statement maligns the claimant's "professional competence and fitness to engage in his profession." *Leavitt v. Cole*, 291 F. Supp. 2d 1338, 1346 (M.D. Fla. 2003).

Dubai World asserts that Jaubert is limited purpose public figure and that Jaubert has not met his resultant burden of showing actual malice by clear and convincing evidence. Dubai World also asserts that common-law privileges of self-defense, fair comment, and accurate reflection of public audit all mandate summary judgment.

1.      Limited Purpose Public Figure

Limited purpose public figures are "public figures [who] have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Silvester*, 839 F.2d at 1494 (quotation omitted). Under the appropriate analysis from *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287 (D.C. Cir.1980), the Court must "(1)

-27-

isolate the public controversy, (2) examine the plaintiff's involvement in the controversy, and (3) determine whether the alleged defamation was germane to the plaintiff's participation in the controversy." *Silvester*, 839 F.2d at 1494  (internal punctuation omitted).

"Under the first prong of the *Waldbaum* test, a public controversy must be more than merely newsworthy." *Id.* " If it is evident that resolution of the controversy will affect people who do not directly participate in it, the controversy is more than merely newsworthy and is of legitimate public concern." *Id.* at 1494-95. "If the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy." *Id.* at 1495 (quoting *Waldbaum*, 627 F.2d at 1297). The issues in this case involve corporate fraud, specifically at Exomos and Dubai World, and, considering the larger context of the Washington Post article, whether or not foreigners are safe in Dubai, particularly with regard to whether Dubai is fabricating reasons to arrest foreign businessmen as economic scapegoats. The statement by Ali pertained to both issues, in that Ali asserted that fraud and overbilling had taken place and by doing so he offered reassurance to would-be travelers who were frightened or concerned by Jaubert's version of events. The wider issue of the safety of foreigners in Dubai, particularly those who go there to work, has foreseeable and substantial ramifications for expatriates and potential expatriate workers, investors, and the economy of Dubai and the rest of the United Arab Emirate. The Washington Post article itself uses information from Jaubert and Ali, as well as other sources, to draw a contrast between the image of Dubai as a glamorous wealthy business center and the image of Dubai as a place where foreign workers are exploited and endangered due to personal determinations of sheiks. A perception that issues such as a "palace struggle over money" could subject foreigners employed in Dubai to spurious criminal charges, imprisonment,

-28-

and torture[17] could potentially, depending on the accuracy of that perception, protect people or wreak needless economic damage.  The wider impact of this issue therefore fulfils the first prong.

"To fulfill the second prong, the plaintiff either (1) must purposely try to influence the outcome of the public controversy, or (2) could realistically have been expected, because of his position in the controversy, to have an impact on its resolution." *Silvester*, 839 F.2d at 1496.  It is undisputed that Jaubert has either purposefully tried to influence the outcome of the public controversy or impacted its resolution by virtue of giving interviews and publishing his book, *Escape from Dubai*.  Jaubert has unambiguously publicly asserted that the charges against him were falsified and that "nefarious Emiratis" in Dubai subjected him to threats and extortion.

Finally, it is undisputed that the alleged defamatory material was germane to Jaubert's participation in the controversy.  Indeed, it is apparent that the reporter in the article solicited the defamatory quote by seeking a response to Jaubert's assertions on the subject.  Accordingly, Jaubert "must present clear and convincing evidence that [Dubai World] acted with actual malice to defeat [its] summary judgment motion." *Id.* at 1498.

To prove actual malice, Jaubert must show that through Ali, Dubai World acted "with knowledge that [the statement] was false or with reckless disregard of whether it was false or not." *Id.* (quoting *New York Times Co. v. Sullivan*, 376 U.S. at 279-80).  "The determination of whether defendants acted with reckless disregard is subjective and requires the plaintiff to show that 'the defendant in fact entertained serious doubts as to the truth of his publication.'" *Id.*

---

[17] The Court notes that Dubai World submitted an expert report from Yazan Saoudi, an attorney with Al Tamimi & Company, a United Arab Emirates ("UAE") law firm, on law in the UAE.  (D.E. No. 89-8.)  The report explains that the UAE is a federation of seven Emirates of which Dubai is a member Emirate, similar to a United States state.  *Id.*  The report states that torture and the threat of torture are illegal in the UAE.  *Id.*

(quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).  In the instant case, Jaubert has

pointed to evidence that creates an issue of fact regarding whether the statement was false, but he

has not pointed to evidence creating an issue of fact about whether Ali knew it was false.  Ali

attributed his statement to his own knowledge regarding the results of Dubai World audits and to

Dubai World's engineer's reports regarding the submarines.  Ali's testimony shows that he

believed his statements to be true.  Jaubert has not pointed to any evidence that calls that evidence

into question or creates a dispute of material fact with regard to actual malice.  Accordingly,

summary judgment is warranted on the defamation claim.  It is hereby:

     **ORDERED and ADJUDGED** that

     1.  Plaintiff Nakheel and Palm Marine's Motion for Partial Summary Judgment for Breach

of Contract (Count I) **(D.E. No. 87)** is **GRANTED IN PART** and **DENIED IN PART**.  It is

GRANTED as to liability for the breach of the Agreement to Purchase Stingray Duo Submarine

and the Agreement to Purchase Discovery Submarine.  The motion is DENIED in all other

respects.  The parties may submit admissible evidence as to damages for this claim at trial.

     2.  Plaintiff Dubai World Corporation's Motion for Summary Judgment on Defendant's

Counterclaims **(D.E. No. 88)** is **GRANTED IN PART** and **DENIED IN PART**.  It is

GRANTED with respect to Jaubert's fraud claim (Counterclaim Claim I) and his defamation

claim (Counterclaim Claim III).  It is DENIED in all other respects.

     DONE AND ORDERED in Chambers at Miami, Florida, February 9, 2011.

JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge Lynch
All Counsel of Record