**113**

1  MR. HESS: Can you let them know we're
2  ready.
3      VIDEOGRAPHER: We are now back on media unit
4  number 2. The time is 11:11 a.m.
5  BY MR. HESS:
6  Q. Mr. Bin Sulayem, we've been off the record
7  for approximately --
8      How long have we been off the record, court
9  reporter?
10     COURT REPORTER: We went off at 11:05 and
11 it's now 11:11.
12 BY MR. HESS:
13 Q. You've had a bit more time to think about
14 and contemplate these documents?
15 A. No.
16 Q. No?
17 A. No.
18 Q. I think I was asking you about your
19 characterization of shipping charges. And you would
20 agree that on none of the four documents does the word
21 "shipping charge" or words "shipping charge" appear,
22 correct?
23 A. No. But usually handling, service/handling
24 usually means also shipping and insurance and all.
25     And I've seen it because I'm in the port

(Coll.)

**114**

1  business. I've seen these words and it's always
2  handling. Handling in a port, it could be packaging,
3  it could be the crane carrying, putting it in a truck,
4  taking it, it could be handling.
5  Q. And on the first page of Exhibit 2, you have
6  that in front of you?
7  A. Exhibit 2, yes.
8  Q. Service and handling charges of $11,900,
9  correct?
10 A. There is 11,000, yes. Yes.
11 Q. On the first page of Exhibit 3, service and
12 handling charges of $11,165.
13 A. Yes.
14 Q. On the second page of Exhibit 3, service and
15 handling charges of $9,730.
16 A. Yes.
17 Q. And the second page of Exhibit 2, service
18 and handling charges of $6,120, correct?
19 A. Yes.
20 Q. All approved by you?
21 A. All those invoices, yes, were approved by
22 me.
23 Q. The shipping, the service and handling
24 charges -- I'm sorry, withdraw that.
25     The service and handling charges on each of

**115**

1  those four documents --
2  A. Yes.
3  Q. -- were approved by you?
4  A. I approved the total amount including that.
5      Now, this is an approval to spend. And we
6  have so many documents that we approve to spend,
7  sometimes it gets spent and sometimes it doesn't get
8  spent.
9      The minute I sign this, that doesn't mean
10 it's going to be spent. There's a process of spending
11 it. And this means it's approved to spend the money,
12 but how they going to spend it and what process, that
13 is to the concerned party, finance and purchase people.
14 Q. I'm asking a very simple question. What I'm
15 asking you is: By signing this, these documents, these
16 four documents --
17 A. Yes.
18 Q. -- you approved, that's the language that's
19 on the documents, correct?
20 A. Yes.
21 Q. You approved the service and handling
22 charges on each one of those documents.
23 A. I approved it, yes.
24     (Sulayem Deposition Exhibit 4 was marked for
25 identification.)

**116**

1  BY MR. HESS:
2  Q. Mr. Bin Sulayem, if you could review that
3  what's been marked as Exhibit 4.
4  A. Yes.
5      Yes.
6  Q. Your signature appears on that document
7  also, correct?
8  A. Yes.
9  Q. Do you have an understanding what this
10 document is? I'll withdraw that question.
11     It's a capital expenditure proposal,
12 correct, that you signed off on?
13 A. Yes.
14 Q. It's regarding the development of the
15 Intruder?
16 A. Yes.
17 Q. What is the Intruder?
18 A. I don't remember which one is Intruder.
19 Q. Okay. At the time that you signed this
20 document did you know what the Intruder was?
21 A. I'm sure I did, but now I don't remember.
22     (Sulayem Deposition Exhibit 5 was marked for
23 identification.)
24 BY MR. HESS:
25 Q. Mr. Bin Sulayem, the court reporter has

30 (Pages 117 to 120)

Page 117

```
 1   given you what's been marked as Exhibit 5.
 2       A.  Yes.
 3       Q.  Have you had an opportunity to review that?
 4       A.  Yes.
 5       Q.  Now, by signing that document you are giving
 6   your approval to what that document contains, correct?
 7       A.  Yes.
 8       Q.  And at the time you were fully advised and
 9   aware of what you were reviewing and what the -- what
10   was contemplated by the document?
11       A.  At that time, yes.
12       Q.  Today do you understand the --
13       A.  I don't remember. I think it is a design.
14   I mean, here, for example, in Exhibit 5, construction
15   testing of single passenger prototype submarine. It
16   is, of course, one of the submarines, I just don't know
17   which one it is.
18           (Sulayem Deposition Exhibit 6 was marked for
19   identification.)
20   BY MR. HESS:
21       Q.  You're being shown what -- the court
22   reporter has handed you what's been marked as Exhibit
23   6. Would you please take your time to look at that and
24   let me know when you've had a chance to review it.
25       A.  There must be an inventory list, which isn't
```

Page 118

```
 1   here, but...
 2       Q.  But you executed that, you signed that
 3   document also, correct?
 4       A.  I signed it, yes.
 5       Q.  And by signing that document you approved
 6   that document, correct?
 7       A.  Yes.
 8           (Sulayem Deposition Exhibit 7 was marked for
 9   identification.)
10   BY MR. HESS:
11       Q.  If you would review that one also.
12           MR. URQUHART: Do you have like a whole mess
13   of these?
14           MR. HESS: I do.
15           MR. URQUHART: Is there any chance like at
16   lunch break you could put them together and
17   we'll stipulate to the fact that he signed them
18   and approved them?
19           MR. HESS: I may want to talk about each --
20   well, I don't mind taking a lunch break and
21   marking them and just wheeling them through.
22           MR. URQUHART: Well, right. But, I mean, if
23   the questions are going to be the same for each
24   one.
25           MR. HESS: No, they're not going to be the
```

Page 119

```
 1   same.
 2           MR. URQUHART: All right.
 3           THE WITNESS: Yes.
 4   BY MR. HESS:
 5       Q.  So you executed that document?
 6       A.  I approved this.
 7       Q.  And you approved it, correct?
 8           Did you understand what you were approving
 9   at the time you executed the document?
10       A.  Yes. If you want me to go through them.
11   This one, for example, says we're going to spend
12   650,000 and projected value would be 4 to 5 million
13   dollars.
14           So usually they show in these documents that
15   by spending this, you're going to save for that, so
16   this should be -- and you can see clearly, in dirhams,
17   you're going to spend 2.5 or 2.9, 2.9, I guess and
18   you're going to make 7 million.
19           So I look at these figures myself and I say,
20   oh, I'm going to spend this much and I'm going to make
21   that much, the company is good. I have always done
22   that.
23       Q.  What is your understanding of the item 10 in
24   that document?
25       A.  This is approved through Seahorse. I can't
```

