1                  UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
2                    FORT PIERCE DIVISION
                 CASE NO.  09-14314-CV-JEM
3

4

5

6  DUBAI WORLD CORPORATION, and its
   subsidiaries, EXOMOS, NAKHEEL and
7  PALM MARINE,

8                  Plaintiffs,

9       vs.

10                                 Fort Pierce, Florida
                                  February 14, 2011
11  HERVE JAUBERT, SEAHORSE
    SUBMARINES INTERNATIONAL
12  INCORPORATED, and Does 1-99,

13                  Defendants.
   _____

14

15

16                  TRANSCRIPT OF JURY TRIAL
                    VOLUME 2 - PAGE 162-265
                BEFORE THE HONORABLE JOSE E. MARTINEZ
17                 UNITED STATES DISTRICT JUDGE

18

19

20

21

22

23  REPORTED BY:        DAWN M. WHITMARSH, RPR
                        Official Court Reporter
                        400 N. Miami Avenue, 10S03
24                      Miami, Florida  33128
                        Telephone:  305-523-5598
25


              PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                    TRANSCRIPT PRODUCED BY COMPUTER

1    **APPEARANCES:**

2    **FOR THE PLAINTIFFS:**
                         *Quinn, Emanuel, Urquhart & Sullivan, LLP*
3                        **BY: JON C. CEDERBERG, ESQ.**
                         **BY:  A. WILLIAM URQUHART, ESQ.**
4                        865 South Figueroa Street
                         10th Floor
5                        Los Angeles, CA  90017

6                        *Astigarraga, Davis, Mullins & Grossman*
                         **BY:  EDWARD MULLINS, ESQ.**
7                        701 Brickell Avenue
                         16th Floor
8                        Miami, Florida 33131

9
     **FOR THE DEFENDANTS:**
10                       *Hess & Heathcock, PA*
                         **BY:  WILLIAM HESS, ESQ.**
11                       **BY:  KATHRYN A. HEATHCOCK, ESQ.**
                         40 Southeast Osceola Street
12                       Stuart,  Florida 34994

13

14

15

16

17

18

19

20

21

22

23

24

25

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1              P-R-O-C-E-E-D-I-N-G-S

2         THE COURT:  I apologize.  We finally left the

3    restaurant without eating because they never got our food to us.

4    So I'm sorry that we're a few minutes late.

5         Let's -- five minutes on each side.  Let's talk about

6    this abuse of process claim and what still is in the case and

7    what isn't.

8         MR. CEDERBERG:  We think, Your Honor, the abuse of

9    process case, the only thing in the case left is whether we --

10   somehow Dubai world delayed Mr. Jaubert receiving his passport

11   or somehow, with regard to the 2008 conviction, used some

12   process in an improper manner.  We don't think the 2007 bullet

13   conviction has anything to do with this case.  We don't think

14   the interrogation by the authorities with regard to the 2007

15   bullet conviction has anything to do with the case.  We don't

16   think the conviction from that does, and we don't think the

17   threats of torture in that has anything to do with the case,

18   because you can't really separate that from the court's prior

19   rulings on the Acts of State Doctrine.  That's conduct by the

20   Dubai government, and the court's government really makes Dubai

21   responsible for what it did.

22        And we would also -- with regard to the lien that

23   supposedly was going to be set on Mr. Jaubert's property, the

24   court clearly --

25        THE COURT:  Wait.  There's a difference between my

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

165

1    saying that they had not proved their case sufficient to grant

2    them a summary judgment and them not ever being able to prove a

3    case.  Which is it that I did?

4         MR. CEDERBERG:  What you did is said the Act of State

5    Doctrine is applicable to this case and that the Acts of State

6    Doctrine does not let in this trial the relitigation of

7    decisions made by --

8         THE COURT:  I understand that.

9         MR. CEDERBERG:  -- by the Dubai courts and the Dubai

10   police.  What they want to do, evidently, is take this whole

11   proceeding by bringing in what the Dubai police allegedly did

12   and what the Dubai courts did and to say this is some type of a

13   sham or things like that.  And the Act of State Doctrine clearly

14   is all over that, Your Honor, and they can't do that.  They've

15   got to talk about what Dubai World did.

16        THE COURT:  All right.  Let me hear from the other

17   side.

18        MR. HESS:  Judge, Your Honor hit the nail on the head.

19   What, Your Honor -- the literal reading of Your Honor's order on

20   the summary judgment denies their summary judgment on the count

21   asserting abuse of process.  It doesn't say that it doesn't --

22   that we're not permitted to, it doesn't permit them a partial

23   summary judgment; summary judgment was denied on the claim, and

24   I would argue that just as Your Honor mentioned, that what that

25   means is that it just means that we had enough to get beyond

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    summary judgment to get to the jury on this abuse of process

2    claim, and Your Honor actually said, at calendar call, that Your

3    Honor is not going to limit us in presenting our case to the

4    jury on those other issues.

5         I did, as a courtesy to counsel -- I don't have any

6    problem, I don't intend to.  They gave me a list of things

7    whether I would agree to or not.  I don't intend to mention

8    Mr. Jaubert's conviction on the illegal possession of bullets,

9    unless they bring it up; I don't intend to do that.  I don't

10   intend to mention any action taken by the courts in Dubai,

11   unless, of course, they open the door, but the distinction has

12   to be made between what happened out of the courts of Dubai, and

13   attacking what happened out of the courts of Dubai.

14        I would argue that it's ridiculous to argue that

15   Mr. Jaubert is not allowed to present evidence of the threats of

16   torture and the things that happened to him because that impacts

17   on the abuse of process.  Because certainly Dubai World knew

18   what was going on.  I'm not going to argue that the

19   interrogations were lawful or unlawful because I'm not allowed

20   to.

21        But I'm arguing that I should be allowed to present to

22   the jury the quantum of fear that Mr. Jaubert faced in terms of

23   facing that extortion by Dubai World.  In other words, during

24   the course of those proceedings, during the course of those

25   negotiations by Dubai World, Mr. Jaubert knew very well about

1    that he was facing severe penalties from the executive branch of

2    the government.

3            As to the other items, as to the lien on Mr. Jaubert's

4    property, we ask to be able to prove that that lien was

5    attempted to be put on his property illegally -- well, through

6    purported legal process, but utilizing an unlawful debt, and

7    that is the bad motivation.  We'll be able to prove that he

8    never owed money for them to utilize or for them to hold that

9    over his head, hold that court process over his head.  So we

10   would ask the court to be able to present to the jury all of

11   these items in our argument.

12           THE COURT:  But you're not saying they actually got a

13   lien are you?

14           MR. HESS:  It was ordered, Judge.

15           THE COURT:  Was a lien placed on his property?

16           MR. CEDERBERG:  No, Your Honor.

17           THE COURT:  I don't know of any evidence, I hadn't seen

18   any.  I don't know everything.

19           MR. HESS:  I'll tell you, Judge, I don't want to be

20   foreclosed in getting into it, but as the case develops -- but I

21   don't intend to say anything to the jury today that I can't

22   prove, so I don't intend in opening to state that there was a

23   lien placed on his property.  But I would ask that the court not

24   foreclose us from presenting those issues in total on our abuse

25   of process claim because, as the court recognizes, we didn't

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

168

1    segregate our claims into a number of different abuse of process

2    claims.  You can't segregate what happened to Mr. Jaubert and

3    take it out of the mix and still give us any viable abuse of

4    process argument to talk to the jury about.

5         THE COURT:  But that's not my problem whether you have

6    a viable abuse of process claim.  That's, you know, your

7    problem.  My problem is I want to make sure that you don't go

8    against my rulings in this case.  And as long as I tell you that

9    that's what I'm telling you to do, I'm not going to limit you as

10   to what you can say, but you may very well end up claiming

11   something that you can't prove, and if you do, then you're the

12   one that's going to look bad.

13        MR. HESS:  I'm hoping not to do that, Judge because I

14   don't want to look bad.  I'm going to make every effort not to

15   have that happen.

16        MR. CEDERBERG:  Your Honor, when the Court says they

17   can't segregate, I say the Court hit the nail on the head

18   because if the country and the government of Dubai does

19   purported conduct that's going to affect Mr. Jaubert that's

20   covered by the Acts of State Doctrine, they want to put it in

21   and seek emotional distress, we can't unscramble that egg, Your

22   Honor.

23        The ruling of the Court is the Act of State Doctrine

24   applies and the conduct of the government of Dubai, and the

25   courts and the police is not something that can control

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    liability, and for them to say you did something and the

2    government did something, they can't do that, Your Honor.

3    They're stuck with what your ruling was, I believe that did we

4    illegally take their passport or detain his passport or would

5    with the 2008 case, did we make any threat.  Not the bullet

6    case, not the case where there was any misconduct by the police,

7    but threat of some type of criminal prosecution.

8         That's what the Court narrowed it down to.  It's not

9    enough at the end to say just prove it, Your Honor, we don't

10   want this to become a forum here where Mr. Jaubert just keeps on

11   spewing things about Dubai where the Court has already ruled Act

12   of State and we have to jump up every five minutes and ask for

13   mistrials and things.

14        THE COURT:  Well, I would hope that you're not going to

15   attempt to show that any of the actions of the government of

16   Dubai are wrong, because I think that the Act of State Doctrine

17   prohibits me from looking into the acts of the government of

18   Dubai.

19        Now, if they, for bad reason, did some things that are

20   illegal and legal proceedings, then that is what I think is an

21   abuse of process.  If that's what you're alleging, I'm going to

22   permit you to say it, but I'm not going to permit you to get

23   into the anything that the government of Dubai did in their

24   legal actions, because I don't think that we want foreign courts

25   to be saying that anything that happened here.  You have to take

1   that up in the courts of that system, not ours.  That's what I

2   understand the act of state doctrine prohibits me from doing.

3           MR. HESS:  May I, Judge?

4           THE COURT:  Yeah.

5           MR. HESS:  Again, I'm very careful to make the

6   distinction of attacking or permitting the jury or the court to

7   be perceived as making the determination as to the conduct of

8   the government.  However, the conduct of the government, good,

9   bad, unattacked, is still relevant to the damages that

10  Mr. Jaubert suffered and the conduct committed by Dubai World.

11  If the government wasn't, if the process, that legal process was

12  benign, then it doesn't matter if Dubai World abused that

13  process because the result of abusing process that's benign

14  would have no real damages.

15          So if I have a process that is unchallengeable, the

16  legality is unchallengeable, I'm arguing that I should be

17  permitted, the jury should know what the extent of that process

18  is without attacking it and, in fact, in a jury instructions, I

19  would ask that that distinction be made.  I put it in my

20  instructions.

21          THE COURT:  Even assuming that it's perfectly proper to

22  tell the government of Dubai about somebody's illegal actions,

23  and the government of Dubai is perfectly within their rights to

24  arrest somebody for violating the law, isn't it true that if it

25  is done for an improper purpose, that that still can be abuse of

171

1    process?

2          MR. CEDERBERG:  We don't think it can, Your Honor.

3          THE COURT:  Why.

4          MR. CEDERBERG:  Abuse of process has to come after.

5    The conduct the abuse has to come after the process is issued.

6          THE COURT:  You mean that if I go and have you

7    arrested, not because I think you violated the law or because I

8    want you to be prosecuted and punished, but because I want you

9    to be out of the way while I go fool around with your wife, you

10   don't think that's an abuse of process?

11         I think it is.  I think if you do it for the wrong

12   purpose a, nd if you do something like that for a purpose that

13   is not the purpose for which it is designed, I think you could

14   be, I'm not saying you are, because they're going to have a heck

15   of a time proving it, but I think that it could be.

16         You got any cases to say that isn't abuse of process?

17   I mean, I think we're trying a very fine line, and factually,

18   well, you know, I do understand that initiating the claim is

19   malicious prosecution.

20         MR. CEDERBERG:  Correct.

21         THE COURT:  But it seems to me that some process

22   involved in the procedure could be abuse of process if it's done

23   for the wrong purpose, if it's done for a malicious purpose.

24   But you're right, initiating the process is a malicious

25   prosecution rather than an abuse of process.  You're limited to

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

172

1   a misuse of some legal process.  I think you guys are trying to

2   give me a headache.  Go ahead.  Let me let the other side talk.

3           MR. HESS:  Judge, on that point, I agree with counsel,

4   that the law is clear on that.  The process has to issue first.

5   But that doesn't change the inquiry on this.  I'm not arguing,

6   the process did issue first.  The process with the bullets

7   issued first.  That permitted Dubai World to attempt to extort

8   monies from Mr. Jaubert.  Again, the process, right or wrong,

9   whether those bullets truly were illegal or not, I can't talk

10  about that because unless they open the door to it --

11          THE COURT:  What process, after that, did they

12  participate in, did they abuse?

13          MR. HESS:  They utilized, they said, in essence, we're

14  not -- we will help you out with the government if you pay us

15  money.

16          THE COURT:  What process are they abusing in there?

17          MR. HESS:  The holding of his passport and the threat

18  of interrogation.

19          THE COURT:  But I thought that you had to be talking

20  about process in the sense of legal proceedings.

21          MR. MULLINS:  You're correct, Your Honor.

22          THE COURT:  That's my understanding of the law that

23  it's legal proceedings, not general all-around nasty behavior.

24  That's a different problem.

25          MR. MULLINS:  You're correct, Your Honor.  In fact, the

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    memo we have the Court, Morrison, Coachman, all of them talk

2    about judicial process and, in fact, one of the cases they try

3    to say this had to do with my driver's license, it's not

4    process.  You had to have judicial process, and I'll be honest

5    with you, by holding the passport, we don't believe is process

6    as well.  He actually testified later that the police held the

7    passport.  Anyway, that was not in the summary judgment, that

8    came in deposition later.

9         But at the end of the day, Your Honor, you have hit the

10   nail on the head.  There's got to be some misuse of process, and

11   our concern is all he's going to be doing is -- and also the Act

12   of State Doctrine problem is because what he's really attacking

13   is the integrity of the Dubai police procedures, and all he's

14   really got is a civil threat.  Those have not been sufficient

15   for abuse of process.

16        All he has is a threat of the case.  And frankly the

17   case really abuse of process claim has no merit, and we believe

18   at the end of the day we'll get a directed verdict.  We are

19   concerned -- if this gets into a whole other realm, we're

20   concerned about what happens in opening.

21        THE COURT:  Are you saying there is no claim under

22   which that behavior can be punished, if that behavior is proven?

23        MR. MULLINS:  Which behavior are you talking about,

24   Your Honor?

25        THE COURT:  Threats to have him incarcerated, threats

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

174

1      to have his passport retained, threats to have him kept in Dubai

2      beyond when he wants to be in Dubai.

3              MR. MULLINS:  Your Honor, if I can, I think the answer

4      to your question is if it turns out there may be an action for

5      some type of 1983.

6              THE COURT:  I mean action surviving in this case.

7              MR. MULLINS:  I honestly do not know of any claim that

8      will be actionable.  I know it's not abuse of process, and

9      that's a claim they had, and we've been here for a year and a

10     half and he brought these claims.  I'm not aware of anything.  I

11     really am not.  I know it's not abuse of process.  I know

12     there's simply no process here that's been -- you know, there is

13     simply nothing there.

14             THE COURT:  So you don't think that the fact that there

15     was a process by which the Dubai government brought, arrested

16     him based upon a complaint, there is a criminal complaint or

17     whatever it is that's done, that if you misuse that, that you

18     can't be punished?  I think if you misuse that, it's abuse of

19     process.

20             MR. CEDERBERG:  Your Honor, Dubai is just like in the

21     United States.  I was an assistant for a long time.  Once the

22     government decides to prosecute, that's their decision.  A

23     victim can come forward and inform the government that this

24     person has cooperated for whatever impact the government wants,

25     but it's the government's call.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

175

1      In this case, it was the government of Dubai's call to

2    prosecute in both instances.  So any civil comments made after

3    that, once the referral is done to the government with the -- in

4    the hands of the government, it's their decision.  To question

5    at all their decision or their tactics or their choices or what

6    the court does on the end runs exactly afoul of the Act of State

7    Doctrine that the court already found to be applicable in the

8    case.

9           THE COURT:  So you don't think it would be abuse of

10   process if Dubai World were somehow to have convinced the Dubai

11   police to retain his passport for longer than they would have

12   retained it otherwise for the purpose of extorting money for him

13   or getting other concessions?

14          MR. MULLINS:  Your Honor, if I may, I don't think,

15   under common law, that would be abuse of judicial process.

16          THE COURT:  You don't think so?

17          MR. MULLINS:  No, Your Honor.  At the end of the day,

18   if the police kept the passport, it would fall right into the

19   Act of State Doctrine.  That's the problem, because what's

20   really going to be happening here is he's going to be attacking

21   the decision of the Dubai police to keep the passport, and

22   that's what we cannot do.

