```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                        FORT PIERCE DIVISION
                     CASE NO.   09-14314-CV-JEM
3


4


5


6   DUBAI WORLD CORPORATION, and its
    Subsidiaries, EXOMOS, NAKHEEL and
7   PALM MARINE,

8                  Plaintiffs,

9        vs.

10                                    Fort Pierce, Florida
                                      February 15, 2011
11  HERVE JAUBERT, SEAHORSE
    SUBMARINES INTERNATIONAL
12  INCORPORATED, and Does 1-99,

13                  Defendants.
    _____

14


15

                     TRANSCRIPT OF JURY TRIAL
16                  VOLUME 3 - PAGE 266-356
              BEFORE THE HONORABLE JOSE E. MARTINEZ
17                 UNITED STATES DISTRICT JUDGE

18


19


20


21


22

    REPORTED BY:        DAWN M. WHITMARSH, RPR
23                      Official Court Reporter
                        400 N. Miami Avenue, 10S03
24                      Miami, Florida  33128
                        Telephone:  305-523-5598
25
```

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    APPEARANCES:

2    FOR THE PLAINTIFFS:
                         *Quinn, Emanuel, Urquhart & Sullivan, LLP*
3                        **BY: JON C. CEDERBERG, ESQ.**
                         **BY:  A. WILLIAM URQUHART, ESQ.**
4                        865 South Figueroa Street
                         10th Floor
5                        Los Angeles, CA  90017

6                        *Astigarraga, Davis, Mullins & Grossman*
                         **BY:  EDWARD MULLINS, ESQ.**
7                        701 Brickell Avenue
                         16th Floor
8                        Miami, Florida 33131

9
     FOR THE DEFENDANTS:
10                       *Hess & Heathcock, PA*
                         **BY:  WILLIAM HESS, ESQ.**
11                       **BY:  KATHRYN A. HEATHCOCK, ESQ.**
                         40 Southeast Osceola Street
12                       Stuart,  Florida 34994

13

14

15

16

17

18

19

20

21

22

23

24

25


**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1                      P-R-O-C-E-E-D-I-N-G-S

 2           COURTROOM DEPUTY:  Case number 09-14314-civil-Martinez,

 3   Dubai World Corporation versus Herve Jaubert, Seahorse

 4   Submarines International, Incorporated.

 5           Counsel, please state your appearances.

 6           MR. CEDERBERG:  Jon Cederberg and William Urquhart for

 7   the Plaintiffs.

 8           MR. HESS:  William Hess and Kathryn Heathcock and

 9   Mr. Jaubert on behalf of Mr. Jaubert and Seahorse.

10           THE COURT:  All right.  Are we ready to proceed?

11           MR. CEDERBERG:  Yes, Judge.

12           THE COURT:  You need anything from me?  You have your

13   first witness ready to go?

14           MR. URQUHART:  Yes, sir.

15           THE COURT:  All right.  Please bring in the jury.

16           (Jury in at 9:42 a.m.)

17           THE COURT:  Please be seated.  Both sides ready to

18   proceed?

19           MR. CEDERBERG:  Yes, Your Honor.

20           MR. HESS:  Yes, Your Honor.

21           THE COURT:  Please call your first witness.

22           MR. URQUHART:  Your Honor, I would like to call, as our

23   first witness, Mr. Dalton here.

24           THE COURT:  Very well.  Please remain standing, raise

25   your right hand.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1              GEORGE DALTON, PLAINTIFF WITNESS, SWORN.
 2            THE COURT:  Please be seated.  Tell us your full name
 3    and spell it.  Speak real close to the microphone.
 4            THE WITNESS:  It's George, G-E-O-R-G-E, Dalton,
 5    D-A-L-T-O-N.
 6            THE COURT:  You may proceed, sir.
 7                        DIRECT EXAMINATION
 8    BY MR. URQUHART:
 9    Q.  Mr. Dalton, where were you born?
10    A.  New Brunswick, New Jersey.
11    Q.  And where did you grow up?
12    A.  Mostly in that area in Perth Amboy, Metuchan, then south
13    along the Jersey shore.
14    Q.  Where did you go to high school?
15    A.  Saint Joseph's in Metuchan.
16    Q.  Do you have any education beyond high school?
17    A.  I do.  I graduated Fordham University in the Bronx and also
18    Fordham Law School.
19    Q.  And would you briefly, very briefly, go through your career
20    after you graduated from Fordham Law School?
21    A.  While I was at law school, I went to school at night, so I
22    worked daytimes for a law firm in Manhattan.  I became an
23    associate there and eventually a partner.
24        I left that firm and formed a firm with a couple of guys I
25    was friendly with and did that for a number of years, then I
```

1   went in-house to a company.

2   Q.  Can I stop you there?  What kind of work did you do as a

3   lawyer while you were with the two law firms?

4   A.  A lot of corporate work, a lot of financing and

5   international law.

6   Q.  Now, you go in-house.  What does in-house mean?

7   A.  I went to work for a company.

8   Q.  What was the name of the company?

9   A.  Sealand.

10   Q.  What is the business of Sealand?

11   A.  They were a very large international US based shipping

12   company.

13   Q.  When you say "international," what was overseas?

14   A.  They're headquartered in the United States, but they had, I

15   don't know, probably activities in about 80-odd countries around

16   the world.

17   Q.  What kind of activities?

18   A.  Shipping, they owned a lot of ships and containers,

19   logistics, trucks, things like that.

20   Q.  Did they also own the ports, also?

21   A.  They didn't own the ports, but they operated the ports like

22   New York, Miami, Long Beach, etcetera.

23   Q.  What was your last position at Sealand?

24   A.  I was counsel to the division, senior counsel, I forget the

25   title, vice president of the Americas division, so I covered

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    North and South America, all of Latin America, Canada, etcetera,

2    and counsel to the marine terminal group.

3    Q.   What happened next?

4    A.   CSX, which was the owner of Sealand, spun Sealand off to a

5    Danish company.

6    Q.   Can I stop you there?  What do you mean when you say --

7    A.   They sold it.  Sorry.  They sold most of Sealand to a big

8    Danish company.  They kept the terminal operating arm, and I was

9    general counsel of the terminal operating arm.

10   Q.   Do you know what the term "public company" means?

11   A.   I do.

12   Q.   Can you tell the jury what that means?

13   A.   Sure.  It's a company that's -- whose shares are traded on a

14   stock market like NASDAQ or the New York Stock Exchange.

15   Q.   Were Sealand and CSX public companies?

16   A.   CSX was, Sealand was not.

17   Q.   And what happened to CSX?

18   A.   CSX, the railroad, is still existing.

19   Q.   What happened to your part?

20   A.   My part, CSX World Terminals was the name of that company,

21   the terminal operating company.  They were purchased by Dubai

22   Ports in 2005.

23   Q.   And when they were purchased, were you offered a position

24   with Dubai Ports?

25   A.   I was.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

272

1   Q.  And did you accept the position?

2   A.  I did.  It was kind of ironic because I was on the other

3   side of the table.  I was working for CSX representing their

4   interests, and Dubai Ports asked me to join them and start their

5   legal department, which I did.

6   Q.  So you actually began the legal department?

7   A.  Yes.

8   Q.  You're the first lawyer?

9   A.  Yes.

10  Q.  That must be an interesting proposition.

11  A.  It was kind of good time of life.  Kids were off to college,

12  so we were empty nesters and took it as an adventure.

13  Q.  Did you actually move to Dubai?

14  A.  I did.  I still live there.

15  Q.  Still live there.  How long were you in the general counsel

16  in the ports business?

17  A.  Of CSX or Dubai Ports?

18  Q.  Dubai Ports.  I'm sorry.

19  A.  From 2005 through 2008.

20  Q.  And Dubai ports, how many ports do they operate around the

21  world?

22  A.  About 50.

23  Q.  50.  Can you give us some examples?

24  A.  Sure.  Hong Kong.  In Spain, Tarragona.  In London, London

25  Gateway.  Several in China, a number in India, Pakistan, of

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    course Dubai.

2    Q.   Any in the Americas?

3    A.   Vancouver.

4    Q.   Okay.  Is Dubai Ports a public company?

5    A.   Dubai Ports is a public company.

6    Q.   And did your position ever change?

7    A.   In 2008, I moved from Dubai Ports to the holding company

8    Dubai World.

9    Q.   Okay.  Can you explain to the jury what a holding company

10   is, please?

11   A.   Yeah.  Effectively it's a large company that will own stock

12   in a number of other companies, and could be a variety of

13   fields.  Pretty commonly used type of device.

14   Q.   So as the holding company, it doesn't do any business

15   itself.

16   A.   No.  It owns shares of other companies.

17   Q.   Could you put up that chart?  Your Honor, I'm going to put

18   up on the screen a chart to which Mr. Hess has already told me

19   he has no objection.

20           THE COURT:  Is it in evidence?

21           MR. URQUHART:  I'll offer it into evidence.

22           THE COURT:  I'll offer it and then put it up.

23           MR. HESS:  No objection, Judge.

24           THE COURT:  What is the number?

25           MR. URQUHART:  It is --

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1           THE COURT:  I need to keep track.

2           MR. URQUHART:  It is 403, or 323.  403, Your Honor.

3           THE COURT:  Exhibit 403?

4           MR. URQUHART:  Yes, sir.

5           MR. HESS:  Can I ask counsel to move the lectern over a

6    little to the left.

7           THE COURT:  I'm not sure how far it moves, I think it's

8    got an umbilical cord.  I have an exhibit list, but I don't have

9    a 403.

10          MR. CEDERBERG:  I do.

11          THE COURT:  Wouldn't it be better if I had one?

12          MR. URQUHART:  Sorry, Your Honor.

13          THE COURT:  Okay.  No.  I don't mean the exhibit, I

14   mean I have an exhibit list that does not include the Number 403

15   on it.  I can't mark it in evidence if I don't have it on my

16   exhibit list.  I need to keep track of what's coming into

17   evidence by going check.  So you need to -- I got 402, photo of

18   Exomos.

19          MR. HESS:  It hasn't been filed yet, Judge.  I received

20   it by e-mail.

21          THE COURT:  Either way, I don't care, I just need an

22   up-to-date exhibit list.  I will write in 403, but please make

23   sure that you give me something before you offer into evidence.

24   It's easier for me to keep track.

25          MR. URQUHART:  Sorry, Your Honor.

```
 1              THE COURT:  No problem.  403, without objection, is in
 2   evidence.
 3              (Plaintiffs' 403 in evidence)
 4   BY MR. URQUHART:
 5   Q.  Well, I thought this would help, but I'm having a hard time
 6   even seeing it from here.  What is this Mr. Dalton?
 7   A.  It's a high-level corporate structured chart, and frankly
 8   I'm going to have a lot of trouble reading that as well.  Can I
 9   use the hard copy?
10   Q.  You can look at it, but the jury has to see it.  So where
11   is -- maybe you could stand up.  Where is Dubai World company
12   that you work for.
13              THE COURT:  Is that all right?  Can you see it a little
14   bit better there?  You can't read it, but you can see it.  Why
15   don't you make ten copies or, you know --
16              MR. URQUHART:  Well, Your Honor, we're going to blow up
17   part of it.
18   BY MR. URQUHART:
19   Q.  So where is Dubai World?
20   A.  It's right here.  That's the holding company.  These are a
21   bunch of companies that are underneath it, and we can talk about
22   that as we go forward.
23              THE COURT:  All right you need to stay in the seat
24   because now you don't have a microphone.
25              THE WITNESS:  I can see it now.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

276

1          MR. URQUHART:  I can see a whole bunch of boxes.

2     BY MR. URQUHART:

3     Q.  What do those boxes indicate?

4     A.  Those boxes are subsidiary companies.  In other words those

5     are companies which Dubai World owns them.

6          THE COURT:  Excuse me for a second.  Do you not have a

7     laser pointer?  Give him a laser pointer so he can point at what

8     he's talking about from his seat behind the microphone.

9     BY MR. URQUHART:

10    Q.  So what are these boxes here?  Before I get into that, you

11    said that Dubai World owns a bunch of companies.  How many does

12    it own?

13    A.  Well, this chart to go back to is actually just a really

14    small high-level grouping.  There's about 1,200 companies

15    underneath Dubai World.  Many of them are subsidiaries of these

16    primary ones ,if you will.  So these are sort of primary

17    companies, and under each of these there are a number of other

18    companies.  In fact, this is just a partial list.  But if you go

19    back -- yeah, if you go back this way, here's Dubai World, and

20    that is what I was referring to earlier as the holding company.

21    These are first tier up here, first tier companies, and we've

22    taken it down a couple levels.  But to put the whole 1,200

23    companies on a chart like this is difficult, and I can't even

24    see this one so...

25    Q.  What were the major businesses of Dubai World?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.   There's probably about three major silos, then another

2    miscellaneous silo.

3    Q.   When you use the term "silo," what do you mean?

4    A.   Groupings of business.  So these businesses are set up and

5    structured for a variety of reasons, including tax.  You'll see

6    the typical Cayman island companies and Swiss and whatever else.

7    American, British, they're all over the place.  But silos would

8    be the types of businesses that it performs, and I think there's

9    probably three primary ones and the miscellaneous one.

10   Q.   What are the three primary ones?

11   A.   I can put logistics and transportation and marine operations

12   as one silo, and that would be -- I'm sorry.  Charles, can you

13   see if you can find Ports and Free Zone?  I think it's here.

14   Can you blow up?  Okay.  So Ports and Free Zone is -- underneath

15   it is DP World Limits, which is the Dubai Ports I refer to

16   earlier.  Economics Zones World, which is a logistics and

17   warehousing group, and Dubai Ferries, which is a ferry company

18   mostly operating in Europe and the United Kingdom.  So that's

19   sort of one arm.

