1                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
2                       FORT PIERCE DIVISION
                    CASE NO.   09-14314-CV-JEM
3

4

5

6   DUBAI WORLD CORPORATION, and its
    Subsidiaries, EXOMOS, NAKHEEL and
7   PALM MARINE,

8                 Plaintiffs,

9       vs.

10                                    Fort Pierce, Florida
                                      February 15, 2011
11  HERVE JAUBERT, SEAHORSE
    SUBMARINES INTERNATIONAL
12  INCORPORATED, and Does 1-99,

13                 Defendants.
    _____

14

15

16                  TRANSCRIPT OF JURY TRIAL
                    VOLUME 4 – PAGE 357-464
                BEFORE THE HONORABLE JOSE E. MARTINEZ
17                UNITED STATES DISTRICT JUDGE

18

19

20

21

22

23  REPORTED BY:       DAWN M. WHITMARSH, RPR
                       Official Court Reporter
                       400 N. Miami Avenue, 10S03
24                     Miami, Florida  33128
                       Telephone:  305-523-5598
25


                PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                      TRANSCRIPT PRODUCED BY COMPUTER

```
1    APPEARANCES:

2    FOR THE PLAINTIFFS:
                         Quinn, Emanuel, Urquhart & Sullivan, LLP
3                        BY: JON C. CEDERBERG, ESQ.
                         BY:  A. WILLIAM URQUHART, ESQ.
4                        865 South Figueroa Street
                         10th Floor
5                        Los Angeles, CA  90017

6                        Astigarraga, Davis, Mullins & Grossman
                         BY:  EDWARD MULLINS, ESQ.
7                        701 Brickell Avenue
                         16th Floor
8                        Miami, Florida 33131

9
     FOR THE DEFENDANTS:
10                       Hess & Heathcock, PA
                         BY:  WILLIAM HESS, ESQ.
11                       BY:  KATHRYN A. HEATHCOCK, ESQ.
                         40 Southeast Osceola Street
12                       Stuart,  Florida 34994

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1                       P-R-O-C-E-E-D-I-N-G-S

 2            (Jury in at 1:31 p.m.)

 3            THE COURT:  Please be seated.  All right, sir.  You may

 4       proceed.

 5            I apologize for starting late, but I was having a bit

 6       of a staff crisis.  Wanda is sick as a dog as you can tell, and

 7       she was in a hospital Sunday.  And I've been trying to get her

 8       to go home, and I finally ordered her to go home, so she's

 9       leaving now, and I was just making arrangements to have another

10       courtroom deputy brought up.  Contrary to what you may feel

11       about federal employees, she will not take sick leave.  She

12       works and works and works and feels like she's letting everybody

13       down if she's not here.  And we tried to explain to her if she's

14       too sick to go to lunch with us, she probably shouldn't be here,

15       so she is leaving.  And I apologize for taking 15 minutes of

16       your time, but I thought it was something that needed to be

17       dealt with, and I needed to call the court executive and the

18       clerk of the court to make sure we have coverage here.

19            So I apologize again.  Please, you may proceed, sir.

20                  CONTINUED DIRECT EXAMINATION

21       BY MR. CEDERBERG:

22       Q.  Before we broke, you told about an incident with the

23       Stingray and a gentleman named Mr. Thapa?

24       A.  Yes.

25            THE COURT:  Uh-huh sounds is spelled a lot like uh-huh.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
1                THE WITNESS:  That's what I thought when I --

2                THE COURT:  So yes, you have to say it.

3    BY MR. CEDERBERG:

4    Q.  Was Mr. Jaubert made aware of that incident?

5    A.  He was there.  He was on-site.

6    Q.  What was Mr. Jaubert's reaction?

7    A.  I don't really recall, actually.  I don't recall any

8    reaction from him on this.

9    Q.  Any reaction whatsoever?

10   A.  I don't recall.

11   Q.  Okay.  You talked about -- earlier you talked about the

12   hatches on the submarine in -- the same kind of hatches that

13   you'd find on a boat or a yacht?

14   A.  Correct.

15   Q.  Just for the record on the boat or the yacht, are these the

16   kind of hatches that go under the water and keep the water out?

17   A.  No.  These are hatches that are on decks designed to bring

18   air in.

19   Q.  Like open windows?

20   A.  Correct.

21   Q.  But if water splashes, sloshes with a wave or that?

22   A.  That's correct, with water coming over the top, sure.

23   Q.  But those hatches that let water in, that was part of

24   Mr. Jaubert's design?

25   A.  Well, they were a part of the submersible, so yes, I would
```

1    include that in the design or the specification for that

2    submarine, and for the Goby and the Discovery as well.

3    Q.  You mentioned about the different roles of Mr. Jaubert and

4    Sanil Subair with regard to the factory coming about?

5    A.  Uh-huh.

6    Q.  Yes?

7    A.  Yes.  Yes.

8         MR. CEDERBERG:  Can we put up 402, Your Honor?  We

9    conferred, and I'd over it in evidence.

10        THE COURT:  All right.  402.  Without objection, 402 --

11   is it already in evidence or is it coming in evidence right now?

12        MR. CEDERBERG:  I think it's coming in.

13        THE COURT:  If it's coming in evidence, it is admitted

14   in evidence without objection.  Yes, you may.

15        (Plaintiffs' 402 admitted)

16   BY MR. CEDERBERG:

17   Q.  Can you tell us what that is?

18   A.  That's a fisheye look at the interior of the factory at

19   Jebel Ali.

20   Q.  Is that the factory completed?

21   A.  It looks like the main structure is completed.  We're

22   looking down towards one end of it, and so I would say a

23   substantially complete.  Okay.

24   Q.  Just to get a magnitude of the size of the factory that was

25   built by Exomos, do you see the little yellow boat on the left

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    hand side?

2    A.   I do.

3    Q.   What model was that?

4    A.   That's the Adventurer.

5    Q.   The Adventurer, Mr. Jaubert's design?

6    A.   Correct.  And actually the Goby is right behind it.

7    Q.   Now, there comes a point in time where Mr. Jaubert's

8    designed and manufactured boats arrive in Dubai, right?

9    A.   Correct.

10   Q.   Were you aware that these were ambient pressure

11   submersibles?

12   A.   Yes.

13   Q.   Are you aware of what one atmosphere submersibles are?

14   A.   Yes.

15   Q.   Can you tell the jury what the difference is between the

16   two?

17   A.   In a one atmosphere submarine or vessel or whatever one

18   atmosphere is, the air that we breathe right here at sea level.

19   Without getting more technical about it, you probably understand

20   that.  So when you go down in a one atmosphere submersible,

21   regardless of the depth, the internal pressure of the vessel

22   itself is just like this.  We can talk to each other.  In an

23   ambient pressure submarine, when you go down, you're subject to

24   the same physiological aspects of a diver.  So when you go

25   down --

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.  What do you mean by that?

2    A.  In other words, as you go down in the water, you're subject

3    to increased pressure, and if you're inside of a space like --

4    we don't have a good picture of the Discovery or whatever -- the

5    air is being compressed and you're subject -- the physiology in

6    the body is not like being at sea level.  It's like being a

7    scuba diver that's going down and diving themselves, and there

8    are risks associated with that.  Known to scuba divers, of

9    course, but there's a vast difference.  And I don't know how far

10   you want me to take the conversation relative to that.

11   Q.  Are there concerns about rapidly going back up to the

12   surface?

13   A.  That is certainly one of them.

14   Q.  What's the concern?

15   A.  The concern is that when one breathes compressed air under

16   pressure or at depths and one ascends too rapidly or holds your

17   breath, for instance, there's a possibility of out gassing

18   nitrogen in the blood.  This is called the bends, and it is

19   possible, in a situation in the ambient pressure sub, in the

20   right conditions with untrained people, to have that.  If you

21   have a rapid ascent and people are holding their breath and so

22   forth.  But the main thing is when you're in the one atmosphere

23   sub, you breathe normally; you can have peanut butter and jelly

24   sandwiches and it's fine.  And when you get in this other one,

25   you're subject to the US Navy dive tables, simple as that.  It's

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

364

1      like scuba diving.

2      Q.   Okay.   Do you remember an experience that you had early on

3      when Mr. Jaubert's submersibles came to Dubai involving a

4      malfunctioning ball valve?

5      A.   Well, yeah.   I think we're discussing the Goby at this

6      particular point.   I had a number of instances when the Goby

7      came over that if you can imagine one of these snorkels, that

8      you would, say, like a child would have, and there's a ball that

9      goes up and seals it off.   When you actually dive down, the ball

10     goes up and seals the snorkel off so no water comes back in.

11          Well, part of the design of the Goby is there's a ball that

12     goes up and goes into a tube, and on at least two occasions when

13     we were diving Goby in a normal situation, the ball didn't

14     settle into the tube correctly.   And the water came gushing down

15     into the sub, hit me on the back.   This was on two separate

16     occasions.

17          One, it was not very good.   And the subs are supposed

18     to be dry.   There are batteries and there's cables below, and

19     the water hits you in the back, you don't expect something like

20     this, went down into the bilge area.   Even on the Goby there's a

21     small bilge pump.   And, you know, you're sitting in very

22     rapidly -- in several inches of water where you're not supposed

23     to have it.

24          That happened on a couple occasions.   I suppose the one

25     thing that shocked me about that is I didn't know where he was

365

1   coming from, and pull things back to find out where this leak

2   was coming from, this is not good.  And I saw this ball, and it

3   was going into what looked like a piece of PVC pipe, like

4   schedule 40 pipe or something you get at Home Depot.  It was --

5   I mean, there was nothing.  It was literally something you would

6   get at a hardware store.  And it didn't settle up in there.  And

7   nevertheless, that was the main way to keep the water out and

8   the pressure in.  So there were a couple of occasions where that

9   happened, and that happened early on.  It was a shock.  That's

10  all.

11  Q.  Do you remember an occasion, early on again, with the Goby

12  with you and Mr. Thapa where the Goby descended to the bottom?

13  A.  The first time we took the Goby to go offshore at

14  Palm Island, we went little bit offshore, we were in 30' of

15  water.  Actually this is one of the ideas we had when we were

16  originally buying the submersibles to use off of Palm Island, to

17  go down there an take a look at things.

18          We actually submerged two airplanes, two F-100s from

19  Djibouti, maybe a year earlier, and they were sitting on the

20  bottom, on blocks.  The fish were running around in them, and

21  they were accumulating coral and so forth.  And we took the Goby

22  out there, we took it down a little bit, and it immediately

23  started descending to the bottom.  There were two reverse

24  thrusters on the bottom which we used to try to offset this

25  rapid descent, and again, it's 30' of water and they didn't show

366

1    any effect whatsoever.

2          We got down to the bottom, and it was clear that the

3    pressurization system that's inside the Goby was not keeping up

4    with the pressure from the outside water.  It was just clear.

5    All of a sudden we started getting some leaks in from the

6    paddles and so forth.  We landed on the bottom, and the next

7    thing that happened was a large cracking sound.  I mean, it was

8    (indicating), and it was clearly coming from the fiberglass

9    right above the top of us.

10          And we prepared for -- we weren't sure what was going

11   to happen, whether it was going to be an explosive decompression

12   situation or whatever.  On the Goby, fortunately, there were

13   kind of a ballistic salvage system.  There were two air bags,

14   one on either side, and as soon as the crack went, Thapa and I

15   prepared -- actually, it worked out very well, and we went up to

16   the surface with it.

17          But it didn't behave at all according to the way that

18   it should have in this particular case, and it was a very, very

19   simple thing.  We were -- we did a very, very moderate descent,

20   went down very, very easy.  It was the first time in open water.

21          So once again, it just underscored the fact, first of

22   all, we weren't going to be diving in open water with this thing

23   or any other thing until we solved these problems, until we knew

24   actually what was going to happen.  And also, hearing that

25   structural sound, it underlined the fact that perhaps we have a

367

1  major problem with the pressurization system, and ultimately

2  steps were taken to deal with that, to keep more pressure into

3  the inside of the Goby and these other submarines when they went

4  down to depths.

5       One last thing is they were supposed to go to 140'.

6  This is what the specs were always all the time.  This should

7  have been -- in a reasonable fashion should have been no

8  problem.

9  Q.  Is it important because of the ambient pressure nature of

10 these submersibles that the operator be able to control the

11 descent up because of the problems that you're talking about?

12 A.  It's critical.

13 Q.  Why so?

14 A.  It's like anything, it's like talking about a car, a Lexus.

15 You need to be able to control it.  You need to be able to

16 anticipate where it's going to go, put it into a location,

17 control the depth.  It's just it's common sense.  That's the

18 reason you have this thing.

19 Q.  Was there a problem with the Goby with the auto hovering

20 system?

21 A.  There was no auto hovering system.  We purchased one, but

22 when the Goby was delivered, I think the most sophisticated

23 thing was -- I mean, there was discussions about radar or so

24 forth that would go out, so many hundred feet and lots of

25 things.  But this was a very nondigital device.  It was

368

1    batteries and cables, and it had some instrumentation on it.  It
2    certainly didn't have anything like an auto hovering device, and
3    the thrusters used for the Goby they were rear thrusters, and
4    there were also vertical thrusters, and they were converted
5    electric trolling motors, much like you would see on these party
6    boats.  They use them on the front to move around a little bit.
7         And so that was being used.  They were converted in
8    some fashion filled with mineral oil or something else like that
9    and used as propulsion, means of propulsion for these
10   submarines.
11        So I've actually lost -- I forgot what I was answering.
12   Sorry.
13   Q.  I was asking you if there was a problem with the auto
14   hovering, and you said it was not?
15   A.  Right, it didn't exist.  Exactly.  There was no system in
16   there, and what we envisioned -- what I envisioned was some sort
17   of a CPU, some sort of a microprocessor, whatever, like on an
18   advanced helicopter.  You would set the altitude, and you would
19   be able to keep it there and the hover motors and whatever,
20   however it worked out, would be able to keep you at a particular
21   level so that you could observe or just stay at that particular
22   level, but there was no hint of that.
23        MR. CEDERBERG:  Your Honor, at this time, after
24   conferring with counsel, I would offer Exhibit 614.  There's no
25   objection.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

369

1          THE COURT:  Hearing no objection, 614 is admitted in

2    evidence.

3          (Plaintiffs' 614 in evidence)

4    BY MR. CEDERBERG:

5    Q.  Can you show the to and from at the top?  Okay.  Then if you

6    go down to where it says "original message" and blow up, say,

7    the first three paragraphs and the to, from line.  We're a

8    little crooked on the screen.  If I touch that, I'm sure I'll

9    break it.  Thank you.

10         Mr. Miller, what is that?

11   A.  This is an e-mail dated March 1st, 2004, from myself to

12   Mr. Jaubert.

13   Q.  I would like to direct your attention to the third paragraph

14   where it says, "It's about good design."  Do you see that?

15   A.  Yes.

16   Q.  It says, "It's about good designs produced by your competent

17   management."  Who are you referring to there?

18   A.  Mr. Jaubert.

19   Q.  "In a volume and in a location that makes sense."  What did

20   you mean by volume?

21   A.  Well, I meant the volume of production.  In other words,

22   we're talking about -- this is about good design, produced by

23   your competent management, that's pretty obvious in a volume.

24   In other words, this is -- it was now going to be an ongoing

25   business.  And producing, selling submarines.  That was the

370

1    whole thing.  In a location that makes sense.

2         What I was referring to there is perhaps the final

3    location -- this was March 2004 -- hadn't been determined, but

4    somewhere in Dubai, perhaps in the port, maybe, that particular

5    things wasn't determined, but in a location that makes sense in

6    this particular area.  That was sort of the thrust.

7    Q.  But in your use of the word "volume," you're trying to

8    communicate your understanding that Mr. Jaubert brought his

9    designs and his manufacturing technique over to Exomos, that he

10    would be able to produce his designs in volume for sales?

11    A.  Absolutely.  This was a business, and so, yes,

12    Q.  Before lunch you testified that one of your roles was going

13    to be with regarding testing the vessels and training operators

14    of the vessels.  Remember that?

15    A.  Yes.

16    Q.  Did you think, before Mr. Jaubert's manufacturing designed

17    submarines came over to Dubai, you would be dealing with the

18    problems of design and manufacture that you talked about here

19    today?

