465

1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                        FORT PIERCE DIVISION
                      CASE NO.   09-14314-CV-JEM
3

4

5

6    DUBAI WORLD CORPORATION, and its
     Subsidiaries, EXOMOS, NAKHEEL and
7    PALM MARINE,

8                    Plaintiffs,

9         vs.

10                                       Fort Pierce, Florida
                                         February 16, 2011
11   HERVE JAUBERT, SEAHORSE
     SUBMARINES INTERNATIONAL
12   INCORPORATED, and Does 1-99,

13                   Defendants.
     _____

14

15

16                   TRANSCRIPT OF JURY TRIAL
                     VOLUME 5 - PAGE 465-577
17          BEFORE THE HONORABLE JOSE E. MARTINEZ
                     UNITED STATES DISTRICT JUDGE

18

19

20

21

22

23   REPORTED BY:        DAWN M. WHITMARSH, RPR
                         Official Court Reporter
                         400 N. Miami Avenue, 10S03
24                       Miami, Florida  33128
                         Telephone:  305-523-5598
25


                PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                     TRANSCRIPT PRODUCED BY COMPUTER

1    **APPEARANCES:**

2    **FOR THE PLAINTIFFS:**

                        *Quinn, Emanuel, Urquhart & Sullivan, LLP*

3                  **BY: JON C. CEDERBERG, ESQ.**

                  **BY:  A. WILLIAM URQUHART, ESQ.**

4                  865 South Figueroa Street

                  10th Floor

5                  Los Angeles, CA  90017

6                  *Astigarraga, Davis, Mullins & Grossman*

                  **BY:  EDWARD MULLINS, ESQ.**

7                  701 Brickell Avenue

                  16th Floor

8                  Miami, Florida 33131

9

    **FOR THE DEFENDANTS:**

10                 *Hess & Heathcock, PA*

                  **BY:  WILLIAM HESS, ESQ.**

11                 **BY:  KATHRYN A. HEATHCOCK, ESQ.**

                  40 Southeast Osceola Street

12                 Stuart,  Florida 34994

13

14

15

16

17

18

19

20

21

22

23

24

25

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

467

```
 1                    P-R-O-C-E-E-D-I-N-G-S

 2           COURTROOM DEPUTY:  Calling case number 09-14314-civil,

 3    Dubai World Corporation versus Herve Jaubert.  Counsel, please

 4    state your appearance for the record.

 5           MR. CEDERBERG:  Jon Cederberg and William Urquhart for

 6    the Plaintiffs.

 7           THE COURT:  Good morning.

 8           MR. HESS:  William Hess and Kathryn Heathcock for the

 9    Defendant.

10           THE COURT:  Good morning.  Somebody needed to talk to

11    me?

12           MR. URQUHART:  Briefly, Your Honor.  As soon as

13    Mr. Miller stands down, we're going to be calling a gentleman

14    named AbdulQadar Ali, who is the head of the audit department,

15    and through him we want to introduce three audits, internal

16    audits, that were done by Dubai World, and what -- we have two

17    versions of the third of those audits and --

18           THE COURT:  Okay.  Explain that.

19           MR. URQUHART:  Well, in the audits there's a charge of

20    sexual harassment against Mr. Jaubert.  There's a reference to

21    the fact that he was convicted in France of extortion and

22    illegal possession of weapons, and there's also a reference to

23    the bullets case, which Your Honor has ruled out.  And I just

24    knew that they would be sensitive, or I assumed they would be

25    sensitive, so we have two versions.  Exhibit 147, and then
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

468

1    Exhibit 147R, which is the redacted version.

2         THE COURT:  Okay.

3         MR. URQUHART:  The only reason I bring it up is

4    because, assuming we use the redacted version, I don't want to

5    have Mr. AbdulQader hop on an airplane and fly all the way back

6    to Dubai and have this subject come up again.

7         THE COURT:  Okay.

8         MR. HESS:  Having those removed, obviously, is a

9    benefit to the proceedings, but I still object.  I don't see how

10   they come in.  I have an objection as to hearsay on those

11   reports.

12        MR. URQUHART:  That's fine.  I'll lay a foundation when

13   the witness testifies.

14        THE COURT:  Okay.  Assuming they can get past the

15   hearsay aspect, why season the whole thing, tell me why the

16   whole thing isn't admissible.

17        MR. HESS:  I don't know how it would come in.  I guess

18   my understanding is they would try to get it in as a business

19   record, but I don't think it meets --

20        THE COURT:  I understand that.  I'm not asking you

21   about that.  I'm asking you about the difference between the two

22   of them.  If it's admissible, why isn't it admissible the way it

23   is?  In other words, without the redaction.  You're saying it's

24   not admissible at all because it's not a business record.

25        MR. HESS:  I am, Judge.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

469

1          THE COURT:  I understand, and what I'm saying to you is

2     what he's saying is he's offering -- or he's talking about the

3     possibility of offering it with that redacted, and you're

4     arguing that the whole thing is inadmissible.  If you want to

5     take the shot at the whole thing, that's fine.  We'll deal with

6     that.  That's the aspect we're talking about now.  I might rule

7     that the whole thing is inadmissible.  If I do, then there's no

8     problem.

9          MR. HESS:  I've got no problem, I appreciate the

10    redaction, so I'm not seeking --

11         THE COURT:  I understand that you appreciate it.  Why

12    is it necessary?  Because I'm assuming they're not doing it out

13    of goodwill, they're doing it because you object and you wanted

14    to have an available version that is redacted; is that correct,

15    Counsel?

16         MR. URQUHART:  That's absolutely correct.

17         THE COURT:  You would prefer to bring in the whole

18    thing?

19         MR. URQUHART:  As I said at the outset, we don't want

20    to create a side show.

21         THE COURT:  I understand.

22         MR. HESS:  Judge, I'm conferring with my partner, and I

23    would prefer that the whole record comes in.  It is the

24    original.

25         THE COURT:  So if it's coming, in the whole thing is

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

470

1    coming in.  All right.

2             MR. URQUHART:  Thank you, Your Honor.

3             THE COURT:  Please bring in the jury.

4             MR. HESS:  Judge, is it possible -- sorry, Judge.  Is

5    it possible that the Court would consider hearing this outside

6    of the hearing of the jury, that issue, because yesterday when

7    Your Honor was instructing as to hearsay, jurors were saying,

8    "Hey, I want to hear that," and I'm just concerned that if they

9    hear all -- this existence of a report and it doesn't come in,

10   it's going to be a concern.

11            THE COURT:  You know, I'm really not too crazy about

12   doing all these things out of the presence of the jury because

13   it means that everything is twice as long.  I would prefer --

14   you know, I have a general good idea of the rules of evidence,

15   and I think we can deal with most of the things in court as they

16   come in.  And so we should.  If there's something that is

17   particularly prejudicial -- in this case, what you're saying is

18   the whole thing shouldn't come in?

19            MR. HESS:  Yes, Judge.

20            THE COURT:  Either he lays a foundation for it or he

21   doesn't.  I don't want to do that twice.  Because I sure don't

22   want to do that then have the jury come in and then just get it

23   in, because then they don't have the benefit of the foundation.

24   So if it's going to come in, I would like them to hear the

25   foundation questions, because it may affect whether they accept

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

471

1    it or don't accept it.  I don't know.  May affect what weight

2    they give to it.  They may give it less weight because they

3    don't like the way it came in or something.  I don't know.  I'd

4    rather not, but that doesn't mean that I won't, in some

5    circumstances.  And clearly if it is something that is so

6    prejudicial, I would hope that you all would give me a heads up

7    like this and give me the opportunity to deal with it.  But

8    that's after this witness anyway, so we got time.

9         So bring in the jury, please.

10        MR. URQUHART:  Thank you, Your Honor.

11        THE COURT:  Thank you, sir.

12        (Jury in at 9:54 a.m.)

13        THE COURT:  Please be seated.  Good morning, ladies and

14   gentlemen.  I trust that you had a good evening at home and

15   rested up and ready to go.  No exposure to anything, nothing you

16   need to tell me about?  Okay.  Then let's move forward.

17        Sir, you're reminded that you're still under oath.

18        THE WITNESS:  Yes.

19        THE COURT:  All right.  You may proceed.

20                      CONTINUED CROSS-EXAMINATION

21   BY MR. HESS

22   Q.  Good morning, Mr. Miller.

23   A.  Good morning.

24   Q.  We spoke yesterday of one incident that you relayed about

25   the Stingray submersible.  There was another incident that you

472

1      were involved with the Stingray shortly after that first

2      incident you relayed, correct?

3      A.   When did this happen?  What day?

4      Q.   Would have been a few months after?

5      A.   A few months after.  Okay.

6      Q.   Do you recall that?

7      A.   Listen, I was with the Stingray probably 60 or 70 times s, o

8      I'm sure there were lots of times I was involved with it.

9      Q.   Do you recall an incident where you were the safety diver

10     with the Stingray and you chose to flip the Stingray over?

11     A.   I never flipped the Stingray over.  Why would I do that?

12              MR. HESS:  Judge, in conference with counsel,

13     defendant's Exhibit 667 is being sought to be introduced as

14     evidence without objection.

15              THE COURT:  667?

16              MR. HESS:  Yes, Judge.

17              THE COURT:  Okay.  667 is admitted without objection.

18              (Defense 667 in evidence)

19     BY MR. HESS:

20     Q.   Mr. Miller, in response to the post-audit concerns that you

21     relayed to Mr. Jaubert, he wrote you an e-mail, correct, or a

22     letter?

23     A.   I have no idea.

24     Q.   Okay.  Does this -- when you read this, if you could read

25     this, does that refresh your recollection in that regard?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

473

1    A.  It's not dated.

2    Q.  If you would just take a moment to read it, please, and see

3    if that helps you.

4    A.  Can I see the entire e-mail.  Or is this an e-mail?  Is this

5    an e-mail?

6    Q.  Yes.

7         THE COURT:  You don't have a hard copy of this that you

8    can give him?

9         MR. HESS:  I do, Judge.

10        THE COURT:  Give him a hard copy because it's hard to

11   read when it's scanning, unless you're scanning it yourself.

12        MR. HESS:  If I may, Judge?

13        THE COURT:  Yes.

14   BY MR. HESS

15   Q.  Mr. Miller?

16   A.  Yes.  I understand what's said here.  I don't recall this at

17   all, and I don't see it coming from Herve to me.  But I do

18   understand this, and it's something -- it makes sense that this

19   conversation would occur.

20   Q.  Okay.  And it makes sense that it would occur following

21   your -- the concerns you expressed following the audit?

22   A.  It certainly seems to.

23   Q.  Thank you.

24        MR. HESS:  Defendant's Exhibit 646.  Again, Your Honor,

25   consulting with counsel, no objection.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

174

1          THE COURT:  I'm sorry what is the number?

2          MR. HESS:  646.

3          THE COURT:  646, without objection, is admitted in

4     evidence at this time.

5          (Defense 646 in evidence)

6          MR. HESS:  Judge, I can do the same thing with the hard

7     copy.

8          THE COURT:  Yeah, please.  It would be a lot easier for

9     him.  I think, would you --

10          THE WITNESS:  Not necessary on this one.  I'm familiar

11    with this one.  This one I understand.

12    BY MR. HESS:

13    Q.  Okay.  And as you can see, this was written -- you were

14    copied on this, correct?  Let's start with the top one.  The --

15    you wrote to Mr. Subair, correct?

16    A.  Yes.

17    Q.  And his concern apparently was this idea that Seahorse was

18    being paid to provide materials to Dubai World or Exomos, or the

19    entity in this case was Palm Marine, correct?

20    A.  I disagree.  I think his concern at this point was that he

21    was being asked to justify sole sourcing Seahorse Submarines in

22    a purchase.

23    Q.  What does that mean to you?

24    A.  Well, if you're in any company, if you're going to sole

25    source something, you better have sufficient justification to do

175

1    it so that there isn't any evidence or -- not evidence.  Yeah,

2    you need to get multiple quotes on something, basically that way

3    so nobody benefits in an incorrect way.

4    Q.   Exactly.  When you say sole sourcing, you're talking about

5    not just the submersibles that were contemplated under the

6    understanding and agreement at the time, but also batteries and

7    all -- and items that were going to be utilized to produce these

8    submersibles in Dubai, correct?

9    A.   Well, understand this particular memo which is from

10   September of 2004?

11   Q.   Correct.

12   A.   This is dealing with a specific issue.  This is -- at the

13   bottom of this particular e-mail -- let's scroll up a little

14   bit.  Let's go to the bottom here, because there should be

15   detail as to what we're talking about.  This dealt with a

16   particular purchase, sole sourcing a number of items that were

17   required, and it wasn't a blanket statement that you sole source

18   everything, you know, for the rest of your life.  It just says

19   that with these purchases that are being made, the buyers are

20   highlighting this, and we need to know why it's necessary to

21   sole source these particular items.

22        Let's take a look at the items.  They should be at the

23   bottom here from the accounting people.  Yeah, parts for

24   Stingray Duo, starts for the Stingray single, scuba tanks,

25   cylinders for the Intruder boat.  These things were specific to

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    the designs and equipment that was coming over from Florida, and

2    due to the tape constraints -- I mean, I listed a number of

3    reasons why I think it was fine to just simply make sure they're

4    bought from Seahorse.

5          Frankly, I thought it was something he could have

6    written, but he asked me to take a look at it and I did.

7    Q.  And you agreed with the determination, obviously, because

8    that's what you wrote, correct?

9    A.  Yes.

10   Q.  Thank you.

11   A.  Sure.

12         MR. HESS:  Judge, this is going to be -- counsel for

13   Plaintiff was kind enough to give me a clean copy, Plaintiff's

14   trial Exhibit 51.  Seek to admit that in evidence without

15   objection.

16         THE COURT:  Okay.  51 is being offered into evidence by

17   the defendant.  No objection?

18         MR. CEDERBERG:  No objection, Your Honor.

19         THE COURT:  Without objection, 51 is admitted in

20   evidence.

21         (Plaintiffs' 51 in evidence)

22         MR. HESS:  It's a multipage document, Judge, if I may

23   approach the witness to provide a copy?

24         THE COURT:  Correct.  It's 36 pages.

25   BY MR. HESS:

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

177

1    Q.  Mr. Miller, take a look at that and see if you can identify
2    that document.
3    A.  I've seen it before.  So this is this particular -- this is
4    a survey, says pre-risk survey, was done by BMT, which is
5    ostensibly an insurance investigator, something before you
6    insure whatever items are in the company.  So that's what this
7    is.
8    Q.  And do you recall because -- during your tenure as the CLO
9    of Exomos, is this something that you looked at and serrated and
10   investigated and evaluated?
11   A.  I don't recall that at all.  The first time I recall going
12   through this was part of this trial.
13   Q.  If you could take a look at Page 3 of that document.
14   A.  Sure.
15   Q.  The 1.2 on that.  Obviously your name doesn't show up there,
16   but you do see that the provider of the document, the pre-risk
17   survey for insurance purposes was assisted throughout by Mark
18   Rigo (ph) and Khurram Nagaria, correct, the financial controller
19   for Exomos?
20   A.  That's correct.
21   Q.  And that's who Mr. Nagaria was, the financial controller for
22   Exomos?
23   A.  He was one of a couple, but yes, he was.  I'm sure he was at
24   this time.
25   Q.  And as you can see, the -- if I could draw your attention

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

178

1    again to Page 3, the paragraph above where we just referred to,

2    you would agree that this document, based upon your reading,

3    establishes that the purpose of the evaluation was to carry out

4    a pre-risk assessment survey of the Exomos submersibles in order

5    to establish the risk associated with the manufacture, build,

6    and testing process currently ongoing, correct?

7    A.   What's the question?

8    Q.   You would agree that -- well, you agree that that is the

9    instructions, and that is the purpose of the survey by its own

10   terms, correct?

11   A.   That's what it says, so of course.

12   Q.   And I guess you don't have any -- other than what we've

13   talked about today about this survey, you have no knowledge of

14   it?

15   A.   No.   I was saying that I -- taking a look at this is part of

16   the pretrial briefing sort of, I saw this document, and that's

17   really the extent.

18   Q.   Okay.  Thank you.

19        MR. HESS:  Judge, at this time we would seek to move

20   into evidence, without objection after conferring with counsel,

21   Defendant's Exhibit 48.

22        THE COURT:  That's actually Plaintiff's Exhibit 48.

23        MR. HESS:  I'm sorry.  Yes, Judge.

24        THE COURT:  Okay.

25        MR. HESS:  Can I have a moment, Your Honor?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

179

