1                   UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
2                       FORT PIERCE DIVISION
                    CASE NO.  09-14314-CV-JEM
3

4

5

6   DUBAI WORLD CORPORATION, and its
    Subsidiaries, EXOMOS, NAKHEEL and
7   PALM MARINE,

8                   Plaintiffs,

9        vs.

10                                  Fort Pierce, Florida
                                    February 16, 2011
11  HERVE JAUBERT, SEAHORSE
    SUBMARINES INTERNATIONAL
12  INCORPORATED, and Does 1-99,

13                  Defendants.
    _____

14

15

                    TRANSCRIPT OF JURY TRIAL
16                  VOLUME 6 - PAGE 578-653
                BEFORE THE HONORABLE JOSE E. MARTINEZ
17                UNITED STATES DISTRICT JUDGE

18

19

20

21

22

    REPORTED BY:        DAWN M. WHITMARSH, RPR
23                      Official Court Reporter
                        400 N. Miami Avenue, 10S03
24                      Miami, Florida  33128
                        Telephone:  305-523-5598
25



            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                    TRANSCRIPT PRODUCED BY COMPUTER

 1     **APPEARANCES:**

 2     **FOR THE PLAINTIFFS:**
                           *Quinn, Emanuel, Urquhart & Sullivan, LLP*
 3                         **BY: JON C. CEDERBERG, ESQ.**
                          **BY:  A. WILLIAM URQUHART, ESQ.**
 4                         865 South Figueroa Street
                          10th Floor
 5                         Los Angeles, CA  90017

 6                         *Astigarraga, Davis, Mullins & Grossman*
                          **BY:  EDWARD MULLINS, ESQ.**
 7                         701 Brickell Avenue
                          16th Floor
 8                         Miami, Florida 33131

 9
       **FOR THE DEFENDANTS:**
10                         *Hess & Heathcock, PA*
                          **BY:  WILLIAM HESS, ESQ.**
11                         **BY:  KATHRYN A. HEATHCOCK, ESQ.**
                          40 Southeast Osceola Street
12                         Stuart,  Florida 34994

