1      **UNITED STATES DISTRICT COURT**
      **SOUTHERN DISTRICT OF FLORIDA**
2       **FORT PIERCE DIVISION**
      **CASE NO.  09-14314-CV-JEM**

3

4

5

6 **DUBAI WORLD CORPORATION, and its**
 **Subsidiaries, EXOMOS, NAKHEEL and**
7 **PALM MARINE,**

8      Plaintiffs,

9  vs.

10          Fort Pierce, Florida
          February 17, 2011
11 **HERVE JAUBERT, SEAHORSE**
 **SUBMARINES INTERNATIONAL**
12 **INCORPORATED, and Does 1-99,**

13      Defendants.

14 ————————————————————————————

15

16     **TRANSCRIPT OF JURY TRIAL**
      **VOLUME 7 – PAGE 654-762**
   **BEFORE THE HONORABLE JOSE E. MARTINEZ**
17    **UNITED STATES DISTRICT JUDGE**

18

19

20

21

22

23 **REPORTED BY:**   **DAWN M. WHITMARSH, RPR**
       **Official Court Reporter**
       **400 N. Miami Avenue, 10S03**
24       **Miami, Florida  33128**
       **Telephone:  305-523-5598**

25

    **PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
     **TRANSCRIPT PRODUCED BY COMPUTER**

1     **APPEARANCES:**

2     **FOR THE PLAINTIFFS:**
                           *Quinn, Emanuel, Urquhart & Sullivan, LLP*
3                          **BY: JON C. CEDERBERG, ESQ.**
                           **BY:  A. WILLIAM URQUHART, ESQ.**
4                          865 South Figueroa Street
                           10th Floor
5                          Los Angeles, CA  90017

6                          *Astigarraga, Davis, Mullins & Grossman*
                           **BY:  EDWARD MULLINS, ESQ.**
7                          701 Brickell Avenue
                           16th Floor
8                          Miami, Florida 33131

9
      **FOR THE DEFENDANTS:**
10                         *Hess & Heathcock, PA*
                           **BY:  WILLIAM HESS, ESQ.**
11                         **BY:  KATHRYN A. HEATHCOCK, ESQ.**
                           40 Southeast Osceola Street
12                         Stuart,  Florida 34994

