1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                       FORT PIERCE DIVISION
                     CASE NO.   09-14314-CV-JEM
3

4

5

6    DUBAI WORLD CORPORATION, and its
     Subsidiaries, EXOMOS, NAKHEEL and
7    PALM MARINE,

8                   Plaintiffs,

9        vs.

10                                        Fort Pierce, Florida
                                          February 17, 2011
11   HERVE JAUBERT, SEAHORSE
     SUBMARINES INTERNATIONAL
12   INCORPORATED, and Does 1-99,

13                   Defendants.
     _____

14

15                   TRANSCRIPT OF JURY TRIAL
                     VOLUME 8 - PAGE 763-882
16           BEFORE THE HONORABLE JOSE E. MARTINEZ
                 UNITED STATES DISTRICT JUDGE
17

18

19

20

21

22   REPORTED BY:        DAWN M. WHITMARSH, RPR
                         Official Court Reporter
23                       400 N. Miami Avenue, 10S03
                         Miami, Florida  33128
24                       Telephone:  305-523-5598

25


                PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                     TRANSCRIPT PRODUCED BY COMPUTER

```
1    APPEARANCES:

2    FOR THE PLAINTIFFS:
                         Quinn, Emanuel, Urquhart & Sullivan, LLP
3                        BY: JON C. CEDERBERG, ESQ.
                         BY:  A. WILLIAM URQUHART, ESQ.
4                        865 South Figueroa Street
                         10th Floor
5                        Los Angeles, CA  90017

6                        Astigarraga, Davis, Mullins & Grossman
                         BY:  EDWARD MULLINS, ESQ.
7                        701 Brickell Avenue
                         16th Floor
8                        Miami, Florida 33131

9
     FOR THE DEFENDANTS:
10                       Hess & Heathcock, PA
                         BY:  WILLIAM HESS, ESQ.
11                       BY:  KATHRYN A. HEATHCOCK, ESQ.
                         40 Southeast Osceola Street
12                       Stuart,  Florida 34994

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

765

```
 1                        P-R-O-C-E-E-D-I-N-G-S
 2            THE COURT:  Are you ready for the jury?
 3            MR. HESS:  Yes, Judge.
 4            MR. CEDERBERG:  Yes, Your Honor.
 5            THE COURT:  All right.  Bring them in please.
 6            (Jury in at 2:30 p.m.)
 7            THE COURT:  We got rid of the chair so you would be
 8    able to get in the back row easier.  Is that the one you want
 9    moved?  Okay.  Well, it's gone.  Be seated please.
10            JUROR:  We just want to be close.
11            THE COURT:  Good.  I like closeness.  All right.
12            Are you ready to proceed?
13            MR. HESS:  Thank you, Judge.
14            THE COURT:  You may proceed, sir.
15            Sir, you're reminded that you're still under oath.
16            THE WITNESS:  Yes.
17                        CONTINUED CROSS-EXAMINATION
18    BY MR. HESS:
19    Q.  Who is Simon Honeybone?
20    A.  He was the new CEO of Exomos.
21    Q.  And he was the new CEO that -- he was the CEO in July of
22    2007?
23    A.  I believe so.
24    Q.  Now, as an auditor, who is your employer?
25    A.  My employer?  Dubai World.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

766

1   Q.   As an auditor for Dubai World, you don't have the authority

2   to retain passports or institute judicial proceedings, correct?

3   A.   No, sir.

4   Q.   And that's across the board as to Mr. Jaubert or anyone,

5   right?

6   A.   Yes, sir.

7   Q.   And that includes Security Judicial Authorities, correct?

8   A.   Correct.

9          THE COURT:   What are we doing?

10         MR. HESS:   while counsel is looking at that --

11  BY MR. HESS:

12  Q.   Let me ask you, Lorenz Krueger, he was an employee of

13  Exomos, correct?

14  A.   Correct.

15  Q.   And he was an employee of Exomos in 2007?

16  A.   Yes, I believe so.

17  Q.   During the period of time that he was -- that you made the

18  inquiries of him regarding the rebreather, he was an employee of

19  Exomos?

20  A.   Yes.

21         MR. HESS:   Judge, I can move on while counsel is

22  reviewing that again.

23         THE COURT:   What are we doing?  I thought we were going

24  to have all this done before we started so we wouldn't be

25  hanging around.  Any objection?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1              MR. CEDERBERG:  Yes, Your Honor.  976 is a half a

 2      document.

 3              THE COURT:  Okay.  There's an objection to 976 of being

 4      half a document.  What's your response?

 5              MR. HESS:  It's not, Judge.

 6              THE COURT:  It's not half a document.  That's the

 7      response.

 8              MR. HESS:  Let me make sure that he's looking at the

 9      same one I am.

10              THE COURT:  All right.  Confer.

11              MR. HESS:  977 also, Judge.

12              THE COURT:  Okay.

13              MR. HESS:  It's two pages.

14              THE COURT:  976 may be half, but you got 977.

15              MR. CEDERBERG:  I believe I have the full document with

16      consecutive numbers.

17              THE COURT:  Okay.  You object to the two of them?

18              MR. CEDERBERG:  No objection to those two documents.

19              THE COURT:  All right.  976 and 977 are admitted in

20      evidence.

21              MR. HESS:  Thank you, Judge.

22              THE COURT:  Without objection, move on please.

23              (Defense 976 & 977 in evidence)

24      BY MR. HESS:

25      Q.  Mr. Hussein, if you'll take a look at what is going to be on
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1  the screen as Defendant's Exhibit 976?  Sorry, Mr. Ramadan.  I'm

2  sorry.  Okay.

3        If you'll notice on the bottom of that page, there's an

4  e-mail from Lorenz Krueger to Mr. Shamsudeen.  Again, there's

5  only one Lorenz Krueger, correct?

6  A.  That's one.

7  Q.  You don't see the whole e-mail.  For your edification, I

8  know it's important for you to see who the topic is and who it

9  was sent to.  V.K. Shamsudeen is the store clerk?

10  A.  No.  He was in charge of purchasing and the stores.

11  Q.  Okay.  Now, if you look at the next page which is marked as

12  defendant's 977 in evidence?  This is a continuation of

13  Mr. Krueger's e-mail.  Can you see that it says "dear Shams,

14  when I was asked to earlier to these points, I didn't saw any

15  bills, drawings or development reports.  Now I have seen the

16  drawings for the 360 degree steering POD 6 nozzle assembly, the

17  development report for the rebreathers was sent to me some weeks

18  ago.  I also saw now the bill of the development costs.  Now I

19  have no doubts on that, that we received those items."

20        See that?

21  A.  Okay.

22  Q.  He doesn't --  well, first of all, it says what it says, but

23  he doesn't mention anything about the problem with the

24  rebreathers in that e-mail?

25  A.  He didn't mention it here, but he mentioned it to me.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.  Okay.  And you became aware.  You've seen that e-mail

2    before, correct?

3    A.  My recollection is I don't recall exactly, but I don't

4    recall.

5    Q.  Okay.  Let me show you.  Let me make sure that you did.  If

6    we can go back to Defendant's Exhibit 976, the top of the page.

7    Please?  And have you read that?

8    A.  Yes.

9    Q.  Okay.  That's an e-mail to you, correct?

10   A.  It was sent to me, yes.

11   Q.  And then if we go down, let's take a look at the e-mails

12   that are referred to in that e-mail to you, which also were

13   included with that e-mail.  If we look at the e-mail from

14   Mr. Jaubert that follows it, it says "okay", and then we look

15   down to the e-mail from Mr. Shamsudeen, "dear, Mr. Herve".  And

16   again, this was copied to you, correct?

17   A.  Well, it wasn't copied to me then but it's an exchange of

18   e-mails correct.

19   Q.  You did see this?  I'm sorry?

20   A.  Yes.

21   Q.  Sorry, court reporter.  So you became aware of Mr. Krueger's

22   statements about the rebreather in this regard.

23   A.  Yes.

24   Q.  And you became aware of them back on May 2007, correct?

25   A.  Correct.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

770

1    Q.  If we could take a look at what is in evidence as

2    Plaintiffs' Exhibit 134, page 250?  You can look at it, but I'm

3    going to ask you a couple questions first.  I'm trying to move

4    it along for everyone.

5         You testified -- before lunch you testified that you

6    know it really didn't matter what was going on with the Seahorse

7    Submarines T-A-O Dominicana litigation as far as you're

8    concerned, because all you cared about was that Exomos had no

9    involvement, right?

10   A.  That's -- yes, that's my conclusion.

11   Q.  So Exomos had no involvement in the litigation, Exomos had

12   no involvement in -- Exomos wasn't going to benefit from the

13   submarine that was the subject of that litigation, right?

14   A.  That's my understanding, yes.

15   Q.  And that's -- and that understanding that Exomos wasn't

16   going to benefit from that litigation, that understanding was

17   part of your conclusions in this thick audit report, that thick

18   investigative report that you did, right?

19   A.  True.

20   Q.  That's part of the reason that you're accusing Mr. Jaubert

21   of fraud and misrepresentation and misappropriation, right?

22   A.  Well, I wasn't accusing him at the time.  Because I was

23   trying to siphon through the facts.  In my report, you can see

24   in my report I didn't make a direct accusation against

25   Mr. Jaubert, we were trying to go, syphon through the facts and

771

1    see what is his is his and what is ours is ours.

2    Q.  Doesn't your property say mismanagement and

3    misappropriation?

4    A.  Those are allegations as you can read.  If you read my

5    report, it says investigation of allegations and mismanagement.

6    Q.  And you concluded that he did mismanage and misappropriate?

7    A.  Yes, he did, yes.

8    Q.  And part of your conclusions?

9    A.  Yeah.

10   Q.  It's based on this idea that Exomos had no benefit in the

11   Tao Dominicana litigation?

12   A.  Exactly.  This is my conclusion.

13   Q.  Okay.  If you could take a look at that now.  Again, that's

14   in evidence as Plaintiff's 134-50.

15          MR. CEDERBERG:  For the record, Your Honor, I believe

16   it's in evidence but as a different number.  We'll straighten

17   that up at the break.

18          THE COURT:  All right.

19   BY MR. HESS:

20   Q.  If I could point your attention to the middle paragraph that

21   starts out as "Mr. Herve".  Have you never seen this document?

22   A.  I have.

23   Q.  You have?

24   A.  I have.

25   Q.  And is this document -- strike that.  Withdraw it.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

72

1          It states that "Mr. Herve have confirmed that final

2    payment of 78,868 will not be claimed as this forms part of the

3    asset acquisition agreement", right?  That's your understanding?

4    A.  That's what the e-mail says.

5    Q.  Was that your understanding in your investigation?

6          THE COURT:  Don't interrupt him.  If you're going to

7    ask him something, give him a chance to answer it.  It's really

8    hard if you ask is that your understanding, is that your

9    understanding, is that your understanding two or three times in

10   a row.  It's hard.

11         MR. HESS:  Just exciting about moving it along, Judge.

12         THE COURT:  I understand.  I wish it was moving along

13   as fast as we were talking.

14         MR. HESS:  Sorry, Judge.

15         THE WITNESS:  That was an e-mail that was sent by

16   someone.  It wasn't me.  Okay.  That was an e-mail that was sent

17   by someone claiming that the final payment will not be claimed

18   as part of the assets of the acquisition agreement.  This is

19   someone else's view.  I may have used in it a different context.

20   That's my view on this.

21   BY MR. HESS:

22   Q.  You know who it was sent by?

23   A.  I think you can look back up.

24   Q.  Sent by.

25         THE COURT:  There you go again.  Slow down.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

 1                MR. HESS:  Sorry, Judge.  Trying to make up for this
 2     morning.  I'm going to calm down and just slow down right now.
 3                THE COURT:  It doesn't help when you interrupt though.
 4                THE WITNESS:  If you can please, if you don't mind if
 5     you can bring the top one.
 6                THE COURT:  No further than that.  The heading.
 7                THE WITNESS:  That was sent by Sanil.
 8     BY MR. HESS:
 9     Q.  Again who is Sanil?
10     A.  Sanil was working at the time with Exomos and other projects
11     helping them setting up the business.  And he's a deceased
12     person.
13     Q.  He was the COO of Exomos, correct?
14     A.  The COO that I know was Jim Miller.  Prior to that he could
15     have been.  He could have been.
16     Q.  He was in a managerial position with Exomos, correct?
17     A.  He was.  He was.
18     Q.  Now, if we could go back to that paragraph that we were
19     talking about, starts out with "Mr. Herve".
20                Mr. Herve, he confirmed that he's not claiming as part
21     of that monies because it forms part of the asset purchase
22     right?  That's what this says?
23     A.  That's what he said.
24     Q.  That's what Mr. Subair says?
25     A.  Yes.

                PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                    TRANSCRIPT PRODUCED BY COMPUTER

774

1    Q.  Goes on to say "the submarine is not completed, however all

2    the equipment related to it been procured by Seahorse Submarine

3    and shipping along with the sub.  The submarine will be

4    completed in Dubai and we would need to spend approximately

5    50,000 plus or minus for completing the outfitting work.

6    Interior works, external painting and purchasing a heavy duty

7    trailer for transportation.  As such we will capitalize this

8    submarine on Capex's 684 and not on the asset acquisition

9    agreement Capex 3800", correct?

10   A.  That's what the e-mail says, yes.

11   Q.  Now, let's go down to the next paragraph.  Or more to the

12   point on the Dominicana.  If you go down to the -- well, let's

13   read the whole thing for completeness.

14        "There was another single propulsion, electric only,

15   Discovery submarine, incomplete, brought to Dubai along with

16   assets for transportation.  This sub was being built by Seahorse

17   Submarine for an Italian customer and the client was on serious

18   breach of contract and in violation of US State Department.  As

19   such, the contract was terminated and appropriate legal actions

20   initiated.  As there is a violation of US State Department, at

21   no point the sub needed to be returned to the customer.  The

22   worst case scenario is refund of the advance payment of US

23   150,000, and this will be dealt by Seahorse Submarine with no

24   implication on Exomos.  The legal battle continues and Mr. Herve

25   is confident of winning the case.  This sub is now completed and

1    tested in Dubai.  The final adjustment works in progress and the

2    sub will be available soon for sale or for tourist operation.

3    We have to expend around 50,000 US to complete the outfitting

4    works, paintings, interior and purchasing a trailer."

5         That's the Tao Dominicana submarine, correct?

6    A.  That's what he's talking about. That's his view, by the way.

7    We did not agree with those statements.

8    Q.  You didn't agree at all with Sanil Subair's statements?

9    A.  No.

10   Q.  Now, I'm going to show  --

11        MR. CEDERBERG:  We're ready to proceed, Your Honor.

12   I'm still confused as to what is going to be done with the

13   document.  I'll make my objections at the appropriate time.

14        THE COURT:  I don't know what's going on.  I'm just

15   waiting for somebody to start talking.

16        MR. HESS:  I'm ready, Judge.  I was waiting for the

17   review.

18   BY MR. HESS:

19   Q.  So let's get back to what we initially started when we

20   turned around because we were waiting for documentation.

21        The Dubai World Corporation and all of its entities do

22   not have the authority to decide to proceed or to continue with

23   Security Judicial Authorities, right?

24   A.  That's correct.

25   Q.  And Dubai World Authorities, Dubai World Corporation and its

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   subsidiaries, they do not hold on to passports, correct?
2   A.  Yes.  My knowledge, yes.
3        MR. HESS:  Judge, at this time I would like to move
4   into evidence what's been marked as Defendant's Exhibit 1584.
5        MR. CEDERBERG:  Objection, Your Honor.
6        THE COURT:  All right.  What is your objection?
7        MR. HESS:  No foundation, authentication, improper.
8        THE COURT:  I haven't heard any foundation yet.  Do you
9   have some?
10       MR. HESS:  It's a party admission.  It's written by --
11       THE COURT:  I don't know that.  So you'll have to tell
12  me what it is.
13       MR. HESS:  I should give the Court a copy, shouldn't I.
14       THE COURT:  If you want me to look at it, yeah.  I'm
15  good but I'm not that good.
16       1584.  I think you better lay a foundation.  I don't
17  know who any of these people are except Mr. Jaubert.
18       MR. HESS:  I'll ask, Judge, again.
19  BY MR. HESS:
20  Q.  Mr. Simon Honeybone, again he was the CEO of Exomos who took
21  over for Mr. Jaubert, correct?
22  A.  That's correct.
23  Q.  And as you testified earlier, he was the CEO in July of
24  2007, correct?
25  A.  To that date, probably yes. I don't recall the date exactly.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

777

```
 1            THE COURT:  This is from Simon Honeybone on the letter
 2    head of Palm Marine, says he's the chief executive officer and
 3    it's to your client and the subject is Bert's letter and you say
 4    that this is an admission of a party opponent?
 5            MR. HESS:  Yes, Judge.  It's -- if I may, if you look,
 6    it's -- the top of it says it's directed to Mr. Jaubert and it
 7    says --
 8            THE COURT:  I know what it says, I read it.  I can read
 9    that.  Go ahead.
10            MR. CEDERBERG:  This is in 2007, Your Honor.  July 11.
11    And Exomos is in existence and is not from someone who is an
12    officer of Exomos.  And I understood this was going to be used
13    for impeachment and there's no foundation that this witness ever
14    saw this.
15            MR. HESS:  I'm seeking to introduce it into evidence,
16    Judge.
17            THE COURT:  Well, if they object -- it's not really
18    your turn to offer evidence so if they object, you got to wait
19    until your turn and we'll see.
20            MR. HESS:  I'll wait.
21    BY MR. HESS:
22    Q.  Now, it's also your testimony, not only does -- well, let's
23    be specific.  Dubai World does not have the authority, nor does
24    it ever take any legal proceedings against a person with the
25    Security Judicial Authorities, correct?
```

1    A.   Take legal proceedings?

2         MR. CEDERBERG:  Objection, Your Honor, incomplete

3    question.

4         THE COURT:  I don't know if it's incomplete or not, but

5    the witness seems to be understanding it so I'll let him try to

6    answer it.

7         THE WITNESS:  Take legal proceedings?  They may take

8    legal proceedings but they're not the authority to hold a

9    passport or to take any further actions in lieu of the

10   authority.

