1084

1            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF FLORIDA
2                FORT PIERCE DIVISION
             CASE NO.  09-14314-CV-JEM
3

4

5

6    DUBAI WORLD CORPORATION, and its
     Subsidiaries, EXOMOS, NAKHEEL and
7    PALM MARINE,

8                Plaintiffs,

9       vs.

10                               Fort Pierce, Florida
                                 February 22, 2011
11   HERVE JAUBERT, SEAHORSE
     SUBMARINES INTERNATIONAL
12   INCORPORATED, and Does 1-99,

13               Defendants.
     _____

14

15

                 TRANSCRIPT OF JURY TRIAL
16             VOLUME 10 - PAGE 1084-1165
           BEFORE THE HONORABLE JOSE E. MARTINEZ
17             UNITED STATES DISTRICT JUDGE

18

19

20

21

22

     REPORTED BY:      DAWN M. WHITMARSH, RPR
23                      Official Court Reporter
                        400 N. Miami Avenue, 10S03
24                      Miami, Florida  33128
                        Telephone:  305-523-5598
25

         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED BY COMPUTER

1085

1    **APPEARANCES:**

2    **FOR THE PLAINTIFFS:**
                         *Quinn, Emanuel, Urquhart & Sullivan, LLP*
3                        **BY: JON C. CEDERBERG, ESQ.**
                         **BY:  A. WILLIAM URQUHART, ESQ.**
4                        865 South Figueroa Street
                         10th Floor
5                        Los Angeles, CA  90017

6                        *Astigarraga, Davis, Mullins & Grossman*
                         **BY:  EDWARD MULLINS, ESQ.**
7                        701 Brickell Avenue
                         16th Floor
8                        Miami, Florida 33131

9
     **FOR THE DEFENDANTS:**
10                       *Hess & Heathcock, PA*
                         **BY:  WILLIAM HESS, ESQ.**
11                       **BY:  KATHRYN A. HEATHCOCK, ESQ.**
                         40 Southeast Osceola Street
12                       Stuart,  Florida 34994

13

14

15

16

17

18

19

20

21

22

23

24

25

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1086

```
 1                    P-R-O-C-E-E-D-I-N-G-S
 2            COURTROOM DEPUTY:  Case number 09-14314-civil-Martinez,
 3     Dubai World Corporation versus Herve Jaubert, Seahorse
 4     Submarines International, Incorporated.
 5            Counsel, please state your appearances for the record.
 6            MR. CEDERBERG:  Jon Cederberg and William Urquhart for
 7     the Plaintiff Your Honor, Ed Mullins is also at counsel table.
 8            THE COURT:  Good morning.
 9            MR. HESS:  Good morning, Judge.  William Hess and
10     Kathryn Heathcock, Hess & Heathcock, on behalf of Seahorse and
11     Mr. Jaubert.
12            THE COURT:  Are we ready to proceed?
13            MR. HESS:  Yes, Judge.  I did advise counsel this
14     morning I'm not going to proceed on the 50 motion this morning
15     and --
16            THE COURT:  You're waiving them?
17            MR. HESS:  I'm not waiving them, but I'm not going to
18     proceed today.
19            THE COURT:  Well, what does that mean?  I don't
20     understand what that means.
21            MR. HESS:  I think I'm entitled to bring them --
22            THE COURT:  You can bring them again at the close of
23     all of the evidence, but if you're going to bring it at the
24     close of the Plaintiffs' evidence, it was to be brought up the
25     other day.  What we're doing is we put that off until today, but
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1087

1    if you don't want to go forward that's fine.

2              MR. HESS:  I just believe I have the right to go

3    forward on that any time prior to submitting the case to the

4    jury.  I know it's typically done at the close of the case, but

5    for reasons that --

6              THE COURT:  Let me make sure that we understand.

7    Here's what I think, and I could be wrong, the Eleventh Circuit

8    is happy to tell me that I'm wrong if I am, but it's my

9    understanding that you have an opportunity to bring a motion for

10   directed verdict, or whatever it's called, at the close of the

11   Plaintiffs' case.  You don't have to bring it, but you can.  I

12   ask, at that point, that we not argue it at that point and that

13   I would permit that, at the close of the Plaintiffs' case, to be

14   done this morning.

15             MR. HESS:  Yes, Judge.

16             THE COURT:  You don't have to bring it at that time,

17   and you don't have to bring it now.  But if you don't bring it

18   now, you're waiving that part of it.  You can bring it anytime,

19   but if you bring it now, it is based upon only the evidence that

20   the Plaintiff had presented in their case.

21             MR. HESS:  Yes, Judge.

22             THE COURT:  When you bring it at a later time, you're

23   stuck with everything that comes in.

24             MR. HESS:  I agree, Judge.

25             THE COURT:  Okay.  So that's fine.  So as long as we

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1088

1    understand that, well, there's nothing we can do until all the

2    jurors that are here.  Only one of them is here.  So, yes, sir.

3              MR. CEDERBERG:  I do have some use of the court's time.

4    There are two witnesses that we received notice may be called

5    today.

6              THE COURT:  Okay.

7              MR. CEDERBERG:  I don't think they'll be called in the

8    morning, and they are Christian Turner and Fiona Turner.  These

9    are two people who we understand will provide evidence of their

10   own experience in Dubai and their alleged mistreatment in Dubai

11   when Mr. Turner was facing criminal charges and that he fled,

12   and we think this is clearly irrelevant, it's prejudicial.

13             THE COURT:  If that's what they're going to testify to,

14   can somebody explain to me how that is admissible.

15             MR. HESS:  Judge, Ms. Turner is going to testify to the

16   404 conduct, Evidence Code 404 conduct of Dubai World and

17   Istithmar and the -- you know we can't utilize conduct to prove

18   that the conduct of the Plaintiff was consistent in that regard,

19   but we can utilize that conduct to prove intent, motive,

20   knowledge, plan and preparation, and opportunity.  That is very

21   relevant to this case because they put on evidence that

22   Mr. Jaubert wasn't coerced into signing that agreement.  In

23   fact, they spent a lot of time talking about that.

24             THE COURT:  Which agreement?

25             MR. HESS:  The agreement that was executed by

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Mr. Jaubert to -- purportedly to agree to repay the millions of

2    dollars.

3            THE COURT:  Okay.  That agreement.

4            MR. HESS:  Yes.  And as the court recalls, they not

5    only said that -- you know, the agreement itself said that it

6    wasn't under duress, and they spent time with witnesses that it

7    wasn't under duress.  In fact, that witness said that the other

8    person that was with them was a little guy and couldn't possibly

9    be under duress.  They put on evidence to show that wasn't their

10   intent to have any duress, that they have no plan, no motive.

11   We're seeking to introduce with an instruction or without on

12   instruction to introduce those other acts by that entity.

13           THE COURT:  So you're saying -- I presume you're saying

14   that at some other time somebody was coerced, and therefore,

15   that means that they must have done this.

16           MR. HESS:  Not that they must have, but that there was

17   plan, intent, motive, preparation.  Not -- and of course, you

18   know, under 404, there's a lot of case law that says it's a fine

19   line between proving acts by prior acts or subsequent acts.  It

20   doesn't have to be a prior act, can be a subsequent act, too,

21   but we're arguing, and I believe it's appropriate; otherwise, I

22   wouldn't be arguing it today, to permit her to testify that she

23   had an occasion, just as Mr. Jaubert did, where she was told

24   that if she didn't do something, that there would be action

25   taken.  I mean I can go into it.  She was told if she didn't

1090

1   sign off on this agreement, she wasn't going to get her passport

2   back, that she was going to be prosecuted, that they were going

3   to continue to prosecute her.

4           THE COURT:  You're talking about Dubai World?

5           MR. HESS:  Yes, they were going to continue to forward

6   with that prosecution, and, in fact, in the document, Dubai

7   World says they're going to do what they need to do to dismiss

8   that criminal case -- in the document that I've also provided to

9   counsel yesterday night.

10          Judge, I don't know how much clear I can make it.  It

11  definitely goes to this case because it was their evidence.

12  They put it in, they're the ones that created the issues.

13  They're the ones that left the jury with the appropriate

14  impression that Dubai World had no intent, no motive, no plan,

15  no opportunity, no knowledge, no preparation, to extort this

16  money from Mr. Jaubert.

17          MR. CEDERBERG:  First of all, Your Honor, Mr. Ramadan

18  testified that he was involved in the agreement that we've just

19  heard talk about.  That was an agreement signed for 140,000

20  Dirham or $30,000, not for millions of dollars, just so the

21  record is clear.

22          Mr. Ramadan also testified that he had no more

23  involvement with Mr. Jaubert, anD I'll proffer, Your Honor, he

24  had no involvement with Mr. Turner.  There really is no 404(b)

25  character evidence of a corporation.  That really doesn't exist.

1091

1    And if we have to go into what happened with the Turners, we're

2    going to have a mini trial here on how.

3         THE COURT:  Tell me about, wait a second.  Let me focus

4    on that.  Do you have any cases that say that 404(b) is

5    admissible against corporations?  I mean, I've heard of it as to

6    individuals.  I've had it used in front of me many, many times.

7    But do you have cases that say that?

8         MR. HESS:  Judge, there's, counsel just said, 404(b)

9    character evidence.  Character evidence possibly not against the

10   corporation.  404(b) isn't character evidence, 404(a) is

11   character evidence.  There may be an argument as to individuals,

12   coercion under 404(a) because it's four --

13        THE COURT:  404(b) is plan, intent, motive,

14        MR. HESS:  Yes, Judge.  404(b), and it's a completely

15   separate argument.  It's other crimes, wrongs, or acts, and

16   there's nothing, there is no law, there is nothing in the

17   statute.  I've never seen a case that purported to draw a

18   distinction between acts of a corporation and not and acts of an

19   individual.  Certainly a corporation can act, and they did in

20   this case, and, Judge, it goes one step further.  Fiona Turner,

21   her testimony will be that.  It will be isolated and short, very

22   short.

23        It's not going to -- you know, despite the assertions

24   of counsel, it's not going to be a mini trial.  Mr. Turner, his

25   relevance, they don't want him to testify for other reasons, but

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1092

1    the fact is that doesn't matter.  The fact is that his testimony

2    is going to be relevant to the evidence that was purportedly

3    adduced by Plaintiff, specifically the validity, the import of

4    the signatures of approval by Mariam Sherot.  She was the one

5    that -- numerous documents were entered into evidence through

6    the hearsay exception on behalf of Plaintiff.  And in some of

7    our documents, she -- her name appears on these documents.  She

8    was the person that was the highest level signatory approving

9    these purchase orders.  And the testimony by -- so far they --

10   again, they put on this testimony.

11        THE COURT:  You're just -- you know, there's no jury

12   here, just tell me what you --

13        MR. HESS:  The reason I believe it's important, because

14   may -- it would be different if they didn't put on this

15   evidence, but they put on evidence leading the jury to believe

16   that those signatures were basically just a superfluous, not

17   really purporting to agree or confirm anything, and not

18   approving anything.  Mr. Turner was the risk management person,

19   one of the highest up in Istithmar.

20        THE COURT:  Let's talk about how similar these

21   agreements are.  This lady's case, you're saying that the

22   agreement said that they would drop the prosecution?

23        MR. HESS:  Yes, Judge.

24        THE COURT:  Does Mr. Jaubert's have that?  I mean,

25   that, in and of itself, seems to imply that there's a difference

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1093

1    between the two of them because Mr. Jaubert's -- they're

2    claiming that there was no coercion.  In that one, it sounds

3    like there was a quid pro quo.

4         MR. CEDERBERG:  It was also a lien on the property in

5    the Turner case.

6         THE COURT:  Well, you tried to get a lien on this one.

7    They said they tried to get a lean on this one, but they

8    couldn't, so that doesn't necessarily help.

9         MR. HESS:  The Turner agreement says -- I don't have

10   the language right in front of me, Judge.  I would like to

11   separate the agreement from the conduct, first of all.  The

12   agreement I gave them --

13        THE COURT:  Well, but you can't separate the agreement

14   from the conduct, because if the circumstances aren't similar,

15   then it doesn't matter.  You know, you have to make them

16   similar.  I'll tell you what, let's address this during -- you

17   know, during the lunch break and we'll try to get to the bottom

18   of it.  Do you intend to call them before lunch.

19        MR. HESS:  When is the court breaking for lunch?

20        THE COURT:  I don't know.  Lunchtime.

21        MR. CEDERBERG:  Your Honor, we have a short brief on

22   this we'll give to court and counsel.

23        THE COURT:  Give it to them, give it to me, and I'll

24   look at it, but I will give them an opportunity to respond, and

25   I'll give an opportunity to present it orally.  Okay?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1094

