1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                       FORT PIERCE DIVISION
                     CASE NO.  09-14314-CV-JEM
3

4

5

6    DUBAI WORLD CORPORATION, and its
     Subsidiaries, EXOMOS, NAKHEEL and
7    PALM MARINE,

8                    Plaintiffs,

9         vs.

10                                      Fort Pierce, Florida
                                        February 22, 2011
11   HERVE JAUBERT, SEAHORSE
     SUBMARINES INTERNATIONAL
12   INCORPORATED, and Does 1-99,

13                    Defendants.
     _____

14

15

16                  TRANSCRIPT OF JURY TRIAL
                 VOLUME 11 - PAGE 1166-1301
                BEFORE THE HONORABLE JOSE E. MARTINEZ
17               UNITED STATES DISTRICT JUDGE

18

19

20

21

22

23   REPORTED BY:        DAWN M. WHITMARSH, RPR
                         Official Court Reporter
                         400 N. Miami Avenue, 10S03
24                       Miami, Florida  33128
                         Telephone:  305-523-5598

25


                 PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                    TRANSCRIPT PRODUCED BY COMPUTER

1    **APPEARANCES:**

2    **FOR THE PLAINTIFFS:**
                          *Quinn, Emanuel, Urquhart & Sullivan, LLP*
3                         **BY: JON C. CEDERBERG, ESQ.**
                          **BY:  A. WILLIAM URQUHART, ESQ.**
4                         865 South Figueroa Street
                          10th Floor
5                         Los Angeles, CA  90017

6                         *Astigarraga, Davis, Mullins & Grossman*
                          **BY:  EDWARD MULLINS, ESQ.**
7                         701 Brickell Avenue
                          16th Floor
8                         Miami, Florida 33131

9
     **FOR THE DEFENDANTS:**
10                        *Hess & Heathcock, PA*
                          **BY:  WILLIAM HESS, ESQ.**
11                        **BY:  KATHRYN A. HEATHCOCK, ESQ.**
                          40 Southeast Osceola Street
12                        Stuart,  Florida 34994

13

14

15

16

17

18

19

20

21

22

23

24

25

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1                        P-R-O-C-E-E-D-I-N-G-S
 2          THE COURT:  Be seated, please.  We have an issue.
 3          For the record, tell us your name.
 4          COURT SECURITY OFFICER:  I am lead CSO Robert Gleason.
 5          THE COURT:  Mr. Gleason has a statement to make
 6   concerning one of the jurors, and I would like you to hear it,
 7   then we'll discuss it.  Go ahead.
 8          COURT SECURITY OFFICER:  Juror number one was coming
 9   through the magnetometer and she stated out loud to this
10   gentleman in the corner here, holding the book, that she
11   believes he's doing a very good job so far.
12          THE COURT:  Okay.  I bring it to your attention for
13   whatever it's worth.  Now, the gentleman, to my knowledge, has
14   been involved in reading one of the deposition and carrying a
15   lot of briefcases and doing a lot of backup work, but obviously
16   it is not a comment that we need to be made and any comments
17   from either side?  Wishes?  You want to just sit on it and talk
18   about it at the end of the day?
19          MR. HESS:  May we, Judge?
20          THE COURT:  Sure.  I think that would be fine.  I don't
21   know what else I can tell them without making a big deal out of
22   it and I don't want to make a big deal out of it until we've
23   discussed it.
24          Any suggestions as to how to deal with it and just
25   leave it alone until later?
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1              MR. CEDERBERG:  I would think, Your Honor, at the end
 2    of the day the Court could just remind the jurors because we're
 3    in a small area there, they will be seeing us and we shall be
 4    seeing them and they should refrain -- we're not being rude not
 5    by not talking to them.
 6              THE COURT:  I've already said that to them almost every
 7    day, twice.  It's gotten to be almost a joke what I said to
 8    them.
 9              All right.  Let's leave it at that then.  Bring in the
10    jury please.  Ready to proceed?  You have a witness ready?
11              MR. URQUHART:  Your Honor, you'll recall this morning
12    we were talking about whether or not Mr. and Mrs. Turner should
13    be able to testify.  Asked us to bring up that issue again
14    before we start.
15              THE COURT:  Okay.
16              MR. URQUHART:  Would you prefer it now or before?
17              THE COURT:  When are you going to call them?
18              MR. HESS:  I'm ready to call them today, Judge.
19              THE COURT:  When today?
20              MR. HESS:  I have one witness that I can put on first,
21    but I anticipated towards the end of the day.
22              THE COURT:  Okay.  Well, let's talk about it during the
23    next break, okay?
24              MR. CEDERBERG:  Okay.
25              THE COURT:  All right.
```

```
 1                    (Jury in at 2:05 p.m.)

 2              THE COURT:  Please be seated.

 3              All right?  Ready to proceed?

 4              MR. HESS:  Yes, Judge.

 5              THE COURT:  Please call your next witness.

 6              MR. HESS:  Mr. Paul Rodig.

 7              THE COURT:  Up here, sir.  Please go into the witness

 8    box, remain standing and raise your right hand.

 9                PAUL RODIG, DEFENSE WITNESS, SWORN

10              THE COURT:  Please be seated.  Tell us your full name

11    and spell it.

12              THE WITNESS:  My name is Paul Gregory Rodig, Senior.  R

13    O D I G.

14              THE COURT:  All right.  You may proceed.

15                        DIRECT EXAMINATION

16    BY MR. HESS:

17    Q.  Thank you, Judge.

18         Mr. Rodig, were you employed by Exomos?

19    A.  Yes, I was.

20    Q.  What period of time?

21    A.  I was employed by Exomos as a consultant from December of

22    '04 to June of '05, and then I was a full-time employee from

23    July 14th of '05 to the end of May of '06.

24    Q.  Would you please explain to the ladies and gentlemen of the

25    jury what is your background, what are your credentials?
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

171

1    A.   How far back do you want me to start?

2    Q.   Let's start with after high school.

3    A.   High school, I joined the United States Air Force.  I was a

4    jet engine technician for ten years stations at McGuire Air

5    Force Base.

6         From that point, I worked with my father's trucking

7    company for approximately 15 years.  I moved to Florida in 2003

8    and was bouncing from trucking to working on boats, at which

9    point my neighbor Hank was instrumental in getting me hired by

10   Seahorse Submarines in Stuart.

11   Q.   That's where you met Mr. Jaubert?

12   A.   Yes, it is.

13   Q.   What did you do for when you -- well, explain to the jury

14   when you say a jet engine technician, what did that contemplate?

15   A.   As a jet engine technician, I started my career as a jet

16   engine mechanic where I worked my way up from apprentice to

17   journeyman.  I would go out on the flight line or into test cell

18   or into the main shop and I would repair jet engines.

19        Five years into my career, I became what is called a

20   seven level, I was inspection qualified, at which point I was

21   third in command of jet engine -- main engine build up shop at

22   McGuire Air Force Base.  We would take jet engines, dismantle

23   them all the way to the last part, see what's wrong with it,

24   replace bad parts and reassemble the jet engine.

25        Because I was inspection qualified, I would inspect my

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

172

1    workers' work, I would inspect another crew's work and sign off

2    red Xs on any critical items.

3    Q.   And these jet engines were in what type of vehicles?

4    A.   It was a TF33P7A which was installed on the C141s.

5    Q.   What is a C141?

6    A.   Cargo aircraft, just like a B1 bomber, a C141.

7    Q.   These are all military planes?

8    A.   Yes.

9    Q.   Is that the training that you utilized in your involvement

10   with submersibles and engines for submersibles and whatnot?

11   A.   Indirectly.  Jet engines, even though they may sound

12   technical, it's basic air pressure systems, fuel systems,

13   hydraulic systems all wrapped up into one small package.  So the

14   hydraulics and the air pressure and the fuel systems and the

15   electrical, it all carried over to submarines.  It's --

16   mechanics is mechanics.

17   Q.   Of course, these jet engines, how many jet engines on these

18   planes?

19   A.   The one 141s had four.

20   Q.   Obviously they had to work, correct?

21   A.   Oh yeah, yeah.  Absolutely.

22   Q.   Now, you became associated with Mr. Jaubert how?  I mean, I

23   understand you were introduced through a neighbor, but what did

24   you do for Seahorse in the beginning?

25   A.   Initially I was hired as an electrician.  And after Herve

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   saw I was able to do mechanical skills also, I was can't say

2   promoted, I was given additional responsibilities where I was

3   able to do anything on the submarines except for fiberglass and

4   paint.

5   Q.  That was because you're not a painter or a fiberglasser?

6   A.  Neither, they both caused me lung problems.

7   Q.  What years did you work for Seahorse?

8   A.  I was there approximately five months before we went over to

9   Dubai.

10  Q.  And in what capacity did you go to Dubai?  Was that as a

11  consultant?

12  A.  Initially, yes.

13  Q.  And who paid you as a consultant?

14  A.  Herve.

15  Q.  Seahorse?  Do you know?

16  A.  Yes, it would have been Seahorse, yes.

17  Q.  You were there how long before you were hired by Exomos?

18  A.  Six months in working time, but it was all of December of

19  '04 and then February through the end of May of '05.

20  Q.  Was there a reason why -- did you apply at Exomos or why is

21  it that you were working as a -- on a consultant basis for

22  Seahorse?

23  A.  Initially Herve wanted me to come over and train all the

24  workers there.  He wanted me to show them how to do the

25  electrical an d how we do the mechanical and to teach the

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

174

1  workers and the some of the sales force on the basic operating

2  principles of the submarine, the basic controls, things of those

3  sort.

4  Q.  And the five months that you were with Seahorse prior to

5  going to Dubai, what did you do during that period of time?

6  A.  Electrical, mechanical.  On the submarines, electrical,

7  mechanical on the submarines.

8  Q.  What was Seahorse doing during that period of time?

9  Building subs?

10  A.  Building subs.  We were doing plans for bigger projects, we

11  were also working on some other projects.  One of them in

12  particular was a -- Herve, help me here.  Sucks the water off

13  the floor, a dredge machine, a miniature dredging machine so you

14  could dredge around your private dock.

15  Q.  Now, these projects that you were involved in at Seahorse,

16  the submarines, the dredge machines, were there plans and

17  drawings that associated with these projects?

18  A.  Absolutely.

19  Q.  Were they detailed plans and drawings?

20  A.  Yes.

21  Q.  How many -- during that five months that you -- when you

22  were at Seahorse, how many submarines were present on the

23  facility?

24  A.  When I first got hired, we had one, two, three, four, we had

25  six submarines there in the time I was there, one of them was

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1175

1   shipped out to Canada, a second one was sold and taken

2   possession from Bacardi Limon -- who is the purchaser of

3   Bacardi?  Bill?  Who bought Bacardi?  I forget.

4   Q.  That's who bought one of the subs?

5   A.  Yes.

6        THE COURT:  You answer them, you can't ask them.

7        THE WITNESS:  Sorry.

8        THE COURT:  That's all right.

9        MR. HESS:  Let me show you what's been marked as

10  defendant's Exhibit 923-4.  It's been, I believe, consulting

11  with counsel there's no objection.

12       THE WITNESS:  That's Bacardi Limon.

13       THE COURT:  Wait, there's no question pending right

14  now.  Wait until he asks you a question.

15       What's the number?

16       MR. HESS:  923-4.

17       MR. CEDERBERG:  No objection, Your Honor.

18       THE COURT:  Without objection, 923-4 is admitted in

19  evidence.

20       (Defense 923-4 in evidence)

21  BY MR. HESS:

22  Q.  Is that the vessel that you were just speaking of?  Is that

23  the one?

24  A.  Correct.  Yes.

25  Q.  That was fabricated in -- that was constructed by Seahorse?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1176

1    A.   Correct.

2    Q.   Did you work on that vessel?

3    A.   Yes.  To answer your question, yes.  I came into it and I

4    did finishing work because it was just in the finishing stages

5    when I first got hired.

6    Q.   Were you also involved -- did you pilot any of these vessels

7    back then?  I'm talking the first five months with Seahorse.

8    A.   I did not pilot any vessels here at Seahorse, although we

9    launched one of them and I got to sit in it.

10   Q.   Was that one -- what type of vessel was that?

11   A.   Limon.

12   Q.   Now, did you actually -- did you submerge in the vessel?

13   A.   No.

14   Q.   Have you ever witnessed the -- let's stick with this one,

15   the Bacardi Limon submerging?

16   A.   Only by video.

17          MR. HESS:  Just going to walk you through a couple of

18   these photos just to give you an impression for the jury.

19          What's been marked as defendant's Exhibit 923.49, again

20   counsel has seen this picture I believe, seeking to move it into

21   evidence.  No objection, I believe.

22          MR. CEDERBERG:  No objection.

23          THE COURT:  923.49?

24          MR. HESS:  Yes, Judge.

25          THE COURT:  All right.  I don't have that one either so

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    give me that one when you get a chance.

2            (Government's 923.49 in evidence)

3    BY MR. HESS:

4    Q.   What is that?   What are we perceiving there?   Do you

5    recognize that?

6    A.   It appears to be an Adventurer in a boat sling underwater.

7    Q.   Is that here locally in Stuart?

8    A.   I don't know where it's at, but it's not in Dubai.

9            MR. HESS:   I'll show what's been marked as defendant's

10   Exhibit 923.48, again counsel has seen this.   I'm seeking to

11   introduce it in evidence without objection.

12           MR. CEDERBERG:   No objection.

13           THE COURT:   Without objection, 923.48 is in evidence.

14           (Government's 923.48 in evidence)

15   BY MR. HESS:

16   Q.   Do you recognize that vessel?

17   A.   Yes, I do.

18   Q.   What vessel was that?

19   A.   This is Lady Lola.

20   Q.   Now Lady Lola, is that -- did you have another encounter --

21   where is this?

22   A.   This is in the Seahorse Submarine Stuart, Florida shop.

23   Q.   What happened Lady Lola?   Was it sold?   What happened to

24   Lady Lola?

25   A.   Lady Lola, from what I believe, was a custom order, we took

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1178

```
1    an Adventurer and maxed it out.  I had nothing to do with the

2    build of Lola because it was sold and delivered well before I

3    was hired.  But I did have a couple of occasions to do some

4    modifications to it.

5    Q.  Okay.  And let me skip ahead, it's kind of a little bit out

6    of order, but since we're talking about that --

7    A.  Sure thing.

8    Q.  The next time the first time you saw Lady Lola was that

9    where?

10   A.  San Martin.

11   Q.  What were the circumstances?

12   A.  I went over to San Martin with a fellow electrician and what

13   we were doing was reconfiguring the submergence valves.

14   Q.  Who were you employed by at that time?

15   A.  Seahorse Submarines, Herve Jaubert.

16   Q.  And what year was that?

17   A.  That would have been November of '04.

18   Q.  Okay.  So you're there, what did you, where did you go?

19   A.  We went to San Martin, we met up with Lady Lola's shadow

20   which was the boat that this submarine was on.

21   Q.  What is a shadow boat?

22   A.  A shadow boat, the customized yacht that Duane Hagadone

23   owned was called Lady Lola.  Nobody was allowed on it unless

24   you're invited.  The shadow boat had all his toys on it.  Beside

25   the submarine, he had a go-fast double hull race boat, he had
```

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    two conventional run-abouts, he had a helicopter, he had the old

2    -- he had an Amficar, if you remember the Amficar from the 50s,

3    he had one of those that was operational.  He had a ton of toys.

4    Jet skis, canoes.

5    Q.  And a submarine?

6    A.  Yes.

7    Q.  So what did you go there to do?

8    A.  We went there to reconfigure the submergence valves.

9    Q.  And what is a submergence valve?

10   A.  A submarine has four ballast tanks.  You've got your two

11   main ballast tanks which when you flood them, the submarine will

12   submerge to just about the very top of the submarine.  You have

13   two more variable ballast tanks that you use to trim the

14   submarine.  When I say trim, you submerge it with extra water in

15   the variable ballast tanks to what's called neutral buoyancy.

16   Just like diving.  You get to a point where you can just sit

17   there and float.

18         The valves were originally designed --

19   Q.  Let me stop you if I may.  When you say sit there and float,

20   you mean kind of hover in the water, in the water column?

21   A.  Correct.  Neutral buoyancy.  Originally the valves, the

22   submarine would take two minutes to submerge to variable ballast

23   tank, so what we had done was we had installed larger valves so

24   it would submerge quicker.

25   Q.  And you were there to put the larger valves in?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   A.  Yes.

2   Q.  And what was your experience while you were there?  What

3   happened?  You put the valves in?

4   A.  Well, we put the valves in and we launched it off the dock

5   right next to the boat, submerged it a few times and everything

6   was fine.

7   Q.  Okay.  Was there another time you saw the same boat?

8   A.  Yes.

9   Q.  What was the next occasion you saw?

10  A.  Okay.

11  Q.  Let me -- before I go into that, did you operate the vessel

12  at that time after the valves were put in?

13  A.  It was limited because we were at a dock, the government of

14  San Martin would not let us run it around the bay, so we just

15  submerged it right next to the dock.

16  Q.  But you submerged it?

17  A.  I took it down 20'.

18  Q.  And you operated it?

19  A.  Uh-huh.

20  Q.  Everything operated properly?

21  A.  Yes.

22  Q.  Any leaking hatches or anything?

23  A.  No.

24  Q.  The next time you saw the Lady Lola?

25  A.  Was in Miami, I went to Dubai right after Lady Lola in San

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Martin.  After Dubai, I went to -- Lady Lola happened to be in

2    America, went to Miami to do some finish work on it.

3    Q.  What type of work?

4    A.  Okay.  Do you see the hatch with the white 5,200 sealant

5    around it?

6    Q.  Yes.

7    A.  What I did is I went around to some of these hatches, we

8    took the 5,200 and we converted it from white to black so it

9    wouldn't be so obtrusive looking because this submarine was just

10   -- this baby had everything in it.  This was really nice.  So I

11   spent approximately about a day there just dressing it up.

12   Q.  And what did you see the next time you saw the boat?

13   A.  The next time was in Cannes, France.

14   Q.  Before we get to that, let me just show you -- see if you

15   recognize these pictures.  If you could put up on the screen

16   930-5.  I believe without objection Your Honor, seek to

17   introduce it into evidence.

18              THE COURT:  What number did you say please?

19              MR. HESS:  930-5.

20              THE COURT:  Okay.  Do I have 930?  Yeah, I think I do

21   but I don't have a dash 5, photos of Seahorse Submarines,

22   etcetera.

23              MR. HESS:  I'm going to make sure there's a

24   supplemental, but I'll make sure Your Honor has it.

