1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                        FORT PIERCE DIVISION
                     CASE NO.   09-14314-CV-JEM
3

4

5

6    DUBAI WORLD CORPORATION, and its
     Subsidiaries, EXOMOS, NAKHEEL and
7    PALM MARINE,

8                    Plaintiffs,

9         vs.

10                                        Fort Pierce, Florida
                                          February 23, 2011
11   HERVE JAUBERT, SEAHORSE
     SUBMARINES INTERNATIONAL
12   INCORPORATED, and Does 1-99,

13                   Defendants.
     _____

14

15

16                    TRANSCRIPT OF JURY TRIAL
                      VOLUME 12 - PAGE 1302-1401
                 BEFORE THE HONORABLE JOSE E. MARTINEZ
17                   UNITED STATES DISTRICT JUDGE

18

19

20

21

22

     REPORTED BY:          DAWN M. WHITMARSH, RPR
23                         Official Court Reporter
                           400 N. Miami Avenue, 10S03
24                         Miami, Florida  33128
                           Telephone:  305-523-5598
25


             PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                   TRANSCRIPT PRODUCED BY COMPUTER

1    APPEARANCES:

2    FOR THE PLAINTIFFS:
                         *Quinn, Emanuel, Urquhart & Sullivan, LLP*
3                        BY: JON C. CEDERBERG, ESQ.
                         BY:  A. WILLIAM URQUHART, ESQ.
4                        865 South Figueroa Street
                         10th Floor
5                        Los Angeles, CA  90017

6                        *Astigarraga, Davis, Mullins & Grossman*
                         BY:  EDWARD MULLINS, ESQ.
7                        701 Brickell Avenue
                         16th Floor
8                        Miami, Florida 33131

9

     FOR THE DEFENDANTS:
10                       *Hess & Heathcock, PA*
                         BY:  WILLIAM HESS, ESQ.
11                       BY:  KATHRYN A. HEATHCOCK, ESQ.
                         40 Southeast Osceola Street
12                       Stuart,  Florida 34994

13

14

15

16

17

18

19

20

21

22

23

24

25

                   **PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
                        **TRANSCRIPT PRODUCED BY COMPUTER**

1304

```
1                       P-R-O-C-E-E-D-I-N-G-S
2              COURTROOM DEPUTY:  Case number 09-14314-civil-Martinez,
3     Dubai World Corporation versus Herve Jaubert, Seahorse
4     Submarines International, Incorporated.
5              Counsel, please state your appearance starting with the
6     Plaintiff.
7              MR. CEDERBERG:  Good morning, Your Honor.  Jon
8     Cederberg, Laith Mosely, and William Urquhart for the Plaintiff.
9              THE COURT:  Good morning.
10             MR. HESS:  Good morning, Your Honor.  William Hess,
11    Kathryn Hess, Hess and Heathcock for Seahorse Submarines.
12             THE COURT:  We're here to talk about juror number one.
13    Anyone have an opinion or comment or want to talk about it?
14             MR. HESS:  Judge, my concern is this, is that the Court
15    has read her clear instructions every day about that issue, and
16    if she's not following the simple instructions, then what else
17    is going on?  And I'm suggesting that -- I'm seeking to
18    disqualify her.
19             THE COURT:  Okay.  What's your position?
20             MR. CEDERBERG:  One second, Your Honor, I just want to
21    make sure.  We concur, Your Honor.
22             THE COURT:  All right.  How do you propose we do this?
23    Just call her in first and excuse her?  And then what do I say
24    to the rest of them?  That we excused her for reasons that don't
25    need to concern them?
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1305

```
1        MR. HESS:  It's agreeable to me, Judge.

2        MR. CEDERBERG:  That's fine, Your Honor.

3        THE COURT:  Okay.  Can you bring her in, please?  Do

4   you know which one she is?

5        COURT SECURITY OFFICER:  Yes, sir.

6        THE COURT:  Ma'am, it's come to my attention that

7   yesterday, or maybe it was the day before, you -- walking

8   through the security area, you made a comment concerning one of

9   the lawyers and talked to them told him he was doing a good job.

10  I told you not to talk to any parties that had anything to do

11  with the case.

12       JUROR:  Yes, sir.

13       THE COURT:  I'm afraid I'm going to have to excuse you

14  as a juror and thank you for your service, but I appreciate it.

15  But I really meant it when I said you can't talk to the parties

16  because somebody will get the wrong idea, and so I'm afraid I'm

17  going to have to excuse you and thank you for your service.

18       JUROR:  Yes, sir.  Thank you.

19       THE COURT:  Thank you very much.  Do you have anything

20  in the jury room?

21       JUROR:  No, sir.

22       THE COURT:  Okay.  Thank you, then.

23       JUROR:  I'm sorry.  It wasn't done intentionally.

24       THE COURT:  None of us believe that it was.  All right.

25  Are we ready for the rest of it the jurors?
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1         MR. HESS:  Apparently you mentioned something to me,

2    something about exhibits or something, reporters.

3         THE COURT:  The reporters have asked to look at the

4    exhibits.  I think I was actually looking for if there was any

5    consensus, but I've been thinking about it.  I think what I'm

6    going to do is tell them they need to go through the clerk's

7    office and then let the clerk's office handle it however they

8    do.

9         The truth of the matter is, the clerk's office doesn't

10   actually have any of the exhibits until we're finished, and when

11   we finish, I would assume that both sides will enter into a

12   stipulation to have the exhibits returned to them, and I will

13   grant that stipulation.  And then what we'll have is the exhibit

14   list, and then whatever exhibits you choose to send to the

15   appellate court will be sent to the appellate court.  But

16   basically I'm not in the business of providing copies of

17   exhibits to media, and I'm not sure it's a good idea to do so.

18        It is open, and they're here and they can look at

19   whatever they want while they're here and it's on the board, but

20   I'm not sure about providing them with copies of exhibits.  So

21   our position has always been, the judges, that we just tell them

22   to go through the clerk's office, and if it's something that's

23   in the clerk's office, they're welcome to it.  What position do

24   you have?

25        MR. HESS:  I don't object to that, Judge.  I just want

1307

1    to be clear because nobody has been talking to the press on our

2    side.

3             THE COURT:  I wasn't implying that you were.  Just that

4    you had already left the room, and so I asked him to tell you

5    that they were asking if they could look at the exhibits, and,

6    frankly, I don't want them walking up here and handling exhibits

7    during the proceedings or during breaks.

8             MR. CEDERBERG:  We concur, Your Honor.  But there is

9    another motion.

10            THE COURT:  Okay.

11            MR. CEDERBERG:  That the Court was going to give us

12   each ten minutes on this morning.

13            THE COURT:  What are you going to talk about?  I

14   forgot.  Tell me.

15            MR. HESS:  It was the issue of presenting the testimony

16   of Fiona Turner and Chris Turner, and Your Honor permitted me --

17            THE COURT:  Yeah, but I was going to let them argue

18   first.  Okay?  Go.

19            MR. URQUHART:  Good morning, Your Honor.

20            THE COURT:  Good morning.

21            MR. URQUHART:  I thought that I had made pretty much

22   all of my arguments yesterday, but I actually thought of one

23   additional one --

24            THE COURT:  Uh-huh.

25            MR. URQUHART:  -- overnight.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1308

1    THE COURT:  Tell me.

2    MR. URQUHART:  Yesterday what I said is that the sole

3    purpose that Mr. Hess was calling Mr. and Mrs. Turner was to

4    basically get into character evidence.  In other words, if Dubai

5    World does this or if the Dubai police do this in this instance

6    with Mr. Turner, that means they must do it all the time.  And I

7    thought that was improper, and still believe it's improper.

8    But I thought of another reason which is probably even

9    more important.  Actually, I think the effects of it are more

10   sinister, and that is that if you really look at this, it's

11   almost the exact sort of -- not the exact same set of

12   circumstances, but somewhat similar circumstances where the

13   police are involved in this, the Dubai prosecutors are involved

14   in this, there was a passport taken by the Dubai police, there

15   was a criminal prosecution by the Dubai prosecutors, et cetera,

16   et cetera, and what I was thinking is that really what they're

17   asking them, the jury, to draw an inference of is that somehow

18   or another this process was wrong, and that it was -- somehow or

19   another it was improper.

20   And the reality is it would be extremely prejudicial to

21   us to have that testimony come in because there's absolutely no

22   proof in the record that whether the process that went on with

23   respect to Mr. and Mrs. Turner was improper in any way

24   whatsoever under the laws of Dubai.  And the question that they

25   would really be asking the jury to decide is that somehow or

1309

1    another this was improper, without laying any foundation through

2    the introduction of expert testimony or otherwise, that, in

3    fact, whatever happened to the Turners over there was even any

4    kind of a violation of Dubai law.

5         And, in fact, in speaking with a Dubai lawyer yesterday

6    morning, he took me through the whole thing, and I'm convinced

7    there wasn't one.  So therefore, I think it would be highly,

8    highly prejudicial.  And it would be sort of -- it's talked

9    about yesterday, 406, getting and the people using 404(b) to get

10   in the front door what they can't get in in the back door, and

11   this would be then.

12        THE COURT:  I think you got it backwards.

13        MR. URQUHART:  You know what I mean.  This would be

14   them getting in this whole abuse of process thing, which Your

15   Honor has said they can get into, they can't get into the acts

16   of the police, they can't get into the acts of the prosecutors,

17   they can't get into the decisions of the courts, and now they

18   will be able to get into the same stuff that Your Honor said you

19   can't get into because it's an act of state.

20        So for that reason, I think that it's another reason

21   why it would be highly improper, and we couldn't, in good faith,

22   get into this without basically conducting a mini trial and

23   cross-examining them on the underlying facts of the case.  And I

24   can tell you, because John has -- the report by KPMG is this

25   thick about the embezzlement by Mr. Turner.  So with that, Your

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Honor, I rest.

2          THE COURT:  All right, sir.  Thank you.

3          MR. HESS:  Judge, first let me -- by no stretch of the

4    imagination will it even come up the propriety of the Dubai

5    courts and the loss.  It's just not even relevant.  It's agreed

6    it's not relevant, and I keep on hearing this over and over.

7    The abuse of process is a claim that the court has sustained on

8    the law.  Of course, we have to present evidence to be able to

9    support the claim.  But we've gone over and over this, and

10   Plaintiffs continue to juggle it.

11         And the reality is, is that the claim is not that the

12   Dubai police or the government or the courts did something

13   wrong.  The claim is, is that Dubai World extorted Mr. Jaubert

14   by virtue of utilizing the prosecution that was already pending.

15   It's not about whether or not the prosecution is right or wrong.

16   We agree never to mention it.  We're not going to do it, we're

17   not going to do it.

18         Didn't do it in opening, not going to do it now.  But

19   the reality is that what's happened -- and I've done some

20   checking, also, last night, so this idea that it's going to

21   somehow infer that the Dubai law was not correct or something is

22   nonsense.  It's absolute nonsense.  It's a red herring, and it's

23   continued to be argued by Plaintiffs just to inject this red

24   herring into the argument.

25         Now, the important argument is, as the court recognized

1311

1    yesterday, is this is unduly prejudicial.  Is it unduly

2    prejudicial, and is this a collateral matter.  That, if you

3    know -- because that does, as Your Honor pointed me to -- you

4    know, that does have some -- that does have a bearing on the

5    issue of 404.  And again mentioned today was 406.  406 is habit

6    evidence.  We're not asking for habit evidence, 406.

7         THE COURT:  I think what their position is, is that

8    you're calling it whatever you want to call it, but that in

9    effect it is habit evidence, and that's what troubles me,

10   because if you -- what you are doing is trying to bring in

11   through whatever, 402, 403, something that really is 406, then

12   you can't do that, and that's what I think they're arguing.  I

13   don't think they're arguing that you're trying to do it through

14   406.  I think they're trying to say that what you are arguing --

15   or what you are trying to adduce is definitely representation.

16   If they did it once, they're going to do it again, and that's

17   wrong.  everybody agrees with that.

18        So now the question is whether what probative value it

19   has, other than to say they did it once so, of course, you can

20   assume that they did it again and again, I go back to the fact

21   that most of the time when this is brought in, it is for the

22   purpose of somebody that says, yeah, I was there in that parking

23   lot and I did hand that package to the undercover police guy,

24   but I thought he was asking for some brown sugar.  And so I --

25   it was a mistake.  And then you can introduce the fact that he's

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1312

1    been convicted two other times for selling brown heroin in that

2    same parking lot.

3           That's a very clear example of motive, lack of mistake,

4    intent, everything else.  And the instruction that you give to

5    the jury is very clear.  It says you can't consider that to

6    prove whether the person did this, but if you find that he was

7    the person -- you know, you don't say it this way, but

8    basically, if you find he was the person in the parking lot,

9    that he did hand that thing over an your question is whether

10   there was intent or motive or mistake, then you can use this for

11   that purpose only after you've made a determination beyond a

12   reasonable doubt that he did commit the physical act that we're

13   talking about.

14          That's not what we're talking about in this instance.

15   That's not even close to what we're talking about in this

16   instance.  Therefore, it leads me to believe that it really is

17   just to point them in a bad light and to talk -- you know,

18   that's not the way we're supposed to try cases.  That's my

19   concern, and that's -- I'm laying it out for you so you can tell

20   me why their intent -- you know, I mean, I can even

21   understand -- well, I mean I'm not going to make your arguments

22   for you.  I can hear some arguments for that side, and then I

23   get to whether it's more prejudicial than it is probative, and

24   that's the part where I'm really kind of stuck right now, is

25   that I can understand your position if your argument would be

1313

1   that it goes to show that their intention in doing this was to

2   abuse t process as opposed to actually getting whatever benefit

3   there is from I don't even know, that doesn't follow through.

4   That doesn't logically -- doesn't scan all the way through.

5          MR. HESS:  If I may, Judge.

6          THE COURT:  Yeah, go ahead.

7          MR. HESS:  Because I've given some thought.

8          THE COURT:  Talk to me.

9          MR. HESS:  It goes to capacity.  It's not one of the

10  words listed in 404, but as the court's aware, the language in

11  404 is not exclusive, and the case law is all over on that.

12  It's anything as long as it's not intended to prove the conduct

13  that is asserted in the case at bar.

14         So it's the capacity of Dubai World to utilize, to

15  abuse the process of the ongoing process, the already occurring

16  process in the Dubai courts.  Because what's happened is

17  Mr. AbdulQader didn't only say that they didn't do it, as Your

18  Honor pointed me to, and that becomes a collateral issue, and

19  extrinsic evidence to be able to rebut that and impeach that.

20  Mr. AbdulQader went one step further he said they don't have the

21  capacity to do it.  He said, "We can't do it.  We don't have any

22  ability to do it," so capacity becomes the issue.

