1640

1                  UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
2                       FORT PIERCE DIVISION
                   CASE NO.   09-14314-CV-JEM
3

4

5

6     DUBAI WORLD CORPORATION, and its
      Subsidiaries, EXOMOS, NAKHEEL and
7     PALM MARINE,

8                   Plaintiffs,

9          vs.

10                                     Fort Pierce, Florida
                                       February 24, 2011
11    HERVE JAUBERT, SEAHORSE
      SUBMARINES INTERNATIONAL
12    INCORPORATED, and Does 1-99,

13                  Defendants.
      _____

14

15

                        TRANSCRIPT OF JURY TRIAL
16                   VOLUME 15 - PAGE 1640-1782
                  BEFORE THE HONORABLE JOSE E. MARTINEZ
17                   UNITED STATES DISTRICT JUDGE

18

19

20

21

22

      REPORTED BY:        DAWN M. WHITMARSH, RPR
23                        Official Court Reporter
                          400 N. Miami Avenue, 10S03
24                        Miami, Florida  33128
                          Telephone:  305-523-5598
25


                PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                      TRANSCRIPT PRODUCED BY COMPUTER

1641

1   **APPEARANCES:**

2   **FOR THE PLAINTIFFS:**
                              *Quinn, Emanuel, Urquhart & Sullivan, LLP*
3                             **BY: JON C. CEDERBERG, ESQ.**
                              **BY:  A. WILLIAM URQUHART, ESQ.**
4                             865 South Figueroa Street
                              10th Floor
5                             Los Angeles, CA  90017

6                             *Astigarraga, Davis, Mullins & Grossman*
                              **BY:  EDWARD MULLINS, ESQ.**
7                             701 Brickell Avenue
                              16th Floor
8                             Miami, Florida 33131

9
    **FOR THE DEFENDANTS:**
10                            *Hess & Heathcock, PA*
                              **BY:  WILLIAM HESS, ESQ.**
11                            **BY:  KATHRYN A. HEATHCOCK, ESQ.**
                              40 Southeast Osceola Street
12                            Stuart,  Florida 34994

13

14

15

16

17

18

19

20

21

22

23

24

25

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1642

```
1                    P-R-O-C-E-E-D-I-N-G-S
2          (Jury in at 1:55 p.m.).
3          THE COURT:  All right, sir.  You may proceed.
4          MR. HESS:  Thank you, Judge.
5          Judge, just a housekeeping initial matter, no objection
6    as to 694, Defendant's Exhibit 694, if I can ask that be put up
7    on the screen.
8          THE COURT:  It's in evidence?  No objection?  Without
9    objection, 694 is admitted in evidence.
10         (Defense 694 in evidence)
11                    CONTINUED DIRECT EXAMINATION
12   BY MR. HESS:
13   Q.  Okay.  Also, this is also -- well, this is a more legible
14   copy of what has already been admitted in Plaintiff's case as
15   147-21.2, I believe it is.
16         Mr. Jaubert, if I could draw your attention to the last
17   paragraph on that?  Thank you.  States that "the completed sub
18   is valued at 350,000 and Mr. Herve have confirmed that no claim
19   will be made by Seahorse Submarine on this sub.  However, he
20   would need us to pay the legal expenses estimated to be around
21   35,000.  As such, our total expenses on this sub would be
22   85,000, 50K plus 35K.  As such, we prefer to charge the
23   additional expenses and the legal expenses on the assets
24   acquisition Capex 3,800, and no additional Capex will be raised
25   for this submarine".
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1           Do you know which submarine they're talking about?

2      A.   The Discovery submarine they ordered.

3      Q.   Is that the Tao Dominicana sub?

4      A.   No, it's not the Tao Dominicana, it's the Discovery they

5      purchased, they ordered.

6      Q.   Okay.  Now, we were talking about the -- you met with

7      Sultan, and you met with Jim Miller, and what happened following

8      that meeting?  Did you arrive at a deal for the Goby?

9      A.   When is that?

10     Q.   After you met with --

11     A.   The first time?

12     Q.   The Sultan and Miller.

13     A.   Okay.  So we had discussions over the phone or e-mail.

14     Either me directly with Jim Miller or me directly with Sultan.

15     Q.   Did those discussions lead to any results regarding the

16     purchase of a submarine?

17     A.   Yes, they processed a down payment for Goby.

18     Q.   Okay.  And we were talking about the hurricanes and whatnot.

19     Did you complete the Goby?

20     A.   The Goby was completed and delivered.

21     Q.   And the Goby, when it was delivered, when was it delivered?

22     A.   I believe it was December 2004.

23     Q.   Okay.  And were you already in Dubai?  When did you arrive

24     in Dubai?

25     A.   November 2004.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1644

1    Q.  All right.  So were you there when the Goby arrived?

2    A.  Yes.

3    Q.  Were you there, what was your -- did you have a contract of

4    employment at that period of time with Exomos, Dubai World,

5    anyone, with Dubai World Corporations?

6    A.  At the time when I arrived in Dubai, I had no contract

7    signed, I had not yet received any monies and I was on a tourist

8    visa.

9    Q.  All right.  When the Goby arrived, what did you do with it,

10   if anything?

11   A.  I reconnected the batteries.  When you ship a vehicle like

12   that, you have to, for safety, you have to disconnect the

13   batteries and this sort of thing.  And so when the Goby arrived

14   in Dubai, I reconfigured it so it would be ready for the dive

15   test which we did.

16   Q.  All right.  And was the -- when was that dive test

17   accomplished?

18   A.  I don't remember the date exactly.  2005, either December

19   2004 or early January 2005.

20   Q.  Was that dive test, has that been discussed in this trial

21   yet?

22   A.  I'm sorry?

23   Q.  Was that dive test, was that discussed in this trial yet?

24   A.  No, not yet.

25   Q.  Okay.  Who conducted the testing of that vessel, of the

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1645

1   vessel at that time, the Goby?

2   A.   I did.  And because it was the first time that Dubai was

3   receiving a submarine, there was a lot of people watching from

4   Nakheel, Dubai World.  I did the first dive that lasted maybe 15

5   minutes.  So, when I shipped Goby, the Goby had not been tested

6   in Stuart.  So the first dive was, like I explained before, the

7   weight adjustment and the trim, so it only maybe 15 minutes.

8   Q.   Did you conduct that first dive of the Goby in the same way

9   that you described the testing procedure of the first dive of

10  the Adventurer?

11  A.   No.  The first dive you don't have any -- I had a crane so

12  it was similar to normal testing procedure.  With a crane,

13  lowering the sub in the water, do the buoyancy test, the

14  thruster test, electrical, leak test, everything, maybe 15, half

15  an hour.  Jim Miller was present.

16  Q.   Anybody else present?

17  A.   A lot of people.  I don't remember who, Sanil Subair.  I

18  conducted that test with Paul Rodig as a co-pilot.

19  Q.   So the sub submerged and operated, is that true?

20  A.   So the sub submerged, operated, it was a difficult dive

21  because I had zero visibility and the water is so hot so -- it

22  was hot.  Besides that, the submarine was working as designed.

23  Q.   Okay.  Now, did there come a time was there another test on

24  the Goby?

25  A.   So the next dive was the next day.  The dive number two in

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1646

1    the Palm Jumeirah Island in open water.

2    Q.  And how was -- who conducted the test, who was the pilot?

3    A.  I was the pilot, Paul Rodig was the co-pilot and Jim Miller

4    was on the deck coordinating everything else.  And again, a lot

5    of people from Nakheel.

6    Q.  And when you say the deck, what deck?

7    A.  You know, the -- whatever floating dock was there.

8    Q.  And was this -- where was the test conducted?  In a marina?

9    Where was it conducted?

10   A.  It was conducted inside the Palm Jumeirah Island, the

11   artificial island.

12   Q.  What was tested on that test, anything in particular?

13   A.  It was just to show the, like I explained before, running on

14   surface, submerging the boat, diving around, landing the

15   submarine on the sea floor, then takeoff and surface.  So maybe

16   half hour.

17   Q.  Any leaks?

18   A.  No issue whatsoever.

19   Q.  Any malfunctions with the electrical?

20   A.  No.

21   Q.  Did the hover work?

22   A.  The hover system worked.  Jim Miller said that --

23   Q.  We'll get -- but did the hover work?

24   A.  The hovering system worked, yes.

25   Q.  Did the any -- even small challenges on that dive?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1647

```
1     A.  Not that I remember, no.  I remember one problem again, but
2     it was visibility problem.  I had -- I could barely see the
3     front of the submarine, the water was so murky so I saw first
4     was too close to the dock and I scratched the paint.  Other than
5     that, nothing else.
6     Q.  How often after that was the Goby -- did the Goby dive?
7     A.  Well, me alone?
8     Q.  Let's start with you personally as the pilot or the
9     passenger.
10    A.  Me, with either Paul Rodig or somebody else, some other
11    pilot, maybe 25 dives.
12    Q.  Okay.  Now, are you aware that the Goby dove with other
13    pilots or without you present?
14    A.  Yes, of course.  Yes.  Jim Miller.
15    Q.  And how were you aware of that?
16    A.  Because I trained him on the Goby.
17    Q.  How were you aware that -- were you there when the Goby was
18    used, was dove, other than the dives you just testified to?
19    A.  Yeah, because many times, even if I'm not the pilot in
20    charge, I like to be in the water, especially at the early stage
21    of the start up of a company, I like to be in the water as a
22    scuba diver to observe how the pilot operates the submarine.
23    Also to indicate him any adjustments that he may have to apply
24    to the control.
25    Q.  In a minute I'm going to ask that we put the Goby, the short
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1648

1     clip of the Goby on there so you can explain some of the parts

2     of the Goby, but let's go on.

3          You mentioned that you trained Jim Miller to operate

4     these submersibles?

5     A.   Yes.

6     Q.   What was -- when did you -- what was that process like?

7     When did you start his training?

8     A.   Right away.

9     Q.   And was that in -- you said you arrived there in December?

10    A.   I arrived in Dubai of November 2004, so his training started

11    right away.  First of all, it's academic training, if you want,

12    where I teach him the basic on how the submarine works and the

13    basic controls.  Then we go over the safety procedures and then

14    when the sub arrived, we go training around the submarine like a

15    preflight check things, if you will, where I show him -- point

16    the different apparatus and devices on the submarine.

17    Q.   Then?

18    A.   And then we do a first dive together, me as a pilot, him as

19    a co-pilot so he can observe what I'm doing.  Then we switch

20    almost right away where he's the pilot and I'm the co-pilot.

21    Q.   Now, can you switch when you're submerged or no?

22    A.   Yes, you can.  Uh-huh.

23    Q.   All right.  How many dives did you accompany Jim Miller on

24    while you were training him, while you were training him?

25    A.   Inside the cockpit?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1649

```
 1   Q.  Yes.
 2   A.  I don't remember.  Three, four, five, something like that.
 3   Q.  And then otherwise, were there times that you were not
 4   inside the cockpit that you were training him or you were
 5   involved in his training to operate the subs?
 6   A.  So me being outside in the water with the scuba equipment,
 7   probably the same, three, four times.
 8   Q.  Okay.  Did he become -- was he competent enough to operate
 9   these vehicles eventually?  Let's just talk about the Goby.
10   A.  I'm sorry, what are you asking?
11       THE COURT:  Was he competent enough to operate these
12   vehicles?
13   BY MR. HESS:
14   Q.  The Goby, I'm sorry.
15   A.  He did not seem to understand.
16   Q.  What do you mean?
17   A.  He did not seem to understand how to operate the sub
18   properly.
19   Q.  And what -- can you give the jury an example?
20   A.  For example, as mentioned several times, hard landings, the
21   submarine is designed to descend or ascend one foot per second.
22   As a safety precaution, the sub is designed can ascend two feet
23   per second.  Normal operation, one foot per second.
24       Jim Miller, for whatever reason, would often go down
25   too fast and land hard on the sea floor.  The submarine, the
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1650

1   water -- almost similar to flying an airplane in the air.  So

2   when the sub goes down, you have the dive planes pointing down,

3   so as you move forward you go down.  When you see the sea floor

4   approaching, you raise the dive plane to round your landing.

5   Sometimes even if the visibility is very bad, you don't see the

6   sea floor.  However, there's an instrument inside the submarine

7   that tells you how much depth you are between the bottom of the

8   sub and the sea floor.

9   Q.  How precise is that instrument?  I mean, what are the

10   increments, how is it calibrated?

11   A.  Half -- 6" precise.  So it is quite precise.

12   Q.  Okay.  And how does that operate?  How does that device

13   work?

14   A.  It's a sonar.

15   Q.  And what do you see in terms of -- what does the pilot see

16   in the vehicle as the vehicle is being operated in that regard?

17   A.  You have an indication on the how far is the sea floor

18   between the bottom of the sub, and also you have a picture, like

19   black and white picture of what is ahead of you.

20   Q.  Would you describe briefly how are the dive planes operated?

21   I think we heard from another witness it's a toggle?

22   A.  It's a fly-by-wire, electric control.

23   Q.  You mentioned it's similar to flying.  Are you a pilot, do

24   you have a pilot's license?

25   A.  Yeah, I have about a hundred, a hundred hours.  I was in

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1651

1    flight school in the Navy, maybe 100 hours on a single engine

2    100 ST airplane.  The difference with when you have a

3    fly-by-wire --

4    Q.  I'm going to ask you about that.  You call it fly-by-wire?

5    A.  Fly-by-wire.

6    Q.  What does that control look like?

7    A.  It's a very small joystick.  You go up and down, left right,

8    but because it's a fly-by-wire, versus the control with the

9    mechanical control, the fly-by-wire you don't have the feeling

10   of where is the dive plane or rudder.  When you pilot an

11   airplane, when you pull the stick, you feel the tension so you

12   know that there's some forces exerted on the field.  Same in the

13   submarine, but because it's a fly-by-wire, when you put the dive

14   plane down or up, you don't feel the resistance so you have to

15   pay attention.

16   Q.  I'm going to show you what's been marked as -- it's

17   Defendant's Exhibit 932.7, it has not been introduced in

18   evidence, I'm seeking to introduce it without objection.

19            THE COURT:  932.7?  No objection?

20            MR. CEDERBERG:  No objection, Your Honor.

21            THE COURT:  Without objection, 932.7 is admitted in

22   evidence.

23            (Defense 932.7 in evidence)

24   BY MR. HESS:

25   Q.  What are we looking at here, Mr. Jaubert?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1652

```
1    A.  Underwater video footage of the Goby doing an operation.

2    Q.  Okay.  And the planes in front, obviously they are the --

3    what are those?

4              THE COURT:  The bow planes.

5              THE WITNESS:  The dive planes are here, as you can see

6    the submarine is going down.  Really too fast.  The dive planes

7    pointing downward.  The sea floor.  Dive planes are still

8    downward.  Hard landing.  Remember the hull --

9              THE COURT:  I'm having difficulty hearing you and I'm

10   sure the jury is too.

11             MR. HESS:  Pause that one second, please.  Thank you.

12   BY MR. HESS:

13   Q.  You were saying that -- you said what something is on the

14   side?

15   A.  The hovering system.

16   Q.  Okay.  Could you point where is the hovering system?  Can

17   you see it in that clip as it's paused or no?

18   A.  As it move on, I will show it.  But as you can see, the dive

19   planes are pointed down and the submarine is moving forward.

20   That is a pilot error.  The dive planes should be up.  So

21   because of that, the submarine is dredging the sea floor.  If

22   you move ahead a little bit, you see that?  Can you stop it now?

23   When you do that, this is a pilot error and through those trial

24   reports --

25   Q.  Go ahead.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1653

1   A.   As you move forward, this is the hovering system here, so

2   it's an electric motor in a tube.  But when you dredge the sea

3   floor the murk, sand, debris are going to fill up that tube.

4   And if the pilot activates at that time the hovering system

5   which is an electric motor, the propeller might be stuck in the

6   sand or mud or whatever accumulated in that tube, and if you

7   apply the power too long, you're going to fry the motor.  So

8   then what happened, the pilot goes back to shop.

9   Q.   We'll talk about that.  Okay.  So let's go forward with this

10  clip if we may please.

11  A.   Jim Miller at the control.  So I'm outside and I showed him

12  how to, you know, with hand signs how to raise the dive planes.

13  but it's still downward.

14  Q.   Now, is that the only way that, aside from inflating the --

15  is that the only way that the sub is going to get off the bottom

16  are the dive planes?

17  A.   It's not the only way, you can leave them always on top and

18  play with the vertical for instance or with the buoyancy system,

19  but this is not the way to operate a submarine.  So you can

20  leave them always on time, a little bit upward, but not

21  downward.  If you're downward, you're going to scrape the floor.

22  Q.   Now, is that -- and what was that an underside of?

23  A.   The complete underside.

24  Q.   Of what?

25  A.   Of the Goby.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1654

1   Q.   What was that?  What's that tube there?

2   A.   That tube is the housing of the hovering system which is an

3   electric motor mounted vertically.

4   Q.   What are we looking on the side there, what is that mounted

5   on the side?

6   A.   Here and here you have two large compartments with air bags

7   that are rolled inside, and that's the emergency floatation

8   system.

9   Q.   You can continue on with that please.  And the air coming

10  out of that, what is that caused by?

11  A.   Can you pause it?

12  Q.   Please.

13  A.   In a one atmosphere submarine, the air content in the cabin

14  is recycled.  Pretty much like in a rebreather, so you have

15  oxygen, you remove with a chemical the carbon dioxide that comes

16  from the passenger and instead, you seep in the cabin floor of

17  pure oxygen.

18        In an ambient pressure submarine, it's not closed, it's

19  an open, you force air from compressed air tanks from one end of

20  the cabin and on the other end of the cabin the air comes out

21  with the carbon dioxide from the passenger.  So the air that you

22  see coming out is the one that circulation, ventilation of air,

23  but also when the submarine is going up, the air inside of the

24  cabin expands because the pressure is reducing.  So as the air

25  expands, it goes out of the submarine with a lot of bubbles.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1655

```
1   Q.  What is the line that's tied to the top of it, do you know?
2   A.  It's a line with a buoy on the surface for safety
3   precaution.
4   Q.  Okay.  If you could finish up that clip please.
5   A.  So it's the same Bomar Hatch.
6   Q.  No questions right now.  It's almost over, I just want to
7   finish up this video.
8         How does the vehicle actually make a turn?
9   A.  You have two means to make a turn.  You have a rudder with
10  an actuator, again it's a fly-by-wire.
11  Q.  You can pause that please?
12  A.  Or with a motor, you have two electric motors on the side so
13  if you push one forward and the other one reverse, you're going
14  to turn on yourself either way.
15  Q.  How are the motors activated or controlled?
16  A.  With the joystick forward, reverse.  Left turn, right turn.
17  Q.  How is the rudder?
18  A.  It's another joystick, only left and right.
19  Q.  Okay.  Are they operated -- if you can operate those things
20  in tandem, together or no?
21  A.  Yes but, I mean, you don't want to put the rudder a full
22  left and activate the motors full right.  That would be another
23  pilot error.
24  Q.  Now, does it take training and does it take experience to be
25  able to operate these?  They sound complicated.  Are they
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1656

1     complicated?

2     A.  It's not complicated.  It's just some people learn faster

3     than others.  There's nobody to blame, just what people should

4     say that if they are not -- if they are good pilot, they can say

5     they are good pilot.  But if they are not good pilot, they

6     should not say they are good pilot.

7     Q.  If we can continue on that video is almost over.  What are

8     we seeing there again?

9     A.  It's the same dive, same pilot.  Very close to the reef.

10    Q.  That was the Goby that Seahorse Submarines delivered to

11    Dubai World?

12    A.  That's the very same Goby, yes.  That's the only one.

13    Q.  What happened to the Goby?  Did it continue to dive or did

14    something happen to it?

15    A.  We operated Goby so many times and in February 2006, which

16    is more than a year later than the delivery, the submarine was

17    in the garage for routine battery charge and two human errors

18    caused a fire inside the cockpit.

19    Q.  How do you know what happened to it?  Were you there?

20    A.  I was home, 10:30, evening, I got a call from -- the

21    security called me that there had been a fire in a submarine.

22    So I drive down to Exomos.  Saw outside fireman, everybody, and

23    they had extinguished the fire inside the Goby.  They had moved

24    Goby outside and extinguished the fire inside.

25    Q.  How did you come to the conclusion that it were two

1657

1    instances of human error?

2    A.  Well, after that incident, I sealed off everything and

3    started to take testimonies and statements from people who were

4    there.  But also when I build the factory, I installed video

5    surveillance, everything was covered in that factory 24-7.

6    Q.  Did you review the video?

7    A.  So I asked security to give me the disk, I reviewed the

8    video.

9    Q.  What did you observe on the video?

10   A.  I could see the -- in that section of the factory, the Goby

11   was close to the wall and there was a wire going through a plug

12   and again, as safety and process, I'm very strict with

13   procedures.  So when you have that big plug in the wall, you

14   have also a tag with a phone number.  So if someone wants to

15   pull the tag, I'm sorry, when someone wants to pull the plug, he

16   has to call that number first because you are 10:30 at night,

17   maybe the electrician in charge is not around.

18          So there was an employee who cleaned --

19   Q.  There was an electrician in charge?

20   A.  There was an electrician in charge, yes.  For the charging

21   of the Goby, the batteries in the Goby are high tech.

22   Q.  Here, going to talk about that.  If you want to talk we'll

23   talk about it now.

24          How often did the Goby have to be charged?

25   A.  Depends how long you use.  Depends how long you operated the

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1658

```
1    Goby.  It's not good to charge a battery that is not completely
2    discharged, so you have to wait that the batteries will
3    discharge to recharge it properly.
4    Q.  Why is that?
5    A.  If you do, if you don't respect that, you're going to reduce
6    the life span of the battery.
7    Q.  Okay.  So would the Goby be charged every night after the
8    dives were done or no?
9    A.  No, we would charge the batteries after two or three hours
10   of operation.
11   Q.  Okay.  How long would the Goby be plugged into the charger?
12   A.  With that particular case, I don't remember.  Maybe two
13   hours charge.
14   Q.  Okay.  You were saying, you have it plugged in and you have
15   a procedure where you have a tag on it that has a telephone
16   number if it's going to be unplugged.  What did you observe on
17   the video?
18   A.  So the person in charge of cleaning the floor was using an
19   electric cart or something and the cord is in the way.  So he
20   unplugged it and did his cleaning around the submarine and when
21   he was done, he replugged it.  But by doing that, he reinitiated
22   the charge in the Goby.  So.
23   Q.  What did that cause?
24   A.  The explosion.  Not explosion, what happens is that vapors
25   accumulate in the housing and it's more like a burst than an
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1659

1    explosion, but the burst of vapors is a high temperature and

2    they get ignited.  So it looks like a flame thrower if you want.

