1783

1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                       FORT PIERCE DIVISION
                     CASE NO.   09-14314-CV-JEM
3

4

5

6    DUBAI WORLD CORPORATION, and its
     Subsidiaries, EXOMOS, NAKHEEL and
7    PALM MARINE,

8                    Plaintiffs,

9         vs.

10                                       Fort Pierce, Florida
                                         February 25, 2011
11   HERVE JAUBERT, SEAHORSE
     SUBMARINES INTERNATIONAL
12   INCORPORATED, and Does 1-99,

13                   Defendants.
     _____
14

15

16                   TRANSCRIPT OF JURY TRIAL
                  VOLUME 16 - PAGE 1783-1880
                BEFORE THE HONORABLE JOSE E. MARTINEZ
17                 UNITED STATES DISTRICT JUDGE

18

19

20

21

22

23   REPORTED BY:          DAWN M. WHITMARSH, RPR
                           Official Court Reporter
                           400 N. Miami Avenue, 10S03
24                         Miami, Florida  33128
                           Telephone:  305-523-5598
25


                PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                     TRANSCRIPT PRODUCED BY COMPUTER

1784

```
 1     APPEARANCES:

 2     FOR THE PLAINTIFFS:
                       Quinn, Emanuel, Urquhart & Sullivan, LLP
 3                     BY: JON C. CEDERBERG, ESQ.
                       BY:  A. WILLIAM URQUHART, ESQ.
 4                     865 South Figueroa Street
                       10th Floor
 5                     Los Angeles, CA  90017

 6                     Astigarraga, Davis, Mullins & Grossman
                       BY:  EDWARD MULLINS, ESQ.
 7                     701 Brickell Avenue
                       16th Floor
 8                     Miami, Florida 33131

 9
       FOR THE DEFENDANTS:
10                     Hess & Heathcock, PA
                       BY:  WILLIAM HESS, ESQ.
11                     BY:  KATHRYN A. HEATHCOCK, ESQ.
                       40 Southeast Osceola Street
12                     Stuart,  Florida 34994

13

14

15

16

17

18

19

20

21

22

23

24

25                         P-R-O-C-E-E-D-I-N-G-S


          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                  TRANSCRIPT PRODUCED BY COMPUTER
```

1785

1    COURTROOM DEPUTY:  Case number 09-14314-civil-Martinez,

2    Dubai World Corporation versus Herve Jaubert, Seahorse

3    Submarines International, Incorporated.  Counsel, please state

4    your appearance.

5         MR. CEDERBERG:  Good morning, your Honor.  Jon

6    Cederberg, William Urquhart and Laith Mosely for the Plaintiffs.

7         THE COURT:  Good morning.

8         MR. HESS:  Good morning, William Hess and Kathryn

9    Heathcock, Hess and Heathcock on behalf of Herve Jaubert.

10        THE COURT:  Good morning.

11        I just wanted to address the issue that was talked

12   about yesterday afternoon at length, that of the ruling of Judge

13   Lynch that the e-mail -- I think it was March 10th, I'm not

14   sure, whatever the date was -- between Mr. Jaubert and a

15   potential attorney agent for representation in his book

16   endeavors was privileged.  I have upheld that.  I'm not going to

17   change my position on that.  I just want to make it very clear

18   that, as far as I am concerned, that doesn't mean that you can't

19   inquire of him if he has ever attempted to sell his book rights

20   to somebody for X amount of money and whatever implication.

21   That's a different problem.  But if he denies doing that, then I

22   would think that you could utilize the e-mail for impeachment

23   purposes because that's different.

24        As I've said before, the rights and privileges are --

25   they're a shield, they're not a sword.  You can't use a ruling

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1786

1    like that to then deny that somebody ever happened, for example.

2    And I do think that it is not improper to ask questions

3    concerning possible motivation for whatever, you know.  I don't

4    know.

5          So I'm not going to permit the e-mail to come directly.

6    You are not to refer to it on your cross-examination unless the

7    contents thereof are denied by Mr. Jaubert.  So the

8    communication itself is privileged.  I believe that it is, and I

9    think it was a good ruling.  So that's all I wanted to say on

10    that.

11          Anything else we need to talk about before we bring the

12    jury in?

13          MR. HESS:  I just wanted to get some clarification on

14    Your Honor's ruling, if I may, to understand.

15          THE COURT:  Sure.  Go ahead.

16          MR. HESS:  So they're going to be permitted to inquire

17    as to the book, even though it wasn't gone into on examination?

18          THE COURT:  They're going to be permitted to do

19    cross-examination that is your classic cross-examination, which

20    could mean that they are permitted to ask him questions about

21    any reason why he might not be telling the truth, as to anything

22    that might attack his credibility, as to anything.  You know,

23    it's just a cross-examination.  They can do whatever.  I'm not

24    telling them what to do.  They can do what people do on

25    cross-examination, which is attack the credibility of the

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1787

1    witness.

2         Now, there are limits as to collateral issues, there

3    are limits as to other things and -- but, you know, generally, I

4    do not want this -- all right.  Let me put it this way:  If it

5    becomes an issue during cross-examination, and he denies having

6    said it, they can use it.  However, one of the big burdens of

7    being a judge is to try to be fair to everybody involved.

8         I have already said that you cannot utilize alleged

9    wrongdoing on the part of Dubai World or whoever on other

10   matters because it might be -- it's really more like they did it

11   once so they'll do it again.  In this instance, I'm not going to

12   permit evidence of particular wrongdoing on the part of --

13   alleged wrongdoing on the part of Mr. Jaubert to be brought up

14   as a collateral issue.  But if, during the cross-examination, it

15   becomes relevant and I were to permit the question and he were

16   to deny it, he can't deny it with the understanding that this

17   memo is off limits.  Do you understand what I'm saying?

18        MR. HESS:  No, Judge, because A, it remains

19   attorney-client privilege no matter what.  I don't think it says

20   what the allegations are, but it remains attorney-client, and

21   he's not -- he can't be asked what he told his attorney

22   regardless of what he told the attorney.

23        THE COURT:  He can be asked -- well, I do understand

24   that.  I didn't say he can be asked what he told his attorney.

25        MR. HESS:  What he said was that if he denies saying

1        that to his attorney, then they get to bring --

2                THE COURT:  No, I don't think I said that.  I think I

3        said if he denies ever having attempted to sell his book to the

4        Dubai, whoever it was, then they may be able to use that, under

5        certain circumstances, to impeach him to say, "Well, don't you

6        remember on such and such a date on an e-mail saying this?"

7                MR. HESS:  That e-mail is privileged.  They shouldn't

8        even have that e-mail.  So how do they get to use that e-mail to

9        impeach a person.  It's attorney-client privilege.  The sword

10       and shield aspect of it is where a person is saying, "Hey, my

11       attorney told me something, I acted upon it, and therefore I

12       have a defense to it."  That's the sword and shield.

13               THE COURT:  No.  If you have a privilege or an immunity

14       or something is not admissible for a particular reason which is

15       designed to protect that person, that doesn't mean the person

16       can lie about the subject matter and expect that because it is

17       privileged or anything else it can never come out.  That's all

18       I'm saying.

19               MR. HESS:  Well, you know, in a criminal case, if I'm

20       told by a defendant something that's clear in the course of my

21       duties as representing a defendant -- I'm just using a criminal

22       case because it's easier, it's cleaner -- that person sitting on

23       the stand in a criminal trial can't be compelled to say, "Hey,

24       did you ever try to make an effort to do such and such, to hide

25       the weapon or to do something?"  And if he told me that during

1   the course of my representation, then he can't be compelled --

2   if they find an e-mail, they can use the e-mail to impeach him.

3   That's exactly what is attempted.

4          The second thing is, Judge, we've heard at least three

5   times in this trial, 403, this idea of probative versus

6   prejudicial and why is this not a collateral issue.  The book,

7   if they were to bring up that, the book and the portrayal of the

8   events in the book, if they can prove they're not true, or his

9   characterization of events when he escaped, as brief as they

10  were, aren't true, then I guess you can go into whether or not

11  that book was motivated by truth or whether it was some attempt

12  for other purposes.

13         But that's not what's being done here.  They can't

14  prove he didn't do that.  In fact, it happened.  So instead this

15  is a purely collateral matter that the Court is permitting the

16  use of extrinsic evidence on, and it's exactly what the Court

17  said I can't do with Dubai.

18         THE COURT:  You're making it sound like Judge Lynch

19  said all communications between Mr. Jaubert and this person,

20  whoever it was, are inadmissible.  That's not what his ruling

21  was.  There are e-mails that are admissible.  There are e-mails

22  that can come in.

23         MR. HESS:  But these were --

24         THE COURT:  What I'm saying to you is I'm not going to

25  permit someone to deny something that was said just because it

1790

1   was a privileged communication if it is a legitimate basis for

2   cross-examination.  That's all I'm saying.  I am not telling

3   that they can do it.  I am just saying that I can conceive of

4   circumstances under which it could come in.  I'm not telling

5   them that it is absolutely in.  I am telling them that I can

6   conceive of circumstances where it could come in, but be very

7   careful.  You've got to be absolutely sure that the door has

8   been opened.  One e-mail about selling the story is already in,

9   not privileged.

10      MR. HESS:  Yes, Judge.

11      THE COURT:  So they can discuss that matter.  And I

12   would -- well, all right.  I've said enough, okay?  That's all.

13      MR. CEDERBERG:  Your Honor, just one point.

14      THE COURT:  Okay.  What is it?

15      MR. CEDERBERG:  The point is that under the time limits

16   the court has given us, we have done our best efforts to

17   narrow -- do a narrow focused cross-examination, and I think

18   we're going to be able to do that.  I would just ask the court

19   to level the playing field and have Mr. Hess not do speaking

20   objections, but just give the code section so it doesn't eat up

21   into my time.

22      THE COURT:  That's what I've always asked.  I get less

23   than full cooperation on it.

24      MR. HESS:  I don't have a problem doing that, Judge.  I

25   don't think I've ever -- well, I'll do that.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1791

1     THE COURT:  Let's try to do nonspeaking objections

2  rather than making a speaking objection in front of the juror

3  requiring me to have the jury walk out, because I'd really like

4  to keep going.  Is there anything else?

5     MR. CEDERBERG:  Not at this time, Your Honor.

6     THE COURT:  All right.  So anyway, just to be clear, if

7  Mr. Jaubert flatly denies having had conversations concerning

8  this, I'll permit argument and may reconsider my ruling, but my

9  ruling at this point is that that is a separate act, that is not

10  an issue, that is not to be gone into.  Do you understand what

11  I'm saying?  It depends on what he says.  I will reconsider at

12  that point if it's appropriate, okay?  That's as clear as mud,

13  and that's as clear as it's getting.

14     MR. CEDERBERG:  Well, if I cross the way I hope I

15  cross, we'll see what it is.

16     THE COURT:  We'll see where it goes, all right?  Let's

17  bring in the jury, please.

18     MR. HESS:  Judge, we do have a problem, Judge.

19     THE COURT:  Okay.  No, wait, have them go back in the

20  room.  Okay.  What's the problem?

21     MR. HESS:  Well, I just -- if the Court could take a

22  look at the picture that is going to be attempted to be utilized

23  in cross-examination, and it's a 403.  It's clearly unduly

24  prejudicial.

25     THE COURT:  I don't know.  Let me see.


**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1792

```
 1              MR. CEDERBERG:  To give you context.

 2              MR. HESS:  Not only that, Judge, I was told at the

 3    beginning of this trial, "Oh, no, we're not going to use that

 4    picture.  We're not going to use that."  Mr. Cederberg himself

 5    told me, "We're not using it, period."

 6              MR. CEDERBERG:  Because I thought the bullets were out

 7    of the case.

 8              MR. HESS:  That's not a bullet.

 9              MR. CEDERBERG:  May I approach?

10              THE COURT:  Yes.

11              MR. CEDERBERG:  And the relevance is, Your Honor, he

12    testified under oath that this was just for target practice and

13    a sporting rifle.

14              THE COURT:  What's the relevance of it?  What does it

15    matter?  It's a total collateral issue.  I don't know.  I don't

16    think you can tell by looking at it whether the rifle is a

17    sporting rifle.  Sporting includes target practice, shooting.

18    No, that's not coming.

19              MR. CEDERBERG:  I do intend to inquire on that subject,

20    Your Honor.

21              THE COURT:  Okay.  What do you intend?  Well, I think

22    you can inquire -- the issue was gone into as to what, you know,

23    the rifle was and what it was -- you know, what type of rifle it

24    was and what it's used for.  I don't have a problem with that.

25    He went into that on direct examination.  Okay.  And I don't
```

1793

1       know how.  Okay.

2                  MR. CEDERBERG:  Okay.

3                  (Jury in at 9:46 p.m.)

4                  THE COURT:  All right.  Please be seated.  Trust you

5       all are well and had a good evening.  Got here safely; don't see

6       any casts or broken bones or anything.

7                  All right.  You may proceed.  Please come back to the

8       stand.  You're reminded, sir, that you're still under oath.

9                  THE WITNESS:  Yes, Your Honor.

10                 THE COURT:  All right.  You may proceed.

11                              CROSS-EXAMINATION

12      BY MR. CEDERBERG:

13      Q.  Mr. Jaubert, you testified on direct examination yesterday

14      that you came to Dubai in November of 2004, correct?

15      A.  Correct.

16      Q.  And you brought your wife with you?

17      A.  My wife and two children.

18      Q.  Correct.  And you also brought your rifle with you, I

19      believe you testified, right?

20      A.  Yes.

21      Q.  And you told us under oath that was the rifle that you used

22      for sport, correct?

23      A.  Yes.

24      Q.  And, in fact, that is a -- you said you use it for target

25      practice, right?

1794

1    A.  Target practice, yes.

2    Q.  Okay.  In fact, that rifle that you brought to Dubai is a

3    Fifty caliber rifle, correct?

4    A.  Yes.  Fifty caliber rifle, bolt rifle.

5    Q.  It's got a scope?

6    A.  With a scope.

7    Q.  And a tripod so you can set it out on the ground?

8    A.  A bipod.

9    Q.  Bipod.  And it has a range of what, over 2,000 feet -- 2,000

10   yards?

11   A.  Yes, 2,000 yards.

12   Q.  And you were going to target practice with a rifle that

13   shoots 2,000 yards?

14   A.  Yes.  1,000 yards.

15   Q.  And it's actually called a Fifty caliber McMillan tech

16   rifle, isn't it?

17   A.  Yes.

18   Q.  And this rifle, you told me -- we've talked before about

19   this case, haven't we, sir?

20   A.  With you?

21   Q.  Yes, I believe so.

22   A.  I believe so.

23   Q.  And you remember you were placed under oath like you are

24   today?