Page 120

```
 1   read the whole thing.
 2       Q.  But your understanding is that the -- well,
 3   it says, "All major systems are going to be procured
 4   through Seahorse Submarines," correct?
 5       A.  That's what it says here.
 6       Q.  And you approved that, correct?
 7       A.  I approved the amount. The detail I didn't
 8   know.
 9       Q.  So is it your testimony today that when you
10   sign these documents you're not really looking at the
11   details, you're just approving the amounts?
12       A.  I approve the amount based on the signature
13   of the people who signed it who sent it to me. I don't
14   go in detail and say, let me read this, because I sign
15   many documents, if you can imagine, I would not leave
16   my office, I need more than 24 hours to read every
17   document and say, oh, is this -- George, can you look
18   at that? I would not. I only have 24 hours. It
19   wouldn't be enough for that.
20           There are other people who their job is to
21   go through the proper requirement and documentation
22   after I sign. So it doesn't mean if I sign it it is a
23   go-ahead, they need to look at it. But it's an
24   approval at least that they can go ahead.
25       Q.  You were aware when you signed it that the
```

Page 121

1  document said that all major systems were going to be
2  procured through Seahorse Submarines, correct?
3     A.  I'm not aware of that, no.
4     Q.  You're not aware of that?
5     A.  No. No.
6     Q.  Whose other signature appears on that
7  document as project manager?
8     A.  Sanil. Sanil is a guy who passed away
9  actually. He used to work for Jaubert.
10    Q.  And what did he do?
11    A.  I think project manager. He was working
12 with Jaubert.
13    Q.  So is your answer the same as your answer to
14 my questions regarding item 10 or in item 12 it says
15 that, "The projected selling value of the Intruder is 4
16 to 5 million with the latest technology upgrade. Palm
17 Marine intends to build 100 Intruder in the next five
18 years and expect a significant profit."
19       Again, you ignored that when you signed it?
20    A.  I looked at here, when they bring this to me
21 I said, oh, approve this 2.9 and we're going to make --
22 we're going to sell it for this. And when I looked at
23 these figures I said, Sanil signed it, the people
24 signed it. I have no issue.
25       Now they go and they do the process.

Page 122

1  Whether they will eventually spend it -- if you tell
2  me, have they spent this? Are you sure they spent
3  this? I have no idea. Because I sign many of these
4  documents. It goes through, you know, all kind of
5  process, some get approved, some of them don't.
6     Q.  Why even have your signature on the
7  document?
8     A.  Because to allocate funds they have to get
9  my signature. But once the funds are allocated that
10 doesn't mean they have the right to go spend it. They
11 do their process before that.
12       I don't get involved in that process.
13    Q.  So if there were an item 14 on there and it
14 said $100,000 of these moneys will go to Mr. Sultan
15 Ahmed Bin Sulayem, you wouldn't -- you're not going to
16 notice that?
17       MR. MULLINS: Objection, form.
18       THE WITNESS: Listen, I don't speculate.
19 You know, you are speculating. You're
20 speculating.
21 BY MR. HESS:
22    Q.  I said if there was.
23       MR. MULLINS: I'm sorry.
24       THE WITNESS: I'm not going to answer
25 something "if." I'm going to answer you what is

Page 123

1  here. If it is here, I can answer you. But if
2  you --
3  BY MR. HESS:
4     Q.  So your testimony is -- and you are a
5  college-trained businessman, correct?
6     A.  What do you mean by college-trained?
7     Q.  Well, you went to college, right?
8     A.  I did.
9     Q.  In fact, where did you go to school for
10 business?
11    A.  Temple University, Philadelphia.
12    Q.  Anywhere else?
13    A.  No.
14    Q.  And The Wharton School of Business?
15    A.  No, I haven't been there.
16    Q.  So it's your practice to execute documents
17 just based upon a number that's provided?
18       MR. URQUHART: Objection, vague and
19 ambiguous.
20 BY MR. HESS:
21    Q.  To approve that number?
22    A.  I approve a number knowing that always we
23 have a process after that.
24       This is not a check. If somebody takes a
25 document like that and goes to the bank and said, I

Page 124

1  have approval, it will not pass. Because to spend it
2  they have to write checks. And the person writes the
3  checks will do the process. I don't write the checks.
4        MR. HESS: This is 8, please.
5        (Sulayem Deposition Exhibit 8 was marked for
6  identification.)
7        THE WITNESS: Yes.
8  BY MR. HESS:
9     Q.  Now, of course, you signed that document
10 also, correct?
11    A.  Yes.
12    Q.  And you approved the 50 percent advance
13 payment?
14    A.  I signed the document, okay, which is
15 basically for that amount, yes.
16    Q.  And, again, your testimony is the same as
17 your others in that regard is that you're just -- what
18 are you approving? What is your understanding of what
19 you're approving in this document?
20    A.  Allocation of fund to invest.
21    Q.  How much money?
22    A.  Here it says the amount is $42,000. And,
23 basically, I looked that the figure and I see the
24 signature and it goes to the process.
25       Now, the process is somebody else's, because

### Page 125

1  those who write the checks will have their process.
2      Q.  You do agree that in the remarks section it
3  says, "50 percent advance payment towards development
4  design, patent and construction of passenger prototype
5  Palm Stingray Duo wet submarines," correct?
6      A.  I see that.
7      Q.  And then it also goes on to say, "and U.S.
8  dollars 25,000 towards 50 percent ownership and
9  worldwide patent rights as per attached" -- what does
10  M/S mean to you?
11     A.  I have to guess. Seahorse Submarines, I
12  guess.
13     Q.  So now you understand that it's for a 50
14  percent advanced payment, correct?
15     A.  Now from this document, yes.
16     Q.  But before when you signed it back in -- do
17  you know when you signed this document?
18     A.  When I signed it, as I tell you, and I will
19  also tell you again, this is a request to pay. And
20  then there's a process for it.
21         (Sulayem Deposition Exhibit 9 was marked for
22  identification.)
23         THE WITNESS: Yes.
24  BY MR. HESS:
25     Q.  You signed and approved that document also?

### Page 126

1      A.  That's right.
2      Q.  What was your understanding of what you were
3  approving in that document?
4      A.  It's a request to spend $85,000.
5      Q.  And now when you look at it, is it anything
6  more specific in there?
7      A.  There are many specific there in it.
8      Q.  So you never looked at the fact that in item
9  10 it was Seahorse Submarines International, Inc. that
10  was the supplier, proposed supplier?
11     A.  No.
12     Q.  Now, so far the documents that I've shown
13  you, these exhibits, without your signature, without
14  your approval of these documents that the capital
15  expenditure proposal can go no further, correct?
16     A.  It will not be allocated.
17     Q.  So it can go no further, won't be allocated?
18     A.  Basically by that signature they understand
19  in their budgeting that they're going to leave this
20  amount. We might spend it for this, we might, because
21  it's been approved.
22         (Sulayem Deposition Exhibit 10 was marked
23  for identification.)
24         (Cell phone interruption).
25         MR. MULLINS: 10 is Bates number 100978? Or

### Page 127

1  937? There's two Bates numbers.
2         MS. HEATHCOCK: We're old fashioned, before
3  you guys redid them.
4         MR. MULLINS: I see.
5         THE WITNESS: Yes.
6  BY MR. HESS:
7      Q.  Now, who signs before -- do you sign before
8  Ahmed Kazim --
9      A.  No.
10     Q.  -- or do you sign after?
11     A.  After.
12     Q.  And, again, you didn't care to notice any of
13  the other items other than the expenditure which was
14  requested, which was, what, 5.6 million dirham?
15     A.  Absolutely, yes.
16     Q.  Now looking at it, you understand that, you
17  read the other portions of it, correct?
18     A.  I see the other portions of it, yes.
19     Q.  And it was for the --
20     A.  Test pool.
21     Q.  Are you aware of the test pool?
22     A.  Yes.
23     Q.  And what is your awareness of the test pool?
24     A.  To test, it's in here, to test the submarine
25  for leakage and all that.