23          THE COURT:  I'm assuming they're keeping is perfectly

24   lawful.  They can keep it as long as they wanted to, but they

25   wouldn't have kept it if Dubai World hadn't told them to.

176

1    That's the part that bothers me, and I think that is what may

2    make it actionable.

3              MR. MULLINS:  Your Honor, it's the police that makes

4    the decision.  Even if we did have all the worse motives in the

5    world --

6              THE COURT:  Well, that's the question for the jury to

7    decide, whether it was the police that made that decision or

8    whether they were influenced by Dubai World.

9              MR. MULLINS:  That's -- it doesn't make a difference,

10   Your Honor.  It's irrelevant because at the end of the day, the

11   police made the decision.  Once the police makes the decision,

12   as you said earlier to Mr. Hess, we're stuck with the decision.

13   We cannot attack that in the court.  The jury can't say, you

14   know, what -- these guys got the police to do something they

15   shouldn't have done because, by definition, you're now attacking

16   the decision of the police to make it to hold the passport.

17   That would be a violation of the Act of State Doctrine.

18             MR. HESS:  Judge, can I jump in here?  It's two against

19   one.  It's the exhortative actions of Dubai World that makes

20   this abuse of process.  This distinction that Dubai World

21   attempts to make is not -- it's not the law.  This distinction

22   that has to be the judicial process is not the law.  It could be

23   an executive or judicial branch process.

24             Now, once the process initiates, the arrest, the

25   criminal investigation, the criminal court case, whatever it be,

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

177

1    that's done, and I can't attack the propriety of that, I can't

2    attack the validity of that.  That's what I can't attack.

3    That's the Act of State Doctrine.  This Court, no one, can

4    attack the validity of the Court's action of the governmental

5    entities of Dubai.  However, once that action happens, the

6    extortion by Dubai World taking advantage of that is what makes

7    it abuse of process, and that's what I intend to prove to the

8    jury.

9         That Dubai World, in essence, extorted money and a

10   signature using the otherwise lawful process of the Dubai courts

11   and authorities.  And I don't think there's any doubt that that

12   is a valid claim.  And I intend to prove that to the jury, if

13   the court permits me.

14        THE COURT:  Yes, sir.  Last chance.

15        MR. CEDERBERG:  Last chance.  First of all, I don't

16   understand how, if Mr. Hess has that understanding of the law,

17   he can tell us that he wants to, in his opening statement, talk

18   about alleged interrogations of threats or torture by the Dubai

19   police or government authority resulting in damages.  And I also

20   would like the court to understand that the only payment, as any

21   part of an extortion in this case, was for $38,000.  That's what

22   the claim is.

23        THE COURT:  What difference does it make if it's a

24   dollar?

25        MR. CEDERBERG:  I understand that.  I just want the

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   Court to know that.  For the other portion some of the Court's

2   concerned about, if you really want to trump up a charge against

3   somebody, that's malicious prosecution.  That's not what we're

4   here to try.

5        MR. HESS:  No, that's not malicious prosecution.

6   Malicious prosecution is if Dubai -- if we wanted to prove that

7   Dubai World went to the authorities, gave them information that

8   did not permit a probable cause determination and that

9   prosecution was instituted.  That's malicious prosecution.  We

10   have something different.  We have first whether or not we're

11   not going to -- whether or not Dubai World went to the

12   authorities and started --

13        THE COURT:  No, I don't think so.  I think that

14   malicious prosecution could be, even if it was a valid claim, as

15   long as it was done for the wrong purpose.

16        MR. HESS:  Yes, Judge.

17        MR. MULLINS:  It would have to be a frivolous lawsuit.

18   It would have to be a valid reasonable basis, no probable cause.

19        THE COURT:  All right.  Malicious prosecution?

20        MR. MULLINS:  Correct, Your Honor.

21        MR. HESS:  As to -- I don't want to re-argue and

22   re-argue, unless the Court wants to hear me on those other

23   points, but the new point that was brought up is this other

24   issue about arguing the -- what the process was.  I'm not ever

25   going to argue to the jury, and, in fact, I've asked for an

179

1    instruction, and the instruction, I think we've agreed to that,

2    that is an appropriate instruction, it is damages are not to be

3    based on the conduct of the country of Dubai or the Emirate of

4    Dubai.  It is exclusively the conduct of Dubai World that the

5    damages have to be based on and the action has to be based on,

6    but if -- again, if the there was no interrogation, and if the

7    threats of interrogation and the interrogations didn't occur,

8    with the knowledge of Dubai World, again, can't attack it, can't

9    attack the validity.  Dubai wants to interrogate people, that's

10   their prerogative, I guess, not -- I guess it is under the Act

11   of State Doctrine.

12        But to isolate the jury from the level of that harm,

13   that arose by -- in terms of the distressed damages and

14   Mr. Jaubert, that doesn't permit him full damages.  To just not

15   to isolate the jury from what happened to him in the hands of

16   Dubai police isolates the jury and doesn't permit the jury the

17   information it needs to fully compensate Mr. Jaubert, and I

18   think if we very easily tailored in a jury instruction to tell

19   the jury look, this isn't about Dubai World.  You just have to

20   assume their conduct is legal and we're not allowed to interfere

21   with it.  I'm sorry.  The Emirate of Dubai.  I apologize.

22        The Emirate of Dubai.  We assume that conduct is legal

23   and unassailable.  The damages, if you choose to award, are

24   exclusively by virtue of the conduct subsequent to the process

25   by Dubai World against Mr. Jaubert, and I think that frames it

180

1   perfectly.

2          MR. MULLINS:  Your Honor, if I could, I know you're

3   trying to move on, but this is where the Act of State -- we

4   cited the Manipat (ph) case.  It's an Eastern District of New

5   York case.  It's on Page 5 of the memo we gave you.  The court

6   granted summary judgment there because the claim was the

7   defendant had persuaded the Japanese authorities to detain the

8   plaintiff, and the court granted summary judgment there, found

9   it to be a violation of abuse of process because by the very

10  nature of that, you have to second-guess the actual

11  interrogation.

12         And what you're hearing from Mr. Hess is, I'm going to

13  look at the Dubai World conduct, but you can't separate it from

14  the ramifications of what they've done, and that is exactly

15  what's prohibited by the Act Of state.  Your Honor, again, it's

16  Page 5.

17         THE COURT:  I see it.

18         MR. MULLINS:  That's the Manipat case, an Eastern

19  District of New York case.  It's similar concept that when you

20  get into the actions of, well, I'm trying to get the related

21  damages that's caused by ramifications or conduct, that's where

22  we get into the Act of State, and that's what is wrong.  And as

23  the Court said, we can't have that.  That's exactly what

24  Mr. Hess wants us to do.  I got to get the whole damages for my

25  client, that's what is prohibited.  That's what we can't have

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1      here in the Southern District of Florida.

2              THE COURT:  Manipat does seem to say that.  Are you

3      familiar with why it doesn't say that?

4              MR. HESS:  Judge, that claim was that they were

5      involved in the interrogative -- in that process.  That the

6      airline was involved with the authorities in the process.

7      That's what that case is dealing with.

8              THE COURT:  Well, what it said is, is they persuaded

9      the authorities to interrogate and detain him.

10             MR. HESS:  I'm not going to argue that, Judge.  You're

11     never going to hear me say that Dubai World persuaded them to

12     interrogate him.

13             THE COURT:  What you're going to say, once they were in

14     the process, that -- fill me in.

15             MR. HESS:  Once the process was initiated, Dubai World

16     had full knowledge of it, and in light of the heinous nature of

17     the process that was being utilized, lawful there, and therefore

18     unassailable here, in light of that, that -- is they chose to

19     utilize that level of weight on Mr. Jaubert to extort money from

20     him.

21             THE COURT:  Aren't we, in effect, then just saying that

22     the Dubai government should not have permitted that, and that

23     they're doing so caused your client damages, and therefore,

24     makes it the Act of State?

25             MR. HESS:  No, Judge.  I'm saying that we need to

182

1    tell --

2             THE COURT:  Why isn't that that?

3             MR. HESS:  Because it's not the -- it is not the

4    actions of the government of Dubai that we are challenging or

5    seeking a damages from.  It is the conduct of Dubai World,

6    knowing what the actions of the Emirate of Dubai were.

7             THE COURT:  I see a difference without a distinction,

8    or distinction without a difference.  I'm not sure which.

9             MR. HESS:  How else, if the conduct if the process at

10   issue isn't relevant, then what is the measure of damages ever?

11   If it's never relevant, then how is a jury to measure damages of

12   the exemption, and how is a jury to believe that a person could

13   be extorted and could be forced to sign an agreement and pay

14   money, agree to pay money?  Otherwise it just shows --

15            THE COURT:  It's an -- exactly the same situation as if

16   your client was broke and they knew he was starving.  That's

17   what you would have to argue, I would think.  That might seem to

18   me to be a reasonable argument, but I think what you're asking

19   me to let you argue to the jury is, in fact, the acts of the

20   Dubai government by interrogating him, locking him up, doing

21   whatever it is they did to him, and I think that any way you cut

22   that, it is the Act of State.

23            I'm hard pressed to see how you can prove that they did

24   something improper with the process, but I'm not the smartest

25   man in the world, so maybe you can figure it out and maybe

                    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                         TRANSCRIPT PRODUCED BY COMPUTER

1    somebody else can figure it out how you're going to do this

2    otherwise.  I think what you're talking about arguing clearly is

3    a violative of the Act of State Doctrine.

4         I think that the interrogation is going to be kept out,

5    but the abuse of process claim will survive because it is

6    possible that there is an abuse of process claim without

7    alleging a wrongful act by the government, but the interrogation

8    that's going on and whatever else the government of Dubai did is

9    not an argument that you can make to the jury because that would

10   be, in effect, saying that the government of Dubai did that

11   wrong.  And while I may have certain feelings about that, and

12   frankly I haven't really studied it enough to have those

13   feelings, I don't think it's my place to do that.

14        I have -- contrary to public belief, I do have

15   limitations on my power, and this might be one of them.  Abuse

16   of Act of State, I think, is pretty clear.  We don't want other

17   government, other lawyers -- excuse me, other judges from other

18   jurisdictions telling us that what we do is wrong, so I suspect

19   that we shouldn't be telling them that what they do is wrong.

20        So I hope that distinction is clear to you.  It's not

21   entirely clear to me, but I may not be right, but I'm never in

22   doubt.

23        MR. MULLINS:  Your Honor, with respect to your ruling,

24   I'd like to know what damages is left to this.

25        THE COURT:  I don't know, because I don't know what the

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

184

1    facts you are --

2              MR. MULLINS:  I asked Mr. Hess before we started here.

3              THE COURT:  Oh, yeah, but you can't do that.

4              MR. HESS:  Judge, how many lawyers on this side, and he

5    asked me my damages when I'm trying to get ready for Your

6    Honor's presentation.

7              MR. MULLINS:  I don't want to put him on the spot.  My

8    only point, Your Honor, is we want to make sure that we

9    understand the nature of this claim, because, as you properly

10   framed it and as you put in your summary judgment order, it's a

11   pretty narrow claim, and I've tried to get that understanding.

12   I don't see possibly --

13             THE COURT:  I don't know.  I don't know, and I'm not

14   going to make him tell me right now, either, because I don't

15   know.  I don't have an answer for you.  That's the best I can

16   do.

17             MR. MULLINS:  I appreciate it, Your Honor, I want to

18   make sure there's no trying in the back door what the Court

19   basically slammed the front door pretty sharp and made very

20   clear what the Court's position is.  Basically I want to make

21   sure we're all on the same page here.

22             MR. HESS:  Judge, if I could, I'm hoping that I'm not

23   articulating it well, and that's why it's coming out this way,

24   but if I could try this one more time.

25             THE COURT:  I think you articulated it quite well.  It

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

185

1    just wasn't successful, but you articulated it well.  Go ahead,

2    try it again.

3         MR. HESS:  I'm asking, and I believe it appropriate,

4    and again, we ask juries to do these type of things all the

5    time.  That's why we have jury instructions.  And I think a

6    clear instruction to the jury saying the governmental conduct is

7    not for the jury's consideration, it is not for the jury's

8    consideration.  Just as Your Honor entered a summary judgment on

9    the two subclaims, Your Honor, I'm asking is going to tell the

10   jury it is not for the jury's determination whether or not there

11   was a breach of contract.  And in the same way, I'm asking the

12   court to leave it open, to permit me to argue to the jury with

13   that instruction:  Ladies and gentlemen of the jury, the conduct

14   of the country the Emirate of Dubai is not open for your

15   scrutiny, your validation, or even your consideration.  You

16   must --

17        THE COURT:  None of my business.

18        MR. HESS:  It's none of your business.

19        THE COURT:  I agree.

20        MR. HESS:  To the jury.  In light of that, but you must

21   determine whether or not, given the circumstances whether or not

22   Dubai World abuse of that process.  It's not the country's

23   abuse, it's Dubai World's abuse of that process resulted in

24   damages to Mr. Jaubert.  Because we have also punitive damages

25   that are pending, and the degree of wrongfulness is measured by

186

1    the exposure of Mr. Jaubert to this process.  Lawful as it may

2    be over there.  I'm not going to make those kind of comments to

3    the jury, but I'm asking -- I'm arguing that without the jury

4    knowing that and cutting that distinction and making it clear to

5    the jury.

6         THE COURT:  I don't know how clear you can make it, and

7    I don't really know how clear I can make it.  All I'm saying is

8    that the Act of State Doctrine bars things where the jury has to

9    find that a governmental action was invalid or wrong.  It should

10   not have happened.  Don't do that.

11        MR. HESS:  I won't argue that.

12        THE COURT:  Okay?  Other than that, let's just move on.

13        MR. HESS:  Thank you, Judge.

14        THE COURT:  It is not the clearest thing in the world,

15   I understand that.  He may very well -- as things come up, I

16   will rule on them, and he may very well end up introducing

17   enough that I would declare a mistrial and we start all over

18   again.  I hope not, because I don't want to do this twice.

19        MR. HESS:  There are other points, Judge, if we could

20   raise.  There are a couple things --

21        MR. CEDERBERG:  I know the Court wants to get the jury

22   back in, but we want to be crystal clear.

23        THE COURT:  You're not going to be crystal clear in

24   this area because it's a fuzzy area.

25        MR. CEDERBERG:  I'm talking about the opening.  As I

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

187

1    understand it, he should not be able to get into the

2    investigation of the bullets, the conviction for the bullets,

3    the interrogations of that.

4         MR. HESS:  I'm not, Your Honor.  Your Honor's ruling

5    was just now, and they're trying to re-argue it.  Your Honor's

6    ruling was I am not allowed to permit the jury to think that

7    they're permitted to consider the lawfulness of any of the acts

8    of the country of Dubai, and I will not do that, and I will be

9    very careful not to do that because it's only Kathy and I.

10        THE COURT:  I don't know what you're asking of me.

11   Tell me more specifically.

12        MR. CEDERBERG:  I want to make sure that it is not

13   brought up in evidence or in argument, any of the conduct by the

14   Dubai police or the Dubai government or any of the effects on

15   Mr. Jaubert of conduct by the Dubai police or the Dubai

16   government.

17        THE COURT:  In the sense that the jury is not going to

18   be asked to rule on whether those are valid or invalid, period.

19   I think that, in context, to explain the context of things, I

20   think it may have to come out at some point, but I don't know

21   what his argument is going to be, and I'm going to permit him to

22   present his case, whenever it is that he's presenting his case,

23   the best way that he can.

24        MR. CEDERBERG:  Your Honor --

25        MR. HESS:  Judge, there are two other --

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

188

1       MR. CEDERBERG:  Your Honor, may I have one minute to

2   confer with the client?

3       THE COURT:  Sure.

4       MR. CEDERBERG:  Thank you.

5       MR. HESS:  The other two points I was going to bring up

6   --

7       THE COURT:  Wait.  No.  What were you going to say?

8       MR. CEDERBERG:  The way we view what the Court has

9   indicated, at least what we feel is going to happen in the

10  opening statement, we're going to have to then bring up in our

11  opening statement so we're not sandbagged, all the details about

12  what happened with attempts to extort Dubai World, all the

13  things that Mr. Jaubert did wrong, all his past conduct and all

14  that.

15      We don't want to have to front that if, at the end of

16  the day, the court is not going to let this in.  We want this

17  case to be as the Court defined it with Acts of State and not

18  turned into some type of media circus to sell books or movies

19  and all that, but to talk about what the case is about as

20  limited by the Court's order.  And we I think the Court has

21  ruled and we want to know that; otherwise, we're going to give a

22  very clear opening statement about what is left in the case, and

23  we'll sit down and then Mr. Hess will get up and start talking

24  about torture and all this alleged tapes.