20        The marine side, if we can go smaller -- and, Your

21   Honor, I'm sorry, I'm just having trouble seeing that far, but

22   can we find Dry Docks?  Okay.  This one here the bluish color.

23   That would be part of our marine group.  Dubai Dry Docks is a

24   shipbuilding and ship repair company.  I think it's the largest

25   in the world now.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

278

 1          And then there are others.  Go back to the smaller one

 2     again?

 3          Istithmar World, which is actually just Arabic for

 4     investments -- yeah, okay.  The purplish, that's an investment

 5     company.  It invests in a lot of variety of things like real

 6     estate, like Barneys, which I think Mr. Urquhart referred to

 7     yesterday.  It has investments all over the world.  It has a

 8     piece of an investment banking house in New York, resorts, book

 9     sellers, a number of other things.  So that's an investment arm.

10          We also throw in a company called Infiniti, which is --

11     I think you heard it referred to yesterday as the City Center

12     development out in Las Vegas, sort of a quasi-investment in

13     quasi-real estate development company, so that kind of cuts

14     across both silos.  That's going to be over here in the yellow.

15     It's this grouping here.  So that would be -- that kind of cuts

16     across two silos. Cuts across the investment side, and also cuts

17     across the real estate an development side.

18          Our third major one is real estate development, which

19     is the Palm Islands that you saw yesterday.  This company called

20     Nakheel, which is primarily a Dubai-based investment arm.  We

21     have something called Limitless, which is mostly in the Arab

22     region where it develops hotels and other kind of properties,

23     residential properties and so forth.

24          There's is something called Dubai World Africa, which

25     develops game preserves in Africa, and then we have the

1    miscellaneous where we have some oil and gas, we have some

2    aviation companies and things like that.  So those are the four

3    silos.

4    Q.  Do you know where Exomos fits in here?

5    A.  It would be under something called Palm Marine, which I

6    think is probably under Dry Docks.  So if you try in here

7    someplace?  So Palm Marine is here, Exomos is how far down the

8    chain, but someplace below this Palm Marine.

9    Q.  Around the world through -- either directly or through its

10   investments, do you have any estimate of how many people are

11   employed by Dubai World?

12   A.  Yes.  Somewhere around 60 to 65,000.

13   Q.  Do you know how many of those people work in the United

14   States?

15   A.  Well the vast majority would be CityCenter.  We probably

16   have about 10,000 employees in the US, about 8,400, something

17   like that, in CityCenter.

18   Q.  Do you know a gentleman named Sultan Ahmed Bin Sulayem?

19   A.  I do.

20   Q.  Who is he?

21   A.  He was the former chairman of Dubai World and my boss.

22   Q.  And so you report directly to him?

23   A.  I do.

24   Q.  What was his management style?

25   A.  Sultan is an interesting guy.  He's a visionary.  He is very

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    hands off in terms of management, he's not a detail guy at all,

2    but he sees big-picture stuff and he has -- sometimes some of

3    his ideas are really incredible.  Where he comes up with them,

4    I'm not sure why.  He's a fast study, he's a fast reader, he

5    speaks a bunch of languages, so he's very trustworthy, and, you

6    know, he lets me do things that former bosses would have -- I

7    would have had to go through a lot of bureaucracy in order to do

8    it.

9    Q.  So you would say he's a guy that trusts the people who

10   report to him?

11   A.  Absolutely.

12   Q.  Thank you, Mr. Dalton.

13          MR. HESS:  I won't need the charts, so --

14          THE COURT:  We can put the lights back on.  Thank you.

15                     CROSS-EXAMINATION

16   BY MR. HESS:

17   Q.  Good morning, Mr. Dalton.

18   A.  Good morning, Mr. Hess.

19   Q.  I don't need you to look at the chart, but where does the

20   group Internal Audit, where does that fit into the Dubai World

21   scheme of things?

22   A.  It's part of what we would describe as a shared services

23   group, and there are several of those, Internal Audit, human

24   resources.  There's financing that goes in there.

25   Q.  But the group Internal Audit, you understand what I'm

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

281

1   talking about, correct?

2   A.   Yes.   It's part of Dubai World.   Some of the major

3   subsidiaries, they have their own internal audit as well, but

4   sitting on top of that is the group Internal Audit.

5   Q.   Now, you've been with Dubai World Corporation since 2008?

6   That's what your testimony is?

7   A.   With Dubai World.   Before that I was with one of the

8   subsidiaries since 2005.

9   Q.   Now, how often does Dubai World -- Dubai World Corporation's

10   board doesn't meet very often, does it?

11   A.   No.

12   Q.   In fact, years go by without a meeting, correct?

13   A.   Sometimes, and then sometimes there's a lot of meetings.

14   Q.   And it would be Sultan Bin Sulayem that would preside over

15   that meeting back when he was the chairman of the board?

16   A.   Correct.

17   Q.   And you would agree that Dubai World Corporation has been

18   radically restructured after running up almost $60 billion of

19   liabilities on ill-judged acquisitions, correct?

20   A.   No, I wouldn't agree with that.

21   Q.   How about the acquisition of the Queen Elizabeth II liner?

22   Dubai World acquired QE II, correct?

23   A.   Correct.

24   Q.   It's sitting in a dry dock somewhere in Dubai, correct?

25   A.   That's correct.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1    Q.   How much did that acquisition cost?

 2    A.   I think it was about 90 million, maybe 100 million.

 3    Q.   And that was Sultan Bin Sulayem, one of his ideas, wasn't

 4    it?

 5    A.   It was either one of his or one of his lieutenants, yes.

 6    Q.   And that's one of the examples of how expansive and what a

 7    genius he was, correct?

 8    A.   In some ways, yes.  And I don't think you can describe it as

 9    an ill-advised acquisition.  It's going under retrofitting, and

10    it's not being used right now, but it will be.