20    A.  No.

21    Q.  Why not?

22    A.  Well, I thought we were buying as per the contract.  I

23    thought we were buying working submarines that we would be -- to

24    get trained up on.  There's no question that Mr. Jaubert is very

25    knowledgeable about this area and that he trained me to go out

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

371

1    first in the Goby and the Adventurer.  I went through that

2    phase.  He walked me through that in a boardroom, and then I

3    think once in the vessel each, and I got it.  But no, the idea

4    was that with some training, you take these things -- I mean,

5    you're spending hundreds of thousands of dollars.  This is not

6    just like buying a used jet ski or something.  And yeah, you can

7    take them with decent training and a reasonable person and go

8    out -- reasonable trained person can go out an operate this

9    safely.

10   Q.  When Exomos, in late 2004, early 2005, took the vessels that

11   Mr. Jaubert designed out and you had the problems that we've

12   talked about a little bit before lunch and after lunch, was

13   there any thought by Exomos of just sending Mr. Jaubert back and

14   shutting this down?

15   A.  No.  Absolutely not.

16   Q.  What were you thinking at that time?

17   A.  Well, I mean we were operating as a team.  These technical

18   issues we were dealing with, the leakage, the thrusters and all

19   the rest of this sort of thing, they seemed like problems that

20   you would just deal with.  I mean, no matter what, nothing is

21   easy, and if you're building a new company and you're building

22   submersibles, it's not going to be easy, it's difficult.

23         But the thing is we had more or less unlimited

24   resources.  We had one of the greatest facilities in the world.

25   We had a guy like Sanil, who was also -- who could make things

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

372

1   happen, and he understood the speed that we needed, or desired

2   to operate, I should say.

3          We put ourselves under these own deadlines.  We wanted

4   to make things happen, we wanted to get the factory going, we

5   wanted to be at the boat show, we wanted to get the training in

6   place, we wanted to make these safe and reliable.  All this

7   stuff was very much a part of our spirit of things.  So when

8   this started to show up, it wasn't a matter of retreating to

9   your corners and saying, "Oh, my God, this is a problem here."

10  Of course it's a problem.

11         But we felt, honestly, that by working through these

12  things, we would solve them, and that's the way we progressed.

13  Q.  In 2005 in March, there was a Dubai boat show, right?

14  A.  Yes.

15  Q.  And what was your role regarding that boat show?

16  A.  Well, at that particular point, my role -- I mean, I was

17  head of marketing and sales, but, in fact, I was spending so

18  much time still on the submarines that Sanil, working with

19  Mr. Jaubert, they orchestrated putting the boats in.  This is a

20  normal trade fair, except in this particular case, we occupied a

21  large bit of on the water space.

22         So they orchestrated the spaces that were necessary,

23  through a contact that I'd been working with for almost four

24  years at this point.  Future Brand of New York City.  They were

25  the people that branded the palm, and it worked with Dubai and a

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

373

1    couple of places.  We convinced them to help us with the

2    branding of Exomos.  So we had this -- beautiful materials, we

3    had beautiful marketing materials, and they set the theme, the

4    colors and so forth for everything.  So we walked through that

5    entire process, did a tremendous job.

6         So we walked up to this boat show with a number of

7    models, test beds that we were using, and lots of brochures and

8    the staff working overtime to make a presence there.  And I

9    spent most of my time, like most of the other people in the

10   company, as we were growing, just getting these boats up there.

11   We were roughly, I don't know, 10 miles or so, 15 miles, 10

12   miles from the factory to where the boat show was at which is a

13   marina.  So that's what I was doing, I was helping getting the

14   equipment out there.

15   Q.  Can you explain to the jury why you had this experience with

16   Mr. Jaubert's submersible in December of '04 and early 2005 and

17   how you can be at a boat show in Dubai in March of 2005

18   presenting vessels that you know are not in shape to be sold?

19   A.  We knew that the boats that we had and were working with

20   were unsalable.  That you couldn't sail those particular things,

21   you couldn't insure them.  At least I understand -- certainly

22   Sanil understood that.  I'm not sure about Mr. Jaubert, we'd

23   have to ask him.

24        But the main thing is we believed that these problems,

25   these issues could be handled, the hatches could be changed,

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1   that you could deal with the things that we were facing.  We had

2   a belief and a strong commitment to making it work.  It was very

3   personal.  I mean, I lived at the place, as well as Sanil.  And

4   Herve spent an extraordinary amount of time, in spite of the

5   fact that he moved his family there.  But we were committed, and

6   we weren't going to take no for an answer.

7   Q.  Was it ever your intention, at that boat show or at any time

8   you were at Exomos, to sell one of Mr. Jaubert's submersibles

9   that you knew didn't function properly, wasn't dry or wasn't

10  safe to anyone?

11  A.  No.

12  Q.  Why not?

13  A.  It's -- it would be a criminal act.  It's a matter of

14  responsibility.  I always used as a standard for putting anyone

15  other than a trained diver or one of the people of our staff.  I

16  was militant about this, about putting anyone into those things

17  that hadn't been trained or weren't working closely with it.  My

18  standard was, could I put my wife down there?  Could I put my

19  dog down in there?  Much less things like the ruler of the

20  country or the chairman or anybody else.

21         When we could do that, when we could take one of

22  Mr. Jaubert's family or his entire family and put them down in a

23  vessel, take them down to 10 meters, show them the sites an come

24  up, then we were there.  So that was my standard.  It was very,

25  very simple.  It had to be safe and reliable, and there's no way

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    we were in that position with the existing vessels that we had.

2    But we had the commitment and belief that we would be able to,

3    working with competent authority and changing what there was

4    about them, to get to a point where we had something that was,

5    in fact, insurable, safe, reliable, and acceptable for tourists.

6    Q.  We're going to talk about the test reports in a bit, but

7    during this time period where you're going through and testing,

8    putting Mr. Jaubert's designs and products in the water, what is

9    the reaction of the Chairman, Sultan?  What does he want?

10   A.  What does he want?

11        MR. HESS:  Objection.  Hearsay.

12   BY MR. CEDERBERG:

13   Q.  What did he tell you?

14        THE COURT:  I'm sorry?

15        MR. HESS:  Hearsay.

16        THE COURT:  It is hearsay.  Or is this an exception?

17   Sustained.

18   BY MR. CEDERBERG:

19   Q.  Did Sultan ever go down in one of these boats?

20   A.  No.

21   Q.  Why not?

22        MR. HESS:  Objection.  Calls for a hearsay response.

23        THE COURT:  Sure does.  Sustained.  Unless it's

24   something you decided, but --

25        THE WITNESS:  He called me.  I'm sorry.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          THE COURT:  You can't tell me what he said.

2     BY MR. CEDERBERG:

3     Q.  Tell me, why you did you decide it wasn't ready for Sultan?

4          MR. HESS:  Objection.  Leading.

5          THE COURT:  I'll permit it under the circumstances.

6     Overruled.

7     BY MR. CEDERBERG:

8     Q.  Did you decide that Sultan would not go down in the

9     submarines?

10    A.  I was the gatekeeper, and he called every week, it seems.

11         MR. HESS:  Objection.

12         THE COURT:  What?

13         MR. HESS:  It's leading, again, to a hearsay response.

14         THE COURT:  Well, how do you know that?  All he said is

15    that he called every week.  That's not hearsay.

16         MR. HESS:  I'll be in my seat.

17         THE COURT:  That's presumptive.  Presumptive strike,

18    which I'm not permitting.  So far all we know is that he called

19    every week.  What else were you going to say?

20         THE WITNESS:  He said, Jim --

21         THE COURT:  Don't tell me.

22         MR. HESS:  Objection.  Hearsay.

23         THE COURT:  Don't tell me what he said.  That's

24    exactly -- that is hearsay.  Okay?  Go ahead.

25    BY MR. CEDERBERG:

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

377

1    Q.  Mr. Miller, when Mr. When Sultan called you, did you make

2    any determination whether or not you would permit him to go into

3    a sub?

4    A.  Yes.

5    Q.  What determination did you make?

6    A.  That they were not safe enough yet to put him at risk by

7    taking him down in the sub.

8    Q.  Even though he was an experienced diver?

9    A.  Yes.  He was the chairman of Dubai World.  Yes.

10   Q.  By the way, when Mr. Jaubert came out in March 2004 for the

11   first time to Dubai for the boat show?

12   A.  Yes.

13   Q.  Did you have an occasion to dive with Mr. Jaubert?

14   A.  Yes, I did.  I did dive with him.

15   Q.  Can you describe that dive.

16   A.  It was a straightforward, very, very simple dive.  It was a

17   courtesy.  He had come over from Florida, and we went out and

18   dived on a site off of Palm Jumeirah.  I'm not certain what the

19   site was, but we there's really not much to say.  I can just

20   remember that we did with him as we did with lots of people that

21   were visiting us.  We kind of kept an eye on him, not because we

22   weren't certain of his abilities, but with the jet lag and

23   everything else, we weren't sure, but very much a nonevent.  We

24   got in the water, we got out of the water, it was a courtesy

25   dive showing somebody this area, showing somebody who you know

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

378

1    is experienced.

2    Q.  When you say it was a nonevent, did Mr. Jaubert come out of

3    the water and say, "Hey, the water here is so terrible no one is

4    going to want to be in a submersible and look out the window"?

5    A.  No, of course not.  This was -- these were very pleasant

6    times.  I mean, that was the earmark of these times.

7    Q.  You talked a little bit about future brand and getting

8    things ready for the 2005 boat show in Dubai.  What was your

9    role in taking media footage of Mr. Jaubert's submersibles to be

10   used in marketing or to test the interests that people may have

11   in these products?

12   A.  I'd say my primary role was especially as a producer for ten

13   some-odd years, and some of that for national television was

14   really to get Falk Eggert, the videographer on-scene who was

15   also a good editor.  We worked together on other things like

16   National Geographic specials that dealt with the area, and we

17   needed to get highly complimentary video pieces done on what we

18   had at that particular point.

19        So I suppose I, in a way, was acting as producer, but

20   pretty much Falk took everything from there.  He shot the video,

21   he edited it in such a way that, you know, you show the best

22   side.  That's what you do, and that was the extent of it.

23   Q.  And when you would show the best side, would you cut out

24   part of the video that showed submarines not performing?

25   A.  Of course.  Of course.  We were trying to show, in a way,

379

1    what you could do with this.  You know, pictures of the Goby

2    drifting next to the coral over the reef, and, you know, the

3    French accent saying this is great and all this stuff.

4    Naturally we were trying to not only sell the submarines, but

5    the joy of operating under water like this.

6         You know they weren't doctored in any way.  We didn't

7    make the water turn green.  What -- it was really blue, but, of

8    course, if there is a leak or a bad angle or something like

9    that, of course you would edit it out just like you would for

10   any new show.

11   Q.  And was there any concern as to what depth you could take

12   any of Mr. Jaubert's designed submersibles in order to get the

13   kind of footage that you were trying to get for marketing

14   purposes?

15   A.  I won't say there's a concern.  I mean, the bulk of the

16   shooting that you do is always in the top 15, 20' anyway.

17   That's where the light is.  So when it came to these marketing

18   things, the issue wasn't going down to depths we're

19   investigating wrecks, so naturally all of this would happen in

20   the upper section where the light came in and showed up the

21   coral and the fish where we had them.  Also a lot of turtles up

22   there.

23        MR. CEDERBERG:  Your Honor, I would offer, after

24   conferring with counsel, Exhibit 626 in evidence.  There was no

25   objection.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          THE COURT:  Without objection, 626 is admitted in

2    evidence.

3          (Plaintiffs' 626 in evidence)

4          MR. CEDERBERG:  Can we blow up the first half of it?

5    BY MR. CEDERBERG:

6    Q.  We're in the summer of 2004.  I apologize for moving around

7    a little bit, but can you tell us what this was?

8    A.  Another e-mail from -- this is from Herve to me, and it

9    says -- do you want me to tell you what this says?

10   Q.  Well, before you do that, let's go down to -- it's hard

11   sometimes with international time to figure out the chain, but

12   let's go down to the e-mail that is below it that you sent.

13   Start out, "Hi, Herve."  Can you blow that up?

14       Okay.  You write, "Hi, Herve, I think I was confused about

15   the Intruder drawings, so I'd like to ask you if you could scan

16   or just take a digital picture of one of your overall drawings

17   of the vessel to pass along to Sultan.  Also, based on the chaos

18   created by recent decisions, when would you like to ship Goby

19   and visit Dubai and put it in service?"

20       What did you mean by "chaos created by recent

21   decisions"?

22   A.  I'm sure this was the decision to actually purchase the

23   assets of Seahorse Submarine and move the Jaubert family over,

24   or have to produce the submarines over there.  Because that

25   changed everything.  At one point we were just buying the

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1   submarines, now we were in a situation where there was asset

2   purchase and there was going to be a factory built and so forth,

3   and it changed the entire sort of temper -- there's a better

4   word than this, but the approach.

5        So no longer was I acting as an owner's agent to buy

6   these things, and as a go-between on this communication, but now

7   we had a whole new game really involved.  It was building

8   submarines.

9   Q.  When you said, "We would like you to ship the Goby and put

10  it in service," were you at the belief, in July of 2004, that

11  this Goby was ready to go?

12  A.  100 percent, sure.  This is what we were buying, that was

13  the vision.

14  Q.  Okay.  Can we go up to the e-mail above it then?  This is

15  the e-mail back from Mr. Jaubert to you, and if we can, let's

16  start with the third line of the e-mail.  And highlight that.

17  And the next line.

18       Mr. Jaubert writes, "I'm expecting to ship Goby in two

19  weeks.  Goby has a more important draft than other subs and I

20  have to go to another place farther to test it, so it makes it

21  more complicated and time consuming."

22       Did you believe Mr. Jaubert was doing his own test to

23  make sure that the Goby was seaworthy?

24  A.  Absolutely.  And I read the e-mail that the Goby has a

25  greater draft referring to the submarine.  He needed more room

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    to be able to descend and ascend in this thing, and he probably

2    couldn't do it in the local areas, he needed to go someplace

3    maybe where there was 30 feet of water, I'm not sure, but yes, I

4    did take that to mean that he was going to test it then send it

5    out.

6    Q.  As part of your position at Exomos to be in charge of

7    testing the submarines and training people, after you found out

8    the problems you're talking about with the submarines, did you

9    institute anything called a trial report?

10   A.  Yes, early on.

11   Q.  Okay.  Can you tell us what a trial report is?

12   A.  All right.  The trial report, it started off at a very basic

13   level, which means that when we originally started working with

14   the submersibles, we would write up basically what the plan of

15   the day or the dive plan was going to be, and then what the

16   results of this thing were.

17        So it originally started off with some hand documents.

18   We quickly progressed to the point where it was an official

19   document, and it was a feedback document.  You had the

20   production area, the factory that would put out something,

21   submersible, it would go over to be put in the water or tested,

22   and this was all duty free reported.  This leaked, this didn't.

23   By its very nature, it doesn't highlight on all the great things

24   that happened, perhaps that you saw a sea turtle or something,

25   but it looks at the squawks, looks at the discrepancies, the

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    things that have to be fixed and -- just as you would in an

2    airplane.

3    Q.  Were these trial reports made at or about the time that the

4    test occurred?

5    A.  Yes.

6    Q.  And were they made with people who -- by people who actually

7    were involved in the testing and had knowledge?

8    A.  Absolutely.

9    Q.  And were they kept in the regular course of business for

10   Exomos?

11   A.  Yes.

12   Q.  How were they used by Exomos?

13   A.  Well, as I say, it's a feedback loop.  It served, first of

14   all, to organize the activities that were taking place with the

15   actual test and in the area, because there was a lot of

16   coordination involved.  You have a surface boat, you have other

17   things that have to be in place.  You need a rescue air bottle.

18   There are basic pre-check, pre-dive checklists that had to be

19   taken care of, and you needed everybody to be briefed on it,

20   then you needed the very important feedback going back.  This is

21   what happened.  This thing was leaking.  And how else could you

22   actually even monitor a trend?  You know, the aft port window is

23   leaking small, or there's a minor leak there, then the next day

24   it gets bigger.  So this became, I mean, rather obvious trail to

25   allow everybody to make the improvements necessary.  I mean,

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

384

1    that was the key.