```
 1              THE COURT:  Sure.  Without objection, it is offered and
 2      admitted in evidence as Exhibit 48.  I'm not changing that it's
 3      a Plaintiffs' exhibit or Defendant exhibit.  It's -- one of the
 4      instructions I'll give you at the end is you can rely on these
 5      things, it doesn't matter who introduced, so it's just in
 6      evidence so you'll be able to look at it.  It's probably marked
 7      as a plaintiff's exhibit.  I would assume it is.
 8              MR. HESS:  It is now, Judge.
 9              THE COURT:  Okay.
10              (Plaintiffs' 48 in evidence)
11      BY MR. HESS:
12      Q.  Mr. Miller, if you could take an opportunity to read through
13      that and let me know after you've had that opportunity and see
14      if that's something you recognize.
15      A.  I recognize this front piece here as a report from Don
16      Walsh.  As far as the whole report --
17      Q.  Let me start out with that.  You do recognize the report?
18      A.  Absolutely.
19      Q.  This was during your tenure, was March of 2006, correct?
20      A.  That's correct.
21      Q.  Is this a report that you initiated or you engaged Mr. Walsh
22      to provide?
23      A.  Well, we engaged at Exomos, starting from the beginning,
24      Dr. Walsh as an expert in this particular field, and pretty much
25      gave him free reign to be able to consult and offer advice.  And
```

180

1    this is just after the 2006 boat show, I guess.  And so the

2    short answer is I certainly didn't commission any reports from

3    him.  But as part of his professional consultancy, he would

4    offer advice, and that's one of the things he did.

5    Q.  So I think what you're saying is this was an ongoing

6    relationship that Mr. Walsh had with Exomos, and he would

7    provide this advice on a regular basis?

8    A.  Sort of on an adhoc basis, exactly.

9    Q.  Better words.  Thank you.  Did you act upon this advice, or

10   what did you do when you did get this, when you reviewed this

11   report?

12   A.  What did I do?

13   Q.  Did it change any way you perceived or the role of Exomos

14   and how it was going -- the business was going to be conducted

15   by Exomos?

16   A.  No.  It was more like there's lots of people that want to

17   give you advice, and his is certainly very sage, but it wasn't a

18   piece of advice -- so as far as acting specifically on anything

19   in this document, I certainly don't recall that.  But you take

20   it is as constructive criticism, advice, however you want to put

21   it.

22   Q.  If I could draw your attention to page 2 of that document.

23   I'm sorry.  Yes, page 2.  If you can look at -- and so the

24   observations, the second bullet down.  If you could read that,

25   please.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.  I read it.

2    Q.  And then Professor Walsh says his observation is that

3    "Nearly two dozen prototype vehicles have been developed with

4    few, if any, being fully tested.  This diversity of stuff is

5    impressive and fills the shop floor with a variety of shapes and

6    colors.  Clearly there's some clever design and engineering

7    behind most of these machines. However, there's no solid

8    indication that any of them are being ready for production."

9         Is that something that you concurred in at that time?

10   A.  His statement?

11   Q.  Yes. In March of 2006?

12   A.  I would certainly -- I don't know about that, but I would

13   certainly agree with it.  I also point out, I mean, when

14   Dr. Walsh uses the words "clever," he's not necessarily -- he's

15   saying in a way a little bit that they're kind of cute.  But the

16   most important point was, yeah, it was de facto obvious there

17   was no indication of any of them being ready for production, so

18   yes, I would certainly agree, and I'm sure I did at that time as

19   well.

20   Q.  And if I could draw your attention to Page 3.  Let's start

21   with the first full bullet on that where it says, "Those large

22   submersible yachts."  Give you a moment to read that.

23   A.  I've read it.

24   Q.  If you know, he's referring there to the Proteus design that

25   Sultan Bin Sulayem arrived at or came up with, correct?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

182

1    A.  Well, the Chairman didn't come up with the design.

2    Q.  Concept?

3    A.  Yeah.  He asked Mr. Jaubert whether or not it was possible

4    to build something like a yacht that would go out, submerged,

5    and he certainly wasn't talking about any military aspects at

6    that point.  Then come to the surface again.  So he wasn't

7    talking design, he was talking about whether or not this could

8    be done, and Mr. Jaubert said sure.

9    Q.  This is one of Sultan's initiated projects, correct, the

10   Proteus?

11   A.  Yes.

12   Q.  Originally known as the Intruder, correct?

13   A.  No.  There's confusion.  The Intruder was a small vessel

14   that the Chairman and I saw when we visited Herve the first

15   time, and that was a vessel.  The problem is that the names get,

16   you know, put on various different products, and that can be

17   confusing.  And so I can help out very quickly on that.

18       So the original Intruder was supposed to be a small

19   submersible, rather, boat that goes out.  It looks a little bit

20   like a rubber duck or a ribbed-type boat, small, handling a

21   couple people.  Goes out somewhere, sinks, comes up to the

22   surface.  The Chairman said, "Can you do that with a larger

23   vessel so people can go out, divers, go out and come up?"

24   Q.  This is the Intruder at that concept, correct?

25   A.  Yes, that's the one we saw.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.   And that has been marked as that idea, that Intruder

2    evolved, as you mentioned, Sultan, that creativity and that

3    evolved into his concept or his questioning of whether or not

4    you could make this type of a boat into a much larger scale,

5    correct?

6    A.   Correct.

7              MR. HESS:   Judge, that's been marked as I have an

8    exhibit, it's defendant's Exhibit 923.

9              THE COURT:   And since you're publishing it into the

10   jury, I assume.

11             MR. HESS:   There has been no objection.

12             THE COURT:   I understand there may not be an objection,

13   but we need to have a record.

14             MR. CEDERBERG:   There is no objection, and it has been

15   marked 923-20.

16             THE COURT:   923-20, you're offering it in evidence?

17             MR. HESS:   I am, Judge.

18             THE COURT:   Without objection, 923-20 is admitted in

19   evidence.

20             (Plaintiffs' 923-20 in evidence)

21             THE COURT:   I just have this silly hang-up about the

22   rules.

23             MR. HESS:   Judge, at this time I would offer into

24   evidence the two exhibits, 923.30 and 923.31.

25             THE COURT:   923.30?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          MR. HESS:  It's part of, yes.

2          THE COURT:  And 923. what?

3          MR. HESS:  31.

4          THE COURT:  31.

5          MR. CEDERBERG:  No objection, Your Honor.

6          THE COURT:  And 20.

7          MR. HESS:  Yes, Judge.

8          THE COURT:  Without objection 923-20, 30, and 31 are

9    admitted in evidence.  They are various photos or drawings.

10   These happen to be photos.  But you're going to have to give me

11   another list with those numbers listed on there and 923 split up

12   since you're not offering them all.

13         MR. HESS:  I will, Judge.  Thank you.

14         (Plaintiffs' 923-30 and 923-31 in evidence)

15   BY MR. HESS:

16   Q.  That early concept evolved into with Mr. Jaubert's design

17   input, evolved into this vessel, correct?

18   A.  Correct.

19         THE COURT:  Talk about what you're holding up;

20   otherwise, the record is not going to be very clear.  Number.

21   Number.

22         MR. HESS:  Yes, this is nine.

23         THE COURT:  Doesn't have a sticker on it?

24         MR. HESS:  It doesn't, Judge.

25         THE COURT:  Well, write on the back of it, then.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

185

1          MR. HESS:  It's 923.31.

2          THE COURT:  Write it on the back in ink at the top so

3     that way we know what we're talking about later.  And write on

4     the back of all the other ones, whatever number it is you're

5     going to put.  You can put an evidence sticker on them later,

6     but right now just write the number.  Do that on your own time.

7     BY MR. HESS:

8     Q.  Likewise this is a photo --

9          THE COURT:  This being?

10          MR. HESS:  923.30.

11          THE COURT:  Okay.  This 923.30 is, then fill in the

12     blank.

13     BY MR. HESS:

14     Q.  Is another photograph of the Intruder, correct, Mr. Miller?

15     A.  Could you bring that closer?

16     Q.  Sure.

17     A.  No, this is not a photograph of the Intruder.

18     Q.  I'm sorry.  The Proteus?

19     A.  This appears to be a photograph of the Proteus, exactly half

20     submerged.

21     Q.  It's the same vessel that we looked at which is marked as

22     923.31, correct?

23     A.  It appears to be.  I mean, in Case 1, the thing is half

24     under water, so yes, it appears to be.

25     Q.  Again, this is the --

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          THE COURT:  The one you were holding up in your left

2    hand is what number?

3          MR. HESS:  923.31.

4          THE COURT:  Okay.

5    BY MR. HESS:

6    Q.  Again, the idea with the Proteus expanding on Sultan's idea

7    of this initial vehicle that he saw in Stuart, Florida, which

8    has been marked as 923.20, is that it's a large vessel that has

9    the capacity to -- well, let me ask you, it has the capacity to

10   lower into the water and it maintains a centralized dry area,

11   correct?

12   A.  That was the plan.

13   Q.  Okay.  And this is a vessel that was designed and built by

14   Mr. Jaubert as requested by Sultan, correct?

15   A.  Yes.  I have to throw in, I believe there was also a naval

16   architect, someone in Florida that was involved in the process,

17   but essentially that's correct.

18   Q.  Do you recall -- well, withdraw that question.

19          And in both items, 923.7 and 923.8 -- I'm going to show

20   you first what's been marked as 923.7.  Do you know what that

21   is?

22   A.  That is a picture of the Adventurer at the test tank of

23   Exomos.

24   Q.  So that's the testing facility that was utilized for these

25   various --

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

187

1    A.  That was the test tank, yes.

2    Q.  And that's you at the back, at the stern, correct?

3    A.  It seems to be my gray hair, yes.

4    Q.  I'm showing you the --

5    A.  My best side.

6         MR. HESS:  I'm doing it to you, Judge.  I apologize.

7    This is actually 923.7 that is on the screen.

8         THE COURT:  That's not in evidence.

9         MR. HESS:  And there's no objection to any of these

10   photos, Judge.

11        THE COURT:  Okay.  But just offer them into evidence so

12   they are in evidence and we know what you're talking about.

13        MR. HESS:  Without objection, I'm offering this into

14   evidence.

15        THE COURT:  923.7 is admitted in evidence without

16   objection.

17        (Plaintiffs' 923.7 in evidence)

18        THE COURT:  And you are referring to 923.7, correct,

19   when you are talking?

20        MR. HESS:  Yes, Judge.

21        MR. CEDERBERG:  For ease, Your Honor, we have no

22   objection to any of the parts of that exhibit.

23   BY MR. HESS:

24   Q.  Again, what I initially showed you is 923.8, which is the

25   back version which is currently up.  Well, that's the front

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1   version.

2           THE COURT:  923.8 also in evidence?

3           MR. HESS:  Requesting that be admitted in evidence.

4           THE COURT:  Okay.  You just give me a list later of

5   what is in evidence, but refer to them by number so that the

6   record will be clear as to what we're talking about, okay?

7           MR. HESS:  Thank you, Judge.

8   BY MR. HESS:

9   Q.  That's the same -- that's from a different angle of the same

10  incident, correct?

11  A.  Correct.  It seems so.

12  Q.  That's the test tank?

13  A.  The test tank.

14  Q.  I'm going to show you now -- I ask my partner to put on the

15  screen 923.12 and seek to introduce it into evidence at this

16  time without objection.

17          THE COURT:  Without objection, 923.12 is admitted in

18  evidence.

19          (Plaintiffs' 923.12 in evidence)

20  BY THE WITNESS::

21  Q.  Who is that individual?

22  A.  His name is Professor Joe Valensic (ph).

23  Q.  So that's Professor Valensic.  What is he standing in front

24  of?

25  A.  He's in front of an Adventurer, it's a submersible called

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

489

1    the Adventurer.

2    Q.  Okay.  Next on the screen I'm going to show you 923.17

3    without objection.

4           THE COURT:  923.17 is admitted in evidence.

5           (Plaintiffs' 923.17 in evidence)

6    BY MR. HESS:

7    Q.  Would you tell the jury what is the Exoscope, do you recall

8    that design?

9    A.  Well, I have to say, I've never seen this picture, and I've

10   never seen the vessel like this.  I recall the original vessel.

11   I can't even remember the name of it, but it was, as I recall,

12   sort of a glass bottom boat that was down in the creek of Dubai,

13   which was brought up, thought to be employed in a commercial

14   venture.  So I've never seen this.  I've never seen the yellow,

15   and it looks pretty cleaned up.  The only time I saw it, it was

16   older, but it's a glass bottom boat where people sit on the

17   bottom, I guess.

18   Q.  This wasn't a design of Mr. Jaubert's, but it was a

19   refurbish and upgrade by Mr. Jaubert and Exomos, correct?

20   A.  That's correct.  With all due respect, it was another

21   Frenchman who had designed and produced this.  I'm sure this was

22   a one-off design, but yes, that's correct.

23   Q.  Was this, again, one of Sultan's ideas, to bring this into

24   the facility and redesign it?

25   A.  If it was, I never heard it.

190

1    Q.  Show you what's been marked -- well, actually, there are two

2    exhibits here, 923.21 and 923.22, and I seek to offer both into

3    evidence without objection, Your Honor.

4          THE COURT:  Without objection, they're both admitted in

5    evidence.

6          (Plaintiffs' 923.21 and 923.22 in evidence)

7          MR. HESS:  Let me also add to that the sequel.  It's

8    923.24.  I also seek to introduce that into evidence.  Let me

9    start with, on the screen, 923.21.

10   BY MR. HESS:

11   Q.  Do you recognize that vessel?

12   A.  Yes, I do.

13   Q.  What is that vessel?

14   A.  This is an air boat much like you'd see in the Everglades

15   around here.

16   Q.  Is there anything particularly -- what powers that air boat?

17   A.  It had -- I can see by the stack on it and also by one of

18   the people seated next to Mr. Jaubert that this is a turbine.

19   Has a small turbine engine, much like you'd find in a

20   helicopter, something small.  So that's what is propelling the

21   fan blades, so it's an air boat.

22   Q.  This was one of Mr. Jaubert's designs and productions,

23   correct?

24   A.  Design, we have to classify what design means.  In other

25   words, was he the fellow that laid out the shroud and so forth?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

191

1      Those air boats are fairly straightforward, so as the chief

2      designer of this thing, absolutely 100 percent.

3      Q.  In fact, one of the concerns that you relayed yesterday was

4      the decibel level of these type of vehicles, correct?

5      A.  Did I say that?

6      Q.  The air boats, didn't you?  I thought you did.

7      A.  No, no.  I talked about it with the hovercraft, when we came

8      up to Port St. Lucie, I said that was loud.  Hovercraft is not

9      an air boat.

10     Q.  But an air boat, you would agree that an air boat often has

11     a decibel level that is uncomfortable?

12     A.  Truthfully, I haven't been around that many.  I've been

13     around these, so I'm not qualified to say that.

14     Q.  Would you agree that, again, Sultan was interested in a fast

15     air boat design?

16     A.  Well, I can only stem back to the first time that we came

17     out to Florida.  At that particular point we were in the market

18     for an air boat that could be used -- well, the picture is

19     great, actually, because it shows you there are areas out there

20     at the tidal conditions where you have a bit of water and not

21     much water and areas that you can traverse.  There's island and

22     so forth in the Persian Gulf you can do that, so we were clearly

23     in the market.  I don't know if that answers the question.

24     Q.  Do you have any understanding of the dynamics, why use a

25     turbine engine versus a more typical engine design?

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    A.  The main thing I understand, the same reason you would in an

2    airplane, is you get a lot of horsepower out of a little weight,

3    and also a turbine engine can use a lot of different fuels.

4    Many of them nonvolatile.  You don't need jet fuel to run a

5    turbine engine.  Apparently it can run on things like diesel if

6    it's all that you have.  So I would say the high power to weight

7    ratio and the wide range of fuels.

8    Q.  And you would agree that Sultan was interested in the speed

9    of these boats, encourage Mr. Jaubert to design boats?

10   A.  I wouldn't know about that.  I wasn't privy with

11   conversations that had that.  I just knew, at one point, the

12   chairman was interested in seeing about procuring air boats for

13   use in the Gulf.

14   Q.  Let me just quickly just flash on the screen, if I may, 923.

15   I'll skip that one.  It's just a closer-up picture of the other.

16   Let me go 923.24.  That's the same boat, different angle?

17   A.  No, it's not.  It's a different boat.

18   Q.  It is different.  What is the difference on that boat?

19   Doesn't have the cowel?

20   A.  To be honest with you, I really can't tell you.  In other

21   words, of course that's -- the obvious thing is that the shroud

22   over that particular area is missing, and also I know there was

23   an eight cylinder air boat that's out there.  Now, this

24   doesn't -- the picture isn't good enough.  I suppose if you zoom

25   in we can tell whether this is a gasoline engine, which is

1       generally what they use, I think, around here.  A car engine.

2               I got to tell you, I'm not a mechanic that way.  It

3       looks like a turbine engine, but I wouldn't necessarily say

4       that's the same boat.  There might have been multiple copies

5       made.  I know it didn't because the driving for console is

6       forward on this boat and the other one is aft.

7       Q.  Just to give some perspective, let me show you what's been

8       marked as 923.25.  Without objection, I ask that it be

9       introduced into evidence.

10              THE COURT:  Without objection it is accepted.

11              (Plaintiffs' 923.25 in evidence)

12      BY MR. HESS:

13      Q.  Can you identify that vessel there?

14      A.  That's the Stingray.

15      Q.  And that's you in the background, correct?

16      A.  That's correct.

17      Q.  Who is in the cockpit?

18      A.  Thapa.

19      Q.  Is that the same vessel that you relayed yesterday in terms

20      of the mishap?

21      A.  Correct.

22      Q.  And that -- I think that canister that the diver in the

23      forefront has in his hand is one of those spare air canisters,

24      correct?

25      A.  That's correct.  It's so labeled.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

194

1        THE COURT:  Point at what you're talking about.  I

2   don't know what you're talking about.  Do you have the pointer.

3   Tell me what you're pointing --

4        THE WITNESS:  This thing right here.  If you look real

5   close, it says "spare air" on it.

6        THE COURT:  The yellow thing.  Okay.  That's all I was

7   asking.

8        MR. HESS:  What's been marked as 923.23, without

9   objection.  Seek to introduce it into evidence, Your Honor.

10       THE COURT:  Without objection, 923.23 is admitted in

11   evidence.

12       (Plaintiffs' 923.23 in evidence)

13   BY MR. HESS:

14   Q.  That's Thapa there?

15   A.  That's correct.

16   Q.  And again, that's the same Stingray vessel that we discussed

17   yesterday?

18   A.  It's the same model.  I mean, you have to understand, if I'm

19   permitted?  You have to understand that it was always undergoing

20   change in an attempt to improve it.  So it's the same model, it

21   has the same color and stripes on it and so forth, but the

22   vessel was always changing, improving.

23   Q.  Based upon these testing and the needs?

24   A.  That's correct.

25   Q.  Yesterday we went through a number of the test reports.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Draw your attention to -- we were discussing the various test

2    reports that were introduced into evidence yesterday.  And you

3    relayed that there were -- your recollection is that there were

4    quite a bit more tests that were done over that period of time,

5    correct?

6    A.   Than represented by the reports that I saw yesterday.

7    Q.   By the paper that we saw yesterday?

8    A.   Yeah, that's what I felt.

9    Q.   Finally, I'll show another test report -- trial report.  I'm

10   sorry.

11          Now, I'm sorry, I misspoke.  These are trial reports,

12   correct, that we talked about?

13   A.   Right.  That's what they're labeled, yeah.

14   Q.   And I'm going to show you in a minute what's been marked as

15   defendant's Exhibit 738, and without objection, I would seek to

16   admit that into evidence at this time.

17          THE COURT:  I'm sorry.  What number is it?

18          MR. HESS:  738, Defendants.

19          THE COURT:  738.  Without objection, 738 is admitted in

20   evidence.

21          (Defense 738 in evidence)

22          MR. CEDERBERG:  Without objection, but I will note it's

23   the same as 362 which has been admitted in evidence.

24          THE COURT:  Then use 362.

25          MR. HESS:  362.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

196

1    BY MR. HESS:

2    Q.  And I just was corrected that this was one of the test

3    reports that you had that maybe we didn't talk about yesterday,

4    but was included in the packet.  If you could take a moment and

5    take a look at that trial report.

6    A.  Let's go to the top again, please, just so I can situate

7    myself in time, place with that.  There we go.  Thank you.

8    Q.  I just wanted to start with the -- let me ask you a couple

9    things first.  These trial reports, you testified yesterday they

10   were all prepared in the same way, correct?  They were all

11   prepared in the ordinary course of business by a person that had

12   all of them, any trial report that was commissioned or prepared