13

14

15

16

17

18

19

20

21

22

23

24

25


                   **PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
                        **TRANSCRIPT PRODUCED BY COMPUTER**

```
1                        P-R-O-C-E-E-D-I-N-G-S

2           THE COURT:  Are you ready to go?  Please bring in the

3    jury.

4           (Jury in at 2:45 p.m.).

5           THE COURT:  Please be seated.  Ready to proceed?

6           MR. URQUHART:  Your Honor, in the interest of moving

7    things along, I'd ask my client, Mr. Dalton, if you'll allow him

8    to use our system.

9           THE COURT:  I hope it will work.  Go.

10          MR. HESS:  Judge, we've agreed on a whole set of

11   documents.

12          THE COURT:  But we've had like an hour where we're

13   waiting, and I tell you let's go, we're going, and now you got

14   to meet?  What were you doing a minute ago?  You were here,

15   start.

16          MR. HESS:  Thank you.

17          THE COURT:  I don't mind yelling if I'm yelling at both

18   of you.  I just don't want the jury to think I'm taking sides.

19   But for God's sake, let's move.

20                        CROSS-EXAMINATION

21   BY MR. HESS:

22   Q.  Good afternoon, Mr. AbdulQader.

23   A.  Good afternoon.

24   Q.  In each of the audit reports that you have discussed today,

25   you had no hands-on -- you didn't have any hands-on
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    participation in the audit, correct?

2    A.  The way we do the audit is we have a team actually works on

3    the audits and they come and talk to me and discuss with me

4    their findings.  That's the process we do.

5    Q.  For instance, in what has been entered into evidence as

6    Plaintiffs 41, Plaintiffs 41, page two, I'm sorry, it's page

7    four.

8         If you could please draw your attention to 2.3, source

9    of information.  Thank you.  The sources of information are as

10   follows:

11        And then the second bullet down it says "various

12   written and oral information, reports, records, corroborative

13   documents and explanation provided to us by the management and

14   staff of the company."

15        Do you have any idea at all who provided that

16   information?

17   A.  You would have to go and look into the audit because that's

18   not at my level, that's done by the audit team who would work

19   there and they would find that's the process we follow.

20   Q.  You personally have no idea who were those sources of

21   information are though, correct?

22   A.  I do not have the specific -- I mean, you need to be more

23   specific so I can tell you what is it because --

24   Q.  Well, it says that "the actual explanation provided to us by

25   the management and staff of the company".

1              For instance which staff members of the company

2      provided information for this audit report?

3      A.   The auditors, when they go in the field they would meet

4      people over there and so that's where we get the information

5      from, we cannot get it from anyone else.  So the people are

6      actually the auditees themselves, in this case people from

7      Exomos.

8      Q.   And that's the extent of your knowledge, people from Exomos?

9      A.   People from Exomos.

10     Q.   Would the same apply for the second audit that's been marked

11     into evidence as Plaintiffs' 80?  I'm sorry, that's the third

12     audit.  It says Plaintiffs' 52 as to the August 2006 audit, same

13     answer?

14     A.   Same principles apply, that we get our information through

15     interviews and meeting the people at the business themselves

16     where we conduct the audit.

17     Q.   But you sitting here today don't know those people?

18     A.   It's very difficult for me to try to look.  We do about a

19     hundred audits in a year, and it's going to be difficult for me

20     to try to find out exactly.  And I have a team of 45 people who

21     they actually met on the floor down there.

22     Q.   So you don't know the people that gave the information.

23     A.   I do not know all of the people, no.

24     Q.   Do you know any of them?

25     A.   Some of them, yes.

1    Q.  Who?

2    A.  The people that like -- one of the person who actually did

3    the report about the submarine, I can't remember his name, but

4    he's the person who said that there were problems with the

5    submarine and they were not working.  He was actually Bert Hertz

6    (ph), and if you look in the report, you'll find out his name.

7    That one of the person that I met personally as well.

8    Q.  Anyone else?

9    A.  I can't recall very well.  I can't recall.

10   Q.  Sitting here today, that's the only one that you recall,

11   only person?

12   A.  As of now that's what I remember, yes.

13   Q.  Okay.  Then the last of the audit reports what's been marked

14   as Plaintiffs' 80, same answer?

15   A.  This is an investigation report.  An investigation report is

16   different than audit report.  Okay.  An investigation, there

17   could be other people that actually could give us information in

18   this report.  In general, that's what I'm speaking about.

19   Q.  So in the -- what's been marked -- what is Plaintiffs' 80 in

20   evidence, there's a distinction.  There's a difference between

21   that and the previous two reports?

22   A.  Yeah.  Because this is more of an investigation report.  An

23   investigation report is different than an audit report.  They

24   could be talking to some officials, okay, to try, that is

25   possible.  They're trying to get some information about the

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    legal status of the findings that we do, that's possible.

2    Q.  But you don't know?

3    A.  I do not recall.  I can't remember.

4    Q.  Now --

5    A.  But if you want to, you may ask Hussein Ramadan who is

6    actually was the lead investigator about specifically about that

7    report.  He would give you more information because he was

8    hands-on on that report.

9    Q.  Now, the people that talk to him, do you know them?  Do you

10   know of them?

11        Let me put it this way.  Do you know any of the people

12   that your investigator spoke with that permitted him to compile

13   this management abuse investigation?

14   A.  Some of the people I can't remember them, but I met some

15   people throughout.  And this was done in 2007, so some I must

16   have -- you know, I would say from my point of view, I could

17   have met some people during the time, yes.

18   Q.  And we would see your name there in the report then that

19   said that you spoke with this person and they told you such and

20   such, correct?

21   A.  No, my name would not be in that report.

22   Q.  In fact, your name doesn't appear in any of the three

23   reports, correct?

24   A.  You're correct, yes.

25   Q.  Now, the first report was -- it's dated December 31, 2005,

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    that's Plaintiffs' 41 please.  Correct?  December 31, 2005, is

2    that the date of that first report?

3    A.  That's right, yes.

4    Q.  How much time did it take to conduct that audit?

5    A.  Our audit usually take about -- between a period of, you

6    know, an average of two to three months to try to complete an

7    audit.

8    Q.  Okay.  So the audit was being conducted prior to December

9    31, 2005?

10   A.  Because that's when it was issued.

11   Q.  Right.

12   A.  Right to that, yes.

13   Q.  Right.  And you state that it's a review of Exomos, FZE,

14   correct?

15   A.  That's correct.

16   Q.  Exomos FZE didn't exist prior to December 31, 2005, right?

17   A.  Free Zone was always there.

18   Q.  Exomos FZE was always there?

19   A.  I can't remember that, to be very honest.

20          MR. HESS:  Judge, I've got hard copies on those and I

21   don't know if you want -- anyway, let me just proceed with this

22   way.  If I may utilize hard copies, approach the witness?

23          THE COURT:  Sure.

24          MR. HESS:  Judge, even easier, we'll use the projector

25   if we could.  Defendant's Exhibit 775, and without objection

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Your Honor, I'm seeking to introduce that into evidence.

2              THE COURT:  Hearing no objection, 775 is admitted out

3    of turn into evidence.

4              (Defense 775 in evidence)

5    BY MR. HESS:

6    Q.  Mr. AbdulQader, would you please take a look at that

7    document?  Do you recognize that document?  It may be easier if

8    you look on that screen and I do have a hard copy if that's even

9    easier for you.

10   A.  Yes, okay.

11   Q.  Now, do you understand the significance of that document?

12   Have you seen documents like that before?

13   A.  I do not see all the documents.  It's very difficult for me

14   to see all the documents.

15   Q.  I understand.  Do you understand what that document is?

16   It's called a Memorandum of Association of Exomos, Free Zone

17   Establishment?

18   A.  That means establishment of a company called Exomos, okay,

19   in the Free Zone because we have a free zone, we have a free

20   zone and Exomos is licensed in the free zone.

21   Q.  And the first, the number one paragraph, paragraph number

22   one in that document states the name of the establishment is

23   Exomos FZE, correct?

24   A.  That's correct.

25   Q.  That's the same entity that you audited?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

587

1    A.  That's correct.

2    Q.  Not you audited, but --

3    A.  The time we did, that's right, yes.

4    Q.  If you look at the last page of that document, page three,

5    do you recognize the signature?

6    A.  That's Sultan's signature.

7    Q.  That's Sultan Bin Sulayem?

8    A.  Sultan Sulayem.

9    Q.  And he was at this time the chairman of Dubai World

10   Corporation?

11   A.  At the time he was the Dubai World chair, he was the

12   executive chairman.

13   Q.  And he has executed this document on the 31st of December,

14   correct?

15   A.  Correct.

16   Q.  So it is your understanding that Exomos FZE became a

17   corporation or established was established on December 31 of

18   2005, correct?

19   A.  Yes.

20   Q.  Now, there's no doubt in your mind, you're aware that Exomos

21   under the leadership of Mr. Jaubert, obtained a number of ISO

22   certifications, correct?

23   A.  That's correct.

24   Q.  And you know what ISO certifications are, right?

25   A.  Yes, International Standard Organization.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

588

1    Q.   If you could explain what is an ISO?

2    A.   ISO is a system that, you know, just like a standard, like

3    any other standard that you have to actually apply for and if

4    you actually meet the standard, you will get that certificate.

5    Making sure that the things that you are doing, you keep doing

6    the same thing every time.

7         It's a proactive -- it's a way of continuous

8    improvement for yourself.  In the journey of excellence, it is

9    considered the first milestone that you could achieve toward

10   excellence.

11   Q.   You would say it's towards excellence?

12   A.   Towards excellence, yes.

13   Q.   You would agree that Exomos, under the leadership of

14   Mr. Jaubert, was awarded an ISO standard in the design and

15   construction of cutting edge maritime law enforcement,

16   commercial and leisure submersibles and customs boats, correct?

17   A.   That's correct.

18   Q.   And he was issued that certification in March of 2006,

19   correct?

20   A.   That's correct.

21        MR. HESS:  Judge, at this time without objection, I

22   seek to introduce Defendant's Exhibit 777.

23        THE COURT:  Without objection, 777 is admitted out of

24   turn.

25        (Defense 777 in evidence)

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    BY MR. HESS:

2    Q.  And he also -- this is the certificate for that ISO

3    certification, correct?

4    A.  Yes, produced by Veritas (ph).

5    Q.  He also obtained at least another ISO in the 9000 series,

6    correct?  Are you aware?

7    A.  I'm aware that he also received 9000.

8    Q.  Right?  Okay.  That was in 2005, correct?

9    A.  That's correct.

10         MR. HESS:  Judge, for -- then I would also ask that,

11   without objection, 778 be introduced into evidence.

12         THE COURT:  778 is admitted in evidence without

13   objection.

14         (Defense 778 in evidence)

15   BY MR. HESS:

16   Q.  Now, you stated on your direct examination that there were

17   items -- let me exactly see what you said.  You said that one of

18   the things that was uncovered in the April 2006 audit was that

19   there were service charges embedded in the purchase price,

20   correct?

21   A.  That was correct.

22   Q.  What does embedded mean to you?

23   A.  Embedded means that when we say there were no agreement, no

24   formal agreement was done for these service charges to be in

25   that document.  When we see that there's any kind of a charge,

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

590

1     we would like to find out what is the source of that, so when we

2     try to find out if there was any kind of an agreement of that

3     service charge, we did not find any documented agreement of that

4     service charge being met.

5     Q.  Let me move on.  Let me bring your attention to Defendant's

6     Exhibit 813.

7              MR. HESS:  Without objection, Your Honor, I seek to

8     introduce that into evidence.

9              THE COURT:  I got an idea.  Why don't you give them to

10    me all at one time.

11             813.  Any objection?  Without objection, 813 is

12    admitted in evidence.

13             (Defense 813 in evidence)

14             MR. HESS:  1246.

15             THE COURT:  Hold on. 813 is in.  Twelve what?

16             MR. HESS:  46.

17             THE COURT:  1246, admitted without objection.

18             (Defense 1246 in evidence)

19             MR. HESS:  1247.

20             THE COURT:  1247, without objection, is admitted.

21             (Defense 1247 in evidence)

22             MR. HESS:  1248.

23             THE COURT:  1248 is admitted.

24             (Defense 1248 in evidence)

25             MR. HESS:  1249.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1                    THE COURT:  1249 is admitted.

 2                    (Defense 1249 in evidence)

 3                    MR. HESS:  1250.

 4                    THE COURT:  1250 is admitted.

 5                    (Defense 1250 in evidence)

 6                    MR. HESS:  1251.

 7                    THE COURT:  1251 is admitted.

 8                    (Defense 1251 in evidence)

 9                    MR. HESS:  1252.

10                    THE COURT:  1252 is admitted.

11                    (Defense 1252 in evidence)

12                    MR. HESS:  1253.

13                    THE COURT:  Okay.

14                    (Defense 1253 in evidence)

15                    MR. HESS:  1254 and 1255.

16                    (Defense 1254 and 1255 in evidence)

17                    THE COURT:  Okay.

18                    MR. HESS:  1256.

19                    THE COURT:  All right.

20                    (Defense 1256 in evidence)

21                    MR. HESS:  1257.

22                    (Defense 1257 in evidence)

23                    THE COURT:  All right.  That's all on that page.  So

24          1246 through 1257 are admitted in evidence with no objection.

25                    What else you got?
```

```
1              MR. HESS:  Got 1258.

2              (Defense 1258 in evidence)

3              THE COURT:  Okay.

4              MR. HESS:  Go to 1260.

5              THE COURT:  That's in already.

6              MR. HESS:  1261.

7              THE COURT:  1261.

8              (Defense 1261 in evidence)

9              MR. HESS:  1259.

10             THE COURT:  Okay.

11             (Defense 1259 in evidence)

12             MR. HESS:  Then 1160.

13             THE COURT:  1160.  Okay.  1258, 59 and 61 are admitted

14      in evidence as well as 1160.

15             (Defense 1160 in evidence).

16             THE COURT:  Go.

17      BY MR. HESS:

18      Q.  If I can draw your attention to what's been entered in as

19      defendant's 813.  That's 831.  You've had time to review that?

20      A.  Yes, I've seen that, yes.

21      Q.  You saw that at your deposition, correct?

22      A.  Yes.

23      Q.  Now, the signature on the last signature on that document

24      where Mr. Kazim's name is crossed out, that's Sultan Bin

25      Sulayem's signature, correct?
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

593

1    A.  That is correct.

2    Q.  That was executed on -- can you read that date?  I believe

3    it's 1-11-04?

4    A.  '04 I can tell, but some time in 2004.  11 being November.

5    Q.  Some time in November 2004?

6    A.  Some time in November '04.

7        MR. HESS:  Judge, I have -- I've got three more

8    exhibits that I seek to introduce into evidence without

9    objection.

10       THE COURT:  Give me the numbers.

11       MR. HESS:  1443, 1444, and 1446.

12       THE COURT:  1443, four and six are admitted in evidence

13   without objection.

14       MR. HESS:  Thank you, Your Honor.

15       THE COURT:  1443, 1444 and 1446.

16       (Defense 1443, 1444 and 1446 in evidence)

17   BY MR. HESS:

18   Q.  If I could draw your attention to what has been entered into

19   evidence as 1443.

20       Take a look at that document for me please.  Again,

21   while you're looking at that, there is also Sultan Bin Sulayem's

22   signature on that, correct?

23   A.  Yeah.

24   Q.  And his name appears -- it looks like he signed below it,

25   correct?

594

1    A.  His name appears, but looks like the signature from a couple

2    of years ago.

3    Q.  Right.  It says printed name then below says signature,

4    correct?

5    A.  Correct.

6    Q.  When you look at that, you said there were embedded service

7    and handling charges correct?  Embedded?

8    A.  Exactly, embedded.

9    Q.  Now, it is -- you do recognize on line, what is that, line 6

10   or is that line -- I'm sorry.  Four, I'm sorry.

11   A.  Yeah.  Service and handling charges.

12   Q.  It's a separate -- there's a separate line as to there and

13   then there's another separate line below that, correct?  The

14   same thing?

15   A.  That's correct.

16   Q.  So there's a service and handling charge that's line itemed

17   on two and a service and handling charge that's line itemed on

18   four, correct?

19   A.  Correct.

20   Q.  If I could draw your attention to what's been introduced as

21   Defendant's 1446.  Can you see that from there?

22   A.  Service and handling charge, correct.

23   Q.  Okay.  That's line itemed on two, correct?

24   A.  Correct.

25   Q.  Again, that's executed by Sultan also, correct?

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

595

1    A.   Appears to be correct.

2    Q.   Then we have what's been marked as 1444 Defendant's and also

3    introduced into evidence as Defendant's 1444, you see on line

4    item three?

5    A.   Service and handling charges.

6    Q.   That also is executed -- I guess that's executed by Sultan

7    Bin Sulayem also, correct?

8    A.   Correct.

9    Q.   Now, let's start with this one.  You can see the date on the

10   upper right-hand corner, October 2005?

11   A.   15 October 2005.

12   Q.   If I could just go back to 1443 please.  That's dated the

13   same place?  That's dated November 2005, correct?

14   A.   Correct.

15   Q.   If we could just go back briefly to 1446, we don't have a

16   date there because it looks like it's cut off, but if you look

17   down below, down below Mr. Jaubert's signature in the middle

18   bottom page, it's got a date of 7-11-05.  November of '05,

19   correct?

20   A.   Correct.

21   Q.   If I could draw your attention to -- let me put these in

22   order to make it as easy as possible.  Start with -- let me

23   start with this one first, a little bit out of order but let me

24   start with Defendant's 1260 in evidence.  Can you read that

25   language that appears in that open area there that's going to

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    "soon be"?

2    A.  Says "services charges usually not added.  However, purchase

3    department introduced that, this supplier is charging us very

4    low rate".

5    Q.  "Therefore they were allowed to recover service handling

6    charges".

7    A.  "To pay as per approved PO."

8    Q.  I think if we look at that, under the word "therefore", if

9    we could the gall to ask if you would expand that a bit, just

10   the word underneath "therefore" there, is there a way to get

11   that a little bit bigger?  Is that "average 10 percent"? Can you

12   make that out the language right below "therefore"?

13   A.  It appears to be 10 percent.

14   Q.  Average 10 percent.  Thank you.  Now get through these.

15   Let's start with Defendant's 1246, please would you take a look

16   at that document, please?

17   A.  Yes.

18   Q.  Let's start with the bottom, I guess, and that again is

19   executed by Sultan Bin Sulayem; is that correct?

20   A.  That is the signature.

21   Q.  And if we go up to the top, the top left, it looks like that

22   is April 13 of 2004 dated?

23   A.  That's correct, 13.

24   Q.  Again, this is a request for payment not by Exomos, but by

25   Ports, Customs and Free Zone Corporation, correct?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

597

1    A.  Appears to be because that was before I actually joined the

2    Dubai World.

3    Q.  But as you testified to, Exomos didn't become into existence

4    and didn't come in to existence until December 31 of 2005,

5    correct?

6    A.  I think it came in existence when you showed that document

7    exactly when it became.  That's an official document.

8    Q.  If I can draw your attention to what's been introduced into

9    evidence as 1247 please.  That's dated June of 2004, correct?

10   A.  That's correct.

11   Q.  And again, it's also executed by Sultan Ahmed Bin Sulayem?

12   A.  It appears to be from the document.  That was before my time

13   joining.

14   Q.  It appears to be his signature?  That's his name there,

15   correct?

16   A.  That's his name.  Looks like his signature on this one.

17   Q.  And Mr. Subair's name is also on that document?

18   A.  Mr. who?

19   Q.  Mr. Sanil Subair.  Do you know him?

20   A.  No, I haven't --

21   Q.  If I can draw your attention to what has been marked as

22   Defendant's 1248.  I already did that.

23        1249, please.  That's dated November of 2004, correct?

24   A.  Appears to be, correct.

25   Q.  And that's not executed by Sultan, but it's executed by

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Mr. Kazim, correct?

2    A.  Hamed Kazim.

3    Q.  What was his position?

4    A.  He's no longer with the company.

5    Q.  He was the chief financial officer?

6    A.  You're correct.

7    Q.  Thank you.  And again, I know you don't know him, but

8    Mr. Subair's name also appears to be executed on that document

9    also, correct?

10   A.  Correct.

11   Q.  If I can draw your attention to what has been introduced as

12   Defendant's 1250, and that is a document that's dated February

13   of 2005.  Correct?

14   A.  That's correct.

15   Q.  Do you recognize the signature, the last signature on that

16   document where it says "verified"?  And what does that say?  Do

17   you know?  Can you tell?

18   A.  "Verified and logged".  I think, "verified and logged".

19   Q.  Then says "sent to finance on 5-3-05"?

20   A.  Correct.

21   Q.  "Processed as requested"?

22   A.  That's correct.

23   Q.  We've got what's been introduced as 1251 Defendant's.  Dated

24   April of 2005?

25   A.  That's correct.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

599

```
 1    Q.  Again, that's executed by the chief operating officer at the

 2    time?