13

14

15

16

17

18

19

20

21

22

23

24

25                              P-R-O-C-E-E-D-I-N-G-S


              **PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
                     **TRANSCRIPT PRODUCED BY COMPUTER**

```
 1              (Jury in at 9:34 a.m.)

 2              COURTROOM DEPUTY:  Calling case number 09-14314. Dubai

 3   World Corporation versus Herve Jaubert.

 4              Counsel, please state your appearance for the record.

 5              MR. CEDERBERG:  Good morning, Your Honor.  Good

 6   morning.  John Cederberg and Bill Urquhart for the Plaintiff.

 7              MR. HESS:  Good morning, Judge.  William Hess and

 8   Ms. Heathcock on behalf of Mr. Jaubert and Seahorse.

 9              THE COURT:  Good morning.  Ready to proceed?

10              MR. CEDERBERG:  Yes, Your Honor.  First, I would like

11   to approach and give the Court the deposition transcripts that

12   we worked on together last night.

13              THE COURT:  All right.  Let me see them so I can be

14   working on them.

15              MR. HESS:  Judge, if I may, what I designated the

16   portions of our depos, of the depositions, I may have been --

17   led the testimony as overinclusive, so over the lunch break I'm

18   going to pare those down a little bit.

19              THE COURT:  Okay.  All right.  We're ready to proceed?

20              MR. CEDERBERG:  Yes, Your Honor.

21              THE COURT:  Witness need to be sworn?

22              MR. CEDERBERG:  We call Hussein Ramadan.

23              THE COURT:  All right, sir.  Would you please stand and

24   raise your right hand.

25               HUSSEIN RAMADAN, PLAINTIFFS' WITNESS, SWORN.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          THE COURT:  Please be seated.  Tell us your name and

2     spell it, please.

3          THE WITNESS:  My name is Hussein Ramadan.  My first

4     name is Hussein, H-U-S-S-E-I-N.  Last name is Ramadan,

5     R-A-M-A-D-A-N.

6          THE COURT:  Yes, sir.  Keep your voice up as much as

7     possible, and speak right into the microphone whenever you can.

8     Thank you.

9                         DIRECT EXAMINATION

10    BY MR. CEDERBERG:

11    Q.  Mr. Ramadan, where do you live?

12    A.  Currently I live in Dubai, United Arab Emirates.

13         THE COURT:  Sir, could you move a little bit to your

14    left so you're speaking across the microphone.  If you could

15    move a little bit this way and move it that way, that way you

16    can be speaking across it.  Thank you.  All right.

17    BY MR. CEDERBERG:

18    Q.  Keep your voice up.

19    A.  Okay.

20    Q.  The sound here is not the best.

21    A.  I'll try.

22    Q.  What do you do for a living, Mr. Ramadan?

23    A.  I am an auditor and fraud investigator.

24    Q.  Okay.  For whom are you an auditor and fraud investigator?

25    A.  Currently I am with the Dubai World and for the Group

                   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                       TRANSCRIPT PRODUCED BY COMPUTER

1    Internal Audit.

2    Q.  Did you conduct a fraud investigation audit involving

3    Mr. Jaubert and Seahorse Submarines?

4    A.  Yes, sir.

5    Q.  Okay.  When did that happen?

6    A.  It started in October 2006.

7    Q.  And approximately how long was your involvement?

8    A.  It took about five months, and there was a culmination of it

9    in May of 2007.

10   Q.  Before we get into what you did with that audit and what you

11   found, can you tell the jury your background?  First of all,

12   what country are you a citizen?

13   A.  I'm a citizen of the United States.

14   Q.  Naturalized?

15   A.  Yes.

16   Q.  Do you travel with a United States passport?

17   A.  Yes, sir.

18   Q.  Can you describe to the jury your education from after high

19   school to university.

20   A.  I graduated from Florida Atlantic University in Boca Raton

21   in accounting.

22   Q.  Okay.  After you received your degree in accounting from

23   Florida Atlantic University, did you obtain any types of

24   certifications?

25   A.  Yes, sir.  I sat for the CPA exam.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.  We've heard the term "CPA" in this trial.  Can you tell the

2    jury what is it?

3    A.  Certified public accountant.

4    Q.  What is the CPA exam?

5    A.  It's an exam set by the board of the American of Certified

6    Public Accountants, and in order to be a CPA, you have to pass

7    the exam first, and you have to have experience of two years in

8    public accounting to be eventually certified.

9    Q.  Do you have any other certifications as an accountant?

10   A.  Yes, I do.

11   Q.  Can you describe them?

12   A.  One certification is a certified information system auditor.

13   Q.  What does that mean?

14   A.  That means that I audit systems relevant to accounting

15   systems and softwares, hardwares relating to accounting systems,

16   basically.

17   Q.  Any other certifications?

18   A.  Yes, I do have certified fraud examiners.

19   Q.  What is a certified fraud examiner certification?  What does

20   that mean?

21   A.  It's a certification that entitles you to conduct fraud

22   investigations, qualified to investigate fraud.

23   Q.  For these three certifications, what country or state issued

24   those certifications to you?

25   A.  All issued by United States of America.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.  What state?

2    A.  The Institute of Certified Public Accounting is basically

3    across the nation, and the certification that comes from the

4    Association for Certified Fraud Examiners, again, it's a US -- I

5    believe headquarters is in Chicago, if I'm not mistaken, and the

6    certified information system auditors is located in Chicago too.

7    Q.  Where were you located when you received the certifications?

8    A.  The certifications for the certified fraud examiners and the

9    certification of the certified information systems, I sat for

10   them in Dubai and I gained them in Dubai.  Testing.

11   Q.  Have you ever worked as an accountant in Florida?

12   A.  Yes, I did.

13   Q.  Okay.  Where?

14   A.  I work for International Bank in Boca Raton, and I work for

15   a telecommunications company in Boca Raton too.

16   Q.  Did you work for any accounting firm?

17   A.  I did.

18   Q.  What was the name of that firm?

19   A.  There was a firm in Boca Raton named William McCurry.

20   Q.  Okay.

21   A.  And there was another firm -- two firms in Fort Lauderdale,

22   which is -- I don't recall the names.  There was another firm

23   that I worked for in Miami called Golden and Company.

24   Q.  Okay.  When you were working at the McCurry firm as an

25   accountant, what kind of things were you doing?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.   I was doing audits for small businesses, small businesses,

2    and I was doing taxations and other consulting businesses.

3    Q.   Can you describe for the jury just an overview of what

4    auditing is.

5    A.   Auditing, in a nutshell, is the process to add value and

6    improve the organization's operations.   In the sense that we

7    need to know and look at the systems in place, making sure the

8    systems in place are strong and they render, you know,

9    eventually to provide objectives of the company, basically.

10   Q.   When you use the term you want to make sure systems are in

11   place, what do you mean?

12   A.   Systems in place is that needs to be -- it starts from

13   policies and procedures at the company or the business use has

14   to have in place, policies and procedures, and to effect those

15   policies and procedures you have to have basic check and

16   balance, which we call controls.   So when we do audits, we have

17   to look at those checks and balance and make sure they are in

18   place.

19   Q.   When you do an audit, what are the kind of documents that

20   you look for to see if checks and balances are in place so

21   there's sufficient control in the company?

22   A.   It ranges from looking at the organization charts to start

23   with, looking at the procedures, policies, making sure that we

24   understand the environment of the business, and eventually --

25   and looking at all these policies and procedures and making sure

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
1    they are in place, so those are the framework by which a company
2    can run its business properly.
3    Q.   Okay.  Did you work as an accountant in the United States
4    and any other states besides Florida?
5    A.   Yes, I did.
6    Q.   What state was that?
7    A.   That was the state of Washington.
8    Q.   And was that in Seattle?
9    A.   Was in Seattle, yes, sir.
10   Q.   How long did you work there?
11   A.   I work there for about six years.
12   Q.   And what was the name of the company?
13   A.   It was Francis and Company.
14   Q.   How did you end up in Seattle?
15   A.   Seattle is -- I went and visited once, and I fell in love
16   with it because it's such a mountainous country, you know.  It's
17   very similar to Lebanon where I came from, so I -- being in the
18   Gulf for such a long time, I needed to change, so I moved
19   Seattle.
20   Q.   How did you get from Seattle back to Dubai?
21   A.   In Dubai, I worked with my father, who was working in
22   construction.  I was with him at the time.  And went to school
23   to Dubai for about four years and got my high school from Dubai,
24   and then I moved to the states.  My dad was -- come and tell me
25   that you should come back to Dubai to work here, there's a lot
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

663

1    of opportunities.  And sure enough, one day I got a call from

2    the Ruler's Court.  Ruler's Court is a body relating to the

3    rules.  They had established a new audit department, and they

4    asked me to come and join.

5    Q.   And when did you actually move to Dubai?

6    A.   I move to Dubai in 1996.  In February 1996.

7    Q.   While you were in the United States, did you ever work

8    closely with a company known as Arthur Andersen?

9    A.   When I was working with Francis and Company, Francis and

10   Company is a minority firm, and they were auditing -- they have

11   a job from -- federal job and federal job auditing the Metro

12   systems and the Harborview Hospital.  They were conducted by

13   Arthur Andersen, and Arthur Andersen has to give a minority firm

14   a share of the work.  So I was deputized by Francis and Company

15   to work with Arthur Andersen, and I was auditing, at that time,

16   the Metro system and the Harborview Hospital.

17   Q.   When you came to Dubai for the Ruler's Court, did you

18   eventually end up working for Dubai World?

19   A.   I was auditing Dubai World at the time when I was with the

20   Ruler's Court.  I was auditing Dubai World and other government

21   entities.

22   Q.   What was the name of the group you were in when you were

23   auditing for Dubai World?

24   A.   At that time, it was by Port Authority, and then it

25   developed to be called PCFC, which is Pearl Customs Free Zone

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Corporation, so they lumped three major entities into one

2    umbrella of company.

3    Q.  While you worked as an auditor in Dubai, did you eventually

4    work in a group that was -- one of their objectives was to audit

5    for fraud?

6    A.  Well, fraud, it exists everywhere, and this is known to all

7    professionals.  Our job was to audit, and we used to come to a

8    situation where we had some I call fraud or misappropriations of

9    funds, and we go after those cases and we investigate them.

10   Q.  Did there come a time while you were working as an auditor

11   with Dubai World that you came in contact with Mr. Jaubert and

12   his company Seahorse Submarines?

13   A.  I came to be in contact with Mr. Jaubert after -- in --

14   sometime in October to November of 2006.

15           MR. CEDERBERG:  May I approach, Your Honor?

16           THE COURT:  Yes, you may.

17   BY MR. CEDERBERG:

18   Q.  How did Mr. Jaubert and his company come to your attention?

19   A.  It came to my attention, our -- my boss brought to me two

20   audit reports.  One was dated December 2005, one was dated

21   August 2006.

22   Q.  And who was your boss that you just referred to?

23   A.  Mr. AbdulQader Obaid Ali.

24   Q.  Mr. AbdulQader who testified yesterday?

25   A.  Yes, sir.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

665

1    Q.  What did you do with those two audit reports, ones for

2    December 2005 and August 2006?

3    A.  I read them.

4    Q.  Why?

5    A.  He asked me to read them and to get my opinion as to what I

6    thought at that time of those reports.

7    Q.  And did you use those reports to develop a program or plan

8    to do a fraud audit of Mr. Jaubert and Exomos?

9            MR. HESS:  Objection, leading.

10           THE COURT:  All right.  Hold on.  You are leading.

11   Please ask a different question.  Thank you.

12   BY MR. CEDERBERG:

13   Q.  How did you use those fraud reports, or how did you use

14   those two audit reports in preparing for your fraud

15   investigation?

16   A.  I used them because there's one particular area which is the

17   purchases that were made through the Seahorse Submarines, which

18   is owned by Mr. Jaubert.

19   Q.  Okay.  What did you understand Mr. Jaubert's position was at

20   Exomos at that time?

21   A.  He was a CEO, chief executive officer.

22   Q.  Why did that cause you concern that from an auditing and

23   fraud standpoint, that Mr. Jaubert owned Seahorse and was the

24   chief executive officer of Exomos?

25   A.  That's a clear conflict of interest.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.  Pardon?

2    A.  That's a clear conflict of interest.

3    Q.  Okay.  How so?

4    A.  Because a CEO cannot really be doing work with his own

5    private company and still impartial.  And because it's just the

6    appearance of -- sometimes what we call just the appearance of

7    being -- having conflict of interest can shed some doubt and

8    credibility and the effectiveness of the CEO.

9    Q.  And because of that conflict, what did you decide to do with

10   regard to your fraud audit?

11   A.  We then took the purchases, and we start really going into

12   that direction to see basically the open purchase orders, the

13   purchase orders that were actually issued and payments were

14   made, but there was no deliveries of items.

15   Q.  Okay.  Did you actually put a fraud team together to examine

16   Seahorse, Exomos, and Mr. Jaubert?

17   A.  Yes, I did.

18   Q.  And can you tell us the names of the people who assisted you

19   in that fraud audit?

20   A.  Yes.  Before we do any fraud audit, we do put a scheme, we

21   put a plan, and the plan is that first to gather information

22   about the subject, and without really confront the subject.  So

23   when we first -- the first step is to audit or interview people

24   around the subject.  And that was the first step.  And I

25   interview many senior people in Exomos.  One of them was

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    Jim Miller, the other person was Bert de Wijs.  He was a general

2    manager.  Lorenz Krueger was the design manager, V.K. Shamsudeen

3    was the purchase controller stores, and Marc Rego was the head

4    of the shop.

5    Q.  And did you also interview Mr. Jaubert?

6    A.  Not at the very, very much later stage after we really tried

7    to gather information and making sure that we have our -- enough

8    information to talk to Mr. Jaubert, this is when we sat with

9    Mr. Jaubert and start really talking to him.

10   Q.  I've put a rather large binder in front of you that's been

11   marked and admitted as Exhibit 147.  Can you take a look at

12   that?  The beginning is just an exhibit list.

13   A.  The first exhibit?

14   Q.  Yeah.  First exhibit.  That's just an exhibit list for the

15   whole case.  That's a document for the Court.  Okay.  Looking at

16   Exhibit 147, generally, have you seen that before?

17   A.  Yes, I did.

18   Q.  Can you tell the jury what it is?

19   A.  It's a report that -- what we called at that time

20   mismanagement and abuses in Exomos.

21   Q.  Is that the report that your audit -- does this report

22   reflect the findings of your fraud audit?

23   A.  Yes, sir.

24   Q.  Okay.  And I asked you a question before, I don't know if I

25   got an answer in the record.  When you put a team together, what

1   other people helped you with this audit?

2   A.  I had one assistant who was working with me.

3   Q.  Can you give us his name.

4   A.  His name was Ali Asghar.  And he was an internationality.  I

5   had -- who was an adviser at the time, and I had two key people

6   as whistle blowers that would come and give me information

7   directly from Exomos.

8   Q.  Exomos employees who --

9   A.  Yes, Exomos.

10  Q.  Exomos employees who gave you information or tips?

11  A.  Yes.

12  Q.  I apologize, but I have to have you sit down so you can use

13  the microphone again.  Can you put up, Mr. Duncan, 147.07?

14  147.0-7, I guess it is.  Can you blow up the second half of the

15  page "Objectives and Scope" and put it up higher so all the

16  jurors can see.  Okay.  This is part of the report you wrote?

17  A.  Yes.

18  Q.  Okay.  3.1 Objective.  "The objective of this task is to

19  investigate allegations of mismanagement abuse committed by

20  Exomos CEO"?  Why did you put that in the report?

21  A.  That was the objective of the report because, we had tips,

22  we have information that the way things were happening in the

23  business units, there were some questions about them.

24  Q.  Okay.  Then let's go down to scope, 3.2.  "Our investigation

25  scope included review of policies and procedures employed by

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Exomos to determine if mismanagement and favoritism practices

2    were evident, and whether internal controls were adequate

3    surrounding this matter."  That's part of your report?

4    A.  Yes, sir.

5    Q.  And the third one is 3.3 talks about interviewing

6    individuals and reviewing documents and files.  Charles can lift

7    up so they can see the individuals listed.  Is this in your

8    report that you listed the people that you just testified to

9    that you interviewed in the course of your fraud investigation?

10   A.  Yes.

11   Q.  Why did you want to include that in your report?

12   A.  It is key information that these are the key senior people

13   that I had interviewed.  This is part of the process.  It's what

14   we investigate, we had to show the people that we met and

15   interviewed.

16   Q.  Okay.  And it also says on that page -- we don't need to

17   highlight it back up because the jury has seen it before -- that

18   you looked at certain documents and files, right?

19   A.  I'm sorry.  Say that again.

20   Q.  You look at certain documents and files?

21   A.  Yes.

22   Q.  Okay.

23        MR. HESS:  Judge, again, counsel is leading the

24   witness.

25        THE COURT:  I don't believe that was leading.  Try to

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

670

1    avoid leading.

2         Let me just explain to the jury, witness when they call

3    -- a lawyer, when they call their own witness is not permitted

4    to lead them, which basically is a question that suggests an

5    answer.  Now, there are exceptions that are different.  For

6    example, if it is a hostile witness, or if it is a witness of

7    limited intelligence or like an eight-year-old kid or young kid,

8    you might need to lead them because they don't know what you're

9    talking about and you need to do that.  But that's not supposed

10   to happen.  You can do it with a hostile witness or when you're

11   on cross-examination because the idea is you're not going to

12   lead a hostile witness into anything.  But sometimes you permit

13   it at the beginning of interrogations because it just gets you

14   into the right area.

15        The call is is it something that suggests an answer.

16   And that was close, but I decided that it doesn't.  But just so

17   you understand what we're talking about, it's not like he's

18   trying to do some magic voodoo or he's not claiming anything

19   like that.  So just so you're aware of what it is.  So try to

20   ask more neutral question, okay?

21   BY MR. CEDERBERG:

22   Q.  What documents and files did you look at when you conducted

23   your audit?

24   A.  We looked so many documents, and especially we looked at the

25   purchase orders and -- which was open and -- meaning open that

671

1    items and goods were not delivered.

2    Q.   Okay.  Now, you say you look at purchase orders that were

3    open.  What kind of orders did your examination find?

4    A.   Throughout the examinations, we kept going back and trying

5    to find whether those items ordered through Seahorse were

6    differed.  And we went back and forth to the stores, we spoke to

7    the purchase controllers and the stores, we spoke to other guys,

8    the head of design there at the time, and all of them confirmed

9    that those items were not received.

10   Q.   When you look at purchase orders and you spoke to the

11   people, who told you that the items weren't received?  Did you

12   actually physically try to look for the items yourself?

13   A.   Yes, sir.

14   Q.   When you use the word stores, that's not like going down to

15   target or Walmart, right?  What do you mean by "store"?

16   A.   Store is a place.  It depends on the title, the items to be

17   stored.  Some of them have to be stored in certain temperatures,

18   controlled temperatures.  Some of them don't have to.  Now,

19   there was a store -- store where items were supposed to be

20   stored there, and it's a covered warehouse so-to-speak, and when

21   we go and talk to the storekeeper, all the purchase controller

22   and ask them where the items are, they would say that items were

23   not received.

24   Q.   Okay.  But did you physically go to those stores and try to

25   find out if they were on the shelves or not?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

672

1   A.   I did with my assistants, yes.  On many, many occasions.

2   Q.   And does your report tally up how many open purchase orders

3   you found where goods were ordered, paid for in advance, and

4   never received?

5   A.   Yes.

6   Q.   What's the category in your report that describes that kind

7   of series of events that you looked at?

8   A.   The category always, our focus, basically, on that

9   particular area was on the open purchase orders.  Open purchase

10  orders was we were homing and zeroing on the open purchase

11  orders.

12  Q.   So if I wanted to find out what your total was for the goods

13  that you couldn't find but were paid in your report, I would

14  look under the label "Open Purchase Orders"?

15  A.   Correct.

16  Q.   Okay.  Now, in Exhibit 147, which has all those other sub

17  exhibits in it, you've seen that document before you got to

18  court here, right?

19  A.   Yes.

20  Q.   Does that Exhibit 147 and all the sub parts does that

21  contain the documents that you looked at to determine a specific

22  transactions, whether they were ordered or whether they were

23  paid for and whether or not they were delivered?

24  A.   You mean the schedule that I had to put in our report?

25  Q.   The schedule and the underlying documents, are they all in

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    147?

2    A.  Should I -- yes, I did.  I did.

3    Q.  Okay.  And you've spent some time looking at that, so you

4    feel comfortable they're in there?

5    A.  Yes.

6    Q.  And did you ever look to find any type of instances where

7    Seahorse sold material to Exomos and the purchase price had been

8    inflated?

9    A.  We believed, yes.

10   Q.  Okay.  Did you go through the records -- what kind of

11   records did you look at to determine that?

12   A.  What we did, the purchase controller who was our main source

13   of information, he was corroborating with us, he was providing

14   us with a lot of inside information.  Without those key

15   information, we would not have been able to conclude our issues.

16   Q.  Who was that person?

17   A.  His name was V.K. Shamsudeen.

18   Q.  That's one of the people you interviewed?

19   A.  Yes.

20   Q.  Okay.

21   A.  He was in charge of purchasing and the stores, so he was in

22   charge of both end.

23   Q.  You didn't just take his say-so, I take it you looked at the

24   document?

25   A.  I had to look at the documents.  I don't take things that

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

674

1    are given to me because as a professional, I have to vouch and

2    make sure the information are credible.

3    Q.   Okay.  And what kind of documents did you look at to

4    determine that Seahorse would buy at one price then raise the

5    price when they sold to Exomos?

6    A.   With the purchase controller's help, because he's aware and

7    knowledgeable about the suppliers who could have those items in

8    stock at a different price.  So we talk with him, and we were

9    able to get documents from different suppliers showing that

10   there was a price of those suppliers were much less than the

11   price that was shown on the purchase orders.

12   Q.   So in other words, so I have this right, you have the

13   invoice and the purchase order in the Exomos files, but you

14   needed to locate the actual purchase price that Seahorse paid

15   its supplier, and that wasn't in the Exomos file?

16   A.   We had this few examples.  We did not have many of these

17   examples because they were not available.  They were not

18   supposed to be there because the relationship was between Exomos

19   and Seahorse, and then the supplier shown on the purchase orders

20   was Seahorse international.  However, we were able to get some