11   BY MR. HESS:

12   Q.   Security Judicial Authorities.

13   A.   No.  They don't take judicial authority.

14   Q.   And that includes Palm Marine who is which is?

15   A.   Includes any of them.

16   Q.   Any of the Dubai World corporations, correct?

17   A.   Yes.

18   Q.   Mr. Bert de Wijs?

19   A.   Bert de Wijs.

20   Q.   Bert, how do you say that?

21   A.   De Wijs.

22   Q.   Close as all ever get I think.

23        THE COURT:  Close.  Just call him something else.

24   BY MR. HESS:

25   Q.   Mr. Bert, you relied on his statements to you as you

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1   testified, in your conclusions that Mr. Jaubert participated in

2   misappropriation of fraud, correct?

3   A.   No, I relied on his report to find out the status of the

4   submarines and the issues that were facing the submarine

5   productions.  One of the report that I had to rely on.

6   Q.   Well, you relied on that report to?

7   A.   Not totally.

8   Q.   To render your report, correct?

9   A.   Not totally, no.  There were other independent reports that

10  we relied on.

11  Q.   I'm not asking you if it was the only thing that you relied

12  on, but you certainly relied on his report as part of your basis

13  for concluding the misappropriation and fraud, correct?

14  A.   I'm not calling it misappropriation of fraud.  Again, we

15  were relying on his report and Lorenz, the report was written by

16  two people, by Bert and by Lorenz, and what -- we're trying to

17  find to prove a point that none of the submarines were workable.

18  None of them.  That was the essence or that was the purpose of

19  the report.

20  Q.   But you found his involvement credible enough?

21  A.   Yes.

22  Q.   And believable enough to rely on it?

23  A.   I do, because he was the general manager of Exomos.

24  Q.   And how was -- do you know how Mr. Bert's involvement and

25  association with Dubai World Corporations ended or terminated?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

780

 1              MR. CEDERBERG:  Objection, Your Honor, relevancy.

 2              THE COURT:  What is the relevance?

 3              MR. HESS:  They relied on his -- the relevance is that

 4      they choose to rely on him then, but later on they did nothing

 5      to rely on him.  And in fact, I don't want to say it in front of

 6      the jury, but I'll be happy to respond.

 7              THE COURT:  How do you know how Mr. Bert's involvement

 8      with Dubai World Corporation ended or terminated?  All right.

 9      I'll let him answer the question.  The question right now is do

10      you know?

11              THE WITNESS:  I knew that he was --

12              THE COURT:  Well, the question is yes or no, do you

13      know.

14              THE WITNESS:  Yes.

15              THE COURT:  Okay.  He does.  Now, the next question is

16      how, and you got to tell me why you think it's relevant.

17              MR. HESS:  Because they're picking and choosing when

18      they want to rely on a person and when they want to terminate a

19      person.

20              THE COURT:  Well, I don't know, but I don't really know

21      how you're going to show personal knowledge on this person's

22      part.  You haven't given the foundation to show that this person

23      has personal knowledge of anything.  I mean, I would think that

24      unless he was involved in the termination of Mr. Bert, that

25      whatever he's relying on is hearsay.  Wouldn't you say?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          MR. HESS:  Judge, on many things that he's relying on

2     is hearsay included in his report.

3          THE COURT:  That may be, but this one is one that's

4     been objected to and I have to rule on it, and it seems to me

5     that without any proper foundation, he doesn't have the ability

6     to testify to this.  So I will not let him answer that unless

7     you can show me a foundation.

8          MR. HESS:  I'll do it another way later, Judge.  Thank

9     you.

10         THE COURT:  All right.  Feel free.

11         MR. HESS:  Just look at my notes here and I'll move on

12    or I think I'm done.

13    BY MR. HESS:

14    Q.  This is my last inquiry.  Could we go back to Plaintiffs' in

15    evidence 135, page 250.

16         THE COURT:  Yes, we can.  That's your last question

17    then?

18         MR. HESS:  No, my last inquiry.

19         THE COURT:  Okay.  I thought that was your last

20    question and I answered it for you.  Okay?  I was hoping.  Go

21    ahead.

22         MR. HESS:  I try not to say last question, Judge.

23         THE COURT:  Okay.

24         MR. HESS:  Sorry everyone.

25         JUROR:  It's okay.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

782

1          THE COURT:  It's like the old Henny Youngman joke that

2     said a lawyer -- a guy asked his lawyer can I ask two questions

3     and the guy says what's your second one?

4          Go ahead.

5     BY MR. HESS:

6     Q.  When we go down to that last paragraph just before the

7     blacked out stuff, yes, Sanil Subair states that "the completed

8     sub", talking about that Discovery sub that was the subject of

9     the Tao Dominican a proceedings in Stuart, Florida, "the

10    completed sub is valued at 350,000 US and Mr. Herve have

11    confirmed that no claim will be made by Seahorse Submarine on

12    this sub.  However, he would need us to pay the legal expenses

13    estimated to be around 35,000.  As much our total expenses on

14    this sub would be 85,000 US", and then it continues on "as such,

15    we prefer to charge the additional expense and legal expenses on

16    the assets acquisition, Capex 3,800 and no additional Capex will

17    be raised for the submarine."

18         Can you make that out on that or do I need to get a

19    cleaner copy?  I'm using the Plaintiffs'.

20         In any event, you disagree with that the determination

21    made by Mr. Subair about that Mr. Jaubert would need Dubai World

22    or its corporations to pay the legal expenses?

23    A.  Yes, I do disagree.

24    Q.  Okay.  And you also disagree, I suppose, that on the

25    analysis that I just read about the cost benefit analysis of

783

```
 1    doing that?

 2    A.  Because I don't know how he derived these numbers.  I have

 3    no idea.  This is just an e-mail and he has to have facts to

 4    support these numbers.

 5    Q.  And you would have to go back to 2005 to determine that too,

 6    correct?  Because he wrote that e-mail as you can see on the

 7    top, Mr. Subair, wrote it 6-4-2005?

 8    A.  Obviously, yes.

 9    Q.  And you weren't even with the company then, were you?

10    A.  I'm sorry?

11    Q.  You were not with Dubai World in 2004?

12    A.  I was with Dubai World, yes.

13    Q.  But have no knowledge about the circumstances addressed in

14    this e-mail?

15    A.  Well, the e-mail that -- this e-mail I saw, yes and we were

16    just only looking at the costs that were mentioned in there in

17    one of the paragraphs.  You can see one, two, three, there are

18    three items here.  This is only used in this e-mail.  But we did

19    not agree with his view because he didn't have full knowledge

20    about when the assets were purchased from Mr. Jaubert and what

21    are the circumstances.  All he had read the contract that says

22    that Seahorse, or for that matter Dubai World, was not liable

23    for any liabilities, that the assets should be free and clear of

24    any liabilities.  That's the conclusion that we made and that's

25    how we came to our conclusions.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

784

1          MR. HESS:  Thank you.

2          THE WITNESS:  You're welcome.

3          THE COURT:  Redirect.

4                              REDIRECT EXAMINATION

5     BY MR. CEDERBERG:

6     Q.  Can you put that one back up?  For the record, this is

7     134-250.  And can you blow up the paragraph right after the one,

8     two and three?  Says here "Mr. Herve has confirmed that the

9     final payment of 78,000 and change will not be claimed as this

10    forms part of the asset acquisition agreement.  The submarine is

11    not completed."

12          This is the one that was purchased by Exomos, right?

13    A.  Yes.

14    Q.  "However, all the equipment related to it been procured by

15    Seahorse Submarine and shipped along with the sub.  The

16    submarine will be completed in Dubai and we would need to spend

17    approximately $50,000 for completing it"?

18    A.  That's correct.

19    Q.  Why does Dubai World have to pay any money, any extra monies

20    for a submarine it bought from Seahorse back when Mr. Jaubert

21    and Seahorse had no connection with Dubai world?

22    A.  That was our main contention, that the final payment was not

23    supposed to be paid.  The reason because it was not delivered,

24    and part of the delivery, the last payment has to be paid upon

25    delivery.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

785

1    Q.  Can you put up 976 which we showed Mr. Ramadan?  I

2    apologize, 977.  And show that top paragraph that was read?  The

3    second sentence says "now I have seen the drawings of the 360

4    degree steering POD 6 nozzle assembly, the development report of

5    the rebreathers was sent to me some weeks ago.  I also saw now

6    the bill for the development cost.  Now I have no doubts that we

7    received these items?"

8             Those would be the drawings?

9    A.  I can't make it out from this e-mail.

10   Q.  Can you tell from that whether it's the drawings or the

11   actual product?

12   A.  Well, as mentioned, it's talking about the drawing.

13   Q.  Okay.  And can we go to 976, the first page of this two page

14   document with two different exhibit numbers.  And can you blow

15   up the top of it?  Do you see the date May 22, 2007?

16   A.  Yes.

17   Q.  And is that before or after you completed your report?

18   A.  That was after.

19   Q.  So this would be information after you completed your

20   report?

21   A.  Yes.

22   Q.  When we talked about the Hummer at the beginning of your

23   cross-examination, if in fact the Hummer is Mr. Jaubert's

24   personal vehicle, did his contract allow that that Dubai World

25   had to pay for the shipping of the Hummer?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

786

1   A.  It wasn't -- nothing was mentioned in the contract that the

2   company has to pay for shipping of his personal belongings.

3   Q.  Now, we did see something that approved the payment, the

4   customs duties.  Are custom duties different than shipping costs

5   of putting the car on the boat and taking it across the

6   Atlantic?

7   A.  Yes.

8   Q.  So an approval of paying the custom duties is not an

9   approval of shipping?

10  A.  No.

11  Q.  And I also believe that you said there was some document --

12  that you saw another document by a woman named Randa?  Do you

13  remember that exchange of e-mails concerning the Hummer?

14  A.  Yes.

15  Q.  Can you put up 147.21-1?  147.27-1.  Can you blow up the

16  bottom of that?  The bottom half of that?  And put it up high so

17  the jurors can see it.

18       Okay.  And let's scroll down a little bit so they can

19  see the -- no, scroll down so we can see up above that.  Okay.

20       Payment toward customs duty of Hummer vehicle.

21  Mr. Herve Jean Jaubert.  Then it says verified Randa.  Is that

22  the document that you were referencing?

23  A.  Yes.

24  Q.  And the person who requested that payment was Mr. Jaubert

25  himself, right?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

787

1    A.  Yes.

2    Q.  Remember the examination that Mr. Hess went into about the

3    Tao Dominicana lawsuit?

4    A.  Yes.

5    Q.  And the payment of legal fees?

6    A.  Yes.

7    Q.  That somehow Exomos paid on behalf of Mr. Jaubert?

8    A.  Yes.

9    Q.  Those were paid to Mr. Hess, weren't they?

10   A.  Yes.

11   Q.  And Mr. Jaubert questioned you placing those legal fees as

12   personal legal fees of Mr. Jaubert?

13        MR. HESS:  Objection, leading.

14        THE COURT:  It is leading.  Ask a different question.

15   BY MR. CEDERBERG:

16   Q.  Okay.  May Exhibit 86 be placed up.  Can you go to page

17   three I believe it is.  And blow that up.  Okay.

18        See where it says personal legal fees?

19   A.  Yes.

20   Q.  You put that in an Herve column instead of an SSII column?

21   A.  Yes, sir.

22   Q.  And you mentioned in response to Mr. Hess' question that you

23   believe it was a lawsuit involving Mr. Jaubert personally?

24   A.  Yes.

25        MR. CEDERBERG:  May I approach?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

788

```
 1            THE COURT:  Yes, sir.
 2            MR. CEDERBERG:  Actually I'd offer 169.  I've conferred
 3    with counsel and there's no objection.
 4            THE COURT:  169?  Is that the number?
 5            MR. CEDERBERG:  Yes.
 6            THE COURT:  Hearing no objection, 169 is admitted in
 7    evidence.
 8            (Plaintiffs' 169 in evidence)
 9    BY MR. CEDERBERG:
10    Q.  Can you blow up the first half of that.  Okay.  Is this the
11    document you looked at?  Did you see as a defendant there, Herve
12    Jaubert individually?
13    A.  At that time I didn't see a legal document that came from US
14    courts.  I did not see that.
15    Q.  You referenced a document that you did see that Mr. Jaubert
16    was his lawsuit as well, right?
17    A.  There was communication between the ex-manager of Palm
18    Marine and Mr. Jaubert and there was another person.
19    Q.  Can we go to page five?
20            MR. HESS:  Judge, the witness has testified that he's
21    never looked at this document.
22            THE COURT:  Yes, and?  I mean, I think that you can ask
23    him questions, but I don't know what he can say about the
24    document that he's never seen.
25            MR. CEDERBERG:  On page five if we show Count III.  Do
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

789

1    you see this is a fraudulent misrepresentation listing

2    Mr. Jaubert as a defendant.  Did he ever tell you that?

3            THE WITNESS:  No.

4    BY MR. CEDERBERG:

5    Q.  With regard to the drawings concerning the rebreather that

6    we just showed -- and were drawings by Mr. Jaubert part of the

7    purchase and sale agreement of the assets of submarines,

8    Seahorse Submarines?

9    A.  Repeat the question please.

10   Q.  When Seahorse Submarines sold its assets and not its

11   liabilities to Exomos, did those assets included drawings,

12   whatever drawings or specifications?

13   A.  They were supposed to, yes.  It is stated in the contract.

14           MR. CEDERBERG:  May I have a moment?

15           THE COURT:  Yes, sir.

16           MR. CEDERBERG:  One second, Your Honor.

17           Nothing further, Your Honor.

18           THE COURT:  All right.  Thank you, sir.  You are

19   excused.

20           Please call your next witness.

21           MR. CEDERBERG:  Dubai World Plaintiffs call Phillip

22   Nuytten.

23           THE COURT:  Please remain standing, raise your right

24   hand.  Yes.  Up there.

25            PHILLIP NUYTTEN, PLAINTIFF WITNESS, SWORN.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          THE COURT:  Please be seated.  Tell us your full name

2     and spell it.

3          THE WITNESS:  My name is -- my formal name is Rene

4     Fuefil (ph) Nuytten, spelled N U Y T T E N, and I go by the name

5     of Phil.

6          THE COURT:  All right.  You may proceed, sir.

7                          DIRECT EXAMINATION

8     BY MR. URQUHART:

9     Q.   Dr. Nuytten, where do you live?

10    A.   I live in Vancouver, British Columbia, Canada.

11    Q.   Can you very briefly go through your business background

12    starting with your first business?

13    A.   My business is the field of undersea technology.  I started

14    quite young.  I started the first dive shop in Western Canada

15    when I was 15 years old.  I ran it after school and on weekends

16    and almost got a teenage ulcer as a result.  But I found there

17    was more to be made in diving and salvage rather than teaching

18    diving or selling equipment.

19          So when I got out of high school, I went into the

20    salvage diving and marine construction business.

21    Q.   Can I stop you there?  When you say salvage, diving and

22    marine, is this hard hat or scuba diving or both?

23    A.   Both.  I started out as a scuba diver, but scuba divers were

24    not trusted by the construction companies, they liked guys with

25    helmets, with hard hats, so I apprenticed with a hard hat diver

791

1    for one summer and took up hard hat diving, and some years later

2    I formed a company called Industrial Marine Divers.

3    Q.   What was the business of Industrial Marine Divers?

4    A.   Industrial Marine was all of the things that divers do.

5    Bridges, docks, dams, pipelines, cable crossings, working,

6    cutting marine, welding, blasting that sort of thing.

7    Q.   What did you do next?

8    A.   From there I was -- the first oil rig came into Canada in

9    the early 60s and I wanted to get the contract to dive on that

10   rig.  But that required a specialized type of diving called

11   oxy-helium, which is really a synthetic mixture of oxygen and

12   helium so you could dive very deep without experiencing what

13   they call rapture of the deep or nitrogen narcosis from

14   breathing air.  So there was very little expertise of that sort

15   in Canada.

16        So I went to California and hooked up a company in

17   California called California Divers.  I formed a company myself

18   called Canadian Divers, so Cal Dive, which is the shortened

19   version of California Divers and Cal Dive became sister

20   companies.  We won the first contract in Western Canada and we

21   were very successful in bidding other contracts for deep diving

22   in other parts of the world.

23        In 1968, myself and four other people did the first

24   ocean working dives to 600', which are old hat these days, but

25   boy, that was very deep in 1968.

1              In 1969, myself and my partner in Cal Dive formed a

2     company called Oceaneering International.  Oceaneering

3     International went on to become the largest underwater

4     technology company in the world.

5     Q.  What kind of stuff did they do?  What kind of work did that

6     company do?

7     A.  Oceaneering did everything undersea, primarily offshore oil

8     to start with in the Norwegian sector in the North Sea,

9     Australia.  We set up offices all over the world.  By the time

10    we had been in business about six years, we were operating in, I

11    think, about 30 countries and had about 4,000 employees.  It was

12    quite successful actually.

13    Q.  Would you mind standing up a second and show the jury your

14    tie?  What are those?

15    A.  These are --

16    Q.  What are those little things?

17    A.  These little things on here are the Newtsuit.  The Newtsuit

18    --

19    Q.  Is that a Monty Python thing?

20    A.  Looks like it, yeah.  A Newtsuit.

21             Our business in Oceaneering was, as I mentioned, oxygen

22    helium diving, breathing a synthetic mixture, a very dangerous

23    type of diving.  In the early days it was called bounce diving

24    where we would go down 600, 700' and do short bottom times, half

25    an hour, a little longer, then come back up that same day, the

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    same time at about seven, eight, 10 hours of decompression.

2         But later on we went into a mode called saturation

3    diving where you would spend eight or nine or 10 hours on the

4    bottom and then live under pressure.  So when you came back up,

5    instead of decompressing, you came back up raised in a diving

6    bell, made it on to a living chamber, and live under pressure

7    for periods of well up to a month.

8         At that time we were able to dive using that system

9    depths over a thousand feet, but the problem was there was all

10   kinds of residual, physiological hazards associated with

11   saturation diving.  Septic bone necrosis, changes in the central

12   nervous system from the direct exposure to pressure.