```
 1              MR. HESS:  Thank you, Judge.
 2              THE COURT:  All right.  Let's just wait for the jury.
 3    I don't know where the gentleman with the tooth problem is.  How
 4    many do we got now?  He was coming from Melbourne, I think.  He
 5    went to a dental procedure in Melbourne and was driving down.  I
 6    think you do have to address the similarity of the plans,
 7    because -- I mean, of the situations, because if they're not
 8    similar, then I don't see how it can possibly be -- show intent
 9    or motive or anything like that if it's not similar.  So that's
10    why I asked about that.
11              MR. HESS:  I will address it.
12              THE COURT:  We'll recess.  You got something else?
13              MR. CEDERBERG:  It's not the same person involved.
14              THE COURT:  Well, it hardly ever is the same person
15    involved, but it has to be the same or similar circumstances
16    involved.  I'll be happy to hear about it at the time.  All
17    right?  Before it comes in.
18              Okay.  We'll be in recess.  We got three jurors and
19    it's 10 minutes of ten.
20              (Brief recess)
21              (Jury in at 10:02 a.m.)
22              THE COURT:  Please recall -- don't we have a witness on
23    the stand?
24              MR. HESS:  Yes, Judge.  Ms. Jaubert.
25              THE COURT:  Please recall her.  Yes, ma'am.  You're
```

1095

1    reminded that you're still under oath.  You may proceed, sir.

2         MR. HESS:  Thank you, Judge.

3              CONTINUED DIRECT EXAMINATION

4    BY MR. HESS:

5    Q.  Good morning, Ms. Jaubert.

6    A.  Good morning.

7    Q.  We were just getting to the point where I was going to ask

8    you -- we were talking about the Goby.  I'll show what's been

9    marked as defendant's Exhibit 923.40, and conferred with

10   counsel, without objection, I seek to introduce that into

11   evidence.

12        MR. CEDERBERG:  No objection, Your Honor.

13        THE COURT:  What's the number, please?

14        MR. HESS:  923.40.

15        THE COURT:  Without objection, 923 is in evidence.

16        (Defense 923.40 in evidence)

17   BY MR. HESS:

18   Q.  Ms. Jaubert, do you recognize that vessel?

19   A.  Yeah.  It's the Goby in Puerto Rico.

20   Q.  Do you recognize that scene?

21   A.  Yes.

22   Q.  Would you let the jury know, what does that contemplate --

23   what are we looking at there?

24   A.  We were taking tourists out for rides.  We had put the

25   submarine on the beach.  I believe that was for the second time.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1096

1    It attracted a lot of attention on the beach that weekend, and

2    it really attracted -- there were reporters.  People from the

3    tourism department were there also.  It got around.  It got

4    pretty viral.

5    Q.  When you said -- so you've got a fully operational vessel

6    there?

7    A.  Yes.  There were people inside of it, in fact.

8    Q.  Who was the pilot of that vessel?

9    A.  I'm sorry?

10   Q.  Who piloted the vessel?

11   A.  It was Herve.

12   Q.  And did you have an opportunity to ride in that, in the

13   Goby?

14   A.  I rode in the ones, yes.

15   Q.  What was your impression of it?  Did it work?

16   A.  Yes.  It was cool.  It was really neat.  We submerged, I

17   think, about 10 to 15 feet, and we saw fish, the water was very

18   visible, just the whole environment, it was very nice.

19   Q.  When you took it out, when you were involved in that dive,

20   did you have any problems leaking?  Did it fail to work?

21   Anything like that?

22   A.  No, not at all.  In fact, Herve was very good about warning

23   people about, like, the noise of the engine, there might have

24   been some humidity.

25          THE COURT:  Hold on a second.  Yes, sir.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          MR. CEDERBERG:  Move to strike as nonresponsive after

2     she answered.

3          THE COURT:  As I said before, nonresponsive is usually

4     the objection of the person that is asked the question, but the

5     problem is that when a question -- when an answer is not

6     responsive, it doesn't give the other side an opportunity to

7     object.

8          Ma'am, I would ask you, you know, if you would try to

9     answer the question as clearly as possible.  This one says,

10    "when you took it out, when you were involved in that dive, did

11    you have any problems leaking?  Did it fail to work> anything

12    like that?"

13         And you said, "No."  Then you started talking about how

14    good he was and warning this and doing that.  That had nothing

15    to do with that question.  So try to answer the question

16    specifically.

17         THE WITNESS:  Okay.

18         THE COURT:  I will overrule your objection because of

19    the nature of it, but I would ask the witness to be more

20    careful, please.

21    BY MR. HESS:

22    Q.  When you took that ride, it worked the way it was supposed

23    to work, correct?

24    A.  Yes.

25    Q.  I think you said there was no leaks, no problems?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
1    A.  No.
2    Q.  Now, what was your role in the submarine tourist business
3    that you guys conducted when you were in -- you and Herve
4    conducted when you were in Puerto Rico?
5    A.  I basically network for him.  We took people out, I
6    introduced -- because there was a language barrier, he didn't
7    speak Spanish, I did, so I spoke to the people, I introduced
8    them to Herve and introduced them and translated how the
9    submarine worked.  And that's how they wanted to go and ride
10   with it.  So I networked.
11   Q.  What type of advertising did you conduct?
12   A.  I work for the Doreta Beach Hotel as a hotel manager.  So a
13   lot of the advertisement came from the hotel.  I networked,
14   social, public relations department.  Department of tourism.  We
15   had a lot of people that stayed at the hotel who knew me, and I
16   promoted the submarine by word of mouth, basically.
17   Q.  Now, could you -- you're aware of how the logistics were
18   about, you know, where the tourists or where the person that
19   wanted the submarine ride would meet the sub an how it took off
20   from the beach or wherever it took off from?
21   A.  Yes.
22   Q.  And could you explain to the jury how did that work?
23   A.  Okay.  Basically, if a person showed interest in the
24   submarine, I'd introduce that person to the concierge, the
25   concierge would have that information, as well, but the person
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1099

1    would be taken to the beach where the submarine was located, and

2    there they would be introduced to Herve.  Herve would give them

3    the rundown as to how the submarine worked.  And there was the

4    translator on the beach itself from the hotel.

5    Q.  Let me stop you there.  Where was the sub?  Was it floating

6    or was it aground or how?

7    A.  It was floating, it was floating.  It was floating, I would

8    say, 15 to 20' offshore, and we would take the passengers from

9    the shore by dinghy to the submarine itself.

10   Q.  And is that about -- was it further from shore than that

11   picture, or is that approximately how the sub was?

12   A.  That's approximate, that's actually how it was in action.

13   Q.  Okay.  So how would it be?  Would it be anchored there and

14   Herve would be on shore?  Or how did that work?

15   A.  It would be pretty much anchored.  It's pretty buoyant.  It

16   floats on its own.  It won't go anywhere unless the engine is on

17   and the propulsion is taken off.

18   Q.  Was there a contract that was signed in order to go for one

19   of these rides?

20   A.  I believe so, yes.

21   Q.  And what was the cost of the -- do you remember what Herve

22   and your business charged for the -- to go on the submarine

23   ride?

24   A.  I believe it was $50.

25   Q.  And how long was the ride?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.   25 minutes.

2    Q.   And how many people did that version of the Goby hold?

3    A.   Two passengers and one pilot.

4    Q.   Were you there when Herve would instruct the prospective

5    passengers on what to expect and the incidentals to going on a

6    submarine ride?

7    A.   Not every single time, but the first time the first

8    passenger came on board, yes, I was there for his briefing and

9    he would explain to the passenger how would that work.

10   Q.   What was the explanation?

11   A.   What to expect as far as how it would submerge, what --

12          THE COURT:  What did he say?  What did he say?

13          THE WITNESS:  He basically --

14          THE COURT:  If you remember.  If you don't remember,

15   you don't remember.  But if you remember, what did he say?

16          THE WITNESS:  I know the first thing, he said to not be

17   scared, that the submarine is going to submerge.  And a lot of

18   people that would go on there would be first timers because they

19   like water.  I don't remember the rest.

20   BY MR. HESS:

21   Q.   When you went, I know you already testified how deep it

22   went.  Do you know if you know -- do you know how deep the

23   tourists would actually go in the sub, if you know?

24   A.   No, I don't remember.

25   Q.   Okay.  Now, how often would the sub be available for rides

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    every day?

2    A.  I would say weekends.  Mostly weekends.

3    Q.  Was there a reason why the weekdays weren't available?

4    A.  No tourists.

5    Q.  Okay.

6    A.  Basically.

7    Q.  And what would you and Herve be doing while the sub wasn't

8    being operated?

9    A.  Maintenance.  I would see him work on it.  Keep up the

10   maintenance work.  I would work a lot of the times at the hotel.

11   If the Goby wasn't working at the beach, he would take it back

12   to the house for maintenance or the garage for maintenance.

13   Q.  Would you haul that -- would he move it each weekend and

14   each day, or would he leave it at the beach overnight?

15   A.  No, he would haul it back and forth.  He would take it back

16   to the garage.

17   Q.  And how would he do that?

18   A.  With a trailer, on wheels.

19   Q.  Would you help him with that, or is that something he did

20   alone?

21   A.  He did that alone with an assistant.

22   Q.  Now, how long did you conduct that enterprise -- did Herve

23   conduct that enterprise?

24   A.  It was on and off.  On and off for a few years.  I would say

25   two or three years.  During the winter months we didn't use it

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

102

1      that much.

2      Q.   That was because?

3      A.   Because of the flow of tourists from the hotel.

4      Q.   So it's accurate to say that it was -- the frequency of the

5      submarine's use was dependent on the tourist industry?

6      A.   Tourist weather, also, because Puerto Rico was prone to a

7      lot of hurricanes and a lot of rain.

8      Q.   During that two or three years, did the business expand?

9      And what else was going on during that period of time, if

10     anything, regarding the submersibles?

11     A.   I wouldn't say it expanded, but only because we had offers

12     to go to the United States with it.  And that aspect, it did

13     expand.

14     Q.   Okay.  Did there come a time that you did come to the United

15     States?

16     A.   Yes.  We came to Florida.

17     Q.   And what was that -- did something prompt that decision to

18     come to the US?

19     A.   He had and he found a warehouse here in the US.  What

20     prompted his decision to come here was just better permissions,

21     better weather.

22     Q.   Was there storms in Puerto Rico that caused anything?  Is

23     that part of the decision, do you recall?

24     A.   I don't remember.

25     Q.   Okay.  Now, when the decision was made to come to the United

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

103

1    States, how did that come about?  What did that entail?  You had

2    to pack up the Goby.  What did you do?

3    A.  Well, I was already -- my contract was high -- at Doreta

4    Beach had already expired.  I wanted to get another job.  That

5    was first and foremost, so for me, I wanted to come to Florida

6    mostly for me, but at the same time it would have been a better

7    opportunity for Herve to expand his business, to build more

8    submarines, because he had more ideas for touristic business

9    here in Florida.

10   Q.  What year are we talking about?  We've gone to two or three

11   years in Puerto Rico?

12   A.  2000.

13   Q.  While you were making this decision to go to Florida?

14   A.  The year 2000.

15   Q.  And did you have children then?

16   A.  Yes.  Our first one was born in 1999.

17   Q.  And that was -- which child was that?

18   A.  Sebastian.

19   Q.  Sebastian.  Thank you.  So you, Herve, Sebastian travel to

20   Florida?

21   A.  Yes.

22   Q.  Did you bring the sub with you?

23   A.  Yes.  It came a month later.  It came by boat.

24   Q.  What was the next event you were involved in in Herve's the

25   new enterprise that he was conducting in Florida?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

104

1    A.   I wasn't involved directly.  I was more, again, getting the

2    permissions and getting paperwork together for him.  But I was

3    out looking to expand my career, as well, so I wasn't involved

4    with him as extensively.

5    Q.   Now, did there come a time that you became involved -- well,

6    did he operate a business in Stuart -- in Florida?

7    A.   Yes, he did.

8    Q.   Was it in Stuart, Florida?

9    A.   Yes, it was.

10   Q.   And were you involved in that business?

11   A.   Not initially.  I came to visit him at the warehouse.  He

12   had found a warehouse, he found some people that were willing to

13   help him finance and find out how we can get money from banks

14   and find investors.

15   Q.   To do what?

16   A.   To expand the business.

17   Q.   And what was the business?  How was that going to be

18   expanded?  Do you know?

19   A.   To build more submarines.

20   Q.   Okay.  Now, and was there a name for this business?

21   A.   Seahorse.  Seahorse Submarines.

22   Q.   So you said that eventually you became involved in the

23   business.  When did -- because when you weren't involved in the

24   business, you don't have much knowledge about what was

25   conducted, correct?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

105

1    A.   Yeah.   Because I was at home taking care of the little one,
2    and I wasn't working at the time.   So I had to stay home to take
3    care of him.
4    Q.   And what was Herve's schedule during that period of time