25              THE COURT:  Okay.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1182

```
1              (Defense 930-5 in evidence)

2    BY MR. HESS:

3    Q.  What is that a photograph of?

4    A.  This is the interior of Lady Lola submarine, sitting in the

5    pilot's seat looking aft.

6    Q.  Now, when you said that Lady Lola was, I can't remember how

7    you did it, decked out or it had everything, what do you mean by

8    that?

9    A.  Can I get up?

10   Q.  Sure.

11   A.  Okay.  This particular submarine was outfitted with three

12   cameras as opposed to one.  The pilot had his own individual

13   viewing screen on the console.  Each passenger had their own

14   viewing screen where they could followed it out.  They could

15   select their own camera that they wanted.  We had a second

16   radio.  We had the entire submarine was all set up with an

17   interior so it would hide all the plumbing and wiring and then

18   we had the seats were stitched with LL and special paint.

19   Q.  What do we see on those canisters on the side to the left?

20   A.  They're what's called spare air.  It gives you five, 10

21   minutes of air in case of an emergency.

22   Q.  Okay.  Now, the next time you saw the Lady Lola was where?

23   A.  Cannes, France.

24   Q.  And what were the circumstances then?  And when was that?

25   A.  That would have been -- I just had gotten hired full-time in
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    July 14, '05.  Three weeks later after that, I went to France to

2    upgrade the submergence valves for a second time.  Also we added

3    pumps into the variable ballast tanks.

4    Q.  On the new models?

5    A.  Correct.

6    Q.  So you were re-fitting it to incorporate the new additions?

7    A.  Yes.

8    Q.  And what was your experience, if you could relay what

9    happened?

10   A.  I spent approximately a week on the boat.  What I had done

11   was the variable ballast tanks were originally worked by

12   venting, whereas you open up the top of the tank and let the

13   water float in from the bottom.  What we had done is we had come

14   up with a pump system that was a lot more intricate.  You pump

15   the water into the variable ballast tank and you have more

16   precision control on how much water comes in so you can get a

17   neutral buoyancy without having to guess.

18        I did that.  That included putting two pumps in on all

19   new wiring, switches, making sure everything was waterproof and

20   then, what we had done was we had come up with huge main ballast

21   tank dump valves.  So instead of taking a minute and a half, two

22   minutes for it to submerge to variable ballast tank depth, it

23   would submerge to the top of the submarine in about five, ten

24   seconds.

25   Q.  And you accomplished that re-fit?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   A.   Uh-huh.

2   Q.   And what happened next?

3   A.   After the re-fit, we prepared the submarine for a launch, we

4   were going to submerge it.  We even set up the submarine with a

5   dock line tether so I could only go so deep.

6   Q.   Can you explain to the jury where was this being

7   accomplished?  Was it out at sea?

8   A.   This was three miles off the cost in the Mediterranean right

9   off of Cannes, France.  Because of the size of the shadow vessel

10   there was no place for it to dock, so all large vessels in

11   France, actually the Mediterranean need to anchor out, so I

12   stayed on the boat, did all the work on the boat itself.

13        The original question?

14   Q.   It was tethered.  You were out to the point you were

15   explaining what happened in the process.

16   A.   Okay.  Thank you.  We launched the submarine and because of

17   the change of ownership, its insurance was dropped.

18   Q.   What change of ownership?

19   A.   The Lady Lola submarine was originally purchased by Duane

20   Hagadone from Idaho.  He got to a certain point he was tired of

21   chasing his boats and toys around the world so he sold

22   everything.  A gentleman by the name of Metau (ph), I don't know

23   his first name, but he's the steel conglomerate from India, he

24   purchased the shadow boat with all the toys.  Change of

25   ownership, the insurance lapses.

1185

1        So I was supposed to be there, I did some upgrades,

2   we're going to submerge the submarine, make sure everything is

3   functioning as designed and at that point, I would surface it,

4   the captain of the vessel was going to get into the submarine, I

5   was going  to show him the new modifications and how they

6   worked.

7   Q.  That would permit a re-insurance?  Is that was your

8   understanding?

9        MR. CEDERBERG:  Objection, Your Honor, no personal

10  foundation.

11       THE COURT:  I don't know how he is supposed to know

12  this, but I'm not sure if -- that it matters if it's true or

13  not.  It's just the basis of what he did.  So I'll permit it,

14  but, you know, I hope the jury understands this isn't

15  necessarily coming in for the truth.  We don't know if that was

16  true or not.

17  BY MR. HESS:

18  Q.  That was your understanding, you were doing all this to

19  permit the re-insurance of the vessel.  The upgrades?

20  A.  Correct.

21  Q.  Now, so what happened?  What did do you?

22  A.  I took the submarine, like I said it was tethered to the

23  shadow boat.  We pushed off, I pushed off inside the submarine I

24  went through all my systems, made sure everything was okay.

25  Used the dive checklist, check hatches, make sure all the

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1186

1    circuit breakers are lit up, make sure the pumps are running,

2    systems check, just like an airplane.

3         At this point, I submerged to variable ballast tank

4    depth which is just the depth of the submarine.  Everything was

5    functioning fine.  So now we're going to do the test of the

6    variable ballast tank pumps work, so as the pumps are working

7    it's slowly submerging, everything is functioning okay.

8         I took it down to approximately 5', the snorkel was

9    still sticking out of the water with the video camera, I could

10   actually see the shadow boat.  At this point I took it down to

11   about 30, 35' and because I'm tethered, I can't run the

12   thrusters.  So I'm going through my systems checks again, making

13   sure the pressurization system is working, making sure that

14   there's no leaks, that I'm not getting water, I'm not getting

15   problems with the electrical system.

16        Everything was okay, I was underwater approximately 30

17   minutes and at the -- I just finished writing up everything

18   looks good, I'm getting ready to vent main ballast tanks and

19   there was a loud explosion so to speak?  Turned around behind me

20   and the center hatch had blown in.

21        So at this point the water is rising rapidly.  Make a

22   decision, have no choice.  So I do what's called CESA,

23   controlled emergency ascent, hyperventilate, open up the hatch

24   above my head and then just swim to the surface.

25   Q.  What happened to the boat?  What did you do then you get to

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1187

1    the surface, you're okay?

2    A.  At this point, it actually sank into 71' of water and

3    actually broke the dock line that we had.

4    Q.  Did you retrieve the sub or was the sub retrieved?

5    A.  Yes, it took us about five hours to get it off the bottom.

6    Q.  And what happened next?  What did you do?

7    A.  We air bagged the submarine.  The captain of the vessel

8    called a diver, an emergency diver from the shore.  He brought

9    four air bags.  We dove on the submarine, we attached four lift

10   air bags to it, inflated them all, the submarine came off of the

11   bottom by about a foot.

12          At this point, I was able to manipulate by reaching in

13   through the hatch, manipulate the emergency air bags that are

14   built into the submarine and with all eight air bags, it came to

15   the surface.

16          At this point we fenagle next to the boat.  They had a

17   very large pump where we pumped all the water out of the inside

18   of the cabin and we hoist it up on the deck.  At that point we

19   went through the boat, I removed the train plug, so to speak, to

20   finish draining the last of the water out of the inside of the

21   cabin.

22          The decision had been made while we were bringing the

23   submarine up, the decision had been made that it was going to

24   get shipped back to Dubai, so shipping costs on the weight.  So

25   we went through the entire submarine and any piece of lead that

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1188

1    we could remove, we removed all the lead.  At this point, I

2    disconnected all the batteries, taped up all the connections,

3    disconnected, vented all the excess air, disconnected those.

4    Taped up all the connections, and then at that point, I was free

5    to go release my emotions.

6    Q.  Okay.  Now, how was the boat, was the sub going to be taken

7    back to shore?

8    A.  I was under the impression we were going to motor in.  I had

9    found out later that had nothing to do with me.  The crew of the

10   vessel was hauling -- was going to haul the submarine to the

11   quay where it could be lifted out of the water onto a container

12   or something to ship back to Dubai.

13   Q.  Do you know, did the boat sink again?

14   A.  As a matter of fact it did, yes.

15   Q.  And was that because the submarine wasn't operable or was

16   that a design defect or something or how did it sink?

17   A.  No, the submarine was not operable at this point because the

18   batteries had gotten sulfated, everything was wet, everything

19   was disconnected.  When the submarine sank, the entire aft

20   portion of the deck blew off the submarine in one big pow.  What

21   had happened was that the crew of the boat took this panel and

22   placed it back where it had blown off from and duct taped it

23   back on.  They closed all the hatches, which was a moot point

24   because one of them was blown in.  They stuck it back in the

25   water, now we're three miles offshore in Cannes, France, the

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   water is not very rough, you have a general two to 3' sea all
2   the time.  They towed the submarine back to the pier and just
3   before they got to the pier, there was a several boats were
4   going by, the wash from their boats washed up on the back of the
5   submarine, the duct tape came undone, the panel dislodged the
6   submarine sank by the tail again.
7   Q.  Now, let's talk about that panel first.  Did you ever -- did
8   you look at what -- let's talk about the hatch first.  I
9   apologize.
10          The hatch, have you ever seen a hatch blow in like that
11  before?
12  A.  Never.
13  Q.  Before or after?
14  A.  Never.
15  Q.  On one of these subs?
16  A.  Never.
17  Q.  Did you come to any conclusions based upon your training and
18  your understanding of these vessels what happened?
19  A.  I'm reasonably confident what happened, within my opinion,
20  it was a combination of things.
21          MR. CEDERBERG:  Excuse me, Your Honor.  No foundation
22  as to expert opinion.
23          THE COURT:  Sustained.
24  BY MR. HESS:
25  Q.  Did you -- how many of these vessels -- by that time period,

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1190

1    how many of these vessels had you participated in the

2    construction of?

3    A.   Four.

4    Q.   And what did you do in terms of the construction?

5    A.   I built them from the fiberglass up.  I knew every inch,

6    every nut, bolt, wire, electrical, tubing, plumbing, switch,

7    circuit breaker.

8    Q.   Are you familiar with the hatches and the structure of the

9    hatches?

10   A.   Yes.

11   Q.   Are you familiar with the upgrades to the hatches?

12   A.   Yes.

13   Q.   Are you familiar with how these hatches work?

14   A.   Yes.

15   Q.   You're familiar with their testing strength and their

16   abilities?

17   A.   That would be something from the factory, although we did

18   our own tests after the fact.

19   Q.   What did you do to test?  Was the test part of the -- that

20   lead you to your conclusion about what you were going to say

21   what happened?

22   A.   Yes.

23   Q.   And what was the test?

24   A.   We took one of the hatches off of Lola.  And we set it on a

25   support that supported only the metal frame.  I built a wooden

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1191

1   stand that only had a one square inch block on the bottom, hence

2   giving me pounds per square inch.  In Dubai, we started stacking

3   what we would call lead biscuits, each lead biscuit kit weighed

4   ten pound.  We stacked lead biscuits on this wooden platform

5   until we were up to 2,800 pound and that hatch, that Lexan never

6   broke.

7   Q.  Did that lead you -- did that give the information necessary

8   to permit you to conclude what caused the failure?

9   A.  It was another month before I came up with a bonafide "this

10  is what happened".  When the hatch blew in --

11       MR. CEDERBERG:  Excuse me, Your Honor.  I believe he's

12  answered the question.

13       THE COURT:  Yes.

14  BY MR. HESS:

15  Q.  And what was your conclusion?

16       MR. CEDERBERG:  Same objection, Your Honor.

17       THE COURT:  Sustained.

18       Do you want to talk about it more?  We can excuse the

19  jury if you want to discuss it, but I don't believe you've laid

20  a foundation at this point.

21       Ladies and gentlemen, if you'll excuse us, go on into the

22  jury room and Mr. Witness, if you'll excuse us by stepping out

23  front and waiting outside the courtroom.

24       COURT SECURITY OFFICER:  All rise.

25       (Jury and witness out at 2:35 p.m.)

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1192

1    THE COURT:  Please be seated.  Give me some reason why

2    he should be allowed to testify in this area.  Frankly, this is

3    kind of scary.  This guy is an aircraft power plant mechanic

4    that all of a sudden becomes an submarine expert.  Some of the

5    opinions he's given already, which were not objected to, appear

6    to me to be ludicrous, but I'm not an expert but I'm not stupid.

7    And it just seems to me that putting pounds of weight on a Lexan

8    panel tests one very limited aspect of the strength of that

9    Lexan panel.  It absolutely is not a scientific test as to

10   whether it will hold air in and water out.

11   I don't know what his background is, but unless you can

12   give me some reason why he has expertise that I haven't seen,

13   some training, something other than the fact that he was picked

14   up because he could work on power plants, then Mr. Jaubert saw

15   that he was smarter than the average bear and therefore he

16   started letting him do more and more things, he's a handyman.

17   He's not an expert in submarine design or theory or even

18   practical aspects of submarines.  I don't know that there are

19   that many, but I can tell you right now this guy isn't one.

20   So you know, give me something or else I'm not going to

21   let him opine.

22   MR. HESS:  I'm not asking him to opine on the leak

23   resistance of the hatch.  I'm asking him to opine on a very

24   simple thing.

25   THE COURT:  Yeah, why did it break and he hasn't given

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1193

1    me the basis that he -- you know, he's certainly not a

2    submersible expert.  And he certainly, I do not believe, has

3    given us any reason to think that he has any real expert idea as

4    to why the hatch broke.  He could give us his theory, he could

5    give us his guess, but heck, I could give you that.  The only

6    benefit he has is that he was in the dumb thing when it

7    happened.  But I don't know that that makes him anymore

8    qualified to be an expert.

9         Under Daubert, it seems to me that you got to go a long

10   way before I would permit him to testify to that.  I mean, just

11   because a person is good at one thing, I suspect that if he came

12   in here to tell me about why a Pratt and Whitney JET57 engine,

13   you know, fell apart in the sky, that I might have to listen to

14   it.  But not this.  I don't think he has expertise in these

15   areas.

16        So I mean, frankly it's scary.  It's like amateur

17   night.  This guy is on the job training as a submarine guy.  I

18   don't know.  That's kind of scary.  Frankly.  Give me something

19   else because if you can't, I can't allow him to testify.

20        MR. HESS:  Judge, I'm just limiting it purely to the

21   issue of, it's a pure square inch analysis.  It's the amount of

22   pressure above the Lexan --

23        THE COURT:  But that's not the issue.  The issue isn't

24   how much weight can you stack on a Lexan panel before it breaks

25   because even I can tell you that that's not what we're talking

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1194

1    about.  What we're talking about is water which compresses and

2    pushes down on it and finds a weak point, that's a little

3    different than stacking biscuits on a thing.  I don't believe

4    that one has anything to do with the other.

5             MR. HESS:  It's exactly the same, Judge.  It's the

6    weight of the water on top of the panel.  It's exactly the same.

7    It's the per inch pressure of the water, the water pressure is

8    the weight of the water in the column above the panel.  The

9    weight of the biscuits, the same thing.

10            THE COURT:  No, it is not.  The weight of the biscuits

11   is a stable thing.  The weight of the water, I thought what he

12   said was that the panel blew in.

13            MR. HESS:  It did.

14            THE COURT:  That's not what -- you know, well, I

15   haven't seen any expertise.

16            MR. HESS:  Actually, Judge, I'll bring it in another

17   way.

18            THE COURT:  Yeah, all right.  Not through him.

19            Bring him back in and bring the jury back in, but I

20   just wanted to explain to you to see if you could give me some

21   reason why he really was an expert.  I haven't seen it yet.

22            Please bring the jury back in and please ask him to

23   step back in, would you?

24            (Jury and witness in at 2:40 p.m.)

25            THE COURT:  And we have figured out the spitting sound

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1     of the microphone.  When I say we, he.

2              All right, sir.  You may proceed.

3              MR. HESS:  Thank you, Judge.

4     BY MR. HESS:

5     Q.  The next time you saw the vessel, where was it?

6     A.  It had arrived in Dubai.

7     Q.  And what was done with the vessel there?

8     A.  We took it, we did an extensive examination of what was left

9     of it and that's -- at that point we did the test on the hatch.

10    Q.  Now, aside from the test on the hatch, did your inspection

11    of the vessel reveal any modifications that were done to the

12    vessel?

13    A.  Yes.

14    Q.  And what were those?

15    A.  It appeared that someone had done some fiberglass repair to

16    it.

17    Q.  And what was the extent of the -- was that done -- when I

18    say modifications, I mean something that wasn't obviously, maybe

19    not obviously, something that wasn't stock, wasn't part of the

20    vessel when it left Seahorse or their design.  Is that what

21    you're talking about?

22    A.  Correct.

23    Q.  What was the modification that you're speaking of

24    specifically?

25    A.  The submarine was dropped during shipment somewhere along

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1  the way.  And instead of having Seahorse slash Exomos come

2  repair it, the owners elected to repair the damage by

3  themselves.

4  Q.  How could you tell that?

5  A.  We sent them the materials but not the people.

6  Q.  They chose to just have the materials sent?

7  A.  Yes.

8  Q.  And what was -- when you looked at the vessel when it

9  arrived in Dubai, could you see what the extent of the

10  modification was?

11  A.  Yes.  It was absolutely -- I can't use that word.  It was a

12  very, very poor repair job.

13  Q.  Did it have anything to do with that section of the aft that

14  you talked about?

15  A.  Yes.

16  Q.  And how big of an area was that?

17  A.  The entire aft platform of the submarine blew off.

18  Q.  What was done with the vessel after?

19  A.  We took it and we stripped it down to the fiberglass and we

20  rebuilt it with different modifications and we used it as one of

21  our training submarines.

22  Q.  Did you pilot that submarine?

23  A.  Oh my goodness, yes.

24  Q.  Did it have a name?

25  A.  Black Submarine.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.  Now, when you -- when it was re-fit, when it arrived back in

2    Dubai, what are we talking about, what's the time period?  What

3    was the date when it arrived back in Dubai and you re-fit the

4    submarine, what was the date, month, year?

5    A.  Be specific.  When it arrived or when I was finished

6    rebuilding it?

7    Q.  When it arrived first?

8    A.  It got to Dubai, I would have to say, mid August.  I'm fuzzy

9    on the exact date.

10   Q.  Of '05 of course.

11   A.  Correct.

12   Q.  And then how long did it take to refurbish it?

13   A.  Just before Christmas.

14   Q.  Who worked on that vessel?

15   A.  All of my guys.  I oversaw it, I was the production

16   supervisor.  Anything that was built there, I oversaw it.

17        Let me rephrase that.  Any part of the submarines that

18   were built there, I oversaw it.  I did not do anything with the

19   surface vessels.

20   Q.  Who took the Black Submarine out the first time?

21   A.  I did.

22   Q.  What was the -- what was your experience in taking that out,

23   piloting it?

24   A.  Man, it was beautiful.  It ran like a finally tuned machine.

25   Everything was brand new.  We went out, we were out for several

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1198

1     hours.  We actually ran out of air which is the reason why we

2     had to come back.

3     Q.  Ran out of air unexpectedly or ran out of air?

4     A.  No, with the air tanks that's in the submarine, you have an

5     air gauge and everything.  So you get down to -- just like

6     diving when you hit 500 PSI, that's it.  Hit the surface, call

7     it quits, tow it in, put it on the trailer, back to the shop.

8     Q.  Who else was on that dive with you?

9     A.  I don't remember.  Specifically it would have been a group

10     of about seven or eight people.

11     Q.  You said that was about December of 2005 around there?

12     A.  Correct.

13     Q.  Who trained you as -- because your an aircraft jet engine

14     technician with inspector qualifications but who trained you to

15     operate a submarine.  It wasn't the Air Force, was it?

16     A.  No, Herve.

17     Q.  What was that process like?

18     A.  Continuous.  The 18 months I was there.  It's always.  I

19     mean, just like flying, you're always training.  You're always

20     being on your game.  You always have to make sure you know the

21     updates and, you know, it's not like your car.  You just on a

22     submarine.  You just can't pull over and fix a battery or fix a

23     flat.  So ongoing training, ongoing inspections.

24     Q.  Did you have a dive license?  Were you authorized to dive

25     prior to meeting Mr. Jaubert?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1199

```
 1   A.  Yeah.  I am -- no.  I was not dive qualified when I worked

 2   for Seahorse which is the reason why I was not allowed to go in

 3   any of the submarines unless they're on the surface.  I got

 4   myself certified in Dubai while I was there as a consultant.

 5   That was one of the conditions of getting hired full-time.

 6   Q.  How many piloting experiences did you have with the Black

 7   Submarine what used to be Lady Lola?

 8   A.  I couldn't break it down per submarines because I was in so

 9   many of them.  If you want me to ballpark it, I can.

10   Q.  Did you guys dive these subs?

11   A.  Every day.  We took these things out every day.  If it

12   wasn't Stingray it was Adventurer, if it was Adventurer it was

13   Discovery.  If it wasn't Discovery we were back to Stingray.  We

14   had two Adventurers so Monday was the black one, Tuesday was the

15   yellow.  Black, yellow, black, yellow.

16   Q.  And would these dives be in the pool or test pool or out in

17   the marina or where would they be?

18   A.  Depends on what we were going to test it for.  If we were

19   going to go out and we wanted to make sure we could get a

20   lengthy dive, we were actually doing endurance dives, see how

21   long we could stay down, see how long the battery lasts, see how

22   long the air lasts.