23         Because they said that -- they could have left it at

24  "We didn't do it."  If they didn't do it, Judge, all the

25  research that I look at last night, as Your Honor pointed me to,

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1314

1    if all he said was he didn't do it, then I agree, I can't bring

2    in the 404, I can't bring in Fiona Turner.  But he didn't say

3    just "We didn't do it."  He went on in direct testimony to say

4    "We don't have the capacity to do it."  So by virtue of him

5    saying that, that renders that a fact that is not collateral

6    anymore.  It would be able to be brought into evidence, the

7    capacity of them.

8         THE COURT:  Why is it not collateral?  That's the

9    problem, because I believe that it is a collateral issue to his

10   testimony.  it isn't the main thrust of his testimony, it's a

11   very collateral issue.  And it puts you in the position where --

12   puts us in a position where we're really talking about mini

13   trials, lots of mini trials, and I don't want lots of mini

14   trials.  This trial is maxi enough without a bunch of little

15   mini trials.

16        MR. HESS:  It's not going to be a mini trial, it's

17   going to be 10 minutes of testimony, not even.

18        THE COURT:  Nonsense.  They're going to bring people in

19   to show that they didn't have the capacity, and there's going to

20   be an issue as to whether they could do that or couldn't do it,

21   whether your people -- whether the witness you're calling is

22   telling the truth or maybe has a reason, no.  It gets into a lot

23   of little rabbit trails that I don't really feel like I want

24   this jury to go start running down.

25        MR. HESS:  Mr. Jaubert is going to prove that part of

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    his case, that he has to.  We have an abuse of process claim.

2    How do we win on abuse of process if we don't prove that they

3    had the capacity to interfere with the process, to extort using

4    the process?

5         That's part of our claim we can't prove, so it's not a

6    collateral matter because a collateral matter is something that

7    would not otherwise be admissible evidence.  It is admissible,

8    it has to be because otherwise how do we prove abuse of process

9    happening?  If they don't have the capacity to abuse the

10   process, then we're not going to win.  We believe we're going to

11   be able to prove it as to Mr. Jaubert's capacity is an issue

12   that is presentable to the jury and has to be.

13        Now, again, what I'm suggesting is that question of

14   whether or not he did it with Ms. Fiona Turner.  It's not, well,

15   I'm sorry, the question that he was asked with Mr. Jaubert

16   whether they did it, that would have been a collateral issue,

17   but whether or not to prove him wrong, I mean, but to utilize

18   extrinsic evidence to come in and challenge that.

19        But whether or not they had the capacity to do it is

20   not a collateral issue.  It is part of the claim.  It is the

21   res judicata of the case, of that claim, of abuse of process.

22   And we seek to prove that they had the capacity by utilizing the

23   contract they entered into with Ms. Fiona Turner that says that

24   they're going to dismiss the case.  They're going to apply to

25   the criminal court to get rid of that case.  And --

1        THE COURT:  I thought that what it said was that they

2    would indicate they had no further interest in the case.

3        MR. HESS:  I'm going to read it, Judge.  I was just

4    pulling it up.

5        THE COURT:  I know there was slightly different

6    language in either one.

7        MR. HESS:  There was slightly, but it has the same

8    bearing.  It says also to submit an application on the same day

9    to local authorities which drops the first party's right in the

10   criminal's proceedings in the second party.

11       THE COURT:  Which language is that?

12       MR. HESS:  That is the one in Ms. Turner's contract.

13       THE COURT:  What's the other?

14       MR. HESS:  In the other unexecuted, but we'll get it

15   into evidence, in Mr. Jaubert's case it says first party commits

16   to waive the case file and Jebel Ali police station after the

17   first payment of the reconciliation amount.  Judge, they're

18   different words, but they mean exactly the same thing.  Waive,

19   commit to drop.  It indicates that they had that ability to do

20   that.

21       But even aside from the agreements, Ms. Turner is going

22   to testify that Mr. AbdulQader, the same person, the same person

23   that testified that we don't have the capacity to interfere with

24   process, was there and told her.

25       THE COURT:  Was where?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1317

1   MR. HESS:  Was with Ms. Fiona Turner.

2   THE COURT:  Where when you said "there"?

3   MR. HESS:  In Dubai during --

4   THE COURT:  Okay.  All right.  I thought you meant at

5   the police station.

6   MR. HESS:  No, Judge.  The same type of meeting that

7   happened with Mr. Jaubert happened with Ms. Turner and what led

8   to the signing of what they call the agreement of

9   reconciliation, or Ms. Turner's case, the final settlement and

10   conciliation agreement.  Mr. AbdulQader was present, he

11   addressed Ms. Turner, he told her exactly that, that they would

12   drop the criminal case.

13   And so the three-prong test in the Eleventh Circuit

14   which is -- which goes way back to when the Fifth Circuit Court

15   of Appeals was precedent, the three prongs are first that

16   whether or not we can establish that the other act happened.  We

17   can establish that.  Whether there was -- and then let me find

18   that case, Judge, because I -- the prior act must be proved, and

19   this is under the -- I think it's Lampley and Beecham is the

20   other case that is cited often as the precedent in the case.

21   The second thing is one, it must be -- well, they go in

22   different order, but first must be relevant to one of the

23   enumerated issues and not to the defendant's character.  Goes to

24   the capacity, not to character, not to propensity; capacity.

25   Two, the prior act must be proved sufficiently to

1    permit a jury determination that the defendant committed the

2    act.  We will prove that, that it happened.  There is a signed

3    agreement and the testimony of Ms. Turner.  Then the evidence is

4    probative value, cannot be substantially outweighed by its undue

5    prejudice.  Every adverse bit of testimony evidence has a

6    prejudicial value to one of the parties; otherwise, it wouldn't

7    be relevant, it wouldn't be used.  But it's not unduly

8    prejudicial.  It's not unduly prejudicial because the court is

9    going to instruct the jury with an instruction saying this is

10   what it comes in for.

11          You cannot use this evidence at all for two reasons,

12   and even the Plaintiffs want another instruction saying you

13   can't use it to impugn the integrity of the Dubai courts, their

14   process, in fact, whatever they did is appropriate, as far as

15   you're concerned, you cannot even second thought it.

16          The second thing in the instruction can be that it is

17   not to be used at all to prove they did it to Mr. Jaubert.  It's

18   just to be used for you to consider as to whether or not they

19   had the capacity to interfere with process and nothing more.

20   And that's not unduly prejudicial, Judge.  The cases that were

21   cited yesterday by the Plaintiff, those --

22          THE COURT:  Is the issue really whether they had the

23   capacity to do it?  Or whether they abused the process in some

24   way by doing something to Mr. Jaubert?  See, I think there's a

25   difference between those two.

1319

```
 1          MR. HESS:  Well, there has to be -- whether they abuse
 2     the process --
 3          THE COURT:  I don't think there has to be.  I think
 4     that there -- well, I don't know.  Maybe they do.  Maybe they
 5     have to.
 6          MR. HESS:  If somebody sued me for abuse of process and
 7     said that they were in Canada and whatever and somehow I -- that
 8     I abused process up there, I don't have the capacity to do it.
 9          THE COURT:  Yeah, but if you did by, for example, using
10     a summons from Canada for the wrong purpose and intimidating
11     somebody with it, then you would be abusing process.  Whether
12     you had the capacity or not.  You might fool some idiot into
13     thinking that you had that capacity, and that would be an abuse
14     of process, wouldn't it?
15          MR. HESS:  I guess you're right, Judge, but in this
16     case, we need to prove capacity.
17          THE COURT:  Why?  That's what I'm asking you is why?
18          MR. HESS:  Because they said they didn't have the
19     capacity.
20          THE COURT:  Don't you really have to prove that they
21     abused it, not that they had the authority to do it?
22          MR. HESS:  I need both, Judge.
23          THE COURT:  Why?
24          MR. HESS:  Because I need -- it goes to their motive,
25     it goes to the damages value calculation.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1320

```
1         THE COURT:  You keep saying it goes to their motive,

2    but tell me how it goes to their motive.  What it goes to is

3    they did it once, so they'll do it again?  That's what you're

4    really talking about.

5         MR. HESS:  No, Judge, I'm not.  I'm not.  That's

6    exactly what I'm not saying.  I'm not saying it.  I conceded if

7    there wasn't this issue of capacity, that that would be the

8    issue.  But this capacity issue --

9         THE COURT:  You know, in a cross-examination, the guy

10   said, "No, we didn't do it.  We can't even do that.  We don't

11   have the ability to do that."  That's exactly what he did, which

12   makes it a very collateral issue.

13        MR. HESS:  We can't even get involved at all in their

14   process.

15        THE COURT:  That's the point.  And the point is that it

16   was in a cross-examination question, that, I think, has to be

17   it, has to be a collateral issue if I've ever heard one.

18        MR. HESS:  It wasn't cross-examination, Judge.  It was

19   direct examination.  It's on Page 572.

20        THE COURT:  What was the question?

21        MR. HESS:  "Mr. Urquhart:  What I'm asking is if you

22   had settled your differences with Mr. Jaubert and told the

23   prosecutor that you settled your differences, does that end the

24   criminal case?

25             "Answer:  Mr. AbdulQader:  I'm sorry, that's out of our
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1321

1    hands.  Once we hand a case to the prosecutor, we cannot get at

2    all -- we cannot get involved at all in that process.  It's up

3    to them."

4            THE COURT:  But you see, that's why I don't think that

5    you have any need to have this woman come in and testify about

6    the things that happened to her.  What you have is the agreement

7    that this gentleman entered into or didn't enter into where they

8    offered to do that.  That's impeachment of what he said.  You

9    don't need some woman to come in and say, "Well, they beat me up

10   and they did terrible things to me."

11           That's the problem and that's prejudicial, especially

12   if you can prove it some other way.  You've got the document

13   there that was supposedly proposed by the other side that maybe

14   wasn't executed, but I don't think that makes it inadmissible

15   that says, "We'll do that"  Well, all right, you impeach him.

16   The guy said they had nothing to do with it, then why are they

17   promising to do it if they had agreed to this?  I don't see any

18   problem with that.  But then going to the other one, I think,

19   goes beyond it, because you've already got proof of it.  That's

20   what makes it unduly prejudicial, is that you can prove this

21   three or four different ways that do not involve some lady

22   coming in here and saying, "They treated me badly and they

23   really were not nice people and they did horrible things to me,

24   and not only that, but they also said they could drop the

25   criminal case."

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1322

1           Because that's not the gravamen of her testimony.

2     That's why I'm not going to permit it.  Sorry.  And I don't want

3     you to think I have not thought about this.  I've thought about

4     it a lot.  Just think it's unduly prejudicial.

5           MR. HESS:  I understand, Judge.  I'm not going to argue

6     with the Court's ruling.

7           As to Mr. Turner, that's a different issue, I still

8     would seek to call him as a witness.

9           THE COURT:  I don't remember what his testimony was.

10          MR. HESS:  His testimony will be this:  He was --

11          THE COURT:  There are an unusual cast of characters in

12    this case that I really can't remember exactly what any of them

13    are going to say, so you have to refresh me.

14          MR. HESS:  I understand, Judge.  I totally understand,

15    Judge.

16          THE COURT:  Is this guy a plumber that is going to come

17    in and talk about building submarines too?

18          MR. HESS:  No, Judge.  He was a risk, I know.  Well,

19    Mr. Miller, who is a --

20          THE COURT:  Hey, I don't know.  I don't know where

21    these people become experts.

22          MR. HESS:  I know.  Kathy and I, we're not even

23    lawyers.

24          THE COURT:  That's all right.  You're doing a fine job.

25          MR. HESS:  What the argument -- well, it's not the

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1323

1    argument.  What we intend to call Mr. Turner for is not for any

2    of these issues.  We understand the court's ruling.

3              THE COURT:  What is it for?

4              MR. HESS:  It's for he was a very high up manager of

5    Istithmar.  The corporation that owns, by the testimony of

6    Plaintiff --

7              THE COURT:  Yeah, I remember now.

8              MR. HESS:  He's going to testify about the -- what --

9    the import of the various signatures.

10             THE COURT:  The approval of expenses.

11             MR. HESS:  Yes, Judge, and he will testify as to that

12   with knowledge, and we intend --

13             THE COURT:  Well, I understand what your position is on

14   that.  I don't think I can rule that he's not to be permitted

15   unless and until -- I think that's for cross-examination.  I

16   think that you have a very fertile ground for cross-examination,

17   if that's true, and we'll find out what he's going to say it is.

18   But I think I do need to let him testify to that.  I don't think

19   that he should be precluded from testifying to that unless you

20   have some law that tells me otherwise.  My leaning is to let it

21   in.  Go ahead.  You got an uphill road.

22             MR. URQUHART:  I know, and I promise this will be the

23   last you hear from me.

24             THE COURT:  I really somehow doubt that, but go ahead.

25             MR. URQUHART:  On this issue.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1324

```
 1              THE COURT:  Oh, all right.

 2              MR. URQUHART:  We have had access to e-mail traffic,

 3    and as far as we can tell, the first time that Mr. Turner ever

 4    communicated with Mr. Jaubert was over a year after Mr. Jaubert

 5    left Dubai.

 6              THE COURT:  Why isn't that good cross-examination

 7    material?

 8              MR. URQUHART:  It's great stuff.

 9              THE COURT:  Why?

10              MR. URQUHART:  It -- he works for a different company,

11    he doesn't work for the same company.

12              THE COURT:  I know, but it's like somebody you know

13    that works for General Motors talking about a Chevrolet thing,

14    don't you think?

15              MR. URQUHART:  I give up.

16              THE COURT:  Yeah, I mean, I think you got good

17    cross-examination, but I think it's admissible and I'll permit

18    it.  What else you got?  Can we bring in the jury, maybe?

19              MR. HESS:  I don't think we have anything else right

20    now.

21              THE COURT:  Can we bring the jury in, then?

22              MR. URQUHART:  Your Honor, we've renewed our motions in

23    limine with respect to two later witnesses.

24              THE COURT:  We're not going to keep the jury sitting in

25    there another half hour, so let's do that, then, maybe at first
```

1325

1   break.  We can take an extra long break and deal with it.  I

2   really don't like to leave them out there.

3              (Jury in at 10 a.m.)

4              THE COURT:  Thank you.  Please be seated.  All right.

5   Could you please -- we have a witness on the stand?

6              MR. CEDERBERG:  I'll get him.

7              THE COURT:  Okay.  Thank you.  Come in, sir.  You're

8   reminded, sir, that you're still under oath.  You may proceed,

9   sir.  As soon as you sit down, has a chance to.  I don't want

10  you to think I'm rushing you, but are you finished yet?

11                 CONTINUED CROSS-EXAMINATION

12  BY MR. CEDERBERG:

13  Q.  You've heard of a company called BMT Surveys before?

14  A.  No, I have not.

15  Q.  You don't have any memory of them coming to Exomos and

16  talking to employees?