3    Not detonation.  And I could see on the video three flames and

4    that's it.

5         The interior was destroyed and then my employees

6    reacted quickly and flooded the compartment with water.

7    Q.  What was the state of the Goby, was it destroyed?

8    A.  The Goby was destroyed, yes.

9    Q.  Did it ever operate again as far as you know?

10   A.  No.

11   Q.  Now, you said that when you were -- step back a bit.

12        When you were in Stuart and you had the meeting with

13   Sultan and Jim Miller, how was it then or when was it that there

14   was a decision made that you were going to go to Dubai and

15   operate a facility there?

16   A.  It wasn't a decision overnight.  Sultan invited me to go to

17   Dubai in March.  Then I came back to Stuart and then he came

18   back, I went to Dubai a second time, then he came back in July.

19   So going back and forth.  So it's little by little and step by

20   step.  Then Sultan brought the idea that maybe I should move the

21   operation to Dubai.

22   Q.  Was it his idea or your idea?

23   A.  His idea.

24   Q.  You mentioned, so Sultan was at your -- at the Seahorse

25   facility twice?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   A.   Twice.

2   Q.   Did Jim Miller accompany him both times?

3   A.   Both times, yes.

4   Q.   The second time, you said it was in July?

5   A.   Second time was in July.

6   Q.   Of which year?

7   A.   2004.

8   Q.   Okay.  And how long did Jim Miller and Sultan -- did they

9   arrive together?

10   A.   They arrived together and Hamed Kazim was there too.

11   Q.   Who is Hamed Kazim?

12   A.   Chief financial officer of Dubai World at the time.

13   Q.   Mr. Kazim, did he also arrive with Sultan?

14   A.   They were all together.

15   Q.   Did they stay the same amount of time?

16   A.   Yes.

17   Q.   How long did they all three stay?

18   A.   Same, two, three hours.

19   Q.   What did they do while they were there?

20   A.   Visited the factory, we talked further about our agreements

21   and contracts.  Buying subs.

22   Q.   What did they -- what did you talk about specifically?

23   A.   Basically it was to confirm what Sultan had said previously

24   which was to by the assets and have me move to Dubai.

25   Q.   Did you have a discussion at that time what the assets were?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1661

1    A.  Everything that was on the floor, equipment, tools, all the

2    documentation, drawings, calculations, intellectual property if

3    you want.  And intellectual property.

4    Q.  Was there a dollar amount that was discussed at that July

5    2004 visit?

6    A.  No.  The dollar amount was discussed later when Sultan hired

7    Ernst and Young to visit my factory for an appraisal.

8    Q.  Did Ernst and Young -- he hired them you said?

9    A.  He hired them.

10   Q.  Did they come to your factory?

11   A.  Yes, like three or four times.

12   Q.  And when you said your factory, you're speaking of the

13   Seahorse Submarines factory?

14   A.  Seahorse Submarines.

15   Q.  And what did Ernst --  I'm not asking you what they said to

16   you, but what did you observe them doing?

17   A.  They were asking me questions and interviewing me, what type

18   of product they took notes.  What they wanted to assess were --

19   the calculations what they were making is they were trying to

20   estimate, let's say, how many hours and how many people it takes

21   to build this vehicle or to design this system.

22   Q.  Okay.  Did they also take a physical inventory of the

23   Seahorse facility?

24   A.  Yes, of course, yes.

25   Q.  Now, are you aware whether or not that inventory and that

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    those inquiries by Ernst and Young, how did that impact on the

2    purchase price, do you know?

3    A.  The purchase price of the assets?

4    Q.  Uh-huh.

5    A.  They appraised the whole thing at $3.5 million, but then

6    when I discussed with Sultan, he offered me $1.5 million because

7    the difference, if you want, would be an interest in profit

8    sharing of the new company in Dubai.

9    Q.  Okay.  Ernst and Young came to your -- to the Seahorse

10   facility when?  I mean --

11   A.  July, August.  July 2004.

12   Q.  Okay.  So it's very quickly, it was a very short period of

13   time between the visit by Sultan, Mr. Kazim and Jim Miller the

14   second time.

15   A.  Very quickly, Yes.

16   Q.  Was there an urgency that was expressed to you by Sultan?

17   A.  Yes.  They wanted me to move quicker.  To Dubai.

18   Q.  Did they tell you why -- first of all, did Sultan tell you

19   why?

20   A.  No, he did not tell me why, no.

21   Q.  Did anyone else tell you why, of the three?

22   A.  No.  No specific reason that I remember.

23   Q.  All right.  Now, the $1.5 million offer that was made by --

24   was that by Sultan you said?

25   A.  Yes, Sultan.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.  Did you agree to that?

2    A.  Yeah, I agreed to it.  Less because of the amount, even if

3    it was half, but more because I believed in the potential that I

4    would make more later.

5           THE COURT:  Hold on a second.  What is it?

6           MR. CEDERBERG:  There's been a ruling by this Court two

7    weeks ago concerning a claim involving what I think he's going

8    into that is no longer relevant in the case.

9           THE COURT:  I'm assuming that he's not going into any

10   claims that are not relevant because we got enough to deal with

11   that is relevant.

12          MR. HESS:  I wasn't going to, Judge, but I was going --

13   if I could go sidebar I guess?

14          THE COURT:  No, I don't want a sidebar.  You know the

15   rulings.

16   BY MR. HESS:

17   Q.  Did you decide to sell the assets of the corporation?

18   A.  Yes.

19   Q.  And did you agree to that amount, the 1.5 million?

20   A.  Yes.

21   Q.  What was your understanding of the -- would you have -- at

22   that time, were you told by Sultan what was your understanding

23   of your relationship to Dubai World when you made that agreement

24   in shortly after July of 2004.

25          MR. CEDERBERG:  Same objection, Your Honor, unless

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1664

1    counsel limits the inquiry to what is still relevant.

2         MR. HESS:  It's still relevant.

3         THE COURT:  All right.  Ladies and gentlemen, why don't

4    you excuse us for a couple minutes so we can talk without going

5    over here in the corner and whispering.  Won't be long.  Short

6    break.  Go quickly.

7         (Jury out at 2:35 p.m.)

8         THE COURT:  All right, sir.  Tell me what you're

9    talking about, both of you.

10        MR. CEDERBERG:  I'm talking about, Your Honor, there

11   was a claim that there was some fraudulent promise of a joint

12   venture to split the profits with the profits and losses.  The

13   Court ruled in the summary judgment there is no joint venture

14   claim left in the case, therefore I don't see the relevancy of

15   bringing up that he had all these other promises that were

16   performed.

17        THE COURT:  Depends on what you're going to say.  What

18   is it that you're eliciting?

19        MR. URQUHART:  Can the witness be here?

20        THE COURT:  I think he has to be here.  He's a party,

21   he has a right to be here.  He's a party.  I thought about it.

22        MR. HESS:  Thank you, Judge.  I'm not going to spend a

23   lot of time on it, but it still remains relevant why it is that

24   he agreed to the half of the purchase price of his assets and

25   two, why it is that when he moved over there, he wasn't given a

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1665

1    contract for months and why a person would stay in Dubai without

2    an employment contract working for Dubai World Corporation, why

3    they would do that.

4              And the simple answer is is because he expected to

5    have an investment potential opportunity with Dubai World and

6    that's all I'm going to say.

7         THE COURT:  So you think that's relevant to the entire

8    case because it explains his lack of action?  Is that what

9    you're saying?

10        MR. HESS:  It explains A, why he reduced the purchase

11   price of his corporation, the assets of the corporation price by

12   half; it explains why he moved over there because that was the

13   main reason he moved over, and it also explains why it is that

14   months went by with him taking no action.

15        THE COURT:  What is the issue about his reduction of

16   the sales price?  Who has raised that as an issue?

17        MR. HESS:  Well, it's an issue because it goes to what

18   the value of those assets, in fact, were and it's going to come

19   up about what the value of the various submarines were.

20        THE COURT:  Isn't the value of his assets what a

21   willing buyer will pay a willing seller, which is what happened

22   here?  I mean, why do we need to evaluate his company when he

23   sold it for X amount of dollars?

24        MR. HESS:  Because he sold it for X amount of dollars

25   because he was under the impression he was going to have an

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1666

1    opportunity to share in the profits of the business.

2         THE COURT:  So it sounds like you think there still is

3    a claim for some fraud.

4         MR. HESS:  No, Judge.  I read Your Honor's ruling, it's

5    clear, it's out.

6         THE COURT:  You're not going to call it that, but

7    you're going to still argue all the facts.  That doesn't work.

8    No, I don't think that's relevant at all.

9         MR. CEDERBERG:  And it would be incredibly prejudicial

10   for us, time consuming for us to have to put on evidence to

11   explain that away, Your Honor.  It's just basically trying to

12   taint us with something that we thought we put behind us to make

13   the case go faster.

14        MR. HESS:  I've heard that over and over about how

15   interested they were about speeding this along, yet they've

16   introduced into evidence hundreds and hundreds of pages of

17   hearsay.  So it's not about the Plaintiffs speeding it along.

18   The first time we wanted to heard the Plaintiffs speeding it

19   along is the second day of our case.

20        THE COURT:  Gentlemen, play nicely.  I'm not impressed

21   by either, so please stop.  Let's get to the point which is that

22   I don't see that the reduction of the purchase price is relevant

23   in any way.  That is what I'm dealing with.  Not the rest of it.

24        MR. HESS:  What about the fact that he was there with

25   no employment contract for months?  How do I get to explain

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1667

1   that?  Because it's clearly relevant, he's operating a huge

2   facility, he's gotten paid nothing to do his job, he's had no

3   employment contracts for months and there's a whole agreement in

4   July of 2005 about the acquisition of Seahorse Submarines

5   International, Inc.  Not 2004.  A year later.

6       How do I explain to the jury that we have a businessman

7   who has agreed to sell the assets of his corporation in July of

8   2004 or shortly thereafter, he moves to Dubai, he moves his

9   family to Dubai and he doesn't have an agreement for what he's

10  been occupied to do until at least July of 2005.

11      THE COURT:  Well, I would assume that they're going to

12  believe that he thought he had an agreement in principle and

13  that he was making a deal that he thought was a good deal.

14  Whether it turns out to have been a good deal or not, I don't

15  know.  But the bottom line is I don't think -- I think you're

16  reading an awful lot into that and I think the probative value

17  of that is not really substantial.

18      Let me hear, what do you have to say, sir?

19      MR. CEDERBERG:  I was just going to say there's no

20  dispute, even if he didn't have a signed agreement, he was being

21  paid regularly over there pursuant to the terms.

22      MR. HESS:  That's not what the evidence is going to

23  show.

24      MR. URQUHART:  You're saying he wasn't paid?

25      THE COURT:  Apparently he's going to testify that he

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1668

1    wasn't paid.  So I think maybe you're going to have to be

2    prepared to prove that he was, if he was.  I don't know.  I

3    wasn't there.  I didn't see it.

4          Well, I don't see any problem with talking about that,

5    I don't see any problem with his testifying to that.  But I

6    don't think that he's going to be permitted to testify to an

7    agreement that would have been oral, if anything, and would be

8    violative of the statute of frauds.  And any number of other

9    things.  I don't know.  I mean, I thought I kind of got rid of

10   this claim during the --

11         MR. HESS:  It's not an affirmative claim, Judge, but

12   it's going to go to mitigation, it's going to go to his -- why

13   he was there.  What he understood things to be.  And how

14   everything happened.

15         You know, everyone except for Your Honor and I guess

16   me, maybe Your Honor, forgets that we have a claim, a claim for

17   abuse of process and part of that picture of that claim is what

18   his motivations were, why he was doing what he was doing and why

19   he put himself in that position.  And not to be able to let the

20   jury know that he went over there with the expectation.  He's

21   already said and already introduced into evidence, he's already

22   said that he expected to have a joint venture, a venture,

23   participation.

24         THE COURT:  Yeah, you've already said it so what are we

25   doing then?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1669

1        MR. HESS:  As long as it's in and I can argue that,

2    Judge.

3        THE COURT:  I'm not saying you can argue, but you've

4    already said it so you can't say it again.  Let's move on.

5        Can we bring the jury back?

6        MR. HESS:  Judge, can I bring this up?  It's also in

7    Plaintiff's 281.  Their evidence, in evidence, it says profit

8    sharing arrangements, details will be provided separately.

9    That's their evidence.

10       THE COURT:  Yeah.

11       MR. CEDERBERG:  But it didn't happen.

12       THE COURT:  But it never happened and I've said that it

13   didn't happen.  So you know, you can -- I'm very frustrated

14   because every time that we have an agreement, I get a response

15   that it makes me feel like I'm in jabberwokky.  You're talking

16   to me about his motivation.  What do I care about his motivation

17   to the abuse of process?  What the heck does his motivation have

18   anything to do with the abuse of process?  You throw me these

19   buzz words that have some legal meaning, but don't have any

20   relationship to what we're talking about and frankly, I'm not

21   easily confused, but it confuses me.  I don't know what the heck

22   we're arguing most of the time.   I want everybody to please

23   focus and tell me the issues that we're talking about.

24       In this instance, there is absolutely no relevance to

25   the motivation of -- his motivation to the abuse of process or

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1670

1    any claim that you have, and I will not permit you to introduce

2    that evidence now.

3              MR. HESS:  Understood.

4              THE COURT:  Move on.  Can we bring the jury back

5    please?  Please bring the jury back.

6              (Jury in at 2:44 p.m.)

7              THE COURT:  Please be seated.

8    BY MR. HESS:

9    Q.  How were the assets of Seahorse, how were they transported

10   to -- were they transported to Dubai?

11   A.  Shipped by container or crates by air.

12   Q.  Who paid for that?

13   A.  Dubai World.

14   Q.  What about your personal possessions?  Let's start with your

15   household possessions.  Did you transfer them to Dubai?

16   A.  Yes, but to save money I pack my stuff in company assets in

17   the container.

18   Q.  Okay.  You had -- did you have two vehicles at that time?

19   A.  I had two vehicles at that time.

20   Q.  And what kind of vehicles were they?

21   A.  Two Hummers.

22   Q.  And did you have an understanding with Sultan or anyone

23   about how those vehicles were going to be transported to Dubai?

24   A.  Yes.  I had conversation with Sultan.  He himself he has a

25   Hummer, so we're joking about his Hummer and my Hummer.  Anyway,

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1671

1  so he agreed that I would ship both vehicles, Seahorse would

2  invoice Dubai World because I was not an employee of Dubai World

3  at the time.  So Seahorse would invoice Dubai World to ship my

4  two vehicles.  But in the end --

5  Q.  So that was -- okay.  And what did you do?  Did you ship --

6  how did you ship the vehicles?

7  A.  So I shipped the vehicle by boat, cargo.

8  Q.  Who made the arrangements for the shipment of the vehicles?

9  A.  I did.

10  Q.  Now, did Seahorse own either of the vehicles?

11  A.  No.

12  Q.  And who paid for the shipment of the vehicles?

13  A.  Seahorse invoiced Dubai World for the shipping and Dubai

14  World paid for the shipping before I moved to Dubai.

15  Q.  Now, let me show you what has been marked as Plaintiff's

16  147.25-2.  147.25-2.  It's in evidence.  Do you recognize that

17  document?

18  A.  Yes, it's an invoice to Nakheel for the shipping of

19  containers and one of my Hummers.

20  Q.  If we could look at -- were the Hummers shipped at different

21  times?

22  A.  Yes.  One month interval.

23  Q.  Why is that?

24  A.  I could not ship them together because then I would be out

25  of vehicle -- look at the date we shipped.  I would be out of

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1672

1    vehicle in Stuart and on the other side, if I shipped, if I wait
2    too long for my vehicle, I'm out of vehicle in Dubai.
3    Q.  And the -- now when the vehicles were shipped to -- well,
4    what was the company that you expect -- did you expect to be
5    working for a company when you moved to Dubai?
6    A.  Exomos did not exist at the time, so my understanding is I
7    was joining a company called Palm Submarines.
8    Q.  And who gave you that understanding?
9    A.  Sultan Bin Sulayem.
10   Q.  And in fact, did that happen?
11   A.  Not -- yeah, after months -- I'm sorry, what's the question?
12            THE COURT:  Did that happen.
13            THE WITNESS:  What happen?
14            MR. HESS:  I'll withdraw it, Judge.  I'll move on.
15   BY MR. HESS:
16   Q.  If we could show Mr. Jaubert Plaintiff's 100-22, please.  It
17   is in evidence.  I'm missing the page number on there.  Never
18   mind.  I'll have to come back to that.
19            How long were you in Dubai before you signed -- before
20   you had a signed contract for your employment?
21   A.  I arrived in Dubai in November 18 on a tourist visa and the
22   first contract I signed was February 25.  And then there was an
23   amended contract in July.
24   Q.  There was a second contract that was signed?  I'm sorry,
25   what did you say?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1673

1   A.   A second contract or amended contract, I'm not sure, but it

2   was in July.  So the final contract was signed in July.

3   Q.   And you were to be -- the contract provided that -- what was

4   your duty?  What was your occupation?

5   A.   To be the chief executive of -- in February there was --

6   Exomos did not exist, the name was not on my contract.  It was

7   in April of 2005, so in July 2005 Exomos was on my contract.

8   Q.   July 2005?

9   A.   July 2005.  I did not create Exomos as company, I created

10   the name Exomos.

11   Q.   That was your idea?

12   A.   Was my idea.

13   Q.   All right.  How did you come up with Exomos, just briefly?

14   A.   I was looking for a name that would be -- that could be

15   pronounced by anybody in the world.  Something that sounds

16   different, and Exomos means double skin.  So when you are under

17   the water, the submarine hull is a double skin.