25   A.  Uh-huh.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1795

```
 1    Q.  And you remember coming into a room at a court reporter's
 2    office?
 3    A.  Yes.
 4    Q.  You remember Mr. Hess and Ms. Heathcoat were there
 5    representing you?
 6          MR. HESS:  It's Heathcock.
 7          MR. CEDERBERG:  Heathcock.  I apologize.
 8    BY MR. CEDERBERG:
 9    Q.  And we asked you questions about your rifle, right?
10    A.  Yes.
11    Q.  And do you remember describing what your rifle could do to
12    us?
13          MR. HESS:  Judge, again, we've gone through this.  This
14    isn't proper impeachment.  I don't know what it is.  He's
15    referring to a deposition.  He's just trying to -- objection,
16    Judge.  Improper impeachment.
17          THE COURT:  Hold on.  I'll permit it.  I understand the
18    argument, but I'll permit it within limit.
19    BY MR. CEDERBERG:
20    Q.  You told me that the rifle that you say is a sporting rifle,
21    with the right ammunition, is designed to shoot down
22    helicopters, correct?
23    A.  No, I never said that.
24          MR. CEDERBERG:  Okay.  I'd like to play the video of
25    the deposition of Mr. Jaubert taken on January 6, and I'd like
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    to play Page 247, Line 20, to 248, Line 13; then 248, Line 18,

2    to 249, 12.

3              May I play it, Your Honor?

4              THE COURT:  You may.

5              (Video deposition playing in open court:

6              "MR. CEDERBERG:  Ask the court reporter to resume the

7    tape."

8              MR. CEDERBERG:  No you got the wrong clip.

9              THE COURT:  Stop.  Stop that.  We're going to play 248,

10   18, to 249, Line 12.

11             (Video deposition playing in open court:

12   "Q. And that Fifty caliber round, Fifty caliber round isn't used

13   for shooting people, is it?

14   "A. Are you I don't know are you asking me?"

15             MR. HESS:  Judge, I'm going to object.

16             THE COURT:  Hold on.  Stop it.  What is the objection?

17             MR. HESS:  It's improper impeachment.  One is talking

18   about a Fifty caliber round.  What the question was is a rifle.

19             MR. CEDERBERG:  First, it's a party admission.  I don't

20   have to impeach to play his deposition.  Secondly, it's totally

21   relevant, Your Honor, because --

22             THE COURT:  All right, ladies and gentlemen, could you

23   step into the other room for just a second.

24             COURT SECURITY OFFICER:  Please, all rise for the jury.

25             MR. CEDERBERG:  Your Honor, if I may.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1797

```
 1              (Jury out at 9:53)

 2          MR. CEDERBERG:  Your Honor, if I may address the issue.

 3          THE COURT:  Yes, sir.  Very briefly.  Be seated,

 4      please.

 5          MR. CEDERBERG:  Mr. Jaubert just denied under oath to

 6      this jury that he ever said that that rifle could shoot down

 7      helicopters.  And what I plan to read.

 8          THE WITNESS:  That's not what I said.  You can shoot

 9      down a helicopter with any rifle.

10          THE COURT:  What he denied was ever saying that that

11      rifle is designed to shoot down helicopters, right?  With the

12      right ammunition, is designed to shoot down helicopters.

13          MR. HESS:  Designed is what he was asked.

14          THE COURT:  That's what he denied having said.  Does

15      this say that?

16          MR. CEDERBERG:  It says, "And are they designed to

17      shoot down helicopters?

18              "Answer:  Which one?

19              "Question:  Fifty caliber.

20              "Answer:  The round, it depends what round.  To shoot a

21      helicopter, you need to meet certain conditions of a round,

22      weapon, and position.

23              "Okay.  But with the kind of weapon you had and the

24      right Fifty caliber bullet, that could be used to shoot down a

25      helicopter, couldn't it?
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          "Answer:  What's the question?

2          "The rifle that you own and the right kind of

3     ammunition, it could be used to shoot a helicopter down,

4     couldn't it?"

5          And he says:  "It could be used, yes."

6          MR. HESS:  He doesn't say it was designed to be.

7     You've -- Counsel, it's unduly prejudicial.

8          THE COURT:  That's up to the jury to decide whether

9     it's proper impeachment.  I will tell you, it is very close to

10    being a collateral issue.  However, in light of the fact of the

11    allegations in this case and the counter-allegations back and

12    forth as to him having had his ammunition, as a result of the

13    ammunition getting into trouble and having his rifle seized,

14    notwithstanding the fact that he had apparently told the people

15    that he was going to be bringing his sporting guns in, I think

16    that it's a legitimate question.

17         MR. HESS:  I couldn't get any of that in, Judge.  Your

18    Honor ruled that to be a collateral issue.  I couldn't get any

19    of it in.

20         THE COURT:  It has gotten in.

21         MR. HESS:  The brief testimony, but Your Honor ruled it

22    was a collateral issue to the extent that I could show that he

23    had written to the Dubai police, to the Customs, that he had

24    said --

25         THE COURT:  I remember reading on the stand here how he

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1799

1    was writing and saying, you know, "Hey, I brought my sporting

2    rifle in so I could target practice, could I please have them."

3    And somebody writing back to him an saying, "I can help you."

4    Well, this might explain why he couldn't help him.

5         MR. HESS:  You didn't let it in evidence, Judge.

6         THE COURT:  Then why was it being played on the screen

7    with the jury in here?

8         MR. HESS:  I don't remember it being on the screen.

9         THE COURT:  Well, I can assure you that I have not been

10   going back and reading through the depositions.  I promise you

11   that.  And I saw it and read it, and the only place I could have

12   seen it and read it is on the screen.

13        MR. HESS:  In -- that was in their report, in one of

14   the audit reports that was already in evidence.  But the volume

15   of documents that I attempted --

16        THE COURT:  What are you telling me?  Are you telling

17   me it's in so you didn't like it coming in?

18        MR. HESS:  No.  I want it in.  I misunderstood.  What

19   isn't in, what Your Honor ruled to be collateral, is all of the

20   supporting documents for their document.  All of the documents

21   that were written by --

22        THE COURT:  So what?  The fact is that before the jury

23   is the fact --

24        MR. HESS:  I understand, Judge.  I understand.  I--

25   just for the record, though, you know, whether or not it's

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1800

1    improper impeachment, I would argue that that's the ruling by

2    the court and not for the jury to decide, and for the record,

3    it's improper impeachment.

4              MR. CEDERBERG:  This is a party, Your Honor.

5              THE COURT:  Yeah, I understand.

6              MR. HESS:  The problem is if he's going to impeach,

7    he's going to use this in a way that the jury is going to take a

8    particular notice, and what he's trying to do is he's trying to

9    confuse the jury.

10             THE COURT:  No.

11             MR. HESS:  It's unduly prejudicial.

12             THE COURT:  That's very simple for you to explain to

13   the jury that this is not impeachment.  This was just a trick on

14   the part of Dubai World to try to make you think that he

15   contradicted himself, but he really didn't contradict himself

16   and has nothing to do with this case.  You can make that

17   argument in 15 seconds.

18             MR. HESS:  And I'll be permitted redirect on the issue

19   anyway, correct?

20             THE COURT:  Yes, of course you can get redirect on

21   anything that he brings up on cross-examination.

22             MR. HESS:  Thank you.

23             THE COURT:  All right.  Can we bring the jury in,

24   please.

25             MR. CEDERBERG:  I'm going to start the tape from the

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1801

```
 1    beginning.  It's short.
 2              THE COURT:  What do you mean?  What you are you telling
 3    me?
 4              MR. CEDERBERG:  A minute 24.  I got stopped right in
 5    the middle of it.
 6              THE COURT:  Yes, you can start back again from the
 7    beginning.
 8              (Jury in at 9:58 a.m.)
 9              THE COURT:  Thank you, folks.  Please be seated.  Yes,
10    sir.  Go ahead.
11              MR. CEDERBERG:  I'm going to play now from
12    Mr. Jaubert's deposition of January 6, 2011, Page 248, Line 18,
13    to Page 249, Line 12.
14              (Video deposition playing in open court:
15    "Q. And that fifty caliber round isn't used for shooting people,
16    is it?
17    "A. Are you -- I don't know.  Are you asking me?
18    "Q. Yeah.
19    "A. Fifty caliber is rifle or machine gun weapons.  They are
20    designed to kill people.
21    "Q. Are they design to shoot down helicopters?
22    "A. Which one.
23    "Q. Fifty caliber.
24    "A. The round -- it depends what round.  To shoot a helicopter,
25    you need to meet certain conditions of round, weapon, and
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1802

1     position.

2     "Q. Okay.  But with the kind of weapon you had and the right

3     fifty caliber bullet, that could be used to shoot down a

4     helicopter, couldn't it?

5     "A. What is the question again?

6     "Q. The rifle that you owned, and the right kind of ammunition,

7     it could be used to shoot a helicopter down, couldn't it?

8     "A. It could be used, yes."

9     BY MR. CEDERBERG:

10    Q.  Mr. Jaubert, you were here when Mr. Miller testified that

11    the warehouse at Exomos was only a few hundred yards away from

12    that part of the port in Dubai that was used by the United

13    States Navy, correct?

14    A.  Correct.

15    Q.  And that's true, isn't it?

16    A.  It's correct.

17    Q.  Now, you know now that Dubai has very strict laws when it

18    comes to guns, correct?

19    A.  When I came to Dubai, I was authorized to bring my rifle, so

20    I did not know the laws.  I was -- I had been made aware, maybe

21    a year and a half later, that I could not -- not that I could

22    not bring it, that I could not have -- that it would take a long

23    time for me to get the license to use in the UAE.

24    Q.  Let me ask the question again.  You know now that Dubai has

25    very strict laws when it comes to guns, don't you?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1803

```
 1                MR. HESS:  Objection.  Relevance, Judge.
 2                THE COURT:  No, I'll permit it.  The question is do you
 3      now know that Dubai has very strict laws when it comes to guns?
 4                THE WITNESS:  It's not that I know now, I knew before
 5      that Dubai had laws regarding -- and regulations regarding
 6      weapons.  I was allowed to bring my rifle.
 7      BY MR. CEDERBERG:
 8      Q.  Your rifle was seized at Customs, wasn't it, sir, when you
 9      tried to bring it in?
10      A.  I was allowed to bring my rifle.  Now, if it was seized, it
11      was not seized by Customs.  When I arrive at the airport, I
12      surrender my weapon, like I do.  "Do you have anything to
13      declare?"  "Yes, I have weapon."  The Customs knew.  I was
14      allowed to bring the rifle in the country.  The captain of the
15      plane allowed me to board the plane with my rifle.
16      Q.  Sir, if you could just answer --
17      A.  So when I get to the Customs --
18      Q.  Could you just answer the question.  Let me try it this way:
19      Once you left Customs, you no longer had your Fifty caliber
20      rifle, did you, sir?
21      A.  No, because I surrendered it to Customs.
22      Q.  You declared it and they took it, correct?
23      A.  I declared it.
24      Q.  And they took it?
25      A.  No, they did not take it.  They kept it.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1804

```
1   Q.  They kept it?

2   A.  I was not caught smuggling anything.

3   Q.  I didn't say that, sir.

4   A.  No, you said they took it.  They did not take it.  They kept

5   it.  That's a big difference.

6   Q.  Okay.  Well, you don't have it now, do you?

7   A.  They still have -- I'm not going back to Dubai to claim it.

8   Q.  And you didn't have it while you were in Dubai, did you?

9   A.  No, because I was waiting for the license to be issued.

10  Q.  And you came in November of '04, right?

11  A.  I'm sorry?

12  Q.  You came in November 2004?

13           MR. HESS:  Objection.

14           THE WITNESS:  November 18.

15           MR. HESS:  Objection.  Vague and ambiguous.

16           THE COURT:  I don't know what that means.  You came

17  where?

18           MR. CEDERBERG:  Into the country.

19           THE COURT:  In what country?

20           MR. CEDERBERG:  Dubai.

21  BY MR. CEDERBERG:

22  Q.  You came in Dubai in 2004, right?

23  A.  November of 2004.  I already said that.

24  Q.  And as of January 2008, you still hadn't gotten a license,

25  had you?
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1805

1    A.   I was waiting for the license to be issued.

2    Q.   Now, you not only brought your rifle with you, you brought

3    some ammunition with you, too, didn't you, sir?

4    A.   Yes, because if you bring a rifle without ammunition, you

5    wouldn't be able to use the rifle.  They go together.

6    Q.   And you know now, don't you, that for that -- to possess

7    that ammunition, you needed to have a license in Dubai?

8           MR. HESS:  Objection.  Relevance now.

9           THE COURT:  That is not relevant.  Move on.

10          MR. CEDERBERG:  Your Honor, may I just be heard

11   briefly?

12          THE COURT:  No.

13          MR. CEDERBERG:  This is central to --

14          THE COURT:  No.  Ruled.  Move on.

15   BY MR. CEDERBERG:

16   Q.   You brought your ammunition.  How much ammunition did you

17   bring?

18   A.   Three boxes of 150 rounds.

19   Q.   So 450 rounds?

20   A.   450 rounds total.

21   Q.   And you shipped them in your personal belongings?

22   A.   Yes, because it's very heavy, and I didn't want to carry

23   ammunition along the rifle for safety precaution.

24   Q.   And that ammunition you didn't keep in your place where you

25   lived in Dubai, did you, sir?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1806

1   A.   No, because I was waiting for Custom clearance, so I kept

2   the ammunitions inside the Free Zone.  So technically it's not

3   Dubai.  When you pass the gate of the Free Zone, then you have

4   to clear Customs.  So I did not take them home because I did not

5   want to break the law.

6           MR. CEDERBERG:  Move to strike as nonresponsive, Your

7   Honor.  I just simply asked "You didn't take them home?"  I

8   didn't ask you --

9           THE COURT:  No.  I think it was an explanation.

10  BY MR. CEDERBERG:

11  Q.   You kept them at Exomos, right?

12  A.   Yes.

13  Q.   Okay.  So technically, they were sitting in Exomos, correct?

14  A.   They were sitting at Exomos to the knowledge of my manager

15  and employees.

16  Q.   And you didn't have a license to possess those 450 rounds of

17  Fifty caliber ammunition, did you, sir?

18  A.   There's no licensing for ammunition possession.  There is a

19  licensing for possession of a rifle.  They go together.  You

20  can't have a rifle without ammunition.  If you have a license

21  for a rifle, the ammunitions go with it.  If you have a license

22  for a rifle, then you have no reason to have ammunitions.

23  Q.   The police filed -- or the prosecutor filed charges against

24  you under Dubai law for possessing those bullets, didn't they,

25  sir?  Yes or no?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1807