### Page 128

1      Q.  Did you know about the test pool prior to
2  today?
3      A.  No, I am aware of it before, yes.
4      Q.  Now, what is your knowledge of the -- do you
5  have an understanding of whether or not Mr. Jaubert was
6  to be -- let me withdraw that. Let me rephrase that.
7         Dubai Corporation was to pay for the
8  relocation expenses of Mr. and Mrs. Jaubert and his
9  family in traveling from Stuart and picking up from
10  Stuart and starting again in Dubai World -- in Dubai,
11  correct?
12        MR. URQUHART: Objection, vague.
13        THE WITNESS: Sorry?
14  BY MR. HESS:
15     Q.  Dubai World Corporation, in order to
16  facilitate Mr. Jaubert's beginning the enterprise in
17  Dubai to construct these submarines to build this
18  factory, Dubai World Corporation agreed to compensate
19  him for the delivery of his vehicles and his
20  possessions, correct?
21        MR. URQUHART: Objection, vague and
22  ambiguous.
23        THE WITNESS: I'm unaware of that.
24  BY MR. HESS:
25     Q.  You're not aware of that?

33 (Pages 129 to 132)

**Page 129**

1  A.  No. I am unaware of the details that he
2  might have made with them, but I'm not aware of that
3  personally.
4      But usually people who travel, who relocate,
5  they compensate them.
6  Q.  So it doesn't surprise you that he was to be
7  compensated for the delivery of his vehicles?
8      MR. URQUHART: Objection, vague and
9  ambiguous.
10     THE WITNESS: Vehicles, no.
11 BY MR. HESS:
12 Q.  It does surprise you or it doesn't?
13 A.  It does surprise me. We don't relocate
14 vehicles for people.
15 Q.  I'm going to show you what's going to be
16 marked as Composite Exhibit 11. I'm sorry, it's not a
17 composite, just one exhibit.
18     (Sulayem Deposition Exhibit 11 was marked
19 for identification.)
20 BY MR. HESS:
21 Q.  Mr. Bin Sulayem, if you would take a look at
22 what's been marked as 11.
23 A.  Yes. I see it, yes.
24 Q.  Rather than Hamed Kazim approving it, you
25 crossed out his name and you approved it, correct?

**Page 130**

1  A.  No, I didn't cross that. Maybe he wasn't
2  available in Dubai and the secretary crossed it.
3  Q.  You signed it?
4  A.  I signed it. I see my signature here.
5  However, you know --
6  Q.  Let me guess, you don't have any idea what
7  was contained in that document --
8  A.  No. No. No. I'm trying to understand,
9  because we don't usually ship people's cars for them.
10 And it could have been, again, and I don't know, I'm
11 just trying to remember and I don't have a memory,
12 could have been that he has asked for us to pay for
13 this and he will pay us back, maybe, I have no idea.
14 But this is unusual. But this is my signature.
15 Q.  So your testimony under oath today is
16 maybe -- your explanation is it's unusual, maybe he
17 asked you to ship them over --
18 A.  Maybe, maybe he has people --
19 Q.  If I could finish.
20 A.  Yes.
21 Q.  Maybe he asked you to ship them over, Dubai
22 World Corporation to ship them over so that he could
23 pay you back?
24 A.  Maybe he will reimburse them. I have no
25 idea.

**Page 131**

1  Q.  Maybe Dubai World Corporation agreed to pay
2  for the two Hummers being shipped over to Dubai, right?
3  A.  Unlikely.
4  Q.  It's more likely that you would requisition,
5  you would approve funds so that you could be paid back?
6  A.  Oh, yeah, it happens with us. People would
7  say, pay me, I will pay you.
8  Q.  Does it say that anywhere in there?
9  A.  In this one?
10 Q.  Yeah. Does it say "to be paid back" --
11 A.  No.
12 Q.  -- or to be compensated?
13 A.  No, but could be anything attached to it. I
14 have no idea what's behind it. Again, this is a
15 request. As I told you, this is not a check, it's a
16 request. When we sign it, it goes through the process.
17 Q.  Was there anything attached to it?
18 A.  I don't know.
19 Q.  So this document, though, when you signed it
20 you recognize that it was for the shipping expense of
21 containers and two Hummer vehicles?
22 A.  I don't remember the circumstances when I
23 sign it, but I did sign it.
24 Q.  Why this document would you not remember if
25 you read the particulars, but in all of the other

**Page 132**

1  countless documents you've testified that it wasn't
2  part of your duties or your abilities to review the
3  details, you were only signing off on a requisition --
4      MR. URQUHART: Objection.
5      THE WITNESS: No, no, easy. We always sign
6  requests. And I told you many time we sign
7  them. Some of them get paid, some of them
8  don't.
9  BY MR. HESS:
10 Q.  But when you signed it you knew that this
11 was for a shipping expense of containers and two Hummer
12 vehicles?
13 A.  I don't remember the detail. There must be
14 something, but this is unusual, I don't remember we
15 ever shipped for somebody any car, especially in Dubai
16 we have plenty of cars.
17 Q.  Do you ever remember hiring a person to come
18 to Dubai to develop a multi-million-dollar submarine
19 manufacturing and design facility?
20     MR. URQUHART: Objection, vague and
21 ambiguous.
22     THE WITNESS: Sorry.
23 BY MR. HESS:
24 Q.  Do you remember ever -- it's very unique
25 that Dubai brought Mr. Jaubert to Dubai to construct a

34 (Pages 133 to 136)

### Page 133

1  multi-million-dollar submarine design and construction
2  facility, correct?
3      MR. URQUHART: Objection, vague and
4  ambiguous.
5      THE WITNESS: It is what?
6  BY MR. HESS:
7   Q.  Unique.
8   A.  What is unique about it?
9   Q.  You know, it's my confusion. I thought
10  before when I was asking you, you only have one
11  manufacturing plant for submarines in Dubai, right?
12  A.  That I'm aware of, yes.
13  Q.  Well, what does unique mean to you?
14  A.  I wouldn't consider it's a unique thing that
15  you have asked a designer to go and design. There are
16  people who are asked to design an underwater hotel, it
17  never got built. It's not unique.
18  Q.  It's not unique -- so you don't construe the
19  hiring -- well, the urging of Mr. Jaubert to come to
20  Dubai --
21      (Cell phone interruption.)
22      THE WITNESS: Excuse me, I'm going to kill
23  this phone. It's off, I don't know why it's on.
24  Sorry, yes.
25      MR. HESS: Let me take a break for a couple