25      THE COURT:  Okay.  I will tell you this:  It would seem

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

189

1 to me that the torture part -- I'm not talking about any of the

2 other aspects of it, I think the torture part of it is governed

3 under what is it 403?  I think the torture part -- well, that's

4 a rule of evidence.  I think that the torture part, the

5 probative effect is far outweighed by the prejudicial effect.

6    MR. HESS:  I won't go into it in opening, Judge.

7    THE COURT:  If you're going to go into the torture,

8 before you try to introduce any evidence of it, have a sidebar,

9 we'll talk about it.  Because I think the torture is something

10 that clearly the prejudicial effect is -- far outweighs any

11 probative value.  I think you're going to have a lot of trouble.

12 You're going to have to convince me that you can show they had

13 something to do with that.  Something with causing it.

14    MR. HESS:  I won't go into that in opening, Judge.

15    MR. CEDERBERG:  Your Honor, there is -- it has come to

16 light in the last couple days that I think bears on what is

17 going to happen in this trial if the door is opened even

18 slightly concerning a relationship to book deals and movies.

19    MR. HESS:  Judge, this is -- we --

20    THE COURT:  I don't know what you're talking about.

21    MR. HESS:  Objection.  We had a discussion.

22    THE COURT:  Wait.  Wait, wait, wait.  One at a time.

23    MR. CEDERBERG:  Could I -- just because it's so

24 important to my client, may I spend another two minutes with my

25 client?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1              THE COURT:  Yeah.  Okay.

2              MR. HESS:  I would like to say on the record, Judge,

3     that a settlement negotiation was instituted by Dubai World on

4     Saturday, Saturday night?  By e-mail, we had a discussion,

5     Mr. Mullins and I.

6              THE COURT:  Why do I care about that?  I don't care.

7              MR. HESS:  They're bringing it up.

8              THE COURT:  No, he didn't bring it up.  He wants two

9     minutes to talk to his client.  I'll give him two minutes to

10    talk to his client.  I don't know why, and I'm not real sure I

11    care.  In federal court we don't get involved in settlement

12    negotiations, and I don't want to.  Go, talk.  That was less

13    than two minutes.  Are you sure you don't need more time?

14             MR. CEDERBERG:  No.  Actually, Your Honor, what we

15    would really request is a sidebar with the Court, if at all

16    possible in this, because I don't want to run afoul of anything,

17    but it's of deep concern to my client, and we want to express

18    that to the court in a sidebar.  And --

19             THE COURT:  I don't like sidebars.  They're rude.

20             MR. CEDERBERG:  I understand, Your Honor.

21             MR. HESS:  Judge, the whole --

22             MR. CEDERBERG:  I think it is necessary in this case.

23             MR. HESS:  Judge how many lawyers -- I mean, I don't

24    even talk about this, but, you know, they're not getting their

25    way, so now they want to talk to the judge.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1              THE COURT:  They're not going to talk to me alone.

 2              MR. HESS:  I understand, Judge, but they're going to

 3    talk to you alone without the rest of the world, and that's what

 4    they want.  I can't talk about it so the rest of the world

 5    doesn't know about how Dubai World is.

 6              THE COURT:  That's not right.  Don't tell me that.

 7    That's not what -- they're going to talk to me about it.

 8              MR. CEDERBERG:  That's what I fear exactly.

 9              MR. HESS:  Judge, I'm ready, Judge.

10              THE COURT:  You're frustrated, but don't take it out in

11    open court, because I don't need it.

12              MR. HESS:  I'm sorry.  I am frustrated.

13              THE COURT:  I can't imagine why I need a sidebar.  I'm

14    not planning on it, no.  Go for anything else.  What else do you

15    need?

16              MR. HESS:  Judge, the other points that are in.

17              THE COURT:  No.  Wait.  He's still talking.  Let him

18    finish talking.

19              MR. CEDERBERG:  Yes, Your Honor.  There are things

20    that -- there are reporters in the courtroom.  We believe it's a

21    very sensitive issue, and we ask the court's indulgence for a

22    sidebar to explain the issue.  After we explain the issue, if

23    the court sends us back to our seats, we know what to do, but we

24    really think we ought to do this in this case.

25              THE COURT:  I'm not real sure what you're talking
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

192

1    about.

2            MR. CEDERBERG:  We're afraid that, like your example,

3    Mr. Hess just made the comment that they don't want us in this

4    courtroom to tell all the terrible things that happened in

5    Dubai.  We want to make sure the court understands what we

6    believe.  If the door is opened a slice, it's going to happen in

7    this case, and we don't think the Court has opened it much, but

8    we can just foresee what is going to happen in this opening

9    statement, and it will only take one minute, Your Honor.

10           MR. HESS:  And when they start putting on all these

11   terrible things about Mr. Jaubert and I ask for a sidebar and

12   ask Your Honor to reconsider its rulings again.

13           THE COURT:  I don't know what you are talking about.  I

14   have no need for a sidebar.  Move on.  What else you got?

15           MR. HESS:  The other issues, Judge.

16           MR. CEDERBERG:  Then, Your Honor, we can do it in open

17   court.

18           THE COURT:  Okay.  Go ahead.

19           MR. URQUHART:  I guess it's good afternoon, Your Honor.

20           THE COURT:  Good afternoon.

21           MR. URQUHART:  My name is Bill Urquhart, and we didn't

22   want to do this in open court with the reporter sitting in the

23   back room, but during -- over the weekend, we found out that

24   Mr. Hess has obtained the rights to Mr. Jaubert's book, which is

25   a clear violation of Florida code of ethics.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

193

```
1          THE COURT:  I don't know that for a fact, but --
2          MR. URQUHART:  We do know it for a fact because it came
3     from Mr. Hess.
4          THE COURT:  No.  I say I don't know for a fact that he
5     did that, and I also don't know for a fact that it's a
6     violation.  I really have not memorized all of the cannons of
7     ethics.  I've never had to.
8          MR. HESS:  I need to make an objection for the record,
9     Judge.  It was during the course of settlement negotiations
10    between Mr. Mullins and I where Mr. Mullins --
11         THE COURT:  You know what, forget it.  I don't need to
12    hear this.  Go ahead.  Finish quickly, please.
13         MR. URQUHART:  Can I finish quickly?  Your Honor, the
14    reason for this ethical wall which prevents lawyers from
15    participating in book deals with their clients is to prevent
16    lawyers from using the courtroom as a defamation-free zone to
17    get up on their soap box and basically sell the press on it.  We
18    know because we've gotten e-mails in this case that Mr. Jaubert
19    tried to extort $30 million from Dubai World.  We know that
20    Mr. Jaubert --
21         MR. HESS:  Objection.  It's all right.
22         MR. URQUHART:  We know, in this case, e-mails that
23    Mr. Jaubert tried to generate publicity to further this
24    extortion scheme.  We know that Mr. Jaubert's old lawyer or his
25    government writer said even the filing of this lawsuit was
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

194