11    Q.   How long is it going to take to be retrofitted?

12    A.   It probably has another year to go.

13    Q.   And since the acquisition for how many million dollars?

14         THE COURT:  90.

15         THE WITNESS:  90 to 100, something like that.

16    BY MR. HESS:

17    Q.   What costs have gone into the retrofit?

18    A.   I have no idea.

19    Q.   And you would also agree that the Madison Avenue retailer,

20    Barneys, that wasn't an ill-judged acquisition?

21    A.   No.

22    Q.   What's the status of Barneys these days?

23    A.   Barneys is -- actually, it was going through a difficult

24    time.  It's now turned around.  No different than a lot of

25    different places.  City Center is a great example of that.  We
```

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

283

1    pumped, I think, $8 billion in to it.  Las Vegas market is very

2    flat in the first half of 2010.  In the second half it's

3    rebounded.  We did a major refinancing there that the bond

4    holders and banks loved.

5    Q.  And Sultan Bin Sulayem is no longer the chairman of Dubai

6    World?

7    A.  That's correct.

8    Q.  When was he removed as chairman?

9    A.  I think it was in November or December of 2010.  He does

10   remain chairman of Ports and Free Zone, which is the DP World of

11   Dubai Ports and Logistics arm, because that was his initial

12   start at building businesses.

13   Q.  You mentioned his style was such that he would come up with

14   these ideas and just hand it off and let people just run with

15   it, right?

16   A.  Yeah, sort of.  I mean, depends on what it was.  I mean, his

17   Ports and Free Zone, for example, he -- probably is kind of his

18   first child, so he's more involved with that.  Others he gets

19   involved with depending upon his own personal interests or not.

20   Things like the investments arm, he wants to know about it, but

21   he doesn't follow precisely what a Perella Weinberg is doing or

22   what a particular hotel is doing.

23   Q.  Why is it that the board doesn't meet on a yearly basis?

24   A.  I think part of that is historical, the way that Dubai World

25   grew.  It grew rapidly over a short period of time.  It's not a

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    whole lot different than a lot of other developing nations.

2    Dubai itself is still a young country, and I think it grew very

3    quickly through a lot of acquisitions and corporate governing

4    style changes.

5    Q.  And you -- from your testimony, you know Sultan Bin Sulayem

6    quite well, correct?

7    A.  I do.

8    Q.  And you're aware that he would instruct his lawyers to --

9    well, for instance, he asked -- well, he instructed Mr. Jaubert

10   to create for him a jet ski with a waterproof compartment for

11   his cell phone and a personal mirror, correct?

12   A.  The first time I heard that was when you mentioned it

13   yesterday, so I have no idea about that.

14            MR. HESS:  Thank you.

15            THE COURT:  Redirect?

16            MR. URQUHART:  I have no questions, Your Honor.

17            THE COURT:  All right.  Thank you, sir.  You are

18   excused.

19            MR. HESS:  I'm sorry, Judge.  With the Court's

20   indulgence, I apologize, I didn't listen to my partner.

21            THE COURT:  Okay.  Back on the witness stand.

22            MR. HESS:  Sorry, Judge.  Sorry, ladies and gentlemen

23   of the jury.

24   BY MR. HESS:

25   Q.  I did want to ask one other question.  You testified that

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

285

1      Sultan Bin Sulayem is a trusting hands-off executive, correct?

2      A.  Correct.

3      Q.  Why is it that when he -- why is it that when he signed off

4      on the Exomos bank account, he wasn't trusting enough to permit

5      the CEO of Exomos to be a signatory on the bank account?

6      A.  I can't answer that directly because I wasn't part of Dubai

7      World at that point.  I was with DPW.

8              MR. URQUHART:  No questions, Your Honor.

9              THE COURT:  Thank you, sir.  You are excused.  Please

10     call your next witness.

11             MR. CEDERBERG:  Dubai World Plaintiff calls

12     James Miller to the stand.

13             THE COURT:  Yes, sir.  Come on up here to the witness

14     box.  Please remain standing when you get there.  Raise your

15     right hand.

16             JAMES MILLER, PLAINTIFF WITNESS, SWORN

17             THE COURT:  Please be seated.  Tell us your full name

18     and spell it for us, please.

19             THE WITNESS:  James Miller.  J-A-M-E-S, M-I-L-L-E-R.

20             THE COURT:  I wasn't paying attention.  I'm sure all of

21     us can spell James Miller.  Go ahead.

22                          DIRECT EXAMINATION

23     BY MR. CEDERBERG:

24     Q.  Mr. Miller --

25             THE WITNESS:  I thought he wanted me to go ahead and

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    spell it again.

2              THE COURT:  No, you're doing fine.

3              MR. CEDERBERG:  We got it.  We're going to see it on

4    100 documents.

5    BY MR. CEDERBERG:

6    Q.  Mr. Miller, tell us where you live now.

7    A.  In Coronado, California.

8    Q.  Directing your attention back to late 2003 through most of

9    2006.  Can you tell the jury what you were doing?

10   A.  I was involved in Dubai, pretty much testing submersibles

11   that were made in Exomos.  And was involved in organizing the

12   operation of, say, the water side of this organization.  So --

13   and I was part of management trying to make this business

14   operation a success.

15   Q.  Before we get into the details of your experience testing

16   products made by -- or Exomos, I'd like to have some of your

17   background, especially your experience involving the water.  Are

18   you scuba certified?

19   A.  I'm an open water diver, correct.

20   Q.  How long have you been certified?

21   A.  I've been diving since the '70s.  I'd have to actually look

22   at the last --

23   Q.  What was your first involvement with boats?

24   A.  Well, when I was 13 years old, I attended the power squadron

25   course.  My father -- we actually had a 38' Matthews boat that

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    we restored.  So starting at a pretty young age.  Actually, I
2    received my Dead Reckoning Courses from Admiral Byrd's
3    Navigator, if you can believe.  He was a very old gentleman.  So
4    I started -- at that particular point, we had a boat, we
5    operated offshore of New York and New Jersey.  I attended
6    Hurricane Island Outward Bound School.  I was an ocean lifeguard
7    involved in surf boat rescue, and continued my love affair with
8    the ocean.
9            I lived in Hawaii for a little bit.  I was a diver and
10   a surfer, and living in Southern California, actually, was where
11   I ended up, primarily to be close to the water and to the
12   mountains and those areas and after working.  Should I go on?
13   Q.  Go on.  Just finish your experience with water, and then I
14   want to get into your employment involving the water.
15   A.  Okay.  Because there is a connection there.  So I also --
16   just to kind of cap it off, basically, I also was a Coast Guard
17   auxiliaries for about seven years, but on the aviation side.
18   For seven years I flew as a co-pilot, searching and rescue
19   missions, marine mammal surveys and environmental investigations
20   off Southern California from Point of Conception to the Mexican
21   border.
22   Q.  Let me stop you right there.  You used a term marine mammal
23   surveys.  Can you tell us what that is?
24   A.  Right.  Basically since we had -- we were the aviation.  We
25   flew at 500' in the offshore waters off California.  So I was

288

1    also, at that particular time, working at Sea World of

2    California and had a pretty good idea of what the various

3    mammals look like.  So we would be recording, if there were

4    large aggregations of dolphins, and sometimes we had blue

5    whales, sometimes we would have two blue whales off the backside

6    of Catalina Island, so we would record those and report those

7    back into Group San Diego which was responsible for this area.

8    Q.  You mentioned Sea World.  Where did you work before you

9    worked at Sea World?

10   A.  I work for Pacific Southwest Airlines.

11   Q.  What did you do there?

12   A.  I was in the crew control area.  So basically one of the

13   sections that operates the airlines.  I was handling crews,

14   scheduling, and the federal aviation regulations and that were

15   applied to their scheduling.

16   Q.  And when was that?  What year was that?

17   A.  That would have been later end of 1985.

18   Q.  How long were you at PSA?

19   A.  About three months.

20   Q.  Why did you decide to leave?

21   A.  I was in a room not unlike this, which the lights were

22   dimmed down, and I had gotten all the qualifications for this,

23   I'd always been an aviation buff, and then received my license

24   to fly single engine airplanes, but I just decided that I didn't

25   want to be inside.  I couldn't take it anymore.  After three

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

289

1     months of this thing, I realized that nothing was worth this, so

2     I set my sights on actually working outside, and that's what

3     took me to Sea World.

4     Q.   Okay.  And when did you start at Sea World?

5     A.   1986.

6     Q.   How long did you work there?

7     A.   Twelve years.

8     Q.   Can you tell us what jobs that you had, just briefly

9     describing your experience at Sea World for me?

10    A.   Sure.

11    Q.   Beginning to where you ended when you left.

12    A.   Okay.  In the beginning, Sea World was still operating these

13    30' passenger hydrofoil boats, and they're basically converted

14    crew boats, I think, from the gulf or something, but they're

15    hydrofoils.  They would lift out of the water about maybe 8'.

16    So I got involved in a crew that was involved in retrofitting

17    these things.  They were done on an annual basis, and then they

18    go through their Coast Guard certification.  So I started there,

19    basically, turning wrenches and doing anything that you need to

20    on that hull work and so forth.

21    Q.   How long did you do that?

22    A.   Probably about five months.  We got the things finished.

23    Q.   After that can you tell us through to the end.

24    A.   Right.  Then over the -- I rose in the ranks at Sea World,

25    and I'm pretty good technically, and I ultimately became the

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    director of entertainment at Sea World in San Diego with a staff

2    of about 200 people and a budget of about 4 and a half million,

3    $5 million.

4         And at some point, the company had been acquired by

5    Anheuser-Busch, so there was an additional infusion of capital

6    and so forth, and that allowed us to get involved in even bigger

7    projects.  So I had a very large staff, and we did things like

8    the shows that you see there, that's for certain, but also large

9    exhibits.  We were involved with basically anything that had to

10   do with what the public saw.

11        And I also had a role at the management of the park at

12   the director level.  You would be called on to be the senior

13   management person of the park.  We would have up to 50,000

14   people in the park on a given day.  July 4th weekend, Mission

15   Bay, 50,000 people would come to the park to, you know, spend

16   their day.  So I also had that.

17   Q.  How long were you at Sea World?

18   A.  Twelve years.

19   Q.  So that takes us to about 1998?

20   A.  Correct.

21   Q.  What did you do after that?

22   A.  In 1998, I joined with Academy Award Winning documentary

23   film maker Mike Hoover, and he had approached me at Sea World.

24        And stepping back a second, I really loved Sea World.

25   I actually loved working there, but I really felt like I had

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    topped out.  I really felt like I wasn't learning anything new.

2    And he talked to me about doing an entire show, which was going

3    to be called *H3O*.  Sort of a play on the water idea.  And it

4    would be shot in high definition and deal with problems that

5    dealt with the ocean.

6         I was impressed with him.  I was certainly impressed

7    with his accomplishments and so forth, and so I made the choice

8    that I would leave the security of the nest, so to speak, and we

9    set out.  And he's about five years older than me.  He's had a

10   lot of time all over the world, but he sent me out on the field

11   things as I was kind of learning this business.  I hadn't been

12   involved in shooting television shows and all sorts of things at

13   Sea World.  I had my -- I knew how to do the stuff, but not at

14   his particular level, so...

15   Q.  When you performed photography tasks for this person, would

16   you actually do diving and underwater photography?

17   A.  Absolutely.

18   Q.  Can you describe to the jury what kind of things you did as

19   a diver?

20   A.  Certainly.  None of this was technical, it was all fairly

21   shallow water, but we did things like we were -- this is going

22   back now to 1999, 1998.  This is the first time that people were

23   recording -- well, for instance, down in south Africa.  There

24   was a researcher there that was swimming outside the shark cages

25   with the Great White sharks.  So I was down there as a producer.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    And also the guy that got in the shark cage and would film there

2    at Shark Alley, offshore, now the story has actually -- it's

3    actually been on *60 Minutes*.

4          But back then, there was nobody around, we were some of

5    the first people to be involved in that.  So I would go down, I

6    would get the gear.  This is also the beginning of the smaller

7    digital video cameras, which were so good.  So we would take

8    them down, and we would be down there months at a time because

9    even though you want to film things, weather and the animals

10   don't cooperate.

11         So I would basically do everything.  We also had an

12   additional cameraman, but in is a very small affair.  We had a

13   couple of people, and so in that and other cases, I would

14   actually shoot in the water.  We also had -- this was a time up

15   in Washington state.  There is an Indian tribe up there that

16   decided to start whaling again, and we were filming that, and I

17   was actually in the water up there with some of the whale boats.

18   That would be fairly typical.  Mike was the same way.

19   Q.  Can you tell us how you got to Dubai and met Sultan Bin

20   Sulayem?

21   A.  The Chairman.

22   Q.  The Chairman.  Is that what you're more comfortable calling

23   him?

24   A.  Absolutely.

25   Q.  And why?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

293

1    A.  Well, he's a colleague.  I mean, he is the Chairman.  In

2    other words, I hold him in a certain esteem.  I would say that.

3    Just --

4    Q.  Okay.

5    A.  Probably a better word for it, but in any case, it's the

6    Chairman.  He doesn't require that but --

7    Q.  Tell us how you got to meet him.

8    A.  I got called, I was actually down in, we were filming

9    elephants down in the Congo or something like this, a researcher

10   that was down in the middle of nowhere, and I got a call from a

11   fellow at Universal that I worked with, and he asked me if I

12   would go up to Dubai and be a stand in for him in a

13   brainstorming session in Dubai.

14        And I said, "Great.  Where is Dubai?"  And he said, "It's

15   out in the Gulf."  He knew very well that I would just go

16   because I had never been there before, actually.  So he asked me

17   to go up and sit in on a sharett, which is basically just an

18   architectural brainstorming session.

19          So I met in Dubai with three other architects from the

20   US.  This was an American group that was out there, and we were

21   out there for 10 days.  And put together a plan that had to do

22   with a shopping center.  Ultimately that was what this was

23   about.  I didn't know that before we got there, but that's what

24   it was about.  And so plans were put together, drawings were put

25   up, and this presentation was made to the Chairman.  He was the

294

1    Chairman of the ports at that particular time, and customs and

2    free zones.  So that was the first time I met him.

3    Q.  So when you say Chairman, you're referring to who other

4    people have called Sultan?

5    A.  Right.  Right.

6    Q.  And how did that relationship develop?

7    A.  Well, that was the first time I met him, but -- and he was

8    on the phone the entire time.  I always tell that story because

9    he was busy even back then, but he claims he heard the

10   presentation.  Then over the following years -- this was in

11   2000 -- well, the first thing was when I saw Dubai, I was taken

12   by the place.  I had never been out in the Middle East, I had

13   never been up in that neck of the woods, and I thought it was

14   incredible.

15        Here we have this creek that comes in -- this area is

16   called the Persian Gulf, but this creek, and you have these

17   vessels coming up from Africa, and I was taken by the place and

18   the people.  I thought it was amazing.  And wherever I went, I

19   got accepted into this Arab hospitality, which you actually have