2    Q.  And were these reports of the regularly conducted activity

3    of these tests used by other people at Exomos to decide what

4    needed to be looked at to remedy the problem?

5    A.  Yes.  Because they were, in fact, copied to everybody, there

6    was really no place to hide.  In other words, if it's a true

7    discrepancy and this was the problem, it was either a leak or

8    something doesn't work, there were video cameras, for instance,

9    some of which were critical to the operation, I was told, on

10   a -- rather critical to the operation on Goby, they had to be

11   remedied or there had to be a good excuse as to why not.

12            MR. CEDERBERG:  May I approach, Your Honor?

13            THE COURT:  Sure.

14   BY MR. CEDERBERG:

15   Q.  Mr. Miller, I've given you a document that I've titled Trial

16   Reports, and ask you if you could look through there, and

17   without revealing the content, tell us what kind of documents

18   you're talking about.

19   A.  This is a binder full of trial reports, looks like each one

20   dated for a separate day beginning with July in 2005.

21   Q.  And are these the kind of business records that you were

22   talking about were made in the regular course of activity?

23   A.  Yes.

24   Q.  And used by Exomos to document the progress and the boats?

25   A.  Yes.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

385

1          MR. CEDERBERG:  Your Honor, I'd offer the trial reports

2     at this time.  I have a list of the various exhibits composing

3     that I can read into the record.

4          MR. HESS:  No objection, Judge.

5          THE COURT:  Without objection, what is the number of

6     it?

7          MR. CEDERBERG:  Well, I can make the notebook a number.

8     I have all of the exhibits in the notebook, and there are

9     probably about 40.

10          THE COURT:  But how are we going to have a record of

11     what is in evidence if you don't tell me what they are?

12          MR. CEDERBERG:  I was going to read them, Your Honor.

13     But if the court wants, I can read them to the court when the

14     jury is out.

15          THE COURT:  I don't care.  I just need to have a record

16     of what we just admitted into evidence.

17          MR. CEDERBERG:  Okay.

18          THE COURT:  However you want to do that.  I mean, it's

19     your business.

20          MR. CEDERBERG:  At the same time, can I pass up the

21     numbers to the court?

22          THE COURT:  No, read them into the record.  She's

23     keeping a record right now.