13   on behalf of Exomos under your -- during the period of time that

14   you were heading up operations, they were all prepared in the

15   same way you testified yesterday, correct?

16   A.  I don't really understand the question.

17   Q.  Let me try it again.  Certainly not your fault.  My fault.

18        What I was suggesting is that all the trial reports

19   that were prepared during the period of time of your tenure at

20   Exomos, they were prepared in the same way with the same

21   particularities and same interest in reports from people that

22   knew what they were saying and in the same way you testified

23   yesterday.  There's not going to be a trial report out there

24   labeled trial report that is differently prepared than how you

25   discussed it yesterday, correct?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.   No.  It's quite possible.  This is a format.  What I put

2    together from the beginning was a format.  You'll notice, for

3    instance, we don't even know exactly who prepares this.  There's

4    no signatory at the end of -- this was an evolving process.

5    What I did was to try to get in some written documents into

6    place right away that would allow for feedback to the production

7    and allow for improvements in the overall system.

8          So it's not like it was set in stone and I can or

9    anybody can guarantee that they were prepared exactly in the

10   same way.  This is a company and an organization and a group

11   that was evolving very quickly.  So that's my answer to the

12   question.

13   Q.   Did they all have the same indicia of reliability?  All?

14   A.   I would agree with that, to the best of my knowledge,

15   absolutely.  Of course, as I say, here's a good example.  I'm on

16   the distribution list, but I'm not there, which probably means I

17   was out of the country or doing something because when I was

18   there and there was an evolution, some sort of a testing that

19   took place, for sure I was outside in the heat.  I was not

20   attending a meeting somewhere.

21   Q.   So you presume that you were out of the country at that

22   time?

23   A.   I'm -- what I'm saying is if there's testing going around

24   and I'm around, that's where I would have been, because that's

25   where I considered to be the heart of the real issues at that

1   point.

2   Q.  Is your testimony that some of these trial reports may not

3   be as reliable as others?

4   A.  No, it's not that.  It's just that the words that you use to

5   characterize all of these, I was just trying to get a little bit

6   more understanding and detail of what that meant.  And I was

7   trying to give you the -- not the flavor, but what these things

8   represent.  In other words, these are the reports from the

9   people that were there based on what happened.  That's it.

10  Q.  And they're titled "Trial Reports."

11  A.  Correct.

12  Q.  Because I misspoke twice, and I want to make sure so the

13  record is clear.

14  A.  I understand either way.

15  Q.  Thank you.  Let me bring to your attention what's been

16  marked as Defendant's Exhibit 1530.  Before we do that, let's

17  stay with this on the screen, and my partner just told me to.

18      If you can take an opportunity, in this particular

19  report, and I just refer to the last sentence of it.  It says,

20  "Thapa was happy with the boat's performance and Stingray's

21  surface," correct?

22  A.  That's correct.

23  Q.  One of the good days for Stingray?

24  A.  Seems so.

25  Q.  Okay.  Now, may I draw your attention to what's been marked

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

199

1    as Defendant's Exhibit 1530?

2              MR. HESS:  I seek to introduce it into evidence without

3    objection.

4              THE COURT:  1530?

5              MR. HESS:  Yes, Judge.

6              THE COURT:  Without objection, 1530 is admitted in

7    evidence.

8              (Defense 1530 in evidence)

9    BY MR. HESS:

10   Q.  This, of course, is not a test report or a trial report.  If

11   you could take a look at that, and I'm referring right now first

12   to where you appear on the CC list, the second portion of that

13   e-mail.  My partner is scrolling down right now.  There it is.

14   Where it says, "Almost all the systems that were tested checked

15   out okay, great.  Unfortunately the thrusters did not work long

16   before they began to work intermitted.  The vessel will be

17   cleaned before it is returned to factory."  Were you involved in

18   that test, do you remember?

19   A.  No.  Well, I'm on the CC list.  You're asking me about

20   something that happened in August.  I'm not sure.  If you show

21   me a picture on-site or whatever, I would have to say I was

22   there, but looking at this e-mail August 2006, truthfully, I

23   couldn't tell you.

24   Q.  Because in light of your testimony yesterday, I was just

25   wondering if this would stand out in your mind that the Stingray

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

500

1      worked?

2      A.  No.  No.  That wouldn't.  It did work, then it didn't work,

3      then it did work, and...

4      Q.  So to be clear, there were times that the Stingray

5      functioned as the submersible it was intended to function as,

6      correct?

7      A.  Absolutely.

8      Q.  Let me -- what's been marked as defense Exhibit 1503, seek

9      to introduce that into evidence without objection.  Draw your

10     attention to that document.

11             MR. HESS:  That's 1503, Your Honor.

12             THE COURT:  Without objection, 1503 is admitted in

13     evidence.

14             (Defense 1503 in evidence)

15     BY MR. HESS:

16     Q.  Now, you were in -- on or about July 28 of 2005, you were --

17     I'm sorry.  On or about October 31, 2004, you were a director of

18     Exomos?

19     A.  No.

20     Q.  Can I draw your attention to -- maybe I misread, but draw

21     your attention to the second page, the bottom of that document.

22             THE COURT:  If you have the document, give it to him so

23     he can read it.

24     BY MR. HESS:

25     Q.  Let me show you a document, a hard copy.  Let me draw your

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

501

1   attention -- I'm sorry.  With that date, what's been attached is

2   an addendum to the October 2004 agreement, but if you could take

3   a look at that.

4   A.   Which page do you want me to look at?

5   Q.   Take a look at the second page, first.  That's probably the

6   easiest.

7   A.   All right.  I'm looking at it.

8   Q.   That's -- do you recognize that document?  Called the

9   Addendum to Memorandum of Understanding?

10  A.   I do recognize this.

11  Q.   Okay.  And do you recall when that addendum was executed?

12  A.   I would have to look at the document to see when it was

13  executed.  I'm guessing this happened sometime in July.

14          THE COURT:  We don't want you guessing.  If you don't

15  know, you don't know.  No guesses.

16          THE WITNESS:  I don't know.

17  BY MR. HESS:

18  Q.   Certainly it was executed after or prior to July 28, 2005,

19  the cover letter that accompanies it.  That's the front page of

20  that document?

21  A.   I see that date.

22          THE COURT:  That doesn't necessary follow.  I mean,

23  it's together now.  He doesn't remember if it was received

24  attached to that letter or not.

25          MR. HESS:  It's referred to in the letter.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

502

 1          THE COURT:  An addendum is referred to in the letter,

 2    you're absolutely right.  I don't know if it's this addendum.

 3          MR. HESS:  I understand, Judge.

 4          THE COURT:  There's something there, he doesn't

 5    remember.  Move on to something else.  I'm not real sure how

 6    important that is, but if it is important, prove it some other

 7    way.  So he doesn't know.  I remember that day was my birthday,

 8    I was 92 at the time.  At least I feel like I was.

 9    BY MR. HESS:

10    Q.  That doesn't help you remember, that document?

11          THE COURT:  My 92nd birthday was an international

12    holiday.  You might remember that.  Everybody got the day off.

13          THE WITNESS:  Can you give me the question again.

14          THE COURT:  Do you remember when the addendum was done?

15          THE WITNESS:  No.

16          THE COURT:  Any requested?  Is there anything that

17    could narrow it down as to what it was?

18          THE WITNESS:  Not that I can think of.

19          THE COURT:  Okay.  Move on, please.

20    BY MR. HESS:

21    Q.  When the addendum was executed however, whatever date it

22    was, you executed that addendum as a director of Exomos,

23    correct?

24    A.  I signed on the back, and yes, I would never sign off on

25    something like that with a title without having it, so that's

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

503

1    correct.

2    Q.  That is your signature?

3    A.  That is my signature.

4    Q.  Thank you.  Going back to something that we talked about

5    earlier regarding the Intruder and the Proteus, let me show you

6    what's been marked as Defendant's Exhibit 610.  I seek to

7    introduce that into evidence without objection.

8         THE COURT:  Without objection, 610 is admitted in

9    evidence.

10        (Defense 610 in evidence)

11   BY MR. HESS:

12   Q.  It's a one-page document, but if you need me to give you a

13   hard copy, I'm happy to do that.

14   A.  Can you just scroll down to the end, please.

15   Q.  Really, all I'm asking -- I have no problem with you reading

16   it.

17   A.  I just wanted to understand what it was.

18   Q.  Sure.  The top of it, it just discusses you contacted

19   Mr. Jaubert, and you relayed the -- what Sultan wanted him to

20   do, which was design an Intruder, although up to 40 feet in

21   length, which turned into the Proteus, correct?

22   A.  Correct.

23   Q.  When we see the initials capitalized, SABS, does that mean

24   anything to you?

25   A.  That stands for the Chairman, Sultan Ahmed Bin Sulayem.  Did

504

1    I use this in this e-mail?

2    Q.   No.  It was in a previous document.

3    A.   Normally I would use a --

4    Q.   I won't comment.  It's not anything you ever said, I don't

5    believe.

6         Let me draw your attention to 1804, Defendant's

7    exhibit, and again, I seek to introduce this into evidence

8    without objection.

9         THE COURT:  Is this, like, a discovery deposition?

10   What are we doing?  Are you cross-examining him?  Let's do

11   something.  Let's cross-examine him on what he was asked

12   yesterday on direct examination.  1804 is in evidence without

13   objection.

14        (Defense 1804 in evidence)

15        MR. HESS:  Thank you, Judge.

16   BY MR. HESS:

17   Q.   Now, on the second page of that document -- let me show you

18   a hard copy.

19   A.   Thank you.

20   Q.   Mr. Jaubert relays to you his the progress in his obtaining

21   insurance, correct?

22   A.   Second page.  Second page.

23   Q.   It's not on the screen.

24   A.   Okay.  Read it.

25   Q.   You recall that e-mail that came to you?

505

1    A.  Yes.

2    Q.  Discussing the insurance?

3    A.  Yes, I do.

4    Q.  So at that time, you were aware -- or at least you were told

5    that Mr. Jaubert was making attempts to obtain liability

6    coverage for the vessels to permit the use of them

7    recreationally?

8    A.  That's correct.

9    Q.  And almost last but not least, it's exhibit -- what's been

10   marked defendant's Exhibit 1818.

11        MR. HESS:  Seek to introduce into evidence without

12   objection.

13        THE COURT:  1818 is admitted in evidence.

14        (Defense 1818 in evidence)

15   BY MR. HESS:

16   Q.  This was -- if I can draw your attention to -- let me start

17   with the initiating e-mail, which was yours which follows that

18   one.  There it is on the screen there.

19   A.  I'm familiar with this document.

20   Q.  You remember that?

21   A.  Yes.

22   Q.  And then do you also recall the --

23        THE COURT:  What is 1818?  It's blank in the exhibit

24   list.

25        MR. HESS:  1818 is an e-mail from -- e-mail dated

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1  Saturday, June 24, 2006, from Mr. Miller to, among, others,

2  Herve Jaubert.

3       THE COURT:  2006 did you say?

4       MR. HESS:  Yes, Judge.

5       THE COURT:  Okay.

6       MR. HESS:  It also includes the responsive e-mail from

7  Mr. Jaubert.

8       THE COURT:  That's automatic.  I just need to be able

9  to identify it.

10  BY MR. HESS:

11  Q.  So you were aware, at that time, that Mr. Jaubert had

12  concerns about -- well, as expressed in the e-mail, correct?

13  A.  What's the question?

14  Q.  You were aware, at the time, that Mr. Jaubert -- you read

15  Mr. Jaubert's reply to your e-mail, correct?

16  A.  I did read his reply.

17  Q.  Okay.  Thank you.  Now, there was another vessel that was

18  called the swat, correct?  That's something that you recall?

19  A.  Yes.

20  Q.  And what was the SWATH vessel?

21  A.  The SWATH vessel is a specialty catamaran that's designed to

22  traverse the open water with -- it has a control system onboard,

23  this catamaran, that allows it to go through a certain level of

24  waves without very much deck motion.  A very technical

25  description of this, and I believe it stands for small wetted

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1   area, and the T-H escapes me at this point, but it is a

2   specialized form of catamaran.

3   Q.  That's another vessel that was not designed by Mr. Jaubert

4   initially, but that's a vessel that was brought to Exomos to be

5   re-fit?

6   A.  That's correct.  It was not designed by Mr. Jaubert, and it

7   was brought over originally.  Sanil was working on this vessel.

8   This was his project.

9   Q.  And originally, it was brought to Palm Marine, correct?

10  A.  Correct.

11  Q.  And then it was brought from Palm Marine to Exomos under

12  Mr. Jaubert's stewardship, correct?

13  A.  Correct.

14  Q.  And again, this was a vessel that was purchased by you at

15  the request of Sultan Bin Sulayem?

16  A.  No.  I didn't buy it.  Dubai ports bought it.  It was a

17  vessel that was to be used to transport people to the Palm and

18  these offshore islands.

19  Q.  What was your involvement in the purchase of that vessel?

20  A.  I facilitated the purchase and monitored the rehabilitation,

21  the vessel needed work.  Basically that was it.  It was a

22  smaller SWATH vessel.  This manufacturer that we're talking

23  about makes big ones, including for the Houston pilot boats, and

24  they also made a large research vessel for Monterray.  But this

25  one had fallen into disrepair, so the boat needed to be

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

508

1   refurbished.  And once it was refurbished it was transported to

2   Dubai.

3   Q.  Do you recall the time period that this was involved?  2005?

4   A.  2004.

5   Q.  2004.  Okay.  The purchase price was somewhere around

6   $45,000 US?

7   A.  For the boat?  No.  I don't know what it was, but it

8   certainly wasn't that.

9   Q.  You realized a 10 percent commission on that, correct?

10  A.  No, of course not.

11  Q.  You didn't?

12  A.  Of course not.

13  Q.  Let me show you what's been marked as defendant's Exhibit

14  1800.  Seek to introduce that without objection.

15          MR. CEDERBERG:  No objection, Your Honor.

16          THE COURT:  1800 is admitted in evidence without

17  objection.

18          (Defense 1800 in evidence)

19  BY MR. HESS:

20  Q.  Take a look at that one line item on the bottom of the

21  document.  Can you read that okay?

22  A.  It says 10 percent of USD $45,000.

23  Q.  Does that refresh your recollection at all?

24  A.  No, not at all.  I've never seen this before, and looks --

25  it says -- the charge says $16,000.  So the only thing I ever

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

509

1    charge for was -- on a monthly basis, a consulting fee, which

2    also included any travel that I did.  But it wasn't related to

3    any specific project.  This is probably how they accounted for

4    my monthly fees at that particular point, so...

5    Q.  Okay.  Thank you.  Then I do have one last document.  I hate

6    to say "last," and it never is.  What's been mark as defense

7    Exhibit 1189, seek to introduce without objection.

8         THE COURT:  1189.  1189, is admitted in evidence

9    without objection.

10        (Defense 1189 in evidence)

11   BY MR. HESS:

12   Q.  It's a multipage document, so let me give it to you in hard

13   copy.  Would you take a moment to look at that.  Identify what

14   that document is for us.

15   A.  This is a purchase agreement, in this particular case,

16   between Exomos and Exomos Nusantara, which was a company that

17   was going to be formed in Indonesia for the purpose of

18   accepting -- or rather, buying boats from Exomos.  I'll be more

19   specific about this.  In buying the submersible patrol vessels

20   for use by the Indonesian Navy.

21   Q.  Were these Intruder vessels?  Is that what they were?

22   A.  Again, the word, it's -- the acronym SPV stands for

23   submersible patrol vessel, and that's what it was.

24   Q.  I think it refers, also, if you take a look at -- it refers

25   to the word Intruder in there?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

510

1    A.   It very well may.

2    Q.   What was your involvement in acquiring or obtaining that

3    contract?

4    A.   Well, we received information through Professor Valensic and

5    another fellow of his, who is a very well-known engineer in

6    Southern California, that the Indonesian government --

7    Indonesian Navy was very interested.  Apparently they had been

8    on the website and had been talking to Professor Valensic.  We

9    heard they were very interested in the products and this idea of

10   the submersible patrol vessel.

11        The Indonesian Navy is quite large in terms of its

12   staffing, but they had been on the do not supply list from the

13   US government for many years.  So they didn't have much in the

14   way of new equipment.  And they were very interested in this

15   whole idea and concept.  We got wind of it during 2005 shortly

16   after Sanil passed away.  And then we asked -- for we certainly

17   weren't going to go charging off to Indonesia until there was

18   something more than just an idea.  We had seen lots of people

19   that were interested in buying things, but they didn't really

20   have the wherewithal.

21        So we asked for and received an MOU from a principal

22   there.  Said basically that we are interested in purchasing ten

23   of your SPVs.  And we would like you to come to Indonesia on

24   your dime, but basically we will meet you at the airport and we

25   will have you meet the head of the Indonesian Navy, and we'll

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    see if we can make this happen.  That was the initial part.

2           And I seizing on this for a number of reasons from the

3    company perspective, military sales by their very nature involve

4    much bigger purchases.  I mean, you can sell 100 Adventurers at

5    $160,000, or you can sell many Adventurers at $160,000 and it

6    wouldn't add up to five or six larger military vessels.  The

7    margins were greater.  And it had to be built to a certain

8    specification, so I felt especially -- I don't want to beat this

9    to death, but simply, when we lost Sanil Subair, who was the

10   chief operating officer, we were in a bit of a quandary here.

11          We now really had to deal with this issue of sales.  We

12   had now gone through our first boat show, so I seized on that

13   particular opportunity to push this through to make it happen,

14   if they wanted to buy these things.  Now, mind you, we hadn't

15   even prototyped these things.  Or rather, we hadn't tested them.

16          But still, the work was ongoing, and we have many

17   documents, I'm sure you can easily find them, that show we're

18   going to be testing the Proteus, which is one of the pictures

19   here, in the next couple of weeks or the next month.  So we went

20   to -- I went to --

21   Q.  That's the Proteus, correct?

22   A.  That is correct.  I went to Indonesia, was met by

23   principals, was taken to see --

24          MR. HESS:  Judge, for interrupt you, but, Judge, for

25   the record, that was 923.31.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

512

1      THE COURT:  Okay.

2      THE WITNESS:  We were met by officials of the

3  Indonesian Navy and taken to the headquarters and ultimately met

4  their equivalent of their chief of naval operations, the head of

5  the Navy, basically, and we had his ear.  We have pictures taken

6  with him, of course.  We had a beautiful model of the vessel,

7  and we sat down to the work of making this deal happen.  All the

8  while, back at the factory, Mr. Jaubert and the rest of the

9  people were working very, very hard to get the Proteus, and

10 ultimately beyond that, the SPV in a position where she can be

11 tested.  You just stop me when you'd like.

12 BY MR. HESS:

13 Q.  That's a perfect time.  I appreciate that information.  I

14 just have one more document.  While my partner is getting that,

15 what was the -- when you arrived in Dubai, did you bring your

16 vehicle over?

17 A.  No.

18 Q.  So how did you get around Dubai?  Was that a company

19 vehicle?

20 A.  Yes.  One was provided by the company, correct.

21 Q.  And it was provided at no expense to you?

22 A.  It was part of the compensation package.  It's a normal

23 expatriate package that includes, usually, accommodations.  In

24 the case of management, I was representing senior management at

25 that point and included a vehicle.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

513

1    Q.  What type of vehicle?

2    A.  It was a Toyota Land Cruiser.

3    Q.  When you got it, it was a new vehicle?

4    A.  When I received it, yes.  They typically rotate these things

5    out after every three or four years or something.

6    Q.  This is the last document I want to show you.  It has been

7    marked as defendant's 1260.

8          MR. HESS:  Without objection, seek to introduce that

9    document, Judge.

10          THE COURT:  1260 is admitted in evidence as a defense

11   exhibit.

12          MR. HESS:  The defense label got peeled off.  Obviously

13   the original will have it.

14          (Defense 1260 in evidence)

15   BY MR. HESS:

16   Q.  Let me show you this.  If I may, I'll bring it up to you.

17   If you could take a look at that.  I'm going to refer down here,

18   which -- let me just stand over here, I guess.  I don't want to

19   block everybody, but it says that this is a document dated

20   7-12-2005.  It's entitled, Ports Customs and Free Zone

21   Corporation Request for Payment.  I want to know if you're aware

22   of this document.

23          THE COURT:  Why don't you just show it to him and ask

24   him if he's aware of it?

25          THE WITNESS:  No.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

514