 3    A.  That appears to be correct.

 4    Q.  And also the administrative assistant?

 5    A.  Administrative assistant.

 6    Q.  Where it says "requested by"?

 7    A.  Yeah.  That's right.  Says there.

 8    Q.  If I could draw your attention to Defendant's 1252 in

 9    evidence.  Dated July of 2005.  Due date -- I'm sorry, dated

10    June of 2005.

11    A.  That's correct.

12    Q.  Correct?

13    A.  Yes.

14    Q.  That was requested, and then an individual signed off on,

15    checked by, then approved by Mr. Jaubert, correct?

16    A.  That's correct.

17    Q.  Now, do you know what the Discovery attorneys' fees was

18    about?  Do you have personal knowledge about that?

19    A.  I cannot remember exactly.

20    Q.  Do you know, did Exomos obtain the Discovery that was the

21    subject of those attorneys' fees?

22    A.  Sorry, can you repeat that?

23    Q.  Did Exomos obtain the vehicle Discovery that was the topic

24    of the -- that generated those attorneys' fees?

25    A.  That was one of the submarine we acquired, that's correct.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

600

1    Q.   And I'll move on.

2         If I could draw your attention to Defendant's 1255.

3    Again, that's dated August of '05.  That was requested by and

4    then checked by and then approved by finally Mr. Jaubert,

5    correct?

6    A.   Appears to be correct.

7    Q.   And it indicates that that was advanced payment against an

8    invoice for an air boat, correct?

9    A.   Appeared to be correct.

10   Q.   Are you aware -- are these documents documents that you've

11   seen before?

12   A.   I do not look at every single document.  The team that

13   actually goes and does the audit, they look into these things.

14   Otherwise, I mean as I stated, we have more than 123 audits we

15   do.  There's no way I can look at each individual of these

16   documents in the audit.

17   Q.   The last one I have, 1259, please.  Dated November of 2005.

18   Correct?

19   A.   That's correct.

20   Q.   Okay.  Now, in the various audits and investigative reports,

21   I'm going to lump them together, put them together for purposes

22   of this question.  There is an allegation that Mr. Jaubert not

23   only embedded these service charges and handling charges, but he

24   -- they were secret, correct?

25   A.   There is no document that we could see that can actually

601

1    give the right for Mr. Jaubert to put these extra charges on the

2    invoices to us.  If there is anything like that, then we would

3    not have any problem with it.  And some of those -- actually

4    some of the charges were inflated by up to 135 percent.

5    Q.  You know that because -- well, you don't personally know

6    that, but you assert that your team acquired the information to

7    come to that conclusion?

8    A.  That is correct.  And I think if you want to further know,

9    Mr. Hussein Ramadan, who was the head of the investigation, you

10   could ask him that as well.

11   Q.  When you say secret then, you don't mean it was not

12   disclosed, you mean it was without a written agreement?

13   A.  Without a written agreement, absolutely.  There is no

14   written agreement.

15   Q.  So it wasn't secret, like nobody knew, it was without

16   written agreement?

17   A.  There was no approval to have that extra handing charges.

18   Q.  And when you stated in your testimony talking about the

19   first audit, the one that was dated December 31, 2005, and again

20   the audit was signed that date or completed that date, but as

21   you testified, it was comprised and prepared over the months

22   preceding December 31, 2005, correct?

23   A.  Can you say that again please?

24   Q.  Yes, I will.

25           The audit is dated December 31, 2005?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

602

1   A.  Exactly.

2   Q.  But all of the investigative work and auditing work was

3   conducted in the months before December 31, 2005?

4   A.  The first audit, the first audit was our first audit of

5   Exomos.  Okay.  And as I indicated before, we identified around,

6   I said, 21 high issues, seven medium and seven low issues there.

7   Q.  But the audit itself was conducted prior to December 31,

8   2005?

9   A.  You're correct.  The audit had to be done for us to produce

10  that report.  We had to do it before absolutely, you're correct.

11  Q.  And prior to December 31, 2005, Mr. Jaubert was not the CEO

12  of Exomos?

13  A.  I cannot recall exactly when he was there, but you're saying

14  he was there when we went and he was the chief executive.

15  Q.  But Exomos didn't exist, it didn't begin until December 31

16  of 2005.

17  A.  My understanding that Exomos was there when we did the audit

18  and the time we did the audit, Mr. Jaubert was the chief

19  executive officer.

20  Q.  Of Exomos FMZ is it?  I'm sorry, Exomos?

21  A.  F, Zed, E, Free Zone Company.

22  Q.  So your testimony is is he was the CEO of Exomos FZE prior

23  to December 31, 2005.

24  A.  He was the chief executive when we did the audit,

25  definitely.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   Q.  How could he be chief executive of a company that did not

2   come into existence until December 31, 2005?

3   A.  I do not recall exactly the document you're talking, but

4   when we went over there to do the audit, he was the current

5   chief executive.

6   Q.  If you could put on the screen what has been introduced as

7   Defendant's 775.  Now, you see again you recognize this

8   document?  We saw this one?

9   A.  Yeah, you said this is the first document, yes.  First time

10  actually I've seen.

11  Q.  But you remember now we looked at this first today, correct?

12  A.  Yes, exactly.

13  Q.  And if you look at that last page, you recall that the

14  association, the corporate identity of Exomos FZE began on

15  December 31, 2005?

16  A.  According to the document, that is correct.

17  Q.  Now, during the course of these audits there came a time

18  where you instructed one of the Dubai World companies to put a

19  lien on Mr. Jaubert's home, correct.

20          MR. URQUHART:  Objection, Your Honor.  I believe it's

21  precluded by previous rulings of the Court.

22          MR. HESS:  It's in their documents, Judge.

23          THE COURT:  It's what?

24          MR. HESS:  It's in there, it's in the report.

25          THE COURT:  So?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

604

1           MR. HESS:  I just wanted to ask if that's true.

2           THE COURT:  I thought we had said that was an Act of

3    State matter.  Or I don't remember.

4           MR. HESS:  I'm not going to ascribe that to the state,

5    I'm not even getting into that topic today.  I don't mean to

6    raise it for that reason, Judge.

7           THE COURT:  I think you can talk about the lien.  Go

8    ahead.

9    BY MR. HESS:

10   Q.  So you had a conversation with your counterpart in another,

11   was it in Nakheel or somewhere else to instruct that counterpart

12   in one of the sister corporations within the Dubai World

13   umbrella to put a lien on Mr. Jaubert's house, correct?

14   A.  When we realized that he stole the money from us, okay, it

15   was -- you know, we do not have the authority, we as internal

16   auditors do not have the authority to put a lien.  As a matter

17   of fact, the house was sold, so that's exactly what happened.

18   We do not have the authority to put a lien on anybody.  If you

19   want to try to put a lien, the only people who can actually put

20   a lien are the legal institute we have.

21   Q.  So it's your testimony, you're clear on this, it's your

22   testimony that you did not request what?

23   A.  What we did request is before the sale of Mr. Jaubert from

24   Nakheel, is the people come back to us, because he owe us money.

25   So in the process, we were trying to put a lien, but

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

605

1    unfortunately it did not work.  And he sold the properties.

2    Q.  Let's get into whether it worked or not.  But first I want

3    to understand, did you or didn't you instruct one of the sister

4    companies to put a lien on his house?

5    A.  We put a request that in case if there is any sale is to

6    come back to us first.  That is correct.  We did that.  And that

7    was for us to try to protect the asset we have.  As auditors, we

8    put that request.

9    Q.  If you could explain, the reason you could do that is

10   because Dubai World owns, as you said, a number of corporations,

11   correct?

12            THE COURT:  Didn't he just say it didn't happen?  Isn't

13   that what he just said?  That the lien never got put on?

14            MR. HESS:  He said --

15            THE COURT:  They asked for it and that it didn't get

16   put on.

17            MR. HESS:  No, that it was sold prior to.

18            THE COURT:  Okay.  So it didn't get -- there was no

19   lien on it.  So move on.

20            MR. HESS:  Thank you, Judge.

21            If I may just have one moment, Judge.

22            THE COURT:  Of course.

23   BY MR. HESS:

24   Q.  You mentioned the Disney approval or not approval, you don't

25   have any personal knowledge whether Disney approved or

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   disapproved of the Nautilus, do you?

2   A.  My understanding is they did not approve.

3   Q.  Do you have any personal knowledge of that?

4   A.  What do you mean personal?

5   Q.  Did you have a discussion.

6   A.  I discussed with my team and they said it was never approved

7   so it's not approved, my team.

8   Q.  Do you remember who that was that you discussed that with?

9   A.  You can speak with Hussein Ramadan.

10  Q.  And when you say it wasn't approved, is that the same in

11  your mind as it was that Disney said you could not do that?

12  A.  My understanding it did not approve.  Or you could not do

13  that or did not approve that, it could not be happen.

14  Q.  Is it your understanding that during the audit process, that

15  your auditors actually conducted personally an inventory of the

16  stores of Exomos?

17  A.  See, in our audit, we do what they call surprise audit.

18  This is not strange for us to try to perform.

19          For example, as I said we do operational, technical in

20  the construction, some time we have what we call surprise audit.

21  Our auditors, they would appear on the site and check to see

22  what's happening.

23          In this particular case, we did, our auditors, they

24  went into the inventory and they were doing what we call a

25  surprise audit.  That is a normal process we do.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

607

1    Q.   What I'm suggesting, what I'm asking though is in the course

2    of, for instance, in the last audit, the investigation audit,

3    did your auditors actually go to the company, the Exomos storage

4    or the warehouse and did they go through the inventory of

5    Exomos?

6    A.   That's a normal process for us to do.  I mean, that is

7    definitely one of the requirement, that they would go and check

8    and verify the asset that we have in the inventory.