21   of the invoices where it shows different price than what was

22   shown on the purchase orders.

23   Q.   Different prices from the people who supplied Seahorse with

24   the material?

25   A.   Yes.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.   And when you reviewed those documents, what did you find?

2    A.   I found there was disparity in prices that were shown on the

3    purchase order were higher than the price shown on the invoice.

4    Q.   When you found out that Seahorse was buying at one price

5    then billing Exomos at a higher price for materials, did you ask

6    Mr. Jaubert about that?

7    A.   Yes, I did.

8    Q.   Okay.  When was that?

9    A.   I don't recall the exact time, but we spoke to him, I spoke

10    to him personally, and I mentioned it to him.

11    Q.   You mentioned to him what you had found?

12    A.   Yes.

13    Q.   Can you tell the jury Mr. Jaubert's response to you?

14    A.   He said, look, you know, I have connections in states, and

15    they do give me a different prices, which is a discounted price,

16    and I factor in that difference.  This is a relationship that I

17    have established through the years through the market, and I'm

18    entitled to the difference that I'm shown on the purchase

19    orders.

20    Q.   He didn't say Exomos was entitled to?

21    A.   No, he didn't.

22    Q.   That he and his company Seahorse was entitled?

23    A.   Yes.

24    Q.   And did you agree with that?

25    A.   No, I didn't.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   Q.   And did you total up the amount of this padding of bills

2   that you just testified to and put the total in the report?

3   A.   From the purchase orders and those transactions that came to

4   our attention, we did because there are other -- there were so

5   many transaction that took place between Exomos and Seahorse,

6   those, I did not really go into them.   We were focusing

7   basically our scope on the open purchase orders.   So for those,

8   yes, I did.

9   Q.   For those padding or overcharges, you total those up in your

10  report?

11  A.   Yes, I did.

12  Q.   And what category, if I was looking in the report, would I

13  look to to find out your total that you were able to determine

14  had inflated charges?

15  A.   There was about 773,000.

16  Q.   I'm asking what category on your chart would I look at?   How

17  did you label the groups?

18  A.   Overcharges.

19  Q.   Okay.   And did you also investigate handling and service

20  charges that were?

21  A.   Yes, I did.

22  Q.   Can you tell the jury, first of all, what you were looking

23  for?

24  A.   Well, when we analyzing the purchase orders, we discovered

25  that there were handling and service charges in 2004, and then

677

 1    when we raised the issue, they said -- Mr. Jaubert said, "Look,

 2    there was a verbal agreement with the chairman for me to charge

 3    handling and shipping charges."

 4            We, as auditors, we always look for written documents,

 5    for written agreements, and he said it was verbal.  And he said,

 6    "Well, you can ask Jim Miller."  And I had an interview with

 7    Jim Miller, and I asked him, and I said, "Was there such things

 8    happening?"  And he said that didn't happen.

 9    Q.  And did you -- were -- when did the -- in your

10    investigation, when did Seahorse start itemizing a line for

11    service and handling on their invoices to Mr. Jaubert's company

12    Exomos?

13    A.  That --

14            MR. HESS:  Objection.  Improper predicate.  Assumes

15    facts not in evidence.

16            THE COURT:  Hold on.  Ask a different question.  I

17    don't even understand that question.  Try it again.

18            MR. CEDERBERG:  I will, Your Honor.

19    BY MR. CEDERBERG:

20    Q.  Can you speak up even louder so -- I'm having trouble

21    hearing you.

22            When you looked at the documents we talked about in

23    Exomos, did you notice there was a line on certain invoices and

24    purchase orders for a service and handling charge?

25    A.  Yes, I did.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

678

1   Q.   Okay.  When did you start seeing that broken out on those

2   documents?

3   A.   I start seeing it in transactions that took place in 2005.

4   Q.   Okay.  Did you total the documents you found that had the

5   service and handling charges that Seahorse had collected from

6   Exomos?

7   A.   Yes, I did.

8   Q.   Okay.  And are they in your report?

9   A.   Yes, sir, they are.

10   Q.   And what category did you label those in your report?

11   A.   As service and handle charges.

12   Q.   Did you also investigate how much money -- well, let me

13   change that back again.

14       There's been some testimony about the company's name,

15   Exomos.  When you did your fraud investigation, did you learn

16   the different names that that same company had?

17   A.   Yes.

18   Q.   Okay.  Can you tell the jury the different names that the

19   company had over that period you audited?

20   A.   There was a name of Palm Marine, of Palm Submarine at the

21   time, and then that name was changed, on October 26 of 2004,

22   into Exomos.

23   Q.   Okay.  Now, was that entity, who paid the money out, that

24   portion, the part of your report?  Did Exomos pay that money

25   out, or was that Dubai World money?

679

1    A.  All the money are paid by Dubai World.

2    Q.  Did you undertake to discover or undertake in your audit to

3    find out how much money Dubai World had paid for each of the

4    submarines that Seahorse sold Dubai World entities?

5    A.  Yes.  They are in my reports.

6    Q.  And what are the names of the submarines that you were

7    looking at?

8    A.  They were three type of submarines.  One was called

9    Discovery submarines, which was purchased outright from

10   Seahorse.  There was -- Stingray submarine was supposed to be

11   purchased directly from Seahorse.  And there was another

12   Discovery submarine, which was supposed to be purchased with the

13   assets that Exomos purchased from submarine, from Seahorse

14   Submarine.

15   Q.  Okay.  And with regard to the Goby submarine, what did you

16   find out?

17   A.  Goby submarine, I didn't really -- didn't come to our

18   attention until way down further down the road after we were

19   almost concluded our report.  And we had tip from insiders said,

20   "Look, this Goby submarine, it doesn't exist.  There is no such

21   thing.  It is a shell sitting somewhere, and it's not

22   functional."

23   Q.  Okay.  Were you able to determine how much Dubai World paid

24   for that submarine?

25   A.  For Goby at the time, we had to put it behind us, and we had

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

680

1   to move on because we were trying to settle the outstanding

2   amounts, so we said let's not exacerbate the issue, let's just

3   move on.

4   Q.  What about with regard to the Discovery submarine, what did

5   your investigation conclude was the amount paid for the

6   Discovery submarine?

7   A.  For the Discovery submarine, there were -- according to the

8   contract, there were two payments made.  And they were made by

9   Dubai World.  The third payment, which is the last payment, was

10  supposed to be paid upon the completion of the submarine, and

11  that's -- the same thing applies to the Stingray.  Those -- the

12  final payments were never paid because those submarines were

13  never delivered for Dubai World to pay the final payments.

14  Q.  Okay.  And in your report, did you calculate how much money

15  was spent on the Discovery and the Stingray Duo?

16  A.  Yes, I did.

17  Q.  Were there other areas that you investigated and concluded

18  that there was money improperly paid?

19  A.  Yes, there were.  When we investigating the expenses that

20  were paid towards the Discovery submarine, we found that there

21  were -- legal expenses were posted into the Discovery account.

22  And when we dug in to it, we found out that there was legal

23  expenses relating to a lawsuit that Mr. Jaubert had here in the

24  states between him and Tao Dominicana.

25  Q.  Did you find out how much was paid and to who for those

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    legal expenses?

2    A.  Yes.  They were paid to legal counsel by the name of

3    Mr. Hess, and the amount is in the -- my report.

4    Q.  Can you put up the first page of Exhibit 31 that's in

5    evidence.  Okay.  Go to -- I think it's Page 3.  Okay.  Can you

6    just blow up the top?  Have you seen this document before?

7    A.  Yes, I did.

8    Q.  As part of your investigation?

9    A.  Yes, sir.

10   Q.  And what did you understand this document was?

11   A.  This is between Istithmar, Exomos, and Dubai, and Seahorse

12   Submarines International.

13   Q.  Okay.  It also has Mr. Jaubert individually, and

14   Helen Jaubert individually as well?

15   A.  At the end of the document, yes.  Yes, you can see it.  Yes.

16   Q.  And, Charles, can you blow up Paragraph 4 down there.  This

17   says, "No assumptions of liability.  The purchaser", being

18   Exomos, and the others up there "have not agreed to pay, shall

19   not be required to assume, and shall have no liability or

20   obligation with respect to any liability or obligation, direct

21   or indirect, absolute, accrued, contingent or otherwise of

22   seller or any associate or failure of seller".

23        Did you take that into consideration when determining

24   if the payment of Seahorse Submarine's legal fees was improper

25   to be paid by Exomos?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

682

1    A.  Absolutely.

2    Q.  Did you look at any issues involving the development of

3    rebreathers?

4    A.  We -- yes.  We do not technically, because we're not

5    technical people, but I was always conferring with

6    Mr. Lorenz Krueger, who was the designer at the time, and the

7    technical person that -- we used to talk to him back and forth.

8    Q.  And what did your investigation find out about the

9    rebreather issue?

10   A.  The rebreather, what Mr. Krueger told me at the time --

11          MR. HESS:  Objection.  Hearsay.

12          THE COURT:  Sustained.  Don't tell us what he told you.

13   Okay?

14   BY MR. CEDERBERG:

15   Q.  What did you conclude about the rebreather that you put in

16   your report?

17   A.  What I concluded is that the money was spent on rebreather,

18   it altered the rebreather's guarantee because.

19          THE COURT:  Altered?

20          MR. CEDERBERG:  Altered, changed.

21          THE WITNESS:  Yes, altered.  Because when you buy a

22   product and you try to modify it, then you lose the guarantee,

23   the warranty, so to speak.  And that's what, from the sources

24   that we had, is that those rebreathers were almost nonusable

25   after the modifications.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

683

1   BY MR. CEDERBERG:

2   Q.  Did you do any investigation and have any findings in your

3   report concerning thermal imaging camera system?

4   A.  That's another item that we received a tip from the purchase

5   controller who said --

6   Q.  Not what he said.

7   A.  Not said.

8   Q.  After you received the tip?

9   A.  After we received the tip, we went there and said, "Okay.

10  Show us where -- that thermal image camera," and we were not

11  able to see it ourselves.

12  Q.  It wasn't there?

13  A.  It wasn't there.

14  Q.  Did you put that in the report?

15  A.  We put it in the open purchase orders to be claimed from

16  Mr. Jaubert.

17  Q.  And what about the development and manufacturing of Customs

18  360-degree steering POD 6 nozzle assembly.  What investigation

19  did you do on that?

20  A.  Our investigation, when it comes to technicalities is

21  limited.  We didn't pursue it down from when it comes to

22  technical matters, but we were focusing on the amount, on where

23  the items was, was delivered.  That's what was -- what we had

24  done.

25  Q.  Did you investigate any charges that Exomos paid concerning

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

684

1    the delivery of a Hummer automobile from Florida to Dubai?

2    A.   Yes, I did.

3    Q.   Can you tell the jury what was involved in that

4    investigation?

5    A.   Well, in the course of our analysis of expenses, our

6    investigations, we found that there was a Hummer, there were two

7    Hummers, actually.  One Hummer for Mrs. Jaubert, which was

8    shipped and paid by the company.  There was another company that

9    was to Mr. Jaubert, which was actually registered in the name of

10   the company at the time, and then the company paid all the

11   expenses for the shipping, the Customs, Duties, and basic other

12   expenses, you know, that were paid on behalf of that and the

13   registration.  It was in the name of the company.

14   Q.   Okay.  Did it stay in the name of the company once the

15   Hummer got there?

16   A.   It was Palm Marine.

17   Q.   And did it stay there the entire time Mr. Jaubert was there?

18   A.   It stayed for almost a year.  When we discovered this, we

19   confronted Mr. Jaubert, and Mr. Jaubert brought us a document

20   where it shows that the chairman has signed it to him saying

21   that Mr. Jaubert said -- claimed at the time that this is -- was

22   his own personal Hummer, and it was mixed up with the Seahorse

23   assets, which were purchased at the time, and the chairman said,

24   for one reason or the other -- he didn't confess it then, he

25   said, "Okay.  Fine."

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

685

1           Now, for us as auditors, or investigators, if we say

2    that this was your personal vehicle, then we need to claim all

3    the expenses back from you.

4    Q.   And did you investigate what those expenses were?

5    A.   Yes.  As I mentioned, those are shipping expenses, Customs

6    duties, registration to register the car with the authorities in

7    Dubai.

8           MR. CEDERBERG:  After conferring with counsel and no

9    objection, I offer Exhibit 25 into evidence.

10          THE COURT:  Without objection, Exhibit 25 is admitted

11   in evidence.

12          MR. CEDERBERG:  No, no, no.  Exhibit 28.

13          THE COURT:  Okay.  Then 25 is not in evidence.  28 is

14   in evidence.  Without objection?  Everybody agree with that?

15          MR. HESS:  Yes, Judge.

16          (Plaintiffs' 28 in evidence)

17   BY MR. CEDERBERG:

18   Q.   Can you see that up on the big screen or the other screen?

19   Or I can bring a copy up to you.

20   A.   That's okay, I can see.

21   Q.   Can you tell the jury what that is?

22   A.   That is an employment contract between Mr. Jaubert and the

23   Ports, Customs and Free Zone Corporation.

24   Q.   Can you scroll down from there.  You reviewed that contract

25   as part of your investigation?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

686

1    A.  Yes.

2    Q.  Did that reveal what Mr. Jaubert's position was at the

3    Exomos company?

4    A.  It was chief executive officer.

5    Q.  And did this contract also show the compensation package

6    that he received?

7    A.  Yes, sir.

8    Q.  Did you look at Exhibit 28 to determine whether or not the

9    it would be proper under the contract of employment for

10   Mr. Jaubert to claim the expenses for shipping his personal

11   automobile to Dubai?

12   A.  That's exactly what we did.  We went to the employment

13   contract, we looked at the employment contract, there was no

14   such provisions, and we said, "Then these expenses needs to be

15   reimbursed to the company."

16   Q.  Okay.  Can you describe -- we talked about purchase orders

17   and invoices.  When a company under the Dubai World umbrella,

18   such as Exomos, wants to make an expenditure, can you kind of

19   walk the jury through the kind of documents necessary for that

20   expenditure to occur?

21   A.  Yes, sir.  The way the process we have there, first, there

22   is a form called Capex.

23   Q.  What is Capex?

24   A.  Capex means capital expenditures.  Capital expenditures

25   means expenditure that the company spend that expenditure would

1   last over more than one year, like a car.  Something you consume

2   within the close of business, within course of business, within

3   one year to capitol expenditures is an item that lasts more than

4   one year, and that form called Capex purchase any amounts in

5   excess of 10,000 dirhams, they need -- the company has -- or the

6   BU, business units, has to raise that Capex and obtain the

7   proper approvals.

8   Q.  Is that approval of a Capex, is that approval to write a

9   check to somebody?

10  A.  Not at all.

11  Q.  Can you tell us what that approval of a Capex document means

12  in the Dubai World system?

13  A.  Yes.  First, before even -- let me take you one step

14  backwards.  Before the Capex, there's a budget.  The budget

15  supposedly is an amount for the company to spend.  Once that

16  budget is approved, then to monitor the spending, they have that

17  Capex form.  So it's not a blank check for everyone to say, "I

18  have a budget of 1 million then I will go on a spending spree

19  for 1 million."

20       No.  They say, "Now you need to buy a car worth

21  $10,000, you raise that capital expenditures form, you state the

22  purpose of that car and what it does to enhance the business."

23  Q.  Let me stop you right there so we can follow along.  If you

24  want to do a purchase over $10,000, you have to give a Capex

25  approval and state why that money should be spent and why it's

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

688

1    necessary for the business?

2    A.  Yes, sir.

3    Q.  Okay.  What is the approval process for that document?

4    A.  That's definitely raised by the initiator, then it goes

5    above to the chairman to sign it.

6    Q.  And is that -- after the chairman approves an expenditure,

7    what's the next level down?

8    A.  After it's been approved, the next level down is for the

9    business units to initiate what we call a purchase acquisition.

10   And a purchase acquisition is a form by which the business units

11   states items, the items, a description of the items without

12   showing any value because they're not supposed to show any

13   value, they don't know the value of the items.  So they show the

14   items that needs to be purchased, and then definitely approved

15   internally by the business units.

16   Q.  And so you have a Capex, then you have a purchase

17   acquisition form that shows the items to be purchased.  Why is

18   there generally no price on that document?

19   A.   It's because it's not the function of the business units to

20   go and scout and obtain prices because to segregate the

21   functions, to make sure that everybody does his own works, we

22   need to make sure there is a segregation of functions, that the

23   business units now orders only the items, and then when it comes

24   to purchasing or procuring the items, you have to go to the

25   specialist who are the purchasing department.

689

1    Q.   Okay.  Let me just take you -- so you have Capex that

2    approves it out of the budget, you have a purchase acquisition

3    that says, yes, you can buy these things, and then it goes down

4    to a procurement person who is assigned to go out and get the

5    best price possible?

6    A.   Yes, sir.

7    Q.   What document is that?

8    A.   We call it purchase order.

9    Q.   Purchase order.

10   A.   Yes.

11   Q.   Can you define the term "Capex"?  What does it mean, the

12   words?

13   A.   The word "Capex"?

14   Q.   Yeah.

15   A.   As I mentioned is called capital expenditures.

16   Q.   Some of these documents have the word Opex on them?

17   A.   Opex is the form by which the business units has to fill out

18   and get the proper approval in the amount above 50,000.  The

19   Opex relates to operating expenditures.  It's for supplies,

20   could be procuring fuel, telephones, telecommunications, any

21   other operating expenditures during the course of the business,

22   and if the amount exceeds 50,000 dirhams, then the entity has to

23   raise what we call an Opex form.

24   Q.   We looked at some documents yesterday in Mr. Hess's

25   examination.  Can 1252 in evidence be placed up on the screen?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    And I guess let's blow up the top half.  What is this form?

2    A.  This is what we call request for payment.

3    Q.  Where does that fit in the level of Capex going all the way

4    down to procurement in a purchase order?

5    A.  Very well.  Since I've gone through -- the process goes from

6    budget to Capex to purchase acquisition, then you have purchase

7    orders, which is issued to the vendors to procure the items.

8    Now, the next step is that for the items to be received by the

9    entity.  When the item is received by the entity, or the items,

10   the entity issues what we call good receipt notes.  And when

11   they issue good receipt notes, it means they received the items

12   ordered.  Then there is invoice that comes from the vendor.

13          After all this these steps, it comes to payments, and

14   the payment -- to affect the payment, we have a process there

15   what we call request for payment.  Here we call in the states

16   like payment voucher, there we call it request for payments.

17   Q.  Okay.  So you go all the way down the hierarchy and you end

18   up with a purchase order and an invoice, then you need a

19   document to authorize the payment of that invoice, and that's

20   what this is?

21   A.  This is to pay invoice.  This is what the form is to pay the

22   invoice.  It's a culmination of all this process basically.

23   Q.  Okay.  And can we blow up from where it says details down to

24   the bottom of that document?  Now, this one it says "Payable to

25   Seahorse Submarines, Inc., payment as per invoice," with the

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   number and a date towards attorneys fees for Discovery one

2   litigation.  Do you see that?  Who is the person who approved

3   that payment on behalf of Exomos?

4   A.  The CEO.

5   Q.  Can you lift that up?

6   A.  Mr. Jaubert, yes.

7   Q.  Mr. Jaubert is the one who approved the payment?

8       THE COURT:  That's what he said.

9   BY MR. CEDERBERG:

10  Q.  Okay.  What does "check by" mean?

11  A.  Checked by mean -- this means that there is a document in

12  the normal accounting documentations.  Usually there's a

13  document that is prepared by checked by and approved by.  This

14  is universal.  So it's been checked by the finance controller.

15  Q.  And when checked by, would the financial controller

16  investigate what the lawsuit was about or what does he check?

17      MR. HESS:  Objection.  Leading.  I don't know if that's

18  cleaned up.

19      THE COURT:  Ask a different question.  That is leading,

20  Counsel.

21  BY MR. CEDERBERG:

22  Q.  Okay.  When it's checked by, what does the checker check?

23  A.  He checks the documents, whether the documents are original

24  or whether the documents are in order, and whether they are for

25  the right purpose of -- the payment is for the right purpose

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

692

1    and, you know, for the business purpose.

2    Q.   And what does the requested by person do?

3    A.   Requested is basically it would be an accountant or clerk.

4    Q.   Now, let's go to 1253-1.  This is another request for

5    payment, right?  And if you just do the bottom half up again

6    okay.  And again you saw this in your investigation?

7    A.   Yes, I did.

8    Q.   And who did you determine approved that payment?

9    A.   Approved by Mr. Jaubert, the CEO.

10   Q.   Then I'm not going to go through all of them that were shown

11   yesterday, because I'm just not.

12          Let me go to Exhibit 124-61, which was shown to

13   Mr. AbdulQader yesterday.  Okay.  Can we blow up the first half

14   of it.  A little higher.  Okay.  This is another request for

15   payment?

16   A.   Yes, sir.

17   Q.   Now, this has a different component in the upper right hand

18   corner than on the other ones that I showed you.  Is that a

19   stamp that Dubai World has?

20   A.   It's a stamp that they use in many business units.  When

21   something is urgent, they stamp it urgent, expedited.

22   Q.   And we go down to the bottom of this request for payment.

23   And that urgent one was signed by Sultan A. Bin Sulayem?

24   A.   Sultan Bin Sulayem.

25   Q.   Do you know him?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

693

1   A.   I do know him, yes.

2   Q.   And let's go to another one, Exhibit 1248.   And that has

3   Sultan's signature on it as well as approved?

4   A.   Yes, sir.

5   Q.   Okay.   And in the upper corner it says "urgent" again?

6   A.   Yes, sir.

7   Q.   Let's go to 1249.   And this one was approved by Sultan?

8   A.   No.

9   Q.   No.   And does this one say "urgent" as well?

10  A.   Urgent.

11  Q.   Now, let's go to 1443.   This document -- I think we may have

12  seen a couple of these, but now that you describe the hierarchy

13  of documents, what is this?

14  A.   This is a purchase requisition form, and it shows the items

15  described here that are supposed to be purchased by the unusual

16  thing that we saw there that was noted at the time that the

17  prices were mentioned on the requisition form, which is unusual

18  and not that I've seen in Dubai Port Authority.

19  Q.   And was this one -- this was the one authorizing that the

20  payment was -- that the purchase could be made for the good of

21  the company?

22            MR. HESS:   Objection, leading.

23            THE WITNESS:   Yes.

24            THE COURT:   Hold on a second.   No, I don't think that's

25  leading.   Go ahead.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

694