13   So I was a very much an advocate of a type of diving that had

14   been done before but not very well, not very successful.  And

15   that was called one atmosphere diving.

16        And that is where you wear an armored diving suit to

17   protect you from the pressure.  And make no mistake, the

18   pressure is the enemy.  It's not the darkness or the cold or

19   you're inability to breath water, it's the pressure.  And you're

20   exposure to the pressure, the gas dissolving in your blood under

21   high pressure, when you come back up, just like a shook up 7Up

22   bottle, it starts to bubble, causes the bends which I'm sure

23   you've heard of, decompression sickness and cripple you or kill

24   you.

25        So I thought the obvious way to go is to dive at one

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

794

1    atmosphere the same way we climb into jet aircraft, and go

2    around the world, the same way we go to the moon, taking our

3    pressure or temperature or atmosphere with us.

4          But the problem was it was very easy to dive, make a

5    steel ball with a window to look out of how but how do you work,

6    how do you get your arms out there and move against these

7    crushing pressures.  So they've been trying for the last 200

8    years to build a successful pressure suit that would hold out

9    the outside pressure but allow you to move your limbs, your legs

10   and your arms and open and close fingers or grippers and do work

11   without ever being exposed to pressure.  Because if you can do

12   that, then you can stay on the bottom all day and come straight

13   back up in five minutes from a thousand feet and not be subject

14   to decompression sickness or the bends.

15         So we were busy working a way at doing our regular

16   diving, saturation diving.  My partner in Canada by the name of

17   Norm McDonald, was burned to death in a decompression chamber

18   fire.  Terrible way to go.  He was decompressing in a surface

19   chamber and the entire interior chamber started to burn and he

20   burned to death in the chamber.

21         So right then and there I decided okay, I'm going to

22   dedicate myself to perfecting this type of atmospheric diving

23   suit.  So I started in the 1970s to figure out a way to make

24   this thing work and in 1985, I took a patent for what ultimately

25   became known as the Newtsuit.  That's what is on this tie.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

795

1   Q.  You're the Newt?

2   A.  Yeah, a take off on my last name.  So the Newtsuit was very

3   successful.

4   Q.  Can I interrupt you for a second?  What was your market for

5   the Newtsuit?

6   A.  The market was both commercial and military.  We use the

7   Newtsuits in the oil field, but the military became very

8   interested because they were using the same systems that we had

9   used, saturation diving, and they saw immediately the tremendous

10  potential for this type of suit.

11          For example, to be first on-scene at a submarine

12  sinking.  You can actually fly the suit out, dive to fairly

13  great depths and be there to check the hatches for clearance to

14  see what the damage was, arrange for salvage and to post-in

15  oxygen, medical supplies, food in the submarine.

16  Q.  Are they still be used to?

17  A.  Oh, yeah.  The Newtsuits are the standard deep dive

18  equipment for, I think, 12 navies right now.  12 navies

19  worldwide.

20  Q.  Including the US Navy?

21  A.  Including the US Navy.  So that got me interested in using

22  the suits for submarine rescue.  I thought that's one thing, the

23  suits get the sub ready to rescue, but what about the people

24  inside.  The ideal thing is to get them out.  So I embarked on a

25  whole campaign to develop an underwater submarine rescue system

1    which became known as the Remora, which is literally a

2    submersible that flies down and sucks on to the submarine and

3    you can make a transfer under pressure, so you can take the crew

4    out five or six at a time, bring them to the surface.

5         So we sold the first one of those.  I started a company

6    at that time called Hardsuits as a spin-off from my company Cal

7    Dive, and we sold the first system to the Australian Navy.  We

8    actually designed it for the US Navy, but they were going to

9    take three years to go through all the tests.  They were very

10   slow.  The Australians jumped on it, said they want it, so we

11   built them a rescue system.  Then finally the US Navy came to

12   the forearm and we built the standard submarine rescue system

13   for the US Navy and it's in use right now.

14   Q.   What was your next business?

15   A.   From there we went into the building of small submarines.

16   We've been using small work class submarines since the 60s.  And

17   I thought there was a way to build even better, deeper diving

18   subs, so I started to design and develop a submersible called

19   the Deep Worker 2000 series.  And this is a 2000 foot deep --

20   Q.   What is the name of this?  Is this the current business?

21   A.   The company was called Nuytco Research, and Nuytco was kind

22   of a company of Hard Suits and Cal Dive and a number of other

23   companies that I have.

24   Q.   What business do you currently own and operate?

25   A.   Well, sort of all of the above.  I operate Nuytco Research

1    which is a company that builds atmospheric diving suits and deep

2    diving submersibles.  I'm the controlling shareholder of a

3    company called Can-Dive Construction, which is the company I

4    started in 1966, Can-Dive, and a bunch of other small companies,

5    Sea Graphic Publishing, we publish a diving magazine, various so

6    ons and so ones like that.

7    Q.  Back to your Newtsuit, have you ever heard the time life

8    support system?

9    A.  Sure.

10   Q.  What does that mean?

11   A.  The life support system in the Newtsuit is all of the

12   internal plumbing that allows you to stay down.  The Newtsuit

13   has a life support of 72 hours.  So although you may only make a

14   five or six hour dive, if you were trapped, for instance, on the

15   bottom, you want to be able to stay -- the life support to be

16   long enough to allow rescue to come from outside.  And this is a

17   requirement of the classification agencies that the suits are

18   classed under.  They're the same as submersibles.  They're

19   classed as submersibles.  They call them submarines that you

20   wear, but the certification agencies class them as submersibles.

21   Q.  So this Newtsuit is literally classified as a submarine?

22   A.  Yes.

23   Q.  What does class mean?

24   A.  Well, when you design and build this deep diving equipment

25   for sale, it goes through a classification agency.  There's half

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

798

1    a dozen or more in the world, but there are four main ones.  In

2    the US it's the American Bureau of Shipping, shorten that to

3    ABS.  In the UK and part of Europe it's Lloyd's, Lloyd's of

4    London, Lloyd's Surveyors.  In other parts of Europe it's Det

5    Norske Veritas.

6         What that means is these are companies that are

7    inspectors, surveyors, and they make sure that the equipment

8    that's designed is designed and built --

9         MR. HESS:  Judge, I'll object.  This is going into

10   hearsay based testimony and, well, it's hearsay.

11        THE COURT:  Hearsay.  Let me see.  I don't know.  I

12   think it is a little much for preliminary.  Let's get to the

13   point.  Okay?  Get to the meat of it.  He does a lot of stuff

14   with diving people.  Move on.

15        MR. URQUHART:  He does.

16        THE COURT:  We got that.

17   BY MR. URQUHART:

18   Q.  All right.  Do you do anything in the entertainment

19   business?

20   A.  Sure.  Fair chunk of our business.

21   Q.  Can you tell us maybe something?

22   A.  25 up to -- depending on the year, but 25 to 30 percent of

23   our revenues are derived from the entertainment business.

24   Q.  Can you give us examples of two movies you work on?

25   A.  *Titanic*, *The Abyss*, *Sphere*, a whole bunch.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

799

1   Q.  What about the submarines in *The Abyss*?

2   A.  We built all the submarines that were in the movie *The*

3   *Abyss*.  I don't know if you saw it, but those are all our subs.

4   Q.  Have you ever heard of a gentleman named Jim Miller?

5   A.  Sure.

6   Q.  And who is Jim Miller?

7   A.  Jim Miller is a -- works for Dubai World or for the Sultan

8   Sulayem, I guess they call him, and they had -- I guess Jim's

9   job, I was never sure exactly what he did, but his job seemed to

10  be to second in command to the Sultan.

11  Q.  Did you ever work with Jim Miller?

12  A.  I worked with him very -- came close to working with him on

13  a project prior to going over to Dubai.  They were looking for a

14  designer for an undersea -- actually a dive shop they wanted to

15  have an undersea elevator involved with, and Jim had knew me

16  through several other mutual friends and came over to see me and

17  that's how I met him.

18  Q.  You ever heard of a company called Exomos?

19  A.  Yes, I have.

20  Q.  Did you -- and you said before you knew Mr. Miller worked

21  with Exomos?

22  A.  Yes, he worked with Exomos and told me a little bit about

23  what --

24          MR. HESS:  Objection, hearsay.

25          THE COURT:  I believe it is hearsay.  Don't tell us

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

800

1    what other people told you.

2            MR. URQUHART:  You can only say what you say, not what

3    they say.

4    BY MR. URQUHART:

5    Q.  Did Mr. Miller ever ask you to come to Dubai?

6    A.  Yes, he did.

7    Q.  And for what purpose?

8    A.  He wanted me to look at the submarines that were being built

9    at Exomos.

10   Q.  Did you come to Exomos?

11   A.  Yes, I did, in 2006.

12   Q.  Was that the connection with a major event?

13   A.  Yes, it was the Dubai Boat Show.

14   Q.  And while you were in Dubai for the Dubai Boat Show, did you

15   get a chance to visit the Exomos facility?

16   A.  Yes, I did.

17   Q.  And did you see the factory?

18   A.  Yes, I did.

19   Q.  What was your impression of the factory?

20   A.  I thought the factory was terrific, a beautiful building and

21   I was green with envy.  Twice the size of our facility.

22   Q.  And can you tell the jury what you saw there in the factory?

23   A.  Yeah.  There was a group of prototype submersibles that were

24   both in the water at the boat show and a bunch of older ones, I

25   guess also in the factory itself in storage.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

801

1    Q.  Were any of them like ready to be sold?

2    A.  My impression was that they were all pre-production

3    prototypes.

4    Q.  Did you meet Mr. Jaubert over there while you were in Dubai?

5    A.  Yes, I did.

6    Q.  And what did he say to you when he met you?

7    A.  Well, when I got there he said he was very pleased I was

8    there, he was honored to meet me, etcetera.  Showed me around,

9    him and Jim Miller showed me around the plant and pointed out

10   all the various things that they were in the process of doing.

11   Q.  Did he know about your background in submarines?

12   A.  Oh yes, I'm sure he did.

13   Q.  So are there any of the models there that stand out in your

14   mind?

15   A.  Well, the one that was certainly the most impressive was the

16   sub called Proteus, or a ship actually, commercial ship.

17   Q.  Okay.  Can you put up Exhibit 405 which we've agreed can be

18   admitted into evidence, both sides please.

19        THE COURT:  405?  Without objection, 405 is admitted in

20   evidence.  I don't have a 405.  When are you going to give me a

21   new exhibit list?  You gave to it somebody.  I'll find it.  I

22   see it.  No, that's 404.  I got so many little pieces of paper

23   this afternoon.  When we're done with that, you all come up and

24   fix this so I only have one list and it has everything that's in

25   and it has.  All the numbers that you're going to need okay?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          405 will go.

2          (Plaintiffs' 405 in evidence)

3    BY MR. URQUHART:

4    Q.  Is that the Proteus that you saw?

5    A.  Yes, it is.  Looking at the screen here, that's the one I

6    was onboard, very impressive looking beast.

7    Q.  Okay.  And did you have an occasion to speak with

8    Mr. Jaubert?

9    A.  I did.  One of the things I was a bit concerned about was

10   the pressurization of the cabin area.  And I said it's a huge

11   area, this sub, this vessel is designed to go on the surface and

12   then suddenly turn itself into a submarine and plunge beneath

13   the waves.  Rather than being a one atmosphere sub, which means

14   that like the Newtsuit, like we are in this room, that you stay

15   at one atmosphere, this submarine was designed to be pressurized

16   from internally to cut -- prevent its collapse, but by the

17   outside water pressure as you go down.

18          My concern is how are you going to flow that amount of

19   gas into this cabin to pressurize it, because as you see in the

20   where it says -- where does it say it?  Somewhere here, time to

21   submerge 60 seconds.  To pressure size that entire cabin in 60

22   seconds requires such an enormous flow of gas, that I couldn't

23   see how it was possible that you could pressurize it that

24   quickly.

25          And I asked Mr. Jaubert how do you do that.  I'm not

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

803

1    aware that you can do that.  And he said it's taken care of, and

2    that's something we'll talk about later.  And that later never

3    came.  So I never did find out how he planned to do that.

4    Q.  After you finished the tour of the facilities there, did you

5    have any discussions with anybody affiliated with Exomos?

6    A.  I talked to both -- Herve for a while, Mr. Jaubert, about

7    what the future would bring.  And I was really concerned.  The

8    more I thought about this business of the gas flows and whatnot,

9    and I started to think about the sort of physiological --

10        MR. HESS:  Objection, nonresponsive, Judge.

11        THE COURT:  Nonresponsive is usually an objection for

12   the person that asks the question.

13        MR. HESS:  I know, Judge.

14        THE COURT:  But it is genuinely a concern if you have a

15   situation where the person that's not responding is answering a

16   question that you might have objected to if the question had

17   been asked.  So tell me what your real objection is.  Not

18   nonresponsive.

19        MR. HESS:  Hearsay, unduly prejudicial.

20        THE COURT:  I think I'm not going to say that it's

21   hearsay, it was his determination based upon what he heard.  No,

22   I'll permit it.

23        MR. HESS:  Also narrative, Judge.

24        THE COURT:  I'll permit it.  It is a narrative answer

25   so cut it off and let him ask questions.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