5    prior to you getting reinvolved in the submarine business?
6    A.   Every day from 9:00 until 6:00.   Sometimes 7:00 building and
7    getting supplies, finding people, finding out how Florida works
8    as far as building submarines, like that.
9    Q.   Okay.   Now, did there -- you mentioned there came a time
10   that you became reintroduced into the submersible industry?
11   A.   Yes.
12   Q.   And when was that?
13   A.   2001.   Around 2001.
14   Q.   So you only had about a year off then?
15   A.   Yes.
16   Q.   And what was your capacity?   How were you involved?   Was it
17   also the Seahorse Submarines International, Inc., business?
18   A.   Yes.
19   Q.   And how were you involved; in what capacity?
20   A.   Administrative, mostly.   Just helping him look for people,
21   networking.   Just finding information on how he can build the
22   business.
23   Q.   And did he have employees at that time in 2001?
24   A.   He had one assistant.   I don't remember his name.
25   Q.   And what was your -- what did you perceive when you

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

106

1    became -- first of all, did you come visit the facility during

2    that period of time when you were taking care of Sebastian

3    between 2000 and 2001?

4    A.   Yes, I did.

5    Q.   And what did you perceive there?

6    A.   I saw a huge 10,000 square foot warehouse where he started

7    to get supplies, and he gave me -- there were pictures and

8    blueprints of other submarines that he wanted to build.

9    Different sizes, different prototypes.  He designed on paper

10   what he wanted to do.

11   Q.   And did there come a time -- was he building submarines at

12   that point?

13   A.   Yes.  He was starting to build a bigger one called the

14   Adventurer.  I believe it was three seats.

15   Q.   Now, we're back shooting forward to 2001 again.  You're

16   involved administratively.  Were you involved in payroll, paying

17   his workers?  Or what were you doing?

18   A.   More like answering phone calls, just answering the phones.

19   I was in and out of the office, going to the DMV, just running

20   errand basically.  Not in the office extensively.

21   Q.   Now, did there come a time where Seahorse employed more than

22   that one person?

23   A.   Yes.

24   Q.   When was the next employee?  Was it a steady increase of

25   employees, or if you could tell the jury what was your

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    experience?

2    A.  It was more like a slow increase.  I would say about two.

3    He hired one more other person who was qualified in the

4    fiberglass, and that same year he hired a second person.  So

5    altogether it was three persons working in the warehouse, so far

6    that I saw, and they were working with fiberglass, sanding, that

7    type of thing, 2002.

8    Q.  What were they building?

9    A.  They were building the mold of the submarine itself.

10   Q.  Was that a process that took time?

11   A.  It did.  Because then one of the employees explained to me

12   that it had to dry for --

13            MR. CEDERBERG:  Objection.  Hearsay, Your Honor.

14            THE COURT:  What is the objection?

15            MR. CEDERBERG:  Hearsay.

16            THE COURT:  I believe it is hearsay.  Don't tell us

17   what other people told you, okay?  All right.  Go ahead.

18   BY MR. HESS:

19   Q.  You perceived this process of constructing molds?

20   A.  Yes.

21   Q.  And how long -- what kind -- if you can give the jury an

22   impression of how long of a process.  Was it days?  Was it

23   months?  Was it weeks?  Was it years?

24   A.  It would take days.  I remember seeing a mold stay the same

25   way, and remembering how the acetone and the smell of the

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

108

1     factory and the fiberglass everywhere.  So, yeah, it was along

2     process, because there was a lot of drawing involved.  I saw

3     employees working in one area, then I saw employees going back

4     to the same mold that had been sitting there for three or four

5     days, but it was because they had to wait for this glue to dry.

6     Q.  You said you saw drawings.  Did you ever witness Herve with

7     plans and drawings?

8     A.  Yes.  Yes.  In the office.  He had a drawing board in the

9     office, and I saw him draw other submarines that he wanted to

10    build, expand it.

11    Q.  What was Herve doing?  Was he in the shop, in the production

12    area?  What was he doing during that period of time that we've

13    been discussing this initial time creating the moulds, creating

14    that Adventurer submarine?

15    A.  When I was there, I saw him giving instructions as to what

16    to do, how long it should dry, what to sand, even down to the

17    color of the submarine.  The Adventurer was supposed to be a

18    bright yellow.  Even the specific yellow that he picked for

19    those specific submarines.  The blue striping had to go a

20    specific way, and Herve was there for -- from the ground up.

21    Q.  Did you perceive anything that was being conducted in terms

22    of the fabrication of the Adventurer or the vessels in there

23    that was done without Herve's guidance and control?

24    A.  I never went into the warehouse without Herve, unless he

25    gave the instructions to the employees.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

109

Q.  Okay.  When you were there with Herve, he was instructing
employees?

A.  Yes.

Q.  Now, did there come a time where this mould turned into
something more than just a mould?

A.  Yes, it did.

Q.  And when was that?  If you can give us an approximate time.
How much after when Herve first started the construction of the
Adventurer and the moulding process, how much time after that
did you perceive, you know, what you could recognize as a
submarine?

A.  When I first saw the mould it was one day, and then when I
came back, I would say three months later, it was almost a full
submarine without the electrical work, if you will.  Then the
electrical work came later, but I would say approximately four
months, and just a four months' time I saw that one submarine go
from a mold to a fully visual submarine.

Q.  And if you could tell the jury -- explain to the jury, was
there another transformation in the business?  Was there a time
that it was not just the Adventurer that was being constructed,
were there other submersibles being constructed?

A.  There were other submersibles being constructed.  I saw one
other submarine that looked like a tube, a tubular submarine,
but the Adventurer was there because it was an order from
somebody; it was requested by a client.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

110

1    Q.  Let me draw your attention to what has been marked as

2    defendants' Exhibit 923-3.  Conferred with counsel, and I seek

3    to introduce that into evidence without objection.

4            MR. HESS:  No objection.

5            MR. CEDERBERG:  No objection.

6            THE COURT:  All right.  Without objection, 923.3 is

7    admitted in evidence.

8            (Defense 923.3 in evidence)

9    BY MR. HESS:

10   Q.  Ms. Jaubert, do you recognize that facility?

11   A.  Yeah.  It's in Stuart.

12   Q.  Okay.  What was that -- was that the same facility you were

13   talking about just now?

14   A.  Yes.

15   Q.  So now we've got to the point where Herve is constructing

16   multiple vessels, correct?

17   A.  Yes.

18   Q.  And obviously there are more than just a couple people

19   working there?

20   A.  Yes.

21   Q.  Now, what was it like?  Do you have an idea when that was?

22   A.  What year?

23   Q.  Approximately, yes, just to make the jury understand the

24   progress.

25   A.  Between 2002 and 2003.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

111

1    Q.  Now, during that period of time, was that a typical scene?

2    Was that what it looked like?

3    A.  Yeah.

4    Q.  Were these workers constructing these things on a daily

5    basis?

6    A.  Every day.  Every single day.  Monday through Friday.

7    Q.  What was your role in the business at that time, if

8    anything?

9    A.  I would go, and basically to help him with phone calls.  I

10   found a payroll company that could help him to pay for his

11   employees to keep track of his books.  But at this time, I was

12   more or less at home.  But if I went into the factory, it was

13   for two days out of the week administrative-wise just to help

14   him with the paperwork.

15   Q.  Would that have been your responsibility, the insurance for

16   the employees?  Did they have insurance, do you remember?

17   A.  I don't remember.

18   Q.  Okay.  Now, was your involvement -- did you have any

19   involvement in the sale of these submersibles, or did you --

20   A.  No.

21   Q.  Did you ever see any -- did you witness any of them being

22   tested or utilized back in that period of time, 2002, 2003?

23   A.  No, I didn't.

24   Q.  Do you know -- okay.  You just didn't witness it?

25   A.  I just wasn't there.  I just didn't.  I was at the factory,

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

112

1    but I wasn't there to see.  I don't remember seeing anything

2    being tested.

3    Q.  Okay.  Now, is that the extent of your understanding of the

4    business in Stuart?

5    A.  Yes.  Administrative-wise I did filing, invoicing, answering

6    phone calls, I spoke to the employees.  One or two only worked

7    part-time.  The rest were full-time.  Some were specialized in

8    fiberglass, some were specialized in sanding.  Just getting to

9    know the employees.

10   Q.  Before we move on to the next phase, what was Herve's work

11   schedule like during this period of time?  Let's call it the

12   later Seahorse/Stuart years.

13   A.  Monday through Friday, 8:00 to 6:00, sometimes 7:00.  It all

14   depending on how late he would work as far as the mouldings.  It

15   all depended on the work itself.

16   Q.  And what was he like when he was home on the weekends?

17   Would he just let go of the submarines and not talk about them?

18   A.  He talk about them all the time.  He brought his work home

19   with him.  He brought his paperwork home with him.  Everything.

20   Everything was submarine life.  Wouldn't stop talking about it.

21   Q.  Now, did there come a time -- were you involved or were you

22   aware -- there came a time you moved to Dubai, correct?

23   A.  Yes.

24   Q.  What do you know about that decision process prior to moving

25   to Dubai?  Anything?

113

1    A.  It happened really fast.  From one day -- I had just had the

2    second baby.  I was still recuperating from the cesarean, and

3    from within one month, he told me people came to visit his

4    factory.  It was the very same factory we're looking at now.

5         MR. CEDERBERG:  Objection.  We're getting into hearsay

6    again.

7         THE COURT:  It is hearsay.  Don't tell us what he said.

8         THE WITNESS:  Okay.

9    BY MR. HESS:

10   Q.  There came a time where you and Herve decided to move to

11   Dubai, correct?

12   A.  Yes.

13   Q.  What was that process like?  Did you have to pack everything

14   up?  Did you pack everything up?  What happened?

15   A.  I packed everything up as far as home.  He was more packing

16   things up at the factory.  Things were necessary as far as his

17   equipment.  The containers were there from one day to the next.

18   The pier containers, those huge 20' containers.  It happened

19   really fast.  And he said, "We're going to Dubai."

20   Q.  You went to Dubai?

21   A.  Yes.

22   Q.  How long did you spend -- do you recall when you arrived in

23   Dubai with your children?

24   A.  Yes.

25   Q.  When did you arrive?

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

114

1  A.  It was November of 2005.  2005.

2  Q.  Now, if you could, did you ever visit the facility in Dubai

3  where Herve worked at?

4  A.  Not initially, no.  Not initially.  In the beginning,

5  Dubai -- it was -- you have to understand, Dubai is a place

6  where females aren't welcomed in very many places, so I was at

7  home taking care of the kids, getting the kids settled.  We were

8  living in a hotel for six weeks.  The first six weeks we were in

9  Dubai we were living in a hotel.  So it's really hard to live in

10  a hotel and a twin bedroom with, I would say, a one-year-old and

11  my five-year-old.  Herve was barely there.  I was pretty much

12  left at the hotel with the kids while he was working with

13  people.  People came to pick him up at the hotel, but I didn't

14  see where he was going.

15  Q.  Did there come a time where you had other living

16  arrangements, accommodations?

17  A.  Yes.  After the -- on the seventh week after we left the

18  hotel, we went to a townhouse, basically.  Looked like a

19  townhouse.

20  Q.  And was your involvement in Herve's work, was it the same?

21  Were you at home?

22  A.  I was at home, but at this point, in Dubai, I had nothing to

23  do with it.  It was more okay, I'm the wife, basically.  He was

24  the man, and he was the one they needed.  My involvement was

25  almost nothing.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

115

1   Q.  You went out, about, sightseeing all those kind of things?

2   A.  It's hard to sightsee when you have two small babies and you

3   don't know the language.

4   Q.  Now, did there come a time where you did travel to -- or

5   drive or take a ride to see where Herve worked at Dubai World

6   and Exomos?

7   A.  Yes, eventually, but it wasn't until almost, I would say

8   three, four months later.  We haven't even had our moving yet.

9   We were still waiting for our furniture to get in; the house was

10  empty.  We were getting -- you know, a part of the contract he

11  had was that we had a house made.  I felt uncomfortable with

12  having a strange lady live in my house, so I was really getting

13  used to the environment itself.  It was very difficult for me,

14  especially for my oldest because he has special needs.

15  Q.  What do you mean "special needs"?  I'll withdraw that.

16      MR. CEDERBERG:  Can we go by question and answer so I

17  can object?  We have these long answers, very hard.

18      THE COURT:  Yeah.  Please try to answer the question

19  specifically.  Again, we're getting narrative answers, which

20  makes it difficult for opposing counsel to know exactly what it

21  is you're going to say, so he doesn't know whether to object.

22  All right?  Would you please try to answer the question.

23  BY MR. HESS:

24  Q.  When you were there, you're in the townhouse, you said, how

25  long was it before -- withdraw that.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

116