23        If we were doing minor repairs, we put in it a tank.

24   If we were doing, okay, we're good, let's go, hit the boat ramp,

25   we would take it out into the open water and we would be out
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    there all day.

2    Q.  Now, in the -- I guess I will ask for some sort of an

3    understanding.  Was it more than 50 dives that you accomplished

4    as the pilot of these various vessels?

5    A.  Oh, man, I stopped -- at 200 dives I stopped using my

6    logbook.

7    Q.  So you had in excess of 200 dives where you piloted these

8    various submarines?

9    A.  If I wasn't PIC, I was safety officer.

10   Q.  PIC, pilot in command?

11   A.  Pilot in command, yes.

12   Q.  In these 200 plus dives, never saw a hatch implode, correct?

13   A.  Just the one.

14   Q.  Ever any issues with the operational functionality of these

15   submarines?

16   A.  There was always -- not always, you have an occasional

17   foible, nothing death defying, nothing safety of flight.  When I

18   say little foibles, look the circuit breaker, I ran out of

19   fuses, the air is depleting, why is the air depleting, someone

20   left something on.

21   Q.  How about hatches leaking excessively?

22   A.  Never.

23   Q.  How about the -- was there any water that would pour into

24   any of these vessels through the balance valve?

25   A.  There was -- Lola had one -- had that problem happen to me

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1201

1   once, and Jim Miller had it happen to us when we took Goby down

2   and both times it was a stupid error.  We both neglected to turn

3   on the electrical system for the air pressurization system.

4   Q.  And could you explain to the jury what does that matter?

5   A.  Okay.  Can I digress to a -- thank you.

6         Conventional submarine is what is called a one

7   atmosphere submarine.  You close the hatch, you're one

8   atmosphere, just like the US Navy, you go underwater, it's the

9   same pressure.

10        Our submarines are what's called ambient pressure.  You

11  pressurize the air cabin to match the water pressure.  So if

12  you're down 30 meters and you've got 35 PSI here on the water,

13  you should have 35 PSI on the air.  Pressure equalization.  The

14  pressure equalization valve is electrical.  If you don't turn on

15  the main, all the main circuit breakers, the pressure valve will

16  not open up the electrical solenoid to let air into the cabin.

17  Air doesn't come into cabin, the balance valve in the snorkel

18  tends to do a bob routine and water can back flow.  It doesn't

19  take much, 5' underwater and as soon as you start getting water

20  coming in, you surface the submarine and check all your circuit

21  breakers.

22  Q.  Said it happened to you once, happened to you once with Jim

23  Miller on the boat?

24  A.  Yes.

25  Q.  Was it confirmed -- how do you know that it was the not

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1202

1    turning on that switch to energize the system?

2    A.  You blow ballast, you surface, and even before you go out of

3    the submarine, you go left to right, you check every switch and

4    when you get to this side you should realize that oops, you

5    missed that.

6            After the second time we did that, what we did was we

7    came up with just like an airplane, we came up with a flight

8    list.  Flying underwater, flying in the air.  So when you got

9    into the submarine, PIC gets his checklist.  Main circuit

10   breakers on.  Air on, air pressure gauges above 3,000 PSI.  It

11   was both sides, two columns that big.  Just like an airplane.

12   Q.  You mentioned you were -- it got to the point where you were

13   doing -- you were conducting endurance dive tests.  Were they

14   tests or --

15   A.  I'm sorry?

16   Q.  Were they tests?  Were they designed -- were they checklists

17   or was it designed to evaluate the various systems on an

18   endurance level?

19   A.  That, and also the pilot.  Patty diving, you have time

20   limits at specific depths.  So we would take the submarines down

21   and we would have to time our dives at ten meters.  If you're

22   allowed to stay down for 216 minutes, we would attempt to stay

23   down for 216 minutes and then surface and do it surface interval

24   of several hours.  Then we recalculate your dive and you do it

25   again.

1    Q.  Were you able to pilot the vessel, these various vessels and

2    keep at a distinct level in the water column?

3    A.  Oh, yeah.  It was a lot of fun.

4    Q.  Was that a skill or was that something that anybody can do?

5    A.  It's a skill.  Just like driving a car, just like flying,

6    you don't learn to fly right away and be perfect at it.  With

7    flying the submarine underwater, yes, it took some finesse, it

8    took some practice.

9    Q.  Did you have an occasion to -- well, I know you said one

10   time, you were in vessels with Jim Miller as the pilot, correct?

11   A.  Yes, lots of them.

12   Q.  And do you have an opinion as to -- I mean, was he a capable

13   pilot of these machines?

14   A.  No.

15   Q.  What leads you to that conclusion?

16   A.  Jim always seemed to have a -- he crashed it a lot.  When I

17   say crash, we would hit the bottom and we would skim along the

18   bottom like you were on a go kart or something like that.  Jim,

19   come on buddy, let's bring it up off the bottom by a few feet.

20   Let's fly it, not drag.

21   Q.  What was the cause of that crashing on the bottom and

22   staying on the bottom?

23        MR. CEDERBERG:  Objection, Your Honor.  No foundation,

24   personal knowledge.

25        THE COURT:  Sustained.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1204

```
 1    BY MR. HESS:
 2    Q.  Do you have personal knowledge as to what caused that
 3    inability or that -- well, let me start that over again.
 4         Do you have -- did you observe what caused Jim Miller's
 5    inability to stay off the bottom?
 6    A.  Well, yes.  Since we were in the submarines extensively,
 7    some people have finesse and some people didn't.  Just couldn't
 8    fly it that's all.
 9    Q.  What are the -- what do you do with your hands?
10         THE COURT:  Are you exercising or are you planning on
11    saying something?
12         MR. HESS:  Probably both, Judge.
13         THE COURT:  No, I mean behind you.
14         MR. CEDERBERG:  No, me.
15         THE COURT:  All right.
16         MR. CEDERBERG:  I don't have a motion to strike, Your
17    Honor.
18         THE COURT:  All right.  Never mind.  Go ahead.  Move
19    on.  I just thought he was saying something and I wasn't hearing
20    him.
21         MR. HESS:  I thought somebody was doing something
22    wrong.  I thought it was me.
23    BY MR. HESS:
24    Q.  Could you explain to the jury what does it take to pilot
25    these things?  What are the mechanics involved, what are your
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1205

1   hands doing to pilot or your feet?

2   A.  It sounds like I'm making it difficult, but it's not really.

3   Once you establish neutral buoyancy and now we're moving

4   forward, you have dive planes and you've got the ballast tanks

5   to trim it.  If you're hovering and you notice that the stern of

6   the submarine is settling more than the bow, you pump some of

7   the water out and introduce little bit more air to get it to the

8   right level.  The front end of the submarine, if you have a

9   picture of it, it has dive planes which helps control the nose.

10  Where the nose goes the submarine goes.  If you point it up,

11  it's going to surface.  If you point it down, it's going to

12  submerge.

13          MR. HESS:  I'll show you what's been marked as

14  Defendant's Exhibit 923.34.  There's no objection, seek to move

15  it into evidence.

16          THE COURT:  923.34.  All right.  923.34 is in.

17          (Defense 923.34 in evidence)

18  BY MR. HESS:

19  Q.  Where are the dive planes?

20  A.  These are the dive planes.  Port, starboard.

21  Q.  What do they do to cause -- how do they operate and how do

22  they cause the --

23  A.  It's electrical solenoid inside the ballast tank that

24  connects to the rod that holds it to and you tilt them up and

25  down to get the submarine to go down, to surface.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1206

1   Q.  And how does that translate to -- is it a steering wheel

2   inside?  Is it a lever?

3   A.  No.  It's an electrical control, it's a joystick.  Push the

4   joystick, the dive planes move.  Let go of the joystick, the

5   dive planes stop moving.

6   Q.  Now, did you perceive when Mr. Miller was operating these,

7   did you perceive his joystick operation?

8   A.  Yes.

9   Q.  And relative to him going to the bottom, what was he doing?

10  What was wrong with his maneuvering?

11        MR. CEDERBERG:  Objection, no foundation.  It's

12  personal knowledge, Your Honor.

13        THE COURT:  Sustained.

14  BY MR. HESS:

15  Q.  Did you watch him when he operated the vessel?

16  A.  Yes.

17  Q.  As it hit the bottom?

18  A.  Yes.

19  Q.  Did you watch his -- the joystick operation?

20  A.  Yes.

21  Q.  And what he was doing that was incorrect?

22  A.  Jim never wanted to point the dive planes up so that they

23  were level.  He would set the dive planes to dive and when you

24  get to a certain point underwater, you need to raise them to

25  either level or to just give you a slight nose up attitude and

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1207

1    he just wouldn't do it.

2    Q.   Did you make an effort to explain to him that?

3    A.   Repeatedly.

4    Q.   Now, was he -- did he permit you to believe that he was

5    interested in your input regarding his ability to pilot these

6    crafts?

7            MR. CEDERBERG:  Objection, Your Honor.

8    Incomprehensible.

9            THE COURT:  I don't have any idea what that means.

10           MR. HESS:  I don't either, Judge.  I'll try it again.

11   BY MR. HESS:

12   Q.   What was his response when you would attempt to educate him

13   on the, you know, how to maneuver these vessels?

14   A.   I'm a certified diver, don't tell me how to do this.  I know

15   what I'm doing.

16   Q.   Now, what would happen to the vessels when you operate

17   these, what would happen?  Did it hit the bottom hard?

18   A.   On several occasions, yes.

19           MR. CEDERBERG:  No foundation on what happened to

20   vessels.

21           THE COURT:  I'll permit it, but you're going to have to

22   get a little bit more concrete.  I don't know that he was on the

23   boat with him every time it happened.  I don't know how many

24   times, nothing.  So...

25   BY MR. HESS:

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1208

```
1    Q.  The times that you perceived Mr. Miller, that you witnessed

2    Mr. Miller, you're in the vessel, let's start with when you're

3    in the vessel and he's operating the vessel and he is

4    inappropriately utilizing the dive planes, how hard did the

5    vessel hit the bottom?

6          MR. CEDERBERG:  Objection, Your Honor.  Compound.  He's

7    not going to tell us which vessel it is.

8          MR. HESS:  I'll stop.

9          THE COURT:  Back off and start over again.

10   BY MR. HESS:

11   Q.  Let's start with, which vessel was this.

12   A.  This is Goby.

13   Q.  Did you witness, were you a passenger in the Goby while Jim

14   Miller was operating it?

15   A.  Lots of times, yes, sir.

16   Q.  And did you witness him on those lots of times?  Did he ever

17   exercise the joystick in such a way as it caused the vessel to

18   hit the bottom?

19   A.  Yes, sir.

20   Q.  How often did that happen?

21   A.  I'm going to have to ballpark you at about maybe a dozen

22   hits with two of them, one in Goby and one Adventurer that were,

23   I don't want to say catastrophic, but damaging.

24   Q.  What damage was -- did you observe, let's talk about the

25   Goby.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1209

1    A.  Do you have any side views of Goby?  Ones that would show

2    the --

3    Q.  If you could put up on the screen 73?

4    A.  Out of the water.

5    Q.  I'm sorry 923-73.

6    A.  Okay.  That's a good shot.

7           MR. HESS:  I believe there's no objection, Judge, I

8    seek to introduce it into evidence.

9           THE COURT:  73 is admitted in evidence then.

10          (Government's 923.73 in evidence)

11          THE WITNESS:  This port right here and matching port on

12   the other side is a hover motor.  Electric motors with

13   propellers that forces you down or forces you up.  The tube is

14   approximately 14" deep in this.  On the catastrophic one, we hit

15   the bottom rough, I mean we bounced.  So now we're moving along

16   on the bottom and we dragged so much crap off the bottom that

17   these two hover ports were filled up full of sand and mussels

18   and to the point where they wouldn't work and we had to actually

19   deploy the air bags to come up that one particular time.  They

20   were so lodged with sea goo.

21   BY MR. HESS:

22   Q.  I'm not sure if the jury can see it real clearly.  Are these

23   tubes where the --

24   A.  This is a thruster motor.  Okay.  Can you pan sideways

25   please?  Okay.  This thruster motor, a smaller version is

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1210

1   mounted in this tube vertically.  These are your forward and

2   reverse thrusts, these are your up and down thrusts.  These

3   tubes, because the bottom of it comes out right here from

4   dragging along the bottom, that hull acted like a scoop and just

5   scooped up all the stuff up off the bottom of the water, filled

6   both of those holes so full of stuff we had to surface.

7   Q.  What is the reason for the inclusion of those thrusters?  Is

8   that the right word, thrusters?

9   A.  Yes.

10      THE COURT:  He told you they make it go up and down.

11  BY MR. HESS:

12  Q.  Is there any other way to make it go up and down?

13  A.  Vent your ballast tanks or deploy the emergency air bags.

14  On this particular submarine, there's a panel here with a hinge,

15  there's a panel here with a hinge, they're on a latch.  There's

16  air bags on them.  When the air bags are inflated, they'll pop

17  out of those hatches and the submarine will come to the surface.

18  Q.  It was necessary to do that when the thrusters were full of

19  debris?

20  A.  Yes.  I'm sorry.  That's how we came to the surface because

21  whenever I was with Jim Miller, I was never PIC, I was always

22  the safety officer.  So he elected to air bag it to the surface.

23      THE COURT:  You're saying that thing won't come to the

24  surface with forward propulsion and the bow planes?

25      THE WITNESS:  Oh, yes, yes Your Honor, it would.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1211

```
 1              THE COURT:  I thought he asked you how did it get to
 2      the surface and you're implying that the airbags or the
 3      thrusters are the only way.
 4              THE WITNESS:  No, sir.  You could fly to the surface or
 5      you could vent the ballast tanks.
 6      BY MR. HESS:
 7      Q.  That time that you utilized the bags, the air bags, whose
 8      decision was that?
 9      A.  Jim Miller.
10      Q.  So as the Court pointed out, could have flown to the surface
11      utilizing the forward propulsion?
12      A.  Yes, or just vented the ballast tanks.
13      Q.  Is that something that you explained to Mr. Miller on that
14      occasion?
15      A.  I was told to be quiet and mind my own business.
16      Q.  Now, let's talk about the Stingray.  You did you pilot the
17      Stingray?
18      A.  Yes, I did.  It's my baby.
19              MR. HESS:  Again, the Stingray, to remind the jury,
20      it's been marked as Exhibit 923.95, and I believe without
21      objection I seek to enter that into evidence.
22              MR. CEDERBERG:  No objection.
23              THE COURT:  923.95.
24              (Defense 923.95 in evidence)
25      BY MR. HESS:
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1212

```
 1    Q.  Does that depict the Stingray?

 2    A.  Yes, that is Stingray number one.

 3    Q.  And I don't know, looks like maybe there's a line in the

 4    back of that.  Is there a line towards the back aft up in the

 5    upper left-hand corner?

 6    A.  Yes, it could be a trailing line.

 7    Q.  Okay.  What does that mean?  What's a trailing line?

 8    A.  The only thing I could think of that you would have a

 9    trailing line for is that looking at this picture, this is

10    Stingray number one, second version.  It was rebuilt three

11    times.  We may have had a dock line on there for a diver to hang

12    on to it while the pilot in command was utilizing the submarine.

13    We would keep divers next to the submarines just in case of any

14    kind of emergencies.

15    Q.  Now, how many times did you operate -- of course only one

16    pilot in that machine, right?

17    A.  Correct.

18    Q.  Only one person in that machine?

19    A.  Correct.

20    Q.  How many times did you operate the Stingray?

21    A.  I was only allowed the operate it four or five times.

22    Q.  Could you describe to the jury, you're half in water, half

23    not in water?

24    A.  You are in water and the only part of you that is dry would

25    be from your shoulders up.  Your head and shoulders are up in
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1213

1    the air pocket.

2    Q.   And what was your experience in operating that vehicle?

3    A.   Man, that's like an underwater Ferrari.  It's the neatest

4    little thing, nimble as you would not believe.

5    Q.   Were you on scene when the first Stingray test was conducted

6    in Dubai?

7    A.   Yes.  No.  Back up.  The first submarine test that was

8    conducted in Dubai was with Herve over the Christmas holiday, I

9    was back in the United States.  That dive lasted approximately

10   five minutes --

11           MR. CEDERBERG:  Objection, Your Honor.  If he wasn't

12   there.

13           THE COURT:  Sustained.

14   BY MR. HESS:

15   Q.   Let's go on.  You were present for a test of the Stingray?

16   A.   Second dive, yes sir.

17   Q.   And was that the dive that Thapa was the pilot?

18   A.   Correct.

19   Q.   Jim Miller was one of the --

20   A.   Safety diver.

21   Q.   Who else was the safety diver?

22   A.   Herve.

23   Q.   Was there anybody else the safety diver?

24   A.   We had a photograph there Falk, I don't recall his entire

25   name.  In an emergency I would have to assume he could end up

1214

1    being a safety diver, but he was there strictly as a

2    photographer.  No.  Three divers in the water, I was on the

3    shore.

4    Q.  Okay.  Could you perceive the -- well, do you have personal

5    knowledge of the depth of that water there?

6    A.  They submerged Stingray in about ten, 12' of water the very

7    first time.

8    Q.  How did Stingray get to the marina there?

9    A.  We brought it there on a trailer.

10   Q.  And just briefly, explain to the jury how does it get in the

11   water?

12   A.  You launch it just like a boat.  You back the trailer into

13   the water, it floats right off.  The pilot gets inside, turns

14   all your controls on, away you go.

15   Q.  And the -- you said you were on the dock.

16   A.  Well, the jetty, but yes.  From here to the end of the

17   courtroom we could see how far they were.  What's that 30, 40

18   feet?

19   Q.  All right.  You said you could perceive how deep the water

20   was there?

21   A.  That's going to be hearsay.  I was told it was 12.

22   Q.  Okay.  What did you witness from the -- you know, in terms

23   of the length of the dive, what did you witness from your

24   perspective?

25   A.  We were watching them launch the submarine.  Thapa, Herve

1215

1    and Jim Miller were in the water.  They starter off in

2    approximately chest deep water.  Thapa practiced getting in,

3    getting out.  Turning things on, making sure everything was

4    function okay, do a swim around, make sure everything is still

5    fine.

6    Q.  When you say swim around, what do you mean by that?

7    A.  Well, this was the very first one.  So Thapa got out of the

8    submarine and he swam around and with a mask on looking, make

9    sure we haven't screwed anything up.  Super safety.

10          After that, what they did was they push the submarine

11   into deeper water so they could submerge it and see if they

12   could get it to hover, see if they could get the controls to

13   work properly.  I was on the shore with a coworker.  We were

14   just observing the air bubbles, occasionally a helmet would come

15   up, Herve would pop up, Jim Miller would come up, how are you

16   doing.

17          At one point we were standing there, sitting there on

18   the rocks watching and there was this huge cascade of air

19   bubbles that came up.  Approximately 15 seconds later, the aft

20   hatch of the submarine float today the surface.

21   Q.  Can you point that out can you show the jury?

22   A.  I'm sorry.  Yes.  The dome and the forward compartment

23   folded forward.  This entire panel came off so you could service

24   the components underneath of it.  The air tanks, replace the air

25   tanks.  10 to 15 seconds into this huge air bubble that came to

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1216

1   the surface the aft hatch floated up.  Less than 30 seconds

2   later, Thapa came to the surface.  He had a spare air bottle in

3   his mouth and you have to understand, Thapa was such a funny

4   guy.  He would come up, oops.

5           MR. CEDERBERG:  Your Honor, could the witness just

6   describe what he saw?

7           THE WITNESS:  I am describing what I saw.

8           THE COURT:  Okay.  Well, you're actually copying it,

9   you're not describing it.  The problem is that it's very hard to

10  build a record based on your interpretation of what you saw.