17  A.  No.  What does BMT Services do?

18  Q.  BMT Services carries out reports for the purpose of doing a

19  prerisk assessment survey of Exomos submersibles in order to

20  establish the risk associated with the manufacture, build, and

21  testing processes currently ongoing.  Do you remember them

22  coming in?

23  A.  No.

24  Q.  Do you remember the BMT people meeting with you, as the

25  production supervisor, and Mr. Jaubert, as the chief executive

                PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                     TRANSCRIPT PRODUCED BY COMPUTER

1326

1    officer, and asking you questions?

2              MR. HESS:  Judge, he's asked and answered this

3    question.  This is the third time he said no.

4              THE COURT:  I'll permit him to ask it one more time.

5              THE WITNESS:  No.

6    BY MR. CEDERBERG:

7    Q.  Do you remember any outside consultants coming into Exomos

8    to ask questions about how the submarines were built and

9    designed?

10   A.  To the best of my knowledge, no.

11             MR. CEDERBERG:  May I please put up Exhibit 51 in

12   evidence?

13   Q.  Have you seen that document before?

14   A.  No.

15   Q.  Do you remember a person named Paul Binks?

16   A.  No.

17   Q.  Do you recall a person named Robin Nichols?

18   A.  Man or woman?

19   Q.  I don't know.  I'm just asking you about the name.

20   A.  No.

21   Q.  Can we look at Page 3 of Exhibit 51.  See where it says,

22   Attendance 1.2?

23   A.  Yes.

24   Q.  Does that jog your memory at all?

25   A.  No.  I met with people on a daily basis, and over the course

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1327

1  of 18 months, I cannot remember everybody that I met, what we

2  talked about.  If it had something to do with insurance, I'm

3  sure I was there.  And I talk to them because my name is on

4  there, but at this point in my life, I have no recollection of

5  what we talked about.

6  Q.  Do you remember talking to anyone about insurance that --

7  where you stated other than the hull design and manufacture, all

8  the other components of the design are essentially off-the-shelf

9  components?

10  A.  That does not ring a bell at all.  If that's what I have

11  down written, then I must have said it.

12  Q.  Did you have, as the production manager, access to wholly

13  engineered designs to build the submarines from?

14  A.  Would you explain that question?

15  Q.  Well, the designs come from Mr. Jaubert, right?

16  A.  Yes.

17  Q.  Then they come, and you're in charge of building the

18  prototype, right?

19  A.  Yes.

20  Q.  Were they wholly engineered designs, complete designs when

21  you got them?

22  A.  I wouldn't get the entire package.  I would get what would

23  be hell to me at the time of the build.  I would get the

24  schematic, the following week I may get the air system, the

25  pneumatic system.  The fiberglass shop would get the fiberglass

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1328

1    schematics because there's no reason for me to have them.

2    Q.  So you didn't have -- did you supervise the fiberglass shop?

3    A.  I oversaw it.  I did not supervise it directly.

4    Q.  Okay.  Did you review structural analysis?

5    A.  No.

6    Q.  Did you review hydrostatic analysis?

7    A.  No.

8    Q.  Did you review hydrodynamic analysis?

9    A.  No.

10   Q.  You just got drawings and built what the drawings showed?

11   A.  Correct.  I'm not an engineer.  I have no reason to be

12   consulted on engineering.

13   Q.  Were the drawings full and complete when you got them for

14   the part you were building, or did you have to interpret?

15   A.  There was a full and complete set of plans, yes.  Just like

16   when you build a house.  When you get the plans for a house, you

17   don't get everything on one page.  You get rough drawings of the

18   carpentry.  I would get rough drawings, I would get the

19   schematics for the electrical systems, and I would design it.  I

20   would get the schematics for what would be required for the

21   schematic systems for the pneumatic system and I would design

22   that.

23   Q.  You would design that?  You take the schematics then you

24   design it?

25   A.  Yes.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1329

1   Q.  So you were doing a design function, not just building.  Not

2   just following the drawings?

3   A.  I would get a drawing.  The drawing would state that you

4   have to have main ballast tank, a variable ballast tank, you

5   need to plumb all this with special back check flow valves,

6   switches, relays, and I would take these components and get them

7   to fit in a uniform, easy to work on package that would fit

8   inside the submarine.

9       Did I get a schematic that said you will build it exactly

10  like this?  No.  I would get an overview of the pneumatic

11  system, I would design it to fit the submarine.

12  Q.  So Mr. Jaubert would give you an overview of what he wanted

13  and leave the design function to you, correct?

14  A.  Correct.

15  Q.  And you're not an engineer, right?

16  A.  Correct.

17  Q.  You're not a naval architect, right?

18  A.  Correct.

19  Q.  You haven't designed any submersibles before you started

20  working at Exomos, had you?

21  A.  No.

22  Q.  But that design function was delegated from Mr. Jaubert to

23  you?

24  A.  Yes.

25  Q.  Okay.  And that didn't have any similarity to the jet

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1330

```
 1   engines you work on, did it?

 2   A.  Nothing has a similarity to the jet engine.

 3   Q.  Nothing in your background, work background, at all prepared

 4   you to design on your own parts of a submersible, did it?

 5   A.  Experience working with systems enabled me to design a

 6   functioning pneumatic electrical propulsion systems.

 7   Q.  Did that experience provide you with the ability to come up

 8   with quality controls within your unit to check on the

 9   performance?

10   A.  Yes.

11   Q.  Of what you designed?

12   A.  Yes.

13   Q.  Do you have any patents on what you design?

14   A.  No.

15   Q.  Did anybody at Exomos -- who at Exomos knows that you were

16   the designer?

17   A.  That would probably be the management.  I wasn't the sole

18   designer.  Herve and I would consult, we would talk with Jim,

19   and there was one other gentleman who worked in the CAD

20   department whose name escapes me that we would consult on

21   different things.

22           THE COURT:  CAD is what?  Computer assisted design?

23           THE WITNESS:  I'm sorry.  Yes, sir.

24   BY MR. CEDERBERG:

25   Q.  So the engineering documentation that you work off was the
```

1331

1  concept drawing, right, from Mr. Jaubert?

2  A.  Initially?

3  Q.  Yes.

4  A.  Yes.

5  Q.  Then you would design this as you built it?

6  A.  No.  We had -- I just stated this.  We had schematics, we

7  had drawings for the pneumatic system, we had drawings for

8  everything.  I can hand you a drawing and you can put together a

9  pneumatic system that's this long, but I need it to fit in this

10  package.  That's what I would do.  I would take a CAD drawing, a

11  computer aided design drawing, from our drafting department,

12  they would give me a complete schematic of what I need to do.  I

13  need to build everything.  It has to fit in a box this big.

14  That's what I did.

15  Q.  And when you design what you had to fit in that box, did you

16  do drawings so somebody could look and see what you did?

17  A.  I would do rough schematics on paper.  We would go back up

18  to the CAD, and we would put it in the way I had it designed.

19  We would now take the schematic that was printed out by the

20  design department, and I would show them, okay, this valve is

21  here, and this valve you have showed me is over here.  And we

22  would line the valves up and you would run all the flexible

23  tubing and the stainless tubing.  Then at that point they would

24  alter the drawing to fit so it had shown how it fits inside of

25  the compartment I had to put all these parts into.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1332

```
 1    Q.  Do you remember experts coming into Exomos and asking for
 2    designs, to look at them themselves?
 3    A.  That would not have anything to do with me, so I have no
 4    idea.
 5    Q.  Do you remember a man named Mr. Krueger while you were
 6    there?
 7    A.  Not particularly.
 8    Q.  Do you remember Phil Nuytten?
 9    A.  Yes, I met Phil Nuytten for about three minutes and that was
10    it.
11    Q.  And that was notable when a person of Mr. Nuytten's
12    reputation came to Exomos?
13    A.  Yes.  Phil Nuytten was a very nice guy.
14    Q.  And in your designs, did you have any failure mode in
15    effect, analysis that you would do on the design component you
16    did for the submarines?
17    A.  Indirectly.
18    Q.  Do you know what that term means?
19    A.  If something failed, what can you do to repair it, what can
20    you do to prevent it from happening again.
21    Q.  Don't you do those tests before it fails?
22    A.  We attempted to, but operations would not allow us on the
23    other side to test these submarines properly.
24    Q.  I'm talking about just the stuff you design?
25    A.  I answered your question.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1333

1   Q.   The stuff you design?

2   A.   Yes.

3   Q.   Did you test it before you put it in the submarine and you

4   put people in it?

5   A.   It's very difficult to test an air system when it's not in

6   the submarine.

7   Q.   Did you have any failsafe mechanisms that you work on?

8   A.   Yes.

9   Q.   Mechanical self-recovery systems?

10  A.   Yes.

11  Q.   You designed those too?

12  A.   No, I didn't design them.  Herve designed them.  I installed

13  them.

14  Q.   System redundant systems?

15  A.   We had some redundant systems, but with the concept of the

16  submarines, we did not feel that redundant systems on absolutely

17  everything was necessary, plus it also doubles the weight.  If

18  you have two air systems, two power systems, two thrusters

19  systems, you've got double the weight and the submarine

20  becomes moot because it won't float.

21  Q.   Pollution control systems?

22  A.   We did not need pollution control systems because they were

23  electric, they were not gas.

24  Q.   Would you agree that these are all aspects of the unit

25  design that needed to be incorporated in the early design stage?

1334

1    A.  Could you read that slowly, please?

2    Q.  Do you believe the different tests of systems that I talked

3    to you about were aspects of the units design that need to be

4    incorporated early in the design stage?

5    A.  I'm at a loss on that one.

6    Q.  Okay.  Let me put up Exhibit 51, Page 13, then.  Can you do

7    Paragraph 3.  This is the BMT report in evidence.  We have seen

8    no failure mode and effect analyses for each of the submersible

9    designs.

10       Do you agree with that statement that they don't exist?

11   A.  No, I'm not going to agree with that because I had a

12   failsafe.  If I was working on something that didn't work, I'd

13   scrap it and start over.

14   Q.  Failsafe mechanical self-recovery, system redundancy,

15   pollution control, et cetera, are aspects of the units design

16   that need to be incorporated early in the design stage.  Do you

17   see that?

18   A.  Yes, I see that.  And I don't know who wrote it up, but they

19   sure weren't looking at the submarines we were building.  We had

20   mechanical recovery systems.  Every submarine had air bag deploy

21   to bring the submarine to the surface in the event of an

22   emergency.  Every submarine had a master power shutdown.  Every

23   submarine had a master air shutdown.  Every submarine, with the

24   exception of Stingray, had surface communication by a buoy that

25   we would design for every submarine that would tow.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1335

1    Q.  And did you understand that this report was in connection

2    with whether third-party companies would believe there were

3    sufficient drawings to ensure the submarines that you were

4    taking part in designing?

5    A.  I had nothing to do with designs and other people coming in.

6    That was not my department.  I have no idea what was going on

7    with that.

8    Q.  You did have things to do with designs.  You just testified

9    to that under oath, right?

10   A.  Third-party people coming in to talk to sales and looking at

11   diagrams was not my department.  If a visitor came in to want to

12   purchase a submarine, they did not talk to me, they talk to

13   either sales or Jim Miller or Herve Jaubert.

14   Q.  Do you know what classification of a vessel is?

15   A.  Yes.

16   Q.  Do you know -- have you ever heard of Bureau Veritas?

17   A.  There's 27 different classifications, is that VS or VC?

18   Q.  Bureau Veritas, have you ever heard of them?

19   A.  Yes.

20   Q.  Have you ever heard of Det Norske Veritas?  Is that a no?

21   A.  That's an I don't know.  As I stated, there's 27 different

22   versions.  We were using Lloyds, if I'm not mistaken.

23   Q.  Have you ever heard of Lloyds Register of Shipping?

24   A.  Yes.

25   Q.  You know that they wanted to see drawings, right?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1336

1   A.   Yes.

2   Q.   They wanted to certify the different components that went in

3   the submarines, right?

4   A.   Correct.

5   Q.   And so you, as a designer, did you meet with them and show

6   them your drawings?

7   A.   No, I did not meet with them to see the drawings.  They

8   would go and they would talk with Herve an Jim Miller, and they

9   would go talk to the design department.

10   Q.   Have you herd of Fortis NV?

11   A.   Is that another certification?

12   Q.   Have you heard of them or not?

13   A.   No.

14   Q.   International Register of Shipping?

15   A.   Yes.

16   Q.   Are you aware that none of these agencies ever certified or

17   classified any of the submarines at Exomos?

18   A.   Yes, I'm aware of that.

19   Q.   Do you know what standards are used for classifying

20   submarines?

21   A.   No.

22   Q.   Are you familiar with what calculations need to be

23   conducted?

24   A.   I'm not an engineer, so I can't speculate on that.

25   Q.   Do you know what equipment is required?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.   Again, I'm not versed on that.

2    Q.   Okay.  Do you know what steps need to be taken to ensure the

3    parts are certified?

4    A.   At a certain point when we were expanding, we had Lloyds

5    come in, and they would observe everything we did so they could

6    certify the hull.  At a certain point, I was contacting

7    everybody that supplied parts for our submarines and asking them

8    if they could -- first off, if their parts were certified by any

9    of the certification companies, and secondly, could they send us

10   copies of 3OR, their certification of either their pumps, their

11   valves, their plumbing, everything.

12   Q.   Had you heard from any source that Mr. Jaubert required

13   certain parts on his submersibles to have serial numbers filed

14   off to avoid reverse engineering?

15   A.   No, that's nuts.

16   Q.   Did you know, as the head of production, that every part in

17   the submersible had to be certified for underwater use?

18   A.   No, they did not have to be certified for underwater use.

19   Q.   Did you know whether the hatches were certified?

20   A.   The hatches were not certified.

21   Q.   Do you know what level of detail is required by these

22   certification companies?

23   A.   No, I do not.

24   Q.   Well, who was above you in the head of production?

25   A.   Herve.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1338

1    Q.   He was your direct report, right?

2    A.   Correct.   I reported directly to Herve.

3    Q.   So if someone came in and asked these questions about how

4    the boats were built, if you don't know, then no one would have

5    known, right?

6    A.   Herve would know.   He's the engineer, I'm not.   If you bring

7    me a starter motor for a Chevy and say install this, I will do

8    that.   If you bring me a starter motor for my boat and tell me

9    to install that, I'm going to check to see if it's the proper

10   part for a boat because the starter for a car versus a boat are

11   two different parts.

12        The same thing with the submarines.   We built the submarines

13   to get them to function.   At this point we are now going to

14   start making upgrades, and we're going to get parts that are

15   certified so that we can further our production.   I had nothing

16   to do with the certification, all I did was build them.

17   Q.   Let me ask the question again.

18   A.   Sure.

19   Q.   If you didn't know, who else would know?

20   A.   Herve, Jim Miller.

21   Q.   You answered my question.   Jim Miller?   There's another

22   person now?

23   A.   Yeah.

24   Q.   Okay.   Now, Mr. Jaubert is not a naval architect, is he?

25   A.   No.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1339

```
1    Q.  And did you ever submit a drawing of a submarine at Seahorse

2    or Exomos for approval?