18   Q.   Now, up until the time that you had a contract with the

19   Dubai World Corporation, as you said in February, late February

20   of 2005, had -- was Seahorse conducting business with Dubai

21   World?

22   A.   When?

23   Q.   Prior to you having a contract in February of 25 of 2005?

24   A.   Yes.  Seahorse was supplying inventory, parts, equipment, to

25   Dubai World.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1674

```
 1    Q.  Was that with any understanding with Exomos or with Dubai
 2    World or was that unknown to Dubai world?
 3    A.  No, it was known to Dubai and it was a normal, it was normal
 4    commercial transactions between company A and company B,
 5    Seahorse.
 6    Q.  Now, what was the process that you utilized that Seahorse
 7    utilized to -- well, let me start back.  What was Seahorse
 8    selling to Dubai World Corporation or one of its entities?
 9    A.  Inventory, lead bricks, foam sheets, plexiglass dome,
10    batteries, tires, whatnot.
11    Q.  When you say inventory, is that part of the assets that was
12    purchased by Dubai World?
13    A.  No, these were ordered separately to constitute and to build
14    up an inventory in Dubai.
15    Q.  All right.  Now, did you have any conversation with anyone
16    in Dubai World to -- regarding your sales, regarding Seahorse's
17    sales to Dubai World?
18    A.  Yes, Jim Miller and Sultan.
19    Q.  Let's start with Sultan, what did he tell you about that?
20    A.  That after you purchased the -- first of all that he needed
21    Seahorse as a purchaser and that after I moved to Dubai, he
22    would keep Seahorse as a purchaser entity.
23    Q.  So Seahorse was to continue as an entity to purchase items
24    for Dubai World?
25    A.  Yes.  It was both my idea and Sultan agreed to it because
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1675

1   when I traveled to Dubai two times, I raised my concern that

2   there's no supply in Dubai.  They don't manufacture anything so

3   if I need batteries, if I need foam sheets, I'm not going to

4   find that in Dubai.  So I need to buy them somewhere else and

5   Seahorse has what we call a vendor list so I know where to go if

6   I need to buy parts and equipment.  And so we decided that

7   Seahorse would continue to purchase equipment that we need and

8   that we cannot find in Dubai.

9   Q.  Now, how do you know you couldn't get those items in Dubai?

10  A.  Sanil Subair investigated that and told me numerous times by

11  e-mail, by phone.

12  Q.  Did you make any independent inquiries when you were there?

13  A.  Yes.  Later -- yes, while I was at Exomos I was always doing

14  that.

15  Q.  Were you ever told by anyone at Dubai that you were -- that

16  Seahorse was not permitted to sell to Dubai World Corporation or

17  any of its sub corporations?

18  A.  No, that's the other way around.  I had been told that

19  Seahorse could purchase on behalf of Dubai World.

20  Q.  What about the 10 percent service charges that were charged

21  by Seahorse?  Was that agreed to?

22  A.  Yes, it was agreed to.

23          MR. CEDERBERG:  Excuse me, Your Honor.  Objection,

24  foundation as to time, time frame.

25          THE COURT:  Yeah, give us a time frame.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1676

1   BY MR. HESS:

2   Q.  Let's start at in the very beginning.  Was Seahorse selling

3   to Dubai World or any of -- or Exomos or any of its corporations

4   prior to you arriving in Dubai?

5   A.  Prior to me arriving in Dubai, there's no agreement

6   whatsoever.

7   Q.  Was Seahorse purchasing items on behalf of Dubai World

8   Corporation or any of its corporations prior to you arriving in

9   Dubai?

10  A.  Yes.

11  Q.  And under what authority was that done?

12          MR. CEDERBERG:  Objection, foundation, Your Honor.

13          THE COURT:  Yeah, how does he know that?

14  BY MR. HESS:

15  Q.  Did you speak with anybody that was -- did you talk to

16  Sultan about that?

17  A.  Yes.  Of course.  Absolutely.

18  Q.  And during that period of time prior to you arriving in

19  Dubai, did you -- did Seahorse charge for its services in

20  purchasing these items for Dubai World Corporation?

21  A.  Prior to me moving to Dubai, it was normal commission

22  transaction between the vendor and the buyer.  So Seahorse would

23  purchase equipment wholesale, Seahorse would pay for the

24  purchase, then Seahorse would invoice Dubai World, retail, and

25  Dubai World would pay Seahorse the amount on the invoice.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
1    Q.  So -- and again, now I'm restricting this to the period of

2    time prior to you arriving in Dubai in November of 2004.  When

3    Seahorse purchased items for -- who ordered -- first of all, who

4    ordered -- during that period of time, who ordered the items

5    that were going to be purchased for Dubai World?  Who ordered

6    the Seahorse -- who ordered the items that Seahorse was buying

7    to benefit Dubai World?

8    A.  Somebody at Dubai World.

9    Q.  Was that Dubai World that was ordering them?  Who ordered

10   the supplies?

11   A.  To whom?

12   Q.  Okay.  Let me try this again.

13        You stated that Seahorse would purchase items and then

14   --

15   A.  I see what you mean.  There were discussions between me,

16   Sanil and Sultan Bin Sulayem to set up a factory.  So to set up

17   a factory, let's say we need 200 batteries.  So then it would be

18   a discussion between -- Sultan would agree that Sanil and myself

19   would discuss how we're going to do it.  Then Sanil investigates

20   in Dubai there's no supplier of battery or if there, is it's

21   going to take forever and it's going to take five times more.

22   So then Sanil Subair says Seahorse by the battery.

23        So I'm doing the ordering because Sanil doesn't know

24   where I'm buying the batteries.  So I'm doing the purchasing and

25   at the same time, I buy the batteries with Seahorse money and
```

1678

1    then I prepare an invoice for Dubai World and they pay me the

2    amount of the whatever cost, whatever I send in the batteries.

3    Q.   Okay.  So you prepare the invoice, Seahorse prepares the

4    invoice right?

5    A.   I prepared the invoice, but Dubai World knew what it was

6    before I prepared the invoice because since Seahorse was putting

7    the money up front, I would not buy 200 batteries if I'm not

8    sure they're going to pay me back.  So at every time, there was

9    a closed discussion, but it was more for me.  I wanted to make

10   sure I would be reimbursed.

11   Q.   Okay.  So -- and each time that Seahorse purchased the

12   items, I mean each time Seahorse ordered these items and

13   purchased them, Seahorse used its money first?

14   A.   Every time first.

15   Q.   How long did it take -- again, now we're talking only the

16   period of time prior to you arriving in Dubai, how long would it

17   take for Dubai World or its various corporations to reimburse

18   Seahorse for the money?

19   A.   Between one and six months.

20   Q.   Now, let me step back just for a moment because you

21   mentioned something that I neglected to go into.

22        The conversations that -- when did it become -- did it

23   ever become -- strike that.

24        Initially you had a conversation with Sultan and Jim

25   Miller and then you had another conversation with Sultan, Jim

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Miller and Hamad Kazim and then you had some other

2    conversations, those were personal conversations, then you had

3    other e-mails and other telephone conversations.

4            When did it evolve to the situation where your

5    understanding was that you were going to be in charge of a

6    facility that was building submersibles in Dubai?

7    A.  It's about July 2004.

8    Q.  Did it start out to be that you were going to be moving to

9    Dubai and building submarines in Dubai?

10   A.  Yes, but at the time I did not know when that would take

11   place.  I knew it would take place, but I did not know when.

12   Q.  Way back in your first meeting with Sultan, did that come

13   up?  Was that an option?

14   A.  It was always an option.  It was left for me to decide.

15   Q.  If I can show you what's been in evidence, Defendant's

16   1160-1.  That document -- can you see what the date of that

17   document is on the bottom?  Upper bottom?

18   A.  27, October.

19   Q.  Of 2004, correct?

20   A.  Of 2004, yes.

21   Q.  And it says under item eight, says "to procure long delivery

22   specialized items of Intruder to start production immediately

23   after the prototype testing in March 2005, these items are

24   special not available in UAE", right?

25   A.  Yes.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1680

1    Q.   Is that your understanding of the situation at the time?

2    A.   Yes.  Uh-huh.

3    Q.   Okay.  And what were they talking about regarding the

4    Intruder?  Were you going to be producing those in Dubai?

5    A.   Yes.  Sultan came up with a concept that you saw on pictures

6    last week or earlier, that big yacht, that goes under the water,

7    so at the time it was called the Intruder.  Later it was named

8    Proteus.  So that was his idea, he wanted me to build it and I

9    had I explain to him that I had to make the decision because

10   it's such big vessel.  So he either had to move my factory from

11   another place in Stuart because it was too small, or I would be

12   building in Dubai in a large factory.

13   Q.   Then item nine, it says "all major systems are procured

14   through Seahorse Submarines to maintain confidentiality on the

15   property design and limiting issuing design and other details to

16   various suppliers".

17           That was your understanding at the time?

18   A.   Yes.  Absolutely, yes.

19   Q.   And you can see that was signed off by who?  Who signed that

20   document?

21   A.   Sultan Bin Sulayem.

22   Q.   Sanil also signed it, correct?

23   A.   And Sanil.

24   Q.   This is the Hamed Kazim that was involved in that second

25   meeting that you talked about in July of 2004, correct?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1681

1    A.  Yeah same individual, yes.

2    Q.  Okay.  Now, when you arrived in Dubai, in November, what

3    were your tasks?  What were you doing in terms of your

4    performing your tasks for Exomos.  Well, for Dubai World.

5    A.  Managing chaos.

6    Q.  What do you mean by that?

7    A.  Well, I arrived in Dubai, Sultan gave me 17 employees, a

8    couple of sheds, and buildings scattered all over the Free Zone

9    and from that I had to build a factory.  There was no company

10   name, I don't know -- one day it was Palm Submarine, the next

11   day it was Palm Marine.

12        So I told Sultan we need a name, we need something

13   precise, concrete.  And as the days passed, they moved more and

14   more employees to my place.  At the same time, I was building

15   the factory from a shed and as the months went by, whatever was

16   scattered in three, four different places on the Free Zone,

17   reunited everything under one roof on the new Exomos building.

18   Q.  And the Free Zone, how big of an area is that?

19   A.  The Free Zone is huge.  Almost half the size of Stuart.

20   Q.  How long did it take you to accomplish the build-out of the

21   facility or where Exomos?

22   A.  About six months.  Six months.

23   Q.  Okay.  And who helped you effectuate the design of that

24   building?

25   A.  Sanil.  Sanil Subair.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1682

1    Q.  Did you work well with him?

2    A.  I worked very well with him.  It was a very nice person,

3    very he was a civil engineer so I designed the factory, but I'm

4    not a civil engineer so I don't know what size of air

5    conditioning unit or stuff like that.  So he would do that type

6    of work and he would communicate with the various contractors to

7    get the job done.

8    Q.  Did you have, at that period of time while this factory was

9    being built over those six months and you had workers, you said

10   when you first got there you had 17 or 16 workers, whatever it

11   was and more, who hired these workers?

12   A.  Dubai World.  It's not -- they hired them, they were already

13   there but in different places.  They just moved them from

14   whatever company to where I was.

15   Q.  And while this the factory was being built, what was being

16   done to produce submarines?

17   A.  The priority at the time was to build Proteus.

18   Q.  Whose priority was that?

19   A.  Sultan Bin Sulayem.

20   Q.  Did he tell you anything at all about what you should be

21   doing regarding the other submersibles that you had planned on

22   building there?

23   A.  I had an issue with the Stingray and the Discovery because

24   they had been shipped partially built.  I left after the

25   hurricanes.  So I shipped the submarines not completed and then

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1683

1   once I am in Dubai, Sultan asked me to do something else.  So I

2   put aside those two submarines to build Proteus and to build

3   other boats because he wanted me to be a present at the Dubai

4   Boat Show.

5   Q.  Let me be clear.  Did he clearly tell you that you were to

6   build the Proteus and not the submarines?

7   A.  He did not say not to build those two submarines, he said to

8   put them on the side for the time being.  The reason was that

9   the Discovery being put on the side was the Discovery model, but

10  I already had one so he did not see the point building a second

11  one.  We could do it later he said.  Same with the Stingray Duo.

12  I shipped two Stingrays to Dubai and the Stingray Duo which is a

13  Stingray with two people instead of one, he said but there's no

14  need to finish it now because we already have two Stingrays so

15  we can wait.  He wanted to have a catalogue of different

16  submarines and I didn't want to build too many of the same ones.

17  Q.  Let's talk about that Stingray.  When you shipped the

18  Stingray, how many Stingrays were shipped over?

19  A.  Stingray One is the Stingray that you saw on the video with

20  one pilot and Stingray Two is the same design, same concept but

21  with two people, one behind another.

22  Q.  And the Stingray was shipped over, was that operational when

23  it was shipped over?

24  A.  No, it was just a shell with all the equipment needed to

25  complete it.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1684

 1   Q.  Now, were you supposed to have shipped over a completed
 2   Stingray?
 3   A.  On the contract it said the submarine had to be shipped
 4   completed.  But after the hurricane, I cannot be at two
 5   different places at the same time.  So if I'm not in Stuart, I
 6   cannot complete the submarine.  If I move to Dubai, either I
 7   don't complete the submarine or I complete them in Dubai.
 8   Q.  What did Sultan want you to do?  Did he tell you?
 9   A.  Sultan, he just wanted to move to Dubai, he said forget it,
10   we'll finish them later.
11   Q.  What was the rush about getting the Proteus up and going?
12           MR. CEDERBERG:  Objection, foundation, Your Honor.
13   BY MR. HESS:
14   Q.  Was there a rush?
15   A.  Yeah, there was a rush.  Absolutely.  He wanted the Proteus
16   to be completed as soon as possible.
17   Q.  Was there a particular reason for that?  Did he tell you?
18   A.  I know as --
19   Q.  Did he tell you?
20   A.  What he told me is that he wanted to -- he wanted to take
21   his friends for a ride in a fishing boat that can go under the
22   water.  Then it evolved to more business type of submarine.
23   Q.  So what were your tasks to get the Proteus built?  What did
24   you do?
25           THE COURT:  I don't understand what that means.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1685

1    BY MR. HESS:

2    Q.  What did you do to effectuate Sultan's desire to get this

3    Proteus built?

4    A.  I started right away the process of construction, designing.

5    I'm not a naval architect, so the calculation on the hull and

6    the structure, I hired naval architects to do that.

7    Q.  Who did you hire to do that?

8    A.  Two naval architects, one from Fort Pierce and the other one

9    from Stuart.

10   Q.  What were their names?  Do you recall?

11   A.  I don't remember.  If I see the name, I would recognize it.

12   Q.  Who paid -- were they paid for their work?

13   A.  Yes.  They were paid for their work, but Seahorse would pay

14   them and then Seahorse would invoice Dubai World and Dubai World

15   would pay Seahorse.

16   Q.  Now, why would Seahorse pay for the naval architects to

17   design the hull of the Proteus in Dubai for Dubai World?

18   A.  Sultan wanted the Proteus underwater in three months.  If I

19   had asked Dubai World to hire a naval architect, it would have

20   taken maybe a year.

21   Q.  Okay.  Any money for the naval architects that Dubai World

22   paid, did Seahorse pay first?

23   A.  Seahorse paid first, yes.

24   Q.  Now, did those naval architects, did they accomplish the

25   design of the hull for the Proteus?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1686

1    A.   They designed -- I designed the hull but they finalized it.

2    There's some calculations involved in the hull that I don't have

3    the software, I don't know how to calculate those, what we call

4    the hull lines, so the naval architect does that.

5    Q.   Did they accomplish that?

6    A.   Yes.  Uh-huh.

7    Q.   And did the hull -- was that the first thing that was

8    started to be built was the hull?

9    A.   So once I have the hull lines, then I would with those -- I

10   sent those drawings to another company to make the wood frames.

11   And then with those wood frames you build what we call a plug

12   which is the first step in building a mould.  So plug which is a

13   wooden structure, then the mould, and then when you have the

14   mould, you produce hulls.  Fiberglass.

15   Q.   And again, how big was the Proteus?  How long was it?

16   A.   If I remember, 60', 65', something like that.

17   Q.   How long did it take -- now, from the time that Sultan told

18   you to get this thing up and running, to get it built, how long

19   from that point did it take to get the hull constructed?

20   A.   The hull the boat was constructed in three months.  The

21   basic boat, if you want.  But it was far from to be finished.

22   Q.   Now, what was the state of the construction of the Exomos

23   facilities at that time?

24   A.   At the time the building was not finished, so I was building

25   a boat when building was also under construction.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1687

1   Q.  All right.

2          THE COURT:  Okay.  You got until 4:00 to finish with

3   your direct examination.  This question, this whole page here is

4   two questions.  That ended up being I don't know what.

5          Start and go please now.

6          MR. HESS:  Judge --

7          THE COURT:  Go.

8          MR. HESS:  I can't finish now.  Judge, they're claiming

9   that he didn't develop --

10          THE COURT:  Go.

11          MR. HESS:  -- the submarines.

12          THE COURT:  Go.

13          MR. HESS:  I'd like to show the jury a picture of what

14   he was talking about.

15          THE COURT:  Go.

16          MR. HESS:  Thank you, Judge.

17   BY MR. HESS:

18   Q.  Did you complete the Intruder or the Proteus?

19   A.  Yes.  Not completely, but I test dived it, yes.

20   Q.  All right.  What else were you accomplishing when the --

21   when did you -- did there come a time that you completed the

22   Stingray or that Exomos completed the Stingray or you or was the

23   Stingray completed during this period of time?

24   A.  Which Stingray?

25   Q.  The Stingray that was shipped over from Seahorse.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1688

```
 1    A.   The one, that incompleted one?

 2    Q.   Yes.

 3    A.   No, this one was never completed.

 4    Q.   Okay.  Did there come a time where there was a Stingray

 5    manufactured at Exomos?

 6    A.   More Stingrays you mean?

 7    Q.   Yes.

 8    A.   Stingrays yes, we built a third one.

 9    Q.   Is that the one that Thapa was testing?

10    A.   It's one of them.

11    Q.   And flipped over?

12    A.   Yes.

13    Q.   How many were built by Exomos?

14    A.   Three.

15    Q.   And that was while you were the CEO of Exomos?

16    A.   Yes.

17    Q.   Did they all function?

18    A.   We used mostly two.  The third one was more like a mockup.

19    Q.   What other -- while you were supposed to be building --

20    well, while you were building submarines, what other projects

21    did Sultan tell you to work on?

22    A.   During my two years at Exomos?

23    Q.   Yes.

24    A.   I worked on 32 projects.

25    Q.   What were they?  We don't have a lot of time, so if you
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    could tell the jury what they were.

2    A.   Submarines, boats, air boats.  I had to take care of the

3    boats from Nakheel.  Sultan's private boat.

4    Q.   What type of boats did you design and build for Sultan?

5    Let's give -- did you build a jet boat?

6    A.   I built -- he came with me December 2005 with a challenge.

7    He had a challenge with his friend in Dubai.  He asked me to

8    build a boat that would reach 60 miles an hour.  But I had three

9    months to do that.  So I said well, I need more time, I need --

10   I don't even have the hull.  So he gave me two aluminum hulls

11   from another company, so I would be able to start from there.

12        But because I already had the hull, that kind of power

13   to push a boat at 60 miles an hour, the engine compartment was

14   too small.  Because engine compartment was too small, I had no

15   choice but to go with gas turbine engine, helicopter engine

16   which was a premiere, nobody has ever done that before.  So I

17   build two boats powered by gas turbine engines, 13, 26, 25,000

18   pounds each.  And I exceeded Sultan Bin Sulayem's expectation

19   because my boat went 80 miles an hour.  In three months.

20   Q.   All right.  So I don't run out of time, let's --

21             THE COURT:  The more comments, the less time.

22             MR. HESS:  While we're getting those materials --

23   BY MR. HESS:

24   Q.   When did you receive the monies for the -- from Dubai for

25   the purchase of the assets of Seahorse Submarines?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1690

1   A.   I received it in installment.   The first installment was

2   March 2005 for $300,000, the last one was in September of 2005

3   for $450,000.   So it was not at once.

4   Q.   So you shipped everything over in November of 2004 and you

5   received the payments over installment until September of 2005.

6   A.   Yes.

7   Q.   During that period of time, were you deriving a salary at

8   all as a CEO of the various corporations that you were in charge

9   of?

10  A.   I received my first salary in March 2005.

11  Q.   You received no monies from Dubai World for your duties in

12  Dubai between November and March of 2005?

13  A.   No.

14  Q.   Now, let me flip ahead.   You know, you heard some when your

15  wife was on the stand.   The money that was put into the bank

16  account in 2007, is that 2007 the bank account here in Stuart?

17  A.   2007, yes.

18  Q.   Do you remember that testimony?

19  A.   Yes.

20  Q.   The bank account was open with $100 that your wife started

21  the account with?

22  A.   Yes.

23  Q.   Who put the other monies into the account?

24  A.   I did.   I transferred the money when I sold my house in

25  Dubai.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1691

1    Q.   Now, how much money was put into that bank account at that

2    time?

3    A.   The proceeds of the sale of my house $2.3 million.

4    Q.   $2.3 million?

5    A.   Yes.

6    Q.   Now, the house that you sold in Dubai to derive those

7    revenues --

8    A.   Yes.

9    Q.   -- how much did you buy that house for in Dubai?

10   A.   $900,000.

11   Q.   Did you ever live in that house?

12   A.   I'm sorry?

13   Q.   Did you ever live in that house?

14   A.   No.

15   Q.   Did you ever extort or take a dime of Dubai World, Exomos,

16   Palm Marine, Palm Submarine, any of the Dubai World

17   Corporation's money.

18        MR. CEDERBERG:  Compound, Your Honor.

19        THE COURT:  No, I'll permit it.

20   BY MR. HESS:

21   Q.   Embezzle, I'm sorry, did you ever embezzle that money?

22   A.   Absolutely not.  Not a dime, not a single dollar, nothing.

23   Q.   And over the period of time that you were working for -- as

24   CEO of these various corporations -- let me step back, did the

25   name of the corporations change while you were working there?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.  I started Palm Submarine but I was not being paid at the

2    time.  Then I operated Exomos, and then in January 2007, they

3    gave me another company to run that is called Palm Marine.  Palm

4    Marine existed before, but it were not doing good.  So in 2007

5    they asked me to take it over.

6    Q.  When in 2007?

7    A.  January 2007.

8    Q.  Now, you heard on the testimony of -- the days of testimony

9    that were presented by Plaintiff about all these instances of

10   you taking money from the Dubai World Corporations, they said

11   that it was wrong for you -- for Seahorse to have an invoice

12   before there was a purchase order from Dubai World.  Do you

13   remember that testimony?

14   A.  Yes, I remember that.

15   Q.  Now, did Seahorse, every time it purchased an item for use

16   by Exomos, did it create an invoice first?

17   A.  Of course it created an invoice first because Seahorse was

18   buying first.  Was putting the money up front.  So then Seahorse

19   would invoice Dubai World to get the money back plus 10 percent

20   service charge which was agreed all along.

21   Q.  That happened every purchase that Seahorse made?

22   A.  Every purchase.  Sometimes Seahorse would get reimbursed six

23   months later.  Six months.  Seahorse put forward up front

24   $200,000 and get reimbursed six months later, I believe, and

25   Sultan believed it was legitimate of Seahorse to charge 10

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1693

1   percent service charge.

2   Q.  Now, sounds crazy that Seahorse is going to come out of

3   pocket to build submarines for -- to permit the submarines to be

4   built by Exomos so Exomos can make money.  Why would Seahorse do

5   that?

6            MR. CEDERBERG:  Objection, argumentative.

7            THE COURT:  I'll permit it.

8            THE WITNESS:  But I moved to Dubai because I really

9   believed there was a potential to achieve what I always wanted

10  to do which was mass produce submarines.  So I did not look too

11  much into the details, how much would be my pay or whatever.  I

12  wanted the company to be successful.  When I saw in Dubai it was

13  very, very difficult to get the materials in time, I decided to

14  help and use Seahorse to purchase the equipment.  I kept an

15  office in Stuart while I was in Dubai and I would -- Seahorse

16  would put up front the money to buy equipment so I would get

17  them quicker and less expensive.

18  BY MR. HESS:

19  Q.  Why not just let Exomos conduct its business like it wanted

20  to conduct its business and it just would take longer for the

21  submarines to be built?  Why not just do that?

22  A.  Because Exomos would fail and it did.  It doesn't work that

23  way in Dubai.

24  Q.  Now, let's talk about -- I'm not going -- let's just --

25  okay.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1694