```
1    A.  Yeah, I believe so.
2    Q.  And you went before a judge for possessing those bullets,
3    correct?
4    A.  I did not understand the word that what he said, however.
5    Q.  Yes or no, sir, did you go before a judge and have a hearing
6    when you were charged with possessing those bullets without a
7    license?  Yes or no?
8    A.  It's not yes or no, I went before a judge, yes.  Now, if
9    it's for licensing possession, I don't know because there is no
10   licensing for possession of ammunition.  So I went before a
11   judge, yes.  For the second part of the question, I don't know.
12   I did -- he speak Arabic, I did not understand a word.
13   Q.  There were no translater.  You had an attorney there, right?
14   Yes or no, sir?  Your attorney was with you representing --
15   A.  Again it is not a yes-or-no question.  You're speaking of
16   two different countries.  Yes, I have an attorney next to me,
17   but he's not representing me, he's representing the court.
18   Q.  Sir?
19   A.  There was a person next to me.
20   Q.  Who was your lawyer?
21   A.  Let me respond.
22   Q.  Was he your lawyer or not?
23   A.  There was a person next to me.
24   Q.  Representing you?
25        MR. HESS:  Judge, he's trying to answer.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1808

```
 1              THE WITNESS:  I'm trying to answer.

 2              THE COURT:  Let him answer the question, please.

 3              THE WITNESS:  There's a person next to me who says he's

 4      my lawyer.  He says he's my lawyer.  Now, I know, as a matter of

 5      fact, that he's not my lawyer.  He's representing somebody else,

 6      but that's not me.

 7      BY MR. CEDERBERG:

 8      Q.  So this is another lie that happened to you in Dubai when he

 9      said you were his lawyer, that was a lie?

10      A.  The lie --

11              THE COURT:  You got that backwards.  He didn't say that

12      he was his lawyer.  He said he was his lawyer.

13              MR. CEDERBERG:  Yeah.  Okay.

14      BY MR. CEDERBERG:

15      Q.  When --

16              THE COURT:  Ask the question again.

17      BY MR. CEDERBERG:

18      Q.  The person next to you was representing you, you felt that

19      wasn't a true thing?

20      A.  Absolutely.

21      Q.  And we talked about -- and what was his name?

22      A.  Mohamed el Khalifa.  From Al Matrooshi law firm.

23      Q.  Now we talked about yesterday another meeting that you had

24      with lawyers in 2008, right?

25      A.  Yes.  Uh-huh.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1809

```
 1    Q.  The same law firm representing you again, right?
 2    A.  It was the same -- again, it's the same person, Al Matrooshi
 3    firm who sent me a gentleman named Mohamed Khalifa.
 4    Q.  And he was representing you, correct?
 5    A.  No.  He says he's representing me.  He says he's my lawyer.
 6    But when that person tells me you should pay Dubai World because
 7    you are facing life in prison, do you think he's representing
 8    me?
 9         MR. CEDERBERG:  Move to strike as nonresponsive, Your
10    Honor.  The question is just did you -- did he think he was his
11    lawyer?
12         MR. HESS:  He's trying to answer, Judge.  He's answered
13    it, actually, and counsel keeps on going into it and he's asking
14    for another explanation.  So asked and answered.  And I'm
15    asking -- and it was responsive.
16         THE COURT:  Well, not really.  I'll permit the answer
17    to stand.  Ask another question.
18    BY MR. CEDERBERG:
19    Q.  You, in fact, in December of 2007, were convicted under
20    Dubai law for possession of your fifty caliber bullets without a
21    license, weren't you, sir.
22         MR. HESS:  Objection.  Compound question.  Asked and
23    answered.
24         MR. CEDERBERG:  Not asked and answered, and not
25    compound, Your Honor.
```

1810

```
 1            MR. HESS:  Convicted of possessing bullets without a
 2   license, that was asked, and Mr. Jaubert answered that.
 3            THE COURT:  I don't remember the answer, but I don't
 4   think it's compound.  Go ahead and answer the question.
 5   BY MR. CEDERBERG:
 6   Q.  Yes or no?
 7   A.  Okay.  Repeat the question.
 8            THE COURT:  In December of 2007, were you convicted,
 9   under Dubai law, for possession of a fifty caliber bullets
10   without a license?
11            THE WITNESS:  I don't know exactly for what I was
12   convicted.  I know I was convicted for something, and I paid a
13   fine of $2,800, but I don't know the exact wording.
14   BY MR. CEDERBERG:
15   Q.  Okay.  The lawyer representing you was able to get the fine
16   at only $2,800, right?
17   A.  Again, you asking me --
18   Q.  Yes or no, sir?
19   A.  No, it's not a yes-or-no answer.  In your question you put
20   the word "only."  What makes you say that?  I don't know if it's
21   only 28, if it was supposed to be plus that or minus that.  So
22   remove that word.  I can't answer it yes or no.
23            THE COURT:  Why can't you answer it?  You know, I
24   understand that you don't -- may not agree that "only" is not --
25   maybe it should be just straight $2,800, but that doesn't change
```

1811

1   the question.  The question was very simply, the lawyer

2   representing you was able to get the fine, at his

3   characterization, is only $2,800?  But the question is, was he

4   able to get the fine to $2,800?

5          MR. HESS:  Objection.  Misleading.  That's like saying

6   that if a person is -- that's like --

7          MR. CEDERBERG:  Your Honor.

8          THE COURT:  No, it's not, sir.  No, it's not.  "Only"

9   is only.

10         MR. HESS:  I'm not saying only, Judge.

11         THE COURT:  Is descriptive of the $2,800.  He may

12  disagree that $2,800 he thinks is a huge amount of money.

13  That's fine.

14         MR. HESS:  I'm not saying only.  I'm saying the

15  inference that it was the attorney that got that fine.  It's the

16  judge.

17         THE COURT:  That was the question.

18         MR. HESS:  I know, but the judge makes the decision,

19  not the attorney.

20         THE COURT:  The question is, was the attorney able to

21  get the fine down $2,800, and we're dancing around it.  That's

22  my point.  Answer the question, please.

23         THE WITNESS:  I paid the fine of $2,800.  I don't know

24  if the lawyer was able to reduce it or that -- I don't know.

25  The only thing I know is I paid a fine of $2,800.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1812

```
1         THE COURT:  All right.  Move on, please.
2    BY MR. CEDERBERG:
3    Q.  You didn't go to prison, right?
4    A.  No, I did not go to prison, no.
5    Q.  You know you got your passport back when that case was over,
6    didn't you, sir?
7    A.  Again --
8    Q.  Yes or no?
9    A.  No it's not a yes-or-no question.  The way you ask the
10   question, it sounds like I paid the fine and thank you, sir, we
11   give you your passport back.  That's not the way it happened.  I
12   got my passport back because they made a mistake.  They did not
13   want to give me my passport back.  They made a mistake, there's
14   some clerical error, or I don't know what, which resulted in me
15   getting my passport back.
16         And I know that as a fact because the next day when I
17   tried to go back to the United States, I had a travel ban on my
18   name and they did not let me board the plane.  I had to go back
19   the next day, and I sleep through mI don't know how, but -- so I
20   cannot say they gave me back my passport, no.  I managed to
21   recover it because it was a mistake or something.
22         THE COURT:  Please, please, the question was after that
23   case was over, did you get your passport back?  Ask questions
24   more directly, please.
25         MR. CEDERBERG:  I think I am.  I'll try again.
```

1813

1          THE COURT:  The question was, "You know you got your

2     passport back when that case was over, don't you, sir?"

3          THE WITNESS:  Yes.

4          THE COURT:  Okay.  Move on, please.

5     BY MR. CEDERBERG:

6     Q.  And as a matter of fact, after that case was over, in

7     January 2008, you used that passport and flew back to the United

8     States, didn't you, sir?

9     A.  Yes.

10    Q.  And then you were in the United States for approximately

11    three weeks?

12    A.  Yes.

13    Q.  And then you flew back to Dubai, didn't you, sir?

14    A.  Yes.

15    Q.  And when you landed in Dubai, you had your passport, didn't

16    you, sir?

17    A.  Yeah, yes.

18    Q.  Nobody took it from you when you landed, did they, sir?

19    A.  They took it later.

20    Q.  When you say "they," no one from -- let me go back.

21         When your passport was taken in connection with the bullets

22    case, that was taken by the Dubai police, wasn't it, sir?

23    A.  Dubai World called the police, then the police took my

24    passport.

25         MR. CEDERBERG:  Your Honor, it's just a speech again.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1814

```
1              THE COURT:  That's true.  The question is, "When your
2     passport was taken, it was taken by the Dubai police, wasn't it,
3     sir?"
4              THE WITNESS:  Yes.  Uh-huh.
5              MR. CEDERBERG:  Now, I'm going to approach the witness.
6     Charles, do we have the ability to put on just on the screen for
7     the witness?
8              MR. HESS:  Judge, 403 objection.
9              THE COURT:  Okay.  Let me see.
10             MR. HESS:  And collateral.  Judge, if you could ask
11    counsel -- before the court permits the jury to see the
12    pictures, if counsel could be a little more careful showing the
13    picture when he walks up.  I know it was inadvertent, but I
14    would appreciate it if he would be a little more careful.
15             MR. CEDERBERG:  Didn't happen, Your Honor.
16             THE COURT:  I didn't see it, but I wasn't looking.  If
17    the jury saw it, they're to disregard it.  Frankly, I'm almost
18    certain nobody could see this from any kind of distance because
19    I'm having trouble seeing it right in front of me, but then I'm
20    old.  I agree, 403.  Move on to something else.
21    BY MR. CEDERBERG:
22    Q.  Now, it's your understanding that the bullets were taken by
23    the Dubai police, correct, from the Exomos warehouse?
24    A.  I was not there when that happened, so the only thing I know
25    is what I've been told by my employees and AbdulQader.
```

1815

```
1    Q.  Okay.  Now, you know that that incident with the bullets

2    happened in March -- February or March 2007, correct?

3    A.  No.

4    Q.  You don't know one way or the other?

5    A.  No, it did not happen in March 2007, it happened in April

6    2007.

7    Q.  Pardon?

8    A.  It happened in April 2007.

9    Q.  Well on April 9, 2007, Dubai World increased your

10   compensation package, didn't they, sir?

11   A.  Repeat that, please.

12   Q.  On April 9, 2007, Dubai World increased your compensation

13   package, didn't they?

14   A.  No, I don't remember that.

15   Q.  Isn't it true that they wrote you and said that, "As

16   promised, I have raised the accommodation allowance with the

17   chairman and have been" --

18              MR. HESS:  Objection.  It's hearsay.

19              MR. CEDERBERG:  It's cross-examination, Your Honor.

20              THE COURT:  I think he's allowed to cross-examine him

21   on hearsay.  Go ahead.

22   BY MR. CEDERBERG:

23   Q.  Isn't it true that Dubai World personnel told you, "Dear

24   Herve:  As promised, I have raised the accommodation allowance

25   with the chairman, and I have been instructed to have your
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1816

1    accommodation allowance as 170,000 per annum once you have moved

2    into your villa?"  Isn't that true?

3    A.  I did not receive that increment.  It was an agreement that

4    once I would move from the company provided house to my personal

5    house, they would give me that allowance.

6    Q.  Okay.  So you did get that promise to increase your benefit

7    package, right?  Same time all this bullet stuff was going on,

8    correct?

9    A.  Yeah.  That was a promise made.  That doesn't mean it

10   happened.

11   Q.  Now, sir, as part of the bullets investigation in

12   April 2007, you were interviewed by the Dubai police, correct?

13   A.  Yes, three times.

14   Q.  And you stated under oath that because of those interviews

15   by the Dubai police, that you were in fear of your life,

16   correct?  Yes or no?

17   A.  Fear of my life, yes.

18   Q.  Okay.  That there were dire consequences?  See that?

19   A.  Yes.

20   Q.  And that you were in grave danger, correct?

21   A.  Yes.

22   Q.  And you felt that your family was in grave danger; that's

23   what you told us, right?

24   A.  Yes.

25   Q.  This is in April of 2007, right?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1817

1    A.  Yes.

2    Q.  Your felt your wife was in danger?

3    A.  I felt my wife was in danger.

4    Q.  You felt your children were in danger?

5    A.  Yes, sir.

6    Q.  And you were very concerned about them, right?

7    A.  Yes, sir.  Extremely concerned.

8         MR. CEDERBERG:  I'd like to play from Mr. Jaubert's

9    deposition taken on January 6th, 2011, Page 66, Lines 04, Page

10   66, Line 24.

11        MR. HESS:  Objection.  Improper impeachment.

12        MR. CEDERBERG:  Your Honor, this is deposition of a

13   party.

14        THE COURT:  Yeah, it is, but this isn't the time to be

15   playing it if you're just playing it as your evidence.  If it is

16   impeachment or you are going to ask him a question about it on

17   cross-examination, you may do so.  But, you know, that would be

18   stuff that you could bring up in your rebuttal case.  You could

19   play the video any way you want.  But, I mean, we haven't been

20   following the strict boundaries of that sort of thing.

21        But yes, you can play an opposing party's deposition

22   for whatever purpose.  And, therefore, you could do it, but if

23   it's not impeachment, then don't play it right now.  That's

24   just -- it seemed to me that you're trying to set him up for

25   some impeachment by your questioning.  I don't know what it

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1818

1   says, so I can't really rule on that.  I don't understand what

2   it is.

3           You want to show me and tell me that it's impeachment?

4   I'll look at it.  Hand it to the court security officer.  Page

5   66, line 4.  Page 66, line 24.  Just one line each place?  Page

6   66, line 4 through 24.

7           MR. CEDERBERG:  It's 6 through 24, and, Your Honor,

8   it's impeachment.

9           THE COURT:  Let me see it first.  No speaking

10  objections or proposing.  Okay.  Objection sustained.

11          MR. CEDERBERG:  Your Honor, may I be heard?

12          THE COURT:  During a break you can talk to me.  Move on

13  to something else, please.

14  BY MR. CEDERBERG:

15  Q.  Well, in July 2007, your wife and your children flew to the

16  United States, didn't they?

17  A.  Yes, without me.

18  Q.  For a three-week vacation, right?

19  A.  For vacation.

20  Q.  Okay.  And they flew first class, didn't they?

21  A.  Yes.

22  Q.  And they brought --

23  A.  I'm not sure, but I think so, yes.

24  Q.  And they brought their maid with them?

25  A.  No.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.  She didn't make the trip?

2    A.  Who?

3    Q.  The maid?

4    A.  No, the maid did not fly to the US, no.  Absolutely not, no.

5    Q.  And your wife and children were in the United States for

6    three weeks, correct?