### Page 134

1  of minutes.
2      MR. URQUHART: Want to just grab lunch?
3      MR. HESS: That works for me.
4      VIDEOGRAPHER: Going off record at 11:41
5  a.m.
6      (A lunch recess was taken from 11:41 a.m. to
7  12:22 p.m.)
8      VIDEOGRAPHER: We are now back on media unit
9  2. The time on the record is 12:22 p.m.
10 BY MR. HESS:
11 Q.  We talked a lot about your approval of
12 requisitioning of funding, correct?
13 A.  Yes.
14 Q.  It's accurate to say that without your
15 signature on a funding requisition, it doesn't happen
16 in Dubai World, correct?
17 A.  Not necessarily. Because some of the
18 company, like DP World, for example, they approve their
19 own requisition --
20 Q.  Let me make is easier. But as far as is
21 Mr. Jaubert was concerned --
22 A.  No. As far as Exomos, if I didn't approve
23 this, then there will not be a process to pay.
24 Q.  So any moneys that Mr. Jaubert requested,
25 desired or received had to begin with your signature?

### Page 135

1   A.  Had to begin with Hamed Kazim and whoever
2  requested on the form and then it comes to me.
3   Q.  So Mr. Jaubert never had an opportunity
4  to -- he didn't have checks for the Exomos account? He
5  couldn't sign checks?
6   A.  Checks cannot be signed. Even the
7  requisite, even my signature is not have a check, it is
8  a process.
9   Q.  In fact, Exomos doesn't have a checking
10 account?
11 A.  I don't know.
12 Q.  Did you involve yourself during any period
13 of time of the Exomos business or Mr. Jaubert's tenure
14 constructing and designing submarines and other
15 vessels, did you involve yourself in any business
16 viability assessments?
17 A.  Viability, no.
18 Q.  So any of the studies that came out, that
19 wasn't something that you were involved with?
20 A.  What's your question?
21 Q.  Viability studies. I think you just
22 answered, but I want to make sure.
23 A.  No, I didn't. It comes through the group, I
24 mean, the CFO and all that.
25 Q.  We touched upon it earlier, but do you have

### Page 136

1  any knowledge or information or opinion about what
2  makes Dubai such a favorable place -- well, let me
3  withdraw that.
4      Let me start that again.
5      Back in 2004 when Dubai was encouraging
6  Mr. Jaubert to come there to build submarines --
7   A.  Yes.
8   Q.  -- was the labor force and the relative
9  cheapness of the labor force, is that something you
10 have any knowledge of? Is that something that
11 concerned you or didn't concern you or something that
12 you know of?
13 A.  Regarding this business?
14 Q.  Uh-huh.
15 A.  Obviously, I think when he came to see the
16 boat show it was enlightening for him to see boat
17 manufacturers there. I don't know really, I can't
18 recall whether labor was a main factor.
19 Q.  What I'm asking is do you --
20 A.  Yeah.
21 Q.  -- did you then, do you have any particular
22 knowledge of the labor force or the dynamics of the
23 labor force back --
24 A.  No, no. Personally?
25 Q.  Yes, personally.

**Page 137**

1  A. No.
2  Q. Do you have any information or knowledge
3  regarding the utilization of Ernst & Young in West Palm
4  Beach to review the assets of Seahorse Submarines back
5  in 2004?
6  A. Yes.
7  Q. And what was your understanding of that?
8  A. It was asked by Hamed, because he used to
9  work for Ernst & Young, so he asked them to do a
10 report.
11 Q. And what did he tell you that he asked them
12 to do?
13 A. I don't recall. I don't recall right now.
14 Q. So your only knowledge is that Ersnt & Young
15 was engaged to complete a review of the assets?
16 A. Yes.
17 Q. But you don't have any knowledge of the
18 review --
19 A. I don't recall. I mean, they must have
20 showed me something, I just don't recall it now.
21 Q. Was it also included in your knowledge that
22 they were evaluating the market value of the
23 intellectual properties and the physical assets of
24 Seahorse Submarines?
25 A. I don't recall the detail.

**Page 138**

1  Q. At some time did you know and you just don't
2  recall today?
3  A. I don't remember really to be honest with
4  you. I can't recall what value was put in details.
5  Q. Now, you would, in your relationship with
6  Mr. Miller, you would relay to Mr. Miller items that he
7  was to discuss with Mr. Jaubert, correct?
8       MR. URQUHART: Objection, vague.
9  BY MR. HESS:
10 Q. During the year 2004 --
11 A. Give me a specific for example.
12 Q. In 2004 when you were -- when Dubai World
13 Corporation was negotiating with Mr. Jaubert about the
14 purchase of submarines and then to the development of a
15 business in Dubai, you would utilize Mr. Miller as a
16 conduit for information from you to Mr. Jaubert,
17 correct?
18 A. What kind of information? Give me an
19 example, an instance that I told Jim to go and tell X
20 to Jaubert so I can recall, that knowledge.
21 Q. For instance, that -- I'll give you one.
22 That Ernst & Young was going to be completing a review
23 of assets.
24 A. So you're asking me that I told Jim Miller
25 to tell Jaubert --

**Page 139**

1  Q. No.
2  Did you understand that Jim Miller was
3  acting as a conduit of information between you and
4  Jaubert about any of the aspects of the purchase of
5  submarines or the enterprise in Dubai?
6  A. Jim Miller was involved in the beginning to
7  find Jaubert's factory and him. And then the rest
8  really stayed with Hamed, who is the finance guy who
9  did the review, I guess, with Ernst & Young.
10 Jim, in the beginning, I might ask him to
11 tell me what's going on in the factory, whether it was
12 finished, he would let me know.
13 Q. What do you mean by in the beginning?
14 A. In the first year, maybe 2004.
15 Q. But Mr. Miller continued to be involved in
16 Exomos, correct?
17 A. Yeah, then he stayed with Exomos.
18 Q. So what do you mean by in the beginning?
19 A. In the -- no, I was asking if they were
20 constructing, they were building -- like if I want to
21 go to the factory and I know Jim is always there. I
22 would call him and say, is it worth coming now to see
23 the building finished or not? And he would tell me,
24 yes, it's finished, or we just finished one, or Jaubert
25 finished one submarine or half finished and then I come

**Page 140**

1  and look at it.
2  Q. Do you have any firsthand knowledge -- let
3  me step back.
4  Do you have any information or knowledge
5  about the fire on the Golby?
6  A. No. I know it happened, but why -- I
7  understand from Jaubert it was charging and it caught
8  fire, but I don't know. I didn't see the damage or the
9  repair on it.
10 Q. When you said you understand from
11 Mr. Jaubert; Mr. Jaubert told you that it was caused by
12 the charging of the batteries?
13 A. Yes.
14 Q. And your understanding is that it
15 happened -- let me start that again.
16 The boat -- the sub didn't catch fire when
17 it was in the water, correct?
18 A. I don't know. I mean, they were charging,
19 but I have no idea.
20 Q. So you don't really have any knowledge or
21 understanding of the process of charging these
22 batteries on these subs?
23 A. No.
24 Q. Dubai World was considering utilizing these
25 shallow water sub -- these submarines, let me just say