```
1    intended to generate publicity.  The reason that they have this
2    ethical bar against this is to prevent the lawyer from being in
3    bed with his client to try and generate publicity.
4              THE COURT:  Why are you telling me this?  What am I
5    going to do about this?  What am I supposed to do about it?
6              MR. URQUHART:  I think it gives you this is what
7    creates the fear.
8              THE COURT:  Are you moving to disqualify Mr. Hess?
9              MR. URQUHART:  I can't move to disqualify him.
10             THE COURT:  Why not?
11             MR. URQUHART:  I don't believe we have the grounds to
12   disqualify him.
13             MR. HESS:  Judge, if I --
14             THE COURT:  What do you want me to do?  I don't
15   understand why you're telling me?  What can I do?  You want to
16   file a complaint with the Florida Bar, you can do so.
17             MR. URQUHART:  That's the point, is to limit the amount
18   of -- I mean, it goes back to the point that Mr. Cederberg and
19   Mr. Mullins made, is we want these -- the case limited to what
20   the case is really about.  And Mr. Hess is trying to get in
21   through the back door what he can't get in through the front
22   door.
23             You say he can't talk about torture, but I guarantee
24   his wife is going to take the stand and start crying about how
25   her husband was abused by the government of Dubai and how they
```

195

1   feared for their life, etcetera.  All to generate publicity so

2   they can sell their book and sell their movie deal.

3         Why do you think the reporter is in the back of the

4   room?  It's not because we invited them in there.  Who do you

5   think generated the publicity about the case beginning on

6   Monday?  We didn't.  We got a call from a reporter asking if we

7   wanted to comment on statements by Mr. Jaubert and Mr. Hess.

8   This is going to turn into an absolute unmitigated circus.

9         THE COURT:  Well, I can assure you it will not, and I

10  can assure you that it will not happen, and I can assure you

11  that -- well, I don't know, I hesitate to put a gag order on all

12  of the attorneys and parties to this case, but I will because I

13  don't believe in trying cases in the newspaper.  You should be

14  trying the case in here.  What happens in open court happens in

15  open court, but I will say that I am a little bit suspicious of

16  publicity coming up the Friday before we're picking a jury.

17  That's really, you know, unusual.

18        I've tried I don't know how many cases up here in the

19  last six, seven years that I've been a judge, a federal judge

20  here in this district, in this particular courthouse, and this

21  is, I believe, the second or third time that I've seen a

22  reporter in the courtroom, and none of them have been in it for

23  the first day.

24        So I don't know how it happened.  I suspect that it's

25  just good newspaper reporting and she's on top of it checking

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

196

1    the docket, but I'm not real happy about it.  But, you know, I'm

2    not saying that they have no right to be here.  They have

3    absolute right to be here.  And they have an absolute right to

4    anything that happens in open court.

5         But I am a little upset at anything that goes out

6    before the jury is selected, which may affect the panel.  I

7    think that fortunately it didn't affect the panel, there were

8    only three people that even indicated any exposure to the

9    article, and two of them were secondhand.  So I don't know.  I

10   don't know what you're asking of me.  I don't know what you

11   expect me to do.  This is kind of interesting, but not as

12   interesting as finishing this case.  So what do you want me to

13   do?

14        What's going on?  What other issues do you want to talk

15   about?

16        MR. HESS:  Judge, I have -- well, I don't have anything

17   else to talk about that.  I don't have anything else to talk

18   about that.

19        THE COURT:  I will tell both sides, I don't want you

20   talking about the case except in open court, period, until this

21   case is over.  All right?  Go.  What else do you have?

22        MR. HESS:  The other issues, Judge, the first issue is

23   that I've learned that they intend to put on expert testimony

24   not previously disclosed in their opening.  And they're under

25   the notion that just because they characterize this testimony as

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   percipient witnesses, that they don't have to file a disclosure

2   and that just isn't the law.  They don't have to file a report,

3   but they certainly have to disclose their experts, and that's

4   clear.  I mean, the case law is absolutely clear on it.  The

5   first case -- I can find 20 cases, but the first one is the

6   Aumand case, A-U-M-A --

7          THE COURT:  I've heard enough.  This case has got to

8   start some day, and I say it's going to start now.  And if they

9   say something that you object to, I will rule on it.  But I

10  don't want to stay here and keep talking back and forth and back

11  and forth.  Bring in the jury.

12          In the wonderful words of Roberto Duran, no mas,

13  enough.  I've taken enough blows today.  Let's move on.

14          (Jury in at 3:07 p.m.)

15          THE COURT:  The jurors have asked if they can take

16  notes, some of them.  I usually do not let them take notes.

17  Anybody have any objection to them taking notes?

18          MR. CEDERBERG:  None whatsoever, Your Honor.

19          MR. HESS:  I don't care one way or the other.

20          COURT SECURITY OFFICER:  All rise for the jury.

21          (Jury in at 3:08 p.m.)

22          THE COURT:  Please be seated.  Please swear the jury.

23  Be seated, please.

24          COURTROOM DEPUTY:  All jurors stand, raise your right

25  hand.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

198

1           (JURY SWORN).

2           THE COURT:  Please be seated.  Ladies and gentlemen,

3    you've now been sworn as the jury to try this case.  By your

4    verdict you will decide the disputed issues of fact.  I will

5    decide all questions of law and procedure that arise during the

6    trial, and before you retire to the jury room at the end of the

7    trial to deliberate upon your verdict and decide the case, I

8    will explain to you the rules of law that you must follow and

9    apply in making your decision.

10           The evidence presented to you during the trial will

11   primarily consist of the testimony of the witnesses and tangible

12   items, including papers or documents called exhibits.  You

13   should pay close attention to the testimony because it will be

14   necessary for you to rely upon your memories concerning what the

15   testimony was.  Although, as you can see, the court reporter is

16   making a stenographic record of everything that is said,

17   typewritten transcripts will probably not be prepared in

18   sufficient time or appropriate form for your use during your

19   deliberations, and you should not expect to receive them.

20           On the other hand, any exhibits admitted in evidence

21   during the trial will be available to you for detailed study, if

22   you wish, during your deliberations.  So if an exhibit is

23   received in evidence but is not fully read or shown to you at

24   the time, don't be concerned because you will get to see and

25   study it later during your deliberations.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

199

1          Usually I don't permit jurors to take notes, and I'll

2    tell you why.  Because this is not a note-taking exercise.  When

3    you go back, one of the reasons that there are so many people on

4    a jury is because it's not just your individual memories, it's

5    your collective memories.  And you should go back and discuss

6    the case with everyone, because that way it might trigger

7    something in your mind, and I don't want it to turn into a

8    note-taking exercise or note-taking contest where somebody says,

9    "My memory is much better than yours, because, look, my notes

10   are neater and clean and they're outlined."

11         Well, you know what, it's a couple of week trial, so

12   I'm going to permit you to take notes.  I'm going to give each

13   of you a legal pad, I'm going to give each of you a pen or a

14   pencil, and you can take notes if you want.  You don't have to

15   take notes.

16         And I don't want somebody, during the deliberations, to

17   say, "Oh, yeah, but I took notes, so therefore, my memory is

18   better than yours."  You might have taken the note wrong, and

19   that's really -- we don't want to do away with everybody using

20   their memory and everybody getting refreshed by everyone else's,

21   but it might be helpful to you to be able to jot something down.

22   And if you do, that's great.

23         Now, that means you don't take the notebook home with

24   you, you leave the notebooks in the jury room, you leave the

25   pens in the jury room, and we'll pick them up every night, put

1    them away and give them back to you in the morning.  So you can

2    do that.

3         During the trial, you should keep an open mind and

4    should avoid reaching any hasty impressions or conclusions.

5    Reserve your judgment until you have heard all the testimony and

6    evidence, the closing arguments or summations of the lawyers,

7    and my instructions or explanation to you concerning the

8    applicable law.

9         Because of your obligation to keep an open mind during

10   the trial, coupled with your obligation to then decide the case

11   only on the basis of the testimony and evidence presented, you

12   must not discuss the case during the trial in any manner among

13   yourselves or with anyone else.  Nor should you permit anyone to

14   discuss it in your presence, and you should avoid reading any

15   newspaper articles that might be published about the case.

16        You should also avoid seeing or hearing any television

17   or radio comment about the trial.  If you are home and you hear

18   something on the radio or television that says federal trial,

19   civil trial, Dubai, any of the names that you hear, do whatever

20   you used to do when you were a kid.  Put your fingers in your

21   ears and hum or something and get up an walk out.  Tell me about

22   it the next day.  It may or may not be about this case, but at

23   the least, you should avoid trying to hear anything, because

24   what's important is you must decide this case based solely upon

25   the evidence presented in this courtroom and any evidence that

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

201

1    is presented, it's all within the four walls of this courtroom.

2           This means that during the trial, you must not conduct

3    any independent research about this case, the matters in the

4    case, the individuals, corporations involved in the case.  In

5    other words, you should not consult dictionaries or reference

6    materials, search the internet, websites, blogs, this list keeps

7    getting longer, or any other electronic tools to obtain

8    information about this case or to help you decide the case.

9    Please do not try to find any information from any source

10   outside the confines of this courtroom.

11          Until you retire to deliberate, you may not discuss

12   this case with anyone, even your fellow jurors.  After you

13   retire to deliberate, you may begin discussing the case with

14   your fellow jurors, but you cannot discuss the case with anyone

15   until you have returned a verdict and the case is at an end.

16          I hope for all of you this case is interesting and

17   noteworthy.  I know that many of you use smart phones, cell

18   phones, Blackberries, internet and other tools of technology.

19   You must also not talk to anyone about this case or use these or

20   any other tools to communicate electronically about the case.

21   This includes your family and friends.  You may not communicate

22   with anyone about the case on your smart phone, cell phone,

23   through e-mail, Blackberry, iPhone, text messaging, or on

24   Twitter, through any blog or website, through any internet

25   chatroom, or by any other way of social networking websites,

202

1    including but not limited to Face Book, My Space, LinkedIn, and

2    You Tube.

3           Insofar as the lawyers are concerned, as well as others

4    whom you may come to recognize as having some connection with

5    the case, you are instructed that in order to avoid even the

6    appearance of impropriety, you should have no conversation

7    whatsoever with those persons while you are serving on the jury.

8    Please use the restrooms in the jury room.  Come in the

9    building, go right to the jury room.

10          From time to time during the trial I may be called upon

11   to make rulings of law on objections or motions made by the

12   lawyers.  You should not infer or conclude from any ruling or

13   other comment I may make that I have any opinions on the merits

14   of the case favoring one side or the other.  And if I should

15   sustain an objection to a question that goes unanswered by a

16   witness, you should not guess or speculate what the answer might

17   have been, nor should you draw any inferences or conclusions

18   from the question itself.

19          During the trial it may be necessary for me to confer

20   with the lawyers from time to time out of your hearing with

21   regard to questions of law or procedure that require

22   consideration by the court or judge alone.  On some occasions,

23   you may be excused from the courtroom for the same reason.  As a

24   matter of fact, probably a lot because we have a little device

25   here that I'm supposed to be able to push that makes white noise

203

1    and then shuts down all the microphones and opens up the

2    microphone.  It's not working.  It's broken.  And consequently,

3    sometimes it works, sometimes it doesn't.  It can be worked from

4    down there, but I can't work it for some reason, so I will

5    probably ask you to excuse us and ask you to go into the jury

6    room rather than try to have sidebar conferences, which is what

7    they are called.

8         I will try to limit these interruptions as much as

9    possible, but you should remember the importance of the matters

10   you are here to determine, and I hope that you're patient even

11   though the case may seem to go slowly.  I will do my best to

12   move it along.

13        The order of the trial's proceedings will be as

14   follows:  In just a few moments the lawyers for each of the

15   parties will be permitted to address you in turn and make what

16   we call opening statements.  The Plaintiffs will then go forward

17   with the calling of witnesses and presentation of evidence

18   during what we call the Plaintiffs' case in chief.

19        When the Plaintiffs finish by announcing that they

20   rest, the Defendants will proceed with witnesses and evidence

21   both to defend against the Plaintiffs' case, and to present

22   Defendant Jaubert's own case in chief.

23        After that, within certain limitations, first the

24   Plaintiff then the Defendant may be permitted to call witnesses

25   again or to present evidence during what we call the rebuttal

204

1    phase of the trial.  When the evidence portion of the trial is

2    completed, the lawyers will be given another opportunity to

3    address you and make their summations or final arguments in the

4    case, after which I will instruct you on the applicable law and

5    you will then retire to deliberate upon your verdict.

6           Now, we will begin by affording an opportunity for each

7    side -- hold on a second, I think I got something out of order

8    here.  Okay.  Now we will begin by affording the lawyers for

9    each side an opportunity to make their opening statements in

10   which they may explain the issues of the case and summarize the

11   facts they expect the evidence will show.

12          I caution you that the statements that the lawyers make

13   now, as well as the arguments they present at the end of the

14   case, are not to be considered by you either as evidence in the

15   case or as your instruction on the law.  If you've ever taken a

16   speech course, you know what they tell you.  Tell them what

17   you're going to tell them, then tell them, then tell them what

18   you told them.  That's kind of what this is, except it's a

19   little bit different.  They have different names, opening

20   statements, closing argument.

21          This first part is not supposed to be an argument to

22   you, it's supposed to be a statement that tells you what they

23   believe the evidence will show.  Of course, it's not evidence,

24   so if they don't actually show that, that's a different problem.

25   You have to go on the basis of what is actually shown in court.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

205

1    But I give them a certain amount of leeway in the opening

2    statements, because sometimes the rules of evidence are a little

3    bit funny, and they let things come in in strange ways, so you

4    get a little piece of information here and a little piece over

5    here, and people sometimes are called out of turn, and

6    consequently you don't know exactly where it fits.  Well, this

7    is kind of like the picture in a jigsaw puzzle.  They tell you

8    the blue is the sky, and then later when it comes in, you'll

9    know to put it there and wait for the rest of it to fill in if

10   it ever comes in.

11         So it's helpful to you.  These are not to be -- I

12   caution you that the lawyers -- that statements that the lawyers

13   make now, as well as the arguments they present at the end of

14   the trial, are not to be considered by you either as evidence in

15   the case or as your instruction on the law.  I give two

16   instructions on the law, and the evidence is what you receive

17   from the witness stand or from exhibits that are introduced in

18   evidence or any stipulations between the parties.

19         Nevertheless, these statements and arguments are

20   intended to help you understand the issues in evidence as it

21   comes in, as well as the positions taken by both sides.  So I

22   ask that you now give the lawyers your close attention as I

23   recognize them for purposes of opening statements.

24         Plaintiff?  You may proceed.  Yeah, wait.  Hold on

25   while they give them the legal pads.  You do not have to take

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    notes.  It's your call if you want to take notes or not.  All

2    right?  You may proceed, sir.

3         MR. URQUHART:  Thank you, Your Honor.  Good afternoon,

4    ladies and gentlemen.  My name is Bill Urquhart.  I'll be trying

5    this case on behalf of our client, Dubai World, general counsel

6    of which is sitting right there.  His name is George Dalton,

7    along with my partner, Jon Cederberg.

8         This case revolves around a gentleman sitting over in

9    the corner there, Herve Jaubert.

10        Herve Jaubert was a self-proclaimed expert in the

11   design and construction of submersible vessels, submarines.  He

12   owned a company called Seahorse Submarines, which operated just

13   down the road here in Stuart, Florida.  Mr. Jaubert also claims

14   to be a former spy for the French government, and he's a

15   self-described master manipulator.

16        And at the conclusion of our case, I think the evidence

17   will show a number of things.  Number one, it will show that

18   Mr. Jaubert, over there, convinced a very sophisticated, huge

19   international company to hire him as CEO of a brand new

20   submarine company, even though he wasn't qualified to take that

21   job, to pay him over $250,000 a year in salary and compensation,

22   to purchase three submersibles from Mr. Jaubert, which did not

23   work when they sold them to him, and, in fact, I'll show it

24   never worked.  And to avoid being fired by Dubai World for three

25   years, even though during his tenure, the company lost $31

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    million, and not a single product was ever sold, not a single

2    penny of revenue was ever received.

3         And while he was doing this, he engaged in a very

4    sophisticated scheme, actually three schemes, accounting

5    schemes, to line his pocket with another million, over a million

6    dollars of Dubai World's money.  And I'll go through that and

7    you can see yourself how he got away with that.

8         I'd like to give you a little background.  Dubai World

9    is a big company.  It has -- I should tell you, Mr. Cederberg,

10   I'm kind of technologically challenged, and I haven't used this

11   high-tech stuff before.  And Mr. Cederberg is going to help me

12   with this by clicking ahead, and probably kicking me if I forget

13   something.  But Dubai World is a multinational holding company,

14   and probably most of you have seen pictures of this.

15        Your Honor, may I come over here?

16        THE COURT:  Sure.

17        MR. URQUHART:  You can see here this is probably the

18   most famous symbol of Dubai World, and if you -- can you click

19   forward, Jon, please?  Actually, Mr. Jaubert owned a home here

20   on one of the palm fronds.  It has -- it has operations

21   literally all over the globe.  And here is where Dubai is.  You

22   can see the little arrow here, it's a tiny little country, and

23   you can see it has some interesting neighbors.

24        You know, I ran over here, Iraq, over here, Afghanistan

25   not too far away.  So it probably doesn't come as a great

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

208

1    surprise to you that Dubai literally is the largest port of call

2    for United States naval vessels outside of the United States

3    itself.  That little Dubai is a -- one of the staunchest isles

4    that the United States has in the entire world.

5        You'll hear our first witness tomorrow, I guess, will

6    be Mr. George Dalton.  And Mr. Dalton is a senior executive with

7    Dubai World.  In fact, he's their chief lawyer, and a whole

8    bunch of lawyers report up to Mr. Dalton.  And before becoming

9    general counsel, Dubai World, he was general counsel at a big

10   United States international company, and Mr. Dalton reported to

11   a guy named Sultan Ahmed Bin Sulayem, and I hope I got that

12   right, which, for the rest of this opening, I'm going to call

13   him Sultan.  And many of you may be thinking, now Sultan, you're

14   thinking Arabian Knights and flowing robes and turbans and that.

15   But Sultan is kind of a first name, a common name like Bob or

16   Joe over at United Arab Emirates.  Sultan is the -- was the

17   chairman of Dubai World.  He's a graduate of Temple University

18   up in Philadelphia, and he owns a home in San Diego.

19       And Dubai World grew into this multi-multi-billion

20   dollar corporation in a large part because of Sultan's vision.

21       Mr. Dalton will also tell you that this gigantic

22   company is run pretty much as companies are all over the world,

23   as a board of director, has accountants, has managing

24   committees, it audit committees, and it's a typical bureaucracy.

25       Dubai World is a holding company; it owns a whole bunch

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   of other companies.  It operates -- it's the third largest

2   operator of ports in the world, you know, when you see the

3   cranes and that.  It owns resorts.  These are the operations,

4   these are either investments or operations of Dubai World

5   literally all over the world.  You can see there are a number of

6   them in the United States.

7           And it has -- this is one of the Dubai World

8   investments.  This is City Center, Las Vegas.  It just opened up

9   last year.  It's the largest publicly, privately funded real

10  estate development project in the history of the United States.

11  Dubai World owns 50 percent interest in that.  It also owns 50

12  percent interest in the Fontainebleau Hotel right down the road

13  here in Miami.  It owns the Mandarin Hotel in New York City.  It

14  owns the Washington Hotel in Washington, DC.  It owns the

15  Barney's mens store in New York City and also in Los Angeles.

16  And overall, it employs some 60,000 people directly, and tens

17  and tens of thousands of additional people indirectly through

18  its investments.  Just through the City Center alone, it

19  probably employs 5,000 people.

20          In any event, it also -- as I said, it operates hotels.

21  Can you fast forward to that.  These are two resorts which are

22  in Dubai.  This is for those of you who have been to the

23  Bahamas.  This is -- looks a lot like the Atlantis in the

24  Bahamas, because it's kind of a copy of it.  In fact, I found

25  out, when I was over there, it's actually bigger than the one in

1    the Bahamas.  This is something called the one and only resort

2    which is also in Dubai, and as you can see, there's water,

3    water, water, water everywhere.

4          What happened is in about 2003 or so, Sultan, the Dubai

5    chairman, was trying to think up ideas of how he could make

6    these investments more attractive, and one of the ideas that he

7    came up with was to purchase submersibles, submarines, so that

8    you can imagine the people walking down to the beach and taking

9    their wives and family and brothers and sisters and aunts and

10   uncles on a little ride going under water, seeing the tropical

11   fish, etcetera.

12         What he did was put a gentleman, who you'll meet in a

13   couple of days, a guy named Jim Miller, he put Jim Miller in

14   charge of the project.  And Jim, as you'll hear from his own

15   mouth, is one of the world's leading underwater photographers,

16   he's a master scuba diver.  And, in fact, Jim and Sultan share

17   this incredible love of the ocean.  So he put Jim in charge of

18   trying to find an investment.

19         So Jim did what our kids do, what we do these days, he

20   scoured the internet and located a number of companies, there

21   aren't actually very many of them, which manufacture submarines,

22   but not for military use but rather for regular use.  And

23   what -- unfortunately what happened was when Mr. Miller started

24   visiting these companies or calling them up, what he found out

25   was that the submarines really didn't fit Sultan's vision.

211

1    Like, if you can imagine those resorts, like how you know how

2    they have Hobe Cats up on the beach, he kind of envisioned

3    something that where you can get on it, maybe pay five bucks a

4    person.  But these submarines cost $30 million or more, so they

5    didn't fit his vision at all.

6         But then he came across the website of Mr. Jaubert's

7    company, a company called Seahorse Submarines, and you'll hear

8    from Mr. Miller that he became extremely excited when he saw

9    this website.  You can see here -- you see these really neat

10   looking models, you see them in the water, control rooms.

11   Here's another one in the water.  And he read the website, and

12   I'll get back to the website in a little bit.  Just got really,

13   really excited.  He got particularly excited when he found out

14   that the base model of Mr. Jaubert's Seahorse Submarine was a

15   submersible that he could purchase for $35,000, a lot less than

16   $30 million.

17        And eventually he speaks to Sultan and said, "We should

18   really investigate this."  And they decide to visit Florida.

19   And they visit Florida and they meet Mr. Jaubert.  Mr. Miller

20   will testify in a couple of days that Mr. Jaubert is an

21   extremely sort of soft sells, really effective salesman.

22   Mr. Miller and Sultan believed what Mr. Jaubert was telling

23   them.  Can we go to that slide, Jon?  About some of the things?

24   Excuse me.

25        What he told them, either via his website or through

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

212

1    his mouth, was that the submarines that he designed and

2    manufactured were dry.  If you can see here, here's his website.

3    It says it is a water tight, and keep that in mind, water tight

4    with a dry cabin where passengers can enjoy the underwater tours

5    without getting wet.  Next he said that the submarines -- he

6    said in multiple places the submarines were safe, but remember,

7    they're talking about taking these and putting them at hotels

8    where you can take, in my case my grandchildren into these

9    boats, and that they were safe.  And here it is durable, tough,

10   high reliability and safety for its passengers.  At all times.

11        He also said that the submarines were -- that you could

12   get standard commercial insurance on these submarines.

13             Next.  Right.  All requirements.  Seahorse meets

14   all requirement for permits and insurance coverage.  All

15   requirements, and I'll come back to this.  He said that the

16   designs were finalized.  He said they were production ready.  He

17   said that he had many happy customers to whom he had sold these

18   submarines.  Here's one of them.  As you can see, we visit them,

19   Sultan and Jim Miller visit them a year later.  This was

20   supposed to be production ready in 2004, 2003, and what you'll

21   hear and see in a little bit what happened when we tried to test

22   those submarines over in Dubai and actually put them in the

23   water.

24        So really, at the core of this is that Sultan and Jim

25   Miller believed that all these things that Mr. Jaubert told them

213

1    about his submarines.  And because they believed him, they took

2    some actions.  The first thing they did was they decided to

3    purchase three of the submarines.  And in the beginning, they

4    were thinking about purchasing them for use sort of trying them

5    out and then seeing how things went.  Here's one of them they

6    purchased.  Can you go to the next one?  Here's another one that

7    they purchased, and here's the third one, which is actually not

8    exactly the one they purchased.  You'll see this one has one

9    bulb here on the top.  The one they purchased was a Stingray

10   Duo, which had a second bulb so it could carry two people rather

11   than one.  Can you go forward, Jon?

12        Here's an agreement which they agreed to purchase the

13   discovery submarine.  I want to take you through a couple of the

14   provisions in the agreement.  All right.  These vessels were

15   supposed to be fully constructed and ready for delivery.  If the

16   seller, Mr. Jaubert and Seahorse, is unable to complete the

17   construction and deliver them so that they -- in a form that

18   they work, we're entitled to get our money back.

19        And as you can see, Sultan appointed Jim Miller, who

20   you're going to hear from in a day or two, as his representative

21   with respect to these submarine purchases.  Lastly, it said that

22   the agreements couldn't be amended except by a writing signed

23   by, in this case, Dubai World.  This is a pretty familiar

24   provision in a lot of contracts because a lot of times, people

25   sign contracts, and then all of a sudden later, "Oh, no, we made

214

1   an oral deal."  This is supposed to prevent oral deals from

2   happening.

3       In any event, they signed, wanted to purchase the Goby

4   submarine, it had all the same provisions as I just showed you

5   then they signed a one to purchase the Stingray Duo submarine,

6   and again that had every one of those representations in the

7   contract.

8       And Dubai World paid $58,225 for the Goby, $251,087 for

9   the Discovery, and $42,500 for the Stingray Duo, and Mr. Miller

10  will testify that, in fact, Dubai World did pay that amount of

11  money.

12      So what's next?  Can you click that?  You know, going

13  back to Mr. Jaubert, what happened is that Jim Miller -- and

14  Sultan believed what he said.  This is a quote, actually a

15  translation from a book that Mr. Jaubert wrote after he

16  completed government service.  He said that he was -- by virtue

17  of being a spy for the government, he became very artful in

18  lying and concealment, and we'll see a little bit later how very

19  well he did at that.

20      In any event, what happened next is that Mr. Jaubert

21  and Mr. Miller remained in pretty constant contact.  Mr. Jaubert

22  was an extremely effective salesman, and Mr. Jaubert ultimately

23  convinced Mr. Miller, and Mr. Miller convinced Sultan that the

24  thing to do was to uproot Mr. Jaubert's operation here in Stuart

25  and move it, lock, stock and barrel, to Dubai.  And the theory

215

1    behind that was if they had a better facility to construct the

2    vessels, if they had access to cheaper labor, he could make more

3    money.

4            So Mr. Jaubert convinced them to move the operation to

5    Dubai.  This resulted in another two contracts, again, written

6    contracts.  The first one, Dubai World agreed to purchase the

7    assets, like, if you can imagine like the molds to those cool

8    looking submersibles, tools, and also -- can you go forward a

9    little bit, Jon?  The contract here was between not only Mr. --

10   not only Dubai World, but also Mr. Jaubert and his wife, and

11   here's the amount of money they paid for the materials.  And

12   you'll see they paid another $300,000 for what they call

13   intellectual property, designs, and what have you.

14           Next they agreed to hire Mr. Jaubert as the CEO of --

15   can you flip forward a little bit, Jon, please?  Thanks.  There

16   is Mr. Jaubert's signature.  The -- next they agreed to hire

17   Mr. Jaubert as the CEO of what was to be a newly formed company.

18   Ultimately it was going to go by the name of Exomos,

19   E-X-O-M-O-S.

20           Here's his contract.  Can we move through this?  Here

21   are the terms of his contract, and what we did was -- can you

22   flip forward one?  What we did was these are in the local

23   currency, which is what they call Dirhams, and what we did is

24   convert this to US dollars.  The conversion rate is fixed, so

25   you can plug it into your calculator.  Salary of $8,000 a month,

216

1    accommodations of $4,000 a month, compensatory allowances of and

2    educational allowances of 1,800 bucks a month.  And as you can

3    see, that all adds up to a pretty considerable amount of money.

4    $20,000 a month, or approximately $240,000 a year

5         So now we have the agreement is set, Mr. Jaubert has

6    agreed to become the CEO of the company, his compensation is

7    set, he's received the $1.5 million for the assets of Seahorse,

8    he's received the money that I showed you for the submarines, so

9    now the operation shifts to Dubai.  The submarines that were

10   supposed to work shift to Dubai, Mr. Jaubert shifts to Dubai,

11   everything shifts to Dubai.  This is the -- a picture of the

12   facility which Dubai World built for Mr. Jaubert's submarines.

13        Can you flip forward, Jon?

14        The unfortunate thing that happened is when the

15   submarines arrived in Dubai, we quickly found out -- or

16   Jim Miller quickly found out that they didn't work.  They just

17   simply didn't work.  And what happened was that they tried to

18   make them work and actually never succeeded.

19        What I'm going to show you now is several of test

20   reports.  What they would do is they would take the submarine

21   out, Mr. Jaubert's submarine out, sometimes take it into the

22   water, run tests on it, and like any good practice, they would

23   write down the results of the test.  So you can see this one,

24   everybody uses sort of European dating here, so this is actually

25   November 16, 2005.  This is a test of the Goby.  This is one of

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

217

1   the ones that Dubai World purchased from Mr. Jaubert.  This was

2   one of the ones that Mr. Jaubert had represented was in final

3   shape, ready to run.

4         Okay.  And can you go back one, quick, Jon?

5         You see that up here this was a test tank.  Think of a

6   big swimming pool where they lower the submarines into the

7   swimming pool or big tank to test them out before they take them

8   out into open water.  And here's Jim Miller, and here is

9   Mr. Jaubert.  Take a look at these reports.  Nick reported on

10  the submarine which was in final design, water leaks, found a

11  serious leak, leaks, leaks, leaks, leaks.  Could you go back?

12        Look at this.  Leaks above and below the control panel,

13  the electronics from which you operate your boat.  The

14  submarines and leaks don't mix.  Submarines and boats don't mix,

15  but submarines, when you're under the water with leaks, is a

16  pretty terrifying thing.  Go forward, please.

17        Air leaks, water leaks, unable to connect the emergency

18  tank, problems, problems, problems.  This is another test of the

19  Goby.  And again, this one is in the test tank, air leaks.

20  Valve does not seal correctly resulting in a gush of water

21  entering the cabin.  Just what you'd want in a boat where you're

22  going to take your grandchildren.

23        Water leaks in the cabin.  Exterior leaks.  Leaks,

24  leaks, leaks.  Problems, problems, problems.  Next one, third

25  Goby test.  All right.  They finally take the Goby out into the

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

218

1    gulf, the Persian Gulf, and what happens?  Well, they can't keep

2    a heading.  And ultimately the boat goes around in circles and

3    circles and circles, and you see this a lot in these test

4    reports.  In the end what happened, the test was never completed

5    and the trials were aborted.  Okay.

6         Here's a test of the Stingray.  All right.  Here's a

7    Stingray.  Another one that Mr. Jaubert said was ready to be

8    sold, ready to be produced in Dubai.  They take it out in the

9    water, and the submarine points down and ultimately points down

10   and ends up hitting the bottom.

11        All right.  This is -- here you take a look at this, it

12   says you know those bubbles, remember the bubbles on the

13   Stingray?  The bubbles are 60 percent full of water.  It's like

14   being in quicksand, except the water is coming up.  You can

15   imagine how what a pleasant tourist experience that would have

16   been?  Again, what happened?  Trial was aborted.

17        If you click back.  After the sub landed stern first

18   and the rudders were damaged.  Can you fast forward Jon, please.

19        Okay.  Here is another one.  Okay.  It was hoisted,

20   could not dive unless three additional passengers were added to

21   the ballasts.  So it was hoisted out, but during the test, what

22   do they find?  Cracks in the hull, water leaks, hull breach.

23   For those of you who aren't boaters, a breach means a crack in

24   the hull.  Air leaks.  Problems, problems, problems.

25        Go forward, Jon.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

219

1        Here's another test.  And this test was of -- again,

2   you see Mr. Miller, you see Mr. Jaubert.  This is of the

3   adventurer, and one of the subs you see.  Now, this one is

4   really interesting.

5        MR. HESS:  Judge, I have an objection if I can come

6   sidebar.

7        THE COURT:  No sidebar.  Tell me what your objection

8   is.

9        MR. HESS:  Objection is he's -- these documents are

10  hearsay, and he is over and over attempting to put in front of

11  the jury documentation that cannot possibly come into evidence.

12        THE COURT:  Well, that's his problem.  If he can't get

13  it in, the jury will remember that he said he was going to

14  introduce it and we'll see then.  This is opening statement,

15  I'll permit him.  He believes this is going to be the evidence.

16        MR. URQUHART:  What I can tell you, Your Honor, is

17  Mr. Miller will be here tomorrow, and Mr. Miller actually

18  participated in these in, some of these tests, and Mr. Miller is

19  going to testify tomorrow.

20        MR. HESS:  Judge -- if I may, Judge.  I'm sorry.

21  Because what I'm speaking of is these are reports that

22  Mr. Miller can talk about all day what his experiences were, but

23  the reports are -- have no evidentiary basis.  For instance,

24  Nick reported that he heard sloshing.  That's a hearsay

25  statement.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1            THE COURT:  Well, it may be or may not be.  I don't
 2     know.  It's his responsibility to introduce what he says he's
 3     going to introduce.  If he doesn't, the jury will remember and
 4     they'll hold it against him.
 5            MR. URQUHART:  I think what the jury will remember --
 6            THE COURT:  You won.  You want to lose?  You're still
 7     arguing; you already won it.
 8            MR. URQUHART:  I know that.
 9            THE COURT:  So if you want to lose it, go ahead.  All
10     right.  Move on.
11            MR. URQUHART:  All right.  I'm moving.  Sorry, Your
12     Honor.
13            THE COURT:  That's okay.
14            MR. URQUHART:  I'm fast forwarding.  Okay. This is
15     really interesting because Mr. Jaubert, or Mr. Hess for
16     Mr. Jaubert is going to show you soon pictures, really neat
17     pictures of the submarines which Mr. Jaubert designed, and trust
18     me, they are really, really cool looking, and he's probably --
19     although I'm not sure -- going to show you footage of --
20     professionally done footage of the submarines to give you the
21     appearance that they actually worked.
22            But if you take a look at this one, they take it out
23     for the purpose of taking movies of it, they decide they better
24     move it to shallow water because the submarine is not working
25     properly.  They have to drain the submarine of water, and you
```