20   to see and be a part of to understand.  And I traveled all

21   around the world.

22        So I was taken by the place, so within six months, I

23   figured, okay, we were involved in shooting these films at

24   various places.  The great white shark thing was originally

25   funded by Discovery, and ultimately -- they paid somebody, but

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    they passed on it, and ultimately this show showed up about two

2    years ago on CBS.  Not a very good show, actually, but ended up

3    in prime time on CBS.  This was the one going back to the

4    sharks.

5         So I thought that more people should see about this

6    place Dubai, and I thought this would work with the Travel

7    Channel.  So I came back by myself with a camera and went down

8    an filmed everything back then in 2000.  So that was the start.

9    Q.  And then what happened next with regards to the Chairman and

10   you?

11   A.  It was just simply that the people I met on the first trip

12   were the people that are still my friends today, after 11 years.

13   And so I was out in the area, involved in shooting this sort of

14   thing, and at some particular point, we took on -- I took on the

15   task of documenting -- I mean, they started to build the first

16   palm.  And I took on the task of documenting, recording under

17   water, the sea life, coral conditions, and well, whatever we

18   could.  We do this in a video fashion.

19        We brought Professor Joseph Wolensick (ph) out from

20   Southern California.  He had quite a bit of experience,

21   actually, in dealing with some of the marine reserves, notably

22   one around San Clemente and so forth, but he was teaching out

23   there and he was an old friend and a well-connected fellow into

24   the rest of the marine community.  So I brought him out, and we

25   started very, very rudimentary documentation.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

296

1    Q.  When you say documentation, can you tell the jury, are you

2    sitting behind a desk making calculations, or what are you doing

3    to document?

4    A.  We would actually go out to a given location, a buoy site,

5    and we would dive on the location then, and then using transects

6    and using these PVC grids.  I was the one -- actually, I was the

7    one coordinating the work, but I wasn't actually doing the

8    science.  That's not my bailiwick.  And we would dive on the

9    sites, take video recordings, then determine how many urchins

10   and what type of coral was available in these particular sites,

11   and we did that all around.

12        And as the Palm came up, the same thing happened.  A

13   lot of rock work went on on this large exterior breakwater that

14   happened.  And the sea in that area, it's very -- it's pretty

15   much uniformly about ten meters, and it's cap rock.  It's this

16   lime -- sorry, lime floor.  And there isn't much -- unless

17   there's a coral area closer to shore, there isn't much out

18   there.  There's not places for the fish to hide.

19        So what we found is when the rocks went out on the

20   breakwater is that it really became a fish aggregating device.

21   It was like putting down a wreck site.  So the small fish came

22   in, and we recorded things like that.

23        So we started that back in 2001, and we were diving.

24   And the Chairman is also a diver, and occasionally he would show

25   up on some of these dives.  Dubai was very -- place at that

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    particular point.

2    Q.  Can you describe the conditions or what you saw when you go

3    there?  What was the water like?

4    A.  It's variable.  I mean, the number two things that always

5    strike people, of course, is that the water is very, very warm.

6    It's -- there's almost no thermal shock in the summer at all.

7    It feels as though it's in the 80s.  And the second thing is the

8    salinity is higher.  There's no question, so it does feel more

9    buoyant.

10           But beyond that, you have the normal things.  We have

11   visibility anywhere -- I'm going to stick to feet in this case,

12   and I'll correct myself if I lapse into meters or something.

13   But if there's a large algae bloom going on, it could be 5', and

14   we would have days where we would have 45' visibility.  It was

15   just -- to me, it was as variable as any other place.  This

16   wasn't the Red Sea.  It's not designed to be.  You're not going

17   to see hundreds of feet under water, but it certainly was

18   suitable for diving out there on a lot of days.  Most days.

19   Q.  Let me stop you right there.  Charles, could you put, just

20   on his projector, Slide 2, a picture of the Palm.

21           THE COURT:  Put a book in front of the projector.  How

22   hard is that?

23   BY MR. CEDERBERG:

24   Q.  Can you tell us what that is?

25   A.  That's the Palm Island.  I mean, that's Palm Jumeirah.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

298

1    Q.  Do you see where it has an exhibit number on the corner of

2    that?

3    A.  I see a Number 2.

4    Q.  Okay.  No.  I'm sorry.

5    A.  No.  I'm sorry.  Okay. 389-1.

6         MR. CEDERBERG:  I'd offer 389, Your Honor.  I believe

7    there's no objection.

8         MR. HESS:  No objection.

9         THE COURT:  Without objection, 389 is admitted in

10   evidence.

11        (Plaintiffs' 389 in evidence)

12        MR. CEDERBERG:  May we show the jury?

13        THE COURT:  Yes, you may.

14   BY MR. CEDERBERG:

15   Q.  Looking up at the screen on your own monitor, is that the

16   Palm development you're talking about?

17   A.  Yes.

18   Q.  And where would the reefs that you were trying to document

19   be on there?

20   A.  The areas we're talking about is all around the exterior

21   running to about one -- three quarters of a mile offshore.

22   This, but also up toward the port.  We have -- okay.  So all

23   this area right here, but we were also looking in the areas that

24   went up toward the Jebel Ali port and beyond that.

25   Q.  What is the Jebel Ali port?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.  It's a large container port, probably one of the largest in

2    the world.  I'm not specifically -- don't know about its

3    ranking, but it is the port for the Gulf area for handling

4    shipping.

5    Q.  Is there one area of the port that's pretty much dedicated

6    to use by the United States Navy?

7    A.  Yes.

8    Q.  Can you describe that to the jury.

9    A.  Well, it's an area that's just been basically secured.  The

10   port of Jebel Ali is the closest thing to an American Navy base

11   in the Gulf that you're going to get.  It's a secure area.  The

12   vessels come in.  The normal security forces that are involved

13   with naval security have been operating in there for, I don't

14   know, 20-some-odd years, since the beginning, practically, of

15   the port.  So it is the place that our sailors can come into,

16   can disembark and safely either stay in the port or go out to

17   the desert and enjoy other activities and so forth.

18   Q.  Can you take that down, please.

19       How did your efforts to document what was going on under

20   water around the palm lead to your relationship with the

21   Chairman?

22   A.  We were basically in the water all the time.  That's the

23   main thing.  And the thing is that at some point, also, because

24   he had seen the presentation that we had done for the shopping

25   center, he asked me to brainstorm potentially a large artificial

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    reef that would happen off of here.  Not only brainstorm it, but

2    put it into animation, get some pictures involved so he could

3    talk about it.

4            So he threw out these ideas, possible ideas that would

5    be interesting and to recreate dive areas of the world out here.

6    Now, you obviously can't recreate the kelp of Southern

7    California.  It wasn't that, but you would set these up because

8    this area was flat.  Just this cap rock.  Set up these

9    structures in these areas so each one would have its own unique

10   flavor.  This one would contain certain elements of diving off

11   Cape Town, and this would be the mall leaves and this and that,

12   and they were themed areas like a theme park, basically, but

13   take a look at that and then put that into an animation so it

14   could be shown.

15           That was the main thing that we were doing, even though

16   the Palm itself -- one of the main things that allowed it to

17   happen was before it was built, an animation had been done that

18   showed what it could be.

19   Q.   Was there a time where the Chairman asked you to get

20   involved in trying to locate potential water vehicles for use

21   for pleasure with his hotel development or Dubai World's hotel

22   developments?

23   A.   Absolutely.

24   Q.   Okay.  Can you tell us about that.

25   A.   Well, since we were already looking at this whole area here,

1    and we were looking at possible ways to put the reefs in, we

2    were also looking at -- there were going to be lots of people

3    living on the palm fronds itself.  So he was looking at all

4    sorts of things that people could use for recreation.

5         We, at that point, had set up a small science station

6    in a port, basically on one of the areas here.  So we were

7    looking at anything that might be available.  That meant

8    hovercrafts, I mean, anything on the water.  At that point, the

9    internet was pretty strong, wasn't that long ago, and there was

10   all kind of things that you could find there.  Some of them

11   haven't been built before, but we were looking for things that

12   might be suitable for use out there and that could be bought by

13   somebody with some disposable income.

14   Q.  And did he assign you any task to do with regard to that?

15   A.  Yes.

16   Q.  Okay.  What did you do?  What did he tell you to do?

17   A.  Well, he was looking for three specific things.  What really

18   initiated.  He was looking for a hovercraft, and possibly one up

19   to maybe 15 people, was looking for a submersible that he could

20   take down and show and use at the resort hotels and so forth,

21   could use off of here.  And what's the third thing?  Hovercraft.

22   Oh, air boat.  He was looking at an air boat because in the

23   area, there were various areas in and around the Gulf, and

24   certainly up towards Bahrain and so forth where you have a lot

25   of mangroves.  Looks very similar actually to some parts of

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    Florida.  So he was looking at something where they could use an

2    air boat on the island.

3    Q.  How did you go about doing your assignment?

4    A.  Well, I live in California, so I got on the internet and I

5    preselected a handful of places.  And when the Chairman was on

6    business down here in Miami, I came out and met him and we went

7    down to Homestead, Florida.  There was a fellow building air

8    boats that I had contacted, and he was literally building it.

9    There was a little metal building.  But basically he was welding

10   this thing outside, and we saw that, saw how it went.  And I was

11   trying to arrange, actually, a ride.

12         And then the next thing is we went to a place called

13   Air Commander.  I think it was Port St. Lucie or somewhere up

14   here.  We were staying in Miami.  Then went aboard one of these

15   -- the Chairman did, anyway, a two-person hovercraft.  And he

16   took that out for -- around and saw how that was and the noise

17   associated with it and everything, and then, of course, we went

18   to Seahorse Submarine after that.

19   Q.  All in the same day?

20   A.  Yeah.  Absolutely.  This was typical, by the way.  We

21   would -- you know, he's -- even at that point he was essentially

22   the head of a company that had probably 30 or 40,000 people, but

23   not very ostentatious.  I mean, basically we get in the rental

24   car and stop by Almons' (ph) then go to the next place.

25   Everything had to be done.  We had to get a lot done in that

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    particular day.  He was a very hard worker, but that is very

2    typical.

3            MR. CEDERBERG:  Can Exhibit 68 just be shown to the

4    witness.  It's not a slide, it's just a regular exhibit.

5            May I approach, Your Honor?

6            THE COURT:  Sure.

7            MR. CEDERBERG:  Your Honor, I have conferred with

8    counsel.  There is no objection, so I would offer 68.

9            THE COURT:  Without objection, 68 is in evidence.

10           (Plaintiffs' 68 in evidence)

11           MR. CEDERBERG:  Now, can you put it on the screen for

12   the witness and the jury.

13   BY MR. CEDERBERG:

14   Q.  Can you tell us what that is?

15   A.  That is the website for Seahorse Submarine.

16   Q.  Is that the one you looked at, to the best of your

17   recollection?

18   A.  Yes, it is.

19   Q.  If you can -- and did you look at the whole thing?

20   A.  I'm familiar with this one.  It was actually up for a very

21   long time.

22   Q.  Okay.

23   A.  I don't mean here, but I mean in --

24   Q.  Can you show -- turn to Page 68-4 for the jury.  Okay.  Can

25   you blow up the first -- the top third of that?  And up above to

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   get the blue as well.

2   Okay.  Did you see that portion on the fourth page of the

3   website that says "safety"?

4   A.  Yes.

5   Q.  And were you concerned, when you were looking for

6   submersibles, about the safety of the submersibles?

7   A.  Well, of course.  Number one thing.

8   Q.  And maybe obvious for the record, can you tell us why?

9   A.  Well, because we're going under water, and as a diver -- and

10  most important, we were -- the purpose of these things was to be

11  able to take other people under water.  So we're talking about

12  family members, we're talking about VIPs, we're talking about

13  the head of the country.  I mean, that's what we were looking

14  for.  So, of course, safety would be paramount.  There had to be

15  no issues with regard to that.

16  Q.  Okay.  Did you want these submarines to work properly?

17  A.  Of course.

18  Q.  Okay.  And what -- how did that relate to whether they

19  stayed dry inside?

20  A.  Well, for -- it's a submarine, it's supposed to be dry on

21  the inside.  Otherwise, we would get a wet submarine or we would

22  just dive.  I mean, that was the purpose.  The idea was to be

23  able to take someone comfortably under water and return them

24  safely to the surface happy.

25  Q.  Were you concerned also about the insurability of any

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    submersible that Dubai World would acquire?

2    A.  Well, it was assumed that it would be insurable.  I mean,

3    we're here, so I don't know if the word "concern" is correct,

4    but that's assumed.  That's sort of tacitly a part of this if

5    you're doing something like this.

6         And I have to say, you know, I related this very much

7    to the aviation side again.  I mean, this has been a significant

8    part of my life, and whether you're flying in a Cessna 152 or

9    172, you accept the fact that there are risks involved, but you

10    mitigate those risks through proper design and procedures and so

11    forth.  So that was assumed, also, when we were looking at

12    these.

13    Q.  Okay.  Now, after you saw the website of Seahorse and you

14    and the Chairman arrived in Stuart, Florida, can you tell the

15    jury, when you arrived at Mr. Jaubert's company, what you saw?

16    A.  Sure.  We came into Stuart, and we saw in a little

17    industrial area a small factory space, kind of a mess, but not

18    disorderly, but just sort of obviously they were working.  We

19    had Mr. Jaubert's office.  He had all sorts of memorabilia and

20    things in there.  This was a guy that was clearly working on

21    lots of different things.  And the requisite hard hat helmet

22    from this area and in the back area.  There were a number of

23    submarines that were under construction.  So the first reaction

24    was we were coming in sort of a -- not a garage, but, you know,

25    a small manufacturer pretty common, actually, in the area.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    Q.   How did your first interactions with Mr. Jaubert -- how did
2    he strike you?
3    A.   Impressive.  Very impressive.  Very charming, and also very
4    knowledgeable.
5    Q.   What about his sales ability?
6    A.   There was no way to judge his sales ability to us or just
7    selling boats.
8    Q.   To you?
9    A.   As I said, he's genuinely likable.  Absolutely.
10   Q.   And how did you and the Chairman feel after you visited
11   Seahorse?
12   A.   We thought it was great because here was a situation where
13   these submarines were being built, and although they weren't
14   inexpensive, it wasn't like it was cheap or whatever, but
15   compared to the other things that we've been used to seeing, the
16   one atmosphere submarines that start at a million dollars and
17   all the rest of this stuff, we felt this guy really found this
18   niche that he was creating these and selling and operating these
19   designs, and we thought it was wonderful.  We were very excited
20   by it.  And as I said, he's a very creative guy.
21   Q.   Which submarines in progress or completed did he show you on