24          MR. CEDERBERG:  Exhibit 30, 322, 333, 338, 339, 342,

25     347, 349, 352, 353, 357, 326, 367, 355, 358, 361, 363, 364, 365,

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

386

```
1    372, 373, 378, 44, 50, 34, 35, 37, 38, 39, 29, 334, 335, 337,

2    341, 345, 378, 350, 354, 359, 362, 366, 369, 375, 45, 54, 55,

3    379, 380 and 62.

4              THE COURT:  All right.  Offered by the Plaintiff

5    exhibits 30 -- well, I'm not going to repeat them all, but all

6    of those just recited into the record are in evidence at this

7    time, and you can give me a list later so I can conform the

8    exhibit list to it.

9              (Plaintiffs' 30, 322, 333, 338, 339, 342, 347, 349,

10   352, 353, 357, 326, 367, 355, 358, 361, 363, 364, 365, 372, 373,

11   378, 44, 50, 34, 35, 37, 38, 39, 29, 334, 335, 337, 341, 345,

12   378, 350, 354, 359, 362, 366, 369, 375, 45, 54, 55, 379, 380 and

13   62 in evidence).

14             THE COURT:  Is that acceptable to both sides?

15             MR. HESS:  Yes, Judge.

16             MR. CEDERBERG:  Yes, Your Honor.

17             THE COURT:  I would have read them back, but

18   unfortunately the real-time ran off the edge of the paper, so I

19   can't.

20             MR. CEDERBERG:  I will submit a list to the Court.

21             THE COURT:  That's all right.  I believe I can find it

22   if I need it.

23             MR. CEDERBERG:  Could you publish Exhibit 30 to the

24   jury?  Can you do the top part of the trial report?

25   BY MR. CEDERBERG:
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.  Mr. Miller, looking at the screen in front of you may orient

2    you.  Can you take the jury through, and this is the report that

3    you designed?

4    A.  Yes.  I mean, we -- I was going to say, it's a

5    collaboration, but I was probably the -- one of more than anyone

6    that was used to this sort of thing from aviation.

7    Q.  Okay.  Where it says "submarine," what was required to be in

8    there?

9    A.  The name of the submarine.

10   Q.  And the date, that's your period of time for July 25th?

11   A.  Correct.

12   Q.  2005.  And why -- what -- why was the trial time important?

13   A.  It sets the time that the evolution or the test itself would

14   occur, and at 8:30 in the morning there would be a pre-check

15   done of all systems so we didn't waste everybody's time.

16   Q.  What is a pre-check?

17   A.  Pre-check would be a checklist, make sure all the systems

18   are functioning.  The electrical, the batteries.  The primary

19   things were the electrical, battery package that were there, and

20   there were compressed air cylinders in there, plus the safety

21   systems.  So you ascertain those are functioning.

22   Q.  Much like you would with a plane?

23   A.  Exactly like you would with a plane.

24   Q.  Then it says, "aim."  What was that?  I mean, not on this

25   one, but what was the purpose of that column on these reports?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

388

1    A.  Just to generalize what was going to be happening, to be

2    able to communicate.  To trial the vessel, to test all the

3    systems are functioning.  So that would be a general statement

4    to be able to communicate to people.

5    Q.  It says "location Jumana."  What is that?

6    A.  It's a marina located about 15 minutes away from the

7    factory.

8    Q.  Then it says "in attendance."  Who would these people be?

9    A.  Those are all employees of Exomos.

10   Q.  I see your name there, and then I see Nick Bowles.  We saw a

11   picture of him?

12   A.  Correct.

13   Q.  Durgesh Thapa and Paul Rodig.  Who is he?

14   A.  He was one of the key employees that Mr. Jaubert brought up

15   from Florida.

16   Q.  And that brings up another point I did want to ask you.  Was

17   Mr. Jaubert allowed to bring personnel with him from his factory

18   in Florida if he wanted to go Dubai to work on the project?

19   A.  Sure.

20   Q.  How many people did he bring?

21   A.  It seems that three people came out during the first, and

22   I'm not sure exactly what the sequence, but three people, three

23   separate individuals.  A British fellow and two American.  Paul

24   Rodig was the senior of the people, and he came out to assist on

25   things.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

389

1   Q.  So Mr. Jaubert was given a free hand as to those people?

2   A.  Of course, yeah.

3   Q.  And distribution, what was the purpose of the distribution?

4   A.  So that -- I mean, as far as I was concerned, what was

5   happening on the water was the most important thing at this

6   particular point.  In other words, what was occurring out there

7   in the testing and operation was the most critical thing for the

8   company.  So, of course, you see Mr. Jaubert, you see Amin and

9   some of these other fellows.  You see Uwe there.  He was a

10  German engineer that was on for a short period of time.  So this

11  was distributed to key people in the company who needed to keep

12  an eye on what was happening and be able to respond to

13  discrepancies that were found.

14  Q.  If you go to the second section that is entitled "brief"

15  within the report, and just generally what was the brief

16  section, what was the purpose of that in the trial reports?

17  A.  This basically states what the intention is today.  This is

18  what the purpose of today's evolution is, the purpose of today's

19  test, and sometimes it's general as it was here.  Sometimes it

20  would be specific, but at this point, this is what you would

21  brief to the people involve in the whole operation.

22          So probably these cases -- I mean, I didn't write these

23  particular things.  I can see I was in attendance, and certainly

24  involved in it, but the crew there was being trained at how to

25  do these things.  Most had not been associated with this kind of

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

390

1    regimentation, so --

2    Q.  There is a section on the second paragraph that says, "Paul

3    will be in PIC with Jim and Thapa as passengers."  What does

4    that mean?

5    A.  PIC, pilot in command.  So we have to designate somebody who

6    is clearly in charge of the vessel.

7    Q.  Captain of the ship?

8    A.  Yes.  In this case it was Paul.

9    Q.  Jim is you?

10   A.  That's me.

11   Q.  And Thapa is the fellow we talk about?

12   A.  Correct.

13   Q.  If we can go down to the third section.  Okay.  What is the

14   purpose of this portion of the trial report?

15   A.  Just supporting data for the day of the operation.  You can

16   see the weather.  They were showing a 1' swell in the area.  No

17   annotations for the wind and visibility.  Actually, they do.

18   They show ten knot visibility, but this area was supposed to

19   show what was occurring that day weatherwise, and there's a

20   heading for this thing.  I don't know what this is up above.

21   Q.  I think it says "report."

22   A.  Okay.  So here -- okay.  Here they discuss what happened on

23   this particular dive.

24   Q.  And if we look at the description on this one, just so the

25   jury is oriented to all the others in evidence, it says -- third

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    sentence where it says, "Adventurer" over on the right.

2    Mr. Duncan, on the right starts "Adventurer" after "okay."  If

3    you can do there on down.  Do the whole thing.

4        Okay.  This one.  It says, "Adventurer descended and did a

5    run submerged for about 15 minutes."  Does that mean at that

6    portion of the test it was functioning properly?

7    A.  Yes.

8    Q.  Okay.  Then it says, "Adventurer ascended and changed

9    courses toward the Jebel Ali port breakwater.  Adventurer did

10   submerged run for about 35 minutes.  On the final ascent,

11   Adventurer surfaced and blew open."  The first half, what does

12   that mean?

13   A.  Means the pressure inside the compartment we were in was

14   great enough to actually blow open the hatch.  Didn't destroy

15   the hatch, but it just, boof, like this because the internal

16   pressure was too great.

17   Q.  Can we go on.  The next page is the fourth part of these

18   trial reports.  If you go back to the first page, at the very

19   bottom is the heading for this section.  If you can light it up.

20   It's hard to read.  This is entitled "Discrepancies,

21   Enhancements."  What are the discrepancies and enhancements?

22   A.  Well, you can see the description right there.  I'm trying

23   to figure out observations or recommendations.  Let's go to the

24   next line on this so I can get the context.  Maybe it's

25   something I can see here.  Right.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

392

1      They list the discrepancies.  So these would be squawk or

2   issues that needed to be looked at and here we have cabin hatch,

3   the first cabin hatch blew open on the surface.  That certainly

4   wasn't right.  They reported that the Number 1 thruster was not

5   working.  And that there was an air leak on the front board, an

6   air leak on one of the brass outlets, so they listed the issues

7   that had to be addressed by the production staff.

8   Q.  Now if we go to Exhibit 332 and put that up, the first one

9   was a report done in July of '05.  If we go to 332, can we blow

10  up the first part?  Was this test on the Adventurer done in

11  October of '05, if I'm reading this right?

12  A.  That's what it shows.

13  Q.  On this one you're not in attendance, but you're on the

14  distribution list?

15  A.  Correct.

16  Q.  Is this Mr. Jaubert?

17  A.  Correct.

18  Q.  And we go over to the second page, the "Discrepancies

19  Enhancement" section, just to put that up.  "Chart plotter had a

20  continual beep."  I take it that's a smaller problem to be

21  corrected?

22  A.  It seems so.

23  Q.  "All hatches continue to leak.  Hatch 2 is particularly

24  bad."  Is that a small problem or a serious problem?

25  A.  It says it's particularly bad.  I assume it's particularly

393

1   bad, that's not good.

2   Q.  The one above it says, "The search lights are filling up

3   with water."  What does that mean?

4   A.  There were lights located on the nose of the vessel, there

5   were two lights up there that were supposed to be used for night

6   operations, and they filled with water.

7   Q.  Now, the exhibits in that notebook, you've had an

8   opportunity to look through them?

9   A.  Yes, I have.

10  Q.  And did you see any reports, out of all the ones I read into

11  the list, that are in that notebook where you found trial

12  reports that said everything was working fine over the whole

13  period of these trial reports?

14  A.  No, I didn't.

15  Q.  Let me just go to a couple more specific ones, since they

16  are in evidence.  Let me show you one which is Exhibit 352, also

17  with the Adventurer.  This one is going to be dated in

18  February 1, '06, still with the Adventurer, and this one was --

19  the aim was, "Trial Adventurer in open water and check all

20  systems."  Do you see that?

21  A.  Yes.

22  Q.  If we go down to the trial report section, the paragraph

23  that starts almost in the middle, "Adventurer had communication

24  problems."  This says, "Adventurer headed for open water and

25  submerged shortly after marina entrance.  Adventurer had VHF

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

394

1    communications problem."  What does that mean?

2    A.  That means the marine radio that was on the vessel wasn't

3    working as well as they felt it should be.

4    Q.  It goes on to say that "It was decided it would be safer to

5    head back to shallow water in the Jumana beach area where media

6    footage would be captured."  What does that mean?

7    A.  This is a case where -- and I see that Falk was in

8    attendance -- clearly they wanted to get video shots probably.

9    Sometimes they were stills, but mostly it was digital video that

10   was shot of the vessel.

11   Q.  Then it goes on to say, "Nick reported that he heard

12   sloshing water in the cabin.  Shortly after he was ankle deep in

13   water and decided to surface.  Then the bilge was used to pump

14   out the water."  Then you recall after they pumped the water out

15   they tried to capture some media footage.

16          Next sentence, "The Adventurer dived and media footage

17   was captured along Joumana Beach."  Based on your experience as

18   one of the marketers trying to get footage and edit footage, was

19   the footage that you were -- that you've seen of Mr. Jaubert's

20   submersibles -- and you've seen a lot of different kind of

21   footage of that?

22   A.  Well sure.  Up to the time that I left Exomos, I saw

23   everything.

24   Q.  Okay.  Was that footage representative of how the

25   submersibles performed when it was being tested?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.  No.  It was representative of a really good marketing effort

2    to show it in the best light possible.  That's what it was.

3    Q.  Let me go to just a different boat.  Let's go to Exhibit 37,

4    and blow up the top one.  Which boat was this for?

5    A.  Goby.

6    Q.  Okay.  November '05?

7    A.  Correct.

8    Q.  Okay.  And if we go down to the trial report, the trial

9    report portion of it, the whole thing, I think we can -- says,

10   "Goby dived, and Nick reported the following."  Highlight the

11   whole thing.  "Goby dived" -- starts in the middle there -- "and

12   Nick reported the following:  Water leaks continue from the

13   bulkhead behind the pilot, air leaks between aft, MBT."  What is

14   that?

15   A.  Main ballast tank.

16   Q.  "And the ball valve closed, did not" -- "ball valve does not

17   seal correctly resulting in a gush of water entering the cabin."

18   Do you see that?

19   A.  That's the same thing I experienced, but they experienced

20   when they were testing it in the tank.

21   Q.  "Goby was loaded back on the trailer, sent to Zebra to get

22   cleaned."  What is Zebra?

23   A.  The Zebra was the compound where the submarine and the dive

24   equipment and the bottle refueling station was.

25   Q.  Let's go to Exhibit 39.  That deals with the Goby as well?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.   Correct.

2    Q.   Let's go to the trial report area of that.  And on the

3    second paragraph that starts OPS team, can you highlight all the

4    way down, highlight the whole thing.  It's just faster.  Okay.

5    If we stop after the third sentence, over on the right, "Goby

6    was very difficult to steer and nearly impossible to hold the

7    heading."  Do you see that?  What's a heading Mr. Miller?

8    A.   There's a magnetic compass located on the dashboard, what we

9    call a whiskey compass.  There's no whiskey in it, but

10   nevertheless it's a magnetic heading, and that's what he's

11   talking about.  And obviously he couldn't hold a straight line.

12   Q.   "And the depth finder and the GPS system did not function

13   either."  What is he talking about?

14   A.   Well, there's a depth finder on board, and so neither that

15   or the GPS system -- I'm not sure exactly how it was rigged that

16   way, where the antenna was for the GPS, but in any case, the

17   rest of the electronics were not functioning.

18   Q.   Next sentence says, "Goby dived, and Nick had to use MM2

19   valve to pressurize the cabin, as the cabin auto pressure system

20   did not work while the hovers were in use."  What does that

21   mean?

22   A.   Well, it sounds as though when they would use the vertical

23   thrusters, that it would shut down the automatic pressurization

24   system.  So the amount of air in the cabin was not being

25   controlled properly.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

397

1          The MM2 refers to a solution that, I assume Mr. Jaubert came

2     up with as a way to force additional air into the cabin space.

3     And I'm not sure what MM2 stands for, but in any case, what it

4     was was a couple of more cylinders added to the submersible with

5     an electrically operated valve, and when it seems as though the

6     regular automatic pressurization system wasn't keeping up with

7     the interior as evidenced by excessive leaking, excessive

8     leaking coming in, you push this MM2 valve and you got this

9     tremendous rush of air that came into the vessel and forced

10    compressed air into the situation allowing him to go a little

11    bit deeper.

12          It certainly worked to pressurize the cabin more, but

13    it also came in with this big noise, and you can imagine in a

14    situation where you're -- all of a sudden the environment you're

15    in becomes pressurized and it would go whoosh, and you pushed

16    this button and it was kind of like being hit with a

17    sledgehammer a little bit.  And certainly no way -- I assume

18    that it was done as a stopgap way to deal with this until a

19    better system could come up.

20          But it ended up being around.  So when he talks about

21    it, he's basically saying when he flips the hovers on, the

22    autopressure system goes off, he's got to use this MM2 system,

23    and that's never very good.  It's not very good for the pilots

24    and the people onboard, and it's sort of a rough way to deal

25    with a lot of cabin pressure.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

398

1  Q.  It goes on to say, "Goby dived for 30 minutes and surfaced,

2  and they could not hold a heading and was running in circles."

3  What did that mean?

4  A.  Well, it just means that, for whatever reason, the vessel

5  was now out of trim, and I don't know whether at the end it

6  shows that one of the thrusters -- there were two aft thrusters

7  on this.  I don't know whether that means one of the thrusters

8  wasn't working or something else.  There was a rudder post on

9  it, but so it basically means the vessel is out of trim.  So it

10  was apparently going in circles, so they aborted this thing and

11  went up with it.

12  Q.  And just to be clear, with regard to the footage that we

13  talked about, were you trying to use that footage to sell

14  Mr. Jaubert's products, or were you trying to use that footage

15  to alert the public into the potential interest and availability

16  of these if and when you could get them fixed and safe?

17  A.  Well, we were selling the whole idea of going under water in

18  submersibles and showing the rest of the world.  We felt part of

19  our overall mission was to be able to produce these things in

20  volume, en mass, so people could go, nondivers, and visit the

21  world below.

22  Q.  And you were trying to generate interest?

23  A.  Absolutely.  Look, as I said myself, especially Falk, and

24  certainly Professor Valensic (ph), who was also out there on

25  these things, we dealt with Discovery Channel and National

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Geographic and these things.  We knew our way around.  We were

2    trying to get the word out.  We were very much interested in

3    letting the rest of the world know that we had this going on in

4    Dubai, this is what happened.

5         So, I mean ultimately, yes, we were looking at selling

6    submarines.  There's no question about that.  But the purpose of

7    the media approach and pulling in film crews that were in the

8    area was to generate enthusiasm, free publicity.

9    Q.  Was your intent to sell unsafe submarines?

10   A.  Of course not.  Of course not.

11   Q.  Let me get away from the trial reports, and I have to do

12   three -- have you ever heard of a design and manufacture

13   submersible by Mr. Jaubert which he called the Nautilus?

14   A.  Yes.

15   Q.  Did you actually see the Nautilus?

16   A.  Yes.

17   Q.  Were you aware outside of problems with -- any problems with

18   the Nautilus and its functioning, were there any other concerns

19   that you had about his submersibles, the Nautilus?

20   A.  Well, my immediate concern on seeing it -- because I was

21   surprised to see this thing show up.  So I immediately looked at

22   the vessel, and I felt that it was pretty much a carbon copy of

23   the model that he kept in his office, which was from the movie

24   20,000 Leagues Under the Sea, a Disney property.

25   Q.  Why did that concern you?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

100

1    A.   After 12 years in the theme park industry and dealing many,

2    many times with the issues of intellectual property, this pretty

3    much looked to me as though it was listed directly that way, and

4    Mr. Jaubert didn't feel that way at all.  And I also felt that

5    it was prudent and necessary, especially with the corporation we

6    were operating, the Dubai World above us, that we make sure we

7    protect these things.

8         And there was also a large -- how do I put it?  A large

9    emphasis to make sure that things like pirated DVDs,

10   intellectual property rights in the Emirates, including things

11   like pirated copies of Microsoft and that kind of stuff, there

12   was a big emphasis to make sure that everybody clean their act

13   up, that there weren't pirated copies of anything.

14        So I looked at that, and it was very obvious to me, and

15   not obvious at all to Mr. Jaubert, but I had been used to

16   dealing with that.  So I asked for an opinion.

17   Q.   Okay.  In your mind, was marketing the Nautilus without any

18   type of permission from Walt Disney going to be a successful

19   marketing technique, or one that was just a waste of time?

20   A.   Well, I felt it was very dangerous.  Dangerous in the sense

21   that I would have been very surprised if Disney intellectual

22   property attorneys -- I mean, Disney is very vigorous about

23   this.  I know many people at that company, and I would have been

24   very surprised if they didn't come charging after us.

25        I also felt there was a possibility that if this could

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    be done correctly, that we could work in conjunction with

2    Disney.  And so that was also a possible option.

3         But I was surprised to see it.  I did see that

4    immediately, the shape, the form of it, and no matter what

5    anybody told me, it was very obvious to me that I had been

6    looking at -- Mr. Jaubert had a model like this located in his

7    office, and he had one when we went to Seahorse, the same thing.

8    But it was a model from the movie, or close enough, let's put it

9    that way.

10   Q.  Did you tell Mr. Jaubert your concerns?

11   A.  Yes.

12   Q.  And what was his reaction?

13   A.  He seemed unconcerned and actually somewhat irritated by the

14   challenge.

15        MR. CEDERBERG:  I'd offer, Your Honor, that I showed to

16   counsel, and I believe there's no objection, Plaintiffs Exhibit

17   384.

18        THE COURT:  Exhibit 384, hearing no objection, is

19   admitted in evidence without objection.

20        (Plaintiffs' 384 in evidence)

21        MR. CEDERBERG:  Can we do the top part of it?  Just why

22   don't you go down about six lines.  That's fine.

23   BY MR. CEDERBERG:

24   Q.  Is this an e-mail that you received from Mr. Jaubert?

25   A.  Yes.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

102

1   Q.  Okay.  And it says, on the second paragraph -- can we

2   highlight the first half of that second paragraph, the second

3   one.  Yes.

4        "Dubai is behind schedule, it is true, but so am I for

5   the following reasons:  Hurricanes that hit us twice put me

6   behind three weeks.  And I'm still getting delays in delivery of

7   work orders because my subcontractors suffered damages that put

8   them two months behind.  Stingray 1 should be finished this way,

9   Stingray 2 needs another three weeks."  Do you see that?

10  A.  Yes.

11  Q.  Mr. Jaubert ever produce a Stingray 2?

12  A.  No.

13       MR. CEDERBERG:  Let me approach, Your Honor, because

14  after discussion with counsel, I want to identify this thing,

15  but I don't want it published yet because we don't have an

16  agreement.

17       THE COURT:  All right.

18       MR. CEDERBERG:  I'm showing you what we've marked as

19  Plaintiffs 41 for identification, a December 2005 group internal

20  audit, if you -- if you've seen that before.

21       THE WITNESS:  Yes.

22  BY MR. CEDERBERG:

23  Q.  Did you read it when you got it?

24  A.  Yes.

25  Q.  How did you decide to go forward after you read the results

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

103

1      of that audit?

2      A.  I used it as a wakeup call.  I considered this to be a

3      wakeup call.  They were -- I felt they were diligent and fair,

4      and that they were highlighting issues in the company at a lot

5      of different levels.  The way some procedures were being done,

6      everything from human resources to the production side of

7      things, and I felt that this was a good template for fixing

8      things.

9      Q.  Did you communicate your belief this should be used as a

10     wakeup call to get the procedures in better order to

11     Mr. Jaubert?

12     A.  Yes.

13     Q.  Let me show you what's been marked for identification as

14     Exhibit 219.  Ask you to look at this and identify it without

15     revealing the contents.

16     A.  Yes.

17     Q.  Can you tell us what that is?

18     A.  This was a personal and confidential memo that I sent to

19     Mr. Jaubert discussing the auditor's report and the impact of

20     this because it created quite a stir once it came.

21     Q.  Did you want to communicate to Mr. Jaubert your thoughts and

22     concerns as a co-employee of Exomos with Mr. Jaubert?

23     A.  Yes.

24             MR. CEDERBERG:  Your Honor, I'd offer Exhibit 219.

25             MR. HESS:  No objection, Judge.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          THE COURT:  Without objection, 219 is admitted in

2     evidence.

3          (Plaintiffs' 219 in evidence)

4     BY MR. CEDERBERG:

5     Q.  Let's blow up the first half of it.  "Hello, Herve.  During

6     the past weeks I have been wrestling hard with what I see as the

7     various challenges facing Exomos and using the time to check

8     with myself to ask is it just me?  No matter how I have made

9     rationalizations to myself and customers, the simple fact

10     remains we have no products ready for the market."  What did you

11     mean by that?

12     A.  Simply that we didn't have anything available to sell to the

13     market.

14     Q.  Nothing worked?

15     A.  At that point, we didn't have, that's correct.

16     Q.  Then you go on to say, "We don't have a marketing problem."

17     You were involved in marketing, right?

18     A.  Yes, exactly.

19     Q.  And did that mean people were interested in these, but you

20     weren't able to have a product that was safe enough?

21     A.  Correct.  We got inquires all the time.

22     Q.  The next paragraph says -- if we can highlight the bottom

23     one, bottom paragraph.  "We just can't continue to bullshit

24     people and promise them products or performance we can't

25     deliver.  This is not a new topic.  But at this critical

1    juncture, this is the only topic."  What did you mean by that?

2    A.  Well, I think it's pretty self-explanatory, and I was saying

3    this is the most important aspect of all things.  This was it.

4    This issue of the product and having something that is safe,

5    reliable, and available for sale.  We had a situation where we

6    had all kind of prototypes, and it was -- we were constipated.

7    They weren't exiting the company.  They were just coming in with

8    materials, and they were getting stopped.  Nothing left.

9    Q.  We go to the next page of the memo you sent Mr. Jaubert, and

10    punch out the top paragraph.  "You can be sure Sultan has

11    already got wind of the audit survey draft, and as you pointed

12    out, it is damming from a number of points, but far from fatal."

13    Were you there, as Mr. Jaubert?

14    A.  Correct.

15    Q.  You had discussions with him about this first audit?

16    A.  Yeah, this was a big deal.  It was -- you never welcome the

17    auditors, even if everything they're going to tell you is great.

18    It's just a normal reaction.  We're here to help.  You know.

19    Q.  Let's go to the fourth page, Exhibit 219-4, and if you can

20    blow up the first Paragraph 8.  You wrote to Mr. Jaubert, "Get

21    our house in order immediately.  Show we aren't overly sensitive

22    to constructive advice.  Use the audit survey as a wakeup call

23    and tool rather than an attack.  Correct the survey where there

24    are falsehoods, or go item by item down the rest of the list and

25    fix the problems.  They are real.  I used to do some of this

1    stuff as a consultant with the exception of the obvious errors I

2    would have written that report pretty much the same way."  What

3    did you mean by that?

4    A.  Well, here's a situation where we had an exterior point of

5    view of our business structure, and I mean, I was a player.  I

6    was in the center of it, so I was in no position to stand on the

7    outside an make the judgments for the entire company.  But what

8    I felt after reading that report, there were some rather silly

9    errors.  There were things that they had made a mistake.  They

10   found something and it wasn't there.

11          But the rest of it was truly constructive advice.  You

12   have to do this, you have to do that, this has to be necessary.

13   Oh, and by the way, you better get some sales into this company,

14   you better sell something have something to sell or the party is

15   over.  I'm paraphrasing.

16   Q.  Then if you go to 219, Page 6, the last -- the way you end

17   the memo, can you highlight the last two paragraphs?  You wrote

18   this?

19   A.  Yes.

20   Q.  "Exomos will survive, expand, and prosper.  It will not be

21   easy, but it will be an extraordinary success, and for me, I am

22   on board as long as I can help it succeed"?

23   A.  This is the usual Jim Miller kind of statement.  That's what

24   I believed.  I believed that we still had a viable vehicle, and

25   as long as I was contributing to the forward progress of it,

1    that I could be counted on to be there.

2    Q.  Did you consider yourself a rogue test pilot whose main goal

3    was to sabotage this program in any way?

4    A.  No.

5    Q.  Did you want it to succeed?

6    A.  In the worst possible way.  Actually, I considered myself as

7    the voice of reason, maturity, stability, the person that had

8    operated in precision environments like aviation, search and

9    rescue, the Coast Guard.  I felt I was the balance to what, for

10   me, was many times some very mysterious decisions.  Some very

11   interesting things.  So I felt quite the opposite.  I felt like

12   the old man, and that was before I needed reading glasses.

13        So, I mean, at that particular time, that's how far

14   opposite of the spectrum we could be.  I was like a monk.  I

15   would go home and go back to the factory.  That was it.  And

16   Friday, you know, I would have breakfast somewhere, and that's

17   it.

18   Q.  We heard yesterday a concept by Sultan about putting gold

19   bricks in the water off the coast of Dubai?

20   A.  Okay.  Sure.

21   Q.  Did you have any awareness or involvement in that?

22   A.  Well, of course, yeah.  That was one of many brainstorming

23   sessions that we had.  When we were looking at the outside reefs

24   at this particular time, this was about the time the Palm

25   Jumeirah was being discussed.  We had brainstorming sessions,

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    everything was on the table, including these reefs, this idea of

2    building the artificial reefs, and one of the ideas was what is

3    an attraction.

4            So we would have -- routinely have brainstorming

5    sessions, and sometimes take those sessions and put them into

6    graphics, or in my particular case, I also had access to

7    animators, and we would animate videos to show this.  And one of

8    these things was, well, you throw a bar of gold every day, a

9    small bar of gold, I -- probably worth something you know,

10   probably worth several hundred dollars, no question, and then

11   divers would go out and find this and locate this.  It would be

12   part of an attraction.

13           So, sure, that was one of a lot of different things

14   that were brainstormed, including underwater hotels and all the

15   rest of this stuff.  So we took it to a conceptual point.

16   Q.  Did you ever take to it the point where you're out dumping

17   bars of gold in the water?

18   A.  No.

19           MR. CEDERBERG:  May I have a moment, Your Honor?

20           THE COURT:  Yes, sir, of course.

21           MR. CEDERBERG:  Briefly, Your Honor.

22   BY MR. CEDERBERG:

23   Q.  We saw trial reports about the Goby having all sorts of

24   different problems.  Were you aware of a fire that ever occurred

25   on the Goby?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.  One happened to me.  Actually it wasn't the Goby it was the

2    Adventurer.  I'm sorry.  You're talking about in the factory.

3    Q.  In the factory?

4    A.  Yes.

5    Q.  What was the result of that fire on the Goby?

6    A.  The result was that the interior of the Goby was destroyed.

7    Q.  Were all the tests that we saw that had the problem with the

8    leaks with the Goby that we went through, did those occur before

9    the fire on the Goby?

10   A.  Yes.

11   Q.  Secondly, in an effort to try and make this project succeed,

12   were you instrumental in bringing various experts to Exomos to

13   talk and consult with Mr. Jaubert?

14   A.  Yes.

15   Q.  Okay.  Can you name some of the ones that you were

16   instrumental in bringing?

17   A.  Well, notably, we had been working with Phil Nuytten in

18   Vancouver, who is recorded as one of the top one atmosphere

19   designers and builders of the submarines.  He has the Deep Orca

20   2000.  He's well known, well respected in the industry.

21       When I was brainstorming and constructing this plan for

22   the artificial reefs, I went up and talked to Phil and showed

23   him what was involved, because he has a lifelong history in an

24   underwater work.  It's as simple as that.  So he was a friend.

25       I met Dr. Don Walsh, who was the first man to the

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

110

1    bottom of the Marianas Trench, along with Jacques Picard.  I met

2    him several years earlier when we were filming one of our shows,

3    and he also -- in addition to going down to the bottom of the

4    Marianas Trench, he also was a submarine captain, an Annapolis

5    graduate, ran the USC maritime program.

6          MR. HESS:  I'm going to object.  It's hearsay.  Lack of

7    personal knowledge.

8          MR. CEDERBERG:  Your Honor, he's testified he brought

9    experts in.  This is why he brought them in.

10          THE COURT:  I don't think that it's hearsay for him to

11    be saying that that's what the man's qualifications were.  I

12    mean, the guy could have been lying to him, I don't know if

13    they're true or not.  It's what he thought.

14          MR. HESS:  Okay.

15          THE COURT:  It was what he was under the impression of,

16    so I'll permit it.

17          THE WITNESS:  These were not only experts, but arguably

18    the best in the world.

19    BY MR. CEDERBERG:

20    Q.  When you brought those in to meet Mr. Jaubert, what was

21    Mr. Jaubert's reaction?

22    A.  I didn't sit in with those meetings.  I brought them in as

23    some of the best resources on the planet to help us with these

24    issues.  He met with them, I wasn't part of that.  I was just

25    instrumental in bringing these fellows together and involved, in

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

111

1    the case of Dr. Walsh, in looking at what we were doing, and

2    specifically also the operations.  These were people that had

3    huge amounts of experience, you know, underneath there, and I

4    wanted to benefit from those in our area, then he -- these

5    fellows would spend time with Mr. Jaubert.

6    Q.  Did you see any evidence that Mr. Jaubert changed his design

7    or the way that he manufactured these based upon his meetings

8    with those experts?

9    A.  No.

10   Q.  Finally, with regard to -- we've talked about, in this case,

11   already -- we've talked about, in this case, about a 10 percent

12   surcharge that appeared on various bills from Seahorse and

13   various inflated bills from Seahorse.  Did anybody, while you

14   were at Exomos, ever tell you that that was being done?

15   A.  If that agreement was in place, I never saw it.

16   Q.  And you weren't aware that it was happening?

17   A.  No.

18          MR. CEDERBERG:  Nothing further.

19          THE COURT:  All right.  Before we go to

20   cross-examination, let's take a break.  Let's take our afternoon

21   break.  We'll be back at 3:15.  All right?

22          COURT SECURITY OFFICER:  Please rise for the jury.

23          (Jury out at 3:01 p.m.)

24          THE COURT:  All right.  Since you're on the stand,

25   you're not permitted to discuss your testimony.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

112

1          MR. CEDERBERG:  May I ask one question, Your Honor?

2          THE COURT:  Sure.  May not answer it, you can ask

3     anything you want.

4          MR. CEDERBERG:  In the exchange of exhibits and

5     objections that we're going to do that, and it's obviously going

6     to work a lot faster if they're of exhibits that are going to be

7     used with Mr. Miller on cross-examination or my exhibits to

8     cross Mr. Jaubert, should we exchange those the night before.

9          THE COURT:  You should, if you know that it's going to

10    happen, yes.  I would like you to do that.  Okay?

11         MR. CEDERBERG:  Thank you, Your Honor.

12         THE COURT:  All right.  Be in recess until 3:15.

13         (Brief recess)

14         (Jury in at 3:15 p.m.)

15         THE COURT:  Please be seated.  All right.  Sir, you may

16    proceed, cross-examination.

17         MR. HESS:  Thank you, Judge.

18                        CROSS-EXAMINATION

19    BY MR. HESS:

20    Q.  Good afternoon, Mr. Miller.

21    A.  Good afternoon.

22    Q.  You stated you you've never had any knowledge of the 10

23    percent processing or shipping and handling charges that were

24    agreed to by Exomos or Dubai World as to Seahorse?

25    A.  Any conversations like this would have been between

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

113