```
1              MR. HESS:  Just hard to read.  Okay.  Thank you.
2              No further questions, Judge.  Thank you.
3              THE COURT:  All right.  Redirect.
4                           REDIRECT EXAMINATION
5    BY MR. CEDERBERG:
6    Q.  Mr. Miller, we heard some questions about the Indonesia
7    deal.  Did that ever happen?
8    A.  No.  No sale was made.
9    Q.  Why not?
10   A.  We went through five separate contracts as the Indonesian
11   Navy worked with some of their local affiliates.  We eventually
12   got to the point where in order to make the transaction happen,
13   because it was a progressive transaction -- the boats were not
14   sitting there, so it was not a matter of executing a contract
15   and delivering a boat.  And they had very specific -- they had
16   specifications that they wanted to see.  We were finally able to
17   tie that up in a contract.  And they were required to put down a
18   deposit, which I would have to take a look at what that was, but
19   I'm sure it was approximately 10 percent of the overall
20   purchase, something like that.
21   Q.  What happened?
22   A.  We set the deadline, and they didn't come up with the
23   deposit and that was it.  Nothing more we could do.
24   Q.  You talked about an Exhibit 1804 about Mr. Jaubert saying --
25   actually, if we can put 1804 up, the second page.  And highlight
```

1    the first top quarter there.

2           Mr. Jaubert writes to you "I had a meeting with the

3    insurance questioned.  I'm getting liability coverage for our

4    subs to be chartered for tourist rides."

5           While you were at Exomos, did they ever obtain

6    insurance?

7    A.   No.

8    Q.   Did they ever even obtain insurance on the divers who tested

9    these things?

10   A.   That, I don't know.

11   Q.   If you could look at -- if we could put up Exhibit 51.  Is

12   it your understanding to obtain insurance on vessels like this,

13   you do need to have some type of engineering documentation?

14   A.   Yes.

15   Q.   Can we go to Page 51-13 of the BMT survey?  And if you can

16   punch up findings and concerns all the way down in Paragraph 2.

17   Yeah.  "Following our on-site survey, various meetings held and

18   review of documentation presented, we would like to comment as

19   follows:  One, there are no engineering documentations,

20   hydrodynamic, structural, hydrostatic, etcetera, to support the

21   design of each of the submersible prototypes.  As such, a

22   third-party review cannot be conducted to support and/or query

23   the validity of each design."  Do you see that?

24   A.   Yes, I do.

25   Q.   Were you aware that many of Mr. Jaubert's designs were done

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

516

1    on a trial-by-error basis?

2    A.  I can say I never saw any engineering drawings after all the

3    equipment arrived.  I never saw a drawing.

4    Q.  And the second paragraph says, "There are no records

5    available to review with regard to submersible designs,

6    essentially for the completed units transferred Seahorse

7    Submarines, Florida, USA meeting classification an regulatory

8    requirements, ABS and the United States Coast Guard."  Is it

9    your understanding that's correct?

10   A.  Yes.

11   Q.  If we can go to Exhibit 51, Page 17, and can we blow up the

12   second paragraph?  And here the BMT report analyzing Exomos

13   says, quote, "Of immediate concern is the apparent lack of

14   documented, conducted engineering analysis that is usual in any

15   design spiral for innovation design.  The jump from conceptual

16   design to prototype and testing is potentially costly in terms

17   of time, finances, and liability, as well as loss of integrity

18   within the marketplace should losses occur."

19          Do you agree with that statement?

20   A.  I don't understand what the word design spiral means.

21   That's the part that --

22   Q.  What about the fact that the lack of documentation and

23   jumping from just a concept to a prototype exposed Exomos to

24   losses of financial losses, potential liability?

25   A.  I definitely agree with that.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

517

1    Q.  Can we look at a photograph that was marked as 9236.

2        THE COURT:  He's going to put it from his computer.  Do

3    you have to clear the screen of yours?  There you go.

4    BY MR. CEDERBERG:

5    Q.  Okay.  Is that the -- we heard some testimony about a

6    diver -- 26.  That's the one I want.

7        THE COURT:  That's 26.

8        MR. CEDERBERG:  Yes.

9    BY MR. CEDERBERG:

10   Q.  About Mr. Thapa being inverted in a submersible.  That's the

11   kind of submersible he was inverted in?

12   A.  That's correct.

13   Q.  And when you talked about being inverted and the bubble that

14   you were looking into with Mr. Thapa upside down, is that the

15   bubble?

16   A.  That's correct.

17   Q.  Okay.  Is that the one that it took you a period of time, 15

18   minutes or so, to dislodge so he could be freed?

19   A.  Either this one or one exactly like it.

20   Q.  If we could look at Exhibit 48, our 48.  That's it.  Thank

21   you.  Look at the second page, third paragraph or fourth

22   paragraph.  In this paper is, "Therefore a composite of my

23   experience with the company, as well as the discussions I had

24   with my colleagues, Nuytten and Saxon."  Do you see that?

25   A.  Yes.

518

1    Q.  Is this Mr. Walsh's report reflecting -- talking with other

2    experts that you arranged to come to try and help Mr. Jaubert,

3    Phil Nuytten and Ross Saxon?

4    A.  Yes.

5    Q.  Can we go down to the bottom of the page, the middle bullet

6    point, says, "During his first year."  Mr. Walsh writes in his

7    report, "During its first year, Exomos has grown horizontally

8    rather than vertically in terms of products.  Nearly two dozen

9    prototype vehicles have been developed with few, if any, being

10   tested."  Do you agree with that?

11   A.  Yes.

12   Q.  "His diversity of stuff is impressive and fills the shop

13   floor with a variety of shapes and colors.  Clearly there is

14   some clever design and engineering behind most of these

15   machines; however, there is no solid indication that any of them

16   are being readied for production. "  True statement?

17   A.  Yes.

18   Q.  Can we go to the next page, Page 3, and bullet point at the

19   bottom that says "Discipline is needed."  Can we highlight that?

20   About halfway into that, starting with the word "designing" in

21   the middle.  Right there.  Yeah.

22        "Designing and building prototypes of a new thing is

23   fun, but at some point you have to sell something.  Going fast

24   and looking lethal, colorful fiberglass constructions, and sexy

25   uniforms are not enough.  Also just selling ones and twos will

519

1    only bring bragging rights.  It is not a manufacturing, and it's

2    not sustainable."  Do you agree with that?

3    A.  I do agree with that.

4    Q.  Can we show 646, please, and can you blow up the second half

5    of that first page.  Do you recall Mr. Hess examined you on this

6    e-mail, and you said he believed that somewhere on the e-mail

7    must be a list of the specific parts that they were talking

8    about?

9    A.  Correct, at the bottom of this one.

10   Q.  Yeah.  Can we go to the second page?  And the bottom e-mail.

11   "Dear Sanil."  Were these the specific parts where you recall

12   were the specific subject of the sole sourcing memo?

13   A.  Yes.

14   Q.  And with regard to sole sourcing, you told us that sole

15   sourcing meant that Mr. Jaubert could add extra charges to the

16   bills that he was sending to Exomos, the company that he ran?

17   A.  Of course not.

18   Q.  Were you told an approval of sole sourcing for these

19   particular parts meant that Mr. Jaubert could order and pay his

20   own company Seahorse for those parts and not ever have them

21   delivered and keep the money?

22   A.  Of course not.

23   Q.  Was it your understanding that this memo you wrote about

24   sole sourcing allowed Mr. Jaubert to put in 10 percent for

25   shipping and handling if Seahorse did no shipping and handling

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

520

1    and the merchandise was sent directly from the supplier to

2    Exomos?

3    A.  No.

4            MR. CEDERBERG:  May I have a moment, Your Honor?

5            THE COURT:  Certainly.

6    BY MR. CEDERBERG:

7    Q.  One question -- a couple questions.  I don't want to say one

8    if I have more than one.  You talk about all the different tests

9    that you were aware of, even more tests that we were able to

10   find trial reports on, tests in the water with Mr. Jaubert's

11   trial submarines?

12   A.  Trial reports, yes.

13   Q.  Trial reports.  How many times was Mr. Jaubert the pilot of

14   those submarines and those tests that you can remember?

15   A.  I would estimate probably out of 100 that I was involved in,

16   he was the pilot in two, two to three.

17           MR. CEDERBERG:  Nothing further, Your Honor.

18           THE COURT:  All right.  Thank you, sir.  You are

19   excused.

20           Why don't we take our morning break.  Let's take about

21   10, 12 minutes, come on back at about 11:30, and we'll have your

22   next witness ready to go at that time, please.

23           MR. CEDERBERG:  Yes, Your Honor.

24           THE COURT:  All right.

25           COURT SECURITY OFFICER:  Please rise for the jury.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

521