9    Q.   And you base the credibility of that investigative audit, in

10   part, on that understanding that somebody from your auditing

11   staff did a thorough physical audit of the Exomos stores?

12   A.   If I understand what you're saying, that is part of the

13   investigation.  That the only one part of the work we do.  Not

14   all the work.

15   Q.   But that certainly has to be one part, correct?

16   A.   It doesn't have to be.  It could be or not.  We do a cash

17   audit, surprise cash audit.  We have a lot of -- we're in a

18   business where we collect cash.  One of our audit, we do a

19   surprise audit.  We go over there and see to try to -- we can

20   count.  Similar thing, like if we go to a place where they have

21   an inventory, we do check the inventory.

22   Q.   I'm not asking really in general, I'm just trying to

23   understand, in terms of the Exomos' investigative audit, one of

24   the parts of the audit that is essential to the proper auditing

25   is a physical inventory of the Exomos stores.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.  One of the -- they look to definitely the store, you're

2    right.

3    Q.  That's the storage area for Exomos, correct?

4    A.  The storage house for, in this case, Exomos.

5    Q.  And in this case, because we're dealing with submarines and

6    those type of vessels, correct, you utilize someone that had a

7    particularized knowledge of what -- how to identify various

8    submarine parts, right?

9    A.  When you do an audit, you're going to verify according to

10   what you have in the master list.  So anybody who would go over

11   there, they would do a check and they would find out, verify.

12   Being a submarine expert, that's not really part of it.

13   Q.  How do they -- withdrawn.

14          MR. HESS:  Nothing further, thank you.

15          THE COURT:  Redirect.

16                          REDIRECT EXAMINATION

17   BY MR. URQUHART:

18   Q.  Just have a few questions.

19          Now, could you put up Exhibit 777, please?  775.  I'm

20   sorry.  All right.  You recall looking at that?

21   A.  No, I don't recall.  Only today I saw.

22   Q.  Today you saw?

23   A.  I saw, yes.

24   Q.  That was the incorporation of Exomos?

25   A.  Yes, exactly.  You're correct.

                    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                        TRANSCRIPT PRODUCED BY COMPUTER

1    Q.  But your understanding was that by the time you conducted

2    this audit, the business which ultimately became Exomos had been

3    going on for some 14 months, right?

4              MR. HESS:  Leading, Judge.

5              THE COURT:  I beg your pardon?

6              MR. HESS:  Leading.

7              THE COURT:  That is leading.  Ask a different question.

8    BY MR. URQUHART:

9    Q.  How long had the business of Exomos been going on when you

10   conducted your audit?

11   A.  It was -- as indicated, this was part of our normal audit we

12   do.  The business at that time that we went was only about 14

13   months that actually in business.

14   Q.  And Dubai World was paying Mr. Jaubert's salary at that

15   time?

16   A.  Absolutely.

17   Q.  And it hired employees?

18   A.  Absolutely.

19   Q.  And it built a factory?

20   A.  Absolutely.

21   Q.  And you had visited that factory?

22   A.  That's correct.

23   Q.  And you'd seen the employees?

24   A.  Absolutely.

25   Q.  And in fact, Dubai World had invested millions and millions

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

610

1    of dollars by that time in point; is that correct?

2    A.  We had.  You're absolutely correct.

3    Q.  And you'll recall that Mr. Hess asked you a bunch of

4    questions about service and handling charges?

5    A.  Yes.

6    Q.  And I want to go back to your testimony this morning.

7    Didn't you say that you told him to stop adding -- stop dealing

8    with Seahorse?

9    A.  In 2005 when we first did the audit, we did request him to

10   stop dealing because that's a conflict of interest.  When we

11   went back again, we did find some other transactions which were

12   actually done with Seahorse as well after we told him to stop

13   it.

14   Q.  Now, when you see the term service and handling on a

15   document, do you assume there's been some handling?

16   A.  My understanding of service and handling is there some

17   added value from the vendor to be able to try to produce a

18   document, whatever the product, for you.

19   Q.  If it's a product, that means you handle it, you touch it,

20   you move it?

21   A.  To move it, exactly.  But from our point of view, when we

22   saw the service has been charged to us 10 percent, and some

23   cases up to 135, we were actually surprised knowing later that

24   he owns the same company.  We saw a clear conflict of interest.

25   Q.  And did you see any evidence of his old company, Seahorse,

611

1    actually handling, like taking goods in, shipping them?

2    A.  Not absolutely, because in some of the cases they were

3    coming directly from the vendor themselves.  But the invoice was

4    coming from Seahorse.

5             MR. URQUHART:  May I confer for a second, Your Honor?

6             THE COURT:  Yes.

7    BY MR. URQUHART:

8    Q.  One other thing.  Could you bring up Exhibit 80 at page

9    seven please, which is actually page five of the report.  The

10   last part on the bottom there, could you blow that up?

11            Now, Mr. Hess, when he was on cross-examination, had

12   asked you whether in fact you knew any of the people who were

13   interviewed in connection with the audit.  Do you know Herve

14   Jaubert?

15   A.  Yes.

16   Q.  Do you know Jim Miller?

17   A.  I heard of him, but I didn't really -- we met.  I don't know

18   him very well.

19   Q.  But there were people?

20   A.  They were definitely people, but I remember Bert, okay,

21   Bert, I met Bert and Bert and Lawrence, those people I met.

22   Q.  And in fact, when we took you through the audit report,

23   there was a comment section.  And wasn't it a fact that you met

24   with a lot of the members of management of Exomos?

25   A.  When we do our presentation to them, to the management,

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

612

1    there is always a place in our audit report for comment that you

2    receive from the people over there.  That's for us to try to

3    make sure who is responsible.  And definitely in the

4    presentation I met a lot of people.

5    Q.  So Mr. Jaubert was interviewed?

6    A.  Definitely.

7    Q.  And the CFO was interviewed?

8    A.  He was absolutely there.

9    Q.  And looks like Mr. Miller was interviewed?

10   A.  Yes.

11   Q.  So there were a bunch of people who were specifically

12   identified and interviewed?

13   A.  Yeah.  Definitely, yes.

14           MR. URQUHART:  I have no questions, Your Honor.

15           MR. HESS:  Judge, with the Court's indulgence, I think

16   we've got an agreement, but I forgot a couple of the exhibits.

17   And if I could confer with counsel real quickly, I'm not going

18   to ask him any questions, I would like to get them in evidence

19   real quickly that way I can put it aside.

20           MR. URQUHART:  Is he excused?  Is the witness excused?

21           MR. HESS:  Yeah.  I don't need him for this.  I'm not

22   going to ask him questions.  I would like to get them in right

23   now.

24           THE COURT:  So we're through with the witness?

25           MR. HESS:  Yes, Judge.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          THE COURT:  Okay.  Thank you, sir.  You are excused.

2          MR. HESS:  Judge, I thought we had -- well, yeah.

3    We'll do it tomorrow.

4          THE COURT:  You guys talk about it, I don't need to

5    know, I don't think.  Before you get into fisticuffs, come see

6    me.  Okay.  Just come see me before you get serious.  Okay?

7          We started late, so can we go just a little longer?  If

8    you need a break, I'll give it to you but let's just keep

9    moving.

10         Call your next witness please.

11         MR. CEDERBERG:  Your Honor, we call Maria Yip.  She's

12   an expert witness and she's a little bit out of order because

13   she has to be in Miami to testify tomorrow.

14         THE COURT:  Okay.  That's fine.  Come forward, please.

15         MARIA YIP, PLAINTIFF WITNESS, SWORN

16         THE COURT:  Please be seated.  Tell us your name and

17   spell it please.

18         THE WITNESS:  Maria M. Yip, Y I P.

19         THE COURT:  All right.  You may proceed, sir.

20                        DIRECT EXAMINATION

21   BY MR. CEDERBERG:

22   Q.  Ms. Yip, where do you reside?

23   A.  Miami, Florida.

24   Q.  What do you do for a living?

25   A.  I'm a forensic accountant.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.  Can you tell us what you mean when you say you're a forensic

2    accountant?

3    A.  Sure.  Forensic accountant is an accountant, which I'm a

4    Certified Public Accountant, a CPA, that is involved in doing

5    investigations, sometimes internal investigations, sometimes

6    investigations for the government.

7            Sometimes it is to calculate damages, to determine how

8    a company has been harmed, things of that nature.

9    Q.  Can you tell us your educational background in the field of

10   accounting?

11   A.  Sure.  I have a bachelors of accounting from Florida

12   International University which is in Miami.  And I have taken

13   graduate courses, I'm a Florida CPA, certified fraud examiner,

14   certified in insolvency and restructuring and also certified in

15   what they call financial forensics by the American Institute of

16   CPAs.

17   Q.  Okay.  Do you belong to any associations or institutes that

18   CPAs join?

19   A.  Yes.  There's national association, it's called the American

20   Institute of CPAs which is a national body.  There's also the

21   Florida Institute of CPAs.  As a CPA I belong to both of those

22   groups.

23           There's also a national organization that's called the

24   Association of Certified Fraud Examiners, and I belong to that

25   national organization.

```
 1              Also since I'm certified in insolvency which is
 2     basically bankruptcy, bankruptcy and restructuring.  There's an
 3     association called the American Institute -- I'm sorry.  I think
 4     it's the American Insolvency and Restructuring Association.  So
 5     I belong to that group as well.
 6     Q.  Can you tell us your employment experience as an accountant?
 7     A.  I began my career at Price Waterhouse in 1993.  I was an
 8     auditor when I started.  And worked also on some forensic and
 9     litigation support cases.  They asked me to transfer to that
10     department, which I did.
11              And at the end of that year, I was recruited out by
12     Arthur Andersen, which many of have probably heard of, and I was
13     with Arthur Andersen until 2002 when the basically the company,
14     after Enron, kind of stopped existing.
15              After Arthur Andersen, as I was leaving Arthur
16     Andersen, I was asked by another accounting firm by the name of
17     Grant Thornton, a national accounting firm as well, to open up a
18     forensic accounting practice for them in Miami.  So I did that.
19     And for about five years we built a nice practice, about 15
20     people or so.
21              Then I was asked by a New York firm to open up a
22     practice for them.
23              And then more recently, two years ago I opened up my
24     own shop.
25     Q.  Where is your own firm located?
```

1    A.  It's located in Coral Gables, Florida.

2    Q.  What's the name of the firm?

3    A.  The firm, the name of the firm is Yip Associates.

4    Q.  You mentioned you did forensic accounting work for the

5    United States government.  Can you tell us what entities you did

6    work for?

7    A.  Yes.  One of the entities is the Securities and Exchange

8    Commission.  In those cases or those instances, the government

9    retained my firm to assist them in investigating allegations of

10   fraud, and in some instances there's been testimony work

11   associated with that.

12        There's another organization, or agency I should say,

13   called the Commodities Futures Trading Commission.  That is

14   another organization that I've done work for.