```
 1    BY MR. CEDERBERG:
 2    Q.   And whose signature is on the bottom with the approval?
 3    A.   That is -- I recognize Mr. Jaubert's signature.
 4    Q.   And who else's?
 5    A.   I don't see Sultan Bin Sulayem.  It's not clear that his
 6    signature is there.
 7    Q.   And Mr. Jaubert was the okay.  Let's go onto 1444.  This is
 8    another materials requisition form that was shown to AbdulQader.
 9    What is the stock number, and then 1 ASDS, what does it say it
10    is?
11    A.   Development of a custom and self-contained breathing system.
12    Q.   Okay.  If we go down to -- over to the other side.  Charles,
13    highlight where it says $25,000.
14    A.   Yes.  Five hours, something hours minimum duration.
15    Q.   Okay.  But my question is, did you determine whether or not
16    that was a goods that were being bought, or whether that was a
17    development, was a service to be performed?
18    A.   From the face value that shows there, it shows like this is
19    a development service.
20    Q.   In your experience as an auditor, is it proper to put
21    service and handling charges on services themselves rather than
22    goods?
23    A.   No, it's very unusual.
24    Q.   In this case here, if you look at that document as an
25    experienced auditor, is that $25,000 included in the service and
```

695

1    handling charge?

2    A.  Yes, it does show.

3    Q.  And how can you tell that?

4    A.  Because there's a separate line item that says, "Service and

5    handling charges 11,165."

6    Q.  And if it were 10 percent, it would be those two numbers

7    added ahead of it, together the 25,000 and 85,000?

8    A.  I would say so, yes.

9         MR. CEDERBERG:  May I have a moment?

10        THE COURT:  You may.

11   BY MR. CEDERBERG:

12   Q.  Let's go back to your report.  And let's, if we could, put

13   up 147.0-4.  147.0-4.  Can you blow up the recommendations and

14   that whole box towards the end.

15        Okay.  We saw a similar chart yesterday with another

16   witness, but this is a chart that you made up?

17   A.  Yes, sir.

18   Q.  And how did you make this chart up?

19   A.  I made it based upon my conclusions of the investigation.

20   Q.  Okay.  We talk about the Discovery submarine.  Did you put,

21   on that chart, the total you found was paid for the Discovery

22   submarine?

23   A.  Yes.  And this amount is not only the two payments that we

24   paid, but inclusive of other costs that were spent from the

25   company's pockets while this Discovery submarine was at the

1    premise of.

2    Q.  What other costs?

3    A.  They are material costs, even though they didn't account for

4    labor costs, incorrect costs what we call for, such as labor,

5    but we only included the material that were purchased and we add

6    them to this.

7    Q.  And you total is 1,545,622, that's in dirhams not dollars?

8    A.  That's dirhams.  All these items are in dirhams, yes.

9    Q.  I don't think we have on the record yet in this trial what

10   is the relationship to dirhams and dollars?

11   A.  The relationship is every dollar is equal 3.674 of dirhams.

12   Q.  Every dollar is 3.674 dirhams?

13   A.  Yes, sir.  Because the dirhams does not fluctuate with the

14   dollar.  Actually the dollar is the back of the dirham, so it's

15   very static, doesn't change.

16   Q.  So we've all heard how a pound and a yen can go up an down.

17   The dirhams don't change?

18   A.  Not at all, except if you buy it from a bank, definitely

19   they will take some commissions, which is slight numbers.

20   Q.  So to convert dirhams to dollars, you would divide that

21   money by 3.76?

22   A.  Yes, sir.

23   Q.  Okay.  Now, the Palm Stingray, what did your fraud

24   investigation undercover was spent on that submersible?

25   A.  Again, these are the payments that were paid for the

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

697

1    submersible.  There could be some other materials that were

2    added that were paid, it comes up to this amount.

3    Q.  Then the third category is outstanding open purchase orders?

4    A.  Yes.

5    Q.  SSII, what's that?

6    A.  That's Seahorse Submarine International, Inc.

7    Q.  Okay.  What did -- again outstanding open purchase orders,

8    what does that category refer to?

9    A.  Open purchase orders are old purchase orders which were

10   ordered through the Seahorse Submarines, but they were never

11   delivered.

12   Q.  Okay.  And they were paid for?

13   A.  They were paid in advance, yes.

14   Q.  And on the next one is personal legal fees?

15   A.  Yes.

16   Q.  What does that represent?

17   A.  That represents the legal fees that were paid toward the Tao

18   Dominicana which was related to the Discovery which was in

19   context with Mr. Jaubert here in the United States.

20   Q.  Can you speak up again just louder.  I know we've only

21   talked about one piece of litigation, this Tao Dominicana

22   involving the Discovery Submarine and Mr. Jaubert.

23   A.  That is what came to our attention at the time.

24   Q.  And it says, "Personal vehicle expense."  What is that?

25   A.  Those are vehicle expenses relating to Mr. Jaubert's an his

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

698

1    wife's vehicles.

2    Q.   Those are the Hummers?

3    A.   The Hummers.   There were two Hummers.

4    Q.   Have you recently seen any of those Hummers?

5    A.   I saw the Hummers when they were -- one of the Hummers that

6    Mr. Jaubert used to drive, I saw it in Dubai, yes.

7    Q.   Did you see it here today?

8    A.   I saw one outside, yes.   Black color.

9    Q.   In the parking lot?

10   A.   In the parking lot.

11   Q.   Says "Overcharge of purchases."   What's that?

12   A.   That's what we -- the time when we investigated the prices,

13   those are the prices that were above and beyond what was

14   supposed to be charged to Dubai.

15   Q.   Okay.   Your total was 773,210 dirham?

16   A.   And those only confined to a number of purchase orders, not

17   all purchase orders, because we did not go back and analyze all

18   the purchase order.   We were focusing only on the open purchase

19   orders.

20   Q.   And the next one is the handling and service charges.   Can

21   you tell us what those are?

22   A.   Those are the -- claim to be 10 percent of service and

23   handling charges, they were supposedly charged by Seahorse

24   International as -- in lieu of services provided to Exomos.

25   Q.   Just to go back, when you look at the various invoices and

699

1   the purchase orders that reflected the service and handling

2   charges or the outstanding open purchase orders, did you see

3   anything unusual about the timing between the purchase orders

4   and the invoices?

5   A.   Yes.  We saw that the invoice that was issued by Seahorse

6   International -- or the date of the invoice that was issued by

7   Seahorse International was earlier than the date of the purchase

8   order, which is extremely unusual.

9   Q.   Okay.  Did that raise any red flags to you as a fraud

10  auditor?

11  A.   Yes, it did.  I mean it did in such a way that the invoice

12  should come after the purchase order.  And that's the way it

13  always works.

14  Q.   It's like sending somebody a bill before they've even asked

15  for anything?

16  A.   I can say that's yes.

17  Q.   Okay.  Then we have development cost of rebreathers at

18  91,850 dirham.  Is that the rebreather that you talked about

19  just a few minutes ago?

20  A.   Yes, sir.

21  Q.   The next one is the camera system.

22  A.   Yes.

23  Q.   Total $91,850 dollars.  Is that the same camera system that

24  you talked about as part of your investigation?

25  A.   Yes.

700

1   Q.  Okay.  And then finally we have these POD 6 nozzle assembly

2   for 139,612 dirham.  Is that the same one that you just talked

3   about a few minutes ago?

4   A.  Yes, sir.

5   Q.  And did you total these up?

6   A.  I did.

7   Q.  And for the record, can you tell us what the total is?

8   A.  We divided the amounts into two separate areas.  One, we

9   call it personal expenses relating to Mr. Jaubert, and the other

10  expenses relating to -- for purchases performed through his

11  company, which is Seahorse Submarines International.

12  Q.  What was the total amount of dirhams that you concluded were

13  owed?

14  A.  The total is 5.2 million.

15  Q.  Now, did there come a time where you talked to Mr. Jaubert

16  about the findings of your audit?

17  A.  Yes, we did repeatedly, many times.

18  Q.  Mr. Ramadan, I've put in front of you what has been

19  premarked as Exhibit 86 for identification.  It's a four-page

20  document.  Could you look at that and tell us if you've seen

21  that before?

22  A.  Yes, I did.

23  Q.  Okay.  And what is it without describing its contents?

24  A.  It's a statement of agreement between Mr. Jaubert and us as

25  internal audit.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.  Is this a document that you took to a meeting with

2    Mr. Jaubert?

3    A.  I'm sorry.

4    Q.  Is this a document that you took to a meeting that you had

5    with Mr. Jaubert?

6    A.  Yes, sir.

7    Q.  Okay.  And did Mr. Jaubert sign it?

8    A.  Yes, sir.

9         MR. CEDERBERG:  Offer Exhibit 86, Your Honor.

10        MR. HESS:  No objection, Judge.

11        THE COURT:  Without objection, Exhibit 86 is admitted

12   in evidence.

13        (Plaintiffs' 86 in evidence)

14   BY MR. CEDERBERG:

15   Q.  Can we blow up that first part so everybody can read it.

16   Okay.  First of all, before we get into the details, describe

17   when the meeting took place.

18   A.  It took place sometimes in May.  It was May 21 to be exact.

19   Q.  Of what year?

20   A.  2007.

21   Q.  Where was the meeting held?

22   A.  It was held in the Group Internal Audit Department in one of

23   the conference rooms.

24   Q.  Who was at the meeting?

25   A.  My assistant Ali Asghar.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

702

1    Q.   And who else?

2    A.   Myself and Mr. Jaubert.

3    Q.   And what happened in that meeting?

4    A.   That meeting was a culmination of many meetings we held with

5    Mr. Jaubert about the open purchase orders that items were never

6    delivered, and after we gave him, many times for him to prove

7    that those items were received, finally he agreed that those

8    items were never delivered and he agreed to sign the affidavit.

9    Q.   Okay.  Can we punch up the "I, Herve Jaubert"?  "I, Herve

10   Jaubert, furnish the following free and voluntarily statement to

11   Mr. Hussein Ramadan, who has identified himself to me as a

12   manager special projects in Group Internal Audit

13   Department-Dubai World.  No threats or promises were made to

14   induce this statement."  Do you see that?

15   A.   Yes, sir.

16   Q.   Did you ever threaten Mr. Jaubert?

17   A.   Never.

18   Q.   In any way?

19   A.   Never.

20   Q.   To sign this statement?

21   A.   Never.

22   Q.   Let's go to the next paragraph on there.  Says, "Group

23   Internal Audit, identified obligations relating to Seahorse

24   Submarines International, Inc., and I" -- that's Mr. Jaubert?

25   "As a result of auditing Exomos's books as stated in the article

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

703

1   agreed schedules of obligations.  I make this statement in order

2   to accept responsibility to settle these amounts."  Do you see

3   that?

4   A.  Yes, sir.

5   Q.  And you mentioned Mr. Ali Asghar?

6   A.  Ali Asghar.

7   Q.  He was with you?

8   A.  Yes.

9   Q.  Can you describe Mr. Asghar to the jury.

10  A.  He's a very -- he's about, maybe, five foot two, very

11  genteel person.

12          MR. HESS:  Objection, Judge.  Relevance.

13          THE COURT:  I'll permit it.

14  BY MR. CEDERBERG:

15  Q.  Continue.

16  A.  And, you know, he was my assistant and nice person.

17  Q.  Did your assistant threaten Mr. Jaubert in any way?

18  A.  Never.

19  Q.  Let's go down to the bottom of Exhibit 32.  "I have read

20  this statement consisting of two pages, and I now sign my name

21  below because the information contained herein is true and

22  correct to the best of my knowledge."  Let's go to the next

23  page.

24          This is Mr. Jaubert, whose signatures are on there?

25  A.  The first signature is Mr. Jaubert's signature.  And the

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    second signature is my signature, yes.  And the third signature

2    is my assistant Ali Asghar.

3    Q.  And the date was May 2007?

4    A.  Yes, sir.

5    Q.  Was this agreed schedule of obligations attached to this

6    document that Mr. Jaubert sign?

7    A.  Yes, and he has his initials at the bottom.

8    Q.  Okay.  Can you show the initials at the bottom.  Would those

9    be Mr. Jaubert's?

10   A.  Yes.

11   Q.  Can you show the schedule and tell the jury what that is.

12   A.  We're trying to settle with Mr. Jaubert amicably and trying

13   to help him in that respect.  We said, "These are direct

14   expenses that needs to be paid to you," which he agreed, and the

15   other ones which we had some -- we gave him the benefit of the

16   doubt that he should settle them with top management.

17   Q.  But these agreed schedule of obligations, are you telling me

18   there's two schedules on this document, we just haven't gotten

19   to the second one yet?

20   A.  Yes, there were two schedules.  One we called Agreed

21   Schedule of Obligations, which was this one, and the next page

22   is what we call contested obligations, because we want to give

23   him the benefit of the doubt for him to take it to his

24   superiors.  And if they forgave him or just ask him not to pay

25   it, then so be it.  So what we try to do is try to give him the

705

1   benefit of the doubt.  We gave him so much leeway for him to

2   settle.

3   Q.  Okay.  So you obtained his agreement on the agreed-upon

4   ones, and on the contested ones, you said, "Mr. Jaubert, if you

5   contest these, take them up to higher management"?

6   A.  Yes, sir.

7   Q.  Can we go back to the slide before?  Can you blow that up?

8   After you had this meeting with Mr. Jaubert and you work out

9   your agreed-upon payments and your -- did you become aware of

10  Mr. Jaubert made any payments to Exomos?

11  A.  He had made a payment of 140,000 relating to his personal

12  expenses.

13  Q.  Is that in dollars or dirhams?

14  A.  That's in dirhams.

15  Q.  Okay.  And here it's only 110,000?

16  A.  Right.  The other -- the difference between 110 and that

17  amount that we had were the shipping expenses of Mr. Jaubert's

18  and his wife's shipping expenses.

19          MR. CEDERBERG:  I've got a couple more subjects to move

20  on to, Your Honor.  Would this be --

21          THE COURT:  Let's take a break right now.  Let's break

22  until 11:15.  Sir, since you're on the stand, you're not

23  permitted to discuss your testimony with anyone.  We'll be in

24  recess until 11:15.

25          COURT SECURITY OFFICER:  All rise for the jury.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          (Jury out at 11 a.m.)

2          THE COURT:  While the jury is out and before we leave,

3     explain something to me.  I'm trying to understand your cryptic

4     notes on these depositions.  If it says "DW," I assume that

5     means Dubai World is proffering this, wants this to come in?

6          MR. CEDERBERG:  Yes.

7          THE COURT:  If it says "HJ," I presume that means it's

8     the individual party, correct?

9          MR. HESS:  Both Seahorse and HJ.

10         THE COURT:  And then if it has 402 and 403 and 102 and

11    403, what is that?

12         MR. CEDERBERG:  402 and 403 is the Federal Rules of

13    Evidence.

14         THE COURT:  I know what they are, but does that mean

15    that you are objecting on the basis of those?

16         MR. CEDERBERG:  Yes.

17         THE COURT:  so there is an objection by whom?  By the

18    opposing party?

19         MR. CEDERBERG:  Yes.

20         THE COURT:  Whoever that is.

21         THE COURT:  Okay.  Let me see.  There's a couple others

22    that I didn't understand.

23         MR. CEDERBERG:  "H" is hearsay.

24         THE COURT:  DW, Dubai World.  Okay.  Hold on.  "None"

25    means what?  No objection?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1      MR. CEDERBERG:  Yeah, we have no objection.

2      THE COURT:  And what is "C-O-L-L"?  Colloquy?

3      MR. CEDERBERG:  Colloquy with counsel.

4      THE COURT:  Means that colloquy shouldn't be included?

5      MR. CEDERBERG:  Correct.

6      THE COURT:  Is it your intention to include the

7   colloquy, or why are we arguing about that?

8      MR. HESS:  I'm not arguing that, Judge.