804

```
 1              MR. URQUHART:  Yes, sir.
 2    BY MR. URQUHART:
 3    Q.  Did you ever speak with Mr. Miller shortly after your visit
 4    to the factory?
 5    A.  Yes, I did.  And I voiced my concerns to Mr. Miller.
 6    Q.  Can you tell us, tell the jury, what concerns you voiced to
 7    Mr. Miller?
 8    A.  I was concerned about the physical possibility of the vessel
 9    working at all in the manner in which it was designed, and my
10    second concern, after a lot of thinking about it, was the way it
11    was designed to function or its market.
12            So there were really two vessels in, I guess you call
13    it, in play.  One was this one you see here, Proteus, which was
14    a commercial vessel or designed to be a commercial vessel and
15    there was an almost identical vessel called the submarine or
16    submersible patrol vessel, SPV, which was virtually identical
17    but was a military model.
18            So I had concerns about two things to do with the
19    commercial end of it besides the gas flow situation and that was
20    how do you take ten, or more, untrained, unqualified observers,
21    put them in the cabin as it was designed to do as a tourist sub,
22    and then pressurize them.  You have no way of knowing whether
23    they can tolerate pressures, whether they can equalize their
24    ears.  Some might be elderly people.  So that was one big
25    concern.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

805

1           Another was the problem of diving to 60', for example,

2      and staying there for some period of time.

3      Q.   What was the problem there?

4      A.   Well, if you breath air under elevated pressure, it starts

5      to dissolve into your blood.  If you come straight back up

6      without decompression, you suffer caisson disease or the bends.

7      So the time that you can spend at 60', which is the rated depth

8      of this particular vessel is less than an hour before you have

9      to undergo decompression before you can come up.  That means you

10     have to undergo stage surfacing.  A vessel of this type is just

11     not possible to hold control in shallow depths of ten feet, 20'

12     of water with surge running possibly, waves, etcetera.  So there

13     is a real huge liability issue in terms of that.

14          Now, it's possible to breath a synthetic mixture much

15     like the oxy-helium I mentioned to start with, which is a

16     mixture of nitrogen, nitrox they call it, a high elevated

17     mixture of oxygen which will allow you to stay longer or stay

18     the same time without decompression, but it requires

19     qualification to do this.

20     And not everybody is qualified to breath these sorts of

21     mixtures.

22          But in the end, what it came down to was

23     classification.  How do you class such a thing.

24     Q.   Why did you view class or classification so important?

25     A.   Well, you can't get insurance unless the vessel --

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

806

1          MR. HESS:  Judge, objection, hearsay, beyond the scope

2     of the witness's capabilities.

3          THE COURT:  I don't know about that.  He hasn't told us

4     what anybody told him.  I think that he's in the business.  I

5     think that he's permitted to testify as to his experience.  I'll

6     overrule.

7     BY MR. URQUHART:

8     Q.  Have you ever sold -- have you ever manufactured any subs?

9     A.  Yes, I have.

10    Q.  Have you ever had any of your subs classed?

11    A.  All of them.

12    Q.  How many?

13    A.  Close to 100.

14    Q.  And what's the process by which somebody gets a sub or

15    classed?

16    A.  You start out with the material itself.  So the foundry that

17    pours the steel, take steel as an example, you track the batch

18    of steel right from the factory when it's poured out, rolled

19    into sheets which will be used to manufacture the sub.

20         A surveyor comes from whichever agency you're dealing

21    with, for many years we dealt with Lloyd Surveyors from London,

22    and they will come and take a sample of that batch of steel,

23    test in it a laboratory and if it meets specification, they then

24    stamp that sheet of steel or that number of sheets of steel.

25         Every time you cut a piece of the steel out to use it

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

807

1    anywhere in the submersible, you have to transfer both the batch

2    number and the stamp to the piece that you've cut, or if you cut

3    it out of the sheet, and you have a new stamp on the sheet.

4          The surveyors come at every stage of the fabrication

5    process right from the bare steel to the bending, the forming

6    hydraulically of the sheet steel, and the welding, that sort of

7    thing.  Then finally, they come and measure the roundness, the

8    sphericity if it's a sphere, and every stage of the process is

9    checked by the surveyor and a written report granted for each

10   one.

11         At the end of the day, when all of the -- you're in

12   compliance with all of the codes that are laid out, then you can

13   then apply for certification.

14         Now the codes -- there are, as I mentioned, a number of

15   certification agencies, but the code that they use is virtually

16   the same.  So some years ago the certification agencies got

17   together and decided that they would use one particular code.

18   This goes back about gosh, a decade and a half now.  And they

19   elected to use the American Society of Mechanical Engineers and

20   have them as the certifying agency or come up with the code that

21   said this is what you must comply with.  And so that code is

22   called PVHO, pressure vessels for human occupancy.  So excuse

23   me, I'm a little dry here,

24   Q.  Do you want some water?

25   A.  Just a second.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1     Q.   Yeah, don't die on me.

2     A.   Stuff must be very boring for the jury.  Makes me dry, I

3     imagine what it would make you like.

4          THE COURT:  We're past that stage.

5     BY  MR. URQUHART:

6     Q.   Can I show you this invoice?

7     A.   So they came up with a thing called PVHO, and that's the

8     code to which all these submersibles are built.

9     Q.   It sounds like you know an awful lot about this

10    classification.  Did you have anything to do with the standard

11    setting?

12    A.   Yes.  I'm on the Submersible Committee of the American

13    Bureau of Shipping, ABS, and so they're one of the -- in the

14    United States that is the leading classification agency.

15    Q.   Of the hundred or so subs that you had classed, were any of

16    them classed by the US Coast Guard?

17    A.   No.

18    Q.   When was the last time you ever heard of any sub being

19    classed by the US Coast Guard?

20    A.   Well, I've never heard of a sub being classed by the US

21    Coast Guard but...

22    Q.   That's fine.  Could you go back and describe to the jury

23    what's the difference like physiologically on a human being

24    between the one atmosphere and an ambient pressure submarine?

25    A.   Sure.  It's the difference between strolling on the beach

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

809

1    and being 100' down in scuba gear.

2          In a one atmosphere, you're at exactly the same

3    pressure inside the submarine, regardless of its depth, as you

4    are sitting in this room.  So you can go down to a thousand feet

5    or down to 35,000 feet, the bottom of the ocean, and you still

6    remain at one atmosphere.  So you can come straight back up

7    without any affects of having been to that pressure or coming

8    back from it.

9          In an ambient pressure sub, you are pressurize, even

10   though you may be in a dry capsule, you're pressurized to the

11   same pressure as the outside water.  So you have the same

12   physiological problems that you would have if you were immersed

13   in the water as a diver.

14   Q.  Can you -- so that -- am I correct then that somebody that's

15   in one of these are subject to the same physiological challenges

16   that a scuba diver would be?

17   A.  That's correct.

18   Q.  So would you think these have special dangers associated

19   with them?

20   A.  Well, yes.  They have special challenges associated with

21   them that you need to take into consideration.  Whether or not

22   those are something that you can overcome, of course is up to

23   the people that are manufacturing them and designing them.

24   Q.  Did you express any opinion to Mr. Miller about whether or

25   not you thought this Proteus was capable of doing what it said

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

810

1    it would do?

2    A.  Well, with sort of the unanswered questions with gas flow

3    and the other things I brought up, I said I really have a

4    concern that this may not be the way to go.  This thing may not

5    work.

6    Q.  And did you express any other concerns to Mr. Miller about

7    anything other than the Proteus?

8    A.  No.  The Proteus was the thing that I was most concerned

9    about.  There were several other subs that worked on exactly the

10   same principal, but several of them were much smaller and didn't

11   make claim to be able to dive so deep so quickly, so those could

12   be made to work.

13        Some of the smaller fiberglass ambient pressure subs

14   were very similar to the designs that appeared in Popular

15   Science, Popular Mechanics.

16   Q.  In the interest of letting these people go home, can I ask

17   you whether or not did you discuss the subject of class with

18   respect to any of these prototypes that you saw on the floor?

19   A.  Yes, I did.  I expressed to Jim Miller that I was quite sure

20   the prototypes they had could not be classed because they had

21   not been gone through the process of having all materials

22   certifications, all material testing, the final element

23   analysis, the calculations, all that sort of thing.  Jim wasn't

24   sure that was the case, but I asked if there were any drawings

25   and I said did you do any calculations, have you had any agency

811

1    involved, he said no, we have not.

2    Q.  You mentioned drawings.  Did these class agencies require

3    very detailed drawings?

4    A.  Oh, boy, do they ever.  It's like designing and building an

5    aircraft.  Right from the very start you have to have the

6    calculations, they have a thing before you start to build

7    anything with the classification agency, they have a thing

8    called plan approval, which means you must submit a plan, your

9    drawings, your calculations, everything that you believe you can

10   convince them that your submarine or your aircraft or whatever

11   it is is going to work, and it will function.

12        So you submit this plan approval, they look it over and

13   if they agree with your calculations and all that, then they say

14   okay, you have approval from us to go ahead.  But each step of

15   the way must be serialed.

16   Q.  So they're all over you all the time?

17   A.  Yes, they are.

18   Q.  How much money would one typically have to expend to get one

19   of your subs classed?

20   A.  The --

21        MR. HESS:  Objection, Your Honor, too broad,

22   speculation.

23        THE COURT:  No, I'll permit it.  You may cross-examine

24   on that.  You may answer.

25        THE WITNESS:  The initial classification cost to do

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    plan approval and the initial classification of a particular
2    model of sub is somewhere around $60,000.  Each subsequent model
3    of that particular one, as long as you don't change anything on
4    it, it stays the same, called serial certification and the price
5    drops down then to about 20,000, 25,000 depending on how many
6    visits are required by the surveyors.
7    BY MR. URQUHART:
8    Q.  By the way, did you ever see this Proteus dive?
9    A.  No.
10   Q.  Did you have the same issues with respect to class with
11   respect to Proteus?
12   A.  Yes.
13   Q.  Did there ever come a time that Mr. Miller visited your
14   facilities?
15   A.  Yes.  When I was in Dubai, I invited both Jim Miller and
16   Mr. Jaubert to come to Vancouver and see our facility and in
17   fact, invited Mr. Jaubert to dive in one of our submarines and
18   in April 2006, he said yes, they were coming over.
19   Q.  Did they?
20   A.  Yes, they did.
21   Q.  And what happened when they came over?
22   A.  They had a dive in our sub and judging by the comments
23   afterwards, they liked it very much.
24   Q.  Okay.  Did there ever come a time when Jill Miller returned?
25   A.  Yes.  He came back with the Sultan a month or so later.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

813

1    Q.  Can I back up?

2         Had Mr. Jaubert ever been in a one atmosphere submarine

3    before?

4    A.  Not that I'm aware of, no.  I think this was the first time

5    he had ever actually been in a one atmosphere sub.

6    Q.  So there did come a time when Sultan and Jim Miller came and

7    visited your facility?

8    A.  Yeah, I think that was a month or two months later.

9    Q.  Did he call you in advance?

10   A.  Yes, he did.  He said he would be in Vancouver and could

11   they see us.

12   Q.  Did he tell you why he wanted to see you?

13   A.  Yes, he did.

14        MR. HESS:  Objection, hearsay.

15        THE COURT:  Sustained.

16   BY MR. URQUHART:

17   Q.  Did they in fact come?

18   A.  Yes, they came to Vancouver.  I would guess it was April,

19   May, probably June, something like that.  2006.

20   Q.  Do you have any recollection of what you said to them while

21   you were there?

22   A.  Yes.  I expressed the same concerns that I had expressed to

23   Jim Miller and said at that time I was told -- actually, I'm

24   sorry.  I just jumped back.  While in Dubai I was told that --

25        MR. HESS:  Objection, hearsay.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1      MR. URQUHART:  Can't talk about what other people say.

2   BY MR. URQUHART:

3   Q.  Just tell your us your own experience, but not what other

4   people said.  You can talk all you want about what you said.

5   A.  All right.  It's going to be difficult because how would I

6   know?  I was under the impression --

7      THE COURT:  You can say that you talked to someone and

8   after you talked to them you did this.

9      THE WITNESS:  Okay.  I talked to someone.

10      THE COURT:  No, you can tell us who you talked to.

11      THE WITNESS:  Okay.  I talked to Jim Miller.

12      THE COURT:  And after you talked to him, what did you

13   do?

14      THE WITNESS:  After I talked to him, I was then aware

15   that --

16      THE COURT:  Don't tell me what you were aware of.  What

17   did you do?  You can tell us what you did.  But you can't tell

18   us what you became aware of because that's the same thing as

19   telling us what he said.

20      THE WITNESS:  Okay.  I'll try hard.

21      I then said to Jim Miller and Sultan, the

22   submarines that you're planning to sell to the Indonesian

23   government may not work and I think you would be extremely

24   embarrassed if they don't, so you might want to have a real

25   close look at them before you go any further.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
 1    BY MR. URQUHART:

 2    Q.  Did you tell them anything about classification issues?

 3    A.  I told them about all the issues I mentioned that I brought

 4    up before, the classification issue, the physiological problems,

 5    the gas flow problems, all that sort of stuff.  I reiterated

 6    those and I told the Sultan at this point, because Miller

 7    already knew why these were such an issue.  He asked me if --

 8             MR. HESS:  Objection, hearsay.

 9             THE COURT:  Well, depends on what it is.  It might not

10    be at all.  I don't know what it is.  You know, you prepared

11    him.  You're the one that might know what he's going to say, so

12    I don't know if it's hearsay, but if it is something that's

13    being told for its truth, move on to something else.

14             MR. URQUHART:  I am.

15    BY MR. URQUHART:

16    Q.  Did you talk at all about the viability of the Exomos

17    business under -- with the current problem?

18    A.  Yes, I did.

19    Q.  What did you say to them?

20    A.  I said to them what you really need is a line of already

21    classed subs to prove the validity of -- at least have some

22    valid classified product that you can sell while you are

23    building these other things or experimenting with them or

24    getting them to the point where they can be classed.

25    Q.  Why did you say that?
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

816

1    A.  Because that was the only thing that made any business sense

2    in my mind.

3    Q.  Okay.  And did you have any other discussions with the

4    Sultan and Jim Miller?

5    A.  Yes, I did.  They asked if I would be interested in selling

6    my company, my line of submarines to Exomos.  And I said sure.

7    Q.  And did you in fact actually have negotiations?

8    A.  Yes, we did.

9    Q.  And did they culminate in a deal?

10   A.  No, they did not.

11   Q.  Why not?

12   A.  Because --

13        MR. HESS:  Objection, calls for a hearsay response.

14        THE COURT:  Calls for hearsay for him to say why he

15   didn't go through with the deal?  I don't think so.

16        MR. HESS:  Well I believe it's going to, Judge.

17        THE COURT:  Well, I don't know.

18        MR. HESS:  I'll stand when it's time.

19        THE COURT:  I think I can tell you why I didn't do

20   something without relating what somebody else said.  Why didn't

21   the deal go through?

22        THE WITNESS:  Because part of the deal was they, at the

23   last minute, they decided that they wanted --

24        MR. HESS:  Objection hearsay, "they".

25        THE COURT:  Well, wait a minute.  Why do we care if

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

817

1    it's true?  It's not for its truth, it's for whether it was said

2    or not.  I'll permit it, it's not hearsay, it's nonhearsay.

3         THE WITNESS:  They wanted me, as part of the deal, to

4    move to Dubai.  I had no intention of moving to Dubai, the deal

5    fell through.

6    BY MR. URQUHART:

7    Q.  And that was the end of it?

8    A.  That was the end of it.

9    Q.  Did you see -- when you were at the Exomos shipyard, did you

10   see a model called Nautilus?

11   A.  Yes, I did.

12   Q.  And did you get to look inside it?

13   A.  Yes.  It was actually a gorgeous thing on the outside, very

14   much, very Walt Disney looking, but I had a chance to look

15   inside and it was obviously completely unfinished inside, so I

16   was not able to form any impression as to its function.

17   Q.  Last question.  Have you won any awards for your work with

18   undersea work?

19   A.  Yes.

20   Q.  Can you give us a list?

21        THE COURT:  Wasn't the last question.  You lied.

22        MR. URQUHART:  Got me.

23        THE COURT:  We could hope, but it wasn't the last

24   question.  Okay.

25   BY MR. URQUHART:

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

818

1  Q.  How many awards have you received approximately?

2  A.  I have no idea.

3  Q.  More than 50?

4  A.  Dozens.

5  Q.  What's that little button or pin?

6  A.  This is the Order of British Columbia, it's the highest

7  award in my whole province in Canada for undersea technology and

8  contributions to the field of submarine safety, that sort of

9  thing.

10 Q.  Have you been inducted into any halls of fame?

11 A.  Yes.

12 Q.  Which ones?

13 A.  All of them.  All of the underwater ones, I should say.  All

14 of them.  I'm sorry about that.  I'd love to be in the Rock &

15 Roll Hall of Fame, but I'm not.

16 Q.  All the ones that pertain to undersea.

17         THE COURT:  Underwater, yes.

18         THE WITNESS:  There are only three of them in North

19 America and I've been inducted in all of them.

20 BY MR. URQUHART:

21 Q.  Including the one where I saw the bust of your head?

22 A.  The granite statute, yes.

23         MR. URQUHART:  Thank you, Your Honor.

24         THE COURT:  Thank you, sir.  You may proceed with

25 cross-examination.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

819

```
 1                       CROSS-EXAMINATION
 2   BY MR. HESS:
 3   Q.  Good afternoon, Dr. Nuytten.  You never saw the Proteus
 4   dive, correct?
 5   A.  No.
 6   Q.  You're aware it did dive, right?
 7   A.  I'm aware it was hung on a crane.  I don't believe it ever
 8   dove free.
 9   Q.  Hung on a crane.  What I'm saying is you're aware it
10   submerged, correct?
11   A.  I wasn't there.  I'm told that is so, that may be hearsay.
12   Q.  I should quit right now.
13           THE COURT:  Thank you.  You're done.
14   BY MR. HESS:
15   Q.  Let's talk about the submarines that your various companies
16   build.  Is it one company that builds the subs?
17   A.  Yes, that's right.  Nuytco Research.
18   Q.  And they are, as you addressed, they're steel hulled
19   submarines, correct?
20   A.  Various metals, steel, aluminum, titanium, but all rigid
21   hulls.
22   Q.  The rigid hulls is because it's necessary to have steel or
23   metal hulls because of the tremendous pressures they're
24   subjected to with depth, correct?
25   A.  If you want to maintain one atmosphere inside, yes.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

820

1   Q.   And if you don't, if it didn't maintain the one atmosphere
2   and the hull wasn't rigid enough for the depth, what would
3   happen?
4   A.   It would collapse and you would be crushed.
5   Q.   Because the air inside can't hold the hull in a rigid
6   position, correct, at that depth?
7   A.   The air inside, yes.  Because the air inside is lesser than
8   the outside pressure.
9   Q.   And you mentioned the entity BBHO?  Is it PVHO?
10  A.   PVHO, yes.  Pressure vessels for human occupancy.
11  Q.   These are pressure rigid hull vessels, correct?
12  A.   They aren't necessarily rigid, no.  They could be made of
13  rubber for that matter.  If they're pressure hulls that
14  withstood internal pressure as well as external pressure.
15  Q.   So works both ways?
16  A.   Yeah, works both ways.
17  Q.   And now the submarines that -- you build everything from a
18  one person submarine to -- well, you build one person?
19  A.   We build one person up to five person.
20  Q.   They're all metal hull, rigid hull, correct?
21  A.   Correct.
22  Q.   What are the cost -- let's start with your single person
23  submarine.  What is the cost of that retail?
24  A.   The cost varies from sort of the bare bones certified sub
25  ready to dive, but with no options, up to one fully loaded.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

821

1    Range between 750,000 and 900,000.

2    Q.   That's a one person sub?

3    A.   That's a one person 2,000' deep water.

4    Q.   These submarines, are they heavy?

5    A.   Yes relatively speaking.  The submarine DeepWorker weighs

6    about two tons, 4,000 pounds.

7    Q.   These submarines you call the DeepWorker?

8    A.   Yes.

9    Q.   I would imagine because of the name they're designed to

10   conduct work at depth?

11   A.   Yes.  The single person subs are designed to conduct work,

12   do surveys, do scientific work.

13   Q.   How deep do these subs go?

14   A.   The DeepWorkers are rated for two thousand feet.

15   Q.   And when you say they're rated for two thousand feet, does

16   that mean that is the typical depth that they're operated at?

17   A.   Yes.

18   Q.   They can't go any deeper than that?

19   A.   They can go deeper because they have 100 percent safety

20   factor because they're designed collapse is four thousand feet,

21   100 percent deeper than their working depth.

22   Q.   And the way the subs operate the depth is that -- are these

23   submarines that you design, let's stick with the single person

24   sub, is it particularly designed to -- for a condition of 30

25   feet or less?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.   It can be.  They can use it in water just over the top of

2    dome if you wish.

3    Q.   The next classification or next size of sub that you

4    designed and build, what is that?

5    A.   That's the Dual DeepWorker, which is a two person sub.

6    Q.   And what is the cost range for that Dual DeepWorker?

7    A.   Not quite double the single, about $1.2 million, $1.3

8    million depending on the fit.

9    Q.   That's for the bare bones and then all the way to what?

10   A.   To that number.  You're only adding a second hull to an

11   already existent single submarine section.

12   Q.   So regardless of the configuration, somebody can walk into

13   your showroom or you can purchase a Dual DeepWorker for $1.2

14   million?

15   A.   1.2 to 1.3 three, yes.

16   Q.   And then is there another size of submarine that your

17   company builds?

18   A.   Yes, there is.  There's the Aquarius style which is a three

19   person sub.

20   Q.   And the cost of the Aquarius, what is the range of that

21   cost?

22   A.   About 1.5 to 1.6.

23   Q.   How many -- before I -- is there -- what's the largest sub

24   that you build?

25   A.   Five person.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.   And let's talk about the five person.  What is the range of

2    cost for the five person?

3    A.   Not much more because it's just an extension of the three

4    person, so it's about 1.7.

5    Q.   And do you have -- do you license the opportunity for people

6    to build your submarines?

7    A.   We have.  We don't at present, but we have done it in the

8    past.

9    Q.   What is the cost of the licensing that you charged in the

10   past?

11   A.   We've done usually a joint venture deal where we take an

12   equity position in the company that's producing.

13   Q.   So there's no upfront charge?

14   A.   We provide them with our expertise and we cover half of the

15   cost of building and we take half of the profits.

16   Q.   And when you say half the cost of building, does it depend

17   on how the facility is?  Do you build a facility to build these

18   things?

19   A.   Not usually.  Usually it's an existing facility that you can

20   simply move the machine into and go over there.