```
1              Who was responsible -- your understanding, who was
2     responsible to ship your and Herve's and your children's
3     personal belongings to Dubai?
4     A.   My understanding was that it was part of his new job.  It
5     was the job that was supposed to, who requested that we move
6     there.
7     Q.   And how long did it take for you to get your -- the things
8     that you needed to live on a daily basis, your furniture, those
9     kind of things?
10    A.   Three months.
11    Q.   And you left -- it was packed when you left --
12    A.   Yes.
13    Q.   -- for Dubai?
14              Now, what's the next phase?  You're getting used to --
15    you're getting acclimated to Dubai, was that a difficult
16    process?
17    A.   Yes.  Very much so.
18    Q.   Why?
19    A.   Language barrier.  Didn't know where I was.  The townhouse
20    we moved to was very remote in the area where we were.  It was
21    sand.  It was just basically desert, so it was very difficult,
22    yes.
23    Q.   Were there any cultural differences that presented that
24    caused you to have to take some time to get used to?
25    A.   Yes.  Being an American in the Middle East is already
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1117

1    difficult.

2              MR. CEDERBERG:  Your Honor.

3              THE COURT:  Sustained.

4    BY MR. HESS:

5    Q.  There came a time that you would visit Herve at his -- at

6    the Exomos facility?

7    A.  Yes.

8    Q.  How would you get there?

9    A.  I would have a taxi or somebody come and pick me up.  He

10   would send for me.  But our cars weren't there yet.  I didn't

11   have a car.

12   Q.  When did the cars arrive?

13   A.  About three months later.

14   Q.  Now, that's three months after your furnishings arrived?

15   A.  It was around the same time.

16   Q.  Okay.  And you car, what cars did you and Herve drive at the

17   time?

18   A.  Hummer.

19   Q.  Okay.  Did you each have one?

20   A.  Yes.

21   Q.  So you would visit Herve, that opportunity you started

22   visiting with him.  Did you visit Herve at his plant frequently?

23   A.  Not frequently.  I would say once every two weeks.

24   Q.  What was his work schedule during that period of time?

25   A.  Very hectic.  He was being called back and forth.  People

1118

1    were surrounding him for information, ideas.  He was in demand,

2    if you will.  I barely spoke to him.  When I was there, I barely

3    spoke to him.

4    Q.   What about in terms of how much time did you see him when he

5    was at the house?  What was his work schedule like in terms of

6    when he left and when he came back?

7    A.   He would leave the house at 7:30 in the morning, and he

8    would come back around 8:00 in the evening.

9    Q.   Did he get calls from -- I don't want to know what they

10   said, but did he get business calls?

11   A.   His phone was constantly ringing, yes.

12   Q.   And he took those calls?

13   A.   Yes.

14   Q.   Now, there came a time where you -- if you could explain to

15   the jury, there came a time where you moved back to United

16   States, correct?

17   A.   I moved.

18   Q.   You moved back to the United States?

19   A.   Yes.

20   Q.   And when was that?

21   A.   During the stay of Dubai?  I don't understand.

22   Q.   When did you leave Dubai to come back to live in the United

23   States?

24   A.   2008.

25   Q.   Okay.  And did -- if you know, did you know a person -- do

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

119

1   you know Sultan Bin Sulayem?

2   A.  I don't know him personally.  I've seen him.  I've seen his

3   photographs on the internet.

4   Q.  Okay.  Did he call Herve, if you know, at home?

5   A.  Yes.  He called him on his cell phone.

6   Q.  Did that happen often?

7   A.  I would say once a week.

8   Q.  Now, in 2008, you left Dubai, correct?

9   A.  Yes.

10   Q.  You left with your children?

11   A.  Yes.

12   Q.  Did you leave with your husband also?

13   A.  No.

14   Q.  If you could explain to the jury, why did you leave?

15        MR. CEDERBERG:  Objection.  Relevancy, Your Honor.

16        THE COURT:  What is the relevance?

17        MR. HESS:  Well, Judge, I'll phrase it in a different

18   way.  I'll be easy.

19   BY MR. HESS:

20   Q.  You left Dubai in 2008.  Do you remember the month you left?

21   A.  March.  Sorry.  I'm sorry.  April.  April.  Because I quit

22   my job in March.

23   Q.  Why is it that you didn't leave with Herve?

24        MR. CEDERBERG:  Objection.  Relevancy, Your Honor.

25        MR. HESS:  Judge, it goes to --

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

120

```
 1                THE COURT:  I'll permit it.
 2                THE WITNESS:  He had no passport.  He told me that --
 3                THE COURT:  That's enough.  Don't talk, please.  You
 4      cannot tell us what other people told you.
 5                THE WITNESS:  Okay.  I'm sorry.
 6                THE COURT:  Again.  So don't do that, please.
 7      BY MR. HESS:
 8      Q.  So you left with the children, he stayed in Dubai?
 9      A.  Yes.
10      Q.  Now, the days preceding your leaving Dubai, what was Herve
11      doing?  What did you witness him doing?
12      A.  I saw marine maps on the desk.  I saw satellite telephones,
13      cell phones, I saw a portable laptop, I saw things that I'd
14      never seen before.
15      Q.  And did you, without -- again, you heard the judge,
16      without -- I'm not asking you what he told you, but what was
17      your -- did you have discussions about what was going on?
18                MR. CEDERBERG:  Objection.  Again, relevancy, Your
19      Honor.
20                THE COURT:  I don't understand what the relevance is of
21      her having discussed things with him which would not involve
22      hearsay.  Sustained.
23      BY MR. HESS:
24      Q.  You left Dubai, you flew to where?
25      A.  I had a connecting flight in London, Heathrow, to my final
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

121

1    destination in Miami.

2    Q.  Couple more inquiries.  Maybe more than two questions, but a

3    couple areas of inquiry.

4           When you left in 2008, did you confirm with Herve upon

5    your departure that you got on the plane?

6    A.  Yes, I did.

7    Q.  And in 2007, were you on a holiday and Herve received a call

8    inquiring him to come back?

9    A.  Yes.  We were in Fugero --

10          MR. CEDERBERG:  Your Honor, I think she's answered the

11   question.  If we don't go question and answer, I won't be able

12   to object.

13          THE COURT:  Yes.  You already answered the question.

14   The question was yes.

15   BY MR. HESS:

16   Q.  And were you there with your children also?

17   A.  Yes.

18   Q.  And when Herve got that call, we don't want to know what he

19   said, but did you go back to Dubai?

20   A.  Yes, we went back to Dubai City, yes.

21   Q.  Was that done in a leisurely, casual way, or was that in a

22   rush?

23   A.  No.  He completely changed demeanor.  He looked rushed, he

24   looked pressured, he was sweating, and we just left very

25   abruptly.  We cut the vacation short.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1     MR. HESS:  Thank you, Judge.  Nothing further.

2     THE COURT:  Cross-examination.

3                     CROSS-EXAMINATION

4   BY MR. CEDERBERG:

5   Q.  Good morning.

6   A.  Good morning.

7   Q.  When you and your husband left for Dubai, first of all, I

8   think you said November 2005.  It was November 2004, right?

9   A.  The same year my son was born.

10  Q.  Which was?

11  A.  2004.  Yes.

12  Q.  Okay.

13  A.  You're right.  Sorry.

14  Q.  When you left in 2004, in November 2004, how many employees

15  did Seahorse have?

16  A.  I don't remember.  I saw three.  There could have been more,

17  there could have been less.

18  Q.  And after you left with your husband and went to Dubai, how

19  many employees did Seahorse have?

20  A.  I don't know.  I didn't see.  There were employees still

21  left, yes.

22  Q.  For how long were those employees left?

23  A.  For two weeks after that because the shop was closing down.

24  Q.  And once the shop was closed down, Seahorse didn't have any

25  more employees in Florida, right?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

123

1    A.   There was Mr. Metcalf, who was running the office, and the

2    secretary who was left.  So two more, yeah.

3    Q.   Mr. Metcalf, he was -- worked with you at your radio station

4    job, right?

5    A.   Yes.

6    Q.   So when you say he was running Seahorse's office, was there

7    a business Seahorse still going on?

8    A.   He was finalizing paperwork for us.

9    Q.   When you say finalizing, do you mean he was wrapping things

10   up?

11   A.   Yes, sir.

12   Q.   Okay.  And he did that for a couple weeks, then there were

13   no more Seahorse employees in Florida?

14   A.   Yes, sir.  Right.

15   Q.   And when you left to go to Dubai, did Mr. Metcalf move into

16   your home?

17   A.   It was almost a year later, yes.

18   Q.   Now, you are or were a half owner of the Seahorse company,

19   weren't you?

20   A.   Yes.

21   Q.   Okay.  And you actually provided assistance to your husband

22   at Seahorse, right?

23   A.   Yes.

24   Q.   And one of the things you did was to arrange and coordinate

25   multiple meetings for your husband?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.   Yes.

2    Q.   You handled all aspects of chief executive office's file

3    organization?

4    A.   I filed invoices, yes.

5    Q.   And you were involved in the location of, quote, sensitive

6    documents, close quote?

7    A.   Yes.

8    Q.   But when you went from Stuart to Dubai, Mr. Jaubert was the

9    person who was handling the invoices, right, not you?

10   A.   Right.

11   Q.   And Mr. Jaubert was doing the ordering?

12   A.   Yes, sir.

13   Q.   And Mr. Jaubert was sending the invoices?

14   A.   Yes.

15   Q.   And Mr. Jaubert was sending purchase orders?

16   A.   Yes.

17   Q.   Mr. Metcalf wasn't involved in that, was he?

18   A.   No.

19   Q.   Now, you say when you went over to Dubai, you had to stay in

20   a hotel room.  Was that hotel the Jumeirah Emirates?

21   A.   Emirates Towers, yes.

22   Q.   Did you ever hear anybody describe that hotel as a five star

23   hotel?

24   A.   I believe so, yes.

25   Q.   And you say you felt you really couldn't go out and see the

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1125

1   sites because of the language problem?

2   A.  It was more because of the children.

3   Q.  Because, in fact, most people in Dubai speak English, don't

4   they?

5   A.  Yeah.

6   Q.  So the language barrier really wasn't a problem, was it?

7   A.  No.

8   Q.  Now, we showed that picture of the Goby.  Can I put that up

9   again?  I think it's --

10          THE COURT:  Whatever it is, 40.

11          MR. CEDERBERG:  923.40.

12  BY MR. CEDERBERG:

13  Q.  Now, this is the Goby that was in Puerto Rico, right?

14  A.  Yes.

15  Q.  And this was the Goby that your husband ordered and was

16  shipped in a crate?

17  A.  Yes.

18  Q.  And the crate was filled with bubble wrapper, you testified

19  to last week?

20  A.  Yes.

21  Q.  And it was kind of like getting a sweater at Christmas?

22  A.  Yes.

23  Q.  And that Goby Mr. Jaubert didn't design, did he?

24  A.  No.

25  Q.  He bought that one, right?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.  Right.

2    Q.  Okay.  And you only went in it once, right?

3    A.  Yes.

4    Q.  And you said it functioned perfectly, right?

5    A.  Yes.

6    Q.  Was that your first time in a submarine?

7    A.  Yes.

8    Q.  Is that your last time in a submarine?

9    A.  No.

10   Q.  You never rode in that one again, right?

11   A.  No.

12   Q.  Now, if I could show you what I believe is in evidence,

13   Exhibit 31, have that put up, please.  And if we could go to

14   31-3 and blow up the first paragraph.

15        Have you ever seen this addendum to memorandum of

16   understanding?

17   A.  No, I've never seen that one.

18   Q.  Do you see, if you can go all the way across, then the line

19   after that, you're Helen Rodriguez Jaubert, right?

20   A.  Yes.

21   Q.  Do you remember signing this?

22   A.  No.

23   Q.  Could we go --

24   A.  I don't remember seeing that at all.

25   Q.  Can we go to 31-4.  If we look at the seller's signature

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    block down there, the one that says Helen Rodriguez Jaubert,

2    that is your signature?

3    A.   That's my signature, yes.

4    Q.   You did sign it?

5    A.   Yes, I signed it, but I don't remember that paragraph.

6    Q.   Do you recall this was the agreement that obligated Dubai

7    World to pay you and your husband $1.5 million for the assets of

8    Seahorse?

9    A.   I believe so.  I remember signing it.  I remember signing

10   lots of papers, but, I mean, I don't read a lot of what I sign.

11   Q.   Can we go to 31-19 of this document.  Let's go to 31-18 and

12   show Ms. Jaubert.

13       Okay.  Do you recognize this certificate of Seahorse

14   Submarines International?

15   A.   Yes.

16   Q.   Okay.  Do you recall this document at all?

17   A.   Honestly, I don't remember.

18   Q.   Okay.  Well, let's go to page -- or the next page, which is

19   31.19.  Okay.  And that's your signature on this one too?

20   A.   Yes.

21   Q.   Okay.  Now, if we go back to 31-18, if you could blow up

22   Paragraph 2.  Is HJ -- what is your husband's middle name?

23   A.   Jean Pierre.

24   Q.   Is HJPJ his initials?

25   A.   Yes.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.   And HRJ your initials?

2    A.   Yes.

3    Q.   And here you signed the document that says together you're

4    the sole shareholders of SSII, that's Seahorse?

5    A.   Yes.

6    Q.   And hold 100 percent of the ownership.  See that?

7    A.   I see it, yes.

8    Q.   Okay.  And if we can go down about two more lines that

9    starts, "SSI has never" -- says, "SSI has never offered or

10   issued any stock or stock certificates whatsoever, has never

11   entered into any agreements to" -- "pursuant to which Seahorse

12   would be required to issue any stock or stock certificate, has

13   never kept stock journal, stock ledger, or stock book of any

14   kind."  Do you see that?

15   A.   Yes, I see that.

16   Q.   Was that true when you sign the agreement, to the best of

17   your knowledge?

18   A.   To be honest, I don't remember.  I don't even remember

19   reading that.

20   Q.   Okay.  Can we show Ms. Jaubert Paragraph 4.  And this says,

21   "SSI has never drafted, prepared, issued, executed, or otherwise

22   put in place any by laws, corporate minutes, or other corporate

23   records."  Do you see that?

24   A.   Yes, I see that.

25   Q.   When you were taking care of sensitive documents for

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1129