11  You need to tell us what it is.  So the record, she's writing it

12  down, I don't know how she's going the write down your gestures

13  is the problem.

14          THE WITNESS:  I'm sorry.  I understand.

15  BY MR. HESS:

16  Q.  Was he at all traumatized?  Did he appear to be traumatized

17  by the event?

18  A.  No, to the contrary.  He came to the surface smiling.

19  Q.  Now, did you notice anything else was there -- did you

20  notice either Mr. Jaubert or Mr. Miller or the other diver, did

21  you notice anything about their conduct or their actions that

22  you can perceive from the shore?

23  A.  When they first came out of the water, they were -- my

24  recollection was that they appeared to be relieved.

25  Q.  Did you see any thrashing of the fins going down or anything

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1217

1    from the surface?

2    A.  After the large bubble of air and then the dock, the aft

3    deck floating up, there was fin thrashing and two sets of fins

4    thrashing and a lot of air venting from, I'm going to have to

5    assume hyperventilation from the divers.

6    Q.  You're sure about the timing of this, 10 to 15 seconds, that

7    -- after it submerged, 10 to 15 seconds, following this large

8    column of air that came up was the aft hatch.

9           MR. CEDERBERG:  Objection, leading, Your Honor.

10          THE COURT:  Yes, it is very leading.  Ask a different

11   question.

12          THE WITNESS:  Large bubble of air.

13          THE COURT:  Hold it.  No.  Let him ask another

14   question.

15   BY MR. HESS:

16   Q.  How is it that you recall the timing of the circumstances

17   that you perceived?

18   A.  I built this thing.  This is my baby.

19          THE COURT:  No, the question is how do you know it was

20   10 to 15 seconds.  Could it have been 30 seconds, could it have

21   been five seconds, could it have been two minutes?  That's the

22   question is how do you know the timing.  Not whether you're

23   familiar with the vessel.

24          THE WITNESS:  I understand, Your Honor.  Mental

25   countdown.  Because I built it, I want to make sure it's not

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1218

1   going to sink, I am seeing a lot of air, which to me indicates

2   that the bubble -- the air came out somehow.  And then the hatch

3   comes up.  Okay.  Wow, hmm, okay.  I'm sorry.  I'm looking at my

4   watch, timing, oh, okay, everybody is up.

5   BY MR. HESS:

6   Q.  What was done after -- was there an analysis done?  Did you

7   all meet or what was done after that event in terms of dealing

8   with whatever issue presented?

9   A.  We all sat down and we had a debriefing on potential causes

10  of what happened.

11  Q.  Was there a determination as to what caused what happened?

12  A.  Pilot error, just a simple mistake.  That's all.

13  Q.  Was there ever an occurrence like that again?

14  A.  No.

15  Q.  Do you recall the time of day this test was conducted?

16  A.  First thing in the morning.  We worked on this all -- we

17  were going to launch it the next day, I mistakenly broke a piece

18  of plexiglass, I spent all night repairing it.  We took the

19  submarine out at approximately 7, 7:30 in the morning.  By the

20  time we were back at Exomos to our shop, we're looking at after

21  lunch, 1, 1:30-ish.

22  Q.  The whole thing was over completed by 1:30?

23  A.  Yes.

24  Q.  What other projects did you work on on Exomos?  You said you

25  work on everything except the surface boats?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.  Correct.

2    Q.  What were the surface boats?  We'll knock those out because

3    we won't talk about those with you.

4    A.  We had a vessel called SWATH, we had two surface vessels

5    that were built for high speed.  Don't know the names of them.

6    Air boat, flying air boat was -- Sebastian was instrumental in

7    that.  I oversaw it only to give Herve updates on what was being

8    done.

9         But I oversaw all the Stingrays, all the Adventurers.

10   The names of the submarines, I just drew a blank in my head.

11   Q.  So you talked about the Adventurer.  So you oversaw the

12   production and the design improvements of the Adventurer?

13   A.  Yeah.  I was the one who did all the design improvements,

14   yes.

15   Q.  And the same was true with, you said with Stingray?  How

16   about the Discovery vessel?

17   A.  I worked on Discovery for the 2005 boat show.  I got it

18   functional and operational.  At which point, Sebastian took over

19   that project and beautified it, so to speak.

20   Q.  What about the lift raft?  Was that one of your projects?

21   A.  Yes, it was.

22   Q.  If you could put on the -- take a look at what's been marked

23   as -- well it's a series.

24        MR. HESS:  923.82, 83, and 84 seek to introduce them

25   into evidence.  Confer with counsel, I don't believe there's any

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1220

1    objection.

2            MR. CEDERBERG:  No.

3            (Defense 923.82, 923.93 & 923.84 in evidence)

4    BY MR. HESS:

5    Q.  Do you recognize that in vessel?

6    A.  Yes, I do.

7    Q.  Whose design was that?

8    A.  Herve's.

9    Q.  Whose production was that?

10   A.  I oversaw production.  This was partially constructed in

11   America, and then the pontoons and -- the pontoons were shipped

12   over from here.  Then from the pontoons up was built in Dubai.

13   Q.  Now, what was this vessel designed to do?  What did it do?

14   A.  This vessel was designed as a multipurpose.  We had plans on

15   lining the deck with five or six Stingrays.  And you take a dive

16   crew out and so instead of wasting all your battery power going

17   out, you take all the submarines on this.  This is designed to

18   submerge so that the second floor platform is actually on the

19   water so you can float your submarines on.

20           We also used to deploy an Adventurer.  We put the

21   Adventurer on there and then we would take the Adventurer out on

22   this and then deploy it that way also.

23   Q.  And 923.84, that's the idea?

24   A.  Correct.

25   Q.  And would you point to -- let's take a look -- how far it

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1221

1    would submerge?  Until what point?

2    A.   You could vary the submergence all the way up to this level.

3    Q.   Did it submerge?  Did you operate the vehicle?

4    A.   We attempted to submerge it, it was not submerging

5    correctly.

6    Q.   Any determination as to why?

7    A.   The people that were doing -- the workers that were putting

8    the -- I don't want to use the word Bondo, marine fillers, the

9    body filler on it, made the top of this thing so heavy, our

10   original plans called for a complete open deck with only a

11   console and some seating to keep the top of the lift raft light.

12   When we were to the point, if you can back up a picture, if we

13   can -- where is the picture we just had?  Okay.

14   Q.   923.82?

15   A.   Now, what happened was management came by and they wanted

16   this entire bench seat added which is all fiberglass.

17   Q.   Who is management?

18   A.   Sultan.  There is another bench seat on the other side which

19   is all fiberglass, then they installed a bar which I thought was

20   quite funny.

21   Q.   And that adds weight?

22   A.   It's all fiberglass and it's all heavy, yes.

23   Q.   You mentioned earlier you're not a fiberglass guy?

24   A.   Correct.

25   Q.   Were there challenges about the -- that the personnel that

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1222

1    were doing the fiberglassing on these various vessels including

2    this one?

3    A.  Yes.  There was challenges.

4    Q.  What were they?  I mean, what was the most significant of

5    them?

6    A.  The worst part was no matter what we instructed the

7    fiberglass shop to do, they took it upon themselves to add three

8    or four or five more layers of glass because they wanted some

9    safety factors built into this.

10   Q.  Were the safety factors already built into the plan?

11   A.  Yes, it was.

12   Q.  Was there a lamination schedule that was contemplated or

13   that was required under the plan?

14   A.  We gave Selby, who was in charge of the fiberglass shop, the

15   lamination schedule, this is what we want.  I want four layers

16   here, I want carbon fiber here, I want one layer here, I need

17   fiberglass fill over here.  And what they would do is they would

18   do that and then they would put three or four more layers of

19   roving on top of it which is very heavy.

20   Q.  Now, when you were instructed to put on the bar and these

21   other the benches, did you advise management of the consequences

22   of putting those nondesign elements?

23   A.  Vehemently.  Don't put any weight up there.  Don't do it.

24   Don't put another ounce of weight on the top.  Repeatedly.

25   Q.  Let's talk about another vessel that you were involved in.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1223

1    The Proteus, correct?

2    A.   Oh, yes.

3    Q.   The Proteus was --

4    A.   The submersible yacht.

5    Q.   Let's show you what's been marked as 923.91, Defendant's

6    Exhibit.

7          MR. HESS:   Seek to introduce it in evidence.  I don't

8    believe there's any objection.

9          MR. CEDERBERG:   No objection.

10         THE COURT:   What is the number?

11         MR. HESS:   923.91.

12         THE COURT:   91?

13         THE WITNESS:   Ooh, yeah.  Look at that.

14         THE COURT:   Admitted in evidence without objection.

15         (Defense 923.91 in evidence)

16   BY MR. HESS:

17   Q.   What are we looking there?  Is that the Proteus?

18   A.   This is the Proteus, yes sir.  Half of it anyway.  The rest

19   of it is underwater.

20   Q.   Here's what I meant to show you, one that's a little less

21   submerged.  Let's take a look at what's been marked as 923.93,

22   first.

23   A.   Okay.

24   Q.   Same vessel?

25   A.   Yes, sir.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1224

1    Q.  Okay.  And this was designed to do what?

2    A.  This was a supposed to be a luxury submersible yacht that

3    can be used to take a group of divers out, you can submerge the

4    entire submarine, the divers can deploy from the submarine while

5    it's underwater, and they can return to the vessel and not have

6    to surface.

7    Q.  If we can go back to 923.91.

8         MR. HESS:  I'm sorry, Judge.  I don't think I entered

9    this into evidence but without objection 923.93, seek to

10   introduce into evidence.

11        THE COURT:  .93 is not in evidence but it is now.

12        (Defense 923.93 in evidence)

13   BY MR. HESS:

14   Q.  Now, we were looking at 923.93.  Now we're looking again at

15   923.91.  Is there a dry area of this vessel?

16   A.  Yes.

17   Q.  Where is that?

18   A.  This is the dry area cabin right here.  Right in the center

19   of the vessel.

20   Q.  You were involved in production of this vessel?

21   A.  I was overseeing the entire production, yes.

22   Q.  Let's look at what's been marked as 923.38.

23        MR. HESS:  Also seek to introduce in evidence, Judge, I

24   believe without objection.

25        THE COURT:  What's the Number? 98?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1225

```
1              MS. HEATHCOCK:  38, Judge.

2              MR. CEDERBERG:  No objection.

3              MR. HESS:  If it's easier, Judge, I'll give you two

4       more.   923.32 and 930.2.

5              THE COURT:  Nine, what is the last number?

6              MR. HESS:  930.2.

7              THE COURT:  I only have just 930.  That's the one we

8       didn't have anything.  930.05 is in and so is 930.2.

9              (Defense 923.32 and 930.2 in evidence).

10             THE COURT:  But I really you need to give me another

11      list.

12             MR. HESS:  I will, Judge.

13      BY MR. HESS:

14      Q.   Let's start with that.  Now you're looking at what has been

15      introduced into 930.2.  What is that?

16      A.   That's the aft deck of Proteus.

17      Q.   Is that a dry area?

18      A.   No, this is a get wet area when you submerge.

19      Q.   Now, let's take a look at what's been marked as 923.32.

20      Where all the people are standing, what area is that?

21      A.   That's again the aft deck that would get wet when you

22      submerge.

23             THE COURT:  Those guys are in for a rude awakening,

24      huh?

25             THE WITNESS:  Yes, Your Honor.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1226

```
 1   BY MR. HESS:
 2   Q.  Then the 932, 923.38?  What is that?  Is that a prop that's
 3   behind Mr. Jaubert's head there?
 4   A.  Yes, there was one on port, one on starboard.
 5   Q.  That's design to do what?
 6   A.  That was the underwater thrust motors.
 7   Q.  Now, the design of this, not the design, but the
 8   fabrication.
 9            THE COURT:  By a prop, you meant propeller as opposed
10   to a device for people to see something?
11            MR. HESS:  Yes, Judge.
12            THE COURT:  Like a stage prop?
13            MR. HESS:  I did mean it to be propeller.  Yes.  Thank
14   you, Judge.  It's a propeller, correct?
15            THE WITNESS:  Yes.
16            MR. HESS:  Functional aspect of the boat.
17            THE WITNESS:  Yes.
18   BY MR. HESS:
19   Q.  So now were you involved in the stages of the -- well, let
20   me ask you what these are first, I guess.
21            MR. HESS:  I'm going to ask to introduce into evidence
22   923.62, 923.63, 923.60.
23            THE COURT:  All right.  Tell me those again?  63, 62
24   and what is it?
25            MR. HESS:  60.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1227

1    THE COURT:  Okay.

2    MR. CEDERBERG:  No objection.

3    THE COURT:  Without objection, they're admitted in

4    evidence.

5    (Defense 923.60, 923.62 & 923.63 in evidence)

6    BY MR. HESS:

7    Q.  What is that?  What are we looking at?

8    A.  This is the preliminary mould, so to speak, this was all

9    assembled and then they laid plywood on this and then it was

10   sealed and then they made the fiberglass mould for the Proteus

11   out of this.

12   Q.  What orientation is that?

13   A.  This is the hull but upside down.

14   Q.  Let's take a look at 923.62.  What are we looking at there?

15   A.  This would be the mould for the deck.

16   Q.  Okay.  And now the lamination, it's composed of what?  What

17   is this made of?

18   A.  Gel coat fiberglass.

19   Q.  Was there a design specification in terms of the amount of

20   fiberglass that was to be utilized on this boat?

21   A.  Yes.

22   Q.  And were these -- did you have any challenges with that?

23   A.  No.  On the hull, we actually called for 25, 30 layers of

24   glass, and I'm not 100 percent sure of the number, but we got 25

25   or 30 layers of glass.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1228

1   Q.  It was a heavily built hull, correct?

2   A.  Correct.

3   Q.  Let me point your attention before I move off this, the

4   Proteus -- well, did you ever have an opportunity to -- were you

5   involved in the testing or submerging of the Proteus?

6   A.  No.  Unfortunately I had come back to the United States

7   before the final testing.  We had it in the water extensively

8   for surface testing, but I never had a chance to submerge it.

9   Q.  Let me show you 923.91 again.  Where it says -- now where it

10  says up to the upper left-hand just off center remote controlled

11  camera, what is that?

12  A.  These are twin periscopes I designed.  One periscope on the

13  starboard side, the right-hand side of the vessel you've got

14  your air mast, you have a GPS antenna, we have a VHF antenna and

15  we have a special order TV remote controlled camera on the top.

16  The other mast was for a radar.

17  Q.  When you say air mast, they function how?

18  A.  Air mast, if you've ever seen the Channel Nine news van

19  outside with the mast with the antenna, it's the same principle

20  only it was, instead of being a 12 or 14 stage, that's only 8'

21  long, these were four stage that started off at 15'.

22  Q.  And when you look at 923.90, which I'm seeking to introduce

23  in evidence at this time, I don't believe there's an objection.

24         MR. CEDERBERG:  No objection.

25         THE COURT:  923.90 is in evidence.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1229

```
 1                (Defense 923.90 in evidence)

 2                MR. HESS:  Thank you, Judge.

 3      BY MR. HESS:

 4      Q.  Is this another view of that camera?

 5      A.  Correct.

 6      Q.  Who was responsible for including the camera into the

 7      Proteus?

 8      A.  It was originally written into the specs of the submarine

 9      from the very beginning.

10      Q.  Who adapted it, who accomplished that design, I mean that --

11      who accomplished putting -- actually physically mounting --

12      A.  I did.

13      Q.  And what did that entail?

14      A.  The air masts that we have on there, what we did was we

15      disassembled them, we got extra long cables from the

16      manufacturer, we had a very large spring on the inside of the

17      air mast that would retract it.  We took the wiring, coiled it

18      down the inside the masts, brought the cabling out of the bottom

19      of the mast through a water proof gland.  Had air pressure

20      hooked up to it so the air pressure would lift it and when you

21      released the air pressure, the spring would lower it.

22      Q.  Was that a waterproof camera, stock?

23      A.  That was a special order camera from England, yeah.  It was

24      rated to either 300 meters or 300', I'm not 100 percent sure,

25      but it was housed in a stainless steel housing and it was 100
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1230

```
1    percent remote controlled from the cabin.
2    Q.  What would it do?  I mean, I know it's a camera, but what
3    made it special?
4    A.  Pan, tilt, rotate.
5    Q.  Did you perceive in your -- during the period of time that
6    you were in Dubai with Exomos, what, 18 months is that
7    approximately?
8    A.  Yes.
9    Q.  Did you perceive a problem with the distinctions that were
10   drawn between operations and production?
11   A.  Yes.
12        MR. CEDERBERG:  Objection, Your Honor, foundation.
13        THE COURT:  Sustained.
14   BY MR. HESS:
15   Q.  Your duties, did they -- what did they include?
16   A.  I was supposed to be instrumental in, like I said, teaching
17   the workers there how to build these and then I was supposed to
18   be showing the people how to work them.  It morphed into
19   overseeing almost every bit of the production to make sure that
20   mistakes weren't made.
21   Q.  Now, let's talk about that.  Why was that necessary that?
22   A.  Well, the working class that we had there, there was
23   approximately 160 workers and it was ad hoc.  Here.  Here's some
24   workers.  They're for you.  Well, can I hire who I want?  No.
25   Here's your workers.  These are your guys.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1231

1        Well, we had workers who had no idea what wiring was

2    and they're electricians.  That doesn't work.

3    Q.  Did you attempt to train these workers?

4    A.  Repeatedly, yes.

5    Q.  And what was your experience with those attempts?

6    A.  Hair pulling and a lot of going into hiding in my office and

7    venting, and it was just difficult.

8    Q.  Were these, for instance, the people that were doing the

9    electrical work on these very -- all the vessels that you were

10   overseeing, did they have the skills and the training necessary

11   to accomplish marine electrical?

12   A.  No.

13        MR. CEDERBERG:  Objection, foundation, Your Honor.

14        THE COURT:  What's the objection?  Lack of foundation?

15        MR. CEDERBERG:  Yes.

16   THE COURT:  Yeah.  I'm not sure you can -- you indicated

17   what his expertise is in accomplishing marine construction.

18   BY MR. HESS:

19   Q.  What is your experience with marine electrical systems?

20   A.  Well, currently I'm a marine electrician, systems mechanic

21   working at Lawson Marine (ph).  I've been there for almost two

22   years.  I was working with Rybovich after I came back from

23   Dubai.  Rybovich Boats down in West Palm Beach, I was there for

24   two and a half years.

25   Q.  How about prior --

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          THE COURT:  I think the issue, what in Dubai, what was

2     your expertise?  What training, schools have you been to, what

3     experience did you have at building the electrical systems of

4     anything.

5          THE WITNESS:  My electrical expertise would have come

6     from the Air Force doing electrical on the jet engines.

7          THE COURT:  All right.

8     BY MR. HESS:

9     Q.   Now, was there a similarity or --

10    A.   Yes.

11    Q.   Why is there a similarity?

12    A.   Well, on jets, wiring is -- needs to be tied down every X

13    number of inches depending on the technical order

14    specifications.  If plugs need to be tight, circuit breakers

15    need to be secured, basic knowledge.  Do you hook the red wire

16    to the black wire?  Wiring diagrams and how to read them and how

17    to write them.

18         My workers had no idea how to read a wiring schematic,

19    they had no idea how to write a wiring schematic.

20    Q.   What would happen?

21    A.   I would have to go back and correct things myself or stand

22    there and oversee the red wires go to the red terminals, the

23    black wires go to the black terminals.

24    Q.   Did you make any efforts to attempt to correct that

25    challenge in the process?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1233

1    A.   Once.

2    Q.   And what was that effort?

3    A.   I was told to shut up or I'll get sent home.

4    Q.   Who did you talk to?

5    A.   Jim Miller.

6    Q.   What did you tell him?

7    A.   I told him that the people that we're getting have no idea

8    what they're doing, and how can you expect to build a

9    multimillion dollar submarine with people that have no idea how

10   to hook up wiring or have no idea how to hook up a pump.