3    A.  No.

4    Q.  Were you aware that when BMT came out, they could not even

5    find any drawings of the submersibles that were built here in

6    Stuart and shipped to Dubai?

7    A.  None of the submersibles -- start that question over, and

8    I'll rephrase my answer.

9    Q.  Are you aware that when BMT came out, they could not locate

10   any drawings for the submersibles that were made in Stuart and

11   shipped to Dubai.

12          MR. HESS:  Judge, objection.  He's already testified at

13   least three times that he doesn't know who BMT was, doesn't have

14   any information regarding that, and this is just attempts by

15   counsel to elicit testimony without knowledge.

16          THE COURT:  Yeah, sustained.  You're beating a dead

17   horse.  he said he didn't know anything about that.  Move on.

18          MR. CEDERBERG:  I'll rephrase it, then.

19   BY MR. CEDERBERG:

20   Q.  Were you aware that there were no drawings at Exomos that

21   depicted the submersibles that were built in Stuart?

22   A.  Well, that's a lie because there were.  I saw.

23          THE COURT:  I think the answer to that, then, is no,

24   that's not true.  Or something like that, but, you know, just

25   don't be -- I don't think he's particularly trying to pick on
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1340

1    you, so just try to answer the questions and we'll move on from

2    there, get it done a lot faster.

3         THE WITNESS:  Yes, Your Honor.

4    BY MR. CEDERBERG:

5    Q.  Exhibit 51-10 be put up?  And can you blow up paragraph

6    4.2?  The first paragraph, can you highlight that?  Completed

7    units such as Stingray, SDV, Proteus, and Adventurer essentially

8    built in the US have been constructed to comply with American

9    Bureau of Shipping rules and US Coast Guard regulations.

10   However, we have not cited any documentation, class approved

11   engineering, notes or drawings in this regard.  Do you see that?

12   A.  Yes, sir, I see that.

13   Q.  It's your position this is a lie?

14   A.  Yes, this is incorrect.  I've seen the drawings, and as to

15   the disposition of the drawings that were at the Exomos before I

16   left, I don't know.

17   Q.  Can we go to Exhibit 51-14, and can you blow up the first

18   half of Paragraph 6.  This says the prototype testing is very

19   good, from what we have seen and witnessed.  The tank testing

20   facilities at zebra are good with plans to develop further

21   on-shore facilities close by, namely a sunken test tank

22   measuring 30 meters by 15 meters by 15 meters.  The

23   documentation in regard to tank testing, trial brief, report,

24   results, feedback, and the various levels of responsibility

25   designated pilot, safety divers, engineers, emergency contact,

1341

1    et cetera, are similarly very good.  Do you see that?

2    A.  Yes, sir.

3    Q.  That sounds like the trial reports, doesn't it, sir?

4    A.  Yes.

5    Q.  Now, is this a lie that the trial reports were very good

6    documentation?

7    A.  No.  This is accurate.

8    Q.  So today, you think the trial reports were good

9    documentations of what happened?

10   A.  That's not what you asked me.

11   Q.  Let me ask it again.  When they say the documentation of the

12   trial reports were very good, is that correct or incorrect?

13   A.  That would be correct.

14   Q.  But you don't think the words in the documentation?

15   A.  You showed me four trial reports, and we've dove those

16   submarine over 500 times.  You pick out four ones that you

17   considered marginal, and I was able to explain to you that

18   operations would overstate problems.  What do you want?  You

19   can't have it both ways.

20   Q.  Sir, you told us yesterday under oath that every report --

21   A.  No, I didn't say every report.

22   Q.  Would you let me finish?

23   A.  You showed me four.

24        THE COURT:  Let him finish his question.

25   BY MR. CEDERBERG:

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1342

1   Q.  You stated that every report that was written by that diver

2   named Ross Gielich wasn't accurate, right?

3   A.  No, I didn't say that.  I did not say every report.  You

4   showed me four, and I contested those four that you pulled and

5   showed to me.

6   Q.  Didn't you say yesterday, under oath, that he always says

7   this stuff and he didn't know what he was doing?

8   A.  If I used the word "always," let's bring it up, but I do not

9   remember using the word "always."

10  Q.  Let's go to another one of these reports.  And you said,

11  under oath yesterday, that all the pilots on these test reports

12  were poor quality except for Thapa, right?

13  A.  Correct.

14  Q.  You stand by that today?

15  A.  Yes.

16  Q.  Let's look at Exhibit 353, and let's go to the top.  And

17  this, again, is for the Adventurer, February 6th, 2006.  You

18  were there, right?

19  A.  Correct.

20  Q.  And you'll see that on the distribution list Mr. Miller is

21  there?

22  A.  Yes.

23  Q.  But he's not listed in attendance?

24  A.  Correct.

25  Q.  You're on the distribution list, right?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1343

1    A.  Correct.

2    Q.  And Mr. Jaubert is on the distribution list, right?

3    A.  Yes.

4    Q.  Okay.  And let's go down to the trial reports section, which

5    is the third one down where it starts with Falk.  Falk was able

6    to obtain valuable media footage, and that's because Exomos

7    always wanted to get footage of the boats, right?

8    A.  Correct.

9    Q.  Adventurer surfaced and pilots rotated.  Adventurer dived

10   periodically, but the dive was aborted as water was leaking into

11   the cabin from the ball valve area onto the electrical system.

12   Do you see that?

13   A.  Yes, I see that.

14   Q.  Okay.  Now, this is one Mr. Miller wasn't the pilot at,

15   right?

16   A.  Correct.

17   Q.  Mr. Miller wasn't even there, was he?

18   A.  Correct.

19   Q.  And it says it resulted in electrical systems not working.

20   Adventurer surfaced to power back to Joumana Marine.  Do you see

21   that?

22   A.  Yes, I do.  It's a lie.

23   Q.  Okay.  You weren't there, were you?

24   A.  No, I wasn't there, but I designed it and the ball valve.

25   Q.  Answer my question, sir.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1344

1    A.   I answered your question.

2    Q.   You weren't there, right?  So you're telling the jury that

3    answer is a lie?

4    A.   I can prove to you it's a lie.

5    Q.   Okay.  Well, did you prove to Mr. Jaubert it was a lie when

6    you saw the report?

7    A.   I proved to everybody there that this was a blatant lie.

8    The ball valve does not -- when the ball valve tubing comes into

9    the submarine, there's no electrical equipment anywhere near the

10   port, so --

11   Q.   Did Mr. Jaubert hold a team meeting and say, "Geez, I've

12   talked to Paul, and boy he's proved that you've been lying in

13   these reports every time we've had this problem with the ball

14   valve."  That didn't happen, did it?

15   A.   Herve and I consulted, and Herve and I bumped heads with

16   operations almost from the very beginning of Exomos's existence.

17   Q.   And the ball valve problem is also on the Goby as well as

18   the Adventurer, wasn't it?

19   A.   With the exception of Stingray, every submarine had a

20   snorkel ball valve, yes.

21   Q.   Well, when you and Herve butted heads with management -- and

22   by the way, he is the chief executive officer, right?

23   A.   He's the chief executive officer, he's not the chief

24   operating officer.  That was Jim Miller.

25   Q.   That was the management.  Mr. Miller was the manager of

1345

```
 1   Mr. Jaubert.  Is that your testimony?
 2   A.  No, that's not my testimony.  Herve designed the submarines,
 3   I built what he needed.  Jim Miller was the operations officer.
 4   He ran operations.
 5   Q.  He found the leaks, right?
 6   A.  Operations department allegedly found the leaks.
 7   Q.  But you're telling us that the bolts you made didn't leak,
 8   despite all these reports, correct?
 9   A.  We had an occasional leakage, yes.  We didn't have any
10   leaks.
11   Q.  And Mr. Miller reported to Mr. Jaubert, too, didn't he?
12   A.  Yes.
13   Q.  Mr. Jaubert was the man in charge, right?
14   A.  I don't know how the hierarchy goes, but I would have to --
15   yes, he should have been executive officer and making all the
16   decisions.
17   Q.  He was Mr. Miller's boss, right?
18   A.  I don't know the hierarchy, but I would they were parallel
19   as opposed to one reports to the other.
20   Q.  You worked there with Mr. Jaubert, you talked with them
21   every day, and you're telling us under oath you don't know the
22   hierarchy between Mr. Jaubert, you, and Mr. Miller?  That's your
23   testimony?
24   A.  I reported directly to Herve.
25   Q.  As did Mr. Miller, right?
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1346

```
1    A.  I don't know upper management.  I don't know who reported to
2    who.  I reported to Herve.  Jim Miller ran operations.
3    Q.  He reported to Herve, didn't he?
4    A.  I don't know the official hierarchy.
5    Q.  But you butted heads without even knowing that, right?
6    A.  With operations, yes.
7    Q.  You said management under oath?
8    A.  Herve and I would consult on reports like this.
9         MR. HESS:  I'm going to object.  That mischaracterizes
10   the testimony.  Counsel said that he butted heads with
11   management, he testified that he butted heads with operations.
12   Misrepresents the testimony.
13        MR. CEDERBERG:  He said management earlier, Your Honor.
14        THE COURT:  Doesn't matter whether it was management or
15   not, the question was you butted heads without even knowing
16   that?
17        With operations, yes.
18        You said management under oath. Jury will be the judges
19   of what the testimony was.  I honestly do not recall.  I'll have
20   to overrule it because I just don't know that.
21   BY MR. CEDERBERG:
22   Q.  Let's turn, if we can, to this Lady Lola where we're just
23   going to talk about -- now, I want to take you to the Lady Lola,
24   according to your story, is in Cannes, right?
25   A.  Correct.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1347

```
1    Q.  And it's anchored, tethered to a boat?

2    A.  No, it's on the boat.

3    Q.  It's on the boat, right?

4    A.  Yes.

5    Q.  But when you tested --

6    A.  Yes, the davit, the lifting crane from the Lady Lola shadow

7    boat would lift the submarine up, swing it out over the gunnel,

8    and set it into the water.

9    Q.  And you were the pilot, right?

10   A.  Correct.

11   Q.  And when you took it down, how far did you take it down

12   before you started to experience problems?

13   A.  I was down 30, 35' approximate for about half an hour.

14   Q.  Okay.  And then the hatch blew inward on you, right?

15   A.  Correct.

16   Q.  And you escaped, right?

17   A.  Correct.

18   Q.  And the boat went down 71', right?

19   A.   Yes, sir.

20   Q.  So if you hadn't been able to escape, that would have been a

21   serious problem for you right?

22   A.  It had the potential, yes.

23   Q.  Well 71', the pressure is a lot different than at 33, right?

24   A.  It's not the pressure of the 71', it's the depth to the

25   surface without air.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1348

1   Q.  Since you were the pilot, I'm assuming your testimony is it

2   certainly wasn't any pilot error that caused that hatch to crash

3   inward was it?

4   A.  The conclusion of my investigation --

5   Q.  No, I asked you if it was pilot error, sir?

6   A.  No, it was not pilot error.

7   Q.  Was not your fault, was it, sir?

8   A.  No, sir.

9   Q.  Okay.  Just so we're clear, it takes about five hours to get

10   that boat up from the 71', right?

11   A.  It took us five hours to recover it, yes, sir.

12   Q.  Then taking the boat back to shore, that's when the second

13   accident occurred?

14   A.  Yes.

15   Q.  And that's when the aft was torn off?

16   A.  Wave action dislodged it because it was taped back on.

17   Q.  Okay.  Then the next time you saw it back in Cannes, there

18   was this Bondo job that somebody, without Exomos's approval, put

19   on the boat, and that's what you saw, right?  There was some

20   repair, unauthorized repair?

21   A.  The unauthorized repair was prior to the accident.

22   Q.  Which accident?

23   A.  The Lady Lola, when she sank.

24   Q.  Which time?

25   A.  Lola sank initially when I was in pilot.  The repairs to it

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1349

1   were done prior to that.  Exactly when, I can't put a date on

2   it.  Four, five months, six months, I don't know.

3   Q.  Just going back to Exhibit 41, which I believe is in

4   evidence.  Page 7 be shown to the witness?  Can you blow up the

5   left hand side?

6       Okay.  That organization chart pretty much look like you

7   remember the organization chart when you were at Exomos?

8   A.  One of several, yes.

9   Q.  Okay.  Mr. Jaubert clearly on top, okay?

10  A.  Yes, sir.

11  Q.  Miller reports to him, right?

12  A.  Yes, sir.

13  Q.  Okay.  And where -- what box would you be in?

14  A.  I'm not in any of those boxes.  I was the production

15  supervisor, and as I stated, I reported directly to Herve.

16  Q.  So you would be way off to the side above everybody else.

17  A.  Yes.  You also have one that's dated December of '05.

18  Q.  You were there then, right?

19  A.  Yes.

20  Q.  But you're a production supervisor then?

21  A.  Yes.

22  Q.  But I'm just trying to figure out, you were the only guy --

23  you and Miller were the only two that responded directly to

24  Mr. Jaubert?

25  A.  I don't know who else responded directly to Herve.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1350

1    Q.  Okay.  Well, if this chart is correct and you belong up on

2    the side here someplace like that, there's not even a box for

3    you, right?

4    A.  Correct.

5    Q.  Where are the people who reported to you?  What box were

6    they in?

7    A.  No idea.

8    Q.  What about production manager, Marc Rigo?

9    A.  I did not report to Marc Rigo.

10   Q.  I said who reported to you?

11   A.  All the shop chiefs and electrical and mechanical reported

12   to me directly.

13   Q.  Okay.  Now, you said you dove over 200 times?

14   A.  Approximate, yes, sir.

15   Q.  Dove so much that you no longer need a logbook?

16   A.  I didn't say I needed it.  I said I stopped using it.

17   Q.  You stopped using it because you didn't feel it was

18   necessary, right?

19   A.  On shallow dives, the -- because of the depth of the gulf or

20   the lack of the depth of the gulf, we would generally dive the

21   submarines to no more than 10 to 12 meters.  10 to 12 meters, I

22   have a downtime of 216 minutes.  In my opinion, it was a waste

23   of good paper to keep documenting a 10-minute dive, a 30-minute

24   dive, going into the tank, so I elected to stop using my dive

25   log.  It's not a crime.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1351

1   Q.  So when you were in one of the submersibles and it went

2   15' --

3   A.  15 meters.

4   Q.  -- 15 meters, that's the kind of thing you put in your dive

5   log?

6   A.  Yeah.  Diving submarines just like diving in open water.

7   You're subject to the pressure just like you were diving in the

8   water.

9   Q.  Okay.  And so these aren't dives, these 200 dives you're

10  talking about, they're not you diving in the water, they're

11  diving in the submarines; is that what you're talking about?

12  A.  It was combination of both.  If I was not the pilot, there

13  would be times I would dive in the submarine and my scuba gear

14  to observe how the submarine dove underwater.

15  Q.  Did you count those in your 200 dives?

16  A.  Yeah, absolutely.

17  Q.  Did all the diving that you testified to in connection with

18  your work at Exomos?

19  A.  Yes.

20          MR. CEDERBERG:  May I have a moment?

21          THE COURT:  Yes, you may.

22  BY MR. CEDERBERG:

23  Q.  With regard to the vessel in Cannes that you talk about,

24  Exomos had to buy that back didn't it?

25  A.  That deal was brokered between management and the owner, so

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1352

1    I don't know whether they had had -- I'm sorry, quotes, had to

2    buy it back, or whether it was an arranged deal.  I was not

3    privy to that.

4    Q.   That's how it got back, it got back into Exomos possession?

5    A.   Correct.

6    Q.   Okay.

7         MR. CEDERBERG:  Nothing further.

8         THE COURT:  Redirect.

9         MR. HESS:  Thank you, Judge.

10                      REDIRECT EXAMINATION

11   BY MR. HESS:

12   Q.   Now, how do you know that there were -- do you know whether

13   or not there was a trial report prepared for each of the 4-, 500

14   dives that these subs took during that period of time that

15   you're talking about?

16   A.   In the very beginning when we were still classified as Palm

17   Submarine as opposed to Exomos, we were what you would say not

18   100 percent organized.  We had several buildings that were

19   spread out throughout the free zone in Jebel Ali, and so when we

20   would do any kind of a dive, we would do this kind of reporting

21   where we would take notes and after the dive we would discuss

22   it.

23        As Exomos came into existence, we sat down and devised

24   reporting predive reports.  There's one report that we used to

25   have that I haven't seen any copies of yet either.  Before a

1    submarine left production, we would have operations come over,

2    and we would inspect the entire submarine together, and they

3    would be signed off and then operations would take the submarine

4    for testing.

5    Q.  How many of those reports --

6            MR. CEDERBERG:  Your Honor, I don't want to jump up

7    each time and say nonresponsive, but can we go by question,

8    answer.

9            THE COURT:  Yeah, try to answer the questions as much

10   as you can.  Go ahead.

11   BY MR. HESS:

12   Q.  How many of those type of reports that you just spoke of,

13   the production, I guess, post production reports, how many of

14   those were prepared?

15   A.  That should have been on the realm of approximately 300,

16   350.

17   Q.  And these are in addition to these trial reports?

18   A.  Correct.  This report was devised because of the differences

19   of opinion between production and operations.

20   Q.  Who prepared -- what do you call those reports?

21   A.  It would be a -- you know, to be 100 percent honest with

22   you, I forget the technical name.  Before the submarine left my

23   shop, operations would come over, and we, meaning me and either

24   whoever was going to be the pilot in command, would inspect the

25   submarine, front to back, side to side, upside down, and we

1354

1    would go through every system that was able to function out --

2    out of the water and opposite check them, i.e., lighting, bilge

3    pumps working, hatches closing, no cracks, no dirt in any of the

4    valves, making sure that there was no salt residue on anything,

5    pre flight.  We would pre flight it in our shop so when

6    operations took it, they couldn't come back later and go, this

7    is wrong and we could prove to them that it wasn't wrong because

8    they were the ones that sign the form OPS.

9    Q.  We'll call them production reports just for sake of to know

10   the terms.  I want to keep them separate from the test reports.

11   A.  That would be fine.

12   Q.  Now, and you said in addition to these trial reports or test

13   reports, there were 300 to 350 of these production reports?

14   A.  Yes.

15   Q.  Now, your recollection in the -- if you have a

16   recollection -- first of all, do you have a recollection, in

17   these 300 to 350 production reports, were there problems found

18   that would have been documented in those reports?

19   A.  Yes.

20   Q.  And what was the rational for finding now in the reports

21   that there were problems found?  Did the sub dive that day?

22   A.  It depends on what the discrepancy was, what the dive was

23   going to be done to accomplish, and where the dive was going to

24   take place.

25   Q.  Who maintained those production -- or for lack of a better

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1355