```
 1              And there were hundreds of invoices that Seahorse
 2     prepared for the various purchases, throughout the time, from
 3     2004 until you were terminated that Seahorse prepared and then
 4     there's an accompany prepared first, presented to Dubai World
 5     Corporation, Exomos or another corporation, followed up by a
 6     purchase order.  Hundreds correct?
 7     A.  Yes.  Uh-huh.
 8     Q.  And each one of those times Seahorse prepared the invoice
 9     first, correct?
10     A.  Yes.
11     Q.  Presented it to Dubai World, correct?
12     A.  Yes.
13     Q.  Or its company, and then that generated a purchase order,
14     correct?
15     A.  Yes.
16     Q.  Was it a surprise to anyone there, do you know --
17              MR. CEDERBERG:  Objection, speculation, Your Honor.
18              MR. HESS:  I'll withdraw that question, Your Honor.
19              THE COURT:  Sustained.
20              MR. HESS:  Judge, I seek to move into evidence
21     Defendant's Exhibits 1375, 1656, 1377, 1657, 1381, 1658, 1382,
22     1660, 1748, 1659, 1386, 1661, 1384, 1662, 1389, I said that
23     again.  1663, 1394, 1666, 1395, 1668, 1669, 1403, 1670.  What
24     those are, Your Honor, are those are the various invoices
25     prepare by Seahorse, accompanied by the --
```

1695

 1          THE COURT:  If I have the numbers right, we're talking

 2   about 1375, 1656, 1377, 1657, 1381, 1658, 1382, 1660, might have

 3   been easier to keep track if we kept them numerical.  1748,

 4   1659, 1386, 1661, 1384, 16662, 1389, 1668, 1669.  That's good,

 5   1403 and 1670.  Is that the right numbers?

 6          MR. HESS:  I believe so, Judge, and they were in date

 7   order rather than exhibit order.

 8          THE COURT:  Okay.  Any objection?  I know you're still

 9   looking.

10          MR. CEDERBERG:  I'm still looking at them, Your Honor.

11   I would --

12          MS. HEATHCOCK:  There were some missing, if I may?

13   1389, 1394.

14          THE COURT:  I said 1389.

15          MS. HEATHCOCK:  1394.

16          THE COURT:  I do not remember saying 1394.  1384.  I

17   don't remember hearing 1394.  In fact after 1662, I believe that

18   Mr. Hess said I already said that one.  And then went on to

19   1389.

20          MS. HEATHCOCK:  Then 1663, Judge?

21          THE COURT:  No, I got an idea.  Read them all, right in

22   a row.  Okay?  Read them all right in a row and I'll mark them

23   down to the best of my ability.  I thought I did that last time

24   but I will be happy to do it again.

25          MS. HEATHCOCK:  I'll go ahead, Judge, if I may.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1696

1      THE COURT:  Yes, of course you may.

2      MS. HEATHCOCK:  1375, 1656, 1377, 1657, 1381, 1658,

3  1666, 1395, 1668, 1669, 1403, 1670, 1382, 1660, 1748, 1659,

4  1386, 1661, 1384, 1662, 1389, I think I might have 1663 and

5  1394.

6      THE COURT:  All right.  1375, 1656, 1377, 1657, 1381,

7  1658, 1666, 1395, 1668, 1669, 1403, 1670, 1382, 1660, 1748,

8  1659, 1386, 1661, 1384, 1662, 1389, 1663 and 1394.  Any

9  objection?

10      MR. CEDERBERG:  Your Honor I haven't looked at them

11  all.  I would propose that they be admitted proficiently so we

12  can move on, then if there's an objection to any specific one,

13  I'll bring it to Mr. Hess's attention.

14      THE COURT:  I'll admit them in evidence subject to

15  their being tied in properly and if there is an objection as to

16  having not been tied in properly or something else, we'll

17  discuss it during a next recess.

18      (Defense Exhibits 1375, 1656, 1377, 1657, 1381, 1658,

19  1666, 1395, 1668, 1669, 1403, 1670, 1382, 1660, 1748, 1659,

20  1386, 1661, 1384, 1662, 1389, 1663 and 1394 in evidence)

21      MR. HESS:  Judge, if I may, I don't understand what

22  that means.

23      THE COURT:  What it means is I'm not going to sit now

24  and do this because the way we had -- the way I had required the

25  lawyers to do is to give them everything the night before.  I do

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1697

1    not think your giving it to them at midnight or this morning is

2    adequate for them to be able to go through it as I'd asked.

3         MR. HESS:  Every day last week, Judge, I got them from

4    them at 2:00 in the morning, 4:00 in the morning, 3:00 in the

5    morning.  I never mentioned it.  I was ready to stipulate in the

6    morning.  If it took me staying up all night, I did that.  It's

7    my wife and I against this.

8         THE COURT:  Wait, wait, wait, wait.  That's not

9    anybody's problem.  That is you took the case --

10        MR. HESS:  I understand, Judge.

11        THE COURT:  You're expected that you can handle it.

12        MR. HESS:  I understand, Judge.  But this idea that

13   12:00 at night was late, I never mentioned that I was getting

14   them every single night at 2:00 in the morning, 3:00 in the

15   morning, sometimes earlier and then they were always

16   supplemented.  Sometimes I would get other ones first thing in

17   the morning and we're talking about numerous documents.  Not the

18   number of documents that I just read into -- that my wife, Ms.

19   Heathcock read into the record, I'm talking about way more

20   documents.  It's just not an accurate portrayal of things to

21   suggest on their side that they haven't been doing worse than

22   providing documents at midnight.  So for the record, Judge.

23        THE COURT:  Pox on both your houses.  What?

24        MR. CEDERBERG:  I believe they're all going to be

25   business records and I don't think I'm going to have an

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1698

1    objection.  I just want to have them available to use now and if

2    I find something and want to bring to it the Court's attention,

3    that's all I ask.

4            THE COURT:  That's what I thought he meant, that's what

5    I understood.  If you don't want to do it that way, we can well

6    --

7            MR. HESS:  I don't have a problem with it, Judge, just

8    as long as if they're not going to agree to a document, that I'm

9    not going to find out later that I'm not allowed to admit it

10   into evidence as a business record, because they're certainly

11   business records.

12           THE COURT:  If they're business records, then you have

13   nothing to worry about.  If they're not business records, I

14   would assume if they object and they show me a reason why it

15   should not be admitted, at that point you will be given an

16   opportunity to fix that somehow.

17           MR. HESS:  Thank you.  That's all I'm asking.

18           THE COURT:  Fine.

19           MR. HESS:  Thank you, Judge.

20           THE COURT:  Move on.

21           MR. HESS:  I'm going a bit out of order now, Judge.

22   BY MR. HESS:

23   Q.  Let's talk about the thermal imaging camera.  Do you recall

24   the thermal imaging camera?

25   A.  Yes, I heard those arguments.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1699

```
 1    Q.  Did Seahorse order a thermal imaging camera?
 2    A.  Seahorse ordered the thermal imaging camera for the Proteus
 3    project.  It's a camera periscope, very sophisticated, to be
 4    installed on the Proteus.  Then Seahorse invoiced Dubai World
 5    for the cost of this camera $25,000, I don't remember if there
 6    was a 10 percent charge or not.  But Seahorse invoiced $25,000.
 7    Q.  Did Seahorse pay the money first?
 8    A.  Seahorse paid the money first.
 9    Q.  Okay.  And what happened to the camera?  Did the camera
10    arrive?
11    A.  The manufacturer is in the U.K.  Being that it's a thermal
12    imaging camera to be installed in a submarine, it's very
13    specific, very special item, the British company called me and
14    said we cannot ship it to Dubai because it's a military
15    equipment, it's subject to export licensing requirement, so they
16    had to cancel my order.  So they cancelled my order, refunded
17    me.
18          Then the following week I ordered the same type of
19    camera without the thermal imaging capability.  So the camera
20    looks the same, but it's a normal camera.  And I paid for that
21    Seahorse paid for that camera $17,000.  The camera was delivered
22    and installed on the Proteus.
23          Now, the $8,000 difference or seven something thousand
24    dollar difference was credited to Dubai World on the next
25    invoice.  So the next invoice, if the next Seahorse invoice to
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1700

1   Dubai World is $35,000 for instance, they would apply -- I would

2   apply a credit of $8,000 and the balance only would be paid by

3   Dubai World.

4        So although Dubai World paid $25,000 for the camera,

5   they did receive the camera plus a credit.

6   Q.  How much was the credit?  I'm sorry?

7   A.  I think $8,000.

8   Q.  Okay.  And the steering mechanism that was discussed during

9   the Plaintiff's case -- I'm sorry.  On the thermal, the camera,

10  you said it was on the Proteus?  It was installed on the

11  Proteus?

12  A.  It was installed on the Proteus.  The reason that --

13  Q.  Let me ask you a question, because we don't have a lot of

14  time.

15       Was the Proteus camera, was that the camera that

16  Mr. Rodig was testifying about?

17  A.  Yeah.  I mean, you can see he's on the picture, can see the

18  camera on the Proteus.

19  Q.  Is that the one though, the one he was talking about on top

20  of --

21  A.  Yeah, that's the one, only it's not thermal because the

22  British company was not allowed to export it.

23  Q.  Okay.  Now --

24       MR. HESS:  Charles, would you please put up what's been

25  entered into evidence as Plaintiff's 147.59-4.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1701

```
1    BY MR. HESS:

2    Q.   Now, do you remember seeing this document?

3    A.   Oh, yes.

4    Q.   All right.  You remember we saw that during the Plaintiff's

5    case, right?

6    A.   Oh, yes.

7    Q.   Saw it a couple times, didn't we?

8    A.   Yes.

9    Q.   Now, before I start showing you documents, explain to the

10   jury whether or not -- did you -- did Seahorse submersible,

11   submarines, did it pay this vendor $186,000?

12   A.   Seahorse paid this vendor $186,000, yes.

13   Q.   Then Seahorse issued an invoice for $186,000?

14   A.   Seahorse issued an invoice to Dubai World for $186,000 plus

15   18,600 service charge.

16   Q.   Now, did Seahorse -- was Seahorse compensated for its

17   initial outlay of its money plus the 10 percent charges for

18   service?

19   A.   No, only the 10 percent.

20   Q.   So Seahorse never was paid the $186,000?

21        THE COURT:  Hold on a second.  Turn the spotlights off,

22   turn this bank off.  Anything there you go.  Perfect.  The rest

23   can that's fine.  Go ahead.  Go.

24   BY MR. HESS:

25   Q.   Seahorse was never reimbursed for the outlay of the
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1702

1    $186,000?

2    A.   No, Seahorse was reimbursed for this amount, yes.

3    Q.   For the whole amount?

4    A.   $204,000.

5    Q.   And this is the -- is this the -- what was the vendor on

6    this case?  Do you recall?

7    A.   It was Marine Turbine Jet something.  American Turbine

8    something.

9    Q.   Now then, when the expert was on the stand, we next looked

10   at the next exhibit which was 147.59, page five.  Okay.

11   Remember looking at this with the expert?  Remember seeing that?

12   A.   Yes.

13   Q.   Now what is that?

14   A.   That's the purchase order from Dubai World to Seahorse.

15   Q.   Okay.  And I'm sorry, Charles could you go back to the

16   previous one please?  It was four I think it was?  And that was

17   what?

18   A.   And that's the invoice from Seahorse submarine to Dubai

19   World.

20   Q.   And the invoice is dated when, the date on there?

21   A.   Yes.  It is October 18, 2005.

22   Q.   Okay.  Then Charles, would you please put back up page five?

23   Thank you.  What is the date of the purchase order?

24   A.   October 26, 2005.

25   Q.   Okay.  So the purchase order is after the invoice, right?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1703

1    A.  Yes.  So that Seahorse can get money back.

2    Q.  Reimbursed, right?

3    A.  Reimbursed, yes.

4    Q.  Now, as you recall, the expert concluded that the actual

5    purchase price was only 162,772.  Is that your understanding?

6    A.  That's what I saw, but this is a lie.

7    Q.  Please put up what's been marked as Defendant's Exhibit

8    1814.  It's not in evidence.

9         MR. HESS:  I'm going to seek to move 1814 in evidence,

10   Judge.

11        MR. CEDERBERG:  No objection.

12        THE COURT:  Without objection, 1814 is admitted in

13   evidence.

14        (Defense 1814 in evidence)

15   BY MR. HESS:

16   Q.  The first page of 1814 is the Union Bank, it's to Tricia,

17   North American Marine Jet, correct?

18   A.  Yes.

19   Q.  And that is the company that the vendor for this hundred --

20   well --

21   A.  Yes.

22   Q.  What the expert said was $162,722, right?

23   A.  Yes.

24   Q.  And the second page is a wire transfer and you can -- thank

25   you.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1704

```
 1              Can you see, do you recognize this document?
 2    A.   Yes, the wire transfer Seahorse sent to Marine Jet American
 3    Jet Turbine.
 4    Q.   Is there a date that you can perceive on there?
 5    A.   2005, July, 20.
 6    Q.   Okay.  Again, that's for $41,000, correct?
 7    A.   $41,000.
 8    Q.   Okay.  Now, if we can take a look at what's been marked as
 9    defendant's -- whoops.
10              Now, let's take a look at what's been marked as
11    Defendant's Exhibit 1827.  Do you have that, Charles?  Or is
12    that one of ours?  Could you give us control please?  You have
13    it?
14              MR. HESS:  I'm seeking to put that in evidence without
15    objection, Judge.
16              THE COURT:  1827.
17              MR. HESS:  Yes.
18              THE COURT:  Is admitted in evidence without objection.
19              (Defense 1827 in evidence)
20    BY MR. HESS:
21    Q.   We can take a look at what has been marked as 1827, second
22    page of that.  I'm sorry.  It's 1827-16.  I was close.  Dash 16.
23    1-6.
24              Now, we're looking -- for the record, we're looking at
25    1827-16.  If, Mr. Jaubert, can you take a look at four items
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1705

1    from the bottom?  I'm looking for 182,716.  Is this yours,

2    Charles?  Are you on this?  Okay.

3              What is that, Mr. Jaubert, on December 22nd for

4    $145,000 to North American Marine Jet?

5    A.  So it's a copy of a bank statement of Seahorse account on

6    December 22, there was a wire transfer to North American Jet for

7    $145,000, which was the balance to the purchase order for those

8    two turbines.  145,000 plus 41,000 equal 186,000.  Not 162.

9    Q.  So let's go back to what the expert looked at on behalf of

10   Dubai World, if we can go back to look at 147.59, page four.

11   Okay.  That's Seahorse's invoice, correct?

12   A.  Yes.

13   Q.  It says two hydrojets, HT 864, I can't read the rest of it

14   but it's $186,000, correct?

15   A.  Yes.

16   Q.  What were the two payments that Seahorse made?

17   A.  41,000 down payment and 145,000 balance.

18   Q.  Which is $186,000?

19   A.  Which is 186,000.

20   Q.  Now, if we can look at what's been marked as Plaintiff --

21   well it's not marked, it's Plaintiffs Exhibit 147.59, page five

22   in evidence that the expert looked at.  That's the purchase

23   order, correct?

24   A.  That's the purchase order.

25   Q.  And what was for the production of that, what was that

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1706

1    amount that was charged, what was the amount that Seahorse was

2    seeking from Dubai world aside from the service charges?

3    A.   204.

4    Q.   Aside from the service charges?

5    A.   186,000.

6    Q.   So you, Seahorse, was asking to be reimbursed exactly what

7    it paid to the vendor, correct?

8    A.   Yes.

9    Q.   If we could look at -- I'll move on.

10                  Did Seahorse pad that bill?

11   A.   Seahorse paid that bill, yes.

12   Q.   Did Seahorse pad that bill?

13   A.   Absolutely not.

14   Q.   Now, is that the case with every single time that Seahorse

15   requested to be reimbursed by from Exomos, was Seahorse seeking

16   exclusively monies that it had already paid out plus the service

17   charge, correct?

18   A.   Yes.

19              MR. CEDERBERG:  Objection, leading and compound, Your

20   Honor.

21              MR. HESS:  I'll rephrase it, Judge.

22              THE COURT:  All right.

23              MR. HESS:  Each and every time -- I think I made my

24   point Judge, I'm not going to ask that.

25   BY MR. HESS:

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1707

1   Q.   Another thing, the issue with the -- well, what was brought

2   up regarding the rebreathers?   Remember that?

3   A.   Yes, I remember.

4   Q.   What was the situation with the rebreathers?   Do you

5   remember that?

6   A.   Yes.

7   Q.   What did you need -- what did Exomos need rebreathers for?

8   A.   I needed a special rebreather to accommodate combat swimmers

9   in swimmer vehicle.   Any existing -- there was no existing

10   rebreather that could work for that type of application.   We're

11   talking about the special rebreather that can be plugged and

12   unplugged from the boat with different mixing gases.   So I

13   needed a rebreather to be modified.

14        So I hired a company who was making rebreather for cave

15   divers, cave divers is a very dangerous diving because they dive

16   for hours and because they are in caves.   If there's a problem

17   they cannot back up to the surface.   So that company was very

18   reliable.   But because that type of rebreather does not exist,

19   they required $25,000 as for research and study on how to modify

20   a rebreather to build it as per my requirements and then there

21   was $86,000 payment to actually build the rebreather.

22        So there was --

23   Q.   Let me ask you now.   So you negotiated to purchase a

24   rebreather, what was the company name?

25   A.   I don't remember.   Intruder?   I don't remember.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.   Do you remember where the company was located?

2    A.   I know it was located in Switzerland.

3    Q.   Okay.  And how much did the company require to purchase the

4    rebreather, just the stock rebreather?

5    A.   So they would buy off the shelf rebreather, I don't

6    remember, $5,000 or something, and then they would modify it so

7    that it can work with my requirements.

8    Q.   Okay.  Can I show you what's been marked as defendant's --

9    thank you, not yet.

10        I don't know if there's an objection.  Okay.  Thank

11   you.

12        MR. HESS:  Let's take a look at 1827-12.

13   BY MR. HESS:

14   Q.   I'm going to show you, Mr. Jaubert, what's in evidence, this

15   is page 12.  I think Ms.  Heathcock is going to highlight that

16   November 1 wire transfer out.  Do you see that wire transfer

17   there on November 1?

18   A.   Yeah, so that was the balance payment for the construction

19   of the rebreather.

20   Q.   Okay.  Now, was there also a down payment that you paid?

21   A.   So there was a down payment of $25,000 for the development

22   of the rebreather.

23   Q.   Okay.  And --

24   A.   The design if you want.  The development and design.

25   Q.   And did you pay that also?  Did Seahorse pay that?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.   Not Seahorse, I paid it personally.   I withdraw $25,000 from

2    my personal account in Dubai because the vendor wanted a

3    certified check.   So I withdraw the money, I had a certified

4    check draw in Euros, 19,000 Euros corresponding to $25,000 that

5    initiated that order.

6    Q.   Okay.   Now, let's take note, the wire transfer out Philippe

7    Chappot November 1st, what year is that?   Do you know?

8    A.   2005.

9    Q.   Okay.   That's the 86,000 you just testified was the balance

10   owed, correct?

11   A.   Was the balance.

12   Q.   Now, if we can take a look at what has been marked as

13   Defendant's Exhibit 1829, I don't believe there's an objection.

14          MR. CEDERBERG:   No objection.

15          THE COURT:   1829 is admitted in evidence at this time.

16          (Defense 1829 in evidence)

17   BY MR. HESS:

18   Q.   If you could take a look at what's dated October 18, 2005,

19   now what is that?

20   A.   That's the 25,000, that's the 19,000 Euro converted to

21   25,000 or thereabouts down payment.

22   Q.   You sent that money to pay -- to have the down payment for

23   what?