7    A.  Yes.

8    Q.  And your wife is a United States citizen?

9    A.  My wife is a US citizen, as well as my children.

10   Q.  Okay.  And while they were in the United States, did you

11   have contact with them?

12   A.  Yes, phone, e-mail.

13   Q.  Okay.  And did you tell your wife that you were in great

14   fear of her life?

15   A.  I told her, but she not believe me.

16   Q.  Okay.  And by the way, who paid this first class airfare for

17   your wife and your children to come back to go back to the

18   United States during this time period you were in great fear of

19   your life.

20           MR. HESS:  Objection.  Relevance, 403.

21           MR. CEDERBERG:  Clearly relevant, Your Honor.

22           THE COURT:  No, I'll overrule that objection.  I think

23   it's already in evidence, but --

24   BY MR. CEDERBERG:

25   Q.  Dubai World paid, didn't they?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1820

```
1   A.  It did not happen that way.  I --

2   Q.  You didn't pay, did you, sir?

3   A.  It's not -- I cannot answer it.  I have to explain.

4   Q.  Let me -- let's go through this by question, by answer.

5   Question and answer.  You didn't pay for that flight, did you,

6   sir?

7   A.  I paid partially.  If you let me explain, I'm going to tell

8   you.

9   Q.  Dubai World or one of its entities paid for that flight,

10  didn't they, sir?

11  A.  They paid partially.

12  Q.  Okay.  And being in grave danger, you had your wife and your

13  children, after three weeks, fly back to Dubai, didn't you?

14  A.  Yeah, she came back with my children, yes.

15  Q.  And your children and your wife were safe in the United

16  States, correct?

17  A.  Yes, but I was not safe.

18  Q.  So you had your wife and your children fly back to this

19  country you felt they were in grave danger with because you were

20  not safe?  That's why you wanted them to fly back?

21  A.  No, that's not.  My wife and children -- my children needs a

22  father, and my wife needs a husband.  If they stay in the US,

23  I'm trapped in Dubai with a life in prison term above my head,

24  they lose a father and they lose a wife.  Once I came out of

25  that police station, I knew it was over, and I came up with a
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1821

1    plan to escape the country safely.

2    Q.  Sir?

3    A.  I have to explain.  You don't let me explain.  It's not that

4    simple.

5    Q.  This has nothing -- I asked you, "Did Dubai World pay for

6    the flight?"  You wanted to explain.

7    A.  No, you don't let me explain.  You asked me if I pay or

8    Dubai World pay.

9          MR. CEDERBERG:  Your Honor, could I ask the Court to

10   instruct the witness to answer the questions?

11         THE COURT:  Answer the questions.  Your lawyer will

12   have an opportunity, on redirect examination, to let you explain

13   everything that you want to, but in order to finish this, we

14   need to have you answer the questions to the best of your

15   ability.  If it is a question that requires an explanation, then

16   answer the question first, then you may start giving an

17   explanation.  And if they object, then I'll rule on it.  But at

18   this point, do your best to answer the question first.

19         This question was, "So you had your wife and your

20   children fly back to this country you felt you were in grave

21   danger with because you were not safe, that's why you wanted

22   them to fly back?"

23         And your answer was, "No, my children needs a

24   father, my wife needs a husband."  That's not exactly the

25   answer.  The answer is you did have them fly back, or somebody

1822

1    else flew them back or whatever.  I don't know.

2              MR. HESS:  That's a compound question, Judge.

3              THE COURT:  Pardon me?

4              MR. HESS:  Compound question on that question.  I think

5    that's the problem, it's a compound question.

6              THE COURT:  I don't believe it's a compound question at

7    all.  It's certainly a compound answer, but it's not a compound

8    question.  The question is, after you say you were in danger,

9    you had your wife an children still fly back?

10             It is a classic cross-examination question, and it's a

11   proper question and it needs an answer.  And if you want him to

12   explain it, you bring it out in redirect examination.

13             MR. HESS:  Thank you.

14             THE COURT:  But it's not an opportunity to make a

15   speech at this point.  Please answer the question.

16             THE WITNESS:  Can you repeat the question, please.

17             MR. CEDERBERG:  Can I have it read back?

18             THE COURT:  Oh please, no.  Just go ahead.

19             MR. CEDERBERG:  Okay.

20             THE COURT:  Paraphrase it.

21   BY MR. CEDERBERG:

22   Q.  You and your wife -- your wife and your child came back to

23   Dubai, even though you believe they were in grave danger,

24   correct?

25   A.  They came back to Dubai, yes.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1823

```
 1   Q.  And you believe they were in grave danger in Dubai, right?

 2   A.  I believe I was in grave danger.

 3   Q.  You told us before that you believed your wife was in grave

 4   danger?

 5   A.  Yes.

 6   Q.  And you believed your children were in grave danger?

 7   A.  Yes.

 8   Q.  And you had your wife and your children leave the United

 9   States and go back to Dubai where you thought they were in grave

10   danger?  Is that your testimony under oath?

11   A.  Yes.

12   Q.  I'm going to ask you one more time, Dubai World paid for

13   that trip, didn't they, sir?

14   A.  Partially.

15          MR. CEDERBERG:  Your Honor, at this time I'd like to

16   read Page 98, Line 7, through 98, Line 22 of Mr. Jaubert's

17   deposition under oath taken January 6, 2011.

18          THE COURT:  Well, I don't know what it says.  Can I see

19   it, please.

20          MR. CEDERBERG:  Sure.

21          THE COURT:  I know it's not the only way to do it, and

22   I know that you have a lot of experience as a lawyer, but

23   wouldn't it be easier to say, "Do you remember telling me,

24   during your deposition, that Dubai World paid for this?"  And

25   then if he does it, you can say, "Do you remember being asked
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1824

1    this question and giving this answer?"

2         MR. CEDERBERG:  Your Honor, with all due respect, I

3    think I'm allowed to show the court the inconsistent statement

4    for the jury to evaluate themselves.

5         MR. HESS:  Judge, that's not true.  Impeachment means

6    that the witness -- the rule says the witness needs an

7    opportunity, is to be confronted with a particular question to

8    be permitted to ask that.

9         THE COURT:  I don't think so.  That's not the

10   impeachment rule.  That's only true for a prior inconsistent

11   statement that was supposedly brought up by some sort of

12   intervening factor.  That's when that comes in.  That's a

13   different rule.  So you just want to show this?

14        MR. CEDERBERG:  I want to show that he said one thing

15   today and he said another thing under oath.

16        THE COURT:  See, my understanding of the rule is that

17   you get him to say it today, then you ask him if he said it

18   differently another time, and if he admits it, then that's fine.

19   If he doesn't admit it, then you can use extrinsic evidence.

20   That's my understanding of the rule.  And I'm afraid that's what

21   my ruling is going to be.  So you have to ask him if he said it

22   to you before.  And if he admits it, then he's admitted the

23   inconsistent statement.  That's the way I understand it.

24   BY MR. CEDERBERG:

25   Q.  Mr. Jaubert, isn't it true, and when I talked to you on

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1825

1    January 6 and I asked you who paid for your wife and your

2    children to go to United States, you told me Dubai World,

3    correct?

4    A.  Yes.

5    Q.  You didn't say partially paid by Dubai World, did you, sir?

6    A.  No, because at the time I'm not sure.

7    Q.  Yes or no, sir?

8    A.  I don't remember.  Today you mentioned first class, so when

9    you said first class, then I remembered that I paid that

10   portion.  Dubai World paid the ticket, but as per my contract,

11   I'm not entitled to first class ticket, so -- and I cancelled my

12   flight.  I had four tickets, but because I didn't have my

13   passport, my ticket was cancelled, so I don't know what

14   happened.  Dubai World paid, but that first class portion, I

15   think I believe I paid it.

16   Q.  Try it this way, Mr. Jaubert:  I asked you a very simple

17   question in your deposition.  "Okay.  July 2007, who paid for

18   your wife and your young children trip to Dubai and then -- or

19   trip to Florida and then back to Dubai?"  And your answer was

20   "Dubai World," wasn't it, sir?

21        MR. HESS:  Objection.  That mischaracterizes the

22   testimony.  If I may approach, Judge.

23        THE COURT:  I read it.  I know exactly what it says.

24   There's an intervening something.

25        MR. HESS:  It says answer.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1              THE COURT:  I know what it says.  I'm asking counsel,

 2    there seems to be, like, two lines in there that are intervening

 3    between the question and the answer "Dubai World."  I think that

 4    the ultimate answer may be Dubai World.

 5              MR. CEDERBERG:  It is, Your Honor.

 6              THE COURT:  But it says Nike World in there, doesn't

 7    it?

 8              MR. HESS:  It also says -- Judge, I'm not sure.  Can

 9    I --

10              THE COURT:  Okay.  So you can't skip those if you're

11    asking -- read the question over again.

12              MR. CEDERBERG:  Your Honor, if I play the tape, they

13    were all on there.

14              THE COURT:  I understand that.

15              MR. CEDERBERG:  It would move quicker.

16              THE COURT:  But you couldn't play the tape until you

17    had given him an opportunity to say that he had said that or had

18    not said it.  I could be wrong, but I'm not in doubt.  Go ahead.

19    BY MR. CEDERBERG:

20    Q.  In any event, Nakheel traveled --

21    A.  It was Nakheel travel.

22    Q.  Nakheel travel?

23    A.  Part of Dubai World.

24    Q.  Part of Dubai World, yes.

25              THE COURT:  But that's what it really says, "Nakheel
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1827

1   World."  Unfortunately the reporter thought it said "Nike

2   World," which is a shoe store.

3   BY MR. CEDERBERG:

4   Q.  Now, this interview you had April 22, 2007, you claim that

5   you taped or recorded that interview with the police, didn't

6   you, sir?

7   A.  Yes.

8   Q.  And you claimed that you recorded it secretly, correct?

9   A.  Yes.  I did not tell them.

10   Q.  And you claimed the way you recorded this interview that put

11   you in grave fear was that you had a cell phone, right?

12   A.  Yes.

13   Q.  And that you were you asked to put it on the table?

14   A.  Yes.

15   Q.  And they told you you could put it on the table, right?

16   A.  No, they did not say.  I just put it on the table.

17   Q.  You told them -- you asked them politely, can I put it on

18   the table, didn't you, sir?

19   A.  I don't remember if I said that.

20       MR. HESS:  Judge, if counsel is going to go into that,

21   I ask that he be specific with time, because there were a number

22   of interviews.

23       MR. CEDERBERG:  I intend to, Your Honor.

24       THE COURT:  All right.  Then let's -- okay.  Move on.

25   BY MR. CEDERBERG:

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1828

1    Q.  Mr. Jaubert, remember when I got to talk to you under oath a

2    couple months ago?  Remember that?

3    A.  Yes.

4    Q.  And you told me under oath about the third interview that

5    you had with the Dubai police on April 22, 2007.  Do you have

6    that in mind?

7    A.  Yes.

8    Q.  You said, quote, "I asked politely if I could leave my phone

9    on because, as a businessman, as a CEO of a big company, I need

10   to keep track of the missed calls."  Do you see that?

11   A.  Yes, I remember that.

12   Q.  You remember that.  And that they said okay, and let you put

13   the phone out on the table, correct?  Remember that?

14   A.  Yeah, I remember but they said the same thing for the three

15   interrogations, so I'm not sure.  I don't remember if it's the

16   first one, the second one, or the third one.

17   Q.  Well, all three interrogations.  In the third interrogation,

18   you asked to put the phone out, correct?

19   A.  To put the phone on the table?

20   Q.  Yes.

21   A.  I believe so, but I don't remember for sure.

22        MR. CEDERBERG:  Your Honor, I'd ask to play the tape,

23   then, if he's going to tell me he doesn't remember.  I certainly

24   can play the tape.

25        THE COURT:  Yes, you can.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1829

 1              MR. CEDERBERG:  I'd like to play page -- from the

 2    deposition of January 6, 2011, Page 178, 15, to 179, 25.

 3              MR. HESS:  Frankly, I don't have a problem with it, but

 4    I think Mr. Cederberg was asking about the third interrogation.

 5    The lines that he's talking about say the second interrogation.

 6    So I -- just for the record, maybe that's the confusion.

 7              THE COURT:  Are we talking about the same

 8    interrogation?  Would you look at it carefully, please, before

 9    you play it.

10              MR. HESS:  I'm looking at Page 178, Line 15.

11              THE COURT:  I understand what you're looking at.  I'm

12    asking him to look at it to see that he's sure.

13              MR. CEDERBERG:  Would you please play it?

14              (Video deposition playing in open court:

15    "Q. The second, as you call it, interrogation, they told you you

16    could have a phone out in front of you in that one, right?

17    "A. Yes.  The same way.  I asked politely if I could leave my

18    phone on because, as a businessman, as a CEO of a big company, I

19    needed to keep track on the missed calls and the -- missed

20    calls.

21    "Q. And they let you do that?

22    "A. They let me do that.

23    "Q. Okay.  Now, let's talk about the third interview or, as you

24    say, interrogation.  You asked them again if you could put your

25    phone out, right?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1830

1    A.   The third interview, because I saw how it worked the

2    previous two.  I decided to this one -- this time walk in the

3    interrogation room with my phone on the recording mode.

4    "Q. Right.

5    "A. It's not that--I didn't have any specific reason or --

6    "Q. Right.

7    "A. -- or suspicion.  Because the second questioning was

8    actually less aggressive than the first one.  So I was assuming

9    that the third one would be maybe the same way.  And I felt

10   confident that they would also accept me to keep my phone on

11   record.  So I put on record and I walked in the interrogation

12   room.  I asked them politely if they could let me do that and --

13   because I have done it two times before.  The officer that was

14   there who saw me do it before felt confident, I don't know, and

15   then they let me do it.

16   "Q. Okay.  So you asked them to do it and they let you do it?

17   "A. Yeah."

18   BY MR. CEDERBERG:

19   Q.   Now you, in your prior life, with the French equivalent of

20   the CIA, you had been involved in secret recordings, correct?

21   A.   Yes.

22   Q.   And you are by trade -- one of the things you are is an

23   electronic engineer, correct?

24   A.   Yes.

25   Q.   And you have spent time in the Middle East in your work with

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1831

1    the French equivalent of the CIA, correct?

2    A.   Yes.

3    Q.   And you're aware of the different levels of police within

4    Dubai, correct?

5    A.   No, at the time I was not aware of the different level of

6    the police in Dubai.

7    Q.   So when you went into this third meeting and asked if you

8    could put the phone on the table and they said okay, you were

9    secretly recording what went on there?  That's your testimony

10   under oath, correct?

11   A.   Yes.

12   Q.   And when you walked out of that meeting, you had, you're

13   telling us, a recording of what went on, correct?

14   A.   Yes.

15   Q.   And this was a recording of an interview, you're telling

16   this jury, put you in fear of grave danger, correct?