36 (Pages 141 to 144)

### Page 141

1  submarines for now --
2  A. Yes.
3  Q. -- as a tourist facility in terms of what,
4  Atlantis at first?
5  A. Yes.
6  Q. Didn't Dubai World also have this idea that
7  they were going to build some underwater structures?
8  A. No, not Dubai World. No. There was some
9  investors who promoted an idea of building underwater
10 hotel. They wrote about it in the paper. It never
11 came really, it never materialized. And not really an
12 investment or proposal from Dubai World. There are
13 people who -- sub developers who approached us.
14 Q. What was your involvement in the contractual
15 relationship that resulted between Mr. Jaubert and
16 Dubai World or a Dubai World subsidiary?
17 A. What do you mean contractual relationship?
18 Q. Do you have any understanding or knowledge
19 of the relationship that ultimately occurred when
20 Mr. Jaubert arrived in Dubai in terms of the building
21 of submarines and the --
22 A. So what's the specific question you're
23 asking me?
24 Q. I'm asking what's your knowledge. Do you
25 know what the relationship was in terms legally,

### Page 142

1  contractually, joint venture, what the relationship
2  was --
3  A. He was working in Palm Marine or Exomos to
4  develop and build submarines.
5  Q. What's the difference between Exomos and
6  Palm Marine?
7  A. I think in the beginning it was Exomos and
8  then later on we changed it to -- we added, I think,
9  Ahmed Butti came -- remember, there was a submarine,
10 there was another company making boats called Palm
11 Marine. So when there was a decision, not by me again,
12 by Ahmed Butti that instead of Palm Marine is utilizing
13 something, some other facility where they pay rent,
14 they can come and produce it in the same place.
15 Q. Now, was Palm Marine developing and
16 producing submarines?
17 A. No, building boats.
18 Q. What did Mr. Jaubert have to do with Palm
19 Marine?
20 A. I think sharing the same premises.
21 Q. But he wasn't an operating officer, he
22 wasn't --
23 A. I don't remember really what position he had
24 with Palm Marine, I can't recall, but we can go back to
25 the records.

### Page 143

1  Q. Now, did you have any involvement in
2  encouraging Mr. Jaubert to work on the prototype subs
3  rather than operating the submarines that had been
4  purchased initially as part of that initial -- those
5  initial transactions that you've talked about?
6  MR. URQUHART: Objection, vague.
7  THE WITNESS: Can you ask me again?
8  MR. HESS: Sure.
9  BY MR. HESS:
10 Q. There were prototype submarines that were
11 being developed, correct?
12 A. Yes.
13 Q. And that was important to Dubai World,
14 wasn't it?
15 A. The whole concept was important not just the
16 prototype. There were submarines that we bought that
17 we needed to operate them and it never operated.
18 Q. Well, there was never any -- are you telling
19 me that you pressured Mr. Jaubert to operate those
20 other submarines or instructed him to operate those
21 other submarines?
22 A. We didn't pressure anybody anything.
23 Jaubert was there to develop, but a lot of the
24 prototype, in my opinion, again, I'm not a salesman,
25 people need to see working submarine before they can

### Page 144

1  buy something. And we never had any operation that was
2  ready, not that cannot be ready, but I haven't seen
3  anything ready.
4  Q. So as far as you're aware, there was no
5  submarine that was operational?
6  A. That we could take customers in, no.
7  Q. So you haven't seen the various brochures --
8  so you're not aware of any film clips or video or
9  photographs --
10 A. No, but in actual. I've seen photographs
11 and Internet and all that. But there were attempts to
12 use the submarines for trials, which I understand, I
13 haven't seen for my own eyes, I can only rely on what
14 people told me, that there were leakage, they were to
15 become dangerous for people to use, as I've been told.
16 Q. So you were told that, but you don't have
17 any independent knowledge of that?
18 A. No. But then we actually employed, again,
19 Hamed and they brought somebody who knows submarines
20 and -- who basically looked at them and they came with
21 a document that they're unsafe. Or they are
22 uncertifiable by class.
23 Q. Or or both?
24 A. Unsafe and both, and also can't be
25 certified. And, again, I'm not saying that, my people

Page 145

- DW

1  say that they have documents for it.
2    Q.  Right.  Because you're not an expert in that
3  regard, correct?
4    A.  No, I'm not.
5    Q.  And you've never been in one of these
6  submarines, correct?
7    A.  No.
8    Q.  Do you know where the -- what happened to
9  those original submarines that were transported from
10 Florida to Dubai?
11   A.  Again, last time maybe a few years ago when
12 he was there I saw them in the factory.  But I haven't
13 been to the factory since.
14   Q.  So you don't know -- you don't have any
15 understanding of the condition of those vessels or --
16   A.  No.  I have no idea.
17   Q.  Do you know how big the Exomos facility was,
18 that manufacturing facility?
19   A.  In size?
20   Q.  Uh-huh.
21   A.  I have no idea.
22   Q.  Do you have any understanding of who
23 designed the building or any of those incidentals?
24   A.  No.  It's available, all that information is
25 available, but I myself can't recall which contractor,

Page 146

- HS

1  which architect designed them.  Who designed them I
2  have no idea, but we can get --
3    Q.  But my understanding of your testimony so
4  far, and correct me if I'm wrong, it just isn't
5  really -- you're the guy on top --
6    A.  Yes.
7    Q.  -- and you rely on other people to make
8  those determinations?
9    A.  Of course, yes.
10   Q.  Now, do you have any understanding of the
11 marketability to -- market ability to purchase
12 materials in the UAE in contrast to the availability of
13 the materials outside the UAE in terms of the building
14 of submarines?
15       MR. URQUHART:  Objection, vague and
16   ambiguous.
17       THE WITNESS:  Can you ask me again?
18 BY MR. HESS:
19   Q.  Sure.
20       Do you have any -- is it within your scope
21 of understanding or knowledge the availability of
22 materials that are necessary to build submarines?
23   A.  No.
24   Q.  So you don't know -- you don't have any
25 understanding or knowledge of what materials are

Page 147

- HS

1  available in the UAE for -- and then in comparison with
2  what materials are available outside the UAE --
3    A.  Absolutely not.
4    Q.  Do you know how many employees that
5  Mr. Jaubert had working under him?
6    A.  I don't know.  I don't remember.
7    Q.  Now, you -- you socialized with Mr. Jaubert,
8  correct?
9    A.  Well, not a regular basis, but I met -- when
10 I was not busy, we would see him in the boat show.
11       We went to Djibouti, which is a
12 French-speaking place.  And we --
13   Q.  It's in Africa, correct?
14   A.  Africa.  And he went with us once, I think.
15 And then he came to my boat once.
16   Q.  What did you do in Djibouti?  What was that
17 for?  Pleasure?
18   A.  No, no, we have a port in Djibouti.  We are
19 building a -- we are constructing a port there.  And
20 it's a good diving place, so we invite him to dive with
21 us there.
22   Q.  Is that your only recollection of what you
23 did in Djibouti, the inspection of the port and the
24 diving --
25   A.  And we did diving and fishing, that's all.