221

1    can see the media was -- in other words, they were taking movies

2    of it, then what happens is ultimately, as with all of these,

3    the dive was aborted and they had to go back.  So what you see

4    is not always what you get.

5           Can we move forward, please.

6           Again, problems, leaks.  Think of it in a submarine,

7    the most elementary place that you want a seal to work, are in

8    your hatches.  We've all seen the movies.  And the hatches are

9    leaking.  This is like amateur hour.  Air leaks.

10          So here we are back to these representations that

11   Mr. Jaubert made in order to induce Dubai World to purchase the

12   assets, to purchase the three submarines, to retain him as CEO

13   at a salary and commission of $250,000 a year, but -- can you

14   flip forward -- later we found out these representations, which

15   we had a right to rely on, were not true.

16          The submarines were not dry.  You see it, leaks, leaks,

17   leaks, leaks, leaks.  They weren't safe.  You couldn't get

18   standard commercial insurance for them because they weren't even

19   completed.  And how can you get insurance on something that

20   isn't completed.  But you'll hear from others that in order to

21   get insurance, you have to be certified by one of five worldwide

22   recognized bureaus, and they never got that.  And most

23   importantly, these designs were never finalized.

24          They weren't production ready.  The whole concept is he

25   had designs.  Mr. Jaubert had designs which were finalized.  He

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

222

1   had tools and ideas which were in place.  They take them and

2   move them from Stuart to Dubai, set up shop, churning out these

3   submarines at a faster rate because we have a bigger factory.

4   Last of all, you'll see that Mr. Jaubert claimed to have been a

5   naval architect when, in fact, his resume shows he was not.  Can

6   we flip forward?

7          Now, you'll also hear from Mr. Miller that when he

8   arrived and was working at Exomos, he quickly recognized that

9   there were problems here.  You take a look at these tests.

10   These submarines were having problems.  So Mr. Miller suggested,

11   and Dubai brought in all these world renowned submarine experts.

12   Dr. Don Walsh, retired captain of the United States Navy.  One

13   of two people who ever went to the deepest place in the ocean.

14   Dr. Phil Nuytten.  Dr. Phil Nuytten has I don't even know how

15   many patents on submarines, and he's one of the people that

16   Mr. Miller visited with respect to sort of the noncommercial

17   submarines.  And you'll actually hear from Dr. Nuytten later

18   this week.  Dr. Ross Saxon, a retired US submarine officer,

19   Mr. Lorenz Krueger, a German engineer, Mr. Bert De Wijs, another

20   submarine expert.  And what Mr. Miller will tell you is each of

21   these men came in, each of them was an expert, Dubai World paid

22   for each of them, and Mr. Jaubert wouldn't listen to them.

23          In fact, Mr. Miller will tell you that he did his best

24   to just get the people, these experts out of his offices.  And

25   in any event, can you flip forward, Jon, please.  This is a

223

1    business viability assessment report dated December 2006, over

2    two years after Mr. Jaubert arrived in Dubai with his

3    production-ready submarines, and this was a report where they

4    brought in four outside consultants, including a retired

5    commander of the, again, submarine service.  And take a look at

6    just two of the things that they wrote.  As of November 2006,

7    after two years of operations, Exomos hasn't booked any

8    revenues, zero.  Shows no evidence of any revenues in the

9    future.  But most importantly, going back to the representations

10   that Mr. Jaubert made to Exomos, what does it say?

11         Look at this.  No product, no product.  In a seaworthy

12   state, in parenthesis, in 2004, and the last part of 2004,

13   Exomos bought products from Seahorse ostensibly for immediate

14   production; however, even these products which were supposed to

15   be finalized designs were seaworthy two years later.  The next

16   is a report done by Mr. Krueger or Mr. De Wijs.  Conclusion,

17   Exomos, from the beginning, didn't have the engineering

18   expertise to design or build or test submarines.  Submarines.

19   The expertise was supposed to come from Mr. Jaubert.

20         So this is their conclusion.  And they say that it's a

21   complete waste, it's a complete waste to invest any more money

22   in under Jaubert's designs because they don't work.

23         THE COURT:  Hold on.  We'll be in brief recess.

24         (Brief recess)

25         JUROR:  Thank you, sir.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

 1            THE COURT:  Yes, ma'am.  All right, sir.  You may

 2    proceed.

 3            MR. URQUHART:  To sort of recap, it's in 2007,

 4    Mr. Jaubert was finally fired by Dubai World and Exomos.  And as

 5    of 2007, you'll hear, AbdulQader, who is the head of the audit

 6    department at the entire Dubai World holding company, will

 7    testify that Dubai World had lost over $33 million in this

 8    investment, that none of the three submarines that were

 9    production ready and in final shape ever passed sea trials, and

10    that the whole operation was a complete loss.

11            But Mr. Miller will testify that they didn't -- when

12    they found that the submarines weren't working in the beginning,

13    they didn't just simply throw Mr. Jaubert out the door, they

14    invested lots of money, they hired all of these experts, they

15    did everything humanely possible to make it a success.

16            So now you're asking yourself, why, then, was -- did

17    they wait so long to fire him?  And why did they fire him?  And

18    the answer is that Mr. Jaubert, notwithstanding the fact they

19    had gotten a million five for useless stuff, the assets of

20    Seahorse, paid $750,000 in salary and gotten -- and received

21    money for three submarines, that wasn't enough for Mr. Jaubert.

22    In fact, I'm going to take you through three schemes that

23    Mr. Jaubert engaged in to line his pockets with well over $1

24    million of company funds.

25            You'll hear, during the course of the testimony this

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

225

1     week, that there were five separate audits that were conducted

2     of Exomos and Dubai World.  The first one was a routine audit in

3     2005, and AbdulQader, who I've met, will testify that audits

4     weren't, frankly, what I thought they were.  Basically the

5     function of the audit department is really to come in and help

6     you, maybe help you design a better way of dealing with

7     receivables, etcetera.  So that was audit number one, and here

8     it is.

9           And what -- they found some red flags.  That's what the

10    auditors call them, red flags, which weren't like -- in my mind,

11    I've read them, they were serious in nature, but correctable,

12    but there were so many of these red flags, they decided to do a

13    follow-up audit, which they did in August of 2006.  And then in

14    the follow-up audit, what they found for the first time was

15    evidence of self-dealing on the part of Mr. Jaubert.

16          Self-dealing through his company, Seahorse, which had

17    no function, except for the function I'm about to describe.  And

18    then because of this self-dealing, they brought in a unit of

19    AbdulQader's group called the Fraud Prevention Group, and what

20    they did was a much more thorough investigation.  And what we're

21    going to do now is I'm going to take you through what they found

22    and how they found it.  Bear with me, and I hope you don't fall

23    asleep because this is some dense stuff.

24          THE COURT:  You're getting to the boring part?  Okay.

25    Okay.  Go ahead.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1              MR. URQUHART:  You're hurting my feelings, Your Honor.

 2              THE COURT:  Talk louder or do something.

 3              MR. URQUHART:  I'll try.

 4              THE COURT:  I don't want to lose the jurors.  I don't

 5      want them falling down.

 6              MR. URQUHART:  This is a standard purchase procedure

 7      for any company.  Here's Exomos, here's Mr. Jaubert, and you

 8      issue a purchase order to a company, call up, get a quote, you

 9      say, "I want to buy X, Y, Z for X amount of money."  They ship

10      you the parts back and the money goes back to the supplier.

11      That's how business is done pretty much all over the world.  But

12      not at Exomos.

13              All right.  This is scheme number one.  I'm a Dire

14      Straits man, so I picked this one out, Money for Nothing.  Can

15      you go up, start this, Jon?  And what this scheme is, is Dubai

16      World paid money, and you'll see large sums of money for

17      materials which never were received.  And let's just go through

18      example number one.  All right.  It involved Seahorse.  So here

19      we go.  Remember, the standard deal is straight to the supplier,

20      but this is different.

21              Can you flip there.  In this instance what happens is

22      Mr. Jaubert's Seahorse company sends an invoice to Exomos.  All

23      right.  Here's an invoice.  I'm just going to show you this

24      once.  This is because we'll be going through about six

25      examples.  Here's the Seahorse emblem, here's the Seahorse
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1  design, this is actually a purchase order number, we'll get to

2  that in the middle, and here's -- down here, Mr. Jaubert's

3  signature.  I know Jon is going to tell me I told you that we'll

4  have all this blown up.  Here says "process payment,"

5  Mr. Jaubert.  So here he is with saying process payment.  In

6  this case it's for $130,000.  Okay.