22   that trip?
23   A.   Well, you know, I'm trying to think.  Of course the one
24   thing that struck out right away, there's this black camouflage
25   thing called the S D V and that was sitting up there and we were

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   very interested in that.  Because it looked absolutely James

2   Bond.  It had a motor on the back, it had it was a kind of like

3   an inflatable and it was tandem, had two seats.  We were very

4   interested in that whole thing.  And that was a swimmer delivery

5   vehicle with a big Mercury or whatever engine on the back that

6   could go out to someplace dive came back to the surface and

7   motor back.

8        We also saw what I later learned to know the Adventurer

9   submarine, at least one of those in there, and then outside

10  there were bits of pieces kind of in their boneyard of

11  fiberglass things.  There was this Goby hull, Goby which was

12  around submarine then other things that he pointed out.

13  He talked about something that interest there was a trimaran,

14  sort of that was called a lift raft, other pieces that you see

15  as part of like fiberglass construction.  It was all very normal

16  that way.  Small, but, you know, great things come out of small

17  places sometimes.

18  Q.  Can you show us Exhibit 68, Page 24.  Can you blow up the

19  top third of that pleas Mr. Duncan.

20       And did you inquire about the availability of the

21  Discovery?

22  A.  Of course, this is the exciting one.  This was the thing

23  that was really of interest because when we first contacted

24  Seahorse, this is what we were looking for.  We were looking for

25  something that would carry six people or so, in the areas that

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    we were talking about.  So this was -- we were there in December

2    of 2003, and this was wonderful.  We thought this is fantastic.

3    In fact, I think I asked him in an e-mail, "Are we going to be

4    able to see this thing?"  So that was -- we thought that was a

5    nice match.  That was exciting.

6    Q.  It says on the bottom there, launch schedule, the first week

7    of December 2003.  So was that one -- did you believe that the

8    Discovery would be ready to be purchased and function properly

9    as a submarine?

10   A.  Well, of course, until we arrived there and then we were

11   told that that was not the case.  But sure.  I mean, that's what

12   it meant.

13            MR. CEDERBERG:  After conferring with counsel, Your

14   Honor, there's no objection, so I'll offer Exhibit 598.

15            THE COURT:  I know I don't have 598.

16            MR. CEDERBERG:  I think that's on the defense exhibit

17   list.

18            THE COURT:  Okay.  You're offering defense Exhibit 598?

19            MR. CEDERBERG:  Correct, Your Honor.

20            THE COURT:  Okay.

21            MR. CEDERBERG:  May I have a moment?

22            THE COURT:  Yes, sir.

23            MR. CEDERBERG:  Your Honor, exhibit numbers over 500

24   will be on the defense exhibit list, under 500 will be on ours.

25            (Plaintiffs' 598 in evidence)

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    BY MR. CEDERBERG:

2    Q.  We should put up Exhibit 598.  Mr. Miller, can you look at

3    this and tell us what it is.

4    A.  This is the initial e-mail to Mr. Jaubert about the

5    availability of some submarines and setting up the first

6    meeting.  I did this in my name only.  We learned from the past

7    that it wasn't good to mention Dubai or anything, so I just said

8    that we -- you know, "We're interested in your products, and we

9    would like to stop by and see you."

10   Q.  That was sent December 11, 2003?

11   A.  Correct.

12   Q.  And there's a reference on your second paragraph there,

13   "Your vessel Discovery seems to be a perfect match"?

14   A.  Right.

15   Q.  What did you mean by that?

16   A.  Well, as I said before, it was.  This is what we were

17   looking for.  We were looking for something we would be able to

18   take six people down and in the water in these offshore areas.

19   So that's exactly what I meant.  Apparently, in looking around,

20   anything else that I had seen had been millions of dollars, and

21   so this just looked ideal.

22   Q.  Then it goes down to say, "A couple of questions.  Has

23   Discovery been launched yet?"  And some other questions, you

24   talk about coming up from Miami.  Is this what set up the

25   appointment with Mr. Jaubert?

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

310

1    A.  Yes.

2    Q.  And then if I could show you Exhibit 309.  But let me confer

3    with counsel first.

4         MR. HESS:  No objection.

5         MR. CEDERBERG:  Offer Exhibit 309, Your Honor.  No

6    objection.

7         THE COURT:  Without objection, 309 is admitted in

8    evidence.

9         (Plaintiffs' 309 in evidence)

10   BY MR. CEDERBERG:

11   Q.  Put it up, sir.  Okay.  I think -- let's start at the

12   bottom.  I think that's where the e-mail chain starts.  And this

13   is an e-mail you wrote that we just saw?

14   A.  That's correct.

15   Q.  Okay.  Then go up to the e-mail right above it, please.  And

16   this was a reply you received, and it says Herve wrote -- who do

17   you understand that to be?

18   A.  Mr. Jaubert.

19   Q.  This confirmed the appointment?

20   A.  Correct.  And the fact that we wouldn't have access to that

21   boat, the Discovery, we talk about right away.

22   Q.  Okay.  It says in that paragraph, "I have a second one in

23   mid-construction, not yet sold, and will be completed in two

24   months."  What did you take that to mean with regard to the

25   availability of these boats?

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

311

1    A.  Well, I took it to mean that there's a second one in

2    construction, and it would be available in two months.

3    Q.  And when it was available, what did you understand that to

4    mean?

5    A.  That it would be completed and available for use and

6    available for sale, and that we could buy it if it was not yet

7    sold to somebody else.

8    Q.  Okay.  And implicit, I have to ask for the record, do you

9    believe it would work as a functioning submarine?

10   A.  Of course.  There's no reason to doubt it.

11   Q.  And why don't we go to Exhibit 600, if I can confer with

12   counsel.

13         MR. CEDERBERG:  Conferred with counsel, there's no

14   objection.  I would offer Exhibit 600.

15         THE COURT:  Without objection, Exhibit 600 is admitted

16   in evidence offered by the Plaintiff.

17         (Plaintiffs' 600 in evidence)

18   BY MR. CEDERBERG:

19   Q.  Okay.  Can you tell us what this is?

20   A.  It's an e-mail from myself to Mr. Jaubert on the day that we

21   met.

22   Q.  And it says, "Hello, Herve.  Nice meeting with you today,

23   and thank you for taking the time to show us around.  Over

24   dinner Sultan asked me to request that you included a

25   four-stroke engine in the Intruder quotation if possible."

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          Would it be fair to say that after you and the Chairman

2     met with Mr. Jaubert at his factory in Stuart, that you were

3     excited about proceeding with the acquiring submarines?

4     A.   Absolutely.  We were excited.  We were very excited about

5     the thing, and even this just refers to the fact that he didn't

6     want -- there was a two-stroke outboard engine in this thing,

7     and he didn't want to be adding oil to it, so he wanted --

8     apparently we asked for a price on that, so he wanted the

9     four-stroke in there.

10    Q.   The one thing I didn't ask you is when you were at

11    Mr. Jaubert's Stuart plant, did you see any of these submarines

12    operating, or did you go down in any submarines?

13    A.   No.  We were -- this was all in the factory itself.

14    Q.   So no demonstration was done for you?

15    A.   No.

16    Q.   And you didn't check one out to make sure it worked?

17    A.   No.

18    Q.   Looking back, can you tell the jury why you didn't do that?

19    A.   Well, we were on land.  We were on a schedule.  This was the

20    initial meeting.  We didn't know what was going to happen.  We

21    clearly weren't going to be buying the air boat from the fellow

22    down in Homestead, even though it looked like a fine device.

23    And the hovercraft wasn't in line, but it was something we were

24    very interested.  So this was the first meeting.

25          So you walk away from that meeting and that's what sets

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

313

1    the tone of it.  And again, I have to characterize this as this

2    is the Chairman.  He's the one that's looking at these things.

3    I'm not buying these.  I'm up there -- of course, I can get

4    excited as well, I'm only human, but certainly that was the

5    tone.  It was a very good, it was a good day.  It was a good

6    day.

7    Q.  Okay.  Let me show you -- or let me confer with counsel, see

8    if there's going to be an objection to 605.

9          MR. HESS:  No objection.

10         THE COURT:  Without objection, 605 is admitted in

11   evidence as Plaintiff's exhibit.

12         (Plaintiffs' 605 in evidence)

13         MR. CEDERBERG:  605, please, Mr. Duncan.

14   BY MR. CEDERBERG:

15   Q.  And can you go to the second page, and blow up the bottom

16   half of the e-mail.  Now, this e-mail has got a lot of computer

17   talk in it, but if you can wade through the computer talk, is

18   this an e-mail that Mr. Jaubert, Herve, on the top, wrote you on

19   February 2, 2004?

20   A.  Yes.

21   Q.  Okay.  We go down, the first paragraph says something about

22   a business card.  Do you recall that at all?

23   A.  You know, only vaguely.  I remember there was a gentleman

24   that was there that ostensibly was employed by Mr. Jaubert, and

25   he handed me a business card.  And I think he was in charge of

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1   marketing or sales or something else.  And to be honest, I

2   really -- didn't really have much of an impact on me.

3   Q.  Let's go down to where it says "font family," and if you can

4   sort through the actual text of the message starting with "A

5   couple of questions, if I may" up on the first line.  The one

6   right above that.  Above that.

7        Okay.  And then the next sentence, If you get by the

8   computer gobbledygook, "what is the cost of labor in AE?  What

9   citizenships, for boat construction, fiberglass and resin must

10  be imported.  Is there any taxes and other duties?  Is there an

11  existing boat manufacturing infrastructure?  And from where most

12  likely they import their stuff?"

13       Does this help you recall what this was about?

14  A.  Certainly.  This is -- these are just questioning by

15  Mr. Jaubert as to what the suitability of building these same

16  things in the UAE would be about.  These are obviously very

17  open.  I mean, the initial and general questions that you would

18  ask.  Because he had not been there before.  At least to my

19  knowledge.

20  Q.  Was it Mr. Jaubert, or was it someone from Dubai World who

21  first suggested Mr. Jaubert move to Dubai to build submarines?

22  A.  This is something I'm very, very clear about. This is

23  something -- and basically, we had been involved in discussing

24  things with Mr. Jaubert and Seahorse.  And we were looking at

25  buying these submarines, and it seemed like a great match to me.

1    They build the submarines here, put them in the container, ship

2    them off, but we were discussing -- we were discussing these.

3    We started a little bit later in this schedule of events.  We

4    made a contract to buy a submarine, then another submarine, and

5    at one particular point I was talking to Mr. Jaubert, and he

6    just said to me, in the course of conversation, "I would be

7    willing to go to Dubai."

8            And it actually took me off a little bit because I was

9    thinking up to that point, you just had a new baby, this was --

10   his wife gave birth sometime in around that area, but, you know,

11   I mean, that was pretty important to me relative to his family,

12   and I was surprised.  But I said, "Well, we'll ask him."

13           So basically I -- when the Chairman came by, I said,

14   "Herve would be willing to move to Dubai."  And that's where it

15   started.  That's where this whole thought started.  As far as

16   I'm concerned, anyway.  That's the initial part of that.  And

17   then what happened after that was a slow gathering of

18   information.  Then it got speeded up as purchases were made.

19   But to me that was -- it was very -- I remember that very, very

20   clearly.  Very clearly.

21   Q.  Okay.

22           MR. CEDERBERG:  Let's go to Exhibit 212.  I'll confer

23   with counsel.

24           MR. HESS:  No objection.

25           THE COURT:  Without objection, 212 is admitted in

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    evidence.

2              (Plaintiffs' 212 in evidence)

3              MR. CEDERBERG:  211, I apologize.  I gave you the wrong

4    number, Your Honor.

5              THE COURT:  211, is there any objection to 211?

6              MR. HESS:  No objection.

7              THE COURT:  Without objection, 211 is admitted in

8    evidence.

9              (Plaintiffs' 211 in evidence)

10   BY MR. CEDERBERG:

11   Q.  Okay.  Can you go down to -- from the top to include

12   Paragraph 2, I think, and tell us what this is.

13   A.  This is another e-mail from me to Mr. Jaubert.  Obviously

14   dated February 4, and this is an e-mail I sent him, and I'm

15   trying to facilitate the purchase and the deployment of this

16   submarine.  That was our job, was to get one of these things out

17   there and operating as quickly as possible.

18              So part of that I just point out the fact that, I mean,

19   clearly he has to be paid, steps are made to do that, then I

20   just put out the list of the rest of the items I thought that

21   were most important.

22   Q.  It says, "We wrote get the Goby completed as soon as

23   possible"?

24   A.  Right.

25   Q.  And when you say "completed," what did you mean?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

317

1    A.  I meant completed.  Done, finished.  Ready for use.  Let's

2    go.  Put it in the water, that kind of thing.

3    Q.  And on the second paragraph you say, "Get the Goby shipped

4    to Dubai as soon as possible"?

5    A.  Right.

6    Q.  Now, had you entered into an actual contract for the Goby at

7    that time?

8    A.  You know, I'd have to take a look at the contract to tell

9    you that.  Certainly I'm using words which would indicate that

10   we made the commitment and we're doing everything possible to

11   facilitate this at this particular point.

12   Q.  Okay.

13            MR. CEDERBERG:  May I confer?

14            THE COURT:  Yes, sir.

15            MR. HESS:  No objection.

16            MR. CEDERBERG:  There's no objection, Your Honor.  I'd

17   offer 609.

18            THE COURT:  609?  609 is offered and admitted as a

19   Plaintiffs exhibit.

20            (Plaintiffs' 609 in evidence).

21            THE COURT:  Without objection.

22   BY MR. CEDERBERG:

23   Q.  Just blow the top up.  Can you tell -- Mr. Miller, can you

24   tell the jury what this is?

25   A.  This is an e-mail from Mr. Jaubert to me on the 9th of

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

318

1    February, and he's talking about the boat show.

2    Q.  What's the boat show?

3    A.  This is a Dubai boat show.  It happened -- in this case mit

4    happened in 2004, I believe in March of 2004.

5    Q.  Can you tell us what the boat show is in Dubai, or what you

6    found out it is?

7    A.  It's the same as a boat show in Fort Lauderdale or anybody

8    else, but it's the place, and all of the local boat

9    manufacturers and the people from Europe all come, and they show

10   their wares.  And it's located not that far from the port of

11   Jebel Ali, kind of midway in the whole thing and in typical

12   fashion.  I mean, the idea was that, well, let's get this thing,

13   let's get it out to Dubai, get it in use.

14        And at this point, we were also talking, I'm sure the

15   Chairman was very interested in seeing what the local interest

16   in submarines was.  So -- and everything happens fairly quickly.

17   I mean, he likes things to move along smartly without delay.  So

18   that was the issue.  The issue is, well, can we get this thing

19   available and out for the 15, let's say, of March for this boat

20   show.

21   Q.  And this is Mr. Jaubert's reply for you?

22   A.  Yeah.  It's too short for the Goby to be at the boat show.

23   Q.  Okay.  Then he says on the -- if you can do the second,

24   third, fourth sentence, if you can highlight those.

25        "At this point it is important to get something going,

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Goby or else.  I am committed to build your subs, and you have a
2    contract from me, but it's been a month now.  I strongly believe
3    in Sultan's project, but I have to keep my production running,
4    and if I start something else because I have to, I will not be
5    able to guarantee the delivery times in my contract."  Do you
6    see that?
7    A.   Sure.  Yes.
8    Q.   What was the situation?  Does that refresh your memory as to
9    what the situation was?
10   A.   A little bit.  I think what we received was a -- one piece