```
 1    Mr. Jaubert and Sanil.
 2    Q.  So your answer is no?
 3    A.  That's correct.
 4    Q.  To this day you have no knowledge of it?
 5    A.  Exactly.
 6    Q.  You've got an extensive history in marketing, correct?
 7    A.  I wouldn't use the word "extensive."  I have some training
 8    in marketing.
 9    Q.  I'm sorry.  You had -- an important part of your role with
10    Dubai World -- was it Dubai World or Exomos that you work for?
11    A.  I work for Exomos.
12    Q.  Important part of your role was marketing, correct?
13    A.  Absolutely, yes.
14    Q.  And you engage professionals, and you -- I think you said
15    you actually produced marketing video, correct?
16    A.  Yes.
17    Q.  Regarding these submarines?
18    A.  Yes.
19    Q.  So you have some knowledge of marketing?
20    A.  Correct.
21    Q.  And you're familiar with marketing tools, correct?
22    A.  Yes, I am.
23    Q.  Like the use of language to embellish or to bring a point --
24    bring across a point?
25    A.  Yes, sir.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

114

1    Q.  And you're quite good at it, correct?

2    A.  No, I'm not that good at it, or I would be highly paid right

3    now, but I'm definitely aware of it.  We live in a marketing

4    world, yes.

5    Q.  Like things that you said during your examination like being

6    hit with a sledgehammer a little bit?

7    A.  That's what it felt like.

8    Q.  How were you hit by a sledgehammer a little bit?

9    A.  Someone comes up with, let's say, a four-pound sledgehammer

10   and smacks you on the side with it.  That's what it feels like.

11   Q.  A little bit.

12   A.  Yeah.

13   Q.  So really, what you meant to say is it was like being hit by

14   a sledgehammer.  The little bit is extraneus, correct?

15   A.  Okay.  I'll accept that.  It's extraneus, exactly.  That

16   definitely could have been phrased better.

17   Q.  You testified that first -- when you first took the stand,

18   you said that you had the first test of a -- of the Stingray.

19   Remember that testimony?

20   A.  Yes.

21   Q.  And when was that?  Did you give a date to that?  Do you

22   remember when that was?

23   A.  No, I didn't give a date to it.  Seemed like it was in the

24   later part of 2004, because it was the first actual open water

25   testing of that particular submersible.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

115

1    Q.  Or could it have been the early part of 2005?

2    A.  I would accept that.

3    Q.  So sometime late 2004, early 2005, you had that test.

4    A.  Correct.

5    Q.  And it was -- and you never mentioned that Mr. Jaubert was

6    there until you were asked directly about it, but he was there,

7    correct?

8    A.  Yes, he was.  We were all there.  Everybody that had

9    anything to do with the testing and so forth was there including

10   Dr. Don Walsh.

11   Q.  And, in fact Dr. Don Walsh wasn't in the water with you?

12   A.  No, he wasn't.

13   Q.  Where was he?

14   A.  He was standing up on the -- there was a boat launch ramp we

15   use at Joumana, so he was standing up there observing.

16   Q.  So when you said to the jury just now it was the first open

17   water test, it wasn't open water, it was about ten feet away

18   from a ramp that you put the submersible into, right?

19   A.  Well, by my definition, open water is anything that's not a

20   test tank.  It wasn't a controlled environment.  We actually

21   couldn't control that body of water.

22   Q.  I think you said you weren't sure about how deep the water

23   was, but the reality was that the Stingray was transported from

24   the facility, correct?

25   A.  Correct.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

116

1    Q.   And do you remember that day?   Do you remember what time of

2    day that was?

3    A.   Yeah.   It was in the later part of the afternoon, because

4    the visibility down below the water was not that good.

5    Q.   And I notice, on many of the test documentation that you

6    discussed, visibility was one and a half, it was in meters,

7    correct?

8    A.   Well, we would have to look at that particular document,

9    but --

10   Q.   How do you measure visibility in your language when you were

11   writing those participating --

12   A.   It depends on the report.   We have to take a look at it.   We

13   have a situation where we have British people, generally it was

14   metric, I have to agree with you, but to be specific, you have

15   to go look at the actual report.

16   Q.   Fair enough.   Often the visibility, one and a half meters,

17   right?

18   A.   I didn't see that so much in the reports, and a lot of times

19   when we dove, it was more than one and a half meters.   I mean,

20   that's roughly 5'.   That's not much at all.

21   Q.   Okay.   But the reports, they speak for themselves, correct?

22   A.   Of course.

23   Q.   You stand by those reports, right?

24   A.   I didn't author them.   I stand by them as being reports that

25   were issued by the operations department.   In many cases, I was

117

1    CC'd on those, but I take them at face value.

2    Q.  Well, I thought they're a business record of Exomos, right?

3    A.  That's right.

4    Q.  They're something Exomos did for business purposes, correct?

5    A.  Correct.

6    Q.  They had a meaning, correct?

7    A.  A very important meaning.

8    Q.  They were meant to be relied on, correct?

9    A.  That's correct.

10   Q.  I'm not asking you if you believe them or not, but that's

11   what you told the jurors, right?

12   A.  Yes.

13   Q.  So if the visibility says whatever it says in those

14   documents, that's a reliable figure, correct?

15   A.  I agree, absolutely.

16   Q.  Everything in those documents is reliable?

17   A.  I was trying to get away from the characterization that all

18   of this happened in one and half meters.  That was not the case.

19   Q.  If I gave you that misunderstanding, I apologize.

20   A.  That's all I was trying to do.

21   Q.  But we can agree then that those reports, they're accurate

22   from top to bottom.

23   A.  I agree, yes.

24   Q.  Okay.  Now, let's get back to that day.  Late 2004, early

25   2005, you had the first test of the Stingray, right?

418

1    A.  Yes.

2    Q.  And you remember it because, I think you characterize it, it

3    was one of the most horrific experience you've ever had, right?

4    A.  Yes.

5    Q.  Frightening.

6    A.  I would use the word frightening, yes.

7    Q.  Because whether or not Thapa -- was he a good friend of

8    yours?

9    A.  He's a very good friend.  At that point, I dived with him

10   for three an a half years.

11   Q.  How old is Thapa?

12   A.  Hard to tell with the Nepalese, but probably 35 or something

13   like that.

14   Q.  And he was quite interested and quite vigorous about being a

15   submarine test pilot, wasn't he?

16   A.  That's correct.

17   Q.  He was fearless, wasn't he?

18   A.  Pretty much.

19   Q.  He enjoyed it, right?

20   A.  Absolutely.

21   Q.  And Exomos employed him to do that -- first of all, Exomos

22   didn't employ him to do that, did it?

23   A.  I'm sorry.  What did they employ him to do?

24   Q.  Exomos wasn't even in existence in 2004, was it?

25   A.  It was.  Because what we had -- I'm sorry.  Could you

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

419

1    rephrase the question again.

2    Q.   Yeah.   Exomos wasn't in existence in late 2004, was it?

3    A.   The branding had not been completed.   I look at it in terms

4    of the organization that existed.

5    Q.   So the corporation -- you're telling the ladies and

6    gentlemen of the jury that the corporation Exomos was in

7    existence in late 2004?

8    A.   No I'm not.

9    Q.   Is that marketing you're saying right now?

10   A.   I don't know.   It's the challenge of an attorney.   I've

11   never been cross-examined before.   I'm trying to figure out

12   exactly what you want, so that's exactly what I'm saying.

13   Pardon me.   I'm just trying to understand this, that's all.

14   Q.   If I may, here's what I want, it's what everybody wants, the

15   truth, the whole truth, and nothing but the truth.

16         MR. CEDERBERG:   Your Honor, argumentative.   Can we go

17   question and answer, please?

18         THE COURT:   Yeah.   No speeches.   Ask him questions.

19         MR. HESS:   Thank you.

20   BY MR. HESS:

21   Q.   Do you know when Exomos became a corporate entity?

22   A.   No.   We'd have to inspect the documents.   Once again, that

23   wasn't my area.

24   Q.   So that day so memorable to you, that first test, what time

25   of day did that happen?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

120

1   A.  I think we probably got out there -- this is just an

2   estimation based on the sun.  I think we got out there about

3   3:00 in the afternoon.

4   Q.  And what was the -- was there a test report written on that?

5   A.  I don't know.

6   Q.  But if there was, it would be in the test reports that you

7   published to the jury, correct?

8   A.  Not necessarily.  In fact, when I looked at the test

9   reports, I noticed that there were -- I mean, this is not a

10  comprehensive library of the test reports.  For instance, I

11  didn't see very many that had my name on it, so undoubtedly

12  there were other test reports that were available, but which

13  weren't in this particular binder right here.

14  Q.  Tens of them?  There were many test reports that aren't in

15  that binder, correct?

16  A.  I would assume so, because when there's an operation, that's

17  when the report is issued, but there would only be one report

18  per day.  So you could count up the days and try to figure out

19  how many that would be during the time we're talking about.

20  Q.  Hundreds, right?

21  A.  I would certainly think so.

22  Q.  And when you prepared for your testimony today, you didn't

23  review hundreds, did you?

24  A.  No.

25  Q.  And you did prepare for your testimony today, correct?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

121

```
 1    A.  Yes.
 2    Q.  And you prepared with counsel for Dubai World, correct?
 3    A.  Yes.
 4    Q.  And they sat down with you and they showed you documents
 5    they were going to ask you about today, right?
 6    A.  Yes.
 7    Q.  And you haven't been paid a dime to come here today?
 8    A.  No.
 9    Q.  And your flight you did just on a charity?
10    A.  It's not charity.  I wanted to set the record straight.
11    Q.  So setting the record straight.  So it's somewhere around
12    3:30, it's late afternoon, late 2004, early 2005, everybody is
13    excited, it's the first test of the Stingray, right?
14    A.  Yeah.  Yeah.
15    Q.  Thapa was excited, right?
16    A.  I was, yes.  It was a very -- it was a monumentous occasion
17    for us.
18    Q.  Who drives and how does the submersible -- the Stingray, how
19    does it get to the marina?
20    A.  It's put on a small trailer, it's taken over by a truck and
21    backed in the same way you would back in any boat.
22    Q.  It's a boat ramp, right?
23    A.  That's correct.
24    Q.  And the truck just backs it in, backs the Stingray into the
25    water, and eventually it gets deep enough where it maintains
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

122

```
1    buoyancy, then you pull the trailer out from underneath it, and
2    it just stays there right?
3    A.   Yes.
4    Q.   You probably have a line on it, right?
5    A.   Yes.
6    Q.   You drove there separately?
7    A.   I don't recall.
8    Q.   Okay.  You didn't drive with Mr. Jaubert, correct?
9    A.   I don't recall.
10   Q.   You are the -- you were head of the operations component of
11   this venture, correct?
12   A.   Correct.
13   Q.   There's an operations component, there's a production
14   component, right?
15   A.   Correct.
16   Q.   You didn't have anything to do with fiberglassing or
17   building these submersibles, did you?
18   A.   That's correct.
19   Q.   And when you talk about the Bondo, you know, do you have any
20   idea what Bondo is used for?
21   A.   Absolutely.  I've owned probably 30 cars in my lifetime,
22   sports cars, and everything else.  I've used tons of Bondo,
23   trust me, but never, never in a situation that would require any
24   sort of mechanical adhesion or anything else.  I wouldn't think
25   about it.  It's a cosmetic thing.  Not to mention using it in
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

123

1    the entertainment business for props.  So yes, I know what

2    Bondo -- I know what it looks like and smells like.

3    Q.  It's a fairing compound, right?

4    A.  That's correct.  That's what I would call it.

5    Q.  Your testimony is it's never used in the boating community,

6    correct?

7    A.  No, I didn't say that.  It's inappropriate.  It's

8    inappropriate to use it in something that's a life support

9    system.  Anything that is going to have to protect the lives of

10   somebody.  I wouldn't use it on an airplane, I certainly

11   wouldn't use it on one of these things.

12   Q.  So you never use it on a water craft that has to protect the

13   life of someone, a floating water craft, a boat?

14   A.  It's not the same thing.  When things go wrong in a

15   submersible, the consequences are immediate, and they are --

16   they can be catastrophic and fatal.

17   Q.  It's your understanding that Bondo was used on these vessels

18   as a structural component?

19   A.  Well, yes, it was part of the structure, so by definition

20   it's a structural component.

21   Q.  Or it fills, it fairs out the top of the vessel, the surface

22   of the vessel, right?