```
 1               (Jury out at 11:15 a.m.)

 2               THE COURT:  We'll be in recess.

 3               MR. CEDERBERG:  Your Honor, witness is excused now?

 4               THE COURT:  Witness is excused.  I've done excused him

 5       already.

 6               MR. CEDERBERG:  Okay.

 7               THE COURT:  He and I have an understanding.  He's gone,

 8       if he wants to be.

 9               (Brief recess)

10               THE COURT:  All right.  Bring in the jury, please.

11               (Jury in at 11:30 a.m.)

12               MR. URQUHART:  Your Honor, if I may, I have the

13       pleasure of introducing Joelle Perry.  She's a recent graduate

14       of the University of Virginia Law School, and this is the first

15       time she's ever been in a trial.

16               THE COURT:  Well, I hope that you're suitably impressed

17       by our amazing surroundings.  Thank you.  Welcome.

18               COURT SECURITY OFFICER:  Please remain standing for the

19       jury.

20               (Jury in at 11:31 a.m.)

21               THE COURT:  Please be seated.

22               ABDULQADER OBAID ALI, PLAINTIFFS' WITNESS, SWORN

23               THE COURT:  Please be seated.  Tell us your name and

24       spell it.

25               THE WITNESS:  My name is AbdulQader,
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A-B-D-U-L-Q-A-D-E-R, Obaid, O-B-A-I-D, Ali, A-L-I.

2         THE COURT:  All right, sir.  Keep speaking up into the

3    microphone as much as you can.  The jury has said that they

4    can't always see the pictures because they're down low, and the

5    people in the back can't see them.  That's their problem.  If

6    they don't show you the pictures, then you can't see them.  It's

7    their job to speak loud enough for to you hear them, to speak

8    clearly enough for you to understand them and to show you the

9    pictures if they think that they have some meaning.  I

10   understand your frustration but don't strain yourselves.  That's

11   their problem.  If they don't do it, shame on them.  I'm not

12   going to tell them what to do or how to do it.  I think there

13   are ways for them to get around it, but don't forget, you will

14   get copies of everything at the end that is in evidence and you

15   will have ample opportunity to review it at that time.

16        I don't want to seem callous, but I do this all the

17   time.  If I were to start worrying about whether lawyers are

18   being courteous to juries or are speaking loud enough, in fact,

19   I have come to the conclusion that falling asleep in the jury

20   box is a social commentary, just like saying I'm bored, and that

21   it is their problem to keep you awake by being interesting.  Do

22   the best you can.  Thank you.  You may proceed.

23                       DIRECT EXAMINATION

24   BY MR. URQUHART:

25   Q.  Where do you live?

523

1    A.   In Dubai, United Arab Emirates.

2    Q.   Did you go to college?

3    A.   Yes, I did.

4    Q.   Where did you go to college?

5    A.   I started when I finished high school in Georgetown

6    University.  Then from there after a while, I went and finish my

7    college degree in Arizona State University.  After working for

8    about nine --

9    Q.   Let me ask you why -- you're one of the most prestigious

10   American university, why did you move from Georgetown to Arizona

11   State?

12   A.   The main reason?

13   Q.   Yes.

14   A.   The weather.  I couldn't stand the snow.  When I first

15   landed there, it was my first experience in seeing snow.  I

16   thought they were nothing but cotton farms downstairs but --

17   Q.   So you went to college.  How did you finance your college

18   education?

19   A.   I received a scholarship from the government.

20   Q.   Did you take any courses beyond your college degree?

21   A.   Yes, I did.  After finishing my degree from ASU, and I

22   worked for about quite -- about eight, nine years.  I

23   received -- I was the owner of something called The Well

24   Professor Award.  This was an award given by the British

25   government.  I was lucky enough to receive the first award, and

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

524

1    I went to Scotland in the UK.  When I did my MSC in technology

2    management.  After -- while working my first company, I was also

3    fortunate enough to try to do a 10-week course at IMD, Institute

4    of Management Development in Switzerland.

5    Q.  To backtrack a little bit, what was your degree in from

6    Arizona State?

7    A.  Electronic engineering.

8    Q.  So when you went to Scotland, the government of Scotland

9    financed your education?

10   A.  It was the British government, actually, financed my

11   scholarship while I was there.  I did one year MSC.

12   Q.  What is that exactly?

13   A.  It's a very short course, usually for master degree.  You

14   take around two years to try to do the work.  This was an

15   extensive program where I -- instead of doing one load, I was

16   doing two loads, was full-time.  So I did the first semester,

17   second semester, then I did my thesis in technology management

18   because, at that time, I was working in IT.

19   Q.  Have you received any honors during the course of your

20   career?

21   A.  The first one was the Well Professor Award, but just about

22   three weeks ago in Dubai, I received Kanu medal for quality.

23   Q.  What is that?

24   A.  It's a special -- Kanu is a Japanese guru that Hamdan

25   University in the UAE put up an award for people that continued

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

525

1    working in the quality field, and I was one of five recipients

2    of this award.

3    Q.  Do you serve on any boards of directors?

4    A.  Yes.  I work on the Dubai median corporation.  I'm a board

5    member over there.  Also, Dubai Quality Group.  I serve as the

6    chairman now.  Also a member of the board of the Dubai Quality

7    Group.  Also, I am the president of the UAE Internal Audit

8    Association, which is linked to the IIA here in the states.

9    Q.  What is the IIA?

10   A.  Institute of Internal Auditors, which is based in the

11   states.  And I was -- I am also a Anul school.  Anul is a

12   special school for special needs.  Those are the --

13   Q.  So I saw once on your business card, it says "CFE."  What

14   does "CFE" mean?