15        The Federal Trade Commission is one that comes up

16   sometimes as well.  The Federal Trade Commission is involved if

17   there's a fraud that generally relates to consumers.  Oftentimes

18   those cases fall under their area.  So I've done work for them

19   as well.

20   Q.  Have you been involved in the forensic analysis connected to

21   white collar investigations?

22   A.  Yes.

23   Q.  What about asset misappropriation or embezzlement cases?

24   A.  Both asset misappropriation and embezzlement in the United

25   States and abroad as well.

1   Q.  Many of us watch on TV the CSI program with their forensics.

2   With an accountant, what kind of forensic investigations do you

3   do?  What tools do you use?

4   A.  The tools that -- it's not nearly as sexy as it is on TV and

5   the characters are not as good looking, so I tell you that in

6   advance.

7         The work that we -- what we deal with is documents

8   primarily.  Data.  And the documents included everything from

9   information on a company's system to invoices, purchase orders,

10  cancelled checks, bank statements, applications, contracts,

11  receipts, packing slips, all sorts of those types of documents.

12  So it's built on evidence and so that part is very similar to

13  the TV show.

14        But it's really an effort of rolling up your sleeves

15  and putting and connecting many dots that you'll see on

16  different types of documents and different types of data.

17  Q.  The kind of documents you look at are the kind that are

18  found in most businesses to keep track of what's bought and

19  what's paid for, what's kept, what's in inventory?

20  A.  Yes.  Regardless of the -- with a couple of exceptions such

21  as in the healthcare industry, that's kind of a particular

22  industry, but in most other industries the type of documentation

23  that you would see is going to be consistent.  The forms may

24  look a little different, but the concept is the same.

25  Q.  Okay.  We've heard throughout this trial the term "purchase

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

618

1    order".  We would like you to tell us specifically what is a

2    purchase order when a business is running?

3    A.   A purchase order is what the two words suggest.  Which is

4    somebody at the company needs an item and the item may be ten

5    staplers for a department.  And a purchase order is put together

6    by somebody who has a need for a product and says I will buy ten

7    staplers at $5, $50.

8         The purchase order indicates what is needed, a purchase

9    order tells the person who is later on going to approve an

10   invoice when it comes in, that it's okay to pay it at $5 because

11   somebody agreed to $5, that's why it's on the purchase order.

12        The reason you want that is you don't want somebody

13   sending it in at $7.  An invoice coming in at $7 and someone not

14   knowing and going ahead, approving it and sending it in.

15   Q.   In your answer you used another term "invoice".  Can you

16   tell us what an invoice is and how it relates to a purchase

17   order in the regular course of how companies do business?

18   A.   Sure.  The invoice is the -- the invoice is the paperwork

19   created by the person that or -- excuse me, the entity that the

20   business is dealing with.  So the seller of those staplers, to

21   follow that example, would send an invoice with a packing slip

22   most likely, in the delivery of the staplers and it would

23   indicate -- there would be a packing slip that would say

24   enclosed are ten staplers.  Packing slips don't generally have

25   the price, but would included the quantity.

619

1        Then you get an invoice from that vendor, could be

2   Office Depot, that would indicate that it was at $5.

3   Q.  So purchase order sent by the people buying the material and

4   the invoice is sent by the people shipping the material

5   requesting payment?

6   A.  Correct.

7   Q.  And then you commonly find evidence of a payment being made

8   by the buyer back to the sender?

9   A.  Yes.  You would see the buyer, after receiving the invoice,

10  making a payment on that invoice.

11  Q.  What were you asked to do in this case?

12  A.  Well, in this case I was asked to review what I would call a

13  fraud type of report that was prepared; to look at the elements

14  of the report, to look at the documentation available in this

15  particular case, and to independently determine whether I saw

16  evidence of the items that were described in the report and to

17  reach my independent conclusion with regard to them.

18  Q.  You said independent conclusion.  Why is that important?

19  A.  Well, I think it's very important that the trier of fact, in

20  this case the jury that's been impaneled, to hear from somebody

21  who is not an employee of the company.

22        You know, you hear the term having skin in the game.  I

23  don't have skin in this game.  I take a great deal of pride in

24  the work that I do and apply conservatism to what I do, so

25  that's -- I think that's my role and purpose here.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
1              MR. CEDERBERG:  May I approach, Your Honor?
2              THE COURT:  Yes, you may.
3              MR. CEDERBERG:  I'm putting in front of the witness
4     Exhibit 147.01 through 147.112 which has already been received
5     in evidence and labeled the Mismanagement of use in Exomos Group
6     Internal Audit.
7     BY MR. CEDERBERG:
8     Q.  In your investigation, did you review those materials?
9     A.  Yes, I did.
10    Q.  And why did you review those materials?
11    A.  I was -- I reviewed the report that had the findings of the
12    team that did the fraud investigation.  And I'm using the word
13    fraud, but that did the investigation.
14              And in order to understand the findings in what was
15    reviewed by the auditors or the individuals on this team, I had
16    to look at what documents they relied on, what documents they
17    looked at and so on.  So it was necessary for me to look at this
18    report in its entirety.
19    Q.  That looks like a lot of documents.  Did it take you a while
20    to do that?
21    A.  Yes, sir.
22    Q.  Were you retained by our firm or Dubai World to review those
23    documents and to analyze those and to give an opinion here
24    today?
25    A.  Yes, in addition to other documents.  But absolutely, yes.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

621

1    Q.   And were you compensated for your time?

2    A.   Yes, I was.

3    Q.   How much were you compensated?

4    A.   I don't have the precise figure, but I think it was around

5    between 20 and $30,000.

6    Q.   And when you reviewed the exhibits that are part of 147, the

7    fraud audit that's been refer to, you saw purchase order and

8    invoices in there?

9    A.   Yes.

10   Q.   Could Exhibit 147.15 in evidence be placed on the screen?

11        Ms. Yip, we have it on the screen there and we have it

12   next to you on a little screen behind you.  If you can see that

13   whichever is best for you.

14   A.   This is better for my vision.

15   Q.   Okay.  We can even make it a little better.  Can we blow up

16   the top half?

17   A.   I wish I had this in my office.

18   Q.   What is that document?

19   A.   This is one of the purchase orders I spoke of a few minutes

20   ago about purchase orders and what their purpose is.  But this

21   is a purchase order, the date in the "to" box is correct.  The

22   date is I believe November 13, 2005.

23   Q.   Can you show us the kind of information that you had to use

24   in order to conduct your audit.

25   A.   Okay.  Do you all see it there?  Okay.  I'm sorry.  Can you

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1      repeat the question?

2      Q.   Yeah.   On that purchase order, what were the kind of

3      information that you felt was important for you to use in doing

4      your analysis of a specific transaction.

5      A.   I looked at a couple of key items.   One is if you look up

6      here, where it says Seahorse Submarines, if you look at this box

7      here, this is really the key box in doing what we do.   This

8      gives you the purchase order number.

9      Q.   How is the purchase order number used by a forensic

10     accountant in trying to trace where money or product went?

11     A.   I mentioned earlier that in trying to do our work, we look

12     at a lot of pieces of evidence.   So we always try to find

13     something that's common, that will help us understand a

14     transaction.   And the purchase order right here in this case

15     was, I would say, the common element that I've used.

16          In other cases you look at a particular client number.

17     In this case, the purchase order is what helped me tie this

18     together.

19          The date, of course, is always important because it's

20     important to put it into context of what's taking place.

21          This tells you the currency.

22          This is a description of the product or the item, what

23     is being charged.

24          And then here you've got your amounts.   And to the

25     right it says delivery date.   And this here says December 30,

1    2005.

2    Q.  That's the date the product is supposed to arrive.

3    A.  Yes.

4    Q.  Now, on this one here, under the description it says service

5    and handling charges.  Does that come out to about 10 percent of

6    what the electric magnet costs?

7    A.  Yes.

8    Q.  Okay.

9    A.  And I don't know if the jury can see it, but it's 119 and

10   then the handling charges is 11,900, so it's 10 percent.

11   Q.  Can we blow up -- take that down and blow up the second half

12   of the purchase order so the jury can see.  So the amount on

13   this purchase order requested on November 13, 2005 was in total

14   $130,994?

15   A.  Yes.

16   Q.  Could we take that down and put up Exhibit 147.15-2.

17   147.15-2?

18   A.  I don't have it in the binder but I can follow the -- yep.

19   Thank you.

20   Q.  What is this?

21   A.  This is an invoice.  I mentioned earlier that it is a big

22   invoice.  I mentioned earlier that the purchase order number is

23   something that is very helpful for time and different elements

24   of the business documents.  As you can see right there, it's

25   been blown up, it's smaller on the document, but gives you the

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    purchase order number.

2    Q.  Okay.  Can we show the --

3    A.  There you see -- so you see -- it's small but, I'm sorry,

4    it's on there.  And then this is the actual invoice.  Something

5    -- just something to -- for instance, as I was telling you

6    earlier, you look at the different documents, you see how they

7    tie together.  One of the things that I always look at is the

8    date.  Does something make sense in the kind of -- in the normal

9    course of business.

10   Q.  With regard to the invoice dealing with these two electric

11   magnets as compared to the purchase order regarding these

12   magnets, each for $130,994, what did you find that interested

13   you as a forensic investigator?

14   A.  Well, a number of things that were of interest to me.  Can

15   we just -- do we have the ability to go back to the prior

16   document?

17   Q.  Sure.  That would be 147.15.  There you go.

18   A.  This is perfect.

19   Q.  Could you blow up, the top half?

20   A.  Okay.  What I want to point out is this is -- the date on

21   this is November 13, 2005.  In other words, we talked earlier

22   about ordering the staplers when you have a need, when you think

23   you need them.  If we can go back and if you look here, this --

24   you might have to blow up, okay.  It's actually November 7.

25   Q.  What's unusual about the invoice being earlier in time than

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    the purchase order, based on your experience?

2    A.  Well, you expect to have an order for something before you

3    expect to get it.  I'm sorry.  You expect to ask for something,

4    to place an order to, to have a need, to put something into the

5    system before you expect to get an invoice from Office Depot

6    showing up at your doorstep.  To use an analogy that we were

7    referring to earlier.  The description is the -- thank you.

8    This description is the same as what you would -- I don't need

9    the date anymore.  You'll see the amount, it's the same 119 that

10   I referred to earlier, this is actually very clear on this

11   document.  Thank you.  I feel like we're both driving the car

12   here.

13   Q.  Can you follow her pointer?  Thank you.

14        And in your experience, for service and handling to be

15   a legitimate charge, what needs to happen?  What does the

16   company have to do to be entitled to a service and handling

17   charge?

18   A.  There has to be a service that's provided.  So sometimes if

19   you purchase something on the internet and they tell you it's

20   9.99, but then there will be a $2.50 service and handling or

21   when you buy a ticket for a concert for instance, they'll charge

22   you and you make a decision of whether you want to get it a

23   different way or pay the 2.50 to have them send me a ticket to

24   my house.