9      THE COURT:  Okay.  So it's going to be deleted somehow?

10     MR. CEDERBERG:  Should be, Judge.

11     THE COURT:  Okay.  Let me just see if there's anything

12  else.  I think I understood everything else.  But I thought I

13  understood those, but I wanted to make sure.

14     MR. CEDERBERG:  I think there's one series of entries

15  that the objections in the record --

16     THE COURT:  What is "R-E-C"?

17     MR. HESS:  Record objections.

18     THE COURT:  Record objection.

19     MR. CEDERBERG:  In other words the objection was

20  interposed on the record.

21     THE COURT:  Was in the record.  I gotcha.  Now, do you

22  have -- are you going to do this from the written one, or are

23  you going to do it from the video one?

24     MR. CEDERBERG:  Sultan's.  We have video clips of the

25  ones we proffer.  On Saxon we'll do -- we'll put a person on the

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

708

1    stand and do Q and A with us reading ours and Mr. Hess reading

2    his.

3           THE COURT:  Okay.

4           MR. HESS:  Same with us also, Judge.  We anticipate

5    using the video for Sultan's depo.

6           THE COURT:  Do you have the ability to delete those

7    portions that are supposed to be deleted?

8           MR. CEDERBERG:  Yes, Judge.

9           THE COURT:  Then I'll keep looking at these and I'll

10   let you know.  We'll be in recess until 11:15.

11           (Brief recess)

12           (Jury in at 11:20 a.m.)

13           THE COURT:  All right, sir.  You may proceed.

14           MR. CEDERBERG:  At this time, Your Honor, offer

15   Exhibit 147.  From the counsel, no objection.

16           THE COURT:  Hearing no objection, 147 -- pardon?

17   Hearing no objection, 147 is admitted in evidence.  Well,

18   there's a thousand.

19           MR. CEDERBERG:  My mistake.  It's one 151, Your Honor.

20           THE COURT:  Okay.  151.  147 is not in evidence at this

21   time.

22           MR. CEDERBERG:  No, 147 is in evidence.  That's that

23   big notebook up there with all the sub-parts.

24           THE COURT:  I have to get back to the beginning of it

25   to see that.  147.71 A is in evidence.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

709

 1          MR. CEDERBERG:  Yesterday we moved that whole notebook

 2     in, Your Honor.

 3          THE COURT:  Well, we'll talk about that later, because

 4     I don't see it in evidence.  151 is in evidence without

 5     objection.  You may proceed.

 6          (Plaintiffs' 151 in evidence)

 7     BY MR. CEDERBERG:

 8     Q.  Have you seen this document before?

 9     A.  Yes, sir.

10     Q.  What is it?

11     A.  This is the policies and procedures for the Dubai Port

12     Authority, Dubai.

13     Q.  Can you look at Page 24?  Okay.  Can you blow up that 9.5?

14     What is that?

15     A.  That is what we call conflict of interest.

16     Q.  Okay.  And was this the conflict of interest, that you -- in

17     the policies and procedures of Dubai World, that you refer to

18     when you did your fraud audit?

19     A.  Yes, sir.

20     Q.  Regarding it self-dealing?

21     A.  Yes, sir.

22     Q.  Now, 147, that big notebook up there with all the different

23     pages on that, those are the exhibits, your report, your audit

24     report?

25     A.  Yes, sir.

1    Q.  With all the exhibits attached?

2    A.  With all the exhibits attached.

3         MR. CEDERBERG:  Your Honor, just for the record, I'll

4    move in the entire notebook, 147.  I think we did it yesterday.

5         THE COURT:  All right.  Any objection?

6         MR. HESS:  There was yesterday, Judge.  Your Honor did

7    admit it yesterday.

8         THE COURT:  All right.  I will make a note of it and go

9    from there.  147 apparently was admitted yesterday, and I will

10   make a note that it was admitted yesterday.  I was just

11   searching for it and noticed that there were many references to

12   it.

13        MR. CEDERBERG:  There's sub-parts in it that go all the

14   way to 112.

15        THE COURT:  If I admitted 147, all of it, why did I

16   admit separately 147.21 and 147.71 A?

17        MR. CEDERBERG:  I think just because when I put them up

18   on the screen.

19        THE COURT:  Okay.  So 147, which consists of I don't

20   know how many sub-parts, all the way to 147.112 are admitted in

21   evidence at this time based on whatever ruling I made yesterday.

22        (Plaintiffs' 147 in evidence)

23        THE COURT:  All right.  You may proceed.

24        MR. CEDERBERG:  Yes, Your Honor.  I'd offer Exhibit 964

25   with no objection, Your Honor.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1              MR. HESS:  Correct, Judge.

2              THE COURT:  Nine?

3              MR. CEDERBERG:  969.  Apologize.

4              THE COURT:  Okay.  Whatever.

5              MR. CEDERBERG:  I'm sorry, Your Honor.

6              THE COURT:  Details, details.  We're not in the detail

7    business.  Nine what?

8              MR. CEDERBERG:  969.

9              THE COURT:  969 is offered into evidence by the

10   Plaintiff off the defendant's list.  No objection?

11             MR. HESS:  No objection, Judge.

12             THE COURT:  Without objection, 964.

13             MR. CEDERBERG:  969.

14             THE COURT:  969 is admitted in evidence.

15             (Plaintiffs' 969 in evidence)

16             THE COURT:  All right.

17   BY MR. CEDERBERG:

18   Q.  What is this document, Mr. Ramadan?

19   A.  This is a letter.  This is the almost to say the final stage

20   to pay to make the payments.  This is a letter instructing the

21   bank to make a payment.

22   Q.  Okay.

23   A.  To a vendor, to supplier.

24   Q.  So on that hierarchy of documents we talk about, that

25   started budget, Capex through budget, purchase orders, and this

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    is the actual authority to make the payment?

2    A.   Yes, sir.

3    Q.   Now, on the bottom of that is a handwritten notation.  Can

4    you blow that up and put it up?  It says "HAR."  Who is that?

5    A.   That's my initials.  Hussein Ahmed Ramadan.

6    Q.   Can you read what you wrote.

7    A.   Yes.  It says, Authorization transferring fund is different

8    from approval of the expenditure.  Miryam and Jamal signed after

9    all forms and formalities are completed; therefore, this

10   signature is by no means approval of the expense.

11   Q.   And what did you mean when you wrote that?

12   A.   It means that the process of making a payment goes through

13   so many layers of check and balance.  When it reaches the higher

14   management, so to speak, the CFO or the COO, there are many

15   layers of within the company have gone through and checked all

16   the documents.  So therefore, these people, what they do at the

17   top, they sign based on others who are supposed to have done

18   their job and have done the check and balance.  Otherwise, these

19   top management would have been bogged down by one of our

20   signatures.

21   Q.   Let me show you a document that's been marked for

22   identification as Plaintiffs' Exhibit 400 that has been shown to

23   counsel.  Can you tell us what that document is, Mr. Ramadan?

24   A.   This document is what we call -- again, this is prior to the

25   bank letter, which is -- the bank letter is the instruction for

713

1    the bank to pay.  What we call this is a check payment voucher.

2    The check payment voucher is actually processed and produced by

3    the centralized finance department to process the payment in the

4    system.  So that way the system captures all the information

5    relative to the payments.

6    Q.  Okay.  When you say the system, is there some computer that

7    data is entered into the computer of the shared services that do

8    the paying?

9    A.  Yes, sir.

10   Q.  Okay.  Are you familiar with the information and how it goes

11   in that system?

12   A.  Definitely.

13   Q.  Okay.  Is it the entries that go on the computer system

14   relating to the payments?  The check payment vouchers, are they

15   made at or near the time when the check vouchers or the checks

16   are paid?

17   A.  Right before issuing the check, or issuing the bank letter,

18   this document has to be produced in order for finance to take it

19   to the next step by either writing the check or making the

20   transfer to the bank.

21   Q.  And is the entry in the computer system made by a person

22   with knowledge that this payment will be made?

23   A.  Absolutely.

24   Q.  And is there a business purpose?  Are those computer records

25   kept in the regular course of business of Dubai World?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

714

1    A.  There are two types of record here.  One is the hard copy

2    records, which is -- consists of the invoice, the request for

3    payments.  That's the hard copy.  The soft copy, what we call

4    this is, and then the hard copy with the check payment voucher.

5    Once these are all approved, then they go key it into the system

6    for the system to capture that information and to properly

7    report into the proper bucket.

8    Q.  And then they're stored in the business records of Dubai

9    World?

10   A.  Yes.  The hard documents are stored archives with the

11   company, within the company, and the soft copy or the electronic

12   data are stored on the system.

13   Q.  And is that a printout of what is in the computer?

14   A.  Yes, sir.

15   Q.  Okay.  Now, it's got a date on it.  Can you tell us what the

16   date is?

17   A.  On the top of -- top right of the -- most top right of the

18   document, it says, "Date 22nd -- 29th, April, 2010, " which

19   means it's the date of the printing of this document.

20   Q.  So the information goes into the computer by people with

21   knowledge as the events occur and is all collected in the

22   computer?

23   A.  Yes, sir.

24   Q.  And that's a printout at any given time what the business

25   records of Dubai World show regarding payments of invoices by

1    purchase numbers?

2        A.   Yes, sir.

3             MR. CEDERBERG:  Offer Exhibit 400, Your Honor.

4             MR. HESS:  No objection.

5             THE COURT:  400 is admitted in evidence at this time.

6             (Plaintiffs' 400 in evidence)

7    BY MR. CEDERBERG:

8    Q.   What is a remittance detail, for example?

9    A.   Remittance details are the description of the items of

10   invoices.  05, it could be a number of invoice, it could be a

11   number of the purchase order, it could be any kind of reference

12   that leads to -- tracks, actually, the payment to the documents.

13   Q.   And on that document or in that computer run, does it also

14   reflect payments being made?

15   A.   Yes.

16   Q.   And is that keyed into various purchase orders, for example,

17   the purchase orders contained in your report Exhibit 147 and

18   that we've seen throughout this trial?

19   A.   Yes.

20   Q.   So if you look at the purchase order, you can look at

21   Exhibit 400 and see that it was actually paid?

22   A.   Yes, it's kind of sometimes what happens.  It depends on the

23   people or the person in the finance department.  Some of them

24   sometimes key in the purchase order number, sometimes they key

25   in the invoice number.  So you have to realize that there could

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    be sometimes keying, either/or, or sometimes both.

2    Q.   Okay.

3    A.   Because it's a description, it's a description field.  It's

4    not a mandatory field where it requires a specific field of a

5    document.

6    Q.   Now, when you went and conducted your fraud audit, we've

7    already talked about looking at invoices and purchase orders,

8    were there other kind of those four-level documents that you

9    expected to find in the books and records of Exomos that you

10   couldn't find, core level, that weren't there?

11   A.   Other documents such as packing slips?

12   Q.   Yes.

13   A.   Yes, I did.  That's a critical document.

14   Q.   What is a packing slip?

15   A.   Packing slip is the slip or a document when a vendor

16   delivers an item to the party ordering the item.

17   Q.   Okay.

18   A.   So it shows the description of the items and the quantity.

19   It doesn't show the price, but only shows the quantity and the

20   description of the item.

21   Q.   And you weren't able to find those when you went looking?

22   A.   For the items that we were looking for, no, we didn't.

23   Q.   And those being the open purchase order?

24   A.   Those being the open purchase orders.

25   Q.   Okay.  Can we put up Page 14 of Exhibit 14.  Let's look at

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

117

1     example Number 1 where it says "prepayment."  Does that show --

2     what does that show?

3     A.   That shows an amount was paid, purchase order 05-231675.

4     Q.   Okay.  Let's look at Page 448.  And can you blow up the

5     remittance details portion of it.

6          MR. MOSELY:  Your Honor, permission to approach?

7          THE COURT:  Sure.  Go ahead.

8     BY MR. CEDERBERG:

9     Q.   Can you see that, Mr. Ramadan?

10    A.   Yes.

11    Q.   What is, like, this remittance detail, what does that show?

12    A.   It shows -- it says an invoice number prepayments.  It's a

13    prepayment, shows the date of the prepayment, second field, and

14    it shows the description, which -- and shows the amount of

15    the -- advanced amount that was paid.

16    Q.   And shows a particular purchase order with that number was

17    paid those amounts in US dollars?

18    A.   Correct.

19    Q.   We've heard some testimony about the Nautilus submarine.

20    Did you make any inquiries about the Nautilus submarine in your

21    investigation?

22    A.   We had some discussions with the designer at the time and

23    Nautilus submarine.

24    Q.   Who is the designer?

25    A.   Lorenz Krueger.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    Q.  And what did you find out about the Nautilus submarine that

2    was relevant to your fraud investigation?

3    A.  The design was supposedly copied from some type of

4    submarines from Disney.

5    Q.  Did you look for any type of a license or any other written

6    evidence of permission to use that design?

7    A.  We didn't find any.

8    Q.  Did you look?

9    A.  We looked.

10   Q.  Were you able to talk to each and every employee that you

11   wanted to, did they come forth and talk to you when you

12   conducted your fraud interview?

13   A.  Yes.  Yes, we did.

14   Q.  Were there any people that refused to talk to you?

15   A.  There was one in particular, there was the storekeeper.  He

16   was first accepted to talk to us because we want to find out how

17   the receipt or receiving the items, how they were logged into

18   the system, but then we were a day later, we were told that this

19   guy doesn't want to talk to us.

20   Q.  And are you familiar with the procedure used for quality

21   control called an ISO?

22   A.  Yes, I do.

23   Q.  Okay.  And what is an ISO?

24   A.  ISO it's a body of organizations that certifies process of a

25   company, irrespective whether the process works or not.  It

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    really supposedly to certify how the company produces or

2    manufactures certain products.

3    Q.  Can you give us an example of what you mean by, it only

4    matters when the process works and not whether the product

5    works?

6    A.  Well, one, I was in the Dubai in one of the conference, and

7    this is one of the comments made, that if you make a life jacket

8    out of steel, that you can still be certified an ISO.  As long

9    as you do that process or you produce that life jacket made out

10   of steel consistently.  However, it doesn't address the safety

11   of the life jacket, because if you ware it out of steel, you're

12   going to sink.  I mean, the safety was not there.  So what

13   process of ISO is just to document the process, period.

14              MR. CEDERBERG:  May I have a moment, Your Honor?

15              THE COURT:  Yes, you may.

16              MR. CEDERBERG:  Nothing further, Your Honor, at this

17   time.

18              THE COURT:  Cross-examination.

19              MR. HESS:  Thank you.  Judge.

20                          CROSS-EXAMINATION

21   BY MR. HESS:

22   Q.  Good morning.

23   A.  Good morning.

24   Q.  Let me ask you first, now, the issue with Mr. Jaubert's

25   Hummer, are you saying that as part of the purchase of Seahorse

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

720

1    Submarines International, Inc., that Mr. Jaubert's Hummer was

2    purchased by Exomos or Dubai World or whichever corporation was