21        I should mention, a lot of this work is farmed out so

22   we use specialty companies to do, for instance, the welding, all

23   that sort of stuff.  We don't do that in-house.  We have a

24   specialty company that does it.  Each one of these companies is

25   certified by the classification agency to do that work.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

824

1    Q.  And these hulls are particularly -- well, they're designed

2    to go down to -- I think you said all of the submarines are

3    designed to go down maximum depth 4,000?

4    A.  No.  Well, 4,000 collapse depth, but the working depth is

5    2,000.  Now the larger submarines, the five person whatnot, are

6    1,000' rated.

7    Q.  Okay.  And that's the collapse depth or is that the --

8    A.  No, that's the rated depth.  Rated depth is the working

9    depth.  The collapse depth is double the working depth.

10   Q.  Always.  Okay.  Now when you build these metal hulled

11   submarines what is the process?  I mean, you get sheet metal

12   from someone?

13   A.  That's right.

14   Q.  And you form it at your factory?

15   A.  No, we form it at a hydraulic forming plants, again

16   certified by the agency.

17   Q.  What is that process of these -- can you walk the jury

18   through, and just briefly, you know, how you manufacture a

19   submarine?  Did you bring a picture of one of your submarines

20   to?

21   A.  There may be -- yeah, there's one in the back on the

22   magazine that --

23        MR. URQUHART:  May I approach, Your Honor?

24        THE COURT:  I don't know.  Do you want to see that?

25        MR. HESS:  I was hoping for a bigger, better picture

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    but that's small.  I'll find another one.

2            THE COURT:  Put it down then.  That's it.  Set it down.

3            MR. HESS:  I'll find another one.

4            THE COURT:  Keep working, keep asking.

5            THE WITNESS:  You take the flat metal.  If you're going

6    to make a cylindrical sub you have to roll the metal into a

7    tube.  So you roll one section of the metal into a tube, this is

8    done on a set of hydraulic rollers, just like an old fashioned

9    washing machine ringer, you run the thing in.  It rolls it

10   around a huge tube, brings it out, then that seam is welded.

11   BY MR. HESS:

12   Q.  I'm sorry.  Can I stop you right there?  I'm going to try to

13   speed it up.

14           The welding is particularly important because it's --

15   again, these are high heavy -- high pressure subs, so that weld

16   seam has to maintain its integrity, correct?

17   A.  That's correct.

18   Q.  Because it's always the weakest link, particularly?

19   A.  No, it's not.

20   Q.  It's not.  So why is the weld important then?

21   A.  Because without it --

22   Q.  I didn't say that the weld was the weakest link, but it's

23   important that the weld is appropriate and strong because

24   otherwise if it's failed there, the sub loses its integrity,

25   correct?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.  Well, if it fails anywhere it loses its integrity.  But the

2    welding process is the one you pay a lot of attention to to make

3    sure that when you're finished, it's no less integral that any

4    of the rest of the hull.

5    Q.  And there's a particular concern with the deep water subs

6    because these are rated at two thousand feet or meters, feet?

7    A.  Well, depending on which model it is, the 2000' are rated to

8    work at 2000 feet, the 1000 subs are rated at 1000 feet.

9    Q.  You can't just leave at depth, at two thousand feet, you

10   can't leave a submarine of your type and swim to the surface

11   without one of your NewtSuits?

12   A.  No.  That's correct.

13   Q.  Okay.  Was there a number that was being discussed when you

14   were talking with Dubai World about producing your submarines

15   there?

16   A.  Well, I was talking about selling them the whole line.  Yes,

17   there was a number.

18   Q.  What was that number?

19   A.  $10 million.

20   Q.  And selling the whole line, you mean the licensing ability?

21   A.  Yes.  Giving them the ability to produce that particular

22   line of subs in Dubai.

23   Q.  And did you -- was it contemplated that you were going to

24   use local workers to do that?

25   A.  Yes.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.  And you were comfortable with the quality, obtaining the

2    quality -- strike that.  Withdraw that.

3         You were told by Dubai World that they could accomplish

4    providing the work force of a quality necessary to manufacture

5    your submersibles, correct?

6    A.  No, what we said was we would train them in the assembly and

7    we would, if necessary, bring in whatever trained, skilled

8    workers were required to meet the certification agency

9    requirement.  If they could do it in Dubai, that's fine.  If

10   they couldn't, then we would bring them here.

11   Q.  Jim Miller never told you that -- as to the Indonesian deal,

12   he never told you that it fell through because of financing with

13   the Indonesian side of things?

14   A.  No, he did not.

15   Q.  He never told you that the Indonesians were on a no-sell

16   list?

17   A.  No.

18   Q.  Now, when you went to -- you're invited to Dubai to

19   participate -- were you invited to Dubai to participate in the

20   boat show?

21   A.  I was invited to Dubai to come and look at Exomos.  Boat

22   show happen to be on at the same time.

23   Q.  Did you do any marketing for your company while you were

24   there at the boat show?

25   A.  No.

828

1    Q.   How long did you spend in Dubai at that time?

2    A.   Four days.

3    Q.   Have you been there since?

4    A.   Yes, many times.  Well, not many times, I've been there to

5    Dubai and Abu Dhabi three times since then.

6    Q.   During the period of time that Exomos was in existence, how

7    many times did you go?

8    A.   Just that one.

9    Q.   So the only time that you saw the Exomos facility or the

10   Exomos produced boats or Mr. Jaubert in his plant was that one

11   time at the boat show?

12   A.   That's correct.

13   Q.   And you saw him subsequent to that when he visited you?

14   A.   Yes.

15   Q.   And you gave him the opportunity to man one of your one

16   person submersibles, correct?

17   A.   That is correct.

18   Q.   Did Mr. Miller also man one of the one persons?

19   A.   Yes.

20   Q.   You recognize that you are in the submarine community,

21   you're well known, correct?

22   A.   Yes.

23   Q.   And you understand that with that well knowing aspect, you

24   understand that your notoriety in that field, well, it's

25   important to you, correct?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

829

1   A.  I would prefer fame rather than notoriety.

2   Q.  Fame.  Your fame.

3   A.  Yes.  Of course, it's important.

4   Q.  Because you have a credibility aspect to it, correct?

5   A.  Yeah, but that was -- you know, the credibility aspect was

6   passed a long, long time ago.  Decades ago.

7   Q.  So you're not careful about, you know, who you're seen with

8   or what submersibles you're seen with or you're not concerned

9   about that?

10  A.  Seen with?

11  Q.  Yeah.

12  A.  The thought has never entered my mind particularly.

13  Q.  Well, most of my questions are bad, but the end of the day

14  it's particularly bad.

15       What I'm saying is that when you pose for a photograph

16  in front of a submersible, you don't have any concerns about,

17  you know, what the public perception is?

18  A.  Not particularly, no.

19  Q.  And not even any concerns about the commercial perception?

20  A.  Are you saying that my posing in front of a submersible

21  causes my endorsement of that submersible?

22  Q.  I'm not saying that, but that never enters into your mind?

23  A.  That didn't at the particular time you're referring to, no.

24  Q.  What particular time are you referring to?

25  A.  I presume you're going to show something at the boat show.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

830

1    That's what originally started this line of questioning on.

2    Q.  Are you presuming that or -- you did have an opportunity to

3    meet with counsel for Dubai World, right?

4    A.  Yes.

5    Q.  And you met with them prior to your testimony today,

6    correct?

7    A.  That's correct.

8    Q.  And you met with them to discuss your testimony today,

9    correct?

10   A.  Not discuss it.  I was curious to know what the protocol

11   was.  Shirt and tie, no shirt and tie, is there anything that,

12   you know, that is important for me to know about this particular

13   session, that sort of thing.

14   Q.  So your testimony is is that none of the Dubai World lawyers

15   from the time, well any time including recently, had a

16   conversation with you about the kind of things you can expect to

17   be asked?

18   A.  Oh yes, absolutely.

19   Q.  And they told you what they were going to ask you, correct?

20   A.  They went along the line of their questioning, yes.

21   They had no idea what you were going to ask me.

22   Q.  Nobody knows what I'm going to ask.

23   A.  That's right.

24   Q.  I will show you though a picture though, yes.

25              MR. HESS:  Judge, at this time without objection, I'm

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

831

1    seeking to enter into evidence what's been marked as Defendant's

2    Exhibit 923.36.

3              THE COURT:  923.36?  Without objection.

4              MR. HESS:  It will have to be added to that list, one

5    of those things that we're going to put on here.

6              THE COURT:  923.36.

7              THE WITNESS:  I haven't seen it.

8              THE COURT:  In evidence.

9              (Defendant's 923.36)

10             MR. HESS:  I'm going to show you.  I just want to make

11   sure that I give the jury an opportunity to see it also.  I'm

12   going to publish that to the jury at this time.  I think they've

13   seen a picture.

14   BY MR. HESS:

15   Q.  Now, that's the time you were speaking of, correct?

16   A.  That is the time I'm speaking of.

17   Q.  What were you told about the Nautilus -- strike that.

18             There was nothing inside the Nautilus when you looked

19   in it at that time?

20   A.  There was some accommodations for seats, that sort of stuff,

21   but was obviously unfinished.

22   Q.  And you didn't then take an opportunity to go inside and

23   inspect the interior?

24   A.  No, I did not.

25   Q.  During your four days there when you had the opportunity to

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

832

1    speak with Mr. Jaubert about your various concerns, what were

2    you doing other than, you know, speaking with Mr. Jaubert?

3    A.   Doing the tourist things, going to the boat show, going to

4    the old marketplace, that sort of thing.

5    Q.   Keeping busy?

6    A.   Yes.

7    Q.   There did come a time -- well, you published a magazine,

8    publish -- I believe, yes, you published the magazine Diver,

9    correct?

10   A.   That's correct.

11   Q.   And it has been marked as Defense Exhibit 941 I believe.

12            MR. URQUHART:   No objection.

13   BY MR. HESS:

14   Q.   How did it come about that --

15            MR. HESS:   Again, Judge, I'm seeking to introduce into

16   evidence what has been previously marked defense Exhibit 941

17   without objection.

18            THE COURT:   941.

19            MR. HESS:   Thank you, Judge.

20            THE COURT:   Without objection is admitted in evidence.

21            (Defense 941 in evidence)

22   BY MR. HESS:

23   Q.   And the text and the photography was yours, correct?

24   A.   That's correct.

25   Q.   How did it come about -- well, you're the publisher of the

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

833

1    magazine so you found it to be of sufficient interest to publish

2    the article, correct?

3    A.   Yes.

4    Q.   And what did you do to investigate -- and you wrote the

5    article, correct?

6    A.   That's correct.

7    Q.   And it was your intention to be truthful and accurate in

8    what you wrote in the article, correct?

9    A.   It is my intention to show Exomos in a favorable light

10   because I thought it was a very good thing that they were

11   building submarines in Dubai, and that any problems that they

12   might have, they certainly would iron out before they ever

13   released a submarine on the market.

14   Q.   So you were comfortable that whatever problems you perceived

15   they were going to be ironed out?

16   A.   I would expect they would have to be, otherwise they

17   wouldn't be able to release any of the submarines.

18   Q.   And at the time you were visiting, you just said -- you told

19   the jury that at the time you visited, you had these serious

20   concerns about the Proteus, right?

21   A.   That's correct.

22   Q.   In fact, you couldn't understand how it is that they could

23   overcome those challenges, right?

24   A.   Well, I asked Mr. Jaubert and I never got an answer.

25   Q.   Right.  So -- and you never got that answer, right?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

834

1    A.   That's correct.

2    Q.   So to this day you have those concerns, right?

3    A.   No, to this day I don't know how they plan to do it.

4    Q.   Right.  So certainly at the boat show at the time of writing

5    your article shopping for a sub that appears in your magazine,

6    you had real concerns about the viability of the Proteus' plan

7    and design?

8    A.   I had real concerns about the prototype and I presume that

9    if the prototype could not be made to work, it would never be

10   released to the public.

11   Q.   And what is your -- and so when you wrote in the Diver

12   Magazine where you said that -- you did say, let me put it on

13   the page, I think it's the second page of that article, and it

14   does -- the pictures are way better in the magazine, it is in

15   color, and the jury will have an opportunity to see that I'm

16   sure, the --

17   A.   I'm sorry.  I can't read that, but if you could relay it to

18   me.

19   Q.   I will.  It says "Proteus is pretty darned spectacular.

20   It's 65' long, 20', six meter beam and displacing at 45 tons".

21        And when you say displacing 45 tons, what does that

22   mean?

23   A.   That means that's the displacement of the ship's hull.

24   Q.   It doesn't weigh 45 tons?

25   A.   It may.

835

1    Q.  But not necessarily?

2    A.  Not necessarily.

3    Q.  The weight of your submersibles, when you say it's a two ton

4    vessel, is that what you said?

5    A.  Two ton, 4,000 pounds.  It weighs 4,000 pounds in air.

6    Weighs nothing in the water of course.

7    Q.  And goes on, says "displacing 45 tons, this submarine yacht

8    travels at 25 knots, well-surfaced and looks like a far-out

9    designer yacht.  But, and this is a big but, Proteus can totally

10   submerge in about 60 seconds with a central masking depth and

11   depth of 60', 18 meters.  There, or shallower, it can proceed at

12   a respectable speed of five knots, for up to 50 nautical miles.

13   Diver columnist Don Walsh and I crawled all over this baby.

14   Proteus is set up to carry up to 14 scuba divers on the forward

15   aft decks.  The divers breathe from a built-in breathing system

16   but wear the usual self-contained air gear or even rebreathers."

17           Can you explain what is a rebreathers?

18   A.  Rebreather is a recirculating gas system much like that used

19   by astronauts.  Normal scuba, every time you take a breath, your

20   exhalation is vented into the water, hence the bubbles.

21   Rebreather has no bubbles.  It circulates the gas.  The oxygen

22   that you metabolize is made up by a fresh injection of oxygen,

23   the $Co_2$ that you produce as a result of metabolizing the oxygen

24   is absorbed by a chemical, lithium hydroxide or various forms of

25   soda light.

836

1  Q.  What is the benefit of a rebreather, typically as a diver?

2  A.  It has a longer duration for a given size set than an air

3  lung.

4  Q.  But the cost is significantly more?

5  A.  Significantly higher.

6  Q.  What does a rebreather -- do you have any understanding of

7  what a rebreather costs.

8  Q.  Sure?

9  A.  What does a rebreather cost?

10 A.  Depends on the make, model and duration.  Anything from a

11 low of about 3,000, $4,000 up to a high of about 10,000.

12 Q.  "In this way, they may leave the vessel, examine areas of

13 interest, return to the vessel and proceed to the next stop or

14 surface.  Inside the cabin, up to eight passengers can enjoy the

15 underwater view through a series of large windows while

16 remaining dry and comfortable in their street clothes.  The dry

17 cabin is automatically pressured to match the outside or ambient

18 pressure, so there's little or no stress on the hull or windows.

19 Since there is no differential pressure."

20          Which isn't true in your subs, correct?

21 A.  That's correct.

22 Q.  "True, both the scuba divers and the cabin inhabitants are

23 subjected to the same physiological requirements, you have to

24 clear your ears on descent and breathe naturally on a quick

25 ascent, and you can't overstay your bottom times without

837

1   decompressing, but what a hell of a way to go for a dive".

2          Those are your words, right?

3   A.  Yes, for the divers.  Not certainly for the people in the

4   cabin.  They're not going tor a dive.

5   Q.  You mentioned you got all these problems clearing your ears

6   and all the stresses.  Have you ever been on a roller coaster

7   ride?

8   A.  Have I ever been?  Yes, of course.

9   Q.  You have the same -- there's a sign that says hey, remember,

10  you're going to be subjected to some pressures, some stresses

11  here.  Make sure that you can handle them, right?

12  A.  The stresses or the pressures you're subjected to, the

13  differential pressures on a roller coasters are the same as

14  going up and down a hill in your car.

15         But remember, the water is 700 times as dense as air,

16  so the resulting pressure changes are absolutely major, which

17  you would never encounter them typically on a roller coaster.

18  Q.  But my point is, certainly you don't put a person -- you

19  want to make sure a person that gets on a roller coaster, just

20  like a person that is going to get into the cabin of the

21  Proteus, understands there are certain physiological components

22  and requirements for their participation, right?

23  A.  And I'm sure that they, by participating in that, there must

24  be some sort of liability on the part of the owner of the

25  machine and it must be certified and all sorts of stuff.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

838

1  Q.  You presume?

2  A.  I presume.  I don't know.  I don't build roller coasters, I

3  build submarines.

4  Q.  You presume the same thing with the submarines.

5  A.  I don't presume that at all.

6  Q.  The liability aspect?

7  A.  I can't look to because I don't know anything about roller

8  coasters.

9  Q.  But you presume the same is true because --

10  A.  No, I don't presume.  You're presuming I presume.  I don't

11  presume.

12  Q.  I thought you said that.  I'm sorry.

13      The same notifications is certainly possible to do,

14  right?

15      I'll withdraw that, Judge.  Let me try it this way.

16      You operated -- when you were growing up, you operated

17  a dive shop, correct?

18  A.  That's correct.

19  Q.  Now, you made certain that anyone participating in -- did

20  you train divers also?

21  A.  Yes.

22  Q.  Anyone engaging in the process of becoming a diver was aware

23  of the physiological requirements, right?

24  A.  The people that were taking diver training all had to have

25  current medical assessments, etcetera.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

839

1    Q.  Okay.  So if you restricted -- withdrawn.

2         You go on in your article, this brings up a point that

3    my partner asked me, let me ask you, you mentioned that you said

4    it look very Disney-ish.  Have you ever read Jules Verne's

5    *20,000 Leagues Under The Sea*?

6    A.  I did a one-hour special on Jules Verne prior to receiving

7    the Jules Verne Award.

8    Q.  So you did read it, correct?

9    A.  Yes.

10   Q.  It was Jules Verne that came up with the notion of the

11   Nautilus, correct?

12   A.  Jules Verne, he came up with the name certainly.

13   Q.  With this idea of the sub called the Nautilus, right?

14   A.  Well, submarines were around long before Jules Verne.

15   Q.  Jules Verne, in his book, described a submarine a vessel

16   called the Nautilus, correct?