```
 1    Seahorse, is it true that you never saw any bylaws, corporate
 2    minutes or corporate records of Seahorse?
 3    A.  I didn't see them.  I don't remember.  Honestly.
 4    Q.  You can't tell us if they exist or not?
 5    A.  I don't know.
 6    Q.  You go on -- it goes on, it states, "Additionally, except
 7    for its articles of incorporation and form business reports
 8    filed, we, the Florida Secretary of State, SSI has never filed
 9    with -- any organizational or informational documents pertaining
10    to its corporate structure or governance with any government
11    entity."  Do you see that?
12    A.  Yes, I see that.
13    Q.  Was that true when you signed that document?
14    A.  I don't know.  I don't remember reading that at all.
15    Q.  Now, in 2002 and 2003, Seahorse Submarines had large losses,
16    didn't it?
17    A.  Yes.
18    Q.  As a matter of fact, it asked to be excused from the
19    corporation, had to ask for reinstatement, correct?
20    A.  I don't know what you mean by "reinstatement."
21         MR. CEDERBERG:  Your Honor, I'd offer Exhibit No. 3.
22    After talking to counsel, they have no objection.
23         THE COURT:  Number 3 admitted in evidence with no
24    objection.
25         (Plaintiffs' 3 in evidence).
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

130

1    BY MR. CEDERBERG:

2    Q.   Okay.  See this application for reinstatement dated

3    October 24, 2003, for Seahorse Submarines?

4    A.   Seahorse Submarines, yes, I see that.

5    Q.   And go to the second page, if you could blow up that letter

6    to the Florida Department of State.  Can you read on that screen

7    okay?

8    A.   Yes.

9    Q.   Okay.  It says, on the -- I guess it's about the sixth line

10   down, "I did not receive any UBR notices, possibly because the

11   actual address of the business changed."  Did Seahorse's address

12   change in 2002, 2003?  It was still at that warehouse, wasn't

13   it?

14   A.   We were still at the warehouse.

15   Q.   Okay.  It says, "I did not have any reasons not to file the

16   business report.  Because I had large losses the previous year

17   of business, I did not have to pay income taxes."  Did you see

18   that?

19   A.   I see it there now.

20   Q.   Did you know that Seahorse wasn't able to file its business

21   taxes in 2002?

22   A.   Well, we had a hurricane that year, I believe.  Yes.  I

23   don't remember that.

24   Q.   Wasn't -- the year you had the two hurricanes, wasn't that

25   2004?

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

131

1   A.   There was another hurricane in 2002.

2   Q.   But you weren't aware that your husband was sending these to

3   the corporations department; is that right?

4   A.   No idea.

5   Q.   Okay.  And when you went back, I think you testified on

6   direct that you took a trip to back to the United States in the

7   summer of 2007?

8   A.   Yes.

9   Q.   Before we take that down, let me just show you the last

10  paragraph.  It says, "I apologize."

11  A.   Uh-huh.

12  Q.   "I apologize for the inconvenience for those reasons, and

13  because I am just recovering from a very difficult economic

14  situation, I will kindly request that the reinstatement fee be

15  waived."  Do you see that?

16  A.   Yeah, I see that.

17  Q.   Was Seahorse going through a tough time then?

18  A.   If that's what he wrote, I believe so, yes.  Yes.

19  Q.   Now, in 2007, you took a trip back to the United States,

20  right?

21  A.   Yes.

22  Q.   And you took your children?

23  A.   Yes.

24  Q.   You took a maid?

25  A.   No.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.  Maid didn't go with you?

2    A.  No, not at all.

3    Q.  You flew first class?

4    A.  I believe so, yes.

5    Q.  Okay.  And you stayed two nights in New York City at a five

6    star hotel?

7    A.  No.

8    Q.  Okay.  And Dubai World paid for that trip?

9    A.  My husband paid for it.

10   Q.  This is in 2007?

11   A.  2007.  July of 2007.

12   Q.  Dubai World paid for that trip, right?

13   A.  My impression was that my husband was paying for that.

14   Q.  Were you aware that your husband's employment contract

15   provided for a once-a-year first class trip for you and your

16   family anyplace in the world?  Business class anywhere in the

17   world?

18   A.  I'm not aware of those details.  You know, I had another

19   job, and I had my children to take care of.

20   Q.  And you brought up you had another job.  You were able to

21   get employment in Dubai, right?

22   A.  Yes.

23   Q.  You worked as a teacher from September 2005 to June 2006?

24   A.  Education assistant.

25   Q.  And then you became -- you got employment on a Dubai 103.5

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

133

```
1    FM Arabian radio station?
2    A.  No, I wasn't -- that wasn't a paid job, that was volunteer.
3    Q.  You were a news freelancer and presenter?
4    A.  Not for Arabian radio, no.
5    Q.  You wrote, edited news headlines, and short five-line
6    stories for them?
7    A.  Yes.
8    Q.  Okay.  And you read Life on Air news every hour?
9    A.  That was for Radio Two, not Arabian news.
10   Q.  And you prerecorded minute news pieces for other frequency
11   when needed?
12   A.  For Radio Two.
13   Q.  And that's a radio station in Dubai?
14   A.  That's a newspaper in Dubai, yes.
15   Q.  Well, didn't you work for -- October 2006 to December 2006
16   with Dubai I-103.8 FM Arabian Radio Network?
17   A.  I was a volunteer.  I was an intern there.  I wasn't
18   working, and I went in one day per week.
19   Q.  Okay.  But it was enough experience you put on your resume,
20   right?
21   A.  Yes.
22   Q.  Now, when you went back to the United States in 2007, you
23   owned a bank account, didn't you?
24   A.  I don't remember.  2007.
25   Q.  Do you remember opening a bank account with a deposit of
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

134

1    $100?

2    A.  Oh, yes.  Yes.

3    Q.  Okay.  And you opened that bank account because you and your

4    husband were contemplating selling some property in Dubai?

5    A.  No.  I opened the bank account because I needed to put my

6    money in the bank.

7    Q.  And that money was from the sale of a house in Dubai?

8    A.  $100?

9    Q.  Well, when you opened the account, was that the purpose of

10   the account?

11   A.  No.  No.

12   Q.  Okay.  Do you have any reason why your next deposit, besides

13   the 100 to open the account, was for $2,380,000?

14   A.  Because he had -- we sold the house.

15   Q.  In Dubai.

16   A.  Right.  That was still in construction.

17   Q.  And that was the first deposit, other than the 100, to open

18   your account, right?

19   A.  I don't remember.  There were other deposits, too, but I

20   don't remember.

21   Q.  Okay.

22          MR. CEDERBERG:  May I have a moment, Your Honor?

23          THE COURT:  Yes.

24          MR. HESS:  Judge, we've agreed -- we're not going to

25   waste the jury's time with authentication issues.  We've agreed

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

135

1    not to require authentication of these bank records, and counsel

2    has reciprocally agreed as to bank records, Bank Atlantic,

3    Seahorse Submarines, and personal records, they're not going to

4    object to hearsay or authentication.

5            MR. CEDERBERG:  We agree to that, Your Honor.

6            THE COURT:  Okay.

7            MR. CEDERBERG:  And 1522 you put up, please.  May I

8    offer 1522.  I apologize.

9            THE COURT:  Okay.  No objection. 1522 is admitted in

10   evidence.

11           (Plaintiffs' 1522 in evidence).

12   BY MR. CEDERBERG:

13   Q.  Okay.  Can you blow up the top where it says "search details

14   for account," blow up those lines.  This is account 64400482 and

15   your name, right?

16   A.  Yes.

17   Q.  This is the bank account you opened when you came back that

18   summer of 2007?

19   A.  It probably is, yes.

20   Q.  Okay.  Now, if we can go down and show maybe the last three

21   or four lines on the statement.  You see how on 7-26, the first

22   action on your account was to open it with $100?

23   A.  Yes.

24   Q.  And you see the very next deposit was $2,380,000?

25   A.  I see that yes.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1136