11   Q.   Now, as part of your work, scope of work there, did you --

12   were you interested -- well, as part of your work to take a

13   production sub and move it right -- I think you were talking

14   about this before I interrupted you, and get it from produced

15   into the water and training someone to operate it.

16   A.   Initially I was told that yes, once you get done building

17   these, Herve's direct instructions were when we get done

18   building these, I want you in there, you built them.  You know

19   these things inside out.  I need you to tell me is everything

20   okay, I trust your judgment.  Is this going to work.  I brought

21   you from America to teach these people and to get these things

22   right and to teach people how to use the submarines.  That was

23   originally the concept, yes.

24   Q.   Was that what was implemented by Exomos or at Exomos?

25   A.   No.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1234

1    Q.   What was implemented at Exomos?

2         MR. HESS:  Objection, Your Honor.  Personal knowledge,

3    vague as to time.

4         THE COURT:  Yeah.  Be more specific as to time and how

5    he would know.

6    BY MR. HESS:

7    Q.  As to time when you arrived -- when you became -- did there

8    come a time where you became aware that you were -- that it was

9    going to be different than you thought it was going to be

10   regarding operating these vessels and training people?

11   A.  Yes.

12   Q.  When was that?

13   A.  That happened when I was still considered a consultant.  I

14   had just gotten my dive qualification over in Dubai.  We were

15   bringing -- on sidebar, we built a tank that was four meters

16   deep, four meters wide, maybe 20 meters long.  This was an above

17   the ground water tank to test the submarines.  I did start to

18   notice things were not going in my direction when we started

19   bringing submarines over and I was told okay, we brought them

20   over, we don't need you here, you can leave.  Well, excuse me, I

21   built it, I know how it works.  Well, you're going to tell me

22   how it works.  When I say "we", the people on the other side of

23   the road that were testing it under Jim Miller's tutelage.

24        MR. CEDERBERG:  Your Honor, I believe the question was

25   when.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1235

1    THE COURT:  Can you listen to -- the question was when

2  was that.

3    THE WITNESS:  That would have been in May of 2005.

4  BY MR. HESS:

5  Q.  As you said, that was during that period of time that you

6  were still operating as a consultant?

7  A.  Correct.

8  Q.  Hired by Seahorse Submarines.

9    THE COURT:  You don't have to repeat it.  After all

10  he'd already gotten it in once.  It's already in evidence once.

11  BY MR. HESS:

12  Q.  So in May of 2005, correct?

13  A.  Yes.

14  Q.  Did that process of excluding you from the testing of the

15  vehicles, did that continue throughout your tenure there?

16  A.  It lasted for the rest of the time I was there.

17  Q.  Explain why it is that it's -- that you believe it's

18  important to be involved as the production side of things and

19  the testing of the subs.

20  A.  Well, I'm the one who oversaw the building of it.  On the

21  Stingray and the Adventurers, I built them almost personally.  I

22  knew every bolt, nut, hose, tube, battery switch.  So if I'm the

23  guy that built this thing intimately, am I going to give it to

24  you to test?  You're a lawyer, you know how to run a submarine?

25  Sorry.  I'm not supposed to ask questions.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1236

1   So at this point I'm getting very annoyed because

2   you're going to take the submarine that I know how it operates.

3   They put it in the tank and something happens and something goes

4   wrong and this broke.  Well, you know, you're not supposed to

5   turn that lever because it's not designed to turn.  This was an

6   ongoing problem for the next year.

7   Q.  Was there any effort, did you perceive any effort made on

8   the operation side of things under Jim Miller to bring the test

9   pilots into production to learn the kind of things that you were

10  just talking about?

11          MR. CEDERBERG:  Objection, Your Honor.  Vague, no

12  foundation as to personal knowledge.

13          THE COURT:  Yeah, that's a very general question.  Ask

14  more specific questions please.

15  BY MR. HESS:

16  Q.  Did there ever come a time that you were involved, in the

17  entire time that you were working at Exomos or as the consultant

18  hired by Seahorse prior to your hiring at Exomos, where you were

19  permitted to teach the test crew, operations crew about the

20  systems and the advances and the changes that were done to the

21  various models.

22          MR. CEDERBERG:  Objection, compound, Your Honor.

23          THE COURT:  Very much so.  I was wondering when you

24  were going to finish that question.  Start with separate pieces

25  please.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1237

1    BY MR. HESS:

2    Q.  Did you ever have the opportunity to teach the -- did you

3    meet with the test crews on a regular basis?

4    A.  Repeatedly.

5    Q.  And what was the function of that?

6    A.  The test crew was supposed to be there to test the

7    functionality of the submarines.  And that's what they were

8    hired for.

9    Q.  And did they -- did you have an opportunity to teach them

10   about the production aspects of these vessels, the advances, the

11   changes in the systems?

12   A.  Initially I was hired to do that, they even brought in some

13   classrooms and they had several classrooms all set up over on

14   the testing side of the facility.  And indirectly I showed Ross

15   and Nick how to operate the submarines, but nowhere was I ever

16   asked to come over in an official capacity and sit them down in

17   a classroom and go over the functions of the submarines from

18   basic to intricate.

19   Q.  The Goby, when it was brought over, were you -- did you --

20   were you there when the Goby was brought over from Seahorse to

21   Dubai?

22   A.  No.  It was shipped without me having to do anything with

23   it.

24   Q.  Did you -- when you were there, did you ever witness the

25   Goby that was shipped over?  Did you witness that operating?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1238

1    A.   I operated that thing several times.   A bunch.

2    Q.   In your experience, was it fully functional?

3    A.   Yes.

4    Q.   Did you have any experience with -- did you learn or did you

5    know who was responsible at Exomos for -- who is the sales team?

6    Did you have any experience with sales team?

7    A.   Unfortunately, yes.

8    Q.   Who was the sales team that Exomos put in place to sell

9    these submarines?

10   A.   Okay.   The person in charge of the entire sales team was

11   Mohamed Amin.   And we are in a Muslim country.   And he hires

12   four women to sell his submarines.   No disrespect towards the

13   women.

14   Q.   Why is that an issue?

15   A.   Because it's an Arab country and women are not citizens in

16   an Arab country.

17            MR. CEDERBERG:   Objection.

18            THE COURT:   You know, I don't think this is

19   appropriate.   I'm sorry, I don't understand it.   I don't know

20   what his view of the Muslim religion or how countries are run, I

21   don't know what his basis for knowledge is of that.

22            MR. HESS:   I'm happy to explore it more.

23            THE WITNESS:   Observations.

24            THE COURT:   I understand it's your observation coming

25   from here over there, I'm not sure how accurate your observation

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    is.  But whatever it is, it's an opinion.  And I don't really

2    think that we need to, you know, get into that.

3              MR. HESS:  I understand, Judge.

4              THE COURT:  I'm not even Muslim and I'm a little bit

5    offended.

6              MR. HESS:  It's not meant to be offensive.

7              THE WITNESS:  My apologies to everyone.

8    BY MR. HESS:

9    Q.  The women --

10             THE COURT:  He can say he hired four women.  You can

11   argue that that was silly, that it was dumb, that it was crazy.

12   Never mind the fact that your client's wife was apparently

13   working there and apparently doing something.  That was work,

14   you know.  So some woman worked there.  But I don't know.  It

15   just seems weird.  Get out of it and go somewhere else.

16             MR. HESS:  I understand, Judge.

17   BY MR. HESS:

18   Q.  Did you speak with the sales team?

19   A.  All the time.

20   Q.  Did they have any knowledge about the submarines?

21   A.  They had no idea, they had no clue.  In fact, at a certain

22   point Herve had me have a class with all the sales women  --

23             MR. CEDERBERG:  Your Honor, the question has been

24   answered.

25             MR. HESS:  Just trying to explain, Judge.


**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1           THE COURT:  The question was did they have any

2     knowledge about the submarines.  They had no idea, they had no

3     idea, they had no clue.

4           Ask another question.

5     BY MR. HESS:

6     Q.  What was done because of that lack of knowledge?

7     A.  Because of that lack of knowledge, Herve asked me to take

8     all the sales --

9           THE COURT:  Sustained.  Don't tell us what Herve told

10    you.  What did you do as a result of that situation?

11          THE WITNESS:  Once a week I would have a class for the

12    sales department to explain to them how the submarines

13    functioned, what was installed in them, some of the options that

14    you could get, the depth, how they would -- how deep they would

15    dive, information like that.

16    BY MR. HESS:

17    Q.  Did that continue on on a weekly basis?

18    A.  Correct.

19    Q.  Did you perceive them to have an understanding about these

20    better understanding of the submarines?

21    A.  No.  What I would do is during this week's class, I would

22    just randomly ask questions from --

23          MR. CEDERBERG:  Again, Your Honor, the answer is no.

24    Getting speeches.

25    BY MR. HESS:

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    Q.   What did you do -- the answer is no?

2         THE COURT:   Yeah, that was the answer.  He started out

3    no.

4    BY MR. HESS:

5    Q.   What did you do -- how did you come to that conclusion?

6    A.   I would orally test them to see if they were retaining the

7    knowledge I was trying to teach them.

8    Q.   And were they?

9    A.   No, they were not.

10   Q.   Did you ever witness Mr. Jaubert sexually discriminating

11   against any employee at Exomos?

12   A.   No, never.

13   Q.   Did you have an occasion to frequently ask a woman there to

14   go out with her?

15        MR. CEDERBERG:   Objection, relevancy, Your Honor.

16        THE COURT:   I don't understand.

17        MR. HESS:   Judge, as part of a huge pile of paper that

18   were moved in into evidence last week by Plaintiffs, one of the

19   reasons that I objected to hearsay was what -- there's a report

20   in there that ascribes a sexual discrimination event to

21   Mr. Jaubert.

22        MR. CEDERBERG:   We offered to take it out and they said

23   they wanted it in.

24        MR. HESS:   We said we wanted the complete document

25   rather than -- we don't know what's been taken out and put in,

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1242

1   but it's there.

2           THE COURT:  Well, you wanted it in, you must have a

3   good reason, but this isn't one of them.  No.  Sustained.

4           MR. HESS:  I did have a good reason, Judge.  In fact,

5   Your Honor said --

6           THE COURT:  He did offer to take out the allegation and

7   you declined to have it taken out.  Not going to now permit that

8   to be used as an entry so that we can get into a bunch of little

9   trials during this trial.  The issues in this trial are limited

10  and that's what we're going to try here.  We're not going to try

11  everything in the world.

12          MR. HESS:  I understand, Judge.  Thank you.

13          THE COURT:  All right.  You're finished with direct?

14          MR. HESS:  Yes, Judge.

15          THE COURT:  Okay.  Then let's take a short break.

16  Let's break until 4:00.  We'll be back in at 4:00.  Short

17  recess.

18          Sir, since you're on the stand, you're not permitted to

19  discuss your testimony with anyone, including the lawyers that

20  called you.

21          We'll be in recess until 4:00.

22          (Jury out at 3:46 p.m.)

23          (Brief recess)

24          THE COURT:  Somebody wanted to talk to me?

25          MR. HESS:  I think both of us did, Judge.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1243

```
1          THE COURT:  All right.  Talk.

2          MR. HESS:  The first thing is I just wanted to ask to

3     be able to address that issue that came up regarding the sexual

4     harassment, and the other issues that we brought up because I

5     want to make certain that the Court is aware and I don't want to

6     waive it for the record.

7          What Plaintiffs have chosen to do -- and this is the

8     document, Judge, this is it.  Included in this document are a

9     couple of instances where there are accusations made.  This is

10    the group internal audit that was --

11         THE COURT:  Wait.  Before, does the witness need to be

12    here?

13         MR. HESS:  No, Judge.

14         THE COURT:  Can you wait for us outside, Mr. Witness?

15    Thank you.  I don't want him to learn anything.  If I do let him

16    testify, he doesn't need to learn it from your conversation.

17         (Witness excused)

18         THE COURT: Tell me what you want to tell me.

19         MR. HESS:  Judge, my what Plaintiffs are attempting to

20    do is to purify their audit report.  They're taking out of it

21    what they believe -- they're not doing it to be nice to

22    Mr. Jaubert, because they haven't been nice and you know, I'm

23    not casting -- that's what litigation is about.  It's not for

24    niceness.  It's because they have strategy.  And I'm arguing the

25    strategy is this:  They're removing from the audit report that
```

1244

1    was conducted in 2008, that was relied upon by their expert by
2    her testimony, they're removing the stuff that they don't think
3    the jury is going to buy, that they don't have the grounds to
4    support and they're removing so that gives that report more
5    weight.
6        For instance, if they chose to remove from the report
7    now matters which we intend to prove were incorrect in the
8    report such as whether or not those payments were actually made
9    by Seahorse, if they remove those, that's the same kind of
10   thing.  They're sanitizing their report, they're making their
11   report more palatable to the jury.  They know we're going to
12   prove that it wasn't Mr. Jaubert that conducted sexual
13   harassment.  They know they can't sustain the allegations that
14   are made in the audit report, that's why they're asked to remove
15   them.  And that's not fair.
16       THE COURT:  You're mixing apples and oranges.  Payments
17   are at the heart of this case.  Sexual harassment is not.
18       MR. HESS:  Judge, the abuse of process, the whole
19   strategy of Dubai World, what they basically done is they said
20   we're going to get rid of this guy.  We're going to accuse him
21   of everything under the sun, included -- and you're right, it
22   should only be about payments, but it's Dubai's group internal
23   audit that found it to be, in their professional scope of work,
24   necessary to opine about these other issues.  They decided.
25   They put their auditors on for hours saying that they are

1245

1    experienced auditors, they've conducted numerous audits and

2    they've attested to each and every one of the things that are in

3    this.

4            And to permit us not to be able to address them,

5    whether we agreed to have them in or not, I'm arguing is unfair.

6    Because what it does is it robs the jury of an opportunity to

7    see to what lengths group internal audit will go to hang

8    Mr. Jaubert.  It's nothing short of that.

9            And you're right, Your Honor, it should be about money.

10   But there are a bunch of things that aren't about money in this

11   audit report.  They're auditors, but they find it necessary to

12   go page after page about bullets, about sexual harassment and

13   about all these side issues.

14           And why is that important?  Because it shows their

15   motivations are not grounded in reality, not true, it's not

16   about embezzlement, they had an agenda to get rid of Mr. Jaubert

17   and they were going to try everything they can.  Remember, these

18   reports were purportedly prepared in 2008.  I'm hearing on the

19   day of trial that they seek to be admitted, that they're going

20   to sanitize them and not put them in.

21           And I'm arguing it's not fair, it doesn't permit the

22   jury a fair analysis of the audit process.  And I'm asking that

23   I be able to address those things.  I'm not going to make it a

24   feature of the trial, it would be two questions.

25           THE COURT:  No, I don't think so.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1246

1        Yes, sir.  You have a comment?

2        MR. URQUHART:  Yes, sir.  I just want to clarify the

3   record.  I think you'll recall that we offered to take out the

4   evidence of the claims of sexual harassment against Mr. Jaubert.

5   We offered to take out the evidence concerning his criminal

6   conviction in France for extortion and illegal possession of

7   firearms.  We offered to do this so it wouldn't turn into a

8   sideshow like this has with him making a speech so that the

9   reporters can hear it so they can generate interest in this

10  silly book which Your Honor has already ruled shouldn't be a

11  proper subject for examination.

12       THE COURT:  I think this is a red herring and I'm not

13  going to permit it.

14       MR. HESS:  What about, can I get at least from Your

15  Honor some sort of advisory indication?  What about this

16  allegation --

17       MR. URQUHART:  We're not going to introduce it unless

18  somehow --

19       THE COURT:  It's not even going to be brought up unless

20  you bring it up.

21       MR. HESS:  Judge, it's not just an exhibit to the

22  report, it's part of the audit.  It's part of the thing that --

23       THE COURT:  And they offered to take it out.

24       MR. HESS:  I know, Judge, but that's like saying --

25  again when we prove --

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1247

```
1            THE COURT:  No.

2            MR. HESS:  -- tomorrow that --

3            THE COURT:  No.  It's totally irrelevant, I wouldn't

4    have left it in, but you said you wanted the whole thing in and

5    therefore you're stuck with it.

6            All right.  Call the witness back in.

7            MR. URQUHART:  There's one other matter, Your Honor.

8    You'll recall that it's the matter of whether or not the Turners

9    should be allowed to testify?

10           THE COURT:  Yes.

11           MR. URQUHART:  And very briefly, Your Honor, if you

12   don't mind if I take the podium?

13           THE COURT:  No.  Go ahead.  It's a lectern though.  You

14   stand on a podium, you stand behind a lectern.  Now you know

15   everything.

16           MR. URQUHART:  You got me once again.

17           Mr. Hess is calling the Turners for one and only one

18   reason, so he that can create an inference in front of the jury

19   that Dubai World somehow or another uses the police, takes

20   people's passports in order to get them to pay money that's due.

21   That's the only possible inference.

22           And I think that what you have to do is take a look at

23   three rules of evidence.  Rule 403, Rule 406 and Rule 404(b).

24   And I don't think you can read three of them in isolation, I

25   think they have to be harmonized.  And what he's trying to do is
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1248

1    get evidence of habit, 406 kind of evidence through the back

2    door through 404(b), and there are courts in this state, federal

3    courts in this state and the Eleventh Circuit have ruled that

4    you just can't simply do that.

5          In fact, if I could draw Your Honor's attention to a

6    case called Jablonsky, which is a Middle District of Florida

7    case, it's an insurance civil case, an insurance case, that

8    claims bad faith, wants to introduce evidence of other acts of

9    bad faith in order to create the inference that this happens all

10   the time.  The judge excludes it under 406, says you can't get

11   it in because there's not a pattern.  Then he tries to get it in

12   through 404(b) and the court rules that you can't get it in

13   through the back door what you can't get in through the front

14   door.

15         There's an Eleventh Circuit case on this called US

16   versus Chavez, 204, F3d 1305 at 1316 through 17.  Here's a case

17   where a man was accused of a murdering his wife, his defense to

18   that charge was that it was self defense.  The prosecution

19   introduced two pieces of evidence.  Both were convictions of

20   this guy for beating his wife.  And the court found that it was

21   reversible error to let those two pieces of evidence in because

22   under 403, it was more prejudicial than probative.

23         Here, the only purpose for the Turners to come in is to

24   say oh, geesh, they must arrest people all the time in order to

25   get them to pay bills.  And I can't see how it would be

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1249

 1    admissible under 403.

 2              THE COURT:  All right, sir.

 3              MR. URQUHART:  I've got a whole bunch of other cases.

 4              THE COURT:  I'm familiar with the line of cases.

 5              Tell me why it's not more prejudicial than probative.

 6              MR. HESS:  First of all, the Turners' testimony are

 7    different.  Fiona Turner would be testifying again exclusively

 8    as to the act of extortion.  And Your Honor asked me about

 9    whether the agreements were the same, and I went back and looked

10    at them and they are the same.  In fact, the agreement of

11    reconciliation which is marked as Defendant's Exhibit 1018, not

12    the same in language, but they have the same clause in it, is

13    the same language that is in the agreement that Ms. Fiona Turner

14    was required to sign.

15              THE COURT:  Tell me what the operative language is.

16              MR. HESS:  That is in the second clause of what has

17    been marked as Defendant's Exhibit 1018 -- I have a copy for

18    counsel.

19              THE COURT:  That's all right.

20              MR. HESS:  Says the first party commits to waive the

21    case file at Jebel Ali police station after the full payment of

22    the reconciliation amount which is AED 3 million.

23              Now, in the Turner case, and it's the same first party,

24    second party language, called a conciliation agreement, final

25    settlement, and in that case it states that the first party --

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1250

1   once the second party pays the settlement amount referred to

2   above, the first party will undertake to abandon the proceedings

3   against the second party -- wrong place, Judge.  That's the

4   civil part of it.

5        It says in the Turner agreement, it states that once

6   the second party pays the settlement amount referred to above,

7   the first party will undertake to abandon the proceedings

8   against the second party in the civil case mentioned above at

9   the first court hearing held after signing the agreement, also

10  to submit an application on the same date to local authorities

11  which drops the first party's right in the criminal proceedings

12  against the second party.

13       It's the same instance.  It's the same situation.  And

14  what's revealing is the case law that was first cited by

15  Plaintiffs', it's a 406 case.  The party attempting to get it

16  under routine habit.  We're not arguing routine habit.  And what

17  that case said is the court says hey, you tried routine habit,

18  we're not going to let you bring in a routine habit, and we're

19  certainly not going to let you then try to get it in somehow

20  through another rule that you didn't assert at first and doesn't

21  really apply.

22       In our case -- and this isn't a bad faith insurance

23  claim.  This is a claim, this is an assertion that is made in

24  response to the Plaintiff's case where they put on evidence to

25  convince the jury.

1251

```
 1          THE COURT:  It's an assertion of what?