```
 1   term, the production reports?
 2   A.  They should have been filed in a folder with the pre dive
 3   check and the post dive report.  Should have all been filed
 4   together.
 5   Q.  And the post dive report, are you referring to the trial
 6   report?
 7   A.  I'm sorry.  Yes, the trial report.
 8   Q.  Do you know why they weren't?
 9   A.  Weren't what?
10   Q.  Did you see, at one time during your tenure with Exomos, did
11   you see those, the production reports, filed with the trial
12   reports?
13   A.  Yes.  When you say file, everything was on computer as
14   opposed to killing a tree.
15   Q.  Did Mr. Miller have access to these production reports?
16   A.  Yes.
17   Q.  Now, you heard counsel for Plaintiffs characterize the ball
18   valve as a ball valve problem.  Now -- and then you said there
19   were ball valves in all the subs except for the Stingray?
20   A.  Correct.
21   Q.  Did you mean to say there was a ball valve problem in each
22   one of the subs?
23   A.  No.
24   Q.  What was the function of the ball valve and the vent or
25   whatever that was?
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1356

1    A.  Do you have something I can draw on?  I can describe it and

2    it won't make any sense.

3         THE COURT:  Do your best.

4         THE WITNESS:  Okay.  Ambient pressure submarine, you

5    pressurize the inside of the cabin with air to match the water

6    pressure on the outside of the submarine so you have equal

7    pressure, 25 psi, 25 psi.  Air pressure, as you begin to

8    surface, the air is going to expand.  It has to escape from the

9    submarine.  The ball valve configuration is an inch and a half,

10   2" tube that rises up approximately 5' above the inside of the

11   submarine, does a 180, 180-degree turn.  It now descends half

12   the distance, or 2'.  We have a ball valve.  It's a stainless

13   steel ball that's weighted specifically to float at 7/8ths

14   underwater.  It has to be very delicate.  You have a seal.  We

15   would manufacture a rubber O ring.  The ball valve would plug up

16   against the snorkel.

17        As you descend, ambient water pressure holds the ball

18   valve in place so the water does not back feed into the

19   submarine.  As you surface, the air inside the submarine

20   expands, goes out the ball valve, comes out the snorkel, and the

21   ball would bob up and down, and you could actually hear it go

22   boom, boom, boom, boom.  It was a very unique sound.  That was

23   the purpose of the ball valve.

24   BY MR. HESS:

25   Q.  So when you are descending, the mechanical seal between the

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1357

1    ball and the gasket seals off, provides the integrity for the

2    sub?

3    A.   Yes, sir.

4    Q.   And then when you're ascending, it's the air pressure that

5    provides the seal, the outgoing air that prevents the water from

6    coming in?

7    A.   Yes, sir.

8    Q.   Could we see what is marked as Exhibit 353, please.  Do you

9    remember seeing this on your cross-examination just a few

10   moments ago?

11   A.   Yes.

12   Q.   You said that was a lie, what was said in that exhibit?

13   A.   Yes, blatant.

14   Q.   Could you explain to the jury what you're talking about,

15   what was a lie?

16   A.   The plumbing configuration on the Adventurer, the ball valve

17   assembly was in the -- do you have an Adventurer picture?  The

18   ball valve and snorkel assembly was in the tail fin.  If you

19   have Lady Lola picture, you can bring that up, and that will be

20   perfect.  Interior --

21   Q.   Why don't you keep talking and describe this.

22   A.   The ball valve, you have a stainless steel through-hole

23   fitting that went into the tubing on the fin.  This particular

24   fitting was in the aft of the submarine.  There was nothing

25   underneath of that except the passenger.  There was no

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1358

1   batteries, there was no electronics, there was nothing.  The

2   only difference was on Lady Lola, there was a VHF radio in that

3   position.

4   Q.  Was that configuration a design on purpose?

5   A.  Yes.

6   Q.  And what was the purpose of it?

7   A.  In case you happened to have a ball valve failure and the

8   water comes in, you won't short out your electronics and create

9   an electrical fire.

10  Q.  So what's the lie you're talking about here?

11  A.  There's no way that the water could come in through the ball

12  valve and shorted out the electronics thusly making an emergency

13  ascent.

14  Q.  Charles, if you could blow up the last four lines in that

15  section please. Thank you.

16          So what you're saying is that it says the water leaked

17  into the cabin in the ball valve area onto the electrical

18  system?

19  A.  Right.  The electrical system's in the front where the

20  pilot's at.

21  Q.  Who wrote this?  Who was the pilot in this instance?

22  A.  This was multiple pilots, because they said they did a pilot

23  rotation, so PIC switched, pilot in command, switched with dive

24  officer.

25  Q.  Do you know how that type of mistake could be made?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1359

1    A.   I can only speculate.  I couldn't give you a definitive

2    answer.

3    Q.   Certainly.  Did you advise the pilots -- advise all the

4    pilots where the electrical components were in relationship to

5    the ball valve entry port?

6    A.   That would be something on indirect during the course of

7    instruction on how the submarine works control function, control

8    placement.  That would have been something that would have been

9    taught, yes.

10   Q.   Now, if you look again, it says that the Adventurer -- well,

11   it says that this resulted in electrical systems not working,

12   Adventurer surfaced and powered back to Joumana Marina.  What

13   was the power -- well you mentioned before, was there gas power

14   in these subs?

15   A.   Strictly electrical.

16   Q.   So if the electrical system is not working, is there power

17   to power back to Joumana Marina?

18   A.   That would be a no.

19          MR. HESS:  If I may for a moment?

20          THE COURT:  Yes, sir.

21   BY MR. HESS:

22   Q.   Now, you mentioned that there were these continuing issues

23   of operations.  Was there an instance that you became aware of

24   or witnessed where Mr. Miller and his operations personnel

25   purposefully rotated upside down one of the Stingrays?

1360

1    A.  Yes.  I was -- that was brought to my attention by

2    Mr. Miller himself, and that was the point where I either almost

3    got fired or almost quit.

4              MR. HESS:  Excuse me, Your Honor.  He said it was

5    brought to his attention by someone else.

6              THE COURT:  Yeah, don't tell us what somebody else told

7    you.

8              MR. HESS:  Judge, he said Mr. Miller.  Obviously that's

9    a party admission at that point.

10             THE COURT:  I don't know that Mr. Miller is a party, is

11   he?

12             MR. HESS:  He's chief operating officer.  Exomos is a

13   party to the proceedings.

14             THE COURT:  All right.  I'll let it in.  I'll leave it

15   in.

16   BY MR. HESS:

17   Q.  Now, what did Mr. Miller tell you?

18   A.  Mr. Miller brought the Stingray back from a dive, and

19   Mr. Miller and Ross and the other operations personnel were just

20   in such a jovial mood they thought it was the greatest thing in

21   the world.  They decided to take the submarine and turn it

22   upside down just to see what would happen to it.

23   Q.  Now, let me stop you.  Is it possible, can that Stingray

24   submarine invert on its own?

25   A.  No, it cannot.  Weight, balance, center of gravity was all

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1361

1  designed.  The first dive with the Stingray, when it

2  accidentally flipped upside down, we were in the process of

3  doing weight and balance and center of gravity.  With flipping

4  the Stingray upside down and purpose, it wasn't just the fact

5  that they flip it upside down.

6  Q.  I want to get to that, but how many people did he tell you

7  it took to flip it upside down?

8  A.  It took three of them.

9  Q.  They're in the water with the Stingray, obviously?

10  A.  Yes.

11  Q.  Okay.  Go on.

12  A.  It's not the fact that they flipped it upside down, because

13  when it flipped upside down by mistake before weight and

14  balance, it was upside down for a few minutes.  They had to have

15  had it upside down for a very prolonged period of time because,

16  as a sidebar, the batteries that were installed in the submarine

17  were Group 31.  Group 31 lead acid battery holds approximately

18  one and a half gallons of acid, hydrochloric, times two.  Two

19  batteries in each Stingray.  When we got the Stingray back --

20       MR. HESS:  Charles, would you mind turning on the

21  system.

22       MR. CEDERBERG:  Your Honor, can we go on by question

23  and answer.  I believe the question was what did Mr. Miller tell

24  you?