24   A.   For the development of those ten rebreathers.

25   Q.   Okay.   Were you reimbursed for that amount from Dubai World?

1710

```
 1   A.  Dubai World paid the invoice to Seahorse Submarines.

 2   Q.  To Seahorse.  Okay.  Now again, why would you come out of

 3   pocket for those monies instead of just waiting for Exomos to

 4   pay for them?

 5   A.  Because if it was through Exomos, it would take months.

 6   Q.  Now, as a business person, don't you lose -- do you lose the

 7   value of money if you come out of pocket for sums of money that

 8   approach $100,000?

 9   A.  Yes, of course.

10   Q.  Moving along, if we could take a look at what has been

11   introduced in evidence as Plaintiff's 147.1001.  Start with

12   that.  Do you recognize that document?

13   A.  Yes.

14   Q.  Now, what is the date of that document?  Looks like it's

15   dated May 12?

16   A.  May 12, 2007.  Yes, it was a copy to myself, an e-mail that

17   I sent to either Hussein Ramadan or AbdulQadar.

18   Q.  Well, who does it say on top?

19   A.  Hussein Ramadan, yeah.

20   Q.  Can you blow that up a little bit more?  Is that possible.

21           THE COURT:  The whole thing?

22           MR. HESS:  Make it a little bigger.  Is it possible to

23   do that?

24           THE COURT:  I don't think it works.

25           MR. HESS:  Can you read that, Mr. Jaubert, on your
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    screen, because I'm going to --

2              THE COURT:  The screen to your left, sir.  The video

3    screen.

4    BY MR. HESS:

5    Q.  Do you recall why you wrote that?

6    A.  At the time I was being harassed by auditors and I was

7    trying to exonerate myself to explain why I did not owe that.  I

8    did not owe that money.

9    Q.  Okay.  And you spent -- how many pages did you spend, if we

10   can take a look at the document, it's the second page please?

11   Then the third page, four page, fifth page, sixth page, you

12   spent six pages discussing the various items that you were

13   accused of wrongdoing regarding, correct?

14   A.  Yes. Many times I sent the same pages, many times to

15   different persons at Dubai World.

16   Q.  Did the accusations continue despite your attempts to

17   explain that you had -- that you did nothing wrong?

18   A.  The accusations continued and were reinforced.

19   Q.  The motors that were ordered that never arrived at Dubai

20   World or Exomos, can you explain to the jury what that was

21   about?

22   A.  When I shipped Discovery with all of its equipment, that

23   included the diesel engine which was in a crated box and the

24   auditors claimed the engine was not there.  So I had to go

25   myself on the factory floor to show one of my employee that the

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1712

1   engine was actually there because the auditors had not taken the

2   effort to look where it was.  They would not know anyway.  They

3   would not recognize a diesel engine, two piston and gas engine.

4   Q.  Did you also explain in this six page correspondence to

5   Mr. Ramadan -- and Mr. Ramadan testified here, correct?

6   A.  Yes.

7   Q.  Did you also explain to him the -- attempt to explain to him

8   the development costs of the rebreathers -- I'm sorry, Mr. --

9   I'm sorry.  I'm going to ask that that be put back up,

10  147.100-5.

11  A.  Yes, I explained that.

12  Q.  And where did you explain that?  Is that in SN8, development

13  cost of rebreathers?

14  A.  Yes, SN8.

15  Q.  When you wrote this e-mail back in May of 2007 to

16  Mr. Ramadan, you said "there was a special order to manufacture

17  ten rebreathers to be used in a swimmer delivery vehicle, the

18  system is not available on the market thus it needed to be

19  developed first then built, which was done by Intruder, Inc.  To

20  be cost effective, the requirement was to start from an existing

21  rebreather and modify to our requirement, which was done, hence

22  the cost of 25,000 for the development and design of the

23  machine.  This machine is not an off-the-shelf machine, it

24  required design and development before manufacturing.  In

25  conclusion there is no reason for refund", correct?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1713

1   A.  That is correct.

2   Q.  Now, you did charge -- did you charge for a service charge

3   on the cost of that $25,000 for the whole order?

4   A.  10 percent service charge.

5   Q.  Okay.

6           THE COURT:  The answer is yes.  Please listen to the

7   question.  We really could get done a lot better if you -- the

8   question was did you charge a service charge on the cost of

9   that?

10          THE WITNESS:  Yes.

11          THE COURT:  And the answer is yes and then you said 10

12  percent.

13          THE WITNESS:  Yes, 10 percent.

14          THE COURT:  Okay.  Move on.

15  BY MR. HESS:

16  Q.  And again, just below that, you explained to Mr. Ramadan

17  back in May of 2007 in SN9, you explained about the thermal

18  camera too then, didn't you?

19  A.  Yes.

20          MR. HESS:  Now, I guess I'm going to have to approach,

21  Judge.  I need to about this issue before I go into it.

22          THE COURT:  Ladies and gentlemen, could you excuse us

23  for a couple minutes so we don't have to whisper around.

24          COURT SECURITY OFFICER:  All rise for the jury.

25          (Jury out at 4:10 p.m.)

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    THE COURT:  All right, sir.  What are we talking about?

2    MR. HESS:  I want to go into what is also on --

3    THE COURT:  Be seated please.

4    MR. HESS:  What's also on Plaintiff's in evidence

5    Plaintiff's 147.100-5, what it says -- well, it's in evidence,

6    what it says is the police investigation, says "the auditors

7    lead by a coerced Exomos employee, took it upon themselves to

8    call the police when they were told that I had three cases of

9    bullets in the store.  I was on vacation in Fujairah, the police

10   called me for questioning, I spent the night being interrogated

11   and two more times for up to 14 hours."

12       Now, this isn't my exhibit in evidence, this is the

13   Plaintiffs, this is one of the hundreds of pages of hearsay.  I

14   want to make sure you understand, Your Honor, before I read

15   this.

16       "I was threatened to be tortured and put in solitary

17   confinement if I did not come up with another story.  The police

18   took my passport away.  Before I came to Dubai, I asked Sanil

19   Subair and Jim Miller if I could bring with me my guns and

20   bullets to do shooting practice.  It was clear that I wanted to

21   make sure I was not violating any laws by coming with my guns

22   and bullets.  I'm a licensed and registered gun owner with a

23   license to carry a gun in US.  I'm a professional marksman with

24   30 years experience of shooting and handling guns and

25   ammunition.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1715

1       "Sanil Subair told me I could bring my guns and

2    ammunition, Jim Miller told me where I could shoot, Jebel Ali

3    Sporting Club.  US Customs authorized the exit of my guns and

4    Emirates Air authorized the shipment of my guns.  The bullets

5    were shipped surface.  Sanil Subair told me Mohamed Amin would

6    be waiting for me at the air park to clear Customs, the Dubai

7    Customs, until I get a permit from the Dubai court.  I filed for

8    a permit, the guns are still at the airport.  The bullets were

9    delivered to Dubai in one of my containers.  I instructed Sanil

10   Subair to be -- to be -- to do the need full for custom

11   declaration and instructed him to put them in the store until

12   cleared.  They were kept in the store since, they were not

13   hidden, the store staff knew about it, Shamsudeen knew about it.

14   At no point I tried to hide anything, at no point anybody told

15   me I could not do it.

16       "I need your support to recover my passport regardless

17   of me being charged or not by the court.  I will have to file a

18   report with the US consulate and the French consulate if I have

19   not recovered my passport by June 2007."

20       Also accompanying this -- I also would like to go into,

21   which is also in evidence as part of the documents attached to

22   147.85, is a letter to Sultan saying that "I'm kindly requesting

23   your help with a personal issue.  I arrived to Dubai one year

24   ago, November 18, 2004 with my family and belongings.  I arrived

25   at the airport with two guns which I legally owned, and I

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1  declared them to the Customs who seized them, see attached

2  receipt", and attached there is a receipt that documents that he

3  did provide the guns at Customs who seized them.

4       "In the US, I am a licensed gun holder and sportsman,

5  however not recognized in the UAE.  I could not leave my guns in

6  the US and had to take them with me.  These two guns are still

7  in Customs' custody.  These are precision, expensive sportsman

8  weapons that need to the least proper maintenance.  Could you

9  help me clear Customs with these two guns", then lists one

10  precision rifle, 50 Caliber, one pistol, 45 Caliber, and then

11  again it has the exhibits that -- well, the attachments that

12  went along with this letter to Sultan by Mr. Jaubert are also in

13  evidence in Plaintiffs' 85.

14       Also in evidence, in Plaintiffs 147.861, is a letter by

15  the human resources manager, corporate services of Ports,

16  Customs and Free Zone corporation, a corporation owned by Dubai

17  World Corporation dated August 19, 2005.  It's dated to the

18  Dubai police and it says "dear sirs, this is to certify that

19  Mr. Herve Jean Pierre Jaubert, holder of French passport number,

20  and gives the passport, is employed by Ports, Customs and Free

21  Zone Corporation, since 20, November, 2004 to date.  He is

22  employed in the capacity of chief executive officer at Exomos.

23  This certificate has been issued at Mr. Jaubert's request.

24  Ports, Customs and Free Zone corporation shall have no liability

25  with respect to this letter."  Again, signed by the resource

1717

1    manager.

2         There's also included in Plaintiff's Exhibit 147.89-1,

3    is a document entitled Certificate of Registration for Personal

4    Effects taken Abroad.  Name of the owner, Herve Jaubert, and it

5    gives the address in the Jensen Beach house that he lived in at

6    the time.  It states description of articles, it states that

7    pistol, .45 Caliber, then it's got the name of the pistol, I

8    don't know guns, Taurus PT 145 or something.  Serial number NVI

9    65482.  And then one 50 Caliber rifle, McMillan, serial number,

10   then gives the serial number.  It states that it's executed by

11   the Customs official at the Department of Treasury United States

12   Customs.

13        There's also attached, and also included as an Exhibit

14   147.90-1 in evidence by Plaintiffs, it's the Dubai Police

15   General, it's dated 11-19, I can't see the year, it is on there,

16   but I think it's in Arabic.  It says "general department of

17   ports and airports, airports department, recovery of and

18   delivery receipt of seized goods".  And it goes through a

19   description, and I can recognize most -- a lot of it is in

20   Arabic, but I can recognize the serial numbers that correspond

21   to the two weapons that are recited in the Customs report.  It's

22   executed by Mr. Jaubert and it is on the Dubai Police General

23   stationary.

24        There is also a letter that's in evidence as

25   Plaintiff's 147.91-1, it says it's to the head of the Dubai

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   Police, it's written by Mr. Jaubert.  It says "dear sir, please

2   be informed that I own a company called Seahorse Submarines,

3   United States of America", dated August 21, 2005.

4        It states that -- again this obviously the predates the

5   other dates.  "Please be informed that I owned a company called

6   Seahorse Submarines in United States of America and as per the

7   acquisition of Dubai based company Exomos Group, company of

8   Ports, Customs and Free Zone Corporation, I have persuaded and

9   shifted the company here in Dubai along with all the company

10  assets.  In addition to my personal belongings, I was carrying a

11  pistol and a rifle which was held by Dubai airport Customs when

12  my arrival.  As Dubai have excellent facility for shooting, I

13  would like to use the pistol and rifle for sports activities and

14  I can confirm that the pistols which I intend to use is purely

15  for sports purpose only.  As such, I request you to provide

16  necessary license for the following", and he lists the two

17  items, the pistol, Caliber .45 taurus PT with the corresponding

18  serial number, as well as two, the rifle .50  Caliber McMillan

19  with the corresponding serial number.

20        Judge, I'd like to be able to talk about it because

21  that's part of our abuse of process claim.  I didn't anticipate

22  getting there this quickly, but I understand the judge wants to

23  finish this case and I'm happy to accomplish that if I can help.

24  But I'd like to start moving into that case.  The judge reminded

25  me we have a claim, we only have one, but we have a claim and if

1719

1    I'm not going to -- I need to start doing that.  So I'd like to

2    start, this is the first step, this is the first event of the

3    abuse of process, this is the first arrest that was made,

4    followed by the first event of extortion by Dubai World and I

5    would like to start moving into that.

6         MR. CEDERBERG:  These are what Mr. Jaubert gave to

7    Mr. Ramadan when Mr. Ramadan interviewed Mr. Jaubert and became

8    part of this entire audit report.  Mr. Jaubert's self-serving

9    own statement.  We had Mr. Ramadan here, we had AbdulQader here,

10   they were here to be asked questions about everything, everybody

11   knew they were here, counsel has waited and ingrained this until

12   4:30 to bring this up now at this point in time.  They're

13   self-serving hearsay statements, Your Honor.  He's taken more

14   time to get to this, just to put us in a bind and he's doing

15   this as a way only because he can't get this information to the

16   people who want to see the exhibits.  They're really, Your

17   Honor, they're not a substitute for proof, it's just part of

18   Mr. Ramadan took the statements of everybody and put them in his

19   report.

20        The Court has already ruled in the summary judgment

21   that the incidents involving the bullets are no longer a basis

22   for abuse of process.  It's in the Court's ruling, Your Honor.

23   The Court has already ruled that any torture is not part of this

24   case.  And this should not be brought up at this late hour.

25   This is -- we have then to put to bullets case on, all over, we

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1720

1    have to get our people in here, we have to put in the extortion

2    claim, we have to -- we've been refraining from putting in the

3    conviction and trying to be straight up with the Court and

4    straight up with the other side and this is pure gamesmanship at

5    this time, Your Honor.  Mr. Jaubert wants to testify about this

6    stuff, I think that we can take it question by question whether

7    it's relevant or not.  But to just come in here and read that

8    have --

9         THE COURT:  But it's in evidence is the problem.  It

10   came in in evidence in your case.

11        MR. CEDERBERG:  It came in evidence as part of

12   Mr. Ramadan's report because he interviewed everybody and did a

13   comprehensive report.

14        MR. HESS:  Judge, it didn't come in qualified in any

15   way.  It came in as evidence.  And for Plaintiff's counsel to a

16   accuse me of gaming this and timing it, this the second day of

17   Mr. Jaubert's and Seahorse's case.  The second day.  They had

18   five days.

19        THE COURT:  I don't care about days because the days

20   were involved in only direct, not only direct, but in

21   cross-examination.  And I must say that although the record

22   doesn't reflect it, it should reflect that there are minutes

23   that go by between questions.  Where you go back and you and

24   your partner consult and you're looking to see what paper you're

25   going to put on and, you know, you're going to kill me up here.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1721

```
1          The bottom line is, this case has taken an inordinate
2     amount of time.  That's not the real issue.  The real issue is
3     what is the relevance of this.  You have not, in my opinion,
4     shown any relevance to the abuse of process claim, and therefore
5     I will not permit this to be introduced.  It's already in
6     evidence, but move on.  You can ask questions but, you know,
7     we're not putting this up on the board and going over it again,
8     you had ample opportunity to go over it in the past, move on to
9     something different.   This is -- we're not wasting time on
10    testimony about Dubai Customs determinations because the Dubai
11    Customs is not a defendant in this case, the act of state
12    doctrine does not permit me to rule on the acts taken by a
13    foreign sovereign.  I already ruled on that.  That's the way it
14    is.  Move on.
15         MR. HESS:  Judge, I don't have a problem with that.
16    But --
17         THE COURT:  I know you keep saying I don't have any
18    problem with that, then you want to do it.  Well judge, I don't
19    have any problem with that but then you're going to do it.
20         MR. HESS:  How do I lay the predicate?
21         THE COURT:  I don't know.  Maybe you can.
22         MR. HESS:  Judge, I can if I'm permitted to.
23         THE COURT:  Okay.  I won't permit you to.  Move on.
24    Okay?  Bring in the jury.  I'm just tired of arguing about it
25    because every time I tell you what my ruling is, you say okay,
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1722

1    and then you try to do it again.  I don't care if you call an

2    apple a rutabaga, I'm still not going to let you bring the apple

3    in.  I don't care what you call it.

4              MR. HESS:  Your Honor never ruled that I was precluded

5    from going into this event.  That is a mischaracterization.  In

6    fact, Your Honor ruled exactly the opposite.  Plaintiff's

7    counsel argued over and over --

8              THE COURT:  Bring in the jury please.

9              MR. HESS:  I'd like to proffer evidence.

10             THE COURT:  I've ruled and I'm not going to listen to

11   arguments after I've ruled.

12             MR. HESS:  Will I be permitted to proffer testimony?

13             THE COURT:  Some day perhaps.

14             MR. HESS:  I'm not waiving it by not doing it.

15             THE COURT:  Okay.

16             MR. HESS:  I'm just asking.

17             THE COURT:  If you say so. I'm tired of talking about

18   it okay?  Everything here is interminable.  I've ruled.  We're

19   stuck with my ruling, take it up.

20             MR. HESS:  I'll take that as a denial of my proffer.

21             THE COURT:  Take it anyway you wish, sir.  I'm tired of

22   talking.

23             MR. HESS:  I understand, Judge.

24             THE COURT:  Yes, please.

25             COURT SECURITY OFFICER:  All rise for the jury please.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          (Jury in at 4:25 PM)

2          THE COURT:  Be seated please.  Please proceed.

3          And bear in mind that I've given you a limit that has

4    been over 25 minutes ago, I will permit you to continue a little

5    bit longer, but I am not going to permit you to continue

6    indefinitely so start and go as fast as you can.

7          MR. HESS:  Apologize for taking time, Judge.  Just

8    under Your Honor's order, I'm trying to rush and we had to

9    re-alter everything in terms of the procedure.

10         THE COURT:  That's fine.

11         MR. HESS:  I understand.

12         I'm going to show you what's been marked as Defendant's

13   Exhibit 1584, it's not in evidence yet.

14         MR. CEDERBERG:  I do have an objection to this, Your

15   Honor.

16         THE COURT:  1584?

17         MR. CEDERBERG:  Yes.

18         THE COURT:  I don't know what it is.  You couldn't have

19   dealt with this before the jury came back?  Let me see it

20   please.  Hand it to the court security officer.  What is the

21   objection?  I don't want a speaking objection, just give me tell

22   me what you're talking about.  Tell me in relationship to the

23   rules.

24         MR. CEDERBERG:  Hearsay 403.

25         THE COURT:  Hearsay 403.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1                MR. HESS:  I'd like to respond, Judge, if I may.

 2                THE COURT:  Let me read it first.

 3                MR. HESS:  To remind the Court in the Plaintiff's case

 4      I sought to introduce it, it was objected on.

 5                THE COURT:  And it wasn't your turn so since it was

 6      objected --

 7                MR. HESS:  Yes, Judge.  It was objected on

 8      authentication grounds.

 9                THE COURT:  You're saying this is hearsay?

10                MR. HESS:  I'm saying it's a party admission by the

11      CEO, the new CEO of the corporation.

12                THE COURT:  All right.  Ladies and gentlemen, I'm going

13      to have to ask you to step out again because we're going to have

14      to argue this.  I apologize.

15                COURT SECURITY OFFICER:  All rise please.

16                (Jury out at 4:27 p.m.)

17                THE COURT:  All right, sir.  The door is closed.

18                Please tell me why it's not hearsay.  It's not hearsay

19      because it is a party opponent and Palm Marine being a group

20      member of Istithmar and Dubai World.  Why is it not an admission

21      of a party opponent?

22                MR. CEDERBERG:  Well Your Honor, it's really 403 is my

23      key argument, Your Honor.  Because 403, I think they can lay the

24      foundation.  Maybe not through this witness, maybe they can, to

25      make it a party admission.  But this goes into another situation
```

1   of another employee who ran afoul of Dubai law and has to deal

2   with the passport, and this just is fraught with the same

3   problems we went before with the Turners.  And this is where

4   he's going.

5          MR. HESS:  Judge, it's not a 404 issue now.  You know,

6   everything is not a 404 issue.

7          THE COURT:  No, it isn't.  Tell me what you think, what

8   are you proving with this?

9          MR. HESS:  I don't think -- well, I'm proving that

10  Mr. Jaubert was instructed to write that e-mail and --

11         THE COURT:  Okay.  That part I understand.  What does

12  that prove?

13         MR. HESS:  It shows that he was instructed to write the

14  e-mail and included in the e-mail -- I don't have another copy

15  --

16         THE COURT:  What is the relevance?

17         MR. HESS:  It says that he is that he's threatening the

18  employee, that --

19         THE COURT:  And what does that prove.

20         MR. HESS:  And resort to judicial --

21         THE COURT:  And what does that prove other than the

22  fact that they did it once?

23         MR. HESS:  It proves that Mr. Jaubert understood at

24  that time that that was going to happen to him.  That's his

25  abuse of process situation.  That shows that he understood that

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1726

1   they were going to do that to him because it happened through

2   him by instruction of the CEO to another employee.

3            THE COURT:  Did he actually send this letter out?

4            MR. HESS:  He did.

5            THE COURT:  Okay.

6            MR. HESS:  And then after that, he tried to retract it

7   because he felt badly about it but they wouldn't let him.  I'm

8   not going to go into that all, Judge.  It's as simple as that.

9   I'll move on, put it up there and move on.

10            Judge, if I can't do any of this, then I might as will

11   dismiss my claim now.  I mean, really, I won't have an abuse of

12   process claim.  I don't -- I won't be able to.

13            THE COURT:  I'm not sure you do have an abuse of

14   process claim, but I do believe you're limited in your abuse of

15   process claim to actions that are not related to actions of the

16   Dubai government.  Now, this one is a totally separate matter,

17   the question is whether an act of misconduct as to another

18   person has any probative value as to whether he did it, whether

19   it was done to him in this case and whether the probative

20   effect, if any, outweighs the prejudicial effect.  That's the

21   real issue as far as I see it.

22            MR. HESS:  I understand.  And for two reasons --

23            THE COURT:  Okay.

24            MR. HESS:  For two reasons the probative value of that

25   far exceeds the prejudicial value of it.  Of course it's

1727

1   prejudicial because it makes Dubai World look like they extort

2   people over these things.  Of course it does.  First of all, it

3   shows Mr. Jaubert understood that they had the capacity to do

4   so.  Foremost, which is a completely different issue than was

5   the case with Ms. Fiona Turner, who was not an employee of Dubai

6   World, but was the wife of a Dubai World employee.  It shows

7   that which is completely different than Fiona's case.

8        The reason that's important also is because it's

9   important for me to be able to show, prove my case --

10       THE COURT:  What is this letter saying?  This letter

11  says Dear Herve, write this letter to Bert and in the letter to

12  Bert you're saying, Bert we found out you were taking, you were

13  in business activities outside and you did some work that was

14  conflict.  As a result, I've been told by the chairman that you

15  have two options.  First is they'll do a formal investigation

16  and after it's done, you'll sign it and we'll forward to the

17  Dubai criminal and civil courts for whatever they feel like

18  doing or second, you can waive all of your financial

19  entitlements and quit.  And leave.  And not take any legal

20  proceedings against you -- and will not take any legal

21  proceedings against you with the Security Judicial Authorities.

22       Is that what was done in this case?

23       MR. HESS:  Yes.

24       MR. CEDERBERG:  No, Your Honor.

25       MR. HESS:  Yes.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1728

1    THE COURT:  I don't think so.

2    MR. CEDERBERG:  As a matter of fact, in this case the

3    evidence is that Mr. Jaubert had counsel with him to advise him

4    at every step of the way.  The only thing it could possibly be

5    left was the 2008 meeting in which he didn't sign any document

6    or pay any money.

7    MR. HESS:  I guess the agreement of reconciliation,

8    which has been marked Defendant's Exhibit 1018 which says the

9    first party commits -- the first party being Dubai World

10   Corporation commits to waive the case file at Jebel Ali police

11   station after the full payment of the reconciliation amount.

12       It's the same thing.  Again, if we're going to go into

13   this whether it's extrinsic or not, this has been bothering me

14   for a day now.  And the analogy I have is it's capacity and the

15   analogy I have is driving.  Let's say it's the simplest case.

16   It's a car accident case.  They don't get much simpler than

17   that.  The defense, on behalf of the defendant is, I wasn't the

18   person, which is what Your Honor said which made that an

19   extrinsic event in this case because Dubai World is saying hey,

20   we never do that.  So I can't bring in testimony to contradict

21   that because it's extrinsic.  That would be the case.  On that

22   driver case too.  It's not me.  Bring any evidence into show

23   just because she was driving two days ago, she was driving then

24   and got in a car accident.  No.  This driver says I can't drive.

25   I'm not able to drive.  I can't do it.  But lo and behold, she

1729

1    was driving two days before and she was driving two days

2    afterwards.

3         THE COURT:  This doesn't prove that they did it, it

4    proves that they threatened to do it.

5         MR. HESS:  It proves they had the ability to do it.

6         THE COURT:  How does that prove it?

7         MR. HESS:  Judge, first of all, the evidence -- the 403

8    analysis doesn't require that it proves it, it must be relevant

9    to it.  And it certainly is relevant to a jury that if they had

10   the capacity to do stuff, that they tell their CEO or the former

11   CEO to write a letter to another employee saying to threaten

12   this.  It goes to whether or not they could do it.  Why would

13   they send it if they can't.  And if they are just merely

14   threatening it without the capacity to do it, I suggest that's

15   up to the jury.  It's relevant.

16        THE COURT:  But their claim isn't that they couldn't

17   initiate the judicial process, anybody can initiate judicial

18   process unless that's a weird place, but calling the police and

19   filing a complaint.  Their argument or their position is they

20   couldn't terminate it.  This doesn't move the ball in that

21   direction.  They're not saying I couldn't tell the police about

22   it.  What they're saying is once the police heard about it, we

23   couldn't stop it.  And we did not have the power to get him out

24   of this.  And therefore, what he's saying about that, we were

25   going to get him out if he paid us or we were going to get him

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1730