17   A.   Yes.

18   Q.   And your wife would be in grave danger, right?

19   A.   Yes.

20   Q.   And your children, right?

21   A.   And my children.

22   Q.   Okay.  And you don't have that original recording anymore,

23   do you, sir?

24   A.   No, I don't.

25   Q.   You didn't give that phone with the recording to your wife

1832

1  when she went back to the United States in July to put it in a
2  safe place, did you, sir?
3  A.  No.
4  Q.  Yes or no?
5  A.  But I'd like to explain why.
6         THE COURT:  But you have to answer it first, and then
7  explain it.
8         THE WITNESS:  I did not ask my wife to take my phone
9  with her when she went back to the US, and I would like to
10  explain why.
11 BY MR. CEDERBERG:
12 Q.  You've told me, when I interviewed you, why.  I'm going to
13 ask you right now.  You thought that the Dubai police were
14 tracking you by GPS with your phone, correct?
15 A.  Yeah, but that's not the only reason.
16 Q.  And you thought if your wife took your phone back to the
17 United States, the Dubai police, who are monitoring everything
18 you would do, would arrest you.  Isn't that correct?
19 A.  Yeah, that eventually they would arrest me if my phone
20 disappeared from the network.
21 Q.  And you know if you just turn your phone off, the GPS
22 doesn't work, right?
23 A.  I did not say GPS.
24 Q.  Okay.  You said they could track you by your phone?
25 A.  They can track your phone, but not by GPS.  And if you turn

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1833

1       off your phone, the tracking stops.

2       Q.  Then why didn't you just turn off your phone and give it to

3       your wife?  You didn't do that, did you?

4       A.  It's not tracking.  What I said is that if you turn off your

5       phone, or if my wife takes the phone away, I'm the CEO of

6       Exomos.  If my phone disappears from the network, it's going to

7       raise a red flag.  Somebody is going to look for me.  If it's

8       only for two days, that's fine, maybe I'm on vacation somewhere

9       at the beach.  But if my phone is off and I'm in Dubai, they're

10      going to think that there's something wrong and I'm going to be

11      arrested.

12      Q.  So if you lost your phone, you were in danger of being

13      arrested?

14      A.  No.  Because if I lost my phone, I'm going to get a new one

15      and Dubai World will know that I bought a new one because I lost

16      my phone.  However, I could not do that either because without a

17      passport, I could not buy another phone.

18      Q.  And -- well, that's not true, is it, sir?  You could buy a

19      phone on the black market?

20      A.  Let me correct that.  You can buy a phone.  You cannot have

21      phone service.  That's impossible.  Without a passport, you may

22      buy 20 phones if you want.  Black market, white market, red

23      market, wherever, you can buy phones, but you cannot have phone

24      service if you don't have a passport.

25      Q.  When you went from Dubai in January 2008 for those three

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1834

1    weeks, you took your phone with you, didn't you, sir?

2    A.  Yes, I took my phone with me.

3    Q.  And no one at Dubai was there when you came back ready to

4    arrest you at the airport, were they, sir?

5    A.  No, because --

6    Q.  Yes or no.  Just simply yes or no?

7    A.  I'd like to explain.

8    Q.  Well --

9    A.  So I respond.  No.

10       MR. CEDERBERG:  Your Honor, could I ask the witness to

11   please not cut into my cross-examination time with these

12   speeches.

13       THE COURT:  Well, let's see what it is, because if he

14   knows why no one was at the airport ready to arrest him, that's

15   fine.  But, you know, just to make a speech, no.  So the answer

16   is no, and what's your explanation?

17       THE WITNESS:  When I came back to Dubai, I was not

18   arrested because I had a normal behavior.

19       THE COURT:  Okay.  Go ahead.  Ask another question.

20   BY MR. CEDERBERG:

21   Q.  But your phone was gone for three weeks, right?

22   A.  Yes, but it's normal.  If I'm not in the country, when you

23   pass the airport in or back -- I mean, out or back, the police

24   tracks your movement.  So when you leave the country and your

25   phone is off, that's normal if the phone turns off.  But I'm

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1835

1   still in the country.  That's not normal.  So when I come back

2   to Dubai, they don't arrest me.  It's normal.  I travel with my

3   phone, it's normal.  Everybody travel with their phone.

4   Q.  I thought it was a glitch that you got to travel?

5   A.  However a glitch or not, the minute I passed the

6   immigration, my name was in the system that I left the country.

7   And I'm sure they were very happy when I came back.

8   Q.  When you were back in the United States after the gun case,

9   after you got your passport back from the police --

10  A.  Yes.

11  Q.  -- and you're sitting in the United States in Monroe County,

12  right?

13  A.  Martin County.

14  Q.  Martin County.  You didn't try to make a recording of that

15  recording on your phone, did you?

16  A.  I did not know.  You mentioned before that I was skilled in

17  electronics, yes, but I'm not skilled in computer software and

18  things like that.  So I just did not have the equipment to

19  download the recording from my phone to whatever.  I went to

20  Radio Shack and shopping around, and when I showed them my

21  phone, they did not have whatever accessory goes with that

22  phone.  And in Stuart, Jensen Beach, when I was in my house, I

23  did not have access to internet.  I was here for just three

24  weeks, so I did not go online to look for either software or

25  cables or accessories to download the conversation.

1836

1   Q.  Now, remember in your deposition, I asked you did you try to

2   get just a little cassette with a recorder and put it up to your

3   phone and record that message so you had a safe copy of it?  Do

4   you remember that?

5   A.  Yes, I remember that, and I also explained to you that that

6   recording was not my priority.  Whether I have it or not, what

7   am I going to do with it anyway?  Doesn't prove anything.  That

8   was not my priority.  When I came back to the US for three

9   weeks, I had much more important things to do.  I was planning

10  the return of my family.  The telephone and the recording was

11  absolutely not my priority.

12  Q.  The recording of what you're telling us put you in grave

13  fear and caused you to plan the escape was not a high priority

14  to you?

15  A.  The recording itself, no.  What can I do with the recording?

16  What am I going to do with it?

17  Q.  We'll get into what you did with it in a bit.

18  A.  So it's not my priority, no.

19  Q.  You also told me, when I got to talk to you under oath, that

20  you couldn't find a cassette player in Martin County.  You

21  looked around but couldn't find one that you could use to just

22  put next to your phone and make another copy.  Do you remember

23  that?

24  A.  Yes.  Uh-huh.

25  Q.  Radio Shack doesn't sell cassettes?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    A.   What?

2    Q.   Radio Shack, you couldn't find a little tape recorder in

3    Radio Shack?

4    A.   Actually, no, they did not have one.

5    Q.   Okay.  But you also told me under oath that you spent an

6    hour and a half of this nonpriority business of you writing down

7    word for word everything that was on the original recording.  Do

8    you remember that testimony?

9    A.   Yes, I do.

10   Q.   And you took your time because you wanted this transcript to

11   be absolutely word for word what was on that phone, right?

12   A.   Yes.

13   Q.   That was a priority for you, wasn't it, sir?

14   A.   No, it was not a priority.  I mean, it was easy to do.  I

15   just had to type down the -- write the transcript.

16   Q.   As a matter of fact --

17   A.   Just in case.  Not -- doesn't mean it was a priority.

18   Q.   As a matter of fact, we asked you for the original of that

19   word-for-word transcript that you did of this recording that put

20   you in fear of your life.

21        MR. HESS:  Objection, judge.  If we could have a

22   sidebar on this.

23        THE COURT:  All right.

24        (SIDEBAR CONFERENCE:

25        THE COURT:  Yes, sir.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1838

 1          MR. HESS:  Just simply not true.  I ask that counsel

 2   show Your Honor what the request for production exactly says.

 3   It doesn't say that.  And what they're leading to is there is an

 4   e-mail between myself and Mr. Mosely, and I said I would produce

 5   the original copy of the recording.

 6          Now, that was responsive to the request for production.

 7   But the fact of the matter is, is I'll tell Your Honor what was

 8   going on during that period of time.  We were being pressured

 9   with the production of thousands of documents, we had computer

10   issues, and I just -- basically just said here's the original

11   copy.  And they've put that in evidence, and they listed

12   Mr. Mosely as a proposed witness.  And if we're going to get

13   into that, I've got no problem with that.

14          MR. CEDERBERG:  All I'm going to ask him is what he

15   said in his deposition, that this transcript that he

16   painstakingly did that he hand wrote out, he lost that too.

17          THE COURT:  I don't know.

18          MR. HESS:  That's not what he asked.  He asked and we

19   asked you for the original recording.

20          MR. CEDERBERG:  I asked where the original transcript

21   was.

22          MR. HESS:  That's not what you said.

23          MR. CEDERBERG:  I think I said transcript.

24          THE COURT:  I don't know.  I don't remember.  No the

25   question was, "As a matter of fact, we asked you for the

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1839

1  original of that word-for-word transcript that you did of this

2  recording."

3        MR. HESS:  "Of this recording."  Then I misspoke,

4  Judge.  I have no problem with that question.

5        (END OF SIDEBAR)

6        THE COURT:  Never mind.  We have come to an agreement.

7  Ask your question again.  You want me to repeat it?

8        MR. CEDERBERG:  Yes.

9        THE COURT:  As a matter of fact, we asked you for the

10  original of that word-for-word transcript that you did of this

11  recording that put you in fear of your life.

12  BY MR. CEDERBERG:

13  Q.  Do you remember that?

14  A.  You asked me for the original.

15  Q.  The original transcript?

16  A.  Transcript, yes.

17  Q.  Yeah.  And you told me you couldn't find it.  You didn't

18  know where it was, right?

19  A.  I don't know where it was.

20  Q.  So even the transcript, the word-for-word transcript,

21  keeping that in a safe place wasn't a priority for you, correct?

22  A.  No.  The original -- the reason I could not find it is

23  because, from the first transcript, I transcribed it again maybe

24  two or three times, so I don't know what I did with the first

25  one.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1840

```
1   Q.  When you returned to -- from the United States back to Dubai
2   in 2008, in January, traveling on your passport, you were still
3   the CEO of Exomos, weren't you?
4   A.  No.  I had been fired in September 2007.  So when I returned
5   to the US, I was not CEO of Exomos.
6   Q.  So you don't have the original tape, you don't have the
7   original recording anymore, correct?
8   A.  No.  When I escaped -- I don't have it, because when I
9   escaped, I left my phone behind as a beacon so that they would
10  know -- they would think I'm in a specific area when I'm
11  somewhere else.
12  Q.  You left in it a store, right?
13  A.  I left it in some convenience store in gas station.
14  Q.  So they would think you were in that gas station for a
15  period of days if they were monitoring everything you did?
16  A.  They would not think I was in a gas station, they would
17  think I'm in the area.  It's not that precise.
18  Q.  And --
19  A.  And I did it many times.
20  Q.  Now, there came a time, didn't it, sir, when -- let me
21  strike that.
22          You testified yesterday that in order to escape, you
23  got into this little dinghy, right?
24  A.  Yes.
25  Q.  And then from that dinghy, you made it into a boat and then
```

1841

1    on to India, correct?

2    A.   Okay.  That's the other way around.  I jumped in the dinghy.

3    Q.   Right.

4    A.   Sailed off shore about 24 miles, reached international

5    waters.  Once I was in international waters, I had -- I waited

6    for my friend.  So he's the one who met me.  Not me who met the

7    boat.  I was waiting for him for maybe three hours.

8    Q.   And you told me, when I got to talk to you under oath two

9    and a half months ago, that it was while floating in that

10   dinghy?

11   A.   It was, I'm sorry.

12   Q.   While you were in that dinghy, you first came up with the

13   idea, "Hey, I'm going to write a book about all this stuff.

14   This would be a good book."  That's what you told me under oath?

15   A.   Yeah, that's true.

16   Q.   That's simply not true, is it, sir?

17   A.   I believe I had the idea to write a book in that boat.

18   Q.   Well, you took pictures of yourself preparing for your

19   escape, correct?

20   A.   No, I did not take any pictures.

21   Q.   There are no pictures of you preparing for your escape

22   dressed with a rebreather in your book?  Is that what you're

23   telling us?

24   A.   When I escaped, I did not take any pictures.  That would be

25   an absolute no-no to do that.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.  Well, that's what I'm getting at.  You took the pictures

2    before you escaped, didn't you?

3    A.  What pictures?

4    Q.  The pictures you put in your book, sir.

5    A.  No, I did not take those pictures before, I took those

6    pictures after.

7    Q.  You say in your book these are pictures of you getting ready

8    to escape, don't you, sir?

9    A.  I'm not sure of the exact wording.  I'm not sure of the

10   wording, but I did not say -- I'm not sure of the wording.

11   Q.  And as a matter of fact, once you got to the United States,

12   you decided you would write a book about your escape, right?

13   A.  No, I decided before, once I returned to the US, I started

14   to actually write the book right away.

15   Q.  But to generate interest for that book, you talked to

16   various news people, correct?

17   A.  Not -- no, not so many.

18   Q.  Well Craig Copetus?

19   A.  I started to write my book in June 2008.  I talked to

20   Greg Copetus, I believe it was in December 2008, so that's six

21   months later.

22   Q.  Well, you realized if you were going to write a book, you

23   needed to have the evidence, correct?

24   A.  Evidence of what?

25   Q.  Of what transpired in this interview in 2007 that put you in

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    grave fear of your life, right?

2    A.   I don't need evidence.

3    Q.   Well, isn't it a fact, sir, that in 2008, at the boat show

4    in Florida in Fort Lauderdale, you contacted two friends you had

5    from Yemen?

6    A.   They contacted me.

7    Q.   And they just happened to be in town?

8    A.   And they were there for the boat show.

9    Q.   And you decided this would be a good time to do a

10   reenactment of what was on your phone, correct?

11   A.   Yes.  Uh-huh.

12   Q.   And you went -- you got your car and you drove down to

13   Stuart -- from Stuart, Florida, to Fort Lauderdale, right?

14   A.   Yes.

15   Q.   Because they wanted to meet you, right?

16   A.   Yes.

17   Q.   And you told me they wanted to meet the hero of the escape

18   from Dubai, correct?

19   A.   No, they did not know they wanted to meet the hero, the guy

20   who managed to get out, because they knew I've done it through

21   my friend Sebastian in Dubai.  Nobody else knew.  They didn't

22   even know the title.