Page 148

- HS

1       We were building -- we were constructing a
2  hotel.  We were constructing a port at that time.  And
3  we stayed briefly, I think, maybe a day or two maximum.
4    Q.  Now, do you have any understanding of the
5  way that Mr. Jaubert would acquire and pay for items
6  through Seahorse Submarines?
7    A.  No.
8    Q.  And is it typical in Dubai World Corp. --
9  forget about "typical."
10      Do you have any understanding or knowledge
11 regarding the process of being reimbursed for payments
12 rather than Dubai World actually buying supplies and
13 materials for these submarines?
14      MR. URQUHART:  Objection, vague and
15  ambiguous.
16      THE WITNESS:  Ask me again, please.
17 BY MR. HESS:
18   Q.  Sure.
19      Were you aware that Mr. Jaubert, in terms of
20 being able to accomplish the construction of the
21 submarines, would purchase the items first and then
22 would request that he be reimbursed for those items?
23   A.  I'm not aware of that.
24   Q.  What involvement did you have in the
25 criminal prosecution of Mr. Jaubert in Dubai?

obj.

402
403
SJ
(24-25)

38 (Pages 149 to 152)

Page 149

1  A. Criminal?
2  Q. Was there a criminal prosecution?
3  A. I'm not aware of it. I don't know. We had
4  a criminal -- I don't understand the question.
5  Q. Well, I'm asking. Are you aware of a
6  criminal prosecution of Mr. Jaubert in Dubai?
7  A. I am aware that during an audit of the
8  premises, the auditors, who is Abdul Gadar, we
9  mentioned his name, did an audit as a regular, they do
10 audit on everybody. And he told me, I have a concern
11 on bills, I have a concern on the factory and I need to
12 go and visit. And, of course, auditors, we have --
13 nobody can tell him no as an auditor. I mean --
14 Q. That's what auditors do, right?
15 A. -- I will really have -- will hang myself if
16 I told him no. If he sees a document on my desk and he
17 said, I want to take it, I can't tell him no.
18 Auditors.
19     So I said, yes, of course.
20     So he went to -- and he told me during the
21 search for document they found bullets. And one of
22 them was -- I haven't seen it, they showed me pictures,
23 this big (indicating).
24     Now, immediately he reported to the police,
25 because we have a naval base, American Naval Base less

Page 150

1  than a mile from his factory. So, naturally, he has to
2  tell the police.
3      And so there were two issues, as I
4  understand. One is they wanted to know where this --
5  how did this bullet come here and whether there's only
6  one or there's stacks. And, you know, when it comes to
7  ammunition or bullets, the security will go paranoid.
8  And the American Base, you know, anybody even passing
9  by there, he could be shot. They don't take these
10 things lightly.
11     And so he did not call me and tell me, oh,
12 can I take it to the police?
13     And when I asked him he says, Sultan, I
14 couldn't tell you, we have to do our process.
15     So, basically, there were two issues, one
16 the police want to talk to him regarding -- which he
17 called me, he was concerned. And I said to him, have
18 you done anything wrong?
19     He said, no.
20     Then I said, don't worry if you haven't done
21 anything wrong. You have to answer to them.
22     And then there was a case regarding
23 basically the bills, which they did a report on it, the
24 auditors. And the auditor found that we overpaid or
25 something and so they started to talk to Jaubert about

Page 151

1  a settlement.
2  Q. I don't mean to interrupt you, but I just
3  want to understand. The things that you've talked
4  about, you're deriving that information through other
5  people, correct?
6  A. Yes.
7  Q. You weren't involved personally?
8  A. No, no, not at all. I wasn't involved
9  personally at all.
10 Q. Okay.
11     One of the accusations is that Mr. Jaubert
12 was improperly charging 10 percent surcharges, correct?
13 10 percent handling and service charges.
14 A. Yea, I mean, this could be one of them. I
15 am not aware of the total thing.
16 Q. So you're aware that he was accused of these
17 improprieties, but you're not aware that that was one
18 of them?
19 A. I'm not aware of the detail of what they're
20 accusing him on. They said overpayment. I don't
21 remember.
22     I mean, I can get the details from my people
23 of the list of what the auditors were questioning. I
24 can't rely on my memory, to be honest with you, because
25 I am supposed to tell you the truth and I can't just

Page 152

1  say anything without verifying it.
2  Q. And that honesty is appreciated.
3      Now, you know, though, that they're accusing
4  Mr. -- Dubai World Corporation is accusing Mr. Jaubert
5  of, at least in one part of their accusations, of
6  unlawfully and improperly charging 10 percent overages?
7      MR. URQUHART: I would just instruct you not
8  to answer anything that you learned from either
9  Mr. Dalton or me or legal staff.
10     If you have some kind of an independent
11 knowledge, please go ahead and answer.
12     THE WITNESS: Let me tell you. The
13 accusation and the case is done not only by
14 Dubai World, but actually instigated or started,
15 initiated by the auditors. Because the auditors
16 have the responsibility of, if they find
17 something wrong with the accounts, they take the
18 steps to recover that.
19     Part of taking the steps is this case. So
20 this is in them taking documentation.
21     And I believe you are meeting the auditor, I
22 think. I don't know. And you can ask him the
23 details of that really. And he will have a
24 proper answer for you.
25 BY MR. HESS:

Page 153

1  Q. So is your -- my question was: You are
2  aware that one of the accusations is is that
3  Mr. Jaubert improperly charged the 10 percent service
4  and handling charges.
5  A. I'm not aware really of the total thing
6  against him. If you say this is one of them, I'll take
7  your word, but I haven't seen the document that been
8  submitted, to be honest with you.
9  Q. I don't want you to take my word.
10 A. I haven't seen it. And my auditor will have
11 actually the list of things that they're accusing him
12 of mishandling. They have it.
13 Q. So your testimony is is that you just don't
14 know that one of the items that they're accusing
15 Mr. Jaubert of --
16 A. I don't know. It could --
17 Q. -- is this 10 percent --
18 A. Yeah --
19     MR. MULLINS: Whoa, whoa. Question and
20 answer.
21     THE WITNESS: I'm sorry, it's me.
22 BY MR. HESS:
23 Q. I'm just trying to get a yes or no.
24     Right now I know there's a bunch of things,
25 but I'm just asking you about one thing. And the only