7          So then what happens is a purchase order issues.  All

8  right.  This is the Dubai World entity.  It issues the purchase

9  order to Seahorse, Mr. Jaubert's company, but this is really

10  important because in each and every one of these purchase

11  orders, there's a ship to.  See where it says "ship to."  Exomos

12  in Dubai.  Keep that in the back of your mind.  For a net total

13  of 130,944.

14          So the money goes from Exomos where Mr. Jaubert is

15  chairman, to his company, Seahorse, which he owns entirely with

16  his wife.  Here's the -- remember the purchase order?  All

17  right.  Same purchase order.  Here's the check register showing

18  that the amount was paid to Seahorse, full amount.  All right.

19  Here's the interesting part.  All right.  Again, you see

20  Mr. Jaubert's signature at the bottom.

21          And you see received crossed out, and then you look

22  down here and what does it say?  Will be delivered by 2008.  Can

23  you back up one?  And no, you can go forward.  Here's the order.

24  Here's the order 2005.  And you see Mr. Jaubert's signature

25  saying, oh, we didn't get what we ordered in 2005.  It says

228

1    "received," crosses it out, he says we're going to get it three

2    years after it was ordered.  And a point of fact, we never got

3    it.  $130,000 out of our pockets into Mr. Jaubert's pockets via

4    his company Seahorse.  Here's the audit that was conducted,

5    delivery yes or no.  No.  Here's what Mr. Jaubert said, "Oh, we

6    haven't gotten it yet," this is what he says to the audit, "We

7    haven't gotten it yet, but don't worry, the check is in the

8    mail."

9            Now, in a company, any company of any size, certainly a

10   company the size of Mr. Jaubert's company, the one he ran, there

11   are procedures for taking things into inventory; otherwise,

12   there would be chaos.  There is a receiving department, it comes

13   in.  The receiving department makes a notation, "received."  If

14   there's a problem with what is received, if it's broken, they

15   say, "Okay.  Received broken, returned for refund."  But not

16   here.

17           The auditors looked.  And you'll hear from a gentleman

18   named Hussain Ramadan, who conducted the ground research in

19   this.  He actually is a US citizen notwithstanding his name,

20   went to college right down the road here in Florida.  He was a

21   CPA and was trained by one of the big five companies, and he's

22   the one that looked around.  He looked at the accounts

23   receivable, he looked for inventory in case somebody failed to

24   book it, couldn't find the part, couldn't find any entry,

25   couldn't find anyone, $31,000 returned, so money for nothing.

229

1     That's example number one.

2          Here's the next scheme that he engaged in.  This is

3     scheme number two.  Returned, no refund.  In this scheme what

4     happens is you see Mr. -- here's, again, Exomos -- pardon me for

5     a second.  In any event, Exomos, Seahorse in the middle, invoice

6     goes to Exomos, here it is, 66,000 -- I'm sorry, $176,000.  This

7     is Herve Jaubert, here's his signature.  So Herve Jaubert is

8     billing as president of Seahorse, bills Exomos for $176,000.

9          Purchase order issues, same thing.  Dubai entity, to

10    Seahorse, invoice number, where is the ship to place?  Straight

11    to Dubai.  And again, that becomes really important for reasons

12    I'll get into in a minute, and money goes, right, money paid, by

13    Dubai, to Seahorse, 176,000, and what happens?

14         Auditors are on Mr. Jaubert's trail again.  Says

15    "Returned, not working."  Right.  Returned, not working.  The

16    auditors get in there, people in receiving departments, people

17    in inventory departments.  Departments, they keep track of

18    things like this.  Something is returned, there's a notation in

19    the leger saying "returned."  And but there's no notation in the

20    leger returned, there are no parts in inventory, and once again,

21    Dubai World is out.  Here's the results of the audit.  No

22    documentation present, technical staff unable to locate any of

23    these parts.

24         So what happens, another $176,000 that we're out of

25    pocket.  Okay.  That's scheme Number 1.  And Jon calls the

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   second one 11A.

2          But scheme Number 2 is this invoice padding.  You'll

3   see how this one works.  Again, starts out invoice from Seahorse

4   to Exomos.  You've seen the routine by now.  All right.  Again,

5   Herve Jaubert, you can imagine him with his Seahorse cap on,

6   signs the invoice, $16,700.  Runs around a desk, puts on his

7   Exomos hat and says approved.  Purchase order issues.

8          Look at this.  You see this one?  Can you -- do we have

9   this blown up, Jon?  Well, I'm sure you can't read it from over

10  there.  Says, as per quotation.  As per quotation $16,700 as per

11  quotation.  Now, let's see what really happened.  Again,

12  purchase order.  He did have it as per quotation, $16,700, so --

13  you went too fast, Jon.

14         So money goes from Exomos, the full 167.  What does the

15  supplier receive?  $12,650.  Can we move forward?  Again, the

16  full amount is paid, but here's the company from which Seahorse

17  is ordering the goods.  This is the actual -- this invoice to

18  Seahorse for the goods that Exomos is paying for.  Here it is,

19  bill to Seahorse.  Once again, where is it delivered?  It's

20  delivered to Dubai.  But look at this magic thing that happens

21  here.  All right?  Here's what Seahorse pays.  $5,700.  Here's

22  what Seahorse charges Exomos, $7,700.  Here's what Seahorse

23  pays, here's what they charge.  $8,200.  They even marked up a

24  crate $50.  So the end result of it is $4,000 into Mr. Jaubert's

25  pocket, into Seahorse's pocket out of Dubai World's pocket.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1

2          So we're up to what, three?  Okay.  This is the

3     improper service and handling charges.  And I ask you to focus

4     on the -- where it always says, "Ship to Dubai," "Ship to

5     Dubai," "Ship to Dubai" on all of these?  And let's start this

6     one.

7          Again starts as all of them, invoice for Mr. Jaubert to

8     Mr. Jaubert.  Purchase order from Mr. Jaubert to Mr. Jaubert.

9     All right.  Process, Mr. Jaubert.  $122,815.  And what is it

10    for?  This is really -- this is, I thought, like a little bit

11    going over the top.  You'll see this is development of a system.

12    In other words, this is paying for labor, not for a part.  For

13    labor.  And here Mr. Jaubert adds on service and handling

14    charges, not only on the $86,000 for the part, but on the

15    service.  So it's service charges on top of service charges.

16         And can you back up one, please.  One more.  I'm sorry.

17    This is for service and handling.  Seahorse is handling nothing.

18    Seahorse is servicing nothing.  It's not like any of these parts

19    were shipped to Stuart, consolidated, put in a container and

20    shipped to Dubai.  As you can see, every single one of these

21    invoices, the goods were shipped directly to Dubai.  There was

22    no handling involved.

23         Can we fast forward?  Here's the purchase order again,

24    invoice purchase order, and you see -- do we have this

25    highlighted, Jon?

1      MR. CEDERBERG:  I don't think so.

2      MR. URQUHART:  Do you see at the bottom -- can I just

3  read it to you.  This says Sultan's name, says "approved by

4  Sultan."  And in deposition, those of you who have never been in

5  a lawsuit before, what happens is that under the Federal Rules

6  of Civil Procedure, we're entitled to take depositions.

7  Depositions are basically you take the same exact oath as the

8  witness would take when they took the stand.

9      And during the deposition of Mr. Jaubert, he claimed

10  that Sultan had approved him padding his bills by 10 percent,

11  and, you know, I thought this was just ridiculous because the

12  bills, some of them -- first of all, it's only a handful out of

13  all of them, but secondly, isn't the CEO of a company entitled

14  to rely upon one of his managers to charge him only for what is

15  appropriate, not to include a service charge for no service,

16  handling for no handling?

17      But in any event, so what happens is invoice, money

18  paid, here is evidence of the money being paid to Mr. Jaubert,

19  and we see that extra service and handling charge for doing

20  essentially nothing.  This is actually my partner Jon

21  Cederberg's favorite of all of them because this is -- he calls

22  it double dipping.

23      In this one I'm going to show you that first

24  Mr. Jaubert pads the bill, like we saw in scheme Number 2 where

25  he takes -- pays 10,000 bucks for it, then charges 12,000 bucks

233

1    for it.  So first he initiates the bill, then he adds service

2    and handling charge on the entire inflated bill.  You'll see it

3    in a second.  Invoice $204,600.  Same drill, purchase order,

4    process payment, Mr. Jaubert, pay myself.  Here is the -- for

5    204,600.

6        Let's click forward, Jon, please.  Purchase order 2,400

7    (sic) and -- all right.  Again, ship to Exomos.  Seahorse,

8    purchase order from Dubai World.  What do we see?  2,400.  All

9    right.  2,400, right?  And what does Mr. Jaubert pay for the

10   goods?  He doesn't pay 204,600, he pays $162,772.

11       So here's evidence of the payment, here's what was

12   paid, really paid, and so if you go back to the beginning, he's

13   charging padding the bill, inflating the bill to the company

14   that he's the CEO of, and then to add insult to injury, he puts

15   a service and handling charge on it when it's being shipped

16   directly to Dubai.  And I think that's the end of those.

17       So at this point, you're probably wondering what

18   happened to all of that money that went into Seahorse.  Well,

19   during the -- I told you before about depositions, what happens,

20   also, is we have an opportunity to look at his e-mails, his

21   business records, he has an opportunity to look at ours, and we

22   found these wiring instructions.  From Seahorse, from

23   originator, Seahorse Submarines, Mr. Jaubert's company, to

24   Mr. Jaubert, $130,000.  There's another one, $110,000 from

25   Seahorse to Mr. Jaubert.  $50,000, another $50,000.  I know

234

1    there's one more, $40,000.  All money wiring out.  All going

2    into Mr. Jaubert's pocket through his company Seahorse.  And

3    when the auditors testify -- I just picked out six examples,

4    there are dozens and dozens and dozens of examples of this.

5          And here's one thing that we found almost kind of

6    humorous.  Here is Seahorse paying to ship to Dubai from

7    Switzerland, Mr. Jaubert's brand new Lamborghini, and there he

8    is in his powder blue Lamborghini in Dubai living the good life.

9          In any event, this audit is conducted, and it's like

10   pretty much any other audit.  The audit results are presented to

11   Mr. Jaubert, he's given an opportunity to contest the results,

12   and ultimately, the results of the audit are finalized, and

13   you'll hear from AbdulQader later this week, the head of audit

14   at Dubai World, that there were attempts to reach a settlement

15   with Mr. Jaubert, steeply discounted from not trying to get the

16   $33 million they lost back, not trying to get the million five

17   they paid for the useless company assets, just the money that

18   was stolen through the accounting schemes, and they offered a

19   steep discount, and ultimately it resulted in a meeting, and on

20   February -- there's another one.  Hold it.  Can we back up?  Oh.

21         What happened is that Mr. AbdulQader, he became tired

22   of dealing with Mr. Jaubert, and ultimately just said, "This is

23   embarrassment, I'm turning it over to the prosecutors."

24         But interestingly in Dubai, they have all sorts of,

25   well, additional, I guess, protections for people.  In cases of

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

235

1    financial fraud or financial misdealings, before the prosecutors

2    will charge you, you'll hear this from AbdulQader, before the

3    prosecutor charges you, the court appoints an independent

4    expert.  There's an outsider, not employed by, in this case,

5    Dubai World.  And they did -- and his name is Tarek Ahmed, and

6    he's a got his CPA in Egypt, and it's called charter public

7    accounting.  In the US it's certified public accounting.

8            In any event, AbdulQader does an independent

9    investigation, and here is what AbdulQader said in his

10    deposition which took place in Dubai.  Ms. Heathcock and

11    Mr. Hess were there.  They had an opportunity to ask him

12    questions.  Is your auditing firm considered to be an expert?

13    Yes, we are registered with the courts.

14            What does that mean when you register with the courts?

15    We are sworn by the courts based on our background and

16    experience in financial cases because sometimes the court judge

17    is not a financial guy, doesn't know about financial things of

18    core problems, so they refer the case to certain registered

19    court expert to give the opinion about the documents in the case

20    and the conflict between the parties.

21            What does that mean, independent?  Independent means

22    that I don't work for somebody.  I work for the court.

23            Okay.  So did you read the audit report?  These are

24    questions that Mr. Hess asked.  Yes.

25            Did you agree with the conclusion at that time?

236

1  Answer, I don't put an opinion when I read any report.  When I

2  see the documents when I investigate myself, then I put my

3  opinion.

4          If you look down below, it was not pointed to agree or

5  disagree with their report.  I was appointed to investigate a

6  special case, and I investigated and put my report to my

7  conclusion.

8          Was the report of Dubai World correct?  He says, I

9  don't know because I did my own independent report.

10          And what did he find?  At any time after reading the

11  report after conducting your investigation did you agree with

12  them?  I didn't want to prejudge or come to a preconclusion.

13  Through the interpreter, he just reviewed and came with the

14  conclusion on his own.

15          And what did he find?  That Mr. Jaubert was illegally

16  charging personal expenses to Exomos, he was improperly buying

17  items through the three schemes I just described to you from

18  Seahorse.  He was buying items through Seahorse for items that

19  weren't delivered and he was padding invoices.

20          Okay.  Flip forward, please.

21          So the criminal charges are filed.  And just like in

22  the United States, once you turn it over to a prosecutor, you

23  know, it's out of your hands.  And but nonetheless, they still

24  tried to reach a settlement agreement, and, in fact, they

25  thought they had reached a settlement agreement in March 2008,

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

237

1    and ultimately Mr. Jaubert never paid Exomos any of the money

2    that they claim that they owe him.

3           So, here we are three years later.  And take a look at

4    this.  This is pretty astounding.  This is Mr. Jaubert's three

5    years in Dubai.  $780,000 in income and benefits.  Remember, you

6    paid for the assets of Seahorse and the submarines, so he got

7    nearly $2 million for the assets and the submarines.  His

8    company Seahorse, and ultimately he ended up paying $575,000 for

9    parts that they never received.  They paid an additional

10   $210,000 for padding the invoices again into Seahorse, into

11   Mr. Jaubert's pocket.  And an additional $400,000 for the 10

12   percent service and handling charges for a subtotal of $3.8

13   million for his three years in Dubai.

14          And you remember at the beginning I showed you

15   Mr. Jaubert had that house on Palm Island?  Well, Mr. Jaubert

16   owned the house for three years and bought it for, I think,

17   $780,000, and sold it for over $2 million for a profit of nearly

18   $1.5 million.

19          So in his three years in Dubai, driving around in his

20   powder blue Lamborghini, Mr. Jaubert had a total of a -- and the

21   grand total is?  $5.3 million.

22          And at the end of those same three years, what did Dubai

23   World get?  A factory that it didn't need, a business that was

24   worthless, three submarines that never worked.  Thank you very

25   much.  I know all of you paid very close attention to me, and I

1      appreciate your attention this late in the afternoon, and I hope

2      you enjoy the rest of the case.  Thanks.  Thank you, Your Honor.

3              THE COURT:  Thank you, sir.  You may proceed, sir.

4              You know what, while you're setting that up, why don't

5      we take a short break and let the jurors walk out and go to the

6      jury room.  And we'll start in about -- as soon as you can get

7      finished, maybe 5, 10 minutes?  Go on into the jury room, we'll

8      take a few minutes.

9              COURT SECURITY OFFICER:  Please rise for the jury.

10             (Jury out at 4:30 p.m.)

11             THE COURT:  We'll be in recess for a few minutes.

12             (Brief recess)

13             (Jury in at 4:41 p.m.)

14             THE COURT:  All right, sir.  Are you ready to proceed?

15             MR. HESS:  Yes, Judge.  May I inquire how long do I

16     have?

17             THE COURT:  An hour and 15 minutes.  Actually, an hour

18     an 14 minutes and 59 seconds, because I charged you with one

19     second before.

20             MR. HESS:  Thank you.  I will not keep the jury nor the

21     Court that long.

22             Ladies and gentlemen, my name is William Hess, again,

23     and I'm here with my partner, also my wife, Kathryn Heathcock.

24     With pleasure, she's going to help me coordinate this opening

25     statement.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

239

1        You've heard a lot of things by counsel for Dubai

2   World, and as the judge instructed you, those are not evidence.

3   At this portion of the case, I'm going to tell you what the

4   evidence is going to reveal.  The evidence is going to reveal a

5   far different picture than has been portrayed on the last big

6   screen so far this afternoon.

7        First of all, the evidence is going to show that the

8   facility that Mr. Jaubert constructed, designed, was a facility

9   of this nature.  It was an ongoing facility, producing

10  submarines and submersibles, and this is a picture here,

11  demonstrates exactly a part of that facility.  It's even much

12  larger than that picture shows.  I'm sorry.  That's the -- I

13  should move this back.  That facility is here in Florida.  And

14  it was this facility that he was operating when he was

15  approached by Dubai World.