11   of paper which was a sales contract, and basically says, "We
12   will sell you this submarine for so many dollars and so forth."
13   I remember receiving that and thinking, "Well, this is fine, but
14   it's entirely too rudimentary."  And having dealt with some
15   shipyards before, although this wasn't that type of a thing, I
16   knew we needed to get the proper legal contract in place.

17          So Mr. Jaubert had no objection to that.  I mean, the
18   idea was to protect both the parties, but I think that's what
19   this is sort of talking about.  He says that he put a contract
20   back, we came back with a contract that laid out the duties,
21   responsibilities, the payment schedule, and other items relative
22   to the purchase, just like you would for any boat.  This was the
23   first submersible that we were purchasing, but we knew what
24   happens when you buy a boat, so same thing applied.

25          THE COURT:  Let's take our morning break.  And here's

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    what I would like you to do now and each evening.  I want you to

2    show him all the exhibits you're going to use, and then when

3    it's time for the next one, you just tell him the number.  He

4    should have copies of all of the exhibits.  Then you don't have

5    to take them over to him and let him read them because we're all

6    sitting here waiting and we don't need that.  So you show him

7    all the exhibits you're going to offer, then when you turn to

8    him and say 904 or whatever it is, he knows what it is.  If he

9    has an objection, he will have told me.  You know, he'll know

10   what he's going to say to me, and we can just move more smoothly

11   that way all right?

12        We'll take our morning break right now.  Let's take a

13   break for about ten minutes, and we'll be back in in about ten

14   minutes.  All right?  Show him what you're going to do for the

15   rest of the morning.

16        COURT SECURITY OFFICER:  Please rise for the jury.

17        (Jury out at 11 a.m.)

18        THE COURT:  Sir, because you're on the stand, you'll

19   not be able to discuss your testimony with anyone, even the

20   lawyers that called you.  Okay?

21        THE WITNESS:  I understand.

22        THE COURT:  Thank you.  We'll be in recess for ten

23   minutes.

24        (Brief recess)

25        (Jury in at 11:13 a.m.)

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

321

1        COURT SECURITY OFFICER:  Have a seat, please.

2        THE COURT:  Be seated, please.

3        Please continue.

4        MR. CEDERBERG:  Your Honor, after conferring with

5   counsel, we have reached agreement on several exhibits, so we'll

6   go fast now.  I'd offer Exhibit 5, no objection.

7        THE COURT:  Without objection, Exhibit 5 is admitted in

8   evidence.

9        (Plaintiffs' 5 in evidence).

10        MR. CEDERBERG:  Would you show the first page of that,

11   sir, and blow up the first part of it.

12   BY MR. CEDERBERG:

13   Q.  Can you tell us what this is?

14   A.  This is the purchase contract for the Goby.

15   Q.  Were you involved in this?

16   A.  Yes.

17   Q.  Can you tell us what you did with regard to the Goby.

18   A.  I worked with the attorney to set the purchase contract for

19   the submarine.  That's what this represents.

20   Q.  And the date of the purchase is February 17, 2004?

21   A.  Correct.

22   Q.  Look on that first paragraph, Mr. Duncan, it has the date

23   there.  Okay.  And then can we go down to where it says "vessel"

24   and blow up the first three or four lines?  No, up above where

25   it defines the vessel, Paragraph 1.  Yeah.  The vessel is model

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

322

1    Goby 2004, dry cabin, three passenger, 13' long submarine.  Is

2    that the Goby that was eventually transported to Dubai?

3    A.   That's correct.

4    Q.   And then can you go down to the third paragraph that starts

5    out "Without limiting the foregoing."  "Without limiting the

6    foregoing, the vessel shall be constructed by seller in first

7    class fashion using highest grade materials pursuant to and in

8    accordance with the plans and specifications set forth in

9    Exhibit A."  Do you see that?

10   A.   I do.

11   Q.   And why did Dubai World insist that the submersible it was

12   buying be constructed in a first class fashion?

13   A.   Because the submarine was essentially a life support system.

14   This would be normal for anything that was being purchased, but

15   certainly in this case.

16        MR. CEDERBERG:  Can we go to Page 2 of Exhibit 5.  At

17   the top the top paragraph, please.

18   BY MR. CEDERBERG

19   Q.   This talks about the money to be paid.  Do you see "To be

20   paid as follows:  Upon execution of the agreement by both

21   parties, buyer shall pay to seller an initial payment of

22   $58,225"?  Do you see that?

23   A.   I do.

24   Q.   And were you kind of the point man for Dubai World with

25   regard to this contract?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.   Yes, I was facilitating this purchase, no question.

2    Q.   Was the initial payment of $55,225 actually made to Seahorse

3    Submarine?

4    A.   It was made.

5    Q.   And can we go down to the last paragraph on that page, "In

6    the event seller."  "In the event seller is unable to complete

7    such construction and delivery of the vessel by the completion

8    date, the initial payment and other payments made by buyer for

9    the vessel shall be fully refundable to buyer."  Do you see

10   that?

11   A.   I do.

12   Q.   And what was the purpose of that provision?

13   A.   In the event that the terms of the contract weren't met, it

14   simply voided the contract and we he would have to return the

15   deposit.

16   Q.   Can you go to Page 3 of Exhibit 5, please.  And if we go

17   down to the bottom where it says -- just before "miscellaneous,"

18   "buyer's representative."  Do you see that right there?  Yeah.

19   "Buyer hereby appoints Jim Miller as its representative in

20   connection with that agreement."  Is that you?

21   A.   Correct.

22   Q.   And we're going to more quickly go through the other two

23   agreements, but is there a similar agreement that you were

24   involved in regarding the purchase of the Discovery submersible

25   from Mr. Jaubert?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.  Yes.

2    Q.  And was that contract substantially similar to the one we've

3    just seen?

4    A.  We used the same basic outline for that contract, of course,

5    and just put in whatever was different or any variations that

6    occurred, but essentially the same, yes.

7    Q.  Price was different for the Discovery?

8    A.  Yes.

9    Q.  Okay.  And for example --

10        MR. CEDERBERG:  I'd offer Exhibit 8, Your Honor.  We

11   conferred, no objection.

12        THE COURT:  Without objection, Exhibit 8 is admitted in

13   evidence.

14        (Plaintiffs' 8 in evidence)

15   BY MR. CEDERBERG:

16   Q.  This is, at the top, "Agreement to purchase the Discovery

17   submarine," that's dated June 12, 2004.  Is that correct?

18   A.  Correct.

19   Q.  Okay.  Now, on the second page -- well, at the bottom of the

20   first page, it lists purchase price.  And I assume these

21   submarines have different prices?

22   A.  Correct.

23   Q.  Okay.  Let's look at the purchase price.  Total purchase

24   price buyer shall pay to seller for the vessel is $313,450.  Do

25   you see that?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

325

1    A.  Yes.

2    Q.  Then on the next page, if we can blow up the first

3    paragraph, seller, and initial payment in the amount of

4    $156,725.  Do you see that?

5    A.  Yes.

6    Q.  And was that initial payment made?

7    A.  Yes.

8    Q.  And then did Seahorse Submarine also get a second

9    installment for $78,362.00?

10   A.  Yes.

11          MR. CEDERBERG:  Have a moment, Your Honor?

12          THE COURT:  Yes.

13          MR. CEDERBERG:  At this time, Your Honor, I would

14   offer, after conferring with counsel, Plaintiff's Exhibit

15   147.71.

16          THE COURT:  You got .71A and .71B.  Which is it?

17          MR. CEDERBERG:  I believe it's A, Your Honor.

18          THE COURT:  I don't know.

19          MR. CEDERBERG:  Let me make sure.  The description is

20   identical.  Says, "Supporting documents to Exhibit 147."  The

21   Bates numbers are different.  1555 is 71A.  1555 through 1557.

22          MR. CEDERBERG:  Okay it is 147.71A.

23          THE COURT:  All right.  Without objection, 147.71A is

24   admitted in evidence.

25          (Plaintiffs' 147.71A in evidence)


**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          MR. CEDERBERG:  Can we go to the third page of that

2     document.  Just a moment, Your Honor, too many As.

3          THE COURT:  I'm not touching that line.

4          MR. CEDERBERG:  Let me go on, Your Honor.  I'll keep

5     examining and go back to that.

6          THE COURT:  Okay.  Your case.

7          MR. CEDERBERG:  I'd offer 619, Your Honor.  There's no

8     objection.

9          THE COURT:  Without objection, 619 is admitted in

10    evidence as a Plaintiff's exhibit.

11          (Plaintiffs' 619 in evidence)

12    BY MR. CEDERBERG:

13    Q.  Tell us what this that is, Mr. Miller.

14    A.  E-mail from me to Mr. Jaubert asking how the family is

15    doing.  Talking about the dives that we've been doing out on the

16    palm, which was pretty consistent.  This is dated May 2, 2004.

17    Q.  A new name is on that for recipient.  CC Sanil Subair can

18    you tell us -- the jury who Mr. Subair was?

19    A.  Sanil Subair was an employee of probably the Free Zone at

20    that particular point.  He was a civil engineer.  I had been

21    working with him for a little while, civil engineer for 12

22    years, actually, out in Dubai, and involved in the design of

23    buildings and anything that had to do, actually, with port

24    operations and so forth.  So he was tasked with helping to

25    facilitate the action with the submarines, and also to help

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    assist me on the artificial reefs.

2    Q.  Was -- did Mr. Sanil Subair have any role in constructing

3    the new factory to be used by Exomos to manufacture these

4    submersibles?

5    A.  Absolutely.  He designed the building, he found the

6    location, he -- this was an older building, older metal-type

7    building structure, and he arranged for the entire -- it's kind

8    of like a butler building, a massive structure, actually, but it

9    had been old and fallen into disrepair, and he arranged to have

10   this whole thing renovated, reskinned, and the entire interior

11   done, including the front office spaces.  It was going to be

12   production in the back area, or most of it was production, and

13   then some really amazing, stunning show areas.

14          So he's the one that designed that, and the work began

15   on that in the middle of -- seems to me about the middle of

16   2004.  As soon as it was understood that we're looking at

17   manufacturing these things in Dubai.

18   Q.  And can you describe for the jury what Mr. Jaubert's role

19   was with regard to building that factory.

20   A.  Well, he was, in a way, acting as the client.  He's the only

21   one that had built submarines before, and he had the facility

22   here in Stuart.  So essentially what he asked for was his needs.

23   What he needed in the way of airlines and so forth.  And Sanil

24   used to carry around -- it was kind of funny because he used to

25   carry around a piece of paper that Mr. Jaubert had given to him,

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1   and it was his request for needs to build in Dubai.  And it was

2   kind of like the operation that was here.  Sanil had a much

3   bigger picture of what was going to be required to actually

4   build them out there at the scale necessary.

5        So Mr. Jaubert acted as someone who was going to be

6   utilizing this, and there was communication back and forth,

7   especially when he was back here in the US, as to what the needs

8   were, and Sanil took those needs and also took his own

9   experience, which was significant.  It's not easy to build

10  anywhere, but in a free zone company and out of Dubai, it's

11  certainly not easier.

12       So he was the -- you know, he was the man.  He was the

13  designer, the biller, he's the guy that supervised it.

14  Q.  Okay.  Do you remember approximately when that building was

15  completed?

16  A.  You know the problem was is that it continued to evolve.  In

17  other words, the first part of the structure was completed a

18  little bit after the boat show, the first boat show that we

19  attended in a big way, in 2005.  So I'm going to set the level

20  for the first level of completion seems to me around May or

21  possibly June of 2005.  And, yeah.  So --

22       MR. CEDERBERG:  Your Honor, I would offer, after

23  conferring with counsel, Exhibit 147.21.

24       THE COURT:  Without objection, 147.21 is admitted in

25  evidence.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          (Plaintiffs' 147.21 in evidence).

2          MR. CEDERBERG:  Can you take that down?  Do you have a

3     21.2.

4          THE COURT:  147.21 is three pages long, Bates numbers

5     1276, 77, and 78, I think.

6          MR. CEDERBERG:  I'm actually putting in evidence at

7     this time, Your Honor, 147.21, Page 2 of that separate e-mail.

8          THE COURT:  Okay.  Page 2 only?

9          MR. CEDERBERG:  Yes.

10    BY MR. CEDERBERG:

11    Q.  Can you blow up, it's hard to read, but that first part of

12    it?  Again, this is an e-mail from Sanil.

13         THE COURT:  Is it Bates Number 1277?

14         MR. CEDERBERG:  Yes, Your Honor.

15         THE COURT:  Okay.

16    BY MR. CEDERBERG:

17    Q.  Is Sanil his first name?

18    A.  Yes.

19    Q.  Mr. Subair to Hamed Kazim, and who is he?

20    A.  Chief financial officer at that point of Istithmar.  I think

21    that's the correct title.

22    Q.  Okay.  And if you can -- the second half of that, if you can

23    just highlight, Charles, from the Discovery submarine, and then

24    the amount paid down below that.

25         We talked earlier about an initial payment of $156,725

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

330

1    for the Discovery, so the second payment was 78,821, I believe

2    it is?  Or 862.  And then do you remember there was a 16,000

3    what they call variations payment?

4    A.   Right.  This had to do with some additions to some extras

5    that you could get, like -- so there were variations in the

6    building, requests for something like auto-hovering system or

7    something, I can't tell you exactly what it was, but that's what

8    the variations meant.

9    Q.   I'll have Mr. Mosely add that up to save me the trouble.  Do

10    you remember the $251,007 is what that -- totals that was

11    actually paid by Dubai World?

12    A.   Yeah, the sum of those payments were made.

13    Q.   By Dubai World to Seahorse?

14    A.   Well, I'm not sure if it was Dubai World, but certainly,

15    yes.  The entity operating was made to Seahorse.

16    Q.   Thank you.  Now, let's go to Exhibit 8, which there's no

17    objection.  Exhibit 7, to which there's no objection.

18           THE COURT:  Exhibit 7 is admitted in evidence.

19           (Plaintiffs' 7 in evidence).

20    BY MR. CEDERBERG:

21    Q.   Go to the front page of this one and the first paragraph.

22    This was an agreement to purchase the Stingray Duo submarine.

23    Can you tell us what the Stingray Duo submarine was supposed to

24    be?

25    A.   The Stingray Duo was supposed to be a wet submarine.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.  What do you mean by that?

2    A.  Well, literally, the -- I was going to say the diver --

3    might as well say the diver, or the driver would actually sit in

4    a flooded fiberglass shell, and there was an acrylic dome.  Duo

5    refers to the fact there were two of them.

6         So this was a wet submarine in tandem where you could

7    have, let's say, a driver, and you could have another diver, but

8    it was wet, so literally you would be covered up to about your

9    chest height in water, and you would be in a bubble of air and

10   have visibility.  That's what it was.

11   Q.  Was it supposed to work when the Stingray Duo would submerge

12   under the water, that bubble would stay water-free?

13   A.  Of course.  Exactly.  There was no other scuba equipment

14   other than rescue equipment.  The idea was the bubble chamber

15   would be refreshed with compressed air, and you could dive down

16   there and be able to, without having anything in your mouth,

17   look around and see the sites.

18   Q.  Was the Stingray Duo ever built?

19   A.  No.  The mockup was done.  The hull was done, and that was

20   actually done for the first show, and there were many, many

21   times I saw it was on the production docket to build out, but it

22   never was built or tested.

23   Q.  Do you remember how much -- in this case it's -- Palm Marine

24   is the contracting party -- Palm Marine paid in total for the

25   Stingray Duo submarine that was never delivered?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.  I'd have to look at the contract.  42,000 sounds familiar to

2    me, but I'm not exactly sure.  I would have to look at the

3    paperwork.

4    Q.  Okay.  If you could look at Paragraph 1.2 at the bottom.  Do