23   A.  Yeah.  That could be.  That's definitely what it was used

24   for.  I assume it was used for.  I don't know.  I never saw it

25   used.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

124

1    Q.  How many vehicles of any type have you constructed utilizing

2    a vacuum bagging system with a fiberglass or epoxy fiberglassing

3    system?

4    A.  None.

5    Q.  So when you just said that it would never be used on a

6    submersible, you don't know what you're talking about, right?

7    A.  I said it would be totally inappropriate.  I do know what

8    I'm talking about.  I'm just saying it doesn't seem appropriate.

9    A reasonable man, a reasonable person whose dealing with these

10    things, would flag the presence of this.  Would certainly ask

11    questions about it.  And you would have to do a lot of

12    convincing for me to believe that this was an appropriate use on

13    that structure.  It is structural.  It's part of the structure.

14    Q.  So let's use the analogy you used.  You would -- your

15    analogy is that instead of banging out the dent, Bondo was used,

16    right?

17    A.  I didn't say that.  I said that Bondo was used.  I didn't

18    say instead of banging out the dent.  What I'm saying is that

19    Bondo was used in these things.

20    Q.  You talked about a dent.  So in your experience, using Bondo

21    with cars?

22    A.  Yes.

23    Q.  It was to -- or whether you did it or not, your experience

24    is it was used to fill a dent in a metallic surface, correct?

25    A.  That's correct.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

125

1  Q.  Okay.  And with automobiles or with metallic surfaces, the

2  alternative is also to bang out that dent or to remove the dent,

3  correct?

4  A.  That's correct.

5  Q.  Now, in a fiberglass surface, is it your understanding that

6  you still -- you have that same option, you can bang out a dent?

7  A.  No.  But you would fill it in with structural fiberglass.

8  You would repair a fiberglass, a fiberglass void or an

9  indentation or anything else like this with fiberglass done

10  properly.  And faired into the hull.  You wouldn't use a filler.

11  Q.  Okay.  So your understanding is so you take -- your

12  understanding is in order to make this surface completely

13  smooth, you take fiberglass sheeting, right?  Is that what

14  you're saying?

15  A.  No.  In other words, you've already accelerated the point

16  you're talking about making the surface smooth.  I wasn't

17  talking about this.  I was talking about looking at this hull,

18  fiberglass hull, which I regard as a life support system, and

19  using in appropriate materials.  I used the word fairing because

20  I was trying to get the words Bondo.  Maybe people don't

21  understand what Bondo or -- or maybe they understand Calidisil

22  (ph) or fairing compound.  So what I was trying to say is the

23  use of that material, the two-part piece that is put in is

24  inappropriate on a structural piece of material that you're

25  going to use in an extreme environment.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.   That's based on your experience with fiberglassing?

2    A.   That's -- yeah, it's been based on my experience, not in

3    fiberglassing, but being around boats my entire life.  If

4    someone can show me that this not the case, I'm more than happy

5    to accept it from a scientific perspective.

6    Q.   I got away from myself a little bit there but, let's get

7    back to this afternoon in late 2004, early 2005, to test the

8    Stingray.  So you don't remember who drove, if you drove alone

9    or not, but you met Mr. Jaubert and Mr. Walsh and Thapa and the

10   submersible, the Stingray there at the marina right?

11   A.   That's correct.

12   Q.   Now, you were operations, correct?

13   A.   Yes, sir.

14   Q.   Mr. Jaubert's not operations, is he?

15   A.   No.

16   Q.   Okay.  So is it production that preps the sub for the dive?

17   A.   Is it production that -- you know, in this particular case,

18   this was so early on, this was before there were a lot of

19   systems in place.  We were getting used to it.  To use those

20   words, I think would be an inaccurate description of what was

21   going on.  We had a wet submarine, which we were taking out to

22   test in this open water situation for the first time.  The

23   leading expert in this particular field, this design, the fellow

24   who designed it and so forth was Mr. Jaubert.  He basically laid

25   down the framework for what the test would be and what would

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

127

1    happen, which was entirely reasonable.  And we were going to,

2    you know, film it, as well.  So to divide this into production,

3    I think that's -- it doesn't work in this particular situation.

4    Q.  You were the head of operations at the time of the test,

5    correct?

6    A.  Yes.

7    Q.  So wasn't it your responsibility to be -- regardless of if

8    it's the first test, the last test, the middle test, to be the

9    head of operations and make sure that sub is ready to operate?

10   A.  Well, yes, but the most important, my Number 1 job was to

11   ensure that it was done safely.  Now, at this particular point,

12   I had very, very little experience with fiberglass wet subs.

13   Nobody did.  The only one that did was Mr. Jaubert.  So the only

14   thing is that I deferred to the workability, the acceptability

15   and so forth of that particular thing to him.  And we were

16   testing a prototype.  Look, you know, it was all cleaned up,

17   certainly, but very much it was a prototype.  There's no

18   question about that.  There were lead biscuits in the bottom, it

19   was a very simplistic affair that was going on.

20        So while I agree that definitely I was in charge of

21   operation, my main concern was safety.

22   Q.  So you delegated your responsibility at head of operations

23   to Mr. Jaubert?

24   A.  Negative.  What I did was take the operations mode and take

25   responsibility for what was happening on the water, and he

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

128

1   continued to maintain his hat, so to speak, of the design of the

2   submarine.  This is what he did.

3       So are we talking about responsibility?  I was responsible

4   for everything that was happening on the water.  And what we had

5   was we had a Stingray that was launched from the site, behaving

6   properly, floating at the particular level, and we loaded -- can

7   we go to the next part of this.  We loaded Thapa up in there,

8   and things looked very good at that particular point.  He was

9   stable on top of the surface.

10      So I disagree that I delegated authority on that.  I

11  never did it.  In fact I couldn't, it would be impossible.  It's

12  not a delegation.  You cannot delegate responsibility for the

13  lives of other people.  I can't.

14  Q.  Okay.  Well, you would agree that operations set up, insured

15  that the dual tanks were in there, the 120 CC double tanks were

16  in the sub, that's operations, right?

17  A.  Absolutely.  I agree.

18  Q.  You would agree that operations was responsible to make

19  certain, not only were the two 100 CC canisters in the sub, but

20  there was also the pony tank in the sub as a tertiary, third

21  level backup, right?

22  A.  What was the second level backup?

23  Q.  Well, you got two tanks?

24  A.  So you're saying the other tank is the backup.  No, I want

25  to know -- I want to know what we're talking about.  We can't

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    talk ambiguously about this.

2    Q.   I agree.  Let's call it the secondary backup then?

3    A.   The spare air?

4    Q.   The pony tank?

5    A.   This is called the spare air.  We'll call it the pony tank,

6    if you would like, but it's a small one, so it was considered to

7    be a spare.  Of course, it was.

8    Q.   It was one of those small tanks you hold it in your hand.

9    It's got a mouthpiece, you put it in your mouth?

10   A.   Exactly.  Independent air source, the way to go.

11   Q.   Now, when you finally got -- let me step to the end first

12   and we'll work our way back because I'm dying to know the end of

13   it, everybody --

14          THE COURT:  Just ask questions.

15          MR. HESS:  Sorry, Judge.

16   BY MR. HESS:

17   Q.   When you finally got Mr. Thapa out of his horrific

18   predicament -- you were a lifeguard, right, you mentioned?

19   A.   Previously, yes.

20   Q.   So you did that cross-chest carry, you took him out off the

21   ramp, and he was drowning, so you had to give him CPR and

22   mouth-to-mouth resuscitation, right?

23   A.   No.

24   Q.   Well, he was drowning.  Didn't you say that three times he

25   was drowning right before you your eyes?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
1    A.  Yes.

2    Q.  So he was drowning.  What, did you do one of those push on

3    his belly and the water came out?

4    A.  No, I didn't.

5    Q.  He walked out of the water, didn't he?

6    A.  Yes.

7    Q.  He swam up, he walked out of the water, that's what

8    happened, right?

9    A.  That's correct.

10   Q.  There was no water in his lungs, right?

11   A.  That's correct.

12   Q.  Didn't have to be transported to the hospital?

13   A.  No.

14   Q.  He got right back into a submersible, the next test, right?

15   A.  That's right.

16   Q.  The test had just begun, right?

17           THE COURT:  Counsel, Counsel, not so much drama.  Ask

18   questions.  Okay?

19           MR. HESS:  I will.

20           THE COURT:  Please.

21           MR. HESS:  I sit here all day, and I just don't get to

22   talk.