15   A.  I'm also a certified fraud investigator, as well.

16   Q.  What does that mean?  Who gives you the CFE?

17   A.  This is from the states.  Couples from the states.  ICFE,

18   Institute of Certified Fraud Investigators.  I received also my

19   CFE from them as well.

20   Q.  For whom do you work?

21   A.  Dubai World.

22   Q.  What position?

23   A.  I am the chief internal auditor right now for Dubai World.

24   Q.  What are your responsibilities as chief internal auditor?

25   A.  Well, when you hear the word "audit," a lot of people will

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

526

```
 1    love you automatically, you know, because what we do is we
 2    audit.  We audit the different entities that we have at Dubai
 3    World.  We are a big holding company, so we have a lot of
 4    companies.  And my responsibility with my team is to audit the
 5    different areas that are under Dubai World.
 6    Q.  What exactly is an audit?  Can you describe what an audit is
 7    to the jury, please?
 8    A.  Now, when you hear auditors are coming tomorrow, a lot of
 9    people want to take leave the next day.  But really, the main
10    purpose of an audit is for continuous improvement of the
11    business.  That is really our main.  We are there for management
12    to try to let them know that we look into the processes of
13    things, we look into how things are in the governments -- when I
14    mean governments, I really mean are things done in the right
15    way.  The policies and procedures are followed by for the
16    management.
17          We come there as independent.  We try to look at these
18    processes.  And really, the main purpose is not to find
19    mistakes.  Because no one is perfect.  But our main purpose is
20    to try to identify where are the areas that we can actually put
21    for the eyes of the management and try to improve them, and
22    that's really the main purpose of an audit.  We work sometime as
23    a consultant.
24    Q.  Can I ask how many people report to you?
25    A.  In the audit, 45 currently.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

527

1    Q.  I'm doing my math.  That leaves ten other people?

2    A.  They work in the fraud investigation department.  I have two

3    departments that currently report to myself.  The first

4    department is the internal audit.  That's internally.  Then we

5    have another department called the fraud prevention department.

6    That particular department -- actually, when we see or when we

7    smell something that's not -- you know, we see could be some

8    fraudulent activity, we will not let the auditors work on there

9    we take the case and we give to it the fraud investigators,

10   because there's a distinct difference between internal audit and

11   fraud.

12        In fraud, you're actually looking after -- you're

13   looking at an individual or a bunch of people.  Looking at them

14   to try to make sure.  And to make sure that the evidence are

15   there, and then that evidence can actually withstand in court.

16   That is different from audit.  The audit is there to try to

17   improve the businesses.  So that's the main difference.

18   Q.  How many audits, just regular audits, does your unit

19   conduct?  Say, how many did you conduct in the last 12 months or

20   so?

21   A.  In the last year, we've conducted for Dubai World around 123

22   audits that we have done across the whole of the wide world

23   entities.  We have more than 90 companies.  So we try to do our

24   best in trying to cover all of those companies.

25   Q.  So is it accurate to say, then, that you're -- the people

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

528

1    who report to you and you do audits on a routine basis of Dubai

2    World companies?

3    A.   Yeah.  The way we do audit, you know, is just not -- you

4    know, we do have what they call audit plan.  An audit plan that

5    we follow.  How we come up with this audit plan is what -- we do

6    something called a risk assessment.

7         Now, trying to explain that in layman terms is -- for

8    example, if I have three different businesses, Business A,

9    Business B, and Business C.  Business A is worth 100 million,

10    Business B is worth 10 million, Business C is worth another 10

11    million.  So where do we select which one we start with is

12    important for us because we have finite resources, and we can

13    only do one thing at one time.  The way we do it, we look at the

14    businesses, and we look -- for example, let's say this is a

15    hundred million, so the importance goes to that because there is

16    more money involved in there, so you would give that a priority.

17         But when it comes to Business B and Business C, they're

18    both worth 10 million, so which one you do.  We do look, we have

19    a criteria list in looking into the asset, look into the number

20    of the transaction, how young the business is, is it -- when was

21    the last time we did the audit report and that, what was the

22    rating of the audit.  Depending on all those factors, we come up

23    with an audit plan, identify what we call a heat map where are

24    the most risky areas we have, and we follow that.  And it's a

25    three year plan that we do.  That's how we do it.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

529

1    Q.  What I'd like to do next is just show you, but not the jury,

2    what's been marked as Exhibit 41.  Can you take a look at it.

3    It's over there on the monitor.

4    A.  Yes I can, definitely.

5    Q.  Do you know what that is?

6    A.  Yes.  This is our report.

7    Q.  Is that an audit report that was done by people who reported

8    to you?

9    A.  Yes, that's right.

10   Q.  Are you the person who initiated the audit, told them to do

11   it?

12   A.  Yes.

13   Q.  Did you consult with them during the course of the audit?

14   A.  Consult with?

15   Q.  The people who were actually performing the audit.

16   A.  Yeah.  The way we start an audit, and there's a difference

17   between an audit -- when we do an audit, we have to let the

18   auditee, the people, know we have come.  It doesn't come by

19   surprise.  What we do is give them an engagement letter, because

20   after all it's a win/win for both of us trying to identify

21   improvement.

22        We say we're going to have an opening meeting.  In this

23   opening meeting, we request the management to be there, say we

24   are going to come into audit you.  Our audit scope, this is what

25   we cover in our audit scope so they understand what we're going

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

530

 1    to try to do to make sure some time the relevant people are

 2    there for us to try to request information from them, and that's

 3    how we start.

 4    Q.   Okay.  With respect to this audit that's Exhibit 41, did you

 5    go to this meeting?

 6    A.   Yes, I did.

 7    Q.   You personally participated?

 8    A.   I was there trying to because a lot of people, of course, as

 9    stated earlier, they love auditors.  But the purpose of an audit

10    is to try to explain what we're trying to do there and to the

11    management, if they have any questions, they can ask us and say

12    this is the scope of our audit.

13    Q.   Were you given regular updates during the course of the time

14    when the auditors were preparing this report?

15    A.   That is a normal process for us.  We do not try to hide

16    anything from the auditee, because we are not trying to find any

17    kind of mistake, as I said.  I get regular updates about what's

18    happening.  Not only that, during the course of audit, we sit

19    down with auditees, and if we identify an issue, we want to make

20    sure they are aware of it so we can actually take the responses.

21         And before we finish our audit, what we do is we

22    generate what we call a draft audit report.  Now, the purpose of

23    this draft audit report is to try to give the management a

24    chance to try to respond to us, to try to say, "Well, these are

25    the issues that was raised, and are they okay or not okay?"

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

531

1          Before we issue the final report, we do a presentation,

2     because we know management are too busy, and especially at the

3     level of the top management, we sit down the presentation, we

4     take them through the highlight of the audit, so they can see

5     what are the high, medium, and low risks that we identified, and

6     at that time, if there was any kind of response, we also like to

7     take that from them.

8     Q.   All right.  Did you actually read that report before it

9     became final?

10    A.   I don't read every single report, but this report I read.

11    Q.   Okay.  You talked about the presentation to senior

12    management.  Did you participate in that?

13    A.   Yes, I was in the presentation, yeah.

14    Q.   Was Mr. Jaubert in that presentation?

15    A.   Yes, he was there.

16    Q.   Did he say anything during the course of the presentation?

17    A.   It was just a normal audit, you know, and we agreed on what

18    to do with these high-risk issues that we identified.

19    Q.   Would you characterize it as sort of a friendly meeting?

20    A.   This was a proactive meeting, because I said audit is there

21    for the purpose of improvement.  So we were there to try to say,

22    "Look, we identified these issues, and how can we work together

23    to try to make sure that these issues are resolved?"

24    Q.   When the audit is completed, do you give a copy of it to the

25    senior management?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

532

1    A.   Yeah.  That's their right.  We definitely give them a copy

2    because, after all, it's their audit.

3    Q.   You file it in your own books and records?

4    A.   This is required.  We do have it.  We have a system where we

5    keep all of our audits, so we have an online system that all of

6    the audits have to be kept in there because they are record of

7    the company.

8         MR. URQUHART:  I'd like to move Exhibit 41 into

9    evidence, Your Honor, as a business record.

10        MR. HESS:  Objection.  Hearsay, Judge.  Doesn't meet

11   the requirement of a business record.  First of all, it lacks

12   any indicia of the trustworthiness as required under the federal

13   rules.  There's no testimony whatsoever that Mr. AbdulQader has

14   any personal knowledge of any of the accumulation of the

15   information that is accumulated in that multipage report.

16        THE COURT:  That part, he said it was done under his

17   direction.  But I don't remember any testimony concerning the

18   business record aspect of this.

19        Are you trying to submit this as a business record?

20   Did you say it was done in the ordinary course of business and

21   prepared at or about the time that he's the custodian?  Because

22   I don't believe that he's testified to any of those things.

23        MR. URQUHART:  May I, then, Your Honor?

24        THE COURT:  Go ahead.  Get some more background.

25   BY MR. URQUHART:

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   Q.  Would you call this a business record of the corporation?

2       THE COURT:  I don't care what he calls it.  Ask him

3   about the background, as to whether it was prepared in the

4   ordinary course of business, whatever the rules are.

5   BY MR. URQUHART:

6   Q.  Was it prepared in the ordinary course of business?

7   A.  Yes, definitely.  This was definitely done for the business.

8   This audit was done for the business here.

9   Q.  You performed similar audits for other business units?

10  A.  We do that.  As I stated earlier, we've done about -- last

11  year, 123 audits.  They are all business audits.  So we have

12  custody of all of those.

13  Q.  Why do you keep them?

14  A.  Because, number one, you know, this is for us to try to do a

15  follow-up.  Okay.  And when we do an audit of any business, so

16  what is the purpose of us going there and doing the audit in the

17  start?  To try to identify, to find out if there are any -- as I

18  said, no one is perfect.  There are areas, there are gaps that

19  we identify in these records, which we classify them as being

20  high, medium, or low.  We will follow-up with the department or

21  the company to try to find out which one of these have actually

22  executed to try to see otherwise.  Why do an audit at all?

23  Q.  Is there a date on that audit?

24  A.  Yeah.  This was done December 2005.

25  Q.  And was it filed in your department about 2005?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
1    A.  Yes.

2    Q.  And was it transmitted to Mr. Jaubert's company about that

3    period of time?

4    A.  Yes.

5    Q.  And is it there so you can refer to it for business

6    purposes?

7    A.  Definitely, yes.

8         MR. URQUHART:  Your Honor, can I move it again into

9    evidence?

10        THE COURT:  have you complied with 8036?  That's what

11   I'm asking you.

12        MR. URQUHART:  I believe I have, Your Honor.

13        THE COURT:  I don't remember you asking him the right

14   questions.  I mean, it doesn't seem like it's all that hard, but

15   I teach a course in this and I get paid to do that.  I don't

16   teach evidence courses in class -- I mean, in court.  It seems

17   to me that you have to ask him certain things to comply with

18   8036.  I have not heard some of the things in there.

19        I would just read to you the text of it.  A memorandum,

20   report, record or data compilation in any form, of acts, events

21   conditions, opinions or diagnosis made at or near the time by or

22   from information transmitted by a person with knowledge, if kept

23   in the course of a regularly conducted business activity, and if

24   it was the regular practice of that business activity to make

25   the memorandum, report, record, or data compilation, all is
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

535

1   shown by the testimony of the custodian or other qualified

2   witness.

3            And, you know, I think you qualified him as a person

4   who is the other.  He's not necessarily the custodian of record.

5   I haven't heard anybody say this was kept in the ordinary course

6   of business, that the events were recorded at or about the time.

7   I'm not going to do it for you, but I think you've got to do

8   that.  I don't think you've asked the magic questions in the

9   right order, and if you do, then it's admissible.  If you don't,

10  then it's not.

11           MR. URQUHART:  Let me see if I can do that, Your Honor.

12           THE COURT:  You probably ought to ask the girl that

13  took evidence last year to do it rather than -- but I don't

14  think -- you can't be swapping back and forth.  She's probably

15  over there twitching in her seat.

16  BY MR. URQUHART:

17  Q.  Who performed sort of the groundwork that goes into that

18  audit?  Were they people that were actual CPAs?

19  A.  See, the audit we do, we have a different range of audit

20  that we do at Dubai World.  Some are actually operational audit,

21  some are financial audit.  Some are what we call technical

22  audit.  We have engineers who actually go into the field,

23  especially construction, and they do audit and we also do IT

24  audit.  All those do require certain skills of people to be able

25  to try to conduct those audits.

536

1            So we have people to say that -- 68 percent of our the

2     people that we have in our department are actually certified to

3     one form or another, whether they are CPAs, whether they are CFE

4     or CIA.  CIA means certified internal auditor.  Those are the

5     people that actually go and conduct the audit.  We have project

6     leader for an audit, and we have a manager as well responsible

7     for that particular day that the audit is actually being

8     performed.

9     Q.  Did the people that conducted the audit of Exomos, which is

10    Exhibit 41, were these people who were skilled in these areas

11    that they were reporting on?

12    A.  They're skilled in the audit process, yes.  Definitely.

13    Q.  And these records, they're kept in your offices?

14    A.  Yes, they are in our office.  We have a system, okay, we are

15    mandated to try to keep this record.  We have a software system

16    that keep all our audit report, and actually in a certain case,

17    any audit we have done, you can actually request and we will be

18    able to try to generate one.

19    Q.  And you're the ultimate custodian because you run the

20    department?

21    A.  Yeah.  Being the chief internal auditor at the top, I am the

22    person who is actually responsible for all those audits, yes.

23    Q.  And that audit was completed on or about the date that's

24    reflected on the cover sheet?

25    A.  Yes, it was.


**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

537

1          MR. URQUHART:  Your Honor, I think I've said the magic

2     words now.

3          MR. HESS:  Same objection, Judge.

4          THE COURT:  Tell me the specifics, because I think he

5     has covered everything.

6          MR. HESS:  Well, what hasn't been covered, Your Honor,

7     is that which is critical, as Your Honor is aware in the hearsay

8     under the business records exception, is it has to be based on

9     information transmitted by a person with knowledge.  Not an

10    outsider or not someone without knowledge.  All he's testified

11    to is that he's got professionals.  That doesn't answer the

12    question because, as Your Honor --

13         THE COURT:  He did ask that question.

14         MR. HESS:  But he doesn't know who did it.

15         THE COURT:  You see, I don't think that you're asking

16    about the -- I don't think that what they're talking about in

17    this is that it has to be done by a person that has knowledge of

18    the underlying business organization.  It only has to be that

19    the person that put the information into the report has

20    knowledge that the information that is put into the report is

21    accurate.  And he has said that.  You know, what he has said is

22    sufficient to prove that to me.  So I believe it is sufficient.

23    And over your objection, I will permit -- what is it 41? -- into

24    evidence at this time.

25         MR. HESS:  Judge, may I address that one point?

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

538

1          THE COURT:  Sure.

2          MR. HESS:  My point is there may be a higher level of

3     professional reliability.  Professional reporting in this case.

4     What isn't here is that all of the other sources of information

5     are not disclosed, and there's no way to ascertain whether or

6     not those persons who reported to the people that made the audit

7     had any duty to report.

8          THE COURT:  I understood that when you said it the

9     first time.  I don't think that's necessary.  I think that what

10    this requires is that the person that put the information into

11    the report that is being offered knew what they were putting

12    into that report.

13         Now, you can attack the underlying information as not

14    being accurate, but the hearsay that we're talking about is from

15    that report to here.  I think that the indicia of reliability is

16    sufficient by what he has said.  So I will overrule your

17    objection.

18         MR. HESS:  I have another basis that I'm objecting.

19         THE COURT:  You better get them all in at once, because

20    once I rule I do not want to hear one more word.

21         MR. HESS:  I will, Judge.

22         THE COURT:  Now tell me your other.

23         MR. HESS:  Two points.

24         THE COURT:  What is it?

25         MR. HESS:  This is not a business record because this

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

539

1   was prepared -- has all the indicia of being prepared in

2   anticipation of litigation.

3           THE COURT:  Overruled.

4           MR. HESS:  Last is lack of trustworthiness.

5           THE COURT:  Overruled.  Give them all to me at once,

6   because once I rule, I don't want to hear anymore. We could be

7   here for three weeks, and you're going to be here by yourselves,

8   and not even in this courtroom, because Judge Moore is coming

9   down in two weeks and he has the courtroom.

10          Go ahead, sir, you may proceed.  41 is in

11  evidence.

12          (Plaintiffs' 41 in evidence).

13          MR. URQUHART:  Thank you, Your Honor.

14  BY MR. URQUHART:

15  Q.  I'd like to turn your attention to Page 1 of the audit

16  report.  By the way, up there in the "Group Internal Audit."

17  That's your group?

18  A.  Yeah, right.  That's right.  We're referred to as Group

19  Internal Audit.

20  Q.  Can you take a look at Page 1?  Where the first text

21  appears.  Says "audit rating."  Can you highlight that, please.

22  Can you read that, please.

23  A.  Says, "Based on our findings and review, we rate this audit

24  as unsatisfactory and refer to annex two for details."

25  Q.  And in your world, what is a rating of unsatisfactory mean?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

540

1    A.   When we do any audit, at the end of the audit, based on the

2    finding, we have a rating, and this is a rating that we share

3    with the business.  And the rating -- we have five ratings.

4    Unsatisfactory being the worst.  Goes from unsatisfactory, then

5    goes needs improvement, then we say this is -- we say it's

6    average, then we say good, and we say the ultimate, we say

7    control.

8         The difference is that controlled means we've done our

9    audit, we were satisfied that whatever we look into we were

10   satisfied, and the business is actually functioning fine,

11   there's no problem.  Unsatisfactory means we looked in the

12   business, and depending on the findings, that we do fine from

13   the audit now as I stated.  We defined them in three categories,

14   high, low, and medium risk.

15        In this particular audit, I think, if I recall, is we

16   identify 21 high-risk issues, seven medium, and seven low.

17   Based on the finding that we did find, knowing that the business

18   is also not that mature, we gave that audit report

19   unsatisfactory rating, which means controls are not there.

20   Controls are actually not there.  And looking at it from a

21   proactive point of view, we understand this is a -- relatively a

22   young business, not a business that's been there for the last 30

23   years, so that was the basis where we gave unsatisfactory

24   report.

25   Q.   I'd like to direct your attention to Page 3 of that report.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

541

 1    Can you pull that up?  So what are these?

 2    A.  Okay.  As I stated, you know, they were 21 high risk that we

 3    identified, seven medium, and also seven low.  If I may use

 4    the -- you can see that, for example, when you take a look at

 5    this, it's very difficult to read, but I'll try to read just

 6    some of the highlight, if it's okay.  Just -- I'm not going to

 7    go through all of them, but, you know, we saw some of the

 8    malpractice of charging expenditure among Capex.  Capex is a

 9    system we have, which is called capital expenditure.  It's a

10    term we use.  No effective monitoring of call Capex, practice of

11    obtaining approval of executive chairman prior to adhering to

12    groups Capex process flow, they have to go through a flow

13    approving it.

14         What we know is in some cases, you go straight to the

15    big boss and get his signature on it.  That is not in line with

16    the governess.  You have to follow the process.  We didn't see

17    any production costing, no estimation process, no progress

18    report, no updated formal, no business plan, lack of budgetary

19    control, no monthly management report, no accounting policies

20    and procedure, noncompliance of group HR policy.  We have an HR

21    policy, and we notice some of the policy and recruitment were

22    not really in adherence to the policy.

23    Q.  Can I interrupt you for a second.  Can you take a look at

24    the one down at the very bottom, Number 21.  Could you highlight

25    that, please.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   A.   It says, "Open purchase orders from SSI."

2   Q.   What is SSI?

3   A.   This is the company that Mr. Herve also owns.

4   Q.   Seahorse?

5   A.   Seahorse, yeah.

6   Q.   And why was that identified as a problem?

7   A.   Because during -- we were trying to find out if there's any

8   expenses that what's happening with these expenses.  So when we

9   saw this as really an open purchase of 1.2 since November

10  something is open, we want to know why it's open.  So we just

11  highlighted for the management whether it was a Seahorse or XYZ,

12  doesn't matter.  That's our duty to try to highlight to the

13  management.

14  Q.   I would like to direct your attention to Page 9 of that

15  report, and last full paragraph on the left.  You got that?

16  Your other left.  Can you highlight the first line or two?  Can

17  you read that?

18  A.   Says, "In respect to Seahorse, we noted that no original

19  supporting documents are available.  In addition, as discussed

20  with purchasing controller V.K., the service cost added to

21  Exomos invoices from Seahorse is 10 percent, but we could

22  identify more than this percentage charged under PO" -- stands

23  purchase order -- "143,607.  Where Seahorse charged Exomos

24  approximately 58 percent more than the original supplier

25  invoice."

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

543

1   Q.  What does that mean, that Exomos charged approximately 58

2   percent more than the original supplier invoice?

3   A.  If an item was $100, all of a sudden it's one 158.  Instead

4   of being 110, it would have been 158.

5   Q.  You didn't believe that was appropriate?

6   A.  If there is any kind of an agreement for a service charge or

7   any of that nature, we need to see documentation proving that

8   that's been approve.  For us as an auditor, it doesn't matter

9   whether it's 10 or 20 or 100.  If there is documentation, if

10  there is an agreement that we can see, then we are actually

11  satisfied.  When we see something being charged without

12  justification, we raise the flag for the management.

13  Q.  Can you just highlight after the purchase order numbers?

14  Says, "We could not find"?

15  A.  Yeah.  "We could not find supplier invoices as supporting

16  documents.  Only Seahorse invoices are available.  Also, for the

17  same PO numbers, we could not find delivery notes and no

18  shipment details.  The total value of both POs is around 111,000

19  USD."

20  Q.  How much is that in USD dollars roughly?

21  A.  It says US dollars.

22  Q.  It is US dollars.  I apologize.  Why did you find that

23  troublesome?

24  A.  You know, whenever you buy something, you know, as a system,

25  if you want to try to look at it from a system to try to control

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

544

1    that, you say this camcorder here is costing you a thousand

2    dollars.  So you go and put a purchase requisition to go and buy

3    this camcorder, which is equivalent to a thousand dollars.  How

4    do you know that we bought it?  How do you know that the company

5    bought that camcorder which is a thousand dollars?

6            The way that you can easily prove is you raise an

7    invoice, has been received, the item has been received, where

8    does it go?  It goes to warehouse.  The warehouse people would

9    definitely make sure that when they receive it, they look at the

10   invoice and they look at the delivery note and they see it is

11   there.  When we see that there is no delivery note, we wondering

12   where is this as an asset.  After all, we bought whatever it is,

13   it's a camcorder, piece of equipment.  We start questioning

14   where is the item.

15   Q.  Did you tell Mr. Jaubert, at about this time, that you had

16   problems with him dealing through his own company Seahorse?

17   A.  At the end of the reports, we told him to stop dealing with

18   his own company.  Definitely, you know, Mr. Jaubert is wearing

19   two hats.  One way he's actually chief executive of Exomos, and

20   the second hat he's wearing the hat of Seahorse, you know.  So

21   he cannot deal with his own company.

22   Q.  Okay.  And did he tell you he was going to stop doing that?

23   A.  Yes.

24   Q.  I'd like to direct your attention to Page 33 of that report.

25   I'm sorry.  Page 31, rather.  See where it says, "Status of

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

545

1    trademarks"?  Look at trademarks.  Can you look at the bottom,

2    highlight the last paragraph there.  Particularly interested in

3    the last sentence there, "Disney's refusal to grant Exomos the

4    right to use Disney's copyrighted version of the Nautilus."

5    What were you talking about there?

6    A.  Our concern, Nautilus is a brand name.  Whenever you use a

7    brand name, you need to have approval, whether it is from Disney

8    or anybody, because, you know, you could be counter sued and we

9    don't want to be a case where we can be sued.  So we did request

10   that especially when we're reporting that name is we need to try

11   to get approval from Disney.

12   Q.  Can you slide over to the recommendations column, please?

13   Where it says "Recommendations."  A little bit lower, lower.

14   Right down there.  All right.  What's that recommendation?

15   A.  Especially with the patent, we recommend that the company

16   should adhere to legal counsel and register the patent as

17   advised by the legal counsel.  As I said, we recommend for them.

18   They should actually go ahead and get approval.

19   Q.  Can you slide over to the final column on the right there?

20   See where it says CEO's comment?

21   A.  Yes.  In our report, when we issue our report, we always

22   like to try to get -- wherever possible is get the feedback from

23   the management, because it's very important for us because to

24   try to find out if we did it right or we don't get it right.  In

25   this particular case, this is in process, intellectual property

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

546

1    is very valuable, and all steps are taken to protect it.  So we

2    know this has been accepted by the management.

3    Q.  So was it your view, then, that management was going to

4    approach Disney to get permission to use that?

5    A.  Yes.  I mean that's the process.  How would you get it.

6    Q.  Are you aware of whether or not they ever got permission?

7    A.  I don't think they got permission.

8    Q.  Now, going back to these 21 high priority items, what did

9    you decide to do after you met with Mr. Jaubert and found all of

10   these high priority items and determined that the audit was

11   unsatisfactory?

12   A.  Like any of our audit, when we do an audit of anything, we

13   sit down with the management, and as I said, this is really a

14   proactive approach where we have identified this issue, we

15   request the management -- see, as auditors, we cannot go ahead

16   and fix these things, because otherwise, we lose our

17   independence.  We cannot.  We do request management to try to

18   put a priority and fix these recommendations as soon as

19   possible.

20        As -- and also as a practice with us, when we see an

21   unsatisfactory report, no matter what it is in any business, we

22   just don't leave that.  What we do is we have a system where we

23   would follow-up with this audit to try to make sure those

24   recommendations are actually which were accepted are actually

25   implemented.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

547

1    Q.  So did you decide what you were going to do next?

2    A.  After we finished the report, knowing that this report is

3    unsatisfactory, it's in our interest to put up a follow-up on

4    this, and it's exactly what we did in the following year.  We

5    didn't follow them after two or three months, we followed them

6    next year, and I think, if I'm not mistaken, it was August of

7    the next year that we finished the follow-up report.

8    Q.  Would this be a procedure that you would follow if you had

9    similar results with respect to another Dubai World subsidiary?

10            MR. HESS:  Objection.  Leading.

11            THE COURT:  I believe that is leading.  Ask a different

12   question.  Sustained.

13   BY MR. URQUHART:

14   Q.  What would you do if you found an unsatisfactory report with

15   another one of the Dubai World companies?

16   A.  Now, as I said, the purpose of our audit -- otherwise, how

17   do we ensure, what's the value we're adding to the business if

18   we got to do an audit and then we take that audit and we shelve

19   it and we never look at it again.  It's mandated from us as

20   group, internal audit, that we do a follow-up of all of our

21   audit, but what we do in terms of priority, we would follow-up

22   with the answer with the one that actually have a very low

23   rating because that's what we are needed most.  So we go back to

24   the business and see what they have actually accomplished.

25   Q.  Give them a report card.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

548

1    A.   If you want to call it a report card, we don't want to sound

2    like -- we don't want to be sounding like putting people down,

3    because we are there as internal audit to try to help the

4    departments.   That's what we're trying to do.

5    Q.   Did you, in fact, schedule a follow-up audit?

6    A.   Yes, we did.   As a formal practice we do across all of our

7    audit, whenever we see unsatisfied report, we follow with that.

8    The usual time is you know it takes between some time a year to

9    18 months to try to do a follow-up because we do have a lot of

10   auditing here, but when we see an unsatisfactory report, we

11   would follow-up a little earlier to make sure the

12   recommendations are actually in place.

13   Q.   Did you personally tell your auditors to conduct a follow-up

14   report?

15   A.   Yes that's part of our normal process.   Yes, I did.

16   Q.   And when the report was finalized, was that report done in

17   the ordinary course of business?

18   A.   It was almost another audit report trying to do a follow-up

19   report.   It's a normal follow-up report, which we do absolutely.

20   Q.   Did you discuss the results of the audit as the audit was

21   progressing?

22   A.   The process is the same.   Whenever we conduct an audit or

23   follow-up audit, the process is the same.   That we inform the

24   auditees that we're going to do a follow-up audit.   In this

25   case, we go and discuss with them the findings, and we do our

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

549

1   audit and -- the normal way before issuing the report.  We

2   highlight the issue that we actually see in the audit.

3   Q.  So these are done in the ordinary course of business?

4   A.  Ordinary course of business, yes.

5   Q.  And when they're done, they're filed, I guess, in your

6   offices ultimately under your supervision?

7   A.  Absolutely, in the system that we have, yes.

8       MR. URQUHART:  I'd like to move Exhibit 52 into

9   evidence.

10      MR. HESS:  Judge, objection.  Doesn't comport with the

11  business records requirements,

12      THE COURT:  Tell me what part does it not.

13      MR. HESS:  It doesn't -- again, in this case, there's

14  absolutely no testimony that Mr. AbdulQader is aware that the

15  information contained in the report was reported at all levels

16  by a person with a duty to report or with knowledge

17  contemporaneously of the items that purports to be in the

18  report.  As well as lacks trustworthiness.

19      And also, this is the second audit report.  This is not

20  a business record.  This is an investigation, and under the case

21  law such as the case of --

22      THE COURT:  That will go to the weight of the evidence

23  rather than the admissibility.  I'll overrule your objection,

24  admit Number 52 into evidence.

25      MR. URQUHART:  Could you put up Exhibit 52, please.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

550

```
 1              (Plaintiffs' 52 in evidence)

 2    BY MR. URQUHART:

 3    Q.  Can you tell the jury what this is?

 4    A.  This is another audit report, August 2006.

 5    Q.  Is this the follow-up?

 6    A.  This is the follow-up report, yes.

 7    Q.  Have you seen it before?

 8    A.  Yes.

 9    Q.  Did you read it before it was finalized?

10    A.  I read it and some of the items, actually.

11    Q.  Before the report was finalized, did you meet with

12    Mr. Jaubert?

13    A.  It is our normal practice that we -- it's not for us to try

14    to go ahead and do an audit behind people because our audit is

15    trying to improve.  So we did discuss that and a presentation

16    with the management.