25        So there is a service that is being provided in

1    exchange for handling this and facilitating it, is really the

2    word, and getting you that product.

3    Q.  And that service or that service and handling, is that

4    something in addition to the value of the product that's being

5    bought?

6    A.  Yes.  You would expect to pay that on top.  If a service is

7    provided for a ticket, I expect to pay the price of the ticket,

8    then I expect service and handling charge for them facilitating

9    it and getting it to my house.

10   Q.  Can we just put on the screen 147-15, page two.  Can you

11   blow up the signature in the right-hand corner?  What did you

12   understand that to be?

13   A.  I understood this to be Mr. Jaubert's -- and I apologize if

14   I'm not pronouncing it correctly -- Jaubert's signature, and

15   this is, as I read it, process payment, then this gentleman's

16   signature.  So I view it as a process payment for -- if you

17   could go back to the full document, process payment for this

18   invoice.

19   Q.  Okay.  So you understood that Seahorse Submarines was

20   Mr. Jaubert's company, right?

21   A.  Yes.

22   Q.  The process payment would have been signed and ordered by

23   Mr. Jaubert as part of the purchasing company which would have

24   been Exomos in this case, right?

25   A.  It seems as though it's both.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.   Okay.  He's on both sides of the transaction?

2    A.   Yes.

3    Q.   And did you find in your investigation that that $130,994

4    was actually paid on the invoice that came pursuant to the

5    purchase order?

6    A.   Yes.

7    Q.   Did you conduct any investigation whether Exomos, the

8    company Mr. Jaubert was running, ever received that product when

9    you reviewed the materials?  Did you find any evidence whether

10   or not it was received?

11   A.   The evidence -- the answer is no.  I did not view any

12   documents that indicated that the product was received.

13   Q.   Okay.  Can you put up 147.63-3.  147.64-3.  Apologize.

14        Okay.  What was this document that you found?

15   A.   This was a document in the fraud report that was prepared or

16   incident report that was prepared that relates or -- excuse me,

17   specifically addresses -- remember what I said earlier about the

18   purchase order, as you're trying to connect different

19   transactions, different events, this was one of the key things

20   that I focused on.  So here's the number, I don't know if you

21   will recall it.

22   Q.   Can you blow that up, Charles, and put it up high so the

23   jury can see that whole line?  The whole line.  Blow it up and

24   put it up higher do the jury can see it.

25        Okay.  Will that be helpful to you, Ms. Yip?

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

628

1    A.  Yes.  Is there any way to show the document we were just

2    looking at?  I just wanted the jury to see the invoice.

3    Q.  The invoice again would be 147.15-2.  And we'll go back to

4    this document, I'm sure.

5    A.  So -- excuse me.  Here you'll see -- okay.  So here's your

6    invoice.

7    Q.  Okay.

8    A.  You've got your PO number on it, you have in this section

9    here in the center, you have a description, you just saw that on

10   the other spreadsheet and you see the amount here.

11   Q.  Thank you.  Cut to the one where we put over top.

12        Ms. Yip, can you explain to the jury how you tied those

13   up and what you found with regard to delivery of the product?

14   A.  Yes.  Again, reading from left to right, we have our

15   purchase order number which is the number that we have is a

16   constant.

17        Here is the date that it was supposed to be delivered,

18   December 30, '05, which you'll recall that was also on the prior

19   document, the purchase order when we looked at that, here is the

20   date, payment date to be paid in US dollars.  Okay.

21        This is the local currency, ignore that for a moment.

22   In this column here, remarks as per Mr. Herve delivery on

23   20-04-7, that's April 20, 2007.  So if you look up here at the

24   heading of this document, it says schedule of outstanding

25   purchase orders of Seahorse up to or as of April 11, 2007.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1              So what this tells me is that at the time that this
2        document was put together, somebody spoke to Mr. Jaubert, and
3        was advised that it would be April 20, 2007 when this product
4        would be received.
5              I found this odd in light of the fact that this is
6        something that should have been delivered in December of 2005.
7        Q.  Did you also find it odd there was no notation as to a
8        future delivery date until after the auditors had done their
9        report?
10       A.  Yes.  We have -- the date is suspect for a number of
11       reasons, including paying for something before you receive it.
12       Then we're looking at our the auditors' report which was done at
13       the beginning of 2007.  There is -- I'll just leave it at that.
14       Q.  Okay.
15            MR. CEDERBERG:  May I have a moment, Your Honor?
16            May I approach, Your Honor?
17            THE COURT:  Yes, you may.
18            MR. CEDERBERG:  I'll come back to this, Your Honor.
19       BY MR. CEDERBERG:
20       Q.  Ms. Yip, did you prepare a report of your findings and your
21       investigation?
22       A.  Yes, I did.
23       Q.  And in those findings, did you find different categories of
24       suspicious documents?  Did you try to divide them up into
25       buckets?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.  I found categories of suspicious activity.  The documents

2    were not suspicious.  I think the activity was and I did, I

3    grouped them, I believe, in a similar manner to just to avoid

4    confusion, a similar manner to some of the titles that are used

5    or included in this incident fraud report.

6    Q.  So for the transactions like we just saw where it was

7    invoiced before the purchase order, monies were advanced, no

8    product received, what did you call that bucket of documents?

9    A.  That bucket of transactions were open purchase orders.

10   Q.  Okay.  Did you find more than one when you reviewed all of

11   materials?

12   A.  Yes.

13   Q.  Okay.  Approximately how many did you find like that?

14   A.  I found three purchase orders in which it was very clear to

15   me that they were open.  There were additional purchase orders

16   that had been identified in the fraud report that I had a

17   difficult time connecting those dots, as I mentioned to you

18   earlier, either because the document was very difficult to read,

19   or I was missing a particular document that was referred to and

20   was not available for me to look at.

21   Q.  When you did your report and you found documents that were

22   in 147 that you couldn't read clearly enough for you and you

23   couldn't match up the equipment sufficient to satisfy you, did

24   you included those in outstanding invoices?

25   A.  I did not.  I did not feel comfortable.

631

1    Q.  Why not?

2    A.  Because I'm not comfortable including a transaction that I

3    have not connected the dots and pieced it together.

4    Q.  So your analysis was as conservative as you could be

5    comfortable with?

6    A.  Yes, absolutely.

7    Q.  Okay.  Can we look at Exhibit 147.51, page eight.  If you

8    look up on the screen, Ms. Yip, is this yet another copy of the

9    purchase order dated November 13, 2005 that we talked about just

10   a couple minutes ago?

11   A.  It is.  This one has a different notation.  I recall seeing

12   this one.

13   Q.  Can you blow up the bottom right-hand corner with this

14   notation on what the purchase order says.

15   A.  This one says due by May, looks like shorthand for 2008.  I

16   don't know if you recall, but the prior document in that same

17   section had a 2007 date.  Is that document available for them to

18   see?

19   Q.  Yeah, if we just go back to 147.64-3.

20   A.  No, not that document.

21   Q.  The one in the corner that said 2007?  147.151.  Thank you

22   Mr. Mosely.  What did that say?

23   A.  Will be delivered by -- I've seen a better copy of it, it's

24   May 2007.  You have due up top, I'm sorry.

25   Q.  So we saw one that it wasn't delivered when the auditors did

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    their audit, and was a promise of April 2007 and May 2007 then

2    you saw another document May 2008?

3    A.   Correct.  We just saw in the corner of the prior document,

4    we saw the notation for 2008.

5    Q.   Okay.  I think the jury has that in mind.  We don't have to

6    go back.

7         As a forensic investigator, what did that tell you?

8    A.   Well, that told me that it wasn't -- that the product --

9    that the item had not been received, it corroborated, and that's

10   what we do in -- when we're doing forensic accounting, sometimes

11   the information is not perfect.  So we look at one piece of

12   evidence and see if it makes sense with two and three and four

13   and five other pieces of evidence.  And if the logic is there,

14   if the chronology is there, if it's consistent, then it paints

15   the picture for us.  We're used to working with imperfect

16   documents.

17        We looked at a report earlier dated April 2007, April

18   11, 2007 and as of that date, that product was not there.  It's

19   consistent with what we're seeing here because we're seeing

20   right on the document that the item, as of that date, had still

21   not been received.

22   Q.   Let's look at another transaction.  And can you put up

23   147.59-4.  Okay.

24        Have you seen that invoice before?

25   A.   I have.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

633

1    Q.   And that was from Seahorse, Mr. Jaubert's company?

2    A.   Yes.

3    Q.   Okay.  Can you blow up the middle part of it?  What

4    information did you get off this for your investigation?

5    A.   Well, I had the -- again at the top, I had -- the date

6    provided me with that information.  Obviously I had a

7    description similar, this is very similar to the one you saw

8    earlier of the product and the service charges and handling.

9    And obviously, you have the amount right there.  And similarly

10   to what you saw earlier, this is 10 percent of that number.

11   Q.   Okay.  Just so we're clear for the product on the invoice,

12   what did Mr. Jaubert's company represent to Mr. Jaubert's other

13   company was the purchase price of that product?

14   A.   The purchase price of the product was 18 -- excuse me,

15   186,000.  And in addition to that, there is a service charge of

16   18,600 for a total of $204,600.

17   Q.   Okay.  Now, can we go to Exhibit 147.59, page five?  Were

18   you able to tie this purchase order into the invoice we just

19   showed?

20   A.   Yes.  I just want to point out -- again, we can go from the

21   top down, we have our purchase order number here which was the

22   same number that was handwritten on the document we just looked

23   at.  But again, look at the date.  You've got this purchase

24   order dated October 26, 2005.

25   Q.   After the invoice?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.   Correct.  The invoice is dated October 18th, we just saw

2    that a minute ago.  So again, the same pattern as we saw

3    earlier.

4    Q.   Okay.  Then if you blow up the bottom of it, how much was

5    the purchase order for in dollars?

6    A.   The total price was -- total amount was 204,600.  So that's

7    consistent with what we saw on the invoice.

8    Q.   And did your investigation show that that money, in fact,

9    was paid out to Seahorse?

10   A.   Yes.

11   Q.   Okay.  Now, can we go to Exhibit 147.59, page one.  Can we

12   blow up the top half of that, or the bottom half first.  Bottom

13   up to the description and down.

14        Okay.  So what is this?

15   A.   This is the description portion of an invoice from North

16   American Marine Jet, Inc.  This is an invoice for -- it's a

17   little bit odd, but says one, there's another invoice that

18   actually has that changed to two.  And you can see here 81,386,

19   I don't know if you can see the second line has the same number

20   written underneath it.

21        So at some point, somebody figured out that it was two

22   items, they included the price for both and here's your total.

23   162,772.

24   Q.   Okay.  So 162,772 was the actual purchase price Seahorse

25   paid for the materials?

635

1    A.   Correct, and with the quantity of two.

2    Q.   Yeah.  Can we go to 147-592.  And can we blow up the

3    quantity, the quantity section there about four lines.  This is

4    the document that shows you two orders with the same price of

5    81,386?