3    in existence back in 2004?

4    A.  The documents that came to my attention, there were two

5    documents.  One was a draft document that showed Mr. Jaubert's

6    Hummer part of the list.  However, the final list which is what

7    was created much later of the itemized list did not show

8    Mr. Jaubert's Hummers in that list.

9    Q.  The first list that you relied on the first list, right?

10    A.  No, I didn't rely on the first list.  I relied on eventually

11    whether the Hummer was Mr. Jaubert's or whether the Hummer was

12    the company's.

13    Q.  Well, how do you determine if it's Mr. Jaubert's or the

14    company's without looking at the purchase of assets?

15    A.  Well, Mr. Jaubert's Hummer eventually was transferred to his

16    name, his personal name.  So it becomes his personal property.

17    Q.  That's not my question.  My question is it was Mr. Jaubert's

18    Hummer when he arrived in Dubai, correct?

19    A.  I can't say that because I had two conflicting statements.

20    One that was shown as Mr. Jaubert's Hummer first, and then the

21    second list did not show Mr. Jaubert's -- the Hummer in the

22    second list.

23    Q.  Did you go back and look at how the Hummer was titled when

24    it arrived in the UAE?

25    A.  Throughout my investigations, okay, the document that showed

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    the Hummer was given to Mr. Jaubert by the authorization of the

2    chairman.  That, in itself, told me that okay, that's

3    Mr. Jaubert's Hummer.

4    Q.  Did you look, or did you seek to find or inquire about the

5    certificate of title that accompanied Mr. Jaubert's Hummer in

6    his glove box when it arrived, when it was shipped to Dubai?

7    A.  You're talking about after the fact.  When we first look at

8    Mr. Jaubert's Hummer, we found it to be registered in the name

9    of Palm Marine.  That's the first incident that we, Palm Marine,

10   which was -- which is an entity of Dubai World.

11   Q.  So I guess because you haven't answered my question, the

12   fact is you never look?

13   A.  No, I did.

14   Q.  You didn't?

15   A.  This is how -- this is part of the process.  I have to go

16   back and look, and eventually what we did is when we found out

17   that Mr. Jaubert's Hummer was transferred to him, and that was

18   how we concluded that it was his personal property.

19   Q.  So you never looked at the Florida certificate of title for

20   Mr. Jaubert's Hummer, correct?

21   A.  I didn't have to.

22   Q.  You never looked at it, correct?

23   A.  No, I didn't.

24   Q.  You never asked Mr. Jaubert for it, correct?

25   A.  I did.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.  You ask him for the certificate of title, Florida

2    certificate of title?

3    A.  Not for the certificate of title.  I asked Mr. Jaubert

4    whether it is his personal property or whether this is the

5    company's property.

6    Q.  Now, you did look at, because you did a thorough analysis of

7    this issue, correct?

8    A.  I did.

9    Q.  And you want to do the right thing by Mr. Jaubert, right?

10   A.  Absolutely.

11   Q.  You want to do the fair thing, right?

12   A.  Absolutely.

13   Q.  Because after all, your audit is to help, right?

14   A.  Absolutely.

15   Q.  So when you looked at what's been marked and admitted into

16   evidence as Dubai World 31, are you familiar -- have you ever

17   seen that letter?

18   A.  Yes.

19   Q.  You have, right?  Let me step back.  You've seen the

20   documents that you've been shown today by Dubai World

21   Corporation and the Plaintiffs you've seen before, right?  Each

22   and every one, right?

23   A.  Yes.

24   Q.  In fact, you spent substantial amounts of time with all or

25   some of these lawyers here before you took the stand today,

1    correct?

2    A.   Yes.

3    Q.   Hours, right?

4    A.   Not with the lawyers.

5    Q.   Not with lawyers?

6    A.   Not with the lawyers.

7    Q.   None of the lawyers.

8    A.   This is my work that I have spent, yes, countless hours

9    myself, yes.

10   Q.   I understand.  Before you took the stand today, you never

11   met with any of these gentlemen here?

12   A.   Definitely, I did.

13   Q.   You definitely did.  And you met with them for a substantial

14   amount of time, correct?

15   A.   Yes.

16   Q.   How many times did you meet with them?

17   A.   Basically when I just met them here, because I transferred

18   from the Group Internal Audit to Nakheel to be the finance

19   director in December of 2007.  After that I had no connection

20   with the case, and I didn't meet any further lawyers or anybody

21   else at that time.

22   Q.   So but so you've gone through these documents with the

23   lawyers?

24   A.   Yes, I did.

25   Q.   Okay.  Now, this document, let me show you what has been

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

724

1    attached as -- it's a attached as well.  It's Dubai World 944.

2    I guess that's exhibit -- it is in evidence.  It's the same, I'm

3    just going on Bates stamped numbers.  My copy doesn't have the

4    exhibit designation on it, so it's Plaintiffs' 31.  It's the

5    third to last page, so I guess it's -- thank you.

6          That is the list of assets that was agreed to between

7    Dubai World Corporation and its subsidiaries and Seahorse

8    Submersibles and Mr. Jaubert and Mrs. Jaubert, correct?

9    A.  Correct.

10   Q.  Now, please show me where it says a Hummer on there.

11   A.  As I mentioned, there were two lists.  One list, it was a

12   draft list that showed Mr. Jaubert's on the list.  The second

13   list that didn't show Mr. Jaubert's Hummer on it.  Which is -- I

14   don't see it here.

15   Q.  The first list was a draft list?

16   A.  Yes.

17   Q.  It wasn't signed by anyone, was it?

18   A.  Not to my knowledge.

19   Q.  The second list wasn't a draft list.  That's this one,

20   right?

21   A.  Yes.

22   Q.  That was signed by everyone including Jim Miller as a

23   director of Exomos, correct?

24   A.  Correct.

25   Q.  Now, let's go, if we could go to the page after that,

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1  Charles, please?  The next page, please.  There is a specific

2  item called "motor vehicle"?

3  A.  Yes.

4  Q.  Well, it doesn't say "motor vehicle," does it?  It says

5  "motor vehicle."  It says "motor vehicle," right?

6  A.  Okay.

7  Q.  And Hummer is not on it, right?

8  A.  Okay.

9  Q.  There is listed a Ford F350, right?  Correct?

10  A.  Correct.

11  Q.  And even though you look at this, you still maintained that

12  Seahorse Submarines sold the Hummer to Exomos or transferred the

13  Hummer to Exomos or Dubai World.

14  A.  No.  What I maintain is that the Hummer, when it was

15  shipped, it was shipped in the name of the company, it was

16  registered in the name of the company, and the company paid all

17  of the Customs, duties, and shipping expenses.  So I would

18  assume -- for any layman to assume that this is a company's

19  vehicle.

20  Q.  Well, for any layman, but I'm sorry, you're not a layman are

21  you?

22  A.  I am a layman.

23  Q.  You're a layman?  I thought you were a certified public

24  accountant?

25  A.  Part of being a certified public accountant and still a

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    layman.

2    Q.  So when you talk to the jury, you're really just saying --

3    you're not supposing that you're some sort of an expert on this

4    stuff, you're a layman just as the jury is a layman just as I am

5    a layman as to this issue, right.

6              MR. CEDERBERG:  Objection.  Argumentative, Your Honor.

7              THE COURT:  It is argumentative.

8              MR. HESS:  It was, Judge.  I apologize.

9              THE COURT:  You don't have to apologize.  That's what

10   I'm here for.

11   BY MR. HESS:

12   Q.  So Dubai World, even though it didn't by the Hummer, right?

13   You do agree under this agreement, under any agreement, Dubai

14   World didn't purchase the Hummer, correct?

15   A.  According to the document, it's not there.

16   Q.  According to any document, correct?

17   A.  According -- well, the question is why it was registered in

18   the name of the company.

19   Q.  We'll get to that.  What I'm asking you is have you ever

20   seen a document that indicates that Dubai World -- or any

21   evidence, multitude of corporations purchased Mr. Jaubert's

22   Hummer?

23   A.  I didn't see the purchase.

24   Q.  Now, it's interesting, before -- during your direct

25   examination, you always said, "Well, you know, we have to look

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

727

1   back and find a document that substantiates the agreement,"

2   right?

3   A.   True.

4   Q.   You have to do that, right?

5   A.   Yes.

6   Q.   But in this case, you don't have to do that, right?

7   A.   No, it's not that I don't have to do that.  I have a very

8   mitigating factor is that the company -- the vehicle was

9   registered in the name of the company.  To us that was a very

10  solid evidence is that the company -- the vehicle was the

11  company's assets unless, until Mr. Herve came with the document

12  and say, Hussein, this is my vehicle, and it was authorized by

13  the chairman, so therefore, we kept -- we agreed that the

14  vehicle was his.  However, all the expenses that were incurred

15  as a result of the shipments supposedly was his own personal

16  expense.  That's a fair conclusion.

17  Q.   Who shipped the Hummer over?  Was it Dubai World, correct?

18  A.   It was shipped by Mr. Herve through -- I don't remember the

19  name of the shipping agency.

20  Q.   Dubai World paid for it, right?

21  A.   Yes.

22  Q.   You said that you personally checked the storerooms?

23  A.   Yes, I did.

24  Q.   And you personally looked for these items that you say were

25  not in the storerooms?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.  Items that were in questions relating to the open purchase

2    orders.

3    Q.  Thank you.  For instance, a thermal imaging device.  What

4    does that look like?

5    A.  I didn't see it to describe it.

6    Q.  How would you find it if you don't know what it looks like?

7    A.  True.  I had the purchasing controller, who was my main

8    person, helping me through this investigation.  And

9    Mr. Lorenz Krueger was supposedly, again, cooperating with us.

10   For me, I don't know how it looks like, but I always gone back

11   to the purchasing controller who was in charge of the stores,

12   too, and asking the questions, and he always come up with the

13   answers was negative.

14   Q.  So you're presuming that he knows what it looks like, right?

15   A.  Yes, he's the one, yeah.

16   Q.  Well, you're presuming he knows what it looks like?

17   A.  I presume.

18   Q.  Presume.

19   A.  Yes.

20   Q.  And as to the steering device, do you know what that looks

21   like?

22   A.  No.

23   Q.  And again, you presume that the storekeeper knows what it

24   looks like, correct?

25   A.  Not the storekeeper.  I had to go back and vouch and talk to

729

1    the people who really -- these technical people who know what

2    the steering --

3    Q.  What did they tell you it looks like?

4    A.  They didn't tell what it was like.  I was basically -- my

5    own purpose was to find out whether it was received or not.

6    Q.  So why would you tell the jury that you personally looked,

7    you personally did the inventory?

8    A.  Because if they told me that it was received, I want to go

9    and see it myself that it was received.

10   Q.  Okay.  So to this day, you're relying on these other

11   individuals, you're presuming that these other individuals knew

12   what this device looked like, correct?

13   A.  Well, I had to rely on them, definitely.

14   Q.  In the rebreather, what -- the rebreather was purchased to

15   be modified, correct?

16   A.  That's what I learned.

17   Q.  And it was purchased to be modified because it was going to

18   be retrofitted into a custom device, correct?

19   A.  That's what I learned.  Again, I'm not a technical submarine

20   person.

21   Q.  And the reason it was purchased to be modified into a custom

22   device is because Mr. Jaubert's design for one of the

23   submersibles required it, correct?

24   A.  Supposedly.

25   Q.  So, Exomos, you, the accountant -- sorry, the auditor are

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

730

1    concerned that because Mr. Jaubert wants to benefit Exomos by

2    designing a vessel or vehicle utilizing this rebreather as a

3    component, you're saying it's not appropriate because the

4    warranty for the rebreather would be violated?

5    A.   That's what we learned from the technical people saying that

6    it would be violated.

7    Q.   So rather than have a device, a component enter for a

8    submersible that he's designing, you would rather say, "No,

9    let's not use that as a component, let's not permit that design

10   of a submersible, because that's going to contemplate the

11   termination violation of the warranty"?

12   A.   Not only that -- I think, not only that, the modifications

13   were -- basically were not really serving the purpose, and those

14   rebreathers, I've seen them myself, they were not used because

15   of the modifications.

16   Q.   And you know that because you had the technical expertise as

17   to rebreathers?

18   A.   No, I'm not a technical person, I had to consult with a

19   technical person who told me so.

20   Q.   But that's not what you said.  So what you meant was you

21   consulted with someone who told you that they were lying idle?

22   A.   I've seen them lying idle, but they had to tell me these

23   rebreathers are no longer functioning.

24   Q.   Did they tell you why they're no longer functioning?

25   A.   I didn't go into detail, but they said that's what, in their

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    opinion, is that they're no longer functioning because of the

2    modifications.  And I can't testify further than that because

3    I'm not a technical person.

4    Q.  And your testimony is is you are testifying that you know

5    that these individuals you talked to are experts of the level of

6    Mr. Jaubert as to the use, the design, and the modifications

7    conducted by Mr. Jaubert of those rebreathers?

8         MR. CEDERBERG:  Objection, Your Honor.  Assumes facts

9    not in evidence.

10        THE COURT:  Hold on.  Ask a different question.  That

11   question is very awkward.

12        MR. HESS:  Thank you, Judge.

13   BY MR. HESS:

14   Q.  The people you talk to again, Mr. Krueger?

15   A.  Yes.

16   Q.  Anybody else?

17   A.  The purchase controller of the stores was in charge of

18   purchasing.  I spoke to Marc Rego, who was in charge of the

19   workshop.  I spoke with Bert de Wijs, who was the general

20   manager of Exomos.  And I spoke with Jim Miller.

21   Q.  Okay.  And are these the people that you are testifying have

22   the expertise in rebreathers?

23   A.  I can't tell you that.  I didn't go into that detail with

24   them.  I'm not a technical person to tell you that.

25   Q.  So you don't know that any of them had the expertise?

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

732

1    A.  The expertise, Laurence Krueger was the expertise because he

2    lived in a town -- am I allowed?

3    Q.  It's all I need to know.  I just want to know.

4    A.  He lived in a town in Germany where they used to manufacture

5    these type of equipments, and he's the one that told me about

6    it.

7    Q.  Lorenz Krueger is the one you relied upon for this?

8    A.  He was the design manager of the Exomos.

9           THE COURT:  Don't argue with him.  The question is he

10   was the person you relied upon for this.  Yes, no, and then you

11   can explain it, but you don't have to explain it before you

12   answer it, okay?

13          THE WITNESS:  Yes, sir.

14          THE COURT:  Answer the question yes or no if you can,

15   and then you can explain it.

16          THE WITNESS:  Yes.

17          MR. HESS:  Thank you.  Can we go into what has been

18   entered into evidence as 1252-1.  Sorry.  Could you try 1249?

19   That's not it either.  I'll find it.  Thank you.  One that I do

20   know.  Let's start with one that's easy.  It's Plaintiff's 86.

21   BY MR. HESS:

22   Q.  Now, can we go to the Schedule 86, I guess, 3?  Thank you.

23   If -- when you testified, you testified that these were personal

24   legal fees that were incurred by Mr. Jaubert in the Seahorse

25   litigation versus Dominicana.  The Dominicana people?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

733