17   A.  That's right.

18   Q.  Disney didn't come up with the Nautilus, right?

19   A.  Yes, Disney came up with that particular design you see in

20   the picture.  The Jules Verne Nautilus doesn't resemble that one

21   as much as it resembles the Disney one.

22   Q.  And you're an expert in copyright and all that?  You have

23   that expertise?

24   A.  Yes, because I have a number of copyrights.

25   Q.  But you're an expert -- you have a legal background in

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

840

1    copyright law?

2    A.  No, I do not.

3    Q.  And it does say in your article you recognize that Exomos

4    hasn't finalized the purchase price of the Nautilus, but that it

5    is a first pre-production prototype.  Do you recall that?

6    A.  That's correct.

7    Q.  Is there a reason why you didn't bring up in your article

8    this concern you have that it resembles -- it's so Disney-esque?

9    A.  I'm not concerned about it being Disney-esque.

10   Q.  Okay.  Are you familiar with the depths of the water

11   immediately surrounding Dubai?

12   A.  The Persian Gulf, generally, yes.  It's relatively shallow.

13   Q.  In fact, immediately around there are many areas less than

14   30 feet, correct?

15   A.  There are areas in every ocean of the world that are less

16   than 30 feet.

17   Q.  So your concern was that this Proteus would dive too quickly

18   in those areas, and if the depth of the water was only 30 feet,

19   it's not going to hit the 60' max?

20   A.  If there's not 60' there, it's certainly not going to hit

21   60' max.

22   Q.  Even if it was 60' that there was to descend to, there's

23   still an hour's worth of decompression time, correct?

24   A.  Less than an hour.

25   Q.  The certification process that you spoke of, your

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

841

1    involvement in the process, has been in terms of these rigid

2    hulled submarines, correct?

3    A.   That's correct.

4            MR. HESS:  Thank you.

5            MR. URQUHART:  I have no questions, Your Honor.

6            THE COURT:  All right.  Thank you, sir.  You are

7    excused.  Thank you very much.

8            Call your next witnesses please.

9            MR. CEDERBERG:  Your Honor, at this time I believe

10   we're going to read in some requests for admissions and some

11   answers.

12           THE COURT:  All right.  Go.

13           MR. CEDERBERG:  These are requests for admissions sent

14   by Dubai World Corporation, Exomos, Nakheel and Palm Marine to

15   defendant Herve Jaubert, Seahorse Submarines International,

16   Incorporated.  I'll read the request then the response.

17           Request for admission number two, admit that you have

18   never received any certification from or by Bureau Veritas for

19   any submarine you have designed and produced.  Response, admit.

20           Request for admission number three, admit that you have

21   never received any certification from or by Lloyd's Register of

22   Shipping for any submarine you have designed and produced.

23   Response, admit.

24           Request for admission number four, admit that you have

25   never received any certification from or by Det Norske Veritas

1  for any submarine you have designed and produced.  Response,

2  admit.

3       Request for admission number five, admit that you have

4  never received any certification from or by the American Bureau

5  of Shipping for any submarine you have designed and produced.

6  Response, admit.

7       Request for admission number six, admit that you have

8  never received any certification from or by Registro Italiano

9  Navale for any submarine you have designed and produced.

10  Response, admit.

11       Request for admission number seven, admit that you have

12  never received any certification from or by Fortis NV for any

13  submarine you have designed and produced.  Response, admit.

14       Your Honor, our testimony would be by the two

15  depositions that we handed up to the Court today.

16       THE COURT:  Which I'm still working on.

17       MR. CEDERBERG:  We don't have another live witness

18  today and I'll confer with counsel, but we may be done with live

19  witness testimony.

20       THE COURT:  Ladies and gentlemen, we have a depositions

21  that each side has taken in the past and I'm supposed to go

22  through because they made objections during them and I'm Xing

23  out some things and leaving some things in.  I've gone through

24  100 some pages, but I haven't finished.

25       So maybe we'll just break for the day and start again

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

843

1  tomorrow at 9:30, and I'd like to go from 9:30 to 2 without, you

2  know, just take maybe a couple of ten minute breaks in the

3  middle, then break for the day at 2:00.

4          MR. CEDERBERG:  I believe one of the jurors had an

5  appointment where we start at 10.

6          THE COURT:  No, that's Tuesday.

7          You know, I've been thinking about that.  I just had an

8  implant done and I watched how he did it, I have a pair of

9  pliers in the car.  I think I could probably do it.  I could

10 wash it off or something.

11         JUROR:  They're already gone.

12         THE COURT:  All right.  Well, I don't do stitches.

13 You'll have to go to your own doctor I'm just trying to save you

14 a couple bucks.  I don't have any deductible.

15         All right.  We'll break until -- hold on.  I got to

16 find my form here somewhere.  You know what I was going to tell

17 you.

18         Ladies and gentlemen of the jury, you're reminded that

19 you're not to discuss this case with anyone or permit anyone to

20 discuss it with you.  Until you retire to the jury room at the

21 end of the case to deliberate your verdict, you're simply not to

22 talk about this case.

23         Don't read or listen to anything touching on this case

24 in any way.  If anyone should try to talk to you about it or if

25 you inadvertently come across anything, bring it to my attention

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

844

1    promptly.  Keep in mind you must not do any research or make any

2    investigation about the case on your own.

3         Also remember you must not have any contact with the

4    attorneys, parties or witnesses in the case.

5         Finally, remember you must not form any opinion in this

6    case until all the evidence is in.  You're required to keep an

7    open mind until you start your deliberations at the end of the

8    case.

9         So I'll excuse you and I'll see you tomorrow morning at

10   9:30.  Thank you.

11        COURT SECURITY OFFICER:  All rise for the jury.

12        (Jury out at 4:25 p.m.)

13        THE COURT:  Good night.  Drive carefully.  Somebody

14   left their jacket.

15        Why don't we have a seat.  Why don't we just go through

16   these depositions now, I can tell you what I've done so far and

17   when I get to the part I haven't done, let's just do it together

18   so I can -- we can get it done so you know ahead of time what

19   we're going to do.  However long it takes us to get it done.

20        We are looking at the deposition initially of Sultan

21   Ahmed Bin Sulayem, first designation is on page five, I have no

22   problem with anything on page five, six, seven, page eight.  I'm

23   deleting from line three through the end of the page, the

24   entirety of page nine.  And the first nine lines of page ten.

25        MR. CEDERBERG:  Can I have that again, Your Honor?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

845

1          THE COURT:  Yeah.  I'm starting in the deletion on page

2     eight, line three, the rest of page eight.  You want to pull the

3     depos out so you can look at them?

4          MR. HESS:  That's the one deposition -- I left my whole

5     designation book --

6          MR. CEDERBERG:  We have another copy, I'm sure.

7          THE COURT:  Okay.  Why don't we get them, everybody get

8     it in front of you so we can just go down the line and get it

9     done that way.

10          MR. HESS:  I've carried it back and forth to the

11     courtroom every day this week.

12          THE COURT:  We're doing Sultan Ahmed Bin Sulayem, we're

13     starting on page eight.  I've overruled the objections on page

14     six and seven.

15          On page eight starting at line three through the

16     remainder of that page I am not permitting.

17          The entirety of page nine and the first nine lines of

18     page ten.

19          Page 11 is okay, page 12 is okay, pages 13, 14 and 15

20     are okay.  Except you're going to remove the colloquy on page

21     15.  The colloquy being -- well I'm not sure.  Leave it in

22     there.  It's just the court reporter trying to get something

23     clear, must not have been clear so leave it in there.  No harm

24     to it.

25          Page 17 is fine, page 18.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

846

1        MR. CEDERBERG:  Excuse me, Your Honor.  16 is all in?

2        THE COURT:  16 there's no objection to.

3        MR. CEDERBERG:  Okay.

4        THE COURT:  Page 17 is fine, page 18, line 6 through

5   page 18 and 19 and the top of page, 20 picking up on page -- on

6   line nine of page 20 it's okay from that point on.

7        MR. CEDERBERG:  So page 18, line 20 stays in?

8        THE COURT:  No.  What I said was page 18, line 6

9   through the remainer of the page is out.  Page 19 is out in its

10  entirety.  Page 20, the beginning of it is out and we start at

11  page -- I mean line nine.  From line nine on on page 20 is okay.

12  Up until page two -- excuse me, page 21 through line two.  After

13  that I am deleting the remainder of page 21, all of page 22,

14  page 23 and 24.

15        The top part of page 25, I'm starting again on line 16.

16  I'm overruling the objection on page 19.  Page 26, lines --

17  first five lines are okay.  After that I am deleting the

18  remainder of page 26, page 27 through line 21 is deleted then

19  it's okay after that.

20        Page 28 is okay.  So 27, line 22 you start again with

21  "and you mentioned there was".  And then line 28 -- excuse me,

22  page 28.  All of page 29 is deleted except the last two lines

23  who is AbdulQadar, he is our internal auditor.

24        Page 30 is okay.  The next deletion is line 23 page 31,

25  through line 4 page 32 is deleted.  If you can remove the

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

847

1    objection, that's fine.  If you can't remove the objection, it's
2    okay because it just puts it in context on page 32.
3            MR. HESS:  Judge, would you repeat that last one?  My
4    pen just stopped.
5            THE COURT:  I don't know, what the last one is.
6            MR. HESS:  Through line.
7            THE COURT:  Page 31 through line 22 is okay, line 23,
8    24 and 25 are deleted.  So are the first four lines of page 32.
9    They're out.  That same page you go down to line 22, that is
10   deleted.  From 22 on.  The top of 33 is deleted through line 13
11   pick up again on line 14.  34 is okay.  Except for the colloquy
12   at the end which seems to be like a spitting contest between the
13   witness and the client.  And the attorneys.  So I guess you can
14   leave that in.  Doesn't make any difference, but the question is
15   do we still need this because is this something that's out
16   because of the summary judgment or not?  I don't know.  If you
17   need it, I guess you can have it, but I think that I'm
18   questioning whether you do need it because of the summary
19   judgment.  Look at it and see if there's anything that might be
20   irrelevant and bring it to my attention tomorrow.
21           MR. CEDERBERG:  Where is this, Your Honor?
22           THE COURT:  On page 35.  Excuse me, page 36.  Page 36.
23   You're the one that objected on the basis of the summary
24   judgment, so I assume you had a reason.  I don't know.
25   Otherwise I'm overruling it.  But on the summary judgment, I'll

848

1    give you an opportunity to talk to each other about it.

2           37 is fine.  38, if you can get rid of that objection

3    on line five and six, do so.  If not, leave it in.  Remainder on

4    that page 38, 39, 40 is okay.  Same thing on page 41, lines 15

5    and 16.  If you can get rid of it, you can, but if you can't

6    that's okay.

7           Page four 42 I am deleting from line three, through

8    page 44 line 15.  All of that is deleted.  You start with

9    Mr. Miller had a car, it was supplied by Dubai World

10   corporation, and the remainder of that page is fine.

11          Page 45 is okay.  46 is okay.  Page four 47, I'm

12   deleting lines 11 through 20.

13          MR. CEDERBERG:  47, lines 11 through 20?

14          THE COURT:  Yeah. 11 through 20, then picking up again

15   on 21.  Page 48, deleting lines 20 through the end of the page

16   and the first line of page 49.

17          Page 50, deleting lines 16 through the end of the page

18   and the first seven lines on page 51.

19          Page 52 is okay.  Page 53 is okay.  There is nothing on

20   the next four pages.  53 to 56.  Page 57 is okay.

21          Page 58 deleting from line 12 through the bottom of

22   page 58 and the first four lines of page 59.

23          Page 61.  Lines three through the end of the page are

24   deleted.

25          Page 62, if you can delete the objection on lines 13

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

849

1    and 14, do so.  If you can't, it's not the end of the world.

2            Continuing, 65 is okay, 66 is okay.

3            Page 67 is out in its entirety.  Page 68 is out in its

4    entirety.  Page 69 through line 16 is deleted.  The colloquy

5    starting on line 25 of page 69 through the comments of the

6    videographer on line eight of 70 are deleted.  From then on it's

7    okay.   No problem on the other.

8            On page 73 you can delete the objection, on line 12, do

9    so.  If you can't, that's all right too.

10            77 is okay.  78, 79 are all right.  80 I take it that

11   part of that has been withdrawn.  Line 6 through whatever.

12           MR. CEDERBERG:  Yes, Your Honor.

13           THE COURT:  But line 12 through the end of the page is

14   deleted.

15           Page 81 the entire page is out.  82 the entire page is

16   out.  83, the entire page is out or withdrawn.  Through the

17   first line, first two lines on page 84 you may delete the

18   objection on 17 and 18 if you can.  Page 85, 86, 87, 88 is fine.

19   89, 90 and the first nine lines of page 91 are fine starting on

20   line ten of page 91 through the end of page 92 is deleted.

21   Through page 93.

22           MR. CEDERBERG:  Your Honor, may I just pause for 91?

23   The Court is overruling my objection that on line eight question

24   about having two wives?

25           THE COURT:  I didn't see -- Yes, I am overruling that.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    I don't find it to be particularly scandalous, I assume it's

2    legal over there.  I wouldn't know.

3            MR. CEDERBERG:  Under 403, Your Honor, I would argue

4    it's more prejudicial than probative of anything.

5            THE COURT:  I don't know that it's probative of

6    anything.

7            MR. CEDERBERG:  I have 402 and 403.  I just don't see

8    why --

9            THE COURT:  Yeah, let's delete lines eight and nine

10   also.  I don't think it's relevant to anything, doesn't prove

11   anything that's important.

12           MR. HESS:  How about Mr. Jaubert up to line four where

13   it says Mr. Jaubert has been on your boat.

14           THE COURT:  No, you can continue through line seven

15   that he's married.

16           MR. HESS:  Thank you, Judge.

17           THE COURT:  But I'm not permitting any discussion of

18   prostitution or anything else like that.

19           93, 94, 95, 96, 97, and the first three lines of 98 are

20   deleted.  That was really where I was still working on this.  So

21   let's go through these together.  I guess we're going to be here

22   a while, but if I'm going to be here, you better be here too.

23           Okay.  Through 98 you can delete the objection on lines

24   12 and 13.  All right.  Let me see. 99, I think the little

25   colloquy at the end of page 99, 24 and 25 and the first line of

851

1    100 delete it.  I don't understand.  You two were spitting on

2    each other.  I don't know  for what particular reason.

3              MR. CEDERBERG:  On 99, based upon the summary judgment

4    ruling, the discussion has to do with traveling with weapons.

5    Because of the summary judgment ruling we would --

6              THE COURT:  What's the relevance of that now that I've

7    entered the summary judgment?  Is that one of the areas you're

8    going to withdraw?

9              MR. HESS:  No, Judge.  We believe that's one of the

10   things we argued over and over again at the beginning of this

11   case an d Your Honor made a ruling on that.  I'm not going to

12   bring in any aspect of asking the juror or anyone to decide any

13   of the issues that are attendant to the Act of State Doctrine,

14   but it's going to go -- well, they've opened the door.  Forget

15   about opening the door.  It's in their materials already.  It's

16   in numerous places, attached to their various audit reports and

17   their expert reports about Mr. Jaubert having this happen to

18   him, and I think I deserve the opportunity to have the Chairman

19   testify as to that.

20             MR. CEDERBERG:  Your Honor --

21             THE COURT:  What's it prove or disprove?  Where does it

22   move the ball in this case?  How does it move it one way or the

23   other?

24             MR. HESS:  Well, it shows first of all that when he was

25   arrested why he was arrested.  It's relevant to that point and

852

1    it's not unduly prejudicial at all, so it's clearly relevant.  I

2    believe it's clearly relevant.  I'm asking the Court to find

3    that it is relevant and I don't see the prejudice in it.

4         THE COURT:  Why do you not want it?  What's it harm

5    you?  We didn't say they did anything wrong, that he was

6    arrested for bringing in a rifle.

7         MR. CEDERBERG:  I don't see what's relevant about that

8    anymore based on the Court's ruling, our view of the summary

9    judgment.  Whether he was arrested correctly or incorrectly is

10   no longer an issue in the case.

11        MR. HESS:  There's not one word of arrest in there,

12   there's not one word about -- all it's asking is --

13        THE COURT:  Actually they said they seized it.  They

14   confiscated the weapons.

15        MR. HESS:  Again, it goes to bad faith, it goes to one

16   of their defenses, actually on the two of the defenses on the

17   abuse of process claims that they've asserted, and Mr. Jaubert

18   is going to testify that he was permitted through Sultan's

19   process to bring in the weapons and bring in the ammunition.

20        MR. CEDERBERG:  That, Your Honor --

21        THE COURT:  I don't think that proves that at all

22   because I don't think it said that Sultan had anything to do

23   with that.  It sounds to me like he denied that.

24        MR. HESS:  He may have denied, but does that mean the

25   Court making a determination that the jury has to believe him in

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    denying that?

2          THE COURT:  No.  What I'm making a determination is is

3    that there's no evidence that did he that.  Because the only

4    evidence so far is that he denies it.  There's no evidence that

5    he did do it.

6          MR. HESS:  Mr. Jaubert's evidence.  Mr. Jaubert's

7    testimony.

8          THE COURT:  Okay.  Well, I haven't seen Mr. Jaubert's

9    testimony.

10         MR. HESS:  I'll proffer that, Judge.

11         MR. CEDERBERG:  Even if Mr. Jaubert were to say this,

12   the only relevance would be if the police did something wrong

13   because Sultan somehow approved it, we get all into the Act of

14   State.

15         MR. HESS:  That's not true at all.  That's what we

16   heard round and round again on Monday and that's absolutely

17   incorrect.  That is not what it's saying.

18         What it's saying is that that process began and that's

19   when it began and that my client, Mr. Jaubert, is going to

20   testify that Sultan knew, gave him a copy of his passport and

21   I'm asking the Court to permit the jury to make a credibility

22   determination on that.

23         THE COURT:  I'll let him deny it.  I'll put it in

24   there.  Yes, I'll permit it.  Whether later I may strike it or

25   tell the jury that they don't have anything to deal with that,

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

854

1    but at this point I'll let it in.

2         MR. CEDERBERG:  Then going back the 99, where do we

3    start with what's in?