```
 1    Q.  You were responsible for that deposit?
 2    A.  I wasn't responsible for that deposit.  I didn't have that
 3    on me.
 4    Q.  Was it wired into your account from the sale of a home?
 5    A.  If that's what that is, yes.
 6    Q.  And if we can look up an entry for 10-19-2007.  Is that --
 7    $1,192,231 and some change to Olympia Escrow, is that for the
 8    purchase of a new house in Florida?
 9    A.  Olympia Escrow, oh, in Florida, yes.  Yes.
10    Q.  Is that the home you live in now?
11    A.  Yes.
12    Q.  What city -- is that in Wellington?
13    A.  Wellington.
14         MR. CEDERBERG:  May I have a moment, Your Honor?
15         THE COURT:  Yes, sir.  Let's go.
16    BY MR. CEDERBERG:
17    Q.  You say, when you were in -- when you would walk in where
18    your husband was working in Stuart, you'd see blueprints.
19    A.  Right.  His designs.
20    Q.  His designs.  Those would be his sketches, his designs?
21    A.  Yes.
22    Q.  Like the kind he put on his napkin?
23    A.  Yes.
24    Q.  And that's what you meant by blueprints?
25    A.  Yes.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          MR. CEDERBERG:  Nothing further.

2          THE COURT:  Redirect.

3                    REDIRECT EXAMINATION

4    BY MR. HESS:

5    Q.  Ms. Jaubert, whether or not you put the money in or not, the

6    2 million plus number, was that from the sale of the home that

7    you purchased in Dubai that you and Herve purchased in Dubai?

8    A.  I believe so, yes.

9    Q.  Did --

10         MR. HESS:  Nothing further, Judge.

11         THE COURT:  All right.  Thank you, ma'am.  You are

12   excused.  Take our morning break.  Let's take ten minutes.  Be

13   back in in about 20 after.

14         COURT SECURITY OFFICER:  All rise.

15         (Jury out at 11:10 a.m.)

16         (Brief recess)

17         (Jury in at 11:25 a.m.)

18         THE COURT:  Hi, Colette, what are you doing here?

19   Going to fix this?  Okay.

20         All right.  Please call your next witness.

21         MR. HESS:  Mr. Mark Coute.

22         COURTROOM DEPUTY:  Please raise your right hand.  The

23   interpreters, please stand.

24         (French Interpreters sworn)

25         COURTROOM DEPUTY:  Please state both of your names for

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

138

1    the record.

2              INTERPRETER 1:  Elise Gichon Strauss.

3              INTERPRETER 2:  Catherine Doerr.

4              THE COURT:  Okay.

5              MARK COUTE, DEFENSE WITNESS, SWORN

6              THE WITNESS:  Yes, I do.

7              THE COURT:  Please have a seat.  State your name and

8    spell it for the record.

9              THE WITNESS:  (Through interpreter):  My name is Mark

10   Pierre Coute.

11                        DIRECT EXAMINATION

12   BY MR. HESS:

13   Q.  Good morning, Mr. Coute.

14             THE COURT:  Now, he said something.  I don't know what

15   he said but he said something.  Can we get a translation of it?

16             THE INTERPRETER:  I didn't hear anything.  I apologize.

17             THE COURT:  I guess I just heard, apologize.  Ask a

18   question.

19             THE WITNESS:  I haven't said anything.

20             THE COURT:  Okay.  The chair squeaked.

21             THE WITNESS:  My back hurts and it's difficult for me

22   to turn either way.  Sorry.

23             THE COURT:  No heavy lifting anD no big turning, don't

24   worry.

25             THE WITNESS:  Thank you.  (In English)

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1139

```
1    BY MR. HESS:

2    Q.  Mr. Coute, do you know Mr. Jaubert?

3    A.  (In English):  Yes.  Yes.

4    Q.  And how is it that you know Mr. Jaubert?

5    A.  (Through Interpreter) He was my ex-boss in a company called

6    Exomos in Dubai.

7    Q.  Let me spend a few moments on your credentials, your

8    certifications.  You have a certification in the building and

9    repair of marine engines, correct?

10   A.  I have 25 years of repair in mechanic, naval mechanic for

11   boats.

12   Q.  And you're also a commercial diver?

13   A.  I have been diving for 20 years, and I have -- in 2003

14   obtained my certification as a professional scuba diver.

15   Q.  And how many dives have you -- would you estimate that you

16   have participated in or had in your career?

17   A.  Approximately 1,000 dives.

18   Q.  And how deep is the deepest dive that you were at?

19   A.  The maximum that I did diving was professional diving in

20   Africa on oil rigs in Gabon for the Total Company, and it was 64

21   meters of depth with different mixtures of gas.

22   Q.  You also have a certification as a rescue diver to rescue

23   other divers?

24   A.  Yes.  It is an obligation for professional divers.

25   Q.  There came a time where you were employed by Exomos?
```

140

1    A.  Yes.

2    Q.  And when was that?

3    A.  In the year 2005.  From the beginning of the year 2005,

4    until the end of the year 2005, approximately.

5    Q.  And during that period of time, what were your obligations?

6    A.  My tasks were mainly given to me by Mr. Jaubert to work

7    internally in the company, to manage and improve the submarines

8    and provide training for personnel.  And to find different,

9    novel, new techniques for work, and to improve things inside --

10   internally in the company.

11   Q.  Did you also work as a safety diver?

12   A.  Could you please repeat your question, because I do not

13   quite understand it.

14   Q.  Did you do diving?  Were you employed by Exomos to do any of

15   these safety dives with the submersibles?

16   A.  Yes.  During my diving, I had the opportunity to go into

17   diving, go to the test pool or to test the different elements,

18   to verify that security was in order, that any problems could be

19   taken care of, and also to increase or approve technical

20   elements, if needed.

21   Q.  Did you have a -- were you involved with the SDV project?

22   A.  Yes.

23   Q.  What did you do -- would you explain to the jury, what did

24   you do with the SDV project?

25   A.  The SDV was a prototype, and as such, it had to be continued

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

141

1    improved, redone, because certain elements were not as pretty as

2    they should have been.  My work consistently improving,

3    embellish the elements so they function better, so they would be

4    cleaner and prettier.  Modernize the machine so that it would

5    be -- it would have an aspect that was more military, that it

6    would be more beautiful, more professional.

7    Q.  Direct your attention to what has been previously marked as

8    defendant's Exhibit 923.11, and I conferred with counsel,

9    923.11, 923.80, and 923.100 -- I conferred with counsel, and I

10   don't believe there's an objection as to the admissibility, and

11   I would move --

12             THE COURT:  I don't have a 100.  Do I have --

13             MR. HESS:  Should be, Judge.  Judge, we just filed an

14   updated exhibit list.

15             THE COURT:  Got it right here.  And it goes through

16   923-35.  I got 923-40, and I added that one onto it.  I mean, I

17   can add it on, it's no big deal, but you got --

18             MR. HESS:  We have a new one prepared, Judge.  I'll

19   make sure that's taken care of today.

20             THE COURT:  I thought this was the one I got.  So what

21   is it?  923, what?

22             MR. HESS:  923.11, 923.80 and 923.100.

23             THE COURT:  All right. 923.11, 80, and 100 are admitted

24   in evidence without objection.

25             (Defense 923.11, 923.80, 923.100 in evidence)

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1142

1       MR. HESS:  Thank you, Judge.

2   BY MR. HESS:

3   Q.  Mr. Coute, I'm going to show you that vessel.  You have a

4   monitor there, if it's easier.  I don't want to cause you back

5   problems.  But if you could identify that vessel there.

6   A.  Yes.  This is the SDV on the left side of the photo.

7   Q.  Did you ever pilot the SDV?

8   A.  Yes, I piloted the SDV in the test pool.

9   Q.  Was it operational?

10  A.  Yes, it was operational.

11  Q.  Show you what's been marked as exhibit -- well, it's been

12  introduced as an exhibit at 923.100.  Do you recognize that

13  instrument board?

14  A.  Yes.

15  Q.  I'm going to show you now -- I'm going to show you another

16  one, 923.80.

17  A.  The picture that you showed before this one is the picture

18  prior to my work of reconditioning and redoing the design and

19  doing all the internal work.

20  Q.  So the photo that you have in front of you now and the jury

21  is looking at now, that is the product of your work in the SDV

22  program with Exomos?

23  A.  Exactly, yes.

24  Q.  Now, what is it that the -- what was the SDV designed to do?

25  A.  This is a submarine that can transport two combat swimmers

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

143

1    to certain zone, a certain area.  There they will be able to

2    dive.  In other words, they will leave the submarine, they could

3    go swim, go do -- commit the action or do what they have to do

4    militarily, then go back to the submarine and sail back.

5    Q.  And this vessel operated below the water and above the

6    water, correct?

7    A.  Exactly.  I was looking for a worD.  I'm sorry, I'm still

8    looking for the word.  I'm sorry.  I'm drawing a blank.

9    Q.  Okay.  If it comes back to you, please let us know.

10   A.  May I please have a piece of paper?

11           THE INTERPRETER:  May I give him a piece of paper, Your

12   Honor?

13           THE COURT:  Sure.  You can give him a piece of paper.

14   I'm not sure.

15           MR. HESS:  May I take a look?

16           THE COURT:  I don't know what he's doing.  I thought he

17   might need to wipe his hands off or something.

18           MR. HESS:  What is it you need the paper for?

19           THE WITNESS:  In case I remember that name so I can

20   write it down.

21           MR. HESS:  Okay.  Good.

22           THE COURT:  Thought his hands were dirty or something,

23   I don't know.

24           THE WITNESS:  (In English):  Sorry.

25           MR. HESS:  That's what I get for lifting something,

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Judge.

2         THE COURT:  Right.  You let the guy with the bad back

3    lift it.  Workers' Comp.  Now you've done it.  If that's my

4    easel, it's going to cost you.  I don't think it is.  Mine is a

5    real old, ugly wooden one.

6         MR. HESS:  Yes.  The new versions that don't hold up

7    very well.

8    BY MR. HESS:

9    Q.  Now, in addition to your day-to-day duties with the SDV

10   program at Exomos, what were they?  Would you tell the jury,

11   describe to the jury.

12   A.  I was in charge, actually, to work with several submarines,

13   to work with several teams of people, and to select the best

14   elements that would lead to the best possible result.

15   Q.  In addition to the SDV submersibles, what other design did

16   you work with?

17   A.  So the fact -- in fact, I was taking pictures to create some

18   type of a book, a book, a manual that would allow the workers to

19   get some clarification of what we were looking for.  In other

20   words, we took before and after pictures to show them why, for

21   instance, a certain handle would have a certain color, would be

22   placed in a certain way.  So the workers would really understand

23   how they had to do it.

24   Q.  Why was that important?

25   A.  It is because the workers were basically unskilled, or if

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

145

1    they were skilled, they came from other working areas such as

2    construction or other areas in naval industry.  So this way we

3    show them why things were done, and I felt by giving them a

4    report like that, we would have things progress in a better

5    fashion in the company.

6    Q.  Were you successful in disseminating that report?

7    A.  No.  Because I was let go prior to being able to finish my

8    work or to finish even the work on the SDV.

9    Q.  Did you work -- aside from the SDV, did you work on any of

10   the other submarines, the Discovery, the Stingray, the Goby, or

11   the Adventurer?