 2          MR. HESS:  There was no coercion.  That there was no

 3   coercion and there was no extortion and there was no -- it was

 4   --

 5          THE COURT:  It's an assertion on your part that there

 6   was no coercion?  It was an assertion on your part of what?  I

 7   know what you said, what I'm asking you is please articulate for

 8   me what your assertion is that this evidence of probative of.

 9          MR. HESS:  That they have the motive, the opportunity,

10   intent, preparation, plan.

11          THE COURT:  You're reading the rule to me.

12          MR. HESS:  I know, Judge, but those -- that's what it

13   is.  They -- this is what they had the opportunity --

14          THE COURT:  In English, tell me what they're going to

15   say that is going to prove -- that is going to move the ball in

16   this case.

17          MR. HESS:  That is that it was no mistake, that they --

18   when they said they wanted Mr. Jaubert to pay the 2 million plus

19   dirhams, and under this agreement of reconciliation, that they

20   meant and they told him, and it's in the agreement, that if he

21   didn't pay, he was going to maintain -- the criminal prosecution

22   --

23          THE COURT:  I would like to diagram that sentence of

24   yours because I don't know what the heck you're talking about.

25          Start over again and tell me clearly and articulate for
```

1    me what the Turners are going to say that moves the ball in this

2    case.  Tell me what you think they're going to prove.

3          MR. HESS:  Mrs. Turner -- first of all, Mr. Turner is a

4    completely different subject.  Mrs. Turner --

5          THE COURT:  Wait, please.  Don't start going off into

6    little rabbit trails.  Starting right here, tell me in two

7    minutes or less what anybody is going to say that is in dispute

8    that moves the ball in this case.

9          MR. HESS:  That she was threatened that if she did not

10   pay the amount that they insisted on, and again --

11         THE COURT:  Don't go off on a tangent.

12         MR. HESS:  Mr. Qadar told her if she didn't pay the

13   amount, that the criminal proceedings would continue.  And if

14   she paid the amounts, they would stop.  And that's the

15   agreement.

16         THE COURT:  Why is that not a misconduct not charged?

17   Another act of misconduct that is prejudicial, what does it

18   prove?

19         MR. HESS:  Mr. Qadar said on the stand we don't have

20   the authority to request of the police to stop termination of

21   prosecution of.  He testified to that.  So in this case --

22         THE COURT:  Maybe they do or maybe they don't.  What

23   you're saying is he told her too?

24         MR. HESS:  Yes.  And she's going to testify he was

25   there.  And he was there in Mr. Jaubert's case.  He was present

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1253

```
1    at the meetings.  He's the same person that said the same thing
2    to both of them after testifying today -- last week in court
3    that they never interject themselves into the criminal process.
4    In fact, they did with Ms. Turner, they did with Mr. Jaubert and
5    it's not habit, it's motive and intent.
6             THE COURT:  Okay.  Let me hear.
7             MR. URQUHART:  Well, first of all, the gentleman was
8    sitting on the stand there, both of them, for half of a day and
9    I didn't hear Mr. Hess ask a single question about Ms. Turner or
10   Mrs. Turner.
11            But the second point really comes down to what Your
12   Honor has hit the nail on the head.  This is precisely the
13   reason why you don't let them in.  Let me just cite to a
14   Minnesota case called Witchard v Bailey (ph).  And in that case
15   it was a case brought by convict, and the convict claimed that
16   he had reported some guards to the authorities.  And that the
17   guards came into his cell and beat him up in order to get even.
18   Then what he tried to do was introduce evidence that -- earlier
19   in the year, I think the exact same guards, the exact same
20   guards had been reported to the authorities, they had been
21   censured by authorities, they had gone for beating up the
22   person.  And the court ruled you're not allowed to get this in
23   under 403  Says, even if the evidence would be admissible to
24   show intent -- which I think is what he's arguing -- however,
25   the court finds that the damager of unfair prejudice far
```

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    outweighs any probative weight it would have.  The risk is too

2    high that the jury, regardless of how well it was instructed,

3    would conclude that because these officers had used improper

4    force on a prisoner before, they were more likely to have done

5    so here.  This is precisely the inference Rule 404(b) prohibits.

6    And then it cites to a bunch of other cases.  There's a Second

7    Circuit case to the same effect.

8         I challenge him, putting aside discrimination case, to

9    show a single case, any case from anywhere in the United States

10    of America in which a court has allowed a single incident, a

11    single prior incident to prove that sort of habit that the

12    person is more likely than not --

13         THE COURT:  See, the way I understand the law and the

14    way I have seen it come up over and over again in criminal

15    cases, which is where it mostly comes up in, it is that there

16    really isn't very much question as to whether they actually did

17    that.  The question is did they do it by accident or did they do

18    it by mistake or is it, you know, is it somebody else that --

19    you know.  But not when it's a situation where their position is

20    this never happened.  They are not saying if it happened we did

21    it innocently, they're saying this never happened.  And that's

22    where the reason that it doesn't -- that it shouldn't come in,

23    in my opinion, is because all you're doing is saying they did it

24    once, so they must have done it again.  And that's not -- that

25    is -- the instruction is very clear.  You cannot use it.  You

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1255

1    can only use it if you find, in a criminal case, beyond a

2    reasonable doubt that the person committed the act charged.  But

3    you have a question, you can use this to show that they didn't

4    do it by mistake, that the motive was to do it, that this was

5    part of a scheme or a plan or a modus operandi or, you know,

6    that's when you use this.  And I think that this is

7    bootstrapping it the other way around.  I don't believe it's

8    admissible.

9         I have to agree with counsel that this is not what

10   would be admissible and as I say, this comes up almost entirely

11   in criminal cases when the issue is motive or intent.  Or

12   mistake.  Or something like that.  One of those five things that

13   they have in the elements or the instructions.

14        Yeah, go ahead.

15        MR. HESS:  Judge, one of the other -- and I don't want

16   to read from the rule, but it also says plan.  It's their plan

17   to do this.  It's a plan.  And it says that in the rule and

18   again, what Mr. Urquhart said --

19        THE COURT:  As opposed to them having done it by

20   mistake.  That's the real question.  Yeah, they did this by a

21   plan because they do it, you know, this was not a mistake.  This

22   was not somebody else that did it.  This was not done with no

23   ill motive.  This was not done by mistake.  This was done on

24   purpose as part of a plan.  That's what this would be admissible

25   for.  But I'm afraid that what you are doing, the probative

1   value is so limited because their position is very simply, it

2   never happened.  Not we did it, but we had really clean motives.

3   We couldn't help ourselves.  You know, whatever.  I mean, I can

4   see places where it might be, you know, a question of identity

5   or something like that.

6          But in this instance, they're the only people that

7   could have done it if they did it.  If the jury believes they

8   did it, they don't need to know anymore than that.  If they

9   believe that they did it, they don't need to know anymore than

10  the fact that they were the ones that were in a position that

11  they could do it.  But what we're doing is we're bringing in

12  this other one to try to argue or to try to -- I don't know why

13  you're doing it, but I don't believe that motive is an issue in

14  this instance.  I believe that it is not admissible because of

15  the way that I believe that the law has developed and I don't

16  think it's admissible.

17         Go ahead.  You had something else to say.

18         MR. HESS:  Judge, may I have this evening to accumulate

19  the case law on that issue?  I'm just not as prepared because of

20  my lack of having eight lawyers.  May I address it again

21  tomorrow morning just briefly if I can find some case law?

22         THE COURT:  Yeah.  Just look at it from this point of

23  view though.  That lady, Mrs. Turner, doesn't show that they

24  have the motive to extort Jaubert, or to abuse process on

25  Jaubert.  All -- you know, I don't know.

1        MR. HESS:  I'm not really talking motive, Judge.  I

2   wasn't ever saying motive, I said plan.  That this is a plan.

3        THE COURT:  Well, plan, you know, plan, I think that

4   plan is something that is used in a different context than this

5   one.  I mean, if you use it in the context that it's a lot of

6   times used in, what it means is they did it once so they did it

7   again and that's not what you can use it for.  You're not

8   allowed to use it for that purpose.  You have to actually

9   instruct the jury.  You can't use this to prove whether they did

10  this or not, but only to -- if you find that they did the act

11  that is charged, then to somehow show that they didn't do it by

12  mistake.  Or that they did it in accordance with a plan.

13       MR. HESS:  Also Judge, why can't I use it to impeach

14  Mr. Qadar through her testimony?

15       THE COURT:  Because it's an act -- it's a collateral

16  fact.  You can't use extrinsic evidence to prove a collateral

17  fact.

18       MR. HESS:  Judge, this goes to the heart of the abuse

19  of process claim.

20       THE COURT:  Wait.  Wait.  Of course you can use it if

21  she was testifying that they did it to him, but she's not

22  testifying to that.  She's testifying they did it to her.

23       MR. HESS:  Except Judge, he said they never do it.  He

24  didn't say that they didn't do it to Mr. Jaubert, he was very

25  clear.  In fact, he made almost a joke about it.  He said we

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   don't have the authority to do that.

2           THE COURT:  Which makes it a collateral issue.  That's

3   why you cannot use extrinsic evidence.

4           See, the problem is that I think that your argument has

5   backed you into the position that really you are saying that you

6   want to use it for the purpose that you cannot use it for.  I

7   think it's inadmissible.

8           MR. HESS:  May I have until tomorrow morning?

9           THE COURT:  But I'll will be happy to hear 10 minutes

10  you're going to have.  Yes, sir.  You'll have 10 minutes too.

11          MR. URQUHART:  He's been talking.

12          THE COURT:  Maybe you can change my mind.

13          MR. URQUHART:  Well no, no.  The only point is if you

14  look at this, it's going to turn into like a mini trial.  Like

15  what happened --

16          THE COURT:  I already used that.  Okay?

17          MR. URQUHART:  I'll sit down.

18          MR. HESS:  Judge, as the other issue, Mr. Turner is not

19  going to be testifying to that.  He will be testifying as a lay

20  witness with his experience in the management of --

21          MR. URQUHART:  A different company.

22          MR. HESS:  The owner of Exomos.  He will testify very

23  clearly and precisely.

24          THE COURT:  He's what?

25          MR. HESS:  He was the head of risk management with

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1259

1    Istithmar, who was the owner, pursuant to the testimony --

2         THE COURT:  The company that owned all of the shares of

3    Exomos.  Enough of them or something.

4         MR. HESS:  And he will know and it's his job, and I

5    will proffer that he will have the expertise, he will have the

6    factual expertise to be able to testify that he knows the

7    process of payment, he knows the import of the approval process,

8    he knows what Mariam Sharif's obligations are, what she truly is

9    checking for when she signs that as the controller, the

10   financial officer.

11        THE COURT:  That the auditor worked for him.  Is that

12   what he's going to say?

13        MR. HESS:  No.  She's not the auditor, Judge.  She was

14   a -- I can't remember.  She's a financial controller, something

15   like that.

16        THE COURT:  I thought she was an auditor, internal.

17        MR. HESS:  No, but she wasn't even involved in the

18   audit process.  She was on the every day checking the -- whether

19   or not it should be paid or not.  The argument by Plaintiffs is

20   that it's -- Mr. Jaubert, once he signs it, then all those other

21   signatures are superfluous.

22        Mr. Turner is going to be very clear and his range of

23   knowledge is going to be very clear that that is not the case.

24   That in fact, she has a responsibility to check into and budget

25   those monies.  That she has to know exactly what they're for and

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1260

1  they're not paid until there is a determination that they are

2  appropriate and necessary, which is exactly opposite the

3  Plaintiff's case.  We're not going to bring in anything else

4  with him.

5          MR. URQUHART:  Your Honor, Mr. Turner was never

6  designated as an expert.  I don't believe he is an expert.  His

7  testimony is irrelevant because he works for -- not for the

8  company.  As far as I can tell, since I only found out about

9  this this morning, Mr. Turner never even heard of Mr. Jaubert

10 until after both of them had left the country and Mr. Turner got

11 in touch with Mr. Jaubert.  I can go on and on and on and I can

12 tell you that we have e-mails that show that the two of them

13 conspired to extort $30 million from Mr. Dalton and this

14 company.  This would turn into the circus that I told you we

15 were hoping that we would avoid.

16         THE COURT:  I'm not ruling on Mr. Turner because I can

17 conceive of some circumstances under which he could testify.

18 But I think you're opening a very large door and I don't know

19 what's going to come through it.

20         MR. URQUHART:  Your Honor, this man is convicted of a

21 crime.  He was accused of another crime in --

22         THE COURT:  I don't think you can use an accusation of

23 a crime.

24         MR. URQUHART:  You got me on that one, Your Honor.  But

25 what's going to happen is we're going to get into him and

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1261

```
1    Mr. Jaubert, the threats to extort through even Mr. Dalton here.
2    It's just going to turn into --
3         THE COURT:  You can cross-examine.  Sounds like you got
4    a lot of stuff to cross-examine.
5         MR. URQUHART:  Well, we'll never end by Friday.
6         THE COURT:  Oh, yes you will.  I promise you you'll end
7    by Friday.  Please call the jury in.  Yes, please ask the
8    witness to step back in.
9         Can I see the lawyers at sidebar?
10        (SIDEBAR CONFERENCE:
11        THE COURT:  I am trying to avoid asking the jury the
12   questions while the lawyers are in the courtroom.
13        I'm trying to avoid doing anything while the reporter
14   is in the room.  I'll see if she leaves by the end of the day if
15   she has every time, then I'll deal with it then.
16        But I just wanted to comment to you people so you can
17   be thinking about that the juror, she's just goofy.  I mean, I
18   don't mean that in a nasty way.  She has been making little
19   comments all the time from the jury box that I've ignored
20   because they haven't been pertinent to anything, they're just
21   smart aleck comments and I don't mean smart aleck, just silly.
22   So I don't think she meant anything by it, but you all think
23   about it and we'll talk about it.  I think it could have been
24   said, she could have said that to anybody that's involved in the
25   case.  I don't think she means anything by it, but I'll talk to
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1262

1    you about it and I wanted you to understand why I wasn't

2    bringing it up right yet, okay?

3                (END OF SIDEBAR)

4                THE COURT:  All right.  You may proceed, sir.  You're

5    reminded you're still under oath.

6                              CROSS-EXAMINATION

7    BY MR. CEDERBERG:

8    Q.  Mr. Rodig?

9    A.  Rodig.

10   Q.  Rodig.  I apologize.

11   A.  No problem.  And you are?

12   Q.  Mr. Cederberg.

13       You came to work at Seahorse in Stuart in about August

14   2004?

15   A.  No, it would be closer to July.

16   Q.  July 2004.

17   A.  Yes, sir.

18   Q.  And you referred to Mr. Jaubert here as Herve a lot, right?

19   A.  Yeah-huh, that's my boss.

20   Q.  Is your boss now?

21   A.  No, e was my boss.

22   Q.  Is he a friend of yours now?

23   A.  Well, e are acquaintances.  He's not the kind of friend I go

24   to visit him at his house all the time, no.

25   Q.  Okay.  He hired you in July of 2004 at Seahorse?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1263

1    A.  Yes, sir.

2    Q.  And had you ever been exposed to ambient pressure submarines

3    before that?

4    A.  Only on the internet.

5    Q.  So you've never been in one when he hired you?

6    A.  Correct.

7    Q.  And when you worked at Seahorse?

8         The COURT:  You got to wait until he finishes the

9    question, otherwise you step on each other and it doesn't come

10   across very clearly.

11        THE WITNESS:  I'm sorry, Your Honor.

12        THE COURT:  Okay.  No problem.

13   BY MR. CEDERBERG:

14   Q.  And when you were at Seahorse here in Stuart, you started as

15   an electrician?

16   A.  Correct.

17   Q.  And there were about three workers at Seahorse then?

18   A.  Am I allowed to name them?  We had -- I was electrician,

19   there was a second electrician whose name escapes me, there was

20   a fiberglass technician, Marshall, there was a second fiberglass

21   technician, Graham Tyler.  There was two painters whose names

22   escape me.  There was my former neighbor Hank, and there was one

23   other, Eric, was another electricians and there was a carpenter

24   whose name escapes me also.

25   Q.  When you started at Seahorse?

1    A.   Correct.

2    Q.   Okay.  And then you worked at Seahorse until December 2004?

3    A.   Correct.

4    Q.   And then you went over to Dubai?

5    A.   Yes, sir.

6    Q.   And you were brought to Dubai by Mr. Jaubert to teach the

7    people over there how to man the submarines?

8    A.   How to build them and how to operate them, yes sir.

9    Q.   Okay.  Well, you told us on direct, didn't you, that you had

10   never been in one of the submarines at Seahorse when it was

11   underwater, correct?

12   A.   Correct.

13   Q.   Because you didn't have your dive license then, right?

14   A.   Correct.

15   Q.   So Mr. Jaubert selected you to come over and teach the

16   people in Dubai how to man his submarines when you had never

17   operated one?

18   A.   No, that's not how it was.  He offered every employee at

19   Seahorse Submarines the opportunity to come over and help out

20   and I was the only one who took him up on his offer.

21   Q.   There's a difference between coming over and helping out,

22   and being brought over to teach people how to man a submarine

23   that you yourself had never been in underwater, right?

24   A.   Yes, sir.  As I had stated earlier though, naturally I

25   initially I came over and was going to do certain things and it

1    morphed into a job offer.

2    Q.   Okay.  And Mr. Jaubert offered his employees the ability to

3    come over to Dubai because Dubai told Mr. Jaubert if he's got

4    qualified employees, that he would bring them over, correct?

5    A.   Correct.

6    Q.   And your experience was as an electrician and a mechanic,

7    right?

8    A.   Yes, sir.

9    Q.   As a matter of fact, when you were at Seahorse, you didn't

10   have any involvement at all with the fiberglass aspect of making

11   these boats, right?

12   A.   Correct.

13   Q.   And you didn't have any involvement in the painting of the

14   boats, right?

15   A.   Correct.

16   Q.   And in addition to having you come over to teach the people

17   at Exomos how to man these submarines, Mr. Jaubert also brought

18   you over to be the head of production for those submarines?

19   A.   Once again, I was originally brought over to teach and to

20   help them build the first ones which morphed into a job offer.

21   Q.   Okay.  So you weren't teaching people how to man the

22   submarines when you came over December '04, in through the first

23   five or six months of '05?

24   A.   December of '04 was originally to go over to get Goby

25   trimmed, balanced, and operating completely.

1    Q.  Now, isn't it true that the event with Mr. Thapa and the

2    Stingray occurred in late December '04, or January '05, correct?

3    A.  No.  February of '05.

4    Q.  Had you taught people how to -- were you in charge of

5    teaching people how to man the boats by February '05?

6    A.  No.

7    Q.  And when you saw what you described happen to Mr. Thapa, you

8    were up on the levy you said, right?