25       THE COURT:  Yeah.  Ask another question.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1362

```
 1    BY MR. HESS:

 2    Q.   So is this the Stingray?

 3    A.   That's the Stingray, yes.

 4    Q.   That is Exhibit 923.95 in evidence.  Did Mr. Miller tell how

 5    long it was upside down?

 6    A.   No, he didn't.  I figure it out.

 7    Q.   Okay.  What as the -- what did you perceive -- I imagine the

 8    sub was taken out of the tank.  Is that where it happened?  Was

 9    it in the tank, they flip it, or was in it the marina?

10    A.   I want to believe it was in the tank.

11    Q.   Did you look at the sub after it was brought back to

12    production?

13    A.   Yes.

14    Q.   And what did you see?

15    A.   It was destroyed.  It was -- the acid from the batteries, it

16    destroyed everything.  The paint began to wrinkle.  The acrylic

17    dome began to crase, minute cracking.  Every bit of wiring, the

18    insulation was melted off of it.  All the hosing, the rubber

19    tubing from the air bottles was all deteriorated to the point

20    that it needed to be replaced.  Every O ring on every part of

21    the submarine disintegrated.  This had to be dismantled to the

22    fiberglass.  The fiberglass was beginning to delaminate from the

23    acid, so we had to do a complete sand job.  And they tried to do

24    a resuscitation of the fiberglass, but ever since they flipped

25    it over, it was never the same.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1363

1    Q.   Now, have you, in how many hundreds of dives that the

2    Stingray accomplished, in your experience --

3    A.   Yes.

4    Q.   -- ever flip over, aside from when Mr. Miller, his two

5    companions flipped it, or when it initially dove to the bottom

6    when you were doing the weight testing?

7    A.   Never.

8    Q.   You've piloted the Stingray, correct?

9    A.   Yes.

10   Q.   Can you somehow make it flip upside down by operating it?

11   A.   You could make it flip upside down the same way Thapa did

12   when we were doing the weight and balance.  If you were to get

13   on the bottom and get the very nose of it wedged then hit your

14   vertical thrusters to ascend, you could create a tip over

15   effect.  You could do the same thing with your car by running

16   into a wall.

17   Q.   You have to do it on purpose?

18   A.   Yes, you have to do it on purpose.

19   Q.   Or you have to do it recklessly in a reckless operation?

20   A.   Correct.

21   Q.   Now, were these batteries -- you mentioned battery acid and

22   all that.  Were the batteries otherwise -- were there

23   precautions taken that the batteries were otherwise isolated

24   from the occupant so that they're not going to be burned with

25   battery acid except for this time of catastrophic misuse?

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1364

1   A.  Yes, the battery box was located directly behind the pilot.

2   You had two batteries, one stacked on top of another in battery

3   holders.  Then above the second battery was the compartment for

4   all of the electrical and mechanical devices as in -- may I?

5   Q.  That has been marked as Exhibit 923.26.

6          MR. CEDERBERG:  Can we at least have the attorney call

7   the exhibit up rather than just show it.

8          THE COURT:  Yeah.  I thought we had this discussion

9   from your point of view yesterday.

10          MR. HESS:  I understand, Judge.

11          MS. HEATHCOCK:  Sorry.

12          MR. HESS:  We're just trying to move things along.

13          THE COURT:  I understand, but that is what they were

14   doing.  And turn about is fair play.

15          MR. HESS:  I understand, Judge.  923.26, I'm not sure

16   that's in evidence, Judge.  I don't believe there's an objection

17   that was provided.  It's in evidence, Judge.

18          THE COURT:  All right.  If you say so, then I don't

19   care.

20          MR. HESS:  It is.

21   BY MR. HESS:

22   Q.  Now, does that show you -- would you please describe what

23   we're looking at there?

24   A.  This is the Stingray Model 2 with the aft hatch removed so

25   you can see the components.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1365

1    Q.  Where are the batteries at?

2    A.  This would be the pilot seat.  This compartment right here

3    would have two batteries stacked one on top of the other, then

4    you would have an 8" compartment this size where you would have

5    all your electrical, mechanical.

6    Q.  Looks like that's pretty much sealed off.  It's not?

7    A.  You have sealed top hatch for when you have to remove the

8    batteries, but when you're doing charging or inspection to make

9    sure everything is okay, you would have a deck plate that we

10   would remove so you could take the charging cord out.

11   Q.  Now, how is it that, in the occasion where the -- where

12   Mr. Miller and his companions inverted the submarine

13   intentionally, how is it that the battery acid got out of that

14   compartment?

15   A.  Okay.  Even though this is a little tiny --

16           MR. CEDERBERG:  Objection, Your Honor.  No foundation

17   as to personal knowledge.  He was just told this happened.

18           THE COURT:  Yeah.  You'll have to get some

19   authentication or some background.

20           MR. HESS:  On what part, Judge?  It was a party

21   admission that it happened.  I'm not sure.  I don't understand.

22   It already came into evidence that it happened.  Then he's

23   testifying now as to how in his, and he already testified that

24   he perceived the submarine following the incident.

25           THE COURT:  I don't know how he would know that, how

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    the battery acid got out of the compartment.

2              MR. HESS:  That's what I'm going to ask him, Judge.

3              THE COURT:  No.  You asked him how is it that it got

4    out of there.  You didn't ask him "How did you find out?"

5    That's what I'm saying.  Get some foundation.

6    BY MR. HESS:

7    Q.  Do you know how the battery acid got out of the compartment?

8    A.  Yes, I do.

9    Q.  How is it that you know that?

10             MR. CEDERBERG:  Objection.  Foundation.

11             THE COURT:  He's asking it now.  How is it that you

12   know that?

13   BY MR. HESS:

14   Q.  How do you know?

15   A.  How do I know that?  I'm the one that built this, and I know

16   how the vent system works.

17   Q.  How did it come out then?

18   A.  Even though this is a very small one-man submarine, you

19   still have the same components that you have in the large

20   submarine.  Ambient pressure.  Any tank has to be pressurized so

21   it doesn't collapse from the water pressure.  So the way this

22   was designed is that this compartment is broken into three.  The

23   battery compartment was in the center.  This fin and the other

24   fin are your main ballast tanks.  You flood them, the submarine

25   will submerge to this point.  We discussed variable ballast

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1367

1    tanks yesterday.  You have a very small variable ballast tank

2    here.  This was very, very touchy.

3           THE COURT:  Yeah, so is that screen.

4           THE WITNESS:  Yes, sir.  It's very difficult to see the

5    picture, but there is air lines here, there's air lines here,

6    and there are air lines here.  These air lines converged on the

7    pressurization valves so that when you pressurized these

8    compartments when you're submerging, they don't collapse.  When

9    you rise, just like the big submarine, we have the equivalent of

10   a snorkel where.  When you're rising, the air pressure is

11   expanding, the air pressure has to vent from the battery and the

12   ballast tanks, so the vent would go down to the very bottom of

13   the submarine and they would vent below the level of the

14   batteries.

15          Now, what happens is when you turn it upside down, all

16   the liquid from the batteries is now -- this is inverted.  This

17   is now the bottom.  All your acid is laying in here.  The

18   submarine was inverted for at least 15 minutes.  The reason I

19   know this is because if you take a standard lead acid battery

20   and turn it upside down, it does not glug, glug, glug, glug,

21   glug out, it trickles out slowly.

22          When we got the submarine back, because all the acid

23   was here, upside down, hydrochloric acid has a lighter specific

24   gravity than water, it's seeking a higher altitude, it starts to

25   come up, starts to accumulate all in here and starts melting

1368

1    everything.

2          MR. CEDERBERG:  Move to strike, Your Honor.  No

3    foundation.  Expert testimony.

4          THE COURT:  It does sound like expert testimony, and

5    building something does not necessarily make you a scientific

6    expert.  I understand you built this.  I've heard this.

7          MR. HESS:  Judge, it's not expert testimony, it's

8    layperson.

9          THE COURT:  He's opining on a specific gravity of

10   battery acid.  He's opined on several things that seem to me to

11   require expert testimony.  Now, he has a lot of practical

12   knowledge, I do not question that.  But I don't know that he's

13   been qualified as an expert to be giving expert opinions as to

14   how something happened.

15         MR. HESS:  For instance, Judge, as to the issue of

16   taking a battery and turning it over and saying how long it

17   takes for the battery acid to evacuate, that's not expert

18   testimony, that's layperson testimony.  That's admissible just

19   like a person saying, as a layperson says, that over there that

20   smelled like alcohol, or over there it smelled like acetone.

21   That's layperson.  I don't think there's any dispute that that

22   comes in in front of the jury.

23         THE COURT:  You mean for me to say if you turn over a

24   car battery, it takes 43.2 minutes to drain?  Doesn't that

25   require some sort of test?  I mean --

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1369

1      MR. HESS:  He said 15 minutes, Judge.

2      THE COURT:  I know.  I'm guessing.  I never turned one

3  over because I'm not dumb enough to turn over a battery and have

4  to worry about where the acid is going.  But the point is, I

5  don't know if anybody does experiment like that, but I sure

6  haven't heard about them.

7      MR. HESS:  I'll ask him, Judge.

8      THE COURT:  But you see the difference?

9      MR. HESS:  I do, Judge.  I understand.  I'll ask.

10  BY MR. HESS:

11  Q.  Have you ever had an occasion to take one of the batteries,

12  such as the one that was utilized in the Stingray, and turn it

13  over to ascertain how long it takes to evacuate the battery

14  acid?

15  A.  Yes.  I've seen that happen personally several times not

16  equated to Stingray.  I've seen automobile batteries that have

17  been flipped upside down, I've seen boat batteries that have

18  been flipped upside down.  It takes quite awhile for them to

19  drain completely.

20  Q.  Okay.  All right.

21      THE COURT:  That, I'll buy.  I'll buy that quite a

22  while.  But for somebody to say it takes 10 minutes or 15

23  minutes or something --

24      MR. HESS:  I understand, Judge.

25      THE COURT:  Okay.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1370

```
 1   BY MR. HESS:

 2   Q.  Now, without relaying specific gravity and all those big

 3   words, what do you mean by -- what is the relationship between

 4   acid and water that you're conveying to the jury in everyday

 5   terms?  Does it float battery acid?

 6            MR. CEDERBERG:  Objection, Your Honor.  No foundation.

 7   BY MR. HESS:

 8   Q.  Do you know whether or not battery acid will float in water,

 9   will rise?

10            THE COURT:  No, I'll permit him to say that.

11            MR. CEDERBERG:  Can we go by not leading, then, Your

12   Honor?

13            THE COURT:  Yeah.  Ask questions.  Asking questions

14   isn't working, so let him lead.  Lead.

15            MR. HESS:  I'm trying, Judge.  I'm trying to get it

16   done.

17            THE COURT:  Just get moving.

18   BY MR. HESS:

19   Q.  What did you mean to say -- without relaying that -- the

20   details, your specific gravity references, what do you mean to

21   say to the jury about the battery acid and where it was and the

22   import of how you found it and how you ascertained where it

23   accumulated?

24   A.  Battery acid is lighter than water.

25   Q.  So what does that mean?  It floats?  It rises above water?
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
1    A.  It will rise to the surface and dissipate.

2    Q.  Now, since we're talking about some batteries, battery

3    things, did there come a time when you became aware of a fire

4    regarding the Goby?

5    A.  Yes.

6    Q.  And how did you become aware of that?

7    A.  Phone call.

8    Q.  And don't say what they said, but who called you?

9    A.  Kaleel Bagdadi (ph), who was the electrical supervisor,

10   called me and said that there was a --

11        MR. CEDERBERG:  Objection, Your Honor.  Hearsay.

12        THE COURT:  Sustained.

13   BY MR. HESS:

14   Q.  What did you do in response to the phone call?

15   A.  I immediately ran back to the shop to see what was going on.

16   Q.  And what did you perceive?

17   A.  When I got to the shop, the fire department had showed up at

18   this point, pulled the submarine out front, and unfortunately

19   flooded it with foam.

20   Q.  Was the submarine in the water at the time?

21   A.  No.  It was on a transportation trailer.

22   Q.  And did you know, from personal knowledge, what had -- do

23   you know what caused the fire?

24   A.  Yes.

25   Q.  And how is it that you know what caused the fire?
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1372

1   A.   I saw the video.

2   Q.   And the video was maintained by Exomos?

3   A.   Correct.

4   Q.   And you reviewed the video?

5   A.   Several times, yes.

6   Q.   And what did the video depict?

7        MR. CEDERBERG:  Objection, Your Honor.  Best evidence,

8   going into expert testimony.

9        MR. HESS:  Judge best evidence would apply; however, it

10  was maintained by Exomos, it hadn't been produced to us,

11  Mr. Jaubert doesn't have it.

12       THE COURT:  Did you ask for it?

13       MR. HESS:  Yes.

14       THE COURT:  Okay.

15       MR. HESS:  We'll get a stipulation.  If I need to read

16  the request for production, I will.

17       THE COURT:  That's fine.  I'll let him testify.

18  BY MR. HESS:

19  Q.   What is it that you perceived on the video?

20  A.   The video showed that.

21  Q.   Let me step back.  Is it within your personal knowledge that

22  -- were the Exomos facilities videotaped?

23  A.   The entire shop was under video surveillance, yes.

24  Q.   And what period of time was it under surveillance?

25  A.   24/7.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.   What did you perceive on the video?

2    A.   The shop closed at 5:00, and the gentleman who drove the

3    Tennant floor cleaning machine was doing his passes back and

4    forth.  He came up to the extension cord that the battery

5    chargers for Goby were plugged into.

6    Q.   Is Goby out in the video also?

7    A.   Yes.

8    Q.   Where is Goby in the shop?

9    A.   In the shop.  The floor cleaning gentleman comes up to where

10   the extension cord is plugged in, and he unplugs it and he drops

11   the cord over here, then he drives his Tennant machine through

12   and he does some passes to clean behind the submarine, then he

13   comes back out this way and he leans over and he plugs the

14   extension cord back in.  What he did was he unplugged the

15   battery chargers that are electronic and they're timed.  He

16   reset the timing clock to zero, so it started an 18-hour charge

17   from zero again.

18   Q.   And what did that result in?

19   A.   It blew the batteries up.

20   Q.   Did you see that on the video?

21   A.   Oh, yes.

22   Q.   What did it look like?

23   A.   The first explosion, when the batteries are being charged,

24   the hatch of the submarine was open.  Because the cables go in

25   through the hatch, the first explosion --

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.  Let me save some time.  Did it destroy the sub?

2    A.  Yes.

3    Q.  How many times prior to that had the Stingray been charged

4    and recharged?  Was this an every day -- did you plug --

5    A.  Stingray or Goby?

6    Q.  I'm sorry, the Goby.  How many times had the Goby been

7    charged in that same way?

8    A.  By this point, probably only about a dozen.

9    Q.  Okay.  And were there procedures put in place to ensure that

10   the maintenance crew didn't do that again?

11   A.  Yes.

12   Q.  Did it ever happen again?

13   A.  No.

14   Q.  Now, you saw a -- if you could please put back up onto the

15   screen Exhibit 41.  I'm sorry.  I thought it was 41.  What's the

16   organizational chart?  Page 7 of that, please.  If you could

17   blow up that organizational chart, please.

18       Let's look at this.  Did you have a chance to look at

19   the whole chart?

20   A.  Uh-huh.  Yes, sir.

21   Q.  And it says -- what does it say on the top?  If you could

22   please blow up the top three lines on that.

23       THE COURT:  You can read that.  Everybody can read

24   that.

25   BY MR. HESS:

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1375

1    Q.  Says "Source resolution approved by."

2         THE COURT:  I thought you meant the three lines, the

3    footnote.  The source footnote, can you blow that up, please, up

4    top there.

5    BY MR. HESS:

6    Q.  Okay.  Now, is that anything you have any information about,

7    whether this -- how this was approved, how this chart came into

8    being?

9    A.  No.  I was never consulted on any -- how any of the

10   hierarchy was assembled.

11   Q.  Did you ever see this chart before today?

12   A.  Not this version.

13   Q.  On a daily basis, did you perceive -- when Mr. Jaubert was

14   working with Mr. Miller, did you perceive the relationship to be

15   one where Mr. Miller was reporting to Mr. Jaubert?

16        MR. CEDERBERG:  Objection, Your Honor.  Asked and

17   answered.  No personal knowledge.  Calls for opinion.

18        MR. HESS:  I don't believe I've asked that.  It's an

19   easy one.

20        THE COURT:  Hold on.  I don't really think the

21   perception of a third party is relevant or proves anything, so I

22   will not.