```
 1    out if he did this or did that, you know, see, it's backwards.
 2              MR. HESS:  I don't have the copy of the letter.
 3              THE COURT:  Well, here, take this one.  I've read it,
 4    but I don't see there's anything in there that talks about the
 5    termination of the legal process.  For abuse of process, if you
 6    could show that they -- you know, somehow that they failed to
 7    take it back, promise to waive.
 8              MR. HESS:  I'm not saying that it is -- it proves our
 9    case.  I'm saying that it's relevant.  Relevant.
10              THE COURT:  Tell me how.
11              MR. HESS:  It's relevant to show --
12              THE COURT:  What does it prove?
13              MR. HESS:  It's relevant to show that they were --
14    well, it's still extortion.  It's not abuse of process, it's
15    extortion to say I'm not --
16              THE COURT:  Then you have gotten into the position
17    where you are saying that you are wanting to prove one bad act
18    to prove that they did another bad act, and that's what you're
19    not allowed to do.
20              MR. HESS:  No, Judge.  I'm wanting to prove that they
21    don't have the capacity.  If the Court is going to constrain
22    this to be such a narrow issue when he took the stand, and I'll
23    look at the testimony, I don't believe that what he said was it
24    was limited to that point that they don't have any power to stop
25    a prosecution.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    THE COURT:  I don't care what he said.  The abuse of

2 process that is alive in this case is their ability to terminate

3 the proceedings by taking the -- by going to the police and

4 saying drop everything, we've settled everything.  But we're not

5 going to do that unless you do A, B, C and D.  That's the abuse

6 of process that I think remains in this case.

7    MR. HESS:  I understand.  Also -- Judge, I'm not going

8 to argue with Your Honor.  I don't want to take anymore time on

9 this, I think Your Honor has ruled so I'm not going to do that.

10 I can't make my point any clearer that I did.

11    THE COURT:  I have to admit that you have always been

12 courteous and I appreciate and I do not ascribe ill motives to

13 what you're saying or doing.  I happen to disagree with you, but

14 you have done it as a gentleman and I appreciate it and I want

15 to make sure I interject that because I don't want you to feel

16 that you're doing in it a wrong way.  I think you're wrong, but

17 I don't think you're doing it for bad purpose.

18    MR. HESS:  The other reason then, Judge, as I stated

19 that it goes to Mr. Jaubert's situation where he's told by Dubai

20 that he's to do this and gives him the understanding of what

21 they will do and what they have the capacity to do.

22    THE COURT:  That even goes in the contrary because if

23 you look at the last paragraph, in the last paragraph they say

24 this doesn't stop you from the responsibility of paying back the

25 money.  It doesn't say, and if you do, we'll drop everything.

1732

1    If it did, then you would have a much better argument.  Do you

2    understand my position on it?  From looking at it, it doesn't

3    look like it's the same kind of situation.  It's a supposedly

4    bad act, and I'm not analyzing to say that it is a bad act, but

5    it's a supposedly bad act, one that the jury might look at with

6    disfavor that is going to show that they did another bad act at

7    another time and I can permit that.  So that's my ruling.

8                MR. HESS:  I understand.

9                THE COURT:  Okay.  Bring in the jury please.

10               MR. HESS:  I don't know, maybe we have some other

11   issues please.

12               THE COURT:  Let's see if we have them because we need

13   to resolve them.

14               MR. HESS:  I'm going to seek the introduction of the

15   reconciliation.  I'm going to seek the introduction of --

16               MR. CEDERBERG:  Just a moment, Your Honor.

17               Your Honor, my response to the proposed admission of

18   the agreement of reconciliation is my understanding that this

19   document came off Mr. Jaubert's own computer and is a

20   translation of an Arabic document.  So I would ask that a good

21   foundation be laid for this.

22               THE COURT:  Okay.  How did it get translated?  Do we

23   know?

24               MR. HESS:  Judge, if I can take a moment and confer

25   with my client?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1733

```
1              THE COURT:  Well, why don't you just ask him now
2    without the jury being here and we'll figure it out, because I'm
3    not sure you should be able to consult with him in the middle of
4    his testimony.  That's the problem we have.
5              MR. HESS:  All right.  I'll ask him.
6              Mr. Jaubert, are you aware of the -- well, can I show
7    him?
8              THE COURT:  Sure, of course.
9              MR. HESS:  What has been marked as Defendant's Exhibit
10   1018.  Have you ever seen that document?
11             THE WITNESS:  Yes, in the auditor's office.
12             (Questioning outside the presence of the jury as
13   follows:
14   BY MR. HESS:
15   Q.  Who provided you with that document?
16   A.  AbdulQader.
17   Q.  AbdulQader is who?
18   A.  I'm sorry.
19   Q.  Who is AbdulQader?
20   A.  The director of Group International Audit of Dubai World.
21   Q.  And he testified at this trial, correct?
22   A.  Yes.
23   Q.  What is that agreement?  What did they seek by that
24   agreement?  What was your understanding?
25   A.  What they seek is that I pay the money that they want and
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1734

1    that if I do so, they would stop -- they would have the

2    prosecution to be stopped and help me recover my passport.

3           MR. HESS:  Judge, this is the document that Your Honor

4    said to me yesterday that we don't need Mrs. Fiona Turner's

5    abuse of process and extortion because I have this document that

6    I have --

7           THE COURT:  It's his position that it was given to him

8    by the auditor?

9           MR. HESS:  Yes, Judge.

10          THE COURT:  What do you have to say about that?

11          MR. CEDERBERG:  May I voir dire?

12          THE COURT:  Very briefly.

13   BY MR. CEDERBERG:

14   Q.  That document is in English.  The document given to you was

15   in Arabic?

16   A.  No, the document was in English.

17   Q.  Okay.  And you had your attorney present at the time?

18   A.  I had an attorney present, yes.

19   Q.  Okay.  And AbdulQader was here in court?

20   A.  Yes.

21   Q.  Okay.  No questions were asked about him on this document.

22          THE COURT:  No, that's argument that you make to the

23   jury.  That's not background.

24          MR. CEDERBERG:  That's my voir dire.

25          THE COURT:  I'll permit it in evidence over your

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1735

```
 1      objection and you can cross-examine on it.

 2                (Defense Exhibit 1018 in evidence)

 3                MR. HESS:  Judge, I have another that I don't know if

 4      it's going to be a problem.  It was marked as 1158, also

 5      provided.

 6                THE COURT:  What number was that one we were talking

 7      about?

 8                MR. HESS:  That's been an exhibit since day one.

 9                THE COURT:  That's in evidence.

10                MR. HESS:  It's 1158, two page document.

11                THE COURT:  That's 1018.

12                MR. HESS:  I'm sorry, Judge.

13                THE COURT:  All right.

14                MR. HESS:  1018 is in evidence.

15                THE COURT:  Now, what are you showing him?

16                MR. HESS:  It's an e-mail.

17                THE COURT:  And it's 1158.  Is that what you're saying?

18                MR. HESS:  Yes.

19                MR. CEDERBERG:  Your Honor, the top portion of the

20      e-mail I have no objection to because that came from us.  The

21      bottom portion is an e-mail from Mr. Jaubert which we can --

22                MR. HESS:  I don't have a problem with that not coming

23      in.

24                THE COURT:  So you'll redact that part?  That's fine.

25      And you will not refer to it and you'll redact it out before you
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    give it to the jury.

2         MR. HESS:  I will, Judge.

3         THE COURT:  Then 1158 subject to that is admitted in

4    evidence.

5         (Defense 1158 in evidence)

6         THE COURT:  All right.  Can we bring the jury in?

7         MR. HESS:  If I can just take a look at this one,

8    Judge?

9         Judge, am I permitted the simple question to justify my

10   abuse of process claim, am I permitted to ask Mr. Jaubert if he

11   was arrested because of the bullets?  That's it.  Because I need

12   that to be able to prove the abuse of process, the first abuse

13   of process that occurred post-arrest.

14        MR. CEDERBERG:  That opens up --

15        THE COURT:  I don't care what it opens up.  I think

16   that he's entitled to say that -- let me think about this.

17        MR. HESS:  Judge, after two hearings on this --

18        THE COURT:  I think you can ask him briefly on whether

19   they held his passport and, you know, which is connected to the

20   bullets, not to the gun and then yeah, that is sufficient.  You

21   need to do that.  You can ask him that, yes sir.

22        MR. CEDERBERG:  Well, first of all, the arrest was a

23   decision by the police of Dubai.

24        THE COURT:  Well, it was and I'm not questioning,

25   nobody is arguing about the legality of that, it is the fact

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1737

1    they had his passport and it was related to the bullets and then

2    he can -- I don't know how he's going to flesh out his abuse of

3    process, but he has to have a starting point.

4              MR. CEDERBERG:  Just so the Court's clear, the passport

5    taken in connection with the bullets wasn't given back, not in

6    time to make the vacation but was given back.

7              THE COURT:  You can develop that.

8              MR. CEDERBERG:  The letter that we're talking about

9    that we just had the voir dire on has to do with a subsequent

10   take --

11             MR. HESS:  There are two events.

12             THE COURT:  I do understand that.  We are talking about

13   two separate events.

14             MR. CEDERBERG:  Well, if the relevancy of the first

15   event is the effect on Mr. Jaubert, he only paid a $2,800 fine

16   for it, Your Honor.

17             THE COURT:  That's not the point, they had his passport

18   and you know, you can go into when he got it back or if he got

19   it back or whatever else.  He needs to have some starting point

20   for his abuse of process.

21             MR. CEDERBERG:  As long as it's a starting and ending

22   point, Your Honor.

23             THE COURT:  I don't know about that, that's up to the

24   skill of his attorney.  We'll see.

25             MR. CEDERBERG:  Okay.  But I will be objecting because

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1      --

2              THE COURT:  Okay.

3              MR. CEDERBERG:  As we go along this opens --

4              THE COURT:  I don't get upset when people object,

5      within reason.  Go ahead.  Call the jury please.

6              MR. HESS:  Judge, while the jury is coming in, may I

7      also -- I don't want to take up time unnecessarily but the one

8      thing I do want the jury to see that they haven't seen is the

9      Discovery in Dubai, it's relevant and I have a short video clip

10     that shows that being it's trailered.

11             THE COURT:  How long?

12             MR. HESS:  I think it's two minutes something.

13             THE COURT:  It's your time, you use it however you

14     want.

15             MR. HESS:  It's not two minutes, Judge, it may be four

16     minutes.  But I want them to see it because --

17             THE COURT:  Okay.  All right.  Go ahead and show parts

18     of it then.

19             MR. CEDERBERG:  Your Honor, I'll just point out I

20     believe the Court ruled in summary judgment that as liability on

21     the claim for the Discovery, has already been found --

22             THE COURT:  Okay.  That's all right.  We'll let him

23             (Jury in at 4:44 p.m.)

24             MR. HESS:  I'm sorry.  I said Discovery, Judge, I meant

25     Adventurer.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1              THE COURT:  Okay.  Adventurer.
 2              MR. CEDERBERG:  Less of an objection.
 3              THE COURT:  Okay.  Please be seated.
 4              We're going to try to get some stuff done so we might
 5    keep you a few minutes, but it's not by choice I promise you.
 6              Yes, sir.  You may proceed.
 7              MR. HESS:  Thank you, Judge.
 8              THE COURT:  And we're making progress no matter what it
 9    looks like.  With the cooperation of both sides and their
10    attorneys.  We're doing as well as we can.
11    BY MR. HESS:
12    Q.  Did there come a time during your stay in Dubai that you
13    were arrested by the police?
14    A.  Yes.
15    Q.  And what was that arrest for?  What was alleged in the
16    arrest?
17    A.  I'm sorry?
18    Q.  What were you arrested for?
19    A.  Two years and a half before when I move to Dubai, I brought
20    with me some ammunitions.  And in April, 2007, AbdulQader called
21    the police to make a statement, to declare that I had
22    ammunitions in my office.
23              MR. CEDERBERG:  Your Honor, move to strike, no
24    foundation as to what -- outside of what he was arrested for and
25    added things that he has no personal knowledge of.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1740

 1          MR. HESS:  No objection.

 2          THE COURT:  We'll strike that and the jury will

 3     disregard that.  Ask him a different question.  Be more precise.

 4     And I'm not saying you did that on purpose, but it just came

 5     out.

 6     BY MR. HESS:

 7     Q.  You were arrested in Dubai, correct?

 8     A.  Yes.

 9     Q.  And what were you arrest -- just first, let's just start out

10     with what was the allegation against you that caused you to be

11     arrested?

12     A.  Because I had ammunitions at Exomos.

13     Q.  And what kind of ammunitions were they?

14     A.  50 Caliber sport shooting bullets.

15     Q.  And why did you bring those bullets with you?

16          MR. CEDERBERG:  Objection, relevancy, Your Honor.

17          THE COURT:  Yeah, I don't think it matters why.

18          MR. HESS:  Can I at least go into the fact that he had

19     a sporting rifle with him briefly, Judge.

20          THE COURT:  Yeah.  You know, I think everybody is aware

21     of that, but yeah, go ahead.

22     BY MR. HESS:

23     Q.  Did you bring with you a .50 Caliber shooting rifle?

24     A.  Yes.

25     Q.  Okay.  And as the result of that arrest, was your passport

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    confiscated?

2    A.   My passport was confiscated, yes.

3    Q.   Now, during that period of time following your passport

4    being confiscated, did Dubai World approach you to sign an

5    agreement?

6    A.   Yes.   They were asking me to -- they said they wanted to

7    help me recover my passport, so they said if I help them, they

8    would help me.

9    Q.   What did they want you to sign?

10        MR. CEDERBERG:   Your Honor, objection as to "they", can

11   we have specific --

12        THE COURT:   Yeah, be more specific.   Who approached

13   you, who asked you.

14   BY MR. HESS:

15   Q.   Who did you talk to?

16   A.   AbdulQader and Hussein Ramadan.

17   Q.   The two people that testified?

18   A.   The two people that were here.

19   Q.   What did they tell you?

20        MR. CEDERBERG:   Same objection.   Can we be more

21   specific?

22        THE COURT:   Who said what to you?

23   BY MR. HESS:

24   Q.   Yes.   What did AbdulQader tell you regarding your passport

25   being held by the police?

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    A.  He told me that if I --

2    Q.  Because of the bullets case.

3    A.  He told me if I paid the money they wanted, he would help,

4    he would facilitate the return of my passport.

5    Q.  How much money did he want you to pay?

6    A.  I think it was almost $2 million.  I don't remember.  1.5

7    million, $2 million.

8            MR. HESS:  If you could show what's been marked as

9    Defendant's Exhibit -- the one that's redacted,

10   BY MR. HESS:

11   Q.  What you're looking at is Defendant's Exhibit 1158-1.  Do

12   you recognize that document?

13   A.  Yes.  This is an e-mail I sent to somebody I thought was a

14   friend.

15   Q.  Look at this document.  Who is that document from?

16   A.  It's from Yousef Kazim to me.

17   Q.  Who is Yousef Kazim?

18   A.  He's a director at Nakheel Dubai World.

19   Q.  This was sent by Mr. Kazim on June 28, 2007, correct?

20   A.  Yes.

21   Q.  And it says "Dear Herve, I had a meeting with AbdulQader.

22   Your passport is tied up with GIA, sorry I can't help.  Regards

23   Yousef Kazim", correct?

24   A.  Yes.

25   Q.  What is GIA?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.   Group Internal Audit.

2    Q.   Now, when you have no passport in Dubai or when you have no

3    passport and you're an expatriate, what disabilities does that

4    create?

5         MR. CEDERBERG:   Objection, calls for a legal

6    conclusion, speculation, foundation, Your Honor.

7         THE COURT:   Ask him what happened to him as a result of

8    not having his passport.

9    BY MR. HESS:

10   Q.   Okay.   Without a passport what was the repercussions, could

11   you rent a car?

12   A.   I can -- a passport when you're in the US, is a travel

13   document.   In Dubai, your passport is everything.   Not just a

14   travel document.   You cannot buy a car.   Without a passport, you

15   cannot buy a car, you cannot a rent a house --

16        MR. CEDERBERG:   Your Honor, the question -- what the

17   Court instructed was what happened to him.

18        THE COURT:   Yeah.   Tell us what happened to you as a

19   result of -- how did it limit you in your every day activities?

20        THE WITNESS:   What happened to me is that without my

21   passport, I could not function normally as a human being.

22   BY MR. HESS:

23   Q.   Could you leave the country?

24   A.   I could not leave the country.   I could not support my

25   family, I was evicted out of my house.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.  Now, did there come a time where -- now in light of your

2    understanding that group internal audit, did you sign an

3    agreement with group internal audit?

4    A.  I signed one agreement under duress, that it was under

5    duress.  An agreement that I would pay about $40,000 to Dubai

6    World.

7    Q.  Okay.  That's the document we saw during Plaintiff's case?

8    A.  Yeah, but it was under duress and I did it, I planned it, I

9    did it on purpose because I knew that at the time.

10         MR. CEDERBERG:  Objection, Your Honor, it's beyond the

11   scope of the question, Your Honor.

12         THE COURT:  Yeah.  It wasn't the question.  Sustained.

13   Ask a different question.  Ask another question.

14         MR. HESS:  First I'd like him to take a look at that.

15   If you can show Mr. Jaubert what's been marked as Plaintiff's

16   Exhibit 100-161 in evidence.  That's not the document.

17         Showing counsel what's been marked as Defendant's

18   Exhibit 1743.

19         MR. CEDERBERG:  No objection, Your Honor.

20         THE COURT:  Without objection, 1743 is admitted in

21   evidence.

22         MR. HESS:  Thank you, Judge.

23         (Defense 1743 in evidence)

24   BY MR. HESS:

25   Q.  If I could show the defendant 1743, show Mr. Jaubert 1743.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1              THE COURT:  Okay.  Look at it on the board.  It might
 2   be easier to look at it on the screen in front of you.
 3   BY MR. HESS:
 4   Q.  Do you see that, Mr. Jaubert?
 5   A.  Yes, this is the payment, 140,000 dirham which is about
 6   $40,000 that I was forced to pay Dubai World under the threat of
 7   being imprisoned if I did not.
 8   Q.  Now, when you said the threat of being imprisoned, did Dubai
 9   World threaten you with imprisonment?
10   A.  AbdulQader in person and Hussein Ramadan on two different
11   occasions said that they would -- if I paid they would keep me
12   out of prison.
13   Q.  They tell you what would happen if you didn't pay?
14   A.  If I did not pay, I would go to prison.
15   Q.  Did you believe them?
16   A.  Yes, I believed it.
17   Q.  Now, there came a time where you were arrested again,
18   correct?
19   A.  Yes.  Second time, nine months later.
20   Q.  Now, what was that arrest for?
21   A.  This time it was for the accusations of embezzlement, fraud
22   and whatever.
23   Q.  All right.  Now, did there come a time where you were --
24   where you met with AbdulQader again?
25   A.  Yes.  Shortly after the questioning by the police, they took
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    my passport again and I asked a meeting with AbdulQader.