23   Q.   You decided, when you went down there, to bring a tape

24   recorder or some recording device that you finally figured out

25   how to work, right?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1844

```
 1    A.  No, not the first time.  When I first met them, I did not
 2    have -- I did it the next day.
 3    Q.  So you went down to Florida, to Fort Lauderdale, met with
 4    them, and then decided to use them to do a recreation?
 5    A.  To do a reenactment, yes.
 6    Q.  So you drove back up to Stuart, right, correct?
 7    A.  Uh-huh.
 8    Q.  And the next day you got yourself a recording device, right?
 9    A.  Yes.
10    Q.  And you got yourself a copy of the original transcript,
11    right?
12    A.  Yes.
13    Q.  And you met your two friends from Yemen, right?
14    A.  Yes.
15    Q.  And you don't remember their names, do you?
16    A.  One was Hamed, the other one I don't remember.
17    Q.  And you met with those two friends from Yemen in a Chinese
18    restaurant in Fort Lauderdale, didn't you, sir?
19    A.  Yeah, Chinese dinner.
20    Q.  And it was about 11:00 at night and no one was in there
21    except the woman who ran the restaurant, right?
22    A.  Yes.
23    Q.  Tables were empty, correct?
24    A.  Tables were empty.
25    Q.  And you and your two friends decided to put the recording
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1845

1    device down, correct?  Yes or no?

2    A.  I believe we put it down on the table, yes.

3    Q.  And you had transcripts for each of your friends and

4    yourself, or were you all working off the same transcript?

5    A.  No, we had -- it was not the original transcript.  When I

6    printed the three different transcript, I retyped three

7    different transcripts for every one of us.

8    Q.  Okay.  So you're each sitting around that empty Chinese

9    restaurant with the transcripts and the tape recorder, right?

10   A.  Yes.

11   Q.  And one of the persons from Yemen decided to be police

12   officer Number 1, right?

13   A.  Yes, and the other police officer Number 2.  A citizen, I

14   knew the name of one of the police officer Aziz.

15   Q.  And you got to play yourself, right?

16   A.  And I played myself, yes.

17   Q.  And you did a recreation in your words?

18   A.  Reenactment.

19   Q.  Reenactment, right?

20   A.  Yes.

21   Q.  And this reenactment was so thorough in the reenactment you

22   actually made the sound of walking upstairs because that's what

23   you remembered was on the original tape, right?

24   A.  No, it was walking outside.

25            MR. HESS:  Objection.  Mischaracterizes.  It's not a

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1846

```
 1     tape.  Never a tape.  Recording on a phone.

 2              THE COURT:  It's a recording.  So --

 3              MR. CEDERBERG:  Recording.

 4              THE COURT:  Okay.  You're old fashioned, sir.  I don't

 5     think anybody uses tape anymore.

 6              MR. CEDERBERG:  So stipulated, Your Honor.

 7     BY MR. CEDERBERG:

 8     Q.  You wanted to make this recording so realistic, you put the

 9     sound of walking into this recreation, didn't you?

10     A.  It's not that I wanted to make it so realistic, I wanted to

11     make it close as to what happened so I would never forget what

12     happened.  I did not want to make it realistic, I just wanted to

13     make it close to what happened.

14     Q.  And you told me a couple months ago you wanted to make it

15     seem real or as close to what happened so you could remember the

16     incident better, right?

17     A.  Yes.  Uh-huh.

18     Q.  Well, you could have remembered the incident better if you

19     kept the original recording, right?

20     A.  Again, I had to leave my original recording behind because I

21     left my phone behind.  I have very good reason to explain why I

22     did it.  I'm a professional.  I know what I did, and I know why

23     I did it.  If you don't do that, if you -- if I had taken my

24     phone with me, I would have been arrested.  I had to leave my

25     phone behind.  There was no other way.  The reason --
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1847

1   Q.  Get back to my question, sir.  You didn't need to have two

2   people with Middle Eastern or Middle East accents to make a

3   recreation of your tape to help you remember it, did you, sir?

4   A.  Do you think it would have worked better with German

5   nationals?

6   Q.  Well, if it was only for you, I think you could have

7   struggled through it, couldn't you, sir?

8   A.  I think it sounded better with two Arabic speaking persons

9   and -- than two Chinese persons for the atmosphere.

10   Q.  So you're looking for atmosphere in your recreation?

11   A.  No.  The police interrogation with Arabic people, I'm not

12   going to make a reenactment with Chinese people.

13   Q.  So you wanted to make it as realistic as possible, correct?

14   A.  Not realistic.  Close to what happened.

15   Q.  Okay.  And you went down there and everybody played their

16   roles and you made a recording, right?

17   A.  I made a recording.

18   Q.  And then you picked your recorder up, picked the transcripts

19   up, and you drove back to Stuart for that night, correct?

20   A.  Yes.

21   Q.  And you listened to the recording, didn't you?

22   A.  Yes.

23   Q.  And you decided that recording wasn't quite good enough,

24   correct?

25   A.  There was something wrong with the first take, yes.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1848

1    Q.   So you decided to go back to Fort Lauderdale the next day,

2    right?

3    A.   Yes.

4    Q.   Round up your two Yemeni friend, right?

5    A.   Yes.

6    Q.   Meet in the empty Chinese restaurant again around 11:00,

7    right?

8    A.   Yes.

9    Q.   Spread out the transcripts among the three of you again for

10   a second take, right?

11   A.   Yes.

12   Q.   And you and your two friends acted the parts again, correct?

13   A.   Yes.

14   Q.   And then you took that second tape and your transcripts back

15   up to Stuart, correct?

16   A.   Yes.

17   Q.   And then you put both the first tape and the second tape

18   recordings on your computer, right?

19   A.   Yes.  If I remember, yes.

20   Q.   And on that computer, even though you told us that you're

21   not skilled in computers, you were able to splice different

22   parts of the audios that you had downloaded to that computer,

23   right, to make a third tape.

24   A.   Yes, to make a third tape, a third recording.

25   Q.   Because you wanted it so realistic that anybody would

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1849

1   believe it was real, correct?

2   A.  No, that's not what I wanted.  I didn't want to use that

3   recording to anybody actually.  I did not.  I did not publish it

4   on my website.  So many reporters asked me the reenactment, and

5   I did not.  Nobody heard it.  Beside the Greg Copetus and

6   another reporter from the Washington Post, and I gave them the

7   specific instructions to never broadcast it.  I did not want to

8   ever to broadcast it or to make it public.

9   Q.  You -- now you've got your recreated tape, correct?

10  A.  Yes.

11  Q.  And you start telling people like Mr. Copetus, "I have a

12  recording," right?

13  A.  I said, "I have the recording" because I was relying on the

14  recording I had in Dubai in that store, and I asked my friend

15  Sebastian many times to go back to that store to get it back.

16  So when I say I have the recording, I'm thinking I'm relying on

17  the one I have in Dubai.

18  Q.  But to Mr. Copetus, you're telling him -- you're giving him

19  a copy of the one that you had in Dubai, correct?

20  A.  Greg Copetus.

21  Q.  Yes or no, sir?

22  A.  What is the question?

23  Q.  When you tell Mr. Copetus "I've got a recording," you want

24  him to believe it's the original one that you left in Dubai,

25  don't you?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1850

1   A.  It's not I want to.  I don't want him to believe.  I'm just

2   telling him I have a recording and it's in Dubai, and he went to

3   Dubai to meet with my friend to try to get it back.  He went to

4   Dubai for that purpose, among other things.

5        MR. HESS:  No objection, Judge.

6        MR. CEDERBERG:  Your Honor, without objection, offer

7   Exhibit 111.

8        THE COURT:  Without objection, 111 is admitted in

9   evidence.

10       (Plaintiffs' 111 in evidence)

11  BY MR. CEDERBERG:

12  Q.  Can we blow that up as big as you can.  If we go the fourth

13  line down "can you tell me," can you highlight that, please.

14  And all the way across.  And the next line too.

15      This is from you, right?

16  A.  Yeah, this is from me to Greg Copetus.  It is from me from

17  Greg Copetus from Bloomberg.

18  Q.  And you tell Mr. Copetus, "Can you tell me what they know

19  exactly about the tape?  They know I have it obviously."  Do you

20  see that?

21  A.  Yes.

22  Q.  You don't have the original recording at this time, do you,

23  sir?

24  A.  I'm relying on the --

25  Q.  Sir, so we can follow along together, let's take it one

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1851

1    question at a time.  When you tell Mr. Copetas in that e-mail,

2    "Can you tell me what they know exactly about the tape?  They

3    know I have it obviously," you don't have the original tape,

4    original recording, do you, sir?

5            MR. HESS:  Objection.  Vague.  Ambiguous.  The word

6    "have" whether it's in his possession.

7            THE COURT:  I'll overrule the objection.

8            THE WITNESS:  When I write that, is that --

9    BY MR. CEDERBERG:

10   Q.  Sir, my question is, when you wrote that, when you wrote

11   "They know I have it obviously," isn't it the truth the original

12   tape you left -- or the original recording you don't have,

13   right?  It's a simple question.

14   A.  No, I don't have it physically with me.  I'm relying on

15   Sebastian in Dubai and Craig Copetus to get it back.

16   Q.  That's why you told him you have it?

17   A.  That's why I told him I have it.  Counting that Sebastian

18   would get my phone back.

19   Q.  Now, you are fluent in English, aren't you, sir?

20   A.  Yes.  Yeah.

21   Q.  Now, just so we're clear, when you said they know I have it,

22   the last time you saw the phone with the recording was when you

23   left it in a convenience store, correct?  The last time you saw

24   your cell phone that had the recording on it was when you left

25   it in a convenience store in Dubai, right?

1852

```
1    A.  Yes.  Yes.

2    Q.  But you felt comfortable telling Mr. Copetus "They know I

3    have it," because your friend Sebastian may find it in Dubai?

4    Is that what you're telling us?

5    A.  No.  The reason why I wrote that, "They know I have it,"

6    it's simple.  Craig Copetus -- let me check on the date.

7    Q.  My question is very simple, sir.  You wrote "I know they

8    know I have it."  You didn't have it, right?

9    A.  No, I did it not have it, but the reason -- can I explain?

10   Q.  Your counsel can let you explain.  I'm just trying to find

11   out.  You certainly didn't tell Mr. Copetus "I don't have it,"

12   did you?  You say, "They know I have it," right?

13   A.  No, no, I'm perfectly clear.  I always told Craig Copetus.

14   He was aware that the recording was in Dubai.  All the time.  I

15   never lied to Craig Copetus.  He was aware that my recording was

16   in the phone left in Dubai.  He knew that.

17       And the reason why I said "They know I have it" is simple,

18   is because Craig Copetus has a transcript, and when he tried to

19   interview the police, he may have given them some abstract, but

20   the police, they know what they told me.  So if they could

21   remember the questioning and the threat and all that.  So if

22   Craig Copetus produce paper or say something that matches

23   exactly what they said, they're going to believe I have it.

24   Having it means either the recording or the phone.

25   Q.  Sir, when you left your phone in Dubai?
```

1853

1   A.  Yes.

2   Q.  Ten months have gone by now, right?

3   A.  Yes.

4   Q.  You have no idea if that phone is still in Dubai, do you?

5   Do you, sir?

6   A.  I had a pretty good idea my phone would be still there, and

7   this is the reason why, if you let me explain.

8   Q.  Sure.

9   A.  I left my phone in a box, it was -- so I open the box.  It's

10  a camping gear for people to go -- you know, go camping.  Who is

11  going to go camping in the desert.  So I know that item is going

12  to stay forever in that store because nobody is going to buy a

13  camping light and stuff to go camping because it's 160 degrees

14  out there.  So nobody goes camping, so I'm sure that box is not

15  going to be sold ever.

16  Q.  Isn't it true that Mr. Copetus wrote you and told you

17  specifically -- well, before I get to that, the "they" you're

18  talking about, that's the Dubai police, right?

19  A.  Yeah, Dubai police.

20  Q.  Okay.  Mr. Bloomberg or Mr. Copetus of Bloomberg

21  specifically wrote you and in formed you, quote --

22          MR. HESS:  Objection.  Hearsay.

23          MR. CEDERBERG:  Your Honor, it goes to his knowledge,

24  state of mind.

25          THE COURT:  It's not coming in for its truth.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1854

1    Overruled.

2    BY MR. CEDERBERG:

3    Q.  He wrote to you and told you, quote, That recording is the

4    only hard piece of evidence we have on torture, closed quote,

5    didn't he, sir?

6    A.  Yeah, he wrote that, but I disagree with it.  I strongly

7    disagree.  It's not evidence.

8    Q.  You would agree that Mr. Copetus believes it's an original

9    recording to write you and say, quote, That recording is the

10   only hard piece of evidence we have on torture, closed quote?

11   A.  I disagreed with him.  I said it is not a piece of evidence

12   of torture, threats, or whatever.

13   Q.  Mr. Copetus did not write you and say that recreation you

14   did in the Chinese restaurant with your Yemeni friend is the

15   only hard piece of evidence we have on torture?  He didn't tell

16   you that, right?

17   A.  No, but he was aware that I had a reenactment.

18   Q.  You knew Mr. Copetus, when he wrote this, believed that

19   there was real evidence that you had, right?

20   A.  He believed that the original recording with my phone was in

21   Dubai.  He went to Dubai for that.

22   Q.  And he also told you, quote, The most important vital thing

23   is for you to get that telephone with the tape recording to my

24   editor in New York, right?

25   A.  Yes, he said that.  He's a reporter, but I disagreed with

1855

1      it.  I did not want to give it to him.

2      Q.  He knew you weren't going to Dubai, right?

3      A.  I'm sorry?

4      Q.  He knew you weren't going to Dubai, correct?

5      A.  No way in the world I'm going back there.

6      Q.  So for him to write you, quote, The most important vital

7      thing is for you to get that telephone with the tape recording

8      to my editor in New York, he thinks you have it, doesn't he?

9      A.  It doesn't matter what he says to me.  Why don't you show

10     the e-mails where I tell him "I don't want you to give my

11     recording to the editor."  I told him that because I disagreed

12     with what he wanted to do.

13     Q.  As a matter of fact, there was another guy named

14     Andrew Higgins from the Washington Post, right?

15     A.  Yes.

16     Q.  And Mr. Higgins wrote you --

17              MR. HESS:  Judge, objection.  Hearsay.  There's no

18     foundation for it.  I mean, he's just throwing out these

19     statements.  It's not in response to anything to show state of

20     mind.

21              MR. CEDERBERG:  I can show Exhibit 128, Your Honor.

22              THE COURT:  Why don't we just take a short break now.

23     Let's take our morning break.  We'll break for about 10 minutes,

24     we'll come back in a little bit before 11:30, all right?