Page 154

1  thing I'm asking you about is this 10 percent charge.
2      You're not aware that Dubai World
3  Corporation is accusing -- is saying that that was
4  wrong that he received the 10 percent charges?
5  A. It could be one of them. I haven't seen
6  the...
7  Q. Why is it that you haven't been required
8  to -- have you been required to account for your
9  approving those 10 percent charges?
10     MR. URQUHART: Objection, lack of
11 foundation.
12     THE WITNESS: By whom?
13     MR. URQUHART: It's vague and ambiguous.
14 BY MR. HESS:
15 Q. By anyone.
16 A. I approved the bills, then they do a
17 process, as I told you. And they could be -- it could
18 happen one day actually somebody puts a request for
19 payment, falsifies completely and I would sign it,
20 trusting the people who requested it.
21     But in the process, they figure it out and
22 they will stop it. And they come to me, sorry, we
23 stopped it, it was wrong. They do that. So the
24 process they do, I don't really.
25 Q. Yeah, I'm not asking about falsification,

Page 155

1  because I haven't asked you about that, correct?
2      You're not aware that Mr. Jaubert falsified
3  any documents, are you?
4  A. I am not aware. And I'm not aware not also
5  both ways.
6  Q. I'm not asking that.
7      What I'm asking is is this 10 percent
8  surcharge. Did the auditors come to you and say,
9  Sultan, you approved this?
10 A. No.
11     (A discussion was held off the record.)
12 BY MR. HESS:
13 Q. Did you read the Escape From Dubai book?
14 A. No.
15 Q. Have you talked to people about it other
16 than your lawyers?
17 A. No.
18 Q. Now, you said that you had a conversation
19 with Mr. Jaubert about the ammunition, correct?
20 A. Yes.
21 Q. And you told him, if you've got nothing --
22 if you didn't -- you asked him: Did you do anything
23 wrong?
24     And he said, no.
25     Right?

Page 156

1  And you said, then you have nothing to worry
2  about?
3  A. Absolutely.
4  Q. He did write you, though, and say that they
5  threatened to hurt him, right, to torture him?
6  A. I don't remember he wrote me about that.
7  Q. You just don't remember, or it didn't
8  happen?
9  A. No, I don't remember it.
10     MR. HESS: Bear with me one second.
11 BY MR. HESS:
12 Q. Do you have an e-mail address of
13 ssulayem@aol.com?
14 A. Yes.
15 Q. And that's been your e-mail address for the
16 last how many years?
17 A. Many years.
18 Q. Did there come a time where you had
19 discussions about Mr. Jaubert with newspaper or
20 magazine or other type of reporters?
21 A. I don't recall. I guess somebody could have
22 asked me, but I don't recall.
23     MR. MULLINS: Are you asking him personally?
24     MR. HESS: I'm sorry, I don't understand.
25     MR. MULLINS: Are you asking him personally?

40 (Pages 157 to 160)

**Page 157**

1  The question is to him personally?
2      MR. HESS: I can say it again.
3  BY MR. HESS:
4      Q. Did you ever have any conversations with any
5  reporters, newspaper, television or otherwise about
6  Mr. Jaubert?
7      A. I don't recall. It could have happened, but
8  I don't recall really. I mean, usually I don't comment
9  on these things, but somebody caught me off guard. I
10  don't know. I don't remember.
11      Q. But you don't recall any?
12      A. I don't recall any particular, but could
13  have happened.
14      Q. Now --
15      A. They try to see you when you are coming out
16  of a function or something and they pop a question
17  while you're passing, could happen.
18      Q. But if it was something significant, you
19  would remember?
20      A. If it was something -- I mean, I don't
21  recall it. Could have happened, could have happened
22  passing by from a function, you know, they would come
23  and ask you a question and then you will answer whether
24  they were right.
25      Usually all media questions are answered by

**Page 158**

1  our media office. There's a media coordinator named
2  Sarah Lockheed. And she is the one usually when we get
3  questions of media things, it goes to her office. And
4  she would sometimes draft a reply and send it from the
5  media office.
6      Q. So the only time that you would make those
7  statements or it could have happened is if you, like,
8  as you put it, if they caught you running from an
9  engagement or something --
10      A. Yeah. And they will ask you and even if you
11  don't answer, you will, right. Or if it to me, I send
12  it to Sarah. Sarah Lockheed would deal with the media.
13      MR. HESS: Give me five minutes, I think I'm
14  done. Let me just wrap up with my partner and
15  take a break one second.
16      VIDEOGRAPHER: The time is 12:56 p.m.
17      (A recess was taken from 12:56 p.m. to 1:05
18  p.m.)
19      VIDEOGRAPHER: We're now back on media unit
20  2. The time on the record is 1:05 p.m.
21      MR. MULLINS: We were just going to say, and
22  I think we agreed off the record, that the
23  witness would stipulate that he is going to New
24  York to deal with matters dealing with some
25  bankers. And I think that counsel would agree

**Page 159**

1  that was sufficient. We really can't get into
2  any more detail than that. And I appreciate
3  counsel's recognition that's as far as we can go
4  and I think it's pretty obvious that's all the
5  information you need.
6      MR. HESS: My understanding it's in his
7  official capacity and it's urgent and can't be
8  avoided.
9      MR. URQUHART: Then --
10  BY MR. HESS:
11      Q. I did want to follow-up, because when we
12  were off the record, in light of your obligation and
13  your recognition of your obligation to be truthful and
14  complete, you were mentioning that you did -- you now
15  recall a conversation you had with a --
16      A. With Bloomberg, yes.
17      This person actually came to me in one of
18  the functions actually, wanted to speak to me and I
19  usually don't like to speak off guard, so I did not.
20  And he contact Sarah and he said, will he either meet
21  me or I write my story anyway.
22      So Sarah organize a meeting. And we came, I
23  was there, I think Abdul Gadar was there.
24      COURT REPORTER: "I think"...
25      THE WITNESS: Abdul Gadar also was there,

**Page 160**

1  because I wanted to refresh my memory. And then
2  he spoke about -- and that meeting was
3  specifically about the issue of Jaubert. And he
4  asked the background. And so that was the
5  discussion we discussed.
6  BY MR. HESS:
7      Q. When was that, do you recall?
8      A. A year ago, could be a year ago.
9      Q. And other than what you just said, do you
10  recall any of the details of the discussion?
11      A. He asked about our recollection of what
12  happened. And we basically explained -- a lot of talk
13  was by the auditor, who explained some details. He
14  said, Jaubert is your friend, you know, how come you
15  don't stand by him? Or how come you didn't help him?
16  That was the discussion.
17      And I said, well, in my capacity, when it's
18  a police matter, nobody can. No matter how friend you
19  are with somebody, a legal matter with auditors and all
20  that is a legal matter. And I tried as much as I can.
21      That's one issue.
22      Q. I'm sorry, that was one?
23      A. That was one issue he discussed.
24      Q. Was there anything else you recall from
25  that, during that interview or that discussion you

41 (Pages 161 to 164)