16       Before I get into this, it's hard to resist, so I'm

17  going to start with this.  One of the first words that you heard

18  by opposing counsel in his description of what the evidence is

19  going to portray is the country of Dubai with water, water

20  everywhere.  The evidence is going to show that there's water,

21  water everywhere, but the quality of the water is so bad because

22  of the development and because of the salinity and because of

23  the temperatures and because of the combination of those factors

24  that it isn't conducive to the type of underwater sightseeing

25  that Sultan Bin Sulayem, Sultan, promised Mr. Jaubert that he

240

1     would experience with the submersibles once he got over there.

2          The evidence is also going to reveal that instead of

3     the photograph -- you've been presented with photographs today

4     by Dubai World Corporation that show not even -- well, they

5     don't show any of the picture. The evidence is going to reveal

6     you're going to be able to see for yourselves footage of these

7     submersibles, these submarines operating under water, in a safe,

8     functioning capacity.  And these aren't -- this isn't video that

9     was produced by -- under Mr. Jaubert or on his behalf.  You're

10    going to see video that was produced by Exomos, the Dubai World

11    Corporation.  You're going to see footage that was produced by

12    professional photographers and videographers working for press.

13         In addition, you're going to hear that when Mr. Jaubert

14    went to Dubai World to build submarines, you're going to see and

15    you're going to hear that Sultan Bin Sulayem dominated his time

16    with all sorts of other secondary type pursuits.  And again,

17    Sultan Bin Sulayem, he is the chairman of the multibillion

18    dollar corporation, was the chairman of the multibillion dollar

19    corporation, Dubai World, and he was at all times relevant to

20    this case.

21         And he directed Mr. Jaubert to design for him all sorts

22    of play toys for him, everything from a waterproof mirror for

23    his jet ski, to other vehicles, water vehicles, other than

24    submersible vehicles.

25         You're also going to hear that it was Sultan Bin

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

241

1    Sulayem that directed Mr. Jaubert to -- instead of completing

2    the task that he was hired to do early on, to instead take his

3    exclusive time to participate in two consecutive boat shows at

4    Dubai World.

5         You're also going to hear that Dubai World Corporation

6    participated in efforts to sell these submarines through at

7    least two boat shows, international boat shows, in Dubai despite

8    the things that you've heard today that they knew these subs

9    didn't work.

10        I'm going to ask you all to maintain in your memory all

11   of the promises that Dubai World's counsel has made to you

12   today, because that's what they are, they're promises.  They're

13   telling you this is what the evidence is going to show.  That

14   screen right there isn't evidence.  They promised you that they

15   would bring that evidence in.  They promised you you would see

16   those reports.  They promised you you would hear from expert

17   witnesses that they listed, that they say are renowned.  They

18   promised you those things.

19        You were promised that Mr. Jaubert brought a brand new

20   Ferrari -- Lamborghini.  A brand new Lamborghini.  That's what

21   you were promised.  The evidence is going to show that it was a

22   15-year-old vehicle, not at all brand new.

23        And you also heard of the comments that counsel made

24   about personalizing things, that he knows this person and he

25   knows this person, he knows the auditor, he saw this person.  I

1   was there also, I know him also to that extent.  And he also

2   made representations such as even small representations at this

3   time that promises such as that during the deposition of Tarek

4   Ahmed that Ms. Heathcock and I were there.  Ms. Heathcock wasn't

5   there.

6          Now, let me step back just a little bit.  I just

7   couldn't resist going into some of those things, but let me tell

8   you a little bit about who Mr. Jaubert is.  Mr. Jaubert is an

9   extraordinary -- the evidence is going to show he's an

10  extraordinary individual.  He's a US permanent resident, which

11  means that he's a legal, permanent resident in the United

12  States.  He has what we call -- everybody knows it as a green

13  card.  His wife is a citizen, and he's from France originally,

14  but he's lived in the United States since 1996.

15         Aside from this, well, what the evidence will show he

16  much regrets this period of time in Dubai.  Aside from that

17  period of time, he's lived and resided in the US along with

18  Puerto Rico.

19         The evidence is going to show that Mr. Jaubert was born

20  in France in 1956, and he moved his family to Chicago when he

21  was six, and they returned, after a short period of time, they

22  returned back to France.  The evidence is going to show that

23  during his schooling, Mr. Jaubert was always directed to and he

24  excelled in mathematics, chemistry, physics, and the sciences.

25  He's won national awards in France during his youth, he built

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   rockets from scratch back in the day before people weren't doing

2   those kind of things out of boxes.  He built, even as a child, a

3   remote-controlled submarine, remote-controlled airplanes.  Even

4   got in trouble with his father when, at an early age, he was a

5   music producer, and he used some of his father's music equipment

6   to wire the inside of the house.  Not to listen to people, but

7   just because he's that type of an individual.  He's a tactical

8   engineering mind.

9        The evidence is going to show that when, as a child, he

10   became interested in karate, and at the age of 11 or 16, and

11   studied karate for hours a week, and eventually went to aikido

12   and mastered that skill as well.  And the evidence will show

13   that Mr. Jaubert wanted nothing more than to serve his country,

14   and that's what he did.

15       So after graduating the top of his class in high

16   school, he attended the a university in Paris for two years,

17   again with the curriculum all geared towards the sciences.

18   After that, he joined the French Navy at the age of 22, and

19   was -- immediately entered the French Naval Academy.  He was in

20   the First Aeronautical Engineering Academy for electrical and

21   mechanical engineering.  And he'll testify that he attended the

22   Naval Academy from 1979 to 1983, and again his coursework

23   engineering, mathematics, and mechanics.

24       Mr. Jaubert will testify that in order to expand on his

25   desire to serve, he interviewed and was told how to apply to the

244

1    DGSE, and the DGSE is the counterpart in France of the CIA in

2    this country.  The evidence will show that prior to being

3    admitted into the DGSE, that he was assigned to the Survey

4    Hydrographic Organization Marine for a year in France while part

5    of the Navy, where he conducted maritime surveys, international

6    water surveys and such.

7         In 1983 to late 1985, he attended the DGSE's academy to

8    obtain training as an intelligence officer.  He earned the rank

9    of lieutenant.  The evidence will show that he was trained in

10   another academy following that in counter-espionage, and he also

11   learned about the role of intelligence gathering regarding

12   countries and organizations.

13        He'll testify that he was trained extensively in all

14   types of weapons and all types of vehicles and all types of

15   entry to -- whether it be from jumping out of helicopters, to

16   boats, to any other -- all the things that we think of when we

17   think about a person engaged in the service of

18   counter-espionage.  He wasn't a spy, he was a

19   counter-intelligence officer.  He worked with the DGSE for two

20   years.

21        And in 1985, after two years, he was placed in charge

22   of a cell of 12 persons, and the missions that which he -- to

23   which he was assigned were those that involved technical aspect,

24   whether it be electrical, mechanical, or chemical, and he was

25   tasked with creating and effectuating all aspects of the

245

1    technical applications of the various missions to which he was

2    assigned.

3         He will testify that he was in worldwide extensive

4    dangerous situations, but due to his planning and his abilities

5    and his training, he never was -- never exposed as an operative,

6    and none of his men were either.

7         He'll testify -- you will hear testimony that of his

8    great deal of experience in creating and utilizing mechanical,

9    electrical equipment, including submarines, and that in 1993,

10   after over ten years of service with the DGSE, he chose to leave

11   the service.  He wanted a life outside of the demands that we

12   can all imagine are imposed working in counter-espionage and

13   counter-intelligence.

14        Upon his retirement, he worked for a contractor of the

15   DGSE in corporate counter-espionage, and these type of things

16   were involving that client's offices and homes were being

17   monitored and they were secure and that other trade secrets and

18   proprietary information were also secure.  He'll testify that

19   after six months, he chose to work on his own in this field.

20        Now, let me take -- you also heard today a promise,

21   again, by Dubai World, that the writing that you saw ascribed to

22   Mr. Jaubert in the first book that he published was a true and

23   accurate representation.  That writing, I think, ladies and

24   gentlemen, you all remember.  It was that little quotation where

25   it said these are Jaubert's words.  That is less than a

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

246

1    paragraph taken out of a book published in France years ago.

2    And the evidence is going to show that it was completely taken

3    out of context, and the evidence is going to show that it isn't

4    even an accurate translation of the language.  It was written in

5    French and translated by Dubai World.  And the evidence is going

6    to show that it was misleading.

7         The evidence is going to show that Mr. Jaubert was

8    always inspired, and, in fat, elated by the ideas of Jacques

9    Cousteau and -- as a kid, and that while in the Navy, he dove in

10   Bora Bora and other amazing places, so he saw the beauty of

11   underwater.  And it was his dream, just as Jacques Cousteau

12   brought the underwater to all of our homes through television,

13   it was Mr. Jaubert's dream to bring the person under water.

14   Inspired by the Jacques Cousteau's inspiring participation with

15   the water.

16        He purchased a submarine hull from a company and

17   manufactured his first recreational submarine, which he called

18   the Goby.  He operated the business with the submarine in

19   Puerto Rico, and that business was profitable.  The submarine

20   would dive 20', and the ride would last 30 to 40 minutes and

21   cost about $95 per person.  And that while he was in Puerto

22   Rico, he built and sold four submarines.

23        Due to Puerto Rico being hit by a hurricane, he

24   relocated his company to Stuart.  His company in Puerto Rico

25   wasn't hurt, but the tourist industry was so decimated that he

1    had to look for another -- well, he wanted, again, to bring his

2    submarines to the people.  He wanted to bring the people to the

3    water and under the water, so he moved to Stuart, Florida.

4         And in Stuart, Florida, you're also going to hear that

5    he was registered with the US Coast Guard.  He operated under a

6    code that was assigned by the US Coast Guard to put on the hulls

7    of the submarines, and that evidence is going to show that he

8    operated a tourist submarine business fully with the -- in the

9    confines of the law and the requirements of the US Coast Guard.

10   The evidence is going to show that this is one of the submarines

11   that he built and operated, and this is a picture in Florida.

12        Now Seahorse, this is another vessel that

13   Mr. Jaubert -- this is what is called -- the evidence is going

14   to show and we're going to find out, we're going to hear a lot

15   about the distinction of these type of submarines.  There's a

16   wet version and a dry version.  The wet version, obviously

17   you're meant to get wet in it.  The dry version is -- the idea

18   is to stay dry in it, and these are all what is called one

19   atmosphere submarines.  I'm sorry.  Been a long day.  Ambient

20   pressure submarines.  And what that means is these submarines

21   aren't built to go to tremendous depths.  These aren't the

22   nuclear submarines, they're not designed that way, they're not

23   meant to be that way, they're designed for shallow water

24   operation.  Again, to facilitate his dream to bring the

25   underwater experience, to bring the person to the underwater

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

248

1   experience.

2          The evidence is going to show that Sultan Bin Sulayem

3   and Mr. Miller, who knew each other already, came to Stuart,

4   Florida, to look at his Seahorse Submarines facility.  My

5   partner here is showing you -- again, this is the facility here

6   that we started off with.

7          And the evidence will show that both Sultan and

8   Mr. Miller were enamored by Mr. Jaubert's abilities after they

9   visited a number of occasions, after they saw the submarines.

10  And the evidence is going to show that Sultan Bin Sulayem,

11  Sultan, the chairman of the multibillion dollar Dubai World, and

12  Mr. Miller, after doing inquiries and diligence, requested

13  Mr. Jaubert to relocate to Dubai.  Not the other way around.

14         And to make Mr. Jaubert's decision easier about that,

15  Stuart, Florida, was hit by two hurricanes in one year.  That

16  made his decision much easier because his opportunities -- he

17  had other opportunities here, but there would be delays to them.

18  So he looked at this as an opportunity, again, to foster his

19  desire to bring people under water.  And this is why I

20  mentioned, again, this idea that -- he relied on this idea from

21  Sultan Bin Sulayem and Jim Miller that the waters in Dubai were

22  conducive and conducive to a tourist underwater experience.

23         Little did he know.  He knew when he got over there

24  that they aren't.  The dredging, salinity, the water

25  temperature, all caused the conditions, underwater conditions to

249

1   decline, destroyed the reefs.  There is no underwater type of an

2   experience in Dubai that he was promised.  Not locally.  Sure,

3   out far, but again, these are designed to be limited depth,

4   limited distance submarines.

5       And in fact, here's the Goby that we've heard about.

6   That is in Dubai.  The cradle there is a cradle bringing it in

7   and out of the test tank.

8       Now, one of the other things that Mr. Jaubert relied

9   upon and really inspired him to bring his submersibles over and

10  his business and his ideas and his genus to Dubai was Sultan's

11  dream to have these floating homes.  We're talking about Dubai.

12  And as you recognize, and you saw Dubai World's counsel, you

13  know they do things like build giant palm tree shaped, man made,

14  not even islands, housing development.  That's Dubai.

15      They build the largest casinos in the country.  Here.

16  That's Dubai.  They have the resources, the money to do that,

17  that's their inclination, that's Dubai.  And one of the things

18  that Sultan Bin Sulayem talked about with Mr. Jaubert that

19  really encouraged him and made him go over there, desire to want

20  to go over there, was this notion of having these floating homes

21  with all these resources, then having submarines that can

22  actually access the homes under water, and each one of these

23  homes would have a submarine.

24      One of the other notions that Sultan told Mr. Jaubert

25  was his idea was to take a brick of gold, on a periodic basis,

1    and throw it in the water in Dubai and let somebody find it.

2    That's Dubai.  That's the resources that we're talking about.

3            Now, I promised you I wouldn't keep you as long, but I

4    just want to show you some things so that you can keep your eyes

5    open and your thoughts open about this.  Many of the times that

6    you were shown purchase orders and monies that were coming from

7    Seahorse Submarines International, Mr. Jaubert, still -- being

8    promised when he left Stuart for Dubai, Dubai still hadn't given

9    him a contract of employment, still hadn't paid him for being

10   employed, even despite the fact that he, both from here in

11   Stuart, as well as when he arrived in Dubai, almost

12   single-handedly designed and orchestrated this huge facility in

13   Dubai to build these submarines.

14           You also heard, when you saw some of these charts, that

15   Mr. Jaubert also owed Dubai the return of certain personal

16   expenses.  You're going hear that Mr. Jaubert, as part of the

17   purchase of his company, Dubai's purchase of his company, which

18   he was paid for initially, one of the agreements was they were

19   going to ship everything over, including his vehicles.  His wife

20   had a vehicle, and he had a vehicle.  And they were shipped

21   over.  And then years later, you're going to hear lo and behold,

22   the group Internal Audit of Dubai said that was never the deal

23   and we're going to make you pay that money back, years later.

24   You will see evidence that that was a deal and that there was

25   documentation for the understanding that Mr. Jaubert's vehicles

1    would be sent over there.

2         You're also going to hear the ridiculous notion that it

3    was actually serving the Dubai World finances to ship his

4    vehicles over, because Mr. Miller, instead of doing that, he

5    rented and leased vehicles that cost numbers times more than the

6    shipping expenses that were attributed to shipping Mr. Jaubert's

7    vehicles over.  Mr. Jaubert could have easily just opted for

8    that.  he was about and is about building submarines.  He's not

9    a finance guy, he's about building submarines.

10        Now, you're going to hear that when he left for Dubai,

11   he packed up his wife, his two young boys, all the assets of

12   Dubai, all his personal possessions -- I mean, all the assets of

13   Seahorse Submarines, all Seahorse Submarines' documentation,

14   everything, because he sold it all, packed it all up, and it was

15   shipped to Dubai, paid for by Dubai World.

16        He arrived in Dubai November of 2004, and immediately

17   began working on completing the Exomos factory and ensuring the

18   operability of the Goby.  And I think we have a picture of the

19   facility.  I have to cut this short so my partner wife -- it's

20   not scripted anymore.  So the evidence is going to reveal

21   exactly what type of facility this was.  And the type of vessels

22   and the magnitude of the production of vessels that were being

23   built, designed, and maintained by Mr. Jaubert, as the CEO of

24   Exomos.

25        But remember, Exomos didn't even exist there in the

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

252

1      beginning.  He gets over there in 2004, he reported directly to

2      Sultan Bin Sulayem, again, the chairman of the multibillion

3      dollar Dubai World.  And one of the first distractions that was

4      imposed upon him was that he was to get ready for the boat show.

5      He was to spend all his resources, all his energy to get ready

6      for the first international boat show that he was involved in in

7      Dubai, and he did so.

8              And it brought with it huge amounts of publicity, huge

9      amounts of press, and huge attendance, including by people in

10     the Emirates.  With the pictures that we're going to show you

11     here, that is one of the -- that's the first boat show on the

12     Proteus, which is a very large vessel that's actually as big as

13     this is.  Actually lowered into the water to permit an

14     underwater viewing and underwater experience, and the Proteus,

15     the full picture of the Proteus is the one on the bottom there.