5    you see where?

6    A.  Yes.

7    Q.  There's an initial payment of $42,500?

8    A.  Right.

9    Q.  Okay.  And that payment was made?

10   A.  Yes.

11   Q.  Do you recall there was another payment of $7,500 that was

12   paid for some type of splitting?

13   A.  Yeah, the intellectual property, the idea that this

14   particular design had an associated intellectual property value

15   to it.  So that would be reflected in this 17,500, which was

16   split.  I'm coming up to speed on this but -- so what's the

17   question?

18   Q.  I just want to know if there was intellectual property

19   component on top of the 425?

20   A.  I don't know.  I'd have to look at this.

21   Q.  Okay.  But 425 was paid?

22   A.  Yes.

23        MR. CEDERBERG:  I'd offer Exhibit 639, Your Honor,

24   which has been agreed upon by counsel.

25        THE COURT:  Without objection, 639 is admitted in

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

333

1    evidence.

2              (Plaintiffs' 639 in evidence)

3    BY MR. CEDERBERG:

4    Q.  Can you blow up the two, from -- and the first three or four

5    lines.  Okay.  This was an e-mail from Mr. Jaubert to

6    Sanil Subair, right?

7    A.  Correct.

8    Q.  And you were carbon copied on that?

9    A.  Also correct.

10   Q.  And why were you carbon copied?  Were you kept in the loop?

11   A.  Yeah very much so.  At this particular point, the three of

12   us we're working very closely.  Sanil, Mr. Jaubert, myself, on

13   anything.  There was so many things happening at this particular

14   point to try to coordinate the show activities.  This is August

15   of 2004, and shipments coming over from Seahorse, the family

16   matters, so we were coordinating everything at that point.

17            In fact, whenever it was that Herve was out there, I

18   don't think he came until November, we made a practice of eating

19   lunch together every day so we could talk about things.  It

20   really was, you know, three people operating this whole

21   organization and sort of mission.

22   Q.  And once Mr. Jaubert came out in November of 2004, what were

23   each of your roles, Mr. Jaubert's, what were you taking care of,

24   what was Sanil Subair taking care of?

25   A.  Mr. Jaubert was the expert in manufacturing and

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    submersibles.  He was the engineer, the designer, the fellow

2    that made these things.  Sanil was the fellow that had the long

3    history of operating Dubai and in ports and building, and was an

4    engineer.  He was a civil engineer, but he seemed to be a fine

5    engineer in adjacent areas as well.  He had just couple of -- a

6    major project involving a large private -- at that point was the

7    largest private yacht in the world, Platinum, that he had been

8    deeply involved in.  So his job was to get in factory, deal with

9    the administration, deal with the paperwork and so forth.

10       My job was to take these submersibles that we had that

11   we were receiving, like the Goby and some of these other things

12   that we talked about so far, the Discovery -- well, of course,

13   we found out that really wasn't ready.  We -- also we received a

14   boat called the Adventurer, and to set up an operation in Dubai

15   at the port that would allow us to work out the methodology of

16   testing, and also work up the training procedure.  Because no

17   handbook came with these things.  There wasn't a vast set of

18   documents that showed this is exactly how it's supposed to go.

19       So it was very obvious, very quickly that we needed to

20   put infrastructure in this thing.  And even though I have had a

21   long time on the water, I'd had verbally no experience with

22   submersibles at this particular level.  I had -- actually, where

23   I live is within about three blocks of the DSRV unit, which is

24   at North Island, and that's the deep submergants unit.

25       So I'd been over on Alban (ph), I mean, I live in this

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    community.  But to say I had anything more than a layman's look

2    at this thing would be a gross exaggeration.  But I did have a

3    lot of time in the Gulf and the conditions out there.  The

4    temperatures, the people, I mean, there were 19 different -- at

5    least, minimum, 19 different nationalities working in the

6    organization there.

7         So I brought that to bear, and wanted to make sure that

8    we weren't going to hurt anybody and that we could figure out

9    what's necessary in terms of support and testing and procedures

10   and so forth.  That was my job.  So I had these other two guys

11   who were handling the administration and the building an so

12   forth, and I could focus on getting these things to a point

13   where they were salable.

14   Q.  And that's after November 2004 when Mr. Jaubert came to

15   Dubai, right?

16   A.  Yes.

17   Q.  Okay.  Now this e-mail, we're at August 2004?

18   A.  Right.

19   Q.  It says, "Dear Sanil, I am working on the order for supplies

20   in VIP, vacuum infusion plastic.  In the meantime, on your end,

21   it means the installation of permanent vacuum lines inside the

22   facility in the fiberglass production, moulding, fabrication

23   areas next to the air pressure lines."  What was that all about?

24   A.  Well, he was giving Sanil his needs for this system that

25   they were going to be installing, and so he let Sanil know what

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    his requirements were going to be.  In this case, he needed

2    these vacuum lines installed in a particular location so that he

3    could put this infusion system in.  So it would be the same

4    thing like a restaurant making sure you have drains and the

5    proper water faucets.  The factory was large, and so I'm sure he

6    was just -- there was a constant communication between these two

7    gentlemen to make sure that Herve had everything that he needed.

8    Q.  So it could be up and running to produce submersibles when

9    Mr. Jaubert arrived?

10   A.  Well, it wasn't going to be at that point because the

11   building was still under construction, so there was a lot of --

12   wasn't so much chaos, but there was a lot of things coming

13   together at one particular point, and he was really truly the

14   only one that had the knowledge on how to do this.  This is what

15   he had been doing.  This was his profession.  He was a

16   professional at this.  So we were very much trying to

17   accommodate, where we could, these type of things, and I'm sure

18   that's what Sanil was doing.

19   Q.  Okay.

20        MR. CEDERBERG:  Your Honor, I've conferred with

21   counsel, and we would offer the first page only to Exhibit 650.

22   650-1.

23        THE COURT:  650-1, which is Page 109A Bates number,

24   correct?

25        MR. CEDERBERG:  Yes.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          THE COURT:  Admitted in evidence.

2          (Plaintiffs' 650-1 in evidence)

3          MR. CEDERBERG:  Can you put that up?

4     No 650-1.

5          THE COURT:  E-mail, J. Miller to H. Jaubert, dated

6     10-6-2004.

7     BY MR. CEDERBERG:

8     Q.  This is an e-mail from you to Mr. Jaubert in October of

9     2004.  It refers to the MOU.  Can you tell us what that was

10    about?

11    A.  This was the MOU for the purchase of the assets of Seahorse

12    Submarine, and that was the instrument that -- I mean,

13    effectively, let's face it, Mr. Jaubert was very concerned, as

14    he should have been, about the -- you know when he would receive

15    payments for what had been decided.  So that's what it refers

16    to.

17    Q.  And were you involved in the agreement between -- the

18    agreement with Seahorse and Mr. and Mrs. Jaubert to purchase the

19    assets of Seahorse Submarine for $1,500,000?

20    A.  Yes.

21    Q.  Okay.

22          MR. CEDERBERG:  I'd offer, Your Honor, without

23    objection, Exhibit 31.

24          THE COURT:  Without objection, Exhibit 31 is admitted

25    in evidence.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1                   (Plaintiffs' 31 in evidence)

2       BY MR. CEDERBERG:

3       Q.  On the first page, can we just -- that's from a law firm

4       Ross, Dixson, Bell.  Who are they?

5       A.  They were a law firm in San Diego that was working on

6       various contracts for -- in this case, for Dubai World, or for

7       Istithmar, relative to purchases that were being made in the US.

8       Q.  Can we go to Exhibit 31, Page-3 okay.  Can we highlight.

9                   MR. HESS:  Judge, I'm sorry.  I just -- I know we want

10      to keep going fast, but we weren't provided these copies last

11      night or even now, and we're going so fast and we can't see the

12      screen, so I just ask that we be provided copies so we can keep

13      up or some consideration be made.

14                  THE COURT:  You haven't been given copies of this in

15      discovery?

16                  MR. HESS:  Well, in discovery, Judge, but we just --

17                  THE COURT:  Okay.

18                  MR. CEDERBERG:  Your Honor, what we did last night is

19      give them exhibit numbers.

20                  THE COURT:  Okay.

21                  MR. CEDERBERG:  That we're going to use.

22                  MR. HESS:  At 12:15 last night.

23                  THE COURT:  Well, whenever it was.

24                  MR. HESS:  I understand, Judge.

25                  THE COURT:  No, you're throwing in a jab, and I don't

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    need it, okay?  I understand that that happens before trials and

2    during trials.  Give it to them at a reasonable time tonight.

3    Right now show them the exhibit.  From now on you get the

4    exhibit numbers and you find your exhibit somewhere.  If you

5    can't find them, you let them know and they'll give you another

6    copy.

7              MR. HESS:  They have been gracious enough now.  Both

8    sides are going to provide copies.

9              MR. CEDERBERG:  Electronic copies.

10             THE COURT:  That's fine.  I don't really want to kill

11   that many trees, so if you got copies, make them.

12             MR. CEDERBERG:  Just electronic, Judge.

13             THE COURT:  All right.

14   BY MR. CEDERBERG:

15   Q.  Look at Page 3 at the top.  This is the -- well, tell us

16   what it is.

17   A.  It says that it's an addendum to the MOU, which is part of

18   the purchase agreement.

19   Q.  Okay.  If you can light up the page, the first paragraph,

20   and was this the agreement that you talk about to have the

21   assets of Seahorse purchased for 1.5 million?

22   A.  That's correct.  1.5 million, yes.

23   Q.  Can we go to Paragraph 2.  Says, "payment."  Do you see that

24   has a $1,200,000 component, and that was for the hard goods,

25   moulds, tools, things like that?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.   Correct.

2    Q.   And then there was a $300,000 component.  What was that for?

3    A.   Allocated for intellectual property rights on designs and so

4    forth.  Whatever that constituted.

5    Q.   Okay.  And was that 1.5 million paid over time to Seahorse?

6    A.   Yes, it was.  It was.  In full.

7    Q.   Now, we talked about three contracts for the different boats

8    and the payments that were made, and we talked about the

9    contract for the purchase and sale of assets that the payment

10   was made.

11        Did you have any involvement at all in negotiating the

12   contract with Mr. Jaubert, what he would be compensated at as an

13   employee of Exomos?

14   A.   No, I had no part in that negotiation.

15   Q.   Just so we're clear, are you employed by Dubai World or any

16   of their subsidiaries today?

17   A.   No.

18   Q.   Okay.  Are you being paid or compensated in any way for your

19   testimony today?

20   A.   No.  I worked for them until December 31, 2009.  So no.

21   Q.   Now, if we could turn to Exhibit 313?

22        MR. CEDERBERG:  Which I've showed to counsel, Your

23   Honor.  I believe there's no objection.

24        MR. HESS:  Correct.

25        THE COURT:  Without objection, 13 is admitted evidence.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

341

1          MR. CEDERBERG:  313.

2          THE COURT:  Sorry?

3          MR. CEDERBERG:  313.

4          THE COURT:  Okay.  313 is admitted in evidence without

5     objection.

6          (Plaintiffs' 313 in evidence)

7     BY MR. CEDERBERG:

8     Q.  Can you show the heading at the top?  This is from

9     Mohammad Amin.  Who is he?

10    A.  Mohammad Amin.  At this point, this is June 19, 2006, so he

11    was acting as the deputy chief operating officer.  So this is

12    from him to Khurram, who was the financial fellow at that time,

13    and then copies me.

14    Q.  Okay.  And it talks about the Proteus.  What was the

15    Proteus?

16    A.  The Proteus was the submersible yacht that was under

17    construction.

18    Q.  Okay.  And it said "insurance."  Can you tell us what your

19    concerns were about insuring the different products that

20    Mr. Jaubert designed and was in charge of machine manufacturing?

21    A.  Insurance on the maritime thing -- side is everything.

22    Everything that we sold had to be insured.  I mean, that was a

23    requirement, actually, of Dubai World and any other, you know,

24    reasonable organization.  So it wasn't a concern, it was just a

25    mandate.  It's a rule.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.  When you say "everything that was sold," are you talking

2    about the whole Dubai World organization, that was the

3    requirement?

4    A.  I think that's safe to say, anything that was produced.  I

5    think we were unique in being probably the -- with the exception

6    of the Palm Marine, one of the few production outfits, but

7    regardless, yeah, insurance was a requirement, absolutely.  For

8    obvious reasons.

9    Q.  In fact, did Exomos ever, while you were there or to your

10   knowledge, sell any of these submersibles designed by

11   Mr. Jaubert and manufactured under his watch?

12   A.  No.

13   Q.  Are you aware of any revenue that Exomos took in from any

14   source during the period while Mr. Jaubert was there as the

15   designer and the head of the manufacturing portion?

16   A.  I'm only aware of one, $15,000 piece of income, which was

17   the repair of a submarine in the Mediterranean.

18   Q.  What submarine was that?

19   A.  Well, I think we called it A-2.  It was an Adventurer.  It

20   had been sold by Seahorse earlier, I don't know when.  And sold

21   to another buyer.

22   Q.  And what was Exomos's involvement in that purchase when

23   Seahorse went back in existence?

24   A.  None.

25   Q.  And what was Seahorse's, or what was Exomos's involvement

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    that generated the $15,000?

2    A.  Well, this -- the way it was told to me.  Okay.  And --

3          MR. HESS:  Objection.  Hearsay.

4          THE COURT:  Sustained.

5    BY MR. CEDERBERG:

6    Q.  Were you involved at all in whether Exomos expended the

7    effort to repair that submarine?

8    A.  Yes.

9    Q.  Can you tell us what your involvement was?

10   A.  Well --

11         THE COURT:  You can't tell us what other people told

12   you.  That's the problem.

13         THE WITNESS:  Right, right, right.  I understand.  I

14   understand.  We essentially sent one of Mr. Jaubert's key

15   employees, who, at that point, was an Exomos employee, the top

16   technician, and sent him up to France where a large shadow

17   boat -- it's a boat that was designed to be the kind of

18   follow-up boat for a large yacht.  Aboard this shadow boat was a

19   submarine, a blue submarine, very good looking submarine that

20   had been sold apparently years earlier.  And as a way of

21   generating revenue, Mr. Jaubert had arranged with the owner of

22   that submarine to install a new type of valve, a venting valve

23   on the top of this.  And for $15,000, by sending the technician

24   up, they would install this new valve, or he would install this

25   new valve.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

344

1          So the technician went up, installed this new venting

2   valve on this submarine in the Mediterranean, and then in a

3   series of what I can only now characterize, and at the time, as

4   monumental stupidity, decided to test this thing himself.  This

5   is -- this was the Adventurer, so it's roughly, what, 18' long

6   or something like that.

7          MR. HESS:  Judge, I would object.  Lack of personal

8   knowledge.

9          MR. CEDERBERG:  You can only testify to what -- you

10  sent a fellow up to repair it.

11          THE WITNESS:  Yes.  You're right.  All I have is his

12  description of what happened.

13  BY MR. CEDERBERG:

14  Q.  Okay.  Was the repair a success?

15  A.  No.

16  Q.  Did you receive -- did Exomos receive any income for that

17  repair?

18  A.  I don't know.  I don't know if that $15,000 came in, but I

19  know that we eventually had to repurchase the submarine so as to

20  not open ourselves up to even further liability.  The submarine

21  went to the bottom.  It actually sank twice and almost killed --

22          MR. HESS:  Judge, objection.  Move to strike.

23          THE COURT:  Sustained.

24  BY MR. CEDERBERG:

25  Q.  You had to repair the submarine twice?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

345