23           THE COURT:  Ask questions.  I don't want to hear it.

24   Just ask questions.

25   BY MR. HESS:
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

131

```
 1    Q.  So the test had just begun when it took that nose dive,

 2    right?

 3    A.  Yes.

 4    Q.  There were the two 120 cubic feet each canisters at the

 5    depth of that test would last hours, right?

 6    A.  Yes.

 7    Q.  You never told the jury that?

 8    A.  No, I didn't.

 9    Q.  How is it that your responsibility to this individual,

10    watching him drown, such a horrific experience, how do you relay

11    that and not relay that incidental that he had two hours of air

12    in there?

13    A.  He had two hours of air, but it wasn't accessible.  The

14    thing had gone inverted, and the lead biscuits that were in the

15    bottom had fallen and come up and fallen into his lap.  The man

16    was upside down, and you know what Thapa did?  He held his

17    breath.  He held his breath.

18         Now, I couldn't tell that.  I was looking at a man who

19    was totally inverted, upside down, trapped by a vessel in the

20    mud and in the dark caused by the sediment coming up, and he

21    looked like he was on spare air, but it didn't look like he was

22    breathing.  As far as I was concerned he was drowning, and he

23    couldn't access the tanks that you're talking about.

24         So for all practical purposes, what good were they?  I

25    don't care if he had a thousand cubic inches down there, the
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

132

1    simple fact is, other than the bottom of spare air that he had,

2    he didn't have any other way to breath down there and he was

3    trapped.

4    Q.  So he didn't know that there was a regulator hose that was

5    available to him to utilize that entire --

6    A.  He couldn't get to it.

7    Q.  Both tanks of air?

8    A.  I'm sorry.

9    Q.  He couldn't get to it?

10   A.  Exactly.

11   Q.  Okay.  And he couldn't get to the spare air?

12   A.  No.  He had the spare air.  He had the spare air in his

13   hand.

14   Q.  He just chose not to use it?

15   A.  I want to point out, he's upside down, he's inverted, he's

16   crammed against -- I suggest that anyone of us try to do this.

17   And this is a fellow that was trained.  Thank God he didn't

18   panic.  But he was down there, and I asked him, actually, were

19   you on the spare air?

20        Remember, he's upside down.  Try to breathe upside

21   down.  Go in a closet and try to breathe upside down on one of

22   these things.  So while these things were in place upside down,

23   crammed in, lead biscuits falling on top of him, no air, and

24   it's getting dark.

25   Q.  I'm not going to challenge you on the rest.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

133

1    A.  Thank you.

2    Q.  So you're saying that people can't breathe when they're

3    upside down?  That's your understanding?

4    A.  No, I didn't say that.  I said that he wasn't breathing.

5    I'm just saying it's very, very difficult.  He had access to the

6    spare air, but the main issue -- I think we have to focus on the

7    rescue part of this whole thing.  It was necessary to turn this

8    thing over an get him out.  You know, it was closed.  It was

9    closed tight.  It was pinned from the outside and whatever.  He

10   had a lever inside that he was desperately trying to get, like

11   an ejection seat, and no matter what he did on this thing --

12   this is him relating.  Now this is hearsay.

13          MR. HESS:  Objection.  Move to strike.

14          THE COURT:  What are you moving to strike?

15          MR. HESS:  What he just relayed, I thought he was

16   saying that he saw this, but apparently this was relayed by --

17          THE COURT:  Hold on a second.

18          THE WITNESS:  Well, I --

19          THE COURT:  Hold on.  All right.  Yeah, you can't

20   repeat what other people told you.  All right?  Jury will

21   disregard that.  Ask a different question please.

22   BY MR. HESS:

23   Q.  Well, he works for you, right?

24   A.  Yes, he did.

25   Q.  You were the operations, you were responsible, right?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

134

1     A.  Yes.

2     Q.  Who -- did you not have in place you know some system that

3     said, "Hey, here's the hose, you got to grab the hose," if

4     something happens where the submersible fills with water, right?

5     A.  Well, in this particular case, as I said, we were early on

6     in this whole arrangement, and the idea of this thing flipping

7     on its back going over and sticking in the mud truly, honestly,

8     never occurred to me, and I would offer to say that probably

9     never occurred to Mr. Jaubert.  Because I'm sure he would have

10    put something in place to have it happen.  Totally unexpected

11    that way.  But the best safety diver around was next to the

12    thing, and that was me.

13    Q.  Not Mr. Jaubert?

14    A.  No.  I know he was in the area, but when this particular

15    event happened, I couldn't tell you.  This was -- a lot of

16    things happened very, very quickly.  That's for certain.

17    Q.  Okay.  But the video, you said, wouldn't show that

18    immediacy, right?

19    A.  Well, what I'm saying is that these things tend to be not

20    that very dramatic.  In other words it shows the nose up, it

21    goes down, it sticks in the mud, and the camera is thrown away,

22    as we tend to extricate him.

23    Q.  So you're saying the video really doesn't reveal what

24    happened, it's your words revealing what happened?

25    A.  It's me sitting next to this thing looking at him, seeing

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

135

1      him struggle.

2      Q.  So you could see him struggle?

3      A.  Absolutely.  Truthfully, it would be a lot better if I

4      couldn't see what was going on in there, because I really didn't

5      know.  But I saw him inverted, saw him up in there, saw him

6      thrashing up in there trying to get ahold of the release

7      mechanism.  I could see this stuff going on.

8          We actually work through many of these things, so I had

9      a certain basis on which to estimate what was perhaps happening

10     in that bubble, but nevertheless, what I saw was an inverted

11     man, as I said before, upside down, stuck in there struggling,

12     and he held his breath.

13     Q.  So you did have, up until that time, even though this is the

14     first test, I heard you just say you did have the opportunity

15     and did address these type of circumstances.

16     A.  Well, what we addressed is we -- not the vessel going

17     inverted like this.  But we would address the issue of spare

18     air, the issue of having -- I mean, basically if you want to

19     look at the three systems you're talking about, there's the air

20     that's provided to the bubble, there was the air provided on the

21     regulator, and the spare air.  So we effectively had, in a

22     way -- I'm trying to think of what the spare chute on a

23     parachute pack is, but in any case.

24     Q.  The reserve?

25     A.  Thank you.  Effectively we had two backups, and we had

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

136

1   actually, prior to that, you know, worked with all the rest of

2   the controls.  Actually, work in there, worked out the

3   checklists and all that stuff before we got there.

4   Q.  Do you skydive?

5   A.  Yes, sir.

6   Q.  So you know so when you're trained to skydive, you ever

7   skydive back in the old days where you had that parachute where

8   you had to put on your belly?

9   A.  No.  Did anyone?

10  Q.  Anyway, when you jump out of a plane, you don't -- you're

11  not trained to expect things that can go wrong, particularly,

12  you're trained to deal with not having a parachute over your

13  head, right?

14  A.  No, you're trained to do exactly what you said.  You're

15  trained for all of the things that could go wrong.  All of the

16  malfunctions.  You train again and again.  That's what you do.

17  You train on the 15, the 20 to 30 different ways, and that's

18  why -- I thought that's why I felt this incident was so valuable

19  to even the future of the company, because we had something bad

20  happen right away that nobody expected.  Who expected this thing

21  to flip over on its head and go down?  Nobody.

22  Q.  So you didn't train him for all these unexpected things?

23  A.  How can you train him for something you don't know about.

24  Q.  Who was it that was responsible to put the ballast in the

25  submersible?  Who calibrated the ballast?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

137

1    A.  Mr. Jaubert.

2    Q.  Oh, Mr. Jaubert is the operations guy now?

3    A.  No.  He's the designer of this prototype.  I think this

4    issue of segregating the departments is a real stretch here.  We

5    have the fellow that designed a totally unique thing, this

6    Stingray with the ballast tanks, and was out there field testing

7    this.  This was a prototype and the first one on the outside.

8    We didn't have a massive organization, we had a number of people

9    who were very interested in seeing this be successful, and

10   that's what happened.

11   Q.  So Mr. Jaubert said to you, you were the -- he said,

12   "Mr. Miller, don't worry about the ballast."  You did know that

13   the submarines had a ballast, right?

14   A.  Oh, yes.

15   Q.  You did understand the principal that if the ballast is too

16   far forward in the sub, what would that cause?

17   A.  I would assume that if the ballast was forward of center,

18   that the nose would go down.

19   Q.  And you concluded after this event that the ballast was too

20   far forward from center, correct?

21   A.  No.

22   Q.  Okay.

23   A.  As far as I could tell what occurred was a shifting of the

24   ballast.

25   Q.  Could you tell that?  You could see through the hull?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

138

1    A.  Of course not.  That's what I'm trying to say, the after

2    action report for this whole thing is kind of like an NTSB

3    report.  Airplane goes down, the press comes out the next day,

4    and people say it was this and that and so forth.  Six months

5    later you find out it was something mechanical.  These things

6    are not to be trifled with, but is evidence through my eyes and

7    the video that was taken is that she didn't nose up.  And my

8    impression is that the ballast shifted.

9         There were these ingots, I forgot what they call them,

10   but they're lead biscuits, and the thing is that they were in

11   the bottom.  And so my feeling is that one way or the other --

12   now remember, this is one person in this thing.  I'm sure that

13   at that particular point, that Thapa himself could have moved in

14   a certain way and perhaps shifted the balance, but the actual

15   cause of this --

16   Q.  I'm sorry?

17   A.  No problem.  I wanted to make sure.

18   Q.  It's not for me, it's for the jury?

19   A.  Okay.

20        MR. HESS:  Sorry, Judge.

21        THE COURT:  I kind of thought you might want to listen.

22        MR. HESS:  I am listening.  I'm just trying to make

23   things keep moving, and I just --

24        THE COURT:  I still think you probably ought to listen.

25        THE WITNESS:  Anyway, as I was saying was the actual

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

139

1   cause of what occurred on that particular event, I can tell you

2   with certainly what it was.  It would take a full investigation,

3   it would be imprudent and naive to make that kind of claim and I

4   wouldn't.

5   BY MR. HESS:

6   Q.  So we should look at the after action report for this

7   incident?

8   A.  Right.

9   Q.  And where is it?

10  A.  I have no idea.  I don't know that one was produced.

11  Q.  And it wouldn't be operations that would be responsible?

12  A.  You're back to this operations thing again.  As I said, this

13  was a prototype.  Mr. Jaubert was conducting this.  We were

14  learning this game, and that's the way it was.  We were learning

15  how to use his devices that he had built, and this was part of a

16  learning process.  And I just keep referring to this not as a

17  point of trauma for me, but as a wakeup call again that these

18  things can happen.  This is something we had not planned on.

19  It's like flying in an airplane and going out and having it

20  inadvertently spin.  It's supposed to be stable, and submarines,

21  like airplanes, should have a certain level of inherent

22  stability involved in them.

23  Q.  Did you -- prior to that test, did you become acquainted

24  with the ballasting of the submersible or the Stingray prior to

25  the test?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

140

1   A.  Yes.  I became acquainted with it just like Mr. Jaubert did

2   and Thapa.

3   Q.  I'm saying so your testimony is Mr. Jaubert knew how the

4   ballast was applied in that vessel before that test was

5   conducted?  Is that your testimony?

6   A.  That's what I assumed.  That's what I'm assuming now.

7   Q.  Just as Mr. Jaubert was responsible and should know and

8   what -- and was the one that would ensure that the air tanks

9   were full in the vessel?

10  A.  No, not in that case.  That would not have been his

11  responsibility, but the trim of the boat, whatever that was

12  being done, this was a role that he played.  He was always

13  looking at it, he was taking measurement down and so forth.  He

14  was the designer.  It's rare that you actually have the designer

15  of the airplane, the boat, or anything else with you when you're

16  actually testing these things.  That was his role, that was his

17  job.

18  Q.  In any event, you never participated in the preparation of,

19  as you put it, an after action report for this incident?

20  A.  Correct.

21  Q.  As horrendous as it was?

22  A.  Correct.

23  Q.  Now, you also mention you're not sure how deep that water

24  was, are you?

25  A.  I think it was 15'.  It would be very easy, I just can't

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

141

1    recall precisely.

2    Q.  I thought you said 30'?

3    A.  I did originally.  I also corrected it to say 15'.  The

4    thing is, in the harbors around Dubai, they're pretty much all

5    the same depth, so I would say 15 at this particular point.

6    Q.  Your testimony is it's 15', it was about 10' from the ramp?

7    A.  You said that, I never said that.  It was far enough away

8    from the ramp that the ramp was not visible, and we were not

9    dealing with the ramp.  We were out far enough.  There was tidal

10   flow.  We have things called tides even in Dubai, and the thing

11   is, I recall the tide as being relatively high that day, but

12   nevertheless, it was out at a point where the craft would not

13   come down on the ramp, so it was far enough out there that when

14   the test began and when the problems occurred, we were not -- it

15   was not a -- wading in on the test ramp or something else like

16   that.  We were in the water already, and we were also at the

17   point where the silt and so forth was.  It wasn't part of the

18   hard ramp.

19   Q.  You were about 10, 15' away from the bottom of the ramp,

20   right?

21   A.  I have no idea.

22   Q.  Well, you said that Mr. Walsh was -- he was there

23   participating in the test.  He was watching it, right?

24   A.  Yes.

25   Q.  And he was there at the -- well, even further ashore than

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

142

1    the bottom of the ramp?

2    A.  I never stated the distance he was.  He was up on shore, and

3    I'm on the water.  These things are not easily estimated,

4    especially as the sun starts to move down.  We can ascertain

5    this very easily.

6    Q.  We should presume that he was close enough to observe the

7    test if he was participating in it?

8    A.  He was exactly.  Plus, the test involved a descent under

9    water, at which point the only ones that could see it would be

10   divers like myself and Falk and Thapa of course.

11   Q.  And Falk, the photographer, the videographer?

12   A.  Yes.

13   Q.  Where is the video?

14   A.  Where is the video of this thing?  I imagine we have it in

15   the record.  We can find it.

16   Q.  Can you?

17   A.  I would assume so.

18   Q.  Because we don't have it.

19   A.  Well --

20       THE COURT:  Are you testifying now, Counsel?

21       MR. HESS:  Sorry, Judge.

22   BY MR. HESS:

23   Q.  Your testimony is, though, that when the videographer

24   dropped his camera, he retrieved it?

25   A.  Yes.  It's a very expensive camera.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

143

1    Q.  I'm not blaming him.

2    A.  Yeah.

3    Q.  And you actually watched the video?

4    A.  I've seen this video, yes.

5    Q.  Because you relayed earlier that it doesn't have the

6    dramatic nature?

7    A.  Yes, the video exists.  The video exists somewhere.

8           THE COURT:  Or existed.

9           THE WITNESS:  Correct.

10          THE COURT:  You don't know where it is now?

11          THE WITNESS:  That's correct.

12   BY MR. HESS:

13   Q.  Now, when you mentioned the water temperature, you said

14   there's high salinity in the water surrounding the Dubai -- well

15   the entire area has high salinity, correct?

16   A.  It has higher salinity than the rest of the ocean, yes.

17   It's marginally higher, yes.

18   Q.  Marginally higher?

19   A.  Well, it's a percentage.

20   Q.  Do you know the percentage?

21   A.  I should, but I can't recall right now.  I think it was 11

22   percent or something like that.  We used to actually take the

23   salinity measurements, but at this time of the day, I can't

24   quite remember.

25   Q.  So it's something that may come back to you again?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

144

1    A.   It's something I would get on my iPad and just sum it up.

2    Q.   So 11 percent, it's significantly higher than the salinity

3    in California, correct, in the open ocean?

4    A.   Significantly higher?  That's a judgment call.  It's higher.

5    I mean, look, you know it's higher.

6    Q.   Now, you also mentioned that the temperature was high.  You

7    said it felt like 80 degrees.  You're not talking 80 degrees

8    Fahrenheit?

9    A.   Yes.

10   Q.   So your testimony is the water there --

11   A.   I didn't testify to that.  I said the temperature we were

12   dealing with was that.  Let's just take a look at the hydro

13   charts and the temperatures, and we can answer your question

14   very easily.

15   Q.   The water was quite warm, right?

16   A.   It was warm.

17   Q.   Warmer than 80 degrees?

18   A.   What day are we talking about?  Are we still back on this

19   particular, day or are we talking about general?

20   Q.   Yes, let's talk on that day.

21   A.   Well, I truthfully don't recall.  I mean, I was wearing a

22   wet suit.

23         MR. HESS:  Withdrawn, Judge, withdrawn.

24         THE WITNESS:  I was wearing a wet suit.

25   BY MR. HESS:

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

145

1    Q.  Did you talk -- well, when you operated the submersibles, it

2    would get warm in the submersibles when they were under the

3    water for any period of time, correct?

4    A.  Absolutely.

5    Q.  Because of the -- and you would agree that the reason they

6    got warm is because the outside of the water temperature didn't

7    permit them for the vessel to be cool inside, correct?

8    A.  No.  I would say the air inside an ambient pressure

9    submarine is compressed, and when you compress air, you get

10   heat.  That's what happens.  Doesn't happen in a one atmosphere,

11   but happens in these.

12   Q.  So your testimony is that a one atmosphere sub, the reason

13   the temperature is not warm has nothing to do with the outside

14   ambient temperature of the water, or the fact that the air

15   inside of a one atmosphere sub is purified, conditioned, and

16   actually probably cooled, humidified or heated, depending on the

17   circumstance, right?

18   A.  You're drawing a correlation that I didn't remotely even

19   talk about.  What I was saying was that you were talking about

20   those things that contribute to the air temperature inside.

21   What I'm saying is that you're compressing the air.

22           Of course, in any situation, in any system, you deal

23   with the ambient temperature.  Okay.  The ambient temperature of

24   the water in this particular case, then we add to it the effects

25   of compression.  That's all I'm saying.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

146

1    Q.  You never did any calculation to determine what role which

2    one had the more significant effect, did you, or calculate?

3    A.  Wasn't mine -- no, it wasn't my job.  That would be

4    something Mr. Jaubert would take care of.

5    Q.  So when you're testifying that the compressed air inside of

6    the submersible caused the temperature inside to be higher, you

7    don't know how much higher?

8    A.  That's correct.

9    Q.  It could be a 10th of a degree, or it could be whatever,

10   right?

11   A.  Sure, by the empirical evidence.  In other words, if you

12   relate -- look, I just have to go with the experience of my

13   diving out in the area there.  You don't get much of a thermal

14   difference.  At 20 meters, at 60', many times it's the same

15   temperature as it is at 30', so I'm assuming that the water

16   temperature, whatever it is, is at a baseline.  When the

17   temperature starts to really climb in the submarines as we

18   descend, I would make what I consider to be a normal

19   extrapolation that's due to the fact that we're compressing the

20   air in there.

21          And the opposite happens, as we would rise up, the air

22   would expand and the interior of the submarine would cool and

23   form a cloud.  Just the same way dew works.  So this is physics

24   at work.  Your average high school physics student gets this

25   right away.

147

1    Q.  Thank you.  Sanil Subair, he wasn't -- he's not a naval

2    engineer, is he?

3    A.  No.

4    Q.  He's had no training, got no background --

5    A.  He's dead.  He's not here, so let's not talk about him like

6    he's here.  But no, he was a civil engineer building buildings

7    was his trade.

8    Q.  When did he die?  Do you recall?

9    A.  Oh, absolutely.  14 June 2005.

10   Q.  So we won't be hearing from Mr. Sanil Subair?

11   A.  I hope not.

12         THE COURT:  What in the world does that mean?  What is

13   that comment, Counsel?  You have a reason for saying that?

14   That's rude.  At least it's rude.

15         MR. HESS:  I didn't mean it rude, Judge.

16         THE COURT:  Well, sure sounded rude.  Please refrain

17   from extraneus comment, then maybe you can avoid the rude ones

18   too.

19         MR. HESS:  I will, Judge.

20   BY MR. HESS:

21   Q.  Now, you testified to payments being made by -- before I get

22   to that, let's talk about the blue submarine, the French sub,

23   the one that was in France?

24   A.  Correct.

25   Q.  Now, aside from seeing the sub when it got back to -- I

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

148

1    guess, to the Exomos facility?

2    A.   Yes.

3    Q.   Aside from that, everything else in terms of that vessel,

4    you have no personal knowledge of, correct?  You weren't there

5    when it was repaired or not repaired, you weren't there, as you

6    said, when it sank twice, correct?

7    A.   That's correct.  I was not there.

8    Q.   And so you don't know what really -- you don't know what

9    happened?

10   A.   I only know what I was told.

11   Q.   And it was Mr. Rodig that was actually there in France,

12   correct?

13   A.   That's correct.

14   Q.   You also mentioned on your -- I'm sorry.  I don't mean to

15   distract you with that.  You mentioned on your examination that

16   the -- that Mr. Jaubert, he was the client, and you analogized

17   him to be the client in building this facility, the Exomos

18   facility, correct?

19   A.   Yes.

20   Q.   And you analogized his request for the vacuum infusion

21   system to a restaurateur wanting to have drains in his

22   restaurant, right?

23   A.   I was trying to create an example of what that represented,

24   yes.

25   Q.   Do you know what the vacuum infusion system entails?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

149

1    A.   I'm aware of it.  I've seen it in operation, I've seen it at

2    Exomos, and I've seen it -- I've had it explained to me.

3    Q.   It's not a floor drain, is it?

4    A.   No, it isn't.

5    Q.   It's actually a sophisticated mechanical and technological

6    device system?

7    A.   I don't consider it to be sophisticated, I consider it to be

8    a vacuum system that has a large plate with holes in it and a

9    way to evacuate the air.  In my world, it's not sophisticated,

10   but I do understand what's involved and the pressures involved.

11   Yes, it's not a floor drain, but it's not a piece of exotic

12   equipment, either.

13   Q.   It's not a computer?

14   A.   Right, exactly.  Good point.

15   Q.   It is -- you would agree, if you know, it is the best way to

16   facilitate a hull of fiberglass with the most integrity and the

17   least voids?

18   A.   Agreed.  Does a great job.

19   Q.   And that was the device that you were speaking of earlier

20   that Mr. Jaubert insisted on having or wanted to have in the

21   facility?

22   A.   No the reference to, that was just simply that this was an

23   e-mail between Sanil and Mr. Jaubert that had to do with

24   requirements, additional requirements, much like saying I need a

25   compressor located at this location, or I need to make sure that

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    we have ways to get dust out.  All I'm saying is these sorts of

2    needs were brought up.

3         Look, I was there during this whole process, including

4    when the original drawings were made based on the Seahorse

5    manufacturing facility.  And we also toured other places in

6    Dubai, including the Victory place called Victory Boats where

7    they build high-speed racing boats and so forth.  So I was there

8    during this particular process.  There's no mystery to it.

9         So the point of that e-mail was just simply to show

10   that while Mr. Jaubert was in Florida, he was sending over what

11   his needs were, and Sanil was doing that and then more so.  He

12   was taking it to the next level.

13   Q.  Thank you.

14        MR. HESS:  If you would give me just one moment, Judge?

15        THE COURT:  Sure.

16        MR. HESS:  Thank you.

17   BY MR. HESS:

18   Q.  You would agree that when Mr. Jaubert arrived in Dubai, his

19   obligations to the company -- well, his obligations to

20   Sultan Bin Sulayem extended beyond the building of submersibles,

21   correct?

22   A.  I wouldn't characterize that as an obligation.  I would

23   characterize as an opportunity.  He was brought over to bill

24   these submarines and so forth, but he was a very creative guy,

25   and he was interested in anything new.

151

1    Q.  Mr. Jaubert was?

2    A.  Correct.

3    Q.  And maybe I did mis-phrase that.  In any event, what I'm

4    suggesting is -- what I'm asking you is Mr. Jaubert took upon

5    himself responsibilities other than the completion and the

6    production of submarines, correct?

7    A.  Well, you'd have to ask him that.

8    Q.  Well, aren't you aware of the fact that he -- you know, he

9    designed air powered boats?

10   A.  Yes.

11   Q.  At the request of Sultan, correct?

12   A.  I'm aware that he designed the boats and so forth, but I

13   wasn't privy to the communication between these fellows.  And

14   sometimes I would show up and there were whole projects underway

15   that I had no idea.  For instance, the Nautilus.  I was totally

16   shocked.

17   Q.  So you never knew about the Nautilus situation?

18   A.  Situation, what do you mean?  I didn't have any idea this

19   thing was ongoing.  I felt -- I was amazed.

20   Q.  I thought you said that you practically lived at the

21   facility?

22   A.  Yes, that's right, until the time we're talking about.

23   Nautilus occurred during 2005.  Sanil, who I'll also say was my

24   best friend at that particular time, the 18 months we were

25   together and involve in this project, he passed away on the

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

152

1    14th.  He was at the factory on the 13th in the afternoon just

2    before, and we were talking about the Adventurer, and we were

3    talking about how it was going to have to be reworked, and the

4    next day he passed away due to a heart condition.

5         But this thing with the Nautilus, a lot of these things

6    happened after that.  I then started doing travels in support of

7    sales an Indonesian deal, but nevertheless, I wasn't there at

8    the factory all the time because the priority shifted.

9         It was necessary to get some sort of cash flow to sell

10   something -- to make something work and to sell it, so it was no

11   longer necessary for me to be out there in the submarines

12   getting calls.  It was necessary for me -- this is the way I

13   took it.  No one gave me this mandate to focus on the most

14   urgent need of the company.  And to me, that was getting some --

15   you know, getting some sales and cash flow through here.

16   Q.  I understand.  I didn't understand that.  I understand.  So

17   you weren't there -- so you weren't there for significant

18   periods of time?

19   A.  Correct.

20   Q.  And how long -- do you have any idea how long it took to

21   compose and to build that, the Nautilus?

22   A.  No, I don't.

23   Q.  Who else saw the video of that first incident?  Do you know?

24   A.  I have no idea.  I imagine Falk saw it because he shot it,

25   and I saw it because Falk shot it.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.  Before I get into some documents, let me just ask you a

2    couple questions.  You said that you expected that these

3    vessels, I believe it was the -- correct me if I'm wrong, I

4    believe it was the Goby you were talking about, that you

5    expected them to have a central processing unit like on an

6    advanced helicopter?

7    A.  What I expected it to have was what we paid for, which was

8    an auto hovering system.  That can be made out of Swiss cheese

9    if it worked, I really didn't care, but the thing is that's what

10   we paid for, that's what we expected and in those words, you

11   contain the entire purpose and function of that particular

12   add-on to the submarine.

13   Q.  But you were never promised, by Mr. Jaubert, saw anything in

14   the materials that led you to expect there would be a CPU like

15   on an advanced helicopter?

16   A.  No.  I was trying to make something analogous for people.

17   Q.  How many marketing -- these marketing videos that you

18   produced for Exomos, is that accurate?  You produced them?  I

19   don't want to -- is that something that you did?

20   A.  Yes.

21   Q.  Okay.  How many did you produce?

22   A.  I don't know the exact number.  I would -- in looking back

23   on especially the first year an and a half, I would say

24   something on the order of maybe ten.  Ten short clips that

25   showed the particular virtues of one or more of the submarines.

154