17    Q.  Was it your purpose of this audit to review those 21

18    findings to see whether or not they were corrected?

19              MR. HESS:  Objection.  Leading.

20              THE COURT:  Hold on a second.  All right.  Sustained.

21    BY MR. URQUHART:

22    Q.  What was the purpose of this audit?

23    A.  The purpose of this second audit, because of the first

24    report, which was rated as unsatisfactory, you know, for us to

25    try to add value, we wanted to try to follow-up, and this is
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    part of our normal process, is that, you know, we do follow-up

2    audits.  And all of our audits -- not only this particular one,

3    but we do it for all of our audits.  In this particular case,

4    because the first one was unsatisfactory, you know, we wanted to

5    try to follow-up to see what are the things that actually

6    happening in the business, and that's why we followed, we do the

7    follow-up audit.

8    Q.  I'd like to direct your attention to Page 3 of Exhibit 41,

9    or 52, rather.  You see the bullet Number 4 under high priority?

10   First of all, what does "high priority" mean?

11   A.  As I stated, for a business to be able to do -- if you're

12   going to do a hundred things at one time.  If somebody gives you

13   100 things to do, what we want to make sure is the business

14   realize what are the most important things.  The priority here

15   is -- the high priority are the ones that the business should do

16   first.  These are what we call high-risk issue.  Then medium,

17   then low.  So it's like a guideline for the business, which one

18   they should focus and put the resources in first.

19   Q.  All right.  Can you focus now on bullet Number 4?

20   A.  Yeah.

21   Q.  Can you read that to the jury, please.

22   A.  "Purchases amounting to AED 2.8 million are still

23   outstanding from Seahorse.  Payment has already been made, but

24   goods have not received as of date, and as per the purchase

25   department, the vendor has already shut down its operation."

1    Q.  Was this a concern of yours?

2    A.  Definitely a concern.  Why all of a sudden we invested

3    2.8 million Dirhams, and we don't see where it is.  It's

4    definitely a concern.

5    Q.  And aid like to direct your attention to the top -- 1.1 up

6    in the top.  Here you go.  It says, "We conducted our audit in

7    accordance with the standard for the professional practice of

8    internal auditing."  What does that mean?

9    A.  See, all of our audits that based on -- they are based on a

10   standard.  They are not based on ad hoc.  For example, if you

11   find this, this is done in the IIA, Institute of Internal Audit.

12   They have a process we actually follow.  Not only that, if

13   you -- are going to do an IT audit.  We do it in light of covet

14   (ph.  Covet is another standard that we do our audit based on

15   that standard.  So we have a standard that we are following.

16   It's not totally adhoc.

17   Q.  Did this raise any concerns on your part?

18   A.  After the second report, yes, definitely they were of

19   concern, because we also concluded that the findings, the

20   rating's unsatisfactory.  Not only that we saw that still

21   there's a large amount of money, which is still -- we don't know

22   where it is, so it was definitely a red flag for us.

23   Q.  And had Mr. Jaubert stopped dealing with his company

24   Seahorse after he promised he would?

25   A.  No.  We did in the report.  If you look in detail, you will

553

1    find out after we requested Mr. Jaubert to stop dealing with his

2    company, he did identify some purchases which actually are in

3    the report.

4    Q.   What, if anything, did you do when you found out that

5    Mr. Jaubert was still dealing through his company Seahorse and

6    that you had all of these goods that were ordered and you paid

7    for but you couldn't find?

8    A.   After we discussed with him, I gave instruction, because,

9    you know, now the red flag, we started looking into it.  I have

10   two departments as I stated.  I have the Group Internal Audit,

11   which actually work in those two reports.  I have instructed the

12   fraud prevention department.  At that time, I instructed them to

13   go ahead and do a forensic report on the findings.

14   Q.   When you say a forensic report, what does that mean?

15   A.   To try to assure ourselves that, you know, yes there are

16   evidence of fraudulent activity actually happening in this case.

17   Q.   So at the time that you finished your follow-up audit, you

18   hadn't concluded that there was fraudulent activity?

19   A.   No.  We -- at that time, we haven't -- you know, we could

20   smell something, but to talk about fraud, you have to make sure

21   you have clear evidence before you can actually call the case a

22   fraud, because there could be reason, but the best thing is to

23   try to give to it the specialists who are forensic who would

24   look into it and determine from the evidence whether there is a

25   fraud case or not.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

554

1    Q.  All right.  You mentioned the name of a gentleman called

2    Hussein Ramadan?

3    A.  Yes.

4    Q.  Who is he?

5    A.  Hussein Ramadan, at the time, he was heading the fraud

6    prevention department.  I don't have to say he's a CPA, and he

7    was also a CFE, and has a lengthy experience in the field of

8    forensic.

9    Q.  Forensic meaning looking for fraud?

10    A.  Yes.  His job is to look for fraud, definitely.

11    Q.  And does your business unit, your auditing department, I

12    guess that part that does the fraud prevention, have you ever

13    done any other audits like that investigations?

14    A.  Yeah.  We have in the last three years about -- more than

15    250.  We received more than 250 fraud cases by the fraud

16    prevention department.

17    Q.  I'd like to put up on the monitor, just for the witness --

18    whoops -- Exhibit 80.  Do you recognize that?

19    A.  Yes.  This is the report comes out from the fraud prevention

20    department.

21    Q.  Was that prepared in the ordinary course of business?

22    A.  This is done on my instruction because we looked into the

23    first two audit, and if you look at -- this was done after the

24    second follow-up audit.  I gave instruction to the fraud

25    prevention department to go ahead and do the investigation in

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

555

1    this case.

2    Q.  And the investigation was headed by Mr. Ramadan?

3    A.  Mr. Hussein Ramadan, he headed the investigation, yes.

4    Q.  Did you read it at about the time that it was finished?

5    A.  Definitely.  The fraud -- when it comes to fraud cases,

6    because we're dealing with, really, people's fate, it's

7    important to try to make sure I deal into those.

8    Q.  Did you have regular meetings with Mr. Ramadan while the

9    audit was proceeding?

10    A.  Definitely, because, you know, we are very close to each

11    other.

12    Q.  At the -- do you know whether or not the findings of this

13    audit were ever discussed with Mr. Jaubert?

14    A.  We did discuss all of the finding with Mr. Jaubert at the

15    end of it, definitely, because for us to be able to try to

16    conclude, you know, we have to share with the person actually

17    concerned.

18    Q.  Let me back up.  Did you also have any discussions with

19    Mr. Jaubert before it was finalized in which you gave him an

20    opportunity to explain away some of your findings.

21    A.  We had a regular meetings with Mr. Jaubert.  Exact numbers I

22    do not remember.  He was the person was concerned, and this

23    particular report, at the end of it, we did recommend the

24    termination of Mr. Jaubert.

25    Q.  Okay.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

556

1   A.   We couldn't have recommended the termination unless we have

2   enough evidence to recommend that to management.

3   Q.   And you basically gave him the preliminary conclusions, and

4   gave him an opportunity to comment on them before they became

5   final?

6   A.   Definitely.

7          MR. HESS:   Objection.   Leading.

8          THE COURT:   You are leading.   Please ask questions.

9   BY MR. URQUHART:

10  Q.   Did you give Mr. Jaubert an opportunity to look at the

11  findings in the report?

12  A.   We did ask him.   Not only that, but I remember he came to

13  the office and he signed a statement saying that, you know, part

14  of the amount of money that we requested him to pay, that he's

15  accepted it and he paid some of that money, and part of it he

16  contested that this is not the case.   So I remember that very

17  distinctly.

18  Q.   Okay.

19         MR. URQUHART:   Your Honor, I'd like to move Exhibit 80

20  into evidence.

21         MR. HESS:   Judge, at this time, the trustworthiness

22  aspect -- first of all, he hasn't met the burden of the business

23  record exemption.   He hasn't ascertained whether or not this

24  individual has the requisite knowledge of the people that are

25  reporting the information to permit the business record to

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

557

1   maintain its reliability component.  He hasn't done that.  It

2   has numerous levels.  And, in fact, if you read the report, it

3   says the report is based on people, unidentified, without any

4   business duty to report it.

5          As Your Honor is aware, the business records exemption

6   is based on the premise -- one of the few exemptions in the

7   hearsay rules, based on the premise that the reporting as the

8   reliability, because a person has the business duty to report

9   it.

10         Second of all, the trustworthiness of this document is

11  clearly lacking.  Courts have regularly refused to recognize

12  items such as this as business records.  This is a precursor to

13  a criminal investigation or a criminal prosecution.  This isn't

14  a business record.

15         THE COURT:  Give me a case that says that.

16         MR. HESS:  In the case of Scheerer, S-C-H-E-E-R-E-R

17  versus Hardy's Food System at 92 F3d.

18         THE COURT:  What does it say?

19         MR. HESS:  It says that because, in this case, it was

20  utilizing a nonwitness employee, and they said the report was

21  not admissible as a business record under 803 because the source

22  of information contained therein was never identified.

23         Another the case that's very similar is the case that's

24  Underwriters at Lloyd's of London versus Sinkovich at 232, F.3d

25  200.  And in that case it says that litigants cannot obey the

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

558

1    trustworthiness requirement of Rule 8036 by simply hiring an

2    outside party to investigate, and that's what is happening here.

3    They hired not even an outside party.

4              In the Lloyd's case, what the Plaintiff attempted to do

5    was circumvent the rule, hire somebody outside of the corporate

6    structure in order to argue to the court that, "Hey, it's not us

7    investigating our employee," and the court said, "Hey, you can't

8    do it if you utilize your own investigator, and we're certainly

9    not going to let you do it if you try to utilize somebody else

10   outside of your corporation."

11             The whole idea behind a business record is that these

12   records are based, again, on the premise that these are reported

13   by people who have knowledge.  They don't have any ulterior

14   motive to maintain the viability and the trustworthiness of all

15   of the information that is purportedly utilized to arrive at the

16   conclusion.

17             In this case, there is none of those.  It is a document

18   that is going to be used and is being used right now to

19   prosecute civilly in this court, but criminally in Dubai,

20   Mr. Jaubert.  And there is no indicia of reliability.  Certainly

21   isn't a business record.  And this idea that it was filed in

22   their office, I notice that was asked on all three of these

23   reports, that has nothing to do with a business record, and I

24   argue that this should not be admissible as a business record.

25             THE COURT:  Inasmuch as the witness has testified that

1    these reports were prepared in the normal course of business by

2    people who had personal knowledge, because they did the

3    investigation, people who had who interviewed the gazillion

4    employees or his gazillion auditing employees were used and that

5    he said that they were not prepared in anticipation of

6    litigation, he didn't know whether Mr. Jaubert had committed any

7    crime or fraud.  And he said he -- they did about 200 of these a

8    year, I think.  And consequently I believe that this does

9    satisfy the requirements of 8036.  So I will overrule your

10   objection, admit -- what is this, 80?

11            MR. URQUHART:  Yes, Your Honor.

12            THE COURT:  80 into evidence.

13            (Plaintiffs' 80 in evidence)

14   BY MR. URQUHART:

15   Q.  You're back on your job?  Can you turn to -- I'd like to

16   turn your attention to Page 3.  What does it say on the top

17   there?

18   A.  This is really -- the report is a lengthy report, to try to

19   make sure -- because this is submitted to our management, they

20   need to try to see an executive summary.  So they don't have to

21   go into the whole of it, so this is the executive part of the

22   whole report.  Every item in this report has supporting evidence

23   in the report.  But this is -- only is made purely for the

24   management to try to look at the exact, you know I would say the

25   executive summary of the whole report.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.  Okay.  I'd like to direct your attention to Item 1 audit

2    report.  Could you read that and explain what that means to the

3    jury, please.

4    A.  "Group Internal Audit issued two reports.  35 issues were

5    identified and discussed with Exomos chief executive officer and

6    chief operating officer.  60 percent of those issues were rated

7    high priority, which needed immediate action.  Since then,

8    management did not take major steps to mitigate the identified

9    risk.  See Appendix 1 for summary of issues."

10         So this is just a summary of what we talked about to

11   identify the report area.

12   Q.  Then item Number 2, what was that?  Says, "Viability of

13   finished products"?

14   A.  "The viability of finished product is to try to make sure

15   viability of any product when you buy it, whether it is working

16   condition or it is not in working condition."  That's basically

17   what viability really mean.

18        Says here, "Exomos never had viable finished and salable

19   products according to Business Viability Assessment Report and

20   Exomos' engineers Submersible Product Report."

21   Q.  Can I stop there.  What is this Business Viability

22   Assessment Report?

23        MR. HESS:  Objection.  Hearsay.

24        THE COURT:  All right.  Hold on.  It's hearsay for him

25   to tell you what the Business Viability Assessment Report is?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

561

 1          MR. HESS:  It's an out-of-court statement attempted to

 2     be used.

 3          THE COURT:  He's telling you what it is.  I don't think

 4     he's telling you the content of it, is he?  I think the question

 5     was "What is this Business Viability Assessment Report?"

 6          MR. HESS:  I understand, Judge.  My objection would be

 7     describing what the report -- not describing what the report is,

 8     but testifying as to content.

 9          THE COURT:  You can answer the question "What is the

10     Business Viability Assessment Report?"  Then we'll see about the

11     next question.

12          MR. URQUHART:  Your Honor, it's an exhibit to the fraud

13     report.

14          THE COURT:  Number 80.

15          MR. URQUHART:  Yeah, and it's in evidence.

16          THE COURT:  Okay.  But the question is, "What is the

17     Business Viability Assessment Report?"

18          MR. URQUHART:  That is correct.

19          THE COURT:  There's nothing wrong with that question.

20     Answer that question, then you all can dazzle me with your legal

21     footwork later.

22          THE WITNESS:  A Business Viability Assessment Report,

23     from the name of it, would be -- you know, there is actually

24     viability and in the business itself.  We know that we purchased

25     three submarines.  Those three submarines, when we purchased it,

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

562

1    we purchased them and we paid a price.  We expected them to be

2    actually working.  None of those submarines actually worked.

3              THE COURT:  Okay.  Go ahead.

4              MR. URQUHART:  May I approach, Your Honor.

5              THE COURT:  Sure.  Unless you're going to try to slap

6    him around or something.

7              MR. URQUHART:  He won't pay my bill if I slap him

8    around.

9    BY MR. URQUHART:

10   Q.  Can you tell us what this is, this thick book?

11   A.  I have to take a look at this.  Looks like this is all about

12   this case here.

13   Q.  In other words, it's the report plus the exhibits?

14   A.  Yes.  Okay.

15   Q.  So could I turn your attention to -- back to the executive

16   summary and item Number 3.  It says Exomos incurred an operating

17   cumulative deficit.  What does a cumulative deficit mean.  Does

18   that mean a loss?

19   A.  In simple terms, yes.  Means a loss.

20   Q.  And it says $65,418,000.

21   A.  65 million.

22   Q.  Million, do you know what that is?

23             MR. HESS:  Misstates the document, Your Honor.

24             THE COURT:  Say again please.

25             MR. HESS:  Misstates.  It's Dirhams, not dollars.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          THE COURT:  Okay.

2     BY MR. URQUHART:

3     Q.  Can you read that what it says?

4     A.  Basically says Exomos incurred operating cumulative deficit

5     in the amount of million -- 65,418,000 and capital expenditure

6     in the amount Dirhams, 51,247,000 in dollars.  That's around

7     $30 million.  This is a deficit between operating expenses and

8     capital expenditure.  In any business you have operating

9     expenses, and you have what you call -- you capitalize some

10    expenses.  What we have spent in the business as Dubai World, we

11    spent $30 million which we did not receive a penny back.