6    A.   Correct.

7    Q.   Now, can we go back?  First before we go to the invoice, who

8    was the supplier in this case?

9    A.   That was the company I mentioned, North American Marine Jet,

10   Inc, is who it was purchased from.

11   Q.   Where was the product, these 12 volt power shifters, where

12   were they to be sent?

13   A.   To -- we have the ship right -- this portion of it is a

14   little blurry, but up in this section is where it has the ship

15   to address and it's the same as this address here in Dubai.

16   Q.   In other words, North American Marine Jet, Inc. was going to

17   ship the product directly to Exomos in Dubai.

18   A.   Correct.

19   Q.   Now, let's go back to Exhibit 147.594 and look at that

20   invoice again.

21        Now on the invoice that Mr. Jaubert's company Seahorse

22   sent his company Exomos, the purchase price is not the one

23   162,772 we just saw, what was it?

24   A.   The price says 204,600 to -- that's Seahorse's billing.

25   Q.   Okay.  But the actual price for the product on there, is

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

636

1    that 186,000?

2    A.   186.

3    Q.   As opposed to the 162 which is what it brought it for?

4    A.   Correct.

5    Q.   Then the service charges and handling is 18,600?

6    A.   Right.  And that's the same 10 percent that we saw earlier.

7    I think one of the distinctions here that we're looking at is

8    this number had the padding or increase from the 162,000, just

9    to talk in round numbers, that Seahorse paid.  They went from

10   162 to charge 186.  Okay.

11        And then in addition to that, so that -- my point being

12   is that the 10 percent was charged on the price that already had

13   a markup.

14   Q.   By the way, he padded the price and added 10 percent on the

15   padded price?

16   A.   Correct.

17   Q.   And if we can go back to 147.59-1, and you testified before

18   -- if you'll blow up the top half -- when you look at that

19   document that shows it shipped from North American Marine Jet,

20   Inc. straight to Exomos, did you find any shipping and handling

21   by Seahorse that would entitle it to 10 percent?

22   A.   I did not.

23   Q.   Did you find any transaction with service charges and/or

24   padded invoices?

25   A.   Yes.  I found transactions that had both of the items, both

1    shipping and handling charges, as well as transactions that had

2    what I referred to in my report as an overcharge.

3    Q.   Including shipping and handling transactions in your

4    opinion, and including overcharges by Seahorse, did you use the

5    same conservative methodology you talked about?

6    A.   Yes.

7    Q.   Did you also try and undertake what actually was paid by

8    Exomos for the three submarines, the Goby, the Discovery and the

9    Stingray Duo?

10   A.   Yes.

11   Q.   And did you put those in your report as well?

12   A.   I did.

13   Q.   And were there other charges for three other items that -- a

14   development of a rebreather, do you remember looking into that?

15   A.   Yes.

16   Q.   And what did you find?

17   A.   There were three elements or three categories of charges

18   that were included in the misappropriation report that was done.

19   One of them dealt with a rebreather, another one dealt with a

20   thermal camera and the third one dealt with a steering assembly.

21       In those three categories, because in essence the same

22   thing occurred in those categories, there was -- the auditors

23   went to locate and to find those items.  They were not there.

24   The company paid for them, so in one item, and I will tell you

25   which one that is, a portion had been paid.  I'm sorry, a

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    portion of the product had been received, and I did not include

2    that in the damages because, granted you need the whole thing,

3    but just to be conservative, I did not include it in the amounts

4    owed, the portion or the part of the product that was received,

5    but that applies to the rebreathers, it's an upgraded remote

6    control for a thermal camera and a steering assembly.  They have

7    more technical terms, but that's -- those are the titles we gave

8    the categories.

9    Q.  And when you finish your analysis of the amounts paid on the

10   Goby, the Discovery, the Stingray and the outstanding purchase

11   orders, overcharging, handling and services and the three

12   components that you just talked about, did you make a

13   compilation of your findings and put it in your report?

14   A.  I did.

15           MR. CEDERBERG:  May I approach, Your Honor?

16           THE COURT:  Yes, you may.  Once you got permission to

17   approach, you can keep going back.

18           MR. CEDERBERG:  Thank you, Your Honor.

19           Your Honor, I've conferred with counsel and he has no

20   objection to me showing a summary of her damage calculation to

21   the jury.

22           MR. HESS:  With the understanding that I'm not

23   stipulating to the amounts, but I have no objection.

24           THE COURT:  Sure.  You're just stipulating that it is

25   her report.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1          MR. HESS:  Yes, Your Honor.

2          THE COURT:  Okay.

3          MR. CEDERBERG:  Can you put it up just a little bit

4    higher so everybody can see over you?

5          THE COURT:  I don't think he can.

6          MR. CEDERBERG:  Go down just a tad.  Okay.

7    BY MR. CEDERBERG:

8    Q.  Did you prepare this?

9    A.  I did, yes.

10   Q.  Can you, by category, tell the jury what you found and just

11   summarize how you got to that calculation?

12   A.  Sure.  The first line item is, you'll see amount due for

13   refund, Goby, and that's referring to one of the vessels.  The

14   amount that I included in the calculation was a payment that was

15   made in the amount of $58,225.00 that I was able to trace in the

16   way of payments.  And that was that -- I'll deal with all the

17   interest at the same time.

18         But that was -- in looking at Goby, I looked at the

19   agreement, I looked at the purchases that were made in

20   connection with it.  I looked at the report and what was said as

21   to the workings of Goby, excuse me, or the fact that it didn't

22   work.

23         Discovery, similarly another vessel, looked at the

24   payments that were made.  Those are payments that I was able to

25   trace.

640

1          Stingray Duo, same thing.  $42,500 for the initial

2     payment that was made.

3          The next category is outstanding purchase orders.

4     That's the one we spoke about earlier, we saw a couple of

5     examples, those are items that were paid for, items that were

6     ordered and items that were not received.

7     Q.  Let me stop you right there with amount due for outstanding

8     purchase order.  In your investigation, was there a larger

9     number at first, then it was reduced because of an evidence of

10    some type of a payment after being confronted with the auditor?

11    A.  Yes.

12    Q.  Can you tell the jury what that was?

13    A.  Yes.  There was a payment made in the amount of $166,000.

14    If you'll permit me, I believe the date is in July of 2007 and

15    it was a payment where I saw the evidence of the payment and so

16    I -- that number, that 208 would have been 166 more.  I reduced

17    it by 166 because Mr. Jaubert had made that payment.

18    Q.  And with regard to the amounts overcharged by Seahorse, what

19    does that represent?

20    A.  That represents just that.  Those were -- we saw that

21    invoice, excuse me, that product where it was billed at, I want

22    to say 184,000, was purchased for 162.  That's the example that

23    we went through.  That's what I'm referring to, overcharges.

24    Q.  Okay.  The amount due for handling and service charges, is

25    that the 10 percent that you found on certain purchases?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

641

1    A.  Correct.

2    Q.  And then the amount due for development of the rebreathers,

3    can you explain where you got the money column or the damage

4    column for the rebreathers, the camera, and the steering.

5    A.  Sure.  For those three items, those were the monies that the

6    company paid for those products that it did not receive.  For

7    instance, it's supposed to be an upgrade to the thermal imaging

8    camera.  There is a camera, but it wasn't a thermal imaging

9    camera.  So those were actual monies paid.  I don't know if

10   that's clear.

11   Q.  So what did you get in total damages?

12   A.  The total damages in US dollars is 833,427.

13        To the right you'll see a column that says prejudgment

14   interest, and I just wanted the jury, for you all to have that

15   number in the event that prejudgment interest is appropriate.

16   That interest number, I just caution you, is only through May of

17   2010 which is the date of my report.  So if prejudgment interest

18   is found to be appropriate, then that number would need to be

19   run through the date of your findings or -- excuse me, the date

20   of the Court's ruling or of your findings.

21   Q.  Then the last column, what does that represent?

22   A.  The last column represents the sum of the calculated damages

23   plus the prejudgment interest.  And so your grand total there is

24   a $1,064,732.

25   Q.  Now, you conducted several forensic fraud audits?

642

1    A.  Yes.

2    Q.  Okay.  Your review of the fraud audit conducted by Exomos

3    and led by Mr. Ramadan, did that appear a competent audit to

4    you?

5    A.  Yes.

6    Q.  Okay, now if Mr. Ramadan or Exomos's internal audit's number

7    is somewhat higher than yours, how would you explain that?

8    A.  Well, I can tell you that by reviewing their report, I know

9    that the number on that report was higher.  That was a report

10   that was done at a point in time very close to the events.  I'm

11   looking at documents several years later.  I am very, very

12   conservative and if I'm not comfortable that I have seen the

13   transaction all the way through and convinced that the evidence

14   corroborates itself, I'm not going to included it.  And so I

15   respectfully just have a different -- will arrive at a lower

16   number than perhaps that other report.

17        MR. CEDERBERG:  May I have a moment, Your Honor?

18        THE COURT:  Yes, you may.

19        MR. CEDERBERG:  Nothing further, Your Honor.

20        THE COURT:  Cross-examination.

21        Let's take about five minutes right now and let's see

22   if we can come back and finish this witness so we can let her

23   go.

24        COURT SECURITY OFFICER:  All rise.

25        (Jury out at 4:40 p.m.)

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

643

1          THE COURT:  Ma'am, since you're on the stand, you

2     cannot discuss your testimony with anyone.

3          Let's take five minutes.  Let's start at quarter of.  I

4     would like to finish her up before the day is out.

5          (Brief recess)

6          (Jury in at 4:50 p.m.)

7          THE COURT:  Please be seated.  All right.

8          You may proceed, sir.

9          MR. HESS:  Thank you, Judge.

10                         CROSS-EXAMINATION

11    BY MR. HESS:

12    Q.  Good afternoon, Ms. Yip.

13          Of course, when you did your calculations and arrived

14    at your determinations, you're relying on the information

15    provided to you by -- in those three audits or the two audits,

16    in the investigation report, correct?

17    A.  I relied in part on the information that was in those audit

18    reports, and other documents that have been produced in this

19    case.  In my report, I've got a listing of the various types of

20    documents that I relied on.

21    Q.  Primarily what I was discussing is though, you never went to

22    stores at Exomos and reviewed and did a physical inventory of

23    the materials that were there.

24    A.  In 2007, no.

25    Q.  Or ever, correct?

1    A.  Correct.

2    Q.  So you are relying on the information provided to you by

3    Exomos or Dubai World about whether or not those various items

4    that you discussed toward the later part of your testimony, the

5    rebreather, the thermal camera, the steering assembly, whether

6    or not those were in fact delivered.

7    A.   Correct.  In doing the forensic accounting work that we do,

8    we're generally doing it at a later point in time, something has

9    come to light and something is being investigated.  So we look

10   at documents that were created back at that moment in time.