```
 1   A.  It shows personal expenses, yes, Number 2.
 2   Q.  And when you say "personal," you mean personal to
 3   Mr. Jaubert.
 4   A.  Yes.
 5   Q.  Because you have -- you understand the distinction between
 6   personal and corporate liabilities, correct?
 7   A.  Yes, I do.
 8   Q.  What is the difference between personal liability and
 9   corporate liability?
10   A.  Personal has to do with personal expenses.  When it comes to
11   corporate, corporate is a different entity and those expenses
12   are related to the corporate for a business purposes.
13   Q.  Okay.  So it's true that personal expenses would be an
14   expense that is a liability or expense to the person, in this
15   case, Mr. Jaubert, right?  Personal expense?
16   A.  Personal expenses, yes.
17   Q.  And a business liability or expense is the -- makes sense,
18   is the corporation's expense or liability.
19   A.  Correct.
20   Q.  They're two different types of liabilities, right?
21   A.  Correct.
22   Q.  There's a line, a big wall between the two, right?
23   A.  Yes.
24   Q.  You look at -- because are you the expert conducting a fraud
25   investigation, so you were very careful to look at these
```

734

1    documents, correct?

2    A.   Correct.

3    Q.   And so you look at and you spent time looking at the

4    litigation that was conducted in the Dominicana case.

5    A.   I didn't look at the Dominicana case information, but I look

6    at the purpose of these expenses for which were occurred and

7    then charge to Exomos.

8    Q.   They were incurred to pay for legal fees for the Dominicana

9    litigation, correct?

10   A.   Correct.

11   Q.   So wouldn't you have to know who the parties to the

12   Dominicana case were to understand whether they were personal

13   expenses for Mr. Jaubert or corporate expenses for SSII, for

14   Seahorse Submarines International, Inc.?

15   A.   I was not aware of any indications that Exomos was involved

16   in any legal suit, okay; therefore, any expenses were incurred

17   by Mr. Jaubert.  Supposedly are personal expenses.  Because they

18   were not involved with, had nothing to do with Exomos.

19   Q.   How do you know they're not, they shouldn't be in the SSII

20   amount due?

21   A.   How should I know?

22   Q.   Uh-huh.

23   A.   They are personal expenses.

24   Q.   Why?

25   A.   Because they were incurred on by Mr. Jaubert to -- for a

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    lawsuit that was taking place in the United States, which is --

2    has nothing to do with Dubai World or Exomos.  That's -- I'm not

3    Exomos.  I can't go -- I don't know those boundaries.  The only

4    thing I have to decide is whether those expenses are personal

5    expenses or business expenses.

6    Q.  so you never look at the case, so you don't know that the

7    lawsuit never involved Mr. Jaubert personally, right?  You don't

8    know that?

9    A.  I know that my understanding that that lawsuit between

10   Mr. Jaubert and Dominican has to do with a product that

11   Mr. Jaubert has sold to Tao Dominicana, and has nothing to do

12   with Exomos, so therefore, those expenses are relating to

13   Mr. Jaubert's personal expenses.

14   Q.  You said that the lawsuit involving Mr. Jaubert and Tao

15   Dominicana, why do you say Mr. Jaubert?

16   A.  Because this is -- the lawsuit was with Mr. Jaubert.

17   Q.  But you don't know that.  You never saw the documents for

18   the lawsuit?

19   A.  No.  The document -- we have some documents, we have some

20   e-mails.  Based on that, we decided that this -- I know for a

21   fact that Exomos has nothing to do -- or had no lawsuits

22   whatsoever with Tao Dominicana.  None.  None whatsoever.

23   Q.  So --

24             THE COURT:  What are we doing?

25             MR. HESS:  I had provided these, Judge, I think there

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    are some objections for some of them, so I've been asked to go

2    slowly.

3            THE COURT:  Okay.  Not too slowly.

4            MR. HESS:  I'll try.

5            THE COURT:  All right.

6            MR. HESS:  There are a considerable number of

7    documents.

8            THE COURT:  I know, but if I fall off my chair and hurt

9    myself, you're all going to be held personally responsible.

10           MR. CEDERBERG:  No objection.

11           THE COURT:  What's the number?

12           MR. HESS:  It's defendant's 801.

13           THE COURT:  801 is offered.

14           MR. HESS:  804.  I'm sorry, Judge.  804.

15           THE COURT:  You guys are so much fun.  804, a rendering

16   is that what it is?

17           MR. HESS:  It's Defendant's 804.

18           THE COURT:  It's e-mails.  I'm sorry.  805 is a

19   rendering.  Okay.  804 is admitted in evidence without

20   objection.

21           (Defendant's 804 in evidence)

22   BY MR. HESS:

23   Q.  Now, Mr. Ramadan, you had an opportunity to look at that.

24   It's a series of e-mails, it's Exhibit 804.  If you can take a

25   moment to look at that.  Now, because of the order of this,

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    because of the e-mail structure, the top e-mail is an e-mail.

2    Do you know who that was from?  It was to you, it says on Item

3    1, "You are correct."  On Item 2, "I had top management verbally

4    at the time.  I often deal with them on these basis.  In these

5    days top management was Hamed.  Kind regards, Randa."  Does that

6    e-mail look familiar to you?

7    A.  I have to see the entire e-mail.  This is kind of taken out

8    of context.

9    Q.  Let's drop down to the second portion that you write.  "Dear

10   Randa."  Do you recognize that e-mail?

11   A.  Yes.

12   Q.  Now, you asked two questions there.  You asked -- first

13   question, who is Randa?

14   A.  She was the director of human resources.

15   Q.  First question is, you say, "I've reviewed Herve's

16   employment contracts and other documents in his personnel file.

17   As a result, I have the following queries:  First one is,

18   according to your reply, it is part of his revised package.  We

19   don't pay his housemaid directly, but it is built in with his

20   package.  My understanding of this statement is that we are

21   paying for his housemaid indirectly."  Am I correct, that's your

22   statement?

23   A.  Correct.

24   Q.  The second one is regarding Customs duty on his personal

25   Hummer, and in light of your testimony just previously, that

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

738

1    must mean his wife's Hummer, right?  Because he doesn't have a

2    personal Hummer, or does he at this time?

3    A.  I can't tell you exactly what time we're talking about here.

4    Q.  The e-mail.

5           THE COURT:  Wait only one at a time.

6           THE WITNESS:  There was a Hummer for his wife, and

7    there was Hummer for him itself, and during the course of

8    investigations, we found the next Hummer, which is his and was

9    registered in the name of the company, and finally it was taken

10   out and was given to him personally.

11   BY MR. HESS:

12   Q.  We heard that testimony.  That was your testimony earlier,

13   right?

14   A.  Yes.

15   Q.  Okay.  But let me just make clear, there are only two

16   Hummers, right?

17   A.  Yes.

18   Q.  So the second question is, "Regarding Customs duty on his

19   personal Hummer, I did not find any written approval in his file

20   besides the request for payment."  That was what we saw before,

21   correct?  With Sultan Bin Sulayem's signature on it?  You did

22   see that one.  I'm sorry.  The request for payment, do you

23   recall that request for payment?

24   A.  Which request for payment?

25   Q.  The one you're referring to where it says, "I did not find

1    any written approval in his file besides the request for

2    payment"?

3    A.   There was a request for payment where it says Mr. Randa

4    saying logged and it's somewhere in these exhibits.

5    Q.   Show that to you right now and the jury right now.  It's

6    been introduced as 813, Defendant's.  Let me show that to you.

7    If I may, let me show the jury.  The jury has seen this before.

8            THE COURT:  It's in evidence?

9            MR. HESS:  Yes, it is, Judge.

10   BY MR. HESS:

11   Q.   This is the request for payment you're speaking of, correct?

12   Is this it?

13   A.   This shows shipping expenses for containers of two Hummers

14   vehicles.

15   Q.   That is the request for payment that you're referring to in

16   your e-mail, correct?

17   A.   I didn't refer specifically to that, but I was referring to

18   a particular payment, yes.  About the expense of his personal

19   Hummer.

20   Q.   Let me read it again.  If you could please put back up the

21   previous exhibit we had before that, it's what's been marked

22   804.  When you say on the second question, the third down, thank

23   you, you're speaking of -- it says, "I did not find any written

24   approval in his file."  These are your words, right?

25   A.   Yes.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

740

1    Q.  You're the professional writing these, right?

2    A.  Yes.

3    Q.  Let me ask you this:  When you wrote the --

4              THE COURT:  It would be a lot better if you would just

5    ask the question all the way through, because it's really hard

6    when you get in the middle of a question then you switch it to

7    another question.  I'm having trouble following you.  Let me

8    just ask you, this Paragraph 2 here, which Hummer are you

9    talking about, or do you know?

10             THE WITNESS:  I'm talking about his personal Hummer.

11             THE COURT:  Okay.  Is that the one that was in his

12   name, then in the company's name, then in his name, or is that

13   the one that was in his wife's name?  Do you know which one?

14             THE WITNESS:  I'm talking about his personal.

15             THE COURT:  I understand.  That doesn't mean anything

16   to me.  Which one are you talking about?  The one that was in --

17   that ended up in his name.

18             THE WITNESS:  Yes.

19             THE COURT:  Okay.

20             THE WITNESS:  Because his wife's Hummer was clearly

21   stated in some other documents.  That was his wife's Hummer.

22             THE COURT:  So this is the other one.  Okay.  Thank

23   you.

24             MR. HESS:  Thank you, Judge.

25   BY MR. HESS:

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.  You state, in Paragraph 2, your words, "I did not find any

2    written approval in his file," and then you say, "Besides the

3    request for payment."  That's this request for payment, right?

4    A.  There was another one.

5    Q.  There's another one just like this?

6    A.  There's another request for payment where it shows Randa had

7    said "logged," if I can correctly recollect.

8    Q.  Okay.  But it was a request for payment?

9    A.  It was a request for payment.

10   Q.  Just as this is a request for payment?

11   A.  Similar to this.

12   Q.  Request for payment is a request for payment, correct?

13   A.  Request for payment is a request for payment, yes.

14   Q.  Which was signed by you and Herve.  "I am looking for top

15   management approval."  That was your question, right?

16   A.  Yes.

17   Q.  And your response -- the response was what I just what we

18   read before, correct, the first on top?  That's what Randa

19   responded to your questions, rights?

20   A.  Yeah.  If I see her name coming from the top.  E-mails have

21   to be complete --

22   Q.  Okay.

23   A.  -- to be credible.

24   Q.  Okay.  Let's go down to the --

25           THE COURT:  Wait.  Let me see if I understand this.  So

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

742

1     what you're saying is you don't have an independent recollection

2     of her responding to those inquiries?  Is that what you're

3     saying?

4            THE WITNESS:  She relied to my inquiries, but I don't

5     know whether this came from her because it usually in the

6     e-mail.

7            THE COURT:  So you don't have any independent

8     recollection, and this doesn't refresh your memory that this is

9     what she said?  Is that what you're saying?

10           THE WITNESS:  I would say so for now.

11           THE COURT:  Okay.  So move on, please.

12    BY MR. HESS:

13    Q.  Let's proceed to the bottom of that on 804, the first page.

14    It's your e-mail to Randa.

15           THE COURT:  Can you lift that up a little bit, please?

16    Thank you.

17    BY MR. HESS

18    Q.  Says, "Randa" -- this is your e-mail, correct?  You know

19    that's a fact because you can see your name on top, correct?

20    A.  Correct.

21    Q.  It says, "Randa, any news on the outcome of your meeting

22    with the chairman regarding copying of TM documents?"  Right?

23    A.  Yes.

24    Q.  Then you go on in the next page, 804-2?  It's the -- there's

25    only one page on that?  I'll come back to that later, Judge.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Actually, you know what, I'm just going to use the hard copy.

2         MR. HESS:  Apparently I only have the one page.  It's

3    marked 8041 and 8042.  Mishap.  Any objection?

4    BY MR. HESS:

5    Q.  I've got to go up to the e-mail above the one we just did,

6    the one that comes on the March 7, 2007, at 7:48.

7         THE COURT:  That document says Page 1 of 2.  Can you

8    find where Page 2 is.

9         MR. HESS:  I have it here.

10        THE COURT:  Can he find where it is to project it?

11        MR. HESS:  It was Bates stamped, but apparently didn't

12   make the transition.

13        THE COURT:  Okay.  All right.

14        MR. HESS:  I guess, without objection, Your Honor has

15   already admitted this.

16        THE COURT:  I don't think you can just kind of like

17   throw stuff like that because I'll never figure it out.  You

18   guys have to have some sort of plan.

19        MR. HESS:  I'm seeking to introduce 804, Pages 1 and 2

20   without objection.

21        MR. CEDERBERG:  We have no objection.  We would ask

22   counsel to replace 804-1 with 804-1 and 2.

23        MR. HESS:  We'll certainly do that.

24        THE COURT:  That's fine.  We'll do that at some point.

25   So the 804 that is in evidence at this time, we are deeming that

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1   it is contained two pages, and that it will be replaced with a

2   document that has two pages, and somebody in the -- when the

3   world has gone to dust will be looking at this and trying to

4   figure out what the heck we're talking about.  Go ahead.

5   BY MR. HESS:

6   Q.  The March 7, 2007.  This -- recognize this e-mail is not

7   printed in color, but do you recall this e-mail that says, "Good

8   morning, Hussein.  I haven't gotten used to my Blackberry.  I

9   asked the chairman, and says you can make copies of Herve's

10   file.  On your request below, please find response marked in

11   red."

12       Okay?  And now we're going to go down to your request below,

13   and if we could go down to the second page of that, the top of

14   the page.

15          THE COURT:  It doesn't have the second page.  You have

16   the second page.

17          MR. HESS:  Judge, I'm old and I'm tired.  I'm going to

18   approach the witness and show him the second page, then I'll

19   show the jury the second page.  If you could read the second

20   page, please.  Your questions and then her answers to you.

21          THE WITNESS:  Okay.  "Randa, any news on the outcome of

22   your meeting with the chairman regarding copying of TM

23   documents?"  "TM" means top management documents.  "On a

24   different subject, I need to know the following information

25   regarding to Herve Jaubert.  Did the organization pay the salary

745

1    of his two maids?  "

2    Q.  What's her response?

3    A.  Is it part -- I'm just continuing reading from the

4    documents.  "It is part of his revised package.  We don't pay

5    his house maid directly, but it is built into his package."

6        "Did he receive bonus for 2005?"

7        "No, he didn't."

8        "Was the organization supposed to pay the Customs duties of

9    his personal Hummers?  "

10       Says, "Yes."

11   Q.  Thank you.  Now did you look at documentation written by

12   Mr. Krueger regarding this case?

13   A.  In what documentation do you refer to?

14   Q.  Phrase it a different way.  Can you show me again --

15   documents are important, correct?

16   A.  Very much.

17   Q.  And you rely on documents for much of what -- much, if not

18   all of what you do, correct?

19   A.  Yes.

20   Q.  Do you have a document that -- from Mr. Krueger that told

21   you that he designed the Nautilus?

22   A.  No.  I have a report from Mr. Lorenz describing all the

23   problems with the different submarines.

24   Q.  Right.  They wrote a bunch of pages, right?

25   A.  What do you mean a bunch of pages?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

746

1    Q.  There's a number of pages in there of what you read from

2    Bert and from Mr. Lorenz.

3    A.  It's a report.  You call it pages.

4    Q.  Not anywhere in those pages, nowhere in those pages is any

5    assertion by Mr. Krueger that he designed the Nautilus, correct?

6    A.  No.  Not that I know of.

7             MR. HESS:  Could you please put up, it's Exhibit

8    1253-1, please?  It's in evidence.  It's Dubai World, yes.

9    BY MR. HESS:

10   Q.  We've seen -- the jury saw this, and you've seen this before

11   today.  You've seen this today.  If you would look down in the

12   middle of that document, it says, "Less CRN."  Now, that's a

13   credit.  That was a payment made by or credit from Seahorse to

14   Exomos, right?

15   A.  A credit should show a minus or an offset, an amount.  Here

16   I don't show any minus to any of these numbers showing here says

17   showing less credit 8,200.

18   Q.  I'm horrible at math, but I think I can do this.  It says --

19   on top it says, "33,876," then it says, "less CRN," and if you

20   take 33,836 and you subtract from it $8,200, you arrive at an

21   amount payable, right?

22   A.  True.

23   Q.  So there was some sort of a deduction or credit, right?

24   A.  Looks like, yes.

25   Q.  Is there any doubt in your mind?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

747

1   A.  From here from the document, there is no doubt in my mind,

2   no.

3   Q.  Do you know what that credit was for?  Do you know why

4   Seahorse credited?

5   A.  No, because that was not my scope at the time when I was

6   doing the audit.

7   Q.  I think you talked about -- do you know what this payment

8   was for?

9           THE COURT:  Which payment?

10          MR. HESS:  The documentation, the amount payable that

11  this document concerns.

12          THE WITNESS:  No.

13          MR. HESS:  Okay.  Charles, if you would go up just

14  above the remarks.

15  BY MR. HESS:

16  Q.  That is payable to Seahorse International, Inc., correct?

17          THE COURT:  That's not what it says.  Says Seahorse

18  Submarines.  You didn't say Seahorse Submarines International.

19          MR. HESS:  Seahorse Submarines International, right?

20  Inc., correct?

21          THE WITNESS:  Correct.

22  BY MR. HESS:

23  Q.  Now, were you aware, during the conduct of your

24  investigation, your fraud investigation, were you aware of the

25  disarray of the storeroom?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   A.  I wasn't aware.  I went to the storeroom that they were

2   maintaining, and it looked pretty clean to me, but they have

3   another what you call junk or other stores outside open area

4   which has a lot of junk stuff there which was not called stores,

5   but that was not stores.

6   Q.  But you're aware that that junk area, as you put it, there

7   was concern that that contained millions of dirhams worth of

8   valued property, right?

9   A.  That was purely junk at the time, and was nothing there but

10  shells of, you know, submarines that had nothing in it at all.

11  Not functioning.

12  Q.  Did you make yourself aware of the errors that had happened

13  between Palm Marine store and Exomos' store and how, on

14  occasion, Exomos property would arrive or would be maintained in

15  the Palm Marine store?

16  A.  That, I was not aware of.  And shouldn't be because Exomos

17  should receive their merchandise at Exomos.  Why should they

18  receive it somewhere else?

19  Q.  I said either received or maintained and stored.  So --

20  A.  I -- to me, I had to go to Exomos and to Exomos stores.

21  Now, if they were received somewhere else and I wasn't aware of,

22  that's not something that I was looking for.

23  Q.  Okay.  And who is Mr. -- who ran the Exomos store again?

24  A.  The one that was in charge, his name was V.K. Shamsudeen.

25  He was the purchasing controller and the stores in charge.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

749