4         THE COURT:  I'm saying that 98 is where you start with

5    what's coming in.  Mr. Jaubert was on your yacht, remember the

6    Chinese delegation, come a time Jaubert sent you correspondence,

7    you're aware that Jaubert traveled to Dubai with two rifles.

8    I'm not aware of that, no.  You're not aware.  Am I aware that

9    he intended to travel with weapons?  He's basically denying that

10   he didn't know before the fact, that it was brought to his

11   attention after he was there.  So all of that is in.  And you

12   gave him a copy of your passport?  No.  You never gave him a

13   copy, he might have gotten a copy of it, but I just want to

14   clarify, weapons are restricted items.

15        Then I delete 24, 25 and one.  Actually and two.  One

16   and two as being not really questions, more like colloquy.  Then

17   start with line three and then his position on that.  And we go

18   through page 101.

19        MR. CEDERBERG:  For clarification, the record should be

20   clear that we withdrew from line three, I take it that means

21   defendants are proffering?

22        THE COURT:  That's right.  That is their -- that's

23   withdrawn so that's not in.  So we're talking about through line

24   23 and then we start again with line three on page 101.  So page

25   100 is out.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

855

1          MR. HESS:  I only inserted what they hadn't already

2   requested and I'm arguing that we do we want on page --

3          THE COURT:  You know what, guys, we don't have all year

4   to do this.  You know, really.  Come on.  Let's get the act

5   together and get this done however you're going to do it.  I

6   don't care how you do it, but get your act together or I'm going

7   to just sit here and say nothing comes in.  You know, I mean,

8   I'm getting tired.  I'm just nothing is ever simple here.  You

9   could complicate a one car funeral.

10         MR. HESS:  We did these a long time ago.

11         THE COURT:  You did it a long time ago, they withdrew

12  it and it's not designated.

13         MR. HESS:  I understand, Judge, I'm not going to

14  belabor the point.  I understand.

15         THE COURT:  Okay.  100 is out.  101 starting on line

16  three is in.  I've let it in.  102, 103, and starting from line

17  12 is withdrawn.  Unless you want it in now.  No, withdrawn up

18  to line 22.  Okay.  It's withdrawn.

19         We start with 22 on page 104.  And then on page 105

20  lines ten, 11 and 12 are out.  I don't have any idea what we're

21  talking about at the end of line 105 and I presume that on the

22  video you can see it, but I can't tell what it is.  So I don't

23  know how to deal with that.  Sulayem deposition Exhibit 1.

24         MR. CEDERBERG:  I think, Your Honor, it's colloquy

25  through counsel whether a document was previously produced, not

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

856

1    something the jury needs to see.

2              THE COURT:  But on page 106 they're talking about it

3    and I don't know what it is in order to deal with it.  You

4    understand what I'm saying?

5              MR. CEDERBERG:  I understand you don't have an exhibit.

6              THE COURT:  I don't know what it is.  So I'm going to

7    say that starting on page 109, line ten, it is deleted up until

8    the end of the page.  Then we start on 106, line one.  And then

9    I don't know what to deal with.  You ever seen that emblem.

10   Never seen it in public.

11             MR. HESS:  If you guys aren't going to use it --

12             MR. CEDERBERG:  We have no intention to use it.  It's a

13   swastikas, Your Honor.

14             MR. HESS:  It came up with --

15             THE COURT:  So we're deleting 106 in its entirety,

16   correct?

17             MR. CEDERBERG:  Yes.

18             THE COURT:  And 107.  And 108.  All of this deals with

19   that.

20             MR. HESS:  Judge, I'm sorry, now 108 beginning 108, it

21   is a different topic.

22             THE COURT:  He's talking about it never came to you,

23   first time I've seen it.  It never came to you in an e-mail?

24   No.  Mean you never opened an e-mail that it was in?  And I

25   haven't seen an e-mail with something like that.

857

1        MR. HESS:  As long as they're not going to ascribe --

2        THE COURT:  But it all appears to deal with that

3    Exhibit 1.

4        MR. CEDERBERG:  Your Honor, I'll just make a

5    representation, both counsel work together, making sure nothing

6    involving that exhibit is played to the jury.

7        THE COURT:  Okay.  I think that now at the end of 108

8    you seem to be talking about Composite Exhibit 3.  What's that

9    one?  Composite Exhibit 3 is what?

10       MR. CEDERBERG:  My recollection is, Your Honor, it's

11   various of the exhibits that have already been put in evidence

12   like purchasing orders and that that have Sultan's signature on

13   it.

14       MR. HESS:  That's correct, Judge.

15       THE COURT:  So how are you going to square Composite

16   Exhibit 3 with the numbers that are in evidence?  How are you

17   going to do that?  I presume you can do that.

18       MR. HESS:  Yes, Judge, easily.  We have them marked and

19   they're identical documents.  There's a composite Exhibit 3

20   sticker from the court reporter.

21       THE COURT:  We can start at page 108 with line 20.

22       MR. HESS:  Judge, I'm sorry.  I would ask that because

23   it's -- I would ask that we go from line -- question line 4

24   because that deals with the 10 percent service charges.  That is

25   Exhibit 3, Composite Exhibit 3.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

858

1          THE COURT:  Okay.

2          MR. CEDERBERG:  That's fair, Your Honor.

3          THE COURT:  So we go back to line 6.  If you can start

4     at line 6.  If not, we'll take another couple of words, but try

5     to start with line 6.  There came a time that you approved a 10

6     percent service charge.  And delete objection if you can.  I

7     don't remember that.  You don't remember?  Then you went on to

8     show them exhibit 3.  Okay?

9          Then page -- we don't need to have Mr. Urquhart taking

10    a run to the bathroom and going off the record.  So we can

11    delete the first ten lines and then start on page on line 12.

12    I'm sorry.  And then we'll go from there.  This is all composite

13    Exhibit 2 and three.  And so nobody has objected to anything

14    except for the colloquy.  Everybody wanted to take a break.  So

15    we delete from page 112 line 19 through -- why don't we just

16    start again at line 18, page 113.   We don't need to get into

17    how long they've been on a break and whatever, okay?

18          MR. CEDERBERG:  I agree, Your Honor.

19          THE COURT:  We go to page 114, 15, 16, 17, 18.  Then at

20    the bottom, let's delete the end of the discussion on the end of

21    page 118 from line 12 through -- start over again at page 119,

22    line five.  I think you're talking about the same thing.

23    Exhibit 7, you'd review that one also, so you executed that

24    ddocument.  Then go from there, is that correct?

25          We go through 120, 121, 122, and then you have -- I

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    think that that's an inappropriate question.  If you delete 13

2    through line three of page 123 and 122.  Question, if so, if

3    there were an item 14, delete that.  Delete the objection on

4    lines 18 and 19.  And pick up on line 21.

5         Continue through 124, 125.  I'm not real crazy about

6    witnesses guessing, line 11 and 12, but I don't know what the --

7    but he's apparently agreeing that he now knows from reviewing

8    that document what something is, that he was no longer guessing

9    so I'll leave it.

10         Go through -- we'll delete the cell phone interruption

11    and bottom of page 126 lines 24, 25, line 127, the first six

12    lines are deleted and we go from there.  Delete the objection on

13    page 128, line 12.  Delete the objection on 21 and 22.  Delete

14    the objection on page 129, line eight and nine.

15         I don't understand the objection to on page 129, lines

16    15 through 20.  What is the objection there.  Record.  What does

17    that mean.  I can overrule it rule fast.

18         MR. CEDERBERG:  I think it's misplaced.  I think it

19    should be lines eight, nine and I take it when the Court says to

20    delete the objection --

21         THE COURT:  Yeah, the vague and ambiguous I will.  I

22    mean, I'm not crazy about asking people if something would

23    surprise them, but it happens so darned often that I think

24    people think it's okay.  So I'll leave it.

25         All right.  I'll permit the discussion on page 130.

860

1    I'll permit the discussion on page 131.  Overrule the objection.

2    Delete the line 4 on page 132.  I'll overrule the objection.

3    I'll delete the question and the objection and the answer from

4    line 17 through 22.  I'll permit the remainder of the colloquy,

5    I guess it is, question and answer on 133, but I will delete the

6    objection on lines three and four, Mr. Urquhart, and then they

7    go to lunch and delete all the lunch stuff and the cell phone

8    interruption.  Pick up again on line 11 of 134.

9         The next objection is at page 140, what's that?

10        MR. CEDERBERG:  I think we'll withdraw those objections

11   to make it easier.

12        THE COURT:  Okay.  We leave page 140.  And 141 and just

13   delete the first nine lines on page 143 because you reasked the

14   question in a much shorter version.

15        MR. HESS:  Yes, Judge.

16        THE COURT:  144 is -- I don't really know what it is

17   that we're talking about here.  I'll let it come in.  I'll

18   overrule the objection on page 148.  You can delete it.  I will

19   ask you to delete the question on page 148, lines eight through

20   -- delete lines eight through 17 because you asked the question

21   again.  And assure if you can.  I will permit the question on

22   page 149 and the information that's there.

23        I'll overrule the objections on page 150.  What is LPK?

24        MS. HEATHCOCK:  Lack of personal knowledge.

25        THE COURT:  Okay.  This has been withdrawn anyway,

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    correct?

2          MR. HESS:  Yes, Judge, it's a nonissue.  We're not

3    asserting that.

4          THE COURT:  All right.  So everything on 149 and 150 is

5    out, does everybody agree?

6          MR. HESS:  I'm sorry.  We're asking that the 149 and

7    150 stay in.

8          THE COURT:  You didn't ask for it in the first place.

9          MS. HEATHCOCK:  Right.

10         MR. HESS:  I know, Judge.  We want to designate what

11   they already designated.

12         THE COURT:  All right.  So I'll leave 149 and 150 in

13   and 151.  The only thing that bothers me is the lack of personal

14   knowledge.  I do think he's giving you -- in depositions you're

15   allowed to do that, but that doesn't mean it's admissible at

16   trial.  I think that he has -- at page 151 he's basically said

17   that he has no idea about any of this stuff.  I'm going to

18   delete 149, 150 and 151 and 152 and on the basis of lack of

19   personal knowledge.  159 I'll leave.

20         MR. CEDERBERG:  So 153, 54, 55, 56, 57, 58 are all in?

21         THE COURT:  I haven't done that yet.  I was doing one

22   149, 150, 151 and 152 they're out.  153 I'm looking at now.  I

23   do think that's separable from the other.  I don't really know

24   what one of the accusations means, but I would like to have

25   deleted the colloquy on lines 19, 20 and 21, but it might be

1    needed in there.  It might be needed to give context to the next

2    question because the next question is kind of following up on

3    the fact that he said hold it, question and answer, I'm sorry,

4    it's me.  I'm just trying to get a yes or no.  Might make no

5    sense if you take out that slight one line colloquy.

6         MR. HESS:  I can't say.  Looks like there was yes.

7         MR. CEDERBERG:  With the Court's guidelines, we'll keep

8    in the colloquy.

9         THE COURT:  I think that colloquy might have to stay

10   in.

11        MR. CEDERBERG:  We'll err on the side of leaving it in

12   if it could impact the answer.

13        THE COURT:  Okay.  I'll overrule the objection on page

14   154.  So delete lines ten and 11 and 13 and 14.  And just leave

15   in the witness's answer on line 12.  I will delete page 155 line

16   12 through 17.

17        MR. HESS:  The only reason this becomes relevant is

18   because something happens at the end of the deposition that

19   makes this relevant.

20        THE COURT:  All right.  Well, tell me later if I decide

21   that it should.  But right now I'm keeping out 12 through 17 or

22   13 through 17.

23        What's the relevance of the material on line 156,

24   e-mail address and the discussions with newspaper magazine?

25        MR. HESS:  To establish that for authentication

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    purposes that he did receive the e-mail and that is his e-mail

2    for when he disseminates e-mail out.

3         THE COURT:  Okay.  You have some evidence that that

4    e-mail address went to some newspaper or magazine?

5         MR. HESS:  No, it's not as to that issue.

6         THE COURT:  Then those are two separate issues?

7         MR. HESS:  Yes.

8         THE COURT:  I don't have a problem with the e-mail

9    address, but what's the relevance of lines 18 and on?

10        MR. CEDERBERG:  I think the lines before they talk

11   about torture are out under the Court's 403 ruling and I think

12   the lines after that.

13        THE COURT:  Okay.  Wait.

14        MR. HESS:  I agree, Judge.

15        THE COURT:  All right.  So delete what?

16        MR. HESS:  Four and five.

17        THE COURT:  Well, actually six too.

18        MR. CEDERBERG:  Actually except for identifying the

19   e-mail address, Your Honor.  I think this was discovery with

20   regard to potential defamation claims.

21        MR. HESS:  Yes.

22        THE COURT:  So we delete starting on page 155, line 13

23   down through line page 156, line 12.  Line 11.  We start again

24   at line 12 and go 12, 13, 14, 15, 16 and 17, then we delete

25   again starting on line 18, correct?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
1              MR. CEDERBERG:  Correct.

2              THE COURT:  You go through --

3              MR. HESS:  Judge, there is -- I'll revisit again,

4    Judge.  I understand.

5              THE COURT:  All right.  So at this point I'm deleting

6    line 18 down and through page 157 in its entirety and --

7              MR. HESS:  I'd like to have the Court revisit that,

8    also same reason, Judge.

9              THE COURT:  Line one through 158 halfway through.  The

10   rest of it is not offered by anyone.  Well, it is offered but

11   I'll delete the remainder.  Okay.  So you're talking about the

12   -- now we're talking about this one on 159 this Bloomberg thing

13   that was designated by Dubai World before my summary judgment

14   ruling and then withdrawn?

15             MR. CEDERBERG:  Right.  The Bloomberg issue, Your

16   Honor, had to do with the tape and the fake tape and all that

17   stuff that's really not -- we don't believe is any part of the

18   case anymore.

19             THE COURT:  All right.  Tell me why that's admissible?

20             MR. HESS:  Well, we have a representation that's not

21   going to be -- it's not coming up, it's not a fake tape, it's a

22   reenactment tape.  But as long as we have a representation

23   they're not going to bring it up, then I don't have a problem.

24             MR. CEDERBERG:  As I understand where the Court is now,

25   it has to be revisited before it goes.  Right now the only
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    issues are abuse of process on the affirmative claim.

2           THE COURT:  I think so.  So I'll keep that out.  I will

3    keep out the designation on 159, 160, 161, 162, 163, 164, 165.

4    And is there anything on 166 that's coming in?

5           MR. CEDERBERG:  Yes, Your Honor.  We ask that lines one

6    through ten or one through --

7           THE COURT:  Well, actually starts at the end of 165.

8    When is the last time you talk to Mr. Jaubert.  When he was in

9    Dubai just before he left.  Do you recall when that was?  I

10   don't remember the date.  Told him not to worry because

11   basically if he hadn't done anything he shouldn't worry.

12   Mr. Jaubert expected me to do more which is not in my capacity.

13   I'll be honest with you, there's no way I can control the police

14   or tell them which way to go.  That is impossible in Dubai and

15   the audit.  If I tell them that they will laugh at me.

16          MR. CEDERBERG:  I think the not being able to control

17   the police is directly relevant to this abuse of process claim

18   and this alleged threat.

19          THE COURT:  All right.

20          MR. HESS:  I'm agreeing, Judge.  I think that's fair.

21          THE COURT:  All right.  So 166 lines one through 13.

22   All right?  Okay.

23          MR. CEDERBERG:  Then Your Honor, I think both sides, if

24   something changes in the trial we will come back and revisit.

25          THE COURT:  Yeah, tell me before you do it.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
1              Now what's the deposition on Tarek Mohammed Ahmed
2    whatever?  Objection to page four.  What is the relevance of
3    lines -- they don't go through lines.  That's great.  That's
4    going to be easy.  Oh, yeah they do.  Lines 18 through 21?
5              MR. CEDERBERG:  I think nothing, Your Honor.
6              THE COURT:  You're the one that designated it.
7              MR. CEDERBERG:  No.  I did not designate.
8              THE COURT:  No, them.  I'm sorry.  I thought it was
9    Mr. Hess.
10             MR. HESS:  It was.  It apparently was.  But my
11   assistant just went out to the car.  That binder that I have
12   been carrying with me every day this week is not here.
13             THE COURT:  Okay.  You got another copy for him to look
14   at?  It says I'm going to delete lines 18, 19, 20, and the
15   beginning of the question on 21.  I don't have a problem with
16   where do you reside and who do you work for.  All right?  The
17   rest of it, I think, is preliminary and I don't have a problem
18   with it.  Who is this gentleman and why is he different than the
19   guys that were already here?
20             MR. CEDERBERG:  Tarek Ahmed is, under Dubai law, before
21   a federal fraud prosecution can be instituted, the prosecutor
22   must get an independent opinion from a certified public auditor
23   retained by the government as to whether there's suspicion of
24   evidence to proceed for fraud.
25             THE COURT:  All right.  And your objections on behalf
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   of Mr. Jaubert are -- tell me what they are in general so I can

2   have them in mind as I go across.  You have 402, 403 which is

3   basically prejudicial outweighs the probative value.  What's

4   prejudicial about this other than the fact that he says your guy

5   did bad things, which I would anticipate is why they think it's

6   relevant.

7          MR. HESS:  I'm wondering why under the Court's -- I've

8   got to go back to that.  I'll withdraw that, Judge.  I'm tired.

9          THE COURT:  I don't see anything -- really if you got

10  something specific and I don't really -- you know, take a look

11  at those little bitty things that you added like are you with us

12  Bill, I am, and that kind of stuff.  You have cross-designated

13  those.  I don't really know that you mean that because you seem

14  to be trying to add all of the colloquy and the counsel's

15  comments.

16         MR. CEDERBERG:  This is what happened, Your Honor.  We

17  did our designations, Mr. Hess simply e-mailed us and designated

18  everything that we didn't designate which resulted in the

19  colloquies.  He's told the Court and us that if he had time, we

20  would be --

21         THE COURT:  Take out all the colloquy.

22         MR. HESS:  I did say it in my e-mail.

23         THE COURT:  Take out all the colloquies.  Is there

24  anything else that is cross-designated by him?  Because

25  everything I've seen is colloquy so far.  I'm going through page

1    22 -- wait a second.  Here you go.  On page 25.  Okay.  Oh,

2    great.  He's speaking Arabic.  That's going to be helpful.  I

3    take it -- how the hell does the court reporter know what he

4    said speaking Arabic?  I don't understand what that comment

5    means.