12   A.  Okay.  I was testing -- I actually tested the Stingray to

13   see what had to be changed on the design.  And as a matter of

14   fact, a -- the word that I can't remember is point of land.

15   Actually, what it involved was to organize all the elements of

16   the instrument table, instrument dashboard, if you wish, in a

17   logical fashion so they could be seen by the eye, touched

18   easily, and they could be used basically almost like in a car.

19   Q.  Is it that so one of your duties was to provide for the

20   ergonomic conditions of the vessels?

21   A.  This is the word I was looking for, ergonomic.  That was

22   part of design, but the thing that was foremost -- first and

23   foremost in terms of diving for safety was ergonomic.

24   Q.  Why was that so important for safety?

25   A.  For this type, we have two types of pilots.  One, it could

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    be an engineer who is -- conceived and designed the instruments

2    and instrument dashboard.  So this person knows that by heart,

3    but then you have people who are completely foreign or alien to

4    that type of board, and they have to be able to use it in a

5    logical fashion.  So basically what it was, we needed something

6    that was logical and user friendly.  The user, the client should

7    be everybody, everyone should be able to use it.  So it had --

8    didn't have to be a qualified engineer or trained engineer to be

9    able to use.  So -- what we made.  So operationally it had to be

10   easy.  Very often vehicles that were involved in diving, I have

11   seen that were -- that they had elements of the dashboard that

12   showed inconsistency in professional diving, and an

13   inconsistency and a safety problem in diving is not forgiving

14   and that's why I really work for the ergonomics.  It was very

15   important to do that.

16   Q.  Did you also work on the ergonomics on the Discovery?

17   A.  The Discovery, was that the large one?

18   Q.  Let me show you what's been marked as defendant's 923.57.

19   Seek to move it into evidence, Judge.  I believe there's no

20   objection.

21            MR. CEDERBERG:  No objection.

22            THE COURT:  Without objection, 923.57 is admitted in

23   evidence.

24            (Defense 923.57 in evidence)

25            THE WITNESS:  I have worked on this with another man

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    from the company, and we have worked on it in such a way that we

2    would produce something that would be safe and secure and clean.

3    BY MR. HESS:

4    Q.   You've already talked about you tested the Stingray.   Have

5    you witnessed the Goby and the Adventurer in operation?

6    A.   Yes.

7    Q.   And did you witness those vessels in open water in

8    operation?

9    A.   I saw the Goby, and it was actually a reporter who came to

10   shoot a documentary report or repair tag on that, and I went

11   with the crew and I was on a boat and I watched the submarine

12   operate in the water.   And I actually remember that because I

13   liked the reporter, and my parents were also staying at a nearby

14   hotel.

15   Q.   Have you had an opportunity to be a passenger in the

16   Adventurer?

17   A.   Yes.   It happened to me and in the test pool, I was a

18   passenger.

19   Q.   Who was piloting that?   Who was the pilot at that time?

20   A.   Jim Miller.

21   Q.   One time as a passenger in the Adventurer with Jim Miller?

22   A.   No.   I went two or three times in test pool with Jim Miller.

23   Q.   How did you perceive Mr. Miller's abilities to be a pilot

24   for these submersibles?

25   A.   I have nothing against him at all.   But he's not a

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

148

1    technician, he's not an engineer, and he's not someone who

2    really understands mechanics.

3    Q.  Did you witness him to understand how these submersibles

4    worked sufficient for him to be an experienced pilot of these

5    vessels?

6    A.  No, absolutely not.

7    Q.  Could you relate to the jury -- does anything come to mind

8    in any of the times that you were a passenger with Mr. Miller as

9    the pilot, can you give the jury an example of what you mean?

10   A.  I remember one specific time that we were testing the

11   submarine and Jim Miller was steering and we were doing the

12   weight in the back.  At that time, the submarine started diving

13   in the back because he had activated the command for back

14   diving.  Rear diving, actually.  Then he pressed another command

15   to activate the front of the submarine.  And the submarine

16   stayed on the bottom, dived on the bottom and stayed planted

17   with the rear planted and the front up in the water.  In the

18   air, actually.

19        And he stayed like that for 10 minutes with his finger

20   pressed on the command and nothing happened.  At which point I

21   allowed myself to comment to him that the switch for the

22   electric power of that key was on stop.  Jimmy Miller didn't say

23   anything, just waived his hand with the sign of saying "mind

24   your own business."  So I just kept quiet.  I could not allow

25   myself to contradict the boss.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1149

1    Q.  Eventually did you -- well, you got back to the surface,

2    correct?

3    A.  Exactly.

4    Q.  How was that resolved to get back to the surface?

5    A.  Using cranes.

6    Q.  So let me get this straight.  If he had just turned on the

7    switch when you told him to, the submersible would have been

8    able to rise on its own effort?

9    A.  Yes.  We were talking about the submarine diving down.

10   Since the submarine remained oriented towards up, he requested

11   by radio that the submarine be lifted back to the surface and to

12   stop the testing.

13   Q.  So he never followed your advice about turning on that

14   switch?

15            MR. CEDERBERG:  Objection.  Leading.

16            MR. HESS:  It is leading.

17            THE COURT:  Don't ask the question.  Ask another

18   question, please.

19   BY MR. HESS:

20   Q.  Did he ever turn that switch on that dive?

21   A.  No.

22   Q.  Was there -- did the quality of the workers that were

23   employed by Exomos to build these subs, did that present a

24   challenge in getting a finished product that was acceptable?

25   A.  It was extremely difficult.  I personally had to spend a

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

150

1    huge amount of time observing, controlling, checking every

2    element, every piece, everything, and also explain everything

3    and why we were doing this.

4    Q.   Did Mr. Miller -- was Mr. Miller aware of these problems?

5    A.   Mr. Miller was not listening to what I was saying.  He was

6    not reacting to what I was saying, he showed absolutely very

7    little interest, no interest whatsoever with the problems, with

8    the workers, with internal problems.  He had no interest

9    whatsoever.  It was not concerned whatsoever.  He never helped

10   me at any moment at all to resolve any of the problems that we

11   met on a daily basis in this company.  Never at any time.

12   Q.   Did you have an opportunity -- when you completed your work

13   with the SDVs, what did you do to -- what was part of your of --

14   the final completion of that project?  Do you recall?  Let me

15   ask you, did you prepare a report?

16   A.   I attempted to prepare a report, as I told you previously,

17   made out of pictures and simple explanations.  One day while I

18   was making the pictures, putting them together with the

19   element -- pictures of the elements, pictures of the pieces,

20   Mohamed, who was one of the directors, came to ask me, "What on

21   earth are you doing?"  I explained to him that I was making a

22   report, and that report was intended to help all the workers

23   inside the Enterprise.

24   Q.   Were you --

25   A.   After that, Mohamed left and he returned upstairs, and I

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

151

1    observed him with Jim Miller talking and looking at me.

2    Q.  Then what happened?

3         THE COURT:  Wait.  You know enough because this

4    question was did you prepare a report, and we got a page an a

5    half.  So if you're going to say what happened, we could be here

6    for several days.  So ask specific questions, please.

7    BY MR. HESS:

8    Q.  Were you -- did you complete the report?

9    A.  I did not have the time to finish this report.  I was fired

10   from the company before that.

11   Q.  Were you told by Mr. Miller to complete the report or not

12   complete the report?

13   A.  He never said a word to me about this report.  I had spoken

14   to him about this report before, but this never was of any

15   interest to him at all.

16   Q.  Now, the -- there was -- did Mr. Miller instruct you about a

17   distinction between operations and production?

18   A.  He didn't explain anything.  There was actually no

19   communication between the pilots or the so-called pilots and us,

20   the engineers or the production coordinators.  He never asked us

21   any questions about what was inside the submarines.  We could do

22   anything inside that we wanted.  Any change we could make, they

23   never asked us anything.  They would just take the submarine

24   out, they would break something and bring it back.

25   Q.  And last --

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1            MR. HESS:  Nothing further, Judge.
 2            THE COURT:  Wow, this time you said "last" and it
 3    wasn't even the last.  Whoa.  What are we doing here?  Next.
 4    Cross-examination.  We could break now, but I think it might be
 5    easier to finish with the witness.
 6            JUROR:  Yep.
 7            THE COURT:  We got plenty of time.
 8            JUROR:  Yep.
 9                              CROSS-EXAMINATION
10    BY MR. CEDERBERG
11    Q.  Good morning.
12    A.  (In English) Hello.  Good morning.
13    Q.  How many employees did Exomos have that one year that you
14    were there?
15    A.  (Through Interpreter) Approximately 150 to 200 people, I
16    believe.
17    Q.  How many of those French?
18    A.  Two, three.
19    Q.  Two or three?
20    A.  Three.
21    Q.  And you do not speak English?
22    A.  I do speak some English, but today I deemed that it was
23    important, before the judge and before the jury, to express
24    myself in French, to rely on people who have more technical and
25    more accurate vocabulary in order not to risk to be
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

153

1 misunderstood or misspoken.

2 Q. And Mr. Miller didn't speak French, did he?

3 A. He spoke a few words of French.

4 Q. So you had trouble communicating with Mr. Miller, and he had

5 trouble communicating with you, correct?

6 A. At the beginning, a little.

7 Q. Okay.  And you said that there was -- I believe you said

8 there was no communication between so-called pilots and the

9 production coordinators.  Do you remember that?

10 A. Yes.

11 Q. Okay.  And you were a production coordinator?

12 A. Exactly.

13 Q. And Mr. Durgesh Thapa, he was a pilot?

14 A. Yes.

15 Q. Was he what you call a so-called pilot?

16 A. Yes.

17 Q. You didn't have a high opinion of Mr. Thapa as a pilot?

18 A. They were not technicians and they were not engineers.  They

19 had no real understanding of the technical problems that they

20 would encounter every day, and they couldn't give us any

21 explanation about the technical problems they encountered.

22 Q. Was a production coordinator -- did you read trial reports?

23 A. No.

24   THE INTERPRETER:  Excuse me, if I may.  Trial can be

25 interpreted as legal trial or tests.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

154

1               THE INTERPRETER:  What did you mean by trial?

2               MR. CEDERBERG:  Test reports.

3               THE INTERPRETER:  Thank you.

4               MR. CEDERBERG:  That are called trial.

5               THE INTERPRETER 2:  Could you care to repeat your

6    question then?

7    BY MR. CEDERBERG:

8    Q.  Did you ever see any of the test reports that are called

9    trial reports at Exomos when you were there as a production

10   operator?

11   A.  I was never shown any report, whether it be in English or

12   any other language.  Nobody ever, ever came to see me and showed

13   me anything, and it was absolutely no communication between the

14   testing teams and the pilots and the coordination and the inside

15   the factory.

16              THE COURT:  So that's a no?  Is the answer no?

17   BY MR. CEDERBERG:

18   Q.  Is your answer no, sir?

19   A.  I'm not sure I understand.  I just answered the question.

20              THE COURT:  Okay.  Obviously not because the question

21   was, "Did you ever see any of the test reports that are called

22   trial reports at Exomos when you were there as a production

23   operator?"  That question can be answered, yes, I did see the

24   reports, or, no, I didn't see the reports.  Then you can explain

25   it all you want.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

155

1          THE WITNESS:  If I had received any type of report, I
2     would have gone to the trouble of taking a dictionary and peel
3     every word out of there to make sure I understood -- understand
4     it.  I would have spent nights doing that, I would have spent
5     time asking my colleagues, asking Paul, asking anybody and
6     everybody.  I spent time learning English.  I would have spoken
7     to Paul or Herve.  I spent time learning English and talking to
8     my colleagues and all that.  So if I had seen a report, I would
9     have gone through the trouble of understanding every word of it.
10          THE COURT:  So again, your answer is no?  I hope you go
11     out an plant some trees after this to make up for all the trees
12     we're killing with the paper we're printing we're using up.
13          THE WITNESS:  No, I never saw a report.
14          THE COURT:  Ask another question quickly.
15     BY MR. CEDERBERG:
16     Q.  Did Mr. Jaubert ever tell you that when the submarines were
17     tested, that they leaked?
18     A.  No.
19     Q.  Did Mr. Jaubert ever tell you that when the submarines were
20     tested, the test drivers had trouble controlling the submarines?
21     A.  Yes.
22     Q.  Did you ever ask to see any information that would help you
23     understand what that control problem was?
24     A.  Of course, I spent all my time asking for information from
25     the pilot's staff.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1156

1    Q.   But did you get information from Mr. Jaubert as to what was

2    wrong with the submarines when they were tested?