9    A.  Yes, sir.

10   Q.  And it was 12' of water, right?

11   A.  Approximately, yes.

12   Q.  And it wasn't crystal clear, right?

13   A.  No, it was murky.

14   Q.  You couldn't see what was happening down below, right?

15   A.  Correct.

16   Q.  You have no idea whether Mr. Thapa was inverted with his

17   head down, did you sir?

18   A.  After the fact.

19   Q.  You didn't see that, did you sir?

20   A.  Correct.

21   Q.  And then when exactly did it morph from you being a mechanic

22   electrician to being in charge of building all the submersibles

23   in Dubai?

24   A.  After the 2005 boat show, Herve offered me a position upon

25   the fact that I got myself dive qualified.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1267

1    Q.  Had you ever built a boat before that?

2    A.  We built Stingray and Adventurer, yes sir.

3    Q.  Had you ever built a boat before you went to Seahorse?

4    A.  Surface boats.

5    Q.  You never built a submarine, correct?

6    A.  Correct.

7    Q.  So during that short window, you impressed Mr. Jaubert with

8    your skills that he decided for you to be the production manager

9    of all the operations in Exomos?  Is that your testimony?

10   A.  Yes.

11   Q.  And you even testified that you didn't just supervise

12   production, you would improve Mr. Jaubert's designs, correct?

13   A.  I would improve his designs, we would take the plans, we

14   would assemble a submarine to get it to function and then we

15   would take the submarine and fine tune the way the parts are

16   assembled, just like an automobile.  The very first car off a

17   production line is a prototype.  It's not what they sell.  Same

18   with this principle.

19   Q.  Well, you had already known that a Goby was built in Stuart,

20   right?

21   A.  Yes.

22   Q.  And the Discovery was already built in Stuart, right?

23   A.  Correct.

24   Q.  And Stingray Duo was that built in Stuart?

25   A.  None of the Stingrays were built in Stuart.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1268

```
 1    Q.  Were the submarines the Goby and the Discovery, were they
 2    production ready in 2004 to be mass produced?
 3    A.  I would have no idea on whether they were ready to mass
 4    produce.
 5    Q.  You didn't see it happen when you were at Seahorse, did you?
 6    A.  Correct.
 7    Q.  And at Exomos when you got over there, they were still
 8    working on the designs, weren't they?
 9    A.  On the larger submarines, yes.
10    Q.  Okay.  And you said that you, as the production -- head of
11    production operations, you were concerned about the testing of
12    these submarines?
13    A.  Yes.
14    Q.  And you get feedback of what happened when the submarines
15    were tested, right?
16    A.  Yes.
17    Q.  And there was an institutional way you get that feedback,
18    correct?
19    A.  No.
20    Q.  Wasn't there a thing called trial report?
21    A.  There was a thing called trial reports and generally the
22    trial reports were sent up to the office.  What would happen
23    with me is the operations department would wheel the submarine
24    back into the shop, then start to berate me in front of all the
25    workers about how this is broken and that is broken, which is
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    very unprofessional.

2    Q.   But things were broken, weren't they?

3    A.   Things got broken yes, they did.

4    Q.   And as head of production operations, things didn't work on

5    those boats, right?

6    A.   This is true.

7    Q.   And that was your job to make sure things worked, right?

8    A.   Absolutely.   Sorry, Your Honor.

9    Q.   And did you bother to see the trial reports that were

10   generated from these tests?

11   A.   On occasion.

12   Q.   You were on the distribution list of all of them, weren't

13   you sir?

14   A.   Yes, I was.

15   Q.   As a matter of fact, you're even shown as going to many of

16   the tests, correct?

17   A.   Up to a certain point, yes.

18   Q.   Okay.   Well, you were on the distribution list of these

19   trial reports and you were the person assigned to make the boats

20   better.   You read them with great care, didn't you sir?

21   A.   Yes, I did.   And I dismissed most of them.

22   Q.   You dismissed the reports?

23   A.   Yes.

24   Q.   You decided they were not true?

25   A.   No.   The way --

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1270

1   Q.   That's a yes-or-no question, sir.  Did you decide they

2   weren't true?  Is that why you dismissed them?

3   A.   No.

4   Q.   Okay.  Did you ever decide to put something in the file that

5   you disagreed with the reports?

6   A.   I did that several times and was counseled on it.

7   Q.   Did you ever -- did you know Mr. Jaubert was circulated in

8   every one of these reports?

9   A.   Yeah.  We had a standard circulation list that was 17 or 18

10  people that got these reports.

11  Q.   And did you, in doing your job as head of production for

12  these submarines, did you review the comments, you just took the

13  reports as not true and rejected them?

14  A.   In the beginning of the testing, I would review them and at

15  -- very detailed.  Fine tooth comb.  And I would attempt to talk

16  to the operations department who would dismiss me.

17  Q.   Okay.  Well, let's start going through those reports.

18       MR. CEDERBERG:  Could we put up 339 please, which is in

19  evidence.

20  BY MR. CEDERBERG:

21  Q.   We go to the top of the trial report, this is dated November

22  21, 2005, right?

23  A.   Yes.

24  Q.   By this time you've morphed to the head of production,

25  right?

1    A.   Yes.

2    Q.   You're the number one trainer on how to run these

3    submarines, right?

4    A.   No.   I was supposed to be, but that was never assigned to

5    me.

6    Q.   And you were never the test pilot on these tests?

7    A.   I was the test pilot on several of them, yes.

8    Q.   Well, Nick Bowles was the test pilot on this one, wasn't he?

9    A.   I don't know.   It doesn't say.   Just says in attendance,

10   Nick Bowles, Ashu Thapa, Raj and Ross.

11   Q.   Well, you weren't the person because on distribution, you're

12   not listed in attendance, right?

13   A.   Correct.

14   Q.   And it says right in the report Ross will test the

15   Adventurer, right?

16   A.   Correct.

17   Q.   And do you remember this report at all?

18   A.   We had four or 500 of these things.   I can't remember every

19   single one.

20   Q.   You only looked at some, then quit looking at them, right

21   sir?

22   A.   I didn't quit looking at them, I would read them and dismiss

23   them because some of the way the things were written up were

24   asinine, overblown.

25   Q.   Let's look at one.   Let's look at it where it says trial

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1272

1    report.  In the third section down the second paragraph there.

2    The second paragraph, you can start the first couple sentences

3    there.  Highlight it, Charles.

4              "The Adventurer dive shortly after exiting Joumana

5    Marina." Do you see that?

6    A.   Yes.

7    Q.   "Once underway, Ross had problems controlling Adventurer's

8    ability to swim up and down".  Do you see that?

9    A.   Yes.

10   Q.   So you dismissed that as asinine?

11   A.   Once again, there was --

12   Q.   Yes or no?

13   A.   I don't remember this report specifically, sir.

14   Q.   Okay.  Just want to find out.

15             And you would agree, wouldn't you, that if the pilot of

16   the Adventurer, one of your submarines that you were in charge

17   of, had problems controlling its ability to swim up and down,

18   that would be, on its face, a serious problem?

19   A.   Can you repeat the question?  I was reading this.

20   Q.   Would you admit that as the person who is in charge of

21   producing the Adventurer, when you saw a report that the pilot

22   had problems controlling the Adventurer's ability to swim up and

23   down, that would be a serious problem?

24   A.   Yes.

25   Q.   Okay.  Did you think that was asinine?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.  Being able to control the up and down motion would be

2    moderate.  I wouldn't call it severe.

3    Q.  Okay.  Moderate.  Well, these are ambient pressure subs,

4    right?

5    A.  Yes.

6    Q.  And if they go down too far, there's a problem, right?

7    A.  Yes.

8    Q.  And because of the increasing water pressure, right?

9    A.  Correct.

10   Q.  So the ability to control that submarine and know what level

11   you're at, that's important, isn't it?

12   A.  Yes.

13   Q.  That's something you should be concerned about as the head

14   of production, right?

15   A.  Always.

16   Q.  Okay.  Then it says two water leaks were serious enough for

17   Adventurer having to stop and surface because the pilot's feet

18   were covered up to his ankles in water.  That's not good for a

19   submarine, is it sir?

20   A.  No, that's not good for a submarine and if I can remember on

21   several of these reports they wrote the same thing up which we

22   determined to be unfounded.  Because if you had your water in

23   your submarine up to your ankles, your entire battery bank would

24   have been sulfated with the water because the batteries were

25   under the seats which was ankle deep.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.  As the head of production, did you file any objection to

2    this report that this is an absolute untruth?

3    A.  We didn't have an official way to file objections to the

4    report because once it was on the computer, that was it.  What I

5    would do is, I would go over and I would try to speak to Ross, I

6    would try to speak to Nick Bowles, and I would try to speak to

7    Jim Miller who would turn around and tell me to get back on my

8    side of the highway because I build them and they test them and

9    stop telling me what to do.

10   Q.  Sir, isn't it true that by November 2005, Mr. Miller was out

11   doing sales and wasn't there?

12   A.  Mr. Miller was occasionally over doing sales, yes.

13   Q.  Your prior relationship was with Mr. Jaubert, right?  You

14   went all the way back to Stuart with him, right?

15   A.  Yes.

16   Q.  And you couldn't figure out if you were so concerned that

17   someone was lying about your product's performance, to go around

18   and get to Mr. Jaubert?

19   A.  I did that on many occasions.

20   Q.  Was anything filed in any of these reports saying these are

21   not accurate?

22   A.  No.

23   Q.  Goes on to say "the water leaks were traced to the aft

24   bulkhead repaired earlier in the day.  And water being forced

25   into the cabin via the bilge pump".  Do you see that?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
1    A.  Correct.
2    Q.  Okay.  So does that tell me there was a repair done out of
3    your shop but then it didn't hold when they went back in the
4    water there?
5    A.  No.  Once again, that's unfounded because Nick Bowles was
6    not able to determine where the water leak was coming from
7    because the bulge pumps were under a compartment, the bilge
8    pumps also had a backflow check valve in those.  So the bilge
9    pump could not leak.
10   Q.  So Nick Bowles gave bad information in this report as far as
11   you're concerned.
12   A.  As far as I'm concerned, yes.
13   Q.  Then it says "when Adventurer surfaced, the pilot noticed
14   the poor leverage angle on the dive planes explaining the loss
15   of ability to swim Adventurer to the surface".  Are those the
16   dive planes that you showed us on that one picture?
17   A.  Yes.
18   Q.  The fins?  When you read this, did you think Nick Bowles was
19   totally wrong again?
20   A.  Yes, because I leaned into the submarine and used the toggle
21   switch to move the dive planes and the dive planes went full
22   throe up and down.  There was nothing wrong with them.  That's
23   when I discovered in my opinion that it was pilot error, again.
24   Q.  And then it says "the buoyancy problems noticed earlier in
25   the test pool became clear as Ross noticed that the air leak was
```

1    leaking from the aft VBT into the aft MBT".  Do you see that?

2    A.  Yes, I see that.

3    Q.  When you think when you read this that that air leaking was

4    just another pilot error?

5    A.  Yes because Nick -- not Nick, Ross Gielink was hired and

6    Ross gee lick immediately told everybody that he was a

7    professional submarine pilot when in fact he had no experience

8    at all in submarines.

9         The air leak that he was discussing, he would write

10   this up constantly because the way that the variable ballast

11   tank vented was right next door to the water inlet for the main

12   ballast tank.  And when you turn around and see air coming out

13   of a valve that you don't know where it's at, he assumed that it

14   was going leaking into the main ballast tank.  Ross did this

15   frequently.

16   Q.  Goes on to say "the buoyancy problems noticed earlier in the

17   test pool" -- I read that one.

18        Then we go down discrepancies and enhancements.

19   "number two, all hatches continue to leak.  Hatch two is

20   particularly bad".

21   Do you see that?

22   A.  Yes.

23   Q.  Is that Ross' pilot error as well?

24   A.  No, that could have been a problem with the hatch.

25   Q.  The hatch was produced in your shop, right?

1    A.   No.

2    Q.   You're part of production, aren't you?

3    A.   Yes.

4    Q.   Head of production?

5    A.   We bought the hatches.  We didn't make them.

6    Q.   You bought the hatches, right?

7    A.   Uh-huh.

8    Q.   Have you ever been on a real submarine?

9    A.   No, I've never had the pleasure.

10   Q.   You ever notice how those hatches are really big and seal up

11   really well?

12   A.   That's because it's a one atmosphere submarine.  Has to be

13   able to withstand the pressure.

14   Q.   Where is it that you guys bought the hatches for your

15   submarines?

16   A.   They were ordered through Bomar Special.

17   Q.   Bomar Special, they do hatches for boats?

18   A.   Yes.

19   Q.   They don't do it for submarines, right?

20   A.   I don't believe so.

21   Q.   So you're using a boat part as a hatch on the submarine,

22   right?

23   A.   Yes.

24   Q.   And as head of production, did you think that was a sound

25   safety move?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   A.   As I said, they were special ordered with extra features.

2   Q.   Okay.  And then if we two to the next page in this report,

3   if we look at number five "dive plane angle needs to be attended

4   as to as Adventurer cannot be swum to the surface."

5        Do you see that?

6   A.   Yes, I do.

7   Q.   Okay.  "Water leaks from STB aft bulkhead and from the bilge

8   pump."

9        Do you see that?

10  A.   Yes.

11  Q.   When this report came in, did you just decide that this

12  report was asinine or did you --

13  A.   After the fact.

14  Q.   Or did you say well, I better roll up my sleeves and try to

15  fix those problems?

16  A.   I inspect what he -- what Ross had written up to determine

17  whether they were bonafide write ups or not.  Most of them

18  weren't.

19  Q.   Did you ever tell Mr. Jaubert that doing these reports

20  methodically for the two years to document the improvements and

21  the safety features in the boat was just a waste of time?

22  A.   No.

23  Q.   Let's look at Exhibit 357.  And let's do the trial report

24  part of this one.  The top part.  Okay.  Here's one that's done

25  in February 22, 2006, right?

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
 1    A.  Correct.

 2    Q.  Okay.  Mr. Miller is not around, he's out selling them,

 3    right?

 4    A.  I have no idea.

 5    Q.  Okay.  And this was a test in the zebra tank?

 6    A.  Correct.

 7    Q.  Correct?

 8    A.  Correct, yes.

 9    Q.  Okay.  And you were in attendance in that test in the tank,

10    right?

11    A.  It says I was, yes sir.

12    Q.  Well, did you ever get one of these that said you were in

13    attendance and somebody had just made that up?

14    A.  All the time.  I would go over for attendance and the entire

15    operations wouldn't know what I was doing there, my attendance

16    is no longer required there, please leave.  If you don't leave,

17    we're going to go talk to Jim Miller.

18    Q.  Who is not around?

19    A.  Why do you keep saying Jim Miller, he was never around?  He

20    was the chief operating officer.  He was most of the time there.

21    Q.  He was doing sales, wasn't he, sir?

22    A.  He was assisting the sales department, yes.

23    Q.  And Mr. Jaubert was on this distribution list as well,

24    right?

25    A.  Yes.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   Q.   And did you ever go in and tell Mr. Jaubert this report is

2   inaccurate, I really wasn't there or they threw me out?

3   A.   We would have discussions about this, yes.

4   Q.   And when we look here at discrepancies and enhancements on

5   Exhibit 357, okay, you see that "thruster three needs to be

6   secured correctly", right?

7   A.   Yes.

8   Q.   That's not pilot error, is it sir?

9   A.   No.

10   Q.   It says "hatches one and three leak"; that's not pilot

11   error, is it sir?

12   A.   No.

13   Q.   "Starboard forward hover, the hover works intermittently".

14   That's not pilot error, is it, sir?

15   A.   No.

16   Q.   "The navigation lights not working".  That's not pilot

17   error, is it?

18   A.   Yes, it was.  He didn't turn the circuit breaker on and you

19   don't use nav lights during the daytime anyway.

20   Q.   "It says air leak forward MBT deck plate."  That's not pilot

21   error, is it?

22   A.   Yes.  The pilot did not check all six plates.  It was loose,

23   he didn't tighten it up.

24   Q.   You remember this report?

25   A.   These are reports where they write the same things up over

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    and over and over.  Ross was not a submarine pilot, he didn't

2    know his butt from a screwdriver.

3    Q.  So anything he says in the report you believe is not true?

4    A.  Most of it.  It got to the point if I did not go out, okay,

5    here's a report, let's see what stuff he's written up this time.

6    Wrong, wrong, wrong.  You didn't inspect the submarine, wrong.

7    You didn't turn the battery on.

8         Jim Miller hired two guys who had zero experience in

9    submarines, none.  Neither of them had any electrical

10   experience, neither of them had any mechanical experience.  They

11   were fishermen.

12   Q.  When you got hired by Exomos, you had never been in a

13   submarine underwater, correct?

14   A.  Correct.

15   Q.  You had never been in charge of production for a submarine,

16   had you, sir?

17   A.  Correct.

18   Q.  Okay.  And you'll give me at least that Mr. Ross Gielink was

19   there during this test, won't you?

20   A.  Yes.

21   Q.  That's why you think everything is wrong, correct?

22   A.  Correct.

23   Q.  But you told us under oath you weren't even there, correct?

24   A.  Yes.  But when they write the reports up and the submarine

25   comes back to my side of the complex and I inspect it and half

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1282

1    the things he writes up are improper or this is broken.  It's a

2    fuse.  Take the fuse out and change it.  It's not broken.

3    Q.  Sir, it says the hatch one and three leaked.  Didn't say a

4    fuse was broken, did it, sir?

5    A.  I was using that as an example.

6    Q.  Okay.  And thruster three needs to be secured correctly.

7    Didn't say it was a fuse, did it, sir?

8    A.  No, it didn't.

9    Q.  You were trying to give an example to the jury of something

10   real small, weren't you?

11   A.  Correct.

12   Q.  When some of these problems like a submarine leaking are

13   real big, aren't they?

14   A.  Yes, a leak on a submarine would be very big.

15   Q.  Let's go to Exhibit 364.  Another one with the Adventurer.

16   Okay.  Let's do the top third trial report.  Okay.  This is done

17   May 31, 2006.  Do you see that?

18   A.  Yep.

19   Q.  And Ross Gielink is again still there in attendance?

20   A.  Correct.

21   Q.  And you're not in attendance?

22   A.  That's because I got fired.

23   Q.  Okay.  But Mr. Jaubert was in attendance?

24   A.  I have no idea.  I wasn't there.  This was the day I

25   actually left.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   Q.   Okay.  Well, on the date that you left, what was your

2   position as the head of production operations?

3   A.   Production supervisor.

4   Q.   Okay.  So there's no doubt that the boat the Adventurer II

5   that's being tested the day that you left is one you were

6   responsible for seeing the production of, correct?

7   A.   No.  When I was handed my letter of please, we don't want

8   you anymore, get out, I was banned from the shop.

9   Q.   It wasn't the submarine that you had watched and supervised

10   being produced all those months before you were asked to leave?

11   A.   Yes.  I was banned from the shop.  Don't come here, we will

12   arrest you.

13   Q.   Okay.  And the submarine that you supervised being built, it

14   says here if we go to the next page over, you see the bottom one

15   "water leaks from starboard forward windows"?

16   A.   Yeah.

17   Q.   That was the submarine that you produced until that day, you

18   were in charge of production until that day?

19   A.   Your point?

20   Q.   Just want to make sure that's the same submarine that was

21   built on your watch.

22   A.   I would have to assume so.  Doesn't designate which

23   Adventurer it is, but yes, I oversaw it.

24   Q.   Didn't you oversee all Adventurers?

25   A.   Yes.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1284

```
1    Q.  Okay.  And let's go on to another one.  Let's go to Exhibit

2    337.  Okay.  Now this one is dated 11-20-05, correct?

3    A.  Correct.

4    Q.  Stingray, right?

5    A.  Correct.

6    Q.  You're there, right?

7    A.  Yes, sir.

8    Q.  Okay.  And this is the Stingray, that's your baby, right?

9    A.  You bet.

10   Q.  Okay.  And the pilot on this one, who was the pilot?

11   A.  Unknown.

12   Q.  Okay.  Was Nick Bowles a pilot?

13   A.  According to his business card he was, yes.

14   Q.  Okay.  Wasn't a good pilot?

15   A.  He was just as bad as Jim Miller.

16   Q.  Okay.  Was Mr. Thapa, he wasn't a pilot either?

17   A.  Thapa was fantastic.  This boy could fly these things like

18   you wouldn't believe.

19            THE COURT:  Which Mr. Thapa?

20            THE WITNESS:  Durgesh.

21            THE COURT:  He asked was Mr. Thapa there and I don't

22   know which one you were referring to.

23   BY MR. CEDERBERG:

24   Q.  You were referring to Durgesh Thapa?

25   A.  Correct.
```

1   Q.   So when Mr. Thapa is one of the test pilots in your report,

2   you don't think those were pilot error?

3   A.   No.

4   Q.   But anybody else it was pilot error?

5   A.   I didn't say that.

6   Q.   What other pilots were you satisfied with were as good as

7   you?

8   A.   Herve.

9   Q.   Anybody else?

10   A.   No.

11   Q.   Okay.  You'd only been in these things for about nine months

12   at this time, right?

13   A.   Yes.  Which was seven months longer than these two guys.

14   Q.   Okay.  It wasn't longer than Durgesh Thapa, right?

15   A.   Yes.

16   Q.   But Durgesh Thapa was the one who was piloting the Stingray

17   and you said in February or January, February of 2005, right?

18   A.   Correct.

19   Q.   Okay.  You were just learning how to do it then, right?

20   A.   Yes, correct.

21   Q.   If you look at the trial report here, do the one up above it

22   where it says trial report, okay.  Says here the second

23   sentence, "Thapa dived for 45 minutes."  That's the Thapa you

24   think is the good pilot, right?

25   A.   Correct.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.   And reported problems with the cabin pressure system?

2    A.   Right.

3    Q.   The auto pressure system did not work at depth, so Thapa

4    tried to use the manual override but got no response, right?

5    A.   Correct.

6    Q.   So those aren't pilot errors, right?

7    A.   No.

8    Q.   Those are problems with the boat that you manufactured,

9    right?

10   A.   Define boat.  You're saying the entire boat.  It could have

11   been one little part.  It could have been an air valve, a stuck

12   check valve.

13   Q.   Goes on to say, if you go down, "the trial was completed

14   with an emergency exit.  Thapa commented that the safety diver

15   was unable to help him with the emergency exit as the diver

16   could not open the hatch at depth".  Do you see that?

17   A.   Yes.

18   Q.   Pilot error?

19   A.   No.

20   Q.   Goes down on the bottom of the section here, discrepancies.

21   "Cabin pressure system, both the auto and the manual system, do

22   not work at depth".   Do you see that?

23   A.   Yep.

24   Q.   Let's go to 341.  And this is the Stingray, November 2011?

25   November 11, 2005?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.   Correct.

2    Q.   November 21, 2005.  I apologize.  Okay.  And you're on the

3    distribution list for this one?

4    A.   Yes.

5    Q.   And this one says, if we go to the brief part, "that Thapa

6    will pilot the Stingray"?

7    A.   Yes.

8    Q.   You trust this report?

9    A.   Yes.

10   Q.   And do pilots write the report?  Do you even know how the

11   report gets written, I should say?

12   A.   PIC is supposed to write the report, yes.

13   Q.   Okay.  It says, we go down to the trial report part, the

14   third section, "Stingray was hoisted into the tank and a leak

15   was found" okay?  You see that?

16   A.   Yes.

17   Q.   I take it this is -- you take the submersible and you stick

18   it in the dive tank, right?

19   A.   Yes.

20   Q.   Okay.  There's nobody's piloting it in that dive tank, are

21   they?

22   A.   Yeah.  There's a pilot in the dive tank.

23   Q.   There's a pilot in it but he's not going 100', turning

24   around going 100'?

25   A.   No, he can go 40 or 50' and do a U-turn and come back.  But

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   only in a Stingray.  It was only big enough -- the Adventurer

2   would fit in the splash tank, but you couldn't motor them.

3   Q.  The leak that was found.  That's not pilot error, right?

4   A.  Correct.

5   Q.  Did you ever, when you saw these reports that you sometimes

6   chose to believe and sometimes you didn't believe, did you ever

7   say -- send to Mr. Jaubert even one e-mail saying these reports

8   aren't accurate?

9   A.  No.  We would talk face to face.

10  Q.  So there's not one document, if I was looking for documents,

11  that would support what you're telling us now that all of these

12  reports you would just reject them and not use them in your

13  business?

14  A.  We're talking over 500 documents.  You showed me four that

15  are bad.  Where is the 500 that were good?

16  Q.  You never used e-mail?  I'm not going to find an e-mail to

17  Mr. Jaubert, am I?

18  A.  Correct.  We would go talk.

19  Q.  Okay.

20  A.  I mean, his office was 5' from mine.  Why should I send him

21  an e-mail to discuss it when I could just knock on his door.

22  Q.  Well, weren't you concerned about your reputation, running

23  and supervising the production of these submarines and the

24  problems that kept showing up week after week and the submarines

25  you were producing?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1289

1    A.  Of course I'm always worried about my reputation.  I'm also

2    worried about the safety of the product.

3    Q.  If you're worried about the safety of the product and your

4    reputation, you never thought to put one thing in writing that

5    you thought these reports weren't trustworthy whatsoever?

6    A.  Correct.  I didn't put anything in writing in regards to

7    that.  I spoke to Herve directly.

8    Q.  Nothing ever changed, did it?  According to you, the reports

9    kept coming and you kept thinking they were asinine, right?

10   A.  That's correct.

11   Q.  Herve was your buddy, right?

12   A.  He was my supervisor, my immediate supervisor, correct.

13   Q.  And you went to him and you told him that these reports

14   weren't accurate and he kept making sure that there were reports

15   and making sure you were distributed on the distribution list

16   and everybody else who had to know, right?

17            MR. HESS:  Objection, personal knowledge, Judge.

18            THE COURT:  It's cross-examination, I'll permit it.

19            THE WITNESS:  Repeat the question, please.

20            THE COURT:  You went to him and told him these reports

21   weren't accurate and he kept making sure there were reports and

22   making sure you were on the distribution list and everybody else

23   who had to know, right.

24            THE WITNESS:  Correct.

25   BY MR. CEDERBERG:

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

 1    Q.  Let's go to another one.  And when did you leave Exomos?

 2    What was the date you left Exomos?

 3    A.  The end of May 2006.

 4    Q.  Okay.  Then let's show this one, 348.  Show the first part,

 5    this has to do with the Stingray, right?

 6    A.  Yes.

 7    Q.  It's in the zebra tank, right?

 8    A.  Correct.

 9    Q.  Okay.  And you're on the distribution list, correct?

10    A.  Correct.

11    Q.  When it goes in the dive tank, we see if we go down,

12    discrepancies at the bottom.  "The rudder is not turning full to

13    starboard".  Do you see that?

14    A.  Yes.

15    Q.  Okay.  "Leaks, there are two small air leaks from the port's

16    first stage swivel fitting and the thread fitting".  Do you see

17    that?

18    A.  Yes.  Your point?

19    Q.  Well, the rudder, let's just go with the rudder.  Rudder is

20    supposed to work, right?

21    A.  Correct.

22    Q.  Okay.  And the rudder didn't get broken in the dive tank,

23    did it?

24    A.  I don't know where the rudder got broken at.

25    Q.  It should have been fixed by your shop before it got tested

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    again, right?

2    A.   Yes.

3    Q.   And I guess maybe I shouldn't assume that, only it would

4    have only been fixed had you bothered to read that there was a

5    problem in one of the reports, right?

6    A.   Correct.

7    Q.   Okay.  Every one of these reports, there's always a leak,

8    isn't there, sir?

9    A.   Well, you say leak, I see drip.  I go into a submarine and

10   we put the submarine underwater and you have a one drop per

11   minute drip, Ross Gielink writes up oh my goodness, the hatch is

12   leaking.

13        On the rudder, on this particular report you're talking

14   here, the rudder went 35 degrees to port and only 15 degrees to

15   starboard.  It was a minor adjustment on the control cable.

16   We're talking semantics here.

17   Q.   Let's go to 37, see if you see drip?

18   A.   No.  He would write up leak.  Not drip.

19   Q.   Okay.  Let's look at the trial report for the Goby November

20   23, 2005.  Do you see that?

21   A.   Yes.

22   Q.   You're in attendance on that one, right?

23   A.   Yes.

24   Q.   Or do you not know if you were or not or if this is some

25   made up report.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.  Well, if it says I was there, I was there.

2    Q.  I showed you one before and you said that you were there and

3    you said you weren't there.  So I'm asking you.

4    A.  I said I was dismissed and sent back.  I didn't say I was

5    not there.

6    Q.  And if we go down to the trial report portion in the middle,

7    okay?  Says "the ops team went through the trial brief and

8    discussed the trial.  A pretrial check was carried out on Goby

9    to ensure that all systems were functioning at zebra.  Goby was

10   hoisted into the tank and prepared to dive.  Goby dived and Nick

11   reported the following, water leaks continued from the bulkhead

12   behind the pilot, air leaks between aft VBT and aft FBT.  The

13   ball valve does not seal correctly resulting in the gush of

14   water entering the cabin?" Do you see that?

15   A.  Yes.

16   Q.  Serious problem, right sir?

17   A.  Yeah, this is the one where I was talking with the other

18   lawyer.  This is the one that again, we did not turn on the air

19   pressurization system prior to submerging.

20   Q.  If you go back up to the top of the report where it says in

21   attendance, Mr. Miller is not there, right?  That wasn't a

22   mistake by Mr. Miller, was it, sir?

23   A.  I didn't say Mr. Miller.  I said it was a pilot error

24   because this was another example of the pressurization system

25   was not activated.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1293

1   Q.  And did that pressure systemization not activated (sic), did

2   that go through for months and months and months?  Because we're

3   seeing this in reports in early 2005 and after 2005.  Was it a

4   problem ongoing?

5   A.  The ball valve would only leak if you did not turn on the

6   pressurization system.  If the hatch had a drip in it, the pilot

7   in command over in the testing facility would write up that the

8   hatch leaked.

9   Q.  Okay.  Let's look at Exhibit 39.  Can you do the top one on

10  this report?

11  A.  I'm sorry.

12  Q.  I'm going to have him blow up the top third of this report,

13  be easier for you to read.  This was Goby, right?

14  A.  Yes.

15  Q.  Now, were you in attendance or did you get dismissed from

16  attending this one?

17  A.  I have not finished reading the rest of the report, I don't

18  know.  Judging from the date though, I would have to assume not

19  yet.

20         THE COURT:  Not yet what?

21         THE WITNESS:  I'm sorry, Your Honor.  This was still

22  2005, the operations department was brand now, they were all new

23  hires and we did not start butting heads with each other at this

24  point.  So if there was a submarine test, I would have stuck

25  around for the entire test.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1294

1   BY MR. CEDERBERG:

2   Q.  So new people were hired in the operation department after

3   this date?

4   A.  The operations department was all brand new at this time.

5   Nick Bowles, Ashu, Raj, Ross, all these guys were all hired all

6   at once.  The only person that had any dive experience was Ashu

7   Thapa and Durgesh Thapa.

8   Q.  Mr. Miller had been there a long time before that, right?

9   A.  I have no idea how long Mr. Miller was involved with this.

10  Q.  You don't remember Mr. Miller being there in December of

11  2004?

12  A.  Yes, but I don't know how far Mr. Miller goes with Sultan or

13  the company.

14  Q.  This is November 2005.

15  A.  Correct.

16  Q.  So Mr. Miller had been there a year and 11 months, right?

17  A.  Okay.  I didn't mention Jim Miller's name.  I said the

18  people he hired were hired all at once and they were all brand

19  new and the only two certified divers were the Thapa brothers.

20  Q.  And you became -- you started butting heads with the new

21  people that were hired, right?

22  A.  Not immediately.  But, yes.

23  Q.  Yes.  If we look where it says trial report, do you see

24  that?  And if we look at the let's start the second paragraph

25  "the ops team discussed the trial as no written brief was

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    available, a pre-dive check was done and all systems checked

2    out. Rib and Goby were transported to the Joumana Marina and

3    launched".

4         Do you see that?

5    A.   Yes.

6    Q.   "Goby powered out of the marina and reported the following.

7    Goby was difficult to steer and near impossible to hold

8    heading", do you see that?

9    A.   Yes.

10   Q.   And you say this one is not accurate because Nick was the

11   pilot?

12   A.   I don't know about the accuracy of this one.  I'm trying to

13   go back to my mental memory here.

14   Q.   Well, you were there.

15   A.   Well yes, I was there.  But because we took the submarine

16   out into open water, I was probably on the dock again.  If I

17   wasn't on the dock, I was in the rib.

18   Q.   It says a couple lines down from where we highlighted "Goby

19   dived for 30 minutes and surfaced and she was not holding a

20   heading and was running in circles".  Do you see that?

21   A.   Yes.

22   Q.   Do you think Nick made that up?

23   A.   No.

24   Q.   That happened?

25   A.   I would have to assume it happened if it was written up like

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    this.

2    Q.  And that would cause you concern, right?  If you decided

3    that that sentence in one of these trial reports was true,

4    right?

5    A.  Maybe.  Could have been operator error, could have forgotten

6    to turn on the port thruster, don't know, don't remember.

7    Q.  Just above that it says "Goby dived and Nick had to use the

8    MM2 valve to pressurize the cabin because the cabin's auto

9    pressure system did not work while the hovers were in use".  You

10   see that?

11   A.  Yes.

12   Q.  That's a problem.

13   A.  I would have to assume so.

14   Q.  Did you assume that is true?

15   A.  Man, I'll tell you, I don't remember this.

16   Q.  Well if things happened on the open water and the pilots

17   reported I was out in open water and I couldn't hold a head and

18   it just was running in circles, you had no way to think that was

19   asinine, did you?  Because you couldn't tell, right?

20   A.  Correct, especially when you bring it back to the shop and

21   you run the thrusters and you run the rudder and you run the

22   pressurization system in the shop and everything is working

23   there, what do you do?

24   Q.  So you thought Nick just made that up?

25   A.  No, I just assumed he either reported it improperly or did

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    not check out his gauges or circuit breakers or fuses or his

2    piloting skills.

3    Q.  Let's talk a little bit about the submarine that went in

4    that you were dealing with in Cannes?  Remember that?

5    A.  I can't forget it.

6    Q.  It was the Lola?

7    A.  At the time it was no longer Lady Lola submarine.

8         MR. HESS:  May we approach just real briefly?  I don't

9    want to say it in front of the jury.

10        (SIDEBAR CONFERENCE:

11        MR. HESS:  I haven't made a big deal about the use of

12   the yellowing constantly because they're asking questions about

13   it, I'm not making a big deal because it stays up, but what is

14   happening now, even if there is no question he's --

15        THE COURT:  He's highlighting something else.  He has

16   been doing that.  But he did it for you too?

17        MR. HESS:  I know.  I don't know, Judge, I'm not saying

18   he didn't, I don't know.

19        MR. CEDERBERG:  I think he's trying to speed it up but

20   I'll tell him.

21        THE COURT:  Tell him only highlight what you tell him

22   to highlight okay?  Wait.  Come back, Mr. Hess.

23        How much longer are you going to be?

24        MR. CEDERBERG:  I'm going to --

25        THE COURT:  Why don't we break for the evening.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1      There's no sense in keeping them any longer.

2          (END OF SIDEBAR)

3          THE COURT:  That's not the reason we met, but as long

4      as we're here, I asked how long it's going to go and it's going

5      to be a bit longer so we're going the break for the evening.

6          Hold on.  I got to find my -- I don't memorize it, I

7      always read it.

8          Ladies and gentlemen of the jury, you're reminded that

9      you're not to discuss the case with anyone or permit anyone to

10     discuss it with you.  Until you retire at the jury room at the

11     end of the case to deliberate on your verdict, you're simply not

12     to talk about this case.

13         Also remember you're not to read or listen to anything

14     touching on this case in any way.  If anyone should try to talk

15     to you about it, bring it to my attention promptly.

16         Keep in mind you must not do any research or make any

17     investigation with the case on your own.  The only evidence in

18     this case is the testimony of the witnesses that you hear in

19     court, and the evidence that is introduced during the official

20     proceedings the courtroom.

21         Also remember that you must not have any contact with

22     the attorneys, parties or witnesses in the case.  If you should

23     see them, keep in mind that they are not being rude to you, they

24     are required to avoid any contact with you and they are not

25     permitted to talk to you just as you are not permitted to talk

1    to them.

2            Finally, remember you must not form any opinion about

3    this case until all the evidence is in.  You are required to

4    keep an open mind until you start your deliberations at the end

5    of the case.  When you come in in the morning, come straight

6    into the jury room, wait in there.  We'll see you tomorrow

7    morning at 9:30.  Thank you.

8            COURT SECURITY OFFICER:  All rise.

9            (Jury out at 5:19 p.m.)

10           THE COURT:  On that other matter, we talked about it,

11   let's talk about it tomorrow.  I'm getting cranky.  It's getting

12   late.  We'll see you tomorrow morning.

13           MR. HESS:  Judge, how long are we going tomorrow?

14           THE COURT:  All day.  I made arrangements.  I don't

15   want to take a chance on not finishing this case.  We are

16   finishing this case even if tomorrow we have to go until 7 or 8.

17   I would like to be pretty much finished with this case by

18   Thursday morning so we can get this case to the jury.  All

19   right?

20           What does the timing look like for you?  Well, let me

21   just tell you, Mr. Witness, since you are on the stand, you

22   cannot discuss your testimony with anyone, even the lawyers that

23   called you.  You cannot discuss it with any of the parties or

24   anybody else.  We'll see you tomorrow morning at 9:30.  Thank

25   you very much.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          THE WITNESS:  Yes, Your Honor.  Thank you.

2          MR. HESS:  I'll do everything I can, Judge.  It's going

3    to be tight for Thursday morning.  Thursday afternoon?

4          THE COURT:  Oh, please.  Come on.  Get a couple short

5    witnesses, get them in and out.

6          MR. HESS:  We've got -- Mr. Jaubert will be testifying,

7    of course, and I imagine the cross-examination is going to be

8    lengthy.

9          THE COURT:  Not going to be that lengthy.  Depends on

10   the direct examination I would expect, but yes, okay.  Well,

11   let's see what we can do.  I really got to get this case in the

12   record book, done, okay?  We'll be in recess until 9:30 tomorrow

13   morning.  Good day.  Go ahead.  You can go about your business.

14   I got to log out or people will think I'm here all night and

15   they'll ruin my image.

16          (See Volume 12, page 1302 for continuation)
                        *  *  *  *  *

17

18                    C E R T I F I C A T E
     I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

19

20

21

22

     _____        /s/ Dawn M. Whitmarsh
23   Date                        DAWN M. WHITMARSH, RPR

24

25

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
 1                       I N D E X

 2                        WITNESSES

 3     For Defense:                                   Page

 4     Paul Rodig
         Direct Examination by Mr. Hess           1170:15
 5       Cross-Examination by Mr. Cederberg        1262:6

 6                        EXHIBITS

 7     923-4
         In Evidence                              1175:20
 8
       930-5
 9       In Evidence                               1182:1

10     923.34
         In Evidence                              1205:17
11
       923.49
12       In Evidence                               1177:2

13     923.73
         In Evidence                              1209:10
14
       923.90
15       In Evidence                               1229:1

16     923.91
         In Evidence                              1223:15
17
       923.93
18       In Evidence                              1224:12

19     923.95
         In Evidence                              1211:24
20
       923.32 & 930.2
21       In Evidence                               1225:9

22     923.60, 923.62 & 92
         In Evidence                               1227:5
23
       923.82, 923.93 & 92
24       In Evidence                               1220:3

25
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**