23        MR. HESS:  Judge, if I could just briefly, if I may,

24   before the court rules?  I just -- what's been attempted to be

25   elicited is that they're challenging what the hierarchy was in

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1376

```
1    practical terms, and what they're showing is they asked this

2    witness, you know, who reported to who, he testified that -- he

3    didn't really get a chance to testify to it, but they want the

4    jury to believe that Mr. Miller was below Mr. Jaubert for all

5    purposes based upon this chart.  And what's really relevant is

6    how the actual -- in practical terms, how it went on a

7    day-to-day basis.  That's what really is controlling, because

8    the issue here is how much did operations headed by Mr. Miller

9    interfere with its success.

10           THE COURT:  That may be, but it seems to me that the

11   people can testify to -- that is Mr. Jaubert and Mr. Miller.

12   Not somebody on the side that's looking at them and making up

13   his decision as to who is reporting to whom.  Sustained.

14           MR. HESS:  I understand, Judge.

15   BY MR. HESS:

16   Q.  Now, let's -- what was -- in terms of -- you were asked on

17   cross-examination about, you know, why didn't Mr. Jaubert get

18   involved in this test report process.  Remember that?

19   A.  Yes.

20   Q.  Was Mr. Jaubert -- was his duties exclusively, at this time,

21   the submersibles?  Was he operating other projects that you were

22   aware of?

23   A.  Yes.

24   Q.  And what other projects was he operating on, was he working

25   on?
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1377

1    A.   Herve oversaw every project in the shop, airport, surface

2    vessels, Swath, lift raft, anything that was there.  Herve was

3    the prime on all the projects.

4    Q.   And when you were working during these 18 months, did you

5    witness Mr. Jaubert occupied with matters other than the

6    submarines?

7    A.   Not personally, no.  I didn't get involved in the operations

8    of the company.

9    Q.   How did the -- did you -- were you responsible for -- in

10   terms of when you said that -- you were asked about your

11   designing of the various systems that were on the boat, on the

12   submersibles, did you get involved in that design process, the

13   obtaining the materials locally, also, to do your job?

14   A.   Yes.

15   Q.   And what was your experience regarding obtaining materials

16   locally to do your job?

17   A.   Obtaining local materials was an absolute nightmare.

18   Q.   Why is that?

19   A.   First off, a lot of the products that we were using on the

20   submarines were American made or British.  Reasoning for that

21   was metric system versus US.  A lot of the parts we were buying

22   from America we weren't able to get them in bulk, so we would

23   start trying to get some stainless manufactured in Dubai, and we

24   would spend countless thousands of dollars on waste.  We would

25   ask for a part that would be a skin fitting.  It needs to be in

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1378

1    one and a half inch BSP, which is British standard pipe thread,

2    and we would get it in metric or in American or something that's

3    not right.  This was an ongoing problem.

4              MR. CEDERBERG:  Move to strike, Your Honor, as

5    nonresponsive.  He's testifying to we doing something.  I don't

6    think that was the question.

7    BY MR. HESS:

8    Q.  What did you mean by "we"?  Was it you?

9    A.  Yes.

10             THE COURT:  You know, when I say hold on a second, I

11   know it's complicated, but it means hold on a second, okay?  No.

12   I'll permit the testimony.  Go ahead.  Ask another question.

13   Overruled.

14   BY MR. HESS:

15   Q.  What was your response to those challenges?  What did you

16   determine that was necessary to do to obtain the materials you

17   needed to put the subs together?

18   A.  I would make an attempt to try to get stuff from America.

19   It was just easier.

20   Q.  You were asked, on cross-examination, about, you know, you

21   were told that Mr. Miller was absent from the facility on sales

22   projects?

23   A.  Yes.

24   Q.  Was he absent during great -- was he uninvolved in the

25   testing process and the operational testing process of the subs

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1379

1   during any period of time?

2   A.   No.  He was involved.  When Mr. Miller was around, he was

3   involved, yes.

4   Q.   Was there -- withdraw that.

5       Now, in the course of what you were just talking about, the

6   challenge in purchasing locally, purchasing from the United

7   States, during the period of time that you were working with

8   Exomos, were you aware that purchases were being made through

9   Seahorse Submarines?

10  A.   Yeah.  Absolutely.

11  Q.   Who wasn't aware?  Was Mr. Miller aware?

12  A.   Everybody was aware.  I'm sorry.  Let me rephrase that.

13  People that ordered parts were aware.

14  Q.   Was Mr. Miller aware?

15  A.   Absolutely.

16  Q.   The parts that were ordered through Seahorse, was there ever

17  any mention to you by Mr. Miller, any management, that there

18  were any problems with the ordering process through Seahorse?

19  A.   No.  There was no -- I didn't have any problems with

20  ordering parts.

21  Q.   Did you receive the parts?

22  A.   I could order parts, and in four days I could have them

23  shipped halfway around the world, yes.

24  Q.   Now, was the same true -- did you try to do the same thing

25  with local vendors?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.  Yes.

2    Q.  What was the result in your attempts to do that?

3    A.  Either I would get the wrong product, a damaged and

4    incorrectly built product, or I would get phone calls next week,

5    next Thursday, we need twice the money.  This was an ongoing

6    problem.  That was one of our biggest problems with our hatches.

7    Q.  Which is what?

8    A.  Immediately after the Lady Lola incident, we decided to

9    design a dome hatch and eliminate the flat plates, and we had a

10   local vendor come in, he gave us a proposal for 18,000 Dirham,

11   which is approximately $5,000 apiece.  We gave him the approval

12   to go ahead and come up with a bona fide set of CAD drawings,

13   computer aided design drawings, and a parts list and a time

14   element.  He returned to us two weeks later, and now he --

15   instead of 18,000 Dirham each, he wanted 35,000 Dirham each and

16   we dismissed him.

17   Q.  And that wasn't -- was that an unusual result?

18   A.  This was more the norm than the exception to the rule.

19   Q.  Were there time considerations that were brought upon you in

20   production to finish these submarines and to get them

21   operational?

22   A.  Yes.

23   Q.  Did you need parts to do that?

24   A.  Yes.

25   Q.  Did you need supplies to do that?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1381

1  A.  Yes.

2  Q.  Were any of those reasons that purchases were made by you

3  through Seahorse?

4  A.  Excuse me?

5  Q.  Was that a reason why you used Seahorse to purchase items?

6  A.  Yes.

7  Q.  You know what the Stingray Duo was, correct?

8  A.  Yes.

9  Q.  What was that?  Tell the jury, because it's been awhile

10  since they heard about it.

11  A.  The Stingray Duo was a Stingray that was instead of 12 volt

12  with a single thruster motor, it was 36 volt with twin thruster

13  motors.

14  Q.  How many passengers on the Duo?

15  A.  That was only one.

16  Q.  The Duo was one?

17  A.  The Manta Ray was two.

18  Q.  Was there any work that was done on the Duo once it arrived?

19  What happened was the -- was there a shell of a Duo that arrived

20  at Exomos?

21  A.  The Duo was the naked hull of a Stingray that was just

22  outfitted with twin thrusters instead of a single.

23  Q.  Did you work on the Duo?

24  A.  I began working on the Duo.  We were coming out with that

25  just before I was coming back to America.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1382

```
 1    Q.  How about the Discovery that was brought over from Seahorse?

 2    Did you work on that?

 3    A.  Which one?  The operational or nonoperational?

 4    Q.  The non -- we'll get into that through another -- I don't

 5    want to waste the jury's time on this right now.  Thank you.

 6              MR. CEDERBERG:  Briefly, Your Honor.

 7              MR. HESS:  Your Honor, I haven't got --

 8              THE COURT:  I'm sorry.  No, you don't get redirect.

 9              MR. CEDERBERG:  Your Honor, he brought up the Goby,

10    just on redirect, he brought up Jim Miller.

11              THE COURT:  Then he should have said beyond the scope

12    of cross.  No.  One turn, and the person that calls him gets

13    two.  That's all.  Thank you.  Nope.

14              MR. CEDERBERG:  Your Honor, may I just inquire whether

15    the witness kept the admonition last night?

16              THE COURT:  No.  Not now.  Thank you, sir.  You're

17    excused.  Call your next witness.

18              THE WITNESS:  Thank you, Your Honor.

19              MR. HESS:  Judge, I call Crister Turner.

20              THE COURT:  All right.

21              MR. HESS:  Judge, he's here about three minutes away.

22    He's got a child with him, so he's not in the courthouse.  I

23    need five minutes to get him here -- three minutes to get him

24    here.

25              THE COURT:  All right.  Let's take a break.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1383

1     MR. HESS:  I thought he was here.  I just heard from my

2     assistant.

3          THE COURT:  All right.  So we'll take a few minutes.

4     Ladies and gentlemen of the jury, you may have noticed that I've

5     excused Juror Number 1, Laurie Pautenis.  You don't need to

6     concern yourself about why, but she is excused and will no

7     longer be part of the jury.  Thank you.  You may proceed.

8          (Jury out at 11:27 a.m.)

9          THE COURT:  10 minutes, recess.

10         MR. HESS:  Judge, may I address the Court real briefly

11    on one issue?  I just wanted to get some timing from Your Honor

12    in terms -- because I know counsel for the Plaintiffs wish to

13    argue their limine motion regarding our expert Mr. Forest, and I

14    would have called him right now because he is here, but not for

15    that argument, so I don't know when the court wants --

16         THE COURT:  How long is this gentleman going to be on?

17         MR. HESS:  Probably take us to lunch.

18         THE COURT:  Okay.  Then we'll do it at lunchtime.

19         MR. HESS:  Thank you, Judge.

20         THE COURT:  We'll discuss it at lunchtime.

21         (Brief recess)

22         (Jury in at 11:40 a.m.)

23         THE COURT:  Please be seated.  Please call your next

24    witness.

25         MR. HESS:  Mr. Turner, please.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1384

1       THE COURT:  All right.  Please come forward, sir.

2  Please come into the witness box, remain standing, raise your

3  right hand

4       CRISTER THOMAS TURNER, WITNESS, SWORN.

5       THE COURT:  All right, sir.  Please be seated.  Tell us

6  your full name and spell it.

7       THE WITNESS:  My actual name is Crister Thomas Turner.

8  C-R-I-S-T-E-R, T-H-O-M-A-S, Turner.

9       THE COURT:  You may proceed.  We can figure out Turner.

10                      DIRECT EXAMINATION

11  BY MR. HESS:

12  Q.  Mr. Turner, I'm just going to -- you just recently had a

13  heart attack?

14  A.  That's correct.

15  Q.  And that was in December?

16  A.  It was.

17  Q.  And you've got medication that you may have to take during

18  the process today?

19  A.  Hopefully not.

20  Q.  Okay.  Mr. Turner, do you know Herve Jaubert?

21  A.  Personally, no.  We worked in the same group of companies in

22  Dubai.  I've communicated with him by e-mail, we've spoken on

23  the telephone.  And that's how I know him for the last two or

24  three years.  So I know him, yes.  Are we close friends, no.  We

25  work in the same company, we have a common interest.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1385

1   Q.   And the first time you personally met face to face

2   Mr. Jaubert was when?

3   A.   On Sunday.

4   Q.   Did you travel here today for this case?

5   A.   Yes.

6   Q.   You traveled with who?

7   A.   With my wife and my son.

8   Q.   Now, Mr. Turner, did there come a time where you were

9   employed by Dubai World or one of its companies?

10  A.   That is correct.  Initially in September of 2006, I was

11  employed by Dubai World in its information technology center.

12  Q.   What were your tasks in that employment?

13  A.   That was a short role that lasted for three months.  I was

14  the commercial director.  Looked after the events such as major

15  exhibitions that they were recruiting for, essentially.

16  Q.   I'm sorry.  I didn't write this down, what year was that?

17  A.   September 2006.

18  Q.   And after that, where did your participation in Dubai World

19  bring you?

20  A.   In December of 2006, the chief information officer left the

21  company, and there was a restructuring going on internally, so

22  the chairman of Dubai World, Sultan Ahmed Bin Sulayem, suggested

23  I speak to the group chief financial officer, Maryam Sharaf,

24  given my background in finance and banking, to see if there was

25  a suitable role for me within the company, and she suggested I

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1386

 1    speak to a company called Istithmar.  And they were --

 2    essentially they were involved in private equity and purchase of

 3    large real estate investments around the world, and they were

 4    splitting the real estate division off from private equity.  So

 5    she suggested that I speak to the newly appointed chief

 6    executive officer of Istithmar World Real Estate.

 7    Q.  Let me break this up a little bit, okay?  So did you do

 8    that?  Did you speak with that chief executive?

 9    A.  I did indeed, yeah.

10    Q.  Who was that chief executive?

11    A.  Alan Rogers.

12    Q.  What was the result of your communications with Mr. Rogers?

13    A.  He offered me the role of director, head of risk and asset

14    management at Istithmar Real Estate.

15    Q.  Now, you mentioned some names that the jury's heard a couple

16    times before, but Sultan Bin Sulayem?

17    A.  Correct.

18    Q.  Did you know him personally?

19    A.  Yes.

20    Q.  You've had conversations with him personally?

21    A.  Yes, indeed.

22    Q.  And you've had face-to-face meetings with him?

23    A.  Yes.

24    Q.  And what was your relationship with Sultan?  What was

25    your -- what was he to you?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1387

1    A.  Prior to working for Dubai World, he was a friend of my
2    family.
3    Q.  And once you began working with Dubai World in 2006, did --
4    was he a supervisor of yours, or was he --
5    A.  No, he was not a direct supervisor of mine.  He was the
6    chairman of the group, and as such had oversight over everybody.
7    My direct supervisor was Alan Rogers, who was the chief
8    executive officer of Istithmar World Real Estate.
9    Q.  Now, you took this employment with Istithmar.  If --
10   Charles, could you put up what's been entered into evidence as
11   403-1, please?
12       Can you see that okay?  There's a monitor in front of you,
13   also, Mr. Turner.  Just --
14   A.  Okay.  That's better.
15   Q.  Now, is this your understanding of the corporate -- well, do
16   you know the corporate structure of the Dubai World
17   conglomerate?
18   A.  Yes, indeed, because on a number of occasions I had to
19   present it to various banks for funding for asset purchases for
20   buildings, for example.
21   Q.  Before we get to that, let's talk about you got this job,
22   and director head of risk and asset management.  Can you tell
23   the jury what does that mean?
24   A.  It's --
25   Q.  When was it?  When were you engaged as --

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    A.  January of 2007.

2    Q.  And what does director, head of risk and asset management

3    mean?

4    A.  It's a two-part role.  First part, risk management, is

5    basically, if I could use an analogy, you identify the risks

6    that you have in your business or your life.  Most people have a

7    house or live in a house, so they identify a risk as being the

8    loss of that house.  So they take out insurance.  You can draw a

9    direct analogy to the financial services world where you have

10   various investments in businesses or real estate around the

11   world and you need to take measures to mitigate or look after

12   any potential loss in that asset during the time that you own

13   it.

14       The other side of the job was asset management, and that's

15   actually looking after or building spreadsheet models to look

16   after the cash flows coming into and out of the assets that you

17   own.  If it's a building and it has tenants, then they pay rent

18   or lease that's cash coming in.  You have to pay for the

19   maintenance, that's cash going out.  It all adds up to being a

20   cash positive or cash negative position.

21   Q.  Now, you made these analogies.  What type of -- what are the

22   monetary levels that you're dealing with when you were director,

23   head of risk asset management?  What was the amount of money

24   that you were responsible for in terms of the -- what you

25   oversaw?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.   The risk that I measured, I did not have control of any

2    money.   The risk that I measured was up to about 12 an a half,

3    $13 billion.

4    Q.   Billion dollars?

5    A.   Billion.

6    Q.   And what about the assets that you managed?

7    A.   Those were the assets that we managed.

8    Q.   Now, as part of that -- as part of your occupation, I

9    imagine you were compensated for that, correct?

10   A.   Indeed.

11   Q.   Were you compensated well for that?

12   A.   Not by Wall Street standards, but by Dubai standard, yes.

13   Q.   I'm sorry.   Charles, if you could go back to the chart, I

14   think we're ready for the chart now.   It's 403-1 for the record.

15       Now, you were saying you recognize that corporate structure.

16   Is that an accurate portrayal of the corporate identity of Dubai

17   World?

18   A.   It's an accurate portrayal.   It's a representation of the

19   holdings.   It is not an accurate legal structure as to what

20   holding companies own what, which offshore companies there are

21   in between here, but it is an accurate representation to give

22   you a basic understanding of what companies sit within Dubai

23   World.

24   Q.   Just briefly, what do you mean by the offshore holding

25   companies?   Where do they fit into this chart?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1390

1    A.  For example, you have limited companies that can have two

2    shareholders, basically.  There's multiple companies that are

3    set up to form the ownership of private or public joint stock

4    companies.  So there are other companies that sit in between

5    here that allocate the ownership across so that you can actually

6    create a private joint stock company.

7    Q.  Now --

8    A.  The definition of which being you must have three

9    shareholders.

10   Q.  Now, where does Istithmar, your -- the corporation you work

11   for, where is that?

12   A.  Sorry.  It's kind of out of focus.  Is there any way we can

13   adjust the focus?

14        THE COURT:  Look at the one in front of you.  Isn't

15   that easier to see?

16        MR. HESS:  Charles, is it possible to enlarge far

17   right-hand side, the purple.

18        THE WITNESS:  Okay.  There you go.  The part that I

19   work for was -- initially that I work for, looked after

20   Istithmar buildings, Leisure Corp -- well, they don't represent

21   Istithmar World Real Estate, because in 2008, they folded that

22   into another company called Nakheel and they moved the assets

23   over to Nakheel.  It's my understanding, and this is only

24   reading in the business press, that they moved some of these

25   assets back to Istithmar World.  But I'm not aware, and I can't

1391

1    testify as to whether there is a real estate division anymore.

2    BY MR. HESS:

3    Q.  Fair enough.  Do you know where Exomos fit into the

4    structure?

5    A.  That sat under the ventures.  Istithmar Ventures LLC.

6    Q.  That's the third one down from the top there?

7    A.  That's correct, on the right hand side.

8    Q.  So Exomos was owned by the -- am I using the terminology

9    right, Exomos was owned by Istithmar World Ventures?

10   A.  Correct.

11         MR. CEDERBERG:  Objection.  Personal knowledge, and

12   vague as to time, Your Honor.

13         THE COURT:  Yeah.  Be more specific as to time and to

14   what the basis of his knowledge was.  And I don't think reading

15   the financial press is going to cut it.

16         MR. HESS:  I wasn't -- there's no objection, Judge.

17         THE COURT:  I know.  So at this point, though, what

18   you're asking him, ask him what his basis is.

19   BY MR. HESS:

20   Q.  Are you aware -- let's talk about the period of time from

21   December of 2005.

22   A.  '6.

23   Q.  December 2006 until -- do you know what happened to Exomos?

24   A.  January 2008, the beginning.

25   Q.  How do you know this?  How do you have this information?

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1392

1    A.   When I was hired into the role, the first thing that I need

2    to do in my role is to identify the assets that are held within

3    a company, to isolate the legal documentation, create the files

4    for that.   Then to move on to the financial analysis of the

5    assets, to establish a true value of those assets.   Starting

6    point of this is to build basically a big long list of all of

7    the assets that the company owned, that's called an asset

8    register.   And as part of the asset register, Exomos was counted

9    as part of Istithmar World.   That is between the time of the

10   whole of the year 2007, to the best of my knowledge.

11   Q.   Now, let's talk about the incorporation process.   I look at

12   that chart.   Do you know how many corporations there are under

13   the primary Dubai World Corporation?

14   A.   I have no idea.

15   Q.   How many are you aware of?

16   A.   Within Istithmar, again, it was into the hundreds.

17   Q.   This is during the period of time that I'm speaking of that

18   you worked as the director, head of risk and asset management.

19   What was the end date you no longer worked for them?

20   A.   In January 2008.

21   Q.   I'll be asking you -- unless I specify otherwise, I'll be

22   asking you as to the period of time January 2007 to

23   January 2008, okay?

24   A.   Agreed.

25   Q.   How is it that corporations were formed in Dubai?   What was

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1393

1    the process?

2    A.  We had a separate legal division.

3         MR. CEDERBERG:  Excuse me.  Objection.  This is well

4    beyond the proffer, Your Honor.

5         THE COURT:  Well, it may be, but I'll permit him to

6    answer this.  But I think he just said they had a separate legal

7    division.  Are you a lawyer, sir?

8         THE WITNESS:  I'm not a lawyer, no.

9         THE COURT:  Then within those constraints, generally

10   find out what you can as to his personal knowledge.

11        MR. HESS:  I will, Judge.

12   BY MR. HESS:

13   Q.  Do you know how corporations were formed in Dubai?

14   A.  I was only told by our --

15        MR. CEDERBERG:  Objection, Your Honor.

16        MR. HESS:  Who told you?

17        THE WITNESS:  Nick Hornan (ph).

18        MR. HESS:  I'm going to go into whether or not it was a

19   party admission by agent.

20        THE COURT:  See, I don't really -- I don't see how it

21   could be a party admission.  It really has to do with an

22   administrative matter.  I don't think it's -- I guess an

23   admission by party doesn't have to be an admission against

24   interest.

25        MR. HESS:  Exactly, Judge.  Everything comes in as long

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    as I can prove that he's an agent within the scope of his

2    agency.  It's going to be brief.

3          THE COURT:  Go ahead.  Go.  Go.

4    BY MR. HESS:

5    Q.  Who was that individual?

6    A.  Nick Hornan.

7    Q.  What was his occupation?

8    A.  He was legal counsel to Istithmar World PJSC.

9    Q.  When he described to you the incorporation process, was he

10   describing it to you for the purposes so you could do your job?

11         MR. CEDERBERG:  Objection, Your Honor.  That's going to

12   be attorney-client privilege.  Privilege.

13         THE COURT:  That is, and he's not -- it's not his to

14   waive.  That's true.  An unusual point, but a good point.

15   Sustained.

16   BY MR. HESS:

17   Q.  Other than what Mr. Hornan told you, do you have any

18   knowledge about -- is there an entity in Dubai -- whether

19   there's an entity in Dubai that incorporates corporations?

20   A.  I'm aware of it generally because before joining Dubai

21   World, I personally incorporated a company in Dubai and had to

22   go through the Dubai Media City process and was involved in

23   setting up of another company, an offshore holding company in

24   Jebel Ali Free Zone, which is another Dubai corporation.  Not

25   Dubai World, the company, the government.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    MR. HESS:  Well, Judge.  I don't know if you want to do

2    it in front of the jury, but I would like to voir dire the

3    witness whether or not it is attorney-client privilege

4    information.  It has to be maintained in confidence, and whether

5    or not.

6    THE COURT:  You know what, it's noon.  Let's break for

7    lunch.  Let's come back at 1:30, and we'll talk at that time.

8    We'll come back a little bit before then and we'll discuss that

9    without you being in the jury room hanging out.  Okay?  So we'll

10   break.  But I want to remind you that you're not to discuss this

11   case with anyone or permit anyone to discuss it with you.  Until

12   you retire to the jury room at the end of the case to deliberate

13   on your verdict, you're simply not to talk about this case.

14   Also remember, you're not to read or listen to anything

15   touching on this case in any way.  If anyone should try to talk

16   to you about it, bring it to my attention promptly.  Keep in

17   mind you must not do any research or make any inquiries,

18   investigation on your own.  The only evidence in the case which

19   you may consider is what you hear in court and the evidence that

20   is introduced during the official proceedings.

21   Also remember, you must not have any contact with the

22   attorneys, parties, or witnesses in the case.  If you should see

23   them, keep in mind they're not being rude to you, they're

24   avoiding contact with you just because I've asked them to and

25   they're just following instructions.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Finally, remember, you must not form any opinion about

2    this case until all the evidence is in.  You are required to

3    keep an open mind until you start your deliberations at the end

4    of the case.  Thank you very much.  Have a nice lunch.

5    COURT SECURITY OFFICER:  All rise

6    (Jury out at 12 p.m.)

7    THE COURT:  See you at 1:30.  All right.  While they're

8    going out, we can talk for a couple minutes.  Maybe we can

9    resolve this now and I can finally have lunch.  Anorexia has

10   been ruled out, but I definitely want to eat lunch.  Okay.  Yes,

11   sir.  You may inquire, you may proffer.  Have a seat, sir.

12   MR. HESS:  Thank you, Judge.

13   VOIR DIRE EXAMINATION

14   BY MR. HESS:

15   Q.  It was Mr. Hornan?

16   A.  Hornan.

17   Q.  You said he was chief counsel for Istithmar?

18   A.  Correct.

19   Q.  And when he told you that, the incorporation process and the

20   incorporating entities, did he tell you that was to be

21   maintained by you in confidence and it was protected by

22   attorney-client privilege and you were not to disclose it to

23   anyone?

24   A.  No, he did not say that.

25   Q.  Did you, in fact, have any other conversations about the

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1397

1     incorporation process with others outside of Istithmar?

2     A.  Yes.

3               MR. HESS:  Judge, I just proffer that testimony.

4               THE COURT:  I don't think that does it.  I mean, the

5     fact that he wasn't told to keep it in confidence is irrelevant.

6     The fact that he may have breached it by telling other people

7     doesn't mean that the client, that is the corporation, has

8     waived it, does it?

9               MR. HESS:  Yeah, I believe it does.  If the corporate

10    attorney is telling someone a process, if they don't say that

11    this is being provided to you and has to be maintained in

12    confidence, then they've waived the privilege.  Because the

13    privilege only exists --

14              THE COURT:  If he had said, "I don't care who you tell

15    about this," then he's waiving the confidential aspect of it.

16    If it's not confidential, then it's not confidential, but I

17    don't think the fact that he didn't tell him that it was in

18    confidence makes it waived.  I don't know.  It seems to me like

19    you got it backwards.  In other words, yes, you're right,

20    there's no question that if he said this is not necessarily

21    confidential, you can tell anyone you want, then that makes it

22    not confidential.  It's not a confidential communication.

23              But if a lawyer for a corporation is talking to one of

24    the employees of the corporation and giving him legal advice,

25    which it sounds like you're asking him how do, you form a

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1398

1    corporation, what do you do, what are the steps in forming a

2    corporation, that is the privilege of the company, not the

3    privilege of the individual that is being told that.

4            MR. HESS:  That part I have no problem with, Judge.  I

5    agree.  It is definitely the company's privilege.  However,

6    Judge, I don't want if I could just.

7            THE COURT:  Tell me what you're -- what are you trying

8    to get from him?

9            MR. HESS:  It's very simple.  It's nothing nefarious.

10           THE COURT:  Ask him so I can see if it's something that

11    might be.  That's why I said you may proffer.

12    BY MR. HESS:

13    Q.  How simple of a process is it to incorporate a corporation

14    in Dubai, by Dubai World?

15           MR. CEDERBERG:  Your Honor, he's not an expert on that.

16           THE COURT:  That's the problem.  You're asking him

17    basically to take -- to make a judgment on what somebody else

18    told him.

19           MR. HESS:  That was a badly asked question.

20           MR. CEDERBERG:  Your Honor, might I suggest if counsel

21    would just tell us in the court where they want to end up with

22    this?

23           MR. HESS:  That's what I was going to do.

24           THE COURT:  Let's do that.

25           MR. HESS:  All I'm trying to do, Judge, is we have a

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1  document in evidence that incorporated Exomos on December 31 of

2  2005.

3       THE COURT:  Yep.  I've heard about it.

4       MR. HESS:  I just want to get some background on how it

5  is that there's a document that just pops up after Exomos is

6  already purportedly in existence, because that's some of the

7  testimony by Plaintiff, in an odd way, and I just want to know

8  how it is that that document can just pop up and all of a sudden

9  Exomos exists on December 31st when it didn't exist before, and

10  whether this is a long incorporation process that took forever

11  to accomplish, and it was put into the works prior to that time.

12       The proffer I'm going to say is it's a phone call, it's

13  a simple process, I need a corporation, here's the name of it,

14  don't sign it yet, we're going to give you the date when I need

15  it, and that's what the information is.  That's it.

16       MR. CEDERBERG:  Your Honor, the witness never became an

17  employee until December '06.  If they want -- this is just not

18  the witness to do this.  It calls for speculation.  It calls for

19  legal conclusion, no personal knowledge, or reaches

20  attorney-client privilege.  To look at it --

21       MR. HESS:  Judge, waste enough time.  I'm going to

22  withdraw it.  I don't care that much.

23       THE COURT:  I don't know why you would.

24       MR. HESS:  I didn't think it was going to raise this

25  much of a problem, and I don't care that much.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1400

1       THE COURT:  Done.  I will permit you to withdraw.

2       We're on break until 1:30.  Sir, since you're on the

3  stand, you're not permitted to discuss your testimony with

4  anyone including the lawyers that have called you.  You are not

5  permitted to discuss your testimony with anybody that you run

6  into during lunch.  You can talk about the sky, you can talk

7  about the weather, you can talk about anything except your

8  testimony, which includes what you did and in Dubai and that

9  kind of stuff.  All right?  So we'll be in recess until 1:30.

10  Anything else you want to stall me on?

11       MR. CEDERBERG:  Yes, but we want to you have your

12  lunch, Your Honor.  But we have --

13       THE COURT:  I get cranky.

14       MR. CEDERBERG:  I understand.

15       THE COURT:  Crankier.

16       MR. CEDERBERG:  We have -- two motions in limine were

17  renewed with regard to two experts.

18       THE COURT:  All right.  We'll talk at 1:30, and we'll

19  keep the jury out just a little bit.  Okay?  We'll be in recess

20  until 1:30.

21       (Lunch recess)

22       (See Volume 13, page 1402 for continuation)

23

24

25

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1                              * * * * *

2                    C E R T I F I C A T E
   I certify that the foregoing is a correct transcript from the
3  record of proceedings in the above-entitled matter.

4

5

6

7  _____          /s/ Dawn M. Whitmarsh
   Date                        DAWN M. WHITMARSH, RPR
8
                            I N D E X
9
                            WITNESSES
10

11  For Defense:                                           Page

12  Paul Rodig
     Continued Cross-Examination by Mr. Cederberg        1325:11
     Redirect Examination by Mr. Hess                    1352:10
13
    Crister Turner
14   Direct Examination by Mr. Hess                       1384:10
     Voir Dire by Mr. Hess                                1396:13
15

16

17

18

19

20

21

22

23

24

25

              PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                 TRANSCRIPT PRODUCED BY COMPUTER