2    Q.   And did you have that meeting with AbdulQader?

3    A.   I had that meeting with AbdulQader a few days later.

4    Q.   And did you have -- did you get a lawyer because of this

5    second event?

6    A.   I got a lawyer but --

7    Q.   Did you get a lawyer?

8    A.   Yeah, I got a lawyer.

9    Q.   Did you have a lawyer when you were arrested the first time?

10   A.   The first time, no.

11   Q.   The second time for the -- this -- the allegations of

12   extortion?

13   A.   Yes.

14   Q.   Did you have a lawyer then?

15   A.   Yes.

16   Q.   Now, you had a -- were you presented with -- what -- did

17   AbdulQader -- AbdulQader is the person that testified here in

18   your case, right?

19   A.   Yes, uh-huh.

20   Q.   I misspoke.  I didn't mean to say extortion, I meant

21   embezzlement, the allegation of embezzlement was the reason that

22   you were arrested the second time?

23   A.   Yes.

24   Q.   It's the allegation that the Plaintiff is asserting in this

25   case, correct?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

 1    A.  Yes, it's the same allegation.

 2    Q.  It's the allegation that you addressed in that e-mail to

 3    Mr. Ramadan, correct?

 4    A.  Yes.  Yes.

 5    Q.  Okay.  Now, the second time with the second arrest, you said

 6    you had a meeting with Mr. AbdulQader?

 7    A.  Yes.

 8    Q.  Did he -- let's show -- let's -- may we show Mr. Jaubert

 9    what's been introduced into evidence as Defendant's 1018.  Do

10    you recognize that agreement?

11    A.  Yes.

12    Q.  It's called agreement of reconciliation, correct?

13    A.  Yes.

14    Q.  Let's take a look at the second clause of that document if

15    we may.  Blow that up please.  Says the first party and the

16    first party is defined as the auditors of Dubai World company,

17    right?  Says that on -- Charles, can you pull that down so they

18    can see the top?  I'm sorry.  Thank you.

19         It says on number one it says MS auditors of Dubai

20    World Company, referred to hereinafter as the first party.  We

21    go to the second clause.  The first party commits to waive the

22    case file at Jebel Ali police station after the full payment of

23    the reconciliation amount which is AED 3 million.  Right?

24    A.  Right.

25    Q.  This is the document -- who gave you this document?

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    A.   AbdulQader.

2    Q.   What did he tell you?  What did he say?

3    A.   He told me it was not personal, only they just wanted to

4    help me and they wanted that we stay good friends and if I paid

5    3 million dirham, they would solve everything and they would

6    arrange for me to get my passport back.

7    Q.   And under the first clause it says that the first party

8    determined AED 3 million, then it says only 3 million AED as the

9    amount payable by the second party after deducting huge amounts

10   as a glimpse of goodwill to reconcile the issue of disputes,

11   right?

12   A.   Right.

13   Q.   Then when we go up to the top, it also says to the preamble,

14   it says the second party, and that's designed as you, Herve Jean

15   Pierre Jaubert, the second party shall acknowledge, if you can

16   pull up the preamble?  Yes.

17        THE COURT:  No, the preamble is the next thing.

18        MR. HESS:  I just read it.  One more.  Yeah.  No.  One

19   more down.  No, one more down.  Thank you.  Perfect.  Thank you.

20   BY MR. HESS:

21   Q.   The second party shall acknowledge that he is charged with

22   payments in favor of Dubai World Company with the affiliated

23   companies and the company where the second party worked as

24   executive manager, the second party shall show his readiness to

25   reconcile the disputes issue in accordance with the terms and

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    conditions of this contract.  Right?

2    A.  Correct.

3    Q.  Very similar to the first contract they made you sign,

4    right?

5    A.  The one under duress?

6    Q.  Yes.

7    A.  Yes.

8    Q.  Did you sign this one?

9    A.  I did not sign this one.

10   Q.  Why didn't you sign this one?  Well, let's talk about why

11   did you sign the first one.

12   A.  Because I was under duress and AbdulQader said if I did not

13   sign, I would go to prison.

14   Q.  So -- and is the date of this approximate -- did this

15   agreement of reconciliation that's been introduced as 1018, was

16   it presented to you on or about September or -- I'm sorry, March

17   of 2008?

18   A.  It was presented to me, yes, about that time.  But it was

19   not given to me.  I never had that document.  Was presented to

20   me, I remember it and it was produced by Dubai World attorneys.

21   Q.  You saw it back then?

22   A.  Oh, yes.  I saw it, yeah.

23   Q.  Did you sign this document?

24   A.  I did not sign it, but agreed verbally.

25   Q.  And where did it come about that you agreed?  Did you have a

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    meeting?  How did that --

2    A.  It was -- no.  When I had -- after the arrest at the police

3    station, the questioning, I had the meeting with AbdulQader and

4    6 or 7 auditors and at that meeting, I agreed that I would pay

5    $3 million.  Because I agreed verbally, they prepared that

6    document, but I never signed it.  The reason why I agreed

7    verbally was because I needed time to prepare my escape.

8    Q.  Now, when they -- when AbdulQader approached you and said

9    what you said he said, did you have your passport?

10   A.  No, I didn't have my passport, no.

11   Q.  Was your wife and children, were they still here?

12   A.  They were still in Dubai.

13   Q.  Was Hussein Ramadan, was he involved in this agreement of

14   reconciliation?

15   A.  Yes.  Same way.

16   Q.  And he's the same Hussein Ramadan that you sent that e-mail

17   to on May 12 of 2007 which has been marked as Plaintiff's in

18   evidence 147.1,004.  147-1004.  I'm sorry.  147,100-1.  Page

19   one.  That's the e-mail we already looked at, six pages, right?

20   A.  Yes.

21   Q.  He had already gotten that -- prior to, did he already have

22   that prior to AbdulQader and himself approaching you to agree to

23   pay 3 million dirham?

24   A.  What do you mean?  I sent that e-mail prior to that?  Yes.

25   Q.  Now, did you ever admit to anyone that you committed any

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    wrongful act when you were the CEO of Exomos?

2    A.  Absolutely not.

3    Q.  Did you ever commit any wrongful act when you were the CEO

4    of Exomos?

5    A.  Absolutely not.

6    Q.  Did you try to explain to AbdulQader that these accusations

7    are not true?

8    A.  Absolutely.  Once every two weeks for --

9    Q.  What did he say to you in response, if anything?

10   A.  I explained to him that whatever money they were --

11        MR. CEDERBERG:  The question is what is --

12        THE COURT:  Listen to the question please.

13   BY MR. HESS:

14   Q.  What did he explain to you, if anything?

15   A.  He explained that if I did not pay the money, I would go to

16   prison.

17   Q.  Did you believe him?

18   A.  Oh yes, I believed him, yeah.

19   Q.  Now, what did you do when you were presented with this

20   agreement of reconciliation that's marked as 1018?  Could you go

21   back to 1018?

22        MR. CEDERBERG:  Could we be more specific in time

23   because --

24        THE COURT:  Yeah, try to.

25   BY MR. HESS:

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.  When you received -- when you were given this agreement to

2    sign by AbdulQader as you testified to, this one that's on the

3    stand, on the screen, do you see it?

4    A.  I did not sign this agreement.

5    Q.  Okay.

6         THE COURT:  Yeah, we know that.  The question is what

7    did you do then?

8    BY MR. HESS:

9    Q.  What did you do the next day.  Did you go home after that?

10   A.  Yes.  I went home but I was already preparing my escape.

11        MR. CEDERBERG:  Excuse me, Your Honor.  The answer is I

12   went home.  The Court has made some rulings here.

13        THE COURT:  Yeah, that's all right.  Let's just move on

14   from here.  I agree.  Please try to listen to the question

15   carefully and answer the question to the best of your ability.

16   Your lawyer will have an opportunity to ask you more questions.

17        MR. HESS:  Did you prepare -- well, I'm not sure if I

18   understand what the Court's ruling was on that.

19        THE COURT:  The Court's ruling was he should answer

20   your questions.

21        MR. HESS:  I wasn't sure if it was more than that.

22        THE COURT:  And that you have other questions that you

23   can ask him.

24   BY MR. HESS:

25   Q.  Now, what did you do then?  I mean, what was your plan.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          MR. CEDERBERG:  Objection, Your Honor.  Relevance.

2     We've been through this.

3          MR. HESS:  Judge, it goes to the abuse of process, goes

4     to his damages of abuse of process.

5          MR. CEDERBERG:  Your Honor, I believe we've had this

6     discussion and --

7          THE COURT:  Ladies and gentlemen, excuse us again.  I'm

8     sorry to keep running you up and down, but it's good exercise

9     and years from now you'll look back and you'll thank me for

10    this.  Meanwhile I'm sitting over here getting bigger and

11    bigger.

12          (Jury out at 5:07 p.m.)

13          THE COURT:  All right.  Close the door please.

14          Yes, sir.  Tell me what your argument is, defense

15    first.  I mean Plaintiffs first.

16          MR. CEDERBERG:  The argument is simple, Your Honor.  If

17    Mr. Jaubert has economic damages, he certainly hasn't showed

18    them because he didn't pay any money.  If he's got something

19    like mental distress, he can talk about his doctor bills and

20    things like that.

21          What this question is designed to do is elicit

22    Mr. Jaubert to tell the story he wrote in his book, to promote

23    it for a movie which has no relevance, Your Honor.

24          THE COURT:  Do you think he's doing a movie trailer

25    instead of testifying in his case?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1754

1       MR. CEDERBERG:  We do, and we thought it from the very

2    beginning, Your Honor.

3       THE COURT:  Well, I'm going to give him somewhat of an

4    opportunity to sell his book, so I'm going to let him testify

5    about, within limits, because I'm not going to get into a spy

6    story.  This is not a spy story.  Factually you can elicit from

7    him that he made preparations and that he escaped.  And that's

8    fine.  You know, you can ask him how he escaped and that's it.

9    But I do not want to hear this "they messed with the wrong guy"

10   or, you know, "they didn't know who they were fooling with, I'm

11   a spy", and all this other nonsense that I don't want to hear

12   about.

13      MR. HESS:  Not going to do it.

14      MR. CEDERBERG:  Your Honor, because I'm in a bad

15   position because I have to keep jumping up because I don't know

16   --

17      THE COURT:  It's good for you too.  You could use the

18   exercise.

19      MR. CEDERBERG:  I realize I could use the exercise,

20   Your Honor, I'm not disputing that.  Can we confer for one

21   second, Your Honor?

22      THE COURT:  Sure.  Go ahead.

23      MR. CEDERBERG:  Your Honor, we've touched on this

24   before, but if the circumstances of his escape come in which

25   have no relevance to damages whatsoever in this case, we're

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    going to have to extend this trial.  We have to, Your Honor.  To

2    show all the -- to show the escape, all the misstatements in the

3    book about the escape, gives me 300 pages worth of things to

4    cross him on, otherwise he could say whatever he want.

5              THE COURT:  Take your best shot.  I'll deal with that.

6              MR. CEDERBERG:  We have to bring in the plan to write

7    the book, the extortion, attempt to extort money from Dubai, the

8    $30 million, the fact that he left the country and made the

9    escape is fine.  But all the details of how he escaped have

10   nothing to do with damages whatsoever, Your Honor.

11             THE COURT:  I think the escape can show how stressed he

12   was and it can show how it affected him.  I already said that I

13   don't want to hear a lot of the stuff.  If you think he's making

14   stuff up and you have the ability to prove that, go for it.

15             MR. CEDERBERG:  It's going to take me more than a day

16   to prove it, Your Honor.

17             THE COURT:  Maybe not.  We'll see.  All right?

18             MR. CEDERBERG:  I just want --

19             MR. HESS:  I thought it was going to take me more than

20   a day to prove my stuff too.

21             THE COURT:  We'll see how it works.

22             MR. CEDERBERG:  At the beginning, we said this was

23   going to turn into a circus, we're at that point now.

24             THE COURT:  I haven't seen the guy with the red nose

25   yet so it's not really a circus.  I don't like clowns anyway,

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1756

1    they're scary.  Move on please.

2              MR. CEDERBERG:  I will make my objections at the

3    appropriate times until we find out --

4              THE COURT:  Perfect.  Okay.  Thank you.  We'll do that.

5              MR. CEDERBERG:  And Your Honor, if it does go too far,

6    I do want to reserve my right to open up the possibility of a

7    motion for mistrial outside the presence of the jury.

8              THE COURT:  Of course.  We can do that.

9              COURT SECURITY OFFICER:  All rise for the jury please.

10             (Jury in at 5:12 p.m.).

11             THE COURT:  Please be seated.  You may proceed, sir.

12             MR. HESS:  Thank you, Judge.  Judge, housekeeping

13   matter.  I'm seeking to introduce into evidence, we've talked

14   about them before, it's the bank statements, it's Defendant's

15   1743.

16             THE COURT:  I have 1743 already being in evidence.

17             MR. HESS:  Okay.  We missed it.

18             THE COURT:  Okay.  Okay.  Go.

19             MR. HESS:  Thank you, Judge.

20   BY MR. HESS:

21   Q.  Before we start talking about that, I do want to clarify one

22   thing.  How many meetings did you have with Group Internal Audit

23   on this on the issues about the alleged -- the accusations of

24   mismanagement and embezzlement?

25   A.  Between 20 and 30.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   Q.  And where did they occur?

2   A.  At Group Audit offices.

3   Q.  Under what circumstances?  Did they summon you, did you

4   request them?  How did they work or if they differed each one,

5   then make sure you make that clear.

6   A.  Well, basically they called me and they -- I have to go to

7   the office right away.  No notification.  And they also don't

8   ask me to bring any documents or something like that.  Just to

9   go to the office.

10  Q.  And what would they say to you?

11         MR. CEDERBERG:  Objection, Your Honor, with the "they"

12  again.

13         THE COURT:  Who were you talking to?

14  BY MR. HESS:

15  Q.  Who was present?

16  A.  Hussein Ramadan or AbdulQader.

17  Q.  So sometimes it was just Hussein Ramadan?

18  A.  And sometimes it was AbdulQader.

19  Q.  And sometimes it was AbdulQader and Hussein Ramadan

20  together.

21  A.  Yes.

22  Q.  Is that true?

23  A.  Uh-huh.

24  Q.  Okay.  I guess we'll go through them all just briefly.

25         When you were present with Mr. Ramadan, what would he

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1758

```
 1    tell you during these 20 or so sessions that they summoned you
 2    to?
 3    A.  It was always the same.  He would bring those invoices and I
 4    would try to explain and what it was and he would not just -- he
 5    would not listen.  He would keep going and keep going and asking
 6    for the money.  And at one point because the discussions were
 7    not going anywhere --
 8         MR. CEDERBERG:  Excuse me, Your Honor.  We're going
 9    again past what Mr. Ramadan said.
10         THE COURT:  I'll permit this for this point.  At some
11    point I will stop him, but maybe it will help move along.
12    BY MR. HESS:
13    Q.  So it would be the same you said.  So what would happen?  He
14    would ask you -- he would put on a screen, literally on a screen
15    documents?
16    A.  Documents.  Not on a screen, he would give me documents.
17    Q.  And the same documents that you saw during this trial?
18    A.  The same documents, yes.
19    Q.  Did he accuse you of not -- of padding your bills, Seahorse
20    bills?
21    A.  Yes.
22    Q.  Did he accuse you of padding the bill that was for $186,000?
23    A.  Yes.
24    Q.  The one we saw today that Seahorse actually paid the full
25    amount before it was reimbursed.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1              THE COURT:  That's argument, Counsel.  That's argument.
 2     Just ask him what did they say.  Don't lead him.
 3              MR. HESS:  I'm getting an objection, I'm trying to hold
 4     it down.
 5              THE COURT:  I understand.  Just ask him.
 6     BY MR. HESS:
 7     Q.  What did they say?
 8     A.  About what?
 9     Q.  What would they say each time.  You said it was the same.
10     They presented you with these documents?
11     A.  They presented me with these documents.  Every time I would
12     give them the explanation and they would not just listen.  They
13     would ignore, disregard my comments or responses or even the
14     documents that I would show them.
15     Q.  Was the final meeting you had the one where you were
16     presented with the agreement of reconciliation that's been
17     entered into evidence 1018?
18     A.  That was the final meeting where I agreed verbally.  I did
19     not sign that document.
20     Q.  So what, so you said you had a plan.
21     A.  I had a plan.
22     Q.  What was your plan?
23              MR. CEDERBERG:  Objection, relevancy 403.
24              THE COURT:  Overruled.
25     BY MR. HESS:
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.  What was your plan?

2    A.  To escape.

3    Q.  And what did you do to effectuate that plan.  What did you

4    have to do, how much time did it take to --

5    A.  Months.

6    Q.  How much?

7    A.  Months.

8    Q.  And you had a passport during this period of time?

9    A.  I did not have my passport.

10   Q.  Was your family still in Dubai during that period of time.

11        MR. CEDERBERG:  Can we focus on time periods?

12   BY MR. HESS:

13   Q.  The month following the meeting that you had on or about

14   September 3, 2008 where they wanted you to sign the agreement of

15   reconciliation, Mr. AbdulQader, and you refused?

16   A.  Yes, but my family was with me.

17   Q.  When did your wife and children leave Dubai?

18   A.  I believe it was around April 3rd or 4, I'm not sure.  I'm

19   not sure of the date.

20   Q.  I just said September 3.  I just read the date because it's

21   written in the --

22   A.  I sent them back to the US.

23   Q.  Let me finish.  When the agreement of reconciliation, it was

24   in March of 2008, correct?

25   A.  Yes.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.  I just read it wrong.  I said -- okay.

2         So when did your family leave Dubai?

3    A.  April 3rd or 4, I'm not sure.  Around that date.

4    Q.  Had you left Dubai prior to them leaving Dubai?

5    A.  Me?

6    Q.  Yes.

7    A.  No.  I left after they left.

8    Q.  Now, what was the plan that you -- it took a month to

9    accomplish?

10        MR. CEDERBERG:  Objection, relevancy 403.

11        THE COURT:  Overruled.  I'll let him get into it at

12   least in general terms, broad brush terms.

13   BY MR. HESS:

14   Q.  What did you do?

15   A.  I purchased equipment, I purchased a rubber boat, I

16   purchased a sailboat to be able to escape through the ocean and

17   go into India.

18   Q.  Was it difficult to accomplish those things without a

19   passport?

20   A.  Extremely difficult.

21   Q.  Why?

22   A.  You can't travel without a passport.

23   Q.  Can you buy things without a passport?  Could you rent a car

24   without a passport?

25        MR. CEDERBERG:  Objection, Your Honor.  Asked and

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1762

1    answered, compound.

2              MR. HESS:  Going to time period now, Judge.

3              THE COURT:  It has been asked and answered.

4    BY MR. HESS:

5    Q.  What did you do with the items -- well okay, how did you set

6    up your escape?

7              MR. CEDERBERG:  Relevancy, 403.

8              THE COURT:  Overruled.

9    BY MR. HESS:

10   Q.  Tell the jury, step by step, without belaboring the points,

11   how you escaped from Dubai.

12             MR. HESS:  May I have that narrative just to ask him to

13   tell them?

14             THE COURT:  Start talking and we'll see.

15   BY MR. HESS:

16   Q.  Okay.  Go ahead.

17             THE COURT:  If he wanders too far afield, we'll stop

18   him.

19             THE WITNESS:  I jumped in a rubber boat.

20   BY MR. HESS:

21   Q.  Well, let's talk about what did you have to accomplish to do

22   that?

23   A.  It's very complicated.  You just don't escape a country like

24   that without a passport.

25             THE COURT:  Then you can't do a narrative.  Ask him

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1763

1    questions.

2    BY MR. HESS:

3    Q.  It's complicated.  Tell the jury what you did to escape.

4           THE COURT:  You already told us that you bought

5    equipment.

6    BY MR. HESS:

7    Q.  A rubber boat?

8    A.  I bought equipment, a rubber boat like 12' rubber dinghy and

9    a sailboat.

10   Q.  Who did you buy a sailboat from?

11   A.  From the brother of the president.

12   Q.  The president?

13   A.  Of the UAE, but he did not know who I was of course.

14   Q.  What kind of boat was that?

15   A.  It's a sailboat.

16   Q.  How big?

17   A.  40 something feet, 45'.

18   Q.  You have a rubber dinghy and a sailboat.  What did you do to

19   effectuate using the rubber dinghy and the sailboat?

20          MR. CEDERBERG:  Excuse me. 403, relevancy.

21          THE COURT:  Overruled at this point.

22          THE WITNESS:  I trained a friend to operate my

23   sailboat, then I took the rubber boat on a Friday morning,

24   sailed it to international waters.

25   BY MR. HESS:

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   Q.  We're going to get to that, but I want to spend a moment or

2   two.  You said it was complicated.  Was it difficult to get to

3   the point of getting in the rubber dinghy to go the sailboat?

4   Did you have to do anything before then?

5   A.  Of course.

6           MR. CEDERBERG:  Same objections, Your Honor.

7           MR. HESS:  That's what we want to hear about.

8           THE WITNESS:  I had to hide.  When I did not show up

9   for that meeting to sign the agreement, then I became a wanted

10  man with a bounty of $2 million on my head.  So I had to hide.

11          MR. CEDERBERG:  Move to strike, Your Honor, no

12  foundation as to personal knowledge.

13          THE COURT:  Sustained.  But this is precisely why he

14  was doing fine with the simple way and then you wanted more gory

15  details and that's when we get into the problems.  Just a simple

16  fact of what he did, how he did it, you can ask him questions

17  about difficulty and other things, but let's just try to get the

18  how it was done because we are not going to be here all night.

19  I promise you.

20  BY MR. HESS:

21  Q.  During the month that you were preparing, what were you

22  preparing?  What were you doing every day?

23          MR. CEDERBERG:  Same objections, Your Honor.

24          THE COURT:  Overruled at this point.

25          THE WITNESS:  Buying equipment, preparing myself to

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    escape and get to the point to that escape.

2    BY MR. HESS:

3    Q.  What did you buy, did you buy maps?  What did you buy?

4    A.  I buy GPS navigation system, I bought maps, I bought

5    documentations about India, I bought women's clothing, I bought

6    radio transmissions, satellite phone.

7            THE COURT:  All right.  Ask another question.

8    BY MR. HESS:

9    Q.  Where did you -- did you live in your home when this was

10   going on?

11   A.  I had no home at that time.

12   Q.  Okay.  Was your family already gone by this time?

13   A.  My family was already gone so I was being hotels under

14   aliases, different aliases.

15   Q.  Was it confirmed -- did you have confirmation that your wife

16   and children had already gotten out of Dubai at that time?

17   A.  She called me when they were taxiing.

18   Q.  Okay.  Now, so during this period of time, where were you

19   residing?  How did you accomplish that?

20   A.  After they left?

21   Q.  Yes.

22   A.  Between hotels.  I would stay two nights at a hotel then

23   switch to the next.

24   Q.  How would you stay at a hotel without a passport?

25           MR. CEDERBERG:  Relevancy, 403, Your Honor.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1766

1         THE COURT:  No, I'll permit it at this point.  Just get

2    into that.

3         THE WITNESS:  I was using somebody else's passport.

4    BY MR. HESS:

5    Q.  Now, what were you doing when you were going hotel to hotel?

6    Were you preparing anything during that period of time?

7    A.  I was preparing my escape.

8    Q.  What were you doing specifically?

9    A.  Getting paperwork, material and equipment, I bought a

10   sailboat, but it's a used boat.  I had to ready it for a

11   crossing of about 1,300 miles.

12   Q.  Did there come a time where your preparations were

13   completed?

14   A.  At one point my preparation was completed.

15   Q.  What did you do?

16   A.  I also had to train my friend how to maneuver my boat.

17   Q.  How did you do that?

18   A.  We just -- I just explained him in inside the marina, I had

19   -- how to operate the motor, how to steer the boat.  I could not

20   get out of the marina because I didn't have a passport.

21   Q.  So you needed a passport to get out of the marina?

22   A.  Yes.     So I taught him the basic of the navigations, so

23   he could meet me in international waters.

24        MR. CEDERBERG:  Objection, beyond the scope of what he

25   asked.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1767

```
 1              THE COURT:  It is but I'm going to permit it at this
 2    point.
 3    BY MR. HESS:
 4    Q.  Were you ready then to effectuate your escape?
 5    A.  Yes, I was ready.
 6    Q.  Okay.  Now, what was the first -- was there -- when did you
 7    -- was there a point in time where you actually started what you
 8    considered starting your escape, the final escape process?
 9    A.  The final step was when I asked my friend to take the boat
10    out of the marina.  At that point there was no return.
11    Q.  All right.  What did you do?
12              MR. CEDERBERG:  Objection, Your Honor.  Hearsay or --
13    not hearsay, excuse me. 403 and relevancy.
14              THE COURT:  Overruled.
15    BY MR. HESS:
16    Q.  Go ahead.  What did you do?
17    A.  So as he was leaving the marina from south of Dubai --
18    Q.  Did you witness him doing that?
19    A.  Yes, I was there.  So then I went across the Emirates on the
20    other side and waiting for him.
21    Q.  Okay.
22    A.  Then we met in the Port of Fujairah which is the other
23    Emirate across the UAE.  It's not Dubai, it's on the other side
24    on the Arabian Sea.  I took the rubber boat, the rubber boat was
25    on the sailboat, so I put it in the water and I took --
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.   How did you get from Dubai to Fujairah?

2    A.   Yes.

3    Q.   How did you get there?

4         MR. CEDERBERG:   Objection, relevancy, 403.

5         THE COURT:   It's getting close, but --

6    BY MR. HESS:

7    Q.   Did you drive there?  Did you walk there?

8    A.   I took a ride with some tourists who was going over there.

9    Q.   All right.  Go ahead.

10   A.   So once I'm in Fujairah, I wait for my friend.  Then my

11   friend showed up and gave me the rubber boat.  I grabbed my bag

12   and my equipment, we had already prearranged the timing, the

13   schedule, the radio contacts and everything and I jumped in the

14   boat, in my rubber boat.

15   Q.   Did you have a radio to communicate with him?

16   A.   I had a satellite phone.  Not radio.

17   Q.   All right.  Therefore there was a satellite phone on the

18   boat on the sailboat also?

19   A.   A small one.

20   Q.   Okay.  What time of day or night was this?

21   A.   It was in the morning.  10:00 in the morning.

22   Q.   All right.

23   A.   And then I executed the escape course, not just straight

24   offshore because there I could be identified or I could be

25   observed.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1              MR. CEDERBERG:  Your Honor, move to strike.

 2              THE COURT:  Sustained.  Move on.

 3    BY MR. HESS:

 4    Q.  Go on.  No, I'm sorry.  Step back one step.  All right?

 5    What did you do next?

 6              MR. CEDERBERG:  403, relevancy, Your Honor.

 7              THE COURT:  Overruled.  Reluctantly.  Move on please.

 8    Go.

 9              THE WITNESS:  I sailed into international waters 24

10    miles offshore.

11    BY MR. HESS:

12    Q.  All right.  How long did that take you?

13    A.  And then --

14    Q.  How long did that take you?

15    A.  To get there, about two, three hours.

16    Q.  Did you encounter any difficulties along that way?

17    A.  Not really, no.

18    Q.  Now, what was your state of mind?  Were you afraid, were you

19    --

20    A.  I was relieved.

21    Q.  Well, you were relieved when you got to international

22    waters?

23    A.  Yes, I was relieved once I got into international waters

24    because that meant I was outside Dubai jurisdiction.

25    Q.  Okay.  Could you put up what's been marked -- entered into
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   evidence as Plaintiff's 220 please?  We better start with the

2   mall smaller one.  How about the 221.

3         MR. CEDERBERG:  Excuse me, Your Honor.  They're not in

4   evidence.

5         MR. HESS:  220 is in evidence.

6         THE COURT:  220 and 221 are not in evidence.  219 is in

7   evidence, but not 220 or 221.

8         MR. HESS:  I'm going to ask that 220 be entered into

9   evidence, map of the Middle East.

10        MR. CEDERBERG:  Your Honor, I would object, relevancy

11   403.  Now he's in international waters, I think that's the end

12   of that journey.

13        THE COURT:  No, sir.  This is enough.  Move on.

14   BY MR. HESS:

15   Q.  All right.  You're in international waters, you were

16   relieved.  Prior to that time, how long did this final part of

17   your escape take from the morning when you left until when you

18   arrived in international waters?

19   A.  Once I arrived in international waters, I still had to wait

20   --

21   Q.  How long did it take from the morning when you left until

22   your arrival in international waters when you said you were

23   relieved?

24   A.  Three hours.

25   Q.  Now, was it tense, were you happy, was it easy?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1           MR. CEDERBERG:  Objection, leading, Your Honor.

2           THE COURT:  It is leading, but I don't know how he's

3     going to get it out otherwise, so just ask that question.  I'll

4     permit it to be leading.  Was it tense, were you happy, was it

5     easy.  I think he's given you the answers.  Answer it back

6     please.

7           THE WITNESS:  It was tense, I was extremely focussed on

8     what I was doing.

9           THE COURT:  Okay.  Move on please.  That's all you're

10    getting.

11    BY MR. HESS:

12    Q.  So you're in international waters, what happened next?

13          MR. CEDERBERG:  Objection, Your Honor, it's --

14          THE COURT:  I'll sustain it other than the fact that he

15    ended up somewhere.  Go.  You know, tell where he ended up, he

16    got on the boat and he went somewhere.

17          MR. HESS:  We haven't gotten on the boat yet.

18          THE COURT:  You know what, you are probably not going

19    to get on the boat because you're out of time, so go.

20    BY MR. HESS:

21    Q.  Did you arrive to the sailboat, did the sailboat pick you

22    up?

23    A.  I waited another three hours and eventually my friend, we

24    met in international waters and jumped in the sailboat.  Then

25    for the next days --

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
 1            MR. CEDERBERG:  Excuse me, Your Honor.  This is not
 2     responsive.
 3            THE COURT:  No, but I'm going to let him finish this
 4     answer because we're finished with this subject.
 5     BY MR. HESS:
 6     Q.  And then where did you sail to with your friend?
 7            THE COURT:  No, he's finished.  He's on the sailboat
 8     and he's gone.  He's had 100 opportunities to tell you what we
 9     agreed that he could tell you and no other subject.  Come on.
10            MR. HESS:  Proffer at least, Judge?
11            THE COURT:  No.
12            MR. HESS:  All right.  May I confer with counsel,
13     Judge?
14            THE COURT:  Yes.
15            MR. HESS:  Thank you.
16            Nothing further, judge.
17            THE COURT:  We're going to start cross-examination at
18     9:30 tomorrow morning.  We're going to finish tomorrow morning.
19     So hurry.  Be organized, be ready, have your questions ready to
20     go.  If you'll notice I gave him until 4, and it's now 5:30 so I
21     may leak a little but, I'm not going to go overnight.  We're
22     finishing this case.  Period.
23            MR. CEDERBERG:  I understand the Court's concerns, Your
24     Honor, but my cross-examination may not finish our presentation
25     in light of what was said.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    THE COURT:  Well, that may not, that may be, we'll have

2    to see what it is.  But you better have your witnesses ready to

3    go when I say who's next.

4    MR. CEDERBERG:  Understood.

5    THE COURT:  Okay?

6    Ladies and gentlemen, you're reminded -- I can't remind

7    you of anything more because I don't know where I put it.  Here

8    it is.

9    You're reminded that you're not to discuss this case

10   with anyone or permit anyone to discuss it with you.  Until you

11   retire to the jury room at the end of the case to deliberate on

12   your verdict, you're not to talk about this case.

13   Don't read or listen to anything touching on the case.

14   If anybody tries to talk to you, bring it to my attention.  Keep

15   in mind you must not do any research or make any investigation

16   about the case on your own.  The only evidence in this case is

17   the testimony of the witnesses that you hear in court and the

18   evidence that is introduced during the official proceedings in

19   the courtroom.

20   Also remember you must not have any contact with the

21   attorneys, parties or witnesses in the case.  If you should see

22   them, keep in mind they are not being rude to you, they're

23   required to avoid any contact with you, you are required to

24   avoid any contact with them.

25   Finally remember that you must not form any opinion

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    about this case until all the evidence is in.  You are required

2    to keep an open mind until you start your deliberations at the

3    end of the case.

4         Thank you very much, we'll see you tomorrow morning at

5    9:30.

6         COURT SECURITY OFFICER:  All rise.

7         (Jury out at 5:35 p.m.)

8         THE COURT:  If you want to make a proffer of anything,

9    proffer it in writing, and have it to me tomorrow morning and I

10   will look at it and put it in the record.  Is there anything

11   else?  Yes, sir.

12        MR. CEDERBERG:  Yes, Your Honor.  Because I want to

13   start my cross-examination at 9:30, would the Court entertain us

14   talking to the Court about some issues --

15        THE COURT:  Everybody be seated, sure.  Go ahead.  Talk

16   to me.  I'm not leaving this instant, but I'm getting kind of

17   cranky because I'm tired, but go ahead.

18        MR. CEDERBERG:  What we did is we appealed an order

19   from the Magistrate of e-mails that Mr. Jaubert wrote to Ms.

20   Cowie that were asking her to participate in an extortion for

21   money.

22        THE COURT:  I denied the appeal.  I did.  I entered an

23   order denying the appeal.  I don't know why you didn't get it.

24   It should be -- apparently it went awry in the clerk's office,

25   but I think it is filed.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1775

```
1          MR. CEDERBERG:  I was under the impression, Your Honor,
2    that it was much like the motion in limine and something the
3    Court would revisit.
4          THE COURT:  I may have and --
5          MR. CEDERBERG:  And we think now that this door is open
6    about his escape, his motive for that escape --
7          THE COURT:  You want to renew whatever you had in your
8    appeal.
9          MR. CEDERBERG:  Yes, Your Honor.
10         THE COURT:  I'll look at it, but I don't hold out much
11   hope.  I can't tell you right now.
12         MR. CEDERBERG:  Can we just be able --
13         THE COURT:  Tell me.  Two minutes you got to tell me
14   what it's about.
15         MR. CEDERBERG:  Two minutes we got is there were
16   e-mails from Mr. Jaubert to Ms. Cowie, who was the author of his
17   book, a book -- coauthor of the book where he talked about I
18   will bury my book for $30 million.  Excuse me.  If Dubai -- we
19   should present it to Dubai and we'll hand these up to the Court,
20   I will bury my book for $30 million.
21         MR. HESS:  First of all, I need to object because all
22   this was under seal.  It's all attorney-client privilege that
23   was found to be attorney-client privilege by the Magistrate and
24   Your Honor in denying the appeal, and they talk about me trying
25   to talk about things in public that are inappropriate and
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    they're actually doing -- it's a sealed documents, it was

2    appropriately sealed, still maintains the seal and what is being

3    done by Dubai counsel right now is violating the sealed

4    documents by advising everyone in the world what --

5            THE COURT:  He hasn't given me the sealed documents,

6    but Judge Brown did bar them under attorney-client privilege.  I

7    will consider it tonight and I will tell you before you start in

8    the morning, but my inclination is to rule that they are still

9    barred under the attorney-client privilege.

10           MR. CEDERBERG:  Your Honor, to help the Court decide

11   this, can we hand up those documents so the Court has it?

12           THE COURT:  I think I have them, but I'll be happy to

13   see them again.

14           MR. HESS:  This is gone through --

15           THE COURT:  I don't want to walk around with sealed --

16           MR. HESS:  This has gone through an appellate process,

17   it's gone through an initial process, it's been denied all the

18   way, this is exactly what's happened in this case.  I've been

19   permitted a day and a half to present my case and I'm done,

20   apparently.

21           THE COURT:  You had a day and a half with your client.

22   Never mind the case.

23           MR. HESS:  Judge, we've had -- well, you know, I have

24   one client, they have five.

25           THE COURT:  You're implying that you've had a day and a

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1777

1    half to present your case.  Your client has been on the stand on

2    direct examination for a day and a half.

3              MR. HESS:  For a day, Judge.

4              THE COURT:  Today?  Wasn't he on there yesterday?

5              MR. HESS:  Today and a little bit of yesterday.  Not

6    much.

7              THE COURT:  Okay.  And we went late yesterday and all

8    of today, every bit of today.

9              MR. HESS:  So what I'm understanding is that now Dubai

10   World wants to reopen the whole issue with this --

11             THE COURT:  They're talking to me and I have not agreed

12   to redo anything.  But I will look at it because just as I

13   listened to you when you keep talking to me after I've ruled,

14   I'm going to listen to them.  And they want to give me those,

15   we'll take them.  We'll -- you know, you're going to have to

16   show clear error by Judge Brown.  Not just that it would be nice

17   to be able to get some of this in.  However, the privilege is

18   not supposed to be used as a sword, it's a shield to prevent

19   improprieties and things becoming known.  It is not to be used

20   -- I don't know.  I mean, I don't remember the details to know

21   whether -- well, you understand what I'm saying.

22             My position was that Judge Brown did not commit clear

23   error.  He's a very smart guy, he's usually right.  It was Judge

24   Lynch?  I thought it was Judge Brown.  Both of them are smarter

25   than I am, so that's fine.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    MR. CEDERBERG:  Your Honor, we will present this to

2    you.  You may have to get it in the morning because it's not

3    just the documents, it's going to be an area of

4    cross-examination as well.

5    THE COURT:  Don't count on it.  But I will look at it.

6    MR. HESS:  How do we get around the law of the case

7    that's gone up on appeal, it's law of the case, they can't just

8    keep on continuing it.

9    THE COURT:  Right now you're winning.  Are you trying

10   to argue that you want me to change my mind?

11   MR. HESS:  No, Judge.  I just -- I'm going to be --

12   well, I guess we're going to get another big long piece of

13   paper, I'll be handed it to me tomorrow morning and I'll deal

14   with it.  Thank you, Judge.

15   THE COURT:  Thank you.

16   What else do you have?  I will admonish the witness

17   that since he's on the stand, he's not permitted to discuss with

18   his -- even with his attorney his testimony.  He is permitted to

19   discuss other matters, but not his testimony.

20   MR. HESS:  What about this issue of the attorney-client

21   privilege and everything that's being raised right now?  I'm not

22   prepared for anything if I don't talk to him about it.

23   THE COURT:  I don't know, but the bottom line is that

24   if it discusses what his testimony or his cross-examination

25   could be, then I think it's improper.  I think the rule is

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    pretty clear that during his examination he is not permitted to

2    discuss his testimony or the proposed cross-examination.

3         MR. HESS:  Why --

4         THE COURT:  He probably shouldn't have been in here

5    except that as a party, he can't be ruled out of it.

6         MR. HESS:  The timing of this, this is the same issue

7    that has been presented in this case throughout --

8         THE COURT:  But I think their position is that

9    something that he said has caused them to say that they really

10   shouldn't be precluded from being looked into.  And I'm not

11   saying that that's so.  It seems to me that if it's privileged,

12   it's still privileged regardless of what it's done, unless I see

13   some effort at misusing the attorney-client privilege or

14   something, which I don't know.  I would -- we'll see what it is,

15   but I'll look at it, I'll consider it, I don't want you to write

16   up anything, I want you only to give me the documents.  That's

17   all.  I don't want you to write up anything.

18        MR. CEDERBERG:  And we have those and we'll hand those

19   up now, Your Honor.

20        MR. HESS:  May I get a copy of those?

21        THE COURT:  Give them to the court security officer.

22        MR. HESS:  You know what, I don't know what they are

23   because I don't know what you guys are giving him.  So I think

24   I'm entitled to have a copy of what you're giving the judge.

25        THE COURT:  Make a copy, give him a copy.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          MR. CEDERBERG:  I don't like to ask the Court for

2     advisory rulings, but in light of the time constraints and

3     realties of this, I plan on coming in with a very focused

4     cross-examination and I just want to alert -- I don't want to

5     lose that focus by rambling answers that I'm not entitled to get

6     by Mr. Jaubert.

7          THE COURT:  Well, then you need to control your witness

8     and I suspect that you probably have experience at doing that.

9     Deal with it.  You know, I will support you if I think that you

10    are justified in doing so.  If I don't, then I won't.

11         MR. CEDERBERG:  Fair enough.

12         MR. HESS:  Judge, can I get a copy of this please?

13         THE COURT:  Yes, you can get a copy of it.  Get a copy

14    to -- go into the clerk's office and Wanda will be in there and

15    make two copies.  One for me and one for the opposing counsel.

16         MR. HESS:  Judge, here's what they're saying.  They're

17    listening to Your Honor say make a copy and Mr. Urquhart is

18    saying just give him the exhibit list.

19         THE COURT:  If it's on your exhibit list and you have

20    it, then I don't see any need to kill another tree.

21         MR. HESS:  I'm going to have to print them out so I

22    mean --

23         THE COURT:  You mean you don't have the exhibits

24    printed out already?

25         MR. HESS:  We have them, Judge, we have them.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1              MR. CEDERBERG:  Thank you, Your Honor.

 2              THE COURT:  Good day.  Good-bye.  Get out of here.

 3    Leave.  Please.

 4

 5              (See Volume 16, page 1783 for continuation)
                            * * * * *
 6
                         C E R T I F I C A T E
 7    I certify that the foregoing is a correct transcript from the
      record of proceedings in the above-entitled matter.
 8

 9

10    _____           /s/ Dawn M. Whitmarsh
      Date                       DAWN M. WHITMARSH, RPR
11

12                         I N D E X

13                         WITNESSES

14    For Defense:                                        Page

15    Herve Jaubert
       Continued Direct Examination by Mr. Hess          1642:11
16
                           EXHIBITS
17
      694
18     In Evidence                                       1642:10

19    1158
       In Evidence                                       1736:4
20
      1743
21     In Evidence                                       1744:22

22    1814
       In Evidence                                       1703:14
23
      1827
24     In Evidence                                       1704:19

25    1829
       In Evidence                                       1709:16
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1

2   932.7
       In Evidence                                                  1651:23
3

4   1375, 1656, 1377, 1657, 1381, 1658, 1666, 1395,
    1668, 1669, 1403, 1670, 1382, 1660, 1748, 1659,
5   1386, 1661, 1384, 1662, 1389, 1663 and 1394
       In Evidence                                                  1696:21
6

7   1018
       In Evidence                                                  1735:2
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**