25              COURT SECURITY OFFICER:  All rise.


**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1856

```
 1              THE COURT:  All right, sir.  Since you're on the stand,
 2    you won't be able to discuss your testimony with anyone, please.
 3              THE WITNESS:  Yes, Your Honor.
 4              (Jury out at 11:14 a.m.)
 5              THE COURT:  I'm sorry to interrupt you we seemed to be
 6    making some progress, but one of the jurors was pointing to his
 7    throat as being overflowing, so I don't like to torture them.
 8              (Brief recess)
 9              THE COURT:  Yes, sir.
10              MR. HESS:  Judge, I think counsel -- I was just handed
11    a stack of exhibits that weren't disclosed yet, and we're going
12    to do it over lunch, and if we can't agree, we'll bring it up to
13    Your Honor's attention then.
14              THE COURT:  All right.  Bring in the jury, please.
15              (Jury in at 11:30 a.m.)
16              THE COURT:  All right, sir.  You may proceed.
17              MR. CEDERBERG:  Your Honor, without objection, I offer
18    Exhibit 160.
19              THE COURT:  160.
20              MR. HESS:  No objection.
21              THE COURT:  Without objection 160 is admitted in
22    evidence.
23              (Plaintiffs' 160 in evidence)
24              MR. CEDERBERG:  Can you go to 1602-2 first, because I
25    think that's the first in order by the time.  And can you blow
```

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1857

1    up the e-mail.

2    BY MR. CEDERBERG:

3    Q.  Now, this is an e-mail from Andrew Higgins, right?

4    A.  Correct.

5    Q.  And you know who he is, right?

6    A.  Yeah, he's now a reporter at Washington Post.

7    Q.   okay.  And he's writing to you, Herve, right?

8    A.  That's correct.

9    Q.  And he says, "I just want to check that you never sent the

10   recording."  Do you see that?

11   A.  That's right.

12   Q.  And the recording he's talking about is the recording of

13   your interview with the police in Dubai, correct?

14   A.  The original one.

15   Q.  Yes.  And then if we go to page three, you e-mailed Andrew,

16   correct?

17   A.  Yes, that's me.

18   Q.  Let's go to page 1, if that's the right one timewise.  And

19   if you can just highlight the "Hi, Andrew" in the first

20   sentence.  That's an e-mail that you wrote back to

21   Andrew Higgins at the Washington Post, right?

22   A.  That's me to Andrew, yes, correct.

23   Q.  And you said, "Hi, Andrew, I did e-mail you the recording to

24   your alternate e-mail," correct?

25   A.  Yeah, I remember that.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1858

1    Q.  And you knew he wanted the original recording, and that's

2    what you wrote back, correct?

3    A.  Yeah, because he wanted the original one, and I e-mailed him

4    the --

5    Q.  Okay.

6    A.  -- the reenactment, I believe.

7    Q.  And then you wrote him again on 160-3.

8         THE COURT:  This is two weeks before.

9         MR. CEDERBERG:  This is two weeks before?

10        THE COURT:  13 days before.  Yes, sir.  May 13.  The

11   other one was May 26.

12        MR. CEDERBERG:  Okay.  Let's see if I can straighten it

13   out faster.

14   BY MR. CEDERBERG:

15   Q.  Showing the May 13th one here, do you see where you send

16   Mr. Higgins answer.  You write, "Hi, Andrew, the file with the

17   recording would not go through with this e-mail, it's

18   obliterated, big size file.  I sent it from another e-mail

19   account."  Do you see that?

20   A.  Yes.

21   Q.  Then, so I have this in order, it's -- we go back to 160-2,

22   and that's where Higgins says, on May 26, "Herve, I just wanted

23   to check that you never sent the recording," correct?

24        THE COURT:  There's something in between there, isn't

25   there?  Go back to that other page.  I think -- go back to the

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    third page.  Bottom.

2    BY MR. CEDERBERG:

3    Q.  "Herve, thanks for these, I particularly like the photo of

4    you in your frogman's outfit."  That, Your Honor?

5         THE COURT:  That's in response to the one above, I

6    believe.  Okay.

7    BY MR. CEDERBERG:

8    Q.  Okay.  In any event --

9         THE COURT:  Isn't it?  It's 8:11 a.m., May, I think it

10   says, 13th, I can tell, and the other one was when, on May 13th?

11   6:17 p.m.  So this one is in response to the other one.  One is

12   in response to the other.  I know that.

13   BY MR. CEDERBERG:

14   Q.  Okay.  Then we go to May 26th, that -- go to 160-2.  This is

15   when Higgins writes you and says, "I just want to check that you

16   never sent the recording," right?

17   A.  I can read that, yes.

18   Q.  And then if we go to 160-1, that's where you say, on May 26,

19   "Hi, Andrew, I did e-mail the recording to your alternate

20   e-mail."  Do you see that?

21   A.  Yes.

22   Q.  Nowhere in this exchange with Mr. Higgins did you tell them

23   "I did mail the recreation that I did in the Chinese

24   restaurant," did you?

25   A.  You take that e-mail out of context between those.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1860

1    Q.  You didn't, did you?

2    A.  No, he's aware it's a reenactment.

3    Q.  You just told me that with regard to his statement that I

4    just wanted to check that you never sent the recording, that you

5    understood he was asking about the original recording.  That's

6    what you just told this jury under oath, right?

7    A.  I don't understand what you said.

8    Q.  Five minutes ago, I asked you if you understood that was the

9    original recording he wanted, and that's when you told me --

10   correct?

11   A.  Andrew Higgins wanted both the original -- he wanted the

12   device because when they were talking about the original

13   recording, they would call it device.

14   Q.  You didn't tell Mr. Higgins "I'm trying to send you the

15   recreation I did in the Chinese restaurant," did you?

16   A.  No.  Because I never called it that way, but he was aware it

17   was a reenactment.  He was aware that there was a reenactment.

18   He was aware that there was an original one that I was still

19   trying to recover, and by that time, Sebastian has not gone back

20   to the gas station to get it back.  He was afraid.  He don't

21   want to get caught or whatever the reason.

22   Q.  So you're telling me that Mr. Higgins was aware that the

23   tape you were trying to send him was a reenactment, a

24   recreation, correct?

25   A.  Yeah, he was aware I had -- it was a reenactment.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1861

1   Q.  But Mr. Higgins, in fact, quoted from the tape you finally

2   sent him, right, which wasn't the original tape?

3   A.  I did not have the original.  I did not give him the

4   original.

5   Q.  We understand that, Mr. Jaubert.  I'm just saying, you got

6   Mr. Higgins to quote from the tape recording in the paper what

7   you sent out of the reenactment, right?

8   A.  Yes.

9   Q.  And that's what you wanted, right?  Because you wanted to

10  get publicity, didn't you, sir?

11  A.  No, I did not want publicity.  I wanted the truth about --

12  of my story to come out and the truth about what really happens

13  in Dubai.

14  Q.  Isn't it true that when I got to talk to you under oath on

15  January 6th, you told me that at the time you did the

16  reenactment, the draft of your book was almost finished?

17  Remember that?

18  A.  Yes.

19  Q.  And do you remember telling me, "And I have -- I get

20  interest, and I know I can tell you there will be a movie down

21  the line"?  Do you remember telling me that?

22  A.  Yes, I remember.

23  Q.  "And I need a reenactment or there will be a movie or a

24  documentary."  Do you remember telling me that under oath?

25  A.  Yes.  Uh-huh.

1862

1    Q.  Do you remember telling me, "And I needed a reenactment to

2    have the utmost fair"?  Do you see that?

3    A.  Yes, I remember.

4    Q.  And if you were going to try and pitch this as a movie or

5    documentary, people wanted to hear the original tape, right?

6    A.  If it's a movie, it's not going to be.  If it's a fiction

7    movie or if it's a movie, it's not going to be an original tape.

8    Q.  Wouldn't somebody trying to decide whether to want to do a

9    movie be sure that they had the best evidence of what really

10   happened?

11              MR. HESS:  Objection.  Speculation.  Relevance.

12              THE COURT:  Sustained.

13   BY MR. CEDERBERG:

14   Q.  Were you concerned, when you decided to do a reenactment, to

15   help interest -- to get interest in people to do a movie about

16   your escape or to do a documentary, you were trying to make it

17   as realistic as possible so that they would think it was the

18   original?

19              MR. HESS:  Objection.  Compound.  Unintelligible.

20              THE COURT:  No, I'll permit it.  I don't think it's

21   compound.

22              THE WITNESS:  It's not that I want you -- insist with

23   that -- it's not that I want to make it realistic.  It's like a

24   movie.  If it's a movie, you don't need the original one.  And

25   if it's a documentary, whether you have it or not, documentary

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1863

1    is going to be made anyway.  And I think there's way more

2    evidence that Dubai, in general, conduct torture.  So it's not

3    necessarily need my testimony because there are other guys.

4    There was one guy that was caught on tape, on videotape, being

5    tortured by the brother of the president, and what did he do?

6    What happened?  Nothing.

7         So why do you think my recording is going to make a

8    difference when it's only audio?  With no evidence that whether

9    it's an original or reenactment whatsoever when the video

10   doesn't do it?

11        MR. CEDERBERG:  Move to strike as nonresponsive, Your

12   Honor.

13        MR. HESS:  Judge, it was responsive.  He was asking him

14   a question.

15        THE COURT:  Hold on.  No, think it's reasonably

16   responsive.  I'll overrule the motion to strike.

17   BY MR. CEDERBERG:

18   Q.  Now, I asked you under oath, on January 6th, "Okay.  Why did

19   you make the reenactment?"  And you told me, under oath, "For

20   the same reason.  I have the transcript and I wanted to

21   remember.  Now, at that time I'm pretty much advanced in the

22   book, and the draft is almost finished and I have -- I get

23   interest, and I know I can tell you there will be a movie down

24   the line, and there will be a movie or a documentary and I

25   needed to -- reenactment to have the utmost fair."

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1864

```
 1            That's what you told me under oath, didn't you, sir?
 2   A.   Yes.
 3            MR. HESS:  Can I get a line, page, please?
 4            THE COURT:  Just for his information, give him a line
 5   and page.  And the answer was yes.  Move on.
 6   BY MR. CEDERBERG:
 7   Q.   Now, you hired a ghostwriter, didn't you, sir?
 8   A.   Not a ghostwriter.
 9   Q.   Well, a writer to help you write your book, correct?
10   A.   That's not a ghostwriter.  A ghostwriter is somebody that is
11   going to write a book under a different name.  My -- it's my
12   name on the book, not Joe Schmo.  It's my name, so there's no
13   ghostwriter.  I hired an attorney.
14   Q.   An author, too?  Isn't Ms. Cowden an author?
15   A.   I'm not aware if she's a published author.  I'm not sure.
16   Q.   You hired her to write your book, and you're not aware of
17   her background as an author, is that what you're telling us
18   under oath?
19   A.   I'm not sure.  I'm not sure if she published a book, but she
20   claims she has skills and qualification of a writer.
21   Q.   And when you hired -- you did hire Ms. Cowden to help you
22   write the book, right?
23   A.   I hired an attorney who -- it's not just about helping me
24   write a book.
25   Q.   Well, you had conversations with Ms. Cowden about your book,
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    correct?

2    A.   Yes.  Of course.

3    Q.   You had conversations with how you were telling your story

4    and she would make edits, right?

5    A.   Yes, she would edit whatever I write.

6    Q.   And sometimes you would accept the edits and sometimes you

7    wouldn't?

8    A.   Yes.

9    Q.   And the two of you together were trying to write a book,

10   correct?

11   A.   No.  I'm trying to write the book, not her.

12   Q.   You're paying her to help you write the book, correct?

13   A.   Yeah, but she's not writing it.  I write the book, she edit

14   it, she corrects things, and she's helping me through the

15   process and the legalities.

16   Q.   Are you telling me Ms. Cowden never told you anything about

17   the way you phrase things in your drafts?

18   A.   Yeah, of course.

19   Q.   Will not be acceptable?

20   A.   Yeah, of course she did, yes.

21   Q.   And she told you to rewrite it a different way?

22   A.   Yes, of course she did, yes.

23   Q.   And you would take her advice, correct?

24   A.   Yes.

25   Q.   And sometimes you tone down things, right?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1866

1    A.  And sometimes.

2    Q.  You would tone down things based on her advice to make it

3    sound more realistic, correct?

4    A.  She said things like that, yes.

5    Q.  And sometimes she told you that you were a little -- you

6    came across a little too bitter and you should change your tone,

7    correct?

8    A.  Yes, she said that.  Maybe after what happened to me I would

9    be that way.

10   Q.  And she wrote you an e-mail questioning the tape, correct,

11   that you had sent her?

12   A.  I don't remember that.

13   Q.  And you had a lot of exchanges with Ms. Cowden, didn't you,

14   in this process?

15   A.  Yes.  Because sometimes I would send her just a paragraph

16   and she would write me back with a correction, you know.

17   Remember, English is not my maternal language, so my wife helped

18   me a lot, but I need some help.

19   Q.  In a deposition under oath in this case, you testified you

20   were fluent in both French and English, correct?

21   A.  Yes.  I may be fluent in English; however, when it's time to

22   publish a book, I'm not perfect.  I make mistakes.

23        MR. CEDERBERG:  Your Honor, I want to lay a foundation

24   for Exhibit 112.

25        THE COURT:  I don't know what Exhibit 112 is.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1867

```
1              MR. HESS:  403 and collateral.

2              THE COURT:  I don't know what Exhibit 112 is.  Let me

3         see.

4              MR. CEDERBERG:  I should tell the court this was not

5         one that was subject to the motion we talked about this morning.

6              THE COURT:  Okay.

7              MR. HESS:  And relevance, Judge.

8              THE COURT:  Overruled.

9              MR. CEDERBERG:  I'd offer Exhibit 112.

10             THE COURT:  You know what, wait a second.  Let me see

11        it again, please.

12             MR. CEDERBERG:  I can explain to the judge at the

13        sidebar.

14             THE COURT:  All right.  Well I'd rather ask the jury to

15        step out.  Can I ask you all to step out?  We're going to break

16        for lunch close to noon, but I would like to try to resolve this

17        before.

18             (Jury out at 11:48 a.m.)

19             THE COURT:  Okay.  Tell me what -- please be seated.

20        Tell me what you're trying to accomplish and why.

21             MR. CEDERBERG:  I'm trying to accomplish, Your Honor,

22        the motive for why Mr. Jaubert is testifying the way he is and

23        his credibility, because if the court will look, if it's

24        Mr. Jaubert's e-mail on the top.

25             THE COURT:  Yeah.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1868

```
1            MR. CEDERBERG:  And Mr. Jaubert says, "I'm only seeking
2      three bags of those, that's adds of the $30 million and I will
3      bury my book, he, he, he. "
4            THE COURT:  Okay.  I understand that.  Tell me what
5      that proves.
6            MR. CEDERBERG:  That proves that he had a motive to not
7      tell the truth and to fabricate stories about Dubai, and he
8      wants Dubai to pay the $30 million to bury the book, Your Honor.
9      No one else is going to pay the 30 million.  This was a vanity
10     publication.  I mean, Dubai World to pay, and this is his
11     motivation for getting the reporters involved, for making the
12     fake tape, for making up the story he's telling us today.
13           THE COURT:  What does that have to do with whether he
14     stole money from Dubai World?
15           MR. CEDERBERG:  It has to do --
16           THE COURT:  See that's where I'm having a problem with
17     the mix.
18           MR. CEDERBERG:  Because there still is -- is abuse of
19     process case where he says he was in great terror, great danger
20     and all this stuff, and I intend to be able to argue to the jury
21     that this was a plan from the get-go.  In order for him to
22     fabricate along the way to have a payday of $30 million.  And
23     that's his motivation.  When you look at what he says, when he
24     comes in here and says Mr. Ramadan, who the Court saw,
25     threatened him and scared him to death, Mr. AbdulQader did, and
```

1   then he gets in this dinghy and says "I'm going to write a

2   book," he's thinking about writing the book so Dubai World will

3   pay money to bury that book.

4          THE COURT:  Tell me why it's not admissible for that

5   purpose.

6          MR. HESS:  First of all, if it's abuse of process as

7   Your Honor recognized and told me this, if it's abuse of

8   process, it's abuse of process.  Whether his -- if they abused

9   process and he was damaged, then that's abuse of process.

10  Doesn't matter what Mr. Jaubert thought.  And Your Honor said

11  that to me a couple days ago in the alternative.  In the back as

12  to Dubai World.

13         But first of all, it doesn't say that there's anything

14  untrue about his escape.  Doesn't say that at all.  And also, it

15  says "he, he" in it.  There's laughter, and it doesn't tie in to

16  say what Mr. Cederberg said.  So the probative value is far

17  outweighed by the prejudice of arguing this.

18         THE COURT:  Well, it's relevant to his motive to lie.

19  His motive to lie would be that he wants to maintain this facade

20  so he can get this money from these rich people that nobody

21  cares about because they got more money than sense.

22         MR. CEDERBERG:  Precisely, Your Honor.

23         MR. HESS:  But, Judge, it doesn't matter if he's lying

24  or not.  If the book's true, he could try to be getting some

25  money from a rich person or whatever.  It's not about lying.  I

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1870

1    would think that they would need to show some evidence that he's

2    lying about something about his escape.

3        MR. CEDERBERG:  Your Honor, the book talks about, and

4    he's talked about on the stand, he wants -- believe me when I

5    tell you AbdulQader threatened me.  Believe me when I tell you

6    that Hussein Ramadan threatened me, and I want all these damages

7    for emotional distress and I'm entitled, as the Court --

8        THE COURT:  Tell me what the prejudicial effect is.  If

9    it doesn't prove what they want it to prove, then why -- how is

10   it prejudicial at all that he's giggling around with this

11   Leigh Cowden person.

12       MR. HESS:  I'm saying the balance of relevant versus

13   prejudicial.  The probative value versus prejudicial.

14       THE COURT:  What's the prejudice?  What prejudice?

15       MR. HESS:  They're arguing it does something that it

16   doesn't.  That's why the Court is at the gate to try to keep --

17       THE COURT:  What prejudice is this going toward, other

18   than that he has a motive to lie, which is relevant?  What's

19   the -- you know what is it that the jury is going to glean from

20   this that is prejudicial, other than that he's a big fat liar

21   and his pants are on fire, which is relevant to the proceeding?

22   I'm not saying it's true, I'm saying that's their position.

23       MR. HESS:  As long as Mr. Jaubert has, I think it's

24   unduly prejudicial.

25       THE COURT:  Tell me why.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1871

1          MR. HESS:  Because it doesn't bear on that issue.  It

2     seems to, and it can be argued to.

3          THE COURT:  You don't think that it bears on that issue

4     that he --

5          MR. HESS:  It doesn't bear on whether Mr. AbdulQader

6     was lying or wasn't lying or Mr. Jaubert is lying and doesn't

7     lie.  So that's one of the points that was just brought up.  It

8     doesn't bear on that.

9          THE COURT:  You put those together.  Doesn't bear on

10    whether those other people are lying, but the way -- you know,

11    the way that it has been presented has been through Mr. Jaubert,

12    so his motive to lie, if he has one, is highly relevant.  I

13    would think.

14         MR. HESS:  But this --

15         THE COURT:  And his -- the fact of if not lying,

16    exaggeration, or whatever you want to call it, I'll overrule

17    your objection.  I'll permit it this time.  Please bring in the

18    jury.

19         COURT SECURITY OFFICER:  Yes, sir.

20         THE COURT:  Do you intend to use both of the e-mails,

21    the top one and the bottom one?

22         MR. HESS:  What I'd ask is that he use the top one

23    and --

24         MR. CEDERBERG:  The top one is clearly a party

25    admission.  If he wants, I'll put a context to it.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1872

 1          THE COURT:  I don't care.  If both of you want it,

 2     we'll let it in.

 3          MR. HESS:  Actually, Judge, I'm sorry.  I had it

 4     backwards.  It's the top one, it's the one from --

 5          THE COURT:  Yeah, I mean, I think that bottom one shows

 6     his propensity to exaggerate, but I don't know that that's -- I

 7     didn't know why you wanted it in, but there's a lot of things I

 8     don't understand about this case.

 9          MR. HESS:  Yes, Judge.  I'd ask that the whole thing

10     come in.  There's three e-mail exchanges, the whole page.

11          THE COURT:  All right.  The whole page.  That's fine.

12     I don't remember it being fine but whatever it is, it is.

13          (Jury in at 11:55 a.m.)

14          THE COURT:  Then try to get to a good breaking about --

15     in about five or six minutes.

16          MR. CEDERBERG:  It will be after this document, Your

17     Honor.

18          THE COURT:  Okay.  Please be seated.  All right, sir.

19     You may proceed.

20          MR. CEDERBERG:  With no objection from counsel, I

21     offer --

22          THE COURT:  Well, over objection.

23          MR. CEDERBERG:  Over objection, I apologize, Your

24     Honor.

25          THE COURT:  No further objection?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          MR. CEDERBERG:  No further objection.

2          MR. HESS:  No further objection, Judge.

3          THE COURT:  All right.

4          MR. CEDERBERG:  I offer 112 and have it published to

5     the jury.

6          THE COURT:  Go right ahead.  112 is admitted in

7     evidence at this time.

8          (Plaintiffs' 112 in evidence)

9          MR. CEDERBERG:  Charles, can you blow up the last

10    e-mail that starts "Herve."  Yeah.  We don't need the

11    gobbledygook on the bottom.  Further down so we see who said it.

12    Yes, please.

13    BY MR. CEDERBERG:

14    Q.  This is Leigh Cowden, right?

15    A.  Correct.

16    Q.  She's the woman who is helping you with your book?

17    A.  Yes.

18    Q.  And she's writing you about $10 million in the garage,

19    correct?

20    A.  Yes.

21    Q.  And she says, Herve, "I was thinking about the $10 million"

22    in the garage part of the book.  That's the book escape from

23    Dubai that she's helping you with, right?

24    A.  Yes.

25    Q.  "I went back to that part of the story and did some math, a

1874

1    stack of hundred, hundred dollar bills is .43 inches high and is

2    worth $10,000.  It takes a thousand of these to make 10 million.

3    At .43 inches high, that is 430' high.  If you divide that by

4    how many stacks, you could go side by side under a sink, say

5    about six, that equals almost 72'.  No sink is that high.

6    Either my math is or your math is off.  Can you please explain

7    or fix my math?  I'm no mathematician, but you are, so help me

8    out here or tell me that it wasn't 10 million under that sink,

9    that instead it was", then you fill if the blank "or just tell

10   me I'm reading it wrong and help me fix this story."

11          Do you remember that e-mail?

12   A.  Yeah, I remember.

13   Q.  Then you sent a response to it, right?

14   A.  Yes.

15   Q.  And in that response you said -- if we can go up, it starts

16   below the "I get the math," it starts where it says, "On

17   March 12, March 12, 2009, at 7:13 p.m., Jean Pierre wrote,"

18   that's you, right?

19   A.  That's me.

20   Q.  So you wrote this e-mail, right?

21   A.  Yes, I did.

22   Q.  Okay.  You wrote and told her it was the size of a small

23   coffee table.  Under a big sink.  Indeed six times eight piles

24   about 10" high.  So roughly 36 by 20 by 10, right?  Your words?

25   A.  Yes.  Yes.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1875

1    Q.  So let's say 6 times 8, 48 piles, 20 stacks, 960 stacks,

2    roughly 1,000, give or take, times 10,000 equals 10 million,

3    right?

4    A.  Yes.

5    Q.  You're trying to show her how, in some part of your book,

6    you wrote about seeing $10 million worth of money under a sink?

7    A.  I went to, not a friend, an acquaintance, and he had

8    forgotten that he had $10 million stashed under the sink, so it

9    was in a bag, and Leigh Cowden tried to figure out -- she

10   thought it was too small of a bag to contain $10 million.

11   That's why we went into --

12   Q.  This exchange?

13   A.  -- these details.

14   Q.  Then you went on to say, "I don't know how you got your

15   figures.  I'm getting confused with inches and centimeters, but

16   is good you check everything."  Your words, correct?

17   A.  Yes.

18   Q.  And then you wrote, "I am just asking only three bags of

19   those."  And the three bags you meant were $10 million bags a

20   piece, right?

21   A.  Yes.

22   Q.  "And I will bury my book, he, he, he," correct?

23   A.  Yes.

24   Q.  And you were thinking at that time that you could ask Dubai

25   World to pay you that kind of money for you to not publish the

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1876

1   book you wanted to write, correct?

2   A.   Absolutely not.

3   Q.   Did you think anybody else was going to pay you $30 million?

4   A.   Absolutely not.  It was a joke, and it's taken out of the

5   context.

6   Q.   It's your e-mail, sir?

7   A.   Yes, but it's a joke.  There are e-mails, there are phone

8   conversations, it's a joke.  Don't you see at the end "he, he,

9   he, he"?

10  Q.   Now, you talk to Mr. Copetus about asking Dubai World for

11  $50 million at one time, didn't you, sir?

12  A.   I don't remember that.

13  Q.   You don't remember one way or the other?

14  A.   Me asking Craig Copetus to ask $50 million?

15  Q.   Yes.

16  A.   No, I don't remember that.

17  Q.   Okay.  And you told Mr. Copetus that, hang on a second.  You

18  had other conversations or e-mails about burying your book,

19  haven't you, sir?

20  A.   It's not about burying the book, it's about marketing the

21  book.

22  Q.   Okay.  But you had other e-mails or conversations with

23  people about ways that you might not publish your book, correct?

24  A.   That's not the way I put it.

25  Q.   Okay.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1877

1   A.   When the word "bury the book comes up," if you let me

2   explain, if I go to MGM with my book, they're going to make a

3   movie, if MGM buys the right of my book.   Now, if Dubai World

4   was interested to buy the rights of my book, I believe they

5   would bury it, not publish it.

6   Q.   Okay.   So when you wrote "bury my book," you were thinking

7   in your head of Dubai World as a possible person or entity that

8   would pay you the money, correct?

9   A.   It was -- it could be an option.   That's why I questioned

10  Leigh, I asked "what if?"

11  Q.   Just so we're straight, sir, you thought it was an option,

12  when you wrote this e-mail on March 12, 2009, that Dubai World

13  would pay you $30 million to bury your book?

14  A.   Absolutely not, no.   I did not say that.

15  Q.   Okay.   But you just said it could be an option?

16  A.   Let me rephrase it.   It could be a possibility.

17  Q.   You thought, in your head, there was a possibility Dubai

18  World would pay you $30 million?

19  A.   When you write the book on a certain subject when it's

20  nonfiction, somebody might be interested to by the rights.

21  Happens all the time.

22  Q.   Most people, when they write a book, aren't looking for

23  someone to bury it, are they, sir?

24          MR. HESS:   Objection.   Calls for speculation.

25          THE COURT:   Sustained.   That's an argument.   You can

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1878

1    make that argument.

2    BY MR. CEDERBERG:

3    Q.  You thought -- just so we're clear, you thought it was a

4    possibility that Dubai World may be interested in paying you $30

5    million to make sure your book wasn't published.

6    A.  I thought it could be possible that if Dubai World learns

7    that a book is in a publication, in a publishing process, that

8    they might approach somebody to say what do you want to either

9    sell your rights or something like that.

10   Q.  Okay.  So Dubai World paying you this money was one of the

11   things you were thinking?

12   A.  That was a joke.  I had no money in mind.  I don't know how

13   much movie rights or book rights -- I don't know.  I'm not -- I

14   don't know that.  It was a joke.

15   Q.  But it was --

16   A.  And trust me, I don't think that's worth $30 million anyway.

17   So it's a joke.  I have no idea how much worth is the book

18   rights, movie rights, I don't know.  I'm not a professional in

19   that.  I just write the book.  I just wrote a book.

20   Q.  The joke wouldn't have made any sense unless you thought it

21   was possible, right?

22   A.  Possible that it would be interested to acquire the rights,

23   yes, but for 30 million, no.  That was a joke.

24        MR. CEDERBERG:  This is probably a good place to stop

25   for that break.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1879

1          THE COURT:  All right.  Why don't we break for lunch,

2     then.  Let's come back at 1:15.  I would like to get as much

3     work done.  We're finishing this case today, period.  Move on.

4     Thank you.

5          Go to lunch.  Don't talk to anybody, don't let anybody

6     talk to you, don't make up your mind until it's over.  You've

7     heard the stuff over and over again.  Same thing I told you

8     yesterday twice.  Go.

9          COURT SECURITY OFFICER:  All rise for the jury.

10          THE COURT:  Sir, since you're still on the stand, you

11     will not be able to discuss your testimony with anyone.  Thank

12     you.

13          All right.  We'll be in recess.

14          (Jury out at 12:04 p.m.)

15          (See VOlume 17, page 1881 for continuation)
                          * * * * *
16
                    C E R T I F I C A T E
17     I certify that the foregoing is a correct transcript from the
       record of proceedings in the above-entitled matter.
18

19

20     _____          /s/ Dawn M. Whitmarsh
       Date                      DAWN M. WHITMARSH, RPR
21

22                         I N D E X

23                         WITNESSES

24     For Defense:                                    Page

25     Herve Jaubert
        Cross-Examination by Mr. Cederberg              1793:11


              PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                   TRANSCRIPT PRODUCED BY COMPUTER

1880

```
 1                              EXHIBITS

 2        For Plaintiffs:

 3        111
 4         In Evidence                                    1850:10

 5        112
           In Evidence                                    1873:8
 6
          160
 7         In Evidence                                    1856:23

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**