161

1  had with -- who was the reporter, do you remember?
2     A.  Copetos.
3        COURT REPORTER: I'm sorry?
4        THE WITNESS: Copetos.
5        MR. MULLINS: C-O-P-E-T-O-S.
6        MS. HEATHCOCK: C-O-P-E-T-O-S.
7  BY MR. HESS:
8     Q.  Do you recall any other topics that were
9  discussed?
10    A.  I don't remember whether it was in the
11 discussion or he brought the matter of the book, that
12 he's going to write the book. And what do you say?
13       I said, it's up to him, anybody can write a
14 book.
15       And then whether, I'm not sure whether we
16 discussed it during the meeting or after I left he
17 discussed it with my people, I don't remember when. He
18 said, well, if you pay 5 million dollars Jaubert to buy
19 the book, he's willing to sell you the book before he
20 writes it. And I said, no, I'm not authorized to spend
21 money. The book can be written, it can be written.
22 When it comes to media we don't get involved.
23       That I remember it was mentioned to me.
24 Whether -- I don't believe it was in the meeting.
25    Q.  So Mr. Copetos said to you --

162

1     A.  This is what I remember. I know it
2  happened, whether he said it in the meeting there or
3  after I left, I know it happened, but I don't remember.
4  I honestly don't recall when we were sitting there
5  whether he said it or after I left he spoke to Sarah
6  and said, you know, Jaubert is ready to sell the book,
7  you know, if you want to buy the book, it will save him
8  time to publish it, buy the rights for the book.
9        And Sarah came and said, well, this is the
10 offer, you know, from Jaubert.
11       I said, no, we don't do that. I cannot
12 approve an expense like that. It will never pass the
13 auditor. This is something always in return for
14 something. And I told him, I'd rather get the damages,
15 but not pay the money.
16    Q.  What do you mean get the damages?
17    A.  No, I'd rather pay the damages, the
18 consequences, let somebody write a book, they will say
19 bad things about us. We can't stop people from saying
20 bad things. People say bad and good things. And when
21 you are a company, you're vulnerable to this.
22    Q.  So it was Mr. Copetos that said that to you,
23 or someone?
24    A.  No, Mr. Copetos said that. Now whether he
25 said it directly in the meeting or after I left, I

163

1  don't remember. I do not recall. But I know they came
2  to me and they told me that was the offer. I am sure
3  it was after I left. I think it's after I left.
4     Q.  So that would have been made to -- if it was
5  after you left, it would have been said to, by
6  Mr. Copetos to who?
7     A.  To Sarah maybe or to somebody who was with
8  us.
9        I can get who was in the meeting. I know
10 who was in the meeting. We can get it.
11    Q.  How long was this conversation you had?
12    A.  Oh, no, long time, I mean, we stayed like
13 two hours. I mean, he wanted a lot of time and we
14 spent two hours with him.
15    Q.  What else did you discuss?
16    A.  Just background about Dubai and, of course,
17 during this are very interesting because he wanted to
18 talk about things which had nothing to do with Jaubert,
19 asking about confidential information regarding the
20 company, which we're not, you know, we can't answer.
21    Q.  Anything else you recall that he discussed
22 in particular?
23    A.  Other than what I just told you, I don't
24 remember.
25    Q.  Why is it that you didn't recall that when I

164

1  asked you before?
2     A.  I remember. When I went out I told him, I
3  said, by the way -- but when I mentioned Sarah I
4  remember that she -- and then I asked him, who was that
5  Bloomberg guy? And he mentioned to me Copetos. I do
6  remember him.
7     Q.  And do you remember the exact words that
8  were -- well, I guess let me put it this way.
9        You don't even remember if he said it to you
10 or someone else, correct?
11    A.  I don't remember -- I know it was brought to
12 my attention that, by the way, you can buy the right
13 for the book.
14    Q.  Was it -- you don't know that's exactly what
15 he said, though, do you?
16    A.  I can get back, I can get you really. If
17 it's not too late, we will call them, too late in
18 Dubai, but we can get from Sarah all the detail who was
19 in the meeting, what transpired and she will have it.
20       But I think he must have told after I left.
21 Because I was purely asking -- you know, he said,
22 listen, I can talk to Hervé and he could sell you the
23 rights for the book.
24    Q.  So he said, hey, I could talk to Hervé and
25 he could sell you the rights to the book?

**165**

1  A.  You can buy the book.
2  Q.  But what you just said is -- well, you said
3  what you just said.
4      Did you talk to any other reporters now that
5  you recall?
6  A.  No. That was an interview that I remember.
7  Unless Sarah have answer them on behalf of me, no, I
8  don't remember others.
9  Q.  Did you want to take some time to think
10 about that?
11 A.  No, I remember. There wasn't anybody we
12 talked to. He was the one insisting. And he
13 specifically wanted to talk about Jaubert.
14     MR. URQUHART: Just to be clear. You were
15     talking about discussions which Sultan may have
16     had about Mr. Jaubert?
17     MR. HESS: Yes. Yes. I'm not asking --
18     well, he doesn't remember anyways, but I'm not
19     asking you about your discussion with reporters
20     about affairs that have nothing to do with
21     Mr. Jaubert.
22     THE WITNESS: Okay.
23 BY MR. HESS:
24 Q.  When is the last time you talked to
25 Mr. Jaubert?

**166**

1  A.  When he was in Dubai. Just before he left.
2  Q.  Do you recall when that was?
3  A.  I don't remember the date. But I remember
4  he called. He was concerned. And I told him not to
5  worry because basically, you know, if he hasn't done
6  anything, he shouldn't worry.
7      But Mr. Jaubert expected me to do more,
8  which is not in my capacity. I'll be honest with you,
9  there's no way I can control the police or tell them
10 which way to go. That is impossible in Dubai.
11 Q.  And the auditors?
12 A.  And the auditor. And if I tell -- they will
13 laugh at me.
14 Q.  Who's worse, the police or the auditors?
15     I don't have anything further.
16     MR. URQUHART: We have no questions. Thanks
17     a lot for your courtesy.
18     VIDEOGRAPHER: Stand by to go off media unit
19     2. This concludes our deposition. The time off
20     record is 1:14 p.m.
21     (The deposition concluded at 1:14 p.m.)
22
23
24
25

**167**

CERTIFICATE OF OATH


STATE OF FLORIDA
COUNTY OF PALM BEACH

    I, Tracey LoCastro, RPR, Notary Public,
State of Florida, certify that SULTAN AHMED BIN SULAYEM
personally appeared before me on Thursday, June 10,
2010 and was duly sworn.

    WITNESS my hand and official seal on this
day of           , 2010.



    TRACEY S. LOCASTRO, RPR, FPR
    Notary Public
    Commission #DD 0793034
    Expires July 31, 2012

**168**

REPORTER'S CERTIFICATE

STATE OF FLORIDA
COUNTY OF PALM BEACH

    I, TRACEY S. LOCASTRO, RPR, certify that I
was authorized to and did stenographically report the
foregoing deposition of SULTAN AHMED BIN SULAYEM; that
a review of the transcript was requested; and that the
foregoing transcript, pages 1 through 168, is a true
record of my stenographic notes.

    I FURTHER CERTIFY that I am not a relative,
employee, attorney, or counsel of any of the parties,
nor am I a relative or employee of any of the parties'
attorney or counsel connected with the action, nor am I
financially interested in the action.

    Dated this    day of          , 2010
at Palm Beach County, Florida.



    TRACEY S. LOCASTRO, RPR, FPR