16     Got Mr. Miller in the background there that apparently we're

17     going to see soon and other dignitaries, and there's the Sultan

18     Bin Sulayem there, and even Sheik Mohammad was there, who is the

19     ruler of the UAE.

20             The evidence isn't going to show that they quickly

21     learned that the submersibles didn't work, because you didn't

22     hear today that the evidence is going to show that Dubai World

23     perpetrated a fraud on the world because they marketed and

24     permitted these vessels to be marketed and seen and viewed at

25     the international boat show in Dubai.  The evidence is going to

253

1    show that Mr. Jaubert cleverly, in the capacity of a general use

2    in the world of submarines, designed, maintained and facilitated

3    the production of many of these versatile vehicles and Dubai

4    World was giddy-happy over it.

5           Now, you saw during the opening of Dubai World, the

6    beat-up, white, old picture of the Goby that they had to show

7    you -- I mean, of the Stingray, and they had underneath that

8    said Stingray Duo.  It was a beat-up, little, white vessel, and

9    why did they put it up there?  This is the Stingray Duo.  And as

10   was told by Mr. Urquhart in his opening, we both have an

11   opportunity to exchange documentation.  Now, they have this

12   picture, they have this, this is the Duo.  Instead, they decided

13   to show you that beat-up, white version of the -- just the

14   Stingray.

15          And you heard what Dubai World's counsel is saying, the

16   other one had two bubbles in it.  Now, that vessel there was not

17   operational at the time.  It was a prototype.  You're going to

18   not only see still photographs of many of these vessels, you're

19   going to see, as I mentioned, live, operating video of these

20   vessels.

21          And you heard a lot made about Mr. Miller's inability

22   to control these vessels, and these reports that, again, were

23   promised by Dubai World, we'll get into evidence in your hands.

24   The reality is, and the evidence will show, that Mr. Miller was

25   a renegade submarine pilot.  He just operated them like a kid in

1   a school room.  He would purposely make them hit the ground.  He

2   would actually attempt to roll them over, and these vessels

3   aren't designed to roll over, and they would never roll over

4   naturally.  But Mr. Miller chose to try rolling them over, so he

5   would do things where he would accomplish the rolling over of

6   some of these submarines utilizing other swimmers with him

7   apparently just to see what would happen, and what would happen

8   isn't what would ever happen, other than that malfeasance by

9   Mr. Miller.

10      You're also going to hear that Mr. Miller doesn't like

11  Mr. Jaubert.  You're going to hear why during the trial.  And

12  you're going to hear a lot of reasons why it is that Mr. Miller

13  is just happy to say bad things about Mr. Jaubert.  And you're

14  also going to hear a lot of reasons why it is that Mr. Miller,

15  residing in California, choosing to fly all the way out here to

16  testify against Mr. Jaubert.

17      This photograph is the adventurer being tested in the

18  pool that they had, the test tank.  There's Mr. Miller at the

19  stern, I believe it is, yes.  I'm just going to ask my partner,

20  just for your quick enjoyment, just to show you a couple more of

21  these vessels.  Another testing circumstance.  And the evidence

22  is also going to show that Dubai World knew that these vessels,

23  when they were delivered in 2004, were not functional.  They

24  weren't functional because they were going to be, but the

25  hurricanes caused an inability to finish them, and they now --

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

255

1    they said, "Hey, we don't want to wait, ship them over as they

2    are, we'll finish them when we get there."  And that's what

3    Mr. Jaubert did.

4         But again, he was distracted -- not distracted, he was

5    told by the chairman of Dubai World Corporation to focus on

6    things like building him jet helicopter powered air boats,

7    Sea-Doos, or those little things in the water with a mirror on

8    them so he can groom himself and other items like that.

9         In fact, he was -- also designed and built -- sorry.

10   One of the other distractions, the impositions upon his time was

11   the construction of this vessel.  I'm sorry, that he -- this is

12   the one that Mr. Miller purchased, and then he redesigned, and

13   Mr. Jaubert was to redesign and reconfigure to make work.

14        Those are the distractions that he had.  Those are the

15   reasons, if anything, that he wasn't fully on line at this time.

16   And you're also going to see documentation that shows that Dubai

17   World Corporation knew and should have expected, and did expect,

18   that this venture was such that it wasn't going to realize a

19   profit in a mere couple of years, that it was going to take

20   time.  And you're going to hear testimony that it was Dubai

21   World that pulled the plug.  They're the ones that stopped the

22   production.  You're going to hear not only testimony, but you're

23   going to see documentation that shows that.

24        Now, some of the other vessels that Mr. Jaubert

25   designed and Dubai World actually proudly showcased in one of

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   the boat shows, the -- a vessel called the Nautilus.  It's not

2   something that you heard about already today, and this is the

3   Nautilus.  As you can see, it was designed after the Jules Verne

4   Nautilus, has thousands of rivets in it, it's plushly appointed

5   in the interior, and it sits -- it sat in the Dubai warehouse,

6   at least when I was there earlier last year.

7           You're also going to see -- you've also been promised

8   that these so-called experts are going to testify here, you're

9   promised that by Dubai World, and they're promising you that

10  they're going to denigrate Mr. Jaubert's abilities and his

11  designs and his submersibles.  But yet they stand proudly

12  smiling, showcasing one of the largest vessels.  You didn't hear

13  that until now.

14          Ladies and gentlemen, it's late in the day, I don't

15  want to take a lot of time -- more time.  This is the type of --

16  this is what -- keep an open mind in this case.  You heard a lot

17  of bad things initially, and I just don't have the time, I don't

18  have a clicker, and I don't want to put you through with an hour

19  of me going through documents and telling you exactly why it is

20  that what they said is not true.  I will say a couple things,

21  though.

22          This notion that he was paying himself out of this what

23  they call -- I forget some of them.  One of them was money for

24  nothing.  Double-dipping is a new one.  I hadn't heard about

25  that one.  But the fact is what they forget about is is he was

257

1    paid for his company already.  They ask you to believe that the

2    monies that -- in those documents that they showed, the monies

3    going into his bank account, they ask you to believe somehow

4    they're tied in, and they pretty much implied the promise that

5    they're going to show through documentation, they're going to

6    trace the monies that they say Mr. Jaubert double-dipped, and 10

7    percented and all that, they're going to trace that money and

8    show you exactly how it went into that $130,000 money transfer

9    that he did from Dubai to the Florida bank.  The evidence is not

10   going to show that.

11        I'm going to show you some of the documentation that

12   hasn't been shown to you, and I'm not going to spend a lot of

13   time on it, but I'm going to spend some time on it.  It's very

14   difficult to see, and I don't know if you can see it, but this

15   isn't a document that you saw yet.  But this is a document that

16   was written and processed by the Ports, Customs and Free Zone

17   Corporation, a Dubai World Corporation, and it says, "Service

18   charges are usually added" -- "are usually not added; however,

19   purchase department informed that this supplier is charging us

20   very low rate; therefore, they were allowed to recover service

21   handling charges."  And it says -- underneath there it says,

22   "Average 10 percent."  And this is executed by Karram, the

23   financial controller that you heard about earlier.  And you're

24   going to see testimony or hear testimony that Dubai World

25   Corporation and the internal auditor, the internal auditor, the

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

258

1    internal auditor.

2         You're going to hear that they're going to try to say

3    to you, ladies and gentlemen of the jury, that these were

4    secret, hidden charges.  Secret charges.  And yet they appear

5    boldly on these items.  You're also going to hear that they're

6    not line item, that they're embedded in the purchase price.

7    That's what they're going to say.  The documents and the

8    evidence is going to show just to the contrary, they weren't

9    embedded, they weren't hidden, they weren't secret, they're

10   right there, and guess who signs these over and over again.

11   Sultan Bin Sulayem, the director of Dubai World.

12        Now, and he's going to tell, ladies and gentlemen, all

13   of you, that he is such a busy man, that he can't possibly look

14   at what he signs and he just signs them.  And remember, even

15   from the evidence that -- from the slanted -- from the evidence

16   that Dubai World Corporation talked to you about today, or the

17   purported evidence or the promised evidence, remember, how many

18   years went by before they decided that these secret hidden

19   charges weren't agreed to?  Years.

20        And you're going to see, time and time again, transfers

21   made to Seahorse Submarines, who was a company that was --

22   you're going to hear testimony and see written documentation

23   from Dubai World representatives that acknowledged that we need

24   a supplier like Seahorse Submarines that knows how to get these

25   items, that knows how to get them cheaper, and that knows how to

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    put together the components necessary to facilitate this dream

2    of making this submarine producing manufacturing a reality.

3            And notice, it's not Dubai World or Exomos that's

4    paying these, it's another corporation, Nakheel.  Interestingly

5    you're going to find out that Exomos, the company that

6    Mr. Jaubert was the CEO of for years, didn't even have a bank

7    account.  And you're also going to find out that although Sultan

8    Bin Sulayem couldn't authorize a purchase order by signature,

9    that was a meaningless task, apparently he signed it, but there

10   is no reason for it, but you're going to see that he was one of

11   only a handful of people that could sign on the account and

12   Mr. Jaubert, the CEO of Exomos, didn't even have a signatory

13   ability on the Exomos bank account.

14           And this is in 2006.  June of 2006 this is the document

15   right here.  The signatory lists immediately upon Exomos

16   obtaining a bank account, Sultan Bin Sulayem, you've got, Ahmed

17   Butti Ahmed (ph), and a number of other people, but

18   conspicuously absent is Mr. Jaubert.  And this is before any of

19   the things that you've heard today by Dubai World counsel in

20   their view of the evidence, transpired.

21           The evidence is going to show that Mr. Jaubert utilized

22   his resources, his intelligence, his connections to make

23   purchases through his company Seahorse.  Remember, he didn't

24   sell Seahorse, he sold the assets of Seahorse, and with the

25   knowledge of Dubai World corporation, Exomos, and all of the

1    various corporations that Dubai World has, he utilized his

2    resources, connections, and knowledge to advantage Exomos in

3    purchasing items for far less.  For instance, batteries, not

4    only the purchase price was far less, but the delivery time was

5    far less.  And each and every one of the times that you were

6    shown those documents suggesting there was no delivery is not

7    correct.  And I'm asking you, ladies and gentlemen of the jury,

8    to wait to see that evidence.  And some of these orders were for

9    special order items like giant engines that because of things

10   out of anyone's control on Mr. Jaubert's side of things, were

11   delayed in delivery.

12          You're also going to hear from -- if you hear from the

13   auditor or the accountant that we talk about -- I didn't talk

14   about, but that counsel for Dubai World promised you would hear

15   from -- either hear from or through testimony and paper,

16   Mr. Trek Ahmed, that he didn't look through the inventory, he

17   wasn't a submarines expert, he admitted he doesn't know

18   submarines, the parts, although -- but he came to the conclusion

19   that they weren't there in the stores.

20          And you're also going to hear testimony that Exomos is

21   a big corporation in terms of its production.  It had hundreds

22   of people working there.  Mr. Jaubert was the CEO.  He didn't

23   run the storeroom, he didn't run the delivery and the reception

24   of items.  And just as Sultan Bin Sulayem was too busy to look

25   at what he signed, Mr. Jaubert, the evidence will show that he

1    wasn't too busy, but it wasn't within the confines of his

2    responsibilities to obviously to check items in.

3          You're also going to hear that one of the problems of

4    this whole venture was the notion that Sultan Bin Sulayem came

5    to Mr. Jaubert with -- from day one, in 2003, that there was a

6    work force in Dubai that had the abilities, the training, the

7    skills, to manufacture these vessels to the standards that are

8    required.  That wasn't true.  And the evidence will show that.

9          And this is the type of thing that you're going to see

10   in this case that belies what you heard earlier.  You're going

11   to see this notion, the attempt to be utilized to convince you

12   of things, and this is what it is.  That here it says

13   authorization of transferring funds is different from approval

14   of the expenditure.  However, so when you have an authorized

15   signature for an expenditure, that that's different.  You can't

16   do that, but it's okay for that same signature to be authorized

17   to close the Exomos bank account, which it did in March 11 of

18   2009.

19         So the evidence is going to show it's a pick-and-choose

20   mentality that Dubai is playing, and they'll have a signature

21   mean something when they want it to mean something, but they

22   will say it's meaningless when they want to indict Mr. Jaubert.

23         Now, finally, the evidence is going to show that on two

24   occasions, Dubai World Corporation abused the lawful process,

25   the lawful process of the Emirate of Dubai.  They abused it by

1    attempting to extort money from Mr. Jaubert so that he could

2    leave the country.  And they did that on two occasions.  And

3    finally, the evidence is going to show, because I'm getting at

4    least a couple yawns, and I know that should be a sign, I know

5    what that means, but I don't know what it means, but I know what

6    it means now.

7              THE COURT:  That means they're waking up.

8              MR. HESS:  Finally -- I would suggest they stay asleep

9    a little longer.  But the evidence is going to show finally that

10   because of this abuse of process, Mr. Jaubert is damaged.  And,

11   in fact, he had to escape from the Emirate of Dubai, darkness,

12   first on a dinghy, and to a sailboat, to get to India, where he

13   realized his freedom.

14             Ladies and gentlemen, I appreciate your time on this, I

15   know it's late in the afternoon, I promised to go less than

16   this, but I can't stop talking sometimes.  Thank you very much.

17   I ask you to keep an open mind and we've got days together, and

18   thank you.

19             THE COURT:  Ladies and gentlemen of the jury, you're

20   reminded that you're not to discuss the case with anyone or

21   permit anyone to discuss it with you.  Until you retire to the

22   jury room at the end of the case to deliberate on your verdict,

23   you're simply not to talk about this case.

24             Also remember, you're not to read or listen to anything

25   touching on this case in any way.  If anyone should try to talk

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

 1    to you about this case, bring it to my attention immediately.

 2    Keep in mind that you must not do any research or make any

 3    investigation about the case on your own.  The only evidence in

 4    this case that you may consider is the testimony of the

 5    witnesses that you hear in court and the evidence that is

 6    introduced during the official proceedings in the courtroom.

 7          Also remember, you must not have any contact with the

 8    attorneys, parties, or witnesses in the case.  If you should see

 9    them, or anyone that you see that might have any bearing on this

10    case, remember that they're not being rude to you, they're

11    simply following instructions.  They're required to avoid any

12    contact with you, and they're not permitted to talk to you, just

13    as you are not permitted to talk to them.

14          Finally, remember that you must not form any opinion

15    about this case until all the evidence is in.  You are required

16    to keep an open mind until you start your deliberations at the

17    end of the case.  Please wear your juror badges when you come to

18    the courthouse.  Remember, there's only one way in and one way

19    out, so come in through and come on into the jury room as

20    quickly as you can.  And I want to thank you.

21          We're going to start tomorrow morning at 9:30.  Now,

22    what we will probably do is start at 9:30, break at 10:30 or

23    11:00 for 10 or 15 minutes.  If you need a break during, you

24    know, the morning, just raise your hand.  He's supposed to be

25    keeping an eye on you, and he probably will, he or Randy.  You

1    just let him know and we'll take a break.  But I prefer to take

2    a break in the middle of the morning, then we'll break for

3    lunch, and we'll take one in the middle of the afternoon and

4    we'll go hopefully not this late.  I was hoping to let you go an

5    hour ago, but we got tied up in legal arguments that we were

6    doing earlier, and I apologize for that.

7         Thank you very much, and if you'll go into the jury

8    room, you're excused.  We'll see you tomorrow morning at 9:30.

9         (Jury out at 5:35 p.m.)

10    THE COURT:  Have a witness ready to go at 9:30.  We'll

11    be ready to go at this time.

12         MR. CEDERBERG:  May I have one inquiry, Your Honor?

13         THE COURT:  Wait just a second.  Wait until everybody

14    is out of here.  Yes, sir.

15         MR. CEDERBERG:  Would the Court allow a monitor for the

16    witness with documents so the witnesses wouldn't have to keep

17    turning toward the screen when we put things up.

18         THE COURT:  I don't mind.  I don't care.  The only

19    problem is how -- well, it will be from the computer?  So it

20    will be exactly what's on the screen?

21         MR. CEDERBERG:  Yes.

22         THE COURT:  Yes, you can do that.  All right.  We'll be

23    in recess until 9:30 tomorrow morning.

24         (See Volume 3, page 266 for continuation)

25

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1

2                                    * * * * *

3                          C E R T I F I C A T E
      I certify that the foregoing is a correct transcript from the
4     record of proceedings in the above-entitled matter.

5

6

7     _____          /s/ Dawn M. Whitmarsh
      Date                         DAWN M. WHITMARSH, RPR
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


                **PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
                    **TRANSCRIPT PRODUCED BY COMPUTER**