```
1    A.   No, no, the submarine sank twice.

2         MR. HESS:  Objection.

3         MR. CEDERBERG:  Stop there.

4         MR. HESS:  Judge, I move to strike.  Request an

5    instruction.

6         THE COURT:  We'll wait until he answers the question.

7    If he has personal knowledge, it's all right.  I don't know.  I

8    wasn't there.

9         THE WITNESS:  What I --

10        THE COURT:  The question is, do you have personal

11   knowledge?

12        THE WITNESS:  What I saw was when the vessel returned

13   to the port and saw.

14   BY MR. CEDERBERG:

15   Q.  Describe what you saw.

16   A.  Well, we saw, basically, a destroyed boat.  The forward

17   hatch had imploded and flowed the entire vessel out.  The aft --

18   there's an area -- this is a fiberglass boat, but the aft

19   section where the main ballasts tank is supposed to be had

20   ruptured and actually shown two things that horrified me.  I was

21   horrified.  One was that the fiberglass was about a quarter inch

22   thick back there.  Then I saw Bondo or what -- Bondo fairing

23   cement, something you use in a car to make it smooth.  And those

24   things were obvious to me.  It came in on a truck.  Apparently

25   they had just loaded it up in France and sent it down to us, and
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

346

1    that's what I saw.  And then the technician told me what

2    happened but I clearly saw the results of this thing.

3    Q.  Just testify to what you saw.

4    A.  Okay.  That was it.

5         THE COURT:  Jury will disregard anything that wasn't

6    anything he saw.

7         MR. CEDERBERG:  Your Honor, after conferring with

8    counsel, we would introduce Exhibit 397.

9         THE COURT:  Hearing no objection, 397 is admitted in

10   evidence.

11        (Plaintiffs' 397 in evidence)

12   BY MR. CEDERBERG:

13   Q.  Mr. Miller, can you tell the jury who is in that picture?

14   A.  I'm in the lead, Nick Bowles is in the second, and a fellow

15   by the name of Falk Eggert is the third.

16   Q.  You're the fellow with the mustache?

17   A.  Yes.

18   Q.  And Nick Bowles is who?

19   A.  He was a diver and also someone that took over the

20   operations area after I left.

21   Q.  Okay.  And the fellow in the back?

22   A.  Videographer, diver guy.  He shot all of the beautiful

23   footage that we used for our media.

24   Q.  Okay.  And we'll talk a little bit about the footage for the

25   media in the afternoon, but what vehicle or submersible are you

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    in there?

2    A.  From the looks of the picture, this is the Adventurer, one

3    of the Adventurers.

4    Q.  Designed by Mr. Jaubert?

5    A.  Yes.

6    Q.  Produced under his supervision?

7    A.  Yes.

8    Q.  Is that picture taken on land or underwater?

9    A.  Underwater.

10   Q.  What are all those jagged edges that we see around the

11   hatch?  Can you just describe what all that is?

12   A.  It's the state of the finish of the interior at that

13   particular point.  There was a lot of reworking of the windows.

14   There were pretty consistent leaks around these windows, so I

15   would say, at this point, they peeled back some of the moulding

16   that makes it look a little bit better, and what you're seeing

17   is the hull structure and some of this other stuff which is

18   fairly rough.

19   Q.  Okay.  Has that got the Bondo look similar to the one that

20   you saw that came back from France?

21   A.  The Bondo look?

22   Q.  The look where it looks like it's not smooth on the edges?

23   A.  No.  The one from France actually look very polished.

24   Looked like the interior of a Lexus.  It looked and presented

25   very well.  That was really very common to this sort of thing.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

348

1    The ability to produce a nice interior ultimately was -- you

2    know, was one of the most important things, but -- and the Bondo

3    I referred to, that would be on the hull.  That would be where

4    you take something, you have a dent, and instead of, you know,

5    straightening out like in the old days, you fair it out, make it

6    so it's smooth.

7    Q.  Now the hatches, you mentioned the hatch.  Is there anything

8    when Mr. Jaubert's boats first -- or submersibles first started

9    coming to Dubai that you noticed about the hatches?

10   A.  The first submarine we got was the Goby, and the first thing

11   is when he arrived in the a container, mind you, we hadn't seen

12   this.  I had seen the pictures and the hull back here in Stuart,

13   but one of the first things, we were all very excited.  We were

14   getting this submarine for the first time, and we had been

15   working very hard at this.

16          One of the first things we saw was a hatch, a marine

17   hatch that you use on a yacht and that you would buy down at,

18   like, West Marine.  And it had sort of a -- something that would

19   hold the hatch open, and Sanil and I looked at each other at

20   that particular point, and we said this doesn't make sense to

21   us.  It didn't seem appropriate, and it certainly -- but

22   Mr. Jaubert said, Well, "the way the design works is the

23   internal pressures are enough, and this hatch has been," you

24   know, etcetera, etcetera, etcetera.

25          So that was the first time we saw it, and it continued

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1      to be used in all the rest of these things.  It's very obvious,

2      you look at all the pictures and so forth, the same thing went

3      on for quite a while until the complaints were so strong that

4      the production people directed by Mr. Jaubert, you know, started

5      a program to build their own custom hatches on top.  But all of

6      the production ones that we had had, these things, they're made

7      in a little bit of a modification to the actual turn buckle, but

8      they're basically the same things that you can -- that you would

9      go to West Marine to buy.

10     Q.  And did you have, in your experience -- and we'll get into

11     this afternoon -- about testing these submersibles, was there a

12     problem with the hatches?

13     A.  Well, very much so, actually.  This all --

14     Q.  Can you describe the problem to the jury.

15     A.  They leaked.  That was the essence of it is the hatches

16     would leak.  Fixes would be made, things would be done, rubber

17     would be put in place, problems about the -- it was constantly

18     being addressed.  But basically they leaked, and they leak

19     sometimes a little bit, just drips, and we would record the

20     video and at all depths.

21          It wasn't something that just occurred at a certain

22     depth or whatever.  Then sometimes the leaks were quite

23     significant.  And in the beginning we didn't know what to

24     expect.  And there was always rational for this.  We always

25     thought there was something.  Well, we just have to adjust this

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

350

1    to make it work.  Obviously we have to work with this situation.

2    But that was the main thing.  The hatches leaked an even the

3    windows leaked.

4    Q.  Do you remember, in late 2004, after Mr. Jaubert and some of

5    his submersibles arrived in Dubai, any experience with a

6    Stingray, not a Stingray Duo, that was experienced by any of

7    your test pilots?

8    A.  Right.  That was a big event that happened.  The Stingray is

9    a small wet submarine.  I mentioned the Duo, which was supposed

10   to have two people in it, but --

11   Q.  Before you go too far, where were you when the event you're

12   about to describe happened?

13   A.  In all of the -- the -- in the event that I'm about to

14   describe, I was within one foot of the incident and the vessel

15   involved.

16   Q.  And can you tell us what you saw and what happened?

17   A.  Exactly.  We took a small wet submersible called the

18   Stingray, single person, we had Thapa, whose name will probably

19   come up again, but he was our chief diver at that point, mostly

20   because he knew the duffle area very well.  He was a very

21   competent diver, and he had nerves of steel.  That was part of

22   the requirement.  We needed to work with people that could work

23   in these environments and deal with whatever might come up.

24   Q.  What happened?

25   A.  This is going to be the first test of this particular

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

351

1    submarine, and we took it out to a local marina that -- we had

2    30 feet of water, maybe a little less, I have to get that

3    exactly right, and we took it out to test it.  I was on the side

4    as a diver, wearing gear as a safety diver, we actually had a

5    couple more divers, and Falk Eggert, who was right there, is

6    videotaping all this.  And the idea was we already -- they had

7    worked out the design and so forth, and the idea was just to

8    take this down and bring it slowly to the bottom.

9            There was nothing exotic or that was going to go on

10   with this.  This is the first real test of something.  I mean,

11   we had been out in the Goby, they had taken the Goby down a

12   little bit, but then what happened was the top -- and also, by

13   the way, the way this works is that there's a bubble that the

14   fellow sits in.  And that bubble is held down into this

15   particular submarine, and it's held down by two pins that are on

16   the side.

17           Now, in theory, the pilot on the inside can pull a

18   lever and open this bubble up and do a free escape.  He can just

19   get out in case there's trouble.  Like an eject seat almost.

20           But in this particular case -- and there were also two

21   pins on the outside.  What happened was, at the surface, it

22   started down a little bit, and then the entire vessel went nose

23   up, all of the air left the bubble, went into the nose of the

24   craft and this thing went down and landed in the mud upside

25   down.

352

1    Q.  What happened then?

2    A.  I'm down at the bottom, and truthfully was one of the most

3    horrific things I've ever personally experienced, but the air

4    came out of the bubble, Thapa is inverted in this thing, stuck

5    in the mud, and he's drowning.  Now, he had a spare air

6    container.  This is a small bottle that allows you to --

7    depending on how fast you're breathing, to give you a little bit

8    of time.  But he's inverted, it's stuck down here, and I can't

9    get this thing flipped over.  There's led weights in there, it's

10   upside down, but the worst thing is this picture I have of him

11   being inverted in this thing filled with water upside down, one

12   of my best friends, and he's drowning.  And we can't get it

13   over.

14        So I'm trying to lift this, Falk throws the camera

15   away, it's fairly dark down there, now there's sediment that's

16   coming up from the bottom.  This wasn't supposed to happen, but

17   it did happen, so we were dealing with it.

18        Eventually I was able to -- I'm not exactly sure how,

19   but with Falk's help, we were able to get it over on its side,

20   and there was one pin on the outside that sort of was stuck, so

21   he still wasn't coming out.  And eventually I was frantic, I was

22   as close to panic as I've ever been because of him, not because

23   of me.  I pulled the pin out, he popped out and went to the

24   surface, and we actually have that on videotape.  It's less

25   dramatic if you see it on video, but nevertheless you see this

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    thing going down, then the pictures that happened after that.

2         I was very grateful for this incident because it

3    brought to my world was the fact that this is very dangerous.

4    We can kill somebody very, very easily.  It wouldn't have taken

5    anything at this particular point.  And in many ways, we weren't

6    prepared for all the contingencies that could happen.

7         And I don't blame anybody for that.  I don't say that

8    it was Mr. Jaubert, because it was his design or anything else

9    like that.  It just was the nature of this particular evolution

10   we were doing and the way this thing was rigged.  But from then

11   on out, my standard went up, way up, way up on this, because I

12   realized we were facing something that, you know, could go south

13   very, very quickly.  So I get emotional about that because I

14   still see him inverted underneath there drowning.

15   Q.  Understood.

16        MR. CEDERBERG:  Your Honor, is this a good time to

17   break for lunch?

18        THE COURT:  Not as slow as we're going it's not.  Let's

19   go another -- well, all right.  We can break for lunch.  Let's

20   break for lunch now.  We'll be back at 1:30.  And then we'll try

21   to go until a little bit before 5:00.

22        All right.  Since you're on the stand, you're not

23   permitted to talk to any lawyers, even the ones that called you.

24   I got to find my -- there it is.

25        Ladies and gentlemen of the jury, you're reminded that

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    you're not to discuss this case with anyone or permit anyone to

2    discuss it with you.  Until you retire to the jury room at the

3    end of the case to deliberate on your verdict, you're simply not

4    to talk about this case.  Also, remember you're not to read or

5    listen to anything touching on this case in any way.  If anyone

6    should try to talk to you about it, bring to it my attention

7    promptly.

8          Keep in mind you must not do any research or make any

9    investigation about the case on your own.  The only evidence in

10   this case which you may consider is the testimony of the

11   witnesses that you hear in court and the evidence that is

12   introduced during the official proceedings.  Also, remember you

13   must not have any contact with the attorneys, parties, or

14   witnesses.  And finally and very important, remember that you

15   must not form any opinion about this case until all the evidence

16   is in.  You are required to keep an open mind until you start

17   your deliberations at the end of the case.  I hope you have a

18   good lunch, pretty day today, we'll see you at 1:30.

19         COURT SECURITY OFFICER:  Please all rise for the jury.

20         (Jury out at 12:06 p.m.)

21         THE COURT:  We'll be in recess until 1:30.

22         (Lunch recess)

23         (See Volume 4, page 357 for continuation)

24

25

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

355

```
1                              * * * * *

2                        C E R T I F I C A T E
     I certify that the foregoing is a correct transcript from the
3    record of proceedings in the above-entitled matter.

4

5
                          /s/ Dawn M. Whitmarsh
6    Date                 DAWN M. WHITMARSH, RPR

7
                            I N D E X
8
                           WITNESSES
9
     For Plaintiff:                                        Page
10
     George Dalton
11    Direct Examination by Mr. Urquhart              269:7
      Cross-Examination by Mr. Hess                   280:15
12
     James Miller
13    Direct Examination by Mr. Cederberg             285:22

14                           EXHIBITS

15   For Plaintiffs':

16   5
      In Evidence                                     321:9
17
     7
18    In Evidence                                     330:19

19   8
      In Evidence                                     324:14
20
     31
21    In Evidence                                     338:1

22   68
      In Evidence                                     303:10
23
     211
24    In Evidence                                     316:9

25   212
      In Evidence                                     316:2
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
1
        309
2        In Evidence                                      310:9

3       313
         In Evidence                                      341:6
4
        389
5        In Evidence                                      298:11

6       397
         In Evidence                                      346:11
7
        403
8        In Evidence                                      275:3

9       598
         In Evidence                                      308:25
10
        600
11       In Evidence                                      311:17

12      605
         In Evidence                                      313:12
13
        609
14       In Evidence                                      317:20

15      619
         In Evidence                                      326:11
16
        639
17       In Evidence                                      333:2

18      650-1
         In Evidence                                      337:2
19
        147.21
20       In Evidence                                      329:1

21      147.71A
         In Evidence                                      325:25
22

23

24

25
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**