```
1    Q.  Well, they only showed one particular virtue, all the good
2    stuff, right?
3    A.  Well, of course.  But within each submarine, you show the
4    benefits.  I mean, you're breaking it down a little bit further
5    in marketing speak.  There were a number of benefits, including
6    going underwater and being able to transport yourself.  And the
7    beauty of the underwater world and the coolness of having
8    something that looks like this especially appealed to males, so
9    that's what I mean.  Virtues and benefits.
10   Q.  And you didn't perceive that to be misleading?
11   A.  No.  I believe that we were going to take that form and make
12   it work and eliminate the rest of these difficulties.  That
13   hatches could be handled that -- continuing to work on the
14   discrepancies that we would ultimately end up with something
15   that was both safe and reliable.  I believed that.
16   Q.  And as to the Goby, you testified that you were 100 percent
17   sure before it was transferred to Dubai that it was fully
18   operational?  That's your testimony?
19   A.  I believed it, yes.  Well, no, what I'm saying, I'm sorry.
20   Let's step back a second.  We were referring to e-mails that
21   were happening at various points, and counsel pointed out these
22   e-mails at those specific dates and at those particular times
23   when I was a bit -- I understood less about what exactly was
24   going on.  Yes, that's what I believed.  I believed that's what
25   we were going to get.  We were going to get out, get trained,
```

1    and put these things out into the water.

2    Q.  I guess what I'm asking, what is the date that you believed

3    that?  Did it change?

4    A.  Well, we'd have to go back to the specific e-mails that

5    counsel was showing me, and at those particular -- these were

6    before they were actually delivered out there, so at that

7    particular point, I was accepting the word of Mr. Jaubert based

8    on those particular documents.  In other words, we have a

9    professional manufacturer of certifiable boats and so forth, so

10   I accepted that.  There was no reason to believe otherwise at

11   that point.

12   Q.  The Adventurer, you did realize that it wasn't a new

13   vehicle, correct?

14   A.  That's correct.

15   Q.  It was a used submarine, right?

16   A.  Yes.

17   Q.  You knew it?

18   A.  Absolutely, 100 percent.  I understood that.

19   Q.  And the distinction, obviously, between new and used is like

20   buying a used car, right?  Same thing of -- thing in an analogy?

21   A.  I would say that's fairly close except that in the case --

22   well, let's go over to the Goby we were buying that, that was

23   being refurbished, and here we had a factory and we were able to

24   refurbish the Adventurer.  And why?  Because every time we asked

25   how long would it take to make a new Adventurer, it was always

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   six months, six months.  So we took and used what we had.

2   Q.  Did you have discussions with Mr. Jaubert about the -- well,

3   you mentioned the failure of the ball valve.  Did you talk to

4   Mr. Jaubert about what caused those failures or that failure,

5   that item of failure?

6   A.  I'm sure I did.

7   Q.  Do you recall what caused them?

8   A.  I don't actually recall.  I recall -- no, I can't actually

9   pinpoint one particular thing, except that it didn't seat

10  correctly.  It wasn't in the right place, or something had

11  jammed in it, but I truthfully can't recall.  This is a number

12  of years ago, but there was some -- the answer to the question

13  was that it wasn't seating properly.

14  Q.  Okay.

15          MR. HESS:  Judge, we're not using our system, so I had

16  to scramble over the lunch to get this in and --

17          THE COURT:  Not complaining yet.

18          MR. HESS:  I understand, Judge.  If the Court would

19  permit me a moment just to give opposing counsel the notice of

20  the which documents I intend to use?

21          MR. CEDERBERG:  Your Honor, I believe 598 is in

22  evidence.

23          MR. HESS:  That one is, but let's start with this one.

24  Mr. Miller, can you see that document?

25          THE WITNESS:  Yes, I can.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

 1              MR. HESS:  Judge, I'm sorry.  Could I have a moment

 2    just to take care of an electronical situation?  I think my

 3    partner's got it going.

 4              THE COURT:  Go ahead.

 5    BY MR. HESS:

 6    Q.  So is this your first -- I think you talk about it a little

 7    bit, your first communications with Mr. Jaubert?

 8    A.  No, it's not the first one.

 9    Q.  Among the first?

10    A.  Yes.

11    Q.  Okay.  And how did you know, because you had seen the

12    Discovery already in Stuart, correct?

13    A.  This was still based on the website.  I suppose the hull

14    must have been out in the yard, yes.

15    Q.  Okay.  So this set up that meeting on December 15th?

16    A.  Right.

17    Q.  Okay.

18    A.  15 December, correct.

19              THE COURT:  Maybe I'm confused.  Are you saying before

20    that letter went out you had been in Stuart and looked in the

21    yard?  Or are you saying that that letter was to set up your

22    initial meeting?

23              THE WITNESS:  This was to set up the initial meeting.

24              THE COURT:  Okay.  So what were you talking about when

25    you said that you might have seen something in the yard?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1        THE WITNESS:  It's a valid question, Judge.  If we

2   hadn't had the meeting, we wouldn't have been able to see it

3   so --

4        THE COURT:  All right.  I just thought I was confused.

5   Apparently you were.

6        THE WITNESS:  No, I was the one confused.  You're

7   correct.  I was still going off the website information.

8        MR. HESS:  Judge, I'm sorry, but I'm going to have

9   to -- if I could ask for 5, 10 minutes, I'm going to go through

10  this list, just, the computer is giving me --

11       THE COURT:  Just go, we're not going anywhere.  Go, do

12  your thing.  If you all would like to take a few minute to go in

13  the jury room, if you don't -- just sit tight, maybe it won't

14  take ten minutes.

15       (Brief recess)

16       THE COURT:  I'll tell you what, let's break for the

17  day.  You guys work this out, figure out how you're going to do

18  this, and get it ready to go in the morning.  We are wasting too

19  much jurors' time.  I think these people have better things to

20  do.  Actually almost anything they could do is better than this.

21       And I apologize to you.  These are matters that are

22  sometimes beyond our control.  It isn't necessarily their fault,

23  just sometimes Sony won't work where Dell works, and I don't

24  know.  I don't understand it myself, and fortunately I have

25  people that do that.  They apparently are the people.  And

1    they're not doing it.

2         So we'll have to leave now.  Let me find my -- I had a

3    jury that told me once that I didn't tell them this.  I tell

4    them every time.  Ladies and gentlemen of the jury, you're

5    reminded that you're not to discuss the case with anyone or

6    permit anyone to discuss it with you.  Until you retire to the

7    jury room at the end of the case to deliberate on your verdict,

8    you're simply not to talk about this case.

9         Also remember, you're not to read or listen to anything

10   touching on this case in any way.  I presume that none of you

11   got anything that was -- you were exposed to anything last night

12   that had anything to do with this case.  Keep it up.  Let me

13   know if there's something that comes to your attention, bring it

14   to my attention immediately so we can deal with it.

15        Keep in mind you must not do any research or make any

16   investigation about the case on your own.  The only evidence in

17   this case is the testimony of the witnesses you hear in court

18   and the evidence that is introduced during the official

19   proceedings in the courtroom.

20        Finally, remember, you must not form any opinion about

21   this case until all the evidence is in.  You're required to keep

22   an open mind until you start your deliberations on this case.

23   If you see the lawyers or people that you know have anything to

24   do with this case, they're not being rude to you, they're

25   following instructions.

1    Thank you very much, and we'll start at 9:30 tomorrow

2    morning.  Now, tomorrow I have two sentencings that are at 1:30

3    an quarter of 2:00, I'm going to try to have it at 1:30, and I

4    quarter of 2:00, so we'll break late for lunch.  I'm going to

5    try to keep your dead time as limited as possible.  I will do my

6    best, an we'll see what we can get done tomorrow.  Okay?

7    Thank you very much.  You're excused.  I just didn't

8    see any sense in keeping you there to sit there, so go.

9    JUROR:  Thank you.

10   THE COURT:  Thank you, sir.

11   (Jury out at 4:25 p.m.)

12   THE COURT:  All right.  We'll be in recess until 9:30.

13   Anything else we can talk about now?

14   MR. CEDERBERG:  One thing, Your Honor, and that is how

15   does the court -- if we do have dead time come up, we could read

16   depositions, and we have depositions.

17   THE COURT:  Have them ready to go.

18   MR. CEDERBERG:  The Court will just rule on all the

19   objections as we go along?

20   THE COURT:  If you tell me you're going to read them,

21   maybe tomorrow we can start dealing with them, or I can start

22   dealing with them now.  I don't care.

23   You're excused, sir.  You can't discuss your testimony

24   with anybody, okay?

25   THE WITNESS:  Yes.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

461

```
 1          THE COURT:  All right.  Thank you.  You can talk about
 2     them now, if you want to bring them up, then we'll have them
 3     ready to go, but I thought you might need the time to get your
 4     act together.
 5          MR. CEDERBERG:  We do, but for planning for the future
 6     so I can fill any dead time.
 7          THE COURT:  As soon as we can, if you have -- if you
 8     can resolve your issues by dealing with the objections and you
 9     think the objections are well taken and you can deal with them,
10     that's fine.  If you can't, then you bring to me whatever is in
11     dispute, tell me what the proposal is, what the objection is,
12     and I'll deal with it.  All right?
13          MR. CEDERBERG:  Thank you, Your Honor.
14          THE COURT:  Okay.  Anything else we need to talk about
15     today?
16          MR. HESS:  Yes, Judge.  There's a pending motion
17     regarding the use of or the unnecessariness of the use --
18     there's a pending motion as to expert testimony Dubai World.
19     I'm trying -- I spoke with Mr. Mullins yesterday, and I think we
20     got close to resolving it.  I just continue to ask for
21     extensions.  Could we have that discussed with Your Honor,
22     resolved by Your Honor live tomorrow or the next day in terms of
23     timing.
24          THE COURT:  I don't have any idea what you're talking
25     about.  Talk to me in English, tell me exactly what you want.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1           MR. HESS:  Yes, Judge.  There's a pending motion that

2     was filed by Dubai World in terms of how they're going to

3     present the testimony of their Dubai law expert.  In large part

4     that testimony -- I don't think I'm overstating this is -- dealt

5     with issues that Your Honor resolved by the summary judgment.

6           THE COURT:  So you're asking them if they're pushing

7     that?

8           MR. HESS:  What they need or how much time.  What they

9     want to come in is going to bear on how easy it's going to be.

10          THE COURT:  Can you please give them an idea tomorrow

11    of how much you still want to offer from that expert?  I don't

12    know what the extent of what's been decided or not.

13          MR. CEDERBERG:  I think it would be safe to say that he

14    shouldn't plan an opposition to that until I alert him that in a

15    day or so it would come up.  He doesn't need to spend his time

16    doing it.

17          THE COURT:  Don't waste your time yet.  You have more

18    things to deal with.

19          MR. CEDERBERG:  One more thing, Your Honor, that might

20    speed things up.  The Court's order only allowed two computers.

21          THE COURT:  I think that's all you asked me for.

22          MR. HESS:  We each asked for one.  If we have a

23    monitor, we won't have this.

24          MR. CEDERBERG:  If we had a monitor.

25          THE COURT:  That's fine, you can have a monitor.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
1              MS. HEATHCOCK:  Keyboard, mouse?

2              THE COURT:  Yeah, you can have a keyboard and a

3      monitor.  You can bring one more computer in for each side.  Is

4      that what you need?

5              MR. HESS:  Yes, Judge.

6              THE COURT:  One more computer for each side.  Okay.

7      What else?  That's all you need?

8              MR. CEDERBERG:  For now that's plenty.

9              THE COURT:  No surfing on the internet, no Monopoly or

10     Solitaire or Hearts, none of the above, okay?  I'm doing that.

11     I'm the one that's doing that, okay?  All right.

12              (See Volume 5, page 465 for continuation)
                         * * * * *
13                      C E R T I F I C A T E
14     I certify that the foregoing is a correct transcript from the
       record of proceedings in the above-entitled matter.
15

16

17     _____           /s/ Dawn M. Whitmarsh
       Date                       DAWN M. WHITMARSH, RPR
18

19                        I N D E X

20                        WITNESSES

21     For Plaintiffs:                                Page

22     James Miller
         Continued Direct Examination by Mr. Cederberg      359:20
23       Cross-Examination by Mr. Hess                       412:18

24                         EXHIBITS
25
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   219
      In Evidence                                              404:3
2
      384
3       In Evidence                                            401:20

4     402
        In Evidence                                            361:15
5
      614
6       In Evidence                                            369:3

7     626
        In Evidence                                            380:3
8

9   30, 322, 333, 338, 339, 342, 347, 349, 352, 353, 357, 326, 367,

10  355, 358, 361, 363, 364, 365, 372, 373, 378, 44, 50, 34, 35, 37,

11  38, 39, 29, 334, 335, 337, 341, 345, 378, 350, 354, 359, 362,

12  366, 369, 375, 45, 54, 55, 379, 380 and 62

13  In Evidence                                                386:14

14

15

16

17

18

19

20

21

22

23

24

25

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**