12    Q.  Now, can we skip down to "Conflict of Interest"?  Can you

13    focus now on Item A?

14    A.  Seahorse Submarine International charge Exomos 10 percent

15    for handling and service charges on purchases made through

16    Seahorse starting August 2005.  Prior to this date, service

17    charge were embedded in the purchase price.

18    Q.  And was that a problematic?

19    A.  Definitely.  As I stated earlier, you know, we look whenever

20    there is an -- there are any kind of charges, we would like to

21    know what are those charges for.  What they're really meant for,

22    and this we see a documented agreement stating that this is what

23    the charge is for and there -- there is an agreement.  We, as

24    auditors, we have to highlight that.

25    Q.  And I would like to direct your attention to B.  Herve, is

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    that Mr. Jaubert?

2    A.   Yes.

3    Q.   And what does that say?

4    A.   "Herve alleged existence of verbal agreement between Exomos

5    and Seahorse, which was contested by the ex-chief operating

6    officer, Jim Miller."

7    Q.   All right.  Without telling me what he said, did you discuss

8    this issue with Sultan?

9    A.   Yes, I did.

10   Q.   Thank you.  Item C down there.  Can you tell us what that

11   is?

12   A.   Exomos paid Seahorse 1,470,935 for handling and service

13   charges, development costs, attendance, modification, etcetera.

14   Development cost and modification were contested by key

15   technical personnel whether such services were rendered to

16   Exomos.  The aforementioned amount does not included inflated

17   purchase prices, 773,210 shown in Appendix 3, Page 19.

18   Q.   So what had you concluded with respect to those charges?

19   A.   That there were no evidence to us of any kind of agreement

20   of actually putting any kind of a service charge by Seahorse on

21   Dubai World.

22   Q.   All right.  I'd like to direct your attention to Page 4 of

23   that report.  Do you see where it says recommendations?

24   A.   Yes, I do.

25   Q.   I'm sorry.  Could you highlight, Charles, where it says

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    recommendation up in the top, please?

2    A.  Okay.  "The recommendation based on the seriousness of our

3    finding included in this report and issues addressed in our

4    previous audit reports.  We recommend terminating Herve and

5    collect outstanding amounts due from him and Seahorse as

6    follows."

7    Q.  Was that your recommendation?

8    A.  Yes, it is.

9    Q.  Was he fired?

10   A.  We do recommend -- as you know in the fraud, we do recommend

11   to all management.  The firing is not done by us, but we do

12   recommend.  The management, they have the right to fire and

13   hire.  We, as auditors, we just recommend this to our

14   management.

15   Q.  Okay.  So in other words, you made a recommendation, and

16   then it was up to them to decide?

17   A.  It is definitely up to them, yes, it is up to them.

18   Q.  And I'd like to turn your attention to Page 4 of that

19   report.  It's Page 5 of the exhibit.  Has ten items.  What are

20   those ten there, and what's their significance?

21   A.  You know, we bought three submarines from Seahorse.  Okay.

22   And you can see that, you know, we paid some advance, and then

23   there is pending.  Since we did not receive any of these

24   submarines were working, just like when you go and buy something

25   from a store.  And you expect -- you know, you pay for as an

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    advance and you come home, it is not really working.  It's our

2    right to try to get our money back because the items are not

3    working.  So this is really basically summarized the submarine.

4    And also there are outstanding open purchases, personal legal

5    fees.

6    Q.  Can you use the laser pointer?

7    A.  Oh, yeah.  Okay.  For example, here, these are open

8    purchases, which we did not receive the goods from them.

9    Personal fees.

10   Q.  That means you paid the money, but the goods --

11   A.  The goods did not come.  Personal legal fees.  Now, during

12   our audit, we discovered in our fraud investigation that we are

13   paying for a lawsuit in the states, which the lawsuit was

14   between Seahorse and another vendor.  I can't remember the name

15   over there.  We were asking, as you know, why should we pay for

16   a lawsuit that doesn't really belong to us.  It's not ours.

17          Personal, that's the personal legal fees.  Personal

18   vehicle expenses.  Yes, we did buy assets from Seahorse that we

19   shipped them.  But we are not responsible to ship a personal

20   goods of an individual in this here.  We identified there were

21   actually items which are personal, but actually put under the

22   umbrella of the business.  So we contested that.

23          Overcharged of purchases, we discussed that.  Now,

24   we've seen all these costs that, you know, they arrange in some

25   cases up to 135 percent more than the actual original prices and

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    there's no actual agreement.

2           Handling service charges.  Development of cost of

3    rebreathers, which would -- he couldn't find.  We didn't see

4    that.  Upgrade remote control.

5    Q.  Can I direct your attention to the bottom right hand corner

6    that says 5,329,243 Dirhams.  What does that represent?

7    A.  That is the amount actually due to us from Herve.  Now, this

8    report was conducted by Hussein Ramadan.  Okay.  Hussein can

9    give you even more details about each of these item because they

10   were under his supervision.  Actually he did the work.

11   Q.  Okay.  And what happened next after you finished this

12   report.  You met with Mr. Jaubert?

13   A.  We met on several occasions with Mr. Jaubert.  I mean, the

14   idea is that he wanted to try to get our money.  That's the

15   normal action that we want to try to make sure.  We can get our

16   money.  And to that I'll try to go fast forward.  We came up to

17   a mutual agreement, a mutual agreement where this was, I think,

18   around 2008, March of 2008, where he came in with his lawyer, he

19   came with his lawyer, the amount was 5 million, I spoke with the

20   chairman, and the chairman gave me approval to go and discount

21   that amount of 5 million Dirhams, which is about $1.2 million to

22   3 million, so we can actually close this case.  We drafted with

23   his lawyer and our lawyer.  And remember, his lawyers were

24   Anmatoshi (ph).  Anmatoshi, they came and they really settled.

25   And he said he's going to pay 1 million and then pay us 1

1   million one time, then 2 million will give to us in checks.

2   That's the last we heard from Herve.

3   Q.  Okay.  Did there come a time when you made a decision to

4   recommend the filing of a criminal proceedings against

5   Mr. Jaubert?

6   A.  Yeah.

7   Q.  Was that your decision?

8   A.  That was yes, that was my decision.  To try to file the

9   criminal.  You know, when we couldn't get any money, that was

10  earlier, when we could not come to a conclusion, you know we

11  have no authority to try to take the money from anyone because

12  after all, we are internal audit.  The only way we actually can

13  get any money from anyone is we have to go to authorities.  In

14  this case, we file a case, a criminal case.

15  Q.  Can I ask you a question?  Did you discuss the possibility

16  of filing a criminal matter against Mr. Jaubert at any time

17  before you filed it?

18  A.  No.  This is our decision to try to make.  We did not

19  discuss it with him that we are going to.  We filed it at the

20  police station.

21  Q.  All right.  What was the last time that you saw Mr. Jaubert?

22  A.  It was just after we thought we had an agreement in March of

23  2008, that we thought that we really got this case cleared that

24  after that we haven't heard from Mr. Jaubert.

25  Q.  And by this time the criminal case had been filed long ago?

569

1    A.   Yes.  If you recall, it was filed in February of 2008.

2    Q.   So a month before?

3    A.   A month before.  Maybe that's the reason he came forward and

4    try to negotiate with us.

5    Q.   Was he represented by a lawyer at this meeting?

6    A.   Yes, he did, Anmatoshi.  And we had our lawyer, Galadan (ph)

7    to try to do this.

8              MR. URQUHART:  Your Honor, I neglected to ask if I

9    could move Exhibit 147 into evidence.  It's the binder with the

10   exhibits.

11             THE COURT:  What -- Exhibit 147 is what?

12             MR. URQUHART:  It's the fraud prevention report,

13   just -- it's the full fraud prevention report that

14   Mr. AbdulQader --

15             THE COURT:  As opposed to the ones, 41.

16             MR. URQUHART:  It's with all the exhibits.

17             THE COURT:  I don't know what that means.  With all

18   what exhibits?

19             MR. URQUHART:  I'm sorry, Your Honor.

20             THE COURT:  That's all right.  Tell me.

21             MR. URQUHART:  In the fraud prevention report, there's

22   references to exhibits.

23             THE COURT:  Yes.

24             MR. URQUHART:  Everything, most of what's in that

25   binder, are exhibits that are referred to in the fraud

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    prevention report.

2         THE COURT:  Okay.  You're offering them into evidence

3    at this time?

4         MR. URQUHART:  Yes.

5         THE COURT:  What is it, 140?

6         MR. URQUHART:  147.

7         THE COURT:  Actually, you have 147 all the way up to

8    147.100, 147.112; is that right?

9         MR. URQUHART:  Yes, Your Honor.

10        THE COURT:  So 147 is the report of 2006, and it's

11   followed by 119 sub-exhibits within, it correct?

12        MR. URQUHART:  Yes.

13        THE COURT:  Objection?

14        MR. HESS:  All hearsay, Judge.

15        THE COURT:  Why is it not hearsay?

16        MR. URQUHART:  Well, I mean there are 100-something

17   exhibits.

18        THE COURT:  See, I'm having a little problem

19   understanding.  You're telling me that 147 are the exhibits that

20   support what?  41, 31, what?

21        MR. URQUHART:  Exhibit 80.

22        THE COURT:  80.  So 80, which is in, and then you're

23   saying that 147 are the exhibits that support 80?

24        MR. URQUHART:  Correct.

25        THE COURT:  I will let it in for that purpose over your

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    objection.

2             MR. URQUHART:  All right.

3             (Plaintiffs' 147 in evidence)

4    BY MR. URQUHART:

5    Q.  Now, once you filed the -- in other words, once you turned

6    the case over to the prosecutor, let's assume, and did you have

7    any influence over whether or not the prosecutor would

8    prosecute -- not prosecute, terminate?

9    A.  We have a limit as internal audit.  Once we pass the

10   information to the police, to the prosecutor, in this case, was

11   done.  We do not have any say in that.  That is up to the court

12   system.  They deal with that.  Has nothing to do with us.  So we

13   tried our best.  If you look from the time that we requested

14   Mr. Herve to try to pay the amount he owed us, and you can see

15   that the dates of the report, when it was there, until we saw

16   that there were no hope.

17   Q.  Let me ask you a question.  So if Mr. Jaubert and you had

18   reached an agreement, that would not have ended the criminal

19   case?

20   A.  You're correct.

21   Q.  Why is that?

22   A.  Because, you know, the lawyers cost a lot of money, and why

23   should we go to court, if we got our money from him?

24   Q.  My question is a different question.

25             THE COURT:  Listen to the question carefully, and

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    answer it to the best of your ability.

2    BY MR. URQUHART:

3    Q.  What I'm asking is, if you had settled your differences with

4    Mr. Jaubert and told the prosecutor that you settled your

5    differences, does that end the criminal case?

6    A.  I'm sorry.  That's out of our hands.  Once we hand a case to

7    the prosecutor, we cannot get involved at all in that process.

8    It's up to them.

9    Q.  So even if you ask them, they might decide not to?

10   A.  No.  That is totally up to them, not up to us, once we file

11   the criminal.

12   Q.  Have you had any experience where -- similar experience at

13   Dubai World where you actually reached an agreement and the

14   person paid and the criminal proceeding kept on going?

15            MR. HESS:  Objection, Judge.  Relevance.

16            THE COURT:  No, I'll permit it.  Overruled.

17            THE WITNESS:  As I stated, in the last three years

18   we've had something like more than 250 cases.  In some cases,

19   for example, when we do identify, when we file a criminal

20   case -- I'll give you a very simple example.  It was a recent

21   example.

22            We did find out something like siphoning off something

23   like 300,000.  We brought in the person, and he admitted that he

24   actually had taken the money and there was a balance.  He gave

25   us the money, but we still went, we filed a criminal case

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

573

1    against the person.  Once we file it, we do not have any control

2    over it.  Even he came and offered to pay the full amount for

3    us.  After we put in the criminal case, it is not in our hand.

4    It is in the hand of the prosecutor and the system, our court

5    system.  So this is just a recent example that we have that.

6         Before we go to the prosecutor or to the police and if

7    we file them, we do that a lot.  Not all our fraud cases are

8    taken to court.  We find out there is a small amount, something

9    like in the neighborhood of $5,000, we see somebody taking it we

10   settle down -- what we do is we terminate the person from work,

11   and we close it.

12        MR. URQUHART:  Okay.  May I confer for a moment, Your

13   Honor?

14        THE COURT:  Yes, you may.

15   BY MR. URQUHART:

16   Q.  I just have one or two questions.  Did Dubai world or your

17   audit group ever take Mr. Jaubert's passport?

18   A.  No.  We are not authorized to take anybody's passport.

19   Q.  Did you come to learn that the criminal authorities in Dubai

20   did take his passport?

21   A.  Yes, they have taken it, but that is up to them.

22   Q.  Did Mr. Jaubert ever ask for your help in getting his

23   passport back?

24   A.  Yes, he did.

25   Q.  And did you do --

1    A.  I tried to actually -- you know, being a chief examiner, I

2    tried -- I requested my team to look into it, but the answer was

3    given to me that, I'm sorry, this is --

4    Q.  So you tried and failed?

5    A.  I tried and failed, if you want to say, yes.

6         MR. URQUHART:  I have no further questions, Your Honor.

7         THE COURT:  All right.  Let's break for lunch, then.

8    Cross-examination will resume after lunch.  Let's -- looking for

9    my -- let's break until 2:15.  I have a 1:30 and a 2:00.  I'll

10   try to finish it as fast as I can, so you all be back at 2:15.

11   I'll do my best.  We'll be in recess until then.

12        Remember, you're not to discuss this with anyone.

13   Anyone tries to discuss it with you, let me know.  Don't make up

14   your minds.  Thank you.  See you after lunch.

15        (Jury out at 12:49 p.m.)

16        THE COURT:  Mr. Witness, since you're on the stand, you

17   are not permitted to discuss your testimony with anyone, even

18   the lawyers that brought you in.  You can go to lunch with them,

19   talk about the international football, the pretty blue sky,

20   wherever you are, anything you want, but you cannot talk about

21   your testimony, all right?  We'll be in recess, probably be

22   about 2:30.  And I do need you to move these things, especially

23   of anything heavy.  I have two sentencings.  I don't know.

24   Don't put them where anybody that's sitting where that young

25   lady is can reach them.


**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    MR. URQUHART:  We'll do that.  Thank you, Your Honor.

2    MR. HESS:  Do you want us back at 2:30?

3    THE COURT:  2:15, in the hopes I can start at 2:15, but

4    I'm telling you, it's more likely to be 2:30.  No, that's fine,

5    you can leave it on this table, or you can put it over here

6    behind this table is fine.  Just so it's around the corner.

7    That's good.

8         (See Volume 6, page 578 for continuation)
                      *  *  *  *  *

9               C E R T I F I C A T E

10   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

11

12

13

14
     _____         /s/ Dawn M. Whitmarsh
15   Date                     DAWN M. WHITMARSH, RPR

16

17               I N D E X

                 WITNESSES

18
     For Plaintiff:                            Page

19
     James Miller
20    Continued Cross-Examination by Mr. Hess        471:20
      Redirect Examination by Mr. Cederberg          514:4
21
     AbdulQader Obaid Ali
22    Direct Examination by Mr. Urquhart             522:23

23               EXHIBITS

24   For Defense:

25   610
      In Evidence                                    503:10


PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
 1
       646
 2       In Evidence                                    474:5

 3       667
         In Evidence                                    472:18
 4
       1189
 5       In Evidence                                    509:10

 6     1260
         In Evidence                                    513:14
 7
       1503
 8       In Evidence                                    500:14

 9     1530
         In Evidence                                    499:8
10
       1800
11       In Evidence                                    508:18

12     1804
         In Evidence                                    504:14
13
       1818
14       In Evidence                                    505:14

15     For Plaintiffs':

16     41
         In Evidence                                    539:12
17
       48
18       In Evidence                                    479:10

19     51
         In Evidence                                    476:21
20
       52
21       In Evidence                                    550:1

22     80
         In Evidence                                    559:13
23
       147
24       In Evidence                                    571:3

25     923.7
         In Evidence                                    487:17
```

```
 1
         923-20
 2         In Evidence                                    483:20

 3       923.12
           In Evidence                                    488:19
 4
         923.17
 5         In Evidence                                    489:5

 6       923.23
           In Evidence                                    494:12
 7
         923.25
 8         In Evidence                                    493:11

 9       923.21 & 923.22
           In Evidence                                    490:6
10
         923.30 & 923-31
11         In Evidence                                    484:14

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**PROCEEDINGS  RECORDED  BY  MECHANICAL  STENOGRAPHY**
**TRANSCRIPT  PRODUCED  BY  COMPUTER**