11        So you look at who was on the ground, as I say, who was

12   conducting the investigation, what schedules did they prepare,

13   what notations did they put on the documents.  So similar for

14   those particular ones you asked me about.  There were notations

15   that said this item is not here, this cannot be found, that sort

16   of thing.

17        So that's the best that I can use to take me back to

18   2007.

19   Q.  Right.  And that's what I was getting at.  Those items,

20   those notations where you just said those items are not here,

21   notations, those were provided to you by Exomos or Dubai World

22   auditors, correct?

23   A.  Those were included in their report.

24   Q.  And you never spoke with Mr. Jaubert about the

25   discrepancies, correct?

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

645

1    A.   No.

2    Q.   So in performing and doing your work in this case, you

3    haven't had an opportunity to sit down with Mr. Jaubert and

4    permit him to explain to you anything about your findings.

5    A.   That is correct.

6    Q.   Also, when you determined, looking at your summary of

7    damages, you haven't taken into consideration in those damages

8    any mitigation or failure to mitigate on the part of Exomos or

9    Dubai World or the other Plaintiffs, correct?

10            MR. CEDERBERG:   Objection, legal conclusion, compound.

11            THE COURT:   It is compound.   Ask a different question.

12   See if maybe we can get into it the same way.

13   BY MR. HESS:

14   Q.   In arriving at your calculation of the damages, you did not

15   included in your calculation matters of mitigation.

16   A.   The reason I pause is that as I -- as you think of the

17   different types of damages and the types of damages that you

18   would mitigate, the things that the company would have the

19   ability to do something about, to change it, you think about the

20   -- I think about the monies that the company invested in space,

21   in people, etcetera, with this endeavor.   But those are actually

22   more damages that the company had.

23            When I think about the mitigation, it's difficult

24   because of the fact that Mr. Jaubert was really -- well he was

25   in fact involved with both companies.   And so, from the

1    perspective of mitigation, when you're in the driver's seat for

2    one company and the driver's seat for the other, it really --

3    it's difficult to -- the issues of what mitigation could have

4    been done by someone else at the company is hard to contemplate

5    for these particular items that I looked at.

6    Q.  Well, let me draw your attention to specifically the items

7    regarding the amount due for refund for the Discovery, the

8    amount due for refund for Goby and the amount due for refund

9    with the Stingray Duo.

10        You're not aware of any efforts made by Dubai World or

11   any of the subsidiary corporations that are involved in this

12   case to sell those assets or to realize any compensation for

13   those items, are you?

14   A.  One of the vessels, and I included it in my report so I

15   could go back and look at it, but one of the vessels that was

16   inoperable, my understanding from speaking with -- his name

17   escapes me, give me one, Mr. Krueger is his last name, he

18   indicated to me that it's -- the item was put in a showroom and

19   was not something that was safe and could be used.

20        Similarly there were issues safety-wise, so I don't --

21   you know, as I think of mitigation and things that they could

22   have -- that the company could do, I think it's -- you have to

23   consider that these are vessels that may be unsafe.  So I'm not

24   sure that the sale of these things to another party is not

25   actually creating a worse problem.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

647

```
1   Q.  And you say you're not sure because you don't have any
2   personal knowledge of the safety or unsafety of any of these
3   vehicles, correct?
4   A.  Correct, simply from the expert's reports.
5   Q.  In fact, you've never, in person, seen any of the vessels,
6   correct?
7   A.  Correct.  Just photos.
8   Q.  And you've never seen the vessels operating in video or
9   pictures or anything, correct?
10  A.  Correct.  I believe there was a photo of one of them on
11  fire, but that was a photo.
12          MR. HESS:  Thank you.
13          THE COURT:  Next?
14          MR. CEDERBERG:  Redirect, Your Honor, very short.
15          THE COURT:  Yep.  That's what's next.
16                      REDIRECT EXAMINATION
17  BY MR. CEDERBERG:
18  Q.  Ms. Yip, you were asked a question about efforts by Exomos
19  to mitigate damages, do you remember that?
20  A.  Yes.
21  Q.  Okay.  Your conclusion was that Mr. Jaubert and his company
22  stole money from Exomos.  What could Exomos do to mitigate that?
23  A.  I don't know what -- which is why I paused.  I don't know
24  what the company could have done when it had its individual that
25  was in charge and had a duty to its company, that person is
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

648

1    involved in self-dealing, I don't know.  I don't have an answer.

2    Q.  Isn't the only person that could mitigate that loss be

3    Mr. Jaubert paying it back?

4    A.  That's what comes to mind.

5    Q.  And when you did your damages calculation, you talked about

6    the 31 million invested by Exomos and the whole enterprise with

7    the warehouse.  You didn't included that in your damages

8    calculation, did you?

9    A.  No.

10        MR. CEDERBERG:  Nothing further, Your Honor.

11        THE COURT:  Thank you, ma'am.  You are excused.

12        THE WITNESS:  Thank you.

13        THE COURT:  All right.  Well, we're letting you out in

14   a reasonable amount of time so I'm going to let you go now, but,

15   there you go, ladies and gentlemen of the jury, you're reminded

16   that you're not to discuss the case with anyone or permit anyone

17   to discuss it with you.  Until you retire to the jury room at

18   the end of the case to deliberate on your verdict, you're simply

19   not to talk about this case.

20        Also remember you're not to read or listen to anything

21   touching on this case in any way.  If anyone should try to talk

22   to you about it, please bring it to my attention promptly.

23        Again, remember you have to keep an open mind until the

24   end.  In order to talk about it, you've got to, you know, think

25   of something.  So don't.  Don't talk about it at all.  When

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

649

1   you're trying to come up with the words to describe what's going

2   on, you're going to be thinking and trying to commit yourself to

3   something.

4          Keep in mind you must not do any research or make any

5   investigation about the case on your own.  If anyone should try

6   to talk to you about the case, bring it to my attention.  The

7   only evidence is the testimony of the witnesses, the evidence

8   that is introduced and any stipulations between the parties.

9          Also remember you must not have any contact with the

10  attorneys, parties or witnesses in the case.

11         Finally, remember, very important, you must not form

12  any opinion about this case, you're required to keep an open

13  mind until you start your deliberations at the end of the case.

14         Tomorrow, 9:30.  I don't think I have anything else.  I

15  might have -- wait I do.  I have sentencings, but we'll work

16  around them.  We'll break, you know, break for lunch a little

17  bit late so I can -- do the sentencings before you come back.

18         Have a good evening, drive carefully and we'll see you

19  tomorrow morning.

20         COURT SECURITY OFFICER:  All rise.

21         (Jury out at 5 PM).

22         THE COURT:  All right.  We'll see you all tomorrow

23  morning at 9:30.

24         How many more witnesses do you have?

25         MR. CEDERBERG:  Tomorrow we have one live witness and

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

650

1    deposition testimony.

2         THE COURT:  How many more witnesses do you have,

3    period?

4         MR. CEDERBERG:  Two, maybe three.

5         THE COURT:  All right.  Well, if we're finished with

6    all your stuff by 2:00 and I say call your next witness and you

7    don't have any, it's his turn.

8         MR. CEDERBERG:  I understand that, Your Honor.  And

9    what can we do to help the Court, to have the Court in the best

10   way to rule on the deposition so it will go faster?  One may be

11   videotaped, so we need to cut it.

12        THE COURT:  All right.  Well, I can deal with that on

13   the written portion.  I don't have to see the videotape in order

14   to rule on the objections.  If you will gather those and give

15   them to me tomorrow, I can be working on them while the case is

16   going on.  So give them to me in the morning, give me the

17   objections, give me one document that has the proposed things

18   and then objection by code, like, you know, "R" for relevance,

19   you know, whatever the objection is.  And then I'll try to deal

20   with them during the morning presentation.  All right?

21        MR. CEDERBERG:  Okay.  Thank you very much.

22        THE COURT:  Anything else?

23        MR. HESS:  Yes.  We have a translator that -- I mean an

24   interpreter.

25        THE COURT:  Same thing.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1          MR. HESS:  Do I need a motion?  Can we deal with that
2    in open court?
3          THE COURT:  No.  When are you going to bring them?
4          MR. HESS:  Excuse me?
5          MS. HEATHCOCK:  Well, assuming --
6          THE COURT:  We're not done Tuesday?
7          MS. HEATHCOCK:  No, we've got our case.
8          MR. HESS:  It's as quickly as I could get the --
9          MS. HEATHCOCK:  Monday is a holiday, right.
10         THE COURT:  Yeah, Monday is a holiday but we still got
11   tomorrow and Friday.
12         MS. HEATHCOCK:  We're assuming they were going to be,
13   you know.
14         THE COURT:  I don't know that you ought to assume
15   anything because if they finish what they got and there's nobody
16   left, they're done.
17         MR. HESS:  We have others, Judge.  I think that was the
18   only date we could accomplish it with the --
19         THE COURT:  All right.  All right.  Let's give me --
20   make sure I have all of the deposition designations tomorrow
21   morning.  I know I have them, but the objections and what you
22   actually proposing to do, to use.  All right?  Work on them
23   tonight and we'll do it tomorrow.
24         We'll see you tomorrow morning then, okay?
25         (See Volume 7, page 654 for continuation)

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
1

2                          *  *  *  *  *

3                       C E R T I F I C A T E
         I certify that the foregoing is a correct transcript from the
4        record of proceedings in the above-entitled matter.

5

6
         _____         /s/ Dawn M. Whitmarsh
7        Date                       DAWN M. WHITMARSH, RPR

8
                              I N D E X
9
                             WITNESSES
10
         For Plaintiff:                                      Page
11
         AbdulQadar Obaid Ali
12         Cross-Examination by Mr. Hess                     580:20
           Redirect Examination by Mr. Urquhart             608:16
13
         Maria Yip
14         Direct Examination by Mr. Cederberg               613:20
           Cross-Examination by Mr. Hess                     643:10
15         Redirect Examination by Mr. Cederberg             647:16

16                             EXHIBITS

17       For Defense:

18       775
           In Evidence                                       586:4
19
         777
20         In Evidence                                       588:25

21       778
           In Evidence                                       589:14
22
         813
23         In Evidence                                       590:13

24       1160
           In Evidence                                       592:15
25
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1    1246
        In Evidence                                    590:18
 2
      1247
 3      In Evidence                                    590:21

 4    1248
        In Evidence                                    590:24
 5
      1249
 6      In Evidence                                    591:2

 7    1250
        In Evidence                                    591:5
 8
      1251
 9      In Evidence                                    591:8

10    1252
        In Evidence                                    591:11
11
      1253
12      In Evidence                                    591:14

13    1256
        In Evidence                                    591:20
14
      1257
15      In Evidence                                    591:22

16    1258
        In Evidence                                    592:2
17
      1259
18      In Evidence                                    592:11

19    1261
        In Evidence                                    592:8
20
      1262
21      In Evidence                                    592:11

22    1254 & 1255
        In Evidence                                    591:16
23
      1443, 1444 & 1446
24      In Evidence                                    593:16

25
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**