```
 1    Q.  Who was Mr. Minhas, M-i-n-h-a-s?

 2    A.  I don't recall the name.

 3    Q.  Ahmed Minhas?

 4    A.  I don't recall the name.

 5    Q.  I'm going to show you this document.  It's a document --

 6    show that to you.  If you could please read that.

 7    A.  "Dear Mr. Ramadan" --

 8    Q.  Not out loud.  Read it to yourself, please.

 9    A.  Read it to myself?

10    Q.  Please.  That was an e-mail that you received from

11    Mr. Jaubert, correct?

12    A.  Correct.

13    Q.  And do you recall that e-mail after reading it?

14    A.  Yes.

15         MR. HESS:  Judge, I would seek to enter this e-mail

16    into evidence.

17         MR. CEDERBERG:  Objection.  Hearsay, Your Honor.

18         THE COURT:  All right.  Let me see it.  I don't know.

19    Yeah, at this point I'll sustain the objection.

20         MR. HESS:  If I may, Judge?  I'm entering not for the

21    truth of the matter asserted, but because, in light of the fact

22    that there are hundreds of hearsay documents relied on by this

23    individual in the course of his -- the performance of his duties

24    that he's asserted were necessary to be reviewed to do his job

25    in the auditing, I'm arguing that I'm going to ask him if he
```

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

750

1    received it, if he conducted any investigation or evaluation of

2    what was said and in the course of performing his duties.

3          THE COURT:  If it's not coming in for its truth, it's

4    not the slightest bit relevant, then, if it's not coming in for

5    its truth.  That's disingenuous.  I'll sustain the objection at

6    this time.  You might be able to readdress it at a later time.

7          MR. HESS:  Thank you, Judge.

8    BY MR. HESS:

9    Q.  Now, you talk about the various corporate configurations

10    that were utilized by Dubai World in terms of what became known

11    as the Exomos Corporation, correct?

12    A.  Yes.

13    Q.  It was -- did you familiarize yourself with the times that

14    each one of those corporations was actually in place?

15    A.  Well, for my objectives was the sole purpose of my work was

16    to go and look at the numbers and the figures and the facts

17    irrespective of the name of the corporation was to me, the names

18    is secondary to me.

19    Q.  Okay.  So what you're saying is, secondary, really

20    meaningless to you, correct?

21    A.  It's not meaningless.  I didn't say "meaningless."  I said

22    secondary, because I'm looking at Exomos and I'm looking at

23    Exomos systems and internal controls and what are the facts that

24    I'm trying to collect from Exomos.

25    Q.  But if Exomos doesn't exist at a particular time, doesn't

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    that raise a concern to you?

2    A.  What do you mean doesn't exist?

3    Q.  Well, I mean, a corporation has to be in existence before a

4    duty can be owed to it, correct?

5    A.  I know for a fact that Exomos existed when I was conducting

6    my audit.

7    Q.  When you were conducting your work, but did you look at the

8    whole period of Exomos's existence?

9    A.  Yes, I looked at Exomos.  When Exomos was transferred,

10   basically Palm Marine was transferred from Palm Marine to become

11   Exomos.

12   Q.  Do you know when that was?

13   A.  That was on October 26, 2004.

14   Q.  October 26, 2004, Palm Marine became Exomos?

15   A.  Yes.

16   Q.  And which Exomos did it become then?

17   A.  There was one Exomos that I know of.

18   Q.  Could I please have the witness look at what's been

19   introduced into evidence Defense 775?  Now, a memorandum of

20   association, that's the incorporated document, correct?

21   A.  Yes.

22   Q.  And this Exomos, the Exomos FZE is the Exomos that you're

23   speaking of, right?

24   A.  Well, for understanding, I have to look at the entire

25   document.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1    Q.  Okay.  If you could take a look at the first line, you can
 2    also look at it on the screen right next to you if you can, or I
 3    can give you a hard copy.  What's the name of the establishment?
 4    A.  The name of the establishment is Exomos FZE.
 5    Q.  That's the Exomos you're speaking of, correct?
 6    A.  Yes.
 7    Q.  And we would find -- the date of incorporation, we would
 8    find that on the last page if the witness could look at 775-3.
 9    A.  Okay.
10    Q.  That December -- December 31, 2005, correct?
11    A.  Yes.
12    Q.  Right?  So you misspoke before when you said October 2004?
13    A.  There was a document that shows that at that time that Palm
14    Marine became Exomos.  Now, Exomos, what form of Exomos, it was
15    a form of Exomos.  FZE Exomos, that's still irrelevant to me.
16    Q.  I thought you said there was only one Exomos that you know
17    of?
18    A.  Yes.  That I know of, yes.
19    Q.  Which document -- this is the effectuated document
20    incorporating Exomos, correct?
21    A.  It looks like, yes.
22    Q.  So right now sitting here, when was Exomos incorporated?  If
23    this document is true, and it's already in evidence, when was
24    Exomos incorporated?
25    A.  As I said, to me, as an auditor, I looked at these
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    documents.  However, my main objective and focus at the time is

2    to investigate those issues.

3    Q.  And this issue isn't important to you.

4    A.  What do you mean?

5    Q.  When Exomos was incorporated?

6    A.  It's not the main focus of my investigation, no.

7    Q.  Even a distinction of November -- I mean October of 2004 all

8    the way to a year and almost a half later December of 2005?

9    A.  There were a lot of changes within Dubai World for many

10   units and sub unit.  They were always in constant changes, and

11   to me that was not the primary purpose of my -- I would look at

12   them; however, my main objective is to look at what I'm

13   investigating.

14   Q.  And your main area what you were told to investigate was

15   Mr. Jaubert not Exomos, right?

16   A.  Exomos and Mr. Jaubert.  He was the CEO of Exomos, so he is

17   part of Exomos definitely.  He's a leader, he's a commander of

18   Exomos.

19   Q.  You're instructed to investigate Mr. Jaubert and Mr. Jaubert

20   as CEO of Exomos, not investigate Exomos.

21   A.  They're both interrelated.

22   Q.  Why didn't you investigate the distinction, you have two

23   documents.

24   A.  To me -- it's secondary to me at the time.  It was a

25   secondary to me.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.  It's secondary to you now?

2    A.  Well, I still -- because my focus was more important to look

3    at the areas that I was focusing on.

4    Q.  You were engaged on behalf of Exomos, correct?

5    A.  I was engaged on behalf Dubai World.

6    Q.  Who owns Exomos, correct?

7    A.  Correct.

8    Q.  Now, you stated that you gave Mr. Jaubert repeated

9    opportunities to discuss with you the issues that you believed

10   existed regarding the audit or the investigation.

11   A.  Yes, I did.

12   Q.  And he didn't take advantage of those, is that your

13   testimony?

14   A.  He went back and forth a few times.

15   Q.  A few times?

16   A.  Yes.

17   Q.  For instance, what did he say?

18   A.  He goes back and he brought some documents, and we told him

19   those documents were not enough because we were looking at

20   really evidence of receiving the items.

21   Q.  What was -- when you asked him about the issues regarding

22   the -- what happened to -- you're familiar with the Yanmar

23   two-cylinder engine?

24   A.  No.  It's been a while.

25   Q.  It's been a while.  I wasn't sure if when you discussed with

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    him the issues that you believed existed regarding the

2    rebreather, what did he discuss with you?  What did he tell you?

3         MR. CEDERBERG:  Objection.  Hearsay, Your Honor.

4         MR. HESS:  Judge.

5         THE COURT:  Why isn't that hearsay?

6         MR. HESS:  Because they've opened the door.  He said

7    that.

8         THE COURT:  Hearsay is still hearsay.  He can't open

9    the door for hearsay.  The rules of evidence are the rules of

10   evidence.  I'm unaware of any exception that says they opened

11   the door.  It either is admissible or not admissible, and this

12   sounds like hearsay.

13        MR. HESS:  Well, in this case, Judge, if even it's not

14   asserted for the truth of the matter, he's testified on direct

15   on a number of occasions that Mr. Jaubert has responded back to

16   his inquiries, but they weren't adequate.  And in order to be

17   able to present, they've made that an issue in the case.

18        THE COURT:  They can do that because he is a party

19   opponent, and they can use the statement of a party opponent,

20   but that person can't use his statements made to a third person.

21   That's hearsay.  I think that's always been the rule.

22        MR. HESS:  If I could address that after the lunch

23   I'll -- because I'll drop it for now, Judge.

24        THE COURT:  Okay.  You're going to have to do a lot of

25   addressing, because I think I know the rule.


PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1          MR. HESS:  I understand.  I just don't want to waste

2     the jury's time right now with that.

3     BY MR. HESS:

4     Q.  You raised what you believe is an issue, this understanding

5     that it's unusual to have an invoice precede or come before a

6     purchase order?

7     A.  That's correct.

8     Q.  Right?

9     A.  Yes.

10    Q.  Now, were you aware that Seahorse Submarines International,

11    Inc., was invoicing for the purchase of materials to build

12    Exomos subs, and they were paying that invoice initially?  Were

13    you aware of that?

14    A.  I was aware that Exomos was ordering through Submarines

15    International and they were paid in advance.  Now, what they

16    were doing there, to me, you know, that's my understanding of

17    that process.

18    Q.  But you weren't aware that Mr. Jaubert would order an item

19    to put into one of the Exomos submarines -- not Mr. Jaubert, but

20    Seahorse Submarines International, Inc., would invoice, order an

21    item, the invoice goes to the third party, correct?

22    A.  I don't know the process between what Mr. Jaubert's company

23    was doing.

24    Q.  So you never became aware of that?

25    A.  My first responsibility is to see that items that was

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    ordered through Mr. Jaubert's company was received.

2    Q.  Okay.

3    A.  Period.

4    Q.  So you never became aware, nor did you make inquiries

5    regarding the fact that Seahorse Submarines International, Inc.,

6    would advance monies, purchase items to be used, to be shipped

7    to Exomos, and to be used in the Exomos design, manufacturing

8    process.

9    A.  That's what Mr. Jaubert alleged to say.  That's what he told

10   me at the time, yes.

11   Q.  So you were aware?

12   A.  Yeah, this is what he told me.

13   Q.  Okay.  And then so what inquiries did you make to determine

14   whether or not that's true?

15   A.  To me, I didn't have to inquire.  I was focused -- again, my

16   main focus we paid money in advance.  We need to get our items

17   back, irrespective.  That's the whole point.

18   Q.  That doesn't explain to you why it is that it was invoiced

19   before the Exomos purchase order went out?

20   A.  Well, that was one of the issues that we contested, but the

21   bottom line, we said either you refund the advance or you bring

22   us the items.  You just really deliver the items that we

23   purchased.

24   Q.  It's a different issue.  I'm not talking about that.  I'm

25   talking about, doesn't that explain to you why it is that there

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    was an invoice for materials prior to a purchase order by

2    Exomos?

3    A.  Well, it doesn't to me, throughout my experience, the way

4    the process goes is that the invoice comes after the purchase

5    order.  The date of the invoice should be after the purchase

6    order.  That's globally really acceptable.  Someone to say that

7    you date an invoice before the purchase order?  That's a

8    question mark.

9    Q.  It's a question mark?

10   A.  It's a question mark, it's definitely not proper practice.

11   Q.  And it may not be the way that you are used to doing things?

12   A.  Not the way I'm used to doing things.  I've seen this what

13   happened in the states.  I conducted an audit in the states, and

14   this is the way it happens.

15   Q.  It raises a flag is that what you're saying?

16   A.  It raises a flag, but then you take it further that the

17   items were not delivered.  Again, it's all continuous, it's all

18   checked.

19   Q.  If the items were not delivered, if the items were

20   delivered, would it still -- if you have an invoice before the

21   purchase order and the items were delivered, there's no flag,

22   right?

23   A.  Well, I still have a flag.  I still call this improper

24   process.

25   Q.  Is there anything that results to a detriment or to a

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    detriment to Exomos under those circumstances?

2    A.  It's not detriment.  However, by the rules of internal

3    controls, it has to follow the process.

4    Q.  Is there any loss, is there any damages that would result?

5    A.  I wasn't looking at the damage if the item was received.

6    Q.  Is there any loss or damages that would result if the

7    invoice preceded and preceded the purchase order and the item

8    was delivered?

9    A.  Well, I'm not talking about damage here, I'm talking about,

10   again, a process, and the process as a professional.  That

11   raises a flag, as you stated, and that flag, to me, takes us to

12   a different dimension, and we have to look at why this is

13   happening.

14   Q.  I understand.  I don't really -- don't want to put you

15   through -- I don't want to put the jury through asking this

16   again.  All I'm asking is, would the mere fact that an invoice

17   comes before a purchase order, if the item is delivered, there's

18   no loss to the company, right?

19   A.  There is no loss if the item was delivered as required.

20   There was no loss, no.

21   Q.  Thank you.

22        THE COURT:  Are you about done?

23        MR. HESS:  Judge, I was asking if the Court would break

24   for lunch now to give me an opportunity to address these other

25   issues?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER**

1          THE COURT:  I've considered it.

2          MR. HESS:  Okay.  Judge, I'll continue on with my other

3     issues.

4          THE COURT:  I'd really like to get this witness off the

5     stand.

6          MR. HESS:  I'm going to finish before lunch.

7          THE COURT:  That's why I kept going.  And I do have two

8     sentencings, and I changed them to 1:30 and 1:45 so we can start

9     again at 2:00.

10          You know what, we can break.  Let's break now.  Let's

11     break, and we'll come back at 2:00 for this case.  I do have two

12     sentencings, so move anything heavy over there away from the

13     reach of the defendants.

14          And ladies and gentlemen of the jury, we'll break until

15     2:00.  I hope we can start right at 2:00.  Remember all of the

16     instructions I've given you over and over again.  I've somehow

17     managed -- you're reminded that you're not to discuss this case

18     with anyone or permit anyone to discuss it with you.  I

19     understand that one of you -- Mr. Dimon, how do you pronounce

20     it?  Dimon, I understand that you have some dental work.  That

21     shouldn't be a problem.

22          We might even start at 10:00.  Make sure that you can,

23     but I think I'd, rather than make anybody wait, remind me when

24     we break tomorrow.  As I told you, we're going to break a little

25     early tomorrow because I have to be back in Miami before 6:00,

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    and I've gotten caught in crazy traffic before.  So we probably

2    quit at about 2:00, maybe we won't take lunch and just break at

3    2:00 for the day.  I'll tell everybody to act accordingly.

4         All right.  Go to lunch, don't listen to anybody, don't

5    talk to anybody, don't see anybody, good-bye.  See you.  See you

6    at 2:00.

7         (Jury out at 12:45 p.m.)

8         THE COURT:  All right we'll be in recess until 2:00.

9    Thank you.

10        (See Volume 8, page 763 for continuation)
                      * * * * *

11                C E R T I F I C A T E

12   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

13

14

15   _____        /s/ Dawn M. Whitmarsh
     Date                    DAWN M. WHITMARSH, RPR

16

17                    I N D E X

18                    WITNESSES

19   For Plaintiff:                                    Page

20   Hussein Ramadan
      Direct Examination by Mr. Cederberg             657:9
21    Cross-Examination by Mr. Hess                    719:20

22                    EXHIBITS

23   For Defense:

24   804
      In Evidence                                      736:21
25

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1     For Plaintiff:

 2     28
        In Evidence                                  685:16
 3
       86
 4      In Evidence                                  701:13

 5     147
        In Evidence                                  710:22
 6
       151
 7      In Evidence                                  709:6

 8     400
        In Evidence                                  715:6
 9
       969
10      In Evidence                                  711:15

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**