6             MR. CEDERBERG:  He says I don't understand and then he

7    makes some comment.

8             THE COURT:  Okay.  I gotcha.

9             MR. HESS:  It was a partial use of a translater.

10            THE COURT:  Then I will permit that to be

11   cross-designated except for the commentary by the lawyers.

12   Actually I think in that instance, the commentary on the

13   colloquy is needed because otherwise how do you explain that all

14   of a sudden a different guy is starting to ask questions?  All

15   right.

16            I will -- I do not believe that the materials on page

17   30 lines eight through 18 are admissible and I will permit

18   everything else on the page, 19 through 25 and one through seven

19   but deleting the mostly colloquy between eight and 18.

20            Page 32, deleting the colloquy on lines two through 12.

21            MR. HESS:  That's on page 32, Judge.

22            THE COURT:  On page 32, I'm deleting lines two through

23   12.

24            MR. HESS:  But that's right in the middle of an answer.

25   Two through 13?  Am I looking at the same page?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          THE COURT:  Well, you can delete that then because 32

2     is not really in the middle of -- it's like he was going on and

3     then you asked the question.  I'm just deleting that one and

4     then letting you start with your other question.

5          MR. HESS:  Gotcha, Judge.

6          THE COURT:  Okay.  Then on page 33, the bottom, delete

7     the rereading of the question and the colloquy that starts on

8     line one and goes through line 12 because you asked the question

9     again.  What I'm asking is it's a general question, I'm not

10    going to limit it right now, so you asked the question right now

11    so that ought to deal with it.

12         Page 35, delete the colloquy on lines five, six and

13    seven.

14         Page 36 don't need to read the question twice.  If he

15    read it again and he answered it, just do the initial reading

16    then the answer.

17         Page 37, that's a mess.  I have no idea how to fix

18    that.

19         MR. CEDERBERG:  I think the colloquies by Mr.  Urquhart

20    should just be removed.

21         THE COURT:  Yeah, but it's a mess.  There's more

22    talking, more everything.  I think that you just delete

23    everything from lines 12, 13 and 14 and actually just delete

24    everything from line 12 all the way through to line 11 on the

25    next page, because you start another question then you have an

1  answer right there.  I don't think you need all of that.  And

2  then delete the colloquy on page 39 lines 13, 14 and 15 leave in

3  the colloquy on page 40 because I think it explains the answer.

4  I think you need to leave in the colloquy on page four 45 also

5  -- let's look back at 44 though.  43.  I will delete the

6  question on line 17, 18, 19 and the colloquy on 20 and 21.

7  Delete those, and the question is asked again.  It's in a

8  shorter form on line 23 of that.  I'll permit the question on

9  page 44, so delete the -- well I'll leave it in so that the jury

10 has a right to hear that you didn't like the question, but I

11 think that the answer is okay.  I think you need to leave in --

12 this is a video right?

13        MR. CEDERBERG:  This is not a video.  It's going to be

14 question and answer read, so if something comes up, the Court

15 can tell us.

16        THE COURT:  Okay.  Then the interpreter, I think we

17 need to have somebody -- I think you need to have comments from

18 whoever is reading it from the lectern that the interpreter

19 conferred with the witness and said -- and then put in what they

20 said.  Otherwise it doesn't make sense.

21        MR. CEDERBERG:  Correct.  That will be read in.

22        THE COURT:  All right.  I think you need to, on page

23 45, read all of that otherwise it doesn't make any sense.  I'm

24 overruling the objections on page 46 and 47.  And 48.  What

25 settlement are we talking about?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
1              MR. HESS:  I'll withdraw that, Judge.

2              THE COURT:  Settlement expenses, what does that mean?

3    I don't know what that means.  If you're withdrawing it, then

4    leave it.  Then there's nothing there.

5              402 and the summary judgment, I think you should delete

6    the colloquy on line 17, 18, 19, 20 and 21.  This guy is quite a

7    head nodder, isn't he?  I'll overrule the objections on 51, 52,

8    I think you have to read the objections, the commentary.  I'll

9    permit the answer to -- so leave in the commentary on 18 and 19.

10   Objections are overruled on page 54, 55, 56, and 57.  58, okay.

11   I think you need to leave this commentary on the top of page 59

12   and to explain the various positions on why he may or may not be

13   interrupting the witness.  Any problem with that?  I think it

14   needs to stay in.

15             MR. CEDERBERG:  That's fine, Your Honor.

16             THE COURT:  Then lack of personal knowledge on what, on

17   page 60.  I have no idea what is going on on page 60.  I guess

18   the interpreter is reading something to the witness, reading a

19   document to the witness.

20             MR. CEDERBERG:  I believe, Your Honor, the witness --

21   the Court retained expert wrote a report and it refers to the

22   language in the audit report that he wrote.

23             MR. HESS:  That's fine, Judge.  I'll withdraw that

24   objection.

25             THE COURT:  Okay.  So they're coming in.  All right.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    I'll permit you to say everything that's on page 62, 63, 64, 65,

2    66, the rest all the way through.  That one is done.  Okay.

3          This last one appears to be the shortest one.

4    Mr. Saxon.  Dr. Saxon.  All the materials up through page six is

5    preliminary and I think they're admissible through page seven.

6    Through page eight.  Okay.  Through page nine.  I'm going to

7    read through the whole thing, then I'll come back and look at

8    the individual things because I can't really tell without

9    knowing what he's going to be saying.

10         You have several hearsay objections.  Isn't it

11    acceptable for an expert to rely on hearsay.

12               MR. HESS:  Except he's not an expert.  He's a layperson

13    expert.

14               THE COURT:  So you're saying it is acceptable for an

15    expert to rely on hearsay, but he's not an expert.  Is that what

16    you're saying?

17               MR. HESS:  He's a percipient -- I think their position

18    is he's a percipient witness.  Their position is he's permitted

19    in there since -- under the law, that borderline layperson

20    expert.  But it doesn't permit him to opine utilizing --

21    referring to hearsay testimony.

22               MR. CEDERBERG:  Mr. Saxon is one of these five guys

23    that came down to Dubai.

24               THE COURT:  That doesn't make him an expert, makes him

25    kind of a fool for standing in front of that thing, might have

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    collapsed on him.

2            MR. CEDERBERG:  He does have an expertise.

3            THE COURT:  Seems to me to have some expertise.  I

4    don't know that he's the world's expert, but he is a PhD with

5    lots and lots of experience in submersibles.

6            MR. HESS:  He's actually a PhD in a Masters business

7    program.

8            THE COURT:  Well, I didn't say he was a PhD in

9    submersibles, I said he is a PhD with vast experience in

10   submersibles.  Like I think that somebody that goes into the

11   Mariana Trench in a submersible has a certain amount of

12   expertise, I would think.  Didn't he do that.

13           MR. HESS:  That was Walsh.

14           THE COURT:  I thought he said he did that too.  Maybe

15   he was --

16           MR. MOSELY:  Don Walsh and Mr. Piccard.

17           MR. CEDERBERG:  On page 20 he says that Don Walsh was

18   the first pilot to go into the Mariana Trench.

19           THE COURT:  He said he served on the Trieste and

20   piloted the Trieste.  He did not say that he went down in the

21   Mariana Trench, that's true.  And he apparently was the

22   commanding officer of at least one submarine; is that correct?

23           MR. HESS:  No, Judge, he was not.

24           THE COURT:  Then how does he say that Don, he was my

25   executive officer on one submarine, that implies that he was the

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    commanding officer.  Maybe he was a --

2         MR. HESS:  He was below.

3         THE COURT:  He was his executive officer while he was

4    below.  I would have thought that he was the CO and the other

5    guy was my -- that's the way I would have dealt with it if I was

6    the commanding officer.  I would not have said that.  You do

7    understand I retired as a captain in the Navy and I wouldn't go

8    in a bath tub.

9         MR. HESS:  That's why we have the 402, 403 objection on

10   there.

11        THE COURT:  I got you.  Okay.

12        MR. HESS:  Because it is confusing, it does lead to

13   that.

14        THE COURT:  Tell me why you think he can accept

15   hearsay.  If it's going to take you this long, I think you lose.

16        MR. CEDERBERG:  My memory is I believe -- well, first

17   of all, he's not a designated expert in this field.  He has

18   expertise, he was one of the five experts brought in and the

19   evidence will be basically ignored by Mr.  --

20        THE COURT:  So you're saying they called him in and

21   they consulted with him so you should be able to pick his brain?

22   I don't know.  I don't understand that.  What is that?  What

23   difference does it make that they call him in?

24        MR. CEDERBERG:  Dubai World called these people in to

25   help Mr. Jaubert.  Mr. Jaubert's theory is they were making him

875

 1    a scape goat.  Dubai World brings them in, they come in, they

 2    have this expertise, Mr. Jaubert ignores them, doesn't even talk

 3    with them basically.

 4            MR. HESS:  That's not going to come through in the

 5    deposition.  Judge, I think under if they want to utilize

 6    Mr. Saxon or Dr. Saxon as he likes to be called, they can't --

 7    to utilize him over 703, under 703 of the rules of evidence,

 8    then they need to disclose him and they need -- and we need an

 9    expert report.  They've chosen not to do that.  They're using

10    him as a percipient expert.

11            THE COURT:  I don't even know what that means.

12            MR. HESS:  It's --

13            THE COURT:  I mean I know what the word means, but I

14    don't know what the combination of words mean.

15            MR. HESS:  It's a hybrid type of expert that's not even

16    an expert.  A layperson that the law has evolved with this

17    fiction that certain people that have been involved on a factual

18    basis, on a perception basis that they're allowed, just as Dr.

19    Nuytten today, he was allowed to bring his expertise to the jury

20    as a so-called expert lay witness.  They're excluded under the

21    case law, not under the literal meaning of the expert

22    provisions, but they're excluded from having to A, disclose him

23    as an expert and B, require the writing of an expert report.

24            I don't agree, but the fact is that so they're trying

25    to use Saxon in the same capacity, but they can't have it both

1    ways.  The only way that you can use an expert to bring in

2    hearsay is if they're an expert under 703.  If they want to use

3    him under 703, they needed to disclose him and they haven't.

4          There's no doubt they haven't disclosed him, so the

5    choice is if they want to use him as 703, he would have needed

6    to produce a report months ago, they haven't done so.

7          THE COURT:  All right.  But he can use anything that

8    your client may have told him.

9          MR. HESS:  well, I think what -- no, I don't think so,

10   Judge.

11         THE COURT:  Why not?  It's not hearsay.

12         MR. HESS:  Just as an admission?  It's used against

13   him, comes in through him,

14         THE COURT:  It can come in through anybody.

15         MR. HESS:  Yeah.

16         THE COURT:  I mean, seems to me like anything other

17   than from your client they can use.  I mean, excuse me, they

18   can't use.  I tend to agree with you.  Give me a reason why

19   that's not so, if you have one.

20         MR. CEDERBERG:  There's one confusion because I thought

21   I was very careful not to designate what other of these people

22   told Mr. Walsh, and it got designated because it was something I

23   didn't designate.  I will agree with the Court that what those

24   other experts told Mr. Walsh down there is hearsay.  Or told

25   Mr. Saxon, thank you, is hearsay.

```
 1            THE COURT:  Okay.
 2            MR. CEDERBERG:  But I do think the fact that Mr. Saxon
 3   --
 4            THE COURT:  Then let's go back through it because I
 5   told you I wanted to go through it once just to read it in its
 6   entirety to see what this was about.  So he was a chief in the
 7   Navy?
 8            MR. CEDERBERG:  He was also the chief executive and
 9   executive director for the association of diving contractors on
10   page eight.
11            THE COURT:  That doesn't make him an expert because if
12   it had, you would have designated him as such and you would have
13   --
14            MR. CEDERBERG:  I'm not even offering his expert
15   opinion, Your Honor.  I'm offering him just to show that as an
16   expert, he went down there to help Mr. Jaubert and Mr. Jaubert
17   wasn't interested in his help.
18            MR. HESS:  No, because what is attempted to be brought
19   in is he opines on the shape of the vessel.
20            THE COURT:  He says square ships suck and they're
21   dangerous.  That's pretty much what he said.  I saw it.  I don't
22   remember where it was, but let's see.  I was going to say page
23   13.  Do you have any view as to whether the box shape design was
24   conventional or unconventional.  Unconventional.  Do you have
25   any view as to whether the box shape design was potentially
```

1    dangerous.  Potentially dangerous would have been my view.  Why

2    is that.  Because submersibles are normally built from a series

3    of spheres or cylinders with hemispherical heads on the end of

4    them which are inherently much stronger from an engineering and

5    design perspective.

6         Sounds dangerously like an expert opinion.

7         MR. HESS:  Goes on and on, Judge.  If you look at the

8    first lines of page 15, he relies on hearsay as an expert could

9    do if he were a true expert.  Did you see any tests on the

10   Proteus?  I did.  He never witnessed any.

11        THE COURT:  Then you ask him about air strength and

12   tightness test.

13        MR. HESS:  That's what the EXT abbreviation is.  It's

14   inappropriate expert testimony.

15        MR. CEDERBERG:  Where we're going here is on page 19,

16   line 11, how did Jaubert generally act when you attempted to

17   engage him in technical discussion?  I think the gentleman was

18   very distracted by all things taking place.  He did not seem to

19   want to get in any discussion on the various projects I was

20   working on.  I did not get to spend very much time with him at

21   all.

22        In other words, this person came down with all these

23   ideas and Mr. Jaubert wouldn't listen to him.

24        MR. HESS:  The problem is, Judge, he is certainly not

25   at the level of expertise as Mr. Jaubert.  He's got a PhD in a

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    business program and he demand he be called Dr. Saxon.

2         THE COURT:  What's wrong with that?  He earned it.

3         MR. HESS:  I don't mind, but it's misleading to the

4    jury.  I can bring that out because he was asked where his PH.D.

5    came from.

6         THE COURT:  Where did it come from.

7         MR. HESS:  It's on the first couple pages.  Hidden in

8    there, but it's there.

9         MS. HEATHCOCK:  Page 69, line 14.

10        MR. CEDERBERG:  Your Honor, may I make a suggestion to

11   save time?  Now that we've had Mr. Nuytten's testimony,

12   Mr. Saxon's testimony, if I confer back with my team, probably

13   won't be necessary.

14        THE COURT:  I'll tell you what.  No.  I got a better

15   idea.  You take Mr. Dr. Saxon's testimony, go back, figure out

16   what you believe is admissible and why it's admissible and then

17   tomorrow morning give it to me with those designations and then

18   I will look at that while you're fiddling with the other ones

19   and we'll deal with it before we read it or play it.  Okay?

20        MR. CEDERBERG:  And I will do that with the guidelines

21   the Court has given me without hearsay.

22        THE COURT:  The guidelines being I don't think hearsay

23   is admissible, but it may be if it comes from the defendant.

24        MR. CEDERBERG:  Understood.

25        THE COURT:  And that I don't really -- I'm not real

1   sure I want to hear about how cylinders are better than squares,

2   although common sense tells me I've never seen a square

3   submarine in the Navy.  And they probably would like squares

4   because they have more room in them.  I know I got tired of

5   walking around like this in submarines myself.

6          MR. CEDERBERG:  Your Honor, I'm confident with the

7   Court's guidance that I can satisfy the Court and shorten this

8   very much.

9          THE COURT:  Truth is the only time I've ever been in

10   submarines, I was writing wills for them and I don't think we

11   want to talk about that.  Three of them got washed overboard the

12   day I wrote their final wills in Key West.  Not good.  Bad

13   timing.

14          Anyway.  Bye.  See you tomorrow.  With that pleasant

15   interlude, we'll leave.

16          MR. HESS:  Judge, should we count on recessing at 2

17   tomorrow?

18          THE COURT:  You better count on it and if you're doing

19   anything after 2, you will have to do it by Blue Tooth.

20          MR. CEDERBERG:  Your Honor, I have to confer with my

21   colleague, but assume after the depositions are read, we would

22   rest subject to checking the status of the exhibits to make sure

23   or records jive with the courts.

24          THE COURT:  So you may be finished tomorrow?

25          MR. CEDERBERG:  I may be finished tomorrow early

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    enough.

2              THE COURT:  You may need to have a witness, all right?

3    Thank you.  And then how long do you anticipate your case will

4    take?

5              MR. HESS:  Judge, I think we're going to need through

6    Wednesday at least.  I do, if we didn't have Monday.

7              THE COURT:  I know, but you got Tuesday.

8              MR. HESS:  Judge, I learned long ago not to -- I don't

9    want to be charged with -- you know, I think it's going to be

10   Wednesday judge.

11             THE COURT:  We'll get moving at about 10:00 Tuesday.  I

12   think I'll give him until 10 to get here from having sutures

13   removed from his mouth.

14             All right?  Thank you.

15             (See Volume 9, page 883 for continuation)
                             * * * * *

16
                       C E R T I F I C A T E
17   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

18

19

20

21
     _____          /s/ Dawn M. Whitmarsh
22   Date                      DAWN M. WHITMARSH, RPR

23

24

25

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1                          I N D E X

 2                          WITNESSES

 3    For Plaintiff:                                    Page

 4    Hussein Ramadan
        Continued Cross-Examination by Mr. Hess        765:17
 5      Redirect Examination by Mr. Cederberg          784:4

 6    Phillip Nuytten
        Direct Examination by Mr. Urquhart             790:8
 7      Cross-Examination by Mr. Hess                  819:1

 8                          EXHIBITS

 9    For Defense:

10    941
        In Evidence                                    832:21
11
      932.36
12      In Evidence                                    831:9

13    976 & 977
        In Evidence                                    767:23
14
      For Plaintiffs'
15
      169
16      In Evidence                                    788:9

17    405
        In Evidence                                    802:3
18

19

20

21

22

23

24

25
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**