3    A.   Mr. Jaubert and myself tried to find out what the problems

4    were when those occurred.  And very often, the problems came

5    from the pilots.

6    Q.   Are you aware that the submarine leaked because of the

7    pilots?

8    A.   All submarines have leaks.

9    Q.   Are you aware that a hatch blew off of one of the

10   submarines?

11   A.   I believe the submarine hatch must have been poorly closed

12   by the person who was inside.  I saw, during diving tests, that

13   they were little levers or handles to close the hatches

14   properly, and I told the people that these three or four hatches

15   had to be closed properly.  They never listened to me.

16   Q.   Did you learn that the thrusters on the submersibles often

17   didn't work?

18   A.   We had mainly electrical problems.  When the pilots did not

19   brake the submarines by hitting the bottom of the sea with them,

20   because they didn't know how to pilot them, they didn't control

21   the submarine properly.  Then the electrical problem came from

22   our electrician.  If you cut a piece of electric wire, leave it

23   on the ground, then you tape it together with some Scotch tape

24   and dip it in water, it probably won't work.  It's logical.

25   Q.   So you are you telling us, under oath, when the thrusters

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

157

1    didn't work, that's pilot error, not design error?

2    A.  Yes.  I will say this, I will swear this under oath, and I

3    admit it, it is either the problem of the pilot who would brake

4    the engine or the electric who did not connect -- make the

5    connection properly.  The electricians came from electricity in

6    the area of building, construction, they had absolutely no clue

7    as to naval electricity.  So we had engines that broke down

8    quite often.

9    Q.  When the submersibles leaked air, are you telling us that

10   was pilot error as well?

11   A.  Yes.  I'm affirming this.  Yes, we've certain mistakes that

12   occurred because the impacts were done by the pilots on the

13   submarines.  Some mistakes came from the lack of knowledge of

14   workers who made mistakes by screwing things improperly or

15   screwing pipes improperly or putting bad connections where they

16   shouldn't have been.

17       And certain leaks were also done as -- excuse me, certain

18   leaks also occurred as a result of the bad use by the workers of

19   Mastic, of rubber sealant that were put in place without

20   respecting the need for water tightness by letting it dry

21   properly.  If you don't respect or comply with time required for

22   drying, the bolts, when you tighten them, the rubber sealant,

23   the Mastic will just plainly disappear.  And that happened all

24   the time.

25   Q.  You were supervising the workers, weren't you, sir?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

158

1    A.  Yes, but I'm not the engine guard that had a thousand eyes

2    and arms to supervise everything.

3    Q.  But the people you supervised built the submarines the human

4    beings went in when they tested it, correct?

5    A.  Yes.

6    Q.  So it was your job to make sure the workers did it properly

7    so it was safe, right?

8    A.  But I couldn't be everywhere at the same time.  I could not

9    control everything all the time.  I couldn't be everywhere.  I

10   couldn't repeat everything every day, the same thing to people.

11   I couldn't do that.  It wasn't possible.

12   Q.  As a supervisor, if that submersible didn't work, you bear

13   some responsibility for that, don't you, sir?

14   A.  Yes.  Partially, yes.

15   Q.  And to fulfill your responsibility, it was important to know

16   why things didn't work, wasn't it, sir?

17   A.  This is what our attempt at trying to do for eight months

18   before I was let go.

19        (In English) Every day, the weekend or so, every time I

20   search why we have the problem and --

21        THE COURT:  Please use the interpreter, because it's

22   easier.  It gets very confusing if you go back and forth between

23   the interpreter and not using the interpreter.  Thank you, sir.

24        THE WITNESS:  Sorry.  (Through interpreter) I attempted

25   to control everything or to put in place competent people to

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1159

1    control for me, but the problem were with the internal

2    organization, and also the rivalry and disputes between the

3    underlings, the people who were in charge of a small area.

4    These people had problems among themselves for different

5    reasons.  Nationality, ethnic problems, or whatever.

6           And, for instance, when I would take a worker who knew

7    how to work with fiberglass, and sometimes one of these workshop

8    workers who was in charge a little bit would take this capable,

9    competent person, and would replace him with somebody who was

10   unskilled and unqualified and send my competent guy to go and

11   sand boat hulls.

12   BY MR. CEDERBERG:

13   Q.  Mr. Jaubert did the hiring at Exomos, didn't he, sir?

14   A.  Yes.

15   Q.  Could we show Exhibit 923.100.  Okay.  Now, is that a

16   dashboard control panel you redesigned?

17   A.  No.  This was before I redid it.

18   Q.  Okay.  Then is 923.80?  Before or after?

19   A.  That's my work.

20   Q.  Okay.

21   A.  And the workers of course.

22   Q.  And were you proud of that?

23   A.  Yes.  I think that with the workers and the tools that I had

24   available, I did some nice clean work.

25   Q.  So the workers performed satisfactorily when you were

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

160

1    supervising them directly, right?

2    A.  Yes, that's exactly the case.  You had to be present at all

3    times.

4    Q.  You said that one of the things that you did was to try to

5    make the submarines prettier?

6    A.  Yes.

7    Q.  Make them look better, right?

8    A.  It -- so that it would be more esthetical, prettier and

9    easier to use.

10   Q.  And that function of looking prettier had nothing to do with

11   the submarine functioning airtight, under the water,

12   controllable, correct?

13   A.  Well, it was a combination of things.  It had to be

14   completely airtight, water tight, it had to operate properly,

15   and it had to be beautiful.

16   Q.  Well, ergonomics means that it's easier on the user,

17   correct?

18   A.  Exactly.

19   Q.  Now, you talk about this incident with Jim Miller in where

20   the submersible went down to the bottom?

21   A.  The microphone doesn't seem to work properly.

22            THE INTERPRETER:  Excuse me, I hear the voice breaking.

23   I can't hear well through this microphone.

24            THE COURT:  Then talk up without it.  Just speak into

25   his ear.  Lean over and yell at him.  I can't tell you how much

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1161

1    money we've spent in the last week trying to get this sound

2    system fixed.  I got a cart full of equipment in the back closet

3    that's brought up here and replaced all of this stuff.

4            THE INTERPRETER:  Let me just briefly try another

5    earphone.

6            THE COURT:  No, just yell at him.  It is almost

7    lunchtime.  No, I mean talk in his ear.

8            THE INTERPRETER:  I know.

9            THE COURT:  Whatever it takes.  Whatever it takes.

10           THE INTERPRETER:  We're ready to proceed.

11           THE COURT:  You may proceed.  Now, you talked about

12   this incident with Jim Miller and where the submersible went

13   down to the bottom.

14   BY MR. CEDERBERG:

15   Q.  Do you remember that testimony, sir?

16   A.  Yes.

17   Q.  And what submersible was that?

18   A.  The Adventurer.

19   Q.  And where were you when it went to the bottom?

20   A.  One seat away behind Jim Miller.

21   Q.  Do you have any information whether the air worked on the

22   button that you said Mr. Miller should have pushed?

23   A.  The question is not very clear.

24   Q.  Well, it takes air pressure for the button to work on a

25   submarine that sends it up, correct?

1    A.  No, this was a button that was used to have water come in.

2    Q.  And your testimony is you sat down on the bottom for 10

3    minutes and didn't want to tell Mr. Miller what button to press

4    because he was your boss?

5    A.  No, that's not what I explained.

6    Q.  Didn't you say that you couldn't allow yourself to

7    contradict your boss?

8    A.  I cannot force him to obey me, yeah, that's true.

9    Q.  Well, did you think about telling him just to press this

10   button so we could go to the top during that 10 minutes?

11   A.  That's what I did.  I just explained it to you.

12   Q.  It doesn't make any sense, does it, sir, for Exomos to spend

13   $30 million building a factory and not hiring quality employees

14   to make the products they're trying to sell, does it?

15   A.  That's not my problem.  I came to a company in order to

16   perform a certain work.  I didn't select the people to work

17   with.  The people were there.  That's it.  I did the best I

18   could with what I had in front of me.  But I can talk to you,

19   and it will take me about three hours, about the tools and the

20   dysfunctioning of all the things that I saw in the company.

21   Q.  Mr. Jaubert was your boss, correct?

22   A.  Yes.

23   Q.  And you were fired in less than a year there, right?

24   A.  Yes.

25            MR. CEDERBERG:  Nothing further.


**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

163

1          THE COURT:  Redirect examination, please.

2          MR. HESS:  Thank you, Judge.

3                    REDIRECT EXAMINATION

4    BY MR. HESS:

5    Q.  Who was it that caused your termination?  Who fired you?

6    A.  Jim Miller.

7          MR. HESS:  I have nothing further, Judge.

8          THE COURT:  Thank you, sir.  You are excused.

9          MR. CEDERBERG:  One question, Your Honor.

10         THE COURT:  No.  We don't do back and forth, back and

11   forth.  This is his witness, you got cross, he got direct and

12   redirect.  That's all.  We're done.  Thank you, sir.

13         Ladies and gentlemen, we're breaking for lunch.  You're

14   reminded that you're not to discuss this case with anyone or

15   permit anyone to discuss it with you.  Until you retire to the

16   jury room at the end of the case to deliberate on your verdict,

17   you're simply not to talk about this case.  Remember not to read

18   or listen to anything touching on this case in any way.  If

19   anyone should try to talk to you about the case, bring it to my

20   attention promptly.  Keep in mind you must not do any research

21   or make any investigation about the case on your own on any of

22   these websites or devices that I don't even know what they're

23   talking about, but don't go looking.

24         Remember, you must not have any contact with the

25   attorneys, parties, or witnesses in this case.  Finally

1164

1    remember, you must not form any opinion about this case until

2    all the evidence is in; you're required to keep an open mind

3    until you start your deliberation at the end of the case.  Why

4    don't we come back at 2:00.  That will give us a little less

5    than an hour and a half.  All right?  2:00.  Thank you.

6           How's your tooth?  You don't need my pliers?  It's all

7    set?  I can put my pliers back in the trunk?  Perfect.  Okay.

8    I'm glad to hear it.

9           (Jury out at 12:40 a.m.)

10          THE COURT:  I've wanted to work on my basic dentistry.

11   I need a craft for my retirement age.  I'll either build

12   furniture or pull teeth.  All right.  We'll be in recess until

13   2:00.  Thank you, ladies.

14          (See Volume 11, page 1166 for continuation)
                       * * * * *

15                    C E R T I F I C A T E
16   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

17

18
     _____          /s/ Dawn M. Whitmarsh
19   Date                      DAWN M. WHITMARSH, RPR

20

21

22

23

24

25

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1                        I N D E X

 2                        WITNESSES

 3   For Defense:                                    Page

 4   Helen Jaubert
       Continued Direct Examination by              1095:3
 5     Cross-Examination by Mr. Cederberg            1122:3
       Redirect Examination by Mr. Hess             1137:3
 6
     Mark Pierre Coute
 7     Direct Examination by Mr. Hess               1138:11
       Cross-Examination by Mr. Cederberg           1152:9
 8     Redirect Examination by Mr. Hess             1163:3

 9                        EXHIBITS

10   923.3
       In Evidence                                  1110:8
11
     923.40
12    In evidence                                   1095:16

13   923.57
       In Evidence                                  1146:24
14
     923.11, 923.80 & 92
15     In Evidence                                  1141:25

16   For Plaintiffs':

17   3
       In Evidence                                  1129:25
18
     1522
19    In Evidence                                   1135:11

20

